**2026-1581**

# United States Court of Appeals
# for the Federal Circuit

ARBUTUS BIOPHARMA CORPORATION,
GENEVANT SCIENCES, GMBH,

*Plaintiffs-Appellees,*

– v. –

MODERNA, INC., MODERNATX, INC.,

*Defendants-Appellants.*

*On Appeal from the United States District Court for the
District of Delaware in No. 1:22-CV-00252-JDW,
Honorable Joshua D. Wolson, Judge*

**BRIEF OF *AMICUS CURIAE* AMERICAN INTELLECTUAL
PROPERTY LAW ASSOCIATION IN SUPPORT OF
APPELLANTS AND IN SUPPORT OF REVERSAL**

SALVATORE ANASTASI
  *President, American Intellectual
  Property Law Association*
BARLEY SNYDER
Two Great Valley Parkway, Suite 110
Malvern, Pennsylvania 19355
(610) 889-3699
sanastasi@barley.com

RICHARD T. MATTHEWS
WILLIAMS MULLEN
301 Fayetteville Street,
  Suite 1700
Raleigh, North Carolina 27601
(919) 981-4000
rmatthews@williamsmullen.com

*Counsel for Amicus Curiae American Intellectual Property Law Association
(For Additional Counsel See Inside Cover)*

JUNE 5, 2026

COUNSEL PRESS
A ᐅ Proceed Service
The Appellate Experts®
(800) 4-APPEAL • (132206)

CLINTON H. BRANNON
WILLIAMS MULLEN
8350 Broad Street, Suite 1600
Tysons, Virginia 22102
(703) 760-5200
cbrannon@williamsmullen.com

*Counsel for Amicus Curiae American Intellectual Property Law Association*

FORM 9. Certificate of Interest

Form 9 (p. 1)
March 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 26-1581

**Short Case Caption** Arbutus Biopharma Corp. v. Moderna, Inc.

**Filing Party/Entity** American Intellectual Property Law Association

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 06/05/2026

Signature: /s/ Richard T. Matthews

Name: Richard T. Mattews

**FORM 9. Certificate of Interest**

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☑ None/Not Applicable |
| American Intellectual Property Law Association | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☑   None/Not Applicable          ☐   Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐   Yes (file separate notice; see below)   ☐   No   ☑   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑   None/Not Applicable          ☐   Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |

# TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................... i

TABLE OF AUTHORITIES .............................................................................. ii

STATEMENT OF THE ISSUES..........................................................................1

STATEMENT OF INTEREST OF AMICUS CURIAE ...........................................2

STATEMENT OF THE CASE AND THE FACTS.....................................................3

STATEMENT OF AUTHORSHIP AND FUNDING ...............................................6

SUMMARY OF THE ARGUMENT ....................................................................7

STANDARD OF REVIEW .................................................................................8

ARGUMENT ...................................................................................................9

    I.       SECTION 1498(A) HAS TWO DISTINCT REQUIREMENTS: "FOR THE GOVERNMENT" AND "AUTHORIZATION AND CONSENT".................................................................................9

    II.     A FAR AUTHORIZATION AND CONSENT CLAUSE DOES NOT AUTOMATICALLY SATISFY BOTH PRONGS OF § 1498(a)..................................................................................12

    III.    THE ALLEGEDLY INFRINGING ACTIVITY IN THIS CASE WAS UNDERTAKEN "FOR THE GOVERNMENT" DUE TO THE EXTRAORDINARY CIRCUMSTANCES OF THE COVID-19 PANDEMIC ................................................................17

CONCLUSION.............................................................................................23

# TABLE OF AUTHORITIES

Page(s)

**Cases:**

*3rd Eye Surveillance, LLC v. United States*,
133 Fed. Cl. 273 (2017)................................................................15

*Advance Software Design Corp. v. Federal Reserve Bank of St. Louis*,
583 F.3d 1371 (Fed. Cir. 2009) ............................................... 18, 22, 23

*Amoco Oil Co. v. United States*,
234 F.3d 1374 (Fed. Cir. 2000) .....................................................8

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ...................................................................9

*D. Ginsberg & Sons, Inc. v. Popkin*,
285 U.S. 204 (1932) .................................................................11

*Hughes Aircraft Co. v. United States*,
534 F.2d 889 (Ct. Cl. 1976)..................................................... 17, 18

*IRIS Corp. v. Japan Airlines Corp.*,
769 F.3d 1359 (Fed. Cir. 2014) ............................................... 10, 14

*Kelo v. City of New London*,
545 U.S. 469 (2005) ................................................................16

*Larson v. United States*,
26 Cl. Ct. 365 (1992)...............................................................18

*Montclair v. Ramsdell*,
107 U.S. 147 (1883) ................................................................11

ii

*Revolution Eyewear, Inc. v. Aspex Eyewear, Inc.*,
   563 F.3d 1358 (Fed. Cir. 2009) ..................................................................8

*Sevenson Envtl. Servs., Inc. v. Shaw Envtl., Inc.*,
   477 F.3d 1361 (Fed. Cir. 2007) ............................................... 10, 13, 18

*TVI Energy Corp. v. Blane*,
   806 F.2d 1057 (Fed. Cir. 1986) ..............................................................14

*Whitman v. Am. Trucking Ass'ns*,
   531 U.S. 457 (2001) ................................................................................13

**Statutes:**

10 U.S.C. § 2304(c)(2)............................................................................ 4, 19

28 U.S.C. §1498(a) .............................................................................. passim

**Regulations:**

47 C.F.R. § 227-1 ............................................................... 1, 4, 12, 13

## STATEMENT OF THE ISSUES

1.      Whether the plain text of 28 U.S.C. §1498(a) separately requires that an allegedly infringing use or manufacture occur: (a) "with the authorization or consent of the Government," and (b) "for the Government" such that the Government's authorization and consent, in and of itself, is insufficient to bring a contractor's activities within the scope of the statute.

2.      Whether the inclusion of a Federal Acquisition Regulation Authorization and Consent clause, such as FAR 52.227-1, in a Government procurement contract automatically satisfies the "for the Government" prong of 28 U.S.C. § 1498(a) or whether a court must independently evaluate whether the contracted-for goods or services were manufactured or used "for the Government" within the meaning of the statute.

3.      Whether the allegedly infringing manufacture and use of COVID-19 vaccines pursuant to a direct procurement contract executed in support of a declared public health emergency and a declared national emergency were undertaken "for the Government" within the meaning of 28 U.S.C. § 1498(a), where the pandemic's impact on society disrupted the Government's ability to perform core governmental functions such as providing for the national defense and operating federal agencies and courts—and the procurement of vaccines was a direct governmental necessity

1

undertaken to restore the Government's operational capacity and fulfill its constitutional responsibilities.

**STATEMENT OF INTEREST OF AMICUS CURIAE**

The American Intellectual Property Law Association ("AIPLA") is a national bar association representing the interests of approximately 6,500 members engaged in private and corporate practice, government service, and academia. AIPLA's members represent a diverse spectrum of individuals, companies, and institutions involved directly or indirectly in the practice of patent, trade secret, trademark, and copyright law, as well as other fields of law relating to intellectual property. AIPLA's members represent both owners and users of intellectual property. AIPLA's mission includes providing courts with objective analyses to promote an intellectual property system that stimulates and rewards invention, creativity, and investment while accommodating the public's interest in healthy competition, reasonable costs, and basic fairness. AIPLA has no stake in either of the parties to this litigation or in the result of this case. AIPLA's only interest is in seeking correct and consistent interpretation of the law as it relates to intellectual property issues.

AIPLA takes no position on the ultimate merits of the questions of patent validity or infringement in this litigation. Rather, AIPLA submits this brief to assist the Court in adopting the correct legal framework for analyzing when 28 U.S.C. § 1498(a) applies to the manufacture or use of products alleged to infringe a patent.

## STATEMENT OF THE CASE AND THE FACTS

**I.    BACKGROUND**

In December of 2019, a novel coronavirus known as SARS-CoV-2 was first detected, leading to outbreaks of the disease COVID-19 that spread globally. Appx2796. On January 31, 2020, the Secretary of Health and Human Services declared a public health emergency, and on March 1, 2020, the President declared that the COVID-19 outbreak constituted a national emergency. Appx2796. On May 15, 2020 the government initiated Operation Warp Speed ("OWS") pursuant to which the Department of Health and Human Services ("HHS") and the Department of Defense ("DOD") worked to accelerate the development, acquisition, and distribution of COVID-19 vaccines. Appx2796.

Arbutus owns U.S. Patent Nos. 8,058,069; 8,492,359; 8,822,668; 9,364,435; and 11,141,378 ("the Patents-in-Suit"), which relate to lipid nanoparticle ("LNP") technology. Appx3-6. LNP technology can be used to deliver nucleic acid therapeutics, including messenger RNA ("mRNA") therapeutics. Appx7. Moderna developed a COVID-19 vaccine using mRNA technology that allegedly infringes the Patents-in-Suit. Appx7-8.

In August of 2020, Moderna entered into a contract with the Army Contracting Command of the DOD to purchase quantities of Moderna's mRNA-1273 vaccine ("the C-100 Contract"). Appx2778-2830. The C-100 Contract's

Statement of Work provides that "[t]he Department of Defense and Health and Human Services (HHS) require large scale manufacturing of vaccine doses in support of the national emergency response to the Coronavirus Disease 2019 (COVID-19) for the United States Government (USG) and the US population." Appx2796.

The C-100 contract was issued under the authority of former 10 U.S.C. § 2304(c)(2). Appx2778. That statute provided that "the head of an agency may use procedures other than competitive procedures only when . . . the agency's need for the property or services is of such an unusual and compelling urgency that the United States would be seriously injured unless the agency is permitted to limit the number of sources from which it solicits bids or proposals." *Id.*

The C-100 Contract incorporated two FAR "Authorization and Consent" clauses: FAR 52.227-1 and FAR 52.227-1, Alternate I, which is broader. Appx2823. Under Alternate I, "[t]he Government authorizes and consents to all use and manufacture of any invention described in and covered by a United States patent in the performance of this contract or any subcontract at any tier."

The Government purchased 500,001,540 doses of Moderna's COVID-19 vaccine pursuant to the C-100 Contract for a total of approximately $8.2 billion. Appx24. The majority of those doses were administered to members of the general public, with a smaller number administered to government employees. Appx8.

4

## II.     PROCEDURAL HISTORY

Arbutus filed suit in the United States District Court for the District of Delaware on February 28, 2022. Appx8. Moderna filed a motion to dismiss, arguing that 28 U.S.C. § 1498(a) precluded Arbutus's patent infringement claims. Appx8. On November 2, 2022, Judge Goldberg denied Moderna's motion to dismiss, concluding that Moderna had not established as a matter of law that the alleged infringement had been done "for the Government" or with the "authorization and consent" of the Government. Appx8.

On February 14, 2023, the Government filed a Statement of Interest asserting that the Government had granted Moderna its "authorization and consent" under the C-100 Contract, and that, according to the Government, the procurement thus fell within the scope of § 1498(a). Appx946-963. The Government argued essentially that the "for the Government" prong of the inquiry collapses into the "authorization and consent" prong of the inquiry where the Government directly contracts for goods or services, and the contract provides the Government's authorization and consent. Appx958-59.

Following discovery, the parties filed cross motions for summary judgment on the issue of whether § 1498(a) applied to the alleged acts of infringement.

On February 2, 2026, Judge Wolson (to whom the case had been reassigned) issued an opinion granting the motion for summary judgment in part and denying it

in part. Appx32. First, the court held that § 1498(a) has two distinct prongs—"authorization and consent" and "for the Government"—and that authorization and consent alone does not resolve the "for the Government" inquiry. Appx12-13. Second, the court found that the Government was a direct beneficiary for the vaccine doses that it distributed to its own employees and that § 1498(a) applied to bar infringement claims in district court as to those doses. Appx15. Third, the court found that the overwhelming majority of doses that went to the general public were not "for the Government" within the meaning of § 1498(a) because the public, and not the Government, were the beneficiaries of those doses.[1] Appx15. Finally, the court determined that § 1498(a) does not apply to claims of indirect infringement.[2]

## STATEMENT OF AUTHORSHIP AND FUNDING

No party, or party's counsel has authored this brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting this brief. No person other than amici contributed money that was intended to fund preparing or submitting this brief.

---

[1] The district court did not appear to discuss whether doses administered to employees of government contractors should be treated as more similar to those administered to the general public or those administered to government employees.
[2] Amicus Curiae AIPLA takes no position on whether § 1498(a) applies to any allegations of indirect infringement.

6

## SUMMARY OF THE ARGUMENT

AIPLA respectfully submits that this Court should clarify the legal framework governing 28 U.S.C. § 1498(a) in three important respects.

First, as the district court found, the Court should affirm that § 1498(a) requires satisfaction of two distinct and independent prongs — "for the Government" and "authorization and consent" — and that those prongs are not coextensive. The statute's plain language, legislative history, and this Court's precedent make clear that a separate inquiry is required for each prong. Conflating the two prongs would render the "for the Government" requirement superfluous, in violation of fundamental canons of statutory construction.

Second, contrary to the position advanced by the Government in its Statement of Interest below, the presence of a FAR Authorization and Consent clause in a Government procurement contract does not automatically satisfy both elements of § 1498(a). Moreover, the Government's inclusion of such a clause cannot serve as an unreviewable determination that conclusively triggers the statute. Courts, not contracting officers, must determine whether § 1498(a) applies. A FAR clause is relevant evidence of the Government's <u>authorization and consent</u> to an alleged infringement, but standing alone does not demonstrate that the infringement also occurred <u>for the Government</u>.

7

Third, notwithstanding the foregoing legal framework, the specific facts of this case establish that the allegedly infringing activity under the C-100 Contract was undertaken "for the Government" within the meaning of § 1498(a). The Government directly contracted for and procured 500 million doses of a COVID-19 vaccine as part of a national emergency response, financed the manufacturing, and directed the distribution. The Government received direct benefits from this procurement—including the doses administered to the general public—because the pandemic had directly interfered with the Government's ability to perform basic governmental functions, including the operations of federal agencies, the courts, and critical national defense activities. Widespread public vaccination was essential to restoring the Government's operational capacity and enabling it to discharge its constitutional responsibilities. This is the kind of government procurement that § 1498(a) was designed to protect.

## STANDARD OF REVIEW

Issues of statutory interpretation are questions of law reviewed de novo. *Amoco Oil Co. v. United States*, 234 F.3d 1374, 1377 (Fed. Cir. 2000). A district court's grant of summary judgment is reviewed de novo. *Revolution Eyewear, Inc. v. Aspex Eyewear, Inc.*, 563 F.3d 1358, 1365 (Fed. Cir. 2009). Accordingly, when reviewing a grant of summary judgment, the Court must determine whether, viewing the evidence in the light most favorable to the non-moving party, there are any

8

genuine issues of material fact and whether the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

## ARGUMENT

The two-prong framework is essential to the proper interpretation of § 1498(a). The statute's plain language, its legislative history dating back decades, and this Court's precedent all confirm that both prongs must be independently satisfied. Interpreting the statute otherwise would render the "for the Government" requirement superfluous, allow the Executive Branch to unilaterally expand § 1498(a)'s scope via routine government contracts, and deprive patent owners of their statutory procedures and remedies without meaningful judicial oversight.

However, the C-100 Contract was not a run-of-the-mill acquisition vehicle, and the vaccine doses at issue were procured via extraordinary authorities invoked only when the Government's interests are at their zenith. Thus, while courts must carefully scrutinize whether both prongs of § 1498(a) have been met, the exceptional facts of this case indicate that the allegedly infringing activity under the C-100 Contract was both authorized and consented to by the Government and undertaken "for the Government" within the meaning of § 1498(a).

## I. SECTION 1498(A) HAS TWO DISTINCT REQUIREMENTS: "FOR THE GOVERNMENT" AND "AUTHORIZATION AND CONSENT"

28 U.S.C. § 1498(a) provides, in relevant part:

9

> Whenever an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without license of the owner thereof or lawful right to use or manufacture the same, the owner's remedy shall be by action against the United States in the United States Court of Federal Claims for the recovery of his reasonable and entire compensation for such use and manufacture.

The statute further provides that:

> For the purposes of this section, the use or manufacture of an invention described in and covered by a patent of the United States by a contractor, a subcontractor, or any person, firm or corporation for the Government and with the authorization or consent of the Government, shall be construed as use or manufacture for the United States.

The Federal Circuit has consistently applied a two-part inquiry to determine whether alleged infringement by a contractor falls within the ambit of § 1498(a). Specifically, the Court examines whether: (1) the allegedly infringing use is "for the Government," and (2) whether the allegedly infringing use is "with the authorization and consent of the Government." *Sevenson Envtl. Servs., Inc. v. Shaw Envtl., Inc.*, 477 F.3d 1361, 1365 (Fed. Cir. 2007).

This Court has recognized that "a governmental grant of authorization or consent does not mean that the alleged use or manufacture is done 'for the United States' under § 1498(a)." *IRIS Corp. v. Japan Airlines Corp.*, 769 F.3d 1359, 1362 (Fed. Cir. 2014). Authorization and consent may be given for activities that ultimately serve private commercial purposes, and such activities would not be

covered by § 1498(a). Accordingly, conflating the two prongs would render the "for the Government" requirement entirely superfluous. If the Government's authorization alone were sufficient to trigger § 1498(a), then the "for the Government" language would have no independent meaning—and Congress's deliberate inclusion of this separate requirement in the statute would be rendered meaningless.

This interpretation is compelled by the well-established canon against superfluity. Courts must "give effect, if possible, to every clause and word of a statute, avoiding, if it may be, any construction which implies that the legislature was ignorant of the meaning of the language it employed." *Montclair v. Ramsdell*, 107 U.S. 147, 152 (1883). If the Government's authorization and consent alone were sufficient to trigger § 1498(a), the phrase "for the Government" would be rendered mere surplusage—an outcome that "violate[s] the cardinal rule that, if possible, effect shall be given to every clause and part of a statute." *D. Ginsberg & Sons, Inc. v. Popkin*, 285 U.S. 204, 208 (1932). Congress deliberately included both requirements, and courts must honor that deliberate choice.

Accordingly, this Court should reaffirm that § 1498(a) has both a "for the Government" requirement and an "authorization and consent" requirement.

11

## II.    A FAR AUTHORIZATION AND CONSENT CLAUSE DOES NOT AUTOMATICALLY SATISFY BOTH PRONGS OF § 1498(a)

The Federal Acquisition Regulation provides standard Authorization and Consent clauses that may be incorporated into government procurement contracts. FAR 52.227-1 contains the basic authorization and consent language: "The Government authorizes and consents to all use and manufacture, in performing this contract or any subcontract at any tier, of any invention described in and covered by a United States patent." 48 C.F.R. § 52.227-1. FAR 52.227-1, Alternate I, provides a broader authorization and consent: "[t]he Government authorizes and consents to all use and manufacture of any invention described in and covered by a United States patent in the performance of this contract or any subcontract at any tier." 48 C.F.R. § 52.227-1, Alt. I. While these clauses serve an important function in providing the Government's authorization and consent to patent use, they cannot—standing alone—satisfy the separate statutory requirement that the use or manufacture be "for the Government."

### A.    FAR Clauses Cannot Modify the Requirements of § 1498(a)

The "authorization and consent" prong of § 1498(a) is typically satisfied by express contractual language, such as the FAR Authorization and Consent clauses incorporated into government procurement contracts. And where a government contract contains an explicit authorization and consent clause, the scope of the Government's authorization and consent "naturally hinges on the language of that

12

clause." *Sevenson*, 477 F.3d at 1366–67. FAR 52.227-1, Alternate I, provides the broadest authorization: "[t]he Government authorizes and consents to all use and manufacture of any invention described in and covered by a United States patent in the performance of this contract or any subcontract at any tier." 48 C.F.R. § 52.227-1, Alt. I.

Accepting the position advanced by the Government in its Statement of Interest below would permit the Executive Branch to unilaterally expand § 1498(a)'s reach—and correspondingly limit the patent rights of inventors—simply by inserting a standard FAR clause into procurement contracts. This interpretation would raise significant separation-of-powers concerns. Congress has defined the circumstances under which patent owners' remedies are limited to a claim against the United States in the Court of Federal Claims, and a contracting officer cannot expand those circumstances beyond Congress's intent through contractual boilerplate. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) ("Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions."). The Government's interpretation would effectively allow agency action to preempt judicial review of whether the statutory requirements have actually been satisfied—a result inconsistent with fundamental principles of administrative law and separation of powers.

**B.    Courts Must Independently Determine Whether § 1498(a) Applies**

As noted above, this Court has recognized that "a governmental grant of authorization or consent does not mean that the alleged use or manufacture is done 'for the United States' under § 1498(a)." *IRIS Corp.*, 769 F.3d at 1362. In the event that authorization and consent is given for activities that ultimately serve only private commercial purposes, such activities should not fall within the scope of § 1498(a).

For these reasons, courts, not contracting officers, must determine whether § 1498(a) applies to particular infringement claims. The inclusion of an authorization and consent clause reflects the Government's prospective agreement to provide authorization and consent for patent use in performing the contract, but it does not— and cannot—conclusively determine that any particular manufacture or use was "for the Government" within the meaning of the statute. That determination requires judicial analysis of the specific facts and circumstances of the alleged infringement. *See IRIS Corp.*, 769 F.3d at 1362 (rejecting argument that government authorization conclusively established use was "for the United States"); *TVI Energy Corp. v. Blane*, 806 F.2d 1057, 1060 (Fed. Cir. 1986) (courts must examine whether work was performed "for the government"). The district court properly recognized this principle in rejecting Moderna's argument that the FAR clause alone resolved the § 1498(a) inquiry.

14

**C.      Authorization and Consent via a FAR Clause May Be Relevant to Whether a Manufacture or Use Was "For the Government," but Is Not Conclusive Proof**

Although the presence of a FAR Authorization and Consent clause does not automatically satisfy the "for the Government" prong, it may nevertheless be relevant evidence supporting such a finding. Where the Government directly contracts for goods or services, incorporates an authorization and consent clause, and the contract's Statement of Work describes a governmental purpose consistent with the Government's core obligations, these facts collectively may support a finding that the contracted-for activities were "for the Government."

However, relevance is not equivalence. Courts must still independently examine whether the procurement genuinely served governmental interests or whether the Government's role was merely incidental to private commercial activity. This inquiry parallels the analysis courts undertake in the context of Fifth Amendment takings claims.

Indeed, courts have recognized that "[t]he government's unauthorized 'use or manufacture' of a patented article under 28 U.S.C. § 1498(a) is analogous to a taking of property under the Fifth Amendment." *3rd Eye Surveillance, LLC v. United States*, 133 Fed. Cl. 273, 276 (2017).

In the takings context, a sovereign is forbidden from taking the private property of one party solely for the benefit of another private party, and it is the

15

courts who enforce that prohibition. *See Kelo v. City of New London*, 545 U.S. 469, 478 (2005) ("[T]he City would no doubt be forbidden from taking petitioners' land for the purpose of conferring a private benefit on a particular private party."). Just as judicial limits constrain the Government's exercise of eminent domain, so too should courts retain oversight over determinations that particular acts of infringement were undertaken "for the Government."

Judicial oversight is particularly important in contexts where the Government contracts for goods that are ultimately delivered to third parties—for example, where the Government contracts for vaccines to be administered to the general public. In such cases, the court must examine whether the Government itself received a direct benefit—such as fulfilling its emergency response obligations, mitigating the harms of a declared national emergency, or protecting national security—or whether the procurement merely facilitated private transactions between manufacturers and end users that had no substantial impact on the core obligations of the Government.[3]

---

[3] Although certain policy considerations—such as providing certainty to contractors regarding potential liability and expediting the acquisition of goods—might favor collapsing the "for the Government" requirement into the "authorization and consent" requirement when goods are procured via a federal contract, such policy considerations cannot override the plain text of § 1498(a), the case law interpreting it, or the analogous takings jurisprudence.

16

**III.    THE ALLEGEDLY INFRINGING ACTIVITY IN THIS CASE WAS UNDERTAKEN "FOR THE GOVERNMENT" DUE TO THE EXTRAORDINARY CIRCUMSTANCES OF THE COVID-19 PANDEMIC**

The extraordinary, undisputed facts of this case establish that the allegedly infringing activity under the C-100 Contract satisfies this requirement as a matter of law. The Government directly procured COVID-19 vaccines during a declared national emergency, financed the manufacturing, directed distribution, and received the direct benefit of fulfilling its emergency response obligations. This is the kind of government procurement that § 1498(a) was designed to address. The Court of Federal Claims and this Court have consistently recognized that "for the Government" encompasses procurement activities that serve important national interests, even where the ultimate end users of the procured goods are not government employees.

For example, in *Hughes Aircraft Co. v. United States*, 534 F.2d 889 (Ct. Cl. 1976), the Court of Claims found that the U.S. government's participation in the Skynet II satellite program was "for the Government" even though the satellites would ultimately be owned by the United Kingdom. The court concluded that the program was "for the Government" because it was "vital to the military defense and security of the United States." *Id.* at 903-04. Specifically, the Court found that the furnishing of the launch equipment and services was directly related to U.S. national security as an integral step toward expanding the U.S. defense satellite

17

communications system via the shared-use cooperative program set forth in the relevant memoranda of understanding, and that this was sufficient to meet the "for the Government" standard. *Id.*

Similarly, in *Advance Software Design Corp. v. Federal Reserve Bank of St. Louis*, 583 F.3d 1371 (Fed. Cir. 2009), this Court held that the Federal Reserve Banks' use of a patented fraud-detection system for Treasury checks was "for the Government" even though the Reserve Banks are nominally private entities and derived their own economic benefits from the technology. The court expressly stated that the government "need not be the sole beneficiary" (citing *Sevenson*, 477 F.3d at 1365-66), and that the "benefits to the government of using the seal encoding technology on Treasury checks are not incidental effects of private interests."

The facts of this case are distinguishable from *Larson v. United States*, 26 Cl. Ct. 365, 371 (1992). Here, the Government directly contracted for the vaccine doses—this was not a situation where the Government merely approved of or reimbursed private commercial transactions. The C-100 Contract was a direct procurement contract between the Army Contracting Command and Moderna for 500 million doses of the mRNA-1273 vaccine. The fact that the Army—and not a civilian public health agency—managed this procurement further demonstrates that the benefits to the Government were not merely incidental but that the vaccine doses had an important impact on the nation and its security.

Second, the contract was executed pursuant to declared emergency authorities, including the Secretary of Health and Human Services' public health emergency declaration and the President's declaration that the COVID-19 outbreak constituted a national emergency. The contract was issued under former 10 U.S.C. § 2304(c)(2), which authorizes non-competitive procurement when "the agency's need for the property or services is of such an unusual and compelling urgency that the United States would be seriously injured" absent expedited procurement. Thus, by the very terms of the acquisition authority the Government utilized, the vaccine doses were intended to avoid injury to the "United States" and were therefore "for the Government."

Third, the contract itself explicitly stated that the procurement was "in support of the national emergency response to the Coronavirus Disease 2019 (COVID-19) for the United States Government (USG) and the US population." Appx2796. Despite the district court's conclusion to the contrary, the Contract's identification of doses for both the "USG" and the "US population" does not suggest that doses intended for the U.S. population were not "for the Government." To the contrary, the inclusion of doses for the U.S. population within a procurement that is only permitted under circumstances "so unusual and compelling" that absent those doses the United States itself would be "seriously injured" demonstrates that those doses were also "for the benefit" of the United States.

The extraordinary nature of the COVID-19 pandemic, and the direct benefit the Government received from widespread availability of vaccines to the general public can be seen by the direct and measurable impact the pandemic imposed on the functions of the Government itself. That is because not only does the public rely on the Government to perform governmental functions, but the Government also relies upon the public—and the public's ability to function normally—in order to perform those governmental functions.

Defense contractors vital to the Government and the national security were impacted. *See* Cong. Rsch. Serv., IN11288, COVID-19 and the Defense Industrial Base: DOD Response and Legislative Considerations (Mar. 30, 2020). Federally funded research and related activities were heavily impacted. *See* Cong. Rsch. Serv., R46309, Effects of COVID-19 on the Federal Research and Development Enterprise (Apr. 10, 2020). Federal revenues from use of federal lands and federal oil and gas revenues were directly impacted. *See* Cong. Rsch. Serv., R46448, Effect of COVID-19 on Federal Land Revenues (July 13, 2020); Cong. Rsch. Serv., IF11649, Federal Offshore Oil and Gas Revenues During the COVID19 Pandemic (March 8, 2021). And travel restrictions and lockdown orders limited the movement of federal employees and contractors, impeding the Government's capacity to perform essential functions.

20

These disruptions—and the Government's concern over the impact of those disruptions on its operations, the national defense, the innovation pipeline, and its own revenues—demonstrate that COVID-19 was not a mere threat to public health in the abstract such that only indirect benefits would accrue to the Government upon mitigation of the crisis. Rather, the pandemic was an existential challenge to the Government's ability to discharge its most fundamental obligations. Thus, the procurement of vaccines under the C-100 Contract for administration to the "public" was not a benefit to private parties that only incidentally benefited the Government, but a direct governmental necessity. Publicly available vaccines restored the Government's own operational capacity, the national innovation pipeline, and government revenues so that the Government could provide for the common defense and promote the general welfare of the nation.

As yet another example, during the height of the crisis, federal courts across the country suspended in-person proceedings, resulting in significant delays to civil and criminal matters. This Court alone issued several dozen notices or announcements related to closure of the National Courts Building, and access to the building by counsel, litigants, and employees. *See* COVID-19 Information Page, available at: https://www.cafc.uscourts.gov/home/the-court/notices-announcements/covid-19-information-page/.

21

Finally, the C-100 Contract also incorporated provisions of the Public Readiness and Emergency Preparedness ("PREP") Act, further underscoring the extraordinary nature of this procurement and the Government's view that this acquisition was critical to the nation's emergency response. Appx2819 ("[T]he Department of Defense contracting via assisted acquisition on behalf of the HHS, expressly acknowledges and agrees that the HHS Declaration cited above, specifically its language providing immunity from suit and liability is applicable to this acquisition as long as Contractor's activities fall within the terms and conditions of the PREP Act and the PREP Act Declaration.").

Taken together, these factors establish that the Government was not merely an incidental beneficiary of vaccine doses administered to the general public but was a direct beneficiary of the procurement as to those doses. The Government's interest in protecting public health during a declared national emergency is itself a direct governmental benefit when the Government cannot function due to an unmitigated public health crisis. The Government's role here is analogous to its role in *Hughes Aircraft*—where satellites ultimately benefiting the United Kingdom were nevertheless acquired "for the Government" because the program was "vital to the military defense and security" of the United States—and to its role in *Advance Software Design*—where fraud detection benefiting the Federal Reserve Banks was "for the Government" because "the benefits to the government . . . are not incidental

22

effects of private interests." 583 F.3d at 1379. So too here—the benefits to the Government of procuring COVID-19 vaccines for the public during a national emergency were not incidental to private interests but provided direct benefits to the Government itself.

## CONCLUSION

In conclusion, AIPLA respectfully requests that the Court reverse the district court's order denying Moderna's motion for summary judgment on § 1498(a) and hold that the C-100 Contract doses are within the scope of § 1498(a), consistent with the two-prong framework articulated herein.

Salvatore Anastasi
  President
**AMERICAN INTELLECTUAL**
**PROPERTY LAW ASSOCIATION**
**BARLEY SNYDER LLP**
2 Great Valley Parkway, Ste. 110
Malvern, PA 19355
Telephone: (610) 722-3899

**WILLIAMS MULLEN P.C.**

**BY:**   */s/ Richard T. Matthews*
Richard T. Matthews
N.C. State Bar No. 32817
301 Fayetteville St., Ste. 1700
Raleigh, NC 27601
Telephone: (919) 981-4000
Facsimile: (919) 981-4300
Email: rmatthews@williamsmullen.com

Clinton H. Brannon
Virginia State Bar No. 72340
8350 Broad St., Suite 1600
Tysons, VA 22102
Telephone: (703) 760-5226
Email: cbrannon@williamsmullen.com

*Counsel for Amicus Curiae*

24

FORM 19. Certificate of Compliance with Type-Volume Limitations

Form 19
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

### CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:**  26-1581

**Short Case Caption:**  Arbutus Biopharma Corp. v. Moderna, Inc.

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑  the filing has been prepared using a proportionally-spaced typeface and includes  4,787  words.

☐  the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐  the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 06/05/2026

Signature:  /s/ Richard T. Matthews

Name:  Richard T. Matthews