No. 2026-1581

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

ARBUTUS BIOPHARMA CORPORATION, GENEVANT SCIENCES, GMBH,

*Plaintiffs-Appellees*,

*v.*

MODERNA, INC., MODERNATX, INC.,

*Defendants-Appellants.*

On Appeal from the United States District Court, for the District of Delaware in Case No. 1:22-cv-00252-JDW, Judge Joshua D. Wolson.

**BRIEF FOR AMICUS CURIAE DR. MATTHEW HEPBURN IN SUPPORT OF DEFENDANTS-APPELLANTS AND IN SUPPORT OF REVERSAL**

M. ELIZABETH TRUJILLO
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY  10007
(212) 230-8800

THOMAS G. SAUNDERS
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue, N.W.
Washington, DC  20037
(202) 663-6000

*Attorneys for Amicus Curiae Dr. Matthew Hepburn*

June 5, 2026

# CERTIFICATE OF INTEREST

Counsel for Amicus Curiae Dr. Matthew Hepburn certifies the following:

**1.    Represented Entities**.  Fed. Cir. R. 47.4(a)(1).  Provide the full names of all entities represented by undersigned counsel in this case.

Dr. Matthew Hepburn.

**2.    Real Party in Interest**.  Fed. Cir. R. 47.4(a)(2).  Provide the full names of all real parties in interest for the entities.  Do not list the real parties if they are the same as the entities.

None.

**3.    Parent Corporations and Stockholders**.  Fed. Cir. R. 47.4(a)(3). Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

None.

**4.    Legal Representatives**.  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

None.

i

**5.** **Related Cases**. Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below)    ☐ No    ☒ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). Please do not duplicate information. This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

Already filed.

**6.** **Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

None.

Dated: June 5, 2026

/s/ Thomas G. Saunders
THOMAS G. SAUNDERS
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Avenue, N.W.
Washington, DC 20037
(202) 663-6000

ii

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTEREST .................................................................................i

TABLE OF AUTHORITIES .....................................................................................v

STATEMENT OF INTEREST OF AMICUS CURIAE ...........................................1

INTRODUCTION ....................................................................................................3

BACKGROUND ......................................................................................................6

    A.    Pre-COVID 19 Pandemic Preparedness....................................................6

        1.    Vaccines ....................................................................................7

        2.    Collapse of the healthcare system............................................8

        3.    National security .......................................................................9

    B.    COVID-19 Pandemic & Operation Warp Speed .................................9

ARGUMENT .........................................................................................................12

I.    THE GOVERNMENT NEEDED TO ACHIEVE WIDESPREAD
VACCINATION ........................................................................................13

    A.    The Pandemic Strained Supply Chains ................................................15

    B.    Preventing The Collapse of the Healthcare System Was
Paramount...........................................................................................15

    C.    National Security Required Vaccines ...................................................17

    D.    The Government Strategically Prioritized Key Sectors
And Populations For Vaccination .......................................................19

    E.    There Would Not Have Been Vaccines For Government
Employees Without Vaccines For All...................................................24

II.    THE GOVERNMENT COULD NOT AFFORD TO LOSE A DAY...........................28

III.    THE DISTRICT COURT'S DECISION WILL MAKE IT HARDER FOR THE GOVERNMENT TO SECURE PRIVATE-SECTOR COOPERATION IN THE NEXT PUBLIC HEALTH CRISIS ............................................................ 30

CONCLUSION ........................................................................................ 32

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

Page(s)

## STATUTES AND REGULATIONS

28 U.S.C. § 1498(a) ...............................................................................................2

## OTHER AUTHORITIES

Aguilar, Elliot et al., *Adaptive staffing can mitigate essential worker disease and absenteeism in an emerging epidemic*, PNAS (2021) ....................16

Branswell, Helen, *Who will answer the call in the next outbreak? Drug makers feel burned by string of vaccine pleas*, STAT (Jan. 11, 2018) ...................................................................................................25, 26

Collins, Francis, et al, *Operation Warp Speed: Vaccines, Diagnostics, and Therapeutics. Prepared Testimony before the Senate Appropriations Subcommittee on Labor, Health and Humans Services, Education, and Related Agencies* (July 2, 2020) ................................12

Committee on Global Health and the Future of the United States, *Global Health and the Future Role of the United States: A Consensus Study Report* (May 15, 2017) .........................................................9

*Consensus Study Report Highlights: Framework for Equitable Allocation of COVID-19 Vaccine* (Oct. 2020)...........................18, 21, 22, 23, 24

*The Economics of Vaccine Development*, DrugBank Team (Nov. 13, 2024), https://blog.drugbank.com/the-economics-of-vaccine-development/...................................................................................................26

Executive Order 13962, *Ensuring Access to United States Government COVID-19 Vaccines* (Dec. 8, 2020) ...............................................18

French, Geoffrey et al., *Impact of Hospital Strain on Excess Deaths During the COVID-19 Pandemic-United States, July 2020-July 2021*, MMWR (Nov. 19, 2021) ..................................................................16, 17

Hall, John E. et al., *Operation Warp Speed and the Countermeasures Acceleration Group-A Twenty-First Century Manhattan Project*, J. Adv. Military Studies (Spring 2022) ...............................................10, 11, 28, 31

Homeland Security Council, *National Strategy for Pandemic Influenza Implementation Plan* (May 2006)............................................8, 9, 14, 21

Iskander, John et al, *Pandemic Influenza Planning, United States, 1978-2008*. EMERG INFECT DIS. 2013;19(6):879-885............................................6

Korsen, Dana, *National Academies Release Framework for Equitable Allocation of a COVID-19 Vaccine for Adoption by HHS, State, Tribal, Local, and Territorial Authorities*, National Academies (Oct. 2, 2020)............22

Levesque, Paul, *ASC supports Operation Warp Speed with clinical test facilities - Mobile Trailers deployed to expand capacity enable vaccine trials*, dvids (Jan. 7, 2021) ............................................29

Lopez, C. Todd, *Perna: Whole-of-America Operation Warp Speed Effort 'Remarkable Feat,'* DOD News (Dec. 30, 2020)....................................28

Muoio, Dave, *About 800,000 nurses planning to leave the profession by 2027, data show*, FierceHealthcare (Apr. 14, 2023) ....................................16

National Academies of Sciences, Engineering, and Medicine, *Framework for equitable allocation of COVID-19 vaccine* (2020), https://doi.org/10.17226/25917..............................................19

National Security Council, *National Strategy for Countering Biological Threats* (Nov. 2009) ..........................................8, 9

Parkinson, John & Matthew Hepburn, *Operation Warp Speed: Bringing Out the Best in America's Ability to Innovate*, ContagionLive (Apr. 28, 2025) ..............................................28

*Proclamation 9994-Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak*, 134 Stat. 5207 (Mar. 13, 2020) ..............................................10

Sandhu et al., *Emergency Department and Intensive Care Unit Overcrowding and Ventilator Shortages in US Hospitals During the COVID019 Pandemic, 2020-2021*, Public Health Reports (2022)....................16

Silberner, Joanne, *Covid-19: North Dakota and Belgium have let infected health staff work on wards*, BMJ (Nov. 2020) ....................................16

U.S. Department of Defense, *Trump Administration Announces Framework and Leadership for 'Operation Warp Speed'* (May 15, 2020) ..................................................................................10, 11, 12

U.S. Department of Health, Education, & Welfare, *Interagency Work Group on Pandemic Influenza. A Plan for Pandemic Influenza* (1978) ..............................................................................................7, 8

U.S. Department of Health & Human Services, *Explaining Operation Warp Speed*, https://health.mo.gov/living/healthcondiseases/communicable/novel-coronavirus-lpha/pdf/fact-sheet-operation-warp-speed.pdf ............................27

U.S. Department of Health & Human Services, *From the Factory to the Frontlines: The Operation Warp Speed Strategy for Distributing a COVID-19 Vaccine*, https://www.hhs.gov/sites/default/files/strategy-for-distributing-covid-19-vaccine.pdf ...............................................................19, 20

U.S. Department of Health & Human Services, *HHS Pandemic Influenza Plan* (Nov. 2005) ....................................................6, 7, 8, 21

U.S. Department of Health & Human Services, *Pandemic Influenza Plan 2017 Update* (2017) ..................................................6, 7, 8, 21

U.S. GAO, *National Biodefense Strategy Opportunities and Challenges with Early Implementation*, GAO-20-483T (Mar. 11, 2020) ............................17

U.S. GAO, *Operation Warp Speed: Accelerated COVID-19 Vaccine Development Status and Efforts to Address Manufacturing Challenges*, GAO-21-319 (Feb. 2021) .........................................................29

U.S. GAO, *Update on Key Indicators, the Federal Response, and Implementation of GAO Recommendations*, GAO-25-107588 (July 2025) ........................................................................................14

The White House, *American Pandemic Preparedness: Transforming Our Capabilities* (Sept. 2021) ("American Pandemic Preparedness"), available at https://bidenwhitehouse.archives.gov/wp-content/uploads/2021/09/American-Pandemic-Preparedness-Transforming-Our-Capabilities-Final-For-Web.pdf....................................30, 31

WHO, *Epidemic of Ebola Disease caused by Bundibugyo virus in the Democratic Republic of the Congo and Uganda determined a public health emergency of international concern*, WHO (May 17, 2026), available at https://www.who.int/news/item/17-05-2026-epidemic-of-ebola-disease-in-the-democratic-republic-of-the-congo-and-uganda-determined-a-public-health-emergency-of-international-concern ..................................................................30

WHO, *Hantavirus outbreak linked to cruise ship travel, Multi-locations*, WHO (May 28, 2026), available at https://www.who.int/emergencies/disease-outbreak-news/item/2026-DON604 ..............................................................30

WHO, *WHO Director-General's opening remarks at the media briefing on COVID-19 - 11March 2020* (Mar. 11, 2020).............................9, 10

Worldometers, Coronavirus (Apr. 13, 2024), https://www.worldometers.info/coronavirus/ ......................................................10

Worldometers, Coronavirus, United States (Apr. 13, 2024), https://www.worldometers.info/coronavirus/country/us/ ..................................10

**STATEMENT OF INTEREST OF AMICUS CURIAE**[1]

Amicus curiae Dr. Matthew Hepburn is an infectious diseases physician with extensive experience mitigating the impact of infectious diseases and pandemics in the United States.  He has spent more than two decades in biodefense and pandemic preparedness, including as Vaccine Development Lead for Operation Warp Speed during the COVID-19 pandemic.

Dr. Hepburn served for 23 years in the United States Army as an infectious diseases physician, retiring with the rank of Colonel.  He began focusing on biodefense and pandemic preparedness following the anthrax letter attacks in 2001.  Dr. Hepburn joined the Obama White House during the H1N1 pandemic and served as Director of Medical Preparedness on the White House National Security Staff from 2010-2013.  From 2013-2019, he worked at the Defense Advanced Research

---

[1] No counsel for any party authored this brief in whole or in part, and no person or entity other than amicus and his counsel made a monetary contribution intended to fund the preparation or submission of this brief.  The views expressed in this brief are Dr. Hepburn's own, not those of his current employer, CBRN Defense, or any former employer.  Further, the statements in this brief are based solely on public information, not any classified, controlled, procurement-sensitive, privileged, deliberative, confidential, or otherwise nonpublic U.S. government information.  Although WilmerHale represents Moderna in other matters, and some attorneys at WilmerHale other than the undersigned attorney previously provided limited advice to Moderna in connection with *Arbutus v. Moderna*, No. 1:22-cv-252 (D. Del.) as part of a discrete engagement that has terminated, no attorney from WilmerHale is serving as counsel for Moderna in this appeal.  The firm solely represents Dr. Hepburn and has received and will receive no compensation from Moderna, either directly or indirectly, for its work on this brief.  Pursuant to Fed. R. App. P. 29(a)(2), all Parties have consented to the filing of this brief.

1

Projects Agency (DARPA), where his projects included predicting outbreaks and figuring out how to make vaccines and treatments fast enough for future public health crises. After Dr. Hepburn retired from active duty in 2019, he joined the Department of Defense (DOD), where he continued working on biodefense and pandemic preparedness. Dr. Hepburn joined Operation Warp Speed during the COVID-19 pandemic, where he led the daily execution and acceleration of vaccine development. After his Operation Warp Speed assignment, Dr. Hepburn worked on the implementation of the American Pandemic Preparedness Plan (AP3).

Dr. Hepburn has no interest in which party ultimately wins the underlying patent disputes in this case but has a strong interest in this Court's interpretation of 28 U.S.C. § 1498(a), which has significant implications for the ability of the nation to prepare for and respond to public health emergencies. Dr. Hepburn files this brief to provide the Court with information on pandemic preparedness and response and on how the government viewed its role during the COVID-19 pandemic.

**INTRODUCTION**

The district court's conclusion that only vaccine doses administered to government employees were "used or manufactured by or for the United States" is not consistent with the realities the government faced during the pandemic and undermines the government's ability to address the next crisis.

It may be difficult today—years after the widespread vaccination efforts that turned the tide of the COVID-19 pandemic—to remember how frightening 2020 was and how much was unknown in the early days.  There had never been a pandemic sparked by a coronavirus.  The mode of transmission was unknown.  The severity of the disease was unknown.  The most vulnerable population was unknown.  People stayed home.  Grocery shelves were empty.  Refrigerated trucks lined New York City to address the surge in deaths.  Anxiety spread.

The government took extraordinary steps to address this crisis.  It organized a whole-country effort to facilitate the development, testing, and orderly distribution of vaccines.  This included a commitment to purchase and take title to hundreds of millions of doses of multiple vaccine candidates even before it was clear that any candidate would succeed in clinical trials.  The government did not take these unprecedented steps to confer private benefits on private parties, nor did it act for the government only when securing vaccines for its own employees.  It acted "for the United States" from start to finish.

3

During a public health crisis like the COVID-19 pandemic, it is impossible to draw a sharp line between government employees and the rest of the population when analyzing the use of vaccines purchased by the government. The government does not exist in a vacuum and cannot function properly without a stable society. At the most direct level, the government relies on functioning supply chains to meet its needs, and mass vaccination was critical to maintaining basic operations and slowly restoring the systems on which the government depends, which were severely strained by the public health crisis.

More generally, the government is impaired if there is mass illness and death, doctors are not available to treat patients as part of federal medical programs, its employees cannot attend to their duties because the schools are closed, it has to divert resources to keep the peace, or its soldiers are distracted by their loved ones' inability to obtain care in a collapsing medical system. By purchasing vaccines and playing a central role in directing their distribution, the government was able to strategically prioritize key sectors and populations for vaccination, maintain an orderly process that reduced conflict, and advance its foreign policy and national security goals.

Additionally, there may well have been no vaccine for government employees—and certainly not one available as quickly—without the government's commitment to purchase vaccines for the broader population. Federal employees make up only a small percentage of the population, and, in Dr. Hepburn's

4

experience, it would have been difficult for the government to convince partners in the private sector to put their ordinary commercial endeavors on hold and assume the risk of developing a vaccine that might not succeed merely to supply the limited market of government employees.

An overarching consideration in all of this was that every day mattered as the government rushed to save lives in a pandemic that ultimately claimed 1.2 million Americans and could have been far worse. In that context, the government could not have the partners supplying it with vaccines slowed by injunctions or worried about unpredictable patent damages awarded by a jury.

This case is not solely about the last public health crisis; it is also about the next one. In an emergency, the district court's ruling will make the private sector think twice before it drops everything to supply the innovation and risk-taking the government needs to meet the moment. The arbitrary distinctions the court drew between government employees and the rest of society will hinder a coordinated public health response. And the court's unduly narrow view of what it means to act "for the Government" will limit the federal government's ability to fulfill its duty under the Constitution to "insure domestic Tranquility," "provide for the common defense," and "promote the general Welfare."

**BACKGROUND**

**A.    Pre-COVID 19 Pandemic Preparedness**

The United States has grappled with infectious disease outbreaks since the founding of the Nation—from the 1793 yellow fever epidemic in Philadelphia, to waves of cholera and scarlet fever in the nineteenth century, to the 1918 influenza pandemic, to the scourge of polio in the twentieth century, to the H1N1 virus. The U.S. government has played an increasingly central role in responding to these crises.

The first formal U.S. pandemic plan was released in 1978 to address the H1N1 influenza outbreak.[2]  Pandemic planning has continued in the decades since, to address the threat of both bioterrorism and natural outbreaks.[3]  Pandemic preparedness and response center on, among other items, vaccine development, preventing healthcare system collapse, and protecting national security, all of which "require coordination among federal, state, and local government and partners in the private-sector."[4]

---

[2] Iskander et al., *Pandemic Influenza Planning, United States, 1978–2008*. Emerg Infect Dis. 2013;19(6):879-885, at 880-881 ("Iskander 2013").  All emphases added unless otherwise indicated.

[3] *Id.* at Tbl; *see* U.S. Dep't Health & Human Services, *Pandemic Influenza Plan 2017 Update*, at 3 (2017) ("2017 Pandemic Plan").

[4] U.S. Dep't Health & Human Services, *HHS Pandemic Influenza Plan*, at 6 (Nov. 2005) ("2005 HHS Pandemic Plan").

### 1.    Vaccines

The 1978 Pandemic Plan recognized vaccines as a "major weapon," described vaccine research as "imperative," and committed to the removal of "known obstacles to the production of vaccine and the conduct of immunization programs." [5]   By design, the government is involved in nearly all aspects of vaccine development and production for a potential pandemic or bioterrorism threat.

For example, the government helps invest in the research and development of vaccines designed to provide "protection against potential pandemic viral strains."[6] The government is also involved in increasing vaccine production and supplies.  This was a concern, for example, in the 1978 Pandemic Plan, because relatively few companies engaged in biologics production, given the "technical complexity of production and low profit margin."[7]  The quantity of vaccines produced each year was "usually insufficient to provide vaccine for all of the 'high risk' population for which vaccine is recommended annually."[8]  Thus, a guiding principle in pandemic preparedness is developing a domestic vaccine production capacity.[9]

---

[5] U.S. Dep't Health, Education, & Welfare, *Interagency Work Group on Pandemic Influenza. A Plan for Pandemic Influenza* at 2, 4, 9, 44 (1978) ("1978 Pandemic Plan").

[6] 2005 Pandemic Plan at 8; *see also* 2017 Pandemic Plan at 4.

[7] 1978 Pandemic Plan at 17, 49.

[8] *Id.* at 23.

[9] 2005 Pandemic Plan at 20.

Equally important are distribution and prioritization of vaccines.  Early on, the government recognized that "much of the vaccine produced is administered to 'normal' individuals, leaving the 'high-risk' groups relatively under-immunized."[10] The government decided it would distribute vaccines to "pre-determined priority groups."[11]  The groups "receiving priority access to medical countermeasures during a severe pandemic will reflect the need to maintain infrastructure and security functions."[12]

### 2.    Collapse of the healthcare system

Another aspect of pandemic preparedness has been examining the healthcare system and how it would respond in a crisis.  For example, the "effective dissemination of a lethal biological agent within an unprotected population could place at risk the lives of hundreds of thousands of people," and the "unmitigated consequences of such an event could overwhelm our public health capabilities, potentially causing an untold number of deaths."[13]  Various pandemic preparedness plans have accounted for the need to provide "healthcare surge capacity."[14]

---

[10] 1978 Pandemic Plan at 23.

[11] 2005 Pandemic Plan at 6, 21.

[12] Homeland Security Council, *National Strategy for Pandemic Influenza Implementation Plan*, 101, 106 (May 2006) ("2006 Homeland Security Plan").

[13] National Security Council, *National Strategy for Countering Biological Threats*, at 1 (Nov. 2009) ("2009 National Strategy Biological Threats").

[14] *See, e.g.*, 2005 Pandemic Plan at 25; 2017 Pandemic Plan at 4.

### 3.    National security

"National security is not just about protection from state and nonstate actors, but also encompasses protection from emerging infectious diseases and other health outcomes that can threaten the nation's economic vitality and its very way of life."[15] From a national security standpoint, pandemics can disrupt military readiness, transportation, healthcare systems, food supply chains, and critical infrastructure like other large-scale threats.   Unsurprisingly, pandemic preparedness and responses regularly involve agencies like the Department of Defense (DOD).[16]

### B.    COVID-19 Pandemic & Operation Warp Speed

On March 11, 2020, the World Health Organization (WHO) "rung the alarm bell loud and clear," declaring that COVID-19 can be characterized as a pandemic.[17] At that time, 4,291 people had lost their lives and WHO "expect[ed] to see the number of cases, the number of deaths, and the number of affected countries climb

---

[15] Committee on Global Health and the Future of the United States, *Global Health and the Future Role of the United States: A Consensus Study Report*, at 43 (May 15, 2017) ("Consensus Study Report 2017").

[16] *See, e.g.*, 2006 Homeland Security Plan at 18; *see also* 2009 National Strategy Biological Threats at 2.

[17] WHO, *WHO Director-General's opening remarks at the media briefing on COVID-19 – 11 March 2020* (Mar. 11, 2020) ("WHO Remarks 2020").

even higher."[18]   By 2023, that number would reach more than 7 million deaths.[19] The United States would lose more than 1.2 million people.[20]

The U.S. government acted quickly.  Two days after WHO announced COVID-19 a pandemic, the president of the United States declared a national emergency, noting how the "spread of COVID-19 within our Nation's communities threatens to strain our Nation's healthcare systems."[21]  By May 2020, the president announced Operation Warp Speed.[22]

Operation Warp Speed was the "administration's national program to accelerate the development, manufacturing, and distribution of COVID-19 vaccines, therapeutics, and diagnostics."[23]  It was structured as a "public-private partnership" because the government depends on private-sector expertise and cannot mount an

---

[18] *Id.*

[19] Worldometers, Coronavirus (Apr. 13, 2024), https://www.worldometers.info/coronavirus/.

[20] Worldometers, Coronavirus, United States (Apr. 13, 2024), https://www.worldometers.info/coronavirus/country/us/.

[21] *Proclamation 9994—Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak*, 134 Stat. 5207 (Mar. 13, 2020).

[22] Later named the HHS-DOD COVID-19 Countermeasures Acceleration Group (CAG).  Hall et al., *Operation Warp Speed and the Countermeasures Acceleration Group—A Twenty-First Century Manhattan Project*, J. Adv. Military Studies (Spring 2022) ("Hall"); U.S. Dep't of Def., *Trump Administration Announces Framework and Leadership for 'Operation Warp Speed'*, at 1 (May 15, 2020) ("May 2020 Announcement").

[23] *Id.*

effective pandemic response without the private sector.[24]  Operation Warp Speed's mandate was initially to deliver 300 million vaccine doses, enough to vaccinate every American.[25]  It became the nucleus of the "whole-of-America" effort to combat COVID-19.[26]

Operation Warp Speed chose fourteen candidates from more than 100 vaccine candidates, and then "winnowed down to about eight candidates," which underwent "further testing in early stage small clinical trials."[27]  Large-scale randomized trials for safety and efficacy followed rapidly.[28]  In less than nine months, two candidates neared completion of Phase 3 clinical trials, and the final candidate was progressing through Phase 2/3 trials.[29]  In December 2020, the Moderna and Pfizer/BioNTech vaccines received Emergency Use Authorization from the Food and Drug Administration.

To encourage vaccine development and accelerate manufacturing, the government invested "at its own risk much earlier than usual, giving firms

---

[24] May 2020 Announcement at 2.

[25] Hall at 146.

[26] Hall at 145.

[27] May 2020 Announcement at 4.

[28] *Id.*

[29] *Id.*

11

confidence that they can invest aggressively in development of countermeasures."[30] For example, rather than proceeding sequentially with clinical trials followed by manufacturing investment, the government sought parallel development before knowing if the drug would even be safe or efficacious.[31]

For distribution, the government expressed that, before "countermeasures are approved or authorized, the program will build the necessary plans and infrastructure for distributing them, especially the unprecedented effort that will be necessary to deliver a vaccine to hundreds of millions of Americans in a timely manner."[32]  DOD was central to that plan.[33]

## ARGUMENT

The government agreed to purchase and take title to the hundreds of millions of doses of multiple vaccine candidates before it was even clear that any candidate would succeed in clinical trials.  What the government chose to do with each vaccine dose afterwards does not alter that doses were "for the Government."

---

[30] May 2020 Announcement at 5.

[31] Collins, et al., *Operation Warp Speed: vaccines, diagnostics, and therapeutics. Testimony before the Senate Appropriations Subcommittee on Labor, Health and Humans Services, Education, and Related Agencies*, at 2 (July 2, 2020) ("Collins 2020").

[32] May 2020 Announcement at 5.

[33] *Id.*

12

It is impossible to draw a sharp line between government employees and the rest of the population during a pandemic, and mass vaccination of the population was critical to the government for multiple reasons. First, the government depends on a functioning society and cannot operate without intact supply chains. Second, the government needed to act to stabilize the healthcare system, which was strained and could have collapsed. Third, public health is inextricably linked with national security. Fourth, the government not only purchased and acquired title to the vaccines but also dictated who would receive them as part of a prioritization strategy grounded in policy decisions honed over decades of pandemic preparedness. Fifth, although obtaining vaccine doses solely for government employees was never the goal, it is doubtful the government would have attracted the private investment and risk-taking necessary to achieve even that outcome on the timeline needed if it had not contracted to have a larger number of doses manufactured for the government.

The U.S. government relies on the private sector to mount an effective pandemic response, and the district court's ruling will threaten the government's ability to respond as quickly as needed and find willing partners during the next public health crisis.

## I.    THE GOVERNMENT NEEDED TO ACHIEVE WIDESPREAD VACCINATION

It makes no sense to retroactively subdivide the government's purchase based on whether a particular dose ultimately was administered to a government employee

or someone else.  The doses were being manufactured for sale to the government to advance governmental objectives.  The doses were thus for the government regardless of how the government later chose to distribute them on the back end.

The government needed to achieve widespread vaccination to function.  The government does not exist in a vacuum and depends on a functioning society—including intact supply chains, an operative healthcare system, and essential services—all of which were under tremendous strain during the COVID-19 pandemic.

Pandemic preparedness plans recognize that "[a]bsenteeism across multiple sectors related to personal illness, illness in family members, fear of contagion, or public health measures to limit contact with others" threatens "the functioning of critical infrastructure, the movement of goods and services, and operation of institutions such as schools and universities."[34]  A pandemic like COVID-19 has "significant implications for the economy, national security, and the basic functioning of society."[35]  To mitigate these effects, the government relied on COVID-19 vaccination, "that is, prioritizing, allocating, distributing, and administering vaccine doses."[36]

---

[34] 2006 Homeland Security Plan at 1.

[35] *Id.*

[36] U.S. GAO, *Update on Key Indicators, the Federal Response, and Implementation of GAO Recommendations*, GAO-25-107588, at 4 (July 2025).

14

### A.    The Pandemic Strained Supply Chains

The pandemic strained supply chains, from food and clothing to essential medical supplies to electronics. The federal government was not immune from that strain. It relies on procurement of goods and services from the private sector to maintain its operations. The government thus had a clear interest in procuring vaccines for distribution beyond the federal workforce. This included an interest in achieving "herd immunity" through widespread vaccination, which would slow transmission of the illness.

Only an unduly narrow conception of what it means to produce vaccines for the government would encompass direct vaccination of government employees while excluding the public health steps needed to ensure that those employees have necessary supplies. A soldier who stays healthy but has no food or weapons cannot fight. A federal emergency manager who does not have supplies to distribute to hurricane victims cannot fulfill her mission. In a public health emergency, the needs of the government and the needs of society overlap to such an extent that actions taken to save lives and preserve functioning supply chains are also actions taken for the government.

### B.    Preventing The Collapse of the Healthcare System Was Paramount

A particular concern during the COVID-19 pandemic was the risk that the healthcare system would collapse. The pandemic "overburdened the US health care

15

system because of extended and unprecedented patient surges and supply shortages in hospitals."[37]  A massive increase in patient demand led to shortages of key hospital resources.[38]  "Nearly 20% of US hospitals experienced staff shortages, exhausting replacement pools and at times requiring COVID-positive healthcare workers to remain at work."[39]  Nearly 100,000 registered nurses left the profession during the COVID-19 pandemic.[40]

Furthermore, resource limitations "led some facilities to adopt crisis standards of care, the most extreme operating condition for hospitals, in which the focus of medical decision-making shifted from achieving the best outcomes for individual patients to addressing the immediate care needs of larger groups of patients."[41] When deviations from conventional standards of care occurs, many preventive and elective procedures are also suspended, "leading to the progression of serious

---

[37] Sandhu et al., *Emergency Department and Intensive Care Unit Overcrowding and Ventilator Shortages in US Hospitals During the COVID019 Pandemic, 2020-2021*, Public Health Reports, at 796 (2022) ("Sandhu").

[38] Sandhu at 796-798; Silberner, *Covid-19: North Dakota and Belgium have let infected health staff work on wards*, BMJ (Nov. 2020).

[39] Aguilar et al., *Adaptive staffing can mitigate essential worker disease and absenteeism in an emerging epidemic*, PNAS, at 1 (2021).

[40] Muoio, *About 800,000 nurses planning to leave the profession by 2027, data show*, FierceHealthcare (Apr. 14, 2023).

[41] French et al., *Impact of Hospital Strain on Excess Deaths During the COVID-19 Pandemic—United States, July 2020-July 2021*, MMWR, at 1613 (Nov. 19, 2021).

16

conditions among some persons who would have benefitted from earlier diagnosis and intervention."[42]

In a counterfactual world, where the government procured vaccines only for direct government employees, healthcare professionals would have remained at high-risk. Absenteeism would have continued to surge, deaths would have increased, the quality of healthcare would have declined, and it is possible the healthcare system would have collapsed.

### C.    National Security Required Vaccines

The government also needed large-scale vaccine deployment for national security. There is an "inextricable link between security and public health concerns."[43] On the domestic front, maintaining a functioning society is important for national security purposes. The government's involvement in vaccine procurement also helped prevent civil unrest. Large crises increase fear, distrust in institutions, misinformation, polarization, and crime. Just imagine what might have happened if vaccines had been available only to the highest bidder, or food or other essential supplies had run short.

---

[42] *Id.*

[43] U.S. GAO, *National Biodefense Strategy Opportunities and Challenges with Early Implementation*, GAO-20-483T at 1 (Mar. 11, 2020).

Across administrations, the goal of maintaining peace and preventing civil unrest is paramount, and the government made this goal clear during the COVID-19 pandemic. Executive Order 13962, "Ensuring Access to United States Government COVID-19 Vaccines," emphasized that the government "must ensure that Americans have priority access to COVID-19 vaccines developed in the United States or procured by the United States Government" to "ensure the health and safety of our citizens, to strengthen our economy, and to enhance the security of our Nation."[44]

In addition to domestic security, the vaccination program helped promote international security and the government's foreign policy objections. By strategically acquiring large supplies of vaccine, the government was able to use vaccine doses as a foreign policy tool. Executive Order 13962 explained that "it is in the interest of the United States to facilitate international access to United States Government COVID-19 Vaccines."[45] Providing life-saving relief to other countries allowed the government to pursue its foreign policy goals (so-called "vaccine diplomacy").[46] It also helped to prevent "economic and social shocks that will

---

[44] Executive Order 13962, *Ensuring Access to United States Government COVID-19 Vaccines*, at 1 (Dec. 8, 2020) ("EO 13962").

[45] EO 13962 at 1.

[46] *Consensus Study Report Highlights: Framework for Equitable Allocation of COVID-19 Vaccine*, at 4 (Oct. 2020) ("Consensus Study Report Highlights 2020").

further increase global inequities—and with them global instability, displacement, large-scale migration, and ultimately, insecurity."[47]

The notion that only vaccines secured for government employees are "for the Government" cannot be reconciled with contemporaneous evidence of the government seeking to purchase and distribute the vaccines at home and abroad for national security and foreign policy goals.

### D.    The Government Strategically Prioritized Key Sectors And Populations For Vaccination

When vaccine supplies were limited, the government not only purchased and acquired title to the vaccines but also dictated who would receive them.  This government control over vaccine distribution reinforces that even where doses were being administered broadly, the program as a whole was for the government.

Even before there was a vaccine, DOD partnered with the Centers for Disease Control and Prevention (CDC) and other parts of the Department of Health and Human Services (HHS) to "coordinate supply, production, and distribution of vaccines."[48]  The goal was to "ensure safety of the products, *maintain control* and

---

[47] National Academies of Sciences, Engineering, and Medicine, *Framework for equitable allocation of COVID-19 vaccine*, at 206 (2020), https://doi.org/10.17226/25917.

[48] U.S. Dept. Health & Human Services, *From the Factory to the Frontlines: The Operation Warp Speed Strategy for Distributing a COVID-19 Vaccine*, https://www.hhs.gov/sites/default/files/strategy-for-distributing-covid-19-vaccine.pdf.

visibility, manage uptake and acceptance, ensure traceability of product, and maximize coverage, which requires *a centralized solution* as well as close local partnerships."[49]  To fulfill that goal, the CDC partnered with McKesson as "its centralized distributor."[50]  McKesson was a *government* contractor whose actions on the vaccine distribution were dictated by the *government*.

Whether the vaccines were obtained for government employees or non-government employees, their distribution was dictated by the government.  To differentiate vaccine doses based on their end destination—a warehouse or a government employee's arm—ignores that, at all times, it was the government choosing the destination of its property.

Most directly, of the 500,001,540 doses Moderna provided, the government ultimately allocated 19.07% to federal recipients, which included international donations, and doses for Health Resources and Services Administration (HRSA), DOD, Department of Veterans Affairs, Indian Health Service, Bureau of Prisons, Department of State, HHS, and Immigration and Customs Enforcement.[51]

More generally, prioritizing who accesses a vaccine during a public health crisis is rooted in decades of policy decision-making and reflected in numerous

---

[49] *Id.* at 3.

[50] *Id.* at 4.

[51] Appx6994.

pandemic preparedness sources.[52]  To ensure that the allocation and distribution of limited vaccine supplies were strategic and equitable, the CDC and the National Institutes of Health (NIH) asked the National Academies of Sciences to "develop an overarching framework for vaccine allocation that could assist policy makers in the domestic and global health communities."[53]  The report identified important considerations related to coordination, cost, risk communication, community engagement, vaccine acceptance, and global allocation.[54]  The foundational principles were ethical (maximize benefit, equal concern, and mitigation of health inequities) and procedural (fairness, transparency, and evidence-based).

The first phase (Phase 1a) covered approximately 5 percent of the U.S. population and included "high-risk health workers who are involved in direct patient care," and first responders.[55]  Many of these individuals—nurses, doctors, fire-fighters, and police officers—are not federal government employees.  "This group has a critical role in maintaining health care system functionality, high risk of

---

[52] *See* 2005 HHS Pandemic Plan at D-10; 2017 Pandemic Plan; 2006 Homeland Security Plan at 123.

[53] Consensus Study Report Highlights 2020.

[54] *Id.*

[55] *Id.* at 2.

exposure to patients exhibiting symptoms of COVID-19, and higher risk of then transmitting the virus to others, including family members."[56]

The next phase (Phase 1b) covered approximately 10 percent of the U.S. population and included "people of all ages with two or more comorbid or underlying health conditions that put them at significant risk of severe illness or death from COVID-19, defined as having two or more of the conditions listed by CDC as being associated with increased risk of severe COVID-19."[57]  This phase also included "all older adults living in congregate settings, including nursing homes, long-term care facilities, prisons and group homes, and multi-generational households."[58]

The following phase (Phase 2) covered approximately 30-35 percent of the U.S. population and included "K–12 teachers, school staff, and child care workers, a group that includes administrators, environmental services staff, maintenance workers, and school bus drivers."[59]  This phase also included "critical workers in high-risk settings who cannot avoid a high risk of exposure to COVID-19, such as

---

[56] Korsen, *National Academies Release Framework for Equitable Allocation of a COVID-19 Vaccine for Adoption by HHS, State, Tribal, Local, and Territorial Authorities*, National Academies (Oct. 2, 2020).

[57] Consensus Study Report Highlights 2020 at 2.

[58] *Id.*

[59] *Id.*

workers in the food supply system and public transit."[60]    Moreover, this phase covered people "of all ages with comorbid and underlying conditions that put them at moderately higher risk," as well as people in "homeless shelters or group homes for individuals with physical or mental disabilities and all other individuals and staff in prisons, jails, detention centers, and similar facilities who were not included in Phase 1."[61]    All older adults who were not included in the prior phase were included in this phase.[62]

The next phase (Phase 3) covered 40-45 percent of the U.S. population and included all children and young adults in the United States 30 years of age or older, as well as "workers in industries and occupations important to the function of society and at increased risk of exposure who are not covered in Phases 1 and 2."[63]

The last phase (Phase 4) covered all other people living in the United States. The goal is that the "United States should ensure that all U.S.-based individuals who did not have access to the vaccine in previous phases (and for whom the vaccine is not medically contraindicated) have access to the vaccine."[64]

---

[60] *Id.*

[61] *Id.* at 2.

[62] *Id.*

[63] *Id.* at 3.

[64] *Id.*

23

This framework emphasized preventing severe illness and death, relieving the burden on the healthcare system, and maintaining essential health and emergency services to support that goal.[65]  Notably, it did not prioritize only government workers.  If the government had done so, and if its messaging to the country—at a time when people were scared to go to the grocery store or shake hands—had been that the government was working hard to procure vaccines only for its own employees, it would have put the government in an untenable position and been a repudiation of the government's core function.

**E.    There Would Not Have Been Vaccines For Government Employees Without Vaccines For All**

Operation Warp Speed was able to obtain COVID-19 vaccines, and to do so at the unprecedented speed required to effectively address the pandemic, in large part because it guaranteed a government market for vaccine makers. Vaccine makers take a huge risk when they set aside profit-making programs to devote resources to a vaccine that may fail, come too late, or have an insufficient market to recuperate their investment.  Those risks are particularly hard for small, innovative companies to bear.  The government mitigated that risk using advance market commitments, which guaranteed, even before the completion of clinical trials, that the government would purchase vaccines.  This commission to manufacture vaccines for the

---

[65] *Id.*

government was independent of whether there would ever be a recipient or, if there was, who it would be.

When companies rise to the challenge of producing vaccines during a crisis (like with SARS, H1N1 flu pandemic, West Nile, Zika, and West African Ebola), companies set aside "their day-to-day profit-making activities."[66]  That choice is disruptive, and it is a gamble.  "Nearly all the major pharmaceutical companies that work on these vaccines have found themselves holding the bag after at least one of these outbreaks."[67]  For example, after racing to test and license an Ebola vaccine, GSK shelved the experimental vaccine.  Likewise, "[a] number of flu vaccine manufacturers were left on the hook with ordered but unpaid for vaccine during the mild 2009 H1N1 flu pandemic."[68]  For the West Nile virus vaccine, Sanofi Pasteur had to pull the plug on its vaccine because "public fear abated, taking with it the prospects for sales of a vaccine."[69]  The interest and will to provide public health benefits are certainly present across companies, but the reality of the expense and risk to pursue such ventures can be prohibitive.

---

[66] Branswell, *Who will answer the call in the next outbreak? Drug makers feel burned by string of vaccine pleas*, STAT (Jan. 11, 2018) ("Branswell").

[67] *Id.*

[68] *Id.*

[69] *Id.*

If the government had limited its commitment to only doses for government employees, who make up less than 2% of the U.S. population, it is doubtful that it would have attracted the private investment and risk-taking necessary to produce the vaccines on the timeline needed.  Even the limited outcome of securing vaccines solely for government employees—which was never the objective—depended on the decision to procure the manufacture of a much larger set of doses for the government.

Michael Osterholm, director of the Center for Infectious Disease Research and Policy, explained: "The only real expertise in the world to make these vaccines in a quantity and a safety environment is in the private sector" and "[i]f the private sector isn't fully engaged and involved, it's a show stopper."[70]  But investing in vaccines is risky.  Vaccine development and manufacturing require substantial upfront investments with uncertain returns.  Each stage, from research and development, to clinical trials, to manufacturing, is "fraught with risks, with a high probability of failure due to unforeseen safety concerns, lack of efficacy, or manufacturing challenges."[71]

---

[70] Branswell.

[71] *The Economics of Vaccine Development*, DrugBank Team (Nov. 13, 2024), https://blog.drugbank.com/the-economics-of-vaccine-development/.

The government committed to buying doses of vaccines even before the clinical trials were completed, with the understanding that if the clinical trials did not work, the government would still buy vaccines that would never be used. Accordingly, the government made an investment "in the necessary manufacturing capacity at its own risk, giving firms confidence that they can invest aggressively in development and allowing faster distribution of an eventual vaccine."[72] This financially risky approach allowed for immediate distribution upon vaccine approval, and it provided the assurance needed for vaccine makers to go full steam ahead.

If the government had come to the private sector and said it only wanted a vaccine for government employees, there was a substantial risk it would not have succeeded, and certainly not to the same extent and on the same schedule. Focusing on the ultimate recipient of a vaccine, as the district court did, relies on hindsight untethered to the government's goals and the reality of what was required to secure *any* vaccine on the timeline needed. The government's entire purchase of vaccine doses was "for the Government."

---

[72] U.S. Dep't Health & Human Services, *Explaining Operation Warp Speed*, at 2, https://health.mo.gov/living/healthcondiseases/communicable/novel-coronavirus-lpha/pdf/fact-sheet-operation-warp-speed.pdf.

## II.    THE GOVERNMENT COULD NOT AFFORD TO LOSE A DAY

The government spared no resources in its race to procure 500 million vaccine doses.    This race would have been unacceptably hampered had any of the government partners supplying vaccines slowed down because of an injunction or concerns about unpredictable patent damages awarded by a jury.

Before the COVID-19 pandemic, vaccine development took years, not months.  The shortest timeline to bring a vaccine to market before the COVID-19 pandemic was the mumps vaccine, which took more than ***four years***.[73]  The quantity of vaccines sought (500 million doses) was also staggering.  Prior to the COVID-19 pandemic, the government's annual vaccine effort typically distributed around 80 million vaccines a year.[74]    To obtain the previously unobtainable, every hour counted.[75]  Pausing in any way, especially for a non-scientific reason such as a patent injunction against a vaccine maker, would have been unacceptable.  Indeed, even when over 14 million doses of vaccines were already distributed, Army Gen. Gustave F. Perna noted that "every day we push more vaccine."[76]

---

[73] Hall at 148.

[74] *Id.*

[75] Parkinson & Hepburn, *Operation Warp Speed: Bringing Out the Best in America's Ability to Innovate*, ContagionLive (Apr. 28, 2025).

[76] Lopez, *Perna: Whole-of-America Operation Warp Speed Effort 'Remarkable Feat,'* DOD News (Dec. 30, 2020).

The Logistics Civil Augmentation Program (LOGCAP) is a prime example of how Operation Warp Speed sought to save every day possible. Most clinical trials include about 3,000 participants, but the COVID-19 vaccine trials had ***30,000 people***.[77] General Perna called upon LOGCAP to help provide support for this massive endeavor. LOGCAP is "best known for its use in setting up and maintaining base camps in Iraq, Afghanistan and other areas where U.S. troops are deployed."[78] Here, it helped set up trailers for clinical trials.[79]

Similarly, when vaccine companies faced challenges scaling up manufacturing, DOD and HHS worked with companies to mitigate those challenges, including placing "prioritized ratings on 18 supply contracts for vaccine companies under the Defense Production Act, which allows federal agencies with delegated authority to require contractors to prioritize those contracts for supplies needed for vaccine production."[80]

---

[77] Levesque, *ASC supports Operation Warp Speed with clinical test facilities – Mobile Trailers deployed to expand capacity enable vaccine trials*, dvids (Jan. 7, 2021).

[78] *Id.*

[79] *Id.*

[80] U.S. GAO, *Operation Warp Speed: Accelerated COVID-19 Vaccine Development Status and Efforts to Address Manufacturing Challenges*, GAO-21-319, at 2 (Feb. 2021).

29

The government could not have afforded to allow the threat of an injunction or uncertainty about the risk of future patent liability to slow the work of its private-sector partners.

## III. THE DISTRICT COURT'S DECISION WILL MAKE IT HARDER FOR THE GOVERNMENT TO SECURE PRIVATE-SECTOR COOPERATION IN THE NEXT PUBLIC HEALTH CRISIS

This case is about much more than the COVID-19 pandemic, as it will also impact future public health crises. The next pandemic is not a possibility; it is an inevitability. "As devastating as the COVID-19 pandemic [wa]s, there is a reasonable likelihood that another serious pandemic that may be worse than COVID-19 will occur."[81] Indeed, in just the five weeks before this brief was filed, the world has already seen crises such as hantavirus on a cruise ship and Ebola in Central Africa emerge.[82] The question is therefore whether the private sector will remain positioned to provide what the government alone cannot: the rapid development and

---

[81] The White House, *American Pandemic Preparedness: Transforming Our Capabilities* (Sept. 2021) at 5; *id.* ("Future biological threats could be far worse, and we are not adequately prepared."); *id.* at 6 ("Serious biological threats will occur at an increasing frequency.").

[82] *See, e.g.*, *Hantavirus outbreak linked to cruise ship travel, Multi-locations*, WHO (May 28, 2026), available at https://www.who.int/emergencies/disease-outbreak-news/item/2026-DON604; *Epidemic of Ebola Disease caused by Bundibugyo virus in the Democratic Republic of the Congo and Uganda determined a public health emergency of international concern*, WHO (May 17, 2026), available at https://www.who.int/news/item/17-05-2026-epidemic-of-ebola-disease-in-the-democratic-republic-of-the-congo-and-uganda-determined-a-public-health-emergency-of-international-concern.

large-scale manufacturing of vaccines. The district court's holding will make it significantly more difficult for the government to secure that cooperation.

Without the private sector, the impact of COVID-19 would have been far worse. The vaccines and therapeutics produced and delivered averted about 1.1 million *additional* COVID-19 deaths, and more than about 10.3 million *additional* COVID-19 hospitalizations in the United States as of November 2021.[83] Had the healthcare system been forced to function for one more year without a vaccine, it might have collapsed. Indeed, the lesson from the COVID-19 pandemic is not only that collaboration with the private sector is vital, but also that "[b]efore the next pandemic … [the government] need[s] to be able to respond to any possibility and to respond *even faster* and even better."[84]

The district court's decision thwarts such progress because it will have a chilling effect on private-sector innovation and government cooperation. Companies exposed to potentially massive and unpredictable liability may be unwilling or unable to undertake the investment and risk-taking required to support the government. Nor is it tenable in a public health emergency for the government to limit its focus solely to securing vaccines for its own employees.

---

[83] Hall at 148.

[84] *American Pandemic Preparedness* at 6.

The Constitution charges the government with the duty to "insure domestic Tranquility," "provide for the common defense," and "promote the general Welfare." The government fulfilled that duty through Operation Warp Speed, and regardless of who ultimately received the doses, all of the vaccine doses that the government purchased and took title to were for the government.

## CONCLUSION

Operation Warp Speed secured vaccines for both the Nation and its allies through partnerships with private companies like Moderna. The district court's ruling that only doses administered directly to government employees were "for the Government" cannot be reconciled with the realities of the COVID-19 pandemic and will threaten such partnerships in the next public health crisis.

Respectfully submitted,

/s/ Thomas G. Saunders

| | |
|---|---|
| M. ELIZABETH TRUJILLO | THOMAS G. SAUNDERS |
| WILMER CUTLER PICKERING | WILMER CUTLER PICKERING |
|   HALE AND DORR LLP |   HALE AND DORR LLP |
| 7 World Trade Center | 2100 Pennsylvania Avenue, N.W. |
| 250 Greenwich Street | Washington, DC 20037 |
| New York, NY 10007 | (202) 663-6000 |
| (212) 230-8800 | |

*Attorneys for Amicus Curiae Dr. Matthew Hepburn*

June 5, 2026

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because:

1.      The filing has been prepared using a proportionally-spaced typeface and includes 6,549 words.

2.      The filing has been prepared using Microsoft Word for Office 365 in 14-point Times New Roman font.  As permitted by Fed. R. App. P. 32(g), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

/s/ Thomas G. Saunders

THOMAS G. SAUNDERS
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue, N.W.
Washington, DC  20037
(202) 663-6000

June 5, 2026