**No. 2026-1581**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

ARBUTUS BIOPHARMA CORPORATION
and GENEVANT SCIENCES GmbH,

Plaintiffs-Appellees,

v.

MODERNA, INC. and MODERNATX, INC.,

Defendants-Appellants.

On Appeal from the United States District Court for the
District of Delaware in No. 1:22-cv-00252, Judge Joshua D. Wolson

## BRIEF FOR UNITED STATES AS AMICUS CURIAE
## IN SUPPORT OF DEFENDANTS-APPELLANTS AND REVERSAL

BRETT A. SHUMATE
  *Assistant Attorney General*

BRAD HINSHELWOOD
McKAYE L. NEUMEISTER
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7256*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-7823*

**TABLE OF CONTENTS**

<u>Page</u>

INTEREST OF THE UNITED STATES ................................................................... 1

STATEMENT OF THE ISSUE ............................................................................ 2

STATEMENT OF THE CASE ............................................................................ 2

      A.     Statutory Background ............................................................. 2

      B.     Factual Background................................................................ 5

      C.     Prior Proceedings ................................................................. 7

SUMMARY OF ARGUMENT ........................................................................... 10

ARGUMENT ................................................................................................ 13

I.     Section 1498(a) precludes patent-infringement claims based on a federal contractor's activities under a procurement contract with an express authorization-and-consent clause.......................................................... 13

II.    The district court's contrary construction of § 1498(a) is inconsistent with the statutory text, Circuit precedent, and congressional objectives, threatening to undermine government procurement. ......................................... 18

CONCLUSION ............................................................................................. 28

 CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Advanced Software Design Corp. v. Federal Rsrv. Bank of St. Louis,*
 583 F.3d 1371 (Fed. Cir. 2009) .................................................. 2, 4, 13, 19, 20, 21, 22, 24

*Astornet Techs. Inc. v. BAE Sys., Inc.,*
 802 F.3d 1271 (Fed. Cir. 2015) ...................................................................... 17

*Auerbach v. Sverdrup Corp.,*
 829 F.2d 175 (D.C. Cir. 1987) ....................................................................... 14

*Carrier Corp. v. United States,*
 534 F.2d 244 (Ct. Cl. 1976) .......................................................................... 16

*Crozier v. Fried. Krupp Aktiengesellschaft,*
 224 U.S. 290 (1912) ........................................................................................ 3

*Hughes Aircraft Co. v. United States,*
 534 F.2d 889 (Ct. Cl. 1976) ..................................................................... 21, 22

*IRIS Corp. v. Japan Airlines Corp.,*
 769 F.3d 1359 (Fed. Cir. 2014) ............................................. 13, 14, 18, 19, 22

*Larson v. United States,*
 26 Cl. Ct. 365 (1992) .................................................................................... 23

*Richmond Screw Anchor Co. v. United States,*
 275 U.S. 331 (1928) ...............................................................................3, 4, 25

*Sevenson Env't Servs., Inc. v. Shaw Env't, Inc.,*
 477 F.3d 1361 (Fed. Cir. 2007) .......................................... 13, 14, 15, 16, 20, 23

*TVI Energy Corp. v. Blane,*
 806 F.2d 1057 (Fed. Cir. 1986) ...........................................................4, 25, 26

*William Cramp & Sons Ship & Engine Bldg. Co. v. International Curtis Marine Turbine Co.,*
 246 U.S. 28 (1918) ...................................................................................... 3, 24

*Zoltek Corp. v. United States,*
 672 F.3d 1309 (Fed. Cir. 2012) ...................................................................... 3

ii

**Statutes:**

Act of June 25, 1910, ch. 423, 36 Stat. 851, 851 ............................................................... 3

Act of July 1, 1918, ch. 114, 40 Stat. 704, 705 .................................................................. 3

Act of Oct. 31, 1942, ch. 634, § 6, 56 Stat. 1013, 1014...................................................... 4

28 U.S.C. § 1498(a) ........................................... 1, 2, 4, 7, 9, 10, 13, 19, 20, 27

35 U.S.C. § 271.................................................................................................................. 26

35 U.S.C. § 283.................................................................................................................. 26

35 U.S.C. § 284.................................................................................................................. 27

**Regulations:**

48 C.F.R. § 1.102(a) ......................................................................................................... 14

48 C.F.R. § 52.227-1 .......................................................................................................... 6

**Rule:**

Fed. R. App. P. 29(a)(2) .................................................................................................... 1

**Other Authorities:**

Admin. for Strategic Preparedness & Response, U.S. HHS,
  *Center for the Strategic National Stockpile*, https://perma.cc/4YSZ-C5D7 .................... 27

Def. Logistics Agency,
  *About Strategic Materials*, https://perma.cc/7XSQ-TTKQ ......................................... 27

*For*,
  Oxford English Dictionary, https://perma.cc/ET4B-U23Y .................................... 19

Press Release, U.S. DOW,
  *Trump Administration Collaborates With Moderna to Produce 100 Million Doses of
  COVID-19 Investigational Vaccine* (Aug. 11, 2020),
  https://perma.cc/F8T9-UDV7.................................................................................. 5, 15

U.S. Gov't Accountability Off.,
  GAO-21-319, *Operation Warp Speed: Accelerated COVID-19 Vaccine Development Status and Efforts to Address Manufacturing Challenges* (2021),
  https://perma.cc/4DJL-QPPT ........................................................................... 5

U.S. HHS,
  *From the Factory to the Frontlines: The Operation Warp Speed Strategy for Distributing a COVID-19 Vaccine* (Sep. 16, 2020),
  https://perma.cc/67GN-DMFY ....................................................................... 5, 18

## INTEREST OF THE UNITED STATES

The United States respectfully submits this amicus brief pursuant to Federal Rule of Appellate Procedure 29(a)(2). At issue in this appeal is whether the patentees may bring a patent-infringement action in federal district court against a federal contractor for work conducted pursuant to a procurement contract with the U.S. Army that included the government's express authorization and consent to the allegedly infringing activity, or whether instead the patentees must proceed against the United States in the Court of Federal Claims pursuant to 28 U.S.C. § 1498(a).

The United States has a strong interest in the proper interpretation of § 1498(a). That provision is intended to aid government procurement efforts by protecting government contractors from district-court actions for patent infringement—and the concomitant threat of injunctions—when the alleged patent infringement is "by or for the United States." The district court's unprecedented interpretation of § 1498(a) not only conflicts with the statutory text and this Court's interpretation thereof, it threatens a host of practical problems directly at odds with the function Congress intended § 1498(a) to serve. That unworkable interpretation exposes the government's procurement efforts to disruption by injunctions issued in private-party litigation, threatens to chill contractors from working with the government, creates substantial uncertainty regarding government contractors' exposure to treble damages that could inflate the prices the government must pay, and permits district courts to second-guess the government's decision that its acquisition of goods is "for the Government." The

United States urges this Court to reverse the district court's grant of summary judgment to the patentees.

STATEMENT OF THE ISSUE

In 2020, appellants Moderna, Inc. and ModernaTX, Inc. (collectively, Moderna) entered into a procurement contract with the U.S. Army that specified that the government authorized and consented to any use or manufacture of a patented invention in Moderna's performance of the contract.  Pursuant to that contract, Moderna produced and the Army bought over 500 million doses of a COVID-19 vaccine as part of Operation Warp Speed, the government's initiative to coordinate national efforts to accelerate the development, acquisition, and distribution of COVID-19 vaccines.  At issue here is whether the district court erred in holding that Moderna's manufacture of 494 million of those doses purchased by the Army was nonetheless not "for the Government" under 28 U.S.C. § 1498(a) because the government directed those doses to be made available to members of the general public.

STATEMENT OF THE CASE

### A.    Statutory Background

Section 1498(a) provides a limited waiver of the government's sovereign immunity, whereby the government consents to liability for the unauthorized use or manufacture of a patented invention "by or for the United States."  28 U.S.C. § 1498(a); *see Advanced Software Design Corp. v. Federal Rsrv. Bank of St. Louis*, 583 F.3d 1371, 1377-78 (Fed. Cir. 2009) ("[W]hen the requirements of § 1498(a) are met, it functions not

2

only as a waiver of sovereign immunity but also as consent to liability."). The original version of this section was enacted in 1910 to provide patentees with a remedy for the unauthorized use of a patented invention "by the United States." Act of June 25, 1910, ch. 423, 36 Stat. 851, 851; *see Crozier v. Fried. Krupp Aktiengesellschaft*, 224 U.S. 290, 304 (1912) (explaining that the act was a response to cases holding that the United States could not be sued for unauthorized use of a patented invention absent an implied contract). *See generally Zoltek Corp. v. United States*, 672 F.3d 1309, 1315-17 (Fed. Cir. 2012) (describing the history of § 1498(a)).

In 1918, the Supreme Court held that the act did not shield a government contractor from a suit for patent infringement even where the contractor was manufacturing "torpedo boat destroyers" for the World War I naval effort. *William Cramp & Sons Ship & Engine Bldg. Co. v. International Curtis Marine Turbine Co.*, 246 U.S. 28, 35, 42-43 (1918). In response, Congress amended the act to extend the government's assumption of liability to a contractor's use or manufacture of a patented invention "for the United States." Act of July 1, 1918, ch. 114, 40 Stat. 704, 705; *see Zoltek*, 672 F.3d at 1315-16. As the Supreme Court has explained, the purpose of the 1918 amendment "was to relieve the contractor entirely from liability of every kind for the infringement of patents in manufacturing anything for the Government, and to limit the [patentee] … to suit against the United States in the Court of Claims for the recovery of his reasonable and entire compensation for such use and manufacture." *Richmond Screw Anchor Co. v. United States*, 275 U.S. 331, 343 (1928).

3

In its current form, the first paragraph of § 1498(a) provides in relevant part:

> Whenever an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without license of the owner thereof or lawful right to use or manufacture the same, the owner's remedy shall be by action against the United States in the United States Court of Federal Claims for the recovery of his reasonable and entire compensation for such use and manufacture.

28 U.S.C. § 1498(a). The second paragraph, which Congress added in 1942 to clarify the application of the act to government contractors, *see* Act of Oct. 31, 1942, ch. 634, § 6, 56 Stat. 1013, 1014, provides:

> For the purposes of this section, the use or manufacture of an invention described in and covered by a patent of the United States by a contractor, a subcontractor, or any person, firm, or corporation for the Government and with the authorization or consent of the Government, shall be construed as use or manufacture for the United States.

28 U.S.C. § 1498(a).

Section 1498(a) thus "remov[es] the threat of injunction," while "provid[ing] for 'reasonable and entire compensation' for infringing use." *Advanced Software*, 583 F.3d at 1375. This "stimulate[s] contractors" and allows them to fulfill their government contracts "without fear of becoming liable themselves for infringements." *Richmond Screw Anchor Co.*, 275 U.S. at 345. As this Court has noted, "[t]he coverage of § 1498 should be broad so as not to limit the Government's freedom in procurement by considerations of private patent infringement." *TVI Energy Corp. v. Blane*, 806 F.2d 1057, 1060 (Fed. Cir. 1986) (noting "Congressional intent to allow the Government to procure whatever it wished regardless of possible patent infringement").

4

## B.    Factual Background

In response to the COVID-19 pandemic, the federal government initiated Operation Warp Speed, through which the U.S. Department of Health and Human Services (HHS) and Department of War (DOW) collaborated to coordinate national efforts to accelerate the development, acquisition, and distribution of COVID-19 vaccines.  *See* U.S. Gov't Accountability Off., GAO-21-319, *Operation Warp Speed: Accelerated COVID-19 Vaccine Development Status and Efforts to Address Manufacturing Challenges* (2021), https://perma.cc/4DJL-QPPT.  "[T]he principal purpose and objective of Operation Warp Speed" was to "ensur[e] that every American who wants to receive a COVID-19 vaccine can receive one, by delivering safe and effective vaccine doses to the American people beginning January 2021."  HHS, *From the Factory to the Frontlines: The Operation Warp Speed Strategy for Distributing a COVID-19 Vaccine* 1 (2020), https://perma.cc/67GN-DMFY.

As part of that effort, in August 2020 the U.S. Army entered into a contract with Moderna (the 0100 Contract) to purchase up to 500 million doses of Moderna's mRNA vaccine for the prevention of COVID-19.  *See Press Release,* DOW, *Trump Administration Collaborates With Moderna to Produce 100 Million Doses of COVID-19 Investigational Vaccine* (Aug. 11, 2020), https://perma.cc/F8T9-UDV7 (DOW 2020 Press Release); Appx2778, Appx2796.  The 0100 Contract explained that HHS and DOW were "leading a whole of nation effort to ensure development of promising vaccine, diagnostic and therapeutic candidates and ensure that these medical countermeasures

5

[we]re available in the quantities required to reduce SARS-CoV-2 transmission, identify prior and/or current infection, and improve patient care, thereby mitigating the impact of COVID-19 on the nation and its people." Appx2796. "As [Operation Warp Speed] products progress[ed] to clinical trials," in particular, the 0100 Contract noted that it was "critical that, in parallel, the [government] supports large scale manufacturing so that vaccine doses or therapeutic treatment courses are immediately available for nationwide access as soon as a positive efficacy signal is obtained and the medical countermeasures are authorized for widespread use." Appx2796. The 0100 Contract was thus clear that the doses were being procured by the Army "in support of the national emergency response to [COVID-19] for the [government] and the US population." Appx2796.

The Army expressly incorporated into the 0100 Contract an authorization-and-consent clause from the Federal Acquisition Regulation. Appx2823. That clause specifies, in relevant part, that "[t]he Government authorizes and consents to all use and manufacture of any invention described in and covered by a United States patent in the performance of this contract or any subcontract at any tier." 48 C.F.R. § 52.227-1 (Alternate I).

Moderna sold just over 500 million doses of its vaccine to the government pursuant to the 0100 Contract, for which the government paid approximately $8.2 billion. Appx8. Consistent with the government's publicly stated objectives under Operation Warp Speed in entering the contract, the vast majority of those 500 million

doses purchased by the government were ultimately distributed to members of the general public. Appx8. Approximately six million doses were administered directly to federal employees. Appx36.

### C.    Prior Proceedings

1.    Plaintiffs Arbutus Biopharma Corp. and Genevant Sciences GmbH are the holders of various patents related to the administration of mRNA vaccines. Appx3-7 (discussing U.S. Patent Nos. 8,492,359; 8,822,668; 9,364,435; 11,141,378; and 9,504,651). They brought this suit in the U.S. District Court for the District of Delaware, alleging that Moderna infringed their patents in producing its COVID-19 vaccine. Appx380. Moderna moved to dismiss the complaint in part, arguing that any claims involving doses sold to the federal government were barred by 28 U.S.C. § 1498(a). Appx662-683. The district court denied the motion, noting "the limited record appropriate for consideration at this stage" regarding this "affirmative defense," and concluding that "[a]bsent clear language, either in the Complaint or the Contract, establishing that the development of the vaccine was 'for the Government,' … this dispute is not appropriate for resolution in a Rule 12(b)(6) motion." Appx833-834. The court also noted that the government had at that point "not filed any statement of interest indicating its express consent to the accused activities." Appx835.

The United States subsequently submitted a statement of interest confirming the applicability of § 1498(a) here. Appx946. The statement explained that the 0100 Contract includes an express authorization-and-consent clause, and that where the

government has done so, "that decision is appropriately viewed as reflecting the Government's determination that the contract is for the Government's benefit." Appx957-958. "Where, as here, the Government directly contracts to procure the allegedly infringing goods or services in a contract that grants authorization and consent, the 'benefit to the Government' is inherent"; that "the Government obtains goods and services for which it pays is alone sufficient to demonstrate the procurement is 'for the Government' and 'for the benefit of the Government.'" Appx959. And here, the government indeed "received the benefit of its contract, namely, procuring the vaccine that it then offered for free public distribution in an effort to thwart the COVID-19 pandemic." Appx959; *see* Appx958 (explaining that "there is no question here that the Government paid for the vaccine as required by the contract and that the vaccine was delivered in accordance with the contract"). Indeed, despite the 0100 Contract's inclusion of the government's "express 'authorization and consent' in the form of the well-established [Federal Acquisition Regulation] clauses," the United States went on to state that "to the extent that any doubt otherwise existed, the Government's filing of this statement of interest and confirmation of its authorization and consent should resolve the issue" of § 1498's applicability. Appx959, Appx962. Accordingly, as the statement explained, any claims for infringement in the course of Moderna's performance of the 0100 Contract were required to be brought against the United States in the Court of Federal Claims. Appx962.

Following claim construction and discovery, Moderna moved for summary judgment on its affirmative defense under § 1498(a) as well as on other grounds, and plaintiffs cross-moved for summary judgment on certain issues. Appx2647, Appx5803. The district court granted plaintiffs' motion and denied Moderna's motion in relevant part. The court explained that the government had "authorized and consented to any necessary infringement" in the 0100 Contract, and so that requirement under § 1498(a) was satisfied. Appx12. But the court concluded that the vast majority of vaccine doses Moderna sold to the Army pursuant to that contract were not actually "for the Government," Appx14-15, because the court interpreted that phrase in § 1498(a) to mean that the "Government, as an entity, must be the intended recipient of the infringing product, as opposed to the public that the Government represents," Appx13.

The parties then agreed to a consent judgment, asking the district court to enter judgment of infringement in plaintiffs' favor on four of their claims. Appx36-39. As relevant here, the court entered judgment in Moderna's favor on its § 1498(a) defense with respect to the approximately six million vaccine doses purchased pursuant to the 0100 Contract that were administered directly to government employees, but in plaintiffs' favor with respect to the remaining 494 million vaccine doses the Army purchased and directed to be made available to the public. Appx38.[1] In the judgment,

---

[1] Plaintiffs subsequently filed an action against the United States in the Court of Federal Claims under § 1498(a). *See* Compl., *Arbutus Biopharma Corp. v. United States*, No. 1:26-cv-446 (Fed. Cl. Mar. 19, 2026), Dkt. 1. In addressing the possibility of

*Continued on next page.*

9

Moderna expressly reserved the right to appeal on the issue of the § 1498(a) defense; the parties waived all rights to otherwise appeal the judgment.  Appx38.[2]

## SUMMARY OF ARGUMENT

In 28 U.S.C. § 1498(a), Congress provided a mechanism to ensure that the United States can either produce or procure goods without the fear that private patent-infringement litigation will stymy the government's efforts.  Section 1498(a) ensures that patentees can secure "reasonable and entire compensation" from the United States through a Court of Federal Claims action if the government or its contractors use or manufacture a patented invention.  But this provision insulates the United States' activities from the threat of injunctions and treble damages available from district courts in patent-infringement actions against private parties—and importantly, it insulates the government's chosen contractors from patent-infringement liability entirely so long as the allegedly infringing activity is "for the Government and with the authorization or consent of the Government."  Where the government has entered into a contract to purchase goods, and expressly authorized and consented to its contractor making or

---

infringement liability in this filing, the United States does not admit that Moderna's vaccine infringes, nor does it otherwise address the merits of plaintiffs' claims or the government's possible defenses or challenges—matters that must be presented to, and addressed by, the Court of Federal Claims.

[2] Although the district court concluded that plaintiffs could "pursue [their] indirect infringement claims even for the vaccine doses that the Government acquired and distributed to its employees," Appx16, the court ultimately entered judgment for Moderna with respect to those doses at the parties' request, Appx38.

using a patented invention to perform that contract, § 1498(a)'s application is clear and straightforward: any patent-infringement action based on performance of the contract may be brought only against the United States in the Court of Federal Claims.

Here, it is undisputed that the federal government entered into a contract with Moderna in 2020 under which Moderna would produce and then sell the government doses of a COVID-19 vaccine; that the government chose to include a broad and express authorization-and-consent clause covering Moderna's performance of that contract; and that Moderna performed its contractual duties resulting in the government's purchase of approximately 500 million vaccine doses as part of Operation Warp Speed. That should end the § 1498(a) analysis, making the United States the only appropriate defendant in—and the Court of Federal Claims the only appropriate court to entertain—any patent-infringement suit arising out of Moderna's performance of the government contract. Nonetheless, the district court refused to apply § 1498(a), concluding that the government's express attempt to assume patent-infringement liability in connection with Moderna's performance of the contract was ineffectual. The court based that decision on its view that the government's purchase of vaccine doses was not really "for the Government" with respect to any dose the government bought and then made available to the public, i.e., if the ultimate recipient of the items the government purchased was not a government employee.

The district court's crabbed reading of the phrase "for the Government" in § 1498(a) is not only unprecedented, it cannot be reconciled with either the statutory

11

text or this Court's interpretation thereof, which the district court failed to even acknowledge. In conformity with the plain language of the statute as a whole, this Court has interpreted that phrase to require that an alleged infringer's activities (performed with the government's authorization and consent) benefit the government—as Moderna's performance of a government contract formed to combat a nationwide public health emergency plainly did. In contrast, the district court's unworkable ultimate-recipient rule introduces textual anomalies, disregards statutory history, and threatens to destabilize government procurement efforts. In particular—and in direct contravention of Congress's objective in creating and expanding § 1498(a)—the district court's interpretation would subject the government's procurement efforts to disruption by injunctions in private patent-infringement litigation. That interpretation would moreover prevent both the government and its contracting partners from knowing whether the government's authorization and consent to infringing activity in the performance of a procurement contract—a key contract term in many negotiations—would later be honored by courts, potentially chilling contractors' willingness to do business with the government or prompting them to increase prices to account for the substantial uncertainty created by the district court's novel rule. There are limits on government officials' ability to enter into contracts, but the possibility that a court will later use § 1498(a) to second-guess the government's decision that a purchase of goods is "for the Government" is not among them. Accordingly, this Court should reverse the judgment in favor of plaintiffs.

12

## ARGUMENT

I.    **Section 1498(a) precludes patent-infringement claims based on a federal contractor's activities under a procurement contract with an express authorization-and-consent clause.**

Section 1498(a) provides government contractors an affirmative defense to patent-infringement claims where two elements are met:  the accused activities were performed (1) "for the Government" and (2) "with the authorization or consent of the Government." *IRIS Corp. v. Japan Airlines Corp.*, 769 F.3d 1359, 1362 (Fed. Cir. 2014) (quoting 28 U.S.C. § 1498(a)).  Both requirements are satisfied where, as here, the government includes in a procurement contract an express authorization-and-consent provision covering all performance of that contract.

As this Court has explained, the "for the Government" prong requires only that "the alleged use or manufacture … be done 'for the benefit of the government.'" *IRIS Corp.*, 769 F.3d at 1362 (quoting *Advanced Software Design Corp. v. Federal Rsrv. Bank of St. Louis*, 583 F.3d 1371, 1378 (Fed. Cir. 2009)); *see Sevenson Env't Servs., Inc. v. Shaw Env't, Inc.*, 477 F.3d 1361, 1365 (Fed. Cir. 2007) (observing that this prong "impose[s] only a requirement that the use or manufacture of a patented method or apparatus occur pursuant to a contract with the government and for the benefit of the government"). The requirement is satisfied where the accused activities are "in furtherance and fulfillment of a stated Government policy which serves the Government's interests and which is for the Government's benefit," even where the government is not the "sole

13

beneficiary" of the accused activities. *IRIS Corp.*, 769 F.3d at 1362 (quotation marks omitted).

A. Where the government directly contracts with a manufacturer to supply specific goods or services, the analysis under the "for the Government" prong is straightforward. By entering into the contract, the relevant unit of government has necessarily made a determination that it has both a need for the particular product or service to support its governmental objectives, and the relevant statutory authorization to pursue those objectives through this means. *See* 48 C.F.R. § 1.102(a) ("The vision for the Federal Acquisition System is to deliver on a timely basis the best value product or service to the customer, while maintaining the public's trust and fulfilling public policy objectives."). The benefit to the government is thus inherent in the nature of the procurement contract.

Unsurprisingly then, as this Court has recognized, "where infringing activity has been performed by a government contractor pursuant to a government contract and for the benefit of the government, courts have all but bypassed a separate inquiry into whether infringing activity was performed 'for the Government.'" *Sevenson Env't Servs.*, 477 F.3d at 1366. Under such circumstances, "the inquiry has reduced to the 'very simple question' of whether the plaintiffs 'establish that the government authorized or consented to the infringement, if such infringement in fact occurred.'" *Id.* (alterations omitted) (quoting *Auerbach v. Sverdrup Corp.*, 829 F.2d 175, 180 (D.C. Cir. 1987)). In *Sevenson Environmental Services*, for instance, the Army Corps of Engineers contracted

14

with a company for hazardous-waste-remediation work, and in performing that work the contractor was accused of infringing patents claiming "methods for treating hazardous waste." *Id.* at 1363. This Court concluded that "the observation that the government sought and received hazardous waste remediation services at the … site" was sufficient to conclude that the accused activity was "'for the Government.'" *Id.* at 1366.[3]

Similarly here, the allegedly infringing activity was performed by a federal contractor (Moderna) pursuant to a contract with the government (the 0100 Contract) from which the government sought and received a particular good or service (500 million doses of the COVID-19 vaccine which the government owned and determined how to use as part of Operation Warp Speed). *See* DOW 2020 Press Release. The government unquestionably obtained the benefit of its bargain through Moderna's performance under the contract. The inquiry thus "reduce[s]" to the "simple question" of whether the 0100 Contract indeed contains an express authorization-and-consent clause covering the accused activity. *Sevenson Env't Servs.*, 477 F.3d at 1366 (quotation

---

[3] Such recognition that when the government contracts for goods or services, those goods or services are "for the Government" within the meaning of § 1498(a) does not render that prong superfluous. Not all instances in which the government has authorized or consented to an activity are necessarily "for the Government." *Cf. Sevenson Env't Servs.*, 477 F.3d at 1365-66 (discussing a case in which an alleged infringer "leased [offshore] drilling rights from the government for a 12.5% royalty and was required to get government approval for its drilling platform installation methods," but the drilling was not "for the Government" because "the drilling was not a 'governmental function' that the government had sought or required the driller to carry out").

marks omitted). It clearly does. *See* Appx12. The government may of course place limits on its consent and authorization to infringing activity in the course of a contractor's performance of a procurement (or any other) contract, and courts must respect such calibrations of the government's assumption of infringement liability. *See, e.g.*, *Sevenson Env't Servs.*, 477 F.3d at 1366-67 (explaining that where "a government contract contains an explicit authorization and consent clause … the scope of the government's authorization and consent to liability naturally hinges on the language of that clause"); *Carrier Corp. v. United States*, 534 F.2d 244, 249 (Ct. Cl. 1976) (stating that "it is plain that the Government can limit its authorization and consent"). But the authorization-and-consent clause in the 0100 Contract contained no such limits, instead manifesting the government's acceptance of responsibility under § 1498(a) for all infringement liability that Moderna or its subcontractors might incur in performing the 0100 Contract. *See* Appx2823. Section 1498(a) requires nothing more to make an action against the United States in the Court of Federal Claims plaintiffs' only remedy for any patent infringement that occurred in the course of performing the 0100 Contract.[4]

---

[4] As noted, *see supra* p.10, the district court addressed the possibility that plaintiffs could pursue an indirect-infringement theory against Moderna only with respect to the approximately six million vaccine doses administered to government employees, as to which Moderna later secured judgment in its favor. To the extent that the court rested its consent judgment against Moderna with respect to the remaining 494 million doses on a theory of indirect-infringement liability for actions Moderna took to perform its contractual duties to the government, the court erred. This Court has explained that plaintiffs may not evade the limits of § 1498(a) by subjecting "a significant range of government contractors to direct liability (and possible injunctive remedies), namely,

*Continued on next page.*

**B.** The inclusion of an express authorization-and-consent clause that encompasses the allegedly infringing activity in a government contract for the acquisition of goods or services is thus *per se* sufficient to preclude patent-infringement claims against federal contractors under § 1498(a). But even if it were not, the 0100 Contract readily demonstrates on its face that Moderna's manufacture of 500 million COVID-19 vaccine doses at the government's behest, to be purchased by the government, was indeed "for the Government."

The 0100 Contract between the Army and Moderna was entered into as an acknowledged part of Operation Warp Speed, through which the government "support[ed] large scale manufacturing so that vaccine doses … are immediately available for nationwide access as soon as a positive efficacy signal is obtained and the medical countermeasures are authorized for widespread use." Appx2796. The 500 million doses the Army purchased pursuant to the contract were part of a coordinated effort across the federal government to ensure that vaccines were "available in the quantities required to reduce SARS-CoV-2 transmission, … and improve patient care, thereby mitigating the impact of COVID-19 on the nation and its people." Appx2796;

---

those accused of indirect infringement of claims directly infringed by the government." *Astornet Techs. Inc. v. BAE Sys., Inc.*, 802 F.3d 1271, 1277-78 (Fed. Cir. 2015). By the same token, plaintiffs may not so evade § 1498(a) by suing government contractors for indirect infringement where the relevant direct infringement was undertaken "for the Government" by a contractor. *See id.* at 1277 (explaining that § 1498(a) "protects government contractors against infringement liability and remedies where it applies" and that "the statute, within its ambit, makes the remedy against the United States exclusive").

HHS, *From the Factory to the Frontlines: The Operation Warp Speed Strategy for Distributing a COVID-19 Vaccine, supra*, at 1 (describing "delivering safe and effective vaccine doses to the American people" as the "principal purpose and objective of" Operation Warp Speed).

The manufacture of vaccine doses pursuant to the 0100 Contract was thus in furtherance of federal policy objectives regarding HHS and DOW's response to the COVID-19 pandemic, which served the government's interests in dealing with a national public health emergency. *See IRIS Corp.*, 769 F.3d at 1362 ("A use is 'for the Government' if it is in furtherance and fulfillment of a stated Government policy which serves the Government's interests and which is for the Government's benefit." (quotation marks omitted)).

## II. The district court's contrary construction of § 1498(a) is inconsistent with the statutory text, Circuit precedent, and congressional objectives, threatening to undermine government procurement.

The district court erred in rejecting this straightforward application of § 1498(a) in favor of an unprecedented rule that the federal government must be the ultimate recipient of the goods it acquires in order to consider the procurement to be for the government's benefit. The court thus concluded that approximately 494 million doses of Moderna's vaccine the Army purchased under the 0100 Contract were not "for the Government," such that patent-infringement claims in connection with those doses could be brought against Moderna in district court, instead of against the United States in the Court of Federal Claims. The district court's ultimate-recipient rule cannot be

18

reconciled with the statutory text or this Court's case law. Moreover, the court's conclusion disregards statutory history, contravenes congressional objectives, defies common sense, and threatens to undermine government procurement.

**A.** The district court's interpretation of the phrase "for the Government" cannot be squared with either the statutory text or this Court's interpretation thereof. Looking to certain dictionary definitions, the court interpreted § 1498(a) to require the government to be the ultimate recipient of any infringing product. Appx13-14 ("the term 'for' 'introduced the intended recipient'" (alterations omitted)). However, § 1498(a) encompasses "the *use or manufacture* of an invention … for the Government." 28 U.S.C. § 1498(a) (emphasis added). Whereas "manufacture" results in a tangible product that can have an intended recipient, the "use" of a patented invention "for the United States" does not. Accordingly, even had the district court been writing on a blank slate, the word "for" could not be given such a limited construction consistent with the larger statutory text.

By contrast, this Court's interpretation of "for" in "for the Government"—which the district court nowhere acknowledged—accords with both the ordinary meaning of the term "for" and the entirety of the statute's text. This Court has held that this prong requires that the use or manufacture benefit the government. *See Advanced Software*, 583 F.3d at 1378 ("for the benefit of the government"); *IRIS Corp.*, 769 F.3d at 1362 (same); *For*, Oxford English Dictionary, https://perma.cc/ET4B-U23Y (V.16.a) ("With the purpose or result of benefiting or gratifying; as a service to;

19

so as to help."). This Court's benefit-based interpretation of "for" makes sense whether an allegedly infringing "manufacture" or "use" is at issue. Moreover, this Court's interpretation accords with the statute's provision that if the United States *itself* had "used or manufactured" the patented invention, liability would clearly lie only with the United States, regardless of the ultimate recipient of any allegedly infringing goods. 28 U.S.C. § 1498(a). In contrast, the district court's understanding creates an anomaly, permitting the government to trigger § 1498(a) with respect to goods that are ultimately distributed to non-governmental actors if the government itself makes those goods, but not if the government contracts for the production of those goods. This Court's benefit-focused interpretation of "for the Government" avoids this atextual distinction and requires reversal here. The government can clearly benefit from acquiring vaccine doses to administer to the public in combatting the spread of a deadly pandemic as part of a federal public health program, even if the ultimate recipients of the vaccinations are the citizenry.

**B.1.** The district court's crabbed construction of the "for the Government" prong cannot be squared with Circuit precedent in other respects either. This Court has recognized that this prong can be satisfied where the government is not a "party to any contract." *Advanced Software*, 583 F.3d at 1378. Nor must the government be the "sole beneficiary" of the infringing activities, *id.*, or have the "'primary purpose'" of the contract be the benefit to the government, *Sevenson Env't Servs.*, 477 F.3d at 1365. Those

principles are inconsistent with a requirement that the government be the ultimate intended recipient of every infringing product.

Indeed, this Court has recognized that the "for the Government" prong can be satisfied where the government does not ultimately own or possess the infringing product. For instance, *Hughes Aircraft Co. v. United States* involved a cooperative program where allegedly infringing "satellites would be owned by the United Kingdom." *Advanced Software*, 583 F.3d at 1378 (discussing *Hughes Aircraft Co. v. United States*, 534 F.2d 889, 898 (Ct. Cl. 1976)). This Court nonetheless explained (as had its predecessor) that the challenged activity was still "'for the Government' … because the program was vital to the military defense and security of the United States." *Id.*

Similarly, in *Advanced Software*, "private" regional Federal Reserve Banks contracted with a company for a software system that can be used to detect fraudulent U.S. Treasury checks and then faced claims for alleged infringement of patents "relating to a method for detecting fraudulent bank checks." 583 F.3d at 1373-75. The Treasury was not a party to the contract, and while it encoded certain identifying data onto its checks, it did not use software to detect the fraudulent checks—rather, the regional banks possessed and used that software. *See id.* at 1373-74. This Court nevertheless concluded that the company's "dealings with the Reserve Banks and their actions with respect to Treasury checks are 'for the Government.'" *Id.* at 1378.

What mattered in those cases was not whether the government was the ultimate recipient and possessor/user of the infringing product, but whether the government

was a beneficiary of the allegedly infringing activity. Although "[i]ncidental benefit to the government is insufficient" under § 1498(a), the government need not be the "sole beneficiary" of the accused activity to trigger § 1498(a). *IRIS Corp.*, 769 F.3d at 1362 (quotation marks omitted). If the recipient benefits from the infringing product and the government also experiences more than incidental benefit, that is enough. Accordingly, it did not matter that the regional Federal Reserve Banks experienced the significant benefit of avoiding the direct financial loss from paying fraudulent Treasury checks, because "the national interest in averting fraud in Treasury checks, and to the [investigatory] resources Treasury has saved by adopting this efficient technology," were sufficient benefit for the government. *Advanced Software*, 583 F.3d at 1378. Nor did it matter that the United Kingdom would own and benefit from certain infringing satellites at issue in *Hughes Aircraft Co.* "because the program was [also] vital to the military defense and security of the United States." *Id.* at 1378 (citing *Hughes Aircraft Co.*, 534 F.2d at 898).

Similarly here, although private citizens directly benefitted from receiving the COVID-19 vaccine doses purchased by the Army and distributed pursuant to the government's Operation Warp Speed vaccination program, the federal government also benefitted from furthering its interests in responding to a national emergency and preserving resources that otherwise would have been necessary to combat the pandemic and its effects. Such benefits—in connection with the federal government's operation

of a nationwide program of monumental importance in countless ways to both public health and the American economy—cannot reasonably be deemed merely incidental.

    **2.**    In disregarding this established Circuit precedent, the district court relied heavily on the Claims Court's nonprecedential analysis in *Larson v. United States*, 26 Cl. Ct. 365, 367 (1992). In *Larson*, the Claims Court held that the use of patented medical splints by healthcare providers who were reimbursed by the government through federal programs like Medicare did not constitute use of a patented invention "for the Government" under § 1498(a). The district court concluded that this case was "indistinguishable from *Larson*," because "[l]ike the patients receiving splints and casts in *Larson*, the patients receiving Moderna's mRNA vaccines were the beneficiaries." Appx15.

    In *Larson*, however, the court was dealing with a mere governmental "interest in the program generally," and reimbursement for "all or part of its costs," which was considered "too remote to make the government the program's beneficiary" under § 1498(a). 26 Cl. Ct. at 369 (noting precedent concluding that "the reimbursement of Medicare and Medicaid expenses was far removed from the situation in which the government is a user or manufacturer"). As this Court has subsequently explained in distinguishing *Larson*, "the use of those particular [infringing] devices, though funded by the government, was not required by it, nor were the providers under the government's control." *Sevenson Env't Servs.*, 477 F.3d at 1366. And "the government's

participation" was merely to "pay money but with no relation to the benefits of the technology." *Advanced Software*, 583 F.3d at 1379.

Here, by contrast, the government did not merely offer subsequent reimbursement for the cost of goods or services over which the government had no control. Rather, the Army contracted with Moderna in advance to direct the production of this specific vaccine (which allegedly required the technology at issue) as a crucial part of a broader governmental program to address a public health emergency. In other words, it was not possible to serve governmental objectives and obtain the benefit sought through this contract without the alleged infringement. Moreover, unlike *Larson*, here the government itself purchased the alleged infringing doses: this case involves a procurement contract directly between the government and the contractor manufacturing the allegedly infringing product, and an express authorization-and-consent that squarely covers the alleged infringement. As discussed, the benefit to the government is inherent in the nature of the contract.

**C.**    Additionally, the district court's ultimate-recipient rule is fundamentally incompatible with congressional objectives and common sense, threatening to destabilize governmental procurement efforts.

After the Supreme Court's restrictive application of a previous version of § 1498(a) to permit claims against a contractor manufacturing "torpedo boat destroyers" for the government during World War I, *see William Cramp & Sons Ship & Engine Bldg. Co. v. International Curtis Marine Turbine Co.*, 246 U.S. 28, 35, 42-43 (1918),

24

Congress amended the act to reinforce its broad scope. The objective of the 1918 statutory amendment "was to relieve the contractor entirely from liability of every kind for the infringement of patents in manufacturing anything for the Government," so that contractors would be "stimulate[d]" to fulfill their government contracts "without fear of becoming liable themselves." *Richmond Screw Anchor Co. v. United States*, 275 U.S. 331, 343, 345 (1928). As this Court has thus recognized, the scope of § 1498(a) is necessarily "broad so as not to limit the Government's freedom in procurement by considerations of private patent infringement." *TVI Energy Corp. v. Blane*, 806 F.2d 1057, 1060 (Fed. Cir. 1986).

The district court's rule here—which disregards the government's efforts to expressly authorize any patent infringement by a contractor in the course of performing a government contract, as well as upsetting the clear understanding of the contracting parties that the government was assuming any such liability for itself—eviscerates the protection that Congress intended to afford through § 1498(a). Contractors under the regime envisioned by the district court would have cause to fear that, notwithstanding the government's inclusion of an express authorization-and-consent clause, any district court might take it upon itself to second-guess whether the government properly benefitted from a procurement contract if the government distributed any of the procured items to States or private individuals pursuant to a federal policy or program. Section 1498(a) does not empower courts to substitute their judgment for that of the federal government regarding the benefits of federal contracts or otherwise

25

circumscribe the intentionally broad scope of § 1498(a) so as to "defeat the Congressional intent to allow the Government to procure whatever it wishe[s] regardless of possible patent infringement." *TVI Energy Corp.*, 806 F.2d at 1060. Congress has placed limits on government officials' ability to enter into contracts—such as the need for statutory authorization to enter into a contract and appropriated funds to cover the obligations incurred by a contract—but § 1498(a) is supposed to *facilitate* government procurement, not *constrain* it through after-the-fact judicial rejections of the government's assessment that a particular contract will benefit the government.

An interpretation of § 1498(a) enabling courts to invalidate the government's attempt to insulate its contractors—and thus, performance of its contracts—from private patent-infringement litigation could seriously harm the government's procurement efforts. First, such a rule would expose government contractors to the threat of injunctions in their performance of a government contract. Plaintiffs here brought suit under 35 U.S.C. § 271 after Moderna fulfilled its procurement contract with the Army, but under the district court's view of § 1498(a), there is no reason a patentee could not secure an injunction to stop infringement in the ongoing performance of a government procurement contract, thus stymying the government's ability to secure goods or services. *See* 35 U.S.C. § 283. Next, by eliminating the certainty that government contractors can rely on the government's inclusion of a broad and express authorization-and-consent clause, the district court's rule could

26

compromise contractors' willingness to do business with the United States, or at minimum, prompt them to adjust their prices to reflect the potential that a court will later negate the government's attempt to assume infringement liability under § 1498(a). Nor would the inclusion of promises that the government would indemnify its contractors for such private-patent-infringement liability be a reasonable way to combat such harms; even assuming other legal barriers to such clauses did not exist, Congress intended government officials to be able to commit the United States to contracts requiring the payment of "reasonable and entire compensation" for infringing use and manufacture of a patented invention, 28 U.S.C. § 1498(a), not the treble damages potentially available in private-party infringement litigation, *see* 35 U.S.C. § 284.

Finally, the district court's view that § 1498(a) requires the government to be the ultimate recipient of the product procured is simply impractical.  The government often does not know who the ultimate recipient of an item will be at the time of the procurement.  For instance, the government stockpiles various items for use in an emergency.  *See, e.g.*, Admin. for Strategic Preparedness & Response, HHS, *Center for the Strategic National Stockpile*, https://perma.cc/4YSZ-C5D7 (discussing federal stockpile of "emergency medicines, vaccines, and other medical supplies"); Defense Logistics Agency, *About Strategic Materials*, https://perma.cc/7XSQ-TTKQ (discussing National Defense Stockpile).  The government does not necessarily intend to hoard those items for exclusive use by federal employees or facilities.  Materials from those stockpiles could go to any number of state, private, or international recipients, in service of any

27

number of distinct federal objectives. The ultimate recipient of every given item cannot possibly be foreseen at the time of acquisition. This Court should decline to adopt an interpretation of § 1498(a) that would make it impossible for either the government or its contracting partners to determine at the time a procurement contract is formed whether the government may effectually offer its authorization or consent to use or manufacture patented inventions and thus trigger § 1498(a).

## CONCLUSION

For the foregoing reasons, the judgment of the district court in favor of plaintiffs should be reversed.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*


 */s/ Brad Hinshelwood*
BRAD HINSHELWOOD
McKAYE L. NEUMEISTER
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7256*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-7823*
  *Bradley.A.Hinshelwood@usdoj.gov*

June 2026

# CERTIFICATE OF SERVICE

I hereby certify that on June 19, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the appellate CM/ECF system.

*/s/ Brad Hinshelwood*
Brad Hinshelwood

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 29(a)(5) and Federal Circuit Rule 28.1(b) because it contains 6,982 words.

This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*/s/ Brad Hinshelwood*
Brad Hinshelwood