**2026-1581**

# United States Court of Appeals for the Federal Circuit

ARBUTUS BIOPHARMA CORPORATION,
GENEVANT SCIENCES, GMBH,

*Plaintiffs-Appellees,*

– v. –

MODERNA, INC., MODERNATX, INC.,

*Defendants-Appellants.*

*On Appeal from the United States District Court for the
District of Delaware in No. 1:22-CV-00252-JDW,
Honorable Joshua D. Wolson, Judge*

**BRIEF OF *AMICUS CURIAE* ALLIANCE OF STARTUPS AND
INVENTORS FOR JOBS (USIJ) IN SUPPORT OF
APPELLEES AND IN SUPPORT OF AFFIRMANCE**

ROBERT P. TAYLOR
RPT LEGAL STRATEGIES PC
2443 Fillmore Street, #332
San Francisco, CA 94115
(415) 447-3975
robert.taylor@rptstrategies.com

*Counsel for Amicus Curiae*

COUNSEL PRESS
A ▶ Proceed Service
The Appellate Experts®

(800) 4-APPEAL • (715912)

FORM 9. Certificate of Interest

Form 9 (p. 1)
March 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 26-1581

**Short Case Caption** Moderna, et al v. Arbutus and Genevant

**Filing Party/Entity** Alliance of U.S. Startups and Inventors for Jobs ("USIJ")

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 07/15/2026

Signature: /s/ Robert P. Taylor

Name: Robert P. Taylor

**FORM 9. Certificate of Interest**                                    Form 9 (p. 2)
                                                                       **March 2023**

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.  ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.  ☑ None/Not Applicable |
| Alliance of U.S. Startups and Inventors for Jobs | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☐　　None/Not Applicable　　　　☐　　Additional pages attached

| | | |
|---|---|---|
| RPT Legal Strategies PC | | |
| | | |
| | | |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐  Yes (file separate notice; see below)  ☐  No  ☑  N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑　　None/Not Applicable　　　　☐　　Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................. ii

INTEREST OF AMICUS CURIAE ....................................................... 1

SUMMARY OF ARGUMENT ............................................................. 2

ARGUMENT ......................................................................................... 4

I.      The Entire Patent Community Will Be Served by Clarity Regarding the Operation of Section 1498 ........................................................ 4

II.     The Contract at Issue is Not "For the Government" Within the Meaning of § 1498 ....................................................................... 6

III.    The Factual Context Should Not Determine the Interpretation of Section 1498 ................................................................................. 7

IV.    Some Politicians and Consumer Advocates Are Likely to Seize Upon Any Ambiguity in the Coverage of Section 1498 to Encourage Price Controls ...................................................... 11

V.     Conclusion .................................................................................. 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Carter v. Welles-Bowen Realty, Inc.*,
    736 F.3d 722 (6th Cir. 2013)..................................................................9

*Clark v. Martinez*,
    543 U.S. 371 (2005)..............................................................................9

**Statutes & Other Authorities:**

28 U.S.C. §1498 ........................................................................... *passim*

35 U.S.C. §§ 200 - 209 ...........................................................................13

35 U.S.C. § 283 ......................................................................................12

Adam Cancryn, "Bernie Sanders Is Personally Stopping Biden's Top
    Medical Research Nominee - And He's Not Budging," Politico,
    7/11/2023 .........................................................................................13

Engelberg, *et al*, "A New Way to Contain Unaffordable Medication Costs
    - Exercising the Government's Existing Rights," 386 New England
    J. of Medicine (2022)........................................................................15

Hannah Brennan, Amy Kapczynski, Christine H. Monahan, Zain Rizvi,
    "A Prescription for Excessive Drug Pricing: Leveraging
    Government Patent Use for Health," 18 Yale Journal of Law &
    Technology (2016)........................................................................11, 15

Hon. Susan G. Braden, and Joshua A. Kresh, "Section 1498(A) Is Not a
    Rx to Reduce Drug Prices." Food and Drug Journal, 77:3 (2022)...............12

"How the Government Can Lower Drug Prices," New York Times
    Editorial (June 20, 2018) ..................................................................11

"Innovation in the Pharmaceutical Industry: New Estimates of R&D
    Costs," published in the Journal of Health Economics 47 (2016) ...............14

Kapczynski & Kesselheim, "Government Patent Use: A Legal Approach
    to Reducing Drug Spending," 35 Health Affairs (2016)............................15

Prof. Adam Mossoff of George Mason University entitled "The False
    Promise of Breaking Patents to Lower Drug Prices,"
    St. John's Law Review, 98: 287 (2024) .........................................15

*Amicus curiae* Alliance of U.S. Startups and Inventors for Jobs ("USIJ") submits this brief supporting affirmance of the district court's opinion below with respect to that court's application of 28 U.S.C. §1498. We take no position on the other patent law issues raised by the parties.

## INTEREST OF AMICUS CURIAE.

USIJ is a coalition of startup companies, inventors, investors, and entrepreneurs whose businesses depend upon stable and reliable patent protection as an essential foundation for making long-term investments of capital and time commitments to high-risk ventures developing new technologies. USIJ was formed in 2012 to address concerns that legislation, policies and practices adopted by the U.S. Congress, the federal judiciary and certain federal agencies were and are placing individual inventors, entrepreneurs and research-intensive startups ("USIJ Cohort") at an unsustainable disadvantage relative to their larger incumbent rivals, both domestic and foreign, and others that would make wrongful use of their inventions and patents. Members of USIJ innovate in many industries and technologies, including biotechnology. More than half of all new drugs are developed by startups.

USIJ's fundamental mission is to bring attention to the critical role that patents play in our nation's economic health and to the particular importance of startups and small companies in that regard. A disproportionately large number of strategically

1

critical inventions are attributable to such individual inventors and small companies.

Appendix A is list of the current members of USIJ.[1]

## SUMMARY OF ARGUMENT

USIJ urges affirmance of the ruling below as to the proper application of Section 1498 to sales of vaccines by Appellants, Moderna, Inc. and ModernaTX, Inc. (collectively, "Moderna"). Many startups and small companies within the USIJ Cohort, as noted *supra*, rely on their patents as fundamental building blocks of their business models, and many of those companies also receive or benefit from monetary government grants in a variety of situations. Exemplary are biotechnology startups with exclusive patent licenses from universities based on use of federal funds for initial scientific investigation of potential new drug candidates, companies that have received grants from the Small Business Administration, companies that have entered into Cooperative Research and Development Agreements funded in part with federal funds, etc. If any entity infringing the patents owned by such a startup or small company is allowed to force the patent owner into the United States Court of Federal Claims under Section 1498 as a result of delivering goods (or services) to the general public, as Moderna seeks to do here, it will diminish severely

---

[1]     No party or counsel for a party contributed to the preparation of this amicus brief or participated in its writing. *Amicus* USIJ has obtained consent from all parties to file this brief.

the value of such patents, which in turn will have an adverse impact on the willingness of investors and entrepreneurs to accept federal funding for any purpose or to invest in any entity whose patents are potentially subject to a 1498 defense.

We submit that none of the deliveries of vaccines at issue in this case were "for the Government" except doses that were delivered to and used by the government itself. Section 1498 requires a direct and material benefit to the United States itself. Public distribution, public-health benefit, downstream economic benefit, regulatory benefit, or fulfillment of a broad governmental policy objective is not enough.

USIJ recognizes, of course, that all private property, including intellectual property, may be subject in appropriate circumstances to the government's power of eminent domain. As to patents and copyrights, however, Section 1498 limits the exercise of that power to takings that are "for the Government," meaning for the direct benefit of the government. The provision should not be extended to permit the "taking" of intellectual property embodied in products delivered to the general public and to other nations, even though funded by the government.

Moreover, the applicability of Section 1498 should not turn on what is in the procurement contract; the statutory provision has a fixed meaning, and nothing that the parties say in a procurement agreement can alter what Congress specified. If the government wants to reimburse Moderna for the costs of resolving the patent dispute

3

here, it can do so without expanding the scope of Section 1498 and forcing patent owners into the Court of Federal Claims.

In short, USIJ submits that the district court ruled properly as to the applicability of Section 1498. The term "for the Government" refers to procurement that is for the direct and material benefit of the United States itself. Any other interpretation is likely to create unnecessary difficulties for patent owners and the judicial system.

## ARGUMENT

**I.     The Entire Patent Community Will Be Served by Clarity Regarding the Operation of Section 1498.**

Section 1498 is essentially an eminent domain provision allowing the United States government to condemn private property for its own use. Originally enacted to facilitate the government's acquisition of materials needed for wartime military operations, the provision has been modified on several occasions and construed a number of times as to its breadth. That history has been fully briefed by both parties and there is little to be gained from this *amicus* advancing yet another slant on the legislative and judicial history of the provision. We note, however, that the breadth of the federal government's role in the nation's economy has grown by orders of magnitude since the earliest version of this eminent domain statute was enacted, making it particularly important that the application of Section 1498 be carefully limited to acquisitions that actually are "for the Government" and not for some

4

alternative objective.[2]  Anything other than a clear holding that the production and sale of Moderna vaccine distributed to the American public and to other countries were not subject to Section 1498 will invite chaos in patent infringement cases that were preceded by government funding activities.

The instant case will require this Court to establish a boundary between government funding of private activities that are "for the Government" and those activities that further policy objectives falling outside Section 1498.  The need to parse this distinction, as a practical matter, is inescapable.  Moderna does not contend that all activities funded by government grants give rise to immunity from patent infringement claims for the recipient.  In that light, USIJ submits that the boundary established by this Court must be clearly drawn in a manner that enables all parties and others affected by the procurement contract to know whether or not Section 1498 applies.  The danger in ambiguity lies not so much in the possibility of specious litigation against the government, but in specious defenses raised by accused infringers after collaborating with their contracting officers.

---

[2]    We note, by way of example, the government's 2024 grant to Intel Corporation of funds for the rejuvenation of the semiconductor manufacturing industry. *See, e.g.*, https://newsroom.intel.com/press-kit/us-chips-act-funding-intel.    Despite strong governmental interest in increasing the manufacturing capacity of the United States, that grant of funds certainly should not allow Intel to infringe the patents of other entities in the deployment of such funds.

Absent complete clarity in the statutory language, the least ambiguous outcome was the one chosen by the trial judge in the court below – namely "for the Government" refers requires a direct and material benefit to the United States itself. Products and services contracted for by the government for delivery to the American public, other entities or other nations, however, do not become "for the Government" merely because the Government funded or coordinated their distribution.[3] Any other ruling would essentially remove important guardrails that Congress provided.

## II.    The Contract at Issue is Not "For the Government" Within the Meaning of § 1498.

Appellees' Responsive Brief (pp. 9–12) details several aspects of the transaction between the government and Moderna during the negotiation process and embodied in the procurement agreement making clear that the bulk of the vaccine to be delivered was for the benefit of the American public and other countries, not for the Government.  The procurement contract itself provides for delivery, not to the government, but to qualified distribution vendors for further distribution:

---

[3]    There is nothing in such a holding that is unfair to Moderna.  Prior to its negotiations with the government, Moderna was well aware of the lipid vesicle patents and even negotiated licenses to those patents to cover its sales of Covid – 19 vaccines to other customers. *See, e.g., ModernaTx, Inc. v. Arbutus Biopharma Corp.*, 18 F.4th 1352 (Fed. Cir. 2021) (appeal filed in 2019 from a Final Written Decision of the PTAB regarding the validity of the Arbutus patents).

"C.3.2.1.5 Following release of the product the contractor shall deliver the product to the designated distribution site via a qualified distribution vendor in accordance with Section F and paragraph C.7 below."

https://www.hhs.gov/sites/default/files/vaccine-contract-with-moderna-modifications-p00001-p00002-p00003.pdf.    Delivery to a vendor for further distribution to the public is not delivery to the government for its own use, and Section 1498 should not apply to such deliveries. Nor does delivery through public-distribution channels establish that every use of patented technology was "for the Government."

The trial court properly disregarded the after-the-fact statement filed by DOJ arguing that the government, not Moderna, should be responsible for the claims of patent infringement asserted in this case.  The nature of the procurement transaction, not the intent of the parties, should govern the outcome here as to the applicability of Section 1498.  Government contractors and procurement officers often develop good working relationships, but a desire to accommodate a contractor is not something that can change the fundamental nature of the procurement, and certainly is not something should be relevant on an *ad hoc* basis.

### III.    The Factual Context Should Not Determine the Interpretation of Section 1498.

Both Moderna and its *amici*, as well as the DOJ statement filed in the district court, argue essentially that the unique factual situation created by the Covid-19

7

pandemic requires a more expansive interpretation of Section 1498 than the one adopted by the trial court. Moderna's Opening Brief, for example, emphasizes Operation Warp Speed and its implications for the nation and world as relevant to the outcome here.[4] Neither Moderna nor the government contend that Section 1498 makes the government liable for patent infringement in **all cases** where a governmental agency provides funding to an outside contractor selling products or services that may benefit the public. Instead, they argue that, in light of the near-panic conditions confronting the nation in 2020, this procurement was more akin to the acquisition of materials to support warfare. That argument, in essence, would assign a contextual meaning to the term "for the Government," giving it flexibility to meet particular circumstances.

USIJ does not dispute or minimize the factual reality of the situation existing at the time Moderna, Pfizer/BioNTech, and other companies negotiated vaccine contracts with the government, nor do we underestimate the phenomenal speed and accomplishment with which vaccines were made available worldwide to stop the spread of Covid-19. But we submit that the breadth of a statutory provision enacted

---

[4]    Appellants' Opening Brief, pp. 8 *et seq*.

by Congress should not expand or contract depending upon the facts of a particular procurement.[5]

Interpreting Section 1498 as Moderna and its amici are seeking would have consequences far beyond the instant litigation.  Such a ruling would establish a legal doctrine without limiting principles, which, *inter alia,* could precipitate a significant upheaval in the entrepreneurial ecosystem of our country.  Without a properly defined boundary between government funding that is subject to Section 1498 and funding that is not, infringement defendants are likely to look for any plausible basis for setting up such a defense.  The temptation to do so will be compelling (if not mandatory) for defense lawyers.

Consider, for example, monetary grants made by the Small Business Administration for Innovation Research ("SBIR") and Technology Transfers ("SBTT").  These grants often involve government funding designed to achieve some specified governmental objective, but that grant does not give the recipient the right to avoid responsibility for patent infringement by trying to shift liability onto

---

[5]    E.g., *Clark v. Martinez*, 543 U.S. 371, 380 (2005) (Scalia, J) ("We find little to recommend the novel interpretive approach … which would render every statute a chameleon, its meaning subject to change depending on the presence or absence of constitutional concerns in each individual case."); *Carter v. Welles-Bowen Realty, Inc.*, 736 F.3d 722, 730 (6th Cir. 2013) (Sutton, J., concurring)("But a statute is not a chameleon.  Its meaning does not change from case to case.  A single law should have one meaning, and the 'lowest common denominator, as it were, must govern' all of its applications." (citing *Clark v. Martinez*).

the government, as Moderna seeks to do here.   Nor should the existence of a government grant give an accused infringer of the recipient's patents the right to shift liability onto the federal government, except in the narrow situation where the specific accused use was actually "for the Government" and with the Government's authorization or consent.

The same point applies to the government's role as a payor in the pharmaceutical and medical-device markets. The federal government is often one of many payors or program participants in the delivery of medical treatment to private individuals.   But a government payor relationship is not the same thing as Government use required by Section 1498.  Tax dollars fund, reimburse, or subsidize many forms of private medical treatment.  That the government pays for or facilitates treatment received by private citizens does not mean that patented technology used in that treatment is "for the Government."  The direct beneficiaries are the patients who receive the treatment.

Federal funding is not government use. Government collaboration is not Government use. Government payment or reimbursement is not Government use. Trial sponsorship is not Government use.  And a public-health objective is not Government use.  Put differently, such facts are no substitute for the statutory requirement that the accused use or manufacture directly benefit the United States itself.

10

### IV.    Some Politicians and Consumer Advocates Are Likely to Seize Upon Any Ambiguity in the Coverage of Section 1498 to Encourage Price Controls.

Beyond the parties themselves, any ambiguity in the interpretation of Section 1498 is likely to be misconstrued – severely twisted is perhaps a better term – to cover situations completely foreign to the intent of the statute.  Thus, a ruling in favor of Moderna will add fuel to an ongoing effort by a few politicians and consumer groups to control the prices of patented drugs.  In 2016, three law students published a law review article arguing that the government should use Section 1498 to commission generic drug manufacturers to make patented products owned by drug companies, thereby destroying the value of the drug developer's exclusive license.[6]  That law review article inspired the editorial staff of the New York Times to publish essentially the same argument, ignoring the fact that such a move would destroy the value of patents that investors and entrepreneurs had relied on for years to make investments of both monetary and human resources into bringing a new drug to market.  The Times editorial was captioned "How the Government Can Lower Drug Prices,"[7] and suggested that the government could infringe a drug

---

[6]    Hannah Brennan, Amy Kapczynski, Christine H. Monahan & Zain Rizvi, "A Prescription for Excessive Drug Pricing: Leveraging Government Patent Use for Health," 18 Yale Journal of Law & Technology, p.275 (2016).

[7]    "How the Government Can Lower Drug Prices," New York Times Editorial (June 20, 2018).  https://www.nytimes.com/2018/06/20/opinion/prescription-drug-costs-naloxone-opioids.html.

developer's patent protections and send the owner to the Court of Federal Claims if wanted to be compensated.[8]

Within weeks after the Biden Administration took office in 2021, Senator Bernie Sanders cited the New York Times editorial as the basis for his proposed legislation – S. 909 – which he named the Prescription Drug Price Relief Act of 2021. The proposed legislation would have allowed the HHS Secretary to cancel pharmaceutical patents and encourage generics to make drugs that infringed the relevant patents. S.909 died with the Biden Administration, but a ruling in favor of Moderna in this case is likely to give new life to the argument that even a small amount of government funding is enough to move a patent infringement case out of an Article III court and into the U.S. Court of Federal Claims, an Article I administrative tribunal.[9]

---

[8]    Remedies under Section 1498 and those under Title 35 are not even close to equivalent. The former provides for what is essentially cost-based compensation as opposed to market-based compensation to which the patent owner is otherwise entitled. Beyond that, the patent owner would be required to forego a jury trial in violation of its VII[th] Amendment right and to go through the slow and cumbersome process of suing the United States government. Importantly, injunctions to prevent future infringement that are available under 35 U.S.C. § 283 are not available in the Court of Claims.

[9]    An insightful description of this effort by Sen. Sanders and others can be found in an article by Hon. Susan G. Braden, retired judge of the U.S. Court of claims, and Joshua A. Kresh, Managing Director of Center for Intellectual Property and Innovation Policy, Antonin Scalia Law School, George Mason University. The article is entitled "Section 1498(A) is Not a Rx to Reduce Drug Prices." Food and Drug Journal, 77:3, p. 274 et seq (2022).

The political pressure to misconstrue Section 1498 to control the price of patented drugs is now intertwined with years of unsuccessful efforts by the same group of politicians and consumer advocates to misconstrue the "march-in" procedures provided for in the Bayh-Dole Act, 35 U.S.C. §§ 200 – 209 with the same objective.  The Bayh-Dole statute was enacted by Congress in 1980 and allows universities to own and license patents granted on scientific research funded by federal research grants.  The Bayh-Dole Act resulted in the commercialization of hundreds of new medicines and other products, much of it by startups formed by entrepreneurs and venture capitalists based on the belief that enforceable patents would justify the enormous investment and risk in any new venture.  The Bayh-Dole Act does not permit government control of the retail pricing of drugs and other patented products, but the pressure to misconstrue the "march-in" provision as a basis for price controls has nevertheless been relentless.[10]  In short, demands that the

---

[10]    *E.g.*, https://www.sanders.senate.gov/press-releases/news-sanders-statement-on-white-house-proposal-to-consider-price-as-a-factor-in-breaking-patent-monopolies-on-some-taxpayer-funded-prescription-drugs/#:~:text=On%20December%207%2C%202023%2C%20Senator%20Bernie%20Sanders,to%20manufacture%20generic%20versions%20of%20this%20treatment; *accord*: Adam Cancryn, "Bernie Sanders is personally stopping Biden's top medical research nominee — and he's not budging," Politico, 7/11/2023.  The Cancryn article points out that Senator Sanders, as chair of relevant Senate committee in the previous Administration, was holding up the appointment of a Director for NIH to obtain an agreement to force drug companies to sell at lower prices.    https://www.politico.com/news/2023/07/11/sanders-biden-nih-nominee-00105738.

federal government mandate lower prices on patented drugs persist, despite the absence of any legal foundation and despite the destructive impact such price controls would have on future investments in the continued development of new medicines and medical devices. [11]

USIJ respectfully submits that any ambiguity in a ruling by this Court as to the scope of Section 1498 could diminish the flow of capital and human resources necessary to develop new drugs and other science-based products. We are concerned specifically with the danger that any interpretation expanding the concept of what is "for the Government" is likely to be ambiguous in scope and could be seized upon by these same consumer groups and politicians, discussed *supra*, that have pushed unsuccessfully for the use of "march in rights" to control the prices paid by the public for patented drugs and other products. Faced with their inability to use march-in

---

[11]    Patent risk in this circumstance is merely one of several risk factors that must be accounted for in any decision to make an initial investment of human and financial capital, starting with the point that only 13% of development projects actually result in an approved drug. Execution risks, the inability to obtain follow-on investments, the failure of FDA to approve either the safety or efficacy of a drug, all make these very risky investments. https://www.csis.org/analysis/understanding-us-biopharmaceutical-innovation-ecosystem, p. 8.

A report entitled "Innovation in the Pharmaceutical Industry: New Estimates of R&D Costs," published in the Journal of Health Economics 47 (2016) describes a study of 106 new drugs developed by 10 different companies. The study estimates the average cost per drug at $1.4B without considering the time-value of the out-of-pocket investments. If a reasonable cost of funds is added, the total average cost is $2.8B per drug. https://pubmed.ncbi.nlm.nih.gov/26928437.

rights, these same entities are now turning to Section 1498 to achieve the same objective.[12]

There are many facets of this extremely complex problem that are beyond the scope of this *amicus* brief. We refer the Court to a well-reasoned and informative academic paper by Prof. Adam Mossoff of George Mason University entitled "The False Promise of Breaking Patents to Lower Drug Prices," St. John's Law Review, 98: 287-2338 (2024). Professor Mossoff explains the legal history and legislative intent in considerable detail and demonstrates the many reasons why neither the march-in provision in the Bayh-Dole Act nor Section 1498 can properly be construed for such an outcome.[13]

## V.    Conclusion

USIJ urges the Court to avoid making any ruling in this case that would expand the scope of Section 1498 by giving a broader meaning than was intended

---

[12]    *E.g.*, Brennan, et.al., "A Prescription for Excessive Drug Pricing: Leveraging Government Patent Use for Health," 18 Yale L. Journ. 275, 284 (2016); Kapczynski & Kesselheim, "Government Patent Use: A Legal Approach to Reducing Drug Spending," 35 Health Affairs 791 (2016) (claiming that "new medicines . . . are expensive not because they are expensive to manufacture but because they are protected by patents"); Engelberg, *et al*, "A New Way to Contain Unaffordable Medication Costs—Exercising the Government's Existing Rights," 386 New England J. of Medicine 1104 - 1106 (2022) (urging use of Section 1498 for nullifying patent protection).

[13]    *See,*    https://scholarship.law.stjohns.edu/lawreview/vol98/iss2/5.    The same article    is    also    available    at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4348499#.

by the statute.  The term "for the Government," as we read it, means products delivered to the Government for consumption and/or use by the Government.  The statute requires more than some vaguely structured "authorization" to one or more competitors of a patented product to infringe the relevant patents and send the bill to the Federal Government.

Respectfully submitted,


/s/ Robert P. Taylor

_____

Alliance of U.S. Startups and Inventors
for Jobs

By Robert P. Taylor
General Counsel of USIJ


Dated: July 15, 2026

16



# APPENDIX A
## USIJ Member Companies

*Alliance of U.S. Startups and Inventors for Jobs*

July 2026

USIJ is a coalition of inventors, startup companies, venture capitalists, incubators, and research institutions united in support of a strong U.S. patent system. Member companies span medical devices, semiconductors, biotechnology, wireless technology, cybersecurity, and venture capital — sectors where patent protection is critical to sustaining innovation investment and American global competitiveness.

### 23 Member Companies

1. **Altos Labs** | Biotechnology / Longevity Research  *altoslabs.com*
2. **BioCardia** | Medical Devices / Cardiovascular  *biocardia.com*
3. **Calyxo** | Medical Devices / Urology  *calyxoinc.com*
4. **Centripetal** | Cybersecurity / AI  *centripetal.ai*
5. **Direct Flow Medical** | Medical Devices / Cardiovascular  *directflowmedical.com*
6. **DivX** | Digital Media / Video Technology  *divx.com*
7. **ExploraMed** | Medical Device Incubator  *exploramed.com*
8. **Fogarty Institute** | Medical Device Incubator / R&D  *fogartyinstitute.org*
9. **Fortem IP** | IP Management / Licensing  *fortemip.com*
10. **Lauder Partners** | Venture Capital  *lauderpartners.com*
11. **Liquidax Capital** | IP Asset Management / Investment Advisory  *liquidaxcapital.com*
12. **Materna Medical** | Medical Devices / Women's Health  *maternamedical.com*
13. **Netlist** | Semiconductors / Memory Technology  *netlist.com*
14. **NuCurrent** | Wireless Power / IP Licensing  *nucurrent.com*
15. **PuraCath Medical** | Medical Devices / Infection Prevention  *puracath.com*
16. **Rearden** | Technology / AI / Holographics  *rearden.com*
17. **Revelle Aesthetics** | Medical Devices / Aesthetics  *revelleaesthetics.com*
18. **ShapeTx** | Biotechnology / Gene Therapy  *shapetx.com*
19. **SORAA** | Semiconductors / LED Lighting  *soraa.com*
20. **Techquity Capital** | IP Strategy / Venture Capital  *techquitycap.com*
21. **TuneTx** | Biotechnology / Gene Therapy  *tunetx.com*
22. **Willow** | Consumer Health / Medical Devices  *onewillow.com*
23. **Pavey Investments** | Venture Capital  *paveyinvestments.com*

---

**FORM 19. Certificate of Compliance with Type-Volume Limitations**

**Form 19**
**July 2020**

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2026-1581

**Short Case Caption:** Arbutus Biopharma Corporation v. Moderna, Inc.

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes __3,682__ words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: __07/15/2026__

Signature: /s/ Robert P. Taylor

Name: Robert P. Taylor