**NONCONFIDENTIAL**
**Volume I of II (Appx1 to Appx2761)**

No. 26-1581

UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

ARBUTUS BIOPHARMA CORPORATION, GENEVANT SCIENCES, GMBH,

*Plaintiffs-Appellees*,

v.

MODERNA, INC., MODERNATX, INC.,

*Defendants-Appellants*.

On Appeal from the U.S. District Court for the District of Delaware,
The Honorable Joshua D. Wolson, Case No. 1:22-cv-000252-JDW

# JOINT APPENDIX

David I. Berl
Adam D. Harber
Shaun P. Mahaffy
Matthew W. Lachman
Andrew L. Hoffman
Kathryn Larkin
WILLIAMS & CONNOLLY LLP
680 Maine Avenue, SW
Washington, DC 20024
(202) 434-5000

*Counsel for Plaintiffs-Appellees*

William M. Jay
Jaime A. Santos
GOODWIN PROCTER LLP
1900 N Street, NW
Washington, DC 20036
(202) 346-4000

Jordan Bock
Joseph R. Landry
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
(617) 570-1000

Gabriel B. Ferrante
GOODWIN PROCTER LLP
620 Eighth Avenue
New York, NY 10018
(212) 813-8800

*Counsel for Defendants-Appellants*

August 21, 2026

*(additional counsel on inside cover)*

James F. Hurst
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
(312) 862-5230

Mark Charles McLennan
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 909-3451

*Counsel for Defendants-Appellants*

**TABLE OF CONTENTS**


| Date | Dkt. | Document | Appx Pages |
|---|---|---|---|
| **VOLUME I of II** | | | |
| 4/28/2023 | 91 | Stipulated Protective Order | N/A |
| 2/2/2026 | 697 | Memorandum Opinion on Summary Judgment | 1-32 |
| 2/2/2026 | 698 | Order on Summary Judgment | 33-35 |
| 3/4/2026 | 758 | Consent Judgment and Order | 36-39 |
| | | *Select Exhibits to ECF No. 1, Complaint for Patent Infringement*: | |
| 2/28/2022 | 1-2 | Exhibit B, United States Patent No. 8,492,359, dated July 23, 2013 | 40-113 |
| 2/28/2022 | 1-4 | Exhibit D, United States Patent No. 9,364,435, dated June 14, 2016 | 114-187 |
| 2/28/2022 | 1-5 | Exhibit E, United States Patent No. 9,504,651, dated November 29, 2016 | 188-217 |
| 2/28/2022 | 1-6 | Exhibit F, United States Patent No. 11,141,378, dated October 12, 2021 | 218-294 |
| N/A | N/A | Trial Court Docket | 295-379 |
| 2/28/2022 | 1 | Complaint for Patent Infringement | 380-430 |
| 5/6/2022 | 16 | Moderna Inc. and ModernaTX, Inc.'s ("Moderna") Partial Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6) | 658-661 |
| 5/6/2022 | 17 | Moderna's Opening Brief in Support of Their Partial Motion to Dismiss | 662-683 |
| 5/6/2022 | 17-1 | Exhibit A, W911QY20C0100 ("C-100") Contract, dated August 9, 2020[1] | 684-737 |


[1] Exhibits A and B to Moderna's Opening Brief in Support of Their Partial Motion to Dismiss (ECF No. 17-1) were solely filed in redacted form in the proceedings below. *See* Fed. Cir. R. 25.1(a)(4).

| Date | Dkt. | Document | Appx Pages |
|---|---|---|---|
| 5/6/2022 | 17-1 | Exhibit B, Declaration of Shaun Ryan in Support of Moderna's Standing to Appeal filed in *Moderna TX, Inc. v. Arbutus Biopharma Corp.*, No. 2020-2329 (Fed. Cir.), ECF No. 18, dated February 22, 2020 | 738-749 |
| 6/3/2022 | 21 | Plaintiffs' Opposition to Moderna's Partial Motion to Dismiss | 750-775 |
| 11/2/2022 | 31 | Memorandum Opinion Denying Moderna's Motion to Dismiss | 821-836 |
| 2/14/2023 | 49 | Statement of Interest of the United States | 946-963 |
| 3/10/2023 | 64 | Memorandum Opinion Reaffirming November 2, 2022 Memorandum Opinion Denying Moderna's Motion to Dismiss | 1150-1153 |
| 5/13/2024 | 301*<br>316-3† | Plaintiffs' Amended Complaint for Patent Infringement[2] | 1468-1525 |
| 6/10/2024 | 344 | Moderna's Answer to Amended Complaint with Counterclaims | 2032<br>2035<br>2066-2067<br>2083-2084 |
| 8/1/2025 | 507 | Moderna's Motions for Summary Judgment Pursuant to Federal Rules of Civil Procedure 56 | 2641 |

[2] In the "Dkt." column, documents marked with an asterisk (*) were filed under seal in the district court and are included in the confidential appendix. Documents marked with a dagger (†) are public redacted versions of sealed documents; they are included in the nonconfidential appendix.

| Date | Dkt. | Document | Appx Pages |
|---|---|---|---|
| 8/1/2025 | 516✦ | Moderna's Opening Brief in Support of Its Motions for Summary Judgment[3] | 2647<br>2663-2674 |
| 8/1/2025 | 517✦ | Moderna's Statement of Undisputed Facts in Support of Its Motion for Summary Judgment | 2695<br>2703-2714 |
| 8/1/2025 | 511 | Moderna's Opening Brief in Support of Its Motion to Exclude Mr. Pitts' and Mr. Brill's Expert Reports | 2748<br>2757-2761 |
| **VOLUME II of II** | | | |
| 8/1/2025 | 520 | Declaration of Mark C. McLennan in Support of Moderna's Summary Judgment and *Daubert* Motions (Volume 1) | 2765-2776 |
| 8/1/2025 | 520-1 | Exhibit 1, C-100 Contract, dated August 9, 2020 | 2777-2830 |
| 8/1/2025 | 520-8 | Exhibit 8, The White House, Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak, dated March 13, 2020 | 3236-3238 |
| 8/1/2025 | 520-9 | Exhibit 9, 75A50120C00034 ("C-34") Contract, dated April 16, 2020 | 3241-3250<br>3254 |
| 8/1/2025 | 520-10 | Exhibit 10, The White House, Remarks by President Trump on Vaccine Development, dated May 15, 2020 | 3353-3359 |

[3] The cover pages for ECF Nos. 516, 517, 538, 573, 574, and 616, marked with a star (✦) have a black box covering the designation "Outside Counsel's Eyes Only" to indicate that the document was publicly filed. The cover pages were not redacted, and the parties have therefore not filed confidential and non-confidential versions of the cover pages.

| Date | Dkt. | Document | Appx Pages |
|---|---|---|---|
| 8/1/2025 | 520-11 | Exhibit 11, U.S. Department of Health & Human Services ("HHS"), From the Factory to the Frontlines, The Operation Warp Speed Strategy for Distributing a COVID-19 Vaccine, undated | 3365-3376 |
| 8/1/2025 | 520-12 | Exhibit 12, HHS, Explaining Operation Warp Speed, undated | 3377-3382 |
| 8/1/2025 | 520-13 | Exhibit 13, U.S. Department of Defense Press Release, Trump Administration Collaborates with Moderna to Produce 100 Million Doses of COVID-19 Investigational Vaccine, dated August 11, 2020 | 3383-3386 |
| 8/1/2025 | 520-15 | Exhibit 15, Excerpts from the Deposition Transcript of Hamilton Bennett, dated May 20, 2024[4] | 3390-3405 |
| 8/1/2025 | 520-17 | Exhibit 17, Biomedical Advanced Research & Development Authority ("BARDA"), Technical Evaluation, W911QY-20-R-0043 OWS Moderna SARS-CoV-2 mRNA-1273 Vaccine, Version 1, dated July 7, 2020 | 3427-3428<br>3438-3439 |
| 8/1/2025 | 523 | Declaration of Mark C. McLennan in Support of Moderna's Summary Judgment and *Daubert* Motions (Volume 2) | 3472-3474 |
| 8/1/2025 | 523-1 | Exhibit 19, Amendment P00004 to C-100 Contract, dated February 11, 2021 | 3475-3476<br>3491 |
| 8/1/2025 | 523-5 | Exhibit 23, U.S. Food & Drug Administration's Response Letter to ModernaTX, Inc., dated December 18, 2020 | 3547-3548<br>3552<br>3556 |

[4] Appx3394 redacts Ms. Bennett's address under Federal Circuit Rule 25.1(b)(5).

| Date | Dkt. | Document | Appx Pages |
|---|---|---|---|
| 8/1/2025 | 523-6 | Exhibit 24, BARDA Web Announcement, BARDA engages Moderna to expand domestic manufacturing of Moderna SARS-CoV-2 vaccine (mRNA-1273) to protect against COVID-19, dated June 5, 2020 | 3557-3560 |
| 8/1/2025 | 523-12 | Exhibit 30, Declaration of George Rutherford, dated May 13, 2025, with attached Opening and Reply Expert Reports | 3620-3622<br>3637-3648<br>3653-3668 |
| 8/1/2025 | 523-13 | Exhibit 31, Declaration of Christopher Vellturo, dated May 20, 2025, with attached Opening and Reply Expert Reports | 3898-3900<br>3902-3931<br>3949-3971 |
| 8/1/2025 | 523-14 | Exhibit 32, The White House Fact Sheet, President-elect Biden Outlines COVID-19 Vaccination Plan, dated January 15, 2021 | 3983-3986 |
| 8/1/2025 | 523-15 | Exhibit 33, The White House, Remarks by President Trump at the Operation Warp Speed Vaccine Summit, dated December 8, 2020 | 3990-4003 |
| 8/1/2025 | 525 | Declaration of Mark C. McLennan in Support of Moderna's Summary Judgment and *Daubert* Motions (Volume 3) | 4171-4173 |
| 8/1/2025 | 525-15 | Exhibit 62, Responsive Expert Report of Alex M. Brill, dated February 14, 2024 | 4445-4470 |
| 8/1/2025 | 525-16 | Exhibit 63, Rebuttal Expert Report of Peter J. Pitts, dated February 14, 2024 | 4495-4496<br>4503-4522 |

| Date | Dkt. | Document | Appx Pages |
|---|---|---|---|
| 8/1/2025 | 538✦ | Declaration of Matthew W. Lachman in Support of Plaintiffs' Summary Judgment Brief, Motion to Exclude Certain Expert Testimony, and Plaintiffs' Statements of Uncontested Facts | 4688-4692 |
| 8/1/2025 | 526-5*<br>538-5† | Exhibit 5, Responsive Expert Report of Dr. Niren Murthy Regarding Validity, dated February 14, 2025[5] | 4790-4791<br>4874-4876 |
| 8/1/2025 | 538-19 | Exhibit 19, Nature, RNA to the rescue?, dated September 2003 | 5290-5293 |
| 8/22/2025 | 547-3 | Exhibit A, Brief of 16 Former Judges, Former Officials, and Academic Scholars as Amicus Curiae in Opposition in Part to Defendants' Motion for Summary Judgment | 5726-5743 |
| 8/25/2025 | 550-2 | Exhibit A, *Amicus Curiae* Brief of Alliance of U.S. Startups and Inventors For Jobs ("USIJ") in Support of Neither Party | 5746-5759 |
| 8/27/2025 | 555-1 | Exhibit A, Letter Brief of Amicus Curiae the Bayh-Dole Coalition | 5765-5769 |
| 8/29/2025 | 562 | Plaintiffs' Cross Motion for Summary Judgment | 5803-5804 |
| 8/29/2025 | 572 | Plaintiffs' Responsive Brief in Opposition to Moderna's Motion for Summary Judgment and in Support of Plaintiffs' Cross-Motion for Summary Judgment | 5809-5831 |
| 8/29/2025 | 573✦ | Plaintiffs' Affirmative Statement of Uncontested Facts in Support of Their Cross-Motion for Summary Judgment | 5853<br>5855<br>5857-5858 |

[5] Appx4791 was solely filed in redacted form in the proceedings below. *See* Fed. Cir. R. 25.1(a)(4).

| Date | Dkt. | Document | Appx Pages |
|---|---|---|---|
| 8/29/2025 | 574✦ | Plaintiffs' Counterstatement of Facts to Moderna's Motion for Summary Judgment | 5878<br>5883-5885<br>5892<br>5896-5897 |
| 8/29/2025 | 579 | Declaration of Matthew W. Lachman, Esq. in Support of Plaintiffs' Responsive Brief in Opposition to Moderna's Motion for Summary Judgment and in Support of Plaintiffs' Cross-Motion for Summary Judgment | 6007-6015 |
| 8/29/2025 | 579-10 | Exhibit 39, Hannah Brennan, et al., A Prescription for Excessive Drug Pricing: Leveraging Government Patent Use for Health, 18 Yale J.L. & Tech 275, dated 2016 | 6067-6068 |
| 8/29/2025 | 579-11 | Exhibit 40, U.S. Senate Letter to the Secretary of HHS, dated July 28, 2021 | 6148-6154 |
| 8/29/2025 | 579-12 | Exhibit 41, U.S. Senate Letter to the Secretary of HHS, dated June 7, 2023 | 6155-6157 |
| 8/29/2025 | 579-13 | Exhibit 42, Centers for Medicare & Medicaid Services ("CMS"), Estimated Impacts of Proposed National Hepatitis C Elimination Program on Medicaid and Medicare, dated June 14, 2024 | 6158-6159 |
| 8/29/2025 | 571-19*<br>579-19† | Exhibit 48, Opening Expert Report of Dr. Michael Mitchell, dated November 25, 2024[6] | 6357-6358<br>6360-6363<br>6369-6370<br>6572-6580<br>6582-6583<br>6586-6587 |

[6] This document contains highlighting that appeared on the original document in the record.

| Date | Dkt. | Document | Appx Pages |
|---|---|---|---|
| 8/29/2025 | 579-27 | Exhibit 56, Excerpt from the Deposition Transcript of George Rutherford, dated March 27, 2025 | 6690-6693 |
| 8/29/2025 | 579-50 | Exhibit 79, Excerpt from the Deposition Transcript of Said E. Francis, dated May 22, 2024 | 6817-6821 |
| 8/29/2025 | 579-51 | Exhibit 80, Email from S. Whoriskey to S. Hoge, dated February 11, 2013 | 6825-6826 |
| 8/29/2025 | 579-53 | Exhibit 82, Expert Report of Catharine Lawton, dated November 25, 2024 | 6831-6833 |
| 8/29/2025 | 579-57 | Exhibit 86, Email Communication between D. Parsons and J.J. Schariter, dated October 4, 2020 | 6843-6845 |
| 8/29/2025 | 579-59 | Exhibit 88, Email Communication between M. Cornebise and K. Benenato, dated November 15, 2019 | 6850-6851 |
| 9/15/2025 | 596 | Moderna's Reply in Support of Its Motion to Exclude Expert Opinions of Mr. Pitts and Mr. Brill; Moderna's Opposition to Plaintiffs' Motion to Exclude Expert Testimony of Dr. Rutherford, Dr. Vellturo, and Dr. Prud'homme; Moderna's Motion to Exclude Expert Opinions of Dr. Mitchell Regarding Plaintiffs' Cross-Motion for Summary Judgment | 6922<br>6932-6933<br>6935 |
| 9/15/2025 | 607 | Moderna's Responses to Plaintiffs' Counterstatement of Facts to Moderna's Motion for Summary Judgment | 7044<br>7050-7062<br>7066<br>7072<br>7077-7080<br>7096-7098<br>7180<br>7187<br>7189 |

| Date | Dkt. | Document | Appx Pages |
|---|---|---|---|
| 9/15/2025 | 600 | Declaration of Mark C. McLennan in Support of Moderna's Reply in Support of Motion to Exclude Motion for Summary Judgment | 7236-7242 |
| 9/15/2025 | 600-7 | Exhibit 90, Excerpts from the Deposition Transcript of Robert Johnson, dated September 10, 2024 | 7331-7332<br>7383-7386<br>7389-7391<br>7397-7406<br>7456-7458 |
| 9/15/2025 | 600-27 | Exhibit 115, Amendment P00008 to C-100 Contract, dated June 16, 2021 | 7983-7984<br>7994 |
| 9/15/2025 | 600-31 | Exhibit 119, Plaintiff Genevant Sciences GMBH's First Supplemental Responses and Objections to Defendants' Fourth Set of Interrogatories (Nos. 14-17), dated June 7, 2024 | 8019-8020<br>8031-8036 |
| 9/23/2025 | 616✦ | Plaintiffs' Reply Affirmative Statement of Uncontested Facts in Support of Their Cross-Motion for Summary Judgment | 8171<br>8174-8183 |
| 1/23/2026 | 691 | Proposed Joint Pretrial Order | 8535<br>8540-8541 |
| 3/24/2025 | 761 | Notice of Appeal | 8635-8638 |
| 10/3/2023 | 134 | Moderna's Letter to Court | 8639-8642 |
| 10/3/2023 | 134-2 | Exhibit I, Plaintiffs' Letter regarding Discovery, dated July 11, 2023 | 8643-8646 |
| 12/16/2025 | 672-3 | Exhibit Y, Moderna's Offer Letter to HHS, dated May 31, 2020 | 8680-8682 |
| 2/11/2026 | 717 | Declaration of Mark McLennan in Support of Moderna's Motions in *Limine* | 8683-8692 |
| 2/11/2026 | 717-6 | Exhibit Y, Excerpts from the Deposition Transcript of Hamilton Bennett, dated May 20, 2024 | 8693-8696 |

## CONFIDENTIAL MATERIAL OMITTED

Portions of pages 1488-1489, 1493, 1498, 1503, 1509, 1514-1515, 1519, 4874, 6360-6361, 6577-6579, 6582, 6586-6587 were filed under seal in the district court subject to the protective order included in Volume I of the Appendix. The confidential information in the excerpted pages relates to confidential information regarding the underlying technology in this case.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ARBUTUS BIOPHARMA CORPORATION and GENEVANT SCIENCES GmbH,<br><br>Plaintiffs,<br><br>v.<br><br>MODERNA, INC. and MODERNATX, INC.<br><br>Defendants. | C.A. No. 22-252 (MSG) |
| MODERNA, INC. and MODERNATX, INC.,<br><br>Counterclaim-Plaintiffs,<br><br>v.<br><br>ARBUTUS BIOPHARMA CORPORATION and GENEVANT SCIENCES GmbH,<br><br>Counterclaim-Defendants. | |

**STIPULATED PROTECTIVE ORDER**

Disclosure and discovery activity in the above-captioned action may call for the production or disclosure of trade secret or other proprietary or confidential research, development, or commercial information within the meaning of Fed. R. Civ. P. 26(c), other private or competitively sensitive information, and/or personally identifiable information for which protection from public disclosure and from use for any purpose other than prosecuting and defending the above-captioned action is warranted. Accordingly, Plaintiffs Arbutus Biopharma Corporation ("Arbutus") and Genevant Sciences GmbH ("Genevant") and Defendants Moderna, Inc. and ModernaTX, Inc. (collectively, "Moderna") (Plaintiffs and Defendants may be referred to herein as individually as a "Party," or collectively as the "Parties"), hereby stipulate to and ask the Court to enter this Stipulated Protective Order ("Order") pursuant to Fed. R. Civ. P. 26(c) and Fed. R. Evid. 502(d).

The Court retains the right to allow disclosure of any subject covered by this Order or to modify this Order at any time in the interest of justice.

Case: 26-1581 Document: 56-1 Page: 15 Filed: 08/21/2026

## I. DEFINITIONS

1.1 Challenging Party means a Party or Non-Party that challenges the designation of information or items under this Order.

1.2 "CONFIDENTIAL" Material means any Discovery Material a Producing Party has, subject to the provisions of this Order, designated as "CONFIDENTIAL," based on the Producing Party's reasonable and good faith belief that the Discovery Material constitutes or reveals information or material not generally known and which the Producing Party would normally not reveal to third parties, including but not limited to:

(a) Confidential business information;

(b) Sales figures and projections, which will be designated "CONFIDENTIAL";

(c) the lipid molar ratio of the Accused Products and the lipid molar ratio of products developed or licensed by Plaintiffs (for clarity, the lipid molar ratio itself will be treated CONFIDENTIAL, but not necessarily documents that disclose such lipid molar ratios, which are to be designated according to the criteria in this paragraph 1.2 and paragraph 1.8);

(d) Non-public communications with regulators or other governmental bodies that are protected from disclosure by statute or regulation;

(e) Information, materials, and/or other documents reflecting non-public business or financial strategies, and/or confidential competitive information which, if disclosed, could result in competitive harm to the disclosing party;

(f) Sensitive, non-public personal, client, or customer information concerning individuals or other entities.

(g) Information as to which applicable law – foreign or domestic, including but not limited to the EU General Data Protection Regulation – requires the equivalent of

"CONFIDENTIAL" treatment or other protection from unauthorized disclosure as set forth in this Order.

1.3 Counsel (without qualifier) means Outside Counsel and In-House Counsel.

1.4 Designating Party means any Party or Non-Party that designates Discovery Material produced by itself or any other Producing Party as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY."

1.5 Designated In-House Counsel means In-House Counsel who seek access to "CONFIDENTIAL" information in this action. Unless otherwise agreed to by the Parties, Designated In-House Counsel means up to two (2) in-house attorneys for Arbutus, (2) in-house attorneys for Genevant, and two (2) in-house attorneys for Defendants. Designated In-House Counsel for Genevant may be employed by Genevant Sciences Ltd., Genevant Sciences, Inc., Genevant Sciences Corporation, or Genevant Sciences GmbH. If Designated In-House Counsel ceases to be employed by the respective party, that party may substitute Designated In-House Counsel with written notice to all other Parties, which shall include the name, job title, and affiliation of the Designated In-House Counsel to be substituted. In the event of such a substitution, the new Designated In-House Counsel may not receive "CONFIDENTIAL" information for seven (7) days after the notice is provided. In the event of an objection to the substitution of Designated In-House Counsel during this period, the Parties will meet-and-confer and the objecting party will have seven (7) days after the objection to initiate the applicable dispute resolution mechanism. Initial Designated In-House counsel, and their present job titles and affiliations, are set forth below:

For Arbutus:

(1) [To be named at a later date].

(2) [To be named at a later date].

For Genevant:

(1) Peter Zorn, President and Chief Legal Officer, Genevant Sciences, Inc.

(2) [To be named at a later date].

For Defendants:

(1) [To be named at a later date].

(2) [To be named at a later date].

1.6 Discovery Material means all items or information, regardless of the medium or manner in which it is generated, stored or maintained (including, among other things, testimony, transcripts, and tangible things), that are produced in this action.

1.7 Expert and/or Consultant means a person with specialized knowledge or experience in a matter pertinent to this action, along with his or her employees and support personnel, who has been retained by a Party or its Counsel to serve as an expert witness or a consultant in this action, and who is not currently an employee of a Party and who, at the time of retention, is not anticipated to become an employee of a Party.

1.8 "HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY" Material means any Discovery Material a Producing Party has, subject to the provisions of this Order, designated as "HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY" based on the Producing Party's reasonable and good faith belief that the Discovery Material constitutes or reveals:

(a) Confidential trade secret, know-how, personnel, financial, or other proprietary information the disclosure of which would result in competitive, commercial, of financial harm to the Producing Party or its personnel, clients, or customers;

(b) Information that is likely to cause harm to the interests of individuals (e.g., research subjects or patients) who are not parties to this litigation.

1.9 In-House Counsel means the individuals listed in Paragraph 1.5.

1.10 Non-Party means any natural person or entity that is not a named Party to this action.

1.11 Outside Counsel means attorneys, along with their paralegals and other support personnel assisting them with this action (including temporary or contract staff, assistants, and other employees of the respective law firms of Outside Counsel), who are not employees of a Party and who have entered an appearance in this action and did not file a notice of withdrawal before February 10, 2023.

1.12 Party means any party to this action, including all of its officers, directors, employees, consultants, retained Experts, and Outside Counsel (and their support personnel).

1.13 Privileged Material means Discovery Material protected from disclosure under the attorney-client privilege, attorney work product doctrine, United States or foreign bank disclosure laws or regulations, and/or any other applicable United States or foreign statute, law, regulation, privilege, or immunity from disclosure.

1.14 Producing Party means any Party or Non-Party that produces Discovery Material in this action.

1.15 Professional Vendors means persons or entities that provide litigation support services (e.g., photocopying; videotaping; translating; preparing exhibits or demonstrations; organizing, storing, or processing data in any form or medium) and their employees and subcontractors.

1.16 Protected Material means any Discovery Material designated as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY."

1.17 Receiving Party means any Party or Non-Party that receives Discovery Material from a Producing Party.

**II. SCOPE**

2.1 The protections conferred by this Order cover not only Protected Material, but also:

(a) Any information copied or extracted from Protected Material;

(b) All copies, excerpts, summaries, or compilations of Protected Material; and

(c) Any testimony, conversations, or presentations by Parties or their Counsel that might reveal Protected Material.

2.2 The protections conferred by this Order do not cover the following information:

(a) Any information that is in the public domain at the time of disclosure to a Receiving Party or becomes part of the public domain after its disclosure to a Receiving Party as a result of publication not involving a violation of this Order, including becoming part of the public record through litigation or otherwise; and

(b) Any information known to the Receiving Party prior to the disclosure or obtained by the Receiving Party after the disclosure from a source who obtained the information lawfully and under no obligation of confidentiality to the Designating Party.

(c) Any use of Protected Material at trial shall be governed by a separate agreement or order.

**III. DURATION**

3.1 The confidentiality obligations imposed by this Order shall remain in effect (including after an order, mandate, or dismissal terminating this action with prejudice) until the

Designating Party agrees otherwise in writing, this Court orders otherwise, or the information is made public by the Designating Party.

**IV. DESIGNATING PROTECTED MATERIAL**

4.1 Manner and Timing of Designations: Except as otherwise provided in this Order, or as otherwise stipulated or ordered, material that qualifies for protection under this Order must be clearly so designated before the material is disclosed or produced. Designation in conformity with this Order requires:

(a) For documents in hardcopy form or any other tangible items, that the Producing Party affix the legend "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY" to each page that contains Protected Material in such a way so as not to obscure any part of the text or content or in a prominent place on the item itself or exterior of the container or containers in which the information or item is stored.

(b) In the case of electronically stored documents, that the Producing Party note on the image for each document or in the file name when noting on the image is not practicable, in any suitable and readily viewable manner, "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY". Whenever a Receiving Party to whom electronically stored Discovery Material so designated is produced reduces such information to hard copy form, to the extent such pages have not previously been marked by the Producing Party, such Receiving Party shall mark the hard copy by affixing the designation to such document.

(c) For deposition transcripts, that the Designating Party or Non-Party identify on the record, before the close of the deposition, all protected testimony and specify the level of protection being asserted. Alternatively, a Designating Party or Non-Party may specify, at the deposition, or up to 30 days after receipt of the final transcript or recording that (1) the entire transcript shall be treated as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – OUTSIDE

COUNSEL'S EYES ONLY"; or (2) the designating Party or Non-Party may designate the specific portions of the testimony as to which protection is sought and specify the level of protection being asserted. Only those portions of the testimony that are appropriately designated for protection within the 30 days, subject to any other time periods agreed upon by the Parties and Non-Parties, shall be covered by the provisions of this Protective Order.

The use of a document as an exhibit at a deposition shall not in any way affect its designation as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY."

Transcripts containing Protected Material shall have an obvious legend on the title page that the transcript contains Protected Material, and when the entire transcript has not been so designated the title page shall be followed by a list of all pages (including line numbers as appropriate) that have been designated as Protected Material and the level of protection being asserted by the Designating Party. The Designating Party shall inform the court reporter of these requirements. Any transcript prepared before the expiration of the 30-day period for designation shall be treated during that period as if it had been designated "HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY" in its entirety unless otherwise agreed. After the expiration of that period, and any extensions agreed upon by the Parties (and Non-Parties where applicable), the transcript shall be treated only as actually designated.

(d) For reports created by an Expert or Consultant relying on or incorporating Protected Material in whole or in part, that the Party responsible for its creation include the confidentiality designation "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY" on the report.

4.2 Inadvertent Failures to Designate: If corrected, an inadvertent failure to designate qualified information or items does not waive the Designating Party's right to secure protection under this Order for such material of the Producing Party learning of the inadvertent failure to designate. The Party discovering such inadvertent failure to designate must promptly notify counsel for the Receiving Party in writing. Upon such notification of an inadvertent failure to designate, the Receiving Party must make reasonable efforts to assure the material is treated in accordance with the provisions of this Order and notify the Producing Party of any disclosure of the Protected Material, including identifying the persons or entities to whom the Protected Material was disclosed, within ten (10) days of the notification by the Producing Party. The Producing Party shall reproduce the Protected Material with the correct confidentiality designation upon its notification to the Receiving Party. Upon receiving the Protected Material with the correct confidentiality designation, the Receiving Party shall return or securely destroy all Discovery Material that was not designated properly.

A Receiving Party shall not be in breach of this Order for any use of such Discovery Material before the Receiving Party receives notice that such Discovery Material is protected under one of the categories of this Order.

4.3 Upward Designation of Information or Items Produced by Other Parties or Non-Parties: A Party may upward designate (i.e., change any Discovery Material produced without a designation of "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY" to one of those designations, or change any Discovery Material produced as "CONFIDENTIAL" to a designation of "HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY") any Discovery Material produced by another Party or Non-Party, provided that said Discovery Material contains the upward Designating Party's "CONFIDENTIAL" or

"HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY" Material, or otherwise is entitled to protective treatment under Federal Rule of Civil Procedure 26(c) or other law, foreign or domestic, such that the upward designation is appropriate under the terms of this Order. Upward designation shall be accomplished by providing written notice to all Parties identifying (by Bates number or other individually identifiable information) the Discovery Material to be re-designated. Any Party may object to the upward designation of Discovery Material pursuant to the procedures set forth in Section V regarding challenging designations.

**V. CHALLENGING CONFIDENTIALITY DESIGNATIONS**

5.1 Timing of Challenges: Any Party or Non-Party may challenge a designation of confidentiality at any time consistent with the Court's Scheduling Order. A Party does not waive its right to challenge a confidentiality designation by electing not to mount a challenge promptly after the original designation is disclosed.

5.2 Meet and Confer: If a Party elects to challenge a Designating Party's confidentiality designation, it must do so in good faith and must begin the process by notifying the Designating Party in writing of its challenge and identifying the challenged material with as much specificity as reasonably practical, including for example, by production number, and by providing a basis for the challenge. The objecting Party and the Designating Party shall, within seven (7) days after service of the written objections, meet and confer concerning the objections, unless otherwise agreed. The Parties shall meet and confer regarding any challenge to confidentiality designations before raising those disputes with the Court.

5.3 Judicial Intervention: If the Parties are not able to resolve a dispute about a confidentiality designation during the meet and confer process set forth in Section 5.2, the Party challenging the designation may seek relief promptly from the Court in accordance with its rules and procedures. At all times, the Designating Party carries the burden of establishing the propriety

of the designation and protection level. Until the Court rules on the dispute, all Parties shall continue to afford the material in question the level of protection to which it is entitled under the Designating Party's designation. In the event the Court rules that the challenged material's designation should be changed, the Designating Party shall reproduce copies of all materials with their designations removed or changed in accordance with the ruling.

**VI. ACCESS TO AND USE OF DISCOVERY MATERIAL**

6.1 Basic Principles. A Receiving Party may access or use Protected Material that is disclosed or produced by a Producing Party only in connection with the prosecution of, defense of, appeal of, attempted settlement of, or the enforcement of insurance rights with respect to this action or any related appellate proceeding. Except as required by law, Discovery Material may not be used for any other purpose, including, without limitation, any business or commercial purpose, contractual demands, or any purpose related to any other investigation or proceeding. With respect to disclosure of Discovery Material as required by law, the party intending to reveal such Discovery Material shall provide reasonable notice and opportunity to object to the party that produced the Discovery Material, unless consent from the party that produced the Discovery Material was previously obtained. Protected Material may be disclosed only to the categories of persons and under the conditions described in this Order. Following the termination of this action, each Receiving Party must comply with the provisions of Section 12.1, below.

6.2 This Order does not preclude any Party or Non-Party from using Protected Material with the consent of the Designating Party or by order of the Court.

6.3 The recipient of any Protected Material shall maintain such material in a secure and safe area and shall exercise a standard of due and proper care with respect to the storage, custody, use, and/or dissemination sufficient under all applicable laws to safeguard against unauthorized or inadvertent disclosure of such material to persons or entities not authorized under this Order.

6.4 Disclosure of Confidential Material: Unless otherwise ordered by the Court or permitted in writing by the Designating Party, material designated "CONFIDENTIAL" may be disclosed by a Receiving Party only to the following persons:

(a) The Receiving Party's Outside Counsel;

(b) Designated In-House Counsel of the Receiving Party who have signed the "Agreement To Be Bound By Protective Order" (Exhibit A), following the required disclosure procedure set forth in Paragraph 1.5;

(c) Experts and/or Consultants retained by a Party or its Counsel to serve as an expert witness or as a consultant in this action, following the disclosure procedure set forth in Paragraph 6.6, provided that Counsel, in good faith, requires their assistance in connection with this action; and provided further that any part of a report created by such expert or consultant incorporating Protected Material in whole or in part shall be designated appropriately by the Party responsible for its creation; and provided further that experts or consultants may not use Protected Material for any purpose that does not relate to this action (including but not limited to other litigations and other work in their respective fields);

(d) The Court and its personnel;

(e) Special masters, mediators, or other third parties who are appointed by the Court or retained by the Parties for settlement purposes or resolution of discovery or other disputes and their necessary personnel and, in the case of persons retained by the Parties, who have signed the "Agreement To Be Bound By Protective Order" (Exhibit A);

(f) Court reporters and/or videographers, their staffs, and Professional Vendors to the extent that such disclosure is reasonably necessary for this action and with respect to

Professional Vendors only, those Professional Vendors must first sign the "Agreement To Be Bound By Protective Order" (Exhibit A);

(g) The author, addressees, or recipients of the document, or any other natural person who reviewed or had access to such document during his or her employment as a result of the substantive nature of his or her employment position, or who is specifically identified as an author, addressee, or recipient in the document or its accompanying metadata;

(h) Current employees of the Designating Party;

(i) During their depositions or other evidentiary action, former employees of the Designating Party to whom disclosure is reasonably necessary, unless otherwise ordered by the Court;

(j) Professional jury or trial consultants or mock jurors who have signed the "Agreement To Be Bound By Protective Order" (Exhibit A);

(k) Any other person agreed to by the Designating Party in writing; and

(l) Any other person to whom the Court compels disclosure of the Confidential Material or to whom disclosure is required by law.

6.5 Disclosure of "HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY" Material: Material produced and marked as "HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY" may be disclosed by the Receiving Party only to individuals identified in Paragraphs 6.4(a), (c)-(l), unless otherwise ordered by the Court or permitted in writing by the Designating Party.

6.6 Any "HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY" material produced in discovery shall be made available in an electronic format allowing it to be reasonably reviewed and searched. The Receiving Party's Outside Counsel shall host any

electronically stored "HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY" material at their offices and/or the offices of any data hosting Professional Vendor employed by said Outside Counsel, provided that the following restrictions shall apply:

(a) Only Outside Counsel of record (and their support staff) and the hosting Professional Vendor employed by said Outside Counsel shall have direct access to the database(s) that store the entirety of the production of "HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY" material;

(b) The Receiving Party shall store "HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY" material in a secure electronic review database in such a manner as to allow the Receiving Party, if needed and with respect to a good-faith allegation of improper disclosure and upon order of the Court, to generate a list of the specific documents by Bates number from a Producing Party that a given individual has accessed or downloaded in the electronic review database. Outside Counsel shall be required only to track the identity of Outside Counsel who accessed specific documents in a secure electronic review database, but shall not otherwise be required to track Outside Counsel who had access to documents by other means such as a print copy, email, or the like. For clarity, the Receiving Party shall not be required to log any attorney work product or material subject to Fed. R. Civ. P. 26(b)(4) that cites, excerpts, or otherwise references "HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY" material. The Receiving Party shall, within a reasonable period of time, provide a copy of this log to the Producing Party upon request after order of the Court;

(c) The Receiving Party may provide access to "HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY" material to the individuals identified in Section 6.5. Except as otherwise provided herein, the Receiving Party may only provide such access to

"HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY" material to the individuals identified in Paragraphs 6.4 (c), (f), (j), and (k) through a secured web-based interface, a secure electronic review database, or a secure electronic file transfer portal (collectively, "**Secure File Platforms**") in such a manner as to allow the Receiving Party, if needed and with respect to a good-faith allegation of improper disclosure and upon order of the Court, to generate a list of the specific documents by Bates number from a Producing Party that a given individual has been provided access to and/or downloaded. For clarity, the Receiving Party shall not be required to log any attorney work product or material subject to Fed. R. Civ. P. 26(b)(4) that cites, excerpts, or otherwise references "HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY" material. The Receiving Party shall, within a reasonable period of time, provide a copy of this log to the Producing Party upon request after order of the Court; and

(d) The Receiving Party shall maintain all paper copies of any printed portions of the "HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY" material in a secured, locked area when not in use or in transport. When in use or transport, access to such materials shall be limited to those persons identified in 6.5. The Receiving Party shall not create any electronic or other images of the paper copies and shall not convert any of the information contained in the paper copies into any electronic format, except as provided in this section. The Receiving Party shall only make additional paper or electronic copies if such additional copies are (1) necessary to prepare court filings, pleadings, or other papers (including a testifying Expert's expert report), (2) necessary for deposition, or (3) otherwise necessary for the preparation of its case. Subject to Section XI and the foregoing provisions of Section 6.6, all copies of any portion of the "HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY" material in whatever form shall be securely destroyed if they are no longer in use.

6.7 Procedures for Approving or Objecting to Disclosure of "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY" Information or Items to Experts.

(a) Unless otherwise ordered by the Court or agreed to in writing by the Designating Party, a Party that seeks to disclose to an Expert any information or item that has been designated "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY" information first must make a written request to the Designating Party that (1) sets forth the full name of the Expert and the city and state of his or her primary residence and (2) attaches a copy of the Expert's most recent curriculum vitae or resume, (3) provides a list of all publications the Expert authored in the previous 10 years and a list of all other cases in which the Expert testified as an expert at trial or by deposition in the previous 4 years, (4) discloses any work the Expert has previously undertaken for any of the Parties, and (5) attaches a copy of the "Agreement To Be Bound By Protective Order" (Exhibit A) signed by the Expert. If the most recent curriculum vitae or resume of the Expert provides the information required under this paragraph, then the information need not be separately provided.

(b) A Party that makes a request and provides the information specified in the preceding paragraph may disclose the subject Protected Material to the identified Expert unless the Party receives a written objection from the Designating Party within seven (7) days of delivering the request, or as otherwise agreed by the parties. Any such objection must set forth in detail the grounds on which it is based.

(c) A Party that receives a timely written objection must meet and confer with the Designating Party to try to resolve the matter by agreement within seven (7) days of the written objection, or as otherwise agreed by the parties. If no agreement is reached, the Party seeking to

prevent the disclosure to the Expert must initiate the applicable dispute resolution mechanism within fourteen (14) days of the written objection, or as otherwise agreed by the parties.

In any such proceeding, the Party opposing disclosure to the Expert shall bear the burden of proving that the risk of harm the disclosure would entail (under the safeguards proposed) outweighs the Receiving Party's need to disclose the Protected Material to the Expert.

6.8 Retention of Exhibit A: Counsel for the Party that obtains the signed "Agreement To Be Bound By Protective Order" (Exhibit A), as required above, shall retain the hardcopy or electronic copy for six (6) months following the final termination of this action, including any appeals, and shall make them available to other Parties or the Court upon good cause shown.

**VII. PROSECUTION, FDA, AND COMPETITION BAR**

7.1 Absent written consent from the Producing Party, any individual who receives access to "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY" information shall not be involved in the prosecution of patents or patent applications pertaining to (1) lipid nanoparticles, (2) ionizable lipids for nucleic acid delivery, or (3) vaccines comprising nucleic acids; including without limitation the patents identified in this action and any patent or application claiming priority to the patents identified in this action, before any foreign or domestic agency, including the United States Patent and Trademark Office ("the Patent Office"). For clarity, the subject matter in (1) to (3) includes but is not limited to claims and disclosures directed to compositions, apparatuses, methods of manufacture, and methods of use. For purposes of this paragraph, "prosecution" includes directly or indirectly drafting, amending, or advising in a way that affects the scope of patent claims or the maintenance of pending claims. To avoid any doubt, In-House Counsel does not engage in "prosecution" for purposes of this paragraph solely by supervising, directly or indirectly, another individual who engages in prosecution. To further avoid any doubt, "prosecution" as used in this paragraph does not include advising on the

maintenance of issued patents or representing a party challenging or defending a patent before a domestic or foreign agency (including, but not limited to, a reissue protest, *ex parte* reexamination, *inter partes* reexamination, an *inter partes* review proceeding, and/or any similar administrative proceeding pertaining to an issued patent), except that an individual subject to this bar may not draft proposed amended claims in an *inter partes* review proceeding, or otherwise advise in a way that affects the scope of proposed amended claims. For the avoidance of doubt, "defending" a patent does not include involvement in drafting any new claims or claim amendments, which is not permitted under the previous sentence. This prosecution bar applies to all Outside Counsel. For avoidance of doubt, this prosecution bar applies on an individual-by-individual-basis to all Outside Counsel, not a firm-by-firm basis, and does not apply to individuals who have not entered an appearance or who filed a notice of withdrawal before February 10, 2023, so long as those individuals have not accessed "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY" information.

7.2 Absent written consent from the Producing Party, any individual who receives access to "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY" information shall not be involved in the preparation or submission of any FDA correspondence (e.g., citizen petitions) or any similar correspondence in any foreign country pertaining to (1) lipid nanoparticles, (2) ionizable lipids for nucleic acid delivery, or (3) vaccines comprising nucleic acids, unless requested by the FDA or otherwise required by law. In such communications, drafting, and reviewing, however, no such individual shall quote, cite, or refer to any material subject to a confidentiality obligation under this Protective Order and not otherwise known to that individual or to the Party on whose behalf that individual works.

7.3 Absent written consent from the Producing Party, any individual who accesses "HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY" information shall not be involved in any Competitive Decision-Making (strategic business decisions, including marketing, financial, product development/design, and pricing decisions, on issues affecting competition) relating to (1) lipid nanoparticles, (2) ionizable lipids for nucleic acid delivery, or (3) vaccines comprising nucleic acids, for the duration of these actions and for one year after entry of final judgment from which no appeal may be taken (or the dismissal of these actions) without first obtaining (1) consent from the Producing Party or (2) an order from the Court. Competitive Decision-Making shall be interpreted consistently with the Federal Circuit's decision in *In re Deutsche Bank*, 605 F.3d 1373 (Fed. Cir. 2010), and shall not include decision-making as an attorney related to this action.

7.4 The Prosecution and FDA Bar shall begin when the Designating Party first discloses "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY" information and shall end one (1) year after final termination of this action.

**VIII. UNAUTHORIZED DISCLOSURE OF PROTECTED MATERIAL**

8.1 If a Receiving Party learns that, by inadvertence or otherwise, it has disclosed Protected Material to any person or in any circumstance not authorized under this Order, the Receiving Party must immediately (a) notify in writing the Designating Party of the unauthorized disclosures, including identifying the persons or entities to whom the disclosure was made, (b) use its best efforts to retrieve all copies of the Protected Material, (c) inform the person or persons to whom unauthorized disclosures were made of all the terms of this Order, and (d) request such person or persons to execute the "Agreement To Be Bound By Protective Order" (Exhibit A). Unauthorized or inadvertent disclosure does not change the status of Discovery Material or waive a Producing Party's right to maintain the disclosed document or information as Protected Material.

## IX. INADVERTENT PRODUCTION OF PRIVILEGED OR OTHERWISE PROTECTED MATERIAL

9.1 Pursuant to Federal Rule of Evidence 502(d), the production of documents or materials that the Producing Party thereafter claims to be subject to the attorney-client privilege, work-product immunity, or other privilege or immunity ("Privileged Information") shall not constitute a waiver of, or estoppel as to, any claim of privilege or other protection, either as to the Protected Material or as to any other documents or communications embracing the same or similar subject matter, in the above-captioned action or any other federal or state proceeding. This Order shall be interpreted to provide the maximum protection allowed by Federal Rule of Evidence 502(d).

9.2 Upon discovery by a Producing Party (whether by notice from the Receiving Party or otherwise) that it did or may have produced Privileged Information, the Producing Party shall, within five (5) business days of such discovery, request the return or deletion of such Privileged Information by sending a written notification ("Clawback Notice") to the Receiving Party, which shall identify the documents or ESI in question by Bates number or otherwise and the basis on which the Privileged Information should have been withheld from production. The requirements in this paragraph apply equally to instances in which a Producing Party discovers during a deposition that it did or may have produced Privileged Information. For purposes of this Protective Order, "discovery" shall mean "actual notice;" the production of Privileged Information alone is insufficient to constitute actual notice.

9.3 After receiving a Clawback Notice from the Producing Party that documents or materials subject to the attorney-client privilege, work-product immunity, or other protection have been produced, the Receiving Party shall not review, copy, or otherwise disseminate the documents or materials, nor shall it disclose their substance. In addition, the Receiving Party shall

return the documents or materials and all copies within five (5) days from receiving notice, or provide written confirmation of the destruction of the original and all copies of the identified documents, including all documents and things generated by a Receiving Party which contain information derived, including through summary, description, or quotation, from the returned/destroyed materials. The Receiving Party shall not utilize the information contained in the returned/destroyed documents or materials for any purpose, or disseminate or transmit such information. The Producing Party shall, within ten (10) business days of the date of the Clawback Notice, reproduce any document or ESI that is comprised only partially of Privileged Information with the Privileged Information redacted.

(a) If the Receiving Party wishes to contest that any such document or thing is protected by the attorney-client privilege, work-product immunity, or other protection mandated by local law, the Receiving Party shall so notify the producing party in writing when the document or thing is returned to the Producing Party ("Notice of Designation").

(b) Within five (5) days after receiving a Notice of Designation, the Producing Party shall provide to the Receiving Party for each such document or thing a description of the basis for the claim of privilege, immunity, or other protection.

(c) Within five (5) days after the Receiving Party receives such description, the parties shall meet and confer in a good faith attempt to resolve the dispute. In the event that the Parties do not resolve their dispute, within five (5) days of the meet and confer, the Receiving Party may seek relief from the Court to compel production of such documents and things, the protection of which is still disputed. In any such motion to compel production of the returned/destroyed document, the Receiving Party shall not rely upon in any manner or assert as a

ground for ordering production the fact, circumstances, or contents of the production. Any such motion shall be filed under seal.

(d) The parties may stipulate to extend the time periods set forth in (b) and (c) above.

(e) The Producing Party retains the burden—upon challenge pursuant to paragraph (c)—of establishing the privileged or protected nature of the information in question.

(f) Nothing in this Order overrides any attorney's ethical responsibilities to refrain from examining or disclosing materials that the attorney knows or reasonably should know to be privileged and to inform the Producing Party that such materials have been produced. If a Receiving Party discovers that it is in receipt of a document or ESI that it reasonably believes might contain Privileged Information, it shall notify the Producing Party, and identify the document(s) or ESI in question, within ten (10) business days of such discovery.

(g) If, in a deposition, hearing, or other proceeding, the party who made the inadvertent production or disclosure makes a request on the record for return of the inadvertently produced or disclosed document or thing within a reasonably prompt period of time after recognizing that the information has been produced or disclosed, all copies of the inadvertently produced or disclosed document or thing present at the deposition, hearing, or other proceeding shall immediately be sequestered and there shall be no further use of the inadvertently produced or disclosed document or thing. For the avoidance of any dispute, the marking of an inadvertently produced or disclosed document or thing as an exhibit at a deposition, hearing, or other proceeding has no bearing on the timeliness of the request for return.

(h) Nothing in this order limits the right of any party to petition the Court for an in camera review.

(i) This order does not preclude a party from voluntarily waiving the attorney-client privilege or work product protection. The provisions of Federal Rule of Evidence 502(a) apply when the Producing Party uses or indicates that it may use information produced under this order to support a claim or defense.

(j) Under this order, Federal Rule of Evidence 502(b)(3) still applies to require prompt and reasonable steps to rectify erroneous disclosures.

**X. FILING PROTECTED MATERIAL**

10.1 A Party that seeks to file any Protected Material must file under seal. Filings submitted under seal must be accompanied by a motion to seal, in compliance with *In re Avandia, Mktg., Sales Practices, & Products Liab. Litig.*, 924 F.3d 662 (2019) and pursuant to Section G of the Administrative Procedures Governing Filing and Service by Electronic Means. Any Party that submits any filings under seal is responsible for preparing and filing timely the redacted version of such filings. A Party must minimize the amount of Protected Material being filed as much as practical, including by excerpting.

**XI. FINAL DISPOSITION**

11.1 Within 60 days after an order, mandate, or dismissal finally terminating the above-captioned action with prejudice, including all appeals, each Receiving Party must return all Protected Material to the Producing Party or destroy such material. As used in this subdivision, “all Protected Material” includes all copies, abstracts, compilations, summaries, and any other format reproducing or capturing any of the Protected Material. Whether the Protected Material is returned or destroyed, the Receiving Party must submit a written certification to the Producing Party (and, if not the same person or entity, to the Designating Party) by the 60 day deadline that affirms the Receiving Party has not retained any copies, abstracts, compilations, summaries or any other format reproducing or capturing any of the Protected Material. Notwithstanding this

provision, Counsel are entitled to retain an archival copy of all pleadings, motion papers, trial, deposition, and hearing transcripts, legal memoranda, correspondence, deposition and trial exhibits, Expert reports, attorney work product, Expert work product, work product of Professional Vendors, and work product of jury consultants, even if such materials contain Protected Material. Any such archival copies that contain or constitute Protected Material remain subject to this Protective Order.

11.2 This Order shall survive the termination of this action, and this Court shall have continuing jurisdiction for enforcement of its provisions following termination of this action. No part of the restrictions imposed by this Order may be waived or terminated, except by written stipulation executed by Counsel for each Designating Party or by an Order of the Court for good cause shown.

## XII. A DESIGNATING OR PRODUCING PARTY'S USE OF ITS OWN DOCUMENTS

12.1 Nothing in this Order shall be construed to limit in any way any Producing Party's, Receiving Party's, or any other person's use of its own documents, including documents obtained independently and lawfully from sources other than a Producing Party, nor shall it affect any Producing Party's, Receiving Party's, or any other person's subsequent waiver of its own prior designation with respect to its own "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY" Material.

## XIII. LEGAL PROCESS

13.1 If a Receiving Party is served with a discovery request, subpoena, or an order issued in other litigation, or receives some other form of legal process or request from any court, federal or state regulatory or administrative body or agency, legislative body, self-regulatory organization, or other person or entity purporting to have authority to require the production thereof, that seeks

disclosure of any information or items designated in this Action as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY," the Receiving Party must promptly notify, to the extent permitted by law and the rules, requirements, or requests of any relevant governmental or self-regulatory organization, the Designating Party, in writing (by electronic mail and overnight courier, if possible), and shall provide the Producing Party with an opportunity to object to the production of such materials.

13.2 The notice shall include a copy of the discovery request, subpoena, order, or other form of legal process.

13.3 If the Designating Party timely seeks a protective order, the Party served with the subpoena or court order shall not produce any information designated in this action as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY" before a determination by the court from which the subpoena or order issued, unless the Party has obtained the Designating Party's permission. The Designating Party shall bear the burden and expense of seeking protection in that court of its confidential material and nothing in these provisions should be construed as authorizing or encouraging a Receiving Party in this action to disobey a lawful directive from another court.

**XIV. NON-PARTIES**

14.1 Any Party, in seeking discovery from Non-Parties in connection with this action, shall provide any Non-Party from which it seeks discovery with a copy of this Order so as to inform each such Non-Party of his, her, or its rights herein. If a Non-Party provides discovery to any Party in connection with this action, the provisions of this Order shall apply to such discovery as if such discovery were being provided by a Party. Under such circumstances, the Non-Party shall have the same rights and obligations under the Order with respect to designating material as Protected Material set forth in this Order for the Parties to this action. Any Non-Party producing

Discovery Material or giving deposition testimony in this action may avail herself, himself, or itself of the provisions of this Protective Order available to "Parties" for her, his, or its testimony and Discovery Material by executing Exhibit A to this Order and informing the Party that served the subpoena of the same.

**XV. NOTICES**

15.1 All notices required by this Order must be provided by email to Outside Counsel of record for each Party. If applicable, notices to a Non-Party shall be in writing. Any of the notice requirements herein may be waived in whole or in part, but only in writing by an attorney for the Designating Party.

**XVI. AMENDMENT OF ORDER**

16.1 This Order is without prejudice to the right of any Party to seek further or additional protection of information for which the protection of this Order is believed by any Party to be inadequate, and nothing herein shall preclude any Party from seeking to amend this Order in writing for good cause, in the form of a written Amended Stipulated Protective Order signed by each Party's Outside Counsel and filed with the Court for approval. Nor shall anything herein preclude any Party or Non-Party from seeking additional or different protections on a case-by-case basis, including, without limitation, an order that certain information may not be discovered at all.

**XVII. MISCELLANEOUS**

17.1 Right to Assert Other Objections: By stipulating to the entry of this Order, no Producing Party waives any right it otherwise might have to object to disclosing or producing any information or item on any ground not addressed in this Order. Similarly, no Producing Party waives any right to object on any ground to use in evidence of any of the material covered by this Order.

17.2 Counsel's Right to Provide Advice: Nothing in this Order shall bar or otherwise restrict any counsel herein from rendering advice to the counsel's party-client with respect to this action, and in the course thereof, relying upon an examination of Protected Material, provided, however, that in rendering such advice and in otherwise communicating with the party-client, the counsel shall not disclose any Protected Material to anyone not authorized to receive such Protected Material pursuant to the terms of this Order.

17.3 No Modification of Privileges: Except as provided, nothing in this Order shall modify the law regarding the attorney-client privilege, the attorney work product doctrine, the joint defense privilege, and any other applicable privilege or reason for non-disclosure with respect to trade secrets or other confidential information to the extent such privilege or protection exists under applicable law.

17.4 No Waiver: Review of "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY" information as permitted in Section VI above in connection with this action shall not waive the confidentiality of the information or objections to production. The inadvertent, unintentional, or *in camera* disclosure of "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY" information shall not, under any circumstances, be deemed a waiver, in whole or in part, of any Party's claims of confidentiality.

17.5 Execution: This Order shall become effective as a stipulation as among the executing Parties immediately upon written agreement of the Parties, subject to any subsequent modifications if and when so-ordered by the Court. Execution of this Order shall not constitute a waiver of the right of any Party to claim in this action or otherwise that any document,

communication, or any portion thereof, is privileged or otherwise non-discoverable, or is not admissible in evidence in this action or any other proceeding.

17.6 Successors: This Order shall be binding upon the Parties hereto, their successors, and anyone else who obtains access to Protected Material.

17.7 Other Proceedings. By entering this order and limiting the disclosure of information in this case, the Court does not intend to preclude another court from finding that information may be relevant and subject to disclosure in another case. Any person or Party subject to this order who becomes subject to a motion to disclose another Party's Protected Material shall promptly notify that party of the motion so that the party may have an opportunity to appear and be heard on whether that information should be disclosed.

SHAW KELLER LLP

*/s/ Nathan R. Hoeschen*

John W. Shaw (#3362)
Karen E. Keller (#4489)
Nathan R. Hoeschen (#6232)
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
kkeller@shawkeller.com
nhoeschen@shawkeller.com

*Attorney for Plaintiffs*

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Travis J. Murray*

Jack B. Blumenfeld (#1014)
Brian P. Egan (#6227)
Travis J. Murray (#6882)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
began@morrisnichols.com
tmurray@morrisnichols.com

*Attorneys for Defendants*

OF COUNSEL:

David I. Berl
Adam D. Harber
Thomas S. Fletcher
Shaun P. Mahaffy
Jessica Palmer Ryen
Anthony H. Sheh
Lydia B. Cash
WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW
Washington, DC 20024
(202) 434-5000

*Attorneys for Plaintiff Genevant Sciences GmbH*

Daralyn J. Durie
Shaelyn K. Dawson
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105-2482
(415) 268-6080

Kira A. Davis
MORRISON & FOERSTER LLP
707 Wilshire Boulevard
Los Angeles, CA 90017-3543
(213) 892-5200

David N. Tan
MORRISON & FOERSTER LLP
2100 L Street, NW, Suite 900
Washington, DC 20037

*Attorneys for Plaintiff Arbutus Biopharma Corporation*

OF COUNSEL:

James F. Hurst
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
(312) 862-2000

Patricia A. Carson, Ph.D.
Jeanna M. Wacker, P.C.
Mark C. McLennan
Nancy Kaye Horstman
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800

Yan-Xin Li
KIRKLAND & ELLIS LLP
555 California Street, 27th Floor
San Francisco, CA 94104
(415) 439-1400

Alina Afinogenova
KIRKLAND & ELLIS LLP
200 Clarendon Street
Boston, MA 02116
(617) 385-7500

SO ORDERED this 28th day of April, 2023.

***/s/ Mitchell S. Goldberg***
UNITED STATES DISTRICT COURT JUDGE

**EXHIBIT A**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ARBUTUS BIOPHARMA CORPORATION and GENEVANT SCIENCES GmbH,

Plaintiffs,

v.

MODERNA, INC. and MODERNATX, INC.

Defendants.

MODERNA, INC. and MODERNATX, INC.,

Counterclaim-Plaintiffs,

v.

ARBUTUS BIOPHARMA CORPORATION and GENEVANT SCIENCES GmbH,

Counterclaim-Defendants.

C.A. No. 22-252 (MSG)

**Agreement To Be Bound By Protective Order**

I, ______________________________________, have been informed that on ___________________________, the U.S. District Court for the District of Delaware entered a protective order in the above-captioned litigation (the "Protective Order"). I have read the Protective Order, I agree to abide by the obligations of the Protective Order as they apply to me, and I voluntarily submit to the jurisdiction of the U.S. District Court for the District of Delaware for purposes of any proceeding related to the Protective Order, including my receipt or review of information that has been designated as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY."

Dated: ____________________________ By: ____________________________________________

Printed Name:

____________________________

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| **ARBUTUS BIOPHARMA CORPORATION and GENEVANT SCIENCES GMBH,**<br><br>*Plaintiffs*,<br><br>v.<br><br>**MODERNA, INC. and MODERNATX, INC.,**<br><br>*Defendants*. | **Case No. 1:22-cv-00252-JDW** |

**MEMORANDUM**

In Star Trek, members of Starfleet must observe the Prime Directive, even as they jump into or come out of warp speed. In this case, Arbutus Biopharma Corp. and Genevant Sciences GmbH (collectively, "Arbutus") claim that during the U.S. Government's own Operation Warp Speed to find a vaccine for Covid-19, Moderna Inc. and ModernaTX, Inc. (collectively, "Moderna") violated the Prime Directive of patent law: don't copy other people's inventions. Moderna asks me to hold as a matter of law that when it jumped to warp speed to make a Covid-19 vaccine, it did so for the Government, meaning the claims in this case belong in the Court Of Federal Claims. It also argues that Arbutus can't pursue claims under the doctrine of equivalents and that Arbutus's patents are invalid. For the reasons that follow, I conclude that most of this dispute belongs in this Court and that factual disputes require a jury to decide if the patents are invalid. But I also hold that the

prosecution history of some of Arbutus's patents forecloses Arbutus's doctrine-of-equivalents claims based on the molar ratios in Moderna's Covid-19 vaccine. For Arbutus to succeed on those claims, it will have to prove literal infringement.

## I. BACKGROUND

### A. LNP Technology

For many years, modern medicine fought viral infections with traditional vaccines, which work by introducing a weakened or inactive form of the virus into the body to teach the body's immune system how to recognize and attack the real virus. In recent years though, scientists have come up with a new class of vaccinations that introduce nucleic acids, such as DNA or RNA, into the body's cells to instruct them how to defend against a particular virus. Nucleic acids are fragile. They require some sort of protection for safe delivery into a person's body. It took years for scientists to develop a way to protect and transport nucleic acids across the cell membrane.

Liquid-nanoparticle ("LNP") technology provides a solution to that problem. It uses fat-like molecules known as lipids to encapsulate and protect the nucleic acids as they cross the cell membrane and consists of three components: (1) structural lipids, such as phospholipids and cholesterol; (2) cationic lipids, including ionizable lipids that have a positive charge at certain pH levels; and (3) conjugated lipids, which are lipids attached to a polymer such as polyethyleneglycol. Essentially, when one combines a nucleic acid with a particular ratio of structural, cationic, and conjugated lipids, an LNP forms. That LNP is

a lipid-based particle in which lipids surround the nucleic acid, so that the nucleic acid can safely cross the cell membrane into the cell. Once inside the cell, the lipids release the nucleic acid so that it can instruct the cell to fight a particular virus.

### B. Arbutus's Patents

Arbutus claims that its scientists invented LNP technology and then applied for (and received) several patents. One category of patents, the "Molar Ratio Patents"[1] claims the particles comprising the nucleic acid and the various lipids in specific molar ratio amounts.[2] A separate patent, the '651 Patent,[3] claims a new method for developing LNPs involving continuously and rapidly mixing two solutions to form lipid vesicles that can encapsulate nucleic acids.

#### 1. The Molar Ratio Patents

The Molar Ratio Patents are all part of one patent family in which the '069 Patent is the parent. The original '069 Patent application included the following claim:

> A nucleic acid-lipid particle comprising:
>
> (a) a nucleic acid;
>
> (b) a cationic lipid comprising from about 50 mol % to about 65 mol % of the total lipid present in the particle;
>
> (c) a non-cationic lipid comprising a mixture of a phospholipid and

---

[1] The Molar Ratio Patents include U.S. Patent Nos. 8,058,069; 8,492,359; 8,822,668; 9,364,435; and 11,141,378.

[2] On, May 29, 2025, Judge Goldberg ordered Arbutus to narrow the number of asserted patents to "no more than four." (D.I. 475 at 3.) As a result, Arbutus is no longer asserting claims based on the '069 Patent or the '668 Patent.

[3] U.S. Patent No. 9,504,651.

cholesterol or a derivative thereof, wherein the phospholipid comprises from about 4 mol % to about 10 mol % of the total lipid present in the particle and the cholesterol or derivative thereof comprises from about 30 mol % to about 40 mol % of the total lipid present in the particle; and

(d) a conjugated lipid that inhibits aggregation of particles comprising from about 0.5 mol % to about 2 mol % of the total lipid present in the particle.

(D.I. 568 at 41–42.)

During patent prosecution, the patent examiner interpreted the use of the word "about" before each end of the molar ratio ranges listed for the lipid components as an ambiguous word that broadened the listed ranges by an amount of "+/- 10, 20, 30 mol % of [the] lipid component." (D.I. 568 at 46–48.) Given those broad ranges, the examiner rejected the claims of the '069 Patent as obvious and unpatentable, given the apparent overlap with a pending patent application 2006/0008910 ("MacLachlan"). According to the patent examiner, MacLachlan also taught a nucleic-acid-lipid particle with broad molar ratio ranges.

In response to the patent examiner's rejection, Arbutus amended its application to remove the word "about" before each end of the molar ratio ranges listed in the claim. The amended claim appeared as follows:

A nucleic acid-lipid particle comprising:

(a) a nucleic acid;

(b) a cationic lipid comprising from ~~about~~ 50 mol % to ~~about~~ 65 mol % of the total lipid present in the particle;

(c) a non-cationic lipid comprising a mixture of a phospholipid and cholesterol or a derivative thereof, wherein the phospholipid comprises from ~~about~~ 4 mol % to ~~about~~ 10 mol % of the total lipid present in the particle and the cholesterol or derivative thereof comprises from ~~about~~ 30 mol % to ~~about~~ 40 mol % of the total lipid present in the particle; and

(d) a conjugated lipid that inhibits aggregation of particles comprising from ~~about~~ 0.5 mol % to ~~about~~ 2 mol % of the total lipid present in the particle.

(D.I. 568 at 49–50.)

In connection with the amended application, the applicants submitted remarks explaining that they amended the claim "to delete 'about' from the ranges of lipid components" "[i]n an earnest effort to expedite prosecution, but without acquiescing on the merits of the rejection." (D.I. 568 at 50–51.) Their remarks recognized that the patent examiner's rejection of the application was based on "the term 'comprising from about' … embrac[ing] a broad range of lipid components," and went on to "respectfully point[] out that [C]laim 1 as presently amended recites narrow ranges for each of the lipid components compared to the substantially broader ranges taught by MacLachlan." (D.I. 568 at 50–52.) The remarks even included a chart comparing the ranges of the various lipid components of Claim 1 of the '069 Patent Application as amended and the lipid ranges of MacLachlan:

| Lipid Component | Claim 1 as Amended | US 2006/0008910[4] |
|---|---|---|
| Cationic Lipid | 50–65 mol % | "2–60, 5–50, 10–45, 20–40, 30 mol %" |
| Phospholipid | 4–10 mol % | "5–90 mol%" |
| Cholesterol | 30–40 mol % | "20–55 mol %" |
| Conjugated Lipid | 0.5–2 mol % | "1–20 mol %" |

(D.I. 568 at 51–52.) The patent examiner approved the '069 application as amended. (*See* D.I. 568 at 54.) The '069 Patent issued with the narrower ranges that no longer included the word "about." (*See* D.I. 568 at 54.)

The applicants then filed applications for the other Molar Ratio Patents, each of which included claims with molar ratio range limitations. (*See* D.I. 568 at 54.) For two of the Molar Ratio Patents – the '359 Patent and the '435 Patent – the applicants included the word "about" in the molar ratio ranges but removed it in subsequent amendments. (*See* D.I. 568 at 55.) The applications for the other two Molar Ratio Patents – the '668 Patent and the '378 Patent – never included the word "about" before the listed molar ratio ranges. (*See* D.I. 568 at 54–55.)

**2. The '651 Patent**

The '651 Patent claims that "at least 70%," "at least 80%," and "about 90% of the mRNA in the [lipid vesicle] formulation is fully encapsulated in the lipid vesicles." (D.I. 568 at 71.) At the time of the application that led to the '651 Patent, there were several methods for analyzing encapsulation efficiency of oligonucleotides. In fact, at least one article listed various methods of measurement and concluded that the results for

[4] The ranges set forth in this column are reproduced from page 4 of the Office Action mailed by May 12, 2011.

measuring oligonucleotide encapsulation efficiency could differ from one quantification method to another. (*See* D.I. 568 at 96–97.)

**B. The Covid-19 Pandemic And The Moderna Vaccine**

After Arbutus's patents issued, Covid-19 arrived in the United States. On January 31, 2020, the Secretary of Health and Human Services declared a public health emergency under 42 U.S.C. § 247(d). (*See* D.I. 568 at 2.) On May 15, 2020, the Trump Administration initiated Operation Warp Speed, through which the United States Government worked with private companies, including Moderna, to develop a Covid-19 vaccine.

On August 9, 2020, Moderna entered into a supply contract (the "C-100 Contract") with the Army Contracting Command of the United States Department of Defense. The C-100 Contract included two Federal Acquisition Regulation ("FAR") clauses: 52.227-1 and 52.227-1, Alternate I. Under Alternate I, which is the broader of the two clauses, "[t]he Government authorizes and consents to all use and manufacture of any invention described in and covered by a United States patent in the performance of this contract." (D.I. 568 at 18 (quoting 48 C.F.R. § 52.22701, Alt. I.).)

Moderna developed a nucleic acid vaccination using messenger RNA ("mRNA") to fight Covid-19. To ensure the fragile mRNA could cross the cellular membrane, Moderna used LNP technology with molar ratio ranges that differed slightly from those listed in Arbutus's Molar Ratio Patents, as follows:

| **Component** | **Moderna Vaccine** | **'359 Patent** | **'435 Patent** | **'378 Patent** |
|---|---|---|---|---|
| Cationic Lipid | 44.5–49 mol % | 49.5–65.49 mol % | 49.5–85.49 mol % | |
| Non-Cationic Lipid | 50–53.5 mol % | | 12.5–49.549 mol % | |
| Conjugated Lipid | 2.5–3.5 mol % | 0.45–2.49 mol % | 0.45–2.49 mol % | 0.05–2.49 mol % |

(D.I. 568 at 67–68.)

Moderna sold 500,001,540 doses of its Covid-19 vaccine under the C-100 Contact. (*See* D.I. 568 at 24.) The overwhelming number went to members of the general public, while the Government gave a small fraction to government employees.[5] The Government spent approximately $8.2 billion for Moderna's vaccine doses.

### C. Procedural History

Arbutus filed this suit on February 28, 2022. Moderna moved to dismiss, alleging that 28 U.S.C. § 1498(a) bars Arbutus's claims. Judge Goldberg denied the motion to dismiss, reasoning that Moderna failed to show that its infringement was done "for the Government" and that it was done with the "authorization and consent" of the Government. The Government then filed a Statement of Interest arguing that it provided Moderna with its authorization and consent and that such infringement was done for the

[5] Arbutus argues that 98.75% of those doses went to the general public, but the Parties don't include that fact in their statement of facts, so I don't know whether it is undisputed. In preparing for trial, the Parties can determine which doses are part of this lawsuit and which are not, including whether there are factual disputes about those numbers.

Government. Multiple amici filed responses to the Government's Statement of Interest, all of which argued that Section 1498(a) does not apply in this case.

Judge Goldberg issued his claim construction opinion on April 3, 2024. In that opinion, among other things, he addressed several of the Parties' arguments. In response to Moderna's claim that removing the word "about" from the ranges in the Molar Ratio Patents limited its claim to just the recited amounts, Judge Goldberg stated that such removal "only clearly disclaimed the[] broader ranges" that resulted from the patent examiner's expansive interpretation of the word "about." (D.I. 266 at 21.) In connection with Arbutus's argument that a person skilled in the art would have understood the '651 Patent to identify fluorescent dyeing as the method used to measure whether the mRNA in an LNP was "fully encapsulated," Judge Goldberg noted that such "method necessarily counts" partially encapsulated mRNA. (D.I. 266 at 36–37.)

On August 1, 2025, Moderna moved for summary judgment on three issues. Moderna seeks summary judgment on its affirmative defense regarding 28 U.S.C. § 1498; its argument that prosecution history estoppel bars Arbutus from bringing its infringement claims under the doctrine of equivalents; and its argument that some of Arbutus's patent claims are indefinite as a matter of law. In connection with its motion for summary judgment, Moderna filed a motion to exclude expert testimony of Alex Brill and Peter Pitts concerning its Section 1498(a) defense.

Arbutus opposed both motions, filed a cross motion for summary judgment, and moved to exclude expert testimony offered by Dr. George Rutherford, Dr. Christopher Vellturo, and Dr. Robert Prud'homme related to Moderna's Section 1498(a) defense and indefiniteness arguments. In its cross motion for summary judgment, Arbutus requests that I find as a matter of law that Moderna's Section 1498 affirmative defense fails and that most of Arbutus's alleged claims are not indefinite. Moderna opposed Arbutus's motions and moved to exclude expert testimony offered by Dr. Michael Mitchell related to Arbutus's argument that Moderna fraudulently induced the Government into entering the C-100 Contract. All of those motions are ripe for disposition.

## II. LEGAL STANDARD

### A. Summary Judgment

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment must be entered against that party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

### B. *Daubert*

In a patent case, regional circuit law applies to issues concerning the admissibility of expert opinions unless those issues are unique to patent law. *See Micro Chem., Inc. v.*

*Lextron, Inc.*, 317 F.3d 1387, 1390–91 (Fed. Cir. 2003). "Whether proffered evidence should be admitted in a trial is a procedural issue not unique to patent law," so Third Circuit law applies. *Id.* In the Third Circuit, the Federal Rules of Evidence "govern[] the admissibility of expert testimony." *Kannankeril v. Terminix Int'l., Inc.*, 128 F.3d 802, 806 (3d Cir. 1997). Federal Rule of Evidence 702 provides that "[a] witness who is qualified as an expert" may testify if the expert's testimony "will help the trier of fact to understand the evidence or to determine a fact in issue," "the testimony is based on sufficient facts or data," "the testimony is the product of reliable principles and methods," and "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702. But when no question of fact needs to be resolved, there is no need for expert testimony. *See id.*

## III. ANALYSIS

### A. Section 1498

Section 1498 provides that when an patented invention "is used or manufactured by or for the United States … the owner's remedy shall be by action against the United States in the United States Court of Federal Claims for the recovery of his reasonable and entire compensation for such use and manufacture." 28 U.S.C. § 1498(a). The statute explains that the "use or manufacture of an invention described in and covered by a patent of the United States by a contractor … for the Government and with the authorization or consent of the Government, shall be construed as use or manufacture for the United

States." *Id.* The Federal Circuit has further explained that Section 1498 "provides a cause of action against the United States (waiving sovereign immunity) for a patent owner to recover damages for the unauthorized use or manufacture of a patented invention '*by or for* the United States.'" *Astornet Techs. Inc. v. BAE Sys., Inc.*, 802 F.3d 1271, 1277 (Fed. Cir. 2015) (emphasis in original).

A defendant can raise Section 1498 as an affirmative defense in private litigation. *See BAE Sys. Info. & Elec. Sys. Integration Inc. v. Aeroflex Inc.*, Case No. 09-769-LPS, 2011 WL 3474344, at *2 (D. Del. Aug. 2, 2011). Because Section 1498(a) serves as an affirmative defense, the defendant bears the burden of showing that each of the two prongs of Section 1498(a) is met. *See Sevenson Envt'l Servs., Inc. v. Shaw Envt'l, Inc.*, 477 F.3d 1361, 1365 (Fed. Cir. 2007). That means the defendant must establish (1) the infringing use was "for the Government" and (2) the infringing use was done "with the authorization and consent of the Government." *Id.*[6] In the C-100 Contract, the Government authorized and consented to any necessary infringement.[7] But that contractual language does not resolve the question of whether Moderna's manufacture was for the Government.

---

[6] Section 1498(a) initially uses the phrase "used or manufactured by or for **the United States**," but it then describes "use or manufacture … **for the Government**." 28 U.S.C. § 1498(a) (emphases added). From that, it appears that the statute uses the terms "United States" and "Government" synonymously.

[7] Arbutus argues that Moderna procured the C-100 Contract by fraud, which renders it void. Arbutus does not cite a single binding case where a court permitted a party faced with a Section 1498 defense to challenge the validity of the contract that provided the required authorization. In fact, the Federal Circuit case that Arbutus identifies to support

I must first determine what "for the Government" means before I can decide whether the C-100 Contract falls within the statute's scope. As in any statutory construction case, I must start with the statutory text and proceed from the understanding that, unless otherwise defined, I interpret statutory terms in accordance with their ordinary meaning. *Sebelius v. Cloer*, 569 U.S. 369, 376 (2013). In doing so, I must read the statutory text in context. *See Pulsifer v. United States*, 601 U.S. 124, 133 (2024).

Although Section 1498 uses the phrase "for the Government," it does not define the phrase or any of the words in it. When Congress enacted the predecessor to Section 1498(a), the term "for" "[i]ntroduc[ed] the intended recipient." *For*, A New English Dictionary on Historical Principles (1901). And the term "government" referred to "the system of polity in a state," "authority," "the administration," "a commonwealth," and "a state." *Government*, Webster's Practical Dictionary (1910). Taken together, then, the statute indicates that the Government, as an entity, must be the intended recipient of the infringing product, as opposed to the public that the Government represents.

The statute's context reinforces this interpretation. The statute requires both the Government's authorization and that the use be for the Government. Those are separate

---

its voidability argument involves a voidability challenge that the Government made, not a non-contracting third party. *See Long Island Sav. Bank, FSB v. United States*, 503 F.3d 1234, 1246 (Fed. Cir. 2007). But in this case, the Government never claimed that the C-100 Contract is void. In fact, as demonstrated by its Statement of Interest, the Government insists that the contract is valid.

requirements. But, if all it took to invoke Section 1498 were a public benefit, then the Government's authorization alone would be enough because one could infer from the Government's authorization that the Government perceives a public benefit. Congress didn't write the statute that broadly, though. Even if the Government authorizes the manufacture or use of a patented product, it must do so for its own benefit. That additional requirement reinforces that the Government must receive the benefit itself.

Cases interpreting Section 1498 reinforce this conclusion. Courts have held that the benefit to the Government must be material and direct; it cannot be merely incidental or "too remote." *Sheridan v. United States*, 120 Fed. Cl. 127, 131 (2015). The Government's interest can be too remote even if it just has an "interest in [a] program generally[] or funds or reimburses all or part of [the program's] costs." *Larson v. United States*, 26 Cl. Ct. 365, 369 (1992).

The Court Of Claims' decision in *Larson* is particularly instructive. In *Larson*, the Court Of Claims refused to approve a Section 1498 defense where the Government paid for medical splints and casts for patients participating in certain government programs. Rejecting the argument that the use of infringing splints and casts to treat patients was for the Government, the Court Of Claims stated that "[m]edical care is provided for the benefit of the patient, not the [G]overnment." *Id.*

In this case, the C-100 Contract, for the most part, did not authorize the manufacture or use of vaccines for the Government. Instead, it authorized their

manufacture and use for residents of the United States. As Judge Goldberg pointed out at the motion to dismiss stage, "medical care is provided for the benefit of the patient, not the [G]overnment." (D.I. 31 at 3 (quoting *Larson*, 26 Cl. Ct. at 369).) This case is indistinguishable from *Larson*. Like the patients receiving splints and casts in *Larson*, the patients receiving Moderna's mRNA vaccines were the beneficiaries. That is true regardless of whether the Government "funds or reimburses all or part of [the] costs" for them. *Id.*

Moderna points to the language of the C-100 Contract and its proposed expert testimony to argue that its infringement was "for the Government." But that too is not enough. In fact, language of the C-100 Contract arguably supports the holding that the vaccines were not for the Government. It states that the vaccine was to be developed to "improve **patient** care, thereby mitigating the impact of Covid-19 on the nation and **its people**." (D.I. 17–1 at 20 (emphases added).)

While Section 1498 does not apply to the infringement claims related to the vaccine doses that went to the general public, it does apply to the claims of direct infringement for the vaccine doses that the Government acquired and distributed to its own employees. For those doses, the Government was a direct beneficiary because it distributed the vaccines itself to its employees to ensure that it could continue to function. In that sense, the vaccine doses that the Government provided to its employees are not materially different from cellphones, paper, or staples that the Government acquires for

its employees to enable them to perform the work that the Government hires them to do. Those claims belong before the Court Of Federal Claims.

However, even for those doses, only the direct infringement claims must go before the Court Of Claims. Section 1498 does not apply to claims of indirect infringement. The Federal Circuit has recognized that Section 1498(a) does "not waive the Government's sovereign immunity for indirect infringement." *Zoltek v. United States*, 672 F.3d 1309, 1320 (Fed. Cir. 2012). It based that statement on a Court Of Claims decision that held that "the Government is not liable ... for what, but for [S]ection 1498, would be contributory (rather than direct) infringement of its suppliers." *Decca Ltd. V. United States*, 640 F.2d 1156, 1167 (Ct. Cl. 1980). Thus, Arbutus can pursue its indirect infringement claims even for the vaccine doses that the Government acquired and distributed to its employees.

Moderna argues that a plaintiff cannot pursue an indirect infringement claim in district court if the direct infringement claims belong in the Court Of Federal Claims. But the cases that Moderna cites for that proposition address what happens if a third party manufactures a product and then induces the Government to use it in a way that infringes a patent. *See, e.g., Astornet Techs. Inc.*, 802 F.3d at 1277–78; *Morpho Detection, Inc. v. Smiths Detection Inc.*, Case No. 2:11-cv-498, 2013 WL 5701522, at *4–6 (E.D. Va. Oct. 17, 2013). Arbutus, however, asserts that non-governmental third parties infringed and that Moderna contributed to or induced that infringement. Moderna has not pointed me to anything suggesting Congress intended to waive sovereign immunity for claims

concerning the actions of third parties and therefore channel such claims to the Court Of Federal Claims under Section 1498.

Finally, because I can resolve the meaning of the statutory phrase "for the Government" through traditional tools of statutory construction, I do not need expert testimony on what actions were, and were not, for the Government. The facts are not in dispute, and expert testimony is never necessary to shed light on the interpretation of a statute. I will therefore grant the various motions to preclude each side's experts on this issue (*i.e.*, Alex Brill, Peter Pitts, George Rutherford, Chrisopher Vellturo, and Michael Mitchell[8]).

### B. Prosecution History Estoppel

Under the doctrine of equivalents, "a product or process that does not literally infringe upon the express terms of a patent claim may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention." *Warner-Jenkinson Co. v. Hilton Davis Chemical Co.*, 520 U.S. 17, 21 (1997). Recognizing that this doctrine could apply "broadly"

---

[8] Dr. Mitchell's opinions go to Arbutus's fraud-in-the-inducement theory, which I have rejected, so they are irrelevant. Dr. Mitchell also offers some opinions that relate to prosecution history estoppel. Moderna seeks to exclude those opinions solely based on its supposition that Dr. Mitchell couldn't have done all the work that he claims to have done in the time available to him. But Moderna offers no convincing evidence to support that theory, and I will not credit its unsupported speculation. In any event, I do not rely on Dr. Mitchell's opinions in resolving the prosecution history estoppel arguments, so none of this matters.

and "take on a life of its own, unbounded by the patent claims," courts have imposed limits on a patent holder's ability to bring infringement claims pursuant to it. *Eli Lilly & Co. v. Hospira, Inc.*, 933 F.3d 1320, 1329–30 (Fed. Cir. 2019) (alterations accepted and quotations omitted).

Prosecution history estoppel is one such limit. *See Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 733–34 (2002). Under it, a patent holder cannot claim under the doctrine of equivalents subject matter that the patent holder disclaimed during prosecution of the patent. *See id.* In practice, a patent holder can disclaim subject matter in one of two ways: (1) "by making a narrowing amendment to [a] claim" (referred to as "amendment-based estoppel") or (2) "by surrendering claim scope through argument to the patent examiner" (referred to as "argument-based estoppel"). *Amgen Inc. v. Coherus BioSciences Inc.*, 931 F.3d 1154, 1159 (Fed. Cir. 2019). Whether amendment-based or argument-based estoppel bars a doctrine of equivalents claim is a question of law. *See Regents of Univ of Cal. v. Dakocytomation Cal., Inc.*, 517 F.3d 1364, 1371 (Fed. Cir. 2008).

Amendment-based estoppel applies when a patent applicant narrows a claim during patent prosecution by submitting an amended application. *See Festo Corp.*, 535 U.S. at 738. For example, if an examiner rejects a patent application due to the existence of prior art, an applicant may amend his application and remove the subject matter that overlapped with the prior art. *See id.* at 737. "Such a narrowing amendment is presumed to be a surrender of all equivalents within the territory between the original claim and the

amended claim." *Eli Lilly & Co.*, 933 F.3d at 1330 (quotation omitted). That presumption, however, is rebuttable. *See id.*

A patent holder can rebut the presumption by showing that his reason for amending his patent application "bear[s] no more than a tangential relation to the equivalent in question." *Festo Corp.*, 535 U.S. at 740. "The tangential relation criterion for overcoming the … presumption is very narrow." *Honeywell Intern. Inc. v. Hamilton Sundstrand Corp.*, 523 F.3d 1304, 1315 (Fed. Cir. 2008). It focuses "on the patentee's objectively apparent reason for the narrowing amendment" and requires a showing that the "narrowing amendment was peripheral, or not directly relevant, to the alleged equivalent." *Id.* (quotation omitted). The reason for the narrowing amendment "should be discernable from the prosecution history record." *Id.* (quotation omitted). To make this tangentiality determination, courts do not apply a "bright-line" test; instead, the inquiry must "be decided in the context of the invention disclosed in the patent and the prosecution history." *Eli Lilly & Co.*, 933 F.3d at 1333. Courts conduct this analysis on a case-by-case basis. *See Bio-Rad Lab'ys, Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1366 (Fed. Cir. 2020).

Federal Circuit decisions on the tangentiality exception demonstrate that if an amendment cures an issue that is different in kind from the claim limit that is the subject of a claimed equivalent, then it can be tangential. But if the amendment is about the same claim limit, even though it is different in degree, then it is not tangential. Three decisions

illustrate situations where a difference in kind between the portion of the claim limit that the patentee amended and the portion subject to a claimed equivalent led the Federal Circuit to conclude that the tangential exception applied.

- In *Insituform Tech. Inc. v. CAT Contracting, Inc.*, 385 F.3d 1360, 1368 (Fed. Cir. 2004), an applicant amended a claim about a method of using a vacuum or multiple vacuums to fill a flexible tube with resin. A prior art reference disclosed a single vacuum far from the resin source, and the amended application overcame that reference by placing a single vacuum near the resin source. *See id.* at 1369–70. In a later suit, the patentee accused a method involving several vacuums of infringement based on the doctrine of equivalents. *See id.* at 1370. The Federal Circuit held that the tangential exception applied because the purpose of the amendment was to distinguish the distance from the vacuum to the resin source. It was not addressed to the number of vacuums. *See id.* at 1368-70.

- In *Regents of the Univ. of Cal. v. Dakocytomation Cal., Inc.*, 517 F.3d 1364, 1368 (Fed. Cir. 2008), an applicant amended a claim about a method used to detect chromosomal abnormalities. The original application involved a claim directed to general methods of disabling the hybridization capacity of repetitive DNA sequences and a claim that recited blocking nucleic acids. The patent prosecution history indicated that the examiner and inventors discussed ways to distinguish the invention from prior art by including "a proposed claim directed solely to the use of blocking nucleic acids to direct

probe hybridization to unique segments." *Id.* at 1378. The parties then limited the claim to a particular technique that used blocking nucleic acids. Then, in litigation, the patentee accused a blocking method that used synthetic nucleic acids instead of the human nucleic acids that the claim limit required. *See id.* The Federal Circuit concluded that the tangential exception applied because the purpose of the amendment was to overcome prior art on the method of blocking, not on the type of nucleic acid that the patented method would use. *See id.*

- In *Intervet Inc. v. Merial Ltd.*, 617 F.3d 1282, 1284–85 (Fed. Cir. 2010), an applicant amended a claim about DNA sequences that encode a type of porcine circovirus, called "porcine circovirus II." The original claim recited DNA sequences consisting of a group of thirteen open reading frames, which are the portions of a gene that encode proteins. However, as originally written, the claim would have covered any sequence that included one of the thirteen open reading frames. The examiner rejected the original claim, noting that the claim as written could cover open reading frames from any organism. The applicants then amended the claim to require that the open reading frames be of porcine circovirus type II. In litigation, the patentee alleged that a DNA strain found in defendant's vaccine with over 99% nucleotide homology with porcine circovirus type II was an equivalent to porcine circovirus type II. Although the Federal Circuit recognized that there was a presumption that the patentees surrendered all equivalents outside of the open reading frames of porcine circovirus type II, the Court held that the

tangential exception applied because the "rationale for the amendment was to narrow the claimed universe of [open reading frames] down to those of [porcine circovirus type II], and bore only a tangential relation to the question of which DNA sequences are and are not properly characterized as" porcine circovirus type II. *Id.*

On the other hand, when a distinction is one of degree but still touches on the part of the claim limit that led to the amendment, the Federal Circuit has held that the tangential exception does not apply. For instance, in *Biagro Western Sales, Inc. v. Grow More, Inc.*, 423 F.3d 1296 (Fed. Cir. 2005), the examiner rejected claims about a buffered phosphorus fertilizer over a prior art reference that disclosed a fertilizer that buffered when diluted. The applicant amended the claims to distinguish them from the prior art by indicating the claimed fertilizer had to be concentrated rather than diluted. *See id.* at 1306. In particular, the applicant added a limitation that required the fertilizer to include certain components "in an amount of about 30 to about 40 weight percent." *Id.* at 1305–06. The patentee then claimed that a fertilizer with compounds between 59% and 62% was equivalent. *See id.* at 1301. The Federal Circuit held that the tangential relation exception did not apply because "both the reason for the amendment and the asserted equivalent relate to the concentration of the fertilizer." *Id.* at 1306.

In this case, Arbutus narrowed its original application for the '069 Patent to address the examiner's concern about the imprecision of the molar ratio ranges. Now, it asserts an equivalent based on the molar ratio ranges in Moderna's vaccine. Because the

amendment in the application was about the same issue as the equivalent, amendment-based estoppel bars Arbutus from asserting an equivalent because the difference between the purpose of the amendment and the equivalent is one of degree, not of kind.

Arbutus argues that it only disclaimed the broader ranges in the original application to overcome MacLachlan, not the narrower ranges that it invokes against Moderna. However, that's not how amendment-based estoppel works. When an amendment touches on the same aspect of a claim limit as an alleged equivalent, the amendment bars it. Arbutus points to the Federal Circuit's decision in *Eli Lilly & Co.*, 933 F.3d at 1333, for the proposition that there is no "bright line rule" that requires application of amendment-based estoppel when the same claim limit is at issue in an amendment and a proposed equivalent. But that doesn't save Arbutus because the question is what aspect of the claim limit was at issue in the amendment. If, as in this case, it's the same limit as in the equivalent, then estoppel applies.

The Federal Circuit's decision in *Eli Lilly & Co.* does not counsel a different outcome. In that case, Lilly amended a patent claim to limit its claim to pemetrexed disodium, rather than antifolates generally. *See* 933 F.3d at 1326. In litigation, Eli Lilly then argued that a different form of pemetrexed salt was an equivalent. *See id.* at 1326–27. The Federal Circuit held that the narrowing amendment was designed to distinguish between antifolates generally and pemetrexed specifically, but that it did not necessarily limit the patent to a single type of pemetrexed salt. *See id.* at 1331. But the court also explained

that a party invoking the tangential exception must prove that the equivalent was "peripheral, or not directly relevant, to its amendment." *Id.* at 1332 (quoting *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 344 F.3d 1359, 1369 (Fed. Cir. 2003)).

The decision in *Eli Lilly & Co.* is no different than the decision in *Intervet*. In both cases, the Federal Circuit held that an amendment to narrow a claim from a broad category to a specific type within that category did not estop the patentee from claiming that something was equivalent to the specific type of structure that it patented. But that's not this case. This case is about numerical ratios. Arbutus narrowed its claim to specify certain ratios, and now it claims ratios outside the claimed ranges are equivalent. But that imprecision is exactly what the examiner was worried about, and while the equivalent that Arbutus claims is narrower than the range about which the examiner expressed concern, the fact remains that Arbutus seeks to claim an equivalent that is about the very same issue that led to its amendment, not some tangential aspect. Because Arbutus has not shown that its amendment to limit the molar ratios that its patent covered was tangential to an equivalent with a molar ratio outside the range it claims, it has not satisfied its burden of proving that the exception applies.

Arbutus also argues that Judge Goldberg's claim construction ruling forecloses Moderna's argument, but I disagree. In construing the claims, Judge Goldberg determined that Arbutus had only "clearly disclaimed" the broader ranges as part of the amendment process. (D.I. 266 at 21.) But Judge Goldberg had no occasion as part of the claim

construction process to consider the application of amendment-based estoppel, so his ruling on a different issue does not require a different outcome.[9]

### C. Invalidity

An alleged infringer may challenge a patent's validity by contending that it is indefinite. *See* 35 U.S.C. § 282. A patent is indefinite if it fails to "particularly point[] out and distinctly claim[] the subject matter which the [applicant] . . . regards as [his] invention." 35 U.S.C. § 112. Courts have interpreted this statutory language to require a claim to "reasonably apprise those skilled in the art of the scope of the invention." *Solomon v. Kimberly-Clark Corp.*, 216 F.3d 1372, 1378 (Fed. Cir. 2000) (quotation omitted).

---

[9] Moderna also makes an argument about argument-based estoppel. Argument-based estoppel can estop a patent holder from bringing an infringement claim under the doctrine of equivalents for subject matter that the applicant surrendered via argumentation before the patent examiner. *See Conoco, Inc. v. Energy & Environmental Intern., L.C.*, 460 F.3d 1349, 1364 (Fed. Cir. 2006). For this type of estoppel to apply, the applicant's argument before the patent examiner "must evince a clear and unmistakable surrender of subject matter." *Deering Precision Instruments, L.L.C. v. Vector Distrib. Sys., Inc.*, 347 F.3d 1314, 1326 (Fed. Cir. 2003) (quotation omitted). Because I conclude that Arbutus cannot rely on equivalents outside the claimed molar ratios in the Molar Ratio Patents, Moderna's argument-based estoppel argument is moot. However, I note that no competitor would reasonably believe that Arbutus surrendered the equivalents at issue. During prosecution, Arbutus emphasized to the examiner the "new and unexpected results" of the 1:57 SNALP (57 mol % cationic lipid) formulation and the advantages imparted by "increased" amounts of cationic lipid. (*E.g.*, D.I. 514-25 at 11.) The only anchor in the '069 Patent's prosecution history against which to judge an increase is MacLachlan, which discusses 40 mol % cationic lipid or less. From that, it's possible to conclude that Arbutus's arguments to the examiner foreclose any molar ratio below 40 mol %. Moderna's argument to extend the ratio to a 50 mol % relies on rhetorical points in IPR proceedings that do not support its proposed outcome.

Although this requirement "mandates clarity," it does not require "absolute precision." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014).

In the context of evaluating a claim that discloses a particular measurement, the Federal Circuit has said that a "claim is not indefinite if a person of skill in the art would know how to utilize a standard measurement method … to make the necessary measurement." *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 875 F.3d 1369, 1376 (Fed. Cir. 2017). That is, "if a skilled person would choose an established method of measurement, that may be sufficient to defeat a claim of indefiniteness, even if that method is not set forth … in the patent itself." *Dow Chem. Co. v. Nova Chems. Corp. (Canada)*, 809 F.3d 1223, 1224 (Fed. Cir. 2015) (Prost, *C.J.*, Dyk & Wallach, *JJ.*, concurring).

The Parties dispute whether the asserted claims of the '651 Patent are indefinite. On the one hand, Moderna insists that the claims are indefinite as a matter of law. On the other hand, Arbutus argues that the claims are either definite as a matter of law or, at the very least, that there is a genuine dispute of material fact as to whether the claims provide a POSA with reasonable certainty about the scope of the invention. The Parties also argue over whether the claims in Arbutus's Molar Ratio Patents are definite as a matter of law.

**1. Dr. Prud'homme's Indefiniteness Opinion**

The law provides that claims are indefinite where the claims, when read in light of the specification and prosecution history, fail to inform a POSA as to the scope of the invention with reasonable certainty. *See Nautilius, Inc.*, 572 U.S. at 901. While a "potential

infringer" need not "be able to determine ex ante if a particular act infringes the claims," the patent must "apprise the public 'of what is still open to them[]'" such that "a person of ordinary skill in the art could determine whether or not an accused product or method infringes the claim." *Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*, 30 F.4th 1339, 1346–47 (Fed. Cir. 2022). This is an inquiry about the scope of the patent; not one into whether a competitor can determine it infringed. *See id.*; *see also Nautilus, Inc.*, 572 U.S. at 901.

Dr. Prud'homme grounds his opinions in this law. He opines about the indefiniteness of both the '651 Patent and the Molar Ratio Patents. For both, he concludes that they are indefinite because (a) a POSA would not know what method to use to measure the claimed inventions and (b) the various methods of measurement available produce meaningfully different results. Thus, he says, a POSA could not determine the scope of the claim in order to determine infringement. Dr. Prud'homme might not be right, but it is a fair opinion, backed by a stated methodology, about the ability of a POSA to determine the metes and bounds of the asserted claims.

Arbutus's argument to the contrary conflates indefiniteness analysis with infringement analysis. Although the Federal Circuit has used the word "infringes," it has also made clear that the inquiry is one of scope, not infringement. *See Niazi Licensing*, 30 F.4h at 1346–47. While the ability to determine the scope of a patent can implicate a competitor's ability to determine if it has infringed, that does not mean an expert's opinion about a patent's scope is about a competitor's ability to determine infringement.

That is particularly true in a case like this, in which the patents define the inventions in numerical terms, which binds the measurement question inextricably to the scope of the claims. In short, Dr. Prud'homme's indefiniteness opinion was not based on an application of the incorrect legal standard. I will therefore deny Arbutus's motion to exclude his opinions, and I will consider them among the quantum of admissible evidence in resolving the Parties' competing summary judgment motions on indefiniteness.

**2. The '651 Patent**

Claim 1 of the '651 Patent recites, "A lipid vesicle formulation comprising: ... messenger RNA (mRNA), wherein at least 70% of the mRNA in the formulation is fully encapsulated in the lipid vesicles."[10] (D.I. 512-4 at 30.) Judge Goldberg construed the phrase "fully encapsulated" to mean "fully, as distinct from partially" encapsulated. (D.I. 266 at 37.) Under this construction, to be fully encapsulated, the mRNA strand must be "fully contained inside the vesicle;" the claim does not cover strands that are "part-in-part-out" or not encapsulated at all. (D.I. 266 at 35–36.)

There are factual disputes about the definiteness of this claim that make summary judgment inappropriate. Each side has offered expert testimony about what a POSA would understand "fully encapsulated" to mean and what method of measurement that

[10] The other asserted claims of the '651 Patent are dependent on Claim 1. Claims 13 and 14 of the '651 Patent respectively require "at least 80%" and "about 90%" of the mRNA be "fully encapsulated." (D.I. 512-4 at 30.)

person would have understood the patent to require in order to measure encapsulation of mRNA. None of the Parties' arguments persuades me otherwise.

*First*, I disagree with Moderna that it offered unrebutted testimony about the meaning (or lack of meaning) of "fully encapsulated." (D.I. 508 at 30.) It offered Dr. Prud'homme's opinion, but Arbutus offered an opinion of Dr. Murthy, which uses the construction that Judge Goldberg applied, without confusion. (*See* D.I. 571-18 at 240–41.) That conflicting testimony precludes summary judgment, particularly in light of the high burden that Moderna has to demonstrate invalidity.

*Second*, there are factual disputes about what a POSA would have understood about how to measure encapsulation. Moderna offers evidence of at least one article that discloses seven different tests used to measure encapsulation efficiency and notes that the article reports different tests yield different results. (*See* D.I. 508 at 34.) However, the Parties offer conflicting testimony about what measurement method a POSA would have used. Dr. Prud'homme, for Moderna, suggests that a POSA wouldn't know which method to use. On the other hand, Dr. Murthy argues that a POSA would have known to use a dye-exclusion assay to measure full encapsulation within the context of the claimed invention. At this stage of the proceedings, both opinions are forms of admissible evidence, and I can't credit one over the other.

But even if I assumed that a POSA would use a dye-exclusion assay to measure full encapsulation, there would still be genuine issues of fact preventing the grant of summary

judgment. That is because, as Judge Goldberg noted, the technique known as, "fluorescent dyeing" "necessarily counts the inside section of part-in-part-out strands ... while containing no mechanism to identify which strands are part-in-part-out." (D.I. 266 at 36–37.) In other words, fluorescent dying cannot distinguish between partially encapsulated and fully encapsulated mRNA. Moderna argues that this means fluorescent dyeing cannot be a method of measurement that a POSA would have understood as a way of quantifying the "at least 70%," "at least 80%," and "about 90%" encapsulation of mRNA as required by the claims. However, Arbutus provides expert testimony that states partial encapsulation in lipid particles does not exist and, even if it could, there are techniques that can measure fully encapsulated mRNA and differentiate it from the hypothetical partially encapsulated mRNA. This amalgam of conflicting testimony makes summary judgment inappropriate.

**3. The Molar Ratio Patents**

The asserted claims in the Molar Ratio Patents recite three or four lipid-component ranges in "mol %" "of the total lipid present in the particle." However, nothing in the Molar Ratio Patents indicates how to determine the mol % of lipids in individual particles or the formulation. While there is no test to measure the "mol %" of the lipid components in an individual lipid particle directly, there are multiple tests to do so indirectly (*e.g.*, measuring

aggregates or fractionated samples of lipid compositions containing millions of lipid particles).[11]

There is conflicting evidence in the record as to whether the existing methods would give meaningfully different results. "[W]here different approaches to measurement are involved," "the patent and prosecution history must disclose a single known approach or establish that, where multiple known approaches exist, a person having ordinary skill in the art would know which approach to select." *Dow Chem. Co. v. Nova Chems. Corp. (Canada)*, 803 F.3d 620, 630 (Fed. Cir. 2015). Moderna highlights that Arbutus's expert ran different tests, both fractionated and not, on the same batch of samples, and the tests resulted in some lipid amounts being inside the claimed molar ratio ranges while others were not. Arbutus claims this comparison is flawed because the non-fractionated testing method produces "one overall value," whereas the fractionated testing method "yields information about the underlying compositional distribution of particles within the sample." (D.I. 610 at 7–8.) According to Arbutus, even though the tests are different, they do not produce different results. But since the Parties present conflicting evidence over whether the test results are materially different and over which test a POSA would

[11] One technique, known as a fractionation technique, allows researchers to "fractionate" (*i.e.*, separate) the composition of lipid particles. (*See* D.I. 571-18 at 676.) Those fractions can then be analyzed for their lipid composition. (*See id.*) A different technique, referred to as an aggregation technique, involves researchers simply testing the composition without fractionating it. (*See id.* at 673, 677–78.)

understand to have produced the claimed mol % of the lipid components, summary judgment is inappropriate.

## IV. CONCLUSION

Most of Moderna's vaccine doses were not for the Government, so Arbutus's claims about them belong here as Section 1498 does not apply to them. Moderna has proven that prosecution history estoppel bars Arbutus's doctrine-of-equivalents claims about the Molar Ratio Patents, so I will grant Moderna's Motion on that issue. A jury will have to resolve questions of invalidity. An appropriate Order follows.

**BY THE COURT:**

*<u>/s/ Joshua D. Wolson</u>*
JOSHUA D. WOLSON, J.

February 2, 2026

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| **ARBUTUS BIOPHARMA CORPORATION and GENEVANT SCIENCES GMBH**,<br><br>*Plaintiffs*,<br>v.<br><br>**MODERNA, INC. and MODERNTX, INC.**,<br><br>*Defendants.* | **Case No. 1:22-cv-00252-JDW** |

**ORDER**

**AND NOW**, this 2nd day of February, 2026, for the reasons stated in the accompanying Memorandum, it is **ORDERED** as follows.

1. Defendants Moderna, Inc. and ModernaTX, Inc.'s Motion For Summary Judgment (D.I. 507) is **GRANTED IN PART** and **DENIED IN PART** as follows.

a. The Motion is **GRANTED** as to:

i. Defendants' defense made pursuant to 28 U.S.C. § 1498(a) for the vaccines that went directly to United States Government employees; and

ii. Defendants' claim that amendment-based estoppel bars Plaintiffs' infringement claims made pursuant to the doctrine of equivalents for U.S. Patent Nos. 8,492,359; 9,364,435; and 11,141,378; and

b. The Motion is **DENIED** in all other respects.

2. Defendants' Motion To Exclude Mr. Pitts' And Mr. Brill's Expert Reports (D.I. 510) is **GRANTED**.

3. Plaintiffs Arbutus Biopharma Corporation and Genevant Sciences GmbH's Cross Motion For Summary Judgment (D.I. 562) is **GRANTED IN PART** and **DENIED IN PART** as follows:

a. The Motion is **GRANTED** as to Defendants' Section 1498 defense for the vaccines that did not go directly to United Government employees; and

b. The Motion is **DENIED** in all other respects.

4. Plaintiffs' Motion To Exclude Certain Expert Testimony Of Dr. Rutherford, Dr. Vellturo, and Dr. Prud'homme (D.I. 558) is **GRANTED IN PART** and **DENIED IN PART** as follows:

a. The Motion is **GRANTED** as to Dr. Rutherford and Dr. Vellturo; and

b. The Motion is **DENIED** as to Dr. Prud'homme.

5. Defendants' Motion To Exclude Certain Expert Testimony Of Dr. Mitchell (D.I. 595) is **GRANTED IN PART** and **DENIED IN PART**, as follows:

a. The Motion is **GRANTED** as to Dr. Mitchell's opinions concerning Arbutus's fraudulent inducement theory regarding Moderna's C-100 Contract with the Government; and

b. The Motion is **DENIED** as to Dr. Mitchell's opinions concerning prosecution history estoppel.

**BY THE COURT:**

*/s/ Joshua D. Wolson*
JOSHUA D. WOLSON, J.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ARBUTUS BIOPHARMA CORPORATION and GENEVANT SCIENCES GmbH,<br><br>Plaintiffs,<br><br>v.<br><br>MODERNA, INC. and MODERNATX, INC.<br><br>Defendants. | C.A. No. 22-252 (JDW) |

**CONSENT JUDGMENT AND ORDER**

WHEREAS Plaintiffs Arbutus Biopharma Corporation and Genevant Sciences GmbH have asserted various claims for patent infringement against Defendants Moderna, Inc. and ModernaTX, Inc.;

WHEREAS Defendants' Ninth Defense [D.I. 321] alleges that Plaintiffs' claims based on Moderna's manufacture and sale of the COVID-19 Vaccine pursuant to the C-100 Contract are barred by 28 U.S.C. § 1498;

WHEREAS Plaintiffs moved for summary judgment on Defendants' § 1498 defense, including with respect to the vaccines that did not go directly to United States Government employees, and the Court granted that portion of Plaintiffs' motion for summary judgment, *see* D.I. 697, 698 ¶ 3a;

WHEREAS Defendants moved for summary judgment on Defendants' § 1498 defense, including with respect to the 6,244,340 doses that went directly to United States Government employees, and the Court granted that portion of Defendants' motion for summary judgment and denied the motion as to the doses that did not go directly to United States Government employees, *see* D.I. 697, 698 ¶¶ 1(a)(i), 1(b);

NOW THEREFORE, the parties hereby stipulate, subject to the approval of the Court, as follows:

1. To conserve judicial resources and to avoid the time and expense of further litigation related to the asserted patents, the Parties respectfully request, and the Court hereby dismisses with prejudice:
    a. Counts 1 and 3 of Plaintiffs' Amended Complaint [D.I. 301];
    b. Defendants' Declaratory Judgment Counterclaims 1, 3, 7, and 9 [D.I. 321]; and
    c. Defendants' Affirmative Defenses 1, 2, 3, 4, 5, 6, 7, 8, and 10 [D.I. No. 321].
2. To conserve judicial resources and to avoid the time and expense of further litigation related to the asserted patents, the Parties respectfully request, and the Court hereby enters:
    a. judgment of infringement in Plaintiffs' favor as to Counts 2, 4, 5, and 6 of Plaintiffs' Amended Complaint [D.I. 301] and judgment against Defendants as to Defendants' Declaratory Judgment of Non-Infringement Counterclaims 2, 4, 5, and 6 [D.I. 321]; and
    b. judgment of no invalidity in Plaintiffs' favor and against Defendants as to Defendants' Declaratory Judgment of Invalidity Counterclaims 8, 10, 11, and 12 [D.I. No. 321] based solely on the disclosures of the asserted patents' specifications, the relevant priority dates, and the parties' contentions and expert opinions, the specific asserted relevant prior art, the specific prior related proceedings, and the asserted claims in the patents.

3. To conserve judicial resources and to avoid the time and expense of further litigation related to the asserted patents, as to Defendants' Ninth Defense ("Government Sales") [D.I. 321], the Parties respectfully request, and the Court hereby enters:

    a. judgment in Plaintiffs' favor and against Defendants with respect to the vaccines that did not go directly to United States Government employees;

    b. judgment in Defendants' favor and against Plaintiffs with respect to the 6,244,340 doses that were directly administered to United States Government employees; and

    c. the C-100 Contract is a valid contract and the Court hereby enters judgment in Defendants' favor and against Plaintiffs as to Plaintiffs' fraud-in-the-inducement theory regarding § 1498 referenced in footnote 7 of the Court's summary judgment order [D.I. 697].

4. The Parties waive all right to appeal or otherwise move for relief from this Consent Judgment and Order *except* Defendants expressly reserve their right to appeal this Court's adjudication with respect to Defendants' Ninth Defense under 28 U.S.C. § 1498(a) set forth above in Paragraph 3a [D.I. 697, 698]. While the Parties have agreed to the amounts of money owed by Defendants to Plaintiffs upon various dispositions of such an appeal, their dispute concerning the Defendants' Ninth Defense remains a definite and concrete dispute touching the Parties' adverse legal interests.

5. The Parties shall bear their own fees and costs in connection with this litigation, including attorneys' fees.

6. This Court shall retain jurisdiction of this litigation and over the Parties for purposes of enforcement of the provisions of this Consent Judgment and Order.

*/s/ Nathan R. Hoeschen*
John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
kkeller@shawkeller.com
nhoeschen@shawkeller.com
*Attorney for Plaintiffs*

*/s/ Travis J. Murray*
Brian P. Egan (No. 6227)
Travis J. Murray (No. 6882)
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
began@morrisnichols.com
tmurray@morrisnichols.com
*Attorneys for Defendants*

Dated: March 3, 2026

**BY THE COURT:**

March 4, 2026
Date

*/s/ Joshua D. Wolson*
JOSHUA D. WOLSON, J

# Exhibit B

US008492359B2

(12) **United States Patent**
**Yaworski et al.**

(10) **Patent No.: US 8,492,359 B2**
(45) **Date of Patent: *Jul. 23, 2013**

(54) **LIPID FORMULATIONS FOR NUCLEIC ACID DELIVERY**

(75) Inventors: **Edward Yaworski**, Maple Ridge (CA); **Kieu Lam**, Surrey (CA); **Lloyd Jeffs**, Delta (CA); **Lorne Palmer**, Vancouver (CA); **Ian MacLachlan**, Mission (CA)

(73) Assignee: **Protiva Biotherapeutics, Inc.**, Burnaby, BC (CA)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 59 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **13/253,917**

(22) Filed: **Oct. 5, 2011**

(65) **Prior Publication Data**

US 2012/0183581 A1 Jul. 19, 2012

**Related U.S. Application Data**

(63) Continuation of application No. 12/424,367, filed on Apr. 15, 2009, now Pat. No. 8,058,069.

(60) Provisional application No. 61/045,228, filed on Apr. 15, 2008.

(51) **Int. Cl.**
*C12N 15/11* (2006.01)

(52) **U.S. Cl.**
USPC ........................................................ **514/44 A**

(58) **Field of Classification Search**
USPC ........................................................ 514/44 A
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,394,448 | A | 7/1983 | Szoka, Jr. et al. |
| 4,438,052 | A | 3/1984 | Weder et al. |
| 4,515,736 | A | 5/1985 | Deamer |
| 4,598,051 | A | 7/1986 | Papahadjopoulos et al. |
| 4,897,355 | A | 1/1990 | Eppstein et al. |
| 5,013,556 | A | 5/1991 | Woodle et al. |
| 5,171,678 | A | 12/1992 | Behr et al. |
| 5,208,036 | A | 5/1993 | Eppstein et al. |
| 5,225,212 | A | 7/1993 | Martin et al. |
| 5,264,618 | A | 11/1993 | Felgner et al. |
| 5,279,833 | A | 1/1994 | Rose |
| 5,283,185 | A | 2/1994 | Epand et al. |
| 5,320,906 | A | 6/1994 | Eley et al. |
| 5,334,761 | A | 8/1994 | Gebeyehu et al. |
| 5,545,412 | A | 8/1996 | Eppstein et al. |
| 5,578,475 | A | 11/1996 | Jessee |
| 5,627,159 | A | 5/1997 | Shih et al. |
| 5,641,662 | A | 6/1997 | Debs et al. |
| 5,656,743 | A | 8/1997 | Busch et al. |
| 5,674,908 | A | 10/1997 | Haces et al. |
| 5,703,055 | A | 12/1997 | Felgner et al. |
| 5,705,385 | A | 1/1998 | Bally et al. |
| 5,736,392 | A | 4/1998 | Hawley-Nelson et al. |
| 5,820,873 | A | 10/1998 | Choi et al. |
| 5,877,220 | A | 3/1999 | Schwartz et al. |
| 5,885,613 | A | 3/1999 | Holland et al. |
| 5,958,901 | A | 9/1999 | Dwyer et al. |
| 5,976,567 | A | 11/1999 | Wheeler et al. |
| 5,981,501 | A | 11/1999 | Wheeler et al. |
| 6,020,202 | A | 2/2000 | Jessee |
| 6,020,526 | A | 2/2000 | Schwartz et al. |
| 6,034,135 | A | 3/2000 | Schwartz et al. |
| 6,051,429 | A | 4/2000 | Hawley-Nelson et al. |
| 6,075,012 | A | 6/2000 | Gebeyehu et al. |
| 6,165,501 | A | 12/2000 | Tirosh et al. |
| 6,172,049 | B1 | 1/2001 | Dwyer et al. |
| 6,251,939 | B1 | 6/2001 | Schwartz et al. |
| 6,284,267 | B1 | 9/2001 | Aneja |
| 6,287,591 | B1 | 9/2001 | Semple et al. |
| 6,339,173 | B1 | 1/2002 | Schwartz et al. |
| 6,376,248 | B1 | 4/2002 | Hawley-Nelson et al. |
| 6,534,484 | B1 | 3/2003 | Wheeler et al. |
| 6,586,410 | B1 | 7/2003 | Wheeler et al. |
| 6,638,529 | B2 | 10/2003 | Schwartz et al. |
| 6,649,780 | B1 | 11/2003 | Eibl et al. |
| 6,671,393 | B2 | 12/2003 | Hays et al. |
| 6,696,424 | B1 | 2/2004 | Wheeler |
| 6,815,432 | B2 | 11/2004 | Wheeler et al. |
| 6,858,224 | B2 | 2/2005 | Wheeler et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| CA | 2309727 | A1 | 4/1999 |
| CA | 2271582 | A1 | 11/1999 |

(Continued)

OTHER PUBLICATIONS

Arpicco, S., et al., "Preparation and Characterization of Novel Cationic Lipids Developed for Gene Transfection," Proceed. Int'l Symp. Control. Rel. Bioact. Mater. (Controlled Release Society, Inc.), 1999, vol. 26, pp. 759-760.
Arpicco, S., et al., "Synthesis, characterization and transfection activity of new saturated and unsaturated cationic lipids," IL Farmaco, 2004, vol. 59, pp. 869-878.
Ballas, N., et al., "Liposomes bearing a quaternary ammonium detergent as an efficient vehicle for functional transfer of TMV-RNA into plant protoplasts," Biochimica et Biophysica Acta, 1988, vol. 939, pp. 8-18.
Barinaga, M., "Step Taken Toward Improved Vectors for Gene Transfer," Science, 1994, vol. 266, p. 1326.
Bass, "The Short Answer," *Nature*, 2001, 411: 428-9.
Beale, G., et al., "Gene Silencing Nucleic Acids Designed by Scanning Arrays: Anti-EGFR Activity of siRNA, Ribozyme and DNA Enzymes Targeting a Single Hybridization-accessible Region using the Same Delivery System," Journal of Drug Targeting, 2003, vol. 11, No. 7, pp. 449-456.

(Continued)

*Primary Examiner* — Brian Whiteman
(74) *Attorney, Agent, or Firm* — Kilpatrick Townsend & Stockton LLP

(57) **ABSTRACT**

The present invention provides novel, stable lipid particles comprising one or more active agents or therapeutic agents, methods of making the lipid particles, and methods of delivering and/or administering the lipid particles. More particularly, the present invention provides stable nucleic acid-lipid particles (SNALP) comprising a nucleic acid (such as one or more interfering RNA), methods of making the SNALP, and methods of delivering and/or administering the SNALP.

**21 Claims, 24 Drawing Sheets**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 7,166,745 | B1 | 1/2007 | Chu et al. | |
| 7,422,902 | B1 | 9/2008 | Wheeler et al. | |
| 7,479,573 | B2 | 1/2009 | Chu et al. | |
| 7,601,872 | B2 | 10/2009 | Chu et al. | |
| 7,687,070 | B2 | 3/2010 | Gebeyehu et al. | |
| 7,745,651 | B2 | 6/2010 | Heyes et al. | |
| 7,799,565 | B2 | 9/2010 | MacLachlan et al. | |
| 7,803,397 | B2 | 9/2010 | Heyes et al. | |
| 7,807,815 | B2 | 10/2010 | MacLachlan et al. | |
| 7,838,658 | B2 | 11/2010 | MacLachlan et al. | |
| 7,901,708 | B2 | 3/2011 | MacLachlan et al. | |
| 7,915,450 | B2 | 3/2011 | Chu et al. | |
| 7,982,027 | B2 | 7/2011 | MacLachlan et al. | |
| 8,058,068 | B2 | 11/2011 | Hawley-Nelson et al. | |
| 8,058,069 | B2 * | 11/2011 | Yaworski et al. | 435/458 |
| 8,158,827 | B2 | 4/2012 | Chu et al. | |
| 8,227,443 | B2 | 7/2012 | MacLachlan et al. | |
| 2001/0048940 | A1 | 12/2001 | Tousignant et al. | |
| 2003/0069173 | A1 | 4/2003 | Hawley-Nelson et al. | |
| 2003/0077829 | A1 | 4/2003 | MacLachlan | |
| 2003/0143732 | A1 | 7/2003 | Fosnaugh et al. | |
| 2004/0063654 | A1 | 4/2004 | Davis et al. | |
| 2004/0142892 | A1 | 7/2004 | Finn et al. | |
| 2004/0253723 | A1 | 12/2004 | Tachas et al. | |
| 2004/0259247 | A1 | 12/2004 | Tuschl et al. | |
| 2005/0064595 | A1 | 3/2005 | MacLachlan et al. | |
| 2005/0118253 | A1 | 6/2005 | MacLachlan et al. | |
| 2005/0260757 | A1 | 11/2005 | Gebeyehu et al. | |
| 2006/0008910 | A1 | 1/2006 | MacLachlan et al. | |
| 2006/0147514 | A1 | 7/2006 | Gebeyehu et al. | |
| 2006/0228406 | A1 | 10/2006 | Chiou et al. | |
| 2007/0042031 | A1 | 2/2007 | MacLachlan et al. | |
| 2007/0202598 | A1 | 8/2007 | Chu et al. | |
| 2007/0202600 | A1 | 8/2007 | Chu et al. | |
| 2009/0143583 | A1 | 6/2009 | Chu et al. | |
| 2009/0291131 | A1 | 11/2009 | MacLachlan et al. | |
| 2010/0159593 | A1 | 6/2010 | Chu et al. | |
| 2012/0136073 | A1 | 5/2012 | Yang et al. | |
| 2012/0238747 | A1 | 9/2012 | Chu et al. | |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| CA | 2330741 | A1 | 11/1999 |
| CA | 2397016 | A1 | 7/2001 |
| JP | 03-126211 | | 5/1991 |
| JP | 05-202085 | | 8/1993 |
| JP | 06-080560 | | 3/1994 |
| WO | WO 91/16024 | A1 | 10/1991 |
| WO | WO 93/05162 | A1 | 3/1993 |
| WO | WO 93/12240 | A1 | 6/1993 |
| WO | WO 93/12756 | A2 | 7/1993 |
| WO | WO 93/24640 | A2 | 12/1993 |
| WO | WO 93/25673 | A1 | 12/1993 |
| WO | WO 95/02698 | A1 | 1/1995 |
| WO | WO 95/18863 | A1 | 7/1995 |
| WO | WO 95/35301 | A1 | 12/1995 |
| WO | WO 96/02655 | A1 | 2/1996 |
| WO | WO 96/10390 | A1 | 4/1996 |
| WO | WO 96/41873 | A1 | 12/1996 |
| WO | WO 98/51285 | A2 | 11/1998 |
| WO | WO 00/03683 | A2 | 1/2000 |
| WO | WO 00/15820 | A1 | 3/2000 |
| WO | WO 00/62813 | A2 | 10/2000 |
| WO | WO 01/05374 | A1 | 1/2001 |
| WO | WO 01/05873 | A1 | 1/2001 |
| WO | WO 02/34236 | A2 | 5/2002 |
| WO | WO 02/087541 | A1 | 11/2002 |
| WO | WO 03/097805 | A2 | 11/2003 |
| WO | WO 2004/065546 | A2 | 8/2004 |
| WO | WO 2004/110499 | A1 | 12/2004 |
| WO | WO 2005/007196 | A2 | 1/2005 |
| WO | WO 2005/026372 | A1 | 3/2005 |
| WO | WO 2005/035764 | A1 | 4/2005 |
| WO | WO 2005/120152 | A2 | 12/2005 |
| WO | WO 2006/002538 | A1 | 1/2006 |
| WO | WO 2006/053430 | A1 | 5/2006 |
| WO | WO 2007/056861 | A1 | 5/2007 |
| WO | WO 2010/048228 | A2 | 4/2010 |
| WO | WO 2010/088537 | A2 | 8/2010 |
| WO | WO 2010/105209 | A1 | 9/2010 |

OTHER PUBLICATIONS

Behr, J.-P., "Synthetic Gene-Transfer Vectors," Acc. Chem. Res., 1993, vol. 26, pp. 274-278.

Brigham, K., et al., "Rapid Communication: In vivo Transfection of Murine Lungs with a Functioning Prokaryotic Gene Using a Liposome Vehicle," The American Journal of the Medical Sciences, vol. 298, No. 4, pp. 278-281, 1989.

Brummelkamp, et al., "A System for Stable Expression of Short Interfering RNAs in Mammalian Cells," Science, 2002, V. 296. pp. 550-553.

Cevc, G., "How Membrane Chain-Melting Phase-Transition Temperature is Affected by the Lipid Chain Asymmetry and Degree of Unsaturation: An Effective Chain-Length Model," Biochemistry, 1991, vol. 30, pp. 7186-7193.

Chonn et al., "Recent advances in liposomal drug-delivery systems," Current Opinion in Biotechnology, 1995, vol. 6, pp. 698-708.

Cortesi, R., et al., "Effect of cationic liposome composition on in vitro cytotoxicity and protective effect on carried DNA," International Journal of Pharmaceutics, 1996, vol. 139, pp. 69-78.

Crystal, R., "Transfer of Genes to Humans: Early Lessons and Obstacles to Success," Science, 1995, vol. 270, pp. 404-410.

Culver K., "The First Human Gene Therapy Experiment," Gene Therapy: A Handbook for Physicians, 1994, pp. 33-40.

Duzgunes, N., "Membrane Fusion," Subcellular Biochemistry, 1985, vol. 11, pp. 195-286.

Dwarki, V.J., et al., "Cationic Liposome-Mediated RNA Transfection," Methods in Enzymology, 1993, vol. 217, pp. 644-654.

Elbashir, et a., "Duplexes of 21-nucleotide RNAs mediate RNA interference in cultured mammalian cells," Nature, May 2001, pp. 494-498, vol. 411.

Enoch, H., et al., "Formation and properties of 1000-Å-diameter, single-bilayer phospholipid vesicles," Proc. Natl. Acad. Sci. USA, 1979, vol. 76, No. 1, pp. 145-149.

Felgner, J., et al., "Cationic Lipid-Mediated Transfection in Mammalian Cells: 'Lipofection,'" J. Tiss. Cult. Meth., 1993, vol. 15, pp. 63-68.

Felgner, J., et al., "Enhanced Gene Delivery and Mechanism Studies with a Novel Series of Cationic Lipid Formulations," The Journal of Biological Chemistry, 1994, vol. 269, No. 4, pp. 2550-2561.

Felgner, P., et al., "Lipofection: A highly efficient, lipid-mediated DNA-transfection procedure," Proc. Natl. Acad. Sci. USA, 1987, vol. 84, pp. 7413-7417.

Felgner, P.L., et al., "Cationic Liposome Mediated Transfection," Proc. West. Pharmacol. Soc., 1989, vol. 32, pp. 115-121.

Gao, X., et al., "A Novel Cationic Liposome Reagent for Efficient Transfection of Mammalian Cells," Biochem. Biophys. Res. Comm., 1991, vol. 179, No. 1, pp. 280-285.

Gershon, H., et al., "Mode of Formation and Structural Feature of DNA-Cationic Liposome Complexes Used for Transfection," Biochemistry, 1993, vol. 32, pp. 7143-7151.

Global Newswire, retrieved from http://globalnewswire.com on Feb. 27, 2013, Tekmira sues Alnylam Pharmaceuticals for repeated misuse of tradescrets and confidential information, Mar. 16, 2011, pp. 1-3.

Guy-Caffey, J., et al., "Novel Polyaminolipids Enhance the Cellular Uptake of Oligonucleotides," The Journal of Biological Chemistry, 1995, vol. 270, No. 52, pp. 31391-31396.

Hawley-Nelson, P., et al., "LipofectAmine™ Reagent: A New, Higher Efficiency Polycationic Liposome Transfection Reagent," Focus, 1993, vol. 15, No. 3, pp. 73-80.

Heyes et al., "Cationic lipid saturation influences intracellular delivery of encapsulated nucleic acids," Journal of Controlled Release, 2005, vol. 107, pp. 276-287.

Heyes et al., "Synthesis of novel cationic lipids: effect of structural modification on the efficiency of gene transfer," J. Med. Chem., 2002, vol. 45, pp. 99-114.

Hyde, S., et al., "Correction of the ion transport defect in cystic fibrosis transgenic mice by gene therapy," Nature, 1993, vol. 362, pp. 250-255.

Jiang, L., et al., "Comparison of protein precipitation methods for sample preparation prior to proteomic analysis," Journal of Chromatography A, 2004, vol. 1023, pp. 317-320.
Juliano, R., et al., "The Effect of Particle Size and Charge on the Clearance Rates of Liposomes and Liposome Encapsulated Drugs," Biochem. Biophys. Res. Commun., 1975, vol. 63, No. 3, pp. 651-658.
Keough, K., "Influence of chain unsaturation and chain position on thermotropism and intermolecular interactions in membranes," Biochem. Soc. Transactions, 1990, vol. 18, No. 5, pp. 835-837.
Lawrence et al. "The formation, characterization and stability of non-ionic surfactant vesicles," S.T.P. Pharma Sciences, 1996, vol. 6, No. 1, pp. 49-60.
Lawrence et al., "Synthesis and aggregation properties of dialkyl polyoxyethylene glycerol ethers," Chemistry and Physics of Lipids, 1996, 82(2):89-100.
Legendre, J.-Y. et al., "Delivery of Plasmid DNA into Mammalian Cell Lines Using pH-Sensitive Liposomes: Comparison with Cationic Liposomes," Pharm. Res., 1992, vol. 9, No. 10, pp. 1235-1242.
Leventis, R., et al., "Interactions of mammalian cells with lipid dispersions containing novel metabolizable cationic amphiphiles," Biochem. Biophys. Acta, 1990, vol. 1023, pp. 124-132.
Liu, et al., "Cationic Liposome-mediated Intravenous Gene Delivery", J. Biol. Chem., 1995, V. 270, pp. 24864-24870.
Marshall, E., "Gene Therapy's Growing Pains," Science, 1995, vol. 269, pp. 1050-1055.
Murahashi et al., "Synthesis and evaluation of neoglycolipid for liposome modification," Biol. Pharm. Bull., 1997, 20(6):704-707.
Orkin, S., et al., NIH Report, Report and Recommendations of the Panel to Assess the NIH Investment in Research on Gene Therapy, 1995.
Parr et al., Factors influencing the retention and chemical stability of polly(ethylene glycol)-lipid conjugates incorporated into large unilamellar vesicles, Biochimica et Biophysica Acta, 1994, 1195:21-30.
Paul, C., et al., "Effective expression of small interfering RNA in human cells," Nature Biotech., 2002, vol. 20, pp. 505-508.
Puyal, C., et al., "A new cationic liposome encapsulating genetic material: A potential delivery system for polynucleotides," Eur. J. Biochem., 1995, vol. 228, pp. 697-703.
Sawada et al., "Microemulsions in supercritical $CO_2$ utilizing the polyethyleneglycol dialkylglycerol and their use for the solubilization of hydrophiles," Dyes and Pigments, 2005, pp. 64-74, vol. 65.
Shin, et al. "Acid-triggered release via dePEGylation of DOPE liposomes containing acid-labile vinyl ether PEG-lipids," Journal of Controlled Release, 2003, vol. 91, pp. 187-200.
Song et al., "Characterization of the inhibitory effect of PEG-lipid conjugates on the intracellular delivery of plasmid and antisense DNA mediated by cationic lipid liposomes," Biochimica et Biophysica Acta, 2002, 1558:1-13.
Sorensen, et al., "Gene Silencing by Systemic Delivery of Synthetic siRNAs in Adult Mice", J. Biol. Chem., 2003, V. 327, pp. 761-766.
Spagnou, S., et al., "Lipidic Carriers of siRNA: Differences in the Formulation, Cellular Uptake, and Delivery with Plasmid DNA," Biochemistry, 2004, vol. 43, pp. 13348-13356.
Stamatatos, L., et al., "Interactions of Cationic Lipid Vesicles with Negatively Charged Phospholipid Vesicles and Biological Membranes," Biochemistry, 1988, vol. 27, pp. 3917-3925.
Szoka, F., et al., "Comparative Properties and Methods of Preparation of Lipid Vesicles (Liposomes)," Ann. Rev. Biophys. Bioeng., 1980, vol. 9, pp. 467-508.
Szoka, F., et al., "Procedure for preparation of liposomes with large internal aqueous space and high capture by reverse-phase evaporation," Proc. Natl. Acad. Sci. USA, 1978, vol. 75, No. 9, pp. 4194-4198.
Templeton, "Cationic Liposome-mediated Gene Delivery in vivo", Bioscience Reports, 2002, vol. 22, No. 2, pp. 283-295.
Van Der Woude, I., et al., "Parameters influencing the introduction of plasmid DNA into cells by the use of synthetic amphiphiles as a carrier system," Biochimica et Biophysica Acta, 1995, vol. 1240, pp. 34-40.
Wheeler, et al., "Stabilized Plasmid-lipid Particles: Constructions and Characterization," Gene Therapy, V. 6, pp. 271-281, 1999.
Wilson, R., et al., "Counterion-Induced Condensation of Deoxyribonucleic Acid," A Light-Scattering Study, Biochemistry, 1979, vol. 18, No. 11, pp. 2192-2196.
Woodle, M.C., et al., "Versatility in lipid compositions showing prolonged circulation with sterically stabilized liposomes," Biochimica et Biophysica Acta, 1992, vol. 1105, pp. 193-200.
Zhu, N., et al., "Systemic Gene Expression After Intravenous DNA Delivery into Adult Mice," Science, 1993, vol. 261, pp. 209-211.

* cited by examiner


Activity of SNALP on HT29 Cell Line
Viability (% Untreated Cells)
nM Total siRNA
1.2
1
0.8
0.6
0.4
0.2
0
1
10
100
Sample 1
Sample 2
Sample 3
Sample 4
Sample 5
Sample 6
Sample 7
Sample 8

*FIG. 1A*


Activity of SNALP on HT29 Cell Line
Viability (% Untreated Cells)
1.2
1
0.8
0.6
0.4
0.2
0
1
10
100
nM Total siRNA
Sample 9
Sample 10
Sample 11
Sample 12
Sample 13
Sample 14
Sample 15
Sample 16

FIG. 1B


Activity of SNALP Upon Intravenous Administration in Mice
group mean ± SD (n=4)
Liver ApoB:GAPD mRNA Ratio
0.0
0.5
1.0
1.5
2.0
2.5
PBS
Group 2
Group 3
Group 4
Group 5
Group 6
Group 7
Group 8
Group 9
Group 10
Group 11
Group 12
Group 13
Group 14

*FIG. 2*


3.0
2.5
2.0
1.5
1.0
0.5
0.0
Liver ApoB:GAPD mRNA Ratio
-47% vs PBS Control
-77% vs PBS Control
PBS
2:30 SNALP 5x1 mg/kg
1:57 SNALP 5x0.1 mg/kg

*FIG. 3*


Activity of SNALP Upon Intravenous Administration in Mice
group mean ± SD (n=4)
Liver ApoB:GAPD mRNA Ratio
2.0
1.5
1.0
0.5
0.0
PBS
Group 2
Group 3
Group 4
Group 5
Group 6
Group 7
Group 8

*FIG. 4*


Activity of SNALP Upon Intravenous Administration in Mice
group mean ± SD (n=4)
Liver ApoB:GAPD mRNA Ratio
0.0
0.5
1.0
1.5
2.0
PBS
Group 2
Group 3
Group 4
Group 5
Group 6
Group 7
Group 8
Group 9
Group 10
Group 11
Group 12
Group 13
Group 14
Group 15

*FIG. 5*


Tolerability of IV 1:57 SNALP in Female BALB/c Mice, n=4, SD error
Alanine Aminotransferase
Aspartate Aminotransferase
Sorbital Dehydrogenase
Incr'd SDH, ALT levels indicate hepatocyte damage.
IU/L
140
120
100
80
60
40
20
0
37
46
23
40
53
27
50
81
33
41
59
27
69
96
40
168
205
62
58
79
35
PBS
Syringe Citrate 7mg/kg
Syringe PBS 7mg/kg
Gear PBS 7mg/kg
Syringe Citrate 9mg/kg
Syringe PBS 9mg/kg
Gear PBS 9mg/kg

*FIG. 6A*


Tolerability of IV 1:57 SNALP in Female BALB/c Mice, n=4, SD error
Alanine Aminotransferase
Aspartate Aminotransferase
Sorbital Dehydrogenase
2-fold increase ("3xULN") is considered clinically significant
x-Fold Upper Limit of Normal
5
4
3
2
1
0
8.7
7.9
1 2 3 4 5 6 7 8 9 10 11 12 13 14 15 16 17 18 19 20 21 22 23 24 25 26 27 28
PBS
Syringe Citrate
Syringe PBS
Gear PBS
Syringe Citrate
Syringe PBS
Gear PBS
Lipid dose
siRNA dose
77
96
79
99
123
102
7 mg/kg
9 mg/kg

*FIG. 6B*

*FIG. 7A*




*FIG. 7B*




*FIG. 7C*




Tolerability of 1|57 SNALP IV in BALB/c Mice, n=4 (Grp1-3 n=3), SD error
Body Weight Loss at Hour 24 (vs Pre-Dose)
6%
4%
2%
0%
-2%
-4%
-6%
PBS
9:1 7mg/kg
9:1 11mg/kg
PBS
9:1 9mg/kg
9:1 11mg /kg
6:1 11mg /kg
6:1 13mg/ kg
6:1 15mg/ kg
6:1 17mg/ kg
9:1 11mg/ kg

*FIG. 8*


Tolerability of IV 1|57 SNALP Prepared at 9:1 Lipid:Drug Ratio
Platelet Count
10e9 cells/L
1,400
1,200
1,000
800
600
400
200
0
881
909
921
854
854
827
813
794
828
902 ± 21
2%RSD
845 ± 16
-6% ± 2%
812 ± 17
-10% ± 2%
1
2
3
4
5
6
7
8
9
PBS
Gear PBS InLine at
7 (71) mg/kg
Gear PBS InLine at
11 (112) mg/kg

*FIG. 9*


Tolerability of IV 1:57 Gear PBS In-Line SNALP in Female BALB/c Mice, n=4, SD error
Alanine Aminotransferase
Aspartate Aminotransferase
Sorbital Dehydrogenase
Samples taken at 24 h time point except for last grp (48 h).
IU/L
1,200
1,000
800
600
400
200
0
30
22
52
37
148
60
42
27
107
49
456
129
893
220
688
61
PBS
9:1 SNALP 9mg/kg
9:1 SNALP 11mg/kg
6:1 SNALP 11mg/kg
6:1 SNALP 13mg/kg
6:1 SNALP 15mg/kg
6:1 SNALP 17mg/kg
9:1 SNALP 11mg/kg 48h

*FIG. 10A*


Tolerability of IV 1:57 Gear PBS In-Line SNALP in Female BALB/c Mice, n=4, SD error
Alanine Aminotransferase
Aspartate Aminotransferase
Sorbital Dehydrogenase
2-fold increase ("3xULN") is considered clinically significant
x-Fold Upper Limit of Normal
0
10
20
30
40
50
10 11 12 13 14 15 16 17 18 19 20 21 22 23 24 25 26 27 28 29 30 31 32 33 34 35 36 37 38 39 40 41
siRNA dose
Lipid dose
PBS
9mg/kg
92
11mg/kg
112
9:1 SNALP (10)
11mg/kg
78
13mg/kg
93
15mg/kg
107
17mg/kg
121
6:1 SNALP (7)
11mg/kg
112
9:1 (10)

FIG. 10B

FIG. 11A




FIG. 11B




Efficacy of SNALP Reformulations
Fresh Terminal Plasma, n=4 female Balb/c mice, SD Error Bars
Plasma Total Cholesterol (mg/dL)
60
50
40
30
20
10
0
-3%
-15%
-46%
-1%
-18%
-41%
-44%
PBS
0.05 mg/kg
0.1 mg/kg
0.2 mg/kg
0.05 mg/kg
0.1 mg/kg
0.2 mg/kg
0.4 mg/kg
1:57 SNALP (10:1)
New 1:57 SNALP (7:1)

*FIG. 12*


Luc
PLK1424
Body Weight
120%
115%
110%
105%
100%
95%
90%
8
12
16
20
24
28
32
36
40
44
48
52
56
60
Study Day

*FIG. 13*


Control SNALP
Active SNALP
100%
80%
60%
40%
20%
0%
Survival
15 20 25 30 35 40 45 50 55 60 65 70 75 80 85 90
Days after seeding

*FIG. 14*




*FIG. 15*


1
2
3
4
5
6
7
8
9
10
500
400
300
200
100
PLK1424 5'RACE product 476bp

*FIG. 16*



x200 mag



x400 mag



x200 mag



x400 mag

*FIG. 17*


6x2mg/kg Mean tumor volume
Luc-DMA
PLK-DMA
PLK-DSA
Tumor volume
1000
800
600
400
200
0
8
10
12
14
16
18
20
22
24
Days

*FIG. 18*


PLK mRNA silencing in scid /beige mice treated with 2mg/kg 1:57 SNALP against subcutaneous Hep3B tumors
Mean hPLK1/hGAPDH ratio
0.70
0.60
0.50
0.40
0.30
0.20
0.10
0.00
100%
-30%
-15%
-65%
-37%
-52%
24h Luc cDMA 2 mg/kg
24h PLK cDMA 2 mg/kg
72h PLK cDMA 2 mg/kg
24h PLK cDSA 2 mg/kg
72h PLK cDSA 2 mg/kg
24h PLK cDSA 1 mg/kg

*FIG. 19*


6x2mg/kg Mean tumor volume
Luc-DMA
PLK-DMA
PLK-DSA
Crossover dosing of Luc cDMA group with 6 x 2 mg/kg PLK cDSA SNALP
Initial 6 x 2 mg/kg SNALP
Tumor volume
Days
0
200
400
600
800
1000
1200
1400
1600
1800
2000
2200
8 10 12 14 16 18 20 22 24 26 28 30 32 34 36 38 40 42 44 46 48 50

*FIG. 20*


Mean hPLK (1:4) : hGAPDH (1:40) minus "background"
Mean hPLK (1:4) : hGAPDH (1:40)
1.20
1.00
0.80
0.60
0.40
0.20
0.00
0.99
0.23
0.23
0.61
0.42
24h Luc 1:57 cDMA
24h PLK 1:57 cDMA
24h PLK 1:57 cDSA
96h PLK 1:57 cDMA
96h PLK 1:57 cDSA

*FIG. 21*


80
70
60
50
40
30
20
10
0
% injected dose
1:57 PEG-cDSA SNALP
1:57 PEG-cDMA SNALP
0
1
2
3
4
5
6
7
8
9
Time (h)

*FIG. 22*

## LIPID FORMULATIONS FOR NUCLEIC ACID DELIVERY

### CROSS-REFERENCES TO RELATED APPLICATIONS

The present application is a continuation of U.S. application Ser. No. 12/424,367 filed Apr. 15, 2009, now U.S. Pat. No. 8,058,069, which application claims priority to U.S. Provisional Application No. 61/045,228, filed Apr. 15, 2008, the disclosures of which are herein incorporated by reference in their entirety for all purposes.

### STATEMENT REGARDING FEDERALLY SPONSORED RESEARCH OR DEVELOPMENT

Not applicable.

### NAMES OF PARTIES TO A JOINT RESEARCH AGREEMENT

Not applicable.

### REFERENCE TO A "SEQUENCE LISTING," A TABLE, OR A COMPUTER PROGRAM LISTING APPENDIX SUBMITTED AS AN ASCII TEXT FILE

The Sequence Listing written in file-77-2.TXT, created on Mar. 13, 2012, 8,192 bytes, machine format IBM-PC, MS-Windows operating system, is hereby incorporated by reference in its entirety for all purposes.

### BACKGROUND OF THE INVENTION

RNA interference (RNAi) is an evolutionarily conserved process in which recognition of double-stranded RNA (dsRNA) ultimately leads to posttranscriptional suppression of gene expression. This suppression is mediated by short dsRNA, also called small interfering RNA (siRNA), which induces specific degradation of mRNA through complementary base pairing. In several model systems, this natural response has been developed into a powerful tool for the investigation of gene function (see, e.g., Elbashir et al., *Genes Dev.,* 15:188-200 (2001); Hammond et al., *Nat. Rev. Genet.,* 2:110-119 (2001)). More recently, it was discovered that introducing synthetic 21-nucleotide dsRNA duplexes into mammalian cells could efficiently silence gene expression.

Although the precise mechanism is still unclear, RNAi provides a potential new approach to downregulate or silence the transcription and translation of a gene of interest. For example, it is desirable to modulate (e.g., reduce) the expression of certain genes for the treatment of neoplastic disorders such as cancer. It is also desirable to silence the expression of genes associated with liver diseases and disorders such as hepatitis. It is further desirable to reduce the expression of certain genes for the treatment of atherosclerosis and its manifestations, e.g., hypercholesterolemia, myocardial infarction, and thrombosis.

A safe and effective nucleic acid delivery system is required for RNAi to be therapeutically useful. Viral vectors are relatively efficient gene delivery systems, but suffer from a variety of limitations, such as the potential for reversion to the wild-type as well as immune response concerns. As a result, nonviral gene delivery systems are receiving increasing attention (Worgall et al., *Human Gene Therapy,* 8:37 (1997); Peeters et al., *Human Gene Therapy,* 7:1693 (1996); Yei et al., *Gene Therapy,* 1:192 (1994); Hope et al., *Molecular Membrane Biology,* 15:1 (1998)). Furthermore, viral systems are rapidly cleared from the circulation, limiting transfection to "first-pass" organs such as the lungs, liver, and spleen. In addition, these systems induce immune responses that compromise delivery with subsequent injections.



Plasmid DNA-cationic liposome complexes are currently the most commonly employed nonviral gene delivery vehicles (Felgner, *Scientific American,* 276:102 (1997); Chonn et al., *Current Opinion in Biotechnology,* 6:698 (1995)). For instance, cationic liposome complexes made of an amphipathic compound, a neutral lipid, and a detergent for transfecting insect cells are disclosed in U.S. Pat. No. 6,458,382. Cationic liposome complexes are also disclosed in U.S. Patent Publication No. 20030073640.

Cationic liposome complexes are large, poorly defined systems that are not suited for systemic applications and can elicit considerable toxic side effects (Harrison et al., *Biotechniques,* 19:816 (1995); Li et al., *The Gene,* 4:891 (1997); Tam et al., *Gene Ther.,* 7:1867 (2000)). As large, positively charged aggregates, lipoplexes are rapidly cleared when administered in vivo, with highest expression levels observed in first-pass organs, particularly the lungs (Huang et al., *Nature Biotechnology,* 15:620 (1997); Templeton et al., *Nature Biotechnology,* 15:647 (1997); Hofland et al., *Pharmaceutical Research,* 14:742 (1997)).

Other liposomal delivery systems include, for example, the use of reverse micelles, anionic liposomes, and polymer liposomes. Reverse micelles are disclosed in U.S. Pat. No. 6,429,200. Anionic liposomes are disclosed in U.S. Patent Publication No. 20030026831. Polymer liposomes that incorporate dextrin or glycerol-phosphocholine polymers are disclosed in U.S. Patent Publication Nos. 20020081736 and 20030082103, respectively.

A gene delivery system containing an encapsulated nucleic acid for systemic delivery should be small (i.e., less than about 100 nm diameter) and should remain intact in the circulation for an extended period of time in order to achieve delivery to affected tissues. This requires a highly stable, serum-resistant nucleic acid-containing particle that does not interact with cells and other components of the vascular compartment. The particle should also readily interact with target cells at a disease site in order to facilitate intracellular delivery of a desired nucleic acid.

Recent work has shown that nucleic acids can be encapsulated in small (e.g., about 70 nm diameter) "stabilized plasmid-lipid particles" (SPLP) that consist of a single plasmid encapsulated within a bilayer lipid vesicle (Wheeler et al., *Gene Therapy,* 6:271 (1999)). These SPLPs typically contain the "fusogenic" lipid dioleoylphosphatidylethanolamine (DOPE), low levels of cationic lipid, and are stabilized in aqueous media by the presence of a poly(ethylene glycol) (PEG) coating. SPLPs have systemic application as they exhibit extended circulation lifetimes following intravenous (i.v.) injection, accumulate preferentially at distal tumor sites due to the enhanced vascular permeability in such regions, and can mediate transgene expression at these tumor sites. The levels of transgene expression observed at the tumor site following i.v. injection of SPLPs containing the luciferase marker gene are superior to the levels that can be achieved employing plasmid DNA-cationic liposome complexes (lipoplexes) or naked DNA.

Thus, there remains a strong need in the art for novel and more efficient methods and compositions for introducing nucleic acids such as siRNA into cells. In addition, there is a need in the art for methods of downregulating the expression of genes of interest to treat or prevent diseases and disorders

such as cancer and atherosclerosis. The present invention addresses these and other needs.

## BRIEF SUMMARY OF THE INVENTION

The present invention provides novel, serum-stable lipid particles comprising one or more active agents or therapeutic agents, methods of making the lipid particles, and methods of delivering and/or administering the lipid particles (e.g., for the treatment of a disease or disorder).

In preferred embodiments, the active agent or therapeutic agent is fully encapsulated within the lipid portion of the lipid particle such that the active agent or therapeutic agent in the lipid particle is resistant in aqueous solution to enzymatic degradation, e.g., by a nuclease or protease. In other preferred embodiments, the lipid particles are substantially non-toxic to mammals such as humans.

In one aspect, the present invention provides lipid particles comprising: (a) one or more active agents or therapeutic agents; (b) one or more cationic lipids comprising from about 50 mol % to about 85 mol % of the total lipid present in the particle; (c) one or more non-cationic lipids comprising from about 13 mol % to about 49.5 mol % of the total lipid present in the particle; and (d) one or more conjugated lipids that inhibit aggregation of particles comprising from about 0.5 mol % to about 2 mol % of the total lipid present in the particle.

More particularly, the present invention provides serum-stable nucleic acid-lipid particles (SNALP) comprising a nucleic acid (e.g., one or more interfering RNA molecules such as siRNA, aiRNA, and/or miRNA), methods of making the SNALP, and methods of delivering and/or administering the SNALP (e.g., for the treatment of a disease or disorder).

In certain embodiments, the nucleic acid-lipid particle (e.g., SNALP) comprises: (a) a nucleic acid (e.g., an interfering RNA); (b) a cationic lipid comprising from about 50 mol % to about 85 mol % of the total lipid present in the particle; (c) a non-cationic lipid comprising from about 13 mol % to about 49.5 mol % of the total lipid present in the particle; and (d) a conjugated lipid that inhibits aggregation of particles comprising from about 0.5 mol % to about 2 mol % of the total lipid present in the particle.

In one preferred embodiment, the nucleic acid-lipid particle (e.g., SNALP) comprises: (a) an siRNA; (b) a cationic lipid comprising from about 56.5 mol % to about 66.5 mol % of the total lipid present in the particle; (c) cholesterol or a derivative thereof comprising from about 31.5 mol % to about 42.5 mol % of the total lipid present in the particle; and (d) a PEG-lipid conjugate comprising from about 1 mol % to about 2 mol % of the total lipid present in the particle. This preferred embodiment of nucleic acid-lipid particle is generally referred to herein as the "1:62" formulation.

In another preferred embodiment, the nucleic acid-lipid particle (e.g., SNALP) comprises: (a) an siRNA; (b) a cationic lipid comprising from about 52 mol % to about 62 mol % of the total lipid present in the particle; (c) a mixture of a phospholipid and cholesterol or a derivative thereof comprising from about 36 mol % to about 47 mol % of the total lipid present in the particle; and (d) a PEG-lipid conjugate comprising from about 1 mol % to about 2 mol % of the total lipid present in the particle. This preferred embodiment of nucleic acid-lipid particle is generally referred to herein as the "1:57" formulation.

The present invention also provides pharmaceutical compositions comprising a lipid particle described herein (e.g., SNALP) and a pharmaceutically acceptable carrier.

In another aspect, the present invention provides methods for introducing an active agent or therapeutic agent (e.g., nucleic acid) into a cell, the method comprising contacting the cell with a lipid particle described herein such as a nucleic acid-lipid particle (e.g., SNALP).

In yet another aspect, the present invention provides methods for the in vivo delivery of an active agent or therapeutic agent (e.g., nucleic acid), the method comprising administering to a mammalian subject a lipid particle described herein such as a nucleic acid-lipid particle (e.g., SNALP).

In a further aspect, the present invention provides methods for treating a disease or disorder in a mammalian subject in need thereof, the method comprising administering to the mammalian subject a therapeutically effective amount of a lipid particle described herein such as a nucleic acid-lipid particle (e.g., SNALP).

Other objects, features, and advantages of the present invention will be apparent to one of skill in the art from the following detailed description and figures.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1**A (Samples 1-8) and FIG. **1**B (Samples 9-16 illustrate data demonstrating the activity of 1:57 SNALP containing Eg5 siRNA in a human colon cancer cell line.

FIG. **2** illustrates data demonstrating the activity of 1:57 SNALP containing ApoB siRNA following intravenous administration in mice.

FIG. **3** illustrates additional data demonstrating the activity of 1:57 SNALP containing ApoB siRNA following intravenous administration in mice. Each bar represents the group mean of five animals. Error bars indicate the standard deviation.

FIG. **4** illustrates data demonstrating the activity of 1:57 and 1:62 SNALP containing ApoB siRNA following intravenous administration in mice.

FIG. **5** illustrates data demonstrating the activity of 1:62 SNALP containing ApoB siRNA following intravenous administration in mice.

FIG. **6**A (expressed as IU/L) and FIG. **6**B (expressed as x-Fold Upper Limit of Normal) illustrate data demonstrating that the tolerability of 1:57 SNALP containing ApoB siRNA prepared by citrate buffer versus PBS direct dilution did not differ significantly in terms of blood clinical chemistry parameters.

FIG. **7**A (expressed as liver ApoB:GAPD mRNA ratio), FIG. **7**B (expressed as relative plasma ApoB-100 concentration), and FIG. **7**C (expressed as plasma total cholesterol illustrate data demonstrating that the efficacy of 1:57 SNALP containing ApoB siRNA prepared by gear pump was similar to the same SNALP prepared by syringe press.

FIG. **8** illustrates data demonstrating that there was very little effect on body weight 24 hours after administration of 1:57 SNALP containing ApoB siRNA.

FIG. **9** illustrates data demonstrating that there were no obvious changes in platelet count after administration of 1:57 SNALP containing ApoB siRNA.

FIG. **10**A (expressed as IU/L) and FIG. **10**B (expressed as x-Fold Upper Limit of Normal) illustrate data demonstrating that clinically significant liver enzyme elevations (3xULN) occurred at particular drug dosages of 1:57 SNALP containing ApoB siRNA.

FIG. **11**A (expressed as liver ApoB:GAPD mRNA ratio) and FIG. **11**B (expressed as relative plasma ApoB-100 concentration illustrate data demonstrating that the potency of

the lower lipid:drug (L:D) 1:57 SNALP containing ApoB siRNA was as good as that of the higher L:D SNALP at the tested drug dosages.

FIG. **12** illustrates data demonstrating that ApoB protein and total cholesterol levels were reduced to a similar extent by 1:57 SNALP containing ApoB siRNA at a 6:1 input L:D ratio (final ratio of 7:1) and 1:57 SNALP at a 9:1 input L:D ratio (final ratio of 10:1).

FIG. **13** illustrates data demonstrating that a treatment regimen of 1:57 SNALP with siRNA targeting PLK-1 is well tolerated with no apparent signs of treatment related toxicity in mice bearing Hep3B liver tumors.

FIG. **14** illustrates data demonstrating that treatment with 1:57 SNALP containing PLK-1 siRNA caused a significant increase in the survival of Hep3B tumor-bearing mice.

FIG. **15** illustrates data demonstrating that treatment with 1:57 SNALP containing PLK-1 siRNA reduced PLK-1 mRNA levels by 50% in intrahepatic Hep3B tumors growing in mice 24 hours after SNALP administration.

FIG. **16** illustrates data demonstrating that a specific cleavage product of PLK-1 mRNA was detectable by 5' RACE-PCR in mice treated with 1:57 SNALP containing PLK-1 siRNA. 10 μl PCR product/well were loaded onto a 1.5% agarose gel. Lane Nos.: (1) molecular weight (MW) marker; (2) PBS mouse 1; (3) PBS mouse 2; (4) PBS mouse 3; (5) Luc SNALP mouse 1; (6) Luc SNALP mouse 2; (7) PLK SNALP mouse 1; (8) PLK SNALP mouse 2; (9) PLK SNALP mouse 3; and (10) no template control.

FIG. **17** illustrates data demonstrating that control (Luc) 1:57 SNALP-treated mice displayed normal mitoses in Hep3B tumors (top panels), whereas mice treated with 1:57 SNALP containing PLK-1 siRNA exhibited numerous aberrant mitoses and tumor cell apoptosis in Hep3B tumors (bottom panels).

FIG. **18** illustrates data demonstrating that multiple doses of 1:57 PLK-1 SNALP containing PEG-cDSA induced the regression of established Hep3B subcutaneous (S.C.) tumors.

FIG. **19** illustrates data demonstrating PLK-1 mRNA silencing using 1:57 PLK SNALP in S.C. Hep3B tumors following a single intravenous SNALP administration.

FIG. **20** illustrates data demonstrating that PLK-1 PEG-cDSA SNALP inhibited the growth of large S.C. Hep3B tumors.

FIG. **21** illustrates data demonstrating tumor-derived PLK-1 mRNA silencing in Hep3B intrahepatic tumors.

FIG. **22** illustrates data demonstrating the blood clearance profile of 1:57 PLK-1 SNALP containing either PEG-cDMA or PEG-cDSA.

## DETAILED DESCRIPTION OF THE INVENTION

### I. Introduction

The present invention is based, in part, upon the surprising discovery that lipid particles comprising from about 50 mol % to about 85 mol % of a cationic lipid, from about 13 mol % to about 49.5 mol % of a non-cationic lipid, and from about 0.5 mol % to about 2 mol % of a lipid conjugate provide advantages when used for the in vitro or in vivo delivery of an active agent, such as a therapeutic nucleic acid (e.g., an interfering RNA). In particular, as illustrated by the Examples herein, the present invention provides stable nucleic acid-lipid particles (SNALP) that advantageously impart increased activity of the encapsulated nucleic acid (e.g., an interfering RNA such as siRNA) and improved tolerability of the formulations in vivo, resulting in a significant increase in the therapeutic index as compared to nucleic acid-lipid particle compositions previously described. Additionally, the SNALP of the invention are stable in circulation, e.g., resistant to degradation by nucleases in serum, and are substantially non-toxic to mammals such as humans. As a non-limiting example, FIG. **3** of Example 4 shows that one SNALP embodiment of the invention ("1:57 SNALP") was more than 10 times as efficacious as compared to a nucleic acid-lipid particle previously described ("2:30 SNALP") in mediating target gene silencing at a 10-fold lower dose. Similarly, FIG. **2** of Example 3 shows that the "1:57 SNALP" formulation was substantially more effective at silencing the expression of a target gene as compared to nucleic acid-lipid particles previously described ("2:40 SNALP").

In certain embodiments, the present invention provides improved compositions for the delivery of interfering RNA such as siRNA molecules. In particular, the Examples herein illustrate that the improved lipid particle formulations of the invention are highly effective in downregulating the mRNA and/or protein levels of target genes. Furthermore, the Examples herein illustrate that the presence of certain molar ratios of lipid components results in improved or enhanced activity of these lipid particle formulations of the present invention. For instance, the "1:57 SNALP" and "1:62 SNALP" formulations described herein are exemplary formulations of the present invention that are particularly advantageous because they provide improved efficacy and tolerability in vivo, are serum-stable, are substantially non-toxic, are capable of accessing extravascular sites, and are capable of reaching target cell populations.

The lipid particles and compositions of the present invention may be used for a variety of purposes, including the delivery of associated or encapsulated therapeutic agents to cells, both in vitro and in vivo. Accordingly, the present invention provides methods for treating diseases or disorders in a subject in need thereof, by contacting the subject with a lipid particle described herein comprising one or more suitable therapeutic agents.

Various exemplary embodiments of the lipid particles of the invention, as well as compositions and formulations comprising the same, and their use to deliver therapeutic agents and modulate target gene and protein expression, are described in further detail below.

### II. Definitions

As used herein, the following terms have the meanings ascribed to them unless specified otherwise.

The term "interfering RNA" or "RNAi" or "interfering RNA sequence" refers to single-stranded RNA (e.g., mature miRNA) or double-stranded RNA (i.e., duplex RNA such as siRNA, aiRNA, or pre-miRNA) that is capable of reducing or inhibiting the expression of a target gene or sequence (e.g., by mediating the degradation or inhibiting the translation of mRNAs which are complementary to the interfering RNA sequence) when the interfering RNA is in the same cell as the target gene or sequence. Interfering RNA thus refers to the single-stranded RNA that is complementary to a target mRNA sequence or to the double-stranded RNA formed by two complementary strands or by a single, self-complementary strand. Interfering RNA may have substantial or complete identity to the target gene or sequence, or may comprise a region of mismatch (i.e., a mismatch motif). The sequence of the interfering RNA can correspond to the full-length target gene, or a subsequence thereof.

Interfering RNA includes "small-interfering RNA" or "siRNA," e.g., interfering RNA of about 15-60, 15-50, or 15-40 (duplex) nucleotides in length, more typically about

15-30, 15-25, or 19-25 (duplex) nucleotides in length, and is preferably about 20-24, 21-22, or 21-23 (duplex) nucleotides in length (e.g., each complementary sequence of the double-stranded siRNA is 15-60, 15-50, 15-40, 15-30, 15-25, or 19-25 nucleotides in length, preferably about 20-24, 21-22, or 21-23 nucleotides in length, and the double-stranded siRNA is about 15-60, 15-50, 15-40, 15-30, 15-25, or 19-25 base pairs in length, preferably about 18-22, 19-20, or 19-21 base pairs in length). siRNA duplexes may comprise 3' overhangs of about 1 to about 4 nucleotides or about 2 to about 3 nucleotides and 5' phosphate termini. Examples of siRNA include, without limitation, a double-stranded polynucleotide molecule assembled from two separate stranded molecules, wherein one strand is the sense strand and the other is the complementary antisense strand; a double-stranded polynucleotide molecule assembled from a single stranded molecule, where the sense and antisense regions are linked by a nucleic acid-based or non-nucleic acid-based linker; a double-stranded polynucleotide molecule with a hairpin secondary structure having self-complementary sense and antisense regions; and a circular single-stranded polynucleotide molecule with two or more loop structures and a stem having self-complementary sense and antisense regions, where the circular polynucleotide can be processed in vivo or in vitro to generate an active double-stranded siRNA molecule.

Preferably, siRNA are chemically synthesized. siRNA can also be generated by cleavage of longer dsRNA (e.g., dsRNA greater than about 25 nucleotides in length) with the *E. coli* RNase III or Dicer. These enzymes process the dsRNA into biologically active siRNA (see, e.g., Yang et al., *Proc. Natl. Acad. Sci. USA,* 99:9942-9947 (2002); Calegari et al., *Proc. Natl. Acad. Sci. USA,* 99:14236 (2002); Byrom et al., *Ambion TechNotes,* 10(1):4-6 (2003); Kawasaki et al., *Nucleic Acids Res.,* 31:981-987 (2003); Knight et al., *Science,* 293:2269-2271 (2001); and Robertson et al., *J. Biol. Chem.,* 243:82 (1968)). Preferably, dsRNA are at least 50 nucleotides to about 100, 200, 300, 400, or 500 nucleotides in length. A dsRNA may be as long as 1000, 1500, 2000, 5000 nucleotides in length, or longer. The dsRNA can encode for an entire gene transcript or a partial gene transcript. In certain instances, siRNA may be encoded by a plasmid (e.g., transcribed as sequences that automatically fold into duplexes with hairpin loops).

As used herein, the term "mismatch motif" or "mismatch region" refers to a portion of an interfering RNA (e.g., siRNA, aiRNA, miRNA) sequence that does not have 100% complementarity to its target sequence. An interfering RNA may have at least one, two, three, four, five, six, or more mismatch regions. The mismatch regions may be contiguous or may be separated by 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, or more nucleotides. The mismatch motifs or regions may comprise a single nucleotide or may comprise two, three, four, five, or more nucleotides.

An "effective amount" or "therapeutically effective amount" of an active agent or therapeutic agent such as an interfering RNA is an amount sufficient to produce the desired effect, e.g., an inhibition of expression of a target sequence in comparison to the normal expression level detected in the absence of an interfering RNA. Inhibition of expression of a target gene or target sequence is achieved when the value obtained with an interfering RNA relative to the control is about 90%, 85%, 80%, 75%, 70%, 65%, 60%, 55%, 50%, 45%, 40%, 35%, 30%, 25%, 20%, 15%, 10%, 5%, or 0%. Suitable assays for measuring expression of a target gene or target sequence include, e.g., examination of protein or RNA levels using techniques known to those of skill in the art such as dot blots, northern blots, in situ hybridization, ELISA, immunoprecipitation, enzyme function, as well as phenotypic assays known to those of skill in the art.

By "decrease," "decreasing," "reduce," or "reducing" of an immune response by an interfering RNA is intended to mean a detectable decrease of an immune response to a given interfering RNA (e.g., a modified interfering RNA). The amount of decrease of an immune response by a modified interfering RNA may be determined relative to the level of an immune response in the presence of an unmodified interfering RNA. A detectable decrease can be about 5%, 10%, 15%, 20%, 25%, 30%, 35%, 40%, 45%, 50%, 55%, 60%, 65%, 70%, 75%, 80%, 85%, 90%, 95%, 100%, or more lower than the immune response detected in the presence of the unmodified interfering RNA. A decrease in the immune response to interfering RNA is typically measured by a decrease in cytokine production (e.g., IFNγ, IFNα, TNFα, IL-6, or IL-12) by a responder cell in vitro or a decrease in cytokine production in the sera of a mammalian subject after administration of the interfering RNA.

As used herein, the term "responder cell" refers to a cell, preferably a mammalian cell, that produces a detectable immune response when contacted with an immunostimulatory interfering RNA such as an unmodified siRNA. Exemplary responder cells include, e.g., dendritic cells, macrophages, peripheral blood mononuclear cells (PBMCs), splenocytes, and the like. Detectable immune responses include, e.g., production of cytokines or growth factors such as TNF-α, IFN-α, IFN-β, IFN-γ, IL-1, IL-2, IL-3, IL-4, IL-5, IL-6, IL-10, IL-12, IL-13, TGF, and combinations thereof.

"Substantial identity" refers to a sequence that hybridizes to a reference sequence under stringent conditions, or to a sequence that has a specified percent identity over a specified region of a reference sequence.

The phrase "stringent hybridization conditions" refers to conditions under which a nucleic acid will hybridize to its target sequence, typically in a complex mixture of nucleic acids, but to no other sequences. Stringent conditions are sequence-dependent and will be different in different circumstances. Longer sequences hybridize specifically at higher temperatures. An extensive guide to the hybridization of nucleic acids is found in Tijssen, *Techniques in Biochemistry and Molecular Biology—Hybridization with Nucleic Probes*, "Overview of principles of hybridization and the strategy of nucleic acid assays" (1993). Generally, stringent conditions are selected to be about 5-10° C. lower than the thermal melting point ($T_m$) for the specific sequence at a defined ionic strength pH. The $T_m$ is the temperature (under defined ionic strength, pH, and nucleic concentration) at which 50% of the probes complementary to the target hybridize to the target sequence at equilibrium (as the target sequences are present in excess, at $T_m$, 50% of the probes are occupied at equilibrium). Stringent conditions may also be achieved with the addition of destabilizing agents such as formamide. For selective or specific hybridization, a positive signal is at least two times background, preferably 10 times background hybridization.

Exemplary stringent hybridization conditions can be as follows: 50% formamide, 5×SSC, and 1% SDS, incubating at 42° C., or, 5×SSC, 1% SDS, incubating at 65° C., with wash in 0.2×SSC, and 0.1% SDS at 65° C. For PCR, a temperature of about 36° C. is typical for low stringency amplification, although annealing temperatures may vary between about 32° C. and 48° C. depending on primer length. For high stringency PCR amplification, a temperature of about 62° C. is typical, although high stringency annealing temperatures can range from about 50° C. to about 65° C., depending on the primer length and specificity. Typical cycle conditions for both high and low stringency amplifications include a dena-

turation phase of 90° C.-95° C. for 30 sec.-2 min., an annealing phase lasting 30 sec.-2 min., and an extension phase of about 72° C. for 1-2 min. Protocols and guidelines for low and high stringency amplification reactions are provided, e.g., in Innis et al., *PCR Protocols, A Guide to Methods and Applications*, Academic Press, Inc. N.Y. (1990).

Nucleic acids that do not hybridize to each other under stringent conditions are still substantially identical if the polypeptides which they encode are substantially identical. This occurs, for example, when a copy of a nucleic acid is created using the maximum codon degeneracy permitted by the genetic code. In such cases, the nucleic acids typically hybridize under moderately stringent hybridization conditions. Exemplary "moderately stringent hybridization conditions" include a hybridization in a buffer of 40% formamide, 1 M NaCl, 1% SDS at 37° C., and a wash in 1×SSC at 45° C. A positive hybridization is at least twice background. Those of ordinary skill will readily recognize that alternative hybridization and wash conditions can be utilized to provide conditions of similar stringency. Additional guidelines for determining hybridization parameters are provided in numerous references, e.g., Current Protocols in Molecular Biology, Ausubel et al., eds.

The terms "substantially identical" or "substantial identity," in the context of two or more nucleic acids, refer to two or more sequences or subsequences that are the same or have a specified percentage of nucleotides that are the same (i.e., at least about 60%, preferably at least about 65%, 70%, 75%, 80%, 85%, 90%, or 95% identity over a specified region), when compared and aligned for maximum correspondence over a comparison window, or designated region as measured using one of the following sequence comparison algorithms or by manual alignment and visual inspection. This definition, when the context indicates, also refers analogously to the complement of a sequence. Preferably, the substantial identity exists over a region that is at least about 5, 10, 15, 20, 25, 30, 35, 40, 45, 50, 55, or 60 nucleotides in length.

For sequence comparison, typically one sequence acts as a reference sequence, to which test sequences are compared. When using a sequence comparison algorithm, test and reference sequences are entered into a computer, subsequence coordinates are designated, if necessary, and sequence algorithm program parameters are designated. Default program parameters can be used, or alternative parameters can be designated. The sequence comparison algorithm then calculates the percent sequence identities for the test sequences relative to the reference sequence, based on the program parameters.

A "comparison window," as used herein, includes reference to a segment of any one of a number of contiguous positions selected from the group consisting of from about 5 to about 60, usually about 10 to about 45, more usually about 15 to about 30, in which a sequence may be compared to a reference sequence of the same number of contiguous positions after the two sequences are optimally aligned. Methods of alignment of sequences for comparison are well known in the art. Optimal alignment of sequences for comparison can be conducted, e.g., by the local homology algorithm of Smith and Waterman, *Adv. Appl. Math.,* 2:482 (1981), by the homology alignment algorithm of Needleman and Wunsch, *J. Mol. Biol.,* 48:443 (1970), by the search for similarity method of Pearson and Lipman, *Proc. Natl. Acad. Sci. USA,* 85:2444 (1988), by computerized implementations of these algorithms (GAP, BESTFIT, FASTA, and TFASTA in the Wisconsin Genetics Software Package, Genetics Computer Group, 575 Science Dr., Madison, Wis.), or by manual alignment and visual inspection (see, e.g., *Current Protocols in Molecular Biology*, Ausubel et al., eds. (1995 supplement)).



A preferred example of algorithms that are suitable for determining percent sequence identity and sequence similarity are the BLAST and BLAST 2.0 algorithms, which are described in Altschul et al., *Nuc. Acids Res.,* 25:3389-3402 (1977) and Altschul et al., *J. Mol. Biol.,* 215:403-410 (1990), respectively. BLAST and BLAST 2.0 are used, with the parameters described herein, to determine percent sequence identity for the nucleic acids of the invention. Software for performing BLAST analyses is publicly available through the National Center for Biotechnology Information (www.ncbi.nlm.nih.gov/).

The BLAST algorithm also performs a statistical analysis of the similarity between two sequences (see, e.g., Karlin and Altschul, *Proc. Natl. Acad. Sci. USA,* 90:5873-5787 (1993)). One measure of similarity provided by the BLAST algorithm is the smallest sum probability (P(N)), which provides an indication of the probability by which a match between two nucleotide sequences would occur by chance. For example, a nucleic acid is considered similar to a reference sequence if the smallest sum probability in a comparison of the test nucleic acid to the reference nucleic acid is less than about 0.2, more preferably less than about 0.01, and most preferably less than about 0.001.

The term "nucleic acid" as used herein refers to a polymer containing at least two deoxyribonucleotides or ribonucleotides in either single- or double-stranded form and includes DNA and RNA. DNA may be in the form of, e.g., antisense molecules, plasmid DNA, pre-condensed DNA, a PCR product, vectors (P1, PAC, BAC, YAC, artificial chromosomes), expression cassettes, chimeric sequences, chromosomal DNA, or derivatives and combinations of these groups. RNA may be in the form of siRNA, asymmetrical interfering RNA (aiRNA), microRNA (miRNA), mRNA, tRNA, rRNA, tRNA, viral RNA (vRNA), and combinations thereof. Nucleic acids include nucleic acids containing known nucleotide analogs or modified backbone residues or linkages, which are synthetic, naturally occurring, and non-naturally occurring, and which have similar binding properties as the reference nucleic acid. Examples of such analogs include, without limitation, phosphorothioates, phosphoramidates, methyl phosphonates, chiral-methyl phosphonates, 2'-O-methyl ribonucleotides, and peptide-nucleic acids (PNAs). Unless specifically limited, the term encompasses nucleic acids containing known analogues of natural nucleotides that have similar binding properties as the reference nucleic acid. Unless otherwise indicated, a particular nucleic acid sequence also implicitly encompasses conservatively modified variants thereof (e.g., degenerate codon substitutions), alleles, orthologs, SNPs, and complementary sequences as well as the sequence explicitly indicated. Specifically, degenerate codon substitutions may be achieved by generating sequences in which the third position of one or more selected (or all) codons is substituted with mixed-base and/or deoxyinosine residues (Batzer et al., *Nucleic Acid Res.,* 19:5081 (1991); Ohtsuka et al., *J. Biol. Chem.,* 260:2605-2608 (1985); Rossolini et al., *Mol. Cell. Probes,* 8:91-98 (1994)). "Nucleotides" contain a sugar deoxyribose (DNA) or ribose (RNA), a base, and a phosphate group. Nucleotides are linked together through the phosphate groups. "Bases" include purines and pyrimidines, which further include natural compounds adenine, thymine, guanine, cytosine, uracil, inosine, and natural analogs, and synthetic derivatives of purines and pyrimidines, which include, but are not limited to, modifications which place new reactive groups such as, but not limited to, amines, alcohols, thiols, carboxylates, and alkylhalides.

The term "gene" refers to a nucleic acid (e.g., DNA or RNA) sequence that comprises partial length or entire length coding sequences necessary for the production of a polypeptide or precursor polypeptide.

"Gene product," as used herein, refers to a product of a gene such as an RNA transcript or a polypeptide.

The term "lipid" refers to a group of organic compounds that include, but are not limited to, esters of fatty acids and are characterized by being insoluble in water, but soluble in many organic solvents. They are usually divided into at least three classes: (1) "simple lipids," which include fats and oils as well as waxes; (2) "compound lipids," which include phospholipids and glycolipids; and (3) "derived lipids" such as steroids.

A "lipid particle" is used herein to refer to a lipid formulation that can be used to deliver an active agent or therapeutic agent, such as a nucleic acid (e.g., an interfering RNA), to a target site of interest. In the lipid particle of the invention, which is typically formed from a cationic lipid, a non-cationic lipid, and a conjugated lipid that prevents aggregation of the particle, the active agent or therapeutic agent may be encapsulated in the lipid, thereby protecting the agent from enzymatic degradation.

As used herein, the term "SNALP" refers to a stable nucleic acid-lipid particle. A SNALP represents a particle made from lipids (e.g., a cationic lipid, a non-cationic lipid, and a conjugated lipid that prevents aggregation of the particle), wherein the nucleic acid (e.g., siRNA, aiRNA, miRNA, ssDNA, dsDNA, ssRNA, short hairpin RNA (shRNA), dsRNA, or a plasmid, including plasmids from which an interfering RNA is transcribed) is fully encapsulated within the lipid. As used herein, the term "SNALP" includes an SPLP, which is the term used to refer to a nucleic acid-lipid particle comprising a nucleic acid (e.g., a plasmid) encapsulated within the lipid. SNALP and SPLP typically contain a cationic lipid, a non-cationic lipid, and a lipid conjugate (e.g., a PEG-lipid conjugate). SNALP and SPLP are extremely useful for systemic applications, as they can exhibit extended circulation lifetimes following intravenous (i.v.) injection, they can accumulate at distal sites (e.g., sites physically separated from the administration site), and they can mediate expression of the transfected gene or silencing of target gene expression at these distal sites. SPLP include "pSPLP," which comprise an encapsulated condensing agent-nucleic acid complex as set forth in PCT Publication No. WO 00/03683, the disclosure of which is herein incorporated by reference in its entirety for all purposes.

The lipid particles of the invention (e.g., SNALP) typically have a mean diameter of from about 40 nm to about 150 nm, from about 50 nm to about 150 nm, from about 60 nm to about 130 nm, from about 70 nm to about 110 nm, or from about 70 to about 90 nm, and are substantially non-toxic. In addition, nucleic acids, when present in the lipid particles of the invention, are resistant in aqueous solution to degradation with a nuclease. Nucleic acid-lipid particles and their method of preparation are disclosed in, e.g., U.S. Patent Publication Nos. 20040142025 and 20070042031, the disclosures of which are herein incorporated by reference in their entirety for all purposes.

As used herein, "lipid encapsulated" can refer to a lipid particle that provides an active agent or therapeutic agent, such as a nucleic acid (e.g., an interfering RNA), with full encapsulation, partial encapsulation, or both. In a preferred embodiment, the nucleic acid is fully encapsulated in the lipid particle (e.g., to form an SPLP, pSPLP, SNALP, or other nucleic acid-lipid particle).

The term "lipid conjugate" refers to a conjugated lipid that inhibits aggregation of lipid particles. Such lipid conjugates include, but are not limited to, polyamide oligomers (e.g., ATTA-lipid conjugates), PEG-lipid conjugates, such as PEG coupled to dialkyloxypropyls, PEG coupled to diacylglycerols, PEG coupled to cholesterol, PEG coupled to phosphatidylethanolamines, PEG conjugated to ceramides (see, e.g., U.S. Pat. No. 5,885,613, the disclosure of which is herein incorporated by reference in its entirety for all purposes), cationic PEG lipids, and mixtures thereof. PEG can be conjugated directly to the lipid or may be linked to the lipid via a linker moiety. Any linker moiety suitable for coupling the PEG to a lipid can be used including, e.g., non-ester containing linker moieties and ester-containing linker moieties. In preferred embodiments, non-ester containing linker moieties are used.

The term "amphipathic lipid" refers, in part, to any suitable material wherein the hydrophobic portion of the lipid material orients into a hydrophobic phase, while the hydrophilic portion orients toward the aqueous phase. Hydrophilic characteristics derive from the presence of polar or charged groups such as carbohydrates, phosphate, carboxylic, sulfato, amino, sulfhydryl, nitro, hydroxyl, and other like groups. Hydrophobicity can be conferred by the inclusion of apolar groups that include, but are not limited to, long-chain saturated and unsaturated aliphatic hydrocarbon groups and such groups substituted by one or more aromatic, cycloaliphatic, or heterocyclic group(s). Examples of amphipathic compounds include, but are not limited to, phospholipids, aminolipids, and sphingolipids.

Representative examples of phospholipids include, but are not limited to, phosphatidylcholine, phosphatidylethanolamine, phosphatidylserine, phosphatidylinositol, phosphatidic acid, palmitoyloleoyl phosphatidylcholine, lysophosphatidylcholine, lysophosphatidylethanolamine, dipalmitoylphosphatidylcholine, dioleoylphosphatidylcholine, distearoylphosphatidylcholine, and dilinoleoylphosphatidylcholine. Other compounds lacking in phosphorus, such as sphingolipid, glycosphingolipid families, diacylglycerols, and β-acyloxyacids, are also within the group designated as amphipathic lipids. Additionally, the amphipathic lipids described above can be mixed with other lipids including triglycerides and sterols.

The term "neutral lipid" refers to any of a number of lipid species that exist either in an uncharged or neutral zwitterionic form at a selected pH. At physiological pH, such lipids include, for example, diacylphosphatidylcholine, diacylphosphatidylethanolamine, ceramide, sphingomyelin, cephalin, cholesterol, cerebrosides, and diacylglycerols.

The term "non-cationic lipid" refers to any amphipathic lipid as well as any other neutral lipid or anionic lipid.

The term "anionic lipid" refers to any lipid that is negatively charged at physiological pH. These lipids include, but are not limited to, phosphatidylglycerols, cardiolipins, diacylphosphatidylserines, diacylphosphatidic acids, N-dodecanoyl phosphatidylethanolamines, N-succinyl phosphatidylethanolamines, N-glutarylphosphatidylethanolamines, lysylphosphatidylglycerols, palmitoyloleyolphosphatidylglycerol (POPG), and other anionic modifying groups joined to neutral lipids.

The term "cationic lipid" refers to any of a number of lipid species that carry a net positive charge at a selected pH, such as physiological pH (e.g., pH of about 7.0). It has been surprisingly found that cationic lipids comprising alkyl chains with multiple sites of unsaturation, e.g., at least two or three sites of unsaturation, are particularly useful for forming lipid particles with increased membrane fluidity. A number of cationic lipids and related analogs, which are also useful in the present invention, have been described in U.S. Patent Publi-

cation Nos. 20060083780 and 20060240554; U.S. Pat. Nos. 5,208,036; 5,264,618; 5,279,833; 5,283,185; 5,753,613; and 5,785,992; and PCT Publication No. WO 96/10390, the disclosures of which are herein incorporated by reference in their entirety for all purposes. Non-limiting examples of cationic lipids are described in detail herein. In some cases, the cationic lipids comprise a protonatable tertiary amine (e.g., pH titratable) head group, C18 alkyl chains, ether linkages between the head group and alkyl chains, and 0 to 3 double bonds. Such lipids include, e.g., DSDMA, DLinDMA, DLenDMA, and DODMA.

The term "hydrophobic lipid" refers to compounds having apolar groups that include, but are not limited to, long-chain saturated and unsaturated aliphatic hydrocarbon groups and such groups optionally substituted by one or more aromatic, cycloaliphatic, or heterocyclic group(s). Suitable examples include, but are not limited to, diacylglycerol, dialkylglycerol, N-N-dialkylamino, 1,2-diacyloxy-3-aminopropane, and 1,2-dialkyl-3-aminopropane.

The term "fusogenic" refers to the ability of a lipid particle, such as a SNALP, to fuse with the membranes of a cell. The membranes can be either the plasma membrane or membranes surrounding organelles, e.g., endosome, nucleus, etc.

As used herein, the term "aqueous solution" refers to a composition comprising in whole, or in part, water.

As used herein, the term "organic lipid solution" refers to a composition comprising in whole, or in part, an organic solvent having a lipid.

"Distal site," as used herein, refers to a physically separated site, which is not limited to an adjacent capillary bed, but includes sites broadly distributed throughout an organism.

"Serum-stable" in relation to nucleic acid-lipid particles such as SNALP means that the particle is not significantly degraded after exposure to a serum or nuclease assay that would significantly degrade free DNA or RNA. Suitable assays include, for example, a standard serum assay, a DNAse assay, or an RNAse assay.

"Systemic delivery," as used herein, refers to delivery of lipid particles that leads to a broad biodistribution of an active agent or therapeutic agent such as an interfering RNA within an organism. Some techniques of administration can lead to the systemic delivery of certain agents, but not others. Systemic delivery means that a useful, preferably therapeutic, amount of an agent is exposed to most parts of the body. To obtain broad biodistribution generally requires a blood lifetime such that the agent is not rapidly degraded or cleared (such as by first pass organs (liver, lung, etc.) or by rapid, nonspecific cell binding) before reaching a disease site distal to the site of administration. Systemic delivery of lipid particles can be by any means known in the art including, for example, intravenous, subcutaneous, and intraperitoneal. In a preferred embodiment, systemic delivery of lipid particles is by intravenous delivery.

"Local delivery," as used herein, refers to delivery of an active agent or therapeutic agent such as an interfering RNA directly to a target site within an organism. For example, an agent can be locally delivered by direct injection into a disease site such as a tumor or other target site such as a site of inflammation or a target organ such as the liver, heart, pancreas, kidney, and the like.

The term "mammal" refers to any mammalian species such as a human, mouse, rat, dog, cat, hamster, guinea pig, rabbit, livestock, and the like.

The term "cancer" refers to any member of a class of diseases characterized by the uncontrolled growth of aberrant cells. The term includes all known cancers and neoplastic conditions, whether characterized as malignant, benign, soft tissue, or solid, and cancers of all stages and grades including pre- and post-metastatic cancers. Examples of different types of cancer include, but are not limited to, lung cancer, colon cancer, rectal cancer, anal cancer, bile duct cancer, small intestine cancer, stomach (gastric) cancer, esophageal cancer; gallbladder cancer, liver cancer, pancreatic cancer, appendix cancer, breast cancer, ovarian cancer; cervical cancer, prostate cancer, renal cancer (e.g., renal cell carcinoma), cancer of the central nervous system, glioblastoma, skin cancer, lymphomas, choriocarcinomas, head and neck cancers, osteogenic sarcomas, and blood cancers. Non-limiting examples of specific types of liver cancer include hepatocellular carcinoma (HCC), secondary liver cancer (e.g., caused by metastasis of some other non-liver cancer cell type), and hepatoblastoma. As used herein, a "tumor" comprises one or more cancerous cells.

## III. Description of the Embodiments

The present invention provides novel, serum-stable lipid particles comprising one or more active agents or therapeutic agents, methods of making the lipid particles, and methods of delivering and/or administering the lipid particles (e.g., for the treatment of a disease or disorder).

In one aspect, the present invention provides lipid particles comprising: (a) one or more active agents or therapeutic agents; (b) one or more cationic lipids comprising from about 50 mol % to about 85 mol % of the total lipid present in the particle; (c) one or more non-cationic lipids comprising from about 13 mol % to about 49.5 mol % of the total lipid present in the particle; and (d) one or more conjugated lipids that inhibit aggregation of particles comprising from about 0.5 mol % to about 2 mol % of the total lipid present in the particle.

In certain embodiments, the active agent or therapeutic agent is fully encapsulated within the lipid portion of the lipid particle such that the active agent or therapeutic agent in the lipid particle is resistant in aqueous solution to enzymatic degradation, e.g., by a nuclease or protease. In certain other embodiments, the lipid particles are substantially non-toxic to mammals such as humans.

In some embodiments, the active agent or therapeutic agent comprises a nucleic acid. In certain instances, the nucleic acid comprises an interfering RNA molecule such as, e.g., an siRNA, aiRNA, miRNA, or mixtures thereof. In certain other instances, the nucleic acid comprises single-stranded or double-stranded DNA, RNA, or a DNA/RNA hybrid such as, e.g., an antisense oligonucleotide, a ribozyme, a plasmid, an immunostimulatory oligonucleotide, or mixtures thereof.

In other embodiments, the active agent or therapeutic agent comprises a peptide or polypeptide. In certain instances, the peptide or polypeptide comprises an antibody such as, e.g., a polyclonal antibody, a monoclonal antibody, an antibody fragment; a humanized antibody, a recombinant antibody, a recombinant human antibody, a Primatized™ antibody, or mixtures thereof. In certain other instances, the peptide or polypeptide comprises a cytokine, a growth factor, an apoptotic factor, a differentiation-inducing factor, a cell-surface receptor, a ligand, a hormone, a small molecule (e.g., small organic molecule or compound), or mixtures thereof.

In preferred embodiments, the active agent or therapeutic agent comprises an siRNA. In one embodiment, the siRNA molecule comprises a double-stranded region of about 15 to about 60 nucleotides in length (e.g., about 15-60, 15-50, 15-40, 15-30, 15-25, or 19-25 nucleotides in length, or 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, or 25 nucleotides in length). The

siRNA molecules of the invention are capable of silencing the expression of a target sequence in vitro and/or in vivo.

In some embodiments, the siRNA molecule comprises at least one modified nucleotide. In certain preferred embodiments, the siRNA molecule comprises one, two, three, four, five, six, seven, eight, nine, ten, or more modified nucleotides in the double-stranded region. In certain instances, the siRNA comprises from about 1% to about 100% (e.g., about 1%, 5%, 10%, 15%, 20%, 25%, 30%, 35%, 40%, 45%, 50%, 55%, 60%, 65%, 70%, 75%, 80%, 85%, 90%, 95%, or 100%) modified nucleotides in the double-stranded region. In preferred embodiments, less than about 25% (e.g., less than about 25%, 20%, 15%, 10%, or 5%) or from about 1% to about 25% (e.g., from about 1%-25%, 5%-25%, 10%-25%, 15%-25%, 20%-25%, or 10%-20%) of the nucleotides in the double-stranded region comprise modified nucleotides.

In other embodiments, the siRNA molecule comprises modified nucleotides including, but not limited to, 2'-O-methyl (2'OMe) nucleotides, 2'-deoxy-2'-fluoro(2'F) nucleotides, 2'-deoxy nucleotides, 2'-O-(2-methoxyethyl) (MOE) nucleotides, locked nucleic acid (LNA) nucleotides, and mixtures thereof. In preferred embodiments, the siRNA comprises 2'OMe nucleotides (e.g., 2'OMe purine and/or pyrimidine nucleotides) such as, for example, 2'OMe-guanosine nucleotides, 2'OMe-uridine nucleotides, 2'OMe-adenosine nucleotides, 2'OMe-cytosine nucleotides, and mixtures thereof. In certain instances, the siRNA does not comprise 2'OMe-cytosine nucleotides. In other embodiments, the siRNA comprises a hairpin loop structure.

The siRNA may comprise modified nucleotides in one strand (i.e., sense or antisense) or both strands of the double-stranded region of the siRNA molecule. Preferably, uridine and/or guanosine nucleotides are modified at selective positions in the double-stranded region of the siRNA duplex. With regard to uridine nucleotide modifications, at least one, two, three, four, five, six, or more of the uridine nucleotides in the sense and/or antisense strand can be a modified uridine nucleotide such as a 2'OMe-uridine nucleotide. In some embodiments, every uridine nucleotide in the sense and/or antisense strand is a 2'OMe-uridine nucleotide. With regard to guanosine nucleotide modifications, at least one, two, three, four, five, six, or more of the guanosine nucleotides in the sense and/or antisense strand can be a modified guanosine nucleotide such as a 2'OMe-guanosine nucleotide. In some embodiments, every guanosine nucleotide in the sense and/or antisense strand is a 2'OMe-guanosine nucleotide.

In certain embodiments, at least one, two, three, four, five, six, seven, or more 5'-GU-3' motifs in an siRNA sequence may be modified, e.g., by introducing mismatches to eliminate the 5'-GU-3' motifs and/or by introducing modified nucleotides such as 2'OMe nucleotides. The 5'-GU-3' motif can be in the sense strand, the antisense strand, or both strands of the siRNA sequence. The 5'-GU-3' motifs may be adjacent to each other or, alternatively, they may be separated by 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, or more nucleotides.

In some preferred embodiments, a modified siRNA molecule is less immunostimulatory than a corresponding unmodified siRNA sequence. In such embodiments, the modified siRNA molecule with reduced immunostimulatory properties advantageously retains RNAi activity against the target sequence. In another embodiment, the immunostimulatory properties of the modified siRNA molecule and its ability to silence target gene expression can be balanced or optimized by the introduction of minimal and selective 2'OMe modifications within the siRNA sequence such as, e.g., within the double-stranded region of the siRNA duplex. In certain instances, the modified siRNA is at least about 5%, 10%, 15%, 20%, 25%, 30%, 35%, 40%, 45%, 50%, 55%, 60%, 65%, 70%, 75%, 80%, 85%, 90%, 91%, 92%, 93%, 94%, 95%, 96%, 97%, 98%, 99%, or 100% less immunostimulatory than the corresponding unmodified siRNA. It will be readily apparent to those of skill in the art that the immunostimulatory properties of the modified siRNA molecule and the corresponding unmodified siRNA molecule can be determined by, for example, measuring INF-α and/or IL-6 levels from about two to about twelve hours after systemic administration in a mammal or transfection of a mammalian responder cell using an appropriate lipid-based delivery system (such as the SNALP delivery system disclosed herein).

In certain embodiments, a modified siRNA molecule has an $IC_{50}$ (i.e., half-maximal inhibitory concentration) less than or equal to ten-fold that of the corresponding unmodified siRNA (i.e., the modified siRNA has an $IC_{50}$ that is less than or equal to ten-times the $IC_{50}$ of the corresponding unmodified siRNA). In other embodiments, the modified siRNA has an $IC_{50}$ less than or equal to three-fold that of the corresponding unmodified siRNA sequence. In yet other embodiments, the modified siRNA has an $IC_{50}$ less than or equal to two-fold that of the corresponding unmodified siRNA. It will be readily apparent to those of skill in the art that a dose-response curve can be generated and the $IC_{50}$ values for the modified siRNA and the corresponding unmodified siRNA can be readily determined using methods known to those of skill in the art.

In yet another embodiment, a modified siRNA molecule is capable of silencing at least about 5%, 10%, 15%, 20%, 25%, 30%, 35%, 40%, 45%, 50%, 55%, 60%, 65%, 70%, 75%, 80%, 85%, 90%, 95%, or 100% of the expression of the target sequence relative to the corresponding unmodified siRNA sequence.

In some embodiments, the siRNA molecule does not comprise phosphate backbone modifications, e.g., in the sense and/or antisense strand of the double-stranded region. In other embodiments, the siRNA comprises one, two, three, four, or more phosphate backbone modifications, e.g., in the sense and/or antisense strand of the double-stranded region. In preferred embodiments, the siRNA does not comprise phosphate backbone modifications.

In further embodiments, the siRNA does not comprise 2'-deoxy nucleotides, e.g., in the sense and/or antisense strand of the double-stranded region. In yet further embodiments, the siRNA comprises one, two, three, four, or more 2'-deoxy nucleotides, e.g., in the sense and/or antisense strand of the double-stranded region. In preferred embodiments, the siRNA does not comprise 2'-deoxy nucleotides.

In certain instances, the nucleotide at the 3'-end of the double-stranded region in the sense and/or antisense strand is not a modified nucleotide. In certain other instances, the nucleotides near the 3'-end (e.g., within one, two, three, or four nucleotides of the 3'-end) of the double-stranded region in the sense and/or antisense strand are not modified nucleotides.

The siRNA molecules described herein may have 3' overhangs of one, two, three, four, or more nucleotides on one or both sides of the double-stranded region, or may lack overhangs (i.e., have blunt ends) on one or both sides of the double-stranded region. Preferably, the siRNA has 3' overhangs of two nucleotides on each side of the double-stranded region. In certain instances, the 3' overhang on the antisense strand has complementarity to the target sequence and the 3' overhang on the sense strand has complementarity to a complementary strand of the target sequence. Alternatively, the 3' overhangs do not have complementarity to the target sequence or the complementary strand thereof. In some

embodiments, the 3' overhangs comprise one, two, three, four, or more nucleotides such as 2'-deoxy(2'H) nucleotides. In certain preferred embodiments, the 3' overhangs comprise deoxythymidine (dT) and/or uridine nucleotides. In other embodiments, one or more of the nucleotides in the 3' overhangs on one or both sides of the double-stranded region comprise modified nucleotides. Non-limiting examples of modified nucleotides are described above and include 2'OMe nucleotides, 2'-deoxy-2'F nucleotides, 2'-deoxy nucleotides, 2'-O-2-MOE nucleotides, LNA nucleotides, and mixtures thereof. In preferred embodiments, one, two, three, four, or more nucleotides in the 3' overhangs present on the sense and/or antisense strand of the siRNA comprise 2'OMe nucleotides (e.g., 2'OMe purine and/or pyrimidine nucleotides) such as, for example, 2'OMe-guanosine nucleotides, 2'OMe-uridine nucleotides, 2'OMe-adenosine nucleotides, 2'OMe-cytosine nucleotides, and mixtures thereof.

The siRNA may comprise at least one or a cocktail (e.g., at least two, three, four, five, six, seven, eight, nine, ten, or more) of unmodified and/or modified siRNA sequences that silence target gene expression. The cocktail of siRNA may comprise sequences which are directed to the same region or domain (e.g., a "hot spot") and/or to different regions or domains of one or more target genes. In certain instances, one or more (e.g., at least two, three, four, five, six, seven, eight, nine, ten, or more) modified siRNA that silence target gene expression are present in a cocktail. In certain other instances, one or more (e.g., at least two, three, four, five, six, seven, eight, nine, ten, or more) unmodified siRNA sequences that silence target gene expression are present in a cocktail.

In some embodiments, the antisense strand of the siRNA molecule comprises or consists of a sequence that is at least about 80%, 85%, 90%, 95%, 96%, 97%, 98%, or 99% complementary to the target sequence or a portion thereof. In other embodiments, the antisense strand of the siRNA molecule comprises or consists of a sequence that is 100% complementary to the target sequence or a portion thereof. In further embodiments, the antisense strand of the siRNA molecule comprises or consists of a sequence that specifically hybridizes to the target sequence or a portion thereof.

In further embodiments, the sense strand of the siRNA molecule comprises or consists of a sequence that is at least about 80%, 85%, 90%, 95%, 96%, 97%, 98%, or 99% identical to the target sequence or a portion thereof. In additional embodiments, the sense strand of the siRNA molecule comprises or consists of a sequence that is 100% identical to the target sequence or a portion thereof.

In the lipid particles of the invention (e.g., SNALP comprising an interfering RNA such as siRNA), the cationic lipid may comprise, e.g., one or more of the following: 1,2-dilinoleyloxy-N,N-dimethylaminopropane (DLinDMA), 1,2-dilinolenyloxy-N,N-dimethylaminopropane (DLenDMA), 2,2-dilinoleyl-4-(2-dimethylaminoethyl)-[1,3]-dioxolane (DLin-K-C2-DMA; "XTC2"), 2,2-dilinoleyl-4-(3-dimethylaminopropyl)-[1,3]-dioxolane (DLin-K-C3-DMA), 2,2-dilinoleyl-4-(4-dimethylaminobutyl)-[1,3]-dioxolane (DLin-K-C4-DMA), 2,2-dilinoleyl-5-dimethylaminomethyl-[1,3]-dioxane (DLin-K6-DMA), 2,2-dilinoleyl-4-N-methylpepiazino-[1,3]-dioxolane (DLin-K-MPZ), 2,2-dilinoleyl-4-dimethylaminomethyl-[1,3]-dioxolane (DLin-K-DMA), 1,2-dilinoleylcarbamoyloxy-3-dimethylaminopropane (DLin-C-DAP), 1,2-dilinoleyoxy-3-(dimethylamino)acetoxypropane (DLin-DAC), 1,2-dilinoleyoxy-3-morpholinopropane (DLin-MA), 1,2-dilinoleoyl-3-dimethylaminopropane (DLinDAP), 1,2-dilinoleylthio-3-dimethylaminopropane (DLin-S-DMA), 1-linoleoyl-2-linoleyloxy-3-dimethylaminopropane (DLin-2-DMAP), 1,2-dilinoleyloxy-3-trimethylaminopropane chloride salt (DLin-TMA.Cl), 1,2-dilinoleoyl-3-trimethylaminopropane chloride salt (DLin-TAP.Cl), 1,2-dilinoleyloxy-3-(N-methylpiperazino)propane (DLin-MPZ), 3-(N,N-dilinoleylamino)-1,2-propanediol (DLinAP), 3-(N,N-dioleylamino)-1,2-propanedio (DOAP), 1,2-dilinoleyloxo-3-(2-N,N-dimethylamino)ethoxypropane (DLin-EG-DMA), N,N-dioleyl-N,N-dimethylammonium chloride (DODAC), 1,2-dioleyloxy-N,N-dimethylaminopropane (DODMA), 1,2-distearyloxy-N,N-dimethylaminopropane (DSDMA), N-(1-(2,3-dioleyloxy)propyl)-N,N,N-trimethylammonium chloride (DOTMA), N,N-distearyl-N,N-dimethylammonium bromide (DDAB), N-(1-(2,3-dioleoyloxy)propyl)-N,N,N-trimethylammonium chloride (DOTAP), 3-(N-(N',N'-dimethylaminoethane)-carbamoyl)cholesterol (DC-Chol), N-(1,2-dimyristyloxyprop-3-yl)-N,N-dimethyl-N-hydroxyethyl ammonium bromide (DMRIE), 2,3-dioleyloxy-N-[2(spermine-carboxamido)ethyl]-N,N-dimethyl-1-propanaminiumtrifluoroacetate (DOSPA), dioctadecylamidoglycyl spermine (DOGS), 3-dimethylamino-2-(cholest-5-en-3-beta-oxybutan-4-oxy)-1-(cis,cis-9,12-octadecadienoxy)propane (CLinDMA), 2-[5'-(cholest-5-en-3-beta-oxy)-3'-oxapentoxy)-3-dimethyl-1-(cis,cis-9',1-2'-octadecadienoxy)propane (CpLinDMA), N,N-dimethyl-3,4-dioleyloxybenzylamine (DMOBA), 1,2-N,N'-dioleylcarbamyl-3-dimethylaminopropane (DOcarbDAP), 1,2-N,N'-dilinoleylcarbamyl-3-dimethylaminopropane (DLincarbDAP), or mixtures thereof. In certain preferred embodiments, the cationic lipid is DLinDMA, DLin-K-C2-DMA ("XTC2"), or mixtures thereof.

The synthesis of cationic lipids such as DLin-K-C2-DMA ("XTC2"), DLin-K-C3-DMA, DLin-K-C4-DMA, DLin-K6-DMA, and DLin-K-MPZ, as well as additional cationic lipids, is described in U.S. Provisional Application No. 61/104,212, filed Oct. 9, 2008, the disclosure of which is herein incorporated by reference in its entirety for all purposes. The synthesis of cationic lipids such as DLin-K-DMA, DLin-C-DAP, DLin-DAC, DLin-MA, DLinDAP, DLin-S-DMA, DLin-2-DMAP, DLin-TMA.Cl, DLin-TAP.Cl, DLin-MPZ, DLinAP, DOAP, and DLin-EG-DMA, as well as additional cationic lipids, is described in PCT Application No. PCT/US08/88676, filed Dec. 31, 2008, the disclosure of which is herein incorporated by reference in its entirety for all purposes. The synthesis of cationic lipids such as CLinDMA, as well as additional cationic lipids, is described in U.S. Patent Publication No. 20060240554, the disclosure of which is herein incorporated by reference in its entirety for all purposes.

In some embodiments, the cationic lipid may comprise from about 50 mol % to about 90 mol %, from about 50 mol % to about 85 mol %, from about 50 mol % to about 80 mol %, from about 50 mol % to about 75 mol %, from about 50 mol % to about 70 mol %, from about 50 mol % to about 65 mol %, or from about 50 mol % to about 60 mol % of the total lipid present in the particle.

In other embodiments, the cationic lipid may comprise from about 55 mol % to about 90 mol %, from about 55 mol % to about 85 mol %, from about 55 mol % to about 80 mol %, from about 55 mol % to about 75 mol %, from about 55 mol % to about 70 mol %, or from about 55 mol % to about 65 mol % of the total lipid present in the particle.

In yet other embodiments, the cationic lipid may comprise from about 60 mol % to about 90 mol %, from about 60 mol % to about 85 mol %, from about 60 mol % to about 80 mol %, from about 60 mol % to about 75 mol %, or from about 60 mol % to about 70 mol % of the total lipid present in the particle.

In still yet other embodiments, the cationic lipid may comprise from about 65 mol % to about 90 mol %, from about 65 mol % to about 85 mol %, from about 65 mol % to about 80 mol %, or from about 65 mol % to about 75 mol % of the total lipid present in the particle.

In further embodiments, the cationic lipid may comprise from about 70 mol % to about 90 mol %, from about 70 mol % to about 85 mol %, from about 70 mol % to about 80 mol %, from about 75 mol % to about 90 mol %, from about 75 mol % to about 85 mol %, or from about 80 mol % to about 90 mol % of the total lipid present in the particle.

In additional embodiments, the cationic lipid may comprise (at least) about 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67, 68, 69, 70, 71, 72, 73, 74, 75, 76, 77, 78, 79, 80, 81, 82, 83, 84, 85, 86, 87, 88, 89, or 90 mol % (or any fraction thereof or range therein) of the total lipid present in the particle.

In the lipid particles of the invention (e.g., SNALP comprising an interfering RNA such as siRNA), the non-cationic lipid may comprise, e.g., one or more anionic lipids and/or neutral lipids. In preferred embodiments, the non-cationic lipid comprises one of the following neutral lipid components: (1) cholesterol or a derivative thereof; (2) a phospholipid; or (3) a mixture of a phospholipid and cholesterol or a derivative thereof.

Examples of cholesterol derivatives include, but are not limited to, cholestanol, cholestanone, cholestenone, coprostanol, cholesteryl-2'-hydroxyethyl ether, cholesteryl-4'-hydroxybutyl ether, and mixtures thereof. The synthesis of cholesteryl-2'-hydroxyethyl ether is described herein.

The phospholipid may be a neutral lipid including, but not limited to, dipalmitoylphosphatidylcholine (DPPC), distearoylphosphatidylcholine (DSPC), dioleoylphosphatidylethanolamine (DOPE), palmitoyloleoyl-phosphatidylcholine (POPC), palmitoyloleoyl-phosphatidylethanolamine (POPE), palmitoyloleyol-phosphatidylglycerol (POPG), dipalmitoyl-phosphatidylethanolamine (DPPE), dimyristoyl-phosphatidylethanolamine (DMPE), distearoyl-phosphatidylethanolamine (DSPE), monomethyl-phosphatidylethanolamine, dimethyl-phosphatidylethanolamine, dielaidoyl-phosphatidylethanolamine (DEPE), stearoyloleoyl-phosphatidylethanolamine (SOPE), egg phosphatidylcholine (EPC), and mixtures thereof. In certain preferred embodiments, the phospholipid is DPPC, DSPC, or mixtures thereof.

In some embodiments, the non-cationic lipid (e.g., one or more phospholipids and/or cholesterol) may comprise from about 10 mol % to about 60 mol %, from about 15 mol % to about 60 mol %, from about 20 mol % to about 60 mol %, from about 25 mol % to about 60 mol %, from about 30 mol % to about 60 mol %, from about 10 mol % to about 55 mol %, from about 15 mol % to about 55 mol %, from about 20 mol % to about 55 mol %, from about 25 mol % to about 55 mol %, from about 30 mol % to about 55 mol %, from about 13 mol % to about 50 mol %, from about 15 mol % to about 50 mol % or from about 20 mol % to about 50 mol % of the total lipid present in the particle. When the non-cationic lipid is a mixture of a phospholipid and cholesterol or a cholesterol derivative, the mixture may comprise up to about 40, 50, or 60 mol % of the total lipid present in the particle.

In other embodiments, the non-cationic lipid (e.g., one or more phospholipids and/or cholesterol) may comprise from about 10 mol % to about 49.5 mol %, from about 13 mol % to about 49.5 mol %, from about 15 mol % to about 49.5 mol %, from about 20 mol % to about 49.5 mol %, from about 25 mol % to about 49.5 mol %, from about 30 mol % to about 49.5 mol %, from about 35 mol % to about 49.5 mol %, or from about 40 mol % to about 49.5 mol % of the total lipid present in the particle.

In yet other embodiments, the non-cationic lipid (e.g., one or more phospholipids and/or cholesterol) may comprise from about 10 mol % to about 45 mol %, from about 13 mol % to about 45 mol %, from about 15 mol % to about 45 mol %, from about 20 mol % to about 45 mol %, from about 25 mol % to about 45 mol %, from about 30 mol % to about 45 mol %, or from about 35 mol % to about 45 mol % of the total lipid present in the particle.

In still yet other embodiments, the non-cationic lipid (e.g., one or more phospholipids and/or cholesterol) may comprise from about 10 mol % to about 40 mol %, from about 13 mol % to about 40 mol %, from about 15 mol % to about 40 mol %, from about 20 mol % to about 40 mol %, from about 25 mol % to about 40 mol %, or from about 30 mol % to about 40 mol % of the total lipid present in the particle.

In further embodiments, the non-cationic lipid (e.g., one or more phospholipids and/or cholesterol) may comprise from about 10 mol % to about 35 mol %, from about 13 mol % to about 35 mol %, from about 15 mol % to about 35 mol %, from about 20 mol % to about 35 mol %, or from about 25 mol % to about 35 mol % of the total lipid present in the particle.

In yet further embodiments, the non-cationic lipid (e.g., one or more phospholipids and/or cholesterol) may comprise from about 10 mol % to about 30 mol %, from about 13 mol % to about 30 mol %, from about 15 mol % to about 30 mol %, from about 20 mol % to about 30 mol %, from about 10 mol % to about 25 mol %, from about 13 mol % to about 25 mol %, or from about 15 mol % to about 25 mol % of the total lipid present in the particle.

In additional embodiments, the non-cationic lipid (e.g., one or more phospholipids and/or cholesterol) may comprise (at least) about 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, or 60 mol % (or any fraction thereof or range therein) of the total lipid present in the particle.

In certain preferred embodiments, the non-cationic lipid comprises cholesterol or a derivative thereof of from about 31.5 mol % to about 42.5 mol % of the total lipid present in the particle. As a non-limiting example, a phospholipid-free lipid particle of the invention may comprise cholesterol or a derivative thereof at about 37 mol % of the total lipid present in the particle. In other preferred embodiments, a phospholipid-free lipid particle of the invention may comprise cholesterol or a derivative thereof of from about 30 mol % to about 45 mol %, from about 30 mol % to about 40 mol %, from about 30 mol % to about 35 mol %, from about 35 mol % to about 45 mol %, from about 40 mol % to about 45 mol %, from about 32 mol % to about 45 mol %, from about 32 mol % to about 42 mol %, from about 32 mol % to about 40 mol %, from about 34 mol % to about 45 mol %, from about 34 mol % to about 42 mol %, from about 34 mol % to about 40 mol %, or about 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, or 45 mol % (or any fraction thereof or range therein) of the total lipid present in the particle.

In certain other preferred embodiments, the non-cationic lipid comprises a mixture of: (i) a phospholipid of from about 4 mol % to about 10 mol % of the total lipid present in the particle; and (ii) cholesterol or a derivative thereof of from about 30 mol % to about 40 mol % of the total lipid present in the particle. As a non-limiting example, a lipid particle comprising a mixture of a phospholipid and cholesterol may comprise DPPC at about 7 mol % and cholesterol at about 34 mol % of the total lipid present in the particle. In other embodi-

ments, the non-cationic lipid comprises a mixture of: (i) a phospholipid of from about 3 mol % to about 15 mol %, from about 4 mol % to about 15 mol %, from about 4 mol % to about 12 mol %, from about 4 mol % to about 10 mol %, from about 4 mol % to about 8 mol %, from about 5 mol % to about 12 mol %, from about 5 mol % to about 9 mol %, from about 6 mol % to about 12 mol %, from about 6 mol % to about 10 mol %, or about 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, or 15 mol % (or any fraction thereof or range therein) of the total lipid present in the particle; and (ii) cholesterol or a derivative thereof of from about 25 mol % to about 45 mol %, from about 30 mol % to about 45 mol %, from about 25 mol % to about 40 mol %, from about 30 mol % to about 40 mol %, from about 25 mol % to about 35 mol %, from about 30 mol % to about 35 mol %, from about 35 mol % to about 45 mol %, from about 40 mol % to about 45 mol %, from about 28 mol % to about 40 mol %, from about 28 mol % to about 38 mol %, from about 30 mol % to about 38 mol %, from about 32 mol % to about 36 mol %, or about 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, or 45 mol % (or any fraction thereof or range therein) of the total lipid present in the particle.

In further preferred embodiments, the non-cationic lipid comprises a mixture of: (i) a phospholipid of from about 10 mol % to about 30 mol % of the total lipid present in the particle; and (ii) cholesterol or a derivative thereof of from about 10 mol % to about 30 mol % of the total lipid present in the particle. As a non-limiting example, a lipid particle comprising a mixture of a phospholipid and cholesterol may comprise DPPC at about 20 mol % and cholesterol at about 20 mol % of the total lipid present in the particle. In other embodiments, the non-cationic lipid comprises a mixture of: (i) a phospholipid of from about 10 mol % to about 30 mol %, from about 10 mol % to about 25 mol %, from about 10 mol % to about 20 mol %, from about 15 mol % to about 30 mol %, from about 20 mol % to about 30 mol %, from about 15 mol % to about 25 mol %, from about 12 mol % to about 28 mol %, from about 14 mol % to about 26 mol %, or about 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, or 30 mol % (or any fraction thereof or range therein) of the total lipid present in the particle; and (ii) cholesterol or a derivative thereof of from about 10 mol % to about 30 mol %, from about 10 mol % to about 25 mol %, from about 10 mol % to about 20 mol %, from about 15 mol % to about 30 mol %, from about 20 mol % to about 30 mol %, from about 15 mol % to about 25 mol %, from about 12 mol % to about 28 mol %, from about 14 mol % to about 26 mol %, or about 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, or 30 mol % (or any fraction thereof or range therein) of the total lipid present in the particle.

In the lipid particles of the invention (e.g., SNALP comprising an interfering RNA such as siRNA), the conjugated lipid that inhibits aggregation of particles may comprise, e.g., one or more of the following: a polyethyleneglycol (PEG)-lipid conjugate, a polyamide (ATTA)-lipid conjugate, a cationic-polymer-lipid conjugates (CPLs), or mixtures thereof. In one preferred embodiment, the nucleic acid-lipid particles comprise either a PEG-lipid conjugate or an ATTA-lipid conjugate. In certain embodiments, the PEG-lipid conjugate or ATTA-lipid conjugate is used together with a CPL. The conjugated lipid that inhibits aggregation of particles may comprise a PEG-lipid including, e.g., a PEG-diacylglycerol (DAG), a PEG dialkyloxypropyl (DAA), a PEG-phospholipid, a PEG-ceramide (Cer), or mixtures thereof. The PEG-DAA conjugate may be PEG-dilauryloxypropyl (C12), a PEG-dimyristyloxypropyl (C14), a PEG-dipalmityloxypropyl (C16), a PEG-distearyloxypropyl (C18), or mixtures thereof.



Additional PEG-lipid conjugates suitable for use in the invention include, but are not limited to, mPEG2000-1,2-di-O-alkyl-sn3-carbomoylglyceride (PEG-C-DOMG). The synthesis of PEG-C-DOMG is described in PCT Application No. PCT/US08/88676, filed Dec. 31, 2008, the disclosure of which is herein incorporated by reference in its entirety for all purposes. Yet additional PEG-lipid conjugates suitable for use in the invention include, without limitation, 1-[8'-(1,2-dimyristoyl-3-propanoxy)-carboxamido-3',6'-dioxaoctanyl]carbamoyl-ω-methyl-poly(ethylene glycol) (2 KPEG-DMG). The synthesis of 2 KPEG-DMG is described in U.S. Pat. No. 7,404,969, the disclosure of which is herein incorporated by reference in its entirety for all purposes.

The PEG moiety of the PEG-lipid conjugates described herein may comprise an average molecular weight ranging from about 550 daltons to about 10,000 daltons. In certain instances, the PEG moiety has an average molecular weight of from about 750 daltons to about 5,000 daltons (e.g., from about 1,000 daltons to about 5,000 daltons, from about 1,500 daltons to about 3,000 daltons, from about 750 daltons to about 3,000 daltons, from about 750 daltons to about 2,000 daltons, etc.). In preferred embodiments, the PEG moiety has an average molecular weight of about 2,000 daltons or about 750 daltons.

In some embodiments, the conjugated lipid that inhibits aggregation of particles is a CPL that has the formula: A-W-Y, wherein A is a lipid moiety, W is a hydrophilic polymer, and Y is a polycationic moiety. W may be a polymer selected from the group consisting of polyethyleneglycol (PEG), polyamide, polylactic acid, polyglycolic acid, polylactic acid/polyglycolic acid copolymers, or combinations thereof, the polymer having a molecular weight of from about 250 to about 7000 daltons. In some embodiments, Y has at least 4 positive charges at a selected pH. In some embodiments, Y may be lysine, arginine, asparagine, glutamine, derivatives thereof, or combinations thereof.

In certain instances, the conjugated lipid that inhibits aggregation of particles (e.g., PEG-lipid conjugate) may comprise from about 0.1 mol % to about 2 mol %, from about 0.5 mol % to about 2 mol %, from about 1 mol % to about 2 mol %, from about 0.6 mol % to about 1.9 mol %, from about 0.7 mol % to about 1.8 mol %, from about 0.8 mol % to about 1.7 mol %, from about 1 mol % to about 1.8 mol %, from about 1.2 mol % to about 1.8 mol %, from about 1.2 mol % to about 1.7 mol %, from about 1.3 mol % to about 1.6 mol %, from about 1.4 mol % to about 1.5 mol %, or about 1, 1.1, 1.2, 1.3, 1.4, 1.5, 1.6, 1.7, 1.8, 1.9, or 2 mol % (or any fraction thereof or range therein) of the total lipid present in the particle.

In the lipid particles of the invention, the active agent or therapeutic agent may be fully encapsulated within the lipid portion of the particle, thereby protecting the active agent or therapeutic agent from enzymatic degradation. In preferred embodiments, a SNALP comprising a nucleic acid such as an interfering RNA (e.g., siRNA) is fully encapsulated within the lipid portion of the particle, thereby protecting the nucleic acid from nuclease degradation. In certain instances, the nucleic acid in the SNALP is not substantially degraded after exposure of the particle to a nuclease at 37° C. for at least about 20, 30, 45, or 60 minutes. In certain other instances, the nucleic acid in the SNALP is not substantially degraded after incubation of the particle in serum at 37° C. for at least about 30, 45, or 60 minutes or at least about 2, 3, 4, 5, 6, 7, 8, 9, 10, 12, 14, 16, 18, 20, 22, 24, 26, 28, 30, 32, 34, or 36 hours. In

other embodiments, the active agent or therapeutic agent (e.g., nucleic acid such as siRNA) is complexed with the lipid portion of the particle. One of the benefits of the formulations of the present invention is that the lipid particle compositions are substantially non-toxic to mammals such as humans.

The term "fully encapsulated" indicates that the active agent or therapeutic agent in the lipid particle is not significantly degraded after exposure to serum or a nuclease or protease assay that would significantly degrade free DNA, RNA, or protein. In a fully encapsulated system, preferably less than about 25% of the active agent or therapeutic agent in the particle is degraded in a treatment that would normally degrade 100% of free active agent or therapeutic agent, more preferably less than about 10%, and most preferably less than about 5% of the active agent or therapeutic agent in the particle is degraded. In the context of nucleic acid therapeutic agents, full encapsulation may be determined by an Oligreen® assay. Oligreen® is an ultra-sensitive fluorescent nucleic acid stain for quantitating oligonucleotides and single-stranded DNA or RNA in solution (available from Invitrogen Corporation; Carlsbad, Calif.). "Fully encapsulated" also indicates that the lipid particles are serum-stable, that is, that they do not rapidly decompose into their component parts upon in vivo administration.

In another aspect, the present invention provides a lipid particle (e.g., SNALP) composition comprising a plurality of lipid particles. In preferred embodiments, the active agent or therapeutic agent (e.g., nucleic acid) is fully encapsulated within the lipid portion of the lipid particles (e.g., SNALP), such that from about 30% to about 100%, from about 40% to about 100%, from about 50% to about 100%, from about 60% to about 100%, from about 70% to about 100%, from about 80% to about 100%, from about 90% to about 100%, from about 30% to about 95%, from about 40% to about 95%, from about 50% to about 95%, from about 60% to about 95%, %, from about 70% to about 95%, from about 80% to about 95%, from about 85% to about 95%, from about 90% to about 95%, from about 30% to about 90%, from about 40% to about 90%, from about 50% to about 90%, from about 60% to about 90%, from about 70% to about 90%, from about 80% to about 90%, or at least about 30%, 35%, 40%, 45%, 50%, 55%, 60%, 65%, 70%, 75%, 80%, 85%, 90%, 91%, 92%, 93%, 94%, 95%, 96%, 97%, 98%, or 99% (or any fraction thereof or range therein) of the lipid particles (e.g., SNALP) have the active agent or therapeutic agent encapsulated therein.

Typically, the lipid particles (e.g., SNALP) of the invention have a lipid:active agent (e.g., lipid:nucleic acid) ratio (mass/mass ratio) of from about 1 to about 100. In some instances, the lipid:active agent (e.g., lipid:nucleic acid) ratio (mass/mass ratio) ranges from about 1 to about 50, from about 2 to about 25, from about 3 to about 20, from about 4 to about 15, or from about 5 to about 10. In preferred embodiments, the lipid particles of the invention have a lipid:active agent (e.g., lipid:nucleic acid) ratio (mass/mass ratio) of from about 5 to about 15, e.g., about 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, or 15 (or any fraction thereof or range therein).

Typically, the lipid particles (e.g., SNALP) of the invention have a mean diameter of from about 40 nm to about 150 nm. In preferred embodiments, the lipid particles (e.g., SNALP) of the invention have a mean diameter of from about 40 nm to about 130 nm, from about 40 nm to about 120 nm, from about 40 nm to about 100 nm, from about 50 nm to about 120 nm, from about 50 nm to about 100 nm, from about 60 nm to about 120 nm, from about 60 nm to about 110 nm, from about 60 nm to about 100 nm, from about 60 nm to about 90 nm, from about 60 nm to about 80 nm, from about 70 nm to about 120 nm, from about 70 nm to about 110 nm, from about 70 nm to about 100 nm, from about 70 nm to about 90 nm, from about 70 nm to about 80 nm, or less than about 120 nm, 110 nm, 100 nm, 90 nm, or 80 nm (or any fraction thereof or range therein).

In one specific embodiment of the invention, the SNALP comprises: (a) one or more unmodified and/or modified interfering RNA (e.g., siRNA, aiRNA, miRNA) that silence target gene expression; (b) a cationic lipid comprising from about 56.5 mol % to about 66.5 mol % of the total lipid present in the particle; (c) a non-cationic lipid comprising from about 31.5 mol % to about 42.5 mol % of the total lipid present in the particle; and (d) a conjugated lipid that inhibits aggregation of particles comprising from about 1 mol % to about 2 mol % of the total lipid present in the particle. This specific embodiment of SNALP is generally referred to herein as the "1:62" formulation. In a preferred embodiment, the cationic lipid is DLinDMA or DLin-K-C2-DMA ("XTC2"), the non-cationic lipid is cholesterol, and the conjugated lipid is a PEG-DAA conjugate. Although these are preferred embodiments of the 1:62 formulation, those of skill in the art will appreciate that other cationic lipids, non-cationic lipids (including other cholesterol derivatives), and conjugated lipids can be used in the 1:62 formulation as described herein.

In another specific embodiment of the invention, the SNALP comprises: (a) one or more unmodified and/or modified interfering RNA (e.g., siRNA, aiRNA, miRNA) that silence target gene expression; (b) a cationic lipid comprising from about 52 mol % to about 62 mol % of the total lipid present in the particle; (c) a non-cationic lipid comprising from about 36 mol % to about 47 mol % of the total lipid present in the particle; and (d) a conjugated lipid that inhibits aggregation of particles comprising from about 1 mol % to about 2 mol % of the total lipid present in the particle. This specific embodiment of SNALP is generally referred to herein as the "1:57" formulation. In one preferred embodiment, the cationic lipid is DLinDMA or DLin-K-C2-DMA ("XTC2"), the non-cationic lipid is a mixture of a phospholipid (such as DPPC) and cholesterol, wherein the phospholipid comprises from about 5 mol % to about 9 mol % of the total lipid present in the particle (e.g., about 7.1 mol %) and the cholesterol (or cholesterol derivative) comprises from about 32 mol % to about 37 mol % of the total lipid present in the particle (e.g., about 34.3 mol %), and the PEG-lipid is a PEG-DAA (e.g., PEG-cDMA). In another preferred embodiment, the cationic lipid is DLinDMA or DLin-K-C2-DMA ("XTC2"), the non-cationic lipid is a mixture of a phospholipid (such as DPPC) and cholesterol, wherein the phospholipid comprises from about 15 mol % to about 25 mol % of the total lipid present in the particle (e.g., about 20 mol %) and the cholesterol (or cholesterol derivative) comprises from about 15 mol % to about 25 mol % of the total lipid present in the particle (e.g., about 20 mol %), and the PEG-lipid is a PEG-DAA (e.g., PEG-cDMA). Although these are preferred embodiments of the 1:57 formulation, those of skill in the art will appreciate that other cationic lipids, non-cationic lipids (including other phospholipids and other cholesterol derivatives), and conjugated lipids can be used in the 1:57 formulation as described herein.

In preferred embodiments, the 1:62 SNALP formulation is a three-component system which is phospholipid-free and comprises about 1.5 mol % PEG-cDMA (or PEG-cDSA), about 61.5 mol % DLinDMA (or XTC2), and about 36.9 mol % cholesterol (or derivative thereof). In other preferred embodiments, the 1:57 SNALP formulation is a four-component system which comprises about 1.4 mol % PEG-cDMA (or PEG-cDSA), about 57.1 mol % DLinDMA (or XTC2), about 7.1 mol % DPPC, and about 34.3 mol % cholesterol (or derivative thereof). In yet other preferred embodiments, the

1:57 SNALP formulation is a four-component system which comprises about 1.4 mol % PEG-cDMA (or PEG-cDSA), about 57.1 mol % DLinDMA (or XTC2), about 20 mol % DPPC, and about 20 mol % cholesterol (or derivative thereof). It should be understood that these SNALP formulations are target formulations, and that the amount of lipid (both cationic and non-cationic) present and the amount of lipid conjugate present in the SNALP formulations may vary.

The present invention also provides a pharmaceutical composition comprising a lipid particle (e.g., SNALP) described herein and a pharmaceutically acceptable carrier.

In a further aspect, the present invention provides a method for introducing one or more active agents or therapeutic agents (e.g., nucleic acid) into a cell, comprising contacting the cell with a lipid particle (e.g., SNALP) described herein. In one embodiment, the cell is in a mammal and the mammal is a human. In another embodiment, the present invention provides a method for the in vivo delivery of one or more active agents or therapeutic agents (e.g., nucleic acid), comprising administering to a mammalian subject a lipid particle (e.g., SNALP) described herein. In a preferred embodiment, the mode of administration includes, but is not limited to, oral, intranasal, intravenous, intraperitoneal, intramuscular, intra-articular, intralesional, intratracheal, subcutaneous, and intradermal. Preferably, the mammalian subject is a human.

In one embodiment, at least about 5%, 10%, 15%, 20%, or 25% of the total injected dose of the lipid particles (e.g., SNALP) is present in plasma about 8, 12, 24, 36, or 48 hours after injection. In other embodiments, more than about 20%, 30%, 40% and as much as about 60%, 70% or 80% of the total injected dose of the lipid particles (e.g., SNALP) is present in plasma about 8, 12, 24, 36, or 48 hours after injection. In certain instances, more than about 10% of a plurality of the particles is present in the plasma of a mammal about 1 hour after administration. In certain other instances, the presence of the lipid particles (e.g., SNALP) is detectable at least about 1 hour after administration of the particle. In certain embodiments, the presence of an active agent or therapeutic agent such as an interfering RNA (e.g., siRNA) is detectable in cells of the lung, liver, tumor, or at a site of inflammation at about 8, 12, 24, 36, 48, 60, 72 or 96 hours after administration. In other embodiments, downregulation of expression of a target sequence by an active agent or therapeutic agent such as an interfering RNA (e.g., siRNA) is detectable at about 8, 12, 24, 36, 48, 60, 72 or 96 hours after administration. In yet other embodiments, downregulation of expression of a target sequence by an active agent or therapeutic agent such as an interfering RNA (e.g., siRNA) occurs preferentially in tumor cells or in cells at a site of inflammation. In further embodiments, the presence or effect of an active agent or therapeutic agent such as an interfering RNA (e.g., siRNA) in cells at a site proximal or distal to the site of administration or in cells of the lung, liver, or a tumor is detectable at about 12, 24, 48, 72, or 96 hours, or at about 6, 8, 10, 12, 14, 16, 18, 19, 20, 22, 24, 26, or 28 days after administration. In additional embodiments, the lipid particles (e.g., SNALP) of the invention are administered parenterally or intraperitoneally.

In some embodiments, the lipid particles (e.g., SNALP) of the invention are particularly useful in methods for the therapeutic delivery of one or more nucleic acids comprising an interfering RNA sequence (e.g., siRNA). In particular, it is an object of this invention to provide in vitro and in vivo methods for treatment of a disease or disorder in a mammal (e.g., a rodent such as a mouse or a primate such as a human, chimpanzee, or monkey) by downregulating or silencing the transcription and/or translation of one or more target nucleic acid sequences or genes of interest. As a non-limiting example, the methods of the invention are useful for in vivo delivery of interfering RNA (e.g., siRNA) to the liver and/or tumor of a mammalian subject. In certain embodiments, the disease or disorder is associated with expression and/or overexpression of a gene and expression or overexpression of the gene is reduced by the interfering RNA (e.g., siRNA). In certain other embodiments, a therapeutically effective amount of the lipid particle (e.g., SNALP) may be administered to the mammal. In some instances, an interfering RNA (e.g., siRNA) is formulated into a SNALP, and the particles are administered to patients requiring such treatment. In other instances, cells are removed from a patient, the interfering RNA (e.g., siRNA) is delivered in vitro (e.g., using a SNALP described herein), and the cells are reinjected into the patient.

In an additional aspect, the present invention provides lipid particles (e.g., SNALP) comprising asymmetrical interfering RNA (aiRNA) molecules that silence the expression of a target gene and methods of using such particles to silence target gene expression.

In one embodiment, the aiRNA molecule comprises a double-stranded (duplex) region of about 10 to about 25 (base paired) nucleotides in length, wherein the aiRNA molecule comprises an antisense strand comprising 5' and 3' overhangs, and wherein the aiRNA molecule is capable of silencing target gene expression.

In certain instances, the aiRNA molecule comprises a double-stranded (duplex) region of about 12-20, 12-19, 12-18, 13-17, or 14-17 (base paired) nucleotides in length, more typically 12, 13, 14, 15, 16, 17, 18, 19, or 20 (base paired) nucleotides in length. In certain other instances, the 5' and 3' overhangs on the antisense strand comprise sequences that are complementary to the target RNA sequence, and may optionally further comprise nontargeting sequences. In some embodiments, each of the 5' and 3' overhangs on the antisense strand comprises or consists of one, two, three, four, five, six, seven, or more nucleotides.

In other embodiments, the aiRNA molecule comprises modified nucleotides selected from the group consisting of 2'OMe nucleotides, 2'F nucleotides, 2'-deoxy nucleotides, 2'-O-MOE nucleotides, LNA nucleotides, and mixtures thereof. In a preferred embodiment, the aiRNA molecule comprises 2'OMe nucleotides. As a non-limiting example, the 2'OMe nucleotides may be selected from the group consisting of 2'OMe-guanosine nucleotides, 2'OMe-uridine nucleotides, and mixtures thereof.

In a related aspect, the present invention provides lipid particles (e.g., SNALP) comprising microRNA (miRNA) molecules that silence the expression of a target gene and methods of using such compositions to silence target gene expression.

In one embodiment, the miRNA molecule comprises about 15 to about 60 nucleotides in length, wherein the miRNA molecule is capable of silencing target gene expression.

In certain instances, the miRNA molecule comprises about 15-50, 15-40, or 15-30 nucleotides in length, more typically about 15-25 or 19-25 nucleotides in length, and are preferably about 20-24, 21-22, or 21-23 nucleotides in length. In a preferred embodiment, the miRNA molecule is a mature miRNA molecule targeting an RNA sequence of interest.

In some embodiments, the miRNA molecule comprises modified nucleotides selected from the group consisting of 2'OMe nucleotides, 2'F nucleotides, 2'-deoxy nucleotides, 2'-O-MOE nucleotides, LNA nucleotides, and mixtures thereof. In a preferred embodiment, the miRNA molecule comprises 2'OMe nucleotides. As a non-limiting example, the

2'OMe nucleotides may be selected from the group consisting of 2'OMe-guanosine nucleotides, 2'OMe-uridine nucleotides, and mixtures thereof.

As such, the lipid particles of the invention (e.g., SNALP) are advantageous and suitable for use in the administration of active agents or therapeutic agents such as nucleic acid (e.g., interfering RNA such as siRNA, aiRNA, and/or miRNA) to a subject (e.g., a mammal such as a human) because they are stable in circulation, of a size required for pharmacodynamic behavior resulting in access to extravascular sites, and are capable of reaching target cell populations.

IV. Active Agents

Active agents (e.g., therapeutic agents) include any molecule or compound capable of exerting a desired effect on a cell, tissue, organ, or subject. Such effects may be, e.g., biological, physiological, and/or cosmetic. Active agents may be any type of molecule or compound including, but not limited to, nucleic acids, peptides, polypeptides, small molecules, and mixtures thereof. Non-limiting examples of nucleic acids include interfering RNA molecules (e.g., siRNA, aiRNA, miRNA), antisense oligonucleotides, plasmids, ribozymes, immunostimulatory oligonucleotides, and mixtures thereof. Examples of peptides or polypeptides include, without limitation, antibodies (e.g., polyclonal antibodies, monoclonal antibodies, antibody fragments; humanized antibodies, recombinant antibodies, recombinant human antibodies, Primatized™ antibodies), cytokines, growth factors, apoptotic factors, differentiation-inducing factors, cell-surface receptors and their ligands, hormones, and mixtures thereof. Examples of small molecules include, but are not limited to, small organic molecules or compounds such as any conventional agent or drug known to those of skill in the art.

In some embodiments, the active agent is a therapeutic agent, or a salt or derivative thereof. Therapeutic agent derivatives may be therapeutically active themselves or they may be prodrugs, which become active upon further modification. Thus, in one embodiment, a therapeutic agent derivative retains some or all of the therapeutic activity as compared to the unmodified agent, while in another embodiment, a therapeutic agent derivative is a prodrug that lacks therapeutic activity, but becomes active upon further modification.

A. Nucleic Acids

In certain embodiments, lipid particles of the present invention are associated with a nucleic acid, resulting in a nucleic acid-lipid particle (e.g., SNALP). In some embodiments, the nucleic acid is fully encapsulated in the lipid particle. As used herein, the term "nucleic acid" includes any oligonucleotide or polynucleotide, with fragments containing up to 60 nucleotides generally termed oligonucleotides, and longer fragments termed polynucleotides. In particular embodiments, oligonucleotides of the invention are from about 15 to about 60 nucleotides in length. Nucleic acid may be administered alone in the lipid particles of the invention, or in combination (e.g., co-administered) with lipid particles of the invention comprising peptides, polypeptides, or small molecules such as conventional drugs.

In the context of this invention, the terms "polynucleotide" and "oligonucleotide" refer to a polymer or oligomer of nucleotide or nucleoside monomers consisting of naturally-occurring bases, sugars and intersugar (backbone) linkages. The terms "polynucleotide" and "oligonucleotide" also include polymers or oligomers comprising non-naturally occurring monomers, or portions thereof, which function similarly. Such modified or substituted oligonucleotides are often preferred over native forms because of properties such as, for example, enhanced cellular uptake, reduced immunogenicity, and increased stability in the presence of nucleases.

Oligonucleotides are generally classified as deoxyribooligonucleotides or ribooligonucleotides. A deoxyribooligonucleotide consists of a 5-carbon sugar called deoxyribose joined covalently to phosphate at the 5' and 3' carbons of this sugar to form an alternating, unbranched polymer. A ribooligonucleotide consists of a similar repeating structure where the 5-carbon sugar is ribose.

The nucleic acid that is present in a lipid-nucleic acid particle according to this invention includes any form of nucleic acid that is known. The nucleic acids used herein can be single-stranded DNA or RNA, or double-stranded DNA or RNA, or DNA-RNA hybrids. Examples of double-stranded DNA are described herein and include, e.g., structural genes, genes including control and termination regions, and self-replicating systems such as viral or plasmid DNA. Examples of double-stranded RNA are described herein and include, e.g., siRNA and other RNAi agents such as aiRNA and pre-miRNA. Single-stranded nucleic acids include, e.g., antisense oligonucleotides, ribozymes, mature miRNA, and triplex-forming oligonucleotides.

Nucleic acids of the invention may be of various lengths, generally dependent upon the particular form of nucleic acid. For example, in particular embodiments, plasmids or genes may be from about 1,000 to about 100,000 nucleotide residues in length. In particular embodiments, oligonucleotides may range from about 10 to about 100 nucleotides in length. In various related embodiments, oligonucleotides, both single-stranded, double-stranded, and triple-stranded, may range in length from about 10 to about 60 nucleotides, from about 15 to about 60 nucleotides, from about 20 to about 50 nucleotides, from about 15 to about 30 nucleotides, or from about 20 to about 30 nucleotides in length.

In particular embodiments, an oligonucleotide (or a strand thereof) of the invention specifically hybridizes to or is complementary to a target polynucleotide sequence. The terms "specifically hybridizable" and "complementary" as used herein indicate a sufficient degree of complementarity such that stable and specific binding occurs between the DNA or RNA target and the oligonucleotide. It is understood that an oligonucleotide need not be 100% complementary to its target nucleic acid sequence to be specifically hybridizable. In preferred embodiments, an oligonucleotide is specifically hybridizable when binding of the oligonucleotide to the target sequence interferes with the normal function of the target sequence to cause a loss of utility or expression therefrom, and there is a sufficient degree of complementarity to avoid non-specific binding of the oligonucleotide to non-target sequences under conditions in which specific binding is desired, i.e., under physiological conditions in the case of in vivo assays or therapeutic treatment, or, in the case of in vitro assays, under conditions in which the assays are conducted. Thus, the oligonucleotide may include 1, 2, 3, or more base substitutions as compared to the region of a gene or mRNA sequence that it is targeting or to which it specifically hybridizes.

1. siRNA

The siRNA component of the nucleic acid-lipid particles of the present invention is capable of silencing the expression of a target gene of interest. Each strand of the siRNA duplex is typically about 15 to about 60 nucleotides in length, preferably about 15 to about 30 nucleotides in length. In certain embodiments, the siRNA comprises at least one modified nucleotide. The modified siRNA is generally less immunostimulatory than a corresponding unmodified siRNA sequence and retains RNAi activity against the target gene of

interest. In some embodiments, the modified siRNA contains at least one 2'OMe purine or pyrimidine nucleotide such as a 2'OMe-guanosine, 2'OMe-uridine, 2'OMe-adenosine, and/or 2'OMe-cytosine nucleotide. In preferred embodiments, one or more of the uridine and/or guanosine nucleotides are modified. The modified nucleotides can be present in one strand (i.e., sense or antisense) or both strands of the siRNA. The siRNA sequences may have overhangs (e.g., 3' or 5' overhangs as described in Elbashir et al., *Genes Dev.,* 15:188 (2001) or Nykanen et al., *Cell,* 107:309 (2001)), or may lack overhangs (i.e., have blunt ends).

The modified siRNA generally comprises from about 1% to about 100% (e.g., about 1%, 2%, 3%, 4%, 5%, 6%, 7%, 8%, 9%, 10%, 11%, 12%, 13%, 14%, 15%, 16%, 17%, 18%, 19%, 20%, 21%, 22%, 23%, 24%, 25%, 26%, 27%, 28%, 29%, 30%, 35%, 40%, 45%, 50%, 55%, 60%, 65%, 70%, 75%, 80%, 85%, 90%, 95%, or 100%) modified nucleotides in the double-stranded region of the siRNA duplex. In certain embodiments, one, two, three, four, five, six, seven, eight, nine, ten, or more of the nucleotides in the double-stranded region of the siRNA comprise modified nucleotides.

In some embodiments, less than about 25% (e.g., less than about 25%, 24%, 23%, 22%, 21%, 20%, 19%, 18%, 17%, 16%, 15%, 14%, 13%, 12%, 11%, 10%, 9%, 8%, 7%, 6%, 5%, 4%, 3%, 2%, or 1%) of the nucleotides in the double-stranded region of the siRNA comprise modified nucleotides.

In other embodiments, from about 1% to about 25% (e.g., from about 1%-25%, 2%-25%, 3%-25%, 4%-25%, 5%-25%, 6%-25%, 7%-25%, 8%-25%, 9%-25%, 10%-25%, 11%-25%, 12%-25%, 13%-25%, 14%-25%, 15%-25%, 16%-25%, 17%-25%, 18%-25%, 19%-25%, 20%-25%, 21%-25%, 22%-25%, 23%-25%, 24%-25%, etc.) or from about 1% to about 20% (e.g., from about 1%-20%, 2%-20%, 3%-20%, 4%-20%, 5%-20%, 6%-20%, 7%-20%, 8%-20%, 9%-20%, 10%-20%, 11%-20%, 12%-20%, 13%-20%, 14%-20%, 15%-20%, 16%-20%, 17%-20%, 18%-20%, 19%-20%, 1%-19%, 2%-19%, 3%-19%, 4%-19%, 5%-19%, 6%-19%, 7%-19%, 8%-19%, 9%-19%, 10%-19%, 11%-19%, 12%-19%, 13%-19%, 14%-19%, 15%-19%, 16%-19%, 17%-19%, 18%-19%, 1%-18%, 2%-18%, 3%-18%, 4%-18%, 5%-18%, 6%-18%, 7%-18%, 8%-18%, 9%-18%, 10%-18%, 11%-18%, 12%-18%, 13%-18%, 14%-18%, 15%-18%, 16%-18%, 17%-18%, 1%-17%, 2%-17%, 3%-17%, 4%-17%, 5%-17%, 6%-17%, 7%-17%, 8%-17%, 9%-17%, 10%-17%, 11%-17%, 12%-17%, 13%-17%, 14%-17%, 15%-17%, 16%-17%, 1%-16%, 2%-16%, 3%-16%, 4%-16%, 5%-16%, 6%-16%, 7%-16%, 8%-16%, 9%-16%, 10%-16%, 11%-16%, 12%-16%, 13%-16%, 14%-16%, 15%-16%, 1%-15%, 2%-15%, 3%-15%, 4%-15%, 5%-15%, 6%-15%, 7%-15%, 8%-15%, 9%-15%, 10%-15%, 11%-15%, 12%-15%, 13%-15%, 14%-15%, etc.) of the nucleotides in the double-stranded region of the siRNA comprise modified nucleotides.

In further embodiments, e.g., when one or both strands of the siRNA are selectively modified at uridine and/or guanosine nucleotides, the resulting modified siRNA can comprise less than about 30% modified nucleotides (e.g., less than about 30%, 29%, 28%, 27%, 26%, 25%, 24%, 23%, 22%, 21%, 20%, 19%, 18%, 17%, 16%, 15%, 14%, 13%, 12%, 11%, 10%, 9%, 8%, 7%, 6%, 5%, 4%, 3%, 2%, or 1% modified nucleotides) or from about 1% to about 30% modified nucleotides (e.g., from about 1%-30%, 2%-30%, 3%-30%, 4%-30%, 5%-30%, 6%-30%, 7%-30%, 8%-30%, 9%-30%, 10%-30%, 11%-30%, 12%-30%, 13%-30%, 14%-30%, 15%-30%, 16%-30%, 17%-30%, 18%-30%, 19%-30%, 20%-30%, 21%-30%, 22%-30%, 23%-30%, 24%-30%, 25%-30%, 26%-30%, 27%-30%, 28%-30%, or 29%-30% modified nucleotides).

a. Selection of siRNA Sequences

Suitable siRNA sequences can be identified using any means known in the art. Typically, the methods described in Elbashir et al., *Nature,* 411:494-498 (2001) and Elbashir et al., *EMBO J.,* 20:6877-6888 (2001) are combined with rational design rules set forth in Reynolds et al., *Nature Biotech.,* 22(3):326-330 (2004).

Generally, the nucleotide sequence 3' of the AUG start codon of a transcript from the target gene of interest is scanned for dinucleotide sequences (e.g., AA, NA, CC, GG, or UU, wherein N=C, G, or U) (see, e.g., Elbashir et al., *EMBO J.,* 20:6877-6888 (2001)). The nucleotides immediately 3' to the dinucleotide sequences are identified as potential siRNA sequences (i.e., a target sequence or a sense strand sequence). Typically, the 19, 21, 23, 25, 27, 29, 31, 33, 35, or more nucleotides immediately 3' to the dinucleotide sequences are identified as potential siRNA sequences. In some embodiments, the dinucleotide sequence is an AA or NA sequence and the 19 nucleotides immediately 3' to the AA or NA dinucleotide are identified as potential siRNA sequences. siRNA sequences are usually spaced at different positions along the length of the target gene. To further enhance silencing efficiency of the siRNA sequences, potential siRNA sequences may be analyzed to identify sites that do not contain regions of homology to other coding sequences, e.g., in the target cell or organism. For example, a suitable siRNA sequence of about 21 base pairs typically will not have more than 16-17 contiguous base pairs of homology to coding sequences in the target cell or organism. If the siRNA sequences are to be expressed from an RNA Pol III promoter, siRNA sequences lacking more than 4 contiguous A's or T's are selected.

Once a potential siRNA sequence has been identified, a complementary sequence (i.e., an antisense strand sequence) can be designed. A potential siRNA sequence can also be analyzed using a variety of criteria known in the art. For example, to enhance their silencing efficiency, the siRNA sequences may be analyzed by a rational design algorithm to identify sequences that have one or more of the following features: (1) G/C content of about 25% to about 60% G/C; (2) at least 3 A/Us at positions 15-19 of the sense strand; (3) no internal repeats; (4) an A at position 19 of the sense strand; (5) an A at position 3 of the sense strand; (6) a U at position 10 of the sense strand; (7) no G/C at position 19 of the sense strand; and (8) no G at position 13 of the sense strand. siRNA design tools that incorporate algorithms that assign suitable values of each of these features and are useful for selection of siRNA can be found at, e.g., boz094.ust.hk/RNAi/siRNA. One of skill in the art will appreciate that sequences with one or more of the foregoing characteristics may be selected for further analysis and testing as potential siRNA sequences.

Additionally, potential siRNA sequences with one or more of the following criteria can often be eliminated as siRNA: (1) sequences comprising a stretch of 4 or more of the same base in a row; (2) sequences comprising homopolymers of Gs (i.e., to reduce possible non-specific effects due to structural characteristics of these polymers; (3) sequences comprising triple base motifs (e.g., GGG, CCC, AAA, or TTT); (4) sequences comprising stretches of 7 or more G/Cs in a row; and (5) sequences comprising direct repeats of 4 or more bases within the candidates resulting in internal fold-back structures. However, one of skill in the art will appreciate that sequences

with one or more of the foregoing characteristics may still be selected for further analysis and testing as potential siRNA sequences.

In some embodiments, potential siRNA sequences may be further analyzed based on siRNA duplex asymmetry as described in, e.g., Khvorova et al., *Cell,* 115:209-216 (2003); and Schwarz et al., *Cell,* 115:199-208 (2003). In other embodiments, potential siRNA sequences may be further analyzed based on secondary structure at the target site as described in, e.g., Luo et al., *Biophys. Res. Commun.,* 318: 303-310 (2004). For example, secondary structure at the target site can be modeled using the Mfold algorithm (available at www.bioinfo.rpi.edu/applications/mfold/rna/form1.cgi) to select siRNA sequences which favor accessibility at the target site where less secondary structure in the form of base-pairing and stem-loops is present.

Once a potential siRNA sequence has been identified, the sequence can be analyzed for the presence of any immunostimulatory properties, e.g., using an in vitro cytokine assay or an in vivo animal model. Motifs in the sense and/or antisense strand of the siRNA sequence such as GU-rich motifs (e.g., 5'-GU-3',5'-UGU-3',5'-GUGU-3',5'-UGUGU-3', etc.) can also provide an indication of whether the sequence may be immunostimulatory. Once an siRNA molecule is found to be immunostimulatory, it can then be modified to decrease its immunostimulatory properties as described herein. As a non-limiting example, an siRNA sequence can be contacted with a mammalian responder cell under conditions such that the cell produces a detectable immune response to determine whether the siRNA is an immunostimulatory or a non-immunostimulatory siRNA. The mammalian responder cell may be from a naïve mammal (i.e., a mammal that has not previously been in contact with the gene product of the siRNA sequence). The mammalian responder cell may be, e.g., a peripheral blood mononuclear cell (PBMC), a macrophage, and the like. The detectable immune response may comprise production of a cytokine or growth factor such as, e.g., TNF-α, IFN-α, IFN-β, IFN-γ, IL-6, IL-12, or a combination thereof. An siRNA molecule identified as being immunostimulatory can then be modified to decrease its immunostimulatory properties by replacing at least one of the nucleotides on the sense and/or antisense strand with modified nucleotides. For example, less than about 30% (e.g., less than about 30%, 25%, 20%, 15%, 10%, or 5%) of the nucleotides in the double-stranded region of the siRNA duplex can be replaced with modified nucleotides such as 2'OMe nucleotides. The modified siRNA can then be contacted with a mammalian responder cell as described above to confirm that its immunostimulatory properties have been reduced or abrogated.

Suitable in vitro assays for detecting an immune response include, but are not limited to, the double monoclonal antibody sandwich immunoassay technique of David et al. (U.S. Pat. No. 4,376,110); monoclonal-polyclonal antibody sandwich assays (Wide et al., in Kirkham and Hunter, eds., *Radioimmunoassay Methods*, E. and S. Livingstone, Edinburgh (1970)); the "Western blot" method of Gordon et al. (U.S. Pat. No. 4,452,901); immunoprecipitation of labeled ligand (Brown et al., *J. Biol. Chem.,* 255:4980-4983 (1980)); enzyme-linked immunosorbent assays (ELISA) as described, for example, by Raines et al., *J. Biol. Chem.,* 257:5154-5160 (1982); immunocytochemical techniques, including the use of fluorochromes (Brooks et al., *Clin. Exp. Immunol.,* 39:477 (1980)); and neutralization of activity (Bowen-Pope et al., *Proc. Natl. Acad. Sci. USA,* 81:2396-2400 (1984)). In addition to the immunoassays described above, a number of other immunoassays are available, including those described in U.S. Pat. Nos. 3,817,827; 3,850,752; 3,901,654; 3,935,074; 3,984,533; 3,996,345; 4,034,074; and 4,098,876. The disclosures of these references are herein incorporated by reference in their entirety for all purposes.

A non-limiting example of an in vivo model for detecting an immune response includes an in vivo mouse cytokine induction assay as described in, e.g., Judge et al., *Mol. Ther.,* 13:494-505 (2006). In certain embodiments, the assay that can be performed as follows: (1) siRNA can be administered by standard intravenous injection in the lateral tail vein; (2) blood can be collected by cardiac puncture about 6 hours after administration and processed as plasma for cytokine analysis; and (3) cytokines can be quantified using sandwich ELISA kits according to the manufacturer's instructions (e.g., mouse and human IFN-α (PBL Biomedical; Piscataway, N.J.); human IL-6 and TNF-α (eBioscience; San Diego, Calif.); and mouse IL-6, TNF-α, and IFN-γ (BD Biosciences; San Diego, Calif.)).

Monoclonal antibodies that specifically bind cytokines and growth factors are commercially available from multiple sources and can be generated using methods known in the art (see, e.g., Kohler et al., *Nature,* 256: 495-497 (1975) and Harlow and Lane, ANTIBODIES, A LABORATORY MANUAL, Cold Spring Harbor Publication, New York (1999)). Generation of monoclonal antibodies has been previously described and can be accomplished by any means known in the art (Buhring et al., in Hybridoma, Vol. 10, No. 1, pp. 77-78 (1991)). In some methods, the monoclonal antibody is labeled (e.g., with any composition detectable by spectroscopic, photochemical, biochemical, electrical, optical, or chemical means) to facilitate detection.

b. Generating siRNA Molecules

siRNA can be provided in several forms including, e.g., as one or more isolated small-interfering RNA (siRNA) duplexes, as longer double-stranded RNA (dsRNA), or as siRNA or dsRNA transcribed from a transcriptional cassette in a DNA plasmid. The siRNA sequences may have overhangs (e.g., 3' or 5' overhangs as described in Elbashir et al., *Genes Dev.,* 15:188 (2001) or Nykänen et al., *Cell,* 107:309 (2001), or may lack overhangs (i.e., to have blunt ends).

An RNA population can be used to provide long precursor RNAs, or long precursor RNAs that have substantial or complete identity to a selected target sequence can be used to make the siRNA. The RNAs can be isolated from cells or tissue, synthesized, and/or cloned according to methods well known to those of skill in the art. The RNA can be a mixed population (obtained from cells or tissue, transcribed from cDNA, subtracted, selected, etc.), or can represent a single target sequence. RNA can be naturally occurring (e.g., isolated from tissue or cell samples), synthesized in vitro (e.g., using T7 or SP6 polymerase and PCR products or a cloned cDNA), or chemically synthesized.

To form a long dsRNA, for synthetic RNAs, the complement is also transcribed in vitro and hybridized to form a dsRNA. If a naturally occurring RNA population is used, the RNA complements are also provided (e.g., to form dsRNA for digestion by *E. coli* RNAse III or Dicer), e.g., by transcribing cDNAs corresponding to the RNA population, or by using RNA polymerases. The precursor RNAs are then hybridized to form double stranded RNAs for digestion. The dsRNAs can be directly administered to a subject or can be digested in vitro prior to administration.

Methods for isolating RNA, synthesizing RNA, hybridizing nucleic acids, making and screening cDNA libraries, and performing PCR are well known in the art (see, e.g., Gubler and Hoffman, *Gene,* 25:263-269 (1983); Sambrook et al., supra; Ausubel et al., supra), as are PCR methods (see, U.S.

Pat. Nos. 4,683,195 and 4,683,202; *PCR Protocols: A Guide to Methods and Applications* (Innis et al., eds, 1990)). Expression libraries are also well known to those of skill in the art. Additional basic texts disclosing the general methods of use in this invention include Sambrook et al., *Molecular Cloning, A Laboratory Manual* (2nd ed. 1989); Kriegler, *Gene Transfer and Expression: A Laboratory Manual* (1990); and *Current Protocols in Molecular Biology* (Ausubel et al., eds., 1994). The disclosures of these references are herein incorporated by reference in their entirety for all purposes.

Preferably, siRNA are chemically synthesized. The oligonucleotides that comprise the siRNA molecules of the invention can be synthesized using any of a variety of techniques known in the art, such as those described in Usman et al., *J. Am. Chem. Soc.,* 109:7845 (1987); Scaringe et al., *Nucl. Acids Res.,* 18:5433 (1990); Wincott et al., *Nucl. Acids Res.,* 23:2677-2684 (1995); and Wincott et al., *Methods Mol. Bio.,* 74:59 (1997). The synthesis of oligonucleotides makes use of common nucleic acid protecting and coupling groups, such as dimethoxytrityl at the 5'-end and phosphoramidites at the 3'-end. As a non-limiting example, small scale syntheses can be conducted on an Applied Biosystems synthesizer using a 0.2 μmol scale protocol. Alternatively, syntheses at the 0.2 μmol scale can be performed on a 96-well plate synthesizer from Protogene (Palo Alto, Calif.). However, a larger or smaller scale of synthesis is also within the scope of this invention. Suitable reagents for oligonucleotide synthesis, methods for RNA deprotection, and methods for RNA purification are known to those of skill in the art.

siRNA molecules can also be synthesized via a tandem synthesis technique, wherein both strands are synthesized as a single continuous oligonucleotide fragment or strand separated by a cleavable linker that is subsequently cleaved to provide separate fragments or strands that hybridize to form the siRNA duplex. The linker can be a polynucleotide linker or a non-nucleotide linker. The tandem synthesis of siRNA can be readily adapted to both multiwell/multiplate synthesis platforms as well as large scale synthesis platforms employing batch reactors, synthesis columns, and the like. Alternatively, siRNA molecules can be assembled from two distinct oligonucleotides, wherein one oligonucleotide comprises the sense strand and the other comprises the antisense strand of the siRNA. For example, each strand can be synthesized separately and joined together by hybridization or ligation following synthesis and/or deprotection. In certain other instances, siRNA molecules can be synthesized as a single continuous oligonucleotide fragment, where the self-complementary sense and antisense regions hybridize to form an siRNA duplex having hairpin secondary structure.

c. Modifying siRNA Sequences

In certain aspects, siRNA molecules comprise a duplex having two strands and at least one modified nucleotide in the double-stranded region, wherein each strand is about 15 to about 60 nucleotides in length. Advantageously, the modified siRNA is less immunostimulatory than a corresponding unmodified siRNA sequence, but retains the capability of silencing the expression of a target sequence. In preferred embodiments, the degree of chemical modifications introduced into the siRNA molecule strikes a balance between reduction or abrogation of the immunostimulatory properties of the siRNA and retention of RNAi activity. As a non-limiting example, an siRNA molecule that targets a gene of interest can be minimally modified (e.g., less than about 30%, 25%, 20%, 15%, 10%, or 5% modified) at selective uridine and/or guanosine nucleotides within the siRNA duplex to eliminate the immune response generated by the siRNA while retaining its capability to silence target gene expression.

Examples of modified nucleotides suitable for use in the invention include, but are not limited to, ribonucleotides having a 2'-O-methyl (2'OMe), 2'-deoxy-2'-fluoro(2'F), 2'-deoxy, 5-C-methyl, 2'-O-(2-methoxyethyl) (MOE), 4'-thio, 2'-amino, or 2'-C-allyl group. Modified nucleotides having a Northern conformation such as those described in, e.g., Saenger, *Principles of Nucleic Acid Structure*, Springer-Verlag Ed. (1984), are also suitable for use in siRNA molecules. Such modified nucleotides include, without limitation, locked nucleic acid (LNA) nucleotides (e.g., 2'-O, 4'-C-methylene-(D-ribofuranosyl) nucleotides), 2'-O-(2-methoxyethyl) (MOE) nucleotides, 2'-methyl-thio-ethyl nucleotides, 2'-deoxy-2'-fluoro(2'F) nucleotides, 2'-deoxy-2'-chloro(2'Cl) nucleotides, and 2'-azido nucleotides. In certain instances, the siRNA molecules described herein include one or more G-clamp nucleotides. A G-clamp nucleotide refers to a modified cytosine analog wherein the modifications confer the ability to hydrogen bond both Watson-Crick and Hoogsteen faces of a complementary guanine nucleotide within a duplex (see, e.g., Lin et al., *J. Am. Chem. Soc.,* 120:8531-8532 (1998)). In addition, nucleotides having a nucleotide base analog such as, for example, C-phenyl, C-naphthyl, other aromatic derivatives, inosine, azole carboxamides, and nitroazole derivatives such as 3-nitropyrrole, 4-nitroindole, 5-nitroindole, and 6-nitroindole (see, e.g., Loakes, *Nucl. Acids Res.,* 29:2437-2447 (2001)) can be incorporated into siRNA molecules.

In certain embodiments, siRNA molecules may further comprise one or more chemical modifications such as terminal cap moieties, phosphate backbone modifications, and the like. Examples of terminal cap moieties include, without limitation, inverted deoxy abasic residues, glyceryl modifications, 4',5'-methylene nucleotides, 1-(β-D-erythrofuranosyl) nucleotides, 4'-thio nucleotides, carbocyclic nucleotides, 1,5-anhydrohexitol nucleotides, L-nucleotides, α-nucleotides, modified base nucleotides, threo-pentofuranosyl nucleotides, acyclic 3',4'-seco nucleotides, acyclic 3,4-dihydroxybutyl nucleotides, acyclic 3,5-dihydroxypentyl nucleotides, 3'-3'-inverted nucleotide moieties, 3'-3'-inverted abasic moieties, 3'-2'-inverted nucleotide moieties, 3'-2'-inverted abasic moieties, 5'-5'-inverted nucleotide moieties, 5'-5'-inverted abasic moieties, 3'-5'-inverted deoxy abasic moieties, 5'-amino-alkyl phosphate, 1,3-diamino-2-propyl phosphate, 3-aminopropyl phosphate, 6-aminohexyl phosphate, 1,2-aminododecyl phosphate, hydroxypropyl phosphate, 1,4-butanediol phosphate, 3'-phosphoramidate, 5'-phosphoramidate, hexylphosphate, aminohexyl phosphate, 3'-phosphate, 5'-amino, 3'-phosphorothioate, 5'-phosphorothioate, phosphorodithioate, and bridging or non-bridging methylphosphonate or 5'-mercapto moieties (see, e.g., U.S. Pat. No. 5,998,203; Beaucage et al., *Tetrahedron* 49:1925 (1993)). Non-limiting examples of phosphate backbone modifications (i.e., resulting in modified internucleotide linkages) include phosphorothioate, phosphorodithioate, methylphosphonate, phosphotriester, morpholino, amidate, carbamate, carboxymethyl, acetamidate, polyamide, sulfonate, sulfonamide, sulfamate, formacetal, thioformacetal, and alkylsilyl substitutions (see, e.g., Hunziker et al., *Nucleic Acid Analogues: Synthesis and Properties, in Modern Synthetic Methods*, VCH, 331-417 (1995); Mesmaeker et al., *Novel Backbone Replacements for Oligonucleotides, in Carbohydrate Modifications in Antisense Research*, ACS, 24-39 (1994)). Such chemical modifications can occur at the 5'-end and/or 3'-end of the sense strand, antisense strand, or both strands of the siRNA. The disclosures of these references are herein incorporated by reference in their entirety for all purposes.

In some embodiments, the sense and/or antisense strand of the siRNA molecule can further comprise a 3'-terminal overhang having about 1 to about 4 (e.g., 1, 2, 3, or 4) 2'-deoxy ribonucleotides and/or any combination of modified and unmodified nucleotides. Additional examples of modified nucleotides and types of chemical modifications that can be introduced into siRNA molecules are described, e.g., in UK Patent No. GB 2,397,818 B and U.S. Patent Publication Nos. 20040192626, 20050282188, and 20070135372, the disclosures of which are herein incorporated by reference in their entirety for all purposes.

The siRNA molecules described herein can optionally comprise one or more non-nucleotides in one or both strands of the siRNA. As used herein, the term "non-nucleotide" refers to any group or compound that can be incorporated into a nucleic acid chain in the place of one or more nucleotide units, including sugar and/or phosphate substitutions, and allows the remaining bases to exhibit their activity. The group or compound is abasic in that it does not contain a commonly recognized nucleotide base such as adenosine, guanine, cytosine, uracil, or thymine and therefore lacks a base at the 1'-position.

In other embodiments, chemical modification of the siRNA comprises attaching a conjugate to the siRNA molecule. The conjugate can be attached at the 5' and/or 3'-end of the sense and/or antisense strand of the siRNA via a covalent attachment such as, e.g., a biodegradable linker. The conjugate can also be attached to the siRNA, e.g., through a carbamate group or other linking group (see, e.g., U.S. Patent Publication Nos. 20050074771, 20050043219, and 20050158727). In certain instances, the conjugate is a molecule that facilitates the delivery of the siRNA into a cell. Examples of conjugate molecules suitable for attachment to siRNA include, without limitation, steroids such as cholesterol, glycols such as polyethylene glycol (PEG), human serum albumin (HSA), fatty acids, carotenoids, terpenes, bile acids, folates (e.g., folic acid, folate analogs and derivatives thereof), sugars (e.g., galactose, galactosamine, N-acetyl galactosamine, glucose, mannose, fructose, fucose, etc.), phospholipids, peptides, ligands for cellular receptors capable of mediating cellular uptake, and combinations thereof (see, e.g., U.S. Patent Publication Nos. 20030130186, 20040110296, and 20040249178; U.S. Pat. No. 6,753,423). Other examples include the lipophilic moiety, vitamin, polymer, peptide, protein, nucleic acid, small molecule, oligosaccharide, carbohydrate cluster, intercalator, minor groove binder, cleaving agent, and cross-linking agent conjugate molecules described in U.S. Patent Publication Nos. 20050119470 and 20050107325. Yet other examples include the 2'-O-alkyl amine, 2'-O-alkoxyalkyl amine, polyamine, C5-cationic modified pyrimidine, cationic peptide, guanidinium group, amidininium group, cationic amino acid conjugate molecules described in U.S. Patent Publication No. 20050153337. Additional examples include the hydrophobic group, membrane active compound, cell penetrating compound, cell targeting signal, interaction modifier, and steric stabilizer conjugate molecules described in U.S. Patent Publication No. 20040167090. Further examples include the conjugate molecules described in U.S. Patent Publication No. 20050239739. The type of conjugate used and the extent of conjugation to the siRNA molecule can be evaluated for improved pharmacokinetic profiles, bioavailability, and/or stability of the siRNA while retaining RNAi activity. As such, one skilled in the art can screen siRNA molecules having various conjugates attached thereto to identify ones having improved properties and full RNAi activity using any of a variety of well-known in vitro cell culture or in vivo animal models. The disclosures of the above-described patent documents are herein incorporated by reference in their entirety for all purposes.

d. Target Genes

The siRNA component of the nucleic acid-lipid particles described herein can be used to downregulate or silence the translation (i.e., expression) of a gene of interest. Genes of interest include, but are not limited to, genes associated with viral infection and survival, genes associated with metabolic diseases and disorders (e.g., liver diseases and disorders), genes associated with tumorigenesis and cell transformation (e.g., cancer), angiogenic genes, immunomodulator genes such as those associated with inflammatory and autoimmune responses, ligand receptor genes, and genes associated with neurodegenerative disorders.

Genes associated with viral infection and survival include those expressed by a virus in order to bind, enter, and replicate in a cell. Of particular interest are viral sequences associated with chronic viral diseases. Viral sequences of particular interest include sequences of Filoviruses such as Ebola virus and Marburg virus (see, e.g., Geisbert et al., *J. Infect. Dis.*, 193:1650-1657 (2006)); Arenaviruses such as Lassa virus, Junin virus, Machupo virus, Guanarito virus, and Sabia virus (Buchmeier et al., *Arenaviridae*: the viruses and their replication, In: Fields Virology, Knipe et al. (eds.), 4th ed., Lippincott-Raven, Philadelphia, (2001)); Influenza viruses such as Influenza A, B, and C viruses, (see, e.g., Steinhauer et al., *Annu Rev Genet.*, 36:305-332 (2002); and Neumann et al., *J Gen Virol.*, 83:2635-2662 (2002)); Hepatitis viruses (see, e.g., Hamasaki et al., *FEBS Lett.*, 543:51 (2003); Yokota et al., *EMBO Rep.*, 4:602 (2003); Schlomai et al., *Hepatology*, 37:764 (2003); Wilson et al., *Proc. Natl. Acad. Sci. USA*, 100:2783 (2003); Kapadia et al., *Proc. Natl. Acad. Sci. USA*, 100:2014 (2003); and FIELDS VIROLOGY, Knipe et al. (eds.), 4th ed., Lippincott-Raven, Philadelphia (2001)); Human Immunodeficiency Virus (HIV) (Banerjea et al., *Mol. Ther.*, 8:62 (2003); Song et al., *J. Virol.*, 77:7174 (2003); Stephenson, *JAMA*, 289:1494 (2003); Qin et al., *Proc. Natl. Acad. Sci. USA*, 100:183 (2003)); Herpes viruses (Jia et al., *J. Virol.*, 77:3301 (2003)); and Human Papilloma Viruses (HPV) (Hall et al., *J. Virol.*, 77:6066 (2003); Jiang et al., *Oncogene*, 21:6041 (2002)).

Exemplary Filovirus nucleic acid sequences that can be silenced include, but are not limited to, nucleic acid sequences encoding structural proteins (e.g., VP30, VP35, nucleoprotein (NP), polymerase protein (L-pol)) and membrane-associated proteins (e.g., VP40, glycoprotein (GP), VP24). Complete genome sequences for Ebola virus are set forth in, e.g., Genbank Accession Nos. NC_002549; AY769362; NC_006432; NC_004161; AY729654; AY354458; AY142960; AB050936; AF522874; AF499101; AF272001; and AF086833. Ebola virus VP24 sequences are set forth in, e.g., Genbank Accession Nos. U77385 and AY058897. Ebola virus L-pol sequences are set forth in, e.g., Genbank Accession No. X67110. Ebola virus VP40 sequences are set forth in, e.g., Genbank Accession No. AY058896. Ebola virus NP sequences are set forth in, e.g., Genbank Accession No. AY058895. Ebola virus GP sequences are set forth in, e.g., Genbank Accession No. AY058898; Sanchez et al., *Virus Res.*, 29:215-240 (1993); Will et al., *J. Virol.*, 67:1203-1210 (1993); Volchkov et al., *FEBS Lett.*, 305:181-184 (1992); and U.S. Pat. No. 6,713,069. Additional Ebola virus sequences are set forth in, e.g., Genbank Accession Nos. L11365 and X61274. Complete genome sequences for Marburg virus are set forth in, e.g., Genbank Accession Nos. NC_001608; AY430365; AY430366; and AY358025. Marburg virus GP sequences are

set forth in, e.g., Genbank Accession Nos. AF005734; AF005733; and AF005732. Marburg virus VP35 sequences are set forth in, e.g., Genbank Accession Nos. AF005731 and AF005730. Additional Marburg virus sequences are set forth in, e.g., Genbank Accession Nos. X64406; Z29337; AF005735; and Z12132. Non-limiting examples of siRNA molecules targeting Ebola virus and Marburg virus nucleic acid sequences include those described in U.S. Patent Publication No. 20070135370, the disclosure of which is herein incorporated by reference in its entirety for all purposes.

Exemplary Influenza virus nucleic acid sequences that can be silenced include, but are not limited to, nucleic acid sequences encoding nucleoprotein (NP), matrix proteins (M1 and M2), nonstructural proteins (NS1 and NS2), RNA polymerase (PA, PB1, PB2), neuraminidase (NA), and haemagglutinin (HA). Influenza A NP sequences are set forth in, e.g., Genbank Accession Nos. NC_004522; AY818138; AB166863; AB188817; AB189046; AB189054; AB189062; AY646169; AY646177; AY651486; AY651493; AY651494; AY651495; AY651496; AY651497; AY651498; AY651499; AY651500; AY651501; AY651502; AY651503; AY651504; AY651505; AY651506; AY651507; AY651509; AY651528; AY770996; AY790308; AY818138; and AY818140. Influenza A PA sequences are set forth in, e.g., Genbank Accession Nos. AY818132; AY790280; AY646171; AY818132; AY818133; AY646179; AY818134; AY551934; AY651613; AY651610; AY651620; AY651617; AY651600; AY651611; AY651606; AY651618; AY651608; AY651607; AY651605; AY651609; AY651615; AY651616; AY651640; AY651614; AY651612; AY651621; AY651619; AY770995; and AY724786. Non-limiting examples of siRNA molecules targeting Influenza virus nucleic acid sequences include those described in U.S. Patent Publication No. 20070218122, the disclosure of which is herein incorporated by reference in its entirety for all purposes.

Exemplary hepatitis virus nucleic acid sequences that can be silenced include, but are not limited to, nucleic acid sequences involved in transcription and translation (e.g., En1, En2, X, P) and nucleic acid sequences encoding structural proteins (e.g., core proteins including C and C-related proteins, capsid and envelope proteins including S, M, and/or L proteins, or fragments thereof) (see, e.g., Fields Virology, supra). Exemplary Hepatits C virus (HCV) nucleic acid sequences that can be silenced include, but are not limited to, the 5'-untranslated region (5'-UTR), the 3'-untranslated region (3'-UTR), the polyprotein translation initiation codon region, the internal ribosome entry site (IRES) sequence, and/or nucleic acid sequences encoding the core protein, the E1 protein, the E2 protein, the p7 protein, the NS2 protein, the NS3 protease/helicase, the NS4A protein, the NS4B protein, the NS5A protein, and/or the NS5B RNA-dependent RNA polymerase. HCV genome sequences are set forth in, e.g., Genbank Accession Nos. NC_004102 (HCV genotype 1a), AJ238799 (HCV genotype 1b), NC_009823 (HCV genotype 2), NC_009824 (HCV genotype 3), NC_009825 (HCV genotype 4), NC_009826 (HCV genotype 5), and NC_009827 (HCV genotype 6). Hepatitis A virus nucleic acid sequences are set forth in, e.g., Genbank Accession No. NC_001489; Hepatitis B virus nucleic acid sequences are set forth in, e.g., Genbank Accession No. NC_003977; Hepatitis D virus nucleic acid sequence are set forth in, e.g., Genbank Accession No. NC_001653; Hepatitis E virus nucleic acid sequences are set forth in, e.g., Genbank Accession No. NC_001434; and Hepatitis G virus nucleic acid sequences are set forth in, e.g., Genbank Accession No. NC_001710. Silencing of sequences that encode genes associated with viral infection and survival can conveniently be used in combination with the administration of conventional agents used to treat the viral condition. Non-limiting examples of siRNA molecules targeting hepatitis virus nucleic acid sequences include those described in U.S. Patent Publication Nos. 20060281175, 20050058982, and 20070149470; U.S. Pat. No. 7,348,314; and U.S. Provisional Application No. 61/162,127, filed Mar. 20, 2009, the disclosures of which are herein incorporated by reference in their entirety for all purposes.

Genes associated with metabolic diseases and disorders (e.g., disorders in which the liver is the target and liver diseases and disorders) include, for example, genes expressed in dyslipidemia (e.g., liver X receptors such as LXRα and LXRβ (Genback Accession No. NM_007121), farnesoid X receptors (FXR) (Genbank Accession No. NM_005123), sterol-regulatory element binding protein (SREBP), site-1 protease (SIP), 3-hydroxy-3-methylglutaryl coenzyme-A reductase (HMG coenzyme-A reductase), apolipoprotein B (ApoB) (Genbank Accession No. NM_000384), apolipoprotein CIII (ApoC3) (Genbank Accession Nos. NM_000040 and NG_008949 REGION: 5001.8164), and apolipoprotein E (ApoE) (Genbank Accession Nos. NM_000041 and NG_007084 REGION: 5001.8612)); and diabetes (e.g., glucose 6-phosphatase) (see, e.g., Forman et al., *Cell,* 81:687 (1995); Seol et al., *Mol. Endocrinol.,* 9:72 (1995), Zavacki et al., *Proc. Natl. Acad. Sci. USA,* 94:7909 (1997); Sakai et al., *Cell,* 85:1037-1046 (1996); Duncan et al., *J. Biol. Chem.,* 272:12778-12785 (1997); Willy et al., *Genes Dev.,* 9:1033-1045 (1995); Lehmann et al., *J. Biol. Chem.,* 272:3137-3140 (1997); Janowski et al., *Nature,* 383:728-731 (1996); and Peet et al., *Cell,* 93:693-704 (1998)). One of skill in the art will appreciate that genes associated with metabolic diseases and disorders (e.g., diseases and disorders in which the liver is a target and liver diseases and disorders) include genes that are expressed in the liver itself as well as and genes expressed in other organs and tissues. Silencing of sequences that encode genes associated with metabolic diseases and disorders can conveniently be used in combination with the administration of conventional agents used to treat the disease or disorder. Non-limiting examples of siRNA molecules targeting the ApoB gene include those described in U.S. Patent Publication No. 20060134189, the disclosure of which is herein incorporated by reference in its entirety for all purposes. Non-limiting examples of siRNA molecules targeting the ApoC3 gene include those described in U.S. Provisional Application No. 61/147,235, filed Jan. 26, 2009, the disclosure of which is herein incorporated by reference in its entirety for all purposes.

Examples of gene sequences associated with tumorigenesis and cell transformation (e.g., cancer or other neoplasia) include mitotic kinesins such as Eg5 (KSP, KIF11; Genbank Accession No. NM_004523); serine/threonine kinases such as polo-like kinase 1 (PLK-1) (Genbank Accession No. NM_005030; Barr et al., *Nat. Rev. Mol. Cell Biol.,* 5:429-440 (2004)); tyrosine kinases such as WEE1 (Genbank Accession Nos. NM_003390 and NM_001143976); inhibitors of apoptosis such as XIAP (Genbank Accession No. NM_001167); COPS signalosome subunits such as CSN1, CSN2, CSN3, CSN4, CSN5 (JAB1; Genbank Accession No. NM_006837); CSN6, CSN7A, CSN7B, and CSN8; ubiquitin ligases such as COPT (RFWD2; Genbank Accession Nos. NM_022457 and NM_001001740); and histone deacetylases such as HDAC1, HDAC2 (Genbank Accession No. NM_001527), HDAC3, HDAC4, HDAC5, HDAC6, HDAC7, HDAC8, HDAC9, etc. Non-limiting examples of siRNA molecules targeting the Eg5 and XIAP genes include those described in U.S. patent application Ser. No. 11/807,872, filed May 29, 2007, the disclosure of which is herein

incorporated by reference in its entirety for all purposes. Non-limiting examples of siRNA molecules targeting the PLK-1 gene include those described in U.S. Patent Publication Nos. 20050107316 and 20070265438; and U.S. patent application Ser. No. 12/343,342, filed Dec. 23, 2008, the disclosures of which are herein incorporated by reference in their entirety for all purposes. Non-limiting examples of siRNA molecules targeting the CSN5 gene include those described in U.S. Provisional Application No. 61/045,251, filed Apr. 15, 2008, the disclosure of which is herein incorporated by reference in its entirety for all purposes.

Additional examples of gene sequences associated with tumorigenesis and cell transformation include translocation sequences such as MLL fusion genes, BCR-ABL (Wilda et al., *Oncogene,* 21:5716 (2002); Scherr et al., *Blood,* 101:1566 (2003)), TEL-AML1, EWS-FLI1, TLS-FUS, PAX3-FKHR, BCL-2, AML1-ETO, and AML1-MTG8 (Heidenreich et al., *Blood,* 101:3157 (2003)); overexpressed sequences such as multidrug resistance genes (Nieth et al., *FEBS Lett.,* 545:144 (2003); Wu et al, *Cancer Res.* 63:1515 (2003)), cyclins (Li et al., *Cancer Res.,* 63:3593 (2003); Zou et al., *Genes Dev.,* 16:2923 (2002)), beta-catenin (Verma et al., *Clin Cancer Res.,* 9:1291 (2003)), telomerase genes (Kosciolek et al., *Mol Cancer Ther.,* 2:209 (2003)), c-MYC, N-MYC, BCL-2, growth factor receptors (e.g., EGFR/ErbB1 (Genbank Accession Nos. NM_005228, NM_201282, NM_201283, and NM_201284; see also, Nagy et al. *Exp. Cell Res.,* 285:39-49 (2003), ErbB2/HER-2 (Genbank Accession Nos. NM_004448 and NM_001005862), ErbB3 (Genbank Accession Nos. NM_001982 and NM_001005915), and ErbB4 (Genbank Accession Nos. NM_005235 and NM_001042599); and mutated sequences such as RAS (reviewed in Tuschl and Borkhardt, *Mol. Interventions,* 2:158 (2002)). Non-limiting examples of siRNA molecules targeting the EGFR gene include those described in U.S. patent application Ser. No. 11/807,872, filed May 29, 2007, the disclosure of which is herein incorporated by reference in its entirety for all purposes.

Silencing of sequences that encode DNA repair enzymes find use in combination with the administration of chemotherapeutic agents (Collis et al., *Cancer Res.,* 63:1550 (2003)). Genes encoding proteins associated with tumor migration are also target sequences of interest, for example, integrins, selectins, and metalloproteinases. The foregoing examples are not exclusive. Those of skill in the art will understand that any whole or partial gene sequence that facilitates or promotes tumorigenesis or cell transformation, tumor growth, or tumor migration can be included as a template sequence.

Angiogenic genes are able to promote the formation of new vessels. Of particular interest is vascular endothelial growth factor (VEGF) (Reich et al., *Mol. Vis.,* 9:210 (2003)) or VEGFR. siRNA sequences that target VEGFR are set forth in, e.g., GB 2396864; U.S. Patent Publication No. 20040142895; and CA 2456444, the disclosures of which are herein incorporated by reference in their entirety for all purposes.

Anti-angiogenic genes are able to inhibit neovascularization. These genes are particularly useful for treating those cancers in which angiogenesis plays a role in the pathological development of the disease. Examples of anti-angiogenic genes include, but are not limited to, endostatin (see, e.g., U.S. Pat. No. 6,174,861), angiostatin (see, e.g., U.S. Pat. No. 5,639,725), and VEGFR2 (see, e.g., Decaussin et al., *J. Pathol.,* 188: 369-377 (1999)), the disclosures of which are herein incorporated by reference in their entirety for all purposes.

Immunomodulator genes are genes that modulate one or more immune responses. Examples of immunomodulator genes include, without limitation, cytokines such as growth factors (e.g., TGF-α, TFG-β, EGF, FGF, IGF, NGF, PDGF, CGF, GM-CSF, SCF, etc.), interleukins (e.g., IL-2, IL-4, IL-12 (Hill et al., *J. Immunol.,* 171:691 (2003)), IL-15, IL-18, IL-20, etc.), interferons (e.g., IFN-α, IFN-β, IFN-γ, etc.) and TNF. Fas and Fas ligand genes are also immunomodulator target sequences of interest (Song et al., *Nat. Med.,* 9:347 (2003)). Genes encoding secondary signaling molecules in hematopoietic and lymphoid cells are also included in the present invention, for example, Tec family kinases such as Bruton's tyrosine kinase (Btk) (Heinonen et al., *FEBS Lett.,* 527:274 (2002)).

Cell receptor ligands include ligands that are able to bind to cell surface receptors (e.g., insulin receptor, EPO receptor, G-protein coupled receptors, receptors with tyrosine kinase activity, cytokine receptors, growth factor receptors, etc.), to modulate (e.g., inhibit, activate, etc.) the physiological pathway that the receptor is involved in (e.g., glucose level modulation, blood cell development, mitogenesis, etc.). Examples of cell receptor ligands include, but are not limited to, cytokines, growth factors, interleukins, interferons, erythropoietin (EPO), insulin, glucagon, G-protein coupled receptor ligands, etc. Templates coding for an expansion of trinucleotide repeats (e.g., CAG repeats) find use in silencing pathogenic sequences in neurodegenerative disorders caused by the expansion of trinucleotide repeats, such as spinobulbular muscular atrophy and Huntington's Disease (Caplen et al., *Hum. Mol. Genet.,* 11:175 (2002)).

In addition to its utility in silencing the expression of any of the above-described genes for therapeutic purposes, the siRNA described herein are also useful in research and development applications as well as diagnostic, prophylactic, prognostic, clinical, and other healthcare applications. As a non-limiting example, the siRNA can be used in target validation studies directed at testing whether a gene of interest has the potential to be a therapeutic target. The siRNA can also be used in target identification studies aimed at discovering genes as potential therapeutic targets.

2. aiRNA

Like siRNA, asymmetrical interfering RNA (aiRNA) can recruit the RNA-induced silencing complex (RISC) and lead to effective silencing of a variety of genes in mammalian cells by mediating sequence-specific cleavage of the target sequence between nucleotide 10 and 11 relative to the 5' end of the antisense strand (Sun et al., *Nat. Biotech.,* 26:1379-1382 (2008)). Typically, an aiRNA molecule comprises a short RNA duplex having a sense strand and an antisense strand, wherein the duplex contains overhangs at the 3' and 5' ends of the antisense strand. The aiRNA is generally asymmetric because the sense strand is shorter on both ends when compared to the complementary antisense strand. In some aspects, aiRNA molecules may be designed, synthesized, and annealed under conditions similar to those used for siRNA molecules. As a non-limiting example, aiRNA sequences may be selected and generated using the methods described above for selecting siRNA sequences.

In another embodiment, aiRNA duplexes of various lengths (e.g., about 10-25, 12-20, 12-19, 12-18, 13-17, or 14-17 base pairs, more typically 12, 13, 14, 15, 16, 17, 18, 19, or base pairs) may be designed with overhangs at the 3' and 5' ends of the antisense strand to target an mRNA of interest. In certain instances, the sense strand of the aiRNA molecule is about 10-25, 12-20, 12-19, 12-18, 13-17, or 14-17 nucleotides in length, more typically 12, 13, 14, 15, 16, 17, 18, 19, or 20 nucleotides in length. In certain other instances, the

antisense strand of the aiRNA molecule is about 15-60, 15-50, or 15-40 nucleotides in length, more typically about 15-30, 15-25, or 19-25 nucleotides in length, and is preferably about 20-24, 21-22, or 21-23 nucleotides in length.

In some embodiments, the 5' antisense overhang contains one, two, three, four, or more nontargeting nucleotides (e.g., “AA”, “UU”, “dTdT”, etc.). In other embodiments, the 3' antisense overhang contains one, two, three, four, or more nontargeting nucleotides (e.g., “AA”, “UU”, “dTdT”, etc.). In certain aspects, the aiRNA molecules described herein may comprise one or more modified nucleotides, e.g., in the double-stranded (duplex) region and/or in the antisense overhangs. As a non-limiting example, aiRNA sequences may comprise one or more of the modified nucleotides described above for siRNA sequences. In a preferred embodiment, the aiRNA molecule comprises 2'OMe nucleotides such as, for example, 2'OMe-guanosine nucleotides, 2'OMe-uridine nucleotides, or mixtures thereof.

In certain embodiments, aiRNA molecules may comprise an antisense strand which corresponds to the antisense strand of an siRNA molecule, e.g., one of the siRNA molecules described herein. In other embodiments, aiRNA molecules may be used to silence the expression of any of the target genes set forth above, such as, e.g., genes associated with viral infection and survival, genes associated with metabolic diseases and disorders, genes associated with tumorigenesis and cell transformation, angiogenic genes, immunomodulator genes such as those associated with inflammatory and autoimmune responses, ligand receptor genes, and genes associated with neurodegenerative disorders.

3. miRNA

Generally, microRNAs (miRNA) are single-stranded RNA molecules of about 21-23 nucleotides in length which regulate gene expression. miRNAs are encoded by genes from whose DNA they are transcribed, but miRNAs are not translated into protein (non-coding RNA); instead, each primary transcript (a pri-miRNA) is processed into a short stem-loop structure called a pre-miRNA and finally into a functional mature miRNA. Mature miRNA molecules are either partially or completely complementary to one or more messenger RNA (mRNA) molecules, and their main function is to downregulate gene expression. The identification of miRNA molecules is described, e.g., in Lagos-Quintana et al., *Science,* 294:853-858; Lau et al., *Science,* 294:858-862; and Lee et al., *Science,* 294:862-864.

The genes encoding miRNA are much longer than the processed mature miRNA molecule. miRNA are first transcribed as primary transcripts or pri-miRNA with a cap and poly-A tail and processed to short, ~70-nucleotide stem-loop structures known as pre-miRNA in the cell nucleus. This processing is performed in animals by a protein complex known as the Microprocessor complex, consisting of the nuclease Drosha and the double-stranded RNA binding protein Pasha (Denli et al., *Nature,* 432:231-235 (2004)). These pre-miRNA are then processed to mature miRNA in the cytoplasm by interaction with the endonuclease Dicer, which also initiates the formation of the RNA-induced silencing complex (RISC) (Bernstein et al., *Nature,* 409:363-366 (2001). Either the sense strand or antisense strand of DNA can function as templates to give rise to miRNA.

When Dicer cleaves the pre-miRNA stem-loop, two complementary short RNA molecules are formed, but only one is integrated into the RISC complex. This strand is known as the guide strand and is selected by the argonaute protein, the catalytically active RNase in the RISC complex, on the basis of the stability of the 5' end (Preall et al., *Curr. Biol.,* 16:530-535 (2006)). The remaining strand, known as the anti-guide or passenger strand, is degraded as a RISC complex substrate (Gregory et al., *Cell,* 123:631-640 (2005)). After integration into the active RISC complex, miRNAs base pair with their complementary mRNA molecules and induce target mRNA degradation and/or translational silencing.

Mammalian miRNA molecules are usually complementary to a site in the 3' UTR of the target mRNA sequence. In certain instances, the annealing of the miRNA to the target mRNA inhibits protein translation by blocking the protein translation machinery. In certain other instances, the annealing of the miRNA to the target mRNA facilitates the cleavage and degradation of the target mRNA through a process similar to RNA interference (RNAi). miRNA may also target methylation of genomic sites which correspond to targeted mRNA. Generally, miRNA function in association with a complement of proteins collectively termed the miRNP.

In certain aspects, the miRNA molecules described herein are about 15-100, 15-90, 15-80, 15-75, 15-70, 15-60, 15-50, or 15-40 nucleotides in length, more typically about 15-30, 15-25, or 19-25 nucleotides in length, and are preferably about 20-24, 21-22, or 21-23 nucleotides in length. In certain other aspects, miRNA molecules may comprise one or more modified nucleotides. As a non-limiting example, miRNA sequences may comprise one or more of the modified nucleotides described above for siRNA sequences. In a preferred embodiment, the miRNA molecule comprises 2'OMe nucleotides such as, for example, 2'OMe-guanosine nucleotides, 2'OMe-uridine nucleotides, or mixtures thereof.

In some embodiments, miRNA molecules may be used to silence the expression of any of the target genes set forth above, such as, e.g., genes associated with viral infection and survival, genes associated with metabolic diseases and disorders, genes associated with tumorigenesis and cell transformation, angiogenic genes, immunomodulator genes such as those associated with inflammatory and autoimmune responses, ligand receptor genes, and genes associated with neurodegenerative disorders.

In other embodiments, one or more agents that block the activity of a miRNA targeting an mRNA of interest are administered using a lipid particle of the invention (e.g., a nucleic acid-lipid particle). Examples of blocking agents include, but are not limited to, steric blocking oligonucleotides, locked nucleic acid oligonucleotides, and Morpholino oligonucleotides. Such blocking agents may bind directly to the miRNA or to the miRNA binding site on the target mRNA.

4. Antisense Oligonucleotides

In one embodiment, the nucleic acid is an antisense oligonucleotide directed to a target gene or sequence of interest. The terms “antisense oligonucleotide” or “antisense” include oligonucleotides that are complementary to a targeted polynucleotide sequence. Antisense oligonucleotides are single strands of DNA or RNA that are complementary to a chosen sequence. Antisense RNA oligonucleotides prevent the translation of complementary RNA strands by binding to the RNA. Antisense DNA oligonucleotides can be used to target a specific, complementary (coding or non-coding) RNA. If binding occurs, this DNA/RNA hybrid can be degraded by the enzyme RNase H. In a particular embodiment, antisense oligonucleotides comprise from about 10 to about 60 nucleotides, more preferably from about 15 to about 30 nucleotides. The term also encompasses antisense oligonucleotides that may not be exactly complementary to the desired target gene. Thus, the invention can be utilized in instances where non-target specific-activities are found with antisense, or where an antisense sequence containing one or more mismatches with the target sequence is the most preferred for a particular use.

Antisense oligonucleotides have been demonstrated to be effective and targeted inhibitors of protein synthesis, and, consequently, can be used to specifically inhibit protein synthesis by a targeted gene. The efficacy of antisense oligonucleotides for inhibiting protein synthesis is well established. For example, the synthesis of polygalactauronase and the muscarine type 2 acetylcholine receptor are inhibited by antisense oligonucleotides directed to their respective mRNA sequences (see, U.S. Pat. Nos. 5,739,119 and 5,759,829). Furthermore, examples of antisense inhibition have been demonstrated with the nuclear protein cyclin, the multiple drug resistance gene (MDR1), ICAM-1, E-selectin, STK-1, striatal GABAA receptor, and human EGF (see, Jaskulski et al., *Science,* 240:1544-6 (1988); Vasanthakumar et al., *Cancer Commun.,* 1:225-32 (1989); Penis et al., *Brain Res Mol Brain Res.,* 15; 57:310-20 (1998); and U.S. Pat. Nos. 5,801,154; 5,789,573; 5,718,709 and 5,610,288). Moreover, antisense constructs have also been described that inhibit and can be used to treat a variety of abnormal cellular proliferations, e.g., cancer (see, U.S. Pat. Nos. 5,747,470; 5,591,317; and 5,783,683). The disclosures of these references are herein incorporated by reference in their entirety for all purposes.

Methods of producing antisense oligonucleotides are known in the art and can be readily adapted to produce an antisense oligonucleotide that targets any polynucleotide sequence. Selection of antisense oligonucleotide sequences specific for a given target sequence is based upon analysis of the chosen target sequence and determination of secondary structure, $T_m$, binding energy, and relative stability. Antisense oligonucleotides may be selected based upon their relative inability to form dimers, hairpins, or other secondary structures that would reduce or prohibit specific binding to the target mRNA in a host cell. Highly preferred target regions of the mRNA include those regions at or near the AUG translation initiation codon and those sequences that are substantially complementary to 5' regions of the mRNA. These secondary structure analyses and target site selection considerations can be performed, for example, using v.4 of the OLIGO primer analysis software (Molecular Biology Insights) and/or the BLASTN 2.0.5 algorithm software (Altschul et al., *Nucleic Acids Res.,* 25:3389-402 (1997)).

5. Ribozymes

According to another embodiment of the invention, nucleic acid-lipid particles are associated with ribozymes. Ribozymes are RNA-protein complexes having specific catalytic domains that possess endonuclease activity (see, Kim et al., *Proc. Natl. Acad. Sci. USA.,* 84:8788-92 (1987); and Forster et a, *Cell,* 49:211-20 (1987)). For example, a large number of ribozymes accelerate phosphoester transfer reactions with a high degree of specificity, often cleaving only one of several phosphoesters in an oligonucleotide substrate (see, Cech et al., *Cell,* 27:487-96 (1981); Michel et al., *J. Mol. Biol.,* 216:585-610 (1990); Reinhold-Hurek et al., *Nature,* 357:173-6 (1992)). This specificity has been attributed to the requirement that the substrate bind via specific base-pairing interactions to the internal guide sequence ("IGS") of the ribozyme prior to chemical reaction.

At least six basic varieties of naturally-occurring enzymatic RNA molecules are known presently. Each can catalyze the hydrolysis of RNA phosphodiester bonds in trans (and thus can cleave other RNA molecules) under physiological conditions. In general, enzymatic nucleic acids act by first binding to a target RNA. Such binding occurs through the target binding portion of an enzymatic nucleic acid which is held in close proximity to an enzymatic portion of the molecule that acts to cleave the target RNA. Thus, the enzymatic nucleic acid first recognizes and then binds a target RNA through complementary base-pairing, and once bound to the correct site, acts enzymatically to cut the target RNA. Strategic cleavage of such a target RNA will destroy its ability to direct synthesis of an encoded protein. After an enzymatic nucleic acid has bound and cleaved its RNA target, it is released from that RNA to search for another target and can repeatedly bind and cleave new targets.

The enzymatic nucleic acid molecule may be formed in a hammerhead, hairpin, hepatitis δ virus, group I intron or RNaseP RNA (in association with an RNA guide sequence), or *Neurospora* VS RNA motif, for example. Specific examples of hammerhead motifs are described in, e.g., Rossi et al., *Nucleic Acids Res.,* 20:4559-65 (1992). Examples of hairpin motifs are described in, e.g., EP 0360257, Hampel et al., *Biochemistry,* 28:4929-33 (1989); Hampel et al., *Nucleic Acids Res.,* 18:299-304 (1990); and U.S. Pat. No. 5,631,359. An example of the hepatitis 8 virus motif is described in, e.g., Perrotta et al., *Biochemistry,* 31:11843-52 (1992). An example of the RNaseP motif is described in, e.g., Guerrier-Takada et al., *Cell,* 35:849-57 (1983). Examples of the *Neurospora* VS RNA ribozyme motif is described in, e.g., Saville et al., *Cell,* 61:685-96 (1990); Saville et al., *Proc. Natl. Acad. Sci. USA,* 88:8826-30 (1991); Collins et al., *Biochemistry,* 32:2795-9 (1993). An example of the Group I intron is described in, e.g., U.S. Pat. No. 4,987,071. Important characteristics of enzymatic nucleic acid molecules used according to the invention are that they have a specific substrate binding site which is complementary to one or more of the target gene DNA or RNA regions, and that they have nucleotide sequences within or surrounding that substrate binding site which impart an RNA cleaving activity to the molecule. Thus, the ribozyme constructs need not be limited to specific motifs mentioned herein. The disclosures of these references are herein incorporated by reference in their entirety for all purposes.

Methods of producing a ribozyme targeted to any polynucleotide sequence are known in the art. Ribozymes may be designed as described in, e.g., PCT Publication Nos. WO 93/23569 and WO 94/02595, and synthesized to be tested in vitro and/or in vivo as described therein. The disclosures of these PCT publications are herein incorporated by reference in their entirety for all purposes.

Ribozyme activity can be optimized by altering the length of the ribozyme binding arms or chemically synthesizing ribozymes with modifications that prevent their degradation by serum ribonucleases (see, e.g., PCT Publication Nos. WO 92/07065, WO 93/15187, WO 91/03162, and WO 94/13688; EP 92110298.4; and U.S. Pat. No. 5,334,711, which describe various chemical modifications that can be made to the sugar moieties of enzymatic RNA molecules, the disclosures of which are each herein incorporated by reference in their entirety for all purposes), modifications which enhance their efficacy in cells, and removal of stem II bases to shorten RNA synthesis times and reduce chemical requirements.

6. Immunostimulatory Oligonucleotides

Nucleic acids associated with lipid particles of the present invention may be immunostimulatory, including immunostimulatory oligonucleotides (ISS; single- or double-stranded) capable of inducing an immune response when administered to a subject, which may be a mammal such as a human. ISS include, e.g., certain palindromes leading to hairpin secondary structures (see, Yamamoto et al., *J. Immunol.,* 148:4072-6 (1992)), or CpG motifs, as well as other known ISS features (such as multi-G domains; see; PCT Publication No. WO 96/11266, the disclosure of which is herein incorporated by reference in its entirety for all purposes).

Immunostimulatory nucleic acids are considered to be non-sequence specific when it is not required that they specifically bind to and reduce the expression of a target sequence in order to provoke an immune response. Thus, certain immunostimulatory nucleic acids may comprise a sequence corresponding to a region of a naturally-occurring gene or mRNA, but they may still be considered non-sequence specific immunostimulatory nucleic acids.

In one embodiment, the immunostimulatory nucleic acid or oligonucleotide comprises at least one CpG dinucleotide. The oligonucleotide or CpG dinucleotide may be unmethylated or methylated. In another embodiment, the immunostimulatory nucleic acid comprises at least one CpG dinucleotide having a methylated cytosine. In one embodiment, the nucleic acid comprises a single CpG dinucleotide, wherein the cytosine in the CpG dinucleotide is methylated. In an alternative embodiment, the nucleic acid comprises at least two CpG dinucleotides, wherein at least one cytosine in the CpG dinucleotides is methylated. In a further embodiment, each cytosine in the CpG dinucleotides present in the sequence is methylated. In another embodiment, the nucleic acid comprises a plurality of CpG dinucleotides, wherein at least one of the CpG dinucleotides comprises a methylated cytosine. Examples of immunostimulatory oligonucleotides suitable for use in the compositions and methods of the present invention are described in PCT Application No. PCT/US08/88676, filed Dec. 31, 2008, PCT Publication Nos. WO 02/069369 and WO 01/15726, U.S. Pat. No. 6,406,705, and Raney et al., *J. Pharm. Exper. Ther.,* 298:1185-92 (2001), the disclosures of which are each herein incorporated by reference in their entirety for all purposes. In certain embodiments, the oligonucleotides used in the compositions and methods of the invention have a phosphodiester ("PO") backbone or a phosphorothioate ("PS") backbone, and/or at least one methylated cytosine residue in a CpG motif.

B. Other Active Agents

In certain embodiments, the active agent associated with the lipid particles of the invention may comprise one or more therapeutic proteins, polypeptides, or small organic molecules or compounds. Non-limiting examples of such therapeutically effective agents or drugs include oncology drugs (e.g., chemotherapy drugs, hormonal therapeutic agents, immunotherapeutic agents, radiotherapeutic agents, etc.), lipid-lowering agents, anti-viral drugs, anti-inflammatory compounds, antidepressants, stimulants, analgesics, antibiotics, birth control medication, antipyretics, vasodilators, anti-angiogenics, cytovascular agents, signal transduction inhibitors, cardiovascular drugs such as anti-arrhythmic agents, hormones, vasoconstrictors, and steroids. These active agents may be administered alone in the lipid particles of the invention, or in combination (e.g., co-administered) with lipid particles of the invention comprising nucleic acid such as interfering RNA.

Non-limiting examples of chemotherapy drugs include platinum-based drugs (e.g., oxaliplatin, cisplatin, carboplatin, spiroplatin, iproplatin, satraplatin, etc.), alkylating agents (e.g., cyclophosphamide, ifosfamide, chlorambucil, busulfan, melphalan, mechlorethamine, uramustine, thiotepa, nitrosoureas, etc.), anti-metabolites (e.g., 5-fluorouracil (5-FU), azathioprine, methotrexate, leucovorin, capecitabine, cytarabine, floxuridine, fludarabine, gemcitabine, pemetrexed, raltitrexed, etc.), plant alkaloids (e.g., vincristine, vinblastine, vinorelbine, vindesine, podophyllotoxin, paclitaxel (taxol), docetaxel, etc.), topoisomerase inhibitors (e.g., irinotecan (CPT-11; Camptosar), topotecan, amsacrine, etoposide (VP16), etoposide phosphate, teniposide, etc.), antitumor antibiotics (e.g., doxorubicin, adriamycin, daunorubicin, epirubicin, actinomycin, bleomycin, mitomycin, mitoxantrone, plicamycin, etc.), tyrosine kinase inhibitors (e.g., gefitinib (Iresse), sunitinib (Sutent®; SU11248), erlotinib (Tarceva®; OSI-1774), lapatinib (GW572016; GW2016), canertinib (CI 1033), semaxinib (SU5416), vatalanib (PTK787/ZK222584), sorafenib (BAY 43-9006), imatinib (Gleevec®; STI571), dasatinib (BMS-354825), leflunomide (SU101), vandetanib (Zactima™; ZD6474), etc.), pharmaceutically acceptable salts thereof, stereoisomers thereof, derivatives thereof, analogs thereof, and combinations thereof.

Examples of conventional hormonal therapeutic agents include, without limitation, steroids (e.g., dexamethasone), finasteride, aromatase inhibitors, tamoxifen, and goserelin as well as other gonadotropin-releasing hormone agonists (GnRH).

Examples of conventional immunotherapeutic agents include, but are not limited to, immunostimulants (e.g., *Bacillus* Calmette-Guérin (BCG), levamisole, interleukin-2, alpha-interferon, etc.), monoclonal antibodies (e.g., anti-CD20, anti-HER2, anti-CD52, anti-HLA-DR, and anti-VEGF monoclonal antibodies), immunotoxins (e.g., anti-CD33 monoclonal antibody-calicheamicin conjugate, anti-CD22 monoclonal antibody-pseudomonas exotoxin conjugate, etc.), and radioimmunotherapy (e.g., anti-CD20 monoclonal antibody conjugated to $^{111}$In, $^{90}$Y, or $^{131}$I, etc.).

Examples of conventional radiotherapeutic agents include, but are not limited to, radionuclides such as $^{47}$Sc, $^{64}$Cu, $^{67}$Cu, $^{89}$Sr, $^{86}$Y, $^{87}$Y, $^{90}$Y, $^{105}$Rh, $^{111}$Ag, $^{111}$In, $^{117m}$Sn, $^{149}$Pm, $^{153}$Sm, $^{166}$Ho, $^{177}$Lu, $^{186}$Re, $^{188}$Re, $^{211}$At, and, $^{212}$Bi, optionally conjugated to antibodies directed against tumor antigens.

Additional oncology drugs that may be used according to the invention include, but are not limited to, alkeran, allopurinol, altretamine, amifostine, anastrozole, araC, arsenic trioxide, bexarotene, biCNU, carmustine, CCNU, celecoxib, cladribine, cyclosporin A, cytosine arabinoside, cytoxan, dexrazoxane, DTIC, estramustine, exemestane, FK506, gemtuzumab-ozogamicin, hydrea, hydroxyurea, idarubicin, interferon, letrozole, Leustatin, leuprolide, litretinoin, megastrol, L-PAM, mesna, methoxsalen, mithramycin, nitrogen mustard, pamidronate, Pegademase, pentostatin, porfimer sodium, prednisone, rituxan, streptozocin, STI-571, taxotere, temozolamide, VM-26, toremifene, tretinoin, ATRA, valrubicin, and velban. Other examples of oncology drugs that may be used according to the invention are ellipticin and ellipticin analogs or derivatives, epothilones, intracellular kinase inhibitors, and camptothecins.

Non-limiting examples of lipid-lowering agents for treating a lipid disease or disorder associated with elevated triglycerides, cholesterol, and/or glucose include statins, fibrates, ezetimibe, thiazolidinediones, niacin, beta-blockers, nitroglycerin, calcium antagonists, fish oil, and mixtures thereof.

Examples of anti-viral drugs include, but are not limited to, abacavir, aciclovir, acyclovir, adefovir, amantadine, amprenavir, arbidol, atazanavir, atripla, cidofovir, combivir, darunavir, delavirdine, didanosine, docosanol, edoxudine, efavirenz, emtricitabine, enfuvirtide, entecavir, entry inhibitors, famciclovir, fixed dose combinations, fomivirsen, fosamprenavir, foscarnet, fosfonet, fusion inhibitors, ganciclovir, ibacitabine, immunovir, idoxuridine, imiquimod, indinavir, inosine, integrase inhibitors, interferon type III (e.g., IFN-λ molecules such as IFN-λ1, IFN-λ2, and IFN-λ3), interferon type II (e.g., IFN-γ), interferon type I (e.g., IFN-α such as PEGylated IFN-α, IFN-β, IFN-κ, IFN-δ, IFN-ϵ, IFN-τ, IFN-ω, and IFN-ζ, interferon, lamivudine, lopinavir, loviride, MK-0518, maraviroc, moroxydine, nelfinavir, nevirapine, nexavir, nucleoside analogues, oseltamivir, penciclovir,

peramivir, pleconaril, podophyllotoxin, protease inhibitors, reverse transcriptase inhibitors, ribavirin, rimantadine, ritonavir, saquinavir, stavudine, synergistic enhancers, tenofovir, tenofovir disoproxil, tipranavir, trifluridine, trizivir, tromantadine, truvada, valaciclovir, valganciclovir, vicriviroc, vidarabine, viramidine, zalcitabine, zanamivir, zidovudine, pharmaceutically acceptable salts thereof, stereoisomers thereof, derivatives thereof, analogs thereof, and mixtures thereof.

## V. Lipid Particles

The lipid particles of the invention typically comprise an active agent or therapeutic agent, a cationic lipid, a non-cationic lipid, and a conjugated lipid that inhibits aggregation of particles. In some embodiments, the active agent or therapeutic agent is fully encapsulated within the lipid portion of the lipid particle such that the active agent or therapeutic agent in the lipid particle is resistant in aqueous solution to enzymatic degradation, e.g., by a nuclease or protease. In other embodiments, the lipid particles described herein are substantially non-toxic to mammals such as humans. The lipid particles of the invention typically have a mean diameter of from about 40 nm to about 150 nm, from about 50 nm to about 150 nm, from about 60 nm to about 130 nm, from about 70 nm to about 110 nm, or from about 70 to about 90 nm.

In preferred embodiments, the lipid particles of the invention are serum-stable nucleic acid-lipid particles (SNALP) which comprise an interfering RNA (e.g., siRNA, aiRNA, and/or miRNA), a cationic lipid (e.g., a cationic lipid of Formulas I, II, and/or III), a non-cationic lipid (e.g., cholesterol alone or mixtures of one or more phospholipids and cholesterol), and a conjugated lipid that inhibits aggregation of the particles (e.g., one or more PEG-lipid conjugates). The SNALP may comprise at least 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, or more unmodified and/or modified interfering RNA molecules. Nucleic acid-lipid particles and their method of preparation are described in, e.g., U.S. Pat. Nos. 5,753,613; 5,785,992; 5,705,385; 5,976,567; 5,981,501; 6,110,745; and 6,320,017; and PCT Publication No. WO 96/40964, the disclosures of which are each herein incorporated by reference in their entirety for all purposes.

### A. Cationic Lipids

Any of a variety of cationic lipids may be used in the lipid particles of the invention (e.g., SNALP), either alone or in combination with one or more other cationic lipid species or non-cationic lipid species.

Cationic lipids which are useful in the present invention can be any of a number of lipid species which carry a net positive charge at physiological pH. Such lipids include, but are not limited to, N,N-dioleyl-N,N-dimethylammonium chloride (DODAC), 1,2-dioleyloxy-N,N-dimethylaminopropane (DODMA), 1,2-distearyloxy-N,N-dimethylaminopropane (DSDMA), N-(1-(2,3-dioleyloxy)propyl)-N,N,N-trimethylammonium chloride (DOTMA), N,N-distearyl-N,N-dimethylammonium bromide (DDAB), N-(1-(2,3-dioleoyloxy)propyl)-N,N,N-trimethylammonium chloride (DOTAP), 3-(N-(N',N'-dimethylaminoethane)-carbamoyl) cholesterol (DC-Chol), N-(1,2-dimyristyloxyprop-3-yl)-N,N-dimethyl-N-hydroxyethyl ammonium bromide (DMRIE), 2,3-dioleyloxy-N-[2(spermine-carboxamido)ethyl]-N,N-dimethyl-1-propanaminiumtrifluoroacetate (DOSPA), dioctadecylamidoglycyl spermine (DOGS), 3-dimethylamino-2-(cholest-5-en-3-beta-oxybutan-4-oxy)-1-(cis,cis-9,12-octadecadienoxy)propane (CLinDMA), 2-[5'-(cholest-5-en-3.beta.-oxy)-3'-oxapentoxy)-3-dimethyl-1-(cis,cis-9',1-2'-octadecadienoxy)propane (CpLinDMA), N,N-dimethyl-3,4-dioleyloxybenzylamine (DMOBA), 1,2-N,N'-dioleylcarbamyl-3-dimethylaminopropane (DOcarbDAP), 1,2-N,N'-Dilinoleylcarbamyl-3-dimethylaminopropane (DLincarbDAP), 1,2-Dilinoleoylcarbamyl-3-dimethylaminopropane (DLinCDAP), and mixtures thereof A number of these lipids and related analogs have been described in U.S. Patent Publication Nos. 20060083780 and 20060240554; U.S. Pat. Nos. 5,208,036; 5,264,618; 5,279,833; 5,283,185; 5,753,613; and 5,785,992; and PCT Publication No. WO 96/10390, the disclosures of which are each herein incorporated by reference in their entirety for all purposes. Additionally, a number of commercial preparations of cationic lipids are available and can be used in the present invention. These include, e.g., LIPOFECTIN® (commercially available cationic liposomes comprising DOTMA and DOPE, from GIBCO/BRL, Grand Island, N.Y., USA); LIPOFECTAMINE® (commercially available cationic liposomes comprising DOSPA and DOPE, from GIBCO/BRL); and TRANSFECTAM® (commercially available cationic liposomes comprising DOGS from Promega Corp., Madison, Wis., USA).

Additionally, cationic lipids of Formula I having the following structures are useful in the present invention.



(I)

wherein $R^1$ and $R^2$ are independently selected and are H or $C_1$-$C_3$ alkyls, $R^3$ and $R^4$ are independently selected and are alkyl groups having from about 10 to about 20 carbon atoms, and at least one of $R^3$ and $R^4$ comprises at least two sites of unsaturation. In certain instances, $R^3$ and $R^4$ are both the same, i.e., $R^3$ and $R^4$ are both linoleyl ($C_{18}$), etc. In certain other instances, $R^3$ and $R^4$ are different, i.e., $R^3$ is tetradectrienyl ($C_{14}$) and $R^4$ is linoleyl ($C_{18}$). In a preferred embodiment, the cationic lipid of Formula I is symmetrical, i.e., $R^3$ and $R^4$ are both the same. In another preferred embodiment, both $R^3$ and $R^4$ comprise at least two sites of unsaturation. In some embodiments, $R^3$ and $R^4$ are independently selected from the group consisting of dodecadienyl, tetradecadienyl, hexadecadienyl, linoleyl, and icosadienyl. In a preferred embodiment, $R^3$ and $R^4$ are both linoleyl. In some embodiments, $R^3$ and $R^4$ comprise at least three sites of unsaturation and are independently selected from, e.g., dodecatrienyl, tetradectrienyl, hexadecatrienyl, linolenyl, and icosatrienyl. In particularly preferred embodiments, the cationic lipid of Formula I is 1,2-dilinoleyloxy-N,N-dimethylaminopropane (DLinDMA) or 1,2-dilinolenyloxy-N,N-dimethylaminopropane (DLenDMA).

Furthermore, cationic lipids of Formula II having the following structures are useful in the present invention.



(II)

wherein $R^1$ and $R^2$ are independently selected and are H or $C_1$-$C_3$ alkyls, $R^3$ and $R^4$ are independently selected and are alkyl groups having from about 10 to about 20 carbon atoms, and at least one of $R^3$ and $R^4$ comprises at least two sites of

unsaturation. In certain instances, $R^3$ and $R^4$ are both the same, i.e., $R^3$ and $R^4$ are both linoleyl ($C_{18}$), etc. In certain other instances, $R^3$ and $R^4$ are different, i.e., $R^3$ is tetradectrienyl ($C_{14}$) and $R^4$ is linoleyl ($C_{18}$). In a preferred embodiment, the cationic lipids of the present invention are symmetrical, i.e., $R^3$ and $R^4$ are both the same. In another preferred embodiment, both $R^3$ and $R^4$ comprise at least two sites of unsaturation. In some embodiments, $R^3$ and $R^4$ are independently selected from the group consisting of dodecadienyl, tetradecadienyl, hexadecadienyl, linoleyl, and icosadienyl. In a preferred embodiment, $R^3$ and $R^4$ are both linoleyl. In some embodiments, $R^3$ and $R^4$ comprise at least three sites of unsaturation and are independently selected from, e.g., dodecatrienyl, tetradectrienyl, hexadecatrienyl, linolenyl, and icosatrienyl.

Moreover, cationic lipids of Formula III having the following structures (or salts thereof) are useful in the present invention.



(III)

Wherein $R^1$ and $R^2$ are either the same or different and independently optionally substituted $C_{12}$-$C_{24}$ alkyl, optionally substituted $C_{12}$-$C_{24}$ alkenyl, optionally substituted $C_{12}$-$C_{24}$ alkynyl, or optionally substituted $C_{12}$-$C_{24}$ acyl; $R^3$ and $R^4$ are either the same or different and independently optionally substituted $C_1$-$C_6$ alkyl, optionally substituted $C_1$-$C_6$ alkenyl, or optionally substituted $C_1$-$C_6$ alkynyl or $R^3$ and $R^4$ may join to form an optionally substituted heterocyclic ring of 4 to 6 carbon atoms and 1 or 2 heteroatoms chosen from nitrogen and oxygen; $R^5$ is either absent or hydrogen or $C_1$-$C_6$ alkyl to provide a quaternary amine; m, n, and p are either the same or different and independently either 0 or 1 with the proviso that m, n, and p are not simultaneously 0; q is 0, 1, 2, 3, or 4; and Y and Z are either the same or different and independently O, S, or NH.

In some embodiments, the cationic lipid of Formula III is 2,2-dilinoleyl-4-(2-dimethylaminoethyl)-[1,3]-dioxolane (DLin-K-C2-DMA; "XTC2"), 2,2-dilinoleyl-4-(3-dimethylaminopropyl)-[1,3]-dioxolane (DLin-K-C3-DMA), 2,2-dilinoleyl-4-(4-dimethylaminobutyl)-[1,3]-dioxolane (DLin-K-C4-DMA), 2,2-dilinoleyl-5-dimethylaminomethyl-[1,3]-dioxane (DLin-K6-DMA), 2,2-dilinoleyl-4-N-methylpepiazino-[1,3]-dioxolane (DLin-K-MPZ), 2,2-dilinoleyl-4-dimethylaminomethyl-[1,3]-dioxolane (DLin-K-DMA), 1,2-dilinoleylcarbamoyloxy-3-dimethylaminopropane (DLin-C-DAP), 1,2-dilinoleyoxy-3-(dimethylamino)acetoxypropane (DLin-DAC), 1,2-dilinoleyoxy-3-morpholinopropane (DLin-MA), 1,2-dilinoleoyl-3-dimethylaminopropane (DLinDAP), 1,2-dilinoleylthio-3-dimethylaminopropane (DLin-S-DMA), 1-linoleoyl-2-linoleyloxy-3-dimethylaminopropane (DLin-2-DMAP), 1,2-dilinoleyloxy-3-trimethylaminopropane chloride salt (DLin-TMA.Cl), 1,2-dilinoleoyl-3-trimethylaminopropane chloride salt (DLin-TAP.Cl), 1,2-dilinoleyloxy-3-(N-methylpiperazino)propane (DLin-MPZ), 3-(N,N-dilinoleylamino)-1,2-propanediol (DLinAP), 3-(N,N-dioleylamino)-1,2-propanedio (DOAP), 1,2-dilinoleyloxo-3-(2-N,N-dimethylamino)ethoxypropane (DLin-EG-DMA), or mixtures thereof. In preferred embodiments, the cationic lipid of Formula III is DLin-K-C2-DMA (XTC2).

The cationic lipid typically comprises from about 50 mol % to about 90 mol %, from about 50 mol % to about 85 mol %, from about 50 mol % to about 80 mol %, from about 50 mol % to about 75 mol %, from about 50 mol % to about 70 mol %, from about 50 mol % to about 65 mol %, or from about 55 mol % to about 65 mol % of the total lipid present in the particle.

It will be readily apparent to one of skill in the art that depending on the intended use of the particles, the proportions of the components can be varied and the delivery efficiency of a particular formulation can be measured using, e.g., an endosomal release parameter (ERP) assay.

B. Non-Cationic Lipids

The non-cationic lipids used in the lipid particles of the invention (e.g., SNALP) can be any of a variety of neutral uncharged, zwitterionic, or anionic lipids capable of producing a stable complex.

Non-limiting examples of non-cationic lipids include phospholipids such as lecithin, phosphatidylethanolamine, lysolecithin, lysophosphatidylethanolamine, phosphatidylserine, phosphatidylinositol, sphingomyelin, egg sphingomyelin (ESM), cephalin, cardiolipin, phosphatidic acid, cerebrosides, dicetylphosphate, distearoylphosphatidylcholine (DSPC), dioleoylphosphatidylcholine (DOPC), dipalmitoylphosphatidylcholine (DPPC), dioleoylphosphatidylglycerol (DOPG), dipalmitoylphosphatidylglycerol (DPPG), dioleoylphosphatidylethanolamine (DOPE), palmitoyloleoyl-phosphatidylcholine (POPC), palmitoyloleoyl-phosphatidylethanolamine (POPE), palmitoyloleyol-phosphatidylglycerol (POPG), dioleoylphosphatidylethanolamine 4-(N-maleimidomethyl)-cyclohexane-1-carboxylate (DOPE-mal), dipalmitoyl-phosphatidylethanolamine (DPPE), dimyristoyl-phosphatidylethanolamine (DMPE), distearoyl-phosphatidylethanolamine (DSPE), monomethyl-phosphatidylethanolamine, dimethyl-phosphatidylethanolamine, dielaidoyl-phosphatidylethanolamine (DEPE), stearoyloleoyl-phosphatidylethanolamine (SOPE), lysophosphatidylcholine, dilinoleoylphosphatidylcholine, and mixtures thereof. Other diacylphosphatidylcholine and diacylphosphatidylethanolamine phospholipids can also be used. The acyl groups in these lipids are preferably acyl groups derived from fatty acids having $C_{10}$-$C_{24}$ carbon chains, e.g., lauroyl, myristoyl, palmitoyl, stearoyl, or oleoyl.

Additional examples of non-cationic lipids include sterols such as cholesterol and derivatives thereof such as cholestanol, cholestanone, cholestenone, coprostanol, cholesteryl-2'-hydroxyethyl ether, cholesteryl-4'-hydroxybutyl ether, and mixtures thereof.

In some embodiments, the non-cationic lipid present in the lipid particles (e.g., SNALP) comprises or consists of cholesterol or a derivative thereof, e.g., a phospholipid-free lipid particle formulation. In other embodiments, the non-cationic lipid present in the lipid particles (e.g., SNALP) comprises or consists of one or more phospholipids, e.g., a cholesterol-free lipid particle formulation. In further embodiments, the non-cationic lipid present in the lipid particles (e.g., SNALP) comprises or consists of a mixture of one or more phospholipids and cholesterol or a derivative thereof.

Other examples of non-cationic lipids suitable for use in the present invention include nonphosphorous containing lipids such as, e.g., stearylamine, dodecylamine, hexadecylamine, acetyl palmitate, glycerolricinoleate, hexadecyl stearate, isopropyl myristate, amphoteric acrylic polymers, triethanolamine-lauryl sulfate, alkyl-aryl sulfate polyethyloxylated fatty acid amides, dioctadecyldimethyl ammonium bromide, ceramide, sphingomyelin, and the like.

In some embodiments, the non-cationic lipid comprises from about 13 mol % to about 49.5 mol %, from about 20 mol % to about 45 mol %, from about 25 mol % to about 45 mol %, from about 30 mol % to about 45 mol %, from about 35 mol % to about 45 mol %, from about 20 mol % to about 40 mol %, from about 25 mol % to about 40 mol %, or from about 30 mol % to about 40 mol % of the total lipid present in the particle.

In certain embodiments, the cholesterol present in phospholipid-free lipid particles comprises from about 30 mol % to about 45 mol %, from about 30 mol % to about 40 mol %, from about 35 mol % to about 45 mol %, or from about 35 mol % to about 40 mol % of the total lipid present in the particle. As a non-limiting example, a phospholipid-free lipid particle may comprise cholesterol at about 37 mol % of the total lipid present in the particle.

In certain other embodiments, the cholesterol present in lipid particles containing a mixture of phospholipid and cholesterol comprises from about 30 mol % to about 40 mol %, from about 30 mol % to about 35 mol %, or from about 35 mol % to about 40 mol % of the total lipid present in the particle. As a non-limiting example, a lipid particle comprising a mixture of phospholipid and cholesterol may comprise cholesterol at about 34 mol % of the total lipid present in the particle.

In further embodiments, the cholesterol present in lipid particles containing a mixture of phospholipid and cholesterol comprises from about 10 mol % to about 30 mol %, from about 15 mol % to about 25 mol %, or from about 17 mol % to about 23 mol % of the total lipid present in the particle. As a non-limiting example, a lipid particle comprising a mixture of phospholipid and cholesterol may comprise cholesterol at about 20 mol % of the total lipid present in the particle.

In embodiments where the lipid particles contain a mixture of phospholipid and cholesterol or a cholesterol derivative, the mixture may comprise up to about 40, 45, 50, 55, or 60 mol % of the total lipid present in the particle. In certain instances, the phospholipid component in the mixture may comprise from about 2 mol % to about 12 mol %, from about 4 mol % to about 10 mol %, from about 5 mol % to about 10 mol %, from about 5 mol % to about 9 mol %, or from about 6 mol % to about 8 mol % of the total lipid present in the particle. As a non-limiting example, a lipid particle comprising a mixture of phospholipid and cholesterol may comprise a phospholipid such as DPPC or DSPC at about 7 mol % (e.g., in a mixture with about 34 mol % cholesterol) of the total lipid present in the particle. In certain other instances, the phospholipid component in the mixture may comprise from about 10 mol % to about 30 mol %, from about 15 mol % to about 25 mol %, or from about 17 mol % to about 23 mol % of the total lipid present in the particle. As another non-limiting example, a lipid particle comprising a mixture of phospholipid and cholesterol may comprise a phospholipid such as DPPC or DSPC at about 20 mol % (e.g., in a mixture with about 20 mol % cholesterol) of the total lipid present in the particle.

C. Lipid Conjugate

In addition to cationic and non-cationic lipids, the lipid particles of the invention (e.g., SNALP) comprise a lipid conjugate. The conjugated lipid is useful in that it prevents the aggregation of particles. Suitable conjugated lipids include, but are not limited to, PEG-lipid conjugates, ATTA-lipid conjugates, cationic-polymer-lipid conjugates (CPLs), and mixtures thereof. In certain embodiments, the particles comprise either a PEG-lipid conjugate or an ATTA-lipid conjugate together with a CPL.

In a preferred embodiment, the lipid conjugate is a PEG-lipid. Examples of PEG-lipids include, but are not limited to, PEG coupled to dialkyloxypropyls (PEG-DAA) as described in, e.g., PCT Publication No. WO 05/026372, PEG coupled to diacylglycerol (PEG-DAG) as described in, e.g., U.S. Patent Publication Nos. 20030077829 and 2005008689, PEG coupled to phospholipids such as phosphatidylethanolamine (PEG-PE), PEG conjugated to ceramides as described in, e.g., U.S. Pat. No. 5,885,613, PEG conjugated to cholesterol or a derivative thereof, and mixtures thereof. The disclosures of these patent documents are herein incorporated by reference in their entirety for all purposes. Additional PEG-lipids include, without limitation, PEG-C-DOMG, 2 KPEG-DMG, and a mixture thereof.

PEG is a linear, water-soluble polymer of ethylene PEG repeating units with two terminal hydroxyl groups. PEGs are classified by their molecular weights; for example, PEG 2000 has an average molecular weight of about 2,000 daltons, and PEG 5000 has an average molecular weight of about 5,000 daltons. PEGs are commercially available from Sigma Chemical Co. and other companies and include, for example, the following: monomethoxypolyethylene glycol (MePEG-OH), monomethoxypolyethylene glycol-succinate (MePEG-S), monomethoxypolyethylene glycol-succinimidyl succinate (MePEG-S-NHS), monomethoxypolyethylene glycol-amine ($MePEG-NH_2$), monomethoxypolyethylene glycol-tresylate (MePEG-TRES), and monomethoxypolyethylene glycol-imidazolyl-carbonyl (MePEG-IM). Other PEGs such as those described in U.S. Pat. Nos. 6,774,180 and 7,053,150 (e.g., mPEG (20 KDa) amine) are also useful for preparing the PEG-lipid conjugates of the present invention. The disclosures of these patents are herein incorporated by reference in their entirety for all purposes. In addition, monomethoxypolyethyleneglycol-acetic acid ($MePEG-CH_2COOH$) is particularly useful for preparing PEG-lipid conjugates including, e.g., PEG-DAA conjugates.

The PEG moiety of the PEG-lipid conjugates described herein may comprise an average molecular weight ranging from about 550 daltons to about 10,000 daltons. In certain instances, the PEG moiety has an average molecular weight of from about 750 daltons to about 5,000 daltons (e.g., from about 1,000 daltons to about 5,000 daltons, from about 1,500 daltons to about 3,000 daltons, from about 750 daltons to about 3,000 daltons, from about 750 daltons to about 2,000 daltons, etc.). In preferred embodiments, the PEG moiety has an average molecular weight of about 2,000 daltons or about 750 daltons.

In certain instances, the PEG can be optionally substituted by an alkyl, alkoxy, acyl, or aryl group. The PEG can be conjugated directly to the lipid or may be linked to the lipid via a linker moiety. Any linker moiety suitable for coupling the PEG to a lipid can be used including, e.g., non-ester containing linker moieties and ester-containing linker moieties. In a preferred embodiment, the linker moiety is a non-ester containing linker moiety. As used herein, the term "non-ester containing linker moiety" refers to a linker moiety that does not contain a carboxylic ester bond (—OC(O)—). Suitable non-ester containing linker moieties include, but are not limited to, amido (—C(O)NH—), amino (—NR—), carbonyl (—C(O)—), carbamate (—NHC(O)O—), urea (—NHC(O)NH—), disulphide (—S—S—), ether (—O—), succinyl (—(O)$CCH_2CH_2C$(O)—), succinamidyl (—NHC(O)$CH_2CH_2C$(O)NH—), ether, disulphide, as well as combinations thereof (such as a linker containing both a carbamate linker moiety and an amido linker moiety). In a preferred embodiment, a carbamate linker is used to couple the PEG to the lipid.

In other embodiments, an ester containing linker moiety is used to couple the PEG to the lipid. Suitable ester containing linker moieties include, e.g., carbonate (—OC(O)O—), succinoyl, phosphate esters (—O—(O)POH—O—), sulfonate esters, and combinations thereof.

Phosphatidylethanolamines having a variety of acyl chain groups of varying chain lengths and degrees of saturation can be conjugated to PEG to form the lipid conjugate. Such phosphatidylethanolamines are commercially available, or can be isolated or synthesized using conventional techniques known to those of skilled in the art. Phosphatidyl-ethanolamines containing saturated or unsaturated fatty acids with carbon chain lengths in the range of $C_{10}$ to $C_{20}$ are preferred. Phosphatidylethanolamines with mono- or diunsaturated fatty acids and mixtures of saturated and unsaturated fatty acids can also be used. Suitable phosphatidylethanolamines include, but are not limited to, dimyristoyl-phosphatidylethanolamine (DMPE), dipalmitoyl-phosphatidylethanolamine (DPPE), dioleoylphosphatidylethanolamine (DOPE), and distearoyl-phosphatidylethanolamine (DSPE).

The term "ATTA" or "polyamide" refers to, without limitation, compounds described in U.S. Pat. Nos. 6,320,017 and 6,586,559, the disclosures of which are herein incorporated by reference in their entirety for all purposes. These compounds include a compound having the formula:

(IV)



wherein R is a member selected from the group consisting of hydrogen, alkyl and acyl; R' is a member selected from the group consisting of hydrogen and alkyl; or optionally, R and $R^1$ and the nitrogen to which they are bound form an azido moiety; $R^2$ is a member of the group selected from hydrogen, optionally substituted alkyl, optionally substituted aryl and a side chain of an amino acid; $R^3$ is a member selected from the group consisting of hydrogen, halogen, hydroxy, alkoxy, mercapto, hydrazino, amino and $NR^4R^5$, wherein $R^4$ and $R^5$ are independently hydrogen or alkyl; n is 4 to 80; m is 2 to 6; p is 1 to 4; and q is 0 or 1. It will be apparent to those of skill in the art that other polyamides can be used in the compounds of the present invention.

The term "diacylglycerol" refers to a compound having 2 fatty acyl chains, R' and

$R^2$, both of which have independently between 2 and 30 carbons bonded to the 1- and 2-position of glycerol by ester linkages. The acyl groups can be saturated or have varying degrees of unsaturation. Suitable acyl groups include, but are not limited to, lauryl ($C_{12}$), myristyl ($C_{14}$), palmityl ($C_{16}$), stearyl ($C_{18}$), and icosyl ($C_{20}$). In preferred embodiments, $R^1$ and $R^2$ are the same, i.e., $R^1$ and $R^2$ are both myristyl (i.e., dimyristyl), $R^1$ and $R^2$ are both stearyl (i.e., distearyl), etc. Diacylglycerols have the following general formula:

(V)



The term "dialkyloxypropyl" refers to a compound having 2 alkyl chains, $R^1$ and $R^2$, both of which have independently between 2 and 30 carbons. The alkyl groups can be saturated or have varying degrees of unsaturation. Dialkyloxypropyls have the following general formula:

(VI)



In a preferred embodiment, the PEG-lipid is a PEG-DAA conjugate having the following formula:

(VII)



wherein $R^1$ and $R^2$ are independently selected and are long-chain alkyl groups having from about 10 to about 22 carbon atoms; PEG is a polyethyleneglycol; and L is a non-ester containing linker moiety or an ester containing linker moiety as described above. The long-chain alkyl groups can be saturated or unsaturated. Suitable alkyl groups include, but are not limited to, lauryl ($C_{12}$), myristyl ($C_{14}$), palmityl ($C_{16}$), stearyl ($C_{18}$), and icosyl ($C_{20}$). In preferred embodiments, $R^1$ and $R^2$ are the same, i.e., $R^1$ and $R^2$ are both myristyl (i.e., dimyristyl), $R^1$ and $R^2$ are both stearyl (i.e., distearyl), etc.

In Formula VII above, the PEG has an average molecular weight ranging from about 550 daltons to about 10,000 daltons. In certain instances, the PEG has an average molecular weight of from about 750 daltons to about 5,000 daltons (e.g., from about 1,000 daltons to about 5,000 daltons, from about 1,500 daltons to about 3,000 daltons, from about 750 daltons to about 3,000 daltons, from about 750 daltons to about 2,000 daltons, etc.). In preferred embodiments, the PEG has an average molecular weight of about 2,000 daltons or about 750 daltons. The PEG can be optionally substituted with alkyl, alkoxy, acyl, or aryl. In certain embodiments, the terminal hydroxyl group is substituted with a methoxy or methyl group.

In a preferred embodiment, "L" is a non-ester containing linker moiety. Suitable non-ester containing linkers include, but are not limited to, an amido linker moiety, an amino linker moiety, a carbonyl linker moiety, a carbamate linker moiety, a urea linker moiety, an ether linker moiety, a disulphide linker moiety, a succinamidyl linker moiety, and combinations thereof. In a preferred embodiment, the non-ester containing linker moiety is a carbamate linker moiety (i.e., a PEG-C-DAA conjugate). In another preferred embodiment, the non-ester containing linker moiety is an amido linker moiety (i.e., a PEG-A-DAA conjugate). In yet another preferred embodiment, the non-ester containing linker moiety is a succinamidyl linker moiety (i.e., a PEG-S-DAA conjugate).

In particular embodiments, the PEG-lipid conjugate is selected from:



(PEG-C-DMA)



(PEG-C-DOMG)

The PEG-DAA conjugates are synthesized using standard techniques and reagents known to those of skill in the art. It will be recognized that the PEG-DAA conjugates will contain various amide, amine, ether, thio, carbamate, and urea linkages. Those of skill in the art will recognize that methods and reagents for forming these bonds are well known and readily available. See, e.g., March, ADVANCED ORGANIC CHEMISTRY (Wiley 1992); Larock, COMPREHENSIVE ORGANIC TRANSFORMATIONS (VCH 1989); and Furniss, VOGEL'S TEXTBOOK OF PRACTICAL ORGANIC CHEMISTRY, 5th ed. (Longman 1989). It will also be appreciated that any functional groups present may require protection and deprotection at different points in the synthesis of the PEG-DAA conjugates. Those of skill in the art will recognize that such techniques are well known. See, e.g., Green and Wuts, PROTECTIVE GROUPS IN ORGANIC SYNTHESIS (Wiley 1991).

Preferably, the PEG-DAA conjugate is a dilauryloxypropyl ($C_{12}$)-PEG conjugate, dimyristyloxypropyl ($C_{14}$)-PEG conjugate, a dipalmityloxypropyl ($C_{16}$)-PEG conjugate, or a distearyloxypropyl ($C_{18}$)-PEG conjugate. Those of skill in the art will readily appreciate that other dialkyloxypropyls can be used in the PEG-DAA conjugates of the present invention.

In addition to the foregoing, it will be readily apparent to those of skill in the art that other hydrophilic polymers can be used in place of PEG. Examples of suitable polymers that can be used in place of PEG include, but are not limited to, polyvinylpyrrolidone, polymethyloxazoline, polyethyloxazoline, polyhydroxypropyl methacrylamide, polymethacrylamide and polydimethylacrylamide, polylactic acid, polyglycolic acid, and derivatized celluloses such as hydroxymethylcellulose or hydroxyethylcellulose.

In addition to the foregoing components, the particles (e.g., SNALP or SPLP) of the present invention can further comprise cationic poly(ethylene glycol) (PEG) lipids or CPLs (see, e.g., Chen et al., *Bioconj. Chem.,* 11:433-437 (2000)). Suitable SPLPs and SPLP-CPLs for use in the present invention, and methods of making and using SPLPs and SPLP-CPLs, are disclosed, e.g., in U.S. Pat. No. 6,852,334 and PCT Publication No. WO 00/62813, the disclosures of which are herein incorporated by reference in their entirety for all purposes.

Suitable CPLs include compounds of Formula VIII:

A-W-Y (VIII),

wherein A, W, and Y are as described below.

With reference to Formula VIII, "A" is a lipid moiety such as an amphipathic lipid, a neutral lipid, or a hydrophobic lipid that acts as a lipid anchor. Suitable lipid examples include, but are not limited to, diacylglycerolyls, dialkylglycerolyls, N-N-dialkylaminos, 1,2-diacyloxy-3-aminopropanes, and 1,2-dialkyl-3-aminopropanes.

"W" is a polymer or an oligomer such as a hydrophilic polymer or oligomer. Preferably, the hydrophilic polymer is a biocompatible polymer that is nonimmunogenic or possesses low inherent immunogenicity. Alternatively, the hydrophilic polymer can be weakly antigenic if used with appropriate adjuvants. Suitable nonimmunogenic polymers include, but are not limited to, PEG, polyamides, polylactic acid, polyglycolic acid, polylactic acid/polyglycolic acid copolymers, and combinations thereof. In a preferred embodiment, the polymer has a molecular weight of from about 250 to about 7,000 daltons.

"Y" is a polycationic moiety. The term polycationic moiety refers to a compound, derivative, or functional group having a positive charge, preferably at least 2 positive charges at a selected pH, preferably physiological pH. Suitable polycationic moieties include basic amino acids and their derivatives such as arginine, asparagine, glutamine, lysine, and histidine; spermine; spermidine; cationic dendrimers; polyamines; polyamine sugars; and amino polysaccharides. The polycationic moieties can be linear, such as linear tetralysine, branched or dendrimeric in structure. Polycationic moieties have between about 2 to about 15 positive charges, preferably between about 2 to about 12 positive charges, and more preferably between about 2 to about 8 positive charges at selected pH values. The selection of which polycationic moiety to employ may be determined by the type of particle application which is desired.

The charges on the polycationic moieties can be either distributed around the entire particle moiety, or alternatively, they can be a discrete concentration of charge density in one particular area of the particle moiety e.g., a charge spike. If the charge density is distributed on the particle, the charge density can be equally distributed or unequally distributed. All variations of charge distribution of the polycationic moiety are encompassed by the present invention.

The lipid "A" and the nonimmunogenic polymer "W" can be attached by various methods and preferably by covalent attachment. Methods known to those of skill in the art can be used for the covalent attachment of "A" and "W." Suitable linkages include, but are not limited to, amide, amine, carboxyl, carbonate, carbamate, ester, and hydrazone linkages. It will be apparent to those skilled in the art that "A" and "W" must have complementary functional groups to effectuate the linkage. The reaction of these two groups, one on the lipid and the other on the polymer, will provide the desired linkage. For

example, when the lipid is a diacylglycerol and the terminal hydroxyl is activated, for instance with NHS and DCC, to form an active ester, and is then reacted with a polymer which contains an amino group, such as with a polyamide (see, e.g., U.S. Pat. Nos. 6,320,017 and 6,586,559, the disclosures of which are herein incorporated by reference in their entirety for all purposes), an amide bond will form between the two groups.

In certain instances, the polycationic moiety can have a ligand attached, such as a targeting ligand or a chelating moiety for complexing calcium. Preferably, after the ligand is attached, the cationic moiety maintains a positive charge. In certain instances, the ligand that is attached has a positive charge. Suitable ligands include, but are not limited to, a compound or device with a reactive functional group and include lipids, amphipathic lipids, carrier compounds, bioaffinity compounds, biomaterials, biopolymers, biomedical devices, analytically detectable compounds, therapeutically active compounds, enzymes, peptides, proteins, antibodies, immune stimulators, radiolabels, fluorogens, biotin, drugs, haptens, DNA, RNA, polysaccharides, liposomes, virosomes, micelles, immunoglobulins, functional groups, other targeting moieties, or toxins.

The lipid conjugate (e.g., PEG-lipid) typically comprises from about 0.1 mol % to about 2 mol %, from about 0.5 mol % to about 2 mol %, from about 1 mol % to about 2 mol %, from about 0.6 mol % to about 1.9 mol %, from about 0.7 mol % to about 1.8 mol %, from about 0.8 mol % to about 1.7 mol %, from about 0.9 mol % to about 1.6 mol %, from about 0.9 mol % to about 1.8 mol %, from about 1 mol % to about 1.8 mol %, from about 1 mol % to about 1.7 mol %, from about 1.2 mol % to about 1.8 mol %, from about 1.2 mol % to about 1.7 mol %, from about 1.3 mol % to about 1.6 mol %, or from about 1.4 mol % to about 1.5 mol % of the total lipid present in the particle.

One of ordinary skill in the art will appreciate that the concentration of the lipid conjugate can be varied depending on the lipid conjugate employed and the rate at which the nucleic acid-lipid particle is to become fusogenic.

By controlling the composition and concentration of the lipid conjugate, one can control the rate at which the lipid conjugate exchanges out of the nucleic acid-lipid particle and, in turn, the rate at which the nucleic acid-lipid particle becomes fusogenic. For instance, when a PEG-phosphatidylethanolamine conjugate or a PEG-ceramide conjugate is used as the lipid conjugate, the rate at which the nucleic acid-lipid particle becomes fusogenic can be varied, for example, by varying the concentration of the lipid conjugate, by varying the molecular weight of the PEG, or by varying the chain length and degree of saturation of the acyl chain groups on the phosphatidylethanolamine or the ceramide. In addition, other variables including, for example, pH, temperature, ionic strength, etc. can be used to vary and/or control the rate at which the nucleic acid-lipid particle becomes fusogenic. Other methods which can be used to control the rate at which the nucleic acid-lipid particle becomes fusogenic will become apparent to those of skill in the art upon reading this disclosure.

## VI. Preparation of Lipid Particles

The lipid particles of the present invention, e.g., SNALP, in which an active agent or therapeutic agent such as an interfering RNA is encapsulated in a lipid bilayer and is protected from degradation, can be formed by any method known in the art including, but not limited to, a continuous mixing method or a direct dilution process.

In preferred embodiments, the cationic lipids are lipids of Formula I, II, and III, or combinations thereof. In other preferred embodiments, the non-cationic lipids are egg sphingomyelin (ESM), distearoylphosphatidylcholine (DSPC), dioleoylphosphatidylcholine (DOPC), 1-palmitoyl-2-oleoyl-phosphatidylcholine (POPC), dipalmitoyl-phosphatidylcholine (DPPC), monomethyl-phosphatidylethanolamine, dimethyl-phosphatidylethanolamine, 14:0 PE (1,2-dimyristoyl-phosphatidylethanolamine (DMPE)), 16:0 PE (1,2-dipalmitoyl-phosphatidylethanolamine (DPPE)), 18:0 PE (1,2-distearoyl-phosphatidylethanolamine (DSPE)), 18:1 PE (1,2-dioleoyl-phosphatidylethanolamine (DOPE)), 18:1 trans PE (1,2-dielaidoyl-phosphatidylethanolamine (DEPE)), 18:0-18:1 PE (1-stearoyl-2-oleoyl-phosphatidylethanolamine (SOPE)), 16:0-18:1 PE (1-palmitoyl-2-oleoyl-phosphatidylethanolamine (POPE)), polyethylene glycol-based polymers (e.g., PEG 2000, PEG 5000, PEG-modified diacylglycerols, or PEG-modified dialkyloxypropyls), cholesterol, or combinations thereof.

In certain embodiments, the present invention provides for SNALP produced via a continuous mixing method, e.g., a process that includes providing an aqueous solution comprising a nucleic acid such as an interfering RNA in a first reservoir, providing an organic lipid solution in a second reservoir, and mixing the aqueous solution with the organic lipid solution such that the organic lipid solution mixes with the aqueous solution so as to substantially instantaneously produce a liposome encapsulating the nucleic acid (e.g., interfering RNA). This process and the apparatus for carrying this process are described in detail in U.S. Patent Publication No. 20040142025, the disclosure of which is herein incorporated by reference in its entirety for all purposes.

The action of continuously introducing lipid and buffer solutions into a mixing environment, such as in a mixing chamber, causes a continuous dilution of the lipid solution with the buffer solution, thereby producing a liposome substantially instantaneously upon mixing. As used herein, the phrase "continuously diluting a lipid solution with a buffer solution" (and variations) generally means that the lipid solution is diluted sufficiently rapidly in a hydration process with sufficient force to effectuate vesicle generation. By mixing the aqueous solution comprising a nucleic acid with the organic lipid solution, the organic lipid solution undergoes a continuous stepwise dilution in the presence of the buffer solution (i.e., aqueous solution) to produce a nucleic acid-lipid particle.

The SNALP formed using the continuous mixing method typically have a size of from about 40 nm to about 150 nm, from about 50 nm to about 150 nm, from about 60 nm to about 130 nm, from about 70 nm to about 110 nm, or from about 70 nm to about 90 nm. The particles thus formed do not aggregate and are optionally sized to achieve a uniform particle size.

In another embodiment, the present invention provides for SNALP produced via a direct dilution process that includes forming a liposome solution and immediately and directly introducing the liposome solution into a collection vessel containing a controlled amount of dilution buffer. In preferred aspects, the collection vessel includes one or more elements configured to stir the contents of the collection vessel to facilitate dilution. In one aspect, the amount of dilution buffer present in the collection vessel is substantially equal to the volume of liposome solution introduced thereto. As a non-limiting example, a liposome solution in 45% ethanol when

introduced into the collection vessel containing an equal volume of dilution buffer will advantageously yield smaller particles.

In yet another embodiment, the present invention provides for SNALP produced via a direct dilution process in which a third reservoir containing dilution buffer is fluidly coupled to a second mixing region. In this embodiment, the liposome solution formed in a first mixing region is immediately and directly mixed with dilution buffer in the second mixing region. In preferred aspects, the second mixing region includes a T-connector arranged so that the liposome solution and the dilution buffer flows meet as opposing 180° flows; however, connectors providing shallower angles can be used, e.g., from about 27° to about 180°. A pump mechanism delivers a controllable flow of buffer to the second mixing region. In one aspect, the flow rate of dilution buffer provided to the second mixing region is controlled to be substantially equal to the flow rate of liposome solution introduced thereto from the first mixing region. This embodiment advantageously allows for more control of the flow of dilution buffer mixing with the liposome solution in the second mixing region, and therefore also the concentration of liposome solution in buffer throughout the second mixing process. Such control of the dilution buffer flow rate advantageously allows for small particle size formation at reduced concentrations.

These processes and the apparatuses for carrying out these direct dilution processes are described in detail in U.S. Patent Publication No. 20070042031, the disclosure of which is herein incorporated by reference in its entirety for all purposes.

The SNALP formed using the direct dilution process typically have a size of from about 40 nm to about 150 nm, from about 50 nm to about 150 nm, from about 60 nm to about 130 nm, from about 70 nm to about 110 nm, or from about 70 nm to about 90 nm. The particles thus formed do not aggregate and are optionally sized to achieve a uniform particle size.

If needed, the lipid particles of the invention (e.g., SNALP) can be sized by any of the methods available for sizing liposomes. The sizing may be conducted in order to achieve a desired size range and relatively narrow distribution of particle sizes.

Several techniques are available for sizing the particles to a desired size. One sizing method, used for liposomes and equally applicable to the present particles, is described in U.S. Pat. No. 4,737,323, the disclosure of which is herein incorporated by reference in its entirety for all purposes. Sonicating a particle suspension either by bath or probe sonication produces a progressive size reduction down to particles of less than about 50 nm in size. Homogenization is another method which relies on shearing energy to fragment larger particles into smaller ones. In a typical homogenization procedure, particles are recirculated through a standard emulsion homogenizer until selected particle sizes, typically between about 60 and about 80 nm, are observed. In both methods, the particle size distribution can be monitored by conventional laser-beam particle size discrimination, or QELS.

Extrusion of the particles through a small-pore polycarbonate membrane or an asymmetric ceramic membrane is also an effective method for reducing particle sizes to a relatively well-defined size distribution. Typically, the suspension is cycled through the membrane one or more times until the desired particle size distribution is achieved. The particles may be extruded through successively smaller-pore membranes, to achieve a gradual reduction in size.

In some embodiments, the nucleic acids in the SNALP are precondensed as described in, e.g., U.S. patent application Ser. No. 09/744,103, the disclosure of which is herein incorporated by reference in its entirety for all purposes.



In other embodiments, the methods will further comprise adding non-lipid polycations which are useful to effect the lipofection of cells using the present compositions. Examples of suitable non-lipid polycations include, hexadimethrine bromide (sold under the brandname POLYBRENE®, from Aldrich Chemical Co., Milwaukee, Wis., USA) or other salts of hexadimethrine. Other suitable polycations include, for example, salts of poly-L-ornithine, poly-L-arginine, poly-L-lysine, poly-D-lysine, polyallylamine, and polyethyleneimine. Addition of these salts is preferably after the particles have been formed.

In some embodiments, the nucleic acid to lipid ratios (mass/mass ratios) in a formed SNALP will range from about 0.01 to about 0.2, from about 0.02 to about 0.1, from about 0.03 to about 0.1, or from about 0.01 to about 0.08. The ratio of the starting materials also falls within this range. In other embodiments, the SNALP preparation uses about 400 μg nucleic acid per 10 mg total lipid or a nucleic acid to lipid mass ratio of about 0.01 to about 0.08 and, more preferably, about 0.04, which corresponds to 1.25 mg of total lipid per 50 μg of nucleic acid. In other preferred embodiments, the particle has a nucleic acid:lipid mass ratio of about 0.08.

In other embodiments, the lipid to nucleic acid ratios (mass/mass ratios) in a formed SNALP will range from about 1 (1:1) to about 100 (100:1), from about 5 (5:1) to about 100 (100:1), from about 1 (1:1) to about 50 (50:1), from about 2 (2:1) to about 50 (50:1), from about 3 (3:1) to about 50 (50:1), from about 4 (4:1) to about 50 (50:1), from about 5 (5:1) to about 50 (50:1), from about 1 (1:1) to about 25 (25:1), from about 2 (2:1) to about 25 (25:1), from about 3 (3:1) to about 25 (25:1), from about 4 (4:1) to about 25 (25:1), from about 5 (5:1) to about 25 (25:1), from about 5 (5:1) to about 20 (20:1), from about 5 (5:1) to about 15 (15:1), from about 5 (5:1) to about 10 (10:1), about 5 (5:1), 6 (6:1), 7 (7:1), 8 (8:1), 9 (9:1), (10:1), 11 (11:1), 12 (12:1), 13 (13:1), 14 (14:1), or 15 (15:1). The ratio of the starting materials also falls within this range.

As previously discussed, the conjugated lipid may further include a CPL. A variety of general methods for making SNALP-CPLs (CPL-containing SNALP) are discussed herein. Two general techniques include "post-insertion" technique, that is, insertion of a CPL into, for example, a preformed SNALP, and the "standard" technique, wherein the CPL is included in the lipid mixture during, for example, the SNALP formation steps. The post-insertion technique results in SNALP having CPLs mainly in the external face of the SNALP bilayer membrane, whereas standard techniques provide SNALP having CPLs on both internal and external faces. The method is especially useful for vesicles made from phospholipids (which can contain cholesterol) and also for vesicles containing PEG-lipids (such as PEG-DAAs and PEG-DAGs). Methods of making SNALP-CPL, are taught, for example, in U.S. Pat. Nos. 5,705,385; 6,586,410; 5,981,501; 6,534,484; and 6,852,334; U.S. Patent Publication No. 20020072121; and PCT Publication No. WO 00/62813, the disclosures of which are herein incorporated by reference in their entirety for all purposes.

## VII. Kits

The present invention also provides lipid particles (e.g., SNALP) in kit form. The kit may comprise a container which is compartmentalized for holding the various elements of the lipid particles (e.g., the active agents or therapeutic agents such as nucleic acids and the individual lipid components of the particles). In some embodiments, the kit may further

comprise an endosomal membrane destabilizer (e.g., calcium ions). The kit typically contains the lipid particle compositions of the present invention, preferably in dehydrated form, with instructions for their rehydration and administration.

As explained herein, the lipid particles of the invention (e.g., SNALP) can be tailored to preferentially target particular tissues, organs, or tumors of interest. In certain instances, preferential targeting of lipid particles such as SNALP may be carried out by controlling the composition of the particle itself. For instance, as set forth in Example 11, it has been found that the 1:57 PEG-cDSA SNALP formulation can be used to preferentially target tumors outside of the liver, whereas the 1:57 PEG-cDMA SNALP formulation can be used to preferentially target the liver (including liver tumors).

In certain other instances, it may be desirable to have a targeting moiety attached to the surface of the lipid particle to further enhance the targeting of the particle. Methods of attaching targeting moieties (e.g., antibodies, proteins, etc.) to lipids (such as those used in the present particles) are known to those of skill in the art.

VII. Administration of Lipid Particles

Once formed, the lipid particles of the invention (e.g., SNALP) are useful for the introduction of active agents or therapeutic agents (e.g., nucleic acids such as interfering RNA) into cells. Accordingly, the present invention also provides methods for introducing an active agent or therapeutic agent such as a nucleic acid (e.g., interfering RNA) into a cell. The methods are carried out in vitro or in vivo by first forming the particles as described above and then contacting the particles with the cells for a period of time sufficient for delivery of the active agent or therapeutic agent to the cells to occur.

The lipid particles of the invention (e.g., SNALP) can be adsorbed to almost any cell type with which they are mixed or contacted. Once adsorbed, the particles can either be endocytosed by a portion of the cells, exchange lipids with cell membranes, or fuse with the cells. Transfer or incorporation of the active agent or therapeutic agent (e.g., nucleic acid) portion of the particle can take place via any one of these pathways. In particular, when fusion takes place, the particle membrane is integrated into the cell membrane and the contents of the particle combine with the intracellular fluid.

The lipid particles of the invention (e.g., SNALP) can be administered either alone or in a mixture with a pharmaceutically-acceptable carrier (e.g., physiological saline or phosphate buffer) selected in accordance with the route of administration and standard pharmaceutical practice. Generally, normal buffered saline (e.g., 135-150 mM NaCl) will be employed as the pharmaceutically-acceptable carrier. Other suitable carriers include, e.g., water, buffered water, 0.4% saline, 0.3% glycine, and the like, including glycoproteins for enhanced stability, such as albumin, lipoprotein, globulin, etc. Additional suitable carriers are described in, e.g., REMINGTON'S PHARMACEUTICAL SCIENCES, Mack Publishing Company, Philadelphia, Pa., 17th ed. (1985). As used herein, "carrier" includes any and all solvents, dispersion media, vehicles, coatings, diluents, antibacterial and antifungal agents, isotonic and absorption delaying agents, buffers, carrier solutions, suspensions, colloids, and the like. The phrase "pharmaceutically-acceptable" refers to molecular entities and compositions that do not produce an allergic or similar untoward reaction when administered to a human.

The pharmaceutically-acceptable carrier is generally added following particle formation. Thus, after the particle is formed, the particle can be diluted into pharmaceutically-acceptable carriers such as normal buffered saline.

The concentration of particles in the pharmaceutical formulations can vary widely, i.e., from less than about 0.05%, usually at or at least about 2 to 5%, to as much as about 10 to 90% by weight, and will be selected primarily by fluid volumes, viscosities, etc., in accordance with the particular mode of administration selected. For example, the concentration may be increased to lower the fluid load associated with treatment. This may be particularly desirable in patients having atherosclerosis-associated congestive heart failure or severe hypertension. Alternatively, particles composed of irritating lipids may be diluted to low concentrations to lessen inflammation at the site of administration.

The pharmaceutical compositions of the present invention may be sterilized by conventional, well-known sterilization techniques. Aqueous solutions can be packaged for use or filtered under aseptic conditions and lyophilized, the lyophilized preparation being combined with a sterile aqueous solution prior to administration. The compositions can contain pharmaceutically-acceptable auxiliary substances as required to approximate physiological conditions, such as pH adjusting and buffering agents, tonicity adjusting agents and the like, for example, sodium acetate, sodium lactate, sodium chloride, potassium chloride, and calcium chloride. Additionally, the particle suspension may include lipid-protective agents which protect lipids against free-radical and lipid-peroxidative damages on storage. Lipophilic free-radical quenchers, such as alphatocopherol and water-soluble iron-specific chelators, such as ferrioxamine, are suitable.

A. In Vivo Administration

Systemic delivery for in vivo therapy, e.g., delivery of a therapeutic nucleic acid to a distal target cell via body systems such as the circulation, has been achieved using nucleic acid-lipid particles such as those described in PCT Publication Nos. WO 05/007196, WO 05/121348, WO 05/120152, and WO 04/002453, the disclosures of which are herein incorporated by reference in their entirety for all purposes. The present invention also provides fully encapsulated lipid particles that protect the nucleic acid from nuclease degradation in serum, are nonimmunogenic, are small in size, and are suitable for repeat dosing.

For in vivo administration, administration can be in any manner known in the art, e.g., by injection, oral administration, inhalation (e.g., intranasal or intratracheal), transdermal application, or rectal administration. Administration can be accomplished via single or divided doses. The pharmaceutical compositions can be administered parenterally, i.e., intraarticularly, intravenously, intraperitoneally, subcutaneously, or intramuscularly. In some embodiments, the pharmaceutical compositions are administered intravenously or intraperitoneally by a bolus injection (see, e.g., U.S. Pat. No. 5,286,634). Intracellular nucleic acid delivery has also been discussed in Straubringer et al., *Methods Enzymol.,* 101:512 (1983); Mannino et al., *Biotechniques,* 6:682 (1988); Nicolau et al., *Crit. Rev. Ther. Drug Carrier Syst.,* 6:239 (1989); and Behr, *Acc. Chem. Res.,* 26:274 (1993). Still other methods of administering lipid-based therapeutics are described in, for example, U.S. Pat. Nos. 3,993,754; 4,145,410; 4,235,871; 4,224,179; 4,522,803; and 4,588,578. The lipid particles can be administered by direct injection at the site of disease or by injection at a site distal from the site of disease (see, e.g., Culver, HUMAN GENE THERAPY, MaryAnn Liebert, Inc., Publishers, New York. pp. 70-71 (1994)). The disclosures of the above-described references are herein incorporated by reference in their entirety for all purposes.

The compositions of the present invention, either alone or in combination with other suitable components, can be made into aerosol formulations (i.e., they can be "nebulized") to be

administered via inhalation (e.g., intranasally or intratracheally) (see, Brigham et al., *Am. J. Sci.,* 298:278 (1989)). Aerosol formulations can be placed into pressurized acceptable propellants, such as dichlorodifluoromethane, propane, nitrogen, and the like.

In certain embodiments, the pharmaceutical compositions may be delivered by intranasal sprays, inhalation, and/or other aerosol delivery vehicles. Methods for delivering nucleic acid compositions directly to the lungs via nasal aerosol sprays have been described, e.g., in U.S. Pat. Nos. 5,756,353 and 5,804,212. Likewise, the delivery of drugs using intranasal microparticle resins and lysophosphatidyl-glycerol compounds (U.S. Pat. No. 5,725,871) are also well-known in the pharmaceutical arts. Similarly, transmucosal drug delivery in the form of a polytetrafluoroetheylene support matrix is described in U.S. Pat. No. 5,780,045. The disclosures of the above-described patents are herein incorporated by reference in their entirety for all purposes.

Formulations suitable for parenteral administration, such as, for example, by intraarticular (in the joints), intravenous, intramuscular, intradermal, intraperitoneal, and subcutaneous routes, include aqueous and non-aqueous, isotonic sterile injection solutions, which can contain antioxidants, buffers, bacteriostats, and solutes that render the formulation isotonic with the blood of the intended recipient, and aqueous and non-aqueous sterile suspensions that can include suspending agents, solubilizers, thickening agents, stabilizers, and preservatives. In the practice of this invention, compositions are preferably administered, for example, by intravenous infusion, orally, topically, intraperitoneally, intravesically, or intrathecally.

Generally, when administered intravenously, the lipid particle formulations are formulated with a suitable pharmaceutical carrier. Many pharmaceutically acceptable carriers may be employed in the compositions and methods of the present invention. Suitable formulations for use in the present invention are found, for example, in REMINGTON'S PHARMACEUTICAL SCIENCES, Mack Publishing Company, Philadelphia, Pa., 17th ed. (1985). A variety of aqueous carriers may be used, for example, water, buffered water, 0.4% saline, 0.3% glycine, and the like, and may include glycoproteins for enhanced stability, such as albumin, lipoprotein, globulin, etc. Generally, normal buffered saline (135-150 mM NaCl) will be employed as the pharmaceutically acceptable carrier, but other suitable carriers will suffice. These compositions can be sterilized by conventional liposomal sterilization techniques, such as filtration. The compositions may contain pharmaceutically acceptable auxiliary substances as required to approximate physiological conditions, such as pH adjusting and buffering agents, tonicity adjusting agents, wetting agents and the like, for example, sodium acetate, sodium lactate, sodium chloride, potassium chloride, calcium chloride, sorbitan monolaurate, triethanolamine oleate, etc. These compositions can be sterilized using the techniques referred to above or, alternatively, they can be produced under sterile conditions. The resulting aqueous solutions may be packaged for use or filtered under aseptic conditions and lyophilized, the lyophilized preparation being combined with a sterile aqueous solution prior to administration.

In certain applications, the lipid particles disclosed herein may be delivered via oral administration to the individual. The particles may be incorporated with excipients and used in the form of ingestible tablets, buccal tablets, troches, capsules, pills, lozenges, elixirs, mouthwash, suspensions, oral sprays, syrups, wafers, and the like (see, e.g., U.S. Pat. Nos. 5,641,515, 5,580,579, and 5,792,451, the disclosures of which are herein incorporated by reference in their entirety for all purposes). These oral dosage forms may also contain the following: binders, gelatin; excipients, lubricants, and/or flavoring agents. When the unit dosage form is a capsule, it may contain, in addition to the materials described above, a liquid carrier. Various other materials may be present as coatings or to otherwise modify the physical form of the dosage unit. Of course, any material used in preparing any unit dosage form should be pharmaceutically pure and substantially non-toxic in the amounts employed.

Typically, these oral formulations may contain at least about 0.1% of the lipid particles or more, although the percentage of the particles may, of course, be varied and may conveniently be between about 1% or 2% and about 60% or 70% or more of the weight or volume of the total formulation. Naturally, the amount of particles in each therapeutically useful composition may be prepared is such a way that a suitable dosage will be obtained in any given unit dose of the compound. Factors such as solubility, bioavailability, biological half-life, route of administration, product shelf life, as well as other pharmacological considerations will be contemplated by one skilled in the art of preparing such pharmaceutical formulations, and as such, a variety of dosages and treatment regimens may be desirable.

Formulations suitable for oral administration can consist of: (a) liquid solutions, such as an effective amount of a packaged therapeutic agent such as nucleic acid (e.g., interfering RNA) suspended in diluents such as water, saline, or PEG 400; (b) capsules, sachets, or tablets, each containing a predetermined amount of a therapeutic agent such as nucleic acid (e.g., interfering RNA), as liquids, solids, granules, or gelatin; (c) suspensions in an appropriate liquid; and (d) suitable emulsions. Tablet forms can include one or more of lactose, sucrose, mannitol, sorbitol, calcium phosphates, corn starch, potato starch, microcrystalline cellulose, gelatin, colloidal silicon dioxide, talc, magnesium stearate, stearic acid, and other excipients, colorants, fillers, binders, diluents, buffering agents, moistening agents, preservatives, flavoring agents, dyes, disintegrating agents, and pharmaceutically compatible carriers. Lozenge forms can comprise a therapeutic agent such as nucleic acid (e.g., interfering RNA) in a flavor, e.g., sucrose, as well as pastilles comprising the therapeutic agent in an inert base, such as gelatin and glycerin or sucrose and acacia emulsions, gels, and the like containing, in addition to the therapeutic agent, carriers known in the art.

In another example of their use, lipid particles can be incorporated into a broad range of topical dosage forms. For instance, a suspension containing nucleic acid-lipid particles such as SNALP can be formulated and administered as gels, oils, emulsions, topical creams, pastes, ointments, lotions, foams, mousses, and the like.

When preparing pharmaceutical preparations of the lipid particles of the invention, it is preferable to use quantities of the particles which have been purified to reduce or eliminate empty particles or particles with therapeutic agents such as nucleic acid associated with the external surface.

The methods of the present invention may be practiced in a variety of hosts. Preferred hosts include mammalian species, such as primates (e.g., humans and chimpanzees as well as other nonhuman primates), canines, felines, equines, bovines, ovines, caprines, rodents (e.g., rats and mice), lagomorphs, and swine.

The amount of particles administered will depend upon the ratio of therapeutic agent (e.g., nucleic acid) to lipid, the particular therapeutic agent (e.g., nucleic acid) used, the disease or disorder being treated, the age, weight, and condition of the patient, and the judgment of the clinician, but will generally be between about 0.01 and about 50 mg per kilo-

gram of body weight, preferably between about 0.1 and about 5 mg/kg of body weight, or about $10^8$-$10^{10}$ particles per administration (e.g., injection).

B. In Vitro Administration

For in vitro applications, the delivery of therapeutic agents such as nucleic acids (e.g., interfering RNA) can be to any cell grown in culture, whether of plant or animal origin, vertebrate or invertebrate, and of any tissue or type. In preferred embodiments, the cells are animal cells, more preferably mammalian cells, and most preferably human cells.

Contact between the cells and the lipid particles, when carried out in vitro, takes place in a biologically compatible medium. The concentration of particles varies widely depending on the particular application, but is generally between about 1 μmol and about 10 mmol. Treatment of the cells with the lipid particles is generally carried out at physiological temperatures (about 37° C.) for periods of time of from about 1 to 48 hours, preferably of from about 2 to 4 hours.

In one group of preferred embodiments, a lipid particle suspension is added to 60-80% confluent plated cells having a cell density of from about $10^3$ to about $10^5$ cells/ml, more preferably about $2\times10^4$ cells/ml. The concentration of the suspension added to the cells is preferably of from about 0.01 to 0.2 μg/ml, more preferably about 0.1 μg/ml.

Using an Endosomal Release Parameter (ERP) assay, the delivery efficiency of the SNALP or other lipid particle of the invention can be optimized. An ERP assay is described in detail in U.S. Patent Publication No. 20030077829, the disclosure of which is herein incorporated by reference in its entirety for all purposes. More particularly, the purpose of an ERP assay is to distinguish the effect of various cationic lipids and helper lipid components of SNALP based on their relative effect on binding/uptake or fusion with/destabilization of the endosomal membrane. This assay allows one to determine quantitatively how each component of the SNALP or other lipid particle affects delivery efficiency, thereby optimizing the SNALP or other lipid particle. Usually, an ERP assay measures expression of a reporter protein (e.g., luciferase, β-galactosidase, green fluorescent protein (GFP), etc.), and in some instances, a SNALP formulation optimized for an expression plasmid will also be appropriate for encapsulating an interfering RNA. In other instances, an ERP assay can be adapted to measure downregulation of transcription or translation of a target sequence in the presence or absence of an interfering RNA (e.g., siRNA). By comparing the ERPs for each of the various SNALP or other lipid particles, one can readily determine the optimized system, e.g., the SNALP or other lipid particle that has the greatest uptake in the cell.

C. Cells for Delivery of Lipid Particles

The compositions and methods of the present invention are used to treat a wide variety of cell types, in vivo and in vitro. Suitable cells include, e.g., hematopoietic precursor (stem) cells, fibroblasts, keratinocytes, hepatocytes, endothelial cells, skeletal and smooth muscle cells, osteoblasts, neurons, quiescent lymphocytes, terminally differentiated cells, slow or noncycling primary cells, parenchymal cells, lymphoid cells, epithelial cells, bone cells, and the like. In preferred embodiments, an active agent or therapeutic agent such as an interfering RNA (e.g., siRNA) is delivered to cancer cells such as, e.g., lung cancer cells, colon cancer cells, rectal cancer cells, anal cancer cells, bile duct cancer cells, small intestine cancer cells, stomach (gastric) cancer cells, esophageal cancer cells, gallbladder cancer cells, liver cancer cells, pancreatic cancer cells, appendix cancer cells, breast cancer cells, ovarian cancer cells, cervical cancer cells, prostate cancer cells, renal cancer cells, cancer cells of the central nervous system, glioblastoma tumor cells, skin cancer cells, lymphoma cells, choriocarcinoma tumor cells, head and neck cancer cells, osteogenic sarcoma tumor cells, and blood cancer cells.

In vivo delivery of lipid particles such as SNALP encapsulating an interfering RNA (e.g., siRNA) is suited for targeting cells of any cell type. The methods and compositions can be employed with cells of a wide variety of vertebrates, including mammals, such as, e.g, canines, felines, equines, bovines, ovines, caprines, rodents (e.g., mice, rats, and guinea pigs), lagomorphs, swine, and primates (e.g. monkeys, chimpanzees, and humans).

To the extent that tissue culture of cells may be required, it is well-known in the art. For example, Freshney, Culture of Animal Cells, a Manual of Basic Technique, 3rd Ed., Wiley-Liss, New York (1994), Kuchler et al., Biochemical Methods in Cell Culture and Virology, Dowden, Hutchinson and Ross, Inc. (1977), and the references cited therein provide a general guide to the culture of cells. Cultured cell systems often will be in the form of monolayers of cells, although cell suspensions are also used.

D. Detection of Lipid Particles

In some embodiments, the lipid particles of the present invention (e.g., SNALP) are detectable in the subject at about 1, 2, 3, 4, 5, 6, 7, 8 or more hours. In other embodiments, the lipid particles of the present invention (e.g., SNALP) are detectable in the subject at about 8, 12, 24, 48, 60, 72, or 96 hours, or about 6, 8, 10, 12, 14, 16, 18, 19, 22, 24, 25, or 28 days after administration of the particles. The presence of the particles can be detected in the cells, tissues, or other biological samples from the subject. The particles may be detected, e.g., by direct detection of the particles, detection of a therapeutic nucleic acid such as an interfering RNA (e.g., siRNA) sequence, detection of the target sequence of interest (i.e., by detecting expression or reduced expression of the sequence of interest), or a combination thereof.

1. Detection of Particles

Lipid particles of the invention such as SNALP can be detected using any method known in the art. For example, a label can be coupled directly or indirectly to a component of the lipid particle using methods well-known in the art. A wide variety of labels can be used, with the choice of label depending on sensitivity required, ease of conjugation with the lipid particle component, stability requirements, and available instrumentation and disposal provisions. Suitable labels include, but are not limited to, spectral labels such as fluorescent dyes (e.g., fluorescein and derivatives, such as fluorescein isothiocyanate (FITC) and Oregon Green™; rhodamine and derivatives such Texas red, tetrarhodimine isothiocynate (TRITC), etc., digoxigenin, biotin, phycoerythrin, AMCA, CyDyes™, and the like; radiolabels such as $^3H$, $^{125}I$, $^{35}S$, $^{14}C$, $^{32}P$, $^{33}P$, etc.; enzymes such as horse radish peroxidase, alkaline phosphatase, etc.; spectral colorimetric labels such as colloidal gold or colored glass or plastic beads such as polystyrene, polypropylene, latex, etc. The label can be detected using any means known in the art.

2. Detection of Nucleic Acids

Nucleic acids (e.g., interfering RNA) are detected and quantified herein by any of a number of means well-known to those of skill in the art. The detection of nucleic acids may proceed by well-known methods such as Southern analysis, Northern analysis, gel electrophoresis, PCR, radiolabeling, scintillation counting, and affinity chromatography. Additional analytic biochemical methods such as spectrophotometry, radiography, electrophoresis, capillary electrophoresis,

high performance liquid chromatography (HPLC), thin layer chromatography (TLC), and hyperdiffusion chromatography may also be employed.

The selection of a nucleic acid hybridization format is not critical. A variety of nucleic acid hybridization formats are known to those skilled in the art. For example, common formats include sandwich assays and competition or displacement assays. Hybridization techniques are generally described in, e.g., "Nucleic Acid Hybridization, A Practical Approach," Eds. Hames and Higgins, IRL Press (1985).

The sensitivity of the hybridization assays may be enhanced through use of a nucleic acid amplification system which multiplies the target nucleic acid being detected. In vitro amplification techniques suitable for amplifying sequences for use as molecular probes or for generating nucleic acid fragments for subsequent subcloning are known. Examples of techniques sufficient to direct persons of skill through such in vitro amplification methods, including the polymerase chain reaction (PCR) the ligase chain reaction (LCR), Qβ-replicase amplification and other RNA polymerase mediated techniques (e.g., NASBA™) are found in Sambrook et al., In *Molecular Cloning: A Laboratory Manual*, Cold Spring Harbor Laboratory Press (2000); and Ausubel et al., SHORT PROTOCOLS IN MOLECULAR BIOLOGY, eds., Current Protocols, Greene Publishing Associates, Inc. and John Wiley & Sons, Inc. (2002); as well as U.S. Pat. No. 4,683,202; PCR Protocols, A Guide to Methods and Applications (Innis et al. eds.) Academic Press Inc. San Diego, Calif. (1990); Arnheim & Levinson (Oct. 1, 1990), C&EN 36; The Journal Of NIH Research, 3:81 (1991); Kwoh et al., *Proc. Natl. Acad. Sci. USA,* 86:1173 (1989); Guatelli et al., *Proc. Natl. Acad. Sci. USA,* 87:1874 (1990); Lomell et al., *J. Clin. Chem.,* 35:1826 (1989); Landegren et al., *Science,* 241:1077 (1988); Van Brunt, Biotechnology, 8:291 (1990); Wu and Wallace, Gene, 4:560 (1989); Barringer et al., *Gene,* 89:117 (1990); and Sooknanan and Malek, *Biotechnology,* 13:563 (1995). Improved methods of cloning in vitro amplified nucleic acids are described in U.S. Pat. No. 5,426,039. Other methods described in the art are the nucleic acid sequence based amplification (NASBA™, Cangene, Mississauga, Ontario) and Qβ-replicase systems. These systems can be used to directly identify mutants where the PCR or LCR primers are designed to be extended or ligated only when a select sequence is present. Alternatively, the select sequences can be generally amplified using, for example, nonspecific PCR primers and the amplified target region later probed for a specific sequence indicative of a mutation. The disclosures of the above-described references are herein incorporated by reference in their entirety for all purposes.

Nucleic acids for use as probes, e.g., in in vitro amplification methods, for use as gene probes, or as inhibitor components are typically synthesized chemically according to the solid phase phosphoramidite triester method described by Beaucage et al., *Tetrahedron Letts.,* 22:1859 1862 (1981), e.g., using an automated synthesizer, as described in Needham VanDevanter et al., *Nucleic Acids Res.,* 12:6159 (1984). Purification of polynucleotides, where necessary, is typically performed by either native acrylamide gel electrophoresis or by anion exchange HPLC as described in Pearson et al., *J. Chrom.,* 255:137 149 (1983). The sequence of the synthetic polynucleotides can be verified using the chemical degradation method of Maxam and Gilbert (1980) in Grossman and Moldave (eds.) Academic Press, New York, *Methods in Enzymology,* 65:499.

An alternative means for determining the level of transcription is in situ hybridization. In situ hybridization assays are well-known and are generally described in Angerer et al., *Methods Enzymol.,* 152:649 (1987). In an in situ hybridization assay, cells are fixed to a solid support, typically a glass slide. If DNA is to be probed, the cells are denatured with heat or alkali. The cells are then contacted with a hybridization solution at a moderate temperature to permit annealing of specific probes that are labeled. The probes are preferably labeled with radioisotopes or fluorescent reporters.

## VIII. Examples

The present invention will be described in greater detail by way of specific examples. The following examples are offered for illustrative purposes, and are not intended to limit the invention in any manner. Those of skill in the art will readily recognize a variety of noncritical parameters which can be changed or modified to yield essentially the same results.

### Example 1

### Materials and Methods

siRNA:

All siRNA molecules used in these studies were chemically synthesized by the University of Calgary (Calgary, AB) or Dharmacon Inc. (Lafayette, Colo.). The siRNAs were desalted and annealed using standard procedures.

Lipid Encapsulation of siRNA:

In some embodiments, siRNA molecules were encapsulated into nucleic acid-lipid particles composed of the following lipids: the lipid conjugate PEG-cDMA (3-N-[(-Methoxypoly(ethylene glycol)2000)carbamoyl]-1,2-dimyristyloxypropylamine); the cationic lipid DLinDMA (1,2-Dilinoleyloxy-3-(N,N-dimethyl)aminopropane); the phospholipid DPPC (1,2-Dipalmitoyl-sn-glycero-3-phosphocholine; Avanti Polar Lipids; Alabaster, Ala.); and synthetic cholesterol (Sigma-Aldrich Corp.; St. Louis, Mo.) in the molar ratio 1.4:57.1:7.1:34.3, respectively. In other words, siRNAs were encapsulated into SNALP of the following "1:57" formulation: 1.4% PEG-cDMA; 57.1% DLinDMA; 7.1% DPPC; and 34.3% cholesterol. In other embodiments, siRNA molecules were encapsulated into phospholipid-free SNALP composed of the following lipids: the lipid conjugate PEG-cDMA; the cationic lipid DLinDMA; and synthetic cholesterol in the molar ratio 1.5:61.5:36.9, respectively. In other words, siRNAs were encapsulated into phospholipid-free SNALP of the following "1:62" formulation: 1.5% PEG-cDMA; 61.5% DLinDMA; and 36.9% cholesterol. For vehicle controls, empty particles with identical lipid composition were formed in the absence of siRNA. It should be understood that the 1:57 formulation and 1:62 formulation are target formulations, and that the amount of lipid (both cationic and non-cationic) present and the amount of lipid conjugate present in the formulation may vary. Typically, in the 1:57 formulation, the amount of cationic lipid will be 57 mol %±5 mol %, and the amount of lipid conjugate will be 1.5 mol %±0.5 mol %, with the balance of the 1:57 formulation being made up of non-cationic lipid (e.g., phospholipid, cholesterol, or a mixture of the two). Similarly, in the 1:62 formulation, the amount of cationic lipid will be 62 mol % t 5 mol %, and the amount of lipid conjugate will be 1.5 mol % f 0.5 mol %, with the balance of the 1:62 formulation being made up of the non-cationic lipid (e.g., cholesterol).

Example 2

Eg5 siRNA Formulated as 1:57 SNALP are Potent Inhibitors of Cell Growth In Vitro

SNALP formulations were prepared with an siRNA targeting Eg5 as the nucleic acid component. Eg5 is a member of kinesin-related proteins that are involved in functions related to movements of organelles, microtubules, or chromosomes along microtubules. These functions include axonal transport, microtubule sliding during nuclear fusion or division, and chromosome disjunction during meiosis and early mitosis. Eg5 plays a critical role in mitosis of mammalian cells. The Eg5 siRNA used in this study is provided in Table 1. The modifications involved introducing 2'OMe-uridine at selected positions in the sense and antisense strands of the Eg5 2263 siRNA sequence, in which the siRNA duplex contained less than about 20% 2'OMe-modified nucleotides.

TABLE 1

siRNA duplex comprising sense and antisense Eg5 RNA polynucleotides.

| Modification | Eg5 2263 siRNA sequence | SEQ ID NO: | % 2'OMe-Modified | % Modified in DS Region |
|---|---|---|---|---|
| U/U | 5'-C**U**GAAGACC**U**GAAGACAA**U**dTdT-3'<br>3'-dTdTGAC**U**UC**U**GGAC**U**UCUGUUA-5' | 1<br>2 | 6/42 = 14.3% | 6/38 = 15.8% |

Column 1: "U/U" = 2'OMe-uridine modified siRNA duplex;
Column 2: 2'OMe-modified nucleotides are indicated in bold and underlined. The siRNA duplex can alternatively or additionally comprise 2'-deoxy-2'-fluoro (2'F) nucleotides, 2'-deoxy nucleotides, 2'-O-(2-methoxyethyl) (MOE) nucleotides, and/or locked nucleic acid (LNA) nucleotides. "dT" = deoxythymidine.
Column 3: The number and percentage of 2'OMe-modified nucleotides in the siRNA duplex are provided.
Column 4: The number and percentage of modified nucleotides in the double-stranded (DS) region of the siRNA duplex are provided.

The lipid components and physical characteristics of the SNALP formulations are summarized in Table 2. The lipid:drug ratio is described in units of mg total lipid per mg nucleic acid. Mean particle size and polydispersity were measured on a Malvern Instruments Zetasizer. Encapsulation of nucleic acid was measured using a Ribogreen assay essentially as described in Heyes et al., *Journal of Controlled Release*, 107:276-287 (2005).

TABLE 2

Characteristics of the SNALP formulations used in this study.

| Sample No. | Formulation Composition, Mole % PEG(2000)-C-DMA\|DLinDMA\|DPPC\|Cholesterol | Lipid/Drug Ratio | Finished Product Characterization Size (nm) | Polydispersity | % Encapsulation |
|---|---|---|---|---|---|
| 1 | 2\|40\|10\|48 | 12.4 | 57 | 0.07 | 90 |
| 2 | 1.8\|36.4\|18.2\|43.6 | 14.0 | 72 | 0.12 | 89 |
| 3 | 1.4\|27.0\|6.8\|64.9 | 16.5 | 70 | 0.12 | 92 |
| 4 | 1.3\|25.3\|12.7\|60.8 | 18.1 | 76 | 0.07 | 93 |
| 5 | 3.9\|39.2\|9.8\|47.1 | 13.5 | 53 | 0.27 | 86 |
| 6 | 3.6\|35.7\|17.9\|42.9 | 15.1 | 58 | 0.18 | 87 |
| 7 | 2.7\|26.7\|6.7\|64.0 | 17.6 | 56 | 0.17 | 92 |
| 8 | 2.5\|25.0\|12.5\|60.0 | 19.2 | 61 | 0.13 | 92 |
| 9 | 1.4\|57.1\|7.1\|34.3 | 17.8 | 84 | 0.10 | 88 |
| 10 | 1.3\|53.3\|13.3\|32.0 | 19.5 | 83 | 0.10 | 89 |
| 11 | 1.1\|42.6\|5.3\|51.1 | 22.0 | 80 | 0.10 | 93 |
| 12 | 1.0\|40.4\|10.1\|48.5 | 23.6 | 78 | 0.11 | 88 |
| 13 | 2.8\|56.3\|7.0\|33.8 | 19.0 | 62 | 0.14 | 80 |
| 14 | 2.6\|52.6\|13.2\|31.6 | 20.6 | 66 | 0.14 | 82 |
| 15 | 2.1\|42.1\|5.3\|50.5 | 23.1 | 71 | 0.16 | 91 |
| 16 | 2\|40\|10\|48 | 24.7 | 67 | 0.14 | 92 |

Silencing of Eg5 by siRNA transfection causes mitotic arrest and apoptosis in mammalian cells. Cell viability following transfection with SNALP containing an siRNA targeting Eg5 therefore provides a simple biological readout of in vitro transfection efficiency. Cell viability of in vitro cell cultures was assessed using the commercial reagent CellTiter-Blue® (Promega Corp.; Madison, Wis.), a resazurin dye that is reduced by metabolically active cells to the fluorogenic product resorufin. The human colon cancer cell line HT29 was cultured using standard tissue culture techniques. 72 hours after SNALP application, CellTiter-Blue® reagent was added to the culture to quantify the metabolic activity of the cells, which is a measure of cell viability. Data are presented as a percent of cell viability relative to ("untreated") control cells that received phosphate buffered saline (PBS) vehicle only.

FIG. **1** shows that the 1:57 SNALP formulation containing Eg5 2263 U/U siRNA was among the most potent inhibitors of tumor cell growth at all siRNA concentrations tested (see, FIG. **1**B, Sample 9).

Example 3

ApoB siRNA Formulated as 1:57 SNALP have Potent Silencing Activity In Vivo

SNALP formulations were prepared with an siRNA targeting apolipoprotein B (ApoB) as the nucleic acid component. ApoB is the main apolipoprotein of chylomicrons and low density lipoproteins (LDL). Mutations in ApoB are associated with hypercholesterolemia. ApoB occurs in the plasma in 2 main forms, ApoB48 and ApoB 100, which are synthe-

sized in the intestine and liver, respectively, due to an organ-specific stop codon. The ApoB siRNA used in this study is provided in Table 3. The modifications involved introducing 2'OMe-uridine or 2'OMe-guanosine at selected positions in the sense and antisense strands of the ApoB siRNA sequence, in which the siRNA duplex contained less than about 20% 2'OMe-modified nucleotides.

BALB/c mice (female, at least 4 weeks old) were obtained from Harlan Labs. After an acclimation period (of at least 7 days), animals were administered SNALP by intravenous (IV) injection in the lateral tail vein once daily on Study Day 0 (1 dose total per animal). Dosage was 1 mg encapsulated siRNA per kg body weight, corresponding to 10 ml/kg (rounded to the nearest 10 μl). As a negative control, one group of animals was given an IV injection of phosphate buffered saline (PBS) vehicle. On Study Day 2, animals were euthanized and liver tissue was collected in RNAlater.

Liver tissues were analyzed for ApoB mRNA levels normalized against glyceraldehyde-3-phosphate dehydrogenase (GAPDH) mRNA levels using the QuantiGene assay (Pa-

TABLE 3

siRNA duplex comprising sense and antisense ApoB RNA polynucleotides.

| Position | Modification | ApoB siRNA sequence | SEQ ID NO: | % 2'OMe-Modified | % Modified in DS Region |
|---|---|---|---|---|---|
| 10048 | U2/2 G1/2 | 5'-AGU**G**UCA**U**CACAC**U**GAAUACC-3'<br>3'-GU**U**CACAGUA**G**U**G**UGAC**U**UAU-5' | 3<br>4 | 7/42 = 16.7% | 7/38 = 18.4% |

Column 1: The number refers to the nucleotide position of the 5' base of the sense strand relative to the mouse ApoB mRNA sequence XM_137955.

Column 2: The numbers refer to the distribution of 2'OMe chemical modifications in each strand.

Column 3: 2'OMe-modified nucleotides are indicated in bold and underlined. The siRNA duplex can alternatively or additionally comprise 2'-deoxy-2'-fluoro (2'F) nucleotides, 2'-deoxy nucleotides, 2'-O-(2-methoxyethyl) (MOE) nucleotides, and/or locked nucleic acid (LNA) nucleotides.

Column 4: The number and percentage of 2'OMe-modified nucleotides in the siRNA duplex are provided.

Column 5: The number and percentage of modified nucleotides in the double-stranded (DS) region of the siRNA duplex are provided.

The lipid components and physical characteristics of the formulations are summarized in Table 4. The lipid:drug ratio is described in units of mg total lipid per mg nucleic acid. Mean particle size and polydispersity were measured on a Malvern Instruments Zetasizer. Encapsulation of nucleic acid was measured using a Ribogreen assay essentially as described in Heyes et al., *Journal of Controlled Release*, 107:276-287 (2005).

TABLE 4

Characteristics of the SNALP formulations used in this study.

| Group | Formulation Composition Lipid Name & Mole % | Lipid/Drug Ratio | Finished Product Characterization Size (nm) | Polydispersity | % Encapsulation |
|---|---|---|---|---|---|
| 2 | PEG(2000)-C-DMA\|DLinDMA\|DPPC\|Cholesterol 2\|40\|10\|48 | 12.4 | 59 | 0.15 | 93 |
| 3 | PEG(2000)-C-DMA\|DLinDMA\|Cholesterol 2.2\|44.4\|53.3 | 10.7 | 55 | 0.17 | 91 |
| 4 | PEG(2000)-C-DMA\|DLinDMA\|DOPC\|Cholesterol 2\|40\|10\|48 | 12.5 | 59 | 0.16 | 92 |
| 5 | PEG(2000)-C-DMA\|DLinDMA\|DMPC\|Cholesterol 2\|40\|10\|48 | 12.2 | 56 | 0.11 | 92 |
| 6 | PEG(2000)-C-DMA\|DLinDMA\|DPPE\|Cholesterol 1.8\|36.4\|18.2\|43.6 | 13.8 | 66 | 0.16 | 93 |
| 7 | PEG(2000)-C-DMA\|DLinDMA\|DPPC\|Cholestanol 2\|40\|10\|48 | 12.4 | 56 | 0.12 | 92 |
| 8 | PEG(2000)-C-DMA\|DLinDMA\|DPPC\|Cholesterol 1.4\|27.0\|6.8\|64.9 | 16.5 | 60 | 0.10 | 93 |
| 9 | PEG(2000)-C-DMA\|DLinDMA\|DPPC\|Cholesterol 1.3\|25.3\|12.7\|60.8 | 18.1 | 74 | 0.13 | 92 |
| 10 | PEG(2000)-C-DMA\|DLinDMA\|DPPC\|Cholesterol 2.5\|25.0\|12.5\|60.0 | 19.2 | 60 | 0.13 | 93 |
| 11 | PEG(2000)-C-DMA\|DLinDMA\|DPPC\|Cholesterol 1.4\|57.1\|7.4\|34.3 | 17.8 | 79 | 0.09 | 94 |
| 12 | PEG(2000)-C-DMA\|DLinDMA\|DPPC\|Cholesterol 1.0\|40.4\|10.1\|48.5 | 23.6 | 72 | 0.11 | 93 |
| 13 | PEG(2000)-C-DMA\|DLinDMA\|DPPC 2\|70\|28 | 8.7 | 73 | 0.09 | 87 |
| 14 | PEG(2000)-C-DMA\|DLinDMA\|DPPC 1.6\|54.7\|43.8 | 11.3 | 65 | 0.11 | 87 |

nomics; Fremont, Calif.) essentially as described in Judge et al., *Molecular Therapy,* 13:494 (2006).

FIG. **2** shows that the 1:57 SNALP formulation containing ApoB 10048 U2/2 G1/2 siRNA was the most potent at reducing ApoB expression in vivo (see, Group 11).

Example 4

ApoB siRNA Formulated as 1:57 SNALP have Potent Silencing Activity In Vivo

SNALP formulations were prepared with the ApoB siRNA set forth in Table 3. The lipid components and physical characteristics of the formulations are summarized in Table 5. The lipid:drug ratio is described in units of mg total lipid per mg nucleic acid. Mean particle size and polydispersity were measured on a Malvern Instruments Zetasizer. Encapsulation of nucleic acid was measured using a Ribogreen assay essentially as described in Heyes et al., *Journal of Controlled Release,* 107:276-287 (2005).

TABLE 5

Characteristics of the SNALP formulations used in this study.

| SNALP (L:D ratio) | siRNA Payload | Particle Size (Polydispersity) | % Encapsulation |
|---|---|---|---|
| 2:30 (13) | ApoB-10048 U2/2 G1/2 | 65 nm (0.16) | 88 |
| 1:57 (9) | ApoB-10048 U2/2 G1/2 | 74 nm (0.10) | 89 |

encapsulated siRNA per kg body weight, corresponding to 10 ml/kg (rounded to the nearest 10 µl). As a negative control, one group of animals was given IV injections of phosphate buffered saline (PBS) vehicle. On Study Day 7, 72 h after the last treatment, animals were euthanized and liver tissue was collected in RNAlater.

Liver tissues were analyzed for ApoB mRNA levels normalized against glyceraldehyde-3-phosphate dehydrogenase (GAPDH) mRNA levels using the QuantiGene assay (Panomics; Fremont, Calif.) essentially as described in Judge et al., *Molecular Therapy,* 13:494 (2006).

FIG. **3** shows that the 1:57 SNALP containing ApoB 10048 U2/2 G1/2 siRNA was more than 10 times as efficacious as the 2:30 SNALP in mediating ApoB gene silencing in mouse liver at a 10-fold lower dose.

Example 5

ApoB siRNA Formulated as 1:57 or 1:62 SNALP have Potent Silencing Activity In Vivo

SNALP formulations were prepared with the ApoB siRNA set forth in Table 3. The lipid components and physical characteristics of the formulations are summarized in Table 6. The lipid:drug ratio is described in units of mg total lipid per mg nucleic acid. Mean particle size and polydispersity were measured on a Malvern Instruments Zetasizer. Encapsulation of nucleic acid was measured using a Ribogreen assay essentially as described in Heyes et al., *Journal of Controlled Release,* 107:276-287 (2005).

TABLE 6

Characteristics of the SNALP formulations used in this study.

| Group | Formulation Composition Lipid Name & Mole % | Lipid/Drug Ratio | Finished Product Characterization Size (nm) | Polydispersity | % Encapsulation |
|---|---|---|---|---|---|
| 2 | PEG(2000)-C-DMA\|DLinDMA\|DPPC\|Cholesterol 1.4\|57.1\|7.1\|34.3 | 8.9 | 76 | 0.06 | 89 |
| 3 | PEG(2000)-C-DMA\|DLinDMA\|Cholesterol 1.5\|61.5\|36.9 | 8.1 | 76 | 0.04 | 86 |
| 4 | PEG(2000)-C-DMA\|DODMA\|DPPC\|Cholesterol 1.4\|57.1\|7.1\|34.3 | 9.0 | 72 | 0.05 | 95 |
| 5 | PEG(5000)-C-DMA\|DLinDMA\|DPPC\|Cholesterol 1.4\|57.1\|7.1\|34.3 | 9.6 | 52 | 0.16 | 89 |
| 6 | PEG(2000)-C-DMA\|DLinDMA\|DPPC\|Cholestanol 1.4\|57.1\|7.1\|34.3 | 8.9 | 68 | 0.10 | 94 |
| 7 | PEG(2000)-C-DMA\|DLinDMA\|DPPE\|Cholesterol 1.4\|57.1\|7.1\|34.3 | 8.9 | 72 | 0.07 | 95 |
| 8 | PEG(2000)-C-DMA\|DLinDMA\|DPPC 1.8\|70.2\|28.1 | 8.6 | 74 | 0.13 | 86 |

The 2:30 SNALP formulation used in this study is lipid composition 2:30:20:48 as described in molar percentages of PEG-C-DMA, DLinDMA, DSPC, and cholesterol (in that order). This formulation was prepared by syringe press at an input lipid to drug (L:D) ratio (mg:mg) of 13:1.

The 1:57 SNALP formulation used in this study is lipid composition 1.5:57.1:7:34.3 as described in molar percentages of PEG-C-DMA, DLinDMA, DPPC, and cholesterol (in that order). This formulation was prepared by syringe press at an input lipid to drug (L:D) ratio (mg:mg) of 9:1.

BALB/c mice (female, 4 weeks old) were obtained from Harlan Labs. After an acclimation period (of at least 7 days), animals were administered SNALP by intravenous (IV) injection in the lateral tail vein once daily on Study Days 0, 1, 2, 3 & 4 for a total of 5 doses per animal. Daily dosage was either 1.0 (for 2:30 SNALP) or 0.1 (for 1:57 SNALP) mg

BALB/c mice (female, at least 4 weeks old) were obtained from Harlan Labs. After an acclimation period (of at least 7 days), animals were administered SNALP by intravenous (IV) injection in the lateral tail vein once daily on Study Day 0 (1 dose total per animal). Dosage was 0.75 mg encapsulated siRNA per kg body weight, corresponding to 10 ml/kg (rounded to the nearest 10 µl). As a negative control, one group of animals was given an IV injection of phosphate buffered saline (PBS) vehicle. On Study Day 2, animals were euthanized and liver tissue was collected in RNAlater.

Liver tissues were analyzed for ApoB mRNA levels normalized against glyceraldehyde-3-phosphate dehydrogenase (GAPDH) mRNA levels using the QuantiGene assay (Panomics; Fremont, Calif.) essentially as described in Judge et al., *Molecular Therapy,* 13:494 (2006).

Case: 26-1581 Document: 56-1 Page: 149 Filed: 08/14/2026



FIG. **4** shows that the 1:57 and 1:62 SNALP formulations had comparable ApoB silencing activity in vivo (see, e.g., Groups 2 & 3).

## Example 6

### ApoB siRNA Formulated as 1:62 SNALP have Potent Silencing Activity In Vivo

SNALP formulations were prepared with the ApoB siRNA set forth in Table 3. The lipid components and physical characteristics of the formulations are summarized in Table 7.

The lipid:drug ratio is described in units of mg total lipid per mg nucleic acid. Mean particle size and polydispersity were measured on a Malvern Instruments Zetasizer. Encapsulation of nucleic acid was measured using a Ribogreen assay essentially as described in Heyes et al., *Journal of Controlled Release,* 107:276-287 (2005).

TABLE 7

Characteristics of the SNALP formulations used in this study.

| Group | Formulation Composition, Mole % PEG(2000)-C-DMA\|DLinDMA\|Cholesterol | Lipid/Drug Ratio | Finished Product Characterization Size (nm) | Poly-dispersity | % Encap-sulation |
|---|---|---|---|---|---|
| 2 | 1.5\|61.5\|36.9 | 6.1 | 80 | 0.07 | 92 |
| 3 | 1.4\|54.8\|43.8 | 6.6 | 74 | 0.05 | 89 |
| 4 | 2.0\|61.2\|36.7 | 6.2 | 71 | 0.11 | 91 |
| 5 | 1.8\|54.5\|43.6 | 6.7 | 67 | 0.09 | 91 |
| 6 | 1.3\|68.1\|30.6 | 7.4 | 91 | 0.06 | 89 |
| 7 | 1.2\|61.8\|37.1 | 8.0 | 87 | 0.10 | 90 |
| 8 | 1.7\|67.8\|30.5 | 7.6 | 81 | 0.07 | 91 |
| 9 | 1.4\|56.3\|42.3 | 8.6 | 75 | 0.11 | 92 |
| 10 | 1.9\|61.3\|36.8 | 8.2 | 72 | 0.10 | 91 |
| 11 | 1.8\|56.1\|42.1 | 8.8 | 70 | 0.10 | 90 |
| 12 | 1.3\|66.7\|32.0 | 9.5 | 89 | 0.09 | 89 |
| 13 | 1.2\|61.7\|37.0 | 10.0 | 87 | 0.10 | 91 |
| 14 | 1.7\|66.4\|31.9 | 9.6 | 82 | 0.11 | 90 |
| 15 | 1.5\|61.5\|36.9 | 10.1 | 79 | 0.10 | 91 |

BALB/c mice (female, at least 4 weeks old) were obtained from Harlan Labs. After an acclimation period (of at least 7 days), animals were administered SNALP by intravenous (IV) injection in the lateral tail vein once daily on Study Day 0 (1 dose total per animal). Dosage was 0.1 mg encapsulated siRNA per kg body weight, corresponding to 10 ml/kg (rounded to the nearest 10 μl). As a negative control, one group of animals was given an IV injection of phosphate buffered saline (PBS) vehicle. On Study Day 2, animals were euthanized and liver tissue was collected in RNAlater.

Liver tissues were analyzed for ApoB mRNA levels normalized against glyceraldehyde-3-phosphate dehydrogenase (GAPDH) mRNA levels using the QuantiGene assay (Panomics; Fremont, Calif.) essentially as described in Judge et al., *Molecular Therapy,* 13:494 (2006).

FIG. **5** shows that the 1:62 SNALP formulation was one of the most potent inhibitors of ApoB expression at two different lipid:drug ratios (i.e., 6.1 & 10.1) among the phospholipid-free SNALP formulations tested (see, Groups 2 & 15).

## Example 7

### In Vivo Silencing of ApoB Expression Using 1:57 SNALP Prepared Via a Syringe Press or Gear Pump Process

This study illustrates a comparison of the tolerability and efficacy of the 1:57 SNALP formulation with ApoB-targeting siRNA as prepared by various manufacturing processes. In particular, 1:57 SNALP was prepared by a syringe press or gear pump process using either PBS or citrate buffer (post-blend dilution) and administered intravenously in mice.

Experimental Design

Animal Model: Female BALB/c mice, 5 wks old, n=4 per group/cage.

siRNA payload: ApoB10048 U2/2 G1/2 siRNA.

Tolerability:

| Group | Formulation | IV Injection siRNA mg/kg | Lipid mg/kg |
|---|---|---|---|
| 1 | PBS vehicle | Standard 10 mL/kg volume | |
| 2 | 1\|57 Citrate Direct Dil, Syringe Press | 7 | 77 |
| 3 | 1\|57 PBS Direct Dil, Syringe Press | 7 | 96 |
| 4 | 1\|57 PBS Direct Dil, Gear Pump | 7 | 79 |
| 5 | 1\|57 Citrate Direct Dil, Syringe Press | 9 | 99 |
| 6 | 1\|57 PBS Direct Dil, Syringe Press | 9 | 123 |
| 7 | 1\|57 PBS Direct Dil, Gear Pump | 9 | 102 |

Efficacy:

| Group | Formulation | IV Injection siRNA mg/kg | Lipid mg/kg |
|---|---|---|---|
| 8 | PBS vehicle | Standard 10 mL/kg volume | |
| 9 | 1\|57 PBS Direct Dil, Syringe Press | 0.05 | 0.68 |
| 10 | 1\|57 PBS Direct Dil, Gear Pump | 0.05 | 0.57 |
| 11 | 1\|57 PBS Direct Dil, Syringe Press | 0.1 | 1.36 |
| 12 | 1\|57 PBS Direct Dil, Gear Pump | 0.1 | 1.13 |

Formulation:

Formulations are provided at 0.005 to 0.9 mg siRNA/mL, 0.22 μm filter sterilized in crimp top vials.

Formulation Details:

1. Lipid composition "1|57 Citrate blend" used in this study is 1.4:57.1:7.1:34.3 as described in molar percentages of PEG-C-DMA, DLinDMA, DPPC, and cholesterol (in that order). This formulation has an input lipid to drug ratio of 8.9.
2. Gear pump set up included 0.8 mm T-connector and 400 mL/min speed.
3. siRNA used in this study is apoB-10048 U2/2 G1/2 siRNA.

Formulation Summary:

| | 1:57 (9:1) + DOW siRNA | Particle Size Zavg (nm) | Poly | % Encap | Final L:D (mg:mg) |
|---|---|---|---|---|---|
| 322-050807-1 | Syringe PBS Blend | 79 | 0.12 | 92 | 13.6 |
| 322-050807-2 | Syringe Citrate Blend | 86 | 0.11 | 91 | 11.0 |
| 322-050807-3 | Gear PBS Blend | 80 | 0.09 | 93 | 11.3 |

Procedures

Treatment: Just prior to the first treatment, animals are weighed and dose amounts are calculated based on the weight of individual animals (equivalent to 10 mL/kg, rounded to the

nearest 10 µl). Test article is administered by IV injection through the tail vein once on Day 0 (1 dose total per animal). Body weight is measured daily (every 24 h) for the duration of the study. Cage-side observations are taken daily in concert with body weight measurements and additionally as warranted.

Group 1-7 Endpoint:

Animals are sacrificed on Day 1, 24 h after test article administration. Blood is collected by cardiac puncture upon sacrifice. Whole amount is collected into a SST microtainer for serum. Clot for 30 (to 60) min at room temp., centrifuge for 5 min at 16,000×g & 16° C., invert to confirm centrifugation is complete, and store at 4° C. Analyze complete small-animal clinical chemistry panel plus AST and SDH. Top priority list: ALT, AST, SDH, Bilirubin, Alkaline Phosphatase, GGT, BUN, CPK, Glucose. Secondary priority list: Creatinine, Albumin, Globulin, Total Protein.

Group 8-12 Endpoint:

Animals are sacrificed on Day 2, 48 h after test article administration. Blood is collected by cardiac puncture and processed for plasma. Immediately centrifuge for 5 min at 16,000×g (at 16° C.). Record any observations of unusual plasma appearance. Pipette off clear plasma supernatant into a clean microfuge tube and store at −80° C. The following tissues are removed and weighed separately: liver and spleen. The bottom (unattached) half of the left liver lobe is detached and submerged in >5 volumes of RNAlater (<0.3 g in 1.5 mL RNAlater in 2.0 mL tube), stored at least 16 hours at 4° C. prior to analysis and long term storage at −20° C. or −80° C. for archival purposes. Formulations are expected to be well tolerated. Mice which exhibit signs of distress associated with the treatment are terminated at the discretion of the vivarium staff.

Termination:

Mice are anaesthetized with a lethal dose of ketamine/xylazine; then cardiac puncture is performed followed by cervical dislocation.

Data Analysis:

Tolerability of treatment regime is monitored by animal appearance and behavior as well as body weight. Blood clinical chemistry is measured by automated analyzer. ApoB and GAPDH mRNA levels in liver are measured via QG assay. ApoB protein in plasma is measured via ELISA. Total cholesterol in plasma is measured via standard enzymatic/colorimetric assay.

Results

There was no body weight loss or change in animal appearance/behavior upon administration of the 1:57 SNALP formulations. FIG. **6** shows that the tolerability of SNALP prepared by citrate buffer versus PBS direct dilution did not differ significantly in terms of blood clinical chemistry parameters. There was a tolerability difference between syringe citrate and syringe PBS at constant siRNA dosage, but that was likely an artifact dependent on the different final lipid:drug (L:D) ratios of these two preparations.

FIG. **7** shows that the efficacy of the 1:57 SNALP prepared by gear pump was similar to the same SNALP prepared by syringe press. The tolerability profile was improved with the gear pump process, which could be attributed to increased initial encapsulation rate and decreased final L:D ratio.

### Example 8

### In Vivo Silencing of ApoB Expression Using 1:57 SNALP Prepared Via a Direct Dilution or In-Line Dilution Process

This study illustrates a comparison of the tolerability and efficacy of the 1:57 SNALP formulation with ApoB-targeting siRNA as prepared by a direct dilution or in-line dilution process at an input lipid to drug ratio of 6:1 or 9:1.

Experimental Design

Animal Model: Female BALB/c mice, 7 wks old.

siRNA payload: ApoB10048 U2/2 G1/2 siRNA.

CBC/Diff:

| Group | # Mice | Test Article | IV Dosage Encap. siRNA | IV Dosage Total Lipid |
|---|---|---|---|---|
| 1 | 3 | PBS | — | — |
| 2 | 3 | 1\|57 SNALP (9:1) | 7 mg/kg | 71 mg/kg |
| 3 | 3 | 1\|57 SNALP (9:1) | 11 mg/kg | 112 mg/kg |

Clinical Chemistry:

| Group | # Mice | Test Article | IV Dosage Encap. siRNA | IV Dosage Total Lipid |
|---|---|---|---|---|
| 4 | 4 | PBS | — | — |
| 5 | 4 | 1\|57 SNALP (9:1) | 9 mg/kg | 92 mg/kg |
| 6 | 4 | 1\|57 SNALP (9:1) | 11 mg/kg | 112 mg/kg |
| 7 | 4 | (6:1) New 1\|57 SNALP | 11 mg/kg | 78 mg/kg |
| 8 | 4 | (6:1) New 1\|57 SNALP | 13 mg/kg | 93 mg/kg |
| 9 | 4 | (6:1) New 1\|57 SNALP | 15 mg/kg | 107 mg/kg |
| 10 | 4 | (6:1) New 1\|57 SNALP | 17 mg/kg | 121 mg/kg |
| 11 | 4 | 1\|57 SNALP (9:1) | 11 mg/kg | 112 mg/kg |

Activity:

| Group | # Mice | Test Article | IV Dosage Encap. siRNA | IV Dosage Total Lipid |
|---|---|---|---|---|
| 12 | 4 | PBS | — | — |
| 13 | 4 | 1\|57 SNALP (9:1) | 0.05 mg/kg | 0.51 mg/kg |
| 14 | 4 | 1\|57 SNALP (9:1) | 0.1 mg/kg | 1.02 mg/kg |
| 15 | 4 | 1\|57 SNALP (9:1) | 0.2 mg/kg | 2.04 mg/kg |
| 16 | 4 | (6:1) New 1\|57 SNALP | 0.05 mg/kg | 0.36 mg/kg |
| 17 | 4 | (6:1) New 1\|57 SNALP | 0.1 mg/kg | 0.71 mg/kg |
| 18 | 4 | (6:1) New 1\|57 SNALP | 0.2 mg/kg | 1.42 mg/kg |
| 19 | 4 | (6:1) New 1\|57 SNALP | 0.4 mg/kg | 2.85 mg/kg |

Formulation:

Formulations are provided at 0.005 to 1.7 mg siRNA/mL, 0.22 µm filter sterilized in crimp top vials.

Formulation Details:

1. "1|57 SNALP" used in this study is lipid composition 1.4:57.1:7.1:34.3 as described in molar percentages of PEG-C-DMA, DLinDMA, DPPC, and cholesterol (in that order). This formulation was prepared by gear pump at an input lipid to drug ratio of 9:1 (28 mM lipids) or 6:1 (14 mM lipids).
2. siRNA used in this study is apoB-10048 U2/2 G1/2 siRNA.

Formulation Summary:

| | 1:57 SNALP Gear PBS | Particle Size | | | Final L:D |
|---|---|---|---|---|---|
| | In-Line | Zavg (nm) | Poly | % Encap | (mg:mg) |
| 322-051407-1 | Input 9:1 | 78 | 0.07 | 93 | 10.2 |
| 322-051407-2 | Input 6:1 | 81 | 0.05 | 92 | 7.1 |

Procedures

Treatment:

Just prior to the first treatment, animals are weighed and dose amounts are calculated based on the weight of individual animals (equivalent to 10 mL/kg, rounded to the nearest 10 μl). Test article is administered by IV injection through the tail vein once on Day 0 (1 dose total per animal). Body weight is measured daily (every 24 h) for the duration of the study. Cage-side observations are taken daily in concert with body weight measurements and additionally as warranted.

Endpoint:

Animals are sacrificed on Day 1, 24 h after test article administration (Grps 1-10) or on Day 2, 48 h after test article administration (Grps 11-19).

Groups 1-3:

Blood is collected by cardiac puncture upon sacrifice. Whole amount is collected into an EDTA microtainer, mixed immediately to prevent coagulation, and sent for analysis of CBC/Diff profile. Perform brief necropsy.

Groups 4-11:

Blood is collected by cardiac puncture into a SST microtainer for serum. Clot for 30 (to 60) min at room temp., centrifuge for 5 min at 16,000×g & 16° C., invert to confirm centrifugation is complete, and store at 4° C. Analyze complete small-animal clinical chemistry panel plus AST and SDH. Top priority list: ALT, AST, SDH, Bilirubin, Alkaline Phosphatase, GGT, BUN, CPK, Glucose. Secondary priority list: Creatinine, Albumin, Globulin, Total Protein. Perform brief necropsy.

Groups 12-19:

Blood is collected by cardiac puncture and processed for plasma: immediately centrifuge for 5 min at 16,000×g (at 16° C.). Record any observations of unusual plasma appearance. Pipette off clear plasma supernatant into a clean microfuge tube and store at −80° C. The following tissues are removed: liver. The liver is not weighed; the bottom (unattached) half of the left liver lobe is detached and submerged in >5 volumes of RNAlater (<0.3 g in 1.5 mL RNAlater in 2.0 mL tube), stored at least 16 hours at 4° C. prior to analysis and long term storage at −80° C. Formulations are expected to be well tolerated. Mice which exhibit signs of distress associated with the treatment are terminated at the discretion of the vivarium staff.

Termination:

Mice are anaesthetized with a lethal dose of ketamine/xylazine; then cardiac puncture is performed followed by cervical dislocation.

Data Analysis:

Tolerability of treatment regime is monitored by animal appearance and behavior, and body weight. Blood clinical chemistry and CBC/Diff profile is measured by automated analyzer. Liver ApoB mRNA is measured using the QuantiGene Assay.

Plasma ApoB-100 is measured using ELISA. Plasma total cholesterol is measured using a standard enzymatic assay.

Results

Tolerability:

FIG. **8** shows that there was very little effect on body weight 24 hours after 1:57 SNALP administration. The maximum weight loss of 3.6±0.7% was observed at the highest drug dose of 17 mg/kg. There was also no obvious change in animal appearance/behavior at any of the dosages tested.

FIG. **9** shows that there were no obvious changes in platelet count. Reduction of platelets can cause the mean platelet volume to increase as the body produces new platelets in compensation for the treatment-related decrease. Under the conditions of this study, the mean platelet volume did not change in SNALP-treated groups.

FIG. **10** shows that clinically significant liver enzyme elevations (3xULN) occurred at drug dosages of 11 mg/kg for 1:57 SNALP at a lipid:drug (L:D) ratio of 10, and at 13 mg/kg at a L:D of 7. A slight dose response trend upwards in plasma total protein and globulin was also observed.

Efficacy:

FIG. **11** shows that based on the liver mRNA QuantiGene analysis, the potency of the lower L:D SNALP was as good as that of the higher L:D SNALP at the tested drug dosages. In fact, the ApoB silencing activity was identical at the 0.05 and 0.1 mg/kg dosages. As such, the potency of the 1:57 SNALP at a 6:1 input L:D ratio (final ratio of 7:1) was similar to the potency of the 1:57 SNALP at a 9:1 input L:D ratio (final ratio of 10:1) at reducing ApoB expression.

FIG. **12** shows that ApoB protein and total cholesterol levels were reduced to a similar extent by the 1:57 SNALP at a 6:1 input L:D ratio (final ratio of 7:1) and the 1:57 SNALP at a 9:1 input L:D ratio (final ratio of 10:1).

Therapeutic Index:

This study demonstrates that both the 1:57 SNALP at a 6:1 input L:D ratio (final ratio of 7:1) and the 1:57 SNALP at a 9:1 input L:D ratio (final ratio of 10:1) caused about 60% ApoB liver mRNA silencing with a drug dose of 0.1 mg/kg. Interpolating from the available data points in FIG. **10**, a **10**:**1** final L:D ratio at 10 mg/kg may cause a similar degree of enzyme elevation as a 7:1 final L:D ratio at 13 mg/kg. Using these activity and toxicity points, the therapeutic index for the 1:57 SNALP at a 10:1 final L:D ratio is (10 mg/kg)/(0.1 mg/kg)=100 and the therapeutic index for the 1:57 SNALP at a 7:1 final L:D ratio is (13 mg/kg)/(0.1 mg/kg)=130. Using this dataset, the therapeutic index for the 1:57 SNALP at a 7:1 final L:D ratio is 30% greater than the therapeutic index for the 1:57 SNALP at a 10:1 final L:D ratio.

Example 9

In Vivo Silencing of PLK-1 Expression Using 1:57 SNALP Increases Survival of Hep3B Tumor-Bearing Mice

SNALP containing polo-like kinase 1 (PLK-1) siRNA (1:57 SNALP formulation: 1.4% PEG-cDMA; 57.1% DLinDMA; 7.1% DPPC; and 34.3% cholesterol) were tested for their effects on the survival of CD1 nu/nu mice bearing Hep3B liver tumors. PLK-1 is a serine/threonine kinase containing two functional domains: (1) a kinase domain; and (2) a polo-box domain (see, e.g., Barr et al., *Nat. Rev. Mol. Cell Biol.*, 5:429-440 (2004)). The activity and cellular concentration of PLK-1 are crucial for the precise regulation of cell division. PLK-1 is overexpressed in many cancer types including hepatoma and colon cancer, and PLK-1 expression often correlates with poor patient prognosis. Overexpression of PLK-1 (wild-type or kinase inactive) results in multinucleation (genetic instability). Hyperactive PLK-1 overrides the DNA damage checkpoint. Constitutive PLK-1 expression causes transformation of NIH 3T3 cells. PLK-1 phosphorylates the p53 tumor suppressor, thereby inhibiting the pro-apoptotic effects of p53. The PLK-1 siRNA used in this study are provided in Table 8. The modifications involved introducing 2'OMe-uridine or 2'OMe-guanosine at selected positions in the sense and antisense strands of the PLK-1 siRNA sequence, in which the siRNA duplex contained less than about 20% 2'OMe-modified nucleotides.

TABLE 8

siRNA duplexes comprising sense and antisense PLK-1 RNA polynucleotides.

| siRNA | PLK-1 siRNA Sequence | SEQ ID NO: | % Modified in DS Region |
|---|---|---|---|
| PLK1424 U4/GU | 5'-AGA**U**CACCC**U**CCU**U**AAA**U**ANN-3'<br>3'-NNUC**U**AGUGGGAG**G**AAUUUAU-5' | 5<br>6 | 6/38 = 15.8% |
| PLK1424 U4/G | 5'-AGA**U**CACCC**U**CCU**U**AAA**U**ANN-3'<br>3'-NNUCUA**G**U**G**G**G**A**G**GAAUUUAU-5' | 5<br>7 | 7/38 = 18.4% |

Column 1: The number after "PLK" refers to the nucleotide position of the 5' base of the sense strand relative to the start codon (ATG) of the human PLK-1 mRNA sequence NM_005030.
Column 2: 2'-O-methyl (2'OMe) nucleotides are indicated in bold and underlined. The siRNA duplex can alternatively or additionally comprise 2'-deoxy-2'-fluoro (2'F) nucleotides, 2'-deoxy nucleotides, 2'-O-(2-methoxyethyl) (MOE) nucleotides, and/or locked nucleic acid (LNA) nucleotides. N = deoxythymidine (dT) nucleotide, uridine (U) ribonucleotide, or ribonucleotide having complementarity to the target sequence or the complementary strand thereof.
Column 3: The number and percentage of modified nucleotides in the double-stranded (DS) region of the siRNA duplex are provided.

Experimental Groups

20 CD1 nu/nu mice were seeded as follows:

| Group | # Mice | Tumor seeding | SNALP | # Mice | SNALP dosing IV | SNALP dose | Sacrifice | Assay |
|---|---|---|---|---|---|---|---|---|
| A<br>B | 20 to seed | I.H.<br>$1.5 \times 10^6$<br>Hep3B | Luc 1:57<br>PLK 1424 1:57 | 9<br>9 | Days 11, 14, 17, 21, 25, 28, 32, 35, 39, 42 | 10 × 2 mg/kg | When moribund | Survival<br>Body Weights |

Test Articles

All samples were filter-sterilized prior to dilution to working concentration. All tubes were labeled with the formulation date, lipid composition, and nucleic acid concentration. SNALP samples were provided at 0.2 mg/ml nucleic acid. A minimum of 20 ml of each SNALP was required to perform the study. Formulations for this study contained:

| Group | Test Article Description |
|---|---|
| A | Luc U/U SNALP 1:57 (28 mM lipid) |
| B | PLK1424 U4/GU SNALP 1:57 (28 mM lipid) |
| | PLK1424 U4/G SNALP 1:57 (28 mM lipid) |

Procedures

| | |
|---|---|
| Day 0 | Mice will receive Anafen by SC injection (100 μg in 20 μl saline) immediately prior to surgery. Individual mice are anesthetized by isoflourane gas inhalation and eye lube applied to prevent excessive eye drying. While maintained under gas anesthesia from a nose cone, a single 1.5 cm incision across the midline will be made below the sternum. The left lateral hepatic lobe is then exteriorized using an autoclaved cotton wool bud. 25 μl of tumor cells suspended in PBS is injected into the lobe at a shallow angle using a leur tip Hamilton syringe (50 μl) and 30G (3/8") needle. Cells will be injected slowly (~30 s) and a swab applied to the puncture wound immediately after needle withdrawal. After any bleeding has stopped (~1 min), the incision is closed with 5-6 sutures in the muscle wall and 3-4 skin clips. Cell suspensions will be thoroughly mixed immediately prior to each injection. Mice will recover from anesthesia in a clean cage lined with paper towel and monitored closely for 2-4 hours. Animals are then returned to normal housing. |

-continued

| | |
|---|---|
| Day 1 | All mice will be lightly anesthetized by isoflourane gas and the sutures examined. Animals will then receive Anafen by SC injection (100 μg in 20 μl saline). |
| Day 10 | Mice will be randomized into the appropriate treatment groups. |
| Day 11 | Groups A, B - Day 11: All Animals will be administered SNALP at 2 mg/kg by IV injection via the lateral tail vein. Mice will be dosed according to body weight (10 ml/kg). Dosing will be repeated for 5 consecutive days based on initial weight. |
| Day 14-35 | Groups A, B - Days 14, 17, 21, 25, 28, 32, 35: All Animals will be re-administered SNALP at 2 mg/kg by IV injection via the lateral tail vein. Mice will be dosed according to body weight (10 ml/kg). Body weights Groups: Mice will be weighed on the day of dosing for 5 weeks, then twice weekly until close of the study. Endpoint: Tumor burden and formulations are expected to be well tolerated. Mice that exhibit signs of distress associated with the treatment or tumor burden are terminated at the discretion of the vivarium staff. |
| Termination: | Mice are anesthetized with a lethal dose of ketamine/xylazine followed by cervical dislocation. |
| Data Analysis: | Survival and body weights are assayed. |

Results

FIG. **13** shows the mean body weights of mice during therapeutic dosing of PLK1424 SNALP in the Hep3B intrahepatic (I.H.) tumor model. The treatment regimen was well tolerated with no apparent signs of treatment-related toxicity.

FIG. **14** shows that treatment with 1:57 SNALP-formulated PLK1424 caused a significant increase in the survival of Hep3B tumor-bearing mice. This in vivo anti-tumor effect was observed in the absence of any apparent toxicity or immune stimulation.

Example 10

In vivo Silencing of PLK-1 Expression Using 1:57 SNALP Induces Tumor Cell Apoptosis in Hep3B Tumor-Bearing Mice

The objectives of this study were as follows:

1. To determine the level of mRNA silencing in established Hep3B liver tumors following a single IV administration of PLK1424 SNALP.
2. To confirm the mechanism of mRNA silencing by detecting specific RNA cleavage products using RACE-PCR.
3. To confirm induction of tumor cell apoptosis by histopathology.

The 1:57 SNALP formulation (1.4% PEG-cDMA; 57.1% DLinDMA; 7.1% DPPC; and 34.3% cholesterol) was used for this study.

Experimental Groups

20 SCID/beige mice were seeded as follows:

| Group | # Mice | Tumor seeding | SNALP | # Mice | SNALP dosing IV | Sacrifice | Assay |
|---|---|---|---|---|---|---|---|
| A | 20 to | I.H. | PBS | 6 | 1 × 2 | 24 h | Tumor |
| B | seed | $1 \times 10^6$ | Luc | 7 | mg/kg | after | QG |
| | | Hep3B | 1:57 | | Day 20 | treat- | Tumor |
| C | | | PLK | 7 | | ment | RACE- |
| | | | 1424 | | | | PCR |
| | | | 1:57 | | | | Histo- |
| | | | | | | | pathol- |
| | | | | | | | ogy |

Test Articles

All samples were filter-sterilized prior to dilution to working concentration. All tubes were labeled with the formulation date, lipid composition, and nucleic acid concentration. SNALP samples were provided at 0.2 mg/ml nucleic acid. A minimum of 2 ml of SNALP was required to perform the study. Formulations for this study contained:

| Group | Test Article Description |
|---|---|
| A | PBS |
| B | Luc U/U 1:57 SNALP |
| C | PLK1424 U4/GU 1:57 SNALP |

Procedures

| | |
|---|---|
| Day 0 | Mice will receive Anafen by SC injection (100 μg in 20 μl saline) immediately prior to surgery. Individual mice are anesthetized by isoflourane gas inhalation and eye lube applied to prevent excessive eye drying. While maintained under gas anesthesia from a nose cone, a single 1.5 cm incision across the midline will be made below the sternum. The left lateral hepatic lobe is then exteriorized using an autoclaved cotton wool bud. 25 μl of tumor cells suspended in PBS is injected into the lobe at a shallow angle using a leur tip Hamilton syringe (50 μl) and 30G (⅜") needle. Cells will be injected slowly (~30 s) and a swab applied to the puncture wound immediately after needle withdrawal. After any bleeding has stopped (~1 min), the muscle wall incision is closed with 5-6 sutures. The skin incision is then closed with 3-4 metal skin clips. Cell suspensions will be thoroughly mixed immediately prior to each injection. Mice will recover from anesthesia in a clean cage lined with paper towel and monitored closely for 2-4 hours. Animals are then returned to normal housing. |
| Day 1 | All mice will be lightly anesthetized by isoflourane gas and the sutures examined. Animals will then receive Anafen by SC injection (100 μg in 20 μl saline). |
| Day 7 | Mice will be randomized into the appropriate treatment groups. |
| Day 20 | Groups A-C: Mice will be weighed and then administered either PBS, Luc, or PLK1424 SNALP by IV injection via the lateral tail vein. SNALP will be dosed at 2 mg/kg or equivalent volume (10 ml/kg) according to body weight. |
| Day 21 | Groups A-C: All mice will be weighed and then euthanized by lethal anesthesia. |
| | Tumor bearing liver lobes from all mice in each group will be weighed and collected into RNALater for RNA analysis. |
| | Endpoint: Tumor burden and formulations are expected to be well tolerated. Mice that exhibit signs of distress associated with the treatment or tumor burden are terminated at the discretion of the vivarium staff. |
| Termination: | Mice are anaesthetized with a lethal dose of ketamine/xylazine followed by cervical dislocation. |
| Data Analysis: | mRNA analysis of liver tumors by bDNA (QG) assay and RACE-PCR. |
| | Tumor cell apoptosis by histopathology. |



Results

Body weights were monitored from Day 14 onwards to assess tumor progression. On Day 20, 6 mice showing greatest weight loss were randomized into each of the 3 groups and treated. All six mice had substantial-large I.H. tumors at sacrifice (Day 21). Treatment of the remaining 14 mice was therefore initiated on the Day 21 (sacrifice Day 22). 10/14 mice had substantial tumors; 2/14 mice had small/probable tumors; and 2/14 mice had no visible tumor burden.

FIG. **15** shows data from Quantigene assays used to measure human (tumor)-specific PLK-1 mRNA levels. A single 2 mg/kg dose of 1:57 SNALP reduced PLK-1 mRNA levels by about 50% in intrahepatic Hep3B tumors growing in mice.

FIG. **16** shows that a specific cleavage product of PLK-1 mRNA was detectable in mice treated with PLK1424 SNALP by 5' RACE-PCR. No specific PCR product was detectable in mice treated with either PBS or control (Luc) SNALP. Nucleotide sequencing of the PCR product confirmed the predicted cleavage site by PLK1424 siRNA-mediated RNA interference in the PLK-1 mRNA.

FIG. **17** shows Hep3B tumor histology in mice treated with either Luc SNALP (top) or PLK1424 SNALP (bottom). Luc SNALP-treated mice displayed normal mitoses in Hep3B tumors, whereas PLK1424 SNALP-treated mice exhibited numerous aberrant mitoses and tumor cell apoptosis in Hep3B tumors.

Conclusion

This example illustrates that a single administration of PLK1424 1:57 SNALP to Hep3B tumor-bearing mice induced significant in vivo silencing of PLK-1 mRNA. This reduction in PLK-1 mRNA was confirmed to be mediated by RNA interference using 5' RACE-PCR analysis. Importantly, PLK-1 mRNA silencing by the 1:57 SNALP formulation profoundly disrupted tumor cell proliferation (mitosis), causing subsequent apoptosis of tumor cells. As demonstrated in the previous example, this anti-tumor effect translated into extended survival times in the tumor-bearing mice.

Example 11

Comparison of 1:57 PLK-1 SNALP Containing Either PEG-cDMA or PEG-cDSA in a Subcutaneous Hep3B Tumor Model

This example demonstrates the utility of the PEG-lipid PEG-cDSA (3-N-[(-Methoxypoly(ethylene glycol)2000)carbamoyl]-1,2-distearyloxypropylamine) in the 1:57 formulation for systemically targeting distal (e.g., subcutaneous) tumors. In particular, this example compares the tumor targeting ability of 1:57 PLK-1 SNALPs containing either PEG-cDMA ($C_{14}$) or PEG-cDSA ($C_{18}$). Readouts are tumor growth inhibition and PLK1 mRNA silencing. The PLK-1 siRNA used was PLK1424 U4/GU, the sequence of which is provided in Table 8.

Subcutaneous (S.C.) Hep3B tumors were established in scid/beige mice. Multidose anti-tumor efficacy of 1:57 PLK-1 SNALP was evaluated for the following groups (n=5 for each group): (1) "Luc-cDMA"-PEG-cDMA Luc SNALP; (2) "PLK-cDMA"-PEG-cDMA PLK-1 SNALP; and (3) "PLK-cDSA"-PEG-cDSA PLK-1 SNALP. Administration of 6×2 mg/kg siRNA was initiated once tumors reached about 5 mm in diameter (Day 10). Dosing was performed on Days 10, 12, 14, 17, 19, and 21. Tumors were measured by caliper twice weekly.

FIG. **18** shows that multiple doses of 1:57 PLK-1 SNALP containing PEG-cDSA induced the regression of established Hep3B S.C. tumors. In particular, 5/5 tumors in the PLK1-cDSA treated mice appeared flat, measurable only by discoloration at the tumor site.

FIG. **19** shows the mRNA silencing of 1:57 PLK SNALP in S.C. Hep3B tumors following a single intravenous SNALP administration. The extent of silencing observed with the PLK1-cDSA SNALP correlated with the anti-tumor activity in the multi-dose study shown in FIG. **18**.

The Luc-cDMA SNALP-treated group, which had developed large S.C. tumors at Day 24, were then administered PLK-cDSA SNALP on Days 24, 26, 28, 31, 33, and 35. There was no additional dosing of the original PLK-1 SNALP-treated groups. The results from this crossover dosing study with large established tumors is provided in FIG. **20**, which shows that PLK1-cDSA SNALP inhibited the growth of large S.C. Hep3B tumors.

A comparison of the effect of PEG-cDMA and PEG-cDSA 1:57 SNALPs on PLK-1 mRNA silencing was performed using established intrahepatic Hep3B tumors in scid/beige mice. A single 2 mg/kg dose of 1:57 PLK-1 SNALP containing either PEG-cDMA or PEG-cDSA was administered intravenously. Liver/tumor samples were collected at 24 and 96 hours after SNALP treatment. Control=2 mg/kg Luc-cDMA SNALP at 24 hours.

FIG. **21** shows that PLK-cDMA SNALP and PLK-cDSA SNALP had similar silencing activities after 24 hours, but that the PLK-cDSA SNALP may increase the duration of mRNA silencing in intrahepatic tumors.

FIG. **22** shows the blood clearance profile of 1:57 PLK-1 SNALP containing either PEG-cDMA or PEG-cDSA. The extended blood circulation times observed for the PLK-cDSA SNALP may enable the increased accumulation and activity at distal (e.g., subcutaneous) tumor sites.

Thus, this study shows that the 1:57 PEG-cDSA SNALP formulation can be used to preferentially target tumors outside of the liver, whereas the 1:57 PEG-cDMA SNALP can be used to preferentially target the liver.

Example 12

Synthesis of Cholesteryl-2'-Hydroxyethyl Ether

Step 1:

A 250 ml round bottom flask containing cholesterol (5.0 g, 12.9 mmol) and a stir bar was sealed and flushed with nitrogen. Toluenesulphonyl chloride (5.0 g, 26.2 mmol) was weighed into a separate 100-mL round bottom flask, also sealed and flushed with nitrogen. Anhydrous pyridine (2×50 ml) was delivered to each flask. The toluenesulphonyl chloride solution was then transferred, via cannula, into the 250 ml flask, and the reaction stirred overnight. The pyridine was removed by rotovap, and methanol (80 ml) added to the residue. This was then stirred for 1 hour until a homogeneous suspension was obtained. The suspension was filtered, washed with acetonitrile (50 ml), and dried under vacuum to yield cholesteryl tosylate as a fluffy white solid (6.0 g, 86%).

Step 2:

Cholesteryl tosylate (2.0 g, 3.7 mmol), 1,4-dioxane (50 mL), and ethylene glycol (4.6 g, 74 mmol) were added to a 100 ml flask containing a stir bar. The flask was fitted with a condenser, and refluxed overnight. The dioxane was then removed by rotovap, and the reaction mixture suspended in water (100 ml). The solution was transferred to a separating funnel and extracted with chloroform (3×100 ml). The organic phases were combined, washed with water (2×150 ml), dried over magnesium sulphate, and the solvent removed. The crude product was purified by column chromatography (5% acetone/hexane) to yield the product as a white solid (1.1 g, 69%).

The structures of the cholesterol derivatives cholesteryl-2'-hydroxyethyl ether and cholesteryl-4'-hydroxybutyl ether are as follows:




Cholesteryl-2′-hydroxyethyl ether




Cholesteryl-4′-hydroxyethyl ether

It is to be understood that the above description is intended to be illustrative and not restrictive. Many embodiments will be apparent to those of skill in the art upon reading the above description. The scope of the invention should, therefore, be determined not with reference to the above description, but should instead be determined with reference to the appended claims, along with the full scope of equivalents to which such claims are entitled. The disclosures of all articles and references, including patent applications, patents, PCT publications, and Genbank Accession Nos., are incorporated herein by reference for all purposes.

SEQUENCE LISTING

```
<160> NUMBER OF SEQ ID NOS: 7

<210> SEQ ID NO 1
<211> LENGTH: 21
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: synthetic E5 kinesin-related protein 2263 U/U
      siRNA sense strand of siRNA duplex
<220> FEATURE:
<223> OTHER INFORMATION: Description of Combined DNA/RNA Molecule:
      synthetic E5 kinesin-related protein 2263 U/U siRNA sense strand
      of siRNA duplex
<221> NAME/KEY: modified_base
<222> LOCATION: (2)...(19)
<223> OTHER INFORMATION: n = um
<221> NAME/KEY: modified_base
<222> LOCATION: (20)...(21)
<223> OTHER INFORMATION: n = deoxythimidine (dT)

<400> SEQUENCE: 1

cngaagaccn gaagacaann n                                                21


<210> SEQ ID NO 2
<211> LENGTH: 21
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: synthetic E5 kinesin-related protein 2263 U/U
      siRNA antisense strand of siRNA duplex
<220> FEATURE:
<223> OTHER INFORMATION: Description of Combined DNA/RNA Molecule:
      synthetic E5 kinesin-related protein 2263 U/U siRNA antisense
      strand of siRNA duplex
<221> NAME/KEY: modified_base
<222> LOCATION: (8)...(16)
<223> OTHER INFORMATION: n = um
<221> NAME/KEY: modified_base
<222> LOCATION: (20)...(21)
<223> OTHER INFORMATION: n = deoxythimidine (dT)

<400> SEQUENCE: 2

auugucunca ggncuncagn n                                                21


<210> SEQ ID NO 3
<211> LENGTH: 21
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: synthetic apolipoprotein B (ApoB) 10048 U2/2
      G1/2 siRNA sense strand of siRNA duplex
<221> NAME/KEY: modified_base
<222> LOCATION: (4)...(4)
<223> OTHER INFORMATION: n = gm
<221> NAME/KEY: modified_base
<222> LOCATION: (8)...(14)
<223> OTHER INFORMATION: n = um

<400> SEQUENCE: 3

agunucanca cacngaauac c                                                21


<210> SEQ ID NO 4
<211> LENGTH: 21
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: synthetic apolipoprotein B (ApoB) 10048 U2/2
      G1/2 siRNA antisense strand of siRNA duplex
<221> NAME/KEY: modified_base
<222> LOCATION: (4)...(4)
<223> OTHER INFORMATION: n = um
```

```
<221> NAME/KEY: modified_base
<222> LOCATION: (7)...(9)
<223> OTHER INFORMATION: n = gm
<221> NAME/KEY: modified_base
<222> LOCATION: (19)...(19)
<223> OTHER INFORMATION: n = um

<400> SEQUENCE: 4

uauncanunu gaugacacnu g                                               21


<210> SEQ ID NO 5
<211> LENGTH: 21
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: synthetic polo-like kinase 1 (PLK-1) PLK1424
      U4/GU and PLK1424 U4/G siRNA sense strand of siRNA duplex
<220> FEATURE:
<223> OTHER INFORMATION: Description of Combined DNA/RNA Molecule:
      synthetic polo-like kinase 1 (PLK-1) PLK1424 U4/GU and PLK1424
      U4/G siRNA sense strand of siRNA duplex
<221> NAME/KEY: modified_base
<222> LOCATION: (4)...(18)
<223> OTHER INFORMATION: n = um
<221> NAME/KEY: modified_base
<222> LOCATION: (20)...(21)
<223> OTHER INFORMATION: n = deoxythimidine (dT), u or a ribonucleotide
      complementary to target complementary sequence

<400> SEQUENCE: 5

agancacccn ccunaaanan n                                               21


<210> SEQ ID NO 6
<211> LENGTH: 21
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: synthetic polo-like kinase 1 (PLK-1) PLK1424
      U4/GU siRNA antisense strand of siRNA duplex
<220> FEATURE:
<223> OTHER INFORMATION: Description of Combined DNA/RNA Molecule:
      synthetic polo-like kinase 1 (PLK-1) PLK1424 U4/GU siRNA
      antisense strand of siRNA duplex
<221> NAME/KEY: modified_base
<222> LOCATION: (8)...(8)
<223> OTHER INFORMATION: n = gm
<221> NAME/KEY: modified_base
<222> LOCATION: (17)...(17)
<223> OTHER INFORMATION: n = um
<221> NAME/KEY: modified_base
<222> LOCATION: (20)...(21)
<223> OTHER INFORMATION: n = deoxythimidine (dT), u or a ribonucleotide
      complementary to target sequence

<400> SEQUENCE: 6

uauuuaanga gggugancun n                                               21


<210> SEQ ID NO 7
<211> LENGTH: 21
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: synthetic polo-like kinase 1 (PLK-1) PLK1424
      U4/G siRNA antisense strand of siRNA duplex
<220> FEATURE:
<223> OTHER INFORMATION: Description of Combined DNA/RNA Molecule:
      synthetic polo-like kinase 1 (PLK-1) PLK1424 U4/G siRNA
      antisense strand of siRNA duplex
<221> NAME/KEY: modified_base
<222> LOCATION: (9)...(15)
```

-continued

```
<223> OTHER INFORMATION: n = gm
<221> NAME/KEY: modified_base
<222> LOCATION: (20)...(21)
<223> OTHER INFORMATION: n = deoxythimidine (dT), u or a ribonucleotide
      complementary to target sequence

<400> SEQUENCE: 7

uauuuaagna gngunaucun n                                                 21
```

What is claimed is:

**1**. A nucleic acid-lipid particle comprising:

(a) a nucleic acid;

(b) a cationic lipid comprising from 50 mol % to 65 mol % of the total lipid present in the particle;

(c) a non-cationic lipid comprising a mixture of a phospholipid and cholesterol or a derivative thereof, wherein the phospholipid comprises from 3 mol % to 15 mol % of the total lipid present in the particle and the cholesterol or derivative thereof comprises from 30 mol % to 40 mol % of the total lipid present in the particle; and

(d) a conjugated lipid that inhibits aggregation of particles comprising from 0.5 mol % to 2 mol % of the total lipid present in the particle.

**2**. The nucleic acid-lipid particle of claim **1**, wherein the nucleic acid comprises a small interfering RNA (siRNA).

**3**. The nucleic acid-lipid particle of claim **2**, wherein the siRNA comprises at least one modified nucleotide.

**4**. The nucleic acid-lipid particle of claim **2**, wherein the siRNA comprises at least one 2'-O-methyl (2'OMe) nucleotide.

**5**. The nucleic acid-lipid particle of claim **2**, wherein the siRNA is about 19 to about 25 base pairs in length.

**6**. The nucleic acid-lipid particle of claim **2**, wherein the siRNA comprises 3' overhangs.

**7**. The nucleic acid-lipid particle of claim **1**, wherein the cationic lipid comprises from 50 mol % to 60 mol % of the total lipid present in the particle.

**8**. The nucleic acid-lipid particle of claim **1**, wherein the phospholipid comprises dipalmitoylphosphatidylcholine (DPPC), distearoylphosphatidylcholine (DSPC), or a mixture thereof.

**9**. The nucleic acid-lipid particle of claim **1**, wherein the phospholipid comprises from 4 mol % to 15 mol % of the total lipid present in the particle.

**10**. The nucleic acid-lipid particle of claim **1**, wherein the phospholipid comprises from 4 mol % to 12 mol % of the total lipid present in the particle.

**11**. The nucleic acid-lipid particle of claim **1**, wherein the phospholipid comprises from 5 mol % to 12 mol % of the total lipid present in the particle.

**12**. The nucleic acid-lipid particle of claim **1**, wherein the phospholipid comprises from 6 mol % to 12 mol % of the total lipid present in the particle.

**13**. The nucleic acid-lipid particle of claim **1**, wherein the cholesterol or derivative thereof comprises from 30 mol % to 35 mol % of the total lipid present in the particle.

**14**. The nucleic acid-lipid particle of claim **1**, wherein the conjugated lipid that inhibits aggregation of particles comprises a polyethyleneglycol (PEG)-lipid conjugate.

**15**. The nucleic acid-lipid particle of claim **14**, wherein the PEG-lipid conjugate comprises a PEG-diacylglycerol (PEG-DAG) conjugate, a PEG-dialkyloxypropyl (PEG-DAA) conjugate, or a mixture thereof.

**16**. The nucleic acid-lipid particle of claim **15**, wherein the PEG-DAA conjugate comprises a PEG-dimyristyloxypropyl (PEG-DMA) conjugate, a PEG-distearyloxypropyl (PEG-DSA) conjugate, or a mixture thereof.

**17**. The nucleic acid-lipid particle of claim **16**, wherein the PEG has an average molecular weight of about 2,000 daltons.

**18**. The nucleic acid-lipid particle of claim **1**, wherein the conjugated lipid that inhibits aggregation of particles comprises from 1 mol % to 2 mol % of the total lipid present in the particle.

**19**. The nucleic acid-lipid particle of claim **14**, wherein the nucleic acid-lipid particle comprises about 55 mol % cationic lipid, about 11 mol % phospholipid, about 33 mol % cholesterol or a derivative thereof, and about 1.6 mol % PEG-lipid conjugate.

**20**. The nucleic acid-lipid particle of claim **1**, wherein the nucleic acid is fully encapsulated in the nucleic acid-lipid particle.

**21**. A pharmaceutical composition comprising a nucleic acid-lipid particle of claim **1** and a pharmaceutically acceptable carrier.

* * * * *

# Exhibit D

US009364435B2

(12) **United States Patent**
**Yaworski et al.**

(10) **Patent No.: US 9,364,435 B2**
(45) **Date of Patent: *Jun. 14, 2016**

(54) **LIPID FORMULATIONS FOR NUCLEIC ACID DELIVERY**

(71) Applicant: **Protiva Biotherapeutics, Inc.**, Burnaby (CA)

(72) Inventors: **Edward Yaworski**, Maple Ridge (CA); **Kieu Lam**, Surrey (CA); **Lloyd Jeffs**, Delta (CA); **Lorne Palmer**, Vancouver (CA); **Ian MacLachlan**, Mission (CA)

(73) Assignee: **PROTIVA BIOTHERAPEUTICS, INC.**, Burnaby, BC (CA)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **14/462,441**

(22) Filed: **Aug. 18, 2014**

(65) **Prior Publication Data**

US 2015/0164799 A1 Jun. 18, 2015

**Related U.S. Application Data**

(63) Continuation of application No. 13/928,309, filed on Jun. 26, 2013, now Pat. No. 8,822,668, which is a continuation of application No. 13/253,917, filed on Oct. 5, 2011, now Pat. No. 8,492,359, which is a continuation of application No. 12/424,367, filed on Apr. 15, 2009, now Pat. No. 8,058,069.

(60) Provisional application No. 61/045,228, filed on Apr. 15, 2008.

(51) **Int. Cl.**

| | |
|---|---|
| ***C12N 15/11*** | (2006.01) |
| ***A61K 9/127*** | (2006.01) |
| ***A61K 48/00*** | (2006.01) |
| ***C07H 21/00*** | (2006.01) |
| ***C07J 9/00*** | (2006.01) |
| ***C12N 15/113*** | (2010.01) |

(52) **U.S. Cl.**

CPC ............ ***A61K 9/1272*** (2013.01); ***A61K 9/1271*** (2013.01); ***A61K 48/0025*** (2013.01); ***C07H 21/00*** (2013.01); ***C07J 9/00*** (2013.01); ***C12N 15/111*** (2013.01); ***C12N 15/113*** (2013.01); *C12N 2310/14* (2013.01); *C12N 2320/32* (2013.01)

(58) **Field of Classification Search**

CPC . C12N 15/113; C12N 2310/14; A61K 9/1271
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,394,448 | A | 7/1983 | Szoka, Jr. et al. |
| 4,438,052 | A | 3/1984 | Weder et al. |
| 4,515,736 | A | 5/1985 | Deamer |
| 4,598,051 | A | 7/1986 | Papahadjopoulos et al. |
| 4,897,355 | A | 1/1990 | Eppstein et al. |
| 5,013,556 | A | 5/1991 | Woodle et al. |
| 5,171,678 | A | 12/1992 | Behr et al. |
| 5,208,036 | A | 5/1993 | Eppstein et al. |
| 5,225,212 | A | 7/1993 | Martin et al. |
| 5,264,618 | A | 11/1993 | Felgner et al. |
| 5,279,833 | A | 1/1994 | Rose |
| 5,283,185 | A | 2/1994 | Epand et al. |
| 5,320,906 | A | 6/1994 | Eley et al. |
| 5,334,761 | A | 8/1994 | Gebeyehu et al. |
| 5,545,412 | A | 8/1996 | Eppstein et al. |
| 5,578,475 | A | 11/1996 | Jessee |
| 5,627,159 | A | 5/1997 | Shih et al. |
| 5,641,662 | A | 6/1997 | Debs et al. |
| 5,656,743 | A | 8/1997 | Busch et al. |
| 5,674,908 | A | 10/1997 | Haces et al. |
| 5,703,055 | A | 12/1997 | Felgner et al. |
| 5,705,385 | A | 1/1998 | Bally et al. |
| 5,736,392 | A | 4/1998 | Hawley-Nelson et al. |
| 5,820,873 | A | 10/1998 | Choi et al. |
| 5,877,220 | A | 3/1999 | Schwartz et al. |
| 5,885,613 | A | 3/1999 | Holland et al. |
| 5,958,901 | A | 9/1999 | Dwyer et al. |
| 5,976,567 | A | 11/1999 | Wheeler et al. |
| 5,981,501 | A | 11/1999 | Wheeler et al. |
| 6,020,202 | A | 2/2000 | Jessee |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CA | 2309727 A1 | 4/1999 |
| CA | 2271582 A1 | 11/1999 |

(Continued)

OTHER PUBLICATIONS

Arpicco, S., et al., "Preparation and Characterization of Novel Cationic Lipids Developed for Gene Transfection," Proceed. Int'l Symp. Control. Rel. Bioact. Mater. (Controlled Release Society, Inc.), 1999, vol. 26, pp. 759-760.
Arpicco, S., et al., "Synthesis, characterization and transfection activity of new saturated and unsaturated cationic lipids," IL Farmaco, 2004, vol. 59, pp. 869-878.
Ballas, N., et al., "Liposomes bearing a quaternary ammonium detergent as an efficient vehicle for functional transfer of TMV-RNA into plant protoplasts," Biochimica et Biophysica Acta, 1988, vol. 939, pp. 8-18.
Barinaga, M., "Step Taken Toward Improved Vectors for Gene Transfer," Science, 1994, vol. 266, p. 1326.
Bass, "The Short Answer," Nature, 2001, 411: 428-9.
Beale, G., et al., "Gene Silencing Nucleic Acids Designed by Scanning Arrays: Anti-EGFR Activity of siRNA, Ribozyme and DNA Enzymes Targeting a Single Hybridization-accessible Region using the Same Delivery System," Journal of Drug Targeting, 2003, vol. 11, No. 7, pp. 449-456.

(Continued)

*Primary Examiner* — Brian Whiteman
(74) *Attorney, Agent, or Firm* — Kilpatrick Townsend & Stockton LLP

(57) **ABSTRACT**

The present invention provides novel, stable lipid particles comprising one or more active agents or therapeutic agents, methods of making the lipid particles, and methods of delivering and/or administering the lipid particles. More particularly, the present invention provides stable nucleic acid-lipid particles (SNALP) comprising a nucleic acid (such as one or more interfering RNA), methods of making the SNALP, and methods of delivering and/or administering the SNALP.

**20 Claims, 24 Drawing Sheets**

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 6,020,526 | A | 2/2000 | Schwartz et al. | |
| 6,034,135 | A | 3/2000 | Schwartz et al. | |
| 6,051,429 | A | 4/2000 | Hawley-Nelson et al. | |
| 6,075,012 | A | 6/2000 | Gebeyehu et al. | |
| 6,165,501 | A | 12/2000 | Tirosh et al. | |
| 6,172,049 | B1 | 1/2001 | Dwyer et al. | |
| 6,251,939 | B1 | 6/2001 | Schwartz et al. | |
| 6,284,267 | B1 | 9/2001 | Aneja | |
| 6,287,591 | B1 | 9/2001 | Semple et al. | |
| 6,339,173 | B1 | 1/2002 | Schwartz et al. | |
| 6,376,248 | B1 | 4/2002 | Hawley-Nelson et al. | |
| 6,534,484 | B1 | 3/2003 | Wheeler et al. | |
| 6,586,410 | B1 | 7/2003 | Wheeler et al. | |
| 6,638,529 | B2 | 10/2003 | Schwartz et al. | |
| 6,649,780 | B1 | 11/2003 | Eibl et al. | |
| 6,671,393 | B2 | 12/2003 | Hays et al. | |
| 6,696,424 | B1 | 2/2004 | Wheeler et al. | |
| 6,815,432 | B2 | 11/2004 | Wheeler et al. | |
| 6,858,224 | B2 | 2/2005 | Wheeler et al. | |
| 7,166,745 | B1 | 1/2007 | Chu et al. | |
| 7,422,902 | B1 | 9/2008 | Wheeler et al. | |
| 7,479,573 | B2 | 1/2009 | Chu et al. | |
| 7,601,872 | B2 | 10/2009 | Chu et al. | |
| 7,687,070 | B2 | 3/2010 | Gebeyehu et al. | |
| 7,745,651 | B2 | 6/2010 | Heyes et al. | |
| 7,799,565 | B2 | 9/2010 | MacLachlan et al. | |
| 7,803,397 | B2 | 9/2010 | Heyes et al. | |
| 7,807,815 | B2 | 10/2010 | MacLachlan et al. | |
| 7,838,658 | B2 | 11/2010 | MacLachlan et al. | |
| 7,901,708 | B2 | 3/2011 | MacLachlan et al. | |
| 7,915,450 | B2 | 3/2011 | Chu et al. | |
| 7,982,027 | B2 | 7/2011 | MacLachlan et al. | |
| 8,058,068 | B2 | 11/2011 | Hawley-Nelson et al. | |
| 8,058,069 | B2 | 11/2011 | Yaworski et al. | |
| 8,101,741 | B2 | 1/2012 | MacLachlan et al. | |
| 8,158,827 | B2 | 4/2012 | Chu et al. | |
| 8,188,263 | B2 | 5/2012 | MacLachlan et al. | |
| 8,227,443 | B2 | 7/2012 | MacLachlan et al. | |
| 8,236,943 | B2 * | 8/2012 | Lee et al. | 536/24.5 |
| 8,283,333 | B2 | 10/2012 | Yaworski et al. | |
| 8,455,455 | B1 | 6/2013 | Robbins et al. | |
| 8,492,359 | B2 * | 7/2013 | Yaworski et al. | 514/44 A |
| 8,513,403 | B2 | 8/2013 | MacLachlan et al. | |
| 8,569,256 | B2 | 10/2013 | Heyes et al. | |
| 8,598,333 | B2 | 12/2013 | MacLachlan et al. | |
| 8,822,668 | B2 * | 9/2014 | Yaworski et al. | 536/24.5 |
| 9,006,417 | B2 * | 4/2015 | Yaworski et al. | 536/24.5 |
| 2001/0048940 | A1 | 12/2001 | Tousignant et al. | |
| 2003/0069173 | A1 | 4/2003 | Hawley-Nelson et al. | |
| 2003/0072794 | A1 | 4/2003 | Boulikas | |
| 2003/0077829 | A1 | 4/2003 | MacLachlan | |
| 2003/0143732 | A1 | 7/2003 | Fosnaugh et al. | |
| 2004/0063654 | A1 | 4/2004 | Davis et al. | |
| 2004/0142892 | A1 | 7/2004 | Finn et al. | |
| 2004/0253723 | A1 | 12/2004 | Tachas et al. | |
| 2004/0259247 | A1 | 12/2004 | Tuschi et al. | |
| 2005/0064595 | A1 | 3/2005 | MacLachlan et al. | |
| 2005/0118253 | A1 | 6/2005 | MacLachlan et al. | |
| 2005/0260757 | A1 | 11/2005 | Gebeyehu et al. | |
| 2006/0008910 | A1 | 1/2006 | MacLachlan et al. | |
| 2006/0147514 | A1 | 7/2006 | Gebeyehu et al. | |
| 2006/0228406 | A1 | 10/2006 | Chiou et al. | |
| 2006/0240093 | A1 | 10/2006 | MacLachlan et al. | |
| 2007/0042031 | A1 | 2/2007 | MacLachlan et al. | |
| 2007/0202598 | A1 | 8/2007 | Chu et al. | |
| 2007/0202600 | A1 | 8/2007 | Chu et al. | |
| 2009/0143583 | A1 | 6/2009 | Chu et al. | |
| 2009/0291131 | A1 | 11/2009 | MacLachlan et al. | |
| 2010/0130588 | A1 | 5/2010 | Yaworski et al. | |
| 2010/0159593 | A1 | 6/2010 | Chu et al. | |
| 2012/0058188 | A1 | 3/2012 | MacLachlan et al. | |
| 2012/0136073 | A1 | 5/2012 | Yang et al. | |
| 2012/0183581 | A1 | 7/2012 | Yaworski et al. | |
| 2012/0238747 | A1 | 9/2012 | Chu et al. | |
| 2014/0065228 | A1 | 3/2014 | Yaworski et al. | |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| CA | 2330741 | A1 | 11/1999 |
| CA | 2397016 | A1 | 7/2001 |
| CA | 2513623 | | 8/2004 |
| JP | 03-126211 | | 5/1991 |
| JP | 05-202085 | | 8/1993 |
| JP | 06-080560 | | 3/1994 |
| JP | 2002-525063 | | 8/2002 |
| JP | 2003-505401 | | 2/2003 |
| JP | 2007-524349 | | 8/2007 |
| WO | 91/16024 | A1 | 10/1991 |
| WO | 93/05162 | A1 | 3/1993 |
| WO | 93/12240 | A1 | 6/1993 |
| WO | 93/12756 | A2 | 7/1993 |
| WO | 93/24640 | A2 | 12/1993 |
| WO | 93/25673 | A1 | 12/1993 |
| WO | 95/02698 | A1 | 1/1995 |
| WO | 95/18863 | A1 | 7/1995 |
| WO | 95/35301 | A1 | 12/1995 |
| WO | 96/02655 | A1 | 2/1996 |
| WO | 96/10390 | A1 | 4/1996 |
| WO | 96/40964 | A2 | 12/1996 |
| WO | 96/41873 | A1 | 12/1996 |
| WO | 98/51285 | A2 | 11/1998 |
| WO | 00/03683 | A2 | 1/2000 |
| WO | 00/15820 | A1 | 3/2000 |
| WO | 00/62813 | A2 | 10/2000 |
| WO | 01/05374 | A1 | 1/2001 |
| WO | 01/05873 | A1 | 1/2001 |
| WO | 01/75164 | A2 | 10/2001 |
| WO | 01/93836 | | 12/2001 |
| WO | 02/34236 | A2 | 5/2002 |
| WO | 02/087541 | A1 | 11/2002 |
| WO | 03/097805 | A2 | 11/2003 |
| WO | 2004/065546 | A2 | 8/2004 |
| WO | 2004/110499 | A1 | 12/2004 |
| WO | 2005/007196 | A2 | 1/2005 |
| WO | 2005/026372 | A1 | 3/2005 |
| WO | 2005/035764 | A1 | 4/2005 |
| WO | 2005/120152 | A2 | 12/2005 |
| WO | 2006/002538 | A1 | 1/2006 |
| WO | 2006/053430 | A1 | 5/2006 |
| WO | 2007/056861 | A1 | 5/2007 |
| WO | 2009/086558 | A1 | 7/2009 |
| WO | 2009/111658 | A2 | 9/2009 |
| WO | 2010/042877 | A1 | 4/2010 |
| WO | 2010/048228 | A2 | 4/2010 |
| WO | 2010/088537 | A2 | 8/2010 |
| WO | 2010/105209 | A1 | 9/2010 |

OTHER PUBLICATIONS

Behr, J.-P., "Synthetic Gene-Transfer Vectors," Acc. Chem. Res., 1993, vol. 26, pp. 274-278.

Brigham, K., et al., "Rapid Communication: In vivo Transfection of Murine Lungs with a Functioning Prokaryotic Gene Using a Liposome Vehicle," The American Journal of the Medical Sciences, vol. 298, No. 4, pp. 278-281.

Brummelkamp, et al., "A System for Stable Expression of Short Interfering RNAs in Mammalian Cells," Science, 2002, V. 296. pp. 550-553.

Cevc, G., "How Membrane Chain-Melting Phase-Transition Temperature is Affected by the Lipid Chain Asymmetry and Degree of Unsaturation: An Effective Chain-Length Model," Biochemistry, 1991, vol. 30, pp. 7186-7193.

Chonn et al., "Recent advances in liposomal drug-delivery systems," Current Opinion in Biotechnology, 1995, vol. 6, pp. 698-708.

Cortesi, R., et al., "Effect of cationic liposome composition on in vitro cytotoxicity and protective effect on carried DNA," International Journal of Pharmaceutics, 1996, vol. 139, pp. 69-78.

Crystal, R., "Transfer of Genes to Humans: Early Lessons and Obstacles to Success," Science, 1995, vol. 270, pp. 404-410.

Culver K., "The First Human Gene Therapy Experiment," Gene Therapy: A Handbook for Physicians, 1994, pp. 33-40.

Duzgunes, N., "Membrane Fusion," Subcellular Biochemistry, 1985, vol. 11, pp. 195-286.

(56) **References Cited**

OTHER PUBLICATIONS

Dwarki, V.J., et al., "Cationic Liposome-Mediated RNA Transfection," Methods in Enzymology, 1993, vol. 217, pp. 644-654.
Elbashir, et a., "Duplexes of 21-nucleotide RNAs mediate RNA interference in cultured mammalian cells," Nature, May 2001, pp. 494-498, vol. 411.
Enoch, H., et al., "Formation and properties of 1000-Å-diameter, single-bilayer phospholipid vesicles," Proc. Natl. Acad. Sci. USA, 1979, vol. 76, No. 1, pp. 145-149.
Felgner, J., et al., "Cationic Lipid-Mediated Transfection in Mammalian Cells: 'Lipofection,'" J. Tiss. Cult. Meth., 1993, vol. 15, pp. 63-68.
Felgner, J., et al., "Enhanced Gene Delivery and Mechanism Studies with a Novel Series of Cationic Lipid Formulations," The Journal of Biological Chemistry, 1994, vol. 269, No. 4, pp. 2550-2561.
Felgner, P., et al., "Lipofection: A highly efficient, lipid-mediated DNA-transfection procedure," Proc. Natl. Acad. Sci. USA, 1987, vol. 84, pp. 7413-7417.
Felgner, P.L., et al., "Cationic Liposome Mediated Transfection," Proc. West. Pharmacol. Soc., 1989, vol. 32, pp. 115-121.
Gao, X., et al., "A Novel Cationic Liposome Reagent for Efficient Transfection of Mammalian Cells," Biochem. Biophys. Res. Comm., 1991, vol. 179, No. 1, pp. 280-285.
Gershon, H., et al., "Mode of Formation and Structural Feature of DNA-Cationic Liposome Complexes Used for Transfection," Biochemistry, 1993, vol. 32, pp. 7143-7151.
Global Newswire, retrieved from http://globalnewswire.com on Feb. 27, 2013, Tekmira sues Alnylam Pharmaceuticals for repeated misuse of tradesecrets and confidential information, Mar. 16, 2011, pp. 1-3.
Guy-Caffey, J., et al., "Novel Polyaminolipids Enhance the Cellular Uptake of Oligonucleotides," The Journal of Biological Chemistry, 1995, vol. 270, No. 52, pp. 31391-31396.
Hawley-Nelson, P., et al., "LipofectAmine™ Reagent: A New, Higher Efficiency Polycationic Liposome Transfection Reagent," Focus, 1993, vol. 15, No. 3, pp. 73-80.
Heyes et al., "Cationic lipid saturation influences intracellular delivery of encapsulated nucleic acids," Journal of Controlled Release, 2005, vol. 107, pp. 276-287.
Heyes et al., "Synthesis of novel cationic lipids: effect of structural modification on the efficiency of gene transfer," J. Med. Chem., 2002, vol. 45, pp. 99-114.
Hyde, S., et al., "Correction of the ion transport defect in cystic fibrosis transgenic mice by gene therapy," Nature, 1993, vol. 362, pp. 250-255.
Jiang, L., et al., "Comparison of protein precipitation methods for sample preparation prior to proteomic analysis," Journal of Chromatography A, 2004, vol. 1023, pp. 317-320.
Juliano, R., et al., "The Effect of Particle Size and Charge on the Clearance Rates of Liposomes and Liposome Encapsulated Drugs," Biochem. Biophys. Res. Commun., 1975, vol. 63, No. 3, pp. 651-658.
Keough, K., "Influence of chain unsaturation and chain position on thermotropism and intermolecular interactions in membranes," Biochem. Soc. Transactions, 1990, vol. 18, No. 5, pp. 835-837.
Krichevsky, A. et al., "RNAi functions in cultured mammalian neurons," PNAS, 99(18):11926-29, 2002.
Lawrence et al. "The formation, characterization and stability of non-ionic surfactant vesicles," S.T.P. Pharma Sciences, 1996, vol. 6, No. 1, pp. 49-60.
Lawrence et al., "Synthesis and aggregation properties of dialkyl polyoxyethylene glycerol ethers," Chemistry and Physics of Lipids, 1996, 82(2):89-100.
Legendre, J.-Y. et al., "Delivery of Plasmid DNA into Mammalian Cell Lines Using pH-Sensitive Liposomes: Comparison with Cationic Liposomes," Pharm. Res., 1992, vol. 9, No. 10, pp. 1235-1242.
Leventis, R., et al., "Interactions of mammalian cells with lipid dispersions containing novel metabolizable cationic amphiphiles," Biochem. Biophys. Acta, 1990, vol. 1023, pp. 124-132.
Liu, et al., "Cationic Liposome-mediated Intravenous Gene Delivery", J. Biol. Chem., 1995, V. 270, pp. 24864-24870.
Marshall, E., "Gene Therapy's Growing Pains," Science, 1995, vol. 269, pp. 1050-1055.
Murahashi et al., "Synthesis and evaluation of neoglycolipid for liposome modification," Biol. Pharm. Bull., 1997, 20(6):704-707.
Orkin, S., et al., NIH Report, Report and Recommendations of the Panel to Assess the NIH Investment in Research on Gene Therapy, 1995.
Parr et al., Factors influencing the retention and chemical stability of polly(ethylene glycol)-lipid conjugates incorporated into large unilamellar vesicles, Biochimica et Biophysica Acta, 1994, 1195:21-30.
Paul, C., et al., "Effective expression of small interfering RNA in human cells," Nature Biotech., 2002, vol. 20, pp. 505-508.
Puyal, C., et al., "A new cationic liposome encapsulating genetic material: A potential delivery system for polynucleotides," Eur. J. Biochem., 1995, vol. 228, pp. 697-703.
Sawada et al., "Microemulsions in supercritical $CO_2$ utilizing the polyethyleneglycol dialkylglycerol and their use for the solubilization of hydrophiles," Dyes and Pigments, 2005, pp. 64-74, vol. 65.
Shin, et al. "Acid-triggered release via dePEGylation of DOPE liposomes containing acid-labile vinyl ether PEG-lipids," Journal of Controlled Release, 2003, vol. 91, pp. 187-200.
Song et al., "Characterization of the inhibitory effect of PEG-lipid conjugates on the intracellular delivery of plasmid and antisense DNA mediated by cationic lipid liposomes," Biochimica et Biophysica Acta, 2002, 1558:1-13.
Sorensen, et al., "Gene Silencing by Systemic Delivery of Synthetic siRNAs in Adult Mice", J. Biol. Chem., 2003, V. 327, pp. 761-766.
Spagnou, S., et al., "Lipidic Carriers of siRNA: Differences in the Formulation, Cellular Uptake, and Delivery with Plasmid DNA," Biochemistry, 2004, vol. 43, pp. 13348-13356.
Stamatatos, L., et al., "Interactions of Cationic Lipid Vesicles with Negatively Charged Phospholipid Vesicles and Biological Membranes," Biochemistry, 1988, vol. 27, pp. 3917-3925.
Szoka, F., et al., "Comparative Properties and Methods of Preparation of Lipid Vesicles (Liposomes)," Ann. Rev. Biophys. Bioeng., 1980, vol. 9, pp. 467-508.
Szoka, F., et al., "Procedure for preparation of liposomes with large internal aqueous space and high capture by reverse-phase evaporation," Proc. Natl. Acad. Sci. USA, 1978, vol. 75, No. 9, pp. 4194-4198.
Templeton, "Cationic Liposome-mediated Gene Delivery In vivo", Bioscience Reports, 2002, vol. 22, No. 2, pp. 283-295.
Van Der Woude, I., et al., "Parameters influencing the introduction of plasmid DNA into cells by the use of synthetic amphiphiles as a carrier system," Biochimica et Biophysica Acta, 1995, vol. 1240, pp. 34-40.
Wheeler, et al., "Stabilized Plasmid-lipid Particles: Constructions and Characterization," Gene Therapy, V. 6, pp. 271-281.
Wilson, R., et al., "Counterion-Induced Condensation of Deoxyribonucleic Acid, A Light-Scattering Study," Biochemistry, 1979, vol. 18, No. 11, pp. 2192-2196.
Woodle, M.C., et al., "Versatility in lipid compositions showing prolonged circulation with sterically stabilized liposomes," Biochimica et Biophysica Acta, 1992, vol. 1105, pp. 193-200.
Zhu, N., et al., "Systemic Gene Expression After Intravenous DNA Delivery into Adult Mice," Science, 1993, vol. 261, pp. 209-211.

* cited by examiner


Activity of SNALP on HT29 Cell Line
Viability (% Untreated Cells)
1.2
1
0.8
0.6
0.4
0.2
0
1
10
100
nM Total siRNA
Sample 1
Sample 2
Sample 3
Sample 4
Sample 5
Sample 6
Sample 7
Sample 8

*FIG. 1A*


Activity of SNALP on HT29 Cell Line
Viability (% Untreated Cells)
1.2
1
0.8
0.6
0.4
0.2
0
1
10
100
nM Total siRNA
Sample 9
Sample 10
Sample 11
Sample 12
Sample 13
Sample 14
Sample 15
Sample 16

FIG. 1B


Activity of SNALP Upon Intravenous Administration in Mice
group mean ± SD (n=4)
Liver ApoB:GAPD mRNA Ratio
0.0
0.5
1.0
1.5
2.0
2.5
PBS
Group 2
Group 3
Group 4
Group 5
Group 6
Group 7
Group 8
Group 9
Group 10
Group 11
Group 12
Group 13
Group 14

*FIG. 2*


3.0
2.5
2.0
1.5
1.0
0.5
0.0
Liver ApoB:GAPD mRNA Ratio
-47% vs PBS Control
-77% vs PBS Control
PBS
2:30 SNALP 5x1 mg/kg
1:57 SNALP 5x0.1 mg/kg

*FIG. 3*


Activity of SNALP Upon Intravenous Administration in Mice
group mean ± SD (n=4)
Liver ApoB:GAPD mRNA Ratio
2.0
1.5
1.0
0.5
0.0
PBS
Group 2
Group 3
Group 4
Group 5
Group 6
Group 7
Group 8

*FIG. 4*


Activity of SNALP Upon Intravenous Administration in Mice
group mean ± SD (n=4)
Liver ApoB:GAPD mRNA Ratio
2.0
1.5
1.0
0.5
0.0
PBS
Group 2
Group 3
Group 4
Group 5
Group 6
Group 7
Group 8
Group 9
Group 10
Group 11
Group 12
Group 13
Group 14
Group 15

*FIG. 5*


Tolerability of IV 1:57 SNALP in Female BALB/c Mice, n=4, SD error
Alanine Aminotransferase
Aspartate Aminotransferase
Sorbital Dehydrogenase
Incr'd SDH, ALT levels indicate hepatocyte damage.
IU/L
168
205
PBS
Syringe Citrate 7mg/kg
Syringe PBS 7mg/kg
Gear PBS 7mg/kg
Syringe Citrate 9mg/kg
Syringe PBS 9mg/kg
Gear PBS 9mg/kg

*FIG. 6A*


Tolerability of IV 1:57 SNALP in Female BALB/c Mice, n=4, SD error
Alanine Aminotransferase
Aspartate Aminotransferase
Sorbital Dehydrogenase
2-fold increase ("3xULN") is considered clinically significant
x-Fold Upper Limit of Normal
8.7
7.9
PBS
Syringe Citrate
Syringe PBS
Gear PBS
Syringe Citrate
Syringe PBS
Gear PBS
Lipid dose
siRNA dose
77
96
79
99
123
102
7 mg/kg
9 mg/kg

*FIG. 6B*

*FIG. 7A*




*FIG. 7B*




*FIG. 7C*




Tolerability of 1|57 SNALP IV in BALB/c Mice, n=4 (Grp1-3 n=3), SD error
Body Weight Loss at Hour 24 (vs Pre-Dose)
6%
4%
2%
0%
-2%
-4%
-6%
PBS
9:1 7mg/kg
9:1 11mg/kg
PBS
9:1 9mg/kg
9:1 11mg/kg
6:1 11mg/kg
6:1 13mg/kg
6:1 15mg/kg
6:1 17mg/kg
9:1 11mg/kg

*FIG. 8*


Tolerability of IV 1|57 SNALP Prepared at 9:1 Lipid:Drug Ratio
Platelet Count
10e9 cells/L
1,400
1,200
1,000
800
600
400
200
0
881
909
921
854
854
827
813
794
828
902 ± 21
2%RSD
845 ± 16
-6% ± 2%
812 ± 17
-10% ± 2%
1
2
3
4
5
6
7
8
9
PBS
Gear PBS InLine at 7 (71) mg/kg
Gear PBS InLine at 11 (112) mg/kg

*FIG. 9*


Tolerability of IV 1:57 Gear PBS In-Line SNALP in Female BALB/c Mice, n=4, SD error
Alanine Aminotransferase
Aspartate Aminotransferase
Sorbital Dehydrogenase
Samples taken at 24 h time point except for last grp (48 h).
IU/L
1,200
1,000
800
600
400
200
0
30
22
52
37
148
60
42
27
107
49
456
129
893
220
688
61
PBS
9:1 SNALP 9mg/kg
9:1 SNALP 11mg/kg
6:1 SNALP 11mg/kg
6:1 SNALP 13mg/kg
6:1 SNALP 15mg/kg
6:1 SNALP 17mg/kg
9:1 SNALP 11mg/kg 48h

*FIG. 10A*


Tolerability of IV 1:57 Gear PBS In-Line SNALP in Female BALB/c Mice, n=4, SD error
Alanine Aminotransferase
Aspartate Aminotransferase
Sorbital Dehydrogenase
2-fold increase ("3xULN") is considered clinically significant
x-Fold Upper Limit of Normal
0
10
20
30
40
50
10 11 12 13 14 15 16 17 18 19 20 21 22 23 24 25 26 27 28 29 30 31 32 33 34 35 36 37 38 39 40 41
siRNA dose
Lipid dose
PBS
9mg/kg
92
11mg/kg
112
9:1 SNALP (10)
11mg/kg
78
13mg/kg
93
15mg/kg
107
6:1 SNALP (7)
17mg/kg
121
11mg/kg
112
9:1 (10)

*FIG. 10B*

FIG. 11A




FIG. 11B




Efficacy of SNALP Reformulations
Fresh Terminal Plasma, n=4 female Balb/c mice, SD Error Bars
Plasma Total Cholesterol (mg/dL)
60
50
40
30
20
10
0
-3%
-15%
-46%
-1%
-18%
-41%
-44%
PBS
0.05 mg/kg
0.1 mg/kg
0.2 mg/kg
0.05 mg/kg
0.1 mg/kg
0.2 mg/kg
0.4 mg/kg
1:57 SNALP (10:1)
New 1:57 SNALP (7:1)

*FIG. 12*


Luc
PLK1424
120%
115%
110%
105%
100%
95%
90%
Body Weight
8
12
16
20
24
28
32
36
40
44
48
52
56
60
Study Day

*FIG. 13*


Control SNALP
Active SNALP
100%
80%
60%
40%
20%
0%
Survival
15 20 25 30 35 40 45 50 55 60 65 70 75 80 85 90
Days after seeding

*FIG. 14*




*FIG. 15*


1 2 3 4 5 6 7 8 9 10
500
400
300
200
100
PLK1424 5'RACE product 476bp

*FIG. 16*



x200 mag



x400 mag



x200 mag



x400 mag

*FIG. 17*


6x2mg/kg Mean tumor volume
Luc-DMA
PLK-DMA
PLK-DSA
Tumor volume
1000
800
600
400
200
0
8
10
12
14
16
18
20
22
24
Days

***FIG. 18***


PLK mRNA silencing in scid /beige mice treated with 2mg/kg 1:57 SNALP against subcutaneous Hep3B tumors
Mean hPLK1/hGAPDH ratio
0.70
0.60
0.50
0.40
0.30
0.20
0.10
0.00
100%
-30%
-15%
-65%
-37%
-52%
24h Luc cDMA 2 mg/kg
24h PLK cDMA 2 mg/kg
72h PLK cDMA 2 mg/kg
24h PLK cDSA 2 mg/kg
72h PLK cDSA 2 mg/kg
24h PLK cDSA 1 mg/kg

*FIG. 19*


6x2mg/kg Mean tumor volume
Luc-DMA
PLK-DMA
PLK-DSA
Crossover dosing of Luc cDMA group with 6 x 2 mg/kg PLK cDSA SNALP
Initial 6 x 2 mg/kg SNALP
Tumor volume
0
200
400
600
800
1000
1200
1400
1600
1800
2000
2200
8 10 12 14 16 18 20 22 24 26 28 30 32 34 36 38 40 42 44 46 48 50
Days

FIG. 20


Mean hPLK (1:4) : hGAPDH (1:40) minus "background"
Mean hPLK (1:4) : hGAPDH (1:40)
1.20
1.00
0.80
0.60
0.40
0.20
0.00
0.99
0.23
0.23
0.61
0.42
24h Luc 1:57 cDMA
24h PLK 1:57 cDMA
24h PLK 1:57 cDSA
96h PLK 1:57 cDMA
96h PLK 1:57 cDSA

*FIG. 21*

Case: 26-1581 Document: 4-1 Page: 185 Filed: 03/21/2026






*FIG. 22*

# LIPID FORMULATIONS FOR NUCLEIC ACID DELIVERY

## CROSS-REFERENCES TO RELATED APPLICATIONS

The present application is a continuation of U.S. application Ser. No. 13/928,309, filed Jun. 26, 2013, which application is a continuation of Ser. No. 13/253,917, filed Oct. 5, 2011, now U.S. Pat. No. 8,492,359, which application is a continuation of Ser. No. 12/424,367 filed Apr. 15, 2009, now U.S. Pat. No. 8,058,069, which application claims priority to U.S. Provisional Application No. 61/045,228, filed Apr. 15, 2008, the disclosures of which are herein incorporated by reference in their entirety for all purposes.

## STATEMENT REGARDING FEDERALLY SPONSORED RESEARCH OR DEVELOPMENT

Not applicable.

## NAMES OF PARTIES TO A JOINT RESEARCH AGREEMENT

Not applicable.

## REFERENCE TO A "SEQUENCE LISTING," A TABLE, OR A COMPUTER PROGRAM LISTING APPENDIX SUBMITTED AS AN ASCII TEXT FILE

The Sequence Listing written in file-77-3.TXT, created on Aug. 22, 2013, 8,192 bytes, machine format IBM-PC, MS-Windows operating system, is hereby incorporated by reference in its entirety for all purposes.

## BACKGROUND OF THE INVENTION

RNA interference (RNAi) is an evolutionarily conserved process in which recognition of double-stranded RNA (dsRNA) ultimately leads to posttranscriptional suppression of gene expression. This suppression is mediated by short dsRNA, also called small interfering RNA (siRNA), which induces specific degradation of mRNA through complementary base pairing. In several model systems, this natural response has been developed into a powerful tool for the investigation of gene function (see, e.g., Elbashir et al., *Genes Dev.,* 15:188-200 (2001); Hammond et al., *Nat. Rev. Genet.,* 2:110-119 (2001)). More recently, it was discovered that introducing synthetic 21-nucleotide dsRNA duplexes into mammalian cells could efficiently silence gene expression.

Although the precise mechanism is still unclear, RNAi provides a potential new approach to downregulate or silence the transcription and translation of a gene of interest. For example, it is desirable to modulate (e.g., reduce) the expression of certain genes for the treatment of neoplastic disorders such as cancer. It is also desirable to silence the expression of genes associated with liver diseases and disorders such as hepatitis. It is further desirable to reduce the expression of certain genes for the treatment of atherosclerosis and its manifestations, e.g., hypercholesterolemia, myocardial infarction, and thrombosis.

A safe and effective nucleic acid delivery system is required for RNAi to be therapeutically useful. Viral vectors are relatively efficient gene delivery systems, but suffer from a variety of limitations, such as the potential for reversion to the wild-type as well as immune response concerns. As a result, nonviral gene delivery systems are receiving increasing attention (Worgall et al., *Human Gene Therapy,* 8:37 (1997); Peeters et al., *Human Gene Therapy,* 7:1693 (1996); Yei et al., *Gene Therapy,* 1:192 (1994); Hope et al., *Molecular Membrane Biology,* 15:1 (1998)). Furthermore, viral systems are rapidly cleared from the circulation, limiting transfection to "first-pass" organs such as the lungs, liver, and spleen. In addition, these systems induce immune responses that compromise delivery with subsequent injections.



Plasmid DNA-cationic liposome complexes are currently the most commonly employed nonviral gene delivery vehicles (Feigner, *Scientific American,* 276:102 (1997); Chonn et al., *Current Opinion in Biotechnology,* 6:698 (1995)). For instance, cationic liposome complexes made of an amphipathic compound, a neutral lipid, and a detergent for transfecting insect cells are disclosed in U.S. Pat. No. 6,458,382. Cationic liposome complexes are also disclosed in U.S. Patent Publication No. 20030073640.

Cationic liposome complexes are large, poorly defined systems that are not suited for systemic applications and can elicit considerable toxic side effects (Harrison et al., *Biotechniques,* 19:816 (1995); Li et al., *The Gene,* 4:891 (1997); Tam et al, *Gene Ther.,* 7:1867 (2000)). As large, positively charged aggregates, lipoplexes are rapidly cleared when administered in vivo, with highest expression levels observed in first-pass organs, particularly the lungs (Huang et al., *Nature Biotechnology,* 15:620 (1997); Templeton et al., *Nature Biotechnology,* 15:647 (1997); Hofland et al., *Pharmaceutical Research,* 14:742 (1997)).

Other liposomal delivery systems include, for example, the use of reverse micelles, anionic liposomes, and polymer liposomes. Reverse micelles are disclosed in U.S. Pat. No. 6,429,200. Anionic liposomes are disclosed in U.S. Patent Publication No. 20030026831. Polymer liposomes that incorporate dextrin or glycerol-phosphocholine polymers are disclosed in U.S. Patent Publication Nos. 20020081736 and 20030082103, respectively.

A gene delivery system containing an encapsulated nucleic acid for systemic delivery should be small (i.e., less than about 100 nm diameter) and should remain intact in the circulation for an extended period of time in order to achieve delivery to affected tissues. This requires a highly stable, serum-resistant nucleic acid-containing particle that does not interact with cells and other components of the vascular compartment. The particle should also readily interact with target cells at a disease site in order to facilitate intracellular delivery of a desired nucleic acid.

Recent work has shown that nucleic acids can be encapsulated in small (e.g., about 70 nm diameter) "stabilized plasmid-lipid particles" (SPLP) that consist of a single plasmid encapsulated within a bilayer lipid vesicle (Wheeler et al., *Gene Therapy,* 6:271 (1999)). These SPLPs typically contain the "fusogenic" lipid dioleoylphosphatidylethanolamine (DOPE), low levels of cationic lipid, and are stabilized in aqueous media by the presence of a poly(ethylene glycol) (PEG) coating. SPLPs have systemic application as they exhibit extended circulation lifetimes following intravenous (i.v.) injection, accumulate preferentially at distal tumor sites due to the enhanced vascular permeability in such regions, and can mediate transgene expression at these tumor sites. The levels of transgene expression observed at the tumor site following i.v. injection of SPLPs containing the luciferase marker gene are superior to the levels that can be achieved employing plasmid DNA-cationic liposome complexes (lipoplexes) or naked DNA.

Thus, there remains a strong need in the art for novel and more efficient methods and compositions for introducing

nucleic acids such as siRNA into cells. In addition, there is a need in the art for methods of downregulating the expression of genes of interest to treat or prevent diseases and disorders such as cancer and atherosclerosis. The present invention addresses these and other needs.

## BRIEF SUMMARY OF THE INVENTION

The present invention provides novel, serum-stable lipid particles comprising one or more active agents or therapeutic agents, methods of making the lipid particles, and methods of delivering and/or administering the lipid particles (e.g., for the treatment of a disease or disorder).

In preferred embodiments, the active agent or therapeutic agent is fully encapsulated within the lipid portion of the lipid particle such that the active agent or therapeutic agent in the lipid particle is resistant in aqueous solution to enzymatic degradation, e.g., by a nuclease or protease. In other preferred embodiments, the lipid particles are substantially non-toxic to mammals such as humans.

In one aspect, the present invention provides lipid particles comprising: (a) one or more active agents or therapeutic agents; (b) one or more cationic lipids comprising from about 50 mol % to about 85 mol % of the total lipid present in the particle; (c) one or more non-cationic lipids comprising from about 13 mol % to about 49.5 mol % of the total lipid present in the particle; and (d) one or more conjugated lipids that inhibit aggregation of particles comprising from about 0.5 mol % to about 2 mol % of the total lipid present in the particle.

More particularly, the present invention provides serum-stable nucleic acid-lipid particles (SNALP) comprising a nucleic acid (e.g., one or more interfering RNA molecules such as siRNA, aiRNA, and/or miRNA), methods of making the SNALP, and methods of delivering and/or administering the SNALP (e.g., for the treatment of a disease or disorder).

In certain embodiments, the nucleic acid-lipid particle (e.g., SNALP) comprises: (a) a nucleic acid (e.g., an interfering RNA); (b) a cationic lipid comprising from about 50 mol % to about 85 mol % of the total lipid present in the particle; (c) a non-cationic lipid comprising from about 13 mol % to about 49.5 mol % of the total lipid present in the particle; and (d) a conjugated lipid that inhibits aggregation of particles comprising from about 0.5 mol % to about 2 mol % of the total lipid present in the particle.

In one preferred embodiment, the nucleic acid-lipid particle (e.g., SNALP) comprises: (a) an siRNA; (b) a cationic lipid comprising from about 56.5 mol % to about 66.5 mol % of the total lipid present in the particle; (c) cholesterol or a derivative thereof comprising from about 31.5 mol % to about 42.5 mol % of the total lipid present in the particle; and (d) a PEG-lipid conjugate comprising from about 1 mol % to about 2 mol % of the total lipid present in the particle. This preferred embodiment of nucleic acid-lipid particle is generally referred to herein as the "1:62" formulation.

In another preferred embodiment, the nucleic acid-lipid particle (e.g., SNALP) comprises: (a) an siRNA; (b) a cationic lipid comprising from about 52 mol % to about 62 mol % of the total lipid present in the particle; (c) a mixture of a phospholipid and cholesterol or a derivative thereof comprising from about 36 mol % to about 47 mol % of the total lipid present in the particle; and (d) a PEG-lipid conjugate comprising from about 1 mol % to about 2 mol % of the total lipid present in the particle. This preferred embodiment of nucleic acid-lipid particle is generally referred to herein as the "1:57" formulation.

The present invention also provides pharmaceutical compositions comprising a lipid particle described herein (e.g., SNALP) and a pharmaceutically acceptable carrier.

In another aspect, the present invention provides methods for introducing an active agent or therapeutic agent (e.g., nucleic acid) into a cell, the method comprising contacting the cell with a lipid particle described herein such as a nucleic acid-lipid particle (e.g., SNALP).

In yet another aspect, the present invention provides methods for the in vivo delivery of an active agent or therapeutic agent (e.g., nucleic acid), the method comprising administering to a mammalian subject a lipid particle described herein such as a nucleic acid-lipid particle (e.g., SNALP).

In a further aspect, the present invention provides methods for treating a disease or disorder in a mammalian subject in need thereof, the method comprising administering to the mammalian subject a therapeutically effective amount of a lipid particle described herein such as a nucleic acid-lipid particle (e.g., SNALP).

Other objects, features, and advantages of the present invention will be apparent to one of skill in the art from the following detailed description and figures.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1**A (Samples 1-8) and FIG. **1**B (Samples 9-16) illustrate data demonstrating the activity of 1:57 SNALP containing Eg5 siRNA in a human colon cancer cell line.

FIG. **2** illustrates data demonstrating the activity of 1:57 SNALP containing ApoB siRNA following intravenous administration in mice.

FIG. **3** illustrates additional data demonstrating the activity of 1:57 SNALP containing ApoB siRNA following intravenous administration in mice. Each bar represents the group mean of five animals. Error bars indicate the standard deviation.

FIG. **4** illustrates data demonstrating the activity of 1:57 and 1:62 SNALP containing ApoB siRNA following intravenous administration in mice.

FIG. **5** illustrates data demonstrating the activity of 1:62 SNALP containing ApoB siRNA following intravenous administration in mice.

FIG. **6**A (expressed as IU/L) and FIG. **6**B (expressed as x-Fold Upper Limit of Normal) illustrate data demonstrating that the tolerability of 1:57 SNALP containing ApoB siRNA prepared by citrate buffer versus PBS direct dilution did not differ significantly in terms of blood clinical chemistry parameters.

FIG. **7**A (expressed as liver ApoB:GAPD mRNA ratio), FIG. **7**B (expressed as relative plasma ApoB-100 concentration), and FIG. **7**C (expressed as plasma total cholesterol illustrate data demonstrating that the efficacy of 1:57 SNALP containing ApoB siRNA prepared by gear pump was similar to the same SNALP prepared by syringe press.

FIG. **8** illustrates data demonstrating that there was very little effect on body weight 24 hours after administration of 1:57 SNALP containing ApoB siRNA.

FIG. **9** illustrates data demonstrating that there were no obvious changes in platelet count after administration of 1:57 SNALP containing ApoB siRNA.

FIG. **10**A (expressed as IU/L) and FIG. **10**B (expressed as x-Fold Upper Limit of Normal) illustrate data demonstrating that clinically significant liver enzyme elevations (3×ULN) occurred at particular drug dosages of 1:57 SNALP containing ApoB siRNA.

FIG. **11**A (expressed as liver ApoB:GAPD mRNA ratio) and FIG. **11**B (expressed as relative plasma ApoB-100 con-

centration) illustrate data demonstrating that the potency of the lower lipid:drug (L:D) 1:57 SNALP containing ApoB siRNA was as good as that of the higher L:D SNALP at the tested drug dosages.

FIG. **12** illustrates data demonstrating that ApoB protein and total cholesterol levels were reduced to a similar extent by 1:57 SNALP containing ApoB siRNA at a 6:1 input L:D ratio (final ratio of 7:1) and 1:57 SNALP at a 9:1 input L:D ratio (final ratio of 10:1).

FIG. **13** illustrates data demonstrating that a treatment regimen of 1:57 SNALP with siRNA targeting PLK-1 is well tolerated with no apparent signs of treatment related toxicity in mice bearing Hep3B liver tumors.

FIG. **14** illustrates data demonstrating that treatment with 1:57 SNALP containing PLK-1 siRNA caused a significant increase in the survival of Hep3B tumor-bearing mice.

FIG. **15** illustrates data demonstrating that treatment with 1:57 SNALP containing PLK-1 siRNA reduced PLK-1 mRNA levels by 50% in intrahepatic Hep3B tumors growing in mice 24 hours after SNALP administration.

FIG. **16** illustrates data demonstrating that a specific cleavage product of PLK-1 mRNA was detectable by 5' RACE-PCR in mice treated with 1:57 SNALP containing PLK-1 siRNA. 10 μl PCR product/well were loaded onto a 1.5% agarose gel. Lane Nos.: (1) molecular weight (MW) marker; (2) PBS mouse 1; (3) PBS mouse 2; (4) PBS mouse 3; (5) Luc SNALP mouse 1; (6) Luc SNALP mouse 2; (7) PLK SNALP mouse 1; (8) PLK SNALP mouse 2; (9) PLK SNALP mouse 3; and (10) no template control.

FIG. **17** illustrates data demonstrating that control (Luc) 1:57 SNALP-treated mice displayed normal mitoses in Hep3B tumors (top panels), whereas mice treated with 1:57 SNALP containing PLK-1 siRNA exhibited numerous aberrant mitoses and tumor cell apoptosis in Hep3B tumors (bottom panels).

FIG. **18** illustrates data demonstrating that multiple doses of 1:57 PLK-1 SNALP containing PEG-cDSA induced the regression of established Hep3B subcutaneous (S.C.) tumors.

FIG. **19** illustrates data demonstrating PLK-1 mRNA silencing using 1:57 PLK SNALP in S.C. Hep3B tumors following a single intravenous SNALP administration.

FIG. **20** illustrates data demonstrating that PLK-1 PEG-cDSA SNALP inhibited the growth of large S.C. Hep3B tumors.

FIG. **21** illustrates data demonstrating tumor-derived PLK-1 mRNA silencing in Hep3B intrahepatic tumors.

FIG. **22** illustrates data demonstrating the blood clearance profile of 1:57 PLK-1 SNALP containing either PEG-cDMA or PEG-cDSA.

## DETAILED DESCRIPTION OF THE INVENTION

### I. Introduction

The present invention is based, in part, upon the surprising discovery that lipid particles comprising from about 50 mol % to about 85 mol % of a cationic lipid, from about 13 mol % to about 49.5 mol % of a non-cationic lipid, and from about 0.5 mol % to about 2 mol % of a lipid conjugate provide advantages when used for the in vitro or in vivo delivery of an active agent, such as a therapeutic nucleic acid (e.g., an interfering RNA). In particular, as illustrated by the Examples herein, the present invention provides stable nucleic acid-lipid particles (SNALP) that advantageously impart increased activity of the encapsulated nucleic acid (e.g., an interfering RNA such as siRNA) and improved tolerability of the formulations in vivo, resulting in a significant increase in the therapeutic index as compared to nucleic acid-lipid particle compositions previously described. Additionally, the SNALP of the invention are stable in circulation, e.g., resistant to degradation by nucleases in serum, and are substantially non-toxic to mammals such as humans. As a non-limiting example, FIG. **3** of Example 4 shows that one SNALP embodiment of the invention ("1:57 SNALP") was more than 10 times as efficacious as compared to a nucleic acid-lipid particle previously described ("2:30 SNALP") in mediating target gene silencing at a 10-fold lower dose. Similarly, FIG. **2** of Example 3 shows that the "1:57 SNALP" formulation was substantially more effective at silencing the expression of a target gene as compared to nucleic acid-lipid particles previously described ("2:40 SNALP").

In certain embodiments, the present invention provides improved compositions for the delivery of interfering RNA such as siRNA molecules. In particular, the Examples herein illustrate that the improved lipid particle formulations of the invention are highly effective in downregulating the mRNA and/or protein levels of target genes. Furthermore, the Examples herein illustrate that the presence of certain molar ratios of lipid components results in improved or enhanced activity of these lipid particle formulations of the present invention. For instance, the "1:57 SNALP" and "1:62 SNALP" formulations described herein are exemplary formulations of the present invention that are particularly advantageous because they provide improved efficacy and tolerability in vivo, are serum-stable, are substantially non-toxic, are capable of accessing extravascular sites, and are capable of reaching target cell populations.

The lipid particles and compositions of the present invention may be used for a variety of purposes, including the delivery of associated or encapsulated therapeutic agents to cells, both in vitro and in vivo. Accordingly, the present invention provides methods for treating diseases or disorders in a subject in need thereof, by contacting the subject with a lipid particle described herein comprising one or more suitable therapeutic agents.

Various exemplary embodiments of the lipid particles of the invention, as well as compositions and formulations comprising the same, and their use to deliver therapeutic agents and modulate target gene and protein expression, are described in further detail below.

### II. Definitions

As used herein, the following terms have the meanings ascribed to them unless specified otherwise.

The term "interfering RNA" or "RNAi" or "interfering RNA sequence" refers to single-stranded RNA (e.g., mature miRNA) or double-stranded RNA (i.e., duplex RNA such as siRNA, aiRNA, or pre-miRNA) that is capable of reducing or inhibiting the expression of a target gene or sequence (e.g., by mediating the degradation or inhibiting the translation of mRNAs which are complementary to the interfering RNA sequence) when the interfering RNA is in the same cell as the target gene or sequence. Interfering RNA thus refers to the single-stranded RNA that is complementary to a target mRNA sequence or to the double-stranded RNA formed by two complementary strands or by a single, self-complementary strand. Interfering RNA may have substantial or complete identity to the target gene or sequence, or may comprise a region of mismatch (i.e., a mismatch motif). The sequence of the interfering RNA can correspond to the full-length target gene, or a subsequence thereof.

Interfering RNA includes "small-interfering RNA" or "siRNA," e.g., interfering RNA of about 15-60, 15-50, or

15-40 (duplex) nucleotides in length, more typically about 15-30, 15-25, or 19-25 (duplex) nucleotides in length, and is preferably about 20-24, 21-22, or 21-23 (duplex) nucleotides in length (e.g., each complementary sequence of the double-stranded siRNA is 15-60, 15-50, 15-40, 15-30, 15-25, or 19-25 nucleotides in length, preferably about 20-24, 21-22, or 21-23 nucleotides in length, and the double-stranded siRNA is about 15-60, 15-50, 15-40, 15-30, 15-25, or 19-25 base pairs in length, preferably about 18-22, 19-20, or 19-21 base pairs in length). siRNA duplexes may comprise 3' overhangs of about 1 to about 4 nucleotides or about 2 to about 3 nucleotides and 5' phosphate termini. Examples of siRNA include, without limitation, a double-stranded polynucleotide molecule assembled from two separate stranded molecules, wherein one strand is the sense strand and the other is the complementary antisense strand; a double-stranded polynucleotide molecule assembled from a single stranded molecule, where the sense and antisense regions are linked by a nucleic acid-based or non-nucleic acid-based linker; a double-stranded polynucleotide molecule with a hairpin secondary structure having self-complementary sense and antisense regions; and a circular single-stranded polynucleotide molecule with two or more loop structures and a stem having self-complementary sense and antisense regions, where the circular polynucleotide can be processed in vivo or in vitro to generate an active double-stranded siRNA molecule.

Preferably, siRNA are chemically synthesized. siRNA can also be generated by cleavage of longer dsRNA (e.g., dsRNA greater than about 25 nucleotides in length) with the *E. coli* RNase III or Dicer. These enzymes process the dsRNA into biologically active siRNA (see, e.g., Yang et al., *Proc. Natl. Acad. Sci. USA,* 99:9942-9947 (2002); Calegari et al., *Proc. Natl. Acad. Sci. USA,* 99:14236 (2002); Byrom et al., *Ambion TechNotes,* 10(1):4-6 (2003); Kawasaki et al., *Nucleic Acids Res.,* 31:981-987 (2003); Knight et al., *Science,* 293:2269-2271 (2001); and Robertson et al., *J. Biol. Chem.,* 243:82 (1968)). Preferably, dsRNA are at least 50 nucleotides to about 100, 200, 300, 400, or 500 nucleotides in length. A dsRNA may be as long as 1000, 1500, 2000, 5000 nucleotides in length, or longer. The dsRNA can encode for an entire gene transcript or a partial gene transcript. In certain instances, siRNA may be encoded by a plasmid (e.g., transcribed as sequences that automatically fold into duplexes with hairpin loops).

As used herein, the term "mismatch motif" or "mismatch region" refers to a portion of an interfering RNA (e.g., siRNA, aiRNA, miRNA) sequence that does not have 100% complementarity to its target sequence. An interfering RNA may have at least one, two, three, four, five, six, or more mismatch regions. The mismatch regions may be contiguous or may be separated by 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, or more nucleotides. The mismatch motifs or regions may comprise a single nucleotide or may comprise two, three, four, five, or more nucleotides.

An "effective amount" or "therapeutically effective amount" of an active agent or therapeutic agent such as an interfering RNA is an amount sufficient to produce the desired effect, e.g., an inhibition of expression of a target sequence in comparison to the normal expression level detected in the absence of an interfering RNA. Inhibition of expression of a target gene or target sequence is achieved when the value obtained with an interfering RNA relative to the control is about 90%, 85%, 80%, 75%, 70%, 65%, 60%, 55%, 50%, 45%, 40%, 35%, 30%, 25%, 20%, 15%, 10%, 5%, or 0%. Suitable assays for measuring expression of a target gene or target sequence include, e.g., examination of protein or RNA levels using techniques known to those of skill in the art such as dot blots, northern blots, in situ hybridization, ELISA, immunoprecipitation, enzyme function, as well as phenotypic assays known to those of skill in the art.

By "decrease," "decreasing," "reduce," or "reducing" of an immune response by an interfering RNA is intended to mean a detectable decrease of an immune response to a given interfering RNA (e.g., a modified interfering RNA). The amount of decrease of an immune response by a modified interfering RNA may be determined relative to the level of an immune response in the presence of an unmodified interfering RNA. A detectable decrease can be about 5%, 10%, 15%, 20%, 25%, 30%, 35%, 40%, 45%, 50%, 55%, 60%, 65%, 70%, 75%, 80%, 85%, 90%, 95%, 100%, or more lower than the immune response detected in the presence of the unmodified interfering RNA. A decrease in the immune response to interfering RNA is typically measured by a decrease in cytokine production (e.g., IFNγ, IFNα, TNFα, IL-6, or IL-12) by a responder cell in vitro or a decrease in cytokine production in the sera of a mammalian subject after administration of the interfering RNA.

As used herein, the term "responder cell" refers to a cell, preferably a mammalian cell, that produces a detectable immune response when contacted with an immunostimulatory interfering RNA such as an unmodified siRNA. Exemplary responder cells include, e.g., dendritic cells, macrophages, peripheral blood mononuclear cells (PBMCs), splenocytes, and the like. Detectable immune responses include, e.g., production of cytokines or growth factors such as TNF-α, IFN-α, IFN-β, IFN-γ, IL-1, IL-2, IL-3, IL-4, IL-5, IL-6, IL-10, IL-12, IL-13, TGF, and combinations thereof.

"Substantial identity" refers to a sequence that hybridizes to a reference sequence under stringent conditions, or to a sequence that has a specified percent identity over a specified region of a reference sequence.

The phrase "stringent hybridization conditions" refers to conditions under which a nucleic acid will hybridize to its target sequence, typically in a complex mixture of nucleic acids, but to no other sequences. Stringent conditions are sequence-dependent and will be different in different circumstances. Longer sequences hybridize specifically at higher temperatures. An extensive guide to the hybridization of nucleic acids is found in Tijssen, *Techniques in Biochemistry and Molecular Biology—Hybridization with Nucleic Probes*, "Overview of principles of hybridization and the strategy of nucleic acid assays" (1993). Generally, stringent conditions are selected to be about 5-10° C. lower than the thermal melting point ($T_m$) for the specific sequence at a defined ionic strength pH. The $T_m$ is the temperature (under defined ionic strength, pH, and nucleic concentration) at which 50% of the probes complementary to the target hybridize to the target sequence at equilibrium (as the target sequences are present in excess, at $T_m$, 50% of the probes are occupied at equilibrium). Stringent conditions may also be achieved with the addition of destabilizing agents such as formamide. For selective or specific hybridization, a positive signal is at least two times background, preferably 10 times background hybridization.

Exemplary stringent hybridization conditions can be as follows: 50% formamide, 5×SSC, and 1% SDS, incubating at 42° C., or, 5×SSC, 1% SDS, incubating at 65° C., with wash in 0.2×SSC, and 0.1% SDS at 65° C. For PCR, a temperature of about 36° C. is typical for low stringency amplification, although annealing temperatures may vary between about 32° C. and 48° C. depending on primer length. For high stringency PCR amplification, a temperature of about 62° C. is typical, although high stringency annealing temperatures can range from about 50° C. to about 65° C., depending on the primer length and specificity. Typical cycle conditions for

both high and low stringency amplifications include a denaturation phase of 90° C.-95° C. for 30 sec.-2 min., an annealing phase lasting 30 sec.-2 min., and an extension phase of about 72° C. for 1-2 min. Protocols and guidelines for low and high stringency amplification reactions are provided, e.g., in Innis et al., *PCR Protocols, A Guide to Methods and Applications*, Academic Press, Inc. N.Y. (1990).

Nucleic acids that do not hybridize to each other under stringent conditions are still substantially identical if the polypeptides which they encode are substantially identical. This occurs, for example, when a copy of a nucleic acid is created using the maximum codon degeneracy permitted by the genetic code. In such cases, the nucleic acids typically hybridize under moderately stringent hybridization conditions. Exemplary "moderately stringent hybridization conditions" include a hybridization in a buffer of 40% formamide, 1 M NaCl, 1% SDS at 37° C., and a wash in 1×SSC at 45° C. A positive hybridization is at least twice background. Those of ordinary skill will readily recognize that alternative hybridization and wash conditions can be utilized to provide conditions of similar stringency. Additional guidelines for determining hybridization parameters are provided in numerous references, e.g., Current Protocols in Molecular Biology, Ausubel et al., eds.

The terms "substantially identical" or "substantial identity," in the context of two or more nucleic acids, refer to two or more sequences or subsequences that are the same or have a specified percentage of nucleotides that are the same (i.e., at least about 60%, preferably at least about 65%, 70%, 75%, 80%, 85%, 90%, or 95% identity over a specified region), when compared and aligned for maximum correspondence over a comparison window, or designated region as measured using one of the following sequence comparison algorithms or by manual alignment and visual inspection. This definition, when the context indicates, also refers analogously to the complement of a sequence. Preferably, the substantial identity exists over a region that is at least about 5, 10, 15, 20, 25, 30, 35, 40, 45, 50, 55, or 60 nucleotides in length.

For sequence comparison, typically one sequence acts as a reference sequence, to which test sequences are compared. When using a sequence comparison algorithm, test and reference sequences are entered into a computer, subsequence coordinates are designated, if necessary, and sequence algorithm program parameters are designated. Default program parameters can be used, or alternative parameters can be designated. The sequence comparison algorithm then calculates the percent sequence identities for the test sequences relative to the reference sequence, based on the program parameters.

A "comparison window," as used herein, includes reference to a segment of any one of a number of contiguous positions selected from the group consisting of from about 5 to about 60, usually about 10 to about 45, more usually about 15 to about 30, in which a sequence may be compared to a reference sequence of the same number of contiguous positions after the two sequences are optimally aligned. Methods of alignment of sequences for comparison are well known in the art. Optimal alignment of sequences for comparison can be conducted, e.g., by the local homology algorithm of Smith and Waterman, *Adv. Appl. Math.,* 2:482 (1981), by the homology alignment algorithm of Needleman and Wunsch, *J. Mol. Biol.,* 48:443 (1970), by the search for similarity method of Pearson and Lipman, *Proc. Natl. Acad. Sci. USA,* 85:2444 (1988), by computerized implementations of these algorithms (GAP, BESTFIT, FASTA, and TFASTA in the Wisconsin Genetics Software Package, Genetics Computer Group, 575 Science Dr., Madison, Wis.), or by manual alignment and visual inspection (see, e.g., *Current Protocols in Molecular Biology*, Ausubel et al., eds. (1995 supplement)).

A preferred example of algorithms that are suitable for determining percent sequence identity and sequence similarity are the BLAST and BLAST 2.0 algorithms, which are described in Altschul et al., *Nuc. Acids Res.,* 25:3389-3402 (1977) and Altschul et al., *J. Mol. Biol.,* 215:403-410 (1990), respectively. BLAST and BLAST 2.0 are used, with the parameters described herein, to determine percent sequence identity for the nucleic acids of the invention. Software for performing BLAST analyses is publicly available through the National Center for Biotechnology Information (http://www.ncbi.nlm.nih.gov/).

The BLAST algorithm also performs a statistical analysis of the similarity between two sequences (see, e.g., Karlin and Altschul, *Proc. Natl. Acad. Sci. USA,* 90:5873-5787 (1993)). One measure of similarity provided by the BLAST algorithm is the smallest sum probability (P(N)), which provides an indication of the probability by which a match between two nucleotide sequences would occur by chance. For example, a nucleic acid is considered similar to a reference sequence if the smallest sum probability in a comparison of the test nucleic acid to the reference nucleic acid is less than about 0.2, more preferably less than about 0.01, and most preferably less than about 0.001.

The term "nucleic acid" as used herein refers to a polymer containing at least two deoxyribonucleotides or ribonucleotides in either single- or double-stranded form and includes DNA and RNA. DNA may be in the form of, e.g., antisense molecules, plasmid DNA, pre-condensed DNA, a PCR product, vectors (P1, PAC, BAC, YAC, artificial chromosomes), expression cassettes, chimeric sequences, chromosomal DNA, or derivatives and combinations of these groups. RNA may be in the form of siRNA, asymmetrical interfering RNA (aiRNA), microRNA (miRNA), mRNA, tRNA, rRNA, tRNA, viral RNA (vRNA), and combinations thereof. Nucleic acids include nucleic acids containing known nucleotide analogs or modified backbone residues or linkages, which are synthetic, naturally occurring, and non-naturally occurring, and which have similar binding properties as the reference nucleic acid. Examples of such analogs include, without limitation, phosphorothioates, phosphoramidates, methyl phosphonates, chiral-methyl phosphonates, 2'-O-methyl ribonucleotides, and peptide-nucleic acids (PNAs). Unless specifically limited, the term encompasses nucleic acids containing known analogues of natural nucleotides that have similar binding properties as the reference nucleic acid. Unless otherwise indicated, a particular nucleic acid sequence also implicitly encompasses conservatively modified variants thereof (e.g., degenerate codon substitutions), alleles, orthologs, SNPs, and complementary sequences as well as the sequence explicitly indicated. Specifically, degenerate codon substitutions may be achieved by generating sequences in which the third position of one or more selected (or all) codons is substituted with mixed-base and/or deoxyinosine residues (Batzer et al., *Nucleic Acid Res.,* 19:5081 (1991); Ohtsuka et al., *J. Biol. Chem.,* 260:2605-2608 (1985); Rossolini et al., *Mol. Cell. Probes,* 8:91-98 (1994)). "Nucleotides" contain a sugar deoxyribose (DNA) or ribose (RNA), a base, and a phosphate group. Nucleotides are linked together through the phosphate groups. "Bases" include purines and pyrimidines, which further include natural compounds adenine, thymine, guanine, cytosine, uracil, inosine, and natural analogs, and synthetic derivatives of purines and pyrimidines, which include, but are not limited to, modifications which place new reactive groups such as, but not limited to, amines, alcohols, thiols, carboxylates, and alkylhalides.

The term "gene" refers to a nucleic acid (e.g., DNA or RNA) sequence that comprises partial length or entire length coding sequences necessary for the production of a polypeptide or precursor polypeptide.

"Gene product," as used herein, refers to a product of a gene such as an RNA transcript or a polypeptide.

The term "lipid" refers to a group of organic compounds that include, but are not limited to, esters of fatty acids and are characterized by being insoluble in water, but soluble in many organic solvents. They are usually divided into at least three classes: (1) "simple lipids," which include fats and oils as well as waxes; (2) "compound lipids," which include phospholipids and glycolipids; and (3) "derived lipids" such as steroids.

A "lipid particle" is used herein to refer to a lipid formulation that can be used to deliver an active agent or therapeutic agent, such as a nucleic acid (e.g., an interfering RNA), to a target site of interest. In the lipid particle of the invention, which is typically formed from a cationic lipid, a non-cationic lipid, and a conjugated lipid that prevents aggregation of the particle, the active agent or therapeutic agent may be encapsulated in the lipid, thereby protecting the agent from enzymatic degradation.

As used herein, the term "SNALP" refers to a stable nucleic acid-lipid particle. A SNALP represents a particle made from lipids (e.g., a cationic lipid, a non-cationic lipid, and a conjugated lipid that prevents aggregation of the particle), wherein the nucleic acid (e.g., siRNA, aiRNA, miRNA, ssDNA, dsDNA, ssRNA, short hairpin RNA (shRNA), dsRNA, or a plasmid, including plasmids from which an interfering RNA is transcribed) is fully encapsulated within the lipid. As used herein, the term "SNALP" includes an SPLP, which is the term used to refer to a nucleic acid-lipid particle comprising a nucleic acid (e.g., a plasmid) encapsulated within the lipid. SNALP and SPLP typically contain a cationic lipid, a non-cationic lipid, and a lipid conjugate (e.g., a PEG-lipid conjugate). SNALP and SPLP are extremely useful for systemic applications, as they can exhibit extended circulation lifetimes following intravenous (i.v.) injection, they can accumulate at distal sites (e.g., sites physically separated from the administration site), and they can mediate expression of the transfected gene or silencing of target gene expression at these distal sites. SPLP include "pSPLP," which comprise an encapsulated condensing agent-nucleic acid complex as set forth in PCT Publication No. WO 00/03683, the disclosure of which is herein incorporated by reference in its entirety for all purposes.

The lipid particles of the invention (e.g., SNALP) typically have a mean diameter of from about 40 nm to about 150 nm, from about 50 nm to about 150 nm, from about 60 nm to about 130 nm, from about 70 nm to about 110 nm, or from about 70 to about 90 nm, and are substantially non-toxic. In addition, nucleic acids, when present in the lipid particles of the invention, are resistant in aqueous solution to degradation with a nuclease. Nucleic acid-lipid particles and their method of preparation are disclosed in, e.g., U.S. Patent Publication Nos. 20040142025 and 20070042031, the disclosures of which are herein incorporated by reference in their entirety for all purposes.

As used herein, "lipid encapsulated" can refer to a lipid particle that provides an active agent or therapeutic agent, such as a nucleic acid (e.g., an interfering RNA), with full encapsulation, partial encapsulation, or both. In a preferred embodiment, the nucleic acid is fully encapsulated in the lipid particle (e.g., to form an SPLP, pSPLP, SNALP, or other nucleic acid-lipid particle).

The term "lipid conjugate" refers to a conjugated lipid that inhibits aggregation of lipid particles. Such lipid conjugates include, but are not limited to, polyamide oligomers (e.g., ATTA-lipid conjugates), PEG-lipid conjugates, such as PEG coupled to dialkyloxypropyls, PEG coupled to diacylglycerols, PEG coupled to cholesterol, PEG coupled to phosphatidylethanolamines, PEG conjugated to ceramides (see, e.g., U.S. Pat. No. 5,885,613, the disclosure of which is herein incorporated by reference in its entirety for all purposes), cationic PEG lipids, and mixtures thereof. PEG can be conjugated directly to the lipid or may be linked to the lipid via a linker moiety. Any linker moiety suitable for coupling the PEG to a lipid can be used including, e.g., non-ester containing linker moieties and ester-containing linker moieties. In preferred embodiments, non-ester containing linker moieties are used.

The term "amphipathic lipid" refers, in part, to any suitable material wherein the hydrophobic portion of the lipid material orients into a hydrophobic phase, while the hydrophilic portion orients toward the aqueous phase. Hydrophilic characteristics derive from the presence of polar or charged groups such as carbohydrates, phosphate, carboxylic, sulfato, amino, sulfhydryl, nitro, hydroxyl, and other like groups. Hydrophobicity can be conferred by the inclusion of apolar groups that include, but are not limited to, long-chain saturated and unsaturated aliphatic hydrocarbon groups and such groups substituted by one or more aromatic, cycloaliphatic, or heterocyclic group(s). Examples of amphipathic compounds include, but are not limited to, phospholipids, aminolipids, and sphingolipids.

Representative examples of phospholipids include, but are not limited to, phosphatidylcholine, phosphatidylethanolamine, phosphatidylserine, phosphatidylinositol, phosphatidic acid, palmitoyloleoyl phosphatidylcholine, lysophosphatidylcholine, lysophosphatidylethanolamine, dipalmitoylphosphatidylcholine, dioleoylphosphatidylcholine, distearoylphosphatidylcholine, and dilinoleoylphosphatidylcholine. Other compounds lacking in phosphorus, such as sphingolipid, glycosphingolipid families, diacylglycerols, and β-acyloxyacids, are also within the group designated as amphipathic lipids. Additionally, the amphipathic lipids described above can be mixed with other lipids including triglycerides and sterols.

The term "neutral lipid" refers to any of a number of lipid species that exist either in an uncharged or neutral zwitterionic form at a selected pH. At physiological pH, such lipids include, for example, diacylphosphatidylcholine, diacylphosphatidylethanolamine, ceramide, sphingomyelin, cephalin, cholesterol, cerebrosides, and diacylglycerols.

The term "non-cationic lipid" refers to any amphipathic lipid as well as any other neutral lipid or anionic lipid.

The term "anionic lipid" refers to any lipid that is negatively charged at physiological pH. These lipids include, but are not limited to, phosphatidylglycerols, cardiolipins, diacylphosphatidylserines, diacylphosphatidic acids, N-dodecanoyl phosphatidylethanolamines, N-succinyl phosphatidylethanolamines, N-glutarylphosphatidylethanolamines, lysylphosphatidylglycerols, palmitoyloleyolphosphatidylglycerol (POPG), and other anionic modifying groups joined to neutral lipids.

The term "cationic lipid" refers to any of a number of lipid species that carry a net positive charge at a selected pH, such as physiological pH (e.g., pH of about 7.0). It has been surprisingly found that cationic lipids comprising alkyl chains with multiple sites of unsaturation, e.g., at least two or three sites of unsaturation, are particularly useful for forming lipid particles with increased membrane fluidity. A number of cationic lipids and related analogs, which are also useful in the present invention, have been described in U.S. Patent Publi-

cation Nos. 20060083780 and 20060240554; U.S. Pat. Nos. 5,208,036; 5,264,618; 5,279,833; 5,283,185; 5,753,613; and 5,785,992; and PCT Publication No. WO 96/10390, the disclosures of which are herein incorporated by reference in their entirety for all purposes. Non-limiting examples of cationic lipids are described in detail herein. In some cases, the cationic lipids comprise a protonatable tertiary amine (e.g., pH titratable) head group, C18 alkyl chains, ether linkages between the head group and alkyl chains, and 0 to 3 double bonds. Such lipids include, e.g., DSDMA, DLinDMA, DLenDMA, and DODMA.

The term "hydrophobic lipid" refers to compounds having apolar groups that include, but are not limited to, long-chain saturated and unsaturated aliphatic hydrocarbon groups and such groups optionally substituted by one or more aromatic, cycloaliphatic, or heterocyclic group(s). Suitable examples include, but are not limited to, diacylglycerol, dialkylglycerol, N—N-dialkylamino, 1,2-diacyloxy-3-aminopropane, and 1,2-dialkyl-3-aminopropane.

The term "fusogenic" refers to the ability of a lipid particle, such as a SNALP, to fuse with the membranes of a cell. The membranes can be either the plasma membrane or membranes surrounding organelles, e.g., endosome, nucleus, etc.

As used herein, the term "aqueous solution" refers to a composition comprising in whole, or in part, water.

As used herein, the term "organic lipid solution" refers to a composition comprising in whole, or in part, an organic solvent having a lipid.

"Distal site," as used herein, refers to a physically separated site, which is not limited to an adjacent capillary bed, but includes sites broadly distributed throughout an organism.

"Serum-stable" in relation to nucleic acid-lipid particles such as SNALP means that the particle is not significantly degraded after exposure to a serum or nuclease assay that would significantly degrade free DNA or RNA. Suitable assays include, for example, a standard serum assay, a DNAse assay, or an RNAse assay.

"Systemic delivery," as used herein, refers to delivery of lipid particles that leads to a broad biodistribution of an active agent or therapeutic agent such as an interfering RNA within an organism. Some techniques of administration can lead to the systemic delivery of certain agents, but not others. Systemic delivery means that a useful, preferably therapeutic, amount of an agent is exposed to most parts of the body. To obtain broad biodistribution generally requires a blood lifetime such that the agent is not rapidly degraded or cleared (such as by first pass organs (liver, lung, etc.) or by rapid, nonspecific cell binding) before reaching a disease site distal to the site of administration. Systemic delivery of lipid particles can be by any means known in the art including, for example, intravenous, subcutaneous, and intraperitoneal. In a preferred embodiment, systemic delivery of lipid particles is by intravenous delivery.

"Local delivery," as used herein, refers to delivery of an active agent or therapeutic agent such as an interfering RNA directly to a target site within an organism. For example, an agent can be locally delivered by direct injection into a disease site such as a tumor or other target site such as a site of inflammation or a target organ such as the liver, heart, pancreas, kidney, and the like.

The term "mammal" refers to any mammalian species such as a human, mouse, rat, dog, cat, hamster, guinea pig, rabbit, livestock, and the like.

The term "cancer" refers to any member of a class of diseases characterized by the uncontrolled growth of aberrant cells. The term includes all known cancers and neoplastic conditions, whether characterized as malignant, benign, soft tissue, or solid, and cancers of all stages and grades including pre- and post-metastatic cancers. Examples of different types of cancer include, but are not limited to, lung cancer, colon cancer, rectal cancer, anal cancer, bile duct cancer, small intestine cancer, stomach (gastric) cancer, esophageal cancer; gallbladder cancer, liver cancer, pancreatic cancer, appendix cancer, breast cancer, ovarian cancer; cervical cancer, prostate cancer, renal cancer (e.g., renal cell carcinoma), cancer of the central nervous system, glioblastoma, skin cancer, lymphomas, choriocarcinomas, head and neck cancers, osteogenic sarcomas, and blood cancers. Non-limiting examples of specific types of liver cancer include hepatocellular carcinoma (HCC), secondary liver cancer (e.g., caused by metastasis of some other non-liver cancer cell type), and hepatoblastoma. As used herein, a "tumor" comprises one or more cancerous cells.



III. Description of the Embodiments

The present invention provides novel, serum-stable lipid particles comprising one or more active agents or therapeutic agents, methods of making the lipid particles, and methods of delivering and/or administering the lipid particles (e.g., for the treatment of a disease or disorder).

In one aspect, the present invention provides lipid particles comprising: (a) one or more active agents or therapeutic agents; (b) one or more cationic lipids comprising from about 50 mol % to about 85 mol % of the total lipid present in the particle; (c) one or more non-cationic lipids comprising from about 13 mol % to about 49.5 mol % of the total lipid present in the particle; and (d) one or more conjugated lipids that inhibit aggregation of particles comprising from about 0.5 mol % to about 2 mol % of the total lipid present in the particle.

In certain embodiments, the active agent or therapeutic agent is fully encapsulated within the lipid portion of the lipid particle such that the active agent or therapeutic agent in the lipid particle is resistant in aqueous solution to enzymatic degradation, e.g., by a nuclease or protease. In certain other embodiments, the lipid particles are substantially non-toxic to mammals such as humans.

In some embodiments, the active agent or therapeutic agent comprises a nucleic acid. In certain instances, the nucleic acid comprises an interfering RNA molecule such as, e.g., an siRNA, aiRNA, miRNA, or mixtures thereof. In certain other instances, the nucleic acid comprises single-stranded or double-stranded DNA, RNA, or a DNA/RNA hybrid such as, e.g., an antisense oligonucleotide, a ribozyme, a plasmid, an immunostimulatory oligonucleotide, or mixtures thereof.

In other embodiments, the active agent or therapeutic agent comprises a peptide or polypeptide. In certain instances, the peptide or polypeptide comprises an antibody such as, e.g., a polyclonal antibody, a monoclonal antibody, an antibody fragment; a humanized antibody, a recombinant antibody, a recombinant human antibody, a Primatized™ antibody, or mixtures thereof. In certain other instances, the peptide or polypeptide comprises a cytokine, a growth factor, an apoptotic factor, a differentiation-inducing factor, a cell-surface receptor, a ligand, a hormone, a small molecule (e.g., small organic molecule or compound), or mixtures thereof.

In preferred embodiments, the active agent or therapeutic agent comprises an siRNA. In one embodiment, the siRNA molecule comprises a double-stranded region of about 15 to about 60 nucleotides in length (e.g., about 15-60, 15-50, 15-40, 15-30, 15-25, or 19-25 nucleotides in length, or 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, or 25 nucleotides in length). The

siRNA molecules of the invention are capable of silencing the expression of a target sequence in vitro and/or in vivo.

In some embodiments, the siRNA molecule comprises at least one modified nucleotide. In certain preferred embodiments, the siRNA molecule comprises one, two, three, four, five, six, seven, eight, nine, ten, or more modified nucleotides in the double-stranded region. In certain instances, the siRNA comprises from about 1% to about 100% (e.g., about 1%, 5%, 10%, 15%, 20%, 25%, 30%, 35%, 40%, 45%, 50%, 55%, 60%, 65%, 70%, 75%, 80%, 85%, 90%, 95%, or 100%) modified nucleotides in the double-stranded region. In preferred embodiments, less than about 25% (e.g., less than about 25%, 20%, 15%, 10%, or 5%) or from about 1% to about 25% (e.g., from about 1%-25%, 5%-25%, 10%-25%, 15%-25%, 20%-25%, or 10%-20%) of the nucleotides in the double-stranded region comprise modified nucleotides.

In other embodiments, the siRNA molecule comprises modified nucleotides including, but not limited to, 2'-O-methyl (2'OMe) nucleotides, 2'-deoxy-2'-fluoro (2'F) nucleotides, 2'-deoxy nucleotides, 2'-O-(2-methoxyethyl) (MOE) nucleotides, locked nucleic acid (LNA) nucleotides, and mixtures thereof. In preferred embodiments, the siRNA comprises 2'OMe nucleotides (e.g., 2'OMe purine and/or pyrimidine nucleotides) such as, for example, 2'OMe-guanosine nucleotides, 2'OMe-uridine nucleotides, 2'OMe-adenosine nucleotides, 2'OMe-cytosine nucleotides, and mixtures thereof. In certain instances, the siRNA does not comprise 2'OMe-cytosine nucleotides. In other embodiments, the siRNA comprises a hairpin loop structure.

The siRNA may comprise modified nucleotides in one strand (i.e., sense or antisense) or both strands of the double-stranded region of the siRNA molecule. Preferably, uridine and/or guanosine nucleotides are modified at selective positions in the double-stranded region of the siRNA duplex. With regard to uridine nucleotide modifications, at least one, two, three, four, five, six, or more of the uridine nucleotides in the sense and/or antisense strand can be a modified uridine nucleotide such as a 2'OMe-uridine nucleotide. In some embodiments, every uridine nucleotide in the sense and/or antisense strand is a 2'OMe-uridine nucleotide. With regard to guanosine nucleotide modifications, at least one, two, three, four, five, six, or more of the guanosine nucleotides in the sense and/or antisense strand can be a modified guanosine nucleotide such as a 2'OMe-guanosine nucleotide. In some embodiments, every guanosine nucleotide in the sense and/or antisense strand is a 2'OMe-guanosine nucleotide.

In certain embodiments, at least one, two, three, four, five, six, seven, or more 5'-GU-3' motifs in an siRNA sequence may be modified, e.g., by introducing mismatches to eliminate the 5'-GU-3' motifs and/or by introducing modified nucleotides such as 2'OMe nucleotides. The 5'-GU-3' motif can be in the sense strand, the antisense strand, or both strands of the siRNA sequence. The 5'-GU-3' motifs may be adjacent to each other or, alternatively, they may be separated by 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, or more nucleotides.

In some preferred embodiments, a modified siRNA molecule is less immunostimulatory than a corresponding unmodified siRNA sequence. In such embodiments, the modified siRNA molecule with reduced immunostimulatory properties advantageously retains RNAi activity against the target sequence. In another embodiment, the immunostimulatory properties of the modified siRNA molecule and its ability to silence target gene expression can be balanced or optimized by the introduction of minimal and selective 2'OMe modifications within the siRNA sequence such as, e.g., within the double-stranded region of the siRNA duplex. In certain instances, the modified siRNA is at least about 5%, 10%, 15%, 20%, 25%, 30%, 35%, 40%, 45%, 50%, 55%, 60%, 65%, 70%, 75%, 80%, 85%, 90%, 91%, 92%, 93%, 94%, 95%, 96%, 97%, 98%, 99%, or 100% less immunostimulatory than the corresponding unmodified siRNA. It will be readily apparent to those of skill in the art that the immunostimulatory properties of the modified siRNA molecule and the corresponding unmodified siRNA molecule can be determined by, for example, measuring INF-α and/or IL-6 levels from about two to about twelve hours after systemic administration in a mammal or transfection of a mammalian responder cell using an appropriate lipid-based delivery system (such as the SNALP delivery system disclosed herein).

In certain embodiments, a modified siRNA molecule has an $IC_{50}$ (i.e., half-maximal inhibitory concentration) less than or equal to ten-fold that of the corresponding unmodified siRNA (i.e., the modified siRNA has an $IC_{50}$ that is less than or equal to ten-times the $IC_{50}$ of the corresponding unmodified siRNA). In other embodiments, the modified siRNA has an $IC_{50}$ less than or equal to three-fold that of the corresponding unmodified siRNA sequence. In yet other embodiments, the modified siRNA has an $IC_{50}$ less than or equal to two-fold that of the corresponding unmodified siRNA. It will be readily apparent to those of skill in the art that a dose-response curve can be generated and the $IC_{50}$ values for the modified siRNA and the corresponding unmodified siRNA can be readily determined using methods known to those of skill in the art.

In yet another embodiment, a modified siRNA molecule is capable of silencing at least about 5%, 10%, 15%, 20%, 25%, 30%, 35%, 40%, 45%, 50%, 55%, 60%, 65%, 70%, 75%, 80%, 85%, 90%, 95%, or 100% of the expression of the target sequence relative to the corresponding unmodified siRNA sequence.

In some embodiments, the siRNA molecule does not comprise phosphate backbone modifications, e.g., in the sense and/or antisense strand of the double-stranded region. In other embodiments, the siRNA comprises one, two, three, four, or more phosphate backbone modifications, e.g., in the sense and/or antisense strand of the double-stranded region. In preferred embodiments, the siRNA does not comprise phosphate backbone modifications.

In further embodiments, the siRNA does not comprise 2'-deoxy nucleotides, e.g., in the sense and/or antisense strand of the double-stranded region. In yet further embodiments, the siRNA comprises one, two, three, four, or more 2'-deoxy nucleotides, e.g., in the sense and/or antisense strand of the double-stranded region. In preferred embodiments, the siRNA does not comprise 2'-deoxy nucleotides.

In certain instances, the nucleotide at the 3'-end of the double-stranded region in the sense and/or antisense strand is not a modified nucleotide. In certain other instances, the nucleotides near the 3'-end (e.g., within one, two, three, or four nucleotides of the 3'-end) of the double-stranded region in the sense and/or antisense strand are not modified nucleotides.

The siRNA molecules described herein may have 3' overhangs of one, two, three, four, or more nucleotides on one or both sides of the double-stranded region, or may lack overhangs (i.e., have blunt ends) on one or both sides of the double-stranded region. Preferably, the siRNA has 3' overhangs of two nucleotides on each side of the double-stranded region. In certain instances, the 3' overhang on the antisense strand has complementarity to the target sequence and the 3' overhang on the sense strand has complementarity to a complementary strand of the target sequence. Alternatively, the 3' overhangs do not have complementarity to the target sequence or the complementary strand thereof. In some

embodiments, the 3' overhangs comprise one, two, three, four, or more nucleotides such as 2'-deoxy (2'H) nucleotides. In certain preferred embodiments, the 3' overhangs comprise deoxythymidine (dT) and/or uridine nucleotides. In other embodiments, one or more of the nucleotides in the 3' overhangs on one or both sides of the double-stranded region comprise modified nucleotides. Non-limiting examples of modified nucleotides are described above and include 2'OMe nucleotides, 2'-deoxy-2'F nucleotides, 2'-deoxy nucleotides, 2'-O-2-MOE nucleotides, LNA nucleotides, and mixtures thereof. In preferred embodiments, one, two, three, four, or more nucleotides in the 3' overhangs present on the sense and/or antisense strand of the siRNA comprise 2'OMe nucleotides (e.g., 2'OMe purine and/or pyrimidine nucleotides) such as, for example, 2'OMe-guanosine nucleotides, 2'OMe-uridine nucleotides, 2'OMe-adenosine nucleotides, 2'OMe-cytosine nucleotides, and mixtures thereof.

The siRNA may comprise at least one or a cocktail (e.g., at least two, three, four, five, six, seven, eight, nine, ten, or more) of unmodified and/or modified siRNA sequences that silence target gene expression. The cocktail of siRNA may comprise sequences which are directed to the same region or domain (e.g., a "hot spot") and/or to different regions or domains of one or more target genes. In certain instances, one or more (e.g., at least two, three, four, five, six, seven, eight, nine, ten, or more) modified siRNA that silence target gene expression are present in a cocktail. In certain other instances, one or more (e.g., at least two, three, four, five, six, seven, eight, nine, ten, or more) unmodified siRNA sequences that silence target gene expression are present in a cocktail.

In some embodiments, the antisense strand of the siRNA molecule comprises or consists of a sequence that is at least about 80%, 85%, 90%, 95%, 96%, 97%, 98%, or 99% complementary to the target sequence or a portion thereof. In other embodiments, the antisense strand of the siRNA molecule comprises or consists of a sequence that is 100% complementary to the target sequence or a portion thereof. In further embodiments, the antisense strand of the siRNA molecule comprises or consists of a sequence that specifically hybridizes to the target sequence or a portion thereof.

In further embodiments, the sense strand of the siRNA molecule comprises or consists of a sequence that is at least about 80%, 85%, 90%, 95%, 96%, 97%, 98%, or 99% identical to the target sequence or a portion thereof. In additional embodiments, the sense strand of the siRNA molecule comprises or consists of a sequence that is 100% identical to the target sequence or a portion thereof.

In the lipid particles of the invention (e.g., SNALP comprising an interfering RNA such as siRNA), the cationic lipid may comprise, e.g., one or more of the following: 1,2-dilinoleyloxy-N,N-dimethylaminopropane (DLinDMA), 1,2-dilinolenyloxy-N,N-dimethylaminopropane (DLenDMA), 2,2-dilinoleyl-4-(2-dimethylaminoethyl)-[1,3]-dioxolane (DLin-K-C2-DMA; "XTC2"), 2,2-dilinoleyl-4-(3-dimethylaminopropyl)-[1,3]-dioxolane (DLin-K-C3-DMA), 2,2-dilinoleyl-4-(4-dimethylaminobutyl)-[1,3]-dioxolane (DLin-K-C4-DMA), 2,2-dilinoleyl-5-dimethylaminomethyl-[1,3]-dioxane (DLin-K6-DMA), 2,2-dilinoleyl-4-N-methylpepiazino-[1,3]-dioxolane (DLin-K-MPZ), 2,2-dilinoleyl-4-dimethylaminomethyl-[1,3]-dioxolane (DLin-K-DMA), 1,2-dilinoleylcarbamoyloxy-3-dimethylaminopropane (DLin-C-DAP), 1,2-dilinoleyoxy-3-(dimethylamino)acetoxypropane (DLin-DAC), 1,2-dilinoleyoxy-3-morpholinopropane (DLin-MA), 1,2-dilinoleoyl-3-dimethylaminopropane (DLinDAP), 1,2-dilinoleylthio-3-dimethylaminopropane (DLin-S-DMA), 1-linoleoyl-2-linoleyloxy-3-dimethylaminopropane (DLin-2-DMAP), 1,2-dilinoleyloxy-3-trimethylaminopropane chloride salt (DLin-TMA.C1), 1,2-dilinoleoyl-3-trimethylaminopropane chloride salt (DLin-TAP.C1), 1,2-dilinoleyloxy-3-(N-methylpiperazino)propane (DLin-MPZ), 3-(N,N-dilinoleylamino)-1,2-propanediol (DLinAP), 3-(N,N-dioleylamino)-1,2-propanedio (DOAP), 1,2-dilinoleyloxo-3-(2-N,N-dimethylamino)ethoxypropane (DLin-EG-DMA), N,N-dioleyl-N,N-dimethylammonium chloride (DODAC), 1,2-dioleyloxy-N,N-dimethylaminopropane (DODMA), 1,2-distearyloxy-N,N-dimethylaminopropane (DSDMA), N-(1-(2,3-dioleyloxy)propyl)-N,N,N-trimethylammonium chloride (DOTMA), N,N-distearyl-N,N-dimethylammonium bromide (DDAB), N-(1-(2,3-dioleoyloxy)propyl)-N,N,N-trimethylammonium chloride (DOTAP), 3-(N—(N',N'-dimethylaminoethane)-carbamoyl)cholesterol (DC-Chol), N-(1,2-dimyristyloxyprop-3-yl)-N,N-dimethyl-N-hydroxyethyl ammonium bromide (DMRIE), 2,3-dioleyloxy-N-[2(spermine-carboxamido)ethyl]N,N-dimethyl-1-propanaminiumtrifluoroacetate (DOSPA), dioctadecylamidoglycyl spermine (DOGS), 3-dimethylamino-2-(cholest-5-en-3-beta-oxybutan-4-oxy)-1-(cis,cis-9,12-octadecadienoxy)propane (CLinDMA), 2-[5'-(cholest-5-en-3-beta-oxy)-3'-oxapentoxy)-3-dimethy-1-(cis,cis-9',1-2'-octadecadienoxy) propane (CpLinDMA), N,N-dimethyl-3,4-dioleyloxybenzylamine (DMOBA), 1,2-N,N'-dioleylcarbamyl-3-dimethylaminopropane (DOcarbDAP), 1,2-N,N'-dilinoleylcarbamyl-3-dimethylaminopropane (DLincarbDAP), or mixtures thereof. In certain preferred embodiments, the cationic lipid is DLinDMA, DLin-K-C2-DMA ("XTC2"), or mixtures thereof.

The synthesis of cationic lipids such as DLin-K-C2-DMA ("XTC2"), DLin-K-C3-DMA, DLin-K-C4-DMA, DLin-K6-DMA, and DLin-K-MPZ, as well as additional cationic lipids, is described in U.S. Provisional Application No. 61/104,212, filed Oct. 9, 2008, the disclosure of which is herein incorporated by reference in its entirety for all purposes. The synthesis of cationic lipids such as DLin-K-DMA, DLin-C-DAP, DLin-DAC, DLin-MA, DLinDAP, DLin-S-DMA, DLin-2-DMAP, DLin-TMA.C1, DLin-TAP.C1, DLin-MPZ, DLinAP, DOAP, and DLin-EG-DMA, as well as additional cationic lipids, is described in PCT Application No. PCT/US08/88676, filed Dec. 31, 2008, the disclosure of which is herein incorporated by reference in its entirety for all purposes. The synthesis of cationic lipids such as CLinDMA, as well as additional cationic lipids, is described in U.S. Patent Publication No. 20060240554, the disclosure of which is herein incorporated by reference in its entirety for all purposes.

In some embodiments, the cationic lipid may comprise from about 50 mol % to about 90 mol %, from about 50 mol % to about 85 mol %, from about 50 mol % to about 80 mol %, from about 50 mol % to about 75 mol %, from about 50 mol % to about 70 mol %, from about 50 mol % to about 65 mol %, or from about 50 mol % to about 60 mol % of the total lipid present in the particle.

In other embodiments, the cationic lipid may comprise from about 55 mol % to about 90 mol %, from about 55 mol % to about 85 mol %, from about 55 mol % to about 80 mol %, from about 55 mol % to about 75 mol %, from about 55 mol % to about 70 mol %, or from about 55 mol % to about 65 mol % of the total lipid present in the particle.

In yet other embodiments, the cationic lipid may comprise from about 60 mol % to about 90 mol %, from about 60 mol % to about 85 mol %, from about 60 mol % to about 80 mol %, from about 60 mol % to about 75 mol %, or from about 60 mol % to about 70 mol % of the total lipid present in the particle.

In still yet other embodiments, the cationic lipid may comprise from about 65 mol % to about 90 mol %, from about 65 mol % to about 85 mol %, from about 65 mol % to about 80 mol %, or from about 65 mol % to about 75 mol % of the total lipid present in the particle.

In further embodiments, the cationic lipid may comprise from about 70 mol % to about 90 mol %, from about 70 mol % to about 85 mol %, from about 70 mol % to about 80 mol %, from about 75 mol % to about 90 mol %, from about 75 mol % to about 85 mol %, or from about 80 mol % to about 90 mol % of the total lipid present in the particle.

In additional embodiments, the cationic lipid may comprise (at least) about 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67, 68, 69, 70, 71, 72, 73, 74, 75, 76, 77, 78, 79, 80, 81, 82, 83, 84, 85, 86, 87, 88, 89, or 90 mol % (or any fraction thereof or range therein) of the total lipid present in the particle.

In the lipid particles of the invention (e.g., SNALP comprising an interfering RNA such as siRNA), the non-cationic lipid may comprise, e.g., one or more anionic lipids and/or neutral lipids. In preferred embodiments, the non-cationic lipid comprises one of the following neutral lipid components: (1) cholesterol or a derivative thereof; (2) a phospholipid; or (3) a mixture of a phospholipid and cholesterol or a derivative thereof.

Examples of cholesterol derivatives include, but are not limited to, cholestanol, cholestanone, cholestenone, coprostanol, cholesteryl-2'-hydroxyethyl ether, cholesteryl-4'-hydroxybutyl ether, and mixtures thereof. The synthesis of cholesteryl-2'-hydroxyethyl ether is described herein.

The phospholipid may be a neutral lipid including, but not limited to, dipalmitoylphosphatidylcholine (DPPC), distearoylphosphatidylcholine (DSPC), dioleoylphosphatidylethanolamine (DOPE), palmitoyloleoyl-phosphatidylcholine (POPC), palmitoyloleoyl-phosphatidylethanolamine (POPE), palmitoyloleyol-phosphatidylglycerol (POPG), dipalmitoyl-phosphatidylethanolamine (DPPE), dimyristoyl-phosphatidylethanolamine (DMPE), distearoyl-phosphatidylethanolamine (DSPE), monomethyl-phosphatidylethanolamine, dimethyl-phosphatidylethanolamine, dielaidoyl-phosphatidylethanolamine (DEPE), stearoyloleoyl-phosphatidylethanolamine (SOPE), egg phosphatidylcholine (EPC), and mixtures thereof. In certain preferred embodiments, the phospholipid is DPPC, DSPC, or mixtures thereof.

In some embodiments, the non-cationic lipid (e.g., one or more phospholipids and/or cholesterol) may comprise from about 10 mol % to about 60 mol %, from about 15 mol % to about 60 mol %, from about 20 mol % to about 60 mol %, from about 25 mol % to about 60 mol %, from about 30 mol % to about 60 mol %, from about 10 mol % to about 55 mol %, from about 15 mol % to about 55 mol %, from about 20 mol % to about 55 mol %, from about 25 mol % to about 55 mol %, from about 30 mol % to about 55 mol %, from about 13 mol % to about 50 mol %, from about 15 mol % to about 50 mol % or from about 20 mol % to about 50 mol % of the total lipid present in the particle. When the non-cationic lipid is a mixture of a phospholipid and cholesterol or a cholesterol derivative, the mixture may comprise up to about 40, 50, or 60 mol % of the total lipid present in the particle.

In other embodiments, the non-cationic lipid (e.g., one or more phospholipids and/or cholesterol) may comprise from about 10 mol % to about 49.5 mol %, from about 13 mol % to about 49.5 mol %, from about 15 mol % to about 49.5 mol %, from about 20 mol % to about 49.5 mol %, from about 25 mol % to about 49.5 mol %, from about 30 mol % to about 49.5 mol %, from about 35 mol % to about 49.5 mol %, or from about 40 mol % to about 49.5 mol % of the total lipid present in the particle.

In yet other embodiments, the non-cationic lipid (e.g., one or more phospholipids and/or cholesterol) may comprise from about 10 mol % to about 45 mol %, from about 13 mol % to about 45 mol %, from about 15 mol % to about 45 mol %, from about 20 mol % to about 45 mol %, from about 25 mol % to about 45 mol %, from about 30 mol % to about 45 mol %, or from about 35 mol % to about 45 mol % of the total lipid present in the particle.

In still yet other embodiments, the non-cationic lipid (e.g., one or more phospholipids and/or cholesterol) may comprise from about 10 mol % to about 40 mol %, from about 13 mol % to about 40 mol %, from about 15 mol % to about 40 mol %, from about 20 mol % to about 40 mol %, from about 25 mol % to about 40 mol %, or from about 30 mol % to about 40 mol % of the total lipid present in the particle.

In further embodiments, the non-cationic lipid (e.g., one or more phospholipids and/or cholesterol) may comprise from about 10 mol % to about 35 mol %, from about 13 mol % to about 35 mol %, from about 15 mol % to about 35 mol %, from about 20 mol % to about 35 mol %, or from about 25 mol % to about 35 mol % of the total lipid present in the particle.

In yet further embodiments, the non-cationic lipid (e.g., one or more phospholipids and/or cholesterol) may comprise from about 10 mol % to about 30 mol %, from about 13 mol % to about 30 mol %, from about 15 mol % to about 30 mol %, from about 20 mol % to about 30 mol %, from about 10 mol % to about 25 mol %, from about 13 mol % to about 25 mol %, or from about 15 mol % to about 25 mol % of the total lipid present in the particle.

In additional embodiments, the non-cationic lipid (e.g., one or more phospholipids and/or cholesterol) may comprise (at least) about 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, or 60 mol % (or any fraction thereof or range therein) of the total lipid present in the particle.

In certain preferred embodiments, the non-cationic lipid comprises cholesterol or a derivative thereof of from about 31.5 mol % to about 42.5 mol % of the total lipid present in the particle. As a non-limiting example, a phospholipid-free lipid particle of the invention may comprise cholesterol or a derivative thereof at about 37 mol % of the total lipid present in the particle. In other preferred embodiments, a phospholipid-free lipid particle of the invention may comprise cholesterol or a derivative thereof of from about 30 mol % to about 45 mol %, from about 30 mol % to about 40 mol %, from about 30 mol % to about 35 mol %, from about 35 mol % to about 45 mol %, from about 40 mol % to about 45 mol %, from about 32 mol % to about 45 mol %, from about 32 mol % to about 42 mol %, from about 32 mol % to about 40 mol %, from about 34 mol % to about 45 mol %, from about 34 mol % to about 42 mol %, from about 34 mol % to about 40 mol %, or about 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, or 45 mol % (or any fraction thereof or range therein) of the total lipid present in the particle.

In certain other preferred embodiments, the non-cationic lipid comprises a mixture of: (i) a phospholipid of from about 4 mol % to about 10 mol % of the total lipid present in the particle; and (ii) cholesterol or a derivative thereof of from about 30 mol % to about 40 mol % of the total lipid present in the particle. As a non-limiting example, a lipid particle comprising a mixture of a phospholipid and cholesterol may comprise DPPC at about 7 mol % and cholesterol at about 34 mol % of the total lipid present in the particle. In other embodi-

ments, the non-cationic lipid comprises a mixture of: (i) a phospholipid of from about 3 mol % to about 15 mol %, from about 4 mol % to about 15 mol %, from about 4 mol % to about 12 mol %, from about 4 mol % to about 10 mol %, from about 4 mol % to about 8 mol %, from about 5 mol % to about 12 mol %, from about 5 mol % to about 9 mol %, from about 6 mol % to about 12 mol %, from about 6 mol % to about 10 mol %, or about 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, or 15 mol % (or any fraction thereof or range therein) of the total lipid present in the particle; and (ii) cholesterol or a derivative thereof of from about 25 mol % to about 45 mol %, from about 30 mol % to about 45 mol %, from about 25 mol % to about 40 mol %, from about 30 mol % to about 40 mol %, from about 25 mol % to about 35 mol %, from about 30 mol % to about 35 mol %, from about 35 mol % to about 45 mol %, from about 40 mol % to about 45 mol %, from about 28 mol % to about 40 mol %, from about 28 mol % to about 38 mol %, from about 30 mol % to about 38 mol %, from about 32 mol % to about 36 mol %, or about 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, or 45 mol % (or any fraction thereof or range therein) of the total lipid present in the particle.

In further preferred embodiments, the non-cationic lipid comprises a mixture of: (i) a phospholipid of from about 10 mol % to about 30 mol % of the total lipid present in the particle; and (ii) cholesterol or a derivative thereof of from about 10 mol % to about 30 mol % of the total lipid present in the particle. As a non-limiting example, a lipid particle comprising a mixture of a phospholipid and cholesterol may comprise DPPC at about 20 mol % and cholesterol at about 20 mol % of the total lipid present in the particle. In other embodiments, the non-cationic lipid comprises a mixture of: (i) a phospholipid of from about 10 mol % to about 30 mol %, from about 10 mol % to about 25 mol %, from about 10 mol % to about 20 mol %, from about 15 mol % to about 30 mol %, from about 20 mol % to about 30 mol %, from about 15 mol % to about 25 mol %, from about 12 mol % to about 28 mol %, from about 14 mol % to about 26 mol %, or about 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, or 30 mol % (or any fraction thereof or range therein) of the total lipid present in the particle; and (ii) cholesterol or a derivative thereof of from about 10 mol % to about 30 mol %, from about 10 mol % to about 25 mol %, from about 10 mol % to about 20 mol %, from about 15 mol % to about 30 mol %, from about 20 mol % to about 30 mol %, from about 15 mol % to about 25 mol %, from about 12 mol % to about 28 mol %, from about 14 mol % to about 26 mol %, or about 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, or 30 mol % (or any fraction thereof or range therein) of the total lipid present in the particle.

In the lipid particles of the invention (e.g., SNALP comprising an interfering RNA such as siRNA), the conjugated lipid that inhibits aggregation of particles may comprise, e.g., one or more of the following: a polyethyleneglycol (PEG)-lipid conjugate, a polyamide (ATTA)-lipid conjugate, a cationic-polymer-lipid conjugates (CPLs), or mixtures thereof. In one preferred embodiment, the nucleic acid-lipid particles comprise either a PEG-lipid conjugate or an ATTA-lipid conjugate. In certain embodiments, the PEG-lipid conjugate or ATTA-lipid conjugate is used together with a CPL. The conjugated lipid that inhibits aggregation of particles may comprise a PEG-lipid including, e.g., a PEG-diacylglycerol (DAG), a PEG dialkyloxypropyl (DAA), a PEG-phospholipid, a PEG-ceramide (Cer), or mixtures thereof. The PEG-DAA conjugate may be PEG-dilauryloxypropyl (C12), a PEG-dimyristyloxypropyl (C14), a PEG-dipalmityloxypropyl (C16), a PEG-distearyloxypropyl (C18), or mixtures thereof.

Additional PEG-lipid conjugates suitable for use in the invention include, but are not limited to, mPEG2000-1,2-di-O-alkyl-sn3-carbomoylglyceride (PEG-C-DOMG). The synthesis of PEG-C-DOMG is described in PCT Application No. PCT/US08/88676, filed Dec. 31, 2008, the disclosure of which is herein incorporated by reference in its entirety for all purposes. Yet additional PEG-lipid conjugates suitable for use in the invention include, without limitation, 1-[8'-(1,2-dimyristoyl-3-propanoxy)-carboxamido-3',6'-dioxaoctanyl] carbamoyl-ω-methyl-poly(ethylene glycol) (2KPEG-DMG). The synthesis of 2KPEG-DMG is described in U.S. Pat. No. 7,404,969, the disclosure of which is herein incorporated by reference in its entirety for all purposes.

The PEG moiety of the PEG-lipid conjugates described herein may comprise an average molecular weight ranging from about 550 daltons to about 10,000 daltons. In certain instances, the PEG moiety has an average molecular weight of from about 750 daltons to about 5,000 daltons (e.g., from about 1,000 daltons to about 5,000 daltons, from about 1,500 daltons to about 3,000 daltons, from about 750 daltons to about 3,000 daltons, from about 750 daltons to about 2,000 daltons, etc.). In preferred embodiments, the PEG moiety has an average molecular weight of about 2,000 daltons or about 750 daltons.

In some embodiments, the conjugated lipid that inhibits aggregation of particles is a CPL that has the formula: A-W-Y, wherein A is a lipid moiety, W is a hydrophilic polymer, and Y is a polycationic moiety. W may be a polymer selected from the group consisting of polyethyleneglycol (PEG), polyamide, polylactic acid, polyglycolic acid, polylactic acid/polyglycolic acid copolymers, or combinations thereof, the polymer having a molecular weight of from about 250 to about 7000 daltons. In some embodiments, Y has at least 4 positive charges at a selected pH. In some embodiments, Y may be lysine, arginine, asparagine, glutamine, derivatives thereof, or combinations thereof.

In certain instances, the conjugated lipid that inhibits aggregation of particles (e.g., PEG-lipid conjugate) may comprise from about 0.1 mol % to about 2 mol %, from about 0.5 mol % to about 2 mol %, from about 1 mol % to about 2 mol %, from about 0.6 mol % to about 1.9 mol %, from about 0.7 mol % to about 1.8 mol %, from about 0.8 mol % to about 1.7 mol %, from about 1 mol % to about 1.8 mol %, from about 1.2 mol % to about 1.8 mol %, from about 1.2 mol % to about 1.7 mol %, from about 1.3 mol % to about 1.6 mol %, from about 1.4 mol % to about 1.5 mol %, or about 1, 1.1, 1.2, 1.3, 1.4, 1.5, 1.6, 1.7, 1.8, 1.9, or 2 mol (or any fraction thereof or range therein) of the total lipid present in the particle.

In the lipid particles of the invention, the active agent or therapeutic agent may be fully encapsulated within the lipid portion of the particle, thereby protecting the active agent or therapeutic agent from enzymatic degradation. In preferred embodiments, a SNALP comprising a nucleic acid such as an interfering RNA (e.g., siRNA) is fully encapsulated within the lipid portion of the particle, thereby protecting the nucleic acid from nuclease degradation. In certain instances, the nucleic acid in the SNALP is not substantially degraded after exposure of the particle to a nuclease at 37° C. for at least about 20, 30, 45, or 60 minutes. In certain other instances, the nucleic acid in the SNALP is not substantially degraded after incubation of the particle in serum at 37° C. for at least about 30, 45, or 60 minutes or at least about 2, 3, 4, 5, 6, 7, 8, 9, 10, 12, 14, 16, 18, 20, 22, 24, 26, 28, 30, 32, 34, or 36 hours. In other embodiments, the active agent or therapeutic agent

(e.g., nucleic acid such as siRNA) is complexed with the lipid portion of the particle. One of the benefits of the formulations of the present invention is that the lipid particle compositions are substantially non-toxic to mammals such as humans.

The term "fully encapsulated" indicates that the active agent or therapeutic agent in the lipid particle is not significantly degraded after exposure to serum or a nuclease or protease assay that would significantly degrade free DNA, RNA, or protein. In a fully encapsulated system, preferably less than about 25% of the active agent or therapeutic agent in the particle is degraded in a treatment that would normally degrade 100% of free active agent or therapeutic agent, more preferably less than about 10%, and most preferably less than about 5% of the active agent or therapeutic agent in the particle is degraded. In the context of nucleic acid therapeutic agents, full encapsulation may be determined by an Oligreen® assay. Oligreen® is an ultra-sensitive fluorescent nucleic acid stain for quantitating oligonucleotides and single-stranded DNA or RNA in solution (available from Invitrogen Corporation; Carlsbad, Calif.). "Fully encapsulated" also indicates that the lipid particles are serum-stable, that is, that they do not rapidly decompose into their component parts upon in vivo administration.

In another aspect, the present invention provides a lipid particle (e.g., SNALP) composition comprising a plurality of lipid particles. In preferred embodiments, the active agent or therapeutic agent (e.g., nucleic acid) is fully encapsulated within the lipid portion of the lipid particles (e.g., SNALP), such that from about 30% to about 100%, from about 40% to about 100%, from about 50% to about 100%, from about 60% to about 100%, from about 70% to about 100%, from about 80% to about 100%, from about 90% to about 100%, from about 30% to about 95%, from about 40% to about 95%, from about 50% to about 95%, from about 60% to about 95%, %, from about 70% to about 95%, from about 80% to about 95%, from about 85% to about 95%, from about 90% to about 95%, from about 30% to about 90%, from about 40% to about 90%, from about 50% to about 90%, from about 60% to about 90%, from about 70% to about 90%, from about 80% to about 90%, or at least about 30%, 35%, 40%, 45%, 50%, 55%, 60%, 65%, 70%, 75%, 80%, 85%, 90%, 91%, 92%, 93%, 94%, 95%, 96%, 97%, 98%, or 99% (or any fraction thereof or range therein) of the lipid particles (e.g., SNALP) have the active agent or therapeutic agent encapsulated therein.

Typically, the lipid particles (e.g., SNALP) of the invention have a lipid:active agent (e.g., lipid:nucleic acid) ratio (mass/mass ratio) of from about 1 to about 100. In some instances, the lipid:active agent (e.g., lipid:nucleic acid) ratio (mass/mass ratio) ranges from about 1 to about 50, from about 2 to about 25, from about 3 to about 20, from about 4 to about 15, or from about 5 to about 10. In preferred embodiments, the lipid particles of the invention have a lipid:active agent (e.g., lipid:nucleic acid) ratio (mass/mass ratio) of from about 5 to about 15, e.g., about 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, or 15 (or any fraction thereof or range therein).

Typically, the lipid particles (e.g., SNALP) of the invention have a mean diameter of from about 40 nm to about 150 nm. In preferred embodiments, the lipid particles (e.g., SNALP) of the invention have a mean diameter of from about 40 nm to about 130 nm, from about 40 nm to about 120 nm, from about 40 nm to about 100 nm, from about 50 nm to about 120 nm, from about 50 nm to about 100 nm, from about 60 nm to about 120 nm, from about 60 nm to about 110 nm, from about 60 nm to about 100 nm, from about 60 nm to about 90 nm, from about 60 nm to about 80 nm, from about 70 nm to about 120 nm, from about 70 nm to about 110 nm, from about 70 nm to about 100 nm, from about 70 nm to about 90 nm, from about 70 nm to about 80 nm, or less than about 120 nm, 110 nm, 100 nm, 90 nm, or 80 nm (or any fraction thereof or range therein).

In one specific embodiment of the invention, the SNALP comprises: (a) one or more unmodified and/or modified interfering RNA (e.g., siRNA, aiRNA, miRNA) that silence target gene expression; (b) a cationic lipid comprising from about 56.5 mol % to about 66.5 mol % of the total lipid present in the particle; (c) a non-cationic lipid comprising from about 31.5 mol % to about 42.5 mol % of the total lipid present in the particle; and (d) a conjugated lipid that inhibits aggregation of particles comprising from about 1 mol % to about 2 mol % of the total lipid present in the particle. This specific embodiment of SNALP is generally referred to herein as the "1:62" formulation. In a preferred embodiment, the cationic lipid is DLinDMA or DLin-K-C2-DMA ("XTC2"), the non-cationic lipid is cholesterol, and the conjugated lipid is a PEG-DAA conjugate. Although these are preferred embodiments of the 1:62 formulation, those of skill in the art will appreciate that other cationic lipids, non-cationic lipids (including other cholesterol derivatives), and conjugated lipids can be used in the 1:62 formulation as described herein.

In another specific embodiment of the invention, the SNALP comprises: (a) one or more unmodified and/or modified interfering RNA (e.g., siRNA, aiRNA, miRNA) that silence target gene expression; (b) a cationic lipid comprising from about 52 mol % to about 62 mol % of the total lipid present in the particle; (c) a non-cationic lipid comprising from about 36 mol % to about 47 mol % of the total lipid present in the particle; and (d) a conjugated lipid that inhibits aggregation of particles comprising from about 1 mol % to about 2 mol % of the total lipid present in the particle. This specific embodiment of SNALP is generally referred to herein as the "1:57" formulation. In one preferred embodiment, the cationic lipid is DLinDMA or DLin-K-C2-DMA ("XTC2"), the non-cationic lipid is a mixture of a phospholipid (such as DPPC) and cholesterol, wherein the phospholipid comprises from about 5 mol % to about 9 mol % of the total lipid present in the particle (e.g., about 7.1 mol %) and the cholesterol (or cholesterol derivative) comprises from about 32 mol % to about 37 mol % of the total lipid present in the particle (e.g., about 34.3 mol %), and the PEG-lipid is a PEG-DAA (e.g., PEG-cDMA). In another preferred embodiment, the cationic lipid is DLinDMA or DLin-K-C2-DMA ("XTC2"), the non-cationic lipid is a mixture of a phospholipid (such as DPPC) and cholesterol, wherein the phospholipid comprises from about 15 mol % to about 25 mol % of the total lipid present in the particle (e.g., about 20 mol %) and the cholesterol (or cholesterol derivative) comprises from about 15 mol % to about 25 mol % of the total lipid present in the particle (e.g., about 20 mol %), and the PEG-lipid is a PEG-DAA (e.g., PEG-cDMA). Although these are preferred embodiments of the 1:57 formulation, those of skill in the art will appreciate that other cationic lipids, non-cationic lipids (including other phospholipids and other cholesterol derivatives), and conjugated lipids can be used in the 1:57 formulation as described herein.

In preferred embodiments, the 1:62 SNALP formulation is a three-component system which is phospholipid-free and comprises about 1.5 mol PEG-cDMA (or PEG-cDSA), about 61.5 mol % DLinDMA (or XTC2), and about 36.9 mol % cholesterol (or derivative thereof). In other preferred embodiments, the 1:57 SNALP formulation is a four-component system which comprises about 1.4 mol % PEG-cDMA (or PEG-cDSA), about 57.1 mol % DLinDMA (or XTC2), about 7.1 mol % DPPC, and about 34.3 mol % cholesterol (or derivative thereof). In yet other preferred embodiments, the 1:57 SNALP formulation is a four-component system which

comprises about 1.4 mol % PEG-cDMA (or PEG-cDSA), about 57.1 mol % DLinDMA (or XTC2), about 20 mol % DPPC, and about 20 mol % cholesterol (or derivative thereof). It should be understood that these SNALP formulations are target formulations, and that the amount of lipid (both cationic and non-cationic) present and the amount of lipid conjugate present in the SNALP formulations may vary.

The present invention also provides a pharmaceutical composition comprising a lipid particle (e.g., SNALP) described herein and a pharmaceutically acceptable carrier.

In a further aspect, the present invention provides a method for introducing one or more active agents or therapeutic agents (e.g., nucleic acid) into a cell, comprising contacting the cell with a lipid particle (e.g., SNALP) described herein. In one embodiment, the cell is in a mammal and the mammal is a human. In another embodiment, the present invention provides a method for the in vivo delivery of one or more active agents or therapeutic agents (e.g., nucleic acid), comprising administering to a mammalian subject a lipid particle (e.g., SNALP) described herein. In a preferred embodiment, the mode of administration includes, but is not limited to, oral, intranasal, intravenous, intraperitoneal, intramuscular, intra-articular, intralesional, intratracheal, subcutaneous, and intradermal. Preferably, the mammalian subject is a human.

In one embodiment, at least about 5%, 10%, 15%, 20%, or 25% of the total injected dose of the lipid particles (e.g., SNALP) is present in plasma about 8, 12, 24, 36, or 48 hours after injection. In other embodiments, more than about 20%, 30%, 40% and as much as about 60%, 70% or 80% of the total injected dose of the lipid particles (e.g., SNALP) is present in plasma about 8, 12, 24, 36, or 48 hours after injection. In certain instances, more than about 10% of a plurality of the particles is present in the plasma of a mammal about 1 hour after administration. In certain other instances, the presence of the lipid particles (e.g., SNALP) is detectable at least about 1 hour after administration of the particle. In certain embodiments, the presence of an active agent or therapeutic agent such as an interfering RNA (e.g., siRNA) is detectable in cells of the lung, liver, tumor, or at a site of inflammation at about 8, 12, 24, 36, 48, 60, 72 or 96 hours after administration. In other embodiments, downregulation of expression of a target sequence by an active agent or therapeutic agent such as an interfering RNA (e.g., siRNA) is detectable at about 8, 12, 24, 36, 48, 60, 72 or 96 hours after administration. In yet other embodiments, downregulation of expression of a target sequence by an active agent or therapeutic agent such as an interfering RNA (e.g., siRNA) occurs preferentially in tumor cells or in cells at a site of inflammation. In further embodiments, the presence or effect of an active agent or therapeutic agent such as an interfering RNA (e.g., siRNA) in cells at a site proximal or distal to the site of administration or in cells of the lung, liver, or a tumor is detectable at about 12, 24, 48, 72, or 96 hours, or at about 6, 8, 10, 12, 14, 16, 18, 19, 20, 22, 24, 26, or 28 days after administration. In additional embodiments, the lipid particles (e.g., SNALP) of the invention are administered parenterally or intraperitoneally.

In some embodiments, the lipid particles (e.g., SNALP) of the invention are particularly useful in methods for the therapeutic delivery of one or more nucleic acids comprising an interfering RNA sequence (e.g., siRNA). In particular, it is an object of this invention to provide in vitro and in vivo methods for treatment of a disease or disorder in a mammal (e.g., a rodent such as a mouse or a primate such as a human, chimpanzee, or monkey) by downregulating or silencing the transcription and/or translation of one or more target nucleic acid sequences or genes of interest. As a non-limiting example, the methods of the invention are useful for in vivo delivery of interfering RNA (e.g., siRNA) to the liver and/or tumor of a mammalian subject. In certain embodiments, the disease or disorder is associated with expression and/or overexpression of a gene and expression or overexpression of the gene is reduced by the interfering RNA (e.g., siRNA). In certain other embodiments, a therapeutically effective amount of the lipid particle (e.g., SNALP) may be administered to the mammal. In some instances, an interfering RNA (e.g., siRNA) is formulated into a SNALP, and the particles are administered to patients requiring such treatment. In other instances, cells are removed from a patient, the interfering RNA (e.g., siRNA) is delivered in vitro (e.g., using a SNALP described herein), and the cells are reinjected into the patient.

In an additional aspect, the present invention provides lipid particles (e.g., SNALP) comprising asymmetrical interfering RNA (aiRNA) molecules that silence the expression of a target gene and methods of using such particles to silence target gene expression.

In one embodiment, the aiRNA molecule comprises a double-stranded (duplex) region of about 10 to about 25 (base paired) nucleotides in length, wherein the aiRNA molecule comprises an antisense strand comprising 5' and 3' overhangs, and wherein the aiRNA molecule is capable of silencing target gene expression.

In certain instances, the aiRNA molecule comprises a double-stranded (duplex) region of about 12-20, 12-19, 12-18, 13-17, or 14-17 (base paired) nucleotides in length, more typically 12, 13, 14, 15, 16, 17, 18, 19, or 20 (base paired) nucleotides in length. In certain other instances, the 5' and 3' overhangs on the antisense strand comprise sequences that are complementary to the target RNA sequence, and may optionally further comprise nontargeting sequences. In some embodiments, each of the 5' and 3' overhangs on the antisense strand comprises or consists of one, two, three, four, five, six, seven, or more nucleotides.

In other embodiments, the aiRNA molecule comprises modified nucleotides selected from the group consisting of 2'OMe nucleotides, 2'F nucleotides, 2'-deoxy nucleotides, 2'-O-MOE nucleotides, LNA nucleotides, and mixtures thereof. In a preferred embodiment, the aiRNA molecule comprises 2'OMe nucleotides. As a non-limiting example, the 2'OMe nucleotides may be selected from the group consisting of 2'OMe-guanosine nucleotides, 2'OMe-uridine nucleotides, and mixtures thereof.

In a related aspect, the present invention provides lipid particles (e.g., SNALP) comprising microRNA (miRNA) molecules that silence the expression of a target gene and methods of using such compositions to silence target gene expression.

In one embodiment, the miRNA molecule comprises about 15 to about 60 nucleotides in length, wherein the miRNA molecule is capable of silencing target gene expression.

In certain instances, the miRNA molecule comprises about 15-50, 15-40, or 15-30 nucleotides in length, more typically about 15-25 or 19-25 nucleotides in length, and are preferably about 20-24, 21-22, or 21-23 nucleotides in length. In a preferred embodiment, the miRNA molecule is a mature miRNA molecule targeting an RNA sequence of interest.

In some embodiments, the miRNA molecule comprises modified nucleotides selected from the group consisting of 2'OMe nucleotides, 2'F nucleotides, 2'-deoxy nucleotides, 2'-O-MOE nucleotides, LNA nucleotides, and mixtures thereof. In a preferred embodiment, the miRNA molecule comprises 2'OMe nucleotides. As a non-limiting example, the 2'OMe nucleotides may be selected from the group consisting of 2'OMe-guanosine nucleotides, 2'OMe-uridine nucleotides, and mixtures thereof.

As such, the lipid particles of the invention (e.g., SNALP) are advantageous and suitable for use in the administration of active agents or therapeutic agents such as nucleic acid (e.g., interfering RNA such as siRNA, aiRNA, and/or miRNA) to a subject (e.g., a mammal such as a human) because they are stable in circulation, of a size required for pharmacodynamic behavior resulting in access to extravascular sites, and are capable of reaching target cell populations.

## IV. Active Agents

Active agents (e.g., therapeutic agents) include any molecule or compound capable of exerting a desired effect on a cell, tissue, organ, or subject. Such effects may be, e.g., biological, physiological, and/or cosmetic. Active agents may be any type of molecule or compound including, but not limited to, nucleic acids, peptides, polypeptides, small molecules, and mixtures thereof. Non-limiting examples of nucleic acids include interfering RNA molecules (e.g., siRNA, aiRNA, miRNA), antisense oligonucleotides, plasmids, ribozymes, immunostimulatory oligonucleotides, and mixtures thereof. Examples of peptides or polypeptides include, without limitation, antibodies (e.g., polyclonal antibodies, monoclonal antibodies, antibody fragments; humanized antibodies, recombinant antibodies, recombinant human antibodies, Primatized™ antibodies), cytokines, growth factors, apoptotic factors, differentiation-inducing factors, cell-surface receptors and their ligands, hormones, and mixtures thereof. Examples of small molecules include, but are not limited to, small organic molecules or compounds such as any conventional agent or drug known to those of skill in the art.

In some embodiments, the active agent is a therapeutic agent, or a salt or derivative thereof. Therapeutic agent derivatives may be therapeutically active themselves or they may be prodrugs, which become active upon further modification. Thus, in one embodiment, a therapeutic agent derivative retains some or all of the therapeutic activity as compared to the unmodified agent, while in another embodiment, a therapeutic agent derivative is a prodrug that lacks therapeutic activity, but becomes active upon further modification.

### A. Nucleic Acids

In certain embodiments, lipid particles of the present invention are associated with a nucleic acid, resulting in a nucleic acid-lipid particle (e.g., SNALP). In some embodiments, the nucleic acid is fully encapsulated in the lipid particle. As used herein, the term "nucleic acid" includes any oligonucleotide or polynucleotide, with fragments containing up to 60 nucleotides generally termed oligonucleotides, and longer fragments termed polynucleotides.

In particular embodiments, oligonucletoides of the invention are from about 15 to about 60 nucleotides in length. Nucleic acid may be administered alone in the lipid particles of the invention, or in combination (e.g., co-administered) with lipid particles of the invention comprising peptides, polypeptides, or small molecules such as conventional drugs.

In the context of this invention, the terms "polynucleotide" and "oligonucleotide" refer to a polymer or oligomer of nucleotide or nucleoside monomers consisting of naturally-occurring bases, sugars and intersugar (backbone) linkages. The terms "polynucleotide" and "oligonucleotide" also include polymers or oligomers comprising non-naturally occurring monomers, or portions thereof, which function similarly. Such modified or substituted oligonucleotides are often preferred over native forms because of properties such as, for example, enhanced cellular uptake, reduced immunogenicity, and increased stability in the presence of nucleases.

Oligonucleotides are generally classified as deoxyribooligonucleotides or ribooligonucleotides. A deoxyribooligonucleotide consists of a 5-carbon sugar called deoxyribose joined covalently to phosphate at the 5' and 3' carbons of this sugar to form an alternating, unbranched polymer. A ribooligonucleotide consists of a similar repeating structure where the 5-carbon sugar is ribose.

The nucleic acid that is present in a lipid-nucleic acid particle according to this invention includes any form of nucleic acid that is known. The nucleic acids used herein can be single-stranded DNA or RNA, or double-stranded DNA or RNA, or DNA-RNA hybrids. Examples of double-stranded DNA are described herein and include, e.g., structural genes, genes including control and termination regions, and self-replicating systems such as viral or plasmid DNA. Examples of double-stranded RNA are described herein and include, e.g., siRNA and other RNAi agents such as aiRNA and pre-miRNA. Single-stranded nucleic acids include, e.g., antisense oligonucleotides, ribozymes, mature miRNA, and triplex-forming oligonucleotides.

Nucleic acids of the invention may be of various lengths, generally dependent upon the particular form of nucleic acid. For example, in particular embodiments, plasmids or genes may be from about 1,000 to about 100,000 nucleotide residues in length. In particular embodiments, oligonucleotides may range from about 10 to about 100 nucleotides in length. In various related embodiments, oligonucleotides, both single-stranded, double-stranded, and triple-stranded, may range in length from about 10 to about 60 nucleotides, from about 15 to about 60 nucleotides, from about 20 to about 50 nucleotides, from about 15 to about 30 nucleotides, or from about 20 to about 30 nucleotides in length.

In particular embodiments, an oligonucleotide (or a strand thereof) of the invention specifically hybridizes to or is complementary to a target polynucleotide sequence. The terms "specifically hybridizable" and "complementary" as used herein indicate a sufficient degree of complementarity such that stable and specific binding occurs between the DNA or RNA target and the oligonucleotide. It is understood that an oligonucleotide need not be 100% complementary to its target nucleic acid sequence to be specifically hybridizable. In preferred embodiments, an oligonucleotide is specifically hybridizable when binding of the oligonucleotide to the target sequence interferes with the normal function of the target sequence to cause a loss of utility or expression therefrom, and there is a sufficient degree of complementarity to avoid non-specific binding of the oligonucleotide to non-target sequences under conditions in which specific binding is desired, i.e., under physiological conditions in the case of in vivo assays or therapeutic treatment, or, in the case of in vitro assays, under conditions in which the assays are conducted. Thus, the oligonucleotide may include 1, 2, 3, or more base substitutions as compared to the region of a gene or mRNA sequence that it is targeting or to which it specifically hybridizes.

#### 1. siRNA

The siRNA component of the nucleic acid-lipid particles of the present invention is capable of silencing the expression of a target gene of interest. Each strand of the siRNA duplex is typically about 15 to about 60 nucleotides in length, preferably about 15 to about 30 nucleotides in length. In certain embodiments, the siRNA comprises at least one modified nucleotide. The modified siRNA is generally less immunostimulatory than a corresponding unmodified siRNA sequence and retains RNAi activity against the target gene of interest. In some embodiments, the modified siRNA contains at least one 2'OMe purine or pyrimidine nucleotide such as a

2'OMe-guanosine, 2'OMe-uridine, 2'OMe-adenosine, and/or 2'OMe-cytosine nucleotide. In preferred embodiments, one or more of the uridine and/or guanosine nucleotides are modified. The modified nucleotides can be present in one strand (i.e., sense or antisense) or both strands of the siRNA. The siRNA sequences may have overhangs (e.g., 3' or 5' overhangs as described in Elbashir et al., *Genes Dev.,* 15:188 (2001) or Nyilnen et al., *Cell,* 107:309 (2001)), or may lack overhangs (i.e., have blunt ends).

The modified siRNA generally comprises from about 1% to about 100% (e.g., about 1%, 2%, 3%, 4%, 5%, 6%, 7%, 8%, 9%, 10%, 11%, 12%, 13%, 14%, 15%, 16%, 17%, 18%, 19%, 20%, 21%, 22%, 23%, 24%, 25%, 26%, 27%, 28%, 29%, 30%, 35%, 40%, 45%, 50%, 55%, 60%, 65%, 70%, 75%, 80%, 85%, 90%, 95%, or 100%) modified nucleotides in the double-stranded region of the siRNA duplex. In certain embodiments, one, two, three, four, five, six, seven, eight, nine, ten, or more of the nucleotides in the double-stranded region of the siRNA comprise modified nucleotides.

In some embodiments, less than about 25% (e.g., less than about 25%, 24%, 23%, 22%, 21%, 20%, 19%, 18%, 17%, 16%, 15%, 14%, 13%, 12%, 11%, 10%, 9%, 8%, 7%, 6%, 5%, 4%, 3%, 2%, or 1%) of the nucleotides in the double-stranded region of the siRNA comprise modified nucleotides.

In other embodiments, from about 1% to about 25% (e.g., from about 1%-25%, 2%-25%, 3%-25%, 4%-25%, 5%-25%, 6%-25%, 7%-25%, 8%-25%, 9%-25%, 10%-25%, 11%-25%, 12%-25%, 13%-25%, 14%-25%, 15%-25%, 16%-25%, 17%-25%, 18%-25%, 19%-25%, 20%-25%, 21%-25%, 22%-25%, 23%-25%, 24%-25%, etc.) or from about 1% to about 20% (e.g., from about 1%-20%, 2%-20%, 3%-20%, 4%-20%, 5%-20%, 6%-20%, 7%-20%, 8%-20%, 9%-20%, 10%-20%, 11%-20%, 12%-20%, 13%-20%, 14%-20%, 15%-20%, 16%-20%, 17%-20%, 18%-20%, 19%-20%, 1%-19%, 2%-19%, 3%-19%, 4%-19%, 5%-19%, 6%-19%, 7%-19%, 8%-19%, 9%-19%, 10%-19%, 11%-19%, 12%-19%, 13%-19%, 14%-19%, 15%-19%, 16%-19%, 17%-19%, 18%-19%, 1%-18%, 2%-18%, 3%-18%, 4%-18%, 5%-18%, 6%-18%, 7%-18%, 8%-18%, 9%-18%, 10%-18%, 11%-18%, 12%-18%, 13%-18%, 14%-18%, 15%-18%, 16%-18%, 17%-18%, 1%-17%, 2%-17%, 3%-17%, 4%-17%, 5%-17%, 6%-17%, 7%-17%, 8%-17%, 9%-17%, 10%-17%, 11%-17%, 12%-17%, 13%-17%, 14%-17%, 15%-17%, 16%-17%, 1%-16%, 2%-16%, 3%-16%, 4%-16%, 5%-16%, 6%-16%, 7%-16%, 8%-16%, 9%-16%, 10%-16%, 11%-16%, 12%-16%, 13%-16%, 14%-16%, 15%-16%, 1%-15%, 2%-15%, 3%-15%, 4%-15%, 5%-15%, 6%-15%, 7%-15%, 8%-15%, 9%-15%, 10%-15%, 11%-15%, 12%-15%, 13%-15%, 14%-15%, etc.) of the nucleotides in the double-stranded region of the siRNA comprise modified nucleotides.

In further embodiments, e.g., when one or both strands of the siRNA are selectively modified at uridine and/or guanosine nucleotides, the resulting modified siRNA can comprise less than about 30% modified nucleotides (e.g., less than about 30%, 29%, 28%, 27%, 26%, 25%, 24%, 23%, 22%, 21%, 20%, 19%, 18%, 17%, 16%, 15%, 14%, 13%, 12%, 11%, 10%, 9%, 8%, 7%, 6%, 5%, 4%, 3%, 2%, or 1% modified nucleotides) or from about 1% to about 30% modified nucleotides (e.g., from about 1%-30%, 2%-30%, 3%-30%, 4%-30%, 5%-30%, 6%-30%, 7%-30%, 8%-30%, 9%-30%, 10%-30%, 11%-30%, 12%-30%, 13%-30%, 14%-30%, 15%-30%, 16%-30%, 17%-30%, 18%-30%, 19%-30%, 20%-30%, 21%-30%, 22%-30%, 23%-30%, 24%-30%, 25%-30%, 26%-30%, 27%-30%, 28%-30%, or 29%-30% modified nucleotides).

a. Selection of siRNA Sequences

Suitable siRNA sequences can be identified using any means known in the art. Typically, the methods described in Elbashir et al., *Nature,* 411:494-498 (2001) and Elbashir et al., *EMBO J.,* 20:6877-6888 (2001) are combined with rational design rules set forth in Reynolds et al., *Nature Biotech.,* 22(3):326-330 (2004).

Generally, the nucleotide sequence 3' of the AUG start codon of a transcript from the target gene of interest is scanned for dinucleotide sequences (e.g., AA, NA, CC, GG, or UU, wherein N=C, G, or U) (see, e.g., Elbashir et al., *EMBO J.,* 20:6877-6888 (2001)). The nucleotides immediately 3' to the dinucleotide sequences are identified as potential siRNA sequences (i.e., a target sequence or a sense strand sequence). Typically, the 19, 21, 23, 25, 27, 29, 31, 33, 35, or more nucleotides immediately 3' to the dinucleotide sequences are identified as potential siRNA sequences. In some embodiments, the dinucleotide sequence is an AA or NA sequence and the 19 nucleotides immediately 3' to the AA or NA dinucleotide are identified as potential siRNA sequences. siRNA sequences are usually spaced at different positions along the length of the target gene. To further enhance silencing efficiency of the siRNA sequences, potential siRNA sequences may be analyzed to identify sites that do not contain regions of homology to other coding sequences, e.g., in the target cell or organism. For example, a suitable siRNA sequence of about 21 base pairs typically will not have more than 16-17 contiguous base pairs of homology to coding sequences in the target cell or organism. If the siRNA sequences are to be expressed from an RNA Pol III promoter, siRNA sequences lacking more than 4 contiguous A's or T's are selected.

Once a potential siRNA sequence has been identified, a complementary sequence (i.e., an antisense strand sequence) can be designed. A potential siRNA sequence can also be analyzed using a variety of criteria known in the art. For example, to enhance their silencing efficiency, the siRNA sequences may be analyzed by a rational design algorithm to identify sequences that have one or more of the following features: (1) G/C content of about 25% to about 60% G/C; (2) at least 3 A/Us at positions 15-19 of the sense strand; (3) no internal repeats; (4) an A at position 19 of the sense strand; (5) an A at position 3 of the sense strand; (6) a U at position 10 of the sense strand; (7) no G/C at position 19 of the sense strand; and (8) no G at position 13 of the sense strand. siRNA design tools that incorporate algorithms that assign suitable values of each of these features and are useful for selection of siRNA can be found at, e.g., http://boz094.ust.hk/RNAi/siRNA. One of skill in the art will appreciate that sequences with one or more of the foregoing characteristics may be selected for further analysis and testing as potential siRNA sequences.

Additionally, potential siRNA sequences with one or more of the following criteria can often be eliminated as siRNA: (1) sequences comprising a stretch of 4 or more of the same base in a row; (2) sequences comprising homopolymers of Gs (i.e., to reduce possible non-specific effects due to structural characteristics of these polymers; (3) sequences comprising triple base motifs (e.g., GGG, CCC, AAA, or TTT); (4) sequences comprising stretches of 7 or more G/Cs in a row; and (5) sequences comprising direct repeats of 4 or more bases within the candidates resulting in internal fold-back structures. However, one of skill in the art will appreciate that sequences with one or more of the foregoing characteristics may still be selected for further analysis and testing as potential siRNA sequences.

In some embodiments, potential siRNA sequences may be further analyzed based on siRNA duplex asymmetry as

described in, e.g., Khvorova et al., *Cell,* 115:209-216 (2003); and Schwarz at al., *Cell,* 115:199-208 (2003). In other embodiments, potential siRNA sequences may be further analyzed based on secondary structure at the target site as described in, e.g., Luo et al., *Biophys. Res. Commun.,* 318: 303-310 (2004). For example, secondary structure at the target site can be modeled using the Mfold algorithm (available at http://www.bioinfo.rpi.edu/applications/mfold/rna/forml.cgi) to select siRNA sequences which favor accessibility at the target site where less secondary structure in the form of base-pairing and stem-loops is present.

Once a potential siRNA sequence has been identified, the sequence can be analyzed for the presence of any immunostimulatory properties, e.g., using an in vitro cytokine assay or an in vivo animal model. Motifs in the sense and/or antisense strand of the siRNA sequence such as GU-rich motifs (e.g., 5'-GU-3',5'-UGU-3',5'-GUGU-3',5'-UGUGU-3', etc.) can also provide an indication of whether the sequence may be immunostimulatory. Once an siRNA molecule is found to be immunostimulatory, it can then be modified to decrease its immunostimulatory properties as described herein. As a non-limiting example, an siRNA sequence can be contacted with a mammalian responder cell under conditions such that the cell produces a detectable immune response to determine whether the siRNA is an immunostimulatory or a non-immunostimulatory siRNA. The mammalian responder cell may be from a naïve mammal (i.e., a mammal that has not previously been in contact with the gene product of the siRNA sequence). The mammalian responder cell may be, e.g., a peripheral blood mononuclear cell (PBMC), a macrophage, and the like. The detectable immune response may comprise production of a cytokine or growth factor such as, e.g., TNF-α, IFN-α, IFN-β, IFN-γ, IL-6, IL-12, or a combination thereof. An siRNA molecule identified as being immunostimulatory can then be modified to decrease its immunostimulatory properties by replacing at least one of the nucleotides on the sense and/or antisense strand with modified nucleotides. For example, less than about 30% (e.g., less than about 30%, 25%, 20%, 15%, 10%, or 5%) of the nucleotides in the double-stranded region of the siRNA duplex can be replaced with modified nucleotides such as 2'OMe nucleotides. The modified siRNA can then be contacted with a mammalian responder cell as described above to confirm that its immunostimulatory properties have been reduced or abrogated.

Suitable in vitro assays for detecting an immune response include, but are not limited to, the double monoclonal antibody sandwich immunoassay technique of David et al. (U.S. Pat. No. 4,376,110); monoclonal-polyclonal antibody sandwich assays (Wide et al., in Kirkham and Hunter, eds., *Radioimmunoassay Methods*, E. and S. Livingstone, Edinburgh (1970)); the "Western blot" method of Gordon et al. (U.S. Pat. No. 4,452,901); immunoprecipitation of labeled ligand (Brown et al., J. *Biol. Chem.,* 255:4980-4983 (1980)); enzyme-linked immunosorbent assays (ELISA) as described, for example, by Raines et al., *J. Biol. Chem.,* 257:5154-5160 (1982); immunocytochemical techniques, including the use of fluorochromes (Brooks et al., *Clin. Exp. Immunol.,* 39:477 (1980)); and neutralization of activity (Bowen-Pope et al., *Proc. Natl. Acad. Sci. USA,* 81:2396-2400 (1984)). In addition to the immunoassays described above, a number of other immunoassays are available, including those described in U.S. Pat. Nos. 3,817,827; 3,850,752; 3,901,654; 3,935,074; 3,984,533; 3,996,345; 4,034,074; and 4,098,876. The disclosures of these references are herein incorporated by reference in their entirety for all purposes.

A non-limiting example of an in vivo model for detecting an immune response includes an in vivo mouse cytokine induction assay as described in, e.g., Judge et al., *Mol. Ther.,* 13:494-505 (2006). In certain embodiments, the assay that can be performed as follows: (1) siRNA can be administered by standard intravenous injection in the lateral tail vein; (2) blood can be collected by cardiac puncture about 6 hours after administration and processed as plasma for cytokine analysis; and (3) cytokines can be quantified using sandwich ELISA kits according to the manufacturer's instructions (e.g., mouse and human IFN-α (PBL Biomedical; Piscataway, N.J.); human IL-6 and TNF-α (eBioscience; San Diego, Calif.); and mouse IL-6, TNF-α, and IFN-γ (BD Biosciences; San Diego, Calif.)).

Monoclonal antibodies that specifically bind cytokines and growth factors are commercially available from multiple sources and can be generated using methods known in the art (see, e.g., Kohler et al., *Nature,* 256: 495-497 (1975) and Harlow and Lane, ANTIBODIES, A LABORATORY MANUAL, Cold Spring Harbor Publication, New York (1999)). Generation of monoclonal antibodies has been previously described and can be accomplished by any means known in the art (Buhring et al., in Hybridoma, Vol. 10, No. 1, pp. 77-78 (1991)). In some methods, the monoclonal antibody is labeled (e.g., with any composition detectable by spectroscopic, photochemical, biochemical, electrical, optical, or chemical means) to facilitate detection.

b. Generating siRNA Molecules

siRNA can be provided in several forms including, e.g., as one or more isolated small-interfering RNA (siRNA) duplexes, as longer double-stranded RNA (dsRNA), or as siRNA or dsRNA transcribed from a transcriptional cassette in a DNA plasmid. The siRNA sequences may have overhangs (e.g., 3' or 5' overhangs as described in Elbashir et al., *Genes Dev.,* 15:188 (2001) or Nykänen et al., *Cell,* 107:309 (2001), or may lack overhangs (i.e., to have blunt ends).

An RNA population can be used to provide long precursor RNAs, or long precursor RNAs that have substantial or complete identity to a selected target sequence can be used to make the siRNA. The RNAs can be isolated from cells or tissue, synthesized, and/or cloned according to methods well known to those of skill in the art. The RNA can be a mixed population (obtained from cells or tissue, transcribed from cDNA, subtracted, selected, etc.), or can represent a single target sequence. RNA can be naturally occurring (e.g., isolated from tissue or cell samples), synthesized in vitro (e.g., using T7 or SP6 polymerase and PCR products or a cloned cDNA), or chemically synthesized.

To form a long dsRNA, for synthetic RNAs, the complement is also transcribed in vitro and hybridized to form a dsRNA. If a naturally occurring RNA population is used, the RNA complements are also provided (e.g., to form dsRNA for digestion by *E. coli* RNAse III or Dicer), e.g., by transcribing cDNAs corresponding to the RNA population, or by using RNA polymerases. The precursor RNAs are then hybridized to form double stranded RNAs for digestion. The dsRNAs can be directly administered to a subject or can be digested in vitro prior to administration.

Methods for isolating RNA, synthesizing RNA, hybridizing nucleic acids, making and screening cDNA libraries, and performing PCR are well known in the art (see, e.g., Gubler and Hoffman, *Gene,* 25:263-269 (1983); Sambrook et al., supra; Ausubel et al., supra), as are PCR methods (see, U.S. Pat. Nos. 4,683,195 and 4,683,202; *PCR Protocols: A Guide to Methods and Applications* (Innis et al., eds, 1990)). Expression libraries are also well known to those of skill in the art. Additional basic texts disclosing the general methods of use

in this invention include Sambrook et al., *Molecular Cloning, A Laboratory Manual* (2nd ed. 1989); Kriegler, *Gene Transfer and Expression: A Laboratory Manual* (1990); and *Current Protocols in Molecular Biology* (Ausubel et al., eds., 1994). The disclosures of these references are herein incorporated by reference in their entirety for all purposes.

Preferably, siRNA are chemically synthesized. The oligonucleotides that comprise the siRNA molecules of the invention can be synthesized using any of a variety of techniques known in the art, such as those described in Usman et al., *J. Am. Chem. Soc.,* 109:7845 (1987); Scaringe et al., *Nucl. Acids Res.,* 18:5433 (1990); Wincott et al., *Nucl. Acids Res.,* 23:2677-2684 (1995); and Wincott et al., *Methods Mol. Bio.,* 74:59 (1997). The synthesis of oligonucleotides makes use of common nucleic acid protecting and coupling groups, such as dimethoxytrityl at the 5'-end and phosphoramidites at the 3'-end. As a non-limiting example, small scale syntheses can be conducted on an Applied Biosystems synthesizer using a 0.2 μmol scale protocol. Alternatively, syntheses at the 0.2 μmol scale can be performed on a 96-well plate synthesizer from Protogene (Palo Alto, Calif.). However, a larger or smaller scale of synthesis is also within the scope of this invention. Suitable reagents for oligonucleotide synthesis, methods for RNA deprotection, and methods for RNA purification are known to those of skill in the art.

siRNA molecules can also be synthesized via a tandem synthesis technique, wherein both strands are synthesized as a single continuous oligonucleotide fragment or strand separated by a cleavable linker that is subsequently cleaved to provide separate fragments or strands that hybridize to form the siRNA duplex. The linker can be a polynucleotide linker or a non-nucleotide linker. The tandem synthesis of siRNA can be readily adapted to both multiwell/multiplate synthesis platforms as well as large scale synthesis platforms employing batch reactors, synthesis columns, and the like. Alternatively, siRNA molecules can be assembled from two distinct oligonucleotides, wherein one oligonucleotide comprises the sense strand and the other comprises the antisense strand of the siRNA. For example, each strand can be synthesized separately and joined together by hybridization or ligation following synthesis and/or deprotection. In certain other instances, siRNA molecules can be synthesized as a single continuous oligonucleotide fragment, where the self-complementary sense and antisense regions hybridize to form an siRNA duplex having hairpin secondary structure.

c. Modifying siRNA Sequences

In certain aspects, siRNA molecules comprise a duplex having two strands and at least one modified nucleotide in the double-stranded region, wherein each strand is about 15 to about 60 nucleotides in length. Advantageously, the modified siRNA is less immunostimulatory than a corresponding unmodified siRNA sequence, but retains the capability of silencing the expression of a target sequence. In preferred embodiments, the degree of chemical modifications introduced into the siRNA molecule strikes a balance between reduction or abrogation of the immunostimulatory properties of the siRNA and retention of RNAi activity. As a non-limiting example, an siRNA molecule that targets a gene of interest can be minimally modified (e.g., less than about 30%, 25%, 20%, 15%, 10%, or 5% modified) at selective uridine and/or guanosine nucleotides within the siRNA duplex to eliminate the immune response generated by the siRNA while retaining its capability to silence target gene expression.

Examples of modified nucleotides suitable for use in the invention include, but are not limited to, ribonucleotides having a 2'-O-methyl (2'OMe), 2'-deoxy-2'-fluoro (2'F), 2'-deoxy, 5-C-methyl, 2'-O-(2-methoxyethyl) (MOE), 4'-thio, 2'-amino, or 2'-C-allyl group. Modified nucleotides having a Northern conformation such as those described in, e.g., Saenger, *Principles of Nucleic Acid Structure*, Springer-Verlag Ed. (1984), are also suitable for use in siRNA molecules. Such modified nucleotides include, without limitation, locked nucleic acid (LNA) nucleotides (e.g., 2'-O, 4'-C-methylene-(D-ribofuranosyl) nucleotides), 2'-O-(2-methoxyethyl) (MOE) nucleotides, 2'-methyl-thio-ethyl nucleotides, 2'-deoxy-2'-fluoro (2'F) nucleotides, 2'-deoxy-2'-chloro (2'Cl) nucleotides, and 2'-azido nucleotides. In certain instances, the siRNA molecules described herein include one or more G-clamp nucleotides. A G-clamp nucleotide refers to a modified cytosine analog wherein the modifications confer the ability to hydrogen bond both Watson-Crick and Hoogsteen faces of a complementary guanine nucleotide within a duplex (see, e.g., Lin et al., *J Am. Chem. Soc.,* 120:8531-8532 (1998)). In addition, nucleotides having a nucleotide base analog such as, for example, C-phenyl, C-naphthyl, other aromatic derivatives, inosine, azole carboxamides, and nitroazole derivatives such as 3-nitropyrrole, 4-nitroindole, 5-nitroindole, and 6-nitroindole (see, e.g., Loakes, *Nucl. Acids Res.,* 29:2437-2447 (2001)) can be incorporated into siRNA molecules.

In certain embodiments, siRNA molecules may further comprise one or more chemical modifications such as terminal cap moieties, phosphate backbone modifications, and the like. Examples of terminal cap moieties include, without limitation, inverted deoxy abasic residues, glyceryl modifications, 4',5'-methylene nucleotides, 1-(β-D-erythrofuranosyl) nucleotides, 4'-thio nucleotides, carbocyclic nucleotides, 1,5-anhydrohexitol nucleotides, L-nucleotides, α-nucleotides, modified base nucleotides, threo-pentofuranosyl nucleotides, acyclic 3',4'-seco nucleotides, acyclic 3,4-dihydroxybutyl nucleotides, acyclic 3,5-dihydroxypentyl nucleotides, 3'-3'-inverted nucleotide moieties, 3'-3'-inverted abasic moieties, 3'-2'-inverted nucleotide moieties, 3'-2'-inverted abasic moieties, 5'-5'-inverted nucleotide moieties, 5'-5'-inverted abasic moieties, 3'-5'-inverted deoxy abasic moieties, 5'-amino-alkyl phosphate, 1,3-diamino-2-propyl phosphate, 3-aminopropyl phosphate, 6-aminohexyl phosphate, 1,2-aminododecyl phosphate, hydroxypropyl phosphate, 1,4-butanediol phosphate, 3'-phosphoramidate, 5'-phosphoramidate, hexylphosphate, aminohexyl phosphate, 3'-phosphate, 5'-amino, 3'-phosphorothioate, 5'-phosphorothioate, phosphorodithioate, and bridging or non-bridging methylphosphonate or 5'-mercapto moieties (see, e.g., U.S. Pat. No. 5,998,203; Beaucage et al., Tetrahedron 49:1925 (1993)). Non-limiting examples of phosphate backbone modifications (i.e., resulting in modified internucleotide linkages) include phosphorothioate, phosphorodithioate, methylphosphonate, phosphotriester, morpholino, amidate, carbamate, carboxymethyl, acetamidate, polyamide, sulfonate, sulfonamide, sulfamate, formacetal, thioformacetal, and alkylsilyl substitutions (see, e.g., Hunziker et al., *Nucleic Acid Analogues: Synthesis and Properties*, in *Modern Synthetic Methods*, VCH, 331-417 (1995); Mesmaeker et al., *Novel Backbone Replacements for Oligonucleotides*, in *Carbohydrate Modifications in Antisense Research*, ACS, 24-39 (1994)). Such chemical modifications can occur at the 5'-end and/or 3'-end of the sense strand, antisense strand, or both strands of the siRNA. The disclosures of these references are herein incorporated by reference in their entirety for all purposes.

In some embodiments, the sense and/or antisense strand of the siRNA molecule can further comprise a 3'-terminal overhang having about 1 to about 4 (e.g., 1, 2, 3, or 4) 2'-deoxy ribonucleotides and/or any combination of modified and unmodified nucleotides. Additional examples of modified

nucleotides and types of chemical modifications that can be introduced into siRNA molecules are described, e.g., in UK Patent No. GB 2,397,818 B and U.S. Patent Publication Nos. 20040192626, 20050282188, and 20070135372, the disclosures of which are herein incorporated by reference in their entirety for all purposes.

The siRNA molecules described herein can optionally comprise one or more non-nucleotides in one or both strands of the siRNA. As used herein, the term "non-nucleotide" refers to any group or compound that can be incorporated into a nucleic acid chain in the place of one or more nucleotide units, including sugar and/or phosphate substitutions, and allows the remaining bases to exhibit their activity. The group or compound is abasic in that it does not contain a commonly recognized nucleotide base such as adenosine, guanine, cytosine, uracil, or thymine and therefore lacks a base at the 1'-position.

In other embodiments, chemical modification of the siRNA comprises attaching a conjugate to the siRNA molecule. The conjugate can be attached at the 5' and/or 3'-end of the sense and/or antisense strand of the siRNA via a covalent attachment such as, e.g., a biodegradable linker. The conjugate can also be attached to the siRNA, e.g., through a carbamate group or other linking group (see, e.g., U.S. Patent Publication Nos. 20050074771, 20050043219, and 20050158727). In certain instances, the conjugate is a molecule that facilitates the delivery of the siRNA into a cell. Examples of conjugate molecules suitable for attachment to siRNA include, without limitation, steroids such as cholesterol, glycols such as polyethylene glycol (PEG), human serum albumin (HSA), fatty acids, carotenoids, terpenes, bile acids, folates (e.g., folic acid, folate analogs and derivatives thereof), sugars (e.g., galactose, galactosamine, N-acetyl galactosamine, glucose, mannose, fructose, fucose, etc.), phospholipids, peptides, ligands for cellular receptors capable of mediating cellular uptake, and combinations thereof (see, e.g., U.S. Patent Publication Nos. 20030130186, 20040110296, and 20040249178; U.S. Pat. No. 6,753,423). Other examples include the lipophilic moiety, vitamin, polymer, peptide, protein, nucleic acid, small molecule, oligosaccharide, carbohydrate cluster, intercalator, minor groove binder, cleaving agent, and cross-linking agent conjugate molecules described in U.S. Patent Publication Nos. 20050119470 and 20050107325. Yet other examples include the 2'-O-alkyl amine, 2'-O-alkoxyalkyl amine, polyamine, C5-cationic modified pyrimidine, cationic peptide, guanidinium group, amidininium group, cationic amino acid conjugate molecules described in U.S. Patent Publication No. 20050153337. Additional examples include the hydrophobic group, membrane active compound, cell penetrating compound, cell targeting signal, interaction modifier, and steric stabilizer conjugate molecules described in U.S. Patent Publication No. 20040167090. Further examples include the conjugate molecules described in U.S. Patent Publication No. 20050239739. The type of conjugate used and the extent of conjugation to the siRNA molecule can be evaluated for improved pharmacokinetic profiles, bioavailability, and/or stability of the siRNA while retaining RNAi activity. As such, one skilled in the art can screen siRNA molecules having various conjugates attached thereto to identify ones having improved properties and full RNAi activity using any of a variety of well-known in vitro cell culture or in vivo animal models. The disclosures of the above-described patent documents are herein incorporated by reference in their entirety for all purposes.

d. Target Genes

The siRNA component of the nucleic acid-lipid particles described herein can be used to downregulate or silence the translation (i.e., expression) of a gene of interest. Genes of interest include, but are not limited to, genes associated with viral infection and survival, genes associated with metabolic diseases and disorders (e.g., liver diseases and disorders), genes associated with tumorigenesis and cell transformation (e.g., cancer), angiogenic genes, immunomodulator genes such as those associated with inflammatory and autoimmune responses, ligand receptor genes, and genes associated with neurodegenerative disorders.

Genes associated with viral infection and survival include those expressed by a virus in order to bind, enter, and replicate in a cell. Of particular interest are viral sequences associated with chronic viral diseases. Viral sequences of particular interest include sequences of Filoviruses such as Ebola virus and Marburg virus (see, e.g., Geisbert et al., *J. Infect. Dis.,* 193:1650-1657 (2006)); Arenaviruses such as Lassa virus, Junin virus, Machupo virus, Guanarito virus, and Sabia virus (Buchmeier et al., Arenaviridae: the viruses and their replication, In: FIELDS VIROLOGY, Knipe et al. (eds.), 4th ed., Lippincott-Raven, Philadelphia, (2001)); Influenza viruses such as Influenza A, B, and C viruses, (see, e.g., Steinhauer et al., *Annu Rev Genet.,* 36:305-332 (2002); and Neumann et al., *J Gen Virol.,* 83:2635-2662 (2002)); Hepatitis viruses (see, e.g., Hamasaki et al., *FEBS Lett.,* 543:51 (2003); Yokota et al., *EMBO Rep.,* 4:602 (2003); Schlomai et al., *Hepatology,* 37:764 (2003); Wilson et al., *Proc. Natl. Acad. Sci. USA,* 100:2783 (2003); Kapadia et al., *Proc. Natl. Acad. Sci. USA,* 100:2014 (2003); and FIELDS VIROLOGY, Knipe et al, (eds.), 4th ed., Lippincott-Raven, Philadelphia (2001)); Human Immunodeficiency Virus (HIV) (Banerjea et al., *Mol. Ther.,* 8:62 (2003); Song et al., *J. Viral.,* 77:7174 (2003); Stephenson, *JAMA,* 289:1494 (2003); Qin et al., *Proc. Natl. Acad. Sci. USA,* 100:183 (2003)); Herpes viruses (Jia et at, *J. Virol.,* 77:3301 (2003)); and Human Papilloma Viruses (HPV) (Hall et al., *J. Virol.,* 77:6066 (2003); Jiang et al., *Oncogene,* 21:6041 (2002)).

Exemplary Filovirus nucleic acid sequences that can be silenced include, but are not limited to, nucleic acid sequences encoding structural proteins (e.g., VP30, VP35, nucleoprotein (NP), polymerase protein (L-pol)) and membrane-associated proteins (e.g., VP40, glycoprotein (GP), VP24). Complete genome sequences for Ebola virus are set forth in, e.g., Genbank Accession Nos. NC_002549; AY769362; NC_006432; NC_004161; AY729654; AY354458; AY142960; AB050936; AF522874; AF499101; AF272001; and AF086833. Ebola virus VP24 sequences are set forth in, e.g., Genbank Accession Nos. U77385 and AY058897. Ebola virus L-pol sequences are set forth in, e.g., Genbank Accession No. X67110. Ebola virus VP40 sequences are set forth in, e.g., Genbank Accession No. AY058896. Ebola virus NP sequences are set forth in, e.g., Genbank Accession No. AY058895. Ebola virus GP sequences are set forth in, e.g., Genbank Accession No. AY058898; Sanchez et al., *Virus Res.,* 29:215-240 (1993); Will et al., *J. Virol.,* 67:1203-1210 (1993); Volchkov et al., *FEBS Lett.,* 305:181-184 (1992); and U.S. Pat. No. 6,713,069. Additional Ebola virus sequences are set forth in, e.g., Genbank Accession Nos. L11365 and X61274. Complete genome sequences for Marburg virus are set forth in, e.g., Genbank Accession Nos. NC_001608; AY430365; AY430366; and AY358025. Marburg virus GP sequences are set forth in, e.g., Genbank Accession Nos. AF005734; AF005733; and AF005732. Marburg virus VP35 sequences are set forth in, e.g., Genbank Accession Nos. AF005731 and

AF005730. Additional Marburg virus sequences are set forth in, e.g., Genbank Accession Nos. X64406; Z29337; AF005735; and Z12132. Non-limiting examples of siRNA molecules targeting Ebola virus and Marburg virus nucleic acid sequences include those described in U.S. Patent Publication No. 20070135370, the disclosure of which is herein incorporated by reference in its entirety for all purposes.

Exemplary Influenza virus nucleic acid sequences that can be silenced include, but are not limited to, nucleic acid sequences encoding nucleoprotein (NP), matrix proteins (M1 and M2), nonstructural proteins (NS1 and NS2), RNA polymerase (PA, PB1, PB2), neuraminidase (NA), and haemagglutinin (HA). Influenza A NP sequences are set forth in, e.g., Genbank Accession Nos. NC_004522; AY818138; AB166863; AB188817; AB189046; AB189054; AB189062; AY646169; AY646177; AY651486; AY651493; AY651494; AY651495; AY651496; AY651497; AY651498; AY651499; AY651500; AY651501; AY651502; AY651503; AY651504; AY651505; AY651506; AY651507; AY651509; AY651528; AY770996; AY790308; AY818138; and AY818140. Influenza A PA sequences are set forth in, e.g., Genbank Accession Nos. AY818132; AY790280; AY646171; AY818132; AY818133; AY646179; AY818134; AY551934; AY651613; AY651610; AY651620; AY651617; AY651600; AY651611; AY651606; AY651618; AY651608; AY651607; AY651605; AY651609; AY651615; AY651616; AY651640; AY651614; AY651612; AY651621; AY651619; AY770995; and AY724786. Non-limiting examples of siRNA molecules targeting Influenza virus nucleic acid sequences include those described in U.S. Patent Publication No. 20070218122, the disclosure of which is herein incorporated by reference in its entirety for all purposes.

Exemplary hepatitis virus nucleic acid sequences that can be silenced include, but are not limited to, nucleic acid sequences involved in transcription and translation (e.g., En1, En2, X, P) and nucleic acid sequences encoding structural proteins (e.g., core proteins including C and C-related proteins, capsid and envelope proteins including S, M, and/or L proteins, or fragments thereof) (see, e.g., Fields Virology, supra). Exemplary Hepatits C virus (HCV) nucleic acid sequences that can be silenced include, but are not limited to, the 5'-untranslated region (5'-UTR), the 3'-untranslated region (3'-UTR), the polyprotein translation initiation codon region, the internal ribosome entry site (IRES) sequence, and/or nucleic acid sequences encoding the core protein, the E1 protein, the E2 protein, the p7 protein, the NS2 protein, the NS3 protease/helicase, the NS4A protein, the NS4B protein, the NS5A protein, and/or the NS5B RNA-dependent RNA polymerase. HCV genome sequences are set forth in, e.g., Genbank Accession Nos. NC_004102 (HCV genotype 1a), AJ238799 (HCV genotype 1b), NC_009823 (HCV genotype 2), NC_009824 (HCV genotype 3), NC_009825 (HCV genotype 4), NC_009826 (HCV genotype 5), and NC_009827 (HCV genotype 6). Hepatitis A virus nucleic acid sequences are set forth in, e.g., Genbank Accession No. NC_001489; Hepatitis B virus nucleic acid sequences are set forth in, e.g., Genbank Accession No. NC_003977; Hepatitis D virus nucleic acid sequence are set forth in, e.g., Genbank Accession No. NC_001653; Hepatitis E virus nucleic acid sequences are set forth in, e.g., Genbank Accession No. NC_001434; and Hepatitis G virus nucleic acid sequences are set forth in, e.g., Genbank Accession No. NC_001710. Silencing of sequences that encode genes associated with viral infection and survival can conveniently be used in combination with the administration of conventional agents used to treat the viral condition. Non-limiting examples of siRNA molecules targeting hepatitis virus nucleic acid sequences include those described in U.S. Patent Publication Nos. 20060281175, 20050058982, and 20070149470; U.S. Pat. No. 7,348,314; and U.S. Provisional Application No. 61/162,127, filed Mar. 20, 2009, the disclosures of which are herein incorporated by reference in their entirety for all purposes.

Genes associated with metabolic diseases and disorders (e.g., disorders in which the liver is the target and liver diseases and disorders) include, for example, genes expressed in dyslipidemia (e.g., liver X receptors such as LXRα and LXRβ (Genback Accession No. NM_007121), farnesoid X receptors (FXR) (Genbank Accession No. NM_005123), sterol-regulatory element binding protein (SREBP), site-1 protease (SIP), 3-hydroxy-3-methylglutaryl coenzyme-A reductase (HMG coenzyme-A reductase), apolipoprotein B (ApoB) (Genbank Accession No. NM_000384), apolipoprotein CIII (ApoC3) (Genbank Accession Nos. NM_000040 and NG_008949 REGION: 5001.8164), and apolipoprotein E (ApoE) (Genbank Accession Nos. NM_000041 and NG_007084 REGION: 5001.8612)); and diabetes (e.g., glucose 6-phosphatase) (see, e.g., Forman et al., *Cell,* 81:687 (1995); Seol et al., *Mol. Endocrinol.,* 9:72 (1995), Zavacki et al., *Proc. Natl. Acad. Sci. USA,* 94:7909 (1997); Sakai et al., *Cell,* 85:1037-1046 (1996); Duncan et al., *J. Biol. Chem.,* 272:12778-12785 (1997); Willy et al., *Genes Dev.,* 9:1033-1045 (1995); Lehmann et al., *J. Biol. Chem.,* 272:3137-3140 (1997); Janowski et al., *Nature,* 383:728-731 (1996); and Peet et al., *Cell,* 93:693-704 (1998)). One of skill in the art will appreciate that genes associated with metabolic diseases and disorders (e.g., diseases and disorders in which the liver is a target and liver diseases and disorders) include genes that are expressed in the liver itself as well as and genes expressed in other organs and tissues. Silencing of sequences that encode genes associated with metabolic diseases and disorders can conveniently be used in combination with the administration of conventional agents used to treat the disease or disorder. Non-limiting examples of siRNA molecules targeting the ApoB gene include those described in U.S. Patent Publication No. 20060134189, the disclosure of which is herein incorporated by reference in its entirety for all purposes. Non-limiting examples of siRNA molecules targeting the ApoC3 gene include those described in U.S. Provisional Application No. 61/147,235, filed Jan. 26, 2009, the disclosure of which is herein incorporated by reference in its entirety for all purposes.

Examples of gene sequences associated with tumorigenesis and cell transformation (e.g., cancer or other neoplasia) include mitotic kinesins such as Eg5 (KSP, KIF11; Genbank Accession No. NM_004523); serine/threonine kinases such as polo-like kinase 1 (PLK-1) (Genbank Accession No. NM_005030; Barr et al., *Nat. Rev. Mol. Cell Biol.,* 5:429-440 (2004)); tyrosine kinases such as WEE1 (Genbank Accession Nos. NM_003390 and NM_001143976); inhibitors of apoptosis such as XIAP (Genbank Accession No. NM_001167); COP9 signalosome subunits such as CSN1, CSN2, CSN3, CSN4, CSN5 (JAB1; Genbank Accession No. NM_006837); CSN6, CSN7A, CSN7B, and CSN8; ubiquitin ligases such as COP1 (RFWD2; Genbank Accession Nos. NM_022457 and NM_001001740); and histone deacetylases such as HDAC1, HDAC2 (Genbank Accession No. NM 001527), HDAC3, HDAC4, HDAC5, HDAC6, HDAC7, FIDAC8, HDAC9, etc. Non-limiting examples of siRNA molecules targeting the Eg5 and XIAP genes include those described in U.S. patent application Ser. No. 11/807,872, filed May 29, 2007, the disclosure of which is herein incorporated by reference in its entirety for all purposes. Non-limiting examples of siRNA molecules targeting the PLK-1 gene include those described in U.S. Patent Publication Nos. 20050107316 and

20070265438; and U.S. patent application Ser. No. 12/343,342, filed Dec. 23, 2008, the disclosures of which are herein incorporated by reference in their entirety for all purposes. Non-limiting examples of siRNA molecules targeting the CSN5 gene include those described in U.S. Provisional Application No. 61/045,251, filed Apr. 15, 2008, the disclosure of which is herein incorporated by reference in its entirety for all purposes.

Additional examples of gene sequences associated with tumorigenesis and cell transformation include translocation sequences such as MLL fusion genes, BCR-ABL (Wilda et al., *Oncogene,* 21:5716 (2002); Scherr et al., *Blood,* 101:1566 (2003)), TEL-AML1, EWS-FLI1, TLS-FUS, PAX3-FKHR, BCL-2, AML1-ETO, and AML1-MTG8 (Heidenreich et al., *Blood,* 101:3157 (2003)); overexpressed sequences such as multidrug resistance genes (Nieth et al., *FEBS Lett.,* 545:144 (2003); Wu et al, *Cancer Res.* 63:1515 (2003)), cyclins (Li et al., *Cancer Res.,* 63:3593 (2003); Zou et al., *Genes Dev.,* 16:2923 (2002)), beta-catenin (Verma et al., *Clin Cancer Res.,* 9:1291 (2003)), telomerase genes (Kosciolek et al., *Mol Cancer Ther.,* 2:209 (2003)), c-MYC, N-MYC, BCL-2, growth factor receptors (e.g., EGFR/ErbB1 (Genbank Accession Nos. NM_005228, NM_201282, NM_201283, and NM_201284; see also, Nagy et al. *Exp. Cell Res.,* 285:39-49 (2003), ErbB2/HER-2 (Genbank Accession Nos. NM_004448 and NM_001005862), ErbB3 (Genbank Accession Nos. NM 001982 and NM_001005915), and ErbB4 (Genbank Accession Nos. NM_005235 and NM_001042599); and mutated sequences such as RAS (reviewed in Tuschl and Borkhardt, *Mol. Interventions,* 2:158 (2002)). Non-limiting examples of siRNA molecules targeting the EGFR gene include those described in U.S. patent application Ser. No. 11/807,872, filed May 29, 2007, the disclosure of which is herein incorporated by reference in its entirety for all purposes.

Silencing of sequences that encode DNA repair enzymes find use in combination with the administration of chemotherapeutic agents (Collis et al., *Cancer Res.,* 63:1550 (2003)). Genes encoding proteins associated with tumor migration are also target sequences of interest, for example, integrins, selectins, and metalloproteinases. The foregoing examples are not exclusive. Those of skill in the art will understand that any whole or partial gene sequence that facilitates or promotes tumorigenesis or cell transformation, tumor growth, or tumor migration can be included as a template sequence.

Angiogenic genes are able to promote the formation of new vessels. Of particular interest is vascular endothelial growth factor (VEGF) (Reich et al., *Mol. Vis.,* 9:210 (2003)) or VEGFR. siRNA sequences that target VEGFR are set forth in, e.g., GB 2396864; U.S. Patent Publication No. 20040142895; and CA 2456444, the disclosures of which are herein incorporated by reference in their entirety for all purposes.

Anti-angiogenic genes are able to inhibit neovascularization. These genes are particularly useful for treating those cancers in which angiogenesis plays a role in the pathological development of the disease. Examples of anti-angiogenic genes include, but are not limited to, endostatin (see, e.g., U.S. Pat. No. 6,174,861), angiostatin (see, e.g., U.S. Pat. No. 5,639,725), and VEGFR2 (see, e.g., Decaussin et al., *J. Pathol.,* 188: 369-377 (1999)), the disclosures of which are herein incorporated by reference in their entirety for all purposes.

Immunomodulator genes are genes that modulate one or more immune responses. Examples of immunomodulator genes include, without limitation, cytokines such as growth factors (e.g., TGF-α, TGF-□β, EGF, FGF, IGF, NGF, PDGF, CGF, GM-CSF, SCF, etc.), interleukins (e.g., IL-2, IL-4, IL-12 (Hill et al., *J. Immunol.,* 171:691 (2003)), IL-15, IL-18, IL-20, etc.), interferons (e.g., IFN-α, IFN-β, IFN-γ, etc.) and TNF. Fas and Fas ligand genes are also immunomodulator target sequences of interest (Song et al., *Nat. Med.,* 9:347 (2003)). Genes encoding secondary signaling molecules in hematopoietic and lymphoid cells are also included in the present invention, for example, Tec family kinases such as Bruton's tyrosine kinase (Btk) (Heinonen et al., *FESS Lett.,* 527:274 (2002)).

Cell receptor ligands include ligands that are able to bind to cell surface receptors (e.g., insulin receptor, EPO receptor, G-protein coupled receptors, receptors with tyrosine kinase activity, cytokine receptors, growth factor receptors, etc.), to modulate (e.g., inhibit, activate, etc.) the physiological pathway that the receptor is involved in (e.g., glucose level modulation, blood cell development, mitogenesis, etc.). Examples of cell receptor ligands include, but are not limited to, cytokines, growth factors, interleukins, interferons, erythropoietin (EPO), insulin, glucagon, G-protein coupled receptor ligands, etc. Templates coding for an expansion of trinucleotide repeats (e.g., CAG repeats) find use in silencing pathogenic sequences in neurodegenerative disorders caused by the expansion of trinucleotide repeats, such as spinobulbular muscular atrophy and Huntington's Disease (Caplen et al., *Hum. Mol. Genet.,* 11:175 (2002)).

In addition to its utility in silencing the expression of any of the above-described genes for therapeutic purposes, the siRNA described herein are also useful in research and development applications as well as diagnostic, prophylactic, prognostic, clinical, and other healthcare applications. As a non-limiting example, the siRNA can be used in target validation studies directed at testing whether a gene of interest has the potential to be a therapeutic target. The siRNA can also be used in target identification studies aimed at discovering genes as potential therapeutic targets.

2. aiRNA

Like siRNA, asymmetrical interfering RNA (aiRNA) can recruit the RNA-induced silencing complex (RISC) and lead to effective silencing of a variety of genes in mammalian cells by mediating sequence-specific cleavage of the target sequence between nucleotide 10 and 11 relative to the 5' end of the antisense strand (Sun et al., *Nat. Biotech.,* 26:1379-1382 (2008)). Typically, an aiRNA molecule comprises a short RNA duplex having a sense strand and an antisense strand, wherein the duplex contains overhangs at the 3' and 5' ends of the antisense strand. The aiRNA is generally asymmetric because the sense strand is shorter on both ends when compared to the complementary antisense strand. In some aspects, aiRNA molecules may be designed, synthesized, and annealed under conditions similar to those used for siRNA molecules. As a non-limiting example, aiRNA sequences may be selected and generated using the methods described above for selecting siRNA sequences.

In another embodiment, aiRNA duplexes of various lengths (e.g., about 10-25, 12-20, 12-19, 12-18, 13-17, or 14-17 base pairs, more typically 12, 13, 14, 15, 16, 17, 18, 19, or 20 base pairs) may be designed with overhangs at the 3' and 5' ends of the antisense strand to target an mRNA of interest. In certain instances, the sense strand of the aiRNA molecule is about 10-25, 12-20, 12-19, 12-18, 13-17, or 14-17 nucleotides in length, more typically 12, 13, 14, 15, 16, 17, 18, 19, or 20 nucleotides in length. In certain other instances, the antisense strand of the aiRNA molecule is about 15-60, 15-50, or 15-40 nucleotides in length, more typically about 15-30, 15-25, or 19-25 nucleotides in length, and is preferably about 20-24, 21-22, or 21-23 nucleotides in length.

In some embodiments, the 5' antisense overhang contains one, two, three, four, or more nontargeting nucleotides (e.g., "AA", "UU", "dTdT", etc.). In other embodiments, the 3' antisense overhang contains one, two, three, four, or more nontargeting nucleotides (e.g., "AA", "UU", "dTdT", etc.). In certain aspects, the aiRNA molecules described herein may comprise one or more modified nucleotides, e.g., in the double-stranded (duplex) region and/or in the antisense overhangs. As a non-limiting example, aiRNA sequences may comprise one or more of the modified nucleotides described above for siRNA sequences. In a preferred embodiment, the aiRNA molecule comprises 2'OMe nucleotides such as, for example, 2'OMe-guanosine nucleotides, 2'OMe-uridine nucleotides, or mixtures thereof.

In certain embodiments, aiRNA molecules may comprise an antisense strand which corresponds to the antisense strand of an siRNA molecule, e.g., one of the siRNA molecules described herein. In other embodiments, aiRNA molecules may be used to silence the expression of any of the target genes set forth above, such as, e.g., genes associated with viral infection and survival, genes associated with metabolic diseases and disorders, genes associated with tumorigenesis and cell transformation, angiogenic genes, immunomodulator genes such as those associated with inflammatory and autoimmune responses, ligand receptor genes, and genes associated with neurodegenerative disorders.

3. miRNA

Generally, microRNAs (miRNA) are single-stranded RNA molecules of about 21-23 nucleotides in length which regulate gene expression. miRNAs are encoded by genes from whose DNA they are transcribed, but miRNAs are not translated into protein (non-coding RNA); instead, each primary transcript (a pri-miRNA) is processed into a short stem-loop structure called a pre-miRNA and finally into a functional mature miRNA. Mature miRNA molecules are either partially or completely complementary to one or more messenger RNA (mRNA) molecules, and their main function is to downregulate gene expression. The identification of miRNA molecules is described, e.g., in Lagos-Quintana at al., *Science,* 294:853-858; Lau et al., *Science,* 294:858-862; and Lee et al., *Science,* 294:862-864.

The genes encoding miRNA are much longer than the processed mature miRNA molecule. miRNA are first transcribed as primary transcripts or pri-miRNA with a cap and poly-A tail and processed to short, ~70-nucleotide stem-loop structures known as pre-miRNA in the cell nucleus. This processing is performed in animals by a protein complex known as the Microprocessor complex, consisting of the nuclease Drosha and the double-stranded RNA binding protein Pasha (Denli et al., *Nature,* 432:231-235 (2004)). These pre-miRNA are then processed to mature miRNA in the cytoplasm by interaction with the endonuclease Dicer, which also initiates the formation of the RNA-induced silencing complex (RISC) (Bernstein et al., *Nature,* 409:363-366 (2001). Either the sense strand or antisense strand of DNA can function as templates to give rise to miRNA.

When Dicer cleaves the pre-miRNA stem-loop, two complementary short RNA molecules are formed, but only one is integrated into the RISC complex. This strand is known as the guide strand and is selected by the argonaute protein, the catalytically active RNase in the RISC complex, on the basis of the stability of the 5' end (Preall et al., *Curr. Biol.,* 16:530-535 (2006)). The remaining strand, known as the anti-guide or passenger strand, is degraded as a RISC complex substrate (Gregory et al., *Cell,* 123:631-640 (2005)). After integration into the active RISC complex, miRNAs base pair with their complementary mRNA molecules and induce target mRNA degradation and/or translational silencing.

Mammalian miRNA molecules are usually complementary to a site in the 3' UTR of the target mRNA sequence. In certain instances, the annealing of the miRNA to the target mRNA inhibits protein translation by blocking the protein translation machinery. In certain other instances, the annealing of the miRNA to the target mRNA facilitates the cleavage and degradation of the target mRNA through a process similar to RNA interference (RNAi). miRNA may also target methylation of genomic sites which correspond to targeted mRNA. Generally, miRNA function in association with a complement of proteins collectively termed the miRNP.

In certain aspects, the miRNA molecules described herein are about 15-100, 15-90, 15-80, 15-75, 15-70, 15-60, 15-50, or 15-40 nucleotides in length, more typically about 15-30, 15-25, or 19-25 nucleotides in length, and are preferably about 20-24, 21-22, or 21-23 nucleotides in length. In certain other aspects, miRNA molecules may comprise one or more modified nucleotides. As a non-limiting example, miRNA sequences may comprise one or more of the modified nucleotides described above for siRNA sequences. In a preferred embodiment, the miRNA molecule comprises 2'OMe nucleotides such as, for example, 2'OMe-guanosine nucleotides, 2'OMe-uridine nucleotides, or mixtures thereof.

In some embodiments, miRNA molecules may be used to silence the expression of any of the target genes set forth above, such as, e.g., genes associated with viral infection and survival, genes associated with metabolic diseases and disorders, genes associated with tumorigenesis and cell transformation, angiogenic genes, immunomodulator genes such as those associated with inflammatory and autoimmune responses, ligand receptor genes, and genes associated with neurodegenerative disorders.

In other embodiments, one or more agents that block the activity of a miRNA targeting an mRNA of interest are administered using a lipid particle of the invention (e.g., a nucleic acid-lipid particle). Examples of blocking agents include, but are not limited to, steric blocking oligonucleotides, locked nucleic acid oligonucleotides, and Morpholino oligonucleotides. Such blocking agents may bind directly to the miRNA or to the miRNA binding site on the target mRNA.

4. Antisense Oligonucleotides

In one embodiment, the nucleic acid is an antisense oligonucleotide directed to a target gene or sequence of interest. The terms "antisense oligonucleotide" or "antisense" include oligonucleotides that are complementary to a targeted polynucleotide sequence. Antisense oligonucleotides are single strands of DNA or RNA that are complementary to a chosen sequence. Antisense RNA oligonucleotides prevent the translation of complementary RNA strands by binding to the RNA. Antisense DNA oligonucleotides can be used to target a specific, complementary (coding or non-coding) RNA. If binding occurs, this DNA/RNA hybrid can be degraded by the enzyme RNase H. In a particular embodiment, antisense oligonucleotides comprise from about 10 to about 60 nucleotides, more preferably from about 15 to about 30 nucleotides. The term also encompasses antisense oligonucleotides that may not be exactly complementary to the desired target gene. Thus, the invention can be utilized in instances where non-target specific-activities are found with antisense, or where an antisense sequence containing one or more mismatches with the target sequence is the most preferred for a particular use.

Antisense oligonucleotides have been demonstrated to be effective and targeted inhibitors of protein synthesis, and, consequently, can be used to specifically inhibit protein syn-

thesis by a targeted gene. The efficacy of antisense oligonucleotides for inhibiting protein synthesis is well established. For example, the synthesis of polygalactauronase and the muscarine type 2 acetylcholine receptor are inhibited by antisense oligonucleotides directed to their respective mRNA sequences (see, U.S. Pat. Nos. 5,739,119 and 5,759,829). Furthermore, examples of antisense inhibition have been demonstrated with the nuclear protein cyclin, the multiple drug resistance gene (MDR1), ICAM-1, E-selectin, STK-1, striatal GABAA receptor, and human EGF (see, Jaskulski et al., *Science,* 240:1544-6 (1988); Vasanthakumar et al., *Cancer Commun.,* 1:225-32 (1989); Penis et al., *Brain Res Mal Brain Res.,* 15; 57:310-20 (1998); and U.S. Pat. Nos. 5,801,154; 5,789,573; 5,718,709 and 5,610,288). Moreover, antisense constructs have also been described that inhibit and can be used to treat a variety of abnormal cellular proliferations, e.g., cancer (see, U.S. Pat. Nos. 5,747,470; 5,591,317; and 5,783,683). The disclosures of these references are herein incorporated by reference in their entirety for all purposes.

Methods of producing antisense oligonucleotides are known in the art and can be readily adapted to produce an antisense oligonucleotide that targets any polynucleotide sequence. Selection of antisense oligonucleotide sequences specific for a given target sequence is based upon analysis of the chosen target sequence and determination of secondary structure, $T_m$, binding energy, and relative stability. Antisense oligonucleotides may be selected based upon their relative inability to form dimers, hairpins, or other secondary structures that would reduce or prohibit specific binding to the target mRNA in a host cell. Highly preferred target regions of the mRNA include those regions at or near the AUG translation initiation codon and those sequences that are substantially complementary to 5' regions of the mRNA. These secondary structure analyses and target site selection considerations can be performed, for example, using v.4 of the OLIGO primer analysis software (Molecular Biology Insights) and/or the BLASTN 2.0.5 algorithm software (Altschul et al., *Nucleic Acids Res.,* 25:3389-402 (1997)).

5. Ribozymes

According to another embodiment of the invention, nucleic acid-lipid particles are associated with ribozymes. Ribozymes are RNA-protein complexes having specific catalytic domains that possess endonuclease activity (see, Kim et al., *Proc. Natl. Acad Sci. USA.,* 84:8788-92 (1987); and Forster et al., *Cell,* 49:211-20 (1987)). For example, a large number of ribozymes accelerate phosphoester transfer reactions with a high degree of specificity, often cleaving only one of several phosphoesters in an oligonucleotide substrate (see, Cech et al., *Cell,* 27:487-96 (1981); Michel et al., *J. Mol. Biol.,* 216:585-610 (1990); Reinhold-Hurek et al., *Nature,* 357:173-6 (1992)). This specificity has been attributed to the requirement that the substrate bind via specific base-pairing interactions to the internal guide sequence ("IGS") of the ribozyme prior to chemical reaction.

At least six basic varieties of naturally-occurring enzymatic RNA molecules are known presently. Each can catalyze the hydrolysis of RNA phosphodiester bonds in trans (and thus can cleave other RNA molecules) under physiological conditions. In general, enzymatic nucleic acids act by first binding to a target RNA. Such binding occurs through the target binding portion of an enzymatic nucleic acid which is held in close proximity to an enzymatic portion of the molecule that acts to cleave the target RNA. Thus, the enzymatic nucleic acid first recognizes and then binds a target RNA through complementary base-pairing, and once bound to the correct site, acts enzymatically to cut the target RNA. Strategic cleavage of such a target RNA will destroy its ability to direct synthesis of an encoded protein. After an enzymatic nucleic acid has bound and cleaved its RNA target, it is released from that RNA to search for another target and can repeatedly bind and cleave new targets.

The enzymatic nucleic acid molecule may be formed in a hammerhead, hairpin, hepatitis δ virus, group I intron or RNaseP RNA (in association with an RNA guide sequence), or Neurospora VS RNA motif, for example. Specific examples of hammerhead motifs are described in, e.g., Rossi et al., *Nucleic Acids Res.,* 20:4559-65 (1992). Examples of hairpin motifs are described in, e.g., EP 0360257, Hampel et al., *Biochemistry,* 28:4929-33 (1989); Hampel et al., *Nucleic Acids Res.,* 18:299-304 (1990); and U.S. Pat. No. 5,631,359. An example of the hepatitis δ virus motif is described in, e.g., Perrotta et al., *Biochemistry,* 31:11843-52 (1992). An example of the RNaseP motif is described in, e.g., Guerrier-Takada et al., *Cell,* 35:849-57 (1983). Examples of the Neurospora VS RNA ribozyme motif is described in, e.g., Saville et al., *Cell,* 61:685-96 (1990); Saville et al., *Proc. Natl. Acad. Sci. USA,* 88:8826-30 (1991); Collins et al., *Biochemistry,* 32:2795-9 (1993). An example of the Group I intron is described in, e.g., U.S. Pat. No. 4,987,071. Important characteristics of enzymatic nucleic acid molecules used according to the invention are that they have a specific substrate binding site which is complementary to one or more of the target gene DNA or RNA regions, and that they have nucleotide sequences within or surrounding that substrate binding site which impart an RNA cleaving activity to the molecule. Thus, the ribozyme constructs need not be limited to specific motifs mentioned herein. The disclosures of these references are herein incorporated by reference in their entirety for all purposes.

Methods of producing a ribozyme targeted to any polynucleotide sequence are known in the art. Ribozymes may be designed as described in, e.g., PCT Publication Nos. WO 93/23569 and WO 94/02595, and synthesized to be tested in vitro and/or in vivo as described therein. The disclosures of these PCT publications are herein incorporated by reference in their entirety for all purposes.

Ribozyme activity can be optimized by altering the length of the ribozyme binding arms or chemically synthesizing ribozymes with modifications that prevent their degradation by serum ribonucleases (see, e.g., PCT Publication Nos. WO 92/07065, WO 93/15187, WO 91/03162, and WO 94/13688; EP 92110298.4; and U.S. Pat. No. 5,334,711, which describe various chemical modifications that can be made to the sugar moieties of enzymatic RNA molecules, the disclosures of which are each herein incorporated by reference in their entirety for all purposes), modifications which enhance their efficacy in cells, and removal of stem II bases to shorten RNA synthesis times and reduce chemical requirements.

6. Immunostimulatory Oligonucleotides

Nucleic acids associated with lipid particles of the present invention may be immunostimulatory, including immunostimulatory oligonucleotides (ISS; single- or double-stranded) capable of inducing an immune response when administered to a subject, which may be a mammal such as a human. ISS include, e.g., certain palindromes leading to hairpin secondary structures (see, Yamamoto et al., *J. Immunol.,* 148:4072-6 (1992)), or CpG motifs, as well as other known ISS features (such as multi-G domains; see; PCT Publication No. WO 96/11266, the disclosure of which is herein incorporated by reference in its entirety for all purposes).

Immunostimulatory nucleic acids are considered to be non-sequence specific when it is not required that they specifically bind to and reduce the expression of a target sequence in order to provoke an immune response. Thus,

certain immunostimulatory nucleic acids may comprise a sequence corresponding to a region of a naturally-occurring gene or mRNA, but they may still be considered non-sequence specific immunostimulatory nucleic acids.

In one embodiment, the immunostimulatory nucleic acid or oligonucleotide comprises at least one CpG dinucleotide. The oligonucleotide or CpG dinucleotide may be unmethylated or methylated. In another embodiment, the immunostimulatory nucleic acid comprises at least one CpG dinucleotide having a methylated cytosine. In one embodiment, the nucleic acid comprises a single CpG dinucleotide, wherein the cytosine in the CpG dinucleotide is methylated. In an alternative embodiment, the nucleic acid comprises at least two CpG dinucleotides, wherein at least one cytosine in the CpG dinucleotides is methylated. In a further embodiment, each cytosine in the CpG dinucleotides present in the sequence is methylated. In another embodiment, the nucleic acid comprises a plurality of CpG dinucleotides, wherein at least one of the CpG dinucleotides comprises a methylated cytosine. Examples of immunostimulatory oligonucleotides suitable for use in the compositions and methods of the present invention are described in PCT Application No. PCT/US08/88676, filed Dec. 31, 2008, PCT Publication Nos. WO 02/069369 and WO 01/15726, U.S. Pat. No. 6,406,705, and Raney et al., J. Pharm. Exper. Ther., 298:1185-92 (2001), the disclosures of which are each herein incorporated by reference in their entirety for all purposes. In certain embodiments, the oligonucleotides used in the compositions and methods of the invention have a phosphodiester ("PO") backbone or a phosphorothioate ("PS") backbone, and/or at least one methylated cytosine residue in a CpG motif.

B. Other Active Agents

In certain embodiments, the active agent associated with the lipid particles of the invention may comprise one or more therapeutic proteins, polypeptides, or small organic molecules or compounds. Non-limiting examples of such therapeutically effective agents or drugs include oncology drugs (e.g., chemotherapy drugs, hormonal therapeutic agents, immunotherapeutic agents, radiotherapeutic agents, etc.), lipid-lowering agents, anti-viral drugs, anti-inflammatory compounds, antidepressants, stimulants, analgesics, antibiotics, birth control medication, antipyretics, vasodilators, anti-angiogenics, cytovascular agents, signal transduction inhibitors, cardiovascular drugs such as anti-arrhythmic agents, hormones, vasoconstrictors, and steroids. These active agents may be administered alone in the lipid particles of the invention, or in combination (e.g., co-administered) with lipid particles of the invention comprising nucleic acid such as interfering RNA.

Non-limiting examples of chemotherapy drugs include platinum-based drugs (e.g., oxaliplatin, cisplatin, carboplatin, spiroplatin, iproplatin, satraplatin, etc.), alkylating agents (e.g., cyclophosphamide, ifosfamide, chlorambucil, busulfan, melphalan, mechlorethamine, uramustine, thiotepa, nitrosoureas, etc.), anti-metabolites (e.g., 5-fluorouracil (5-FU), azathioprine, methotrexate, leucovorin, capecitabine, cytarabine, floxuridine, fludarabine, gemcitabine, pemetrexed, raltitrexed, etc.), plant alkaloids (e.g., vincristine, vinblastine, vinorelbine, vindesine, podophyllotoxin, paclitaxel (taxol), docetaxel, etc.), topoisomerase inhibitors (e.g., irinotecan (CPT-11; Camptosar), topotecan, amsacrine, etoposide (VP16), etoposide phosphate, teniposide, etc.), antitumor antibiotics (e.g., doxorubicin, adriamycin, daunorubicin, epirubicin, actinomycin, bleomycin, mitomycin, mitoxantrone, plicamycin, etc.), tyrosine kinase inhibitors (e.g., gefitinib (Iressa®), sunitinib (Sutent®; SU11248), erlotinib (Tarceva®; OSI-1774), lapatinib (GW572016; GW2016), canertinib (CI 1033), semaxinib (SU5416), vatalanib (PTK787/ZK222584), sorafenib (BAY 43-9006), imatinib (Gleevec®; STI571), dasatinib (BMS-354825), leflunomide (SU101), vandetanib (Zactima™; ZD6474), etc.), pharmaceutically acceptable salts thereof, stereoisomers thereof, derivatives thereof, analogs thereof, and combinations thereof.

Examples of conventional hormonal therapeutic agents include, without limitation, steroids (e.g., dexamethasone), finasteride, aromatase inhibitors, tamoxifen, and goserelin as well as other gonadotropin-releasing hormone agonists (GnRH).

Examples of conventional immunotherapeutic agents include, but are not limited to, immunostimulants (e.g., *Bacillus Calmette*-Guérin (BCG), levamisole, interleukin-2, alpha-interferon, etc.), monoclonal antibodies (e.g., anti-CD20, anti-HER2, anti-CD52, anti-HLA-DR, and anti-VEGF monoclonal antibodies), immunotoxins (e.g., anti-CD33 monoclonal antibody-calicheamicin conjugate, anti-CD22 monoclonal antibody-pseudomonas exotoxin conjugate, etc.), and radioimmunotherapy (e.g., anti-CD20 monoclonal antibody conjugated to $^{111}$In, $^{90}$Y, or $^{131}$I etc.).

Examples of conventional radiotherapeutic agents include, but are not limited to, radionuclides such as $^{47}$Sc, $^{64}$Cu, $^{67}$Cu, $^{37}$Sr, $^{86}$Y, $^{37}$Y, $^{90}$Y, $^{105}$Rh, $^{111}$Ag, $^{111}$In, $^{117m}$Sn, $^{149}$Pm, $^{153}$Sm, $^{166}$Ho, $^{177}$Lu, $^{186}$Re, $^{188}$Re, $^{211}$At, and $^{212}$Bi, optionally conjugated to antibodies directed against tumor antigens.

Additional oncology drugs that may be used according to the invention include, but are not limited to, alkeran, allopurinol, altretamine, amifostine, anastrozole, araC, arsenic trioxide, bexarotene, biCNU, carmustine, CCNU, celecoxib, cladribine, cyclosporin A, cytosine arabinoside, cytoxan, dexrazoxane, DTIC, estramustine, exemestane, FK506, gemtuzumab-ozogamicin, hydrea, hydroxyurea, idarubicin, interferon, letrozole, leustatin, leuprolide, litertinoin, megastrol, L-PAM, mesna, methoxsalen, mithramycin, nitrogen mustard, pamidronate, Pegademase, pentostatin, porfimer sodium, prednisone, rituxan, streptozocin, STI-571, taxotere, temozolamide, VM-26, toremifene, tretinoin, ATRA, valrubicin, and velban. Other examples of oncology drugs that may be used according to the invention are ellipticin and ellipticin analogs or derivatives, epothilones, intracellular kinase inhibitors, and camptothecins.

Non-limiting examples of lipid-lowering agents for treating a lipid disease or disorder associated with elevated triglycerides, cholesterol, and/or glucose include statins, fibrates, ezetimibe, thiazolidinediones, niacin, beta-blockers, nitroglycerin, calcium antagonists, fish oil, and mixtures thereof.

Examples of anti-viral drugs include, but are not limited to, abacavir, aciclovir, acyclovir, adefovir, amantadine, amprenavir, arbidol, atazanavir, atripla, cidofovir, combivir, darunavir, delavirdine, didanosine, docosanol, edoxudine, efavirenz, emtricitabine, enfuvirtide, entecavir, entry inhibitors, famciclovir, fixed dose combinations, fomivirsen, fosamprenavir, foscarnet, fosfonet, fusion inhibitors, ganciclovir, ibacitabine, imunovir, idoxuridine, imiquimod, indinavir, inosine, integrase inhibitors, interferon type III (e.g., IFN-λ molecules such as IFN-λ1, IFN-λ2, and IFN-λ3), interferon type II (e.g., IFN-γ), interferon type I (e.g., IFN-α such as PEGylated IFN-α, IFN-β, IFN-κ, IFN-δ, IFN-ε, IFN-τ, IFN-ω, and IFN-ξ, interferon, lamivudine, lopinavir, loviride, MK-0518, maraviroc, moroxydine, nelfinavir, nevirapine, nexavir, nucleoside analogues, oseltamivir, penciclovir, peramivir, pleconaril, podophyllotoxin, protease inhibitors, reverse transcriptase inhibitors, ribavirin, rimantadine, ritonavir, saquinavir, stavudine, synergistic enhancers, tenofovir, tenofovir disoproxil, tipranavir, trifluridine, trizivir, tro-

 

mantadine, truvada, valaciclovir, valganciclovir, vicriviroc, vidarabine, viramidine, zalcitabine, zanamivir, zidovudine, pharmaceutically acceptable salts thereof, stereoisomers thereof, derivatives thereof, analogs thereof, and mixtures thereof.

## V. Lipid Particles

The lipid particles of the invention typically comprise an active agent or therapeutic agent, a cationic lipid, a non-cationic lipid, and a conjugated lipid that inhibits aggregation of particles. In some embodiments, the active agent or therapeutic agent is fully encapsulated within the lipid portion of the lipid particle such that the active agent or therapeutic agent in the lipid particle is resistant in aqueous solution to enzymatic degradation, e.g., by a nuclease or protease. In other embodiments, the lipid particles described herein are substantially non-toxic to mammals such as humans. The lipid particles of the invention typically have a mean diameter of from about 40 nm to about 150 nm, from about 50 nm to about 150 nm, from about 60 nm to about 130 nm, from about 70 nm to about 110 nm, or from about 70 to about 90 nm.

In preferred embodiments, the lipid particles of the invention are serum-stable nucleic acid-lipid particles (SNALP) which comprise an interfering RNA (e.g., siRNA, aiRNA, and/or miRNA), a cationic lipid (e.g., a cationic lipid of Formulas I, II, and/or III), a non-cationic lipid (e.g., cholesterol alone or mixtures of one or more phospholipids and cholesterol), and a conjugated lipid that inhibits aggregation of the particles (e.g., one or more PEG-lipid conjugates). The SNALP may comprise at least 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, or more unmodified and/or modified interfering RNA molecules. Nucleic acid-lipid particles and their method of preparation are described in, e.g., U.S. Pat. Nos. 5,753,613; 5,785,992; 5,705,385; 5,976,567; 5,981,501; 6,110,745; and 6,320,017; and PCT Publication No. WO 96/40964, the disclosures of which are each herein incorporated by reference in their entirety for all purposes.

### A. Cationic Lipids

Any of a variety of cationic lipids may be used in the lipid particles of the invention (e.g., SNALP), either alone or in combination with one or more other cationic lipid species or non-cationic lipid species.

Cationic lipids which are useful in the present invention can be any of a number of lipid species which carry a net positive charge at physiological pH. Such lipids include, but are not limited to, N,N-dioleyl-N,N-dimethylammonium chloride (DODAC), 1,2-dioleyloxy-N,N-dimethylaminopropane (DODMA), 1,2-distearyloxy-N,N-dimethylaminopropane (DSDMA), N-(1-(2,3-dioleyloxy)propyl)-N,N,N-trimethylammonium chloride (DOTMA), N,N-distearyl-N,N-dimethylammonium bromide (DDAB), N-(1-(2,3-dioleoyloxy)propyl)-N,N,N-trimethylammonium chloride (DOTAP), 3-(N—(N',N'-dimethylaminoethane)-carbamoyl) cholesterol (DC-Chol), N-(1,2-dimyristyloxyprop-3-yl)-N,N-dimethyl-N-hydroxyethyl ammonium bromide (DMRIE), 2,3-dioleyloxy-N-[2(spermine-carboxamido)ethyl]-N,N-dimethyl-1-propanaminiumtrifluoroacetate (DOSPA), dioctadecylamidoglycyl spermine (DOGS), 3-dimethylamino-2-(cholest-5-en-3-beta-oxybutan-4-oxy)-1-(cis,cis-9,12-octadecadienoxy)propane (CLinDMA), 2-[5'-(cholest-5-en-3.beta.-oxy)-3'-oxapentoxy)-3-dimethy-1-(cis,cis-9',1-2'-octadecadienoxy)propane (CpLinDMA), N,N-dimethyl-3,4-dioleyloxybenzylamine (DMOBA), 1,2-N,N'-dioleylcarbamyl-3-dimethylaminopropane (DOcarbDAP), 1,2-N,N'-Dilinoleylcarbamyl-3-dimethylaminopropane (DLincarbDAP), 1,2-Dilinoleoylcarbamyl-3-dimethylaminopropane (DLinCDAP), and mixtures thereof. A number of these lipids and related analogs have been described in U.S. Patent Publication Nos. 20060083780 and 20060240554; U.S. Pat. Nos. 5,208,036; 5,264,618; 5,279,833; 5,283,185; 5,753,613; and 5,785,992; and PCT Publication No. WO 96/10390, the disclosures of which are each herein incorporated by reference in their entirety for all purposes. Additionally, a number of commercial preparations of cationic lipids are available and can be used in the present invention. These include, e.g., LIPOFECTIN® (commercially available cationic liposomes comprising DOTMA and DOPE, from GIBCO/BRL, Grand Island, N.Y., USA); LIPOFECTAMINE® (commercially available cationic liposomes comprising DOSPA and DOPE, from GIBCO/BRL); and TRANSFECTAM® (commercially available cationic liposomes comprising DOGS from Promega Corp., Madison, Wis., USA).

Additionally, cationic lipids of Formula I having the following structures are useful in the present invention.




(I)

wherein $R^1$ and $R^2$ are independently selected and are H or $C_1$-$C_3$ alkyls, $R^3$ and $R^4$ are independently selected and are alkyl groups having from about 10 to about 20 carbon atoms, and at least one of $R^3$ and $R^4$ comprises at least two sites of unsaturation. In certain instances, $R^3$ and $R^4$ are both the same, i.e., $R^3$ and $R^4$ are both linoleyl ($C_{18}$), etc. In certain other instances, $R^3$ and $R^4$ are different, i.e., $R^3$ is tetradectrienyl ($C_{14}$) and $R^4$ is linoleyl ($C_{18}$). In a preferred embodiment, the cationic lipid of Formula I is symmetrical, i.e., $R^3$ and $R^4$ are both the same. In another preferred embodiment, both $R^3$ and $R^4$ comprise at least two sites of unsaturation. In some embodiments, $R^3$ and $R^4$ are independently selected from the group consisting of dodecadienyl, tetradecadienyl, hexadecadienyl, linoleyl, and icosadienyl. In a preferred embodiment, $R^3$ and $R^4$ are both linoleyl. In some embodiments, $R^3$ and $R^4$ comprise at least three sites of unsaturation and are independently selected from, e.g., dodecatrienyl, tetradectrienyl, hexadecatrienyl, linolenyl, and icosatrienyl. In particularly preferred embodiments, the cationic lipid of Formula I is 1,2-dilinoleyloxy-N,N-dimethylaminopropane (DLinDMA) or 1,2-dilinolenyloxy-N,N-dimethylaminopropane (DLenDMA).

Furthermore, cationic lipids of Formula II having the following structures are useful in the present invention.




(II)

wherein $R^1$ and $R^2$ are independently selected and are H or $C_1$-$C_3$ alkyls, $R^3$ and $R^4$ are independently selected and are alkyl groups having from about 10 to about 20 carbon atoms, and at least one of $R^3$ and $R^4$ comprises at least two sites of unsaturation. In certain instances, $R^3$ and $R^4$ are both the same, i.e., $R^3$ and $R^4$ are both linoleyl ($C_{18}$), etc. In certain other instances, $R^3$ and $R^4$ are different, i.e., $R^3$ is tetradectrienyl ($C_{14}$) and $R^4$ is linoleyl ($C_{18}$). In a preferred embodi-

ment, the cationic lipids of the present invention are symmetrical, i.e., $R^3$ and $R^4$ are both the same. In another preferred embodiment, both $R^3$ and $R^4$ comprise at least two sites of unsaturation. In some embodiments, $R^3$ and $R^4$ are independently selected from the group consisting of dodecadienyl, tetradecadienyl, hexadecadienyl, linoleyl, and icosadienyl. In a preferred embodiment, $R^3$ and $R^4$ are both linoleyl. In some embodiments, $R^3$ and $R^4$ comprise at least three sites of unsaturation and are independently selected from, e.g., dodecatrienyl, tetradectrienyl, hexadecatrienyl, Iinolenyl, and icosatrienyl.

Moreover, cationic lipids of Formula III having the following structures (or salts thereof) are useful in the present invention.



(III)

Wherein $R^1$ and $R^2$ are either the same or different and independently optionally substituted $C_{12}$-$C_{24}$ alkyl, optionally substituted $C_{12}$-$C_{24}$ alkenyl, optionally substituted $C_{12}$-$C_{24}$ alkynyl, or optionally substituted $C_{12}$-$C_{24}$ acyl; $R^3$ and $R^4$ are either the same or different and independently optionally substituted $C_1$-$C_6$ alkyl, optionally substituted $C_1$-$C_6$ alkenyl, or optionally substituted $C_1$-$C_5$ alkynyl or $R^3$ and $R^4$ may join to form an optionally substituted heterocyclic ring of 4 to 6 carbon atoms and 1 or 2 heteroatoms chosen from nitrogen and oxygen; $R^5$ is either absent or hydrogen or C1-C6 alkyl to provide a quaternary amine; m, n, and p are either the same or different and independently either 0 or 1 with the proviso that m, n, and p are not simultaneously 0; q is 0, 1, 2, 3, or 4; and Y and Z are either the same or different and independently O, S, or NH.

In some embodiments, the cationic lipid of Formula III is 2,2-dilinoleyl-4-(2-dimethylaminoethyl)-[1,3]-dioxolane (DLin-K-C2-DMA; "XTC2"), 2,2-dilinoleyl-4-(3-dimethylaminopropyl)-[1,3]-dioxolane (DLin-K-C3-DMA), 2,2-dilinoleyl-4-(4-dimethylaminobutyl)-[1,3]-dioxolane (DLin-K-C4-DMA), 2,2-dilinoleyl-5-dimethylaminomethyl-[1,3]-dioxane (DLin-K6-DMA), 2,2-dilinoleyl-4-N-methylpepiazino-[1,3]-dioxolane (DLin-K-MPZ), 2,2-dilinoleyl-4-dimethylaminomethyl-[1,3]-dioxolane (DLin-K-DMA), 1,2-dilinoleylcarbamoyloxy-3-dimethylaminopropane (DLin-C-DAP), 1,2-dilinoleyoxy-3-(dimethylamino)acetoxypropane (DLin-DAC), 1,2-dilinoleyoxy-3-morpholinopropane (DLin-MA), 1,2-dilinoleoyl-3-dimethylaminopropane (DLinDAP), 1,2-dilinoleylthio-3-dimethylaminopropane (DLin-S-DMA), 1-linoleoyl-2-linoleyloxy-3-dimethylaminopropane (DLin-2-DMAP), 1,2-dilinoleyloxy-3-trimethylaminopropane chloride salt (DLin-TMA.C1), 1,2-dilinoleoyl-3-trimethylaminopropane chloride salt (DLin-TAP.C1), 1,2-dilinoleyloxy-3-(N-methylpiperazino)propane (DLin-MPZ), 3-(N,N-dilinoleylamino)-1,2-propanediol (DLinAP), 3-(N,N-dioleylamino)-1,2-propanedio (DOAP), 1,2-dilinoleyloxo-3-(2-N,N-dimethylamino)ethoxypropane (DLin-EG-DMA), or mixtures thereof. In preferred embodiments, the cationic lipid of Formula III is DLin-K-C2-DMA (XTC2).

The cationic lipid typically comprises from about 50 mol % to about 90 mol %, from about 50 mol % to about 85 mol %, from about 50 mol % to about 80 mol %, from about 50 mol % to about 75 mol %, from about 50 mol % to about 70 mol %, from about 50 mol % to about 65 mol %, or from about 55 mol % to about 65 mol % of the total lipid present in the particle.

It will be readily apparent to one of skill in the art that depending on the intended use of the particles, the proportions of the components can be varied and the delivery efficiency of a particular formulation can be measured using, e.g., an endosomal release parameter (ERP) assay.

B. Non-Cationic Lipids

The non-cationic lipids used in the lipid particles of the invention (e.g., SNALP) can be any of a variety of neutral uncharged, zwitterionic, or anionic lipids capable of producing a stable complex.

Non-limiting examples of non-cationic lipids include phospholipids such as lecithin, phosphatidylethanolamine, lysolecithin, lysophosphatidylethanolamine, phosphatidylserine, phosphatidylinositol, sphingomyelin, egg sphingomyelin (ESM), cephalin, cardiolipin, phosphatidic acid, cerebrosides, dicetylphosphate, distearoylphosphatidylcholine (DSPC), dioleoylphosphatidylcholine (DOPC), dipalmitoylphosphatidylcholine (DPPC), dioleoylphosphatidylglycerol (DOPG), dipalmitoylphosphatidylglycerol (DPPG), dioleoylphosphatidylethanolamine (DOPE), palmitoyloleoyl-phosphatidylcholine (POPC), palmitoyloleoyl-phosphatidylethanolamine (POPE), palmitoyloleyol-phosphatidylglycerol (POPG), dioleoylphosphatidylethanolamine 4-(N-maleimidomethyl)-cyclohexane-1-carboxylate (DOPE-mal), dipalmitoyl-phosphatidylethanolamine (DPPE), dimyristoyl-phosphatidylethanolamine (DMPE), distearoyl-phosphatidylethanolamine (DSPE), monomethyl-phosphatidylethanolamine, dimethyl-phosphatidylethanolamine, dielaidoyl-phosphatidylethanolamine (DEPE), stearoyloleoyl-phosphatidylethanolamine (SOPE), lysophosphatidylcholine, dilinoleoylphosphatidylcholine, and mixtures thereof. Other diacylphosphatidylcholine and diacylphosphatidylethanolamine phospholipids can also be used. The acyl groups in these lipids are preferably acyl groups derived from fatty acids having $C_{10}$-$C_{24}$ carbon chains, e.g., lauroyl, myristoyl, palmitoyl, stearoyl, or oleoyl.

Additional examples of non-cationic lipids include sterols such as cholesterol and derivatives thereof such as cholestanol, cholestanone, cholestenone, coprostanol, cholesteryl-2'-hydroxyethyl ether, cholesteryl-4'-hydroxybutyl ether, and mixtures thereof.

In some embodiments, the non-cationic lipid present in the lipid particles (e.g., SNALP) comprises or consists of cholesterol or a derivative thereof, e.g., a phospholipid-free lipid particle formulation. In other embodiments, the non-cationic lipid present in the lipid particles (e.g., SNALP) comprises or consists of one or more phospholipids, e.g., a cholesterol-free lipid particle formulation. In further embodiments, the non-cationic lipid present in the lipid particles (e.g., SNALP) comprises or consists of a mixture of one or more phospholipids and cholesterol or a derivative thereof.

Other examples of non-cationic lipids suitable for use in the present invention include nonphosphorous containing lipids such as, e.g., stearylamine, dodecylamine, hexadecylamine, acetyl palmitate, glycerolricinoleate, hexadecyl stereate, isopropyl myristate, amphoteric acrylic polymers, triethanolamine-lauryl sulfate, alkyl-aryl sulfate polyethyloxylated fatty acid amides, dioctadecyldimethyl ammonium bromide, ceramide, sphingomyelin, and the like.

In some embodiments, the non-cationic lipid comprises from about 13 mol % to about 49.5 mol %, from about 20 mol % to about 45 mol %, from about 25 mol % to about 45 mol %, from about 30 mol % to about 45 mol %, from about 35 mol % to about 45 mol %, from about 20 mol % to about 40

mol %, from about 25 mol % to about 40 mol %, or from about 30 mol % to about 40 mol % of the total lipid present in the particle.

In certain embodiments, the cholesterol present in phospholipid-free lipid particles comprises from about 30 mol % to about 45 mol %, from about 30 mol % to about 40 mol %, from about 35 mol % to about 45 mol %, or from about 35 mol % to about 40 mol % of the total lipid present in the particle. As a non-limiting example, a phospholipid-free lipid particle may comprise cholesterol at about 37 mol % of the total lipid present in the particle.

In certain other embodiments, the cholesterol present in lipid particles containing a mixture of phospholipid and cholesterol comprises from about 30 mol % to about 40 mol %, from about 30 mol % to about 35 mol %, or from about 35 mol % to about 40 mol % of the total lipid present in the particle. As a non-limiting example, a lipid particle comprising a mixture of phospholipid and cholesterol may comprise cholesterol at about 34 mol % of the total lipid present in the particle.

In further embodiments, the cholesterol present in lipid particles containing a mixture of phospholipid and cholesterol comprises from about 10 mol % to about 30 mol %, from about 15 mol % to about 25 mol %, or from about 17 mol % to about 23 mol % of the total lipid present in the particle. As a non-limiting example, a lipid particle comprising a mixture of phospholipid and cholesterol may comprise cholesterol at about 20 mol % of the total lipid present in the particle.

In embodiments where the lipid particles contain a mixture of phospholipid and cholesterol or a cholesterol derivative, the mixture may comprise up to about 40, 45, 50, 55, or 60 mol % of the total lipid present in the particle. In certain instances, the phospholipid component in the mixture may comprise from about 2 mol % to about 12 mol %, from about 4 mol % to about 10 mol %, from about 5 mol % to about 10 mol %, from about 5 mol % to about 9 mol %, or from about 6 mol % to about 8 mol % of the total lipid present in the particle. As a non-limiting example, a lipid particle comprising a mixture of phospholipid and cholesterol may comprise a phospholipid such as DPPC or DSPC at about 7 mol % (e.g., in a mixture with about 34 mol % cholesterol) of the total lipid present in the particle. In certain other instances, the phospholipid component in the mixture may comprise from about 10 mol % to about 30 mol %, from about 15 mol % to about 25 mol %, or from about 17 mol % to about 23 mol % of the total lipid present in the particle. As another non-limiting example, a lipid particle comprising a mixture of phospholipid and cholesterol may comprise a phospholipid such as DPPC or DSPC at about 20 mol % (e.g., in a mixture with about 20 mol % cholesterol) of the total lipid present in the particle.

C. Lipid Conjugate

In addition to cationic and non-cationic lipids, the lipid particles of the invention (e.g., SNALP) comprise a lipid conjugate. The conjugated lipid is useful in that it prevents the aggregation of particles. Suitable conjugated lipids include, but are not limited to, PEG-lipid conjugates, ATTA-lipid conjugates, cationic-polymer-lipid conjugates (CPLs), and mixtures thereof. In certain embodiments, the particles comprise either a PEG-lipid conjugate or an ATTA-lipid conjugate together with a CPL.

In a preferred embodiment, the lipid conjugate is a PEG-lipid. Examples of PEG-lipids include, but are not limited to, PEG coupled to dialkyloxypropyls (PEG-DAA) as described in, e.g., PCT Publication No. WO 05/026372, PEG coupled to diacylglycerol (PEG-DAG) as described in, e.g., U.S. Patent Publication Nos. 20030077829 and 2005008689, PEG coupled to phospholipids such as phosphatidylethanolamine (PEG-PE), PEG conjugated to ceramides as described in, e.g., U.S. Pat. No. 5,885,613, PEG conjugated to cholesterol or a derivative thereof; and mixtures thereof. The disclosures of these patent documents are herein incorporated by reference in their entirety for all purposes. Additional PEG-lipids include, without limitation, PEG-C-DOMG, 2KPEG-DMG, and a mixture thereof.

PEG is a linear, water-soluble polymer of ethylene PEG repeating units with two terminal hydroxyl groups. PEGs are classified by their molecular weights; for example, PEG 2000 has an average molecular weight of about 2,000 daltons, and PEG 5000 has an average molecular weight of about 5,000 daltons. PEGs are commercially available from Sigma Chemical Co. and other companies and include, for example, the following: monomethoxypolyethylene glycol (MePEG-OH), monomethoxypolyethylene glycol-succinate (MePEG-S), monomethoxypolyethylene glycol-succinimidyl succinate (MePEG-S-NHS), monomethoxypolyethylene glycol-amine (MePEG-$NH_2$), monomethoxypolyethylene glycol-tresylate (MePEG-TRES), and monomethoxypolyethylene glycol-imidazolyl-carbonyl (MePEG-IM). Other PEGs such as those described in U.S. Pat. Nos. 6,774,180 and 7,053,150 (e.g., mPEG (20 KDa) amine) are also useful for preparing the PEG-lipid conjugates of the present invention. The disclosures of these patents are herein incorporated by reference in their entirety for all purposes. In addition, monomethoxypolyethyleneglycol-acetic acid (MePEG-$CH_2COOH$) is particularly useful for preparing PEG-lipid conjugates including, e.g., PEG-DAA conjugates.

The PEG moiety of the PEG-lipid conjugates described herein may comprise an average molecular weight ranging from about 550 daltons to about 10,000 daltons. In certain instances, the PEG moiety has an average molecular weight of from about 750 daltons to about 5,000 daltons (e.g., from about 1,000 daltons to about 5,000 daltons, from about 1,500 daltons to about 3,000 daltons, from about 750 daltons to about 3,000 daltons, from about 750 daltons to about 2,000 daltons, etc.). In preferred embodiments, the PEG moiety has an average molecular weight of about 2,000 daltons or about 750 daltons.

In certain instances, the PEG can be optionally substituted by an alkyl, alkoxy, acyl, or aryl group. The PEG can be conjugated directly to the lipid or may be linked to the lipid via a linker moiety. Any linker moiety suitable for coupling the PEG to a lipid can be used including, e.g., non-ester containing linker moieties and ester-containing linker moieties. In a preferred embodiment, the linker moiety is a non-ester containing linker moiety. As used herein, the term "non-ester containing linker moiety" refers to a linker moiety that does not contain a carboxylic ester bond (—OC(O)—). Suitable non-ester containing linker moieties include, but are not limited to, amido (—C(O)NH—), amino (—NR—), carbonyl (—C(O)—), carbamate (—NHC(O)O—), urea (—NHC(O)NH—), disulphide (—S—S—), ether (—O—), succinyl (—(O)$CCH_2CH_2C$(O)—), succinamidyl (—NHC(O)$CH_2CH_2C$(O)NH—), ether, disulphide, as well as combinations thereof (such as a linker containing both a carbamate linker moiety and an amido linker moiety). In a preferred embodiment, a carbamate linker is used to couple the PEG to the lipid.

In other embodiments, an ester containing linker moiety is used to couple the PEG to the lipid. Suitable ester containing linker moieties include, e.g., carbonate (—OC(O)O—), succinoyl, phosphate esters (—O—(O)POH—O—), sulfonate esters, and combinations thereof.

Phosphatidylethanolamines having a variety of acyl chain groups of varying chain lengths and degrees of saturation can

be conjugated to PEG to form the lipid conjugate. Such phosphatidylethanolamines are commercially available, or can be isolated or synthesized using conventional techniques known to those of skilled in the art. Phosphatidyl-ethanolamines containing saturated or unsaturated fatty acids with carbon chain lengths in the range of $C_{10}$ to $C_{20}$ are preferred. Phosphatidylethanolamines with mono- or diunsaturated fatty acids and mixtures of saturated and unsaturated fatty acids can also be used. Suitable phosphatidylethanolamines include, but are not limited to, dimyristoyl-phosphatidylethanolamine (DMPE), dipalmitoyl-phosphatidylethanolamine (DPPE), dioleoylphosphatidylethanolamine (DOPE), and distearoyl-phosphatidylethanolamine (DSPE).

The term "ATTA" or "polyamide" refers to, without limitation, compounds described in U.S. Pat. Nos. 6,320,017 and 6,586,559, the disclosures of which are herein incorporated by reference in their entirety for all purposes. These compounds include a compound having the formula:

(IV)



wherein R is a member selected from the group consisting of hydrogen, alkyl and acyl; $R^1$ is a member selected from the group consisting of hydrogen and alkyl; or optionally, R and $R^1$ and the nitrogen to which they are bound form an azido moiety; $R^2$ is a member of the group selected from hydrogen, optionally substituted alkyl, optionally substituted aryl and a side chain of an amino acid; $R^3$ is a member selected from the group consisting of hydrogen, halogen, hydroxy, alkoxy, mercapto, hydrazino, amino and $NR^4R^5$, wherein $R^4$ and $R^5$ are independently hydrogen or alkyl; n is 4 to 80; m is 2 to 6; p is 1 to 4; and q is 0 or 1. It will be apparent to those of skill in the art that other polyamides can be used in the compounds of the present invention.

The term "diacylglycerol" refers to a compound having 2 fatty acyl chains, $R^1$ and $R^2$, both of which have independently between 2 and 30 carbons bonded to the 1- and 2-position of glycerol by ester linkages. The acyl groups can be saturated or have varying degrees of unsaturation. Suitable acyl groups include, but are not limited to, lauryl ($C_{12}$), myristyl ($C_{14}$), palmityl ($C_{16}$), stearyl ($C_{18}$), and icosyl ($C_{20}$). In preferred embodiments, $R^1$ and $R^2$ are the same, i.e., $R^1$ and $R^2$ are both myristyl (i.e., dimyristyl), $R^1$ and $R^2$ are both stearyl (i.e., distearyl), etc. Diacylglycerols have the following general formula:

(V)



The term "dialkyloxypropyl" refers to a compound having 2 alkyl chains, $R^1$ and $R^2$, both of which have independently between 2 and 30 carbons. The alkyl groups can be saturated or have varying degrees of unsaturation. Dialkyloxypropyls have the following general formula:

(VI)



In a preferred embodiment, the PEG-lipid is a PEG-DAA conjugate having the following formula:

(VII)



wherein $R^1$ and $R^2$ arc independently selected and are long-chain alkyl groups having from about 10 to about 22 carbon atoms; PEG is a polyethyleneglycol; and L is a non-ester containing linker moiety or an ester containing linker moiety as described above. The long-chain alkyl groups can be saturated or unsaturated. Suitable alkyl groups include, but are not limited to, lauryl ($C_{12}$), myristyl ($C_{14}$), palmityl ($C_{16}$), stearyl ($C_{18}$), and icosyl ($C_{20}$). In preferred embodiments, $R^1$ and $R^2$ are the same, i.e., $R^1$ and $R^2$ are both myristyl (i.e., dimyristyl), $R^1$ and $R^2$ are both stearyl (i.e., distearyl), etc.

In Formula VII above, the PEG has an average molecular weight ranging from about 550 daltons to about 10,000 daltons. In certain instances, the PEG has an average molecular weight of from about 750 daltons to about 5,000 daltons (e.g., from about 1,000 daltons to about 5,000 daltons, from about 1,500 daltons to about 3,000 daltons, from about 750 daltons to about 3,000 daltons, from about 750 daltons to about 2,000 daltons, etc.). In preferred embodiments, the PEG has an average molecular weight of about 2,000 daltons or about 750 daltons. The PEG can be optionally substituted with alkyl, alkoxy, acyl, or aryl. In certain embodiments, the terminal hydroxyl group is substituted with a methoxy or methyl group.

In a preferred embodiment, "L" is a non-ester containing linker moiety. Suitable non-ester containing linkers include, but are not limited to, an amido linker moiety, an amino linker moiety, a carbonyl linker moiety, a carbamate linker moiety, a urea linker moiety, an ether linker moiety, a disulphide linker moiety, a succinamidyl linker moiety, and combinations thereof. In a preferred embodiment, the non-ester containing linker moiety is a carbamate linker moiety (i.e., a PEG-C-DAA conjugate). In another preferred embodiment, the non-ester containing linker moiety is an amido linker moiety (i.e., a PEG-A-DAA conjugate). In yet another preferred embodiment, the non-ester containing linker moiety is a succinamidyl linker moiety (i.e., a PEG-S-DAA conjugate).

In particular embodiments, the PEG-lipid conjugate is selected from:



; and

(PEG-C-DMA)



(PEG-C-DOMG)

The PEG-DAA conjugates are synthesized using standard techniques and reagents known to those of skill in the art. It will be recognized that the PEG-DAA conjugates will contain various amide, amine, ether, thio, carbamate, and urea linkages. Those of skill in the art will recognize that methods and reagents for forming these bonds are well known and readily available. See, e.g., March, ADVANCED ORGANIC CHEMISTRY (Wiley 1992); Larock, COMPREHENSIVE ORGANIC TRANSFORMATIONS (VCH 1989); and Furniss, VOGEL'S TEXTBOOK OF PRACTICAL ORGANIC CHEMISTRY, 5th ed. (Longman 1989). It will also be appreciated that any functional groups present may require protection and deprotection at different points in the synthesis of the PEG-DAA conjugates. Those of skill in the art will recognize that such techniques are well known. See, e.g., Green and Wuts, PROTECTIVE GROUPS IN ORGANIC SYNTHESIS (Wiley 1991).

Preferably, the PEG-DAA conjugate is a dilauryloxypropyl ($C_{12}$)-PEG conjugate, dimyristyloxypropyl ($C_{14}$)-PEG conjugate, a dipalmityloxypropyl ($C_{16}$)-PEG conjugate, or a distearyloxypropyl ($C_{18}$)-PEG conjugate. Those of skill in the art will readily appreciate that other dialkyloxypropyls can be used in the PEG-DAA conjugates of the present invention.

In addition to the foregoing, it will be readily apparent to those of skill in the art that other hydrophilic polymers can be used in place of PEG. Examples of suitable polymers that can be used in place of PEG include, but are not limited to, polyvinylpyrrolidone, polymethyloxazoline, polyethyloxazoline, polyhydroxypropyl methacrylamide, polymethacrylamide and polydimethylacrylamide, polylactic acid, polyglycolic acid, and derivatized celluloses such as hydroxymethylcellulose or hydroxyethylcellulose.

In addition to the foregoing components, the particles (e.g., SNALP or SPLP) of the present invention can further comprise cationic poly(ethylene glycol) (PEG) lipids or CPLs (see, e.g., Chen et al., *Bioconj. Chem.,* 11:433-437 (2000)). Suitable SPLPs and SPLP-CPLs for use in the present invention, and methods of making and using SPLPs and SPLP-CPLs, are disclosed, e.g., in U.S. Pat. No. 6,852,334 and PCT Publication No. WO 00/62813, disclosures of which are herein incorporated by reference in their entirety for all purposes.

Suitable CPLs include compounds of Formula VIII:

$$\text{A-W-Y} \qquad \text{(VIII)},$$

wherein A, W, and Y are as described below.

With reference to Formula VIII, "A" is a lipid moiety such as an amphipathic lipid, a neutral lipid, or a hydrophobic lipid that acts as a lipid anchor. Suitable lipid examples include, but are not limited to, diacylglycerolyls, dialkylglycerolyls, N—N-dialkylaminos, 1,2-diacyloxy-3-aminopropanes, and 1,2-dialkyl-3-aminopropanes.

"W" is a polymer or an oligomer such as a hydrophilic polymer or oligomer. Preferably, the hydrophilic polymer is a biocompatable polymer that is nonimmunogenic or possesses low inherent immunogenicity. Alternatively, the hydrophilic polymer can be weakly antigenic if used with appropriate adjuvants. Suitable nonimmunogenic polymers include, but are not limited to, PEG, polyamides, polylactic acid, polyglycolic acid, polylactic acid/polyglycolic acid copolymers, and combinations thereof. In a preferred embodiment, the polymer has a molecular weight of from about 250 to about 7,000 daltons.

"Y" is a polycationic moiety. The term polycationic moiety refers to a compound, derivative, or functional group having a positive charge, preferably at least 2 positive charges at a selected pH, preferably physiological pH. Suitable polycationic moieties include basic amino acids and their derivatives such as arginine, asparagine, glutamine, lysine, and histidine; spermine; spermidine; cationic dendrimers; polyamines; polyamine sugars; and amino polysaccharides. The polycationic moieties can be linear, such as linear tetralysine, branched or dendrimeric in structure. Polycationic moieties have between about 2 to about 15 positive charges, preferably between about 2 to about 12 positive charges, and more preferably between about 2 to about 8 positive charges at selected pH values. The selection of which polycationic moiety to employ may be determined by the type of particle application which is desired.

The charges on the polycationic moieties can be either distributed around the entire particle moiety, or alternatively, they can be a discrete concentration of charge density in one particular area of the particle moiety e.g., a charge spike. If the charge density is distributed on the particle, the charge density can be equally distributed or unequally distributed. All variations of charge distribution of the polycationic moiety are encompassed by the present invention.

The lipid "A" and the nonimmunogenic polymer "W" can be attached by various methods and preferably by covalent attachment. Methods known to those of skill in the art can be used for the covalent attachment of "A" and "W." Suitable linkages include, but are not limited to, amide, amine, carboxyl, carbonate, carbamate, ester, and hydrazone linkages. It will be apparent to those skilled in the art that "A" and "W" must have complementary functional groups to effectuate the linkage. The reaction of these two groups, one on the lipid and the other on the polymer, will provide the desired linkage. For

example, when the lipid is a diacylglycerol and the terminal hydroxyl is activated, for instance with NHS and DCC, to form an active ester, and is then reacted with a polymer which contains an amino group, such as with a polyamide (see, e.g., U.S. Pat. Nos. 6,320,017 and 6,586,559, the disclosures of which are herein incorporated by reference in their entirety for all purposes), an amide bond will form between the two groups.

In certain instances, the polycationic moiety can have a ligand attached, such as a targeting ligand or a chelating moiety for complexing calcium. Preferably, after the ligand is attached, the cationic moiety maintains a positive charge. In certain instances, the ligand that is attached has a positive charge. Suitable ligands include, but are not limited to, a compound or device with a reactive functional group and include lipids, amphipathic lipids, carrier compounds, bioaffinity compounds, biomaterials, biopolymers, biomedical devices, analytically detectable compounds, therapeutically active compounds, enzymes, peptides, proteins, antibodies, immune stimulators, radiolabels, fluorogens, biotin, drugs, haptens, DNA, RNA, polysaccharides, liposomes, virosomes, micelles, immunoglobulins, functional groups, other targeting moieties, or toxins.

The lipid conjugate (e.g., PEG-lipid) typically comprises from about 0.1 mol % to about 2 mol %, from about 0.5 mol % to about 2 mol %, from about 1 mol % to about 2 mol %, from about 0.6 mol % to about 1.9 mol %, from about 0.7 mol % to about 1.8 mol %, from about 0.8 mol % to about 1.7 mol %, from about 0.9 mol % to about 1.6 mol %, from about 0.9 mol % to about 1.8 mol %, from about 1 mol % to about 1.8 mol %, from about 1 mol % to about 1.7 mol %, from about 1.2 mol % to about 1.8 mol %, from about 1.2 mol % to about 1.7 mol %, from about 1.3 mol % to about 1.6 mol %, or from about 1.4 mol % to about 1.5 mol % of the total lipid present in the particle.

One of ordinary skill in the art will appreciate that the concentration of the lipid conjugate can be varied depending on the lipid conjugate employed and the rate at which the nucleic acid-lipid particle is to become fusogenic.

By controlling the composition and concentration of the lipid conjugate, one can control the rate at which the lipid conjugate exchanges out of the nucleic acid-lipid particle and, in turn, the rate at which the nucleic acid-lipid particle becomes fusogenic. For instance, when a PEG-phosphatidylethanolamine conjugate or a PEG-ceramide conjugate is used as the lipid conjugate, the rate at which the nucleic acid-lipid particle becomes fusogenic can be varied, for example, by varying the concentration of the lipid conjugate, by varying the molecular weight of the PEG, or by varying the chain length and degree of saturation of the acyl chain groups on the phosphatidylethanolamine or the ceramide. In addition, other variables including, for example, pH, temperature, ionic strength, etc. can be used to vary and/or control the rate at which the nucleic acid-lipid particle becomes fusogenic. Other methods which can be used to control the rate at which the nucleic acid-lipid particle becomes fusogenic will become apparent to those of skill in the art upon reading this disclosure.

VI. Preparation of Lipid Particles

The lipid particles of the present invention, e.g., SNALP, in which an active agent or therapeutic agent such as an interfering RNA is encapsulated in a lipid bilayer and is protected from degradation, can be formed by any method known in the art including, but not limited to, a continuous mixing method or a direct dilution process.

In preferred embodiments, the cationic lipids are lipids of Formula I, II, and III, or combinations thereof. In other preferred embodiments, the non-cationic lipids are egg sphingomyelin (ESM), distearoylphosphatidylcholine (DSPC), dioleoylphosphatidylcholine (DOPC), 1-palmitoyl-2-oleoyl-phosphatidylcholine (POPC), dipalmitoyl-phosphatidylcholine (DPPC), monomethyl-phosphatidylethanolamine, dimethyl-phosphatidylethanolamine, 14:0 PE (1,2-dimyristoyl-phosphatidylethanolamine (DMPE)), 16:0 PE (1,2-dipalmitoyl-phosphatidylethanolamine (DPPE)), 18:0 PE (1,2-distearoyl-phosphatidylethanolamine (DSPE)), 18:1 PE (1,2-dioleoyl-phosphatidylethanolamine (DOPE)), 18:1 trans PE (1,2-dielaidoyl-phosphatidylethanolamine (DEPE)), 18:0-18:1 PE (1-stearoyl-2-oleoyl-phosphatidylethanolamine (SOPE)), 16:0-18:1 PE (1-palmitoyl-2-oleoyl-phosphatidylethanolamine (POPE)), polyethylene glycol-based polymers (e.g., PEG 2000, PEG 5000, PEG-modified diacylglycerols, or PEG-modified dialkyloxypropyls), cholesterol, or combinations thereof.

In certain embodiments, the present invention provides for SNALP produced via a continuous mixing method, e.g., a process that includes providing an aqueous solution comprising a nucleic acid such as an interfering RNA in a first reservoir, providing an organic lipid solution in a second reservoir, and mixing the aqueous solution with the organic lipid solution such that the organic lipid solution mixes with the aqueous solution so as to substantially instantaneously produce a liposome encapsulating the nucleic acid (e.g., interfering RNA). This process and the apparatus for carrying this process are described in detail in U.S. Patent Publication No. 20040142025, the disclosure of which is herein incorporated by reference in its entirety for all purposes.

The action of continuously introducing lipid and buffer solutions into a mixing environment, such as in a mixing chamber, causes a continuous dilution of the lipid solution with the buffer solution, thereby producing a liposome substantially instantaneously upon mixing. As used herein, the phrase "continuously diluting a lipid solution with a buffer solution" (and variations) generally means that the lipid solution is diluted sufficiently rapidly in a hydration process with sufficient force to effectuate vesicle generation. By mixing the aqueous solution comprising a nucleic acid with the organic lipid solution, the organic lipid solution undergoes a continuous stepwise dilution in the presence of the buffer solution (i.e., aqueous solution) to produce a nucleic acid-lipid particle.

The SNALP formed using the continuous mixing method typically have a size of from about 40 nm to about 150 nm, from about 50 nm to about 150 nm, from about 60 nm to about 130 nm, from about 70 nm to about 110 nm, or from about 70 nm to about 90 nm. The particles thus formed do not aggregate and are optionally sized to achieve a uniform particle size.

In another embodiment, the present invention provides for SNALP produced via a direct dilution process that includes forming a liposome solution and immediately and directly introducing the liposome solution into a collection vessel containing a controlled amount of dilution buffer. In preferred aspects, the collection vessel includes one or more elements configured to stir the contents of the collection vessel to facilitate dilution. In one aspect, the amount of dilution buffer present in the collection vessel is substantially equal to the volume of liposome solution introduced thereto. As a non-limiting example, a liposome solution in 45% ethanol when

introduced into the collection vessel containing an equal volume of dilution buffer will advantageously yield smaller particles.

In yet another embodiment, the present invention provides for SNALP produced via a direct dilution process in which a third reservoir containing dilution buffer is fluidly coupled to a second mixing region. In this embodiment, the liposome solution formed in a first mixing region is immediately and directly mixed with dilution buffer in the second mixing region. In preferred aspects, the second mixing region includes a T-connector arranged so that the liposome solution and the dilution buffer flows meet as opposing 180° flows; however, connectors providing shallower angles can be used, e.g., from about 27° to about 180°. A pump mechanism delivers a controllable flow of buffer to the second mixing region. In one aspect, the flow rate of dilution buffer provided to the second mixing region is controlled to be substantially equal to the flow rate of liposome solution introduced thereto from the first mixing region. This embodiment advantageously allows for more control of the flow of dilution buffer mixing with the liposome solution in the second mixing region, and therefore also the concentration of liposome solution in buffer throughout the second mixing process. Such control of the dilution buffer flow rate advantageously allows for small particle size formation at reduced concentrations.

These processes and the apparatuses for carrying out these direct dilution processes are described in detail in U.S. Patent Publication No. 20070042031, the disclosure of which is herein incorporated by reference in its entirety for all purposes.

The SNALP formed using the direct dilution process typically have a size of from about 40 nm to about 150 nm, from about 50 nm to about 150 nm, from about 60 nm to about 130 nm, from about 70 nm to about 110 nm, or from about 70 nm to about 90 nm. The particles thus formed do not aggregate and are optionally sized to achieve a uniform particle size.

If needed, the lipid particles of the invention (e.g., SNALP) can be sized by any of the methods available for sizing liposomes. The sizing may be conducted in order to achieve a desired size range and relatively narrow distribution of particle sizes.

Several techniques are available for sizing the particles to a desired size. One sizing method, used for liposomes and equally applicable to the present particles, is described in U.S. Pat. No. 4,737,323, the disclosure of which is herein incorporated by reference in its entirety for all purposes. Sonicating a particle suspension either by bath or probe sonication produces a progressive size reduction down to particles of less than about 50 nm in size. Homogenization is another method which relies on shearing energy to fragment larger particles into smaller ones. In a typical homogenization procedure, particles are recirculated through a standard emulsion homogenizer until selected particle sizes, typically between about 60 and about 80 nm, are observed. In both methods, the particle size distribution can be monitored by conventional laser-beam particle size discrimination, or QELS.

Extrusion of the particles through a small-pore polycarbonate membrane or an asymmetric ceramic membrane is also an effective method for reducing particle sizes to a relatively well-defined size distribution. Typically, the suspension is cycled through the membrane one or more times until the desired particle size distribution is achieved. The particles may be extruded through successively smaller-pore membranes, to achieve a gradual reduction in size.

In some embodiments, the nucleic acids in the SNALP are precondensed as described in, e.g., U.S. patent application Ser. No. 09/744,103, the disclosure of which is herein incorporated by reference in its entirety for all purposes.

In other embodiments, the methods will further comprise adding non-lipid polycations which are useful to effect the lipofection of cells using the present compositions. Examples of suitable non-lipid polycations include, hexadimethrine bromide (sold under the brandname POLYBRENE®, from Aldrich Chemical Co., Milwaukee, Wis., USA) or other salts of hexadimethrine. Other suitable polycations include, for example, salts of poly-L-ornithine, poly-L-arginine, poly-L-lysine, poly-D-lysine, polyallylamine, and polyethyleneimine. Addition of these salts is preferably after the particles have been formed.

In some embodiments, the nucleic acid to lipid ratios (mass/mass ratios) in a formed SNALP will range from about 0.01 to about 0.2, from about 0.02 to about 0.1, from about 0.03 to about 0.1, or from about 0.01 to about 0.08. The ratio of the starting materials also falls within this range. In other embodiments, the SNALP preparation uses about 400 μg nucleic acid per 10 mg total lipid or a nucleic acid to lipid mass ratio of about 0.01 to about 0.08 and, more preferably, about 0.04, which corresponds to 1.25 mg of total lipid per 50 μg of nucleic acid. In other preferred embodiments, the particle has a nucleic acid:lipid mass ratio of about 0.08.

In other embodiments, the lipid to nucleic acid ratios (mass/mass ratios) in a formed SNALP will range from about 1 (1:1) to about 100 (100:1), from about 5 (5:1) to about 100 (100:1), from about 1 (1:1) to about 50 (50:1), from about 2 (2:1) to about 50 (50:1), from about 3 (3:1) to about 50 (50:1), from about 4 (4:1) to about 50 (50:1), from about 5 (5:1) to about 50 (50:1), from about 1 (1:1) to about 25 (25:1), from about 2 (2:1) to about 25 (25:1), from about 3 (3:1) to about 25 (25:1), from about 4 (4:1) to about 25 (25:1), from about 5 (5:1) to about 25 (25:1), from about 5 (5:1) to about 20 (20:1), from about 5 (5:1) to about 15 (15:1), from about 5 (5:1) to about 10 (10:1), about 5 (5:1), 6 (6:1), 7 (7:1), 8 (8:1), 9 (9:1), 10 (10:1), 11 (11:1), 12 (12:1), 13 (13:1), 14 (14:1), or 15 (15:1). The ratio of the starting materials also falls within this range.

As previously discussed, the conjugated lipid may further include a CPL. A variety of general methods for making SNALP-CPLs (CPL-containing SNALP) are discussed herein. Two general techniques include "post-insertion" technique, that is, insertion of a CPL into, for example, a preformed SNALP, and the "standard" technique, wherein the CPL is included in the lipid mixture during, for example, the SNALP formation steps. The post-insertion technique results in SNALP having CPLs mainly in the external face of the SNALP bilayer membrane, whereas standard techniques provide SNALP having CPLs on both internal and external faces. The method is especially useful for vesicles made from phospholipids (which can contain cholesterol) and also for vesicles containing PEG-lipids (such as PEG-DAAs and PEG-DAGs). Methods of making SNALP-CPL, are taught, for example, in U.S. Pat. Nos. 5,705,385; 6,586,410; 5,981,501; 6,534,484; and 6,852,334; U.S. Patent Publication No. 20020072121; and PCT Publication No. WO 00/62813, the disclosures of which are herein incorporated by reference in their entirety for all purposes.

## VII. Kits

The present invention also provides lipid particles (e.g., SNALP) in kit form. The kit may comprise a container which is compartmentalized for holding the various elements of the lipid particles (e.g., the active agents or therapeutic agents such as nucleic acids and the individual lipid components of

the particles). In some embodiments, the kit may further comprise an endosomal membrane destabilizer (e.g., calcium ions). The kit typically contains the lipid particle compositions of the present invention, preferably in dehydrated form, with instructions for their rehydration and administration.

As explained herein, the lipid particles of the invention (e.g., SNALP) can be tailored to preferentially target particular tissues, organs, or tumors of interest. In certain instances, preferential targeting of lipid particles such as SNALP may be carried out by controlling the composition of the particle itself. For instance, as set forth in Example 11, it has been found that the 1:57 PEG-cDSA SNALP formulation can be used to preferentially target tumors outside of the liver, whereas the 1:57 PEG-cDMA SNALP formulation can be used to preferentially target the liver (including liver tumors).

In certain other instances, it may be desirable to have a targeting moiety attached to the surface of the lipid particle to further enhance the targeting of the particle. Methods of attaching targeting moieties (e.g., antibodies, proteins, etc.) to lipids (such as those used in the present particles) are known to those of skill in the art.

VII. Administration of Lipid Particles

Once formed, the lipid particles of the invention (e.g., SNALP) are useful for the introduction of active agents or therapeutic agents (e.g., nucleic acids such as interfering RNA) into cells. Accordingly, the present invention also provides methods for introducing an active agent or therapeutic agent such as a nucleic acid (e.g., interfering RNA) into a cell. The methods are carried out in vitro or in vivo by first forming the particles as described above and then contacting the particles with the cells for a period of time sufficient for delivery of the active agent or therapeutic agent to the cells to occur.

The lipid particles of the invention (e.g., SNALP) can be adsorbed to almost any cell type with which they are mixed or contacted. Once adsorbed, the particles can either be endocytosed by a portion of the cells, exchange lipids with cell membranes, or fuse with the cells. Transfer or incorporation of the active agent or therapeutic agent (e.g., nucleic acid) portion of the particle can take place via any one of these pathways. In particular, when fusion takes place, the particle membrane is integrated into the cell membrane and the contents of the particle combine with the intracellular fluid.

The lipid particles of the invention (e.g., SNALP) can be administered either alone or in a mixture with a pharmaceutically-acceptable carrier (e.g., physiological saline or phosphate buffer) selected in accordance with the route of administration and standard pharmaceutical practice. Generally, normal buffered saline (e.g., 135-150 mM NaCl) will be employed as the pharmaceutically-acceptable carrier. Other suitable carriers include, e.g., water, buffered water, 0.4% saline, 0.3% glycine, and the like, including glycoproteins for enhanced stability, such as albumin, lipoprotein, globulin, etc. Additional suitable carriers are described in, e.g., REMINGTON'S PHARMACEUTICAL SCIENCES, Mack Publishing Company, Philadelphia, Pa., 17th ed. (1985). As used herein, "carrier" includes any and all solvents, dispersion media, vehicles, coatings, diluents, antibacterial and antifungal agents, isotonic and absorption delaying agents, buffers, carrier solutions, suspensions, colloids, and the like. The phrase "pharmaceutically-acceptable" refers to molecular entities and compositions that do not produce an allergic or similar untoward reaction when administered to a human.

The pharmaceutically-acceptable carrier is generally added following particle formation. Thus, after the particle is formed, the particle can be diluted into pharmaceutically-acceptable carriers such as normal buffered saline.

The concentration of particles in the pharmaceutical formulations can vary widely, i.e., from less than about 0.05%, usually at or at least about 2 to 5%, to as much as about 10 to 90% by weight, and will be selected primarily by fluid volumes, viscosities, etc., in accordance with the particular mode of administration selected. For example, the concentration may be increased to lower the fluid load associated with treatment. This may be particularly desirable in patients having atherosclerosis-associated congestive heart failure or severe hypertension. Alternatively, particles composed of irritating lipids may be diluted to low concentrations to lessen inflammation at the site of administration.

The pharmaceutical compositions of the present invention may be sterilized by conventional, well-known sterilization techniques. Aqueous solutions can be packaged for use or filtered under aseptic conditions and lyophilized, the lyophilized preparation being combined with a sterile aqueous solution prior to administration. The compositions can contain pharmaceutically-acceptable auxiliary substances as required to approximate physiological conditions, such as pH adjusting and buffering agents, tonicity adjusting agents and the like, for example, sodium acetate, sodium lactate, sodium chloride, potassium chloride, and calcium chloride. Additionally, the particle suspension may include lipid-protective agents which protect lipids against free-radical and lipid-peroxidative damages on storage. Lipophilic free-radical quenchers, such as alphatocopherol and water-soluble iron-specific chelators, such as ferrioxamine, are suitable.

A. In Vivo Administration

Systemic delivery for in vivo therapy, e.g., delivery of a therapeutic nucleic acid to a distal target cell via body systems such as the circulation, has been achieved using nucleic acid-lipid particles such as those described in PCT Publication Nos. WO 05/007196, WO 05/121348, WO 05/120152, and WO 04/002453, the disclosures of which are herein incorporated by reference in their entirety for all purposes. The present invention also provides fully encapsulated lipid particles that protect the nucleic acid from nuclease degradation in serum, are nonimmunogenic, are small in size, and are suitable for repeat dosing.

For in vivo administration, administration can be in any manner known in the art, e.g., by injection, oral administration, inhalation (e.g., intransal or intratracheal), transdermal application, or rectal administration. Administration can be accomplished via single or divided doses. The pharmaceutical compositions can be administered parenterally, intraarticularly, intravenously, intraperitoneally, subcutaneously, or intramuscularly. In some embodiments, the pharmaceutical compositions are administered intravenously or intraperitoneally by a bolus injection (see, e.g., U.S. Pat. No. 5,286,634). Intracellular nucleic acid delivery has also been discussed in Straubringer et al., *Methods Enzymol.,* 101:512 (1983); Mannino et of, *Biotechniques,* 6:682 (1988); Nicolau et al., *Crit. Rev. Ther. Drug Carrier Syst.,* 6:239 (1989); and Behr, *Acc. Chem. Res.,* 26:274 (1993). Still other methods of administering lipid-based therapeutics are described in, for example, U.S. Pat. Nos. 3,993,754; 4,145,410; 4,235,871; 4,224,179; 4,522,803; and 4,588,578. The lipid particles can be administered by direct injection at the site of disease or by injection at a site distal from the site of disease (see, e.g., Culver, HUMAN GENE THERAPY, MaryAnn Liebert, Inc., Publishers, New York. pp. 70-71(1994)). The disclosures of the above-described references are herein incorporated by reference in their entirety for all purposes.

The compositions of the present invention, either alone or in combination with other suitable components, can be made into aerosol formulations (i.e., they can be "nebulized") to be administered via inhalation (e.g., intranasally or intratracheally) (see, Brigham et al., *Am. J. Sci.,* 298:278 (1989)). Aerosol formulations can be placed into pressurized acceptable propellants, such as dichlorodifluoromethane, propane, nitrogen, and the like.

In certain embodiments, the pharmaceutical compositions may be delivered by intranasal sprays, inhalation, and/or other aerosol delivery vehicles. Methods for delivering nucleic acid compositions directly to the lungs via nasal aerosol sprays have been described, e.g., in U.S. Pat. Nos. 5,756,353 and 5,804,212. Likewise, the delivery of drugs using intranasal microparticle resins and lysophosphatidyl-glycerol compounds (U.S. Pat. No. 5,725,871) are also well-known in the pharmaceutical arts. Similarly, transmucosal drug delivery in the form of a polytetrafluoroetheylene support matrix is described in U.S. Pat. No. 5,780,045. The disclosures of the above-described patents are herein incorporated by reference in their entirety for all purposes.

Formulations suitable for parenteral administration, such as, for example, by intraarticular (in the joints), intravenous, intramuscular, intradermal, intraperitoneal, and subcutaneous routes, include aqueous and non-aqueous, isotonic sterile injection solutions, which can contain antioxidants, buffers, bacteriostats, and solutes that render the formulation isotonic with the blood of the intended recipient, and aqueous and non-aqueous sterile suspensions that can include suspending agents, solubilizers, thickening agents, stabilizers, and preservatives. In the practice of this invention, compositions are preferably administered, for example, by intravenous infusion, orally, topically, intraperitoneally, intravesically, or intrathecally.

Generally, when administered intravenously, the lipid particle formulations are formulated with a suitable pharmaceutical carrier. Many pharmaceutically acceptable carriers may be employed in the compositions and methods of the present invention. Suitable formulations for use in the present invention are found, for example, in REMINGTON'S PHARMACEUTICAL SCIENCES, Mack Publishing Company, Philadelphia, Pa., 17th ed. (1985). A variety of aqueous carriers may be used, for example, water, buffered water, 0.4% saline, 0.3% glycine, and the like, and may include glycoproteins for enhanced stability, such as albumin, lipoprotein, globulin, etc. Generally, normal buffered saline (135-150 mM NaCl) will be employed as the pharmaceutically acceptable carrier, but other suitable carriers will suffice. These compositions can be sterilized by conventional liposomal sterilization techniques, such as filtration. The compositions may contain pharmaceutically acceptable auxiliary substances as required to approximate physiological conditions, such as pH adjusting and buffering agents, tonicity adjusting agents, wetting agents and the like, for example, sodium acetate, sodium lactate, sodium chloride, potassium chloride, calcium chloride, sorbitan monolaurate, triethanolamine oleate, etc. These compositions can be sterilized using the techniques referred to above or, alternatively, they can be produced under sterile conditions. The resulting aqueous solutions may be packaged for use or filtered under aseptic conditions and lyophilized, the lyophilized preparation being combined with a sterile aqueous solution prior to administration.

In certain applications, the lipid particles disclosed herein may be delivered via oral administration to the individual. The particles may be incorporated with excipients and used in the form of ingestible tablets, buccal tablets, troches, capsules, pills, lozenges, elixirs, mouthwash, suspensions, oral sprays, syrups, wafers, and the like (see, e.g., U.S. Pat. Nos. 5,641,515, 5,580,579, and 5,792,451, the disclosures of which are herein incorporated by reference in their entirety for all purposes). These oral dosage forms may also contain the following: binders, gelatin; excipients, lubricants, and/or flavoring agents. When the unit dosage form is a capsule, it may contain, in addition to the materials described above, a liquid carrier. Various other materials may be present as coatings or to otherwise modify the physical form of the dosage unit. Of course, any material used in preparing any unit dosage form should be pharmaceutically pure and substantially non-toxic in the amounts employed.

Typically, these oral formulations may contain at least about 0.1% of the lipid particles or more, although the percentage of the particles may, of course, be varied and may conveniently be between about 1% or 2% and about 60% or 70% or more of the weight or volume of the total formulation. Naturally, the amount of particles in each therapeutically useful composition may be prepared is such a way that a suitable dosage will be obtained in any given unit dose of the compound. Factors such as solubility, bioavailability, biological half-life, route of administration, product shelf life, as well as other pharmacological considerations will be contemplated by one skilled in the art of preparing such pharmaceutical formulations, and as such, a variety of dosages and treatment regimens may be desirable.

Formulations suitable for oral administration can consist of: (a) liquid solutions, such as an effective amount of a packaged therapeutic agent such as nucleic acid (e.g., interfering RNA) suspended in diluents such as water, saline, or PEG 400; (b) capsules, sachets, or tablets, each containing a predetermined amount of a therapeutic agent such as nucleic acid (e.g., interfering RNA), as liquids, solids, granules, or gelatin; (c) suspensions in an appropriate liquid; and (d) suitable emulsions. Tablet forms can include one or more of lactose, sucrose, mannitol, sorbitol, calcium phosphates, corn starch, potato starch, microcrystalline cellulose, gelatin, colloidal silicon dioxide, talc, magnesium stearate, stearic acid, and other excipients, colorants, fillers, binders, diluents, buffering agents, moistening agents, preservatives, flavoring agents, dyes, disintegrating agents, and pharmaceutically compatible carriers. Lozenge forms can comprise a therapeutic agent such as nucleic acid (e.g., interfering RNA) in a flavor, e.g., sucrose, as well as pastilles comprising the therapeutic agent in an inert base, such as gelatin and glycerin or sucrose and acacia emulsions, gels, and the like containing, in addition to the therapeutic agent, carriers known in the art.

In another example of their use, lipid particles can be incorporated into a broad range of topical dosage forms. For instance, a suspension containing nucleic acid-lipid particles such as SNALP can be formulated and administered as gels, oils, emulsions, topical creams, pastes, ointments, lotions, foams, mousses, and the like.

When preparing pharmaceutical preparations of the lipid particles of the invention, it is preferable to use quantities of the particles which have been purified to reduce or eliminate empty particles or particles with therapeutic agents such as nucleic acid associated with the external surface.

The methods of the present invention may be practiced in a variety of hosts. Preferred hosts include mammalian species, such as primates (e.g., humans and chimpanzees as well as other nonhuman primates), canines, felines, equines, bovines, ovines, caprines, rodents (e.g., rats and mice), lagomorphs, and swine.

The amount of particles administered will depend upon the ratio of therapeutic agent (e.g., nucleic acid) to lipid, the particular therapeutic agent (e.g., nucleic acid) used, the dis-

ease or disorder being treated, the age, weight, and condition of the patient, and the judgment of the clinician, but will generally be between about 0.01 and about 50 mg per kilogram of body weight, preferably between about 0.1 and about 5 mg/kg of body weight, or about $10^8$-$10^{10}$ particles per administration (e.g., injection).

B. In Vitro Administration

For in vitro applications, the delivery of therapeutic agents such as nucleic acids (e.g., interfering RNA) can be to any cell grown in culture, whether of plant or animal origin, vertebrate or invertebrate, and of any tissue or type. In preferred embodiments, the cells are animal cells, more preferably mammalian cells, and most preferably human cells.

Contact between the cells and the lipid particles, when carried out in vitro, takes place in a biologically compatible medium. The concentration of particles varies widely depending on the particular application, but is generally between about 1 μmol and about 10 mmol. Treatment of the cells with the lipid particles is generally carried out at physiological temperatures (about 37° C.) for periods of time of from about 1 to 48 hours, preferably of from about 2 to 4 hours.

In one group of preferred embodiments, a lipid particle suspension is added to 60-80% confluent plated cells having a cell density of from about $10^3$ to about $10^5$ cells/ml, more preferably about $2\times10^4$ cells/ml. The concentration of the suspension added to the cells is preferably of from about 0.01 to 0.2 μg/ml, more preferably about 0.1 μg/ml.

Using an Endosomal Release Parameter (ERP) assay, the delivery efficiency of the SNALP or other lipid particle of the invention can be optimized. An ERP assay is described in detail in U.S. Patent Publication No. 20030077829, the disclosure of which is herein incorporated by reference in its entirety for all purposes. More particularly, the purpose of an ERP assay is to distinguish the effect of various cationic lipids and helper lipid components of SNALP based on their relative effect on binding/uptake or fusion with/destabilization of the endosomal membrane. This assay allows one to determine quantitatively how each component of the SNALP or other lipid particle affects delivery efficiency, thereby optimizing the SNALP or other lipid particle. Usually, an ERP assay measures expression of a reporter protein (e.g., luciferase, β-galactosidase, green fluorescent protein (GFP), etc.), and in some instances, a SNALP formulation optimized for an expression plasmid will also be appropriate for encapsulating an interfering RNA. In other instances, an ERP assay can be adapted to measure downregulation of transcription or translation of a target sequence in the presence or absence of an interfering RNA (e.g., siRNA). By comparing the ERPs for each of the various SNALP or other lipid particles, one can readily determine the optimized system, e.g., the SNALP or other lipid particle that has the greatest uptake in the cell.

C. Cells for Delivery of Lipid Particles

The compositions and methods of the present invention are used to treat a wide variety of cell types, in vivo and in vitro. Suitable cells include, e.g., hematopoietic precursor (stem) cells, fibroblasts, keratinocytes, hepatocytes, endothelial cells, skeletal and smooth muscle cells, osteoblasts, neurons, quiescent lymphocytes, terminally differentiated cells, slow or noncycling primary cells, parenchymal cells, lymphoid cells, epithelial cells, bone cells, and the like. In preferred embodiments, an active agent or therapeutic agent such as an interfering RNA (e.g., siRNA) is delivered to cancer cells such as, e.g., lung cancer cells, colon cancer cells, rectal cancer cells, anal cancer cells, bile duct cancer cells, small intestine cancer cells, stomach (gastric) cancer cells, esophageal cancer cells, gallbladder cancer cells, liver cancer cells, pancreatic cancer cells, appendix cancer cells, breast cancer cells, ovarian cancer cells, cervical cancer cells, prostate cancer cells, renal cancer cells, cancer cells of the central nervous system, glioblastoma tumor cells, skin cancer cells, lymphoma cells, choriocarcinoma tumor cells, head and neck cancer cells, osteogenic sarcoma tumor cells, and blood cancer cells.

In vivo delivery of lipid particles such as SNALP encapsulating an interfering RNA (e.g., siRNA) is suited for targeting cells of any cell type. The methods and compositions can be employed with cells of a wide variety of vertebrates, including mammals, such as, e.g, canines, felines, equines, bovines, ovines, caprines, rodents (e.g., mice, rats, and guinea pigs), lagomorphs, swine, and primates (e.g. monkeys, chimpanzees, and humans).

To the extent that tissue culture of cells may be required, it is well-known in the art. For example, Freshney, Culture of Animal Cells, a Manual of Basic Technique, 3rd Ed., Wiley-Liss, New York (1994), Kuchler et al., Biochemical Methods in Cell Culture and Virology, Dowden, Hutchinson and Ross, Inc. (1977), and the references cited therein provide a general guide to the culture of cells. Cultured cell systems often will be in the form of monolayers of cells, although cell suspensions are also used.

D. Detection of Lipid Particles

In some embodiments, the lipid particles of the present invention (e.g., SNALP) are detectable in the subject at about 1, 2, 3, 4, 5, 6, 7, 8 or more hours. In other embodiments, the lipid particles of the present invention (e.g., SNALP) are detectable in the subject at about 8, 12, 24, 48, 60, 72, or 96 hours, or about 6, 8, 10, 12, 14, 16, 18, 19, 22, 24, 25, or 28 days after administration of the particles. The presence of the particles can be detected in the cells, tissues, or other biological samples from the subject. The particles may be detected, e.g., by direct detection of the particles, detection of a therapeutic nucleic acid such as an interfering RNA (e.g., siRNA) sequence, detection of the target sequence of interest (i.e., by detecting expression or reduced expression of the sequence of interest), or a combination thereof.

1. Detection of Particles

Lipid particles of the invention such as SNALP can be detected using any method known in the art. For example, a label can be coupled directly or indirectly to a component of the lipid particle using methods well-known in the art. A wide variety of labels can be used, with the choice of label depending on sensitivity required, ease of conjugation with the lipid particle component, stability requirements, and available instrumentation and disposal provisions. Suitable labels include, but are not limited to, spectral labels such as fluorescent dyes (e.g., fluorescein and derivatives, such as fluorescein isothiocyanate (FITC) and Oregon Green™; rhodamine and derivatives such Texas red, tetrarhodimine isothiocynate (TRITC), etc., digoxigenin, biotin, phycoerythrin, AMCA, CyDyes™, and the like; radiolabels such as $^3$H, $^{125}$I, $^{35}$S, $^{14}$C, $^{32}$P, $^{33}$P, etc.; enzymes such as horse radish peroxidase, alkaline phosphatase, etc.; spectral colorimetric labels such as colloidal gold or colored glass or plastic beads such as polystyrene, polypropylene, latex, etc. The label can be detected using any means known in the art.

2. Detection of Nucleic Acids

Nucleic acids (e.g., interfering RNA) are detected and quantified herein by any of a number of means well-known to those of skill in the art. The detection of nucleic acids may proceed by well-known methods such as Southern analysis, Northern analysis, gel electrophoresis, PCR, radiolabeling, scintillation counting, and affinity chromatography. Additional analytic biochemical methods such as spectrophotometry, radiography, electrophoresis, capillary electrophoresis, high performance liquid chromatography (HPLC), thin layer chromatography (TLC), and hyperdiffusion chromatography may also be employed.

The selection of a nucleic acid hybridization format is not critical. A variety of nucleic acid hybridization formats are known to those skilled in the art. For example, common formats include sandwich assays and competition or displacement assays. Hybridization techniques are generally described in, e.g., "Nucleic Acid Hybridization, A Practical Approach," Eds. Hames and Higgins, IRL Press (1985).

The sensitivity of the hybridization assays may be enhanced through use of a nucleic acid amplification system which multiplies the target nucleic acid being detected. In vitro amplification techniques suitable for amplifying sequences for use as molecular probes or for generating nucleic acid fragments for subsequent subcloning are known. Examples of techniques sufficient to direct persons of skill through such in vitro amplification methods, including the polymerase chain reaction (PCR) the ligase chain reaction (LCR), Qβ-replicase amplification and other RNA polymerase mediated techniques (e.g., NASBA™) are found in Sambrook et al., *In Molecular Cloning: A Laboratory Manual*, Cold Spring Harbor Laboratory Press (2000); and Ausubel et al., Short Protocols in Molecular Biology, eds., Current Protocols, Greene Publishing Associates, Inc. and John Wiley & Sons, Inc. (2002); as well as U.S. Pat. No. 4,683,202; PCR Protocols, A Guide to Methods and Applications (Innis et al. eds.) Academic Press Inc. San Diego, Calif. (1990); Arnheim & Levinson (Oct. 1, 1990), C&EN 36; *The Journal Of NIH Research,* 3:81 (1991); Kwoh et al., *Proc. Natl. Acad. Sci. USA,* 86:1173 (1989); Guatelli et al., *Proc. Natl. Acad. Sci. USA,* 87:1874 (1990); Lomeli et al., *J. Clin. Chem.,* 35:1826 (1989); Landegren et al., *Science,* 241:1077 (1988); Van Brunt, *Biotechnology,* 8:291 (1990); Wu and Wallace, *Gene,* 4:560 (1989); Barringer et al., *Gene,* 89:117 (1990); and Sooknanan and Malek, *Biotechnology,* 13:563 (1995). Improved methods of cloning in vitro amplified nucleic acids are described in U.S. Pat. No. 5,426,039. Other methods described in the art are the nucleic acid sequence based amplification (NASBA™, Cangene, Mississauga, Ontario) and Qβ-replicase systems. These systems can be used to directly identify mutants where the PCR or LCR primers are designed to be extended or ligated only when a select sequence is present. Alternatively, the select sequences can be generally amplified using, for example, nonspecific PCR primers and the amplified target region later probed for a specific sequence indicative of a mutation. The disclosures of the above-described references are herein incorporated by reference in their entirety for all purposes.

Nucleic acids for use as probes, e.g., in in vitro amplification methods, for use as gene probes, or as inhibitor components are typically synthesized chemically according to the solid phase phosphoramidite triester method described by Beaucage et al., *Tetrahedron Letts.,* 22:1859 1862 (1981), e.g., using an automated synthesizer, as described in Needham VanDevanter et al., *Nucleic Acids Res.,* 12:6159 (1984). Purification of ploynucleotides, where necessary, is typically performed by either native acrylamide gel electrophoresis or by anion exchange HPLC as described in Pearson et al., *J. Chrom.,* 255:137 149 (1983). The sequence of the synthetic poluyucleotides can be verified using the chemical degradation method of Maxam and Gilbert (1980) in Grossman and Moldave (eds.) Academic Press, New York, *Methods in Enzymology,* 65:499.

An alternative means for determining the level of transcription is in situ hybridization. In situ hybridization assays are well-known and are generally described in Angerer et al., *Methods Enzymol.,* 152:649 (1987). In an in situ hybridization assay, cells are fixed to a solid support, typically a glass slide. If DNA is to be probed, the cells are denatured with heat or alkali. The cells are then contacted with a hybridization solution at a moderate temperature to permit annealing of specific probes that are labeled. The probes are preferably labeled with radioisotopes or fluorescent reporters.

## VIII. EXAMPLES

The present invention will be described in greater detail by way of specific examples. The following examples are offered for illustrative purposes, and are not intended to limit the invention in any manner. Those of skill in the art will readily recognize a variety of noncritical parameters which can be changed or modified to yield essentially the same results.

### Example 1

### Materials and Methods

siRNA: All siRNA molecules used in these studies were chemically synthesized by the University of Calgary (Calgary, AB) or Dharmacon Inc. (Lafayette, Colo.). The siRNAs were desalted and annealed using standard procedures.

Lipid Encapsulation of siRNA: In some embodiments, siRNA molecules were encapsulated into nucleic acid-lipid particles composed of the following lipids: the lipid conjugate PEG-cDMA (3-N-[(-Methoxypoly(ethylene glycol)2000) carbamoyl]-1,2-dimyristyloxypropylamine); the cationic lipid DLinDMA (1,2-Dilinoleyloxy-3-(N,N-dimethyl)aminopropane); the phospholipid DPPC (1,2-Dipalmitoyl-sn-glycero-3-phosphocolinel; Avanti Polar Lipids; Alabaster, Ala.); and synthetic cholesterol (Sigma-Aldrich Corp.; St. Louis, Mo.) in the molar ratio 1.4:57.1:7.1:34.3, respectively. In other words, siRNAs were encapsulated into SNALP of the following "1:57" formulation: 1.4% PEG-cDMA; 57.1% DLinDMA; 7.1% DPPC; and 34.3% cholesterol. In other embodiments, siRNA molecules were encapsulated into phospholipid-free SNALP composed of the following lipids: the lipid conjugate PEG-cDMA; the cationic lipid DLinDMA; and synthetic cholesterol in the molar ratio 1.5:61.5:36.9, respectively. In other words, siRNAs were encapsulated into phospholipid-free SNALP of the following "1:62" formulation: 1.5% PEG-cDMA; 61.5% DLinDMA; and 36.9% cholesterol. For vehicle controls, empty particles with identical lipid composition were formed in the absence of siRNA. It should be understood that the 1:57 formulation and 1:62 formulation are target formulations, and that the amount of lipid (both cationic and non-cationic) present and the amount of lipid conjugate present in the formulation may vary. Typically, in the 1:57 formulation, the amount of cationic lipid will be 57 mol % f 5 mol %, and the amount of lipid conjugate will be 1.5 mol % f 0.5 mol %, with the balance of the 1:57 formulation being made up of non-cationic lipid (e.g., phospholipid, cholesterol, or a mixture of the two). Similarly, in the 1:62 formulation, the amount of cationic

lipid will be 62 mol % f 5 mol %, and the amount of lipid conjugate will be 1.5 mol %±0.5 mol %, with the balance of the 1:62 formulation being made up of the non-cationic lipid (e.g., cholesterol).

### Example 2

### Eg5 siRNA Formulated as 1:57 SNALP are Potent Inhibitors of Cell Growth In Vitro

SNALP formulations were prepared with an siRNA targeting Eg5 as the nucleic acid component. Eg5 is a member of kinesin-related proteins that are involved in functions related to movements of organelles, microtubules, or chromosomes along microtubules. These functions include axonal transport, microtubule sliding during nuclear fusion or division, and chromosome disjunction during meiosis and early mitosis. Eg5 plays a critical role in mitosis of mammalian cells. The Eg5 siRNA used in this study is provided in Table 1. The modifications involved introducing 2'OMe-uridine at selected positions in the sense and antisense strands of the Eg5 2263 siRNA sequence, in which the siRNA duplex contained less than about 20% 2'OMe-modified nucleotides.



TABLE 2-continued

Characteristics of the SNALP formulations used in this study.

| Sample No. | Formulation Composition, Mole % PEG (2000)-CDMA \| DLinDMA \| DPPC \| Cholesterol | Lipid/Drug Ratio | Finished Product Characterization Size (nm) | Poly-dispersity | % Encapsulation |
|---|---|---|---|---|---|
| 11 | 1.1 \| 42.6 \| 5.3 \| 51.1 | 22.0 | 80 | 0.10 | 93 |
| 12 | 1.0 \| 40.4 \| 10.1 \| 48.5 | 23.6 | 78 | 0.11 | 88 |
| 13 | 2.8 \| 56.3 \| 7.0 \| 33.8 | 19.0 | 62 | 0.14 | 80 |
| 14 | 2.6 \| 52.6 \| 13.2 \| 31.6 | 20.6 | 66 | 0.14 | 82 |
| 15 | 2.1 \| 42.1 \| 5.3 \| 50.5 | 23.1 | 71 | 0.16 | 81 |
| 16 | 2 \| 40 \| 10 \| 48 | 24.7 | 67 | 0.14 | 92 |

Silencing of Eg5 by siRNA transfection causes mitotic arrest and apoptosis in mammalian cells. Cell viability following transfection with SNALP containing an siRNA targeting Eg5 therefore provides a simple biological readout of in vitro transfection efficiency. Cell viability of in vitro cell cultures was assessed using the commercial reagent CellTiter-Blue® (Promega Corp.; Madison, Wis.), a resazurin dye

TABLE 1

siRNA duplex comprising sense and antisense Eg5 RNA polynucleotides.

| Modification | Eg5 2263 siRNA sequence | SEQ ID NO: | % 2'OMe-Modified | % Modified in DS Region |
|---|---|---|---|---|
| U/U | 5'-C**U**GAAGACC**U**GAAGACAA**U**dTdT-3' | 1 | 6/42 = 14.3% | 6/38 = 15.8% |
| | 3'-dTdTGAC**U**UC**U**GGAC**U**UCUGUUA-5' | 2 | | |

Column 1: "U/U" = 2'OMe-uridine modified siRNA duplex;
Column 2: 2'OMe-modified nucleotides are indicated in bold and underlined. The siRNA duplex can alternatively or additionally comprise 2'-deoxy-2'-fluoro (2'F) nucleotides, 2'-deoxy nucleotides, 2'-O-(2-methoxyethyl) (MOE) nucleotides, and/or locked nucleic acid (LNA) nucleotides. "dT" = deoxythymidine.
Column 3: The number and percentage of 2'OMe-modified nucleotides in the siRNA duplex are provided.
Column 4: The number and percentage of modified nucleotides in the double-stranded (DS) region of the siRNA duplex are provided.

The lipid components and physical characteristics of the SNALP formulations are summarized in Table 2. The lipid: drug ratio is described in units of mg total lipid per mg nucleic acid. Mean particle size and polydispersity were measured on a Malvern Instruments Zetasizer. Encapsulation of nucleic acid was measured using a Ribogreen assay essentially as described in Heyes et al., *Journal of Controlled Release*, 107:276-287 (2005).

TABLE 2

Characteristics of the SNALP formulations used in this study.

| Sample No. | Formulation Composition, Mole % PEG (2000)-CDMA \| DLinDMA \| DPPC \| Cholesterol | Lipid/Drug Ratio | Finished Product Characterization Size (nm) | Poly-dispersity | % Encapsulation |
|---|---|---|---|---|---|
| 1 | 2 \| 40 \| 10 \| 48 | 12.4 | 57 | 0.07 | 90 |
| 2 | 1.8 \| 36.4 \| 18.2 \| 43.6 | 14.0 | 72 | 0.12 | 89 |
| 3 | 1.4 \|27.0 \| 6.8 \| 64.9 | 16.5 | 70 | 0.12 | 92 |
| 4 | 1.3 \| 25.3\| 12.7 \| 60.8 | 18.1 | 76 | 0.07 | 93 |
| 5 | 3.9 \| 39.2 \| 9.8 \| 47.1 | 13.5 | 53 | 0.27 | 86 |
| 8 | 3.6 \| 35.7 \| 17.9 \| 42.9 | 15.1 | 58 | 0.18 | 87 |
| 7 | 2.7 \| 26.7 \| 6.7 \| 64.0 | 17.6 | 56 | 0.17 | 92 |
| 8 | 2.5 \| 25.0 \| 12.5 \| 60.0 | 19.2 | 61 | 0.13 | 92 |
| 9 | 1.4 \| 57.1 \| 7.1 \| 34.3 | 17.8 | 84 | 0.10 | 88 |
| 10 | 1.3 \| 53.3 \|13.3 \| 32.0 | 19.5 | 83 | 0.10 | 89 |

that is reduced by metabolically active cells to the flourogenic product resorufin. The human colon cancer cell line HT29 was cultured using standard tissue culture techniques. 72 hours after SNALP application, CellTiter-Blue® reagent was added to the culture to quantify the metabolic activity of the cells, which is a measure of cell viability. Data are presented as a percent of cell viability relative to ("untreated") control cells that received phosphate buffered saline (PBS) vehicle only.

FIG. **1** shows that the 1:57 SNALP formulation containing Eg5 2263 U/U siRNA was among the most potent inhibitors of tumor cell growth at all siRNA concentrations tested (see, FIG. **1**B, Sample 9).

### Example 3

### ApoB siRNA Formulated as 1:57 SNALP have Potent Silencing Activity In Vivo

SNALP formulations were prepared with an siRNA targeting apolipoprotein B (ApoB) as the nucleic acid component. ApoB is the main apolipoprotein of chylomicrons and low density lipoproteins (LDL). Mutations in ApoB are associated with hypercholesterolemia. ApoB occurs in the plasma in 2 main forms, ApoB48 and ApoB100, which are synthesized in the intestine and liver, respectively, due to an organ-specific stop codon. The ApoB siRNA used in this study is provided in Table 3. The modifications involved introducing

2'OMe-uridine or 2'OMe-guanosine at selected positions in the sense and antisense strands of the ApoB siRNA sequence, in which the siRNA duplex contained less than about 20% 2'OMe-modified nucleotides.

TABLE 3

siRNA duplex comprising sense and antisense ApoB RNA polynucleotides.

| Position | Modification | ApoB siRNA sequence | SEQ ID NO: | % 2'OMe-Modified | % Modified in DS Region |
|---|---|---|---|---|---|
| 10048 | U2/2 G1/2 | 5'-AGU**G**UCA**U**CACAC**U**GAAUACC-3'<br>3'-GU**U**CACAGUAGU**G**U**G**AC**U**UAU-5' | 3<br>4 | 7/42 = 16.7% | 7/38 = 18.4% |

Column 1: The number refers to the nucleotide position of the 5' base of the sense strand relative to the mouse ApoB mRNA sequence XM_137955.
Column 2: The numbers refer to the distribution of 2'OMe chemical modifications in each strand.
Column 3: 2'OMe-modified nucleotides are indicated in bold and underlined. The siRNA duplex can alternatively or additionally comprise 2'-deoxy-2'-fluoro (2'F) nucleotides, 2'-deoxy nucleotides, 2'-O-(2-methoxyethyl) (MOE) nucleotides, and/or locked nucleic acid (LNA) nucleotides.
Column 4: The number and percentage of 2'OMe-modified nucleotides in the siRNA duplex are provided.
Column 5: The number and percentage of modified nucleotides in the double-stranded (DS) region of the siRNA duplex are provided.

The lipid components and physical characteristics of the formulations are summarized in Table 4. The lipid:drug ratio is described in units of mg total lipid per mg nucleic acid. Mean particle size and polydispersity were measured on a Malvern Instruments Zetasizer. Encapsulation of nucleic acid was measured using a Ribogreen assay essentially as described in Heyes et al., *Journal of Controlled Release,* 107:276-287 (2005).

TABLE 4

Characteristics of the SNALP formulations used in this study.

| Group | Formulation Composition Lipid Name & Mole % | Finished Product Characterization: Lipid/Drug Ratio | Size (nm) | Polydispersity | % Encapsulation |
|---|---|---|---|---|---|
| 2 | PEG(2000)-C-DMA \| DLinDMA \| DPPC \| Cholesterol<br>2 \| 40 \| 10 \| 48 | 12.4 | 59 | 0.15 | 93 |
| 3 | PEG(2000)-C-DMA \| DLinDMA \| Cholesterol<br>2.2 \| 44.4 \| 53.3 | 10.7 | 55 | 0.17 | 91 |
| 4 | PEG(2000)-C-DMA \| DLinDMA \| DOPC \| Cholesterol<br>2 \| 40 \| 10 \| 48 | 12.5 | 59 | 0.16 | 92 |
| 5 | PEG(2000)-C-DMA \| DLinDMA \| DMPC \| Cholesterol<br>2 \| 40 \| 10 \| 48 | 12.2 | 56 | 0.11 | 92 |
| 6 | PEG(2000)-C-DMA \| DLinDMA \| DPPE \| Cholesterol<br>1.8 \| 36.4 \| 18.2 \| 43.6 | 13.8 | 66 | 0.16 | 93 |
| 7 | PEG(2000)-C-DMA \| DLinDMA \| DPPC \| Cholestanol<br>2 \| 40 \| 10 \| 48 | 12.4 | 56 | 0.12 | 92 |
| 8 | PEG(2000)-C-DMA \| DLinDMA \| DPPC \| Cholesterol<br>1.4 \| 27.0 \| 6.8 \| 64.9 | 16.5 | 60 | 0.10 | 93 |
| 9 | PEG(2000)-C-DMA \| DLinDMA \| DPPC \| Cholesterol<br>1.3 \| 25.3 \| 12.7 \| 60.8 | 18.1 | 74 | 0.13 | 92 |
| 10 | PEG(2000)-C-DMA \| DLinDMA \| DPPC \| Cholesterol<br>2.5 \| 25.0 \| 12.5 \| 60.0 | 19.2 | 60 | 0.13 | 93 |
| 11 | PEG(2000)-C-DMA \| DLinDMA \| DPPC \| Cholesterol<br>1.4 \| 57.1 \| 7.4 \| 34.3 | 17.8 | 79 | 0.09 | 94 |
| 12 | PEG(2000)-C-DMA \| DLinDMA \| DPPC \| Cholesterol<br>1.0 \| 40.4 \| 10.1 \| 48.5 | 23.6 | 72 | 0.11 | 93 |
| 13 | PEG(2000)-C-DMA \| DLinDMA \| DPPC<br>2 \| 70 \| 28 | 8.7 | 73 | 0.09 | 87 |
| 14 | PEG(2000)-C-DMA \| DLinDMA \| DPPC<br>1.6 \| 54.7 \| 43.8 | 11.3 | 65 | 0.11 | 87 |

BALB/c mice (female, at least 4 weeks old) were obtained from Harlan Labs. After an acclimation period (of at least 7 days), animals were administered SNALP by intravenous (IV) injection in the lateral tail vein once daily on Study Day 0 (1 dose total per animal). Dosage was 1 mg encapsulated siRNA per kg body weight, corresponding to 10 ml/kg (rounded to the nearest 10 μl). As a negative control, one group of animals was given an IV injection of phosphate buffered saline (PBS) vehicle. On Study Day 2, animals were euthanized and liver tissue was collected in RNAlater.

Liver tissues were analyzed for ApoB mRNA levels normalized against glyceraldehyde-3-phosphate dehydrogenase (GAPDH) mRNA levels using the QuantiGene assay (Panomics; Fremont, Calif.) essentially as described in Judge et al., *Molecular Therapy,* 13:494 (2006).

FIG. **2** shows that the 1:57 SNALP formulation containing ApoB 10048 U2/2 G1/2 siRNA was the most potent at reducing ApoB expression in vivo (see, Group 11).

Example 4

ApoB siRNA Formulated as 1:57 SNALP have Potent Silencing Activity In Vivo

SNALP formulations were prepared with the ApoB siRNA set forth in Table 3. The lipid components and physical characteristics of the formulations are summarized in Table 5. The

lipid:drug ratio is described in units of mg total lipid per mg nucleic acid. Mean particle size and polydispersity were measured on a Malvern Instruments Zetasizer. Encapsulation of nucleic acid was measured using a Ribogreen assay essentially as described in Heyes et al., *Journal of Controlled Release,* 107:276-287 (2005).

TABLE 5

Characteristics of the SNALP formulations used in this study.

| SNALP (L:D ratio) | siRNA Payload | Particle Size (Polydispersity) | % Encapsulation |
|---|---|---|---|
| 2:30 (13) | ApoB-10048 U2/2 G1/2 | 65 nm (0.16) | 88 |
| 1:57 (9) | ApoB-10048 U2/2 G1/2 | 74 nm (0.10) | 89 |

The 2:30 SNALP formulation used in this study is lipid composition 2:30:20:48 as described in molar percentages of PEG-C-DMA, DLinDMA, DSPC, and cholesterol (in that order). This formulation was prepared by syringe press at an input lipid to drug (L:D) ratio (mg:mg) of 13:1.

The 1:57 SNALP formulation used in this study is lipid composition 1.5:57.1:7:34.3 as described in molar percentages of PEG-C-DMA, DLinDMA, DPPC, and cholesterol (in that order). This formulation was prepared by syringe press at an input lipid to drug (L:D) ratio (mg:mg) of 9:1.

BALB/c mice (female, 4 weeks old) were obtained from Harlan Labs. After an acclimation period (of at least 7 days), animals were administered SNALP by intravenous (IV) injection in the lateral tail vein once daily on Study Days 0, 1, 2, 3 & 4 for a total of 5 doses per animal. Daily dosage was either 1.0 (for 2:30 SNALP) or 0.1 (for 1:57 SNALP) mg encapsulated siRNA per kg body weight, corresponding to 10 ml/kg (rounded to the nearest 10 μl). As a negative control, one group of animals was given IV injections of phosphate buffered saline (PBS) vehicle. On Study Day 7, 72 h after the last treatment, animals were euthanized and liver tissue was collected in RNAlater.

Liver tissues were analyzed for ApoB mRNA levels normalized against glyceraldehyde-3-phosphate dehydrogenase (GAPDH) mRNA levels using the QuantiGene assay (Panomics; Fremont, Calif.) essentially as described in Judge et al., *Molecular Therapy,* 13:494 (2006).

FIG. **3** shows that the 1:57 SNALP containing ApoB 10048 U2/2 G1/2 siRNA was more than 10 times as efficacious as the 2:30 SNALP in mediating ApoB gene silencing in mouse liver at a 10-fold lower dose.

## Example 5

### ApoB siRNA Formulated as 1:57 or 1:62 SNALP have Potent Silencing Activity In Vivo

SNALP formulations were prepared with the ApoB siRNA set forth in Table 3. The lipid components and physical characteristics of the formulations are summarized in Table 6. The lipid:drug ratio is described in units of mg total lipid per mg nucleic acid. Mean particle size and polydispersity were measured on a Malvern Instruments Zetasizer. Encapsulation of nucleic acid was measured using a Ribogreen assay essentially as described in Heyes et al., *Journal of Controlled Release,* 107:276-287 (2005).

TABLE 6

Characteristics of the SNALP formulations used in this study.

| Group | Formulation Composition Lipid Name & Mole % | Lipid/ Drug Ratio | Finished Product Characterization: Size (nm) | Poly-dispersity | % Encapsulation |
|---|---|---|---|---|---|
| 2 | PEG(2000)-C-DMA \| DLinDMA \| DPPC \| Cholesterol 1.4 \| 57.1 \| 7.1 \| 34.3 | 8.9 | 76 | 0.06 | 89 |
| 3 | PEG(2000)-C-DMA \| DLinDMA \| Cholesterol 1.5 \| 61.5 \| 36.9 | 8.1 | 76 | 0.04 | 86 |
| 4 | PEG(2000)-C-DMA \| DODMA \| DPPC \| Cholesterol 1.4 \| 57.1 \| 7.1 \| 34.3 | 9.0 | 72 | 0.05 | 95 |
| 5 | PEG(5000)-C-DMA \| DLinDMA \| DPPC \| Cholesterol 1.4 \| 57.1 \| 7.1 \| 34.3 | 9.6 | 52 | 0.16 | 89 |
| 6 | PEG(2000)-C-DMA \| DLinDMA \| DPPC \| Cholestanol 1.4 \| 57.1 \| 7.1 \| 34.3 | 8.9 | 68 | 0.10 | 94 |
| 7 | PEG(2000)-C-DMA \| DLinDMA \| DPPE \| Cholesterol 1.4 \| 57.1 \| 7.1 \| 34.3 | 8.9 | 72 | 0.07 | 95 |
| 8 | PEG(2000)-C-DMA \| DLinDMA \| DPPC 1.8 \| 70.2 \| 28.1 | 8.6 | 74 | 0.13 | 86 |

BALB/c mice (female, at least 4 weeks old) were obtained from Harlan Labs. After an acclimation period (of at least 7 days), animals were administered SNALP by intravenous (IV) injection in the lateral tail vein once daily on Study Day 0 (1 dose total per animal). Dosage was 0.75 mg encapsulated siRNA per kg body weight, corresponding to 10 ml/kg (rounded to the nearest 10 μl). As a negative control, one group of animals was given an IV injection of phosphate buffered saline (PBS) vehicle. On Study Day 2, animals were euthanized and liver tissue was collected in RNAlater.

Liver tissues were analyzed for ApoB mRNA levels normalized against glyceraldehyde-3-phosphate dehydrogenase (GAPDH) mRNA levels using the QuantiGene assay (Panomics; Fremont, Calif.) essentially as described in Judge et al., *Molecular Therapy,* 13:494 (2006).

FIG. **4** shows that the 1:57 and 1:62 SNALP formulations had comparable ApoB silencing activity in vivo (see, e.g., Groups 2 & 3).

## Example 6

### ApoB siRNA Formulated as 1:62 SNALP have Potent Silencing Activity In Vivo

SNALP formulations were prepared with the ApoB siRNA set forth in Table 3. The lipid components and physical characteristics of the formulations are summarized in Table 7. The

lipid:drug ratio is described in units of mg total lipid per mg nucleic acid. Mean particle size and polydispersity were measured on a Malvern Instruments Zetasizer. Encapsulation of nucleic acid was measured using a Ribogreen assay essentially as described in Heyes et al., *Journal of Controlled Release,* 107:276-287 (2005).

TABLE 7

Characteristics of the SNALP formulations used in this study.

| Group | Formulation Composition, Mole % PEG(2000)-C-DMA \| DLinDMA \| Cholesterol | Lipid/ Drug Ratio | Finished Product Characterization Size (nm) | Poly-dispersity | % Encapsulation |
|---|---|---|---|---|---|
| 2 | 1.5 \| 61.5 \| 36.9 | 6.1 | 80 | 0.07 | 92 |
| 3 | 1.4 \| 54.8 \| 43.8 | 6.6 | 74 | 0.05 | 89 |
| 4 | 2.0 \| 61.2 \| 36.7 | 6.2 | 71 | 0.11 | 91 |
| 5 | 1.8 \| 54.5 \| 43.6 | 6.7 | 67 | 0.09 | 91 |
| 6 | 1.3 \| 68.1 \| 30.6 | 7.4 | 91 | 0.06 | 89 |
| 7 | 1.2 \| 61.8 \| 37.1 | 8.0 | 87 | 0.10 | 90 |
| 8 | 1.7 \| 67.8 \| 30.5 | 7.6 | 81 | 0.07 | 91 |
| 9 | 1.4 \| 56.3 \| 42.3 | 8.6 | 75 | 0.11 | 92 |
| 10 | 1.9 \| 61.3 \| 36.8 | 8.2 | 72 | 0.10 | 91 |
| 11 | 1.8 \| 56.1 \| 42.1 | 8.8 | 70 | 0.10 | 90 |
| 12 | 1.3 \| 66.7 \| 32.0 | 9.5 | 89 | 0.09 | 89 |
| 13 | 1.2 \| 61.7 \| 37.0 | 10.0 | 87 | 0.10 | 91 |
| 14 | 1.7 \| 66.4 \| 31.9 | 9.6 | 82 | 0.11 | 90 |
| 15 | 1.5 \| 61.5 \| 36.9 | 10.1 | 79 | 0.10 | 91 |

BALB/c mice (female, at least 4 weeks old) were obtained from Harlan Labs. After an acclimation period (of at least 7 days), animals were administered SNALP by intravenous (IV) injection in the lateral tail vein once daily on Study Day 0 (1 dose total per animal). Dosage was 0.1 mg encapsulated siRNA per kg body weight, corresponding to 10 ml/kg (rounded to the nearest 10 μl). As a negative control, one group of animals was given an IV injection of phosphate buffered saline (PBS) vehicle. On Study Day 2, animals were euthanized and liver tissue was collected in RNAlater.

Liver tissues were analyzed for ApoB mRNA levels normalized against glyceraldehyde-3-phosphate dehydrogenase (GAPDH) mRNA levels using the QuantiGene assay (Panomics; Fremont, Calif.) essentially as described in Judge et al., *Molecular Therapy,* 13:494 (2006).

FIG. **5** shows that the 1:62 SNALP formulation was one of the most potent inhibitors of ApoB expression at two different lipid:drug ratios (i.e., 6.1 & 10.1) among the phospholipid-free SNALP formulations tested (see, Groups 2 & 15).

## Example 7

## In Vivo Silencing of ApoB Expression Using 1:57 SNALP Prepared Via a Syringe Press or Gear Pump Process

This study illustrates a comparison of the tolerability and efficacy of the 1:57 SNALP formulation with ApoB-targeting siRNA as prepared by various manufacturing processes. In particular, 1:57 SNALP was prepared by a syringe press or gear pump process using either PBS or citrate buffer (post-blend dilution) and administered intravenously in mice.

Experimental Design

Animal Model: Female BALB/c mice, 5 wks old, n=4 per group/cage.

siRNA payload: ApoB10048 U2/2 G1/2 siRNA.

Tolerability:

| Group | Formulation | IV Injection siRNA mg/kg | Lipid mg/kg |
|---|---|---|---|
| 1 | PBS vehicle | Standard 10 mL/kg volume | |
| 2 | 1\|57 Citrate Direct Dil, Syringe Press | 7 | 77 |
| 3 | 1\|57 PBS Direct Dil, Syringe Press | 7 | 96 |
| 4 | 1\|57 PBS Direct Dil, Gear Pump | 7 | 79 |
| 5 | 1\|57 Citrate Direct Dil, Syringe Press | 9 | 99 |
| 6 | 1\|57 PBS Direct Dil, Syringe Press | 9 | 123 |
| 7 | 1\|57 PBS Direct Dil, Gear Pump | 9 | 102 |

Efficacy:

| Group | Formulation | IV Injection siRNA mg/kg | Lipid mg/kg |
|---|---|---|---|
| 8 | PBS vehicle | Standard 10 mL/kg volume | |
| 9 | 1\|57 PBS Direct Dil, Syringe Press | 0.05 | 0.68 |
| 10 | 1\|57 PBS Direct Dil, Gear Pump | 0.05 | 0.57 |
| 11 | 1\|57 PBS Direct Dil, Syringe Press | 0.1 | 1.36 |
| 12 | 1\|57 PBS Direct Dil, Gear Pump | 0.1 | 1.13 |

Formulation:

Formulations are provided at 0.005 to 0.9 mg siRNA/mL, 0.22 μm filter sterilized in crimp top vials.

Formulation Details:

1. Lipid composition "1157 Citrate blend" used in this study is 1.4:57.1:7.1:34.3 as described in molar percentages of PEG-C-DMA, DLinDMA, DPPC, and cholesterol (in that order). This formulation has an input lipid to drug ratio of 8.9.
2. Gear pump set up included 0.8 mm T-connector and 400 mL/min speed.
3. siRNA used in this study is apoB-10048 U2/2 G1/2 siRNA.

Formulation Summary:

| | 1:57 (9:1) + DOW siRNA | Particle Size Zavg (nm) | Poly | % Encap | Final L:D (mg:mg) |
|---|---|---|---|---|---|
| 322-050807-1 | Syringe PBS Blend | 79 | 0.12 | 92 | 13.6 |
| 322-050807-2 | Syringe Citrate Blend | 86 | 0.11 | 91 | 11.0 |
| 322-050807-3 | Gear PBS Blend | 80 | 0.09 | 93 | 11.3 |

Procedures

Treatment: Just prior to the first treatment, animals are weighed and dose amounts are calculated based on the weight of individual animals (equivalent to 10 mL/kg, rounded to the nearest 10 μl). Test article is administered by IV injection through the tail vein once on Day 0 (1 dose total per animal). Body weight is measured daily (every 24 h) for the duration of the study. Cage-side observations are taken daily in concert with body weight measurements and additionally as warranted.

Group 1-7 Endpoint: Animals are sacrificed on Day 1, 24 h after test article administration. Blood is collected by cardiac puncture upon sacrifice. Whole amount is collected into a SST microtainer for serum. Clot for 30 (to 60) min at room temp., centrifuge for 5 min at 16,000×g & 16° C., invert to confirm centrifugation is complete, and store at 4° C. Analyze complete small-animal clinical chemistry panel plus AST and SDII. Top priority list: ALT, AST, SDH, Bilirubin, Alkaline Phosphatase, GGT, BUN, CPK, Glucose. Secondary priority list: Creatinine, Albumin, Globulin, Total Protein.

Group 8-12 Endpoint: Animals are sacrificed on Day 2, 48 h after test article administration. Blood is collected by cardiac puncture and processed for plasma. Immediately centrifuge for 5 min at 16,000×g (at 16° C.). Record any observations of unusual plasma appearance. Pipette off clear plasma supernatant into a clean microfuge tube and store at −80° C. The following tissues are removed and weighed separately: liver and spleen. The bottom (unattached) half of the left liver lobe is detached and submerged in ≥5 volumes of RNAlater (<0.3 g in 1.5 mL RNAlater in 2.0 mL tube), stored at least 16 hours at 4° C. prior to analysis and long term storage at −20° C. or −80° C. for archival purposes. Formulations are expected to be well tolerated. Mice which exhibit signs of distress associated with the treatment are terminated at the discretion of the vivarium staff.

Termination: Mice are anaesthetized with a lethal dose of ketamine/xylazine; then cardiac puncture is performed followed by cervical dislocation.

Data Analysis: Tolerability of treatment regime is monitored by animal appearance and behavior as well as body weight. Blood clinical chemistry is measured by automated analyzer. ApoB and GAPDH mRNA levels in liver are measured via QG assay. ApoB protein in plasma is measured via ELISA. Total cholesterol in plasma is measured via standard enzymatic/colorimetric assay.

Results

There was no body weight loss or change in animal appearance/behavior upon administration of the 1:57 SNALP formulations. FIG. **6** shows that the tolerability of SNALP prepared by citrate buffer versus PBS direct dilution did not differ significantly in terms of blood clinical chemistry parameters. There was a tolerability difference between syringe citrate and syringe PBS at constant siRNA dosage, but that was likely an artifact dependent on the different final lipid:drug (L:D) ratios of these two preparations.

FIG. **7** shows that the efficacy of the 1:57 SNALP prepared by gear pump was similar to the same SNALP prepared by syringe press. The tolerability profile was improved with the gear pump process, which could be attributed to increased initial encapsulation rate and decreased final L:D ratio.

## Example 8

### In Vivo Silencing of ApoB Expression Using 1:57 SNALP Prepared Via a Direct Dilution or in-Line Dilution Process

This study illustrates a comparison of the tolerability and efficacy of the 1:57 SNALP formulation with ApoB-targeting siRNA as prepared by a direct dilution or in-line dilution process at an input lipid to drug ratio of 6:1 or 9:1.

Experimental Design

Animal Model: Female BALB/c mice, 7 wks old.

siRNA payload: ApoB10048 U2/2 G1/2 siRNA.

CBC/Diff:

| | | | IV Dosage | |
|---|---|---|---|---|
| Group | # Mice | Test Article | Encap. siRNA | Total Lipid |
| 1 | 3 | PBS | — | — |
| 2 | 3 | 1\|57 SNALP (9:1) | 7 mg/kg | 71 mg/kg |
| 3 | 3 | 1\|57 SNALP (9:1) | 11 mg/kg | 112 mg/kg |

Clinical Chemistry:

| | | | IV Dosage | |
|---|---|---|---|---|
| Group | # Mice | Test Article | Encap. siRNA | Total Lipid |
| 4 | 4 | PBS | — | — |
| 5 | 4 | 1\|57 SNALP (9:1) | 9 mg/kg | 92 mg/kg |
| 6 | 4 | 1\|57 SNALP (9:1) | 11 mg/kg | 112 mg/kg |
| 7 | 4 | (6:1) New 1\|57 SNALP | 11 mg/kg | 78 mg/kg |
| 8 | 4 | (6:1) New 1\|57 SNALP | 13 mg/kg | 93 mg/kg |
| 9 | 4 | (6:1) New 1\|57 SNALP | 15 mg/kg | 107 mg/kg |
| 10 | 4 | (6:1) New 1\|57 SNALP | 17 mg/kg | 121 mg/kg |
| 11 | 4 | 1\|57 SNALP (9:1) | 11 mg/kg | 112 mg/kg |

Activity:

| | | | IV Dosage | |
|---|---|---|---|---|
| Group | # Mice | Test Article | Encap. siRNA | Total Lipid |
| 12 | 4 | PBS | — | — |
| 13 | 4 | 1\|57 SNALP (9:1) | 0.05 mg/kg | 0.51 mg/kg |
| 14 | 4 | 1\|57 SNALP (9:1) | 0.1 mg/kg | 1.02 mg/kg |
| 15 | 4 | 1\|57 SNALP (9:1) | 0.2 mg/kg | 2.04 mg/kg |
| 16 | 4 | (6:1) New 1\|57 SNALP | 0.05 mg/kg | 0.36 mg/kg |
| 17 | 4 | (6:1) New 1\|57 SNALP | 0.1 mg/kg | 0.71 mg/kg |
| 18 | 4 | (6:1) New 1\|57 SNALP | 0.2 mg/kg | 1.42 mg/kg |
| 19 | 4 | (6:1) New 1\|57 SNALP | 0.4 mg/kg | 2.85 mg/kg |

Formulation:

Formulations are provided at 0.005 to 1.7 mg siRNAImL, 0.22 μm filter sterilized in crimp top vials.

Formulation Details:

1. "1|57 SNALP" used in this study is lipid composition 1.4:57.1:7.1:34.3 as described in molar percentages of PEG-C-DMA, DLinDMA, DPPC, and cholesterol (in that order). This formulation was prepared by gear pump at an input lipid to drug ratio of 9:1 (28 mM lipids) or 6:1 (14 mM lipids).
2. siRNA used in this study is apoB-10048 U2/2 G1/2 siRNA.

Formulation Summary:

| 1\|57 SNALP | Gear PBS In-Line | Particle Size Zavg (nm) | Poly | % Encap | Final L:D (mg:mg) |
|---|---|---|---|---|---|
| 322-051407-1 | Input 9:1 | 78 | 0.07 | 93 | 10.2 |
| 322-051407-2 | Input 6:1 | 81 | 0.05 | 92 | 7.1 |

Procedures

Treatment: Just prior to the first treatment, animals are weighed and dose amounts are calculated based on the weight of individual animals (equivalent to 10 mL/kg, rounded to the nearest 10 μl). Test article is administered by IV injection through the tail vein once on Day 0 (1 dose total per animal). Body weight is measured daily (every 24 h) for the duration of the study. Cage-side observations are taken daily in concert with body weight measurements and additionally as warranted.

Endpoint: Animals are sacrificed on Day 1, 24 h after test article administration (Grps 1-10) or on Day 2, 48 h after test article administration (Grps 11-19).

Groups 1-3: Blood is collected by cardiac puncture upon sacrifice. Whole amount is collected into an EDTA microtainer, mixed immediately to prevent coagulation, and sent for analysis of CBC/Diff profile. Perform brief necropsy.

Groups 4-11: Blood is collected by cardiac puncture into a SST microtainer for serum. Clot for 30 (to 60) min at room

temp., centrifuge for 5 min at 16,000×g & 16° C., invert to confirm centrifugation is complete, and store at 4° C. Analyze complete small-animal clinical chemistry panel plus AST and SDH. Top priority list: ALT, AST, SDH, Bilirubin, Alkaline Phosphatase, GGT, BUN, CPK, Glucose. Secondary priority list: Creatinine, Albumin, Globulin, Total Protein. Perform brief necropsy.

Groups 12-19: Blood is collected by cardiac puncture and processed for plasma: immediately centrifuge for 5 min at 16,000×g (at 16° C.). Record any observations of unusual plasma appearance. Pipette off clear plasma supernatant into a clean microfuge tube and store at −80° C. The following tissues are removed: liver. The liver is not weighed; the bottom (unattached) half of the left liver lobe is detached and submerged in ≥5 volumes of RNAlater (<0.3 g in 1.5 mL RNAlater in 2.0 mL tube), stored at least 16 hours at 4° C. prior to analysis and long term storage at ~80° C. Formulations are expected to be well tolerated. Mice which exhibit signs of distress associated with the treatment are terminated at the discretion of the vivarium staff.

Termination: Mice are anaesthetized with a lethal dose of ketamine/xylazine; then cardiac puncture is performed followed by cervical dislocation.

Data Analysis: Tolerability of treatment regime is monitored by animal appearance and behavior, and body weight. Blood clinical chemistry and CBC/Diff profile is measured by automated analyzer. Liver ApoB mRNA is measured using the QuantiGene Assay. Plasma ApoB-100 is measured using ELISA. Plasma total cholesterol is measured using a standard enzymatic assay.

Results

Tolerability:

FIG. **8** shows that there was very little effect on body weight 24 hours after 1:57 SNALP administration. The maximum weight loss of 3.6±0.7% was observed at the highest drug dose of 17 mg/kg. There was also no obvious change in animal appearance/behavior at any of the dosages tested.

FIG. **9** shows that there were no obvious changes in platelet count. Reduction of platelets can cause the mean platelet volume to increase as the body produces new platelets in compensation for the treatment-related decrease. Under the conditions of this study, the mean platelet volume did not change in SNALP-treated groups.

FIG. **10** shows that clinically significant liver enzyme elevations (3×ULN) occurred at drug dosages of 11 mg/kg for 1:57 SNALP at a lipid:drug (L:D) ratio of 10, and at 13 mg/kg at a L:D of 7. A slight dose response trend upwards in plasma total protein and globulin was also observed.

Efficacy:

FIG. **11** shows that based on the liver mRNA QuantiGene analysis, the potency of the lower L:D SNALP was as good as that of the higher L:D SNALP at the tested drug dosages. In fact, the ApoB silencing activity was identical at the 0.05 and 0.1 mg/kg dosages. As such, the potency of the 1:57 SNALP at a 6:1 input L:D ratio (final ratio of 7:1) was similar to the potency of the 1:57 SNALP at a 9:1 input L:D ratio (final ratio of 10:1) at reducing ApoB expression.

FIG. **12** shows that ApoB protein and total cholesterol levels were reduced to a similar extent by the 1:57 SNALP at a 6:1 input L:D ratio (final ratio of 7:1) and the 1:57 SNALP at a 9:1 input L:D ratio (final ratio of 10:1).

Therapeutic Index:

This study demonstrates that both the 1:57 SNALP at a 6:1 input L:D ratio (final ratio of 7:1) and the 1:57 SNALP at a 9:1 input L:D ratio (final ratio of 10:1) caused about 60% ApoB liver mRNA silencing with a drug dose of 0.1 mg/kg. Interpolating from the available data points in FIG. **10**, a 10:1 final L:D ratio at 10 mg/kg may cause a similar degree of enzyme elevation as a 7:1 final L:D ratio at 13 mg/kg. Using these activity and toxicity points, the therapeutic index for the 1:57 SNALP at a 10:1 final L:D ratio is (10 mg/kg)/(0.1 mg/kg)=100 and the therapeutic index for the 1:57 SNALP at a 7:1 final L:D ratio is (13 mg/kg)/(0.1 mg/kg)=130. Using this dataset, the therapeutic index for the 1:57 SNALP at a 7:1 final L:D ratio is 30% greater than the therapeutic index for the 1:57 SNALP at a 10:1 final L:D ratio.

## Example 9

### In Vivo Silencing of PLK-1 Expression Using 1:57 SNALP Increases Survival of Hep3B Tumor-Bearing Mice

SNALP containing polo-like kinase 1 (PLK-1) siRNA (1:57 SNALP formulation: 1.4% PEG-cDMA; 57.1% DLinDMA; 7.1% DPPC; and 34.3% cholesterol) were tested for their effects on the survival of CD1 nu/nu mice bearing Hep3B liver tumors. PLK-1 is a serine/threonine kinase containing two functional domains: (1) a kinase domain; and (2) a polo-box domain (see, e.g., Barr et al., *Nat. Rev. Mol. Cell Biol.,* 5:429-440 (2004)). The activity and cellular concentration of PLK-1 are crucial for the precise regulation of cell division. PLK-1 is overexpressed in many cancer types including hepatoma and colon cancer, and PLK-1 expression often correlates with poor patient prognosis. Overexpression of PLK-1 (wild-type or kinase inactive) results in multinucleation (genetic instability). Hyperactive PLK-1 overrides the DNA damage checkpoint. Constitutive PLK-1 expression causes transformation of NIH 3T3 cells. PLK-1 phosphorylates the p53 tumor suppressor, thereby inhibiting the pro-apoptotic effects of p53. The PLK-1 siRNA used in this study are provided in Table 8. The modifications involved introducing 2'OMe-uridine or 2'OMe-guanosine at selected positions in the sense and antisense strands of the PLK-1 siRNA sequence, in which the siRNA duplex contained less than about 20% 2'OMe-modified nucleotides.

TABLE 8

siRNA duplexes comprising sense and antisense PLK-1 RNA polynucleotides.

| siRNA | PLK-1 siRNA Sequence | SEQ ID NO: | % Modified in DS Region |
|---|---|---|---|
| PLK1424 | 5'-AGA**U**CACCC**U**CCU**U**AAA**U**ANN-3' | 5 | 6/38 = |
| U4/GU | 3'-NNUC**U**AGUGGGAG**G**AAUUUAU-5' | 6 | 15.8% |
| PLK1424 | 5'-AGA**U**CACCC**U**CCU**U**AAA**U**ANN-3' | 5 | 7/38 = |
| U4/G | 3'-NNUCUA**G**UG**G**GA**G**GAAUUUAU-5' | 7 | 18.4% |

Column 1: The number after "PLK" refers to the nucleotide position of the 5' base of the sense strand relative to the start codon (ATG) of the human PLK-1 mRNA sequence NM_005030.

Column 2: 2'-O-methyl (2'OMe) nucleotides are indicated in bold and underlined. The siRNA duplex can alternatively or additionally comprise 2'-deoxy-2'-fluoro (2'F) nucleotides, 2'-deoxy nucleotides, 2'-O-(2-methoxyethyl) (MOE) nucleotides, and/or locked nucleic acid (LNA) nucleotides. N = deoxythymidine (dT) nucleotide, uridine (U) ribonucleotide, or ribonucleotide having complementarity to the target sequence (antisense strand) or the complementary strand thereof (sense strand).

Column 3: The number and percentage of modified nucleotides in the double-stranded (DS) region of the siRNA duplex are provided.

Experimental Groups

20 CD1 nu/nu mice were seeded as follows:

| Group | # Mice | Tumor seeding | SNALP | # Mice | SNALP dosing IV | SNALP dose | Sacrifice | Assay |
|---|---|---|---|---|---|---|---|---|
| A | 20 to | I.H. | Luc 1:57 | 9 | Days 11, 14, | 10 × 2 | When | Survival |
| B | seed | $1.5 \times 10^6$ | PLK 1424 | 9 | 17, 21, 25, 28, | mg/kg | moribund | Body Weights |
| | | Hep3B | 1:57 | | 32, 35, 39, 42 | | | |

Test Articles

All samples were filter-sterilized prior to dilution to working concentration. All tubes were labeled with the formulation date, lipid composition, and nucleic acid concentration. SNALP samples were provided at 0.2 mg/ml nucleic acid. A minimum of 20 ml of each SNALP was required to perform the study. Formulations for this study contained:

| Group | Test Article Description |
|---|---|
| A | Luc U/U SNALP 1:57 (28 mM lipid) |
| B | PLK1424 U4/GU SNALP 1:57 (28 mM lipid) |
| | PLK1424 U4/G SNALP 1:57 (28 mM lipid) |

Procedures

| | |
|---|---|
| Day 0 | Mice will receive Anafen by SC injection (100 μg in 20 μl saline) immediately prior to surgery. Individual mice are anesthetized by isoflourane gas inhalation and eye lube applied to prevent excessive eye drying. While maintained under gas anesthesia from a nose cone, a single 1.5 cm incision across the midline will be made below the sternum. The left lateral hepatic lobe is then exteriorized using an autoclaved cotton wool bud. 25 μl of tumor cells suspended in PBS is injected into the lobe at a shallow angle using a leur tip Hamilton syringe (50 μl) and 30G (3/8") needle. Cells will be injected slowly (~30 s) and a swab applied to the puncture wound immediately after needle withdrawal. After any bleeding has stopped (~1 min), the incision is closed with 5-6 sutures in the muscle wall and 3-4 skin clips. Cell suspensions will be thoroughly mixed immediately prior to each injection. Mice will recover from anesthesia in a clean cage lined with paper towel and monitored closely for 2-4 hours. Animals are then returned to normal housing. |
| Day 1 | All mice will be lightly anesthetized by isoflourane gas and the sutures examined. Animals will then receive Anafen by SC injection (100 μg in 20 μl saline). |
| Day 10 | Mice will be randomized into the appropriate treatment groups. |
| Day 11 | Groups A, B - Day 11: All Animals will be administered SNALP at 2 mg/kg by IV injection via the lateral tail vein. Mice will be dosed according to body weight (10 ml/kg). Dosing will be repeated for 5 consecutive days based on initial weight. |

-continued

| | |
|---|---|
| Day 14-35 | Groups A, B - Days 14, 17, 21, 25, 28, 32, 35: All Animals will be re-administered SNALP at 2 mg/kg by IV injection via the lateral tail vein. Mice will be dosed according to body weight (10 ml/kg). Body weights Groups: Mice will be weighed on the day of dosing for 5 weeks, then twice weekly until close of the study. Endpoint: Tumor burden and formulations are expected to be well tolerated. Mice that exhibit signs of distress associated with the treatment or tumor burden are terminated at the discretion of the vivarium staff. |
| Termination: | Mice are anesthetized with a lethal dose of ketamine/xylazine followed by cervical dislocation. |
| Data Analysis: | Survival and body weights are assayed. |

Results

FIG. **13** shows the mean body weights of mice during therapeutic dosing of PLK1424 SNALP in the Hep3B intrahepatic (I.H.) tumor model. The treatment regimen was well tolerated with no apparent signs of treatment-related toxicity.

FIG. **14** shows that treatment with 1:57 SNALP-formulated PLK1424 caused a significant increase in the survival of Hep3B tumor-bearing mice. This in vivo anti-tumor effect was observed in the absence of any apparent toxicity or immune stimulation.

## Example 10

### In Vivo Silencing of PLK-1 Expression Using 1:57 SNALP Induces Tumor Cell Apoptosis in Hep3B Tumor-Bearing Mice

The objectives of this study were as follows:

1. To determine the level of mRNA silencing in established Hep3B liver tumors following a single IV administration of PLK1424 SNALP.
2. To confirm the mechanism of mRNA silencing by detecting specific RNA cleavage products using RACE-PCR.
3. To confirm induction of tumor cell apoptosis by histopathology.

The 1:57 SNALP formulation (1.4% PEG-cDMA; 57.1% DLinDMA; 7.1% DPPC; and 34.3% cholesterol) was used for this study.

Experimental Groups

20 SCID/beige mice were seeded as follows:

| Group | # Mice | Tumor seeding | SNALP | # Mice | SNALP dosing IV | Sacrifice | Assay |
|---|---|---|---|---|---|---|---|
| A | 20 to | I.H. | PBS | 6 | 1 × 2 mg/kg | 24 h after | Tumor QG |
| B | seed | $1 \times 10^6$ | Luc 1:57 | 7 | Day 20 | treatment | Tumor RACE-PCR |
| C | | Hep3B | PLK 1424 | 7 | | | Histopathology |
| | | | 1:57 | | | | |

Test Articles

All samples were filter-sterilized prior to dilution to working concentration. All tubes were labeled with the formulation date, lipid composition, and nucleic acid concentration. SNALP samples were provided at 0.2 mg/ml nucleic acid. A minimum of 2 ml of SNALP was required to perform the study. Formulations for this study contained:

| Group | Test Article Description |
|---|---|
| A | PBS |
| B | Luc U/U 1:57 SNALP |
| C | PLK1424 U4/GU 1:57 SNALP |

Procedures

| | |
|---|---|
| Day 0 | Mice will receive Anafen by SC injection (100 μg in 20 μl saline) immediately prior to surgery. Individual mice are anesthetized by isoflourane gas inhalation and eye lube applied to prevent excessive eye drying. While maintained under gas anesthesia from a nose cone, a single 1.5 cm incision across the midline will be made below the sternum. The left lateral hepatic lobe is then exteriorized using an autoclaved cotton wool bud. 25 μl of tumor cells suspended in PBS is injected into the lobe at a shallow angle using a leur tip Hamilton syringe (50 μl) and 30G (3/8") needle. Cells will be injected slowly (~30 s) and a swab applied to the puncture wound immediately after needle withdrawal. After any bleeding has stopped (~1 min), the muscle wall incision is closed with 5-6 sutures. The skin incision is then closed with 3-4 metal skin clips. Cell suspensions will be thoroughly mixed immediately prior to each injection. Mice will recover from anesthesia in a clean cage lined with paper towel and monitored closely for 2-4 hours. Animals are then returned to normal housing. |
| Day 1 | All mice will be lightly anesthetized by isoflourane gas and the sutures examined. Animals will then receive Anafen by SC injection (100 μg in 20 μl saline). |
| Day 7 | Mice will be randomized into the appropriate treatment groups. |
| Day 20 | Groups A-C: Mice will be weighed and then administered either PBS, Luc, or PLK1424 SNALP by IV injection via the lateral tail vein. SNALP will be dosed at 2 mg/kg or equivalent volume (10 ml/kg) according to body weight. |
| Day 21 | Groups A-C: All mice will be weighed and then euthanized by lethal anesthesia.<br>Tumor bearing liver lobes from all mice in each group will be weighed and collected into RNALater for RNA analysis.<br>Endpoint: Tumor burden and formulations are expected to be well tolerated. Mice that exhibit signs of distress associated with the treatment or tumor burden are terminated at the discretion of the vivarium staff. |
| Termination: | Mice are anaesthetized with a lethal dose of ketamine/xylazine followed by cervical dislocation. |
| Data Analysis: | mRNA analysis of liver tumors by bDNA (QG) assay and RACE-PCR.<br>Tumor cell apoptosis by histopathology. |

Results

Body weights were monitored from Day 14 onwards to assess tumor progression. On Day 20, 6 mice showing greatest weight loss were randomized into each of the 3 groups and treated. All six mice had substantial-large I.H. tumors at sacrifice (Day 21). Treatment of the remaining 14 mice was therefore initiated on the Day 21 (sacrifice Day 22). 10/14 mice had substantial tumors; 2/14 mice had small/probable tumors; and 2/14 mice had no visible tumor burden.

FIG. **15** shows data from Quantigene assays used to measure human (tumor)-specific PLK-1 mRNA levels. A single 2 mg/kg dose of 1:57 SNALP reduced PLK-1 mRNA levels by about 50% in intrahepatic Hep3B tumors growing in mice.

FIG. **16** shows that a specific cleavage product of PLK-1 mRNA was detectable in mice treated with PLK1424 SNALP by 5' RACE-PCR. No specific PCR product was detectable in mice treated with either PBS or control (Luc) SNALP. Nucleotide sequencing of the PCR product confirmed the predicted cleavage site by PLK1424 siRNA-mediated RNA interference in the PLK-1 mRNA.

FIG. **17** shows Hep3B tumor histology in mice treated with either Luc SNALP (top) or PLK1424 SNALP (bottom). Luc SNALP-treated mice displayed normal mitoses in Hep3B tumors, whereas PLK1424 SNALP-treated mice exhibited numerous aberrant mitoses and tumor cell apoptosis in Hep3B tumors.

Conclusion

This example illustrates that a single administration of PLK1424 1:57 SNALP to Hep3B tumor-bearing mice induced significant in vivo silencing of PLK-1 mRNA. This reduction in PLK-1 mRNA was confirmed to be mediated by RNA interference using 5' RACE-PCR analysis. Importantly, PLK-1 mRNA silencing by the 1:57 SNALP formulation profoundly disrupted tumor cell proliferation (mitosis), causing subsequent apoptosis of tumor cells. As demonstrated in the previous example, this anti-tumor effect translated into extended survival times in the tumor-bearing mice.

## Example 11

### Comparison of 1:57 PLK-1 SNALP Containing Either PEG-cDMA or PEG-cDSA in a Subcutaneous Hep3B Tumor Model

This example demonstrates the utility of the PEG-lipid PEG-cDSA (3-N-[(-Methoxypoly(ethylene glycol)2000)carbamoyl]-1,2-distearyloxypropylamine) in the 1:57 formulation for systemically targeting distal (e.g., subcutaneous) tumors. In particular, this example compares the tumor targeting ability of 1:57 PLK-1 SNALPs containing either PEG-cDMA ($C_{14}$) or PEG-cDSA ($C_{18}$). Readouts are tumor growth inhibition and PLK1 mRNA silencing. The PLK-1 siRNA used was PLK1424 U4/GU, the sequence of which is provided in Table 8.

Subcutaneous (S.C.) Hep3B tumors were established in scid/beige mice. Multidose anti-tumor efficacy of 1:57 PLK-1 SNALP was evaluated for the following groups (n=5 for each group): (I) “Luc-cDMA”-PEG-cDMA Luc SNALP; (2) “PLK-cDMA”-PEG-cDMA PLK-1 SNALP; and (3) “PLK-cDSA”-PEG-IDSA PLK-1 SNALP. Administration of 6×2 mg/kg siRNA was initiated once tumors reached about 5 mm in diameter (Day 10). Dosing was performed on Days 10, 12, 14, 17, 19, and 21. Tumors were measured by caliper twice weekly.

FIG. **18** shows that multiple doses of 1:57 PLK-1 SNALP containing PEG-cDSA induced the regression of established Hep3B S.C. tumors. In particular, 5/5 tumors in the PLK1-cDSA treated mice appeared flat, measurable only by discoloration at the tumor site.

FIG. **19** shows the mRNA silencing of 1:57 PLK SNALP in S.C. Hep3B tumors following a single intravenous SNALP administration. The extent of silencing observed with the PLK1-cDSA SNALP correlated with the anti-tumor activity in the multi-dose study shown in FIG. **18**.

The Luc-cDMA SNALP-treated group, which had developed large S.C. tumors at Day 24, were then administered PLK-cDSA SNALP on Days 24, 26, 28, 31, 33, and 35. There was no additional dosing of the original PLK-1 SNALP-treated groups. The results from this crossover dosing study with large established tumors is provided in FIG. **20**, which shows that PLK1-cDSA SNALP inhibited the growth of large S.C. Hep3B tumors.

A comparison of the effect of PEG-cDMA and PEG-cDSA 1:57 SNALPs on PLK-1 mRNA silencing was performed using established intrahepatic Hep3B tumors in scid/beige mice. A single 2 mg/kg dose of 1:57 PLK-1 SNALP containing either PEG-cDMA or PEG-cDSA was administered intravenously. Liver/tumor samples were collected at 24 and 96 hours after SNALP treatment. Control=2 mg/kg Luc-cDMA SNALP at 24 hours.

FIG. **21** shows that PLK-cDMA SNALP and PLK-cDSA SNALP had similar silencing activities after 24 hours, but that the PLK-cDSA SNALP may increase the duration of mRNA silencing in intrahepatic tumors.

FIG. **22** shows the blood clearance profile of 1:57 PLK-1 SNALP containing either PEG-cDMA or PEG-cDSA. The extended blood circulation times observed for the PLK-cDSA SNALP may enable the increased accumulation and activity at distal (e.g., subcutaneous) tumor sites.

Thus, this study shows that the 1:57 PEG-cDSA SNALP formulation can be used to preferentially target tumors outside of the liver, whereas the 1:57 PEG-cDMA SNALP can be used to preferentially target the liver.

## Example 12

### Synthesis of Cholesteryl-2'-Hydroxyethyl Ether

Step 1: A 250 ml round bottom flask containing cholesterol (5.0 g, 12.9 mmol) and a stir bar was sealed and flushed with nitrogen. Toluenesulphonyl chloride (5.0 g, 26.2 mmol) was weighed into a separate 100-mL round bottom flask, also sealed and flushed with nitrogen. Anhydrous pyridine (2×50 ml) was delivered to each flask. The toluenesulphonyl chloride solution was then transferred, via cannula, into the 250 ml flask, and the reaction stirred overnight. The pyridine was removed by rotovap, and methanol (80 ml) added to the residue. This was then stirred for 1 hour until a homogeneous suspension was obtained. The suspension was filtered, washed with acetonitrile (50 ml), and dried under vacuum to yield cholesteryl tosylate as a fluffy white solid (6.0 g, 86%).

Step 2: Cholesteryl tosylate (2.0 g, 3.7 mmol), 1,4-dioxane (50 mL), and ethylene glycol (4.6 g, 74 mmol) were added to a 100 ml flask containing a stir bar. The flask was fitted with a condenser, and refluxed overnight. The dioxane was then removed by rotovap, and the reaction mixture suspended in



water (100 ml). The solution was transferred to a separating funnel and extracted with chloroform (3×100 ml). The organic phases were combined, washed with water (2×150 ml), dried over magnesium sulphate, and the solvent removed. The crude product was purified by column chromatography (5% acetone/hexane) to yield the product as a white solid (1.1 g, 69%).

The structures of the cholesterol derivatives cholesteryl-2'-hydroxyethyl ether and cholesteryl-4'-hydroxybutyl ether are as follows:




Cholesteryl-2′-hydroxyethyl ether




Cholesteryl-4′-hydroxybutyl ether

It is to be understood that the above description is intended to be illustrative and not restrictive. Many embodiments will be apparent to those of skill in the art upon reading the above description. The scope of the invention should, therefore, be determined not with reference to the above description, but should instead be determined with reference to the appended claims, along with the full scope of equivalents to which such claims are entitled. The disclosures of all articles and references, including patent applications, patents, PCT publications, and Genbank Accession Nos., are incorporated herein by reference for all purposes.

SEQUENCE LISTING

<160> NUMBER OF SEQ ID NOS: 7

<210> SEQ ID NO 1
<211> LENGTH: 21
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: synthetic E5 kinesin-related protein 2263 U/U siRNA sense strand of siRNA duplex
<220> FEATURE:
<223> OTHER INFORMATION: Description of Combined DNA/RNA Molecule: synthetic E5 kinesin-related protein 2263 U/U siRNA sense strand of siRNA duplex
<221> NAME/KEY: modified_base
<222> LOCATION: (2)...(19)
<223> OTHER INFORMATION: n = um
<221> NAME/KEY: modified_base
<222> LOCATION: (20)...(21)
<223> OTHER INFORMATION: n = deoxythimidine (dT)

<400> SEQUENCE: 1

-continued

```
cngaagaccn gaagacaann n                                              21


<210> SEQ ID NO 2
<211> LENGTH: 21
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: synthetic E5 kinesin-related protein 2263 U/U
      siRNA antisense strand of siRNA duplex
<220> FEATURE:
<223> OTHER INFORMATION: Description of Combined DNA/RNA Molecule:
      synthetic E5 kinesin-related protein 2263 U/U siRNA antisense
      strand of siRNA duplex
<221> NAME/KEY: modified_base
<222> LOCATION: (8)...(16)
<223> OTHER INFORMATION: n = um
<221> NAME/KEY: modified_base
<222> LOCATION: (20)...(21)
<223> OTHER INFORMATION: n = deoxythimidine (dT)

<400> SEQUENCE: 2

auugucunca ggncuncagn n                                              21


<210> SEQ ID NO 3
<211> LENGTH: 21
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: synthetic apolipoprotein B (ApoB) 10048 U2/2
      G1/2 siRNA sense strand of siRNA duplex
<221> NAME/KEY: modified_base
<222> LOCATION: (4)...(4)
<223> OTHER INFORMATION: n = gm
<221> NAME/KEY: modified_base
<222> LOCATION: (8)...(14)
<223> OTHER INFORMATION: n = um

<400> SEQUENCE: 3

agunucanca cacngaauac c                                              21


<210> SEQ ID NO 4
<211> LENGTH: 21
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: synthetic apolipoprotein B (ApoB) 10048 U2/2
      G1/2 siRNA antisense strand of siRNA duplex
<221> NAME/KEY: modified_base
<222> LOCATION: (4)...(4)
<223> OTHER INFORMATION: n = um
<221> NAME/KEY: modified_base
<222> LOCATION: (7)...(9)
<223> OTHER INFORMATION: n = gm
<221> NAME/KEY: modified_base
<222> LOCATION: (19)...(19)
<223> OTHER INFORMATION: n = um

<400> SEQUENCE: 4

uauncanunu gaugacacnu g                                              21


<210> SEQ ID NO 5
<211> LENGTH: 21
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: synthetic polo-like kinase 1 (PLK-1) PLK1424
      U4/GU and PLK1424 U4/G siRNA sense strand of siRNA duplex
<220> FEATURE:
<223> OTHER INFORMATION: Description of Combined DNA/RNA Molecule:
      synthetic polo-like kinase 1 (PLK-1) PLK1424 U4/GU and PLK1424
      U4/G siRNA sense strand of siRNA duplex
<221> NAME/KEY: modified_base
```

-continued

<222> LOCATION: (4)...(18)
<223> OTHER INFORMATION: n = um
<221> NAME/KEY: modified_base
<222> LOCATION: (20)...(21)
<223> OTHER INFORMATION: n = deoxythimidine (dT), u or a ribonucleotide complementary to target complementary sequence

<400> SEQUENCE: 5

agancacccn ccunaaanan n 21

<210> SEQ ID NO 6
<211> LENGTH: 21
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: synthetic polo-like kinase 1 (PLK-1) PLK1424 U4/GU siRNA antisense strand of siRNA duplex
<220> FEATURE:
<223> OTHER INFORMATION: Description of Combined DNA/RNA Molecule: synthetic polo-like kinase 1 (PLK-1) PLK1424 U4/GU siRNA antisense strand of siRNA duplex
<221> NAME/KEY: modified_base
<222> LOCATION: (8)...(8)
<223> OTHER INFORMATION: n = gm
<221> NAME/KEY: modified_base
<222> LOCATION: (17)...(17)
<223> OTHER INFORMATION: n = um
<221> NAME/KEY: modified_base
<222> LOCATION: (20)...(21)
<223> OTHER INFORMATION: n = deoxythimidine (dT), u or a ribonucleotide complementary to target sequence

<400> SEQUENCE: 6

uauuuaanga gggugancun n 21

<210> SEQ ID NO 7
<211> LENGTH: 21
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: synthetic polo-like kinase 1 (PLK-1) PLK1424 U4/G siRNA antisense strand of siRNA duplex
<220> FEATURE:
<223> OTHER INFORMATION: Description of Combined DNA/RNA Molecule: synthetic polo-like kinase 1 (PLK-1) PLK1424 U4/G siRNA antisense strand of siRNA duplex
<221> NAME/KEY: modified_base
<222> LOCATION: (9)...(15)
<223> OTHER INFORMATION: n = gm
<221> NAME/KEY: modified_base
<222> LOCATION: (20)...(21)
<223> OTHER INFORMATION: n = deoxythimidine (dT), u or a ribonucleotide complementary to target sequence

<400> SEQUENCE: 7

uauuuaagna gngunaucun n 21

What is claimed is:

**1**. A nucleic acid-lipid particle comprising:

(a) a nucleic acid;

(b) a cationic lipid comprising from 50 mol % to 85 mol % of the total lipid present in the particle;

(c) a non-cationic lipid comprising from 13 mol % to 49.5 mol % of the total lipid present in the particle; and

(d) a conjugated lipid that inhibits aggregation of particles comprising from 0.5 mol % to 2 mol % of the total lipid present in the particle.

**2**. The nucleic acid-lipid particle of claim **1**, wherein the nucleic acid comprises an interfering RNA, mRNA, an antisense oligonucleotide, a ribozyme, a plasmid, an immunostimulatory oligonucleotide, or mixtures thereof.

**3**. The nucleic acid-lipid particle of claim **2**, wherein the interfering RNA comprises a small interfering RNA (siRNA), an asymmetrical interfering RNA (aiRNA), a microRNA (miRNA), or mixtures thereof.

**4**. The nucleic acid-lipid particle of claim **1**, wherein the cationic lipid comprises from 50 mol % to 65 mol % of the total lipid present in the particle.

**5**. The nucleic acid-lipid particle of claim **1**, wherein the non-cationic lipid comprises a mixture of a phospholipid and cholesterol or a derivative thereof.

**6**. The nucleic acid-lipid particle of claim **5**, wherein the phospholipid comprises dipalmitoylphosphatidylcholine (DPPC), distearoylphosphatidylcholine (DSPC), or a mixture thereof.

**7**. The nucleic acid-lipid particle of claim **5**, wherein the phospholipid comprises from 3 mol % to 15 mol % of the total lipid present in the particle.

**8**. The nucleic acid-lipid particle of claim **5**, wherein the cholesterol or derivative thereof comprises from 30 mol % to 40 mol % of the total lipid present in the particle.

**9**. The nucleic acid-lipid particle of claim **1**, wherein the conjugated lipid that inhibits aggregation of particles comprises a polyethyleneglycol (PEG)-lipid conjugate.

**10**. The nucleic acid-lipid particle of claim **9**, wherein the PEG-lipid conjugate comprises a PEG-diacylglycerol (PEG-DAG) conjugate, a PEG-dialkyloxypropyl (PEG-DAA) conjugate, or a mixture thereof.

**11**. The nucleic acid-lipid particle of claim **10**, wherein the PEG-DAA conjugate comprises a PEG-dimyristyloxypropyl (PEG-DMA) conjugate, a PEG-distearyloxypropyl (PEG-DSA) conjugate, or a mixture thereof.

**12**. The nucleic acid-lipid particle of claim **1**, wherein the conjugated lipid that inhibits aggregation of particles comprises from 1 mol % to 2 mol % of the total lipid present in the particle.

**13**. The nucleic acid-lipid particle of claim **1**, wherein the nucleic acid is fully encapsulated in the nucleic acid-lipid particle.

**14**. A pharmaceutical composition comprising a nucleic acid-lipid particle of claim **1** and a pharmaceutically acceptable carrier.

**15**. A method for introducing a nucleic acid into a cell, the method comprising:

contacting the cell with a nucleic acid-lipid particle of claim **1**.

**16**. A method for the in vivo delivery of a nucleic acid, the method comprising:

administering to a mammalian subject a nucleic acid-lipid particle of claim **1**.

**17**. A method for treating a disease or disorder in a mammalian subject in need thereof, the method comprising:

administering to the mammalian subject a therapeutically effective amount of a nucleic acid-lipid particle of claim **1**.

**18**. The method of claim **17**, wherein the disease or disorder is a viral infection.

**19**. The method of claim **17**, wherein the disease or disorder is a liver disease or disorder.

**20**. The method of claim **17**, wherein the disease or disorder is cancer.

* * * * *

# Exhibit E

US009504651B2

(12) **United States Patent**
**MacLachlan et al.**

(10) **Patent No.: US 9,504,651 B2**
(45) **Date of Patent: Nov. 29, 2016**

(54) **LIPID COMPOSITIONS FOR NUCLEIC ACID DELIVERY**

(71) Applicant: **PROTIVA BIOTHERAPEUTICS, INC.**, Burnaby (CA)

(72) Inventors: **Ian MacLachlan**, Mission (CA); **Lloyd Jeffs**, Burnaby (CA); **Lorne R. Palmer**, Burnaby (CA); **Cory Giesbrecht**, Vancouver (CA)

(73) Assignee: **PROTIVA BIOTHERAPEUTICS, INC.**, Burnaby (CA)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 15 days.

(21) Appl. No.: **14/304,578**

(22) Filed: **Jun. 13, 2014**

(65) **Prior Publication Data**

US 2014/0294937 A1 Oct. 2, 2014

**Related U.S. Application Data**

(60) Continuation of application No. 13/684,066, filed on Nov. 21, 2012, which is a continuation of application No. 12/965,555, filed on Dec. 10, 2010, now Pat. No. 8,329,070, which is a division of application No. 10/611,274, filed on Jun. 30, 2003, now Pat. No. 7,901,708.

(60) Provisional application No. 60/392,887, filed on Jun. 28, 2002.

(51) **Int. Cl.**

| | |
|---|---|
| *A61K 47/10* | (2006.01) |
| *A61K 47/24* | (2006.01) |
| *B01J 13/04* | (2006.01) |
| *A61K 9/127* | (2006.01) |
| *A61K 47/48* | (2006.01) |
| *A61K 31/7084* | (2006.01) |
| *A61K 31/7088* | (2006.01) |
| *A61K 47/44* | (2006.01) |

(52) **U.S. Cl.**
CPC ............. *A61K 9/1271* (2013.01); *A61K 9/127* (2013.01); *A61K 9/1277* (2013.01); *A61K 31/7084* (2013.01); *A61K 31/7088* (2013.01); *A61K 47/10* (2013.01); *A61K 47/24* (2013.01); *A61K 47/44* (2013.01)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,394,448 A 7/1983 Szoka, Jr. et al.
4,438,052 A 3/1984 Weder et al.

(Continued)

FOREIGN PATENT DOCUMENTS

CA 2041075 A1 10/1991
CA 2309727 A1 4/1999

(Continued)

OTHER PUBLICATIONS

Lasic, D. D. "Novel applications of Liposomes" Tibtech, 1998, v. 16, 307-321.*

(Continued)

*Primary Examiner* — Mina Haghighatian
*Assistant Examiner* — Erin Hirt
(74) *Attorney, Agent, or Firm* — Kilpatrick Townsend & Stockton LLP

(57) **ABSTRACT**

The present invention provides apparatus and processes for producing liposomes. By providing a buffer solution in a first reservoir, and a lipid solution in a second reservoir, continuously diluting the lipid solution with the buffer solution in a mixing chamber produces a liposome. The lipid solution preferably comprises an organic solvent, such as a lower alkanol.

**14 Claims, 15 Drawing Sheets**



(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 4,515,736 | A | 5/1985 | Deamer | |
| 4,598,051 | A | 7/1986 | Papahadjopoulos et al. | |
| 4,687,661 | A | 8/1987 | Kikuchi et al. | |
| 4,897,355 | A | 1/1990 | Eppstein et al. | |
| 5,013,556 | A | 5/1991 | Woodle et al. | |
| 5,171,678 | A | 12/1992 | Behr et al. | |
| 5,208,036 | A | 5/1993 | Eppstein et al. | |
| 5,225,212 | A | 7/1993 | Martin et al. | |
| 5,264,618 | A | 11/1993 | Felgner et al. | |
| 5,279,833 | A | 1/1994 | Rose | |
| 5,283,185 | A | 2/1994 | Epand et al. | |
| 5,320,906 | A | 6/1994 | Eley et al. | |
| 5,334,761 | A | 8/1994 | Gebeyehu et al. | |
| 5,424,073 | A | 6/1995 | Rahman et al. | |
| 5,478,860 | A | 12/1995 | Wheeler et al. | |
| 5,545,412 | A | 8/1996 | Eppstein et al. | |
| 5,552,157 | A | 9/1996 | Yagi et al. | |
| 5,578,475 | A | 11/1996 | Jessee | |
| 5,593,622 | A * | 1/1997 | Yoshioka | A61K 9/1271 264/4.3 |
| 5,627,159 | A | 5/1997 | Shih et al. | |
| 5,641,662 | A | 6/1997 | Debs et al. | |
| 5,653,996 | A | 8/1997 | Hsu | |
| 5,656,743 | A | 8/1997 | Busch et al. | |
| 5,674,908 | A | 10/1997 | Haces et al. | |
| 5,703,055 | A | 12/1997 | Felgner et al. | |
| 5,705,385 | A * | 1/1998 | Bally et al. | 435/320.1 |
| 5,736,392 | A | 4/1998 | Hawley-Nelson et al. | |
| 5,820,873 | A | 10/1998 | Choi et al. | |
| 5,830,430 | A * | 11/1998 | Unger et al. | 424/1.21 |
| 5,877,220 | A | 3/1999 | Schwartz et al. | |
| 5,885,613 | A | 3/1999 | Holland et al. | |
| 5,958,901 | A | 9/1999 | Dwyer et al. | |
| 5,976,567 | A | 11/1999 | Wheeler et al. | |
| 5,981,501 | A | 11/1999 | Wheeler et al. | |
| 6,007,838 | A | 12/1999 | Alving et al. | |
| 6,020,202 | A | 2/2000 | Jessee | |
| 6,034,135 | A | 3/2000 | Schwartz et al. | |
| 6,051,429 | A | 4/2000 | Hawley-Nelson et al. | |
| 6,075,012 | A | 6/2000 | Gebeyehu et al. | |
| 6,093,348 | A | 7/2000 | Kowalski et al. | |
| 6,165,501 | A | 12/2000 | Tirosh et al. | |
| 6,172,049 | B1 | 1/2001 | Dwyer et al. | |
| 6,251,939 | B1 | 6/2001 | Schwartz et al. | |
| 6,284,267 | B1 | 9/2001 | Aneja | |
| 6,287,591 | B1 | 9/2001 | Semple et al. | |
| 6,339,173 | B1 | 1/2002 | Schwartz et al. | |
| 6,376,248 | B1 | 4/2002 | Hawley-Nelson et al. | |
| 6,534,484 | B1 | 3/2003 | Wheeler et al. | |
| 6,586,410 | B1 | 7/2003 | Wheeler et al. | |
| 6,596,305 | B1 | 7/2003 | Edgerly-Plug | |
| 6,638,529 | B2 | 10/2003 | Schwartz et al. | |
| 6,649,780 | B1 | 11/2003 | Eibl et al. | |
| 6,671,393 | B2 | 12/2003 | Hays et al. | |
| 6,696,424 | B1 | 2/2004 | Wheeler et al. | |
| 6,734,171 | B1 * | 5/2004 | Saravolac | A61K 48/0008 424/450 |
| 6,815,432 | B2 | 11/2004 | Wheeler et al. | |
| 6,835,395 | B1 | 12/2004 | Semple et al. | |
| 6,843,942 | B2 | 1/2005 | Katinger et al. | |
| 6,858,224 | B2 | 2/2005 | Wheeler et al. | |
| 7,166,745 | B1 | 1/2007 | Chu et al. | |
| 7,341,738 | B2 | 3/2008 | Semple et al. | |
| 7,422,902 | B1 | 9/2008 | Wheeler et al. | |
| 7,479,573 | B2 | 1/2009 | Chu et al. | |
| 7,601,872 | B2 | 10/2009 | Chu et al. | |
| 7,641,915 | B2 | 1/2010 | Chen et al. | |
| 7,687,070 | B2 | 3/2010 | Gebeyehu et al. | |
| 7,745,651 | B2 | 6/2010 | Heyes et al. | |
| 7,799,565 | B2 * | 9/2010 | MacLachlan et al. | 435/458 |
| 7,803,397 | B2 | 9/2010 | Heyes et al. | |
| 7,807,815 | B2 | 10/2010 | MacLachlan et al. | |
| 7,901,708 | B2 * | 3/2011 | MacLachlan | A61K 9/127 424/450 |
| 7,915,450 | B2 | 3/2011 | Chu et al. | |
| 7,982,027 | B2 | 7/2011 | MacLachlan et al. | |
| 8,058,068 | B2 | 11/2011 | Hawley-Nelson et al. | |
| 8,058,069 | B2 * | 11/2011 | Yaworski et al. | 435/458 |
| 8,158,827 | B2 | 4/2012 | Chu et al. | |
| 8,227,443 | B2 | 7/2012 | MacLachlan et al. | |
| 8,283,333 | B2 * | 10/2012 | Yaworski et al. | 514/44 A |
| 8,329,070 | B2 * | 12/2012 | MacLachlan | A61K 9/127 264/4.1 |
| 8,466,122 | B2 * | 6/2013 | Heyes et al. | 514/44 A |
| 8,492,359 | B2 * | 7/2013 | Yaworski et al. | 514/44 A |
| 9,005,654 | B2 | 4/2015 | MacLachlan et al. | |
| 9,006,417 | B2 | 4/2015 | Yaworski et al. | |
| 2001/0048940 | A1 | 12/2001 | Tousignant et al. | |
| 2003/0069173 | A1 | 4/2003 | Hawley-Nelson et al. | |
| 2003/0072794 | A1 | 4/2003 | Boulikas | |
| 2003/0077829 | A1 | 4/2003 | MacLachlan | |
| 2003/0083272 | A1 | 5/2003 | Wiederholt et al. | |
| 2003/0124033 | A1 | 7/2003 | Baker et al. | |
| 2003/0143732 | A1 | 7/2003 | Fosnaugh et al. | |
| 2004/0032037 | A1 | 2/2004 | Katinger et al. | |
| 2004/0037874 | A1 | 2/2004 | Hong et al. | |
| 2004/0063654 | A1 | 4/2004 | Davis et al. | |
| 2004/0142025 | A1 | 7/2004 | MacLachlan et al. | |
| 2004/0142892 | A1 | 7/2004 | Finn et al. | |
| 2004/0253723 | A1 | 12/2004 | Tachas et al. | |
| 2004/0259247 | A1 | 12/2004 | Tuschi et al. | |
| 2005/0064595 | A1 | 3/2005 | MacLachlan et al. | |
| 2005/0118253 | A1 | 6/2005 | MacLachlan et al. | |
| 2005/0260757 | A1 | 11/2005 | Gebeyehu et al. | |
| 2006/0058249 | A1 | 3/2006 | Tong et al. | |
| 2006/0147514 | A1 | 7/2006 | Gebeyehu et al. | |
| 2006/0228406 | A1 | 10/2006 | Chiou et al. | |
| 2007/0042031 | A1 | 2/2007 | MacLachlan et al. | |
| 2007/0202598 | A1 | 8/2007 | Chu et al. | |
| 2007/0202600 | A1 | 8/2007 | Chu et al. | |
| 2008/0200417 | A1 | 8/2008 | Semple et al. | |
| 2009/0143583 | A1 | 6/2009 | Chu et al. | |
| 2009/0191259 | A1 | 7/2009 | Li et al. | |
| 2010/0159593 | A1 | 6/2010 | Chu et al. | |
| 2011/0216622 | A1 | 9/2011 | MacLachlan et al. | |
| 2012/0136073 | A1 | 5/2012 | Yang et al. | |
| 2012/0238747 | A1 | 9/2012 | Chu et al. | |
| 2013/0303587 | A1 | 11/2013 | Yaworski et al. | |
| 2014/0044772 | A1 * | 2/2014 | MacLachlan | A61K 9/127 424/450 |
| 2016/0032320 | A1 | 2/2016 | Yaworski et al. | |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| CA | 2271582 | A1 | 11/1999 |
| CA | 2330741 | A1 | 11/1999 |
| CA | 2397016 | A1 | 7/2001 |
| CA | 2457959 | A1 | 12/2002 |
| CA | 2427640 | A1 | 5/2003 |
| CA | 2473135 | A1 | 6/2003 |
| CA | 2490983 | A1 | 1/2004 |
| CA | 2491164 | A1 | 1/2004 |
| CA | 2513623 | | 8/2004 |
| EP | 0 055 576 | A1 | 7/1982 |
| EP | 1 013 268 | A | 6/2000 |
| EP | 1 203 614 | A1 | 11/2000 |
| IE | 911350 | | 4/1991 |
| JP | 03-126211 | | 5/1991 |
| JP | 05-202085 | | 8/1993 |
| JP | 06-080560 | | 3/1994 |
| JP | 02-525063 | | 8/2002 |
| JP | 03-505401 | | 2/2003 |
| JP | 07-524349 | | 8/2007 |
| WO | 89/07929 | A1 | 9/1989 |
| WO | 91/16024 | A1 | 10/1991 |
| WO | 91/16039 | A1 | 10/1991 |
| WO | 93/05162 | A1 | 3/1993 |
| WO | 93/09236 | A1 | 5/1993 |
| WO | 93/12240 | A1 | 6/1993 |
| WO | 93/12756 | A2 | 7/1993 |
| WO | 93/24640 | A2 | 12/1993 |
| WO | 93/25673 | A1 | 12/1993 |
| WO | 95/02698 | A1 | 1/1995 |
| WO | 95/18863 | A1 | 7/1995 |

(56) **References Cited**

FOREIGN PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| WO | 95/35301 | A1 | 12/1995 | |
| WO | 96/02655 | A1 | 2/1996 | |
| WO | 96/10390 | A1 | 4/1996 | |
| WO | 96/40964 | A2 | 12/1996 | |
| WO | 96/41873 | A1 | 12/1996 | |
| WO | 98/51278 | A2 † | 11/1998 | |
| WO | 98/51285 | A2 | 11/1998 | |
| WO | WO 9851278 | A2 * | 11/1998 | .............. A61K 9/00 |
| WO | 99/14346 | A2 | 3/1999 | |
| WO | 00/03683 | A2 | 1/2000 | |
| WO | 00/15820 | A1 | 3/2000 | |
| WO | 00/29103 | A1 | 5/2000 | |
| WO | 00/62813 | A2 | 10/2000 | |
| WO | 01/05373 | A1 | 1/2001 | |
| WO | 01/05374 | A1 | 1/2001 | |
| WO | 01/05873 | A1 | 1/2001 | |
| WO | 01/75164 | A2 | 10/2001 | |
| WO | 01/93836 | A1 | 12/2001 | |
| WO | 02/34236 | A2 | 5/2002 | |
| WO | 02/43699 | | 6/2002 | |
| WO | 02/43699 | A2 | 6/2002 | |
| WO | 02/085434 | A1 | 10/2002 | |
| WO | 02/087541 | A1 | 11/2002 | |
| WO | 03/059381 | A2 | 7/2003 | |
| WO | 03/097805 | A2 | 11/2003 | |
| WO | 2004/002453 | A1 | 1/2004 | |
| WO | 2004/065546 | A2 | 8/2004 | |
| WO | 2004/110499 | A1 | 12/2004 | |
| WO | 2005/007196 | A2 | 1/2005 | |
| WO | 2005/026372 | A1 | 3/2005 | |
| WO | 2005/120152 | A2 | 12/2005 | |
| WO | 2015/011633 | A1 | 1/2015 | |

OTHER PUBLICATIONS

Meyer, O. et al. "Cationic liposomes coated with polyethylene glycol as carriers for oligonucleotides." J. Biol. Chem. 1998, 273, 15621-15627.*
Arpicco, S., et al., "Preparation and Characterization of Novel Cationic Lipids Developed for Gene Transfection," Proceed. Int'l Symp. Control. Rel. Bioact. Mater. (Controlled Release Society, Inc.), 1999, vol. 26, pp. 759-760.
Arpicco, S., et al., "Synthesis, characterization and transfection activity of new saturated and unsaturated cationic lipids," IL Farmaco, 2004, vol. 59, pp. 869-878.
Ballas, N., et al., "Liposomes bearing a quaternary ammonium detergent as an efficient vehicle for functional transfer of TMV-RNA into plant protoplasts," Biochimica et Biophysica Acta, 1988, vol. 939, pp. 8-18.
Barinaga, M., "Step Taken Toward Improved Vectors for Gene Transfer," Science, 1994, vol. 266, p. 1326.
Bass, "The short answer," Nature, 2001, vol. 411, pp. 428-429.
Batzri et al. "Single Bilayer Liposomes Prepared without Sonication," Biochimica et Biophysica acta 1973, vol. 298, pp. 1015-1019.
Beale, G., et al., "Gene Silencing Nucleic Acids Designed by Scanning Arrays: Anti-EGFR Activity of siRNA, Ribozyme and DNA Enzymes Targeting a Single Hybridization-accessible Region using the Same Delivery System," Journal of Drug Targeting, 2003, vol. 11, No. 7, pp. 449-456.
Behr, J.-P., "Synthetic Gene-Transfer Vectors," Acc. Chem. Res., 1993, vol. 26, pp. 274-278.
Brigham, K., et al., "Rapid Communication: In vivo Transfection of Murine Lungs with a Functioning Prokaryotic Gene Using a Liposome Vehicle," The American Journal of the Medical Sciences, vol. 298, No. 4, pp. 278-281, 1989.
Brummelkamp et al., "A System for Stable Expression of Short Interfering RNAs in Mammalian Cells," Science, 2002, vol. 296, pp. 550-553.
Cevc, G., "How Membrane Chain-Melting Phase-Transition Temperature is Affected by the Lipid Chain Asymmetry and Degree of Unsaturation: An Effective Chain-Length Model," Biochemistry, 1991, vol. 30, pp. 7186-7193.
Chonn et al., "Recent advances in liposomal drug-delivery systems," Current Opinion in Biotechnology, 1995, pp. 698-708, vol. 6.
Cortesi, R., et al., "Effect of cationic liposome composition on in vitro cytotoxicity and protective effect on carried DNA," International Journal of Pharmaceutics, 1996, vol. 139, pp. 69-78.
Crystal, R., "Transfer of Genes to Humans: Early Lessons and Obstacles to Success," Science, 1995, vol. 270, pp. 404-410.
Culver K., "The First Human Gene Therapy Experiment," Gene Therapy: A Handbook for Physicians, 1994, pp. 33-40.
Duzgunes, N., "Membrane Fusion," Subcellular Biochemistry, 1985, vol. 11, pp. 195-286.
Dwarki, V.J., et al., "Cationic Liposome-Mediated RNA Transfection," Methods in Enzymology, 1993, vol. 217, pp. 644-654.
Elbashir, S. et al., "Duplexes of 21-nucleotide RNAs mediate RNA interference in cultured mammalian cells," Nature, 411(24):494-498 (May 2001).
Enoch, H., et al., "Formation and properties of 1000-Å-diameter, single-bilayer phospholipid vesicles," Proc. Natl. Acad. Sci. USA, 1979, vol. 76, No. 1, pp. 145-149.
Felgner, J., et al., "Cationic Lipid-Mediated Transfection in Mammalian Cells: 'lipofection'," J. Tiss. Cult. Meth., 1993, vol. 15, pp. 63-68.
Felgner, J., et al., "Enhanced Gene Delivery and Mechanism Studies with a Novel Series of Cationic Lipid Formulations," The Journal of Biological Chemistry, 1994, vol. 269, No. 4, pp. 2550-2561.
Felgner, P., et al., "Lipofection: A highly efficient, lipid-mediated DNA-transfection procedure," Proc. Natl. Acad. Sci. USA, 1987, vol. 84, pp. 7413-7417.
Felgner, P.L., et al., "Cationic Liposome Mediated Transfection," Proc. West. Pharmacol. Soc., 1989, vol. 32, pp. 115-121.
Gao, X., et al., "A Novel Cationic Liposome Reagent for Efficient Transfection of Mammalian Cells," Biochem. Biophys. Res. Comm., 1991, vol. 179, No. 1, pp. 280-285.
Georgopapadakou, N. H., ed., "Drug Transport in Antimicrobial and Anticancer Chemotherapy," CRC Press, Marcel Dekker, Inc. (1995).
Gershon, H., et al., "Mode of Formation and Structural Feature of DNA-Cationic Liposome Complexes Used for Transfection," Biochemistry, 1993, vol. 32, pp. 7143-7151.
Guy-Caffey, J., et al., "Novel Polyaminolipids Enhance the Cellular Uptake of Oligonucleotides," The Journal of Biological Chemistry, 1995, vol. 270, No. 52, pp. 31391-31396.
Hawley-Nelson, P., et al., "LipofectAmine™ Reagent: A New, Higher Efficiency Polycationic Liposome Transfection Reagent," Focus, 1993, vol. 15, No. 3, pp. 73-80.
Heyes et al., "Cationic lipid saturation influences intracellular delivery of encapsulated nucleic acids," Journal of Controlled Release, 2005, vol. 107, pp. 276-287.
Heyes et al., "Synthesis of novel cationic lipids: effect of structural modification on the efficiency of gene transfer," J. Med. Chem., 2002, vol. 45, pp. 99-114.
Hirota et al., "Simple Mixing Device to Reproducibly Prepare Catonic Lipid-DNA Complexes (Lipoplexes)", BioTechniques, Aug. 1999, vol. 27, No. 2, pp. 286-290.
Hyde, S. et al., "Correction of the ion transport defect in cystic fibrosis transgenic mice by gene therapy," Nature, 1993, vol. 362, pp. 250-255.
Isele et al., "Large-Scale Production of Liposomes Containing Monomeric Zinc Phthalacyanine by Controlled Dilution of Organic Solvents" Journal of Pharmaceutical Sciences, Nov. 1994, vol. 83, No. 11, pp. 1608-1616.
Jiang, L., et al., "Comparison of protein precipitation methods for sample preparation prior to proteomic analysis," Journal of Chromatography A, 2004, vol. 1023, pp. 317-320.
Juliano, R., et al., "The Effect of Particle Size and Charge on the Clearance Rates of Liposomes and Liposome Encapsulated Drugs," Biochem. Biophys. Res. Commun., 1975, vol. 63, No. 3, pp. 651-658.
Keough, K., "Influence of chain unsaturation and chain position on thermotropism and intermolecular interactions in membranes," Biochem. Soc. Transactions, 1990, vol. 18, No. 5, pp. 835-837.

(56) **References Cited**

OTHER PUBLICATIONS

Krichevsky, A. et al., "RNAi functions in cultured mammalian neurons," PNAS, 99(18):11926-29, 2002.
Lawrence et al. "The formation, characterization and stability of non-ionic surfactant vesicles," S.T.P. Pharma Sciences, 1996, vol. 6, No. 1, pp. 49-60.
Lawrence et al., "Synthesis and aggregation properties of dialkyl polyoxyethylene glycerol ethers," Chemistry and Physics of Lipids, 1996, 82(2):89-100.
Legendre, J.-Y. et al., "Delivery of Plasmid DNA into Mammalian Cell Lines Using pH-Sensitive Liposomes: Comparison with Cationic Liposomes," Pharm. Res., 1992, vol. 9, No. 10, pp. 1235-1242.
Leventis, R. et al., "Interactions of mammalian cells with lipid dispersions containing novel metabolizable cationic amphiphiles," Biochem. Biophys. Acta, 1990, vol. 1023, pp. 124-132.
Liu et al., "Cationic liposome-mediated intravenous gene delivery," J. Biol. Chem. 1995, vol. 270, pp. 24864-24870.
MacLachlan, "Liposomal Formulations for Nucleic Acid Delivery," Antisense Drug Technologies, Second Edition; 2007; pp. 237-270.
Marshall, E., "Gene Therapy's Growing Pains," Science, 1995, vol. 269, pp. 1050-1055.
Maurer et al. "Spontaneous Entrapment of Polynucleotides upon Electrostatic Interaction with Ethanol-Destabilized Cationic Liposomes," Biological Journal, May 2001, vol. 80, pp. 2310-2326.
Murahashi et al., "Synthesis and evaluation of neoglycolipid for liposome modification," Biol. Pharm. Bull., 1997, 20(6):704-707.
Orkin, S. et al., NIH Report, Report and Recommendations of the Panel to Assess the NIH Investment in Research on Gene Therapy, 1995.
Parr et al., Factors influencing the retention and chemical stability of polly(ethylene glycol)-lipid conjugates incorporated into large unilamellar vesicles, Biochimica et Biophysica Acta, 1994, 1195:21-30.
Paul, C. et al., "Effective expression of small interfering RNA in human cells," Nature Biotech., 2002, vol. 20, pp. 505-508.
Puyal, C. et al., "A new cationic liposome encapsulating genetic material: A potential delivery system for polynucleotides," Eur. J. Biochem., 1995, vol. 228, pp. 697-703.
Sawada et al., "Microemulsions in supercritical CO2 utilizing the polyethyleneglycol dialkylglycerol and their use for the solubilization of hydrophiles," Dyes and Pigments, 2005, pp. 64-74, vol. 65.
Semple et al. "Efficient encapsulation of antisense oligonucleotides in lipid vesicles using ionizable aminolipids: formation of novel small multilamellar vesicle structures," Biochim. Biophys. Acta, 2001, vol. 1510, No. 1-2, pp. 152-166.
Shin et al. "Acid-triggered release via dePEGylation of DOPE liposomes containing acid-labile vinyl ether PEG-lipids," Journal of Controlled Release, 2003, vol. 91, pp. 187-200.
Song et al., "Characterization of the inhibitory effect of PEG-lipid conjugates on the intracellular delivery of plasmid and antisense DNA mediated by cationic lipid liposomes," Biochimica et Biophysica Acta, 2002, 1558:1-13.
Sorensen et al., "Gene Silencing by Systemic Delivery of Synthetic siRNAs in Adult Mice," J. Mol. Biol., Apr. 4, 2003, vol. 4, pp. 761-766.
Spagnou, S. et al., "Lipidic Carriers of siRNA: Differences in the Formulation, Cellular Uptake, and Delivery with Plasmid DNA," Biochemistry, 2004, vol. 43, pp. 13348-13356.
Stamatatos, L. et al., "Interactions of Cationic Lipid Vesicles with Negatively Charged Phospholipid Vesicles and Biological Membranes," Biochemistry, 1988, vol. 27, pp. 3917-3925.
Szoka, F. et al., "Comparative Properties and Methods of Preparation of Lipid Vesicles (Liposomes)," Ann. Rev. Biophys. Bioeng., 1980, vol. 9, pp. 467-508.
Szoka, F. et al., "Procedure for preparation of liposomes with large internal aqueous space and high capture by reverse-phase evaporation," Proc. Natl. Acad. Sci. USA, 1978, vol. 75, No. 9, pp. 4194-4198.
Templeton, "Cationic liposome-mediated intravenous gene delivery in vivo," Bioscience Reports, 2002, vol. 22, No. 2, pp. 283-295.
Van Der Woude, I. et al., "Parameters influencing the introduction of plasmid DNA into cells by the use of synthetic amphiphiles as a carrier system," Biochimica et Biophysica Acta, 1995, vol. 1240, pp. 34-40.
Wagner et al., "The Crossflow Injection Technique: an Improvement of the Ethanol Injection Method," Journal of Liposome Research, Sep. 2002, vol. 12, No. 3, pp. 259-270.
Wheeler et al., "Stabilized plasmid-lipid particles: construction and characterization," Gene Ther., 1999, vol. 6, No. 2, pp. 271-281.
Wilson, R. et al., "Counterion-Induced Condensation of Deoxyribonucleic Acid. A Light-Scattering Study," Biochemistry, 1979, vol. 18, No. 11, pp. 2192-2196.
Woodle, M.C. et al., "Versatility in lipid compositions showing prolonged circulation with sterically stabilized liposomes," Biochimica et Biophysica Acta, 1992, vol. 1105, pp. 193-200.
Zelphati et al., "Stable and Monodisperse Lipoplex Formulations for Gene Delivery," Gene Therapy, 1998, vol. 5, pp. 1272-1282.
Zhu, N. et al., "Systemic Gene Expression After Intravenous DNA Delivery into Adult Mice," Science, 1993, vol. 261, pp. 209-211.
Global Newswire, retrieved from http://globalnewswire.com on Feb. 27, 2013, Tekmira sues Alnylam Pharmaceuticals for repeated misuse of trade secrets and confidential information, Mar. 16, 2011, pp. 1-3.
Jeffs et al. "A Scalable, Extrusion-Free Method for Efficient Liposomal Encapsulation of Plasmid DNA" Pharmaceutical Research, 2005, vol. 22, No. 3 pp. 362-372.
Kee, J., "e-Study guide for: Clinical calculations," Just the Facts 101, Textbook Key Facts, 6th Ed., 2015, 1 page.
Omega Engineering, Inc., "Omegaflex® Peristaltic Pump Model No. FPU500," retrieved online at <https://web.archive.org/web/20010715124628/http://www.omega.com/pdf/tubing/pumps/fpu500/fpu500.asp>, cached Jul. 15, 2001, 2 pages.

* cited by examiner
† cited by third party


100
110
Lipid
Nucleic Acid Synthesis
112
120
Lipid Solubilization in alkanol
Nucleic Acid Dissolution in Buffer
115
130
Mixing of Lipid & Plasma Solutions to Form Liposomes
140
Dilution
150
Removal of Free Plasmid DNA (Charged Membrane Filtration)
160
Sample Concentration (Ultrafiltration)
170
Ethanol Removal (Ultrafiltration)
180
Buffer Replacement (Ultrafiltration)
190
Sterile Filtration
195
Sterile Fill

FIG. 1


Mixing Step
Dilution Step
High
[Ethanol]
Low
A
Lipid Monomers
B
Meta-Stable SPLP < 200 nm
C
Stable SPLP < 200 nm

FIG. 2


300
350
SPLP COLLECTING VESSEL
340
MIXING CHAMBER
334
336
330
PUMP WITH DUAL PUMPHEADS
320
LIPID & ETHANOL VESSEL
310
PLASMID & BUFFER VESSEL

FIG. 3


400
Citrate Buffer Prep Vessel
Citrate Buffer Reagents
Citrate Buffer Storage Tank
470
Ethanol Storage Tank
Lipids Preparation tank
465
Lipid
460
Lipids Stock Storage Tank
455
HBS Buffer Prep Vessel
HBS Buffer Reagents
463
HBS Buffer Storage Tank
480
450
Incubation Vessel
420
Collection Port
Rotary Lobe Pump
430
Collection Vessel
Anion Exchange Column
425
100,000 MWCO
Ultrafiltration System
HBS Buffer Storage Tank
440
410
Permeate vessel
421
433

FIG. 4


DNA Encapsulation (%)
Diameter (nm)
[Ethanol] (%)
%Encap
Diameter
100
90
80
70
60
50
40
30
20
10
0
180
160
140
120
100
80
60
40
20
0
70
75
80
85
90
95
100

FIG. 5


DNA Encapsulation (%)
Diameter (nm)
pH
%Encap
Diameter
100
90
80
70
60
50
40
30
20
10
0
120
100
80
60
40
20
0
2
3
4
5
6
7
8

*FIG. 6*




*FIG. 7*


DNA Encapsulation (%)
100
90
80
70
60
50
40
30
20
10
0
0
100
200
300
400
500
[NaCl] after dilution (mM)

*FIG. 8*


EPC/Chol (55/45)
In 80 % Ethanol
+
PBS
PH 7.4
EPC/Chol (55/45)
In 80 % Ethanol
+
150 mM Citrate
pH 4
EPC/Chol (55/45)
In 80 % Ethanol
+
300 mM Citrate
pH 4
Mix and dilute using the Lipomixer
PBS
PBS
LUV
94 mM
Citrate
pH 4
94 mM
Citrate
pH 4
188 mM
Citrate
pH 4
188 mM
Citrate
pH 4
Concentrate and Diafiltrate against PBS to replace external buffer with PBS
PBS
PBS
PBS
94 mM
Citrate
pH 4
PBS
188 mM
Citrate
pH 4

FIG. 9A


PBS
PBS
PBS
94 mM
Citrate
pH 4
PBS
188 mM
Citrate
pH 4
Incubate with 0.2 mM Safranine ( ) for 30 min at 37° C
PBS
PBS
PBS
94 mM
Citrate
PBS
188 mM
Citrate
Pass down a size exclusion column to remove free safranine
Free Safranine
Size exclusion gel
LUV's
Collect fractions of the column

FIG. 9B


Dye: Lipid Ratio for Safranine Loaded EPC/Chol LUV's
Dye: Lipid (mg: mg)
0.02
0.018
0.016
0.014
0.012
0.01
0.008
0.006
0.004
0.002
0
PBS, pH 7.4
94 mM Citrate, pH 4.0
188 mM Citrate, pH 4.0
mg: mg
mol. mol

*FIG. 10*




rF before Triton = 0.4 & rF after Triton = 4.0

Therefore, calcein is: (1) encapsulated within the vesicle
(2) self quenching at the current concentration

*FIG. 11*


High
[Ethanol]
Low
A
B
C
LipoMixer
Ethanol drop
DNA encapsulation zone

*FIG. 12*


Diagram of T-Connector Flow Dynamics
Plasmid In Buffer
Lipid Ethanol
D
D = Orifice diameter (cm)
Q = Volume Flow Rate (L/min)
SPLP

FIG. 13

## Conditions and Properties for SPLP and Liposome Formation

Note: all samples prepared at 37°C

| Sample Description | Q Flow rate (L/min) | D Orifice ID (cm) | Vesicle Size (nm) | Size Std Dev (nm) | χ2 | Linear Velocity (m/s) | Shear Rate ($s^{-1}$) | Reynolds number |
|---|---|---|---|---|---|---|---|---|
| SPLP Chol:DSPC:DODMA:PEG-DSG (55:20:15:10 mol ratio) | 0.078 | 0.16 | 108 | 36 | 0.6 | 0.65 | 3233 | 496 |
| SPLP Chol:DSPC:DODMA:PEG-DSG (55:20:15:10 mol ratio) | 0.275 | 0.32 | 112 | 43 | 0.5 | 0.57 | 1430 | 878 |
| Liposomes Chol:DSPC:DODMA:PEG-DSG (55:20:15:10 mol ratio) | 0.1 | 0.32 | 127 | 43 | 1.8 | 0.21 | 518 | 318 |
| Liposomes Chol:DSPC:DODMA:PEG-DSG (55:20:15:10 mol ratio) | 0.4 | 0.32 | 112 | 14 | 0.3 | 0.83 | 2072 | 1272 |
| Liposomes EPC:CHOL (55:45 mol ratio) | 0.275 | 0.32 | 125 | N/d | n/d | 0.57 | 1430 | 887 |
| Liposomes EPC:CHOL (55:45 mol ratio) | 0.078 | 0.16 | 90 | 33 | 2.7 | 0.65 | 3233 | 503 |
| PEI-SPLP Chol:DSPC:POPG:PEG-DSG (50:20:20:10 mol ratio) | 0.078 | 0.16 | 108 | N/d | N/d | 0.65 | 3233 | 503 |

N/dN/d

N/d Not Determined.

FIG. 14

# LIPID COMPOSITIONS FOR NUCLEIC ACID DELIVERY

## CROSS-REFERENCES TO RELATED APPLICATIONS

This application is a continuation of U.S. application Ser. No. 13/684,066, filed Nov. 21, 2012, which is a continuation of U.S. application Ser. No. 12/965,555, filed Dec. 10, 2010, which is a divisional application of U.S. patent application Ser. No. 10/611,274, filed Jun. 30, 2003, which application claims priority to U.S. Provisional Application Ser. No. 60/392,887, filed Jun. 28, 2002, the disclosures of which are hereby incorporated by reference in their entirety.

## BACKGROUND OF THE INVENTION

Many systems for administering active substances into cells are already known, such as liposomes, nanoparticles, polymer particles, immuno- and ligand-complexes and cyclodextrins (see, Drug Transport in antimicrobial and anticancer chemotherapy. G. Papadakou Ed., CRC Press, 1995). Liposomes are typically prepared in the laboratory by sonication, detergent dialysis, ethanol injection or dilution, French press extrusion, ether infusion, and reverse phase evaporation. Liposomes with multiple bilayers are known as multilamellar lipid vesicles (MLVs). MLVs are candidates for time release drugs because the fluids entrapped between layers are only released as each membrane degrades. Liposomes with a single bilayer are known as unilamellar lipid vesicles (UV). UVs may be made small (SUVs) or large (LUVs).

Some of the methods above for liposome production impose harsh or extreme conditions which can result in the denaturation of the phospholipid raw material and encapsulated drugs. In addition, these methods are not readily scalable for mass production of large volumes of liposomes. Further, lipid vesicle formation by conventional ethanol dilution, involves the injection or dropwise addition of lipid in an aqueous buffer. The resulting vesicles are typically heterogenous in size and contain a mixture of unilamellar and multilamellar vesicles.

Conventional liposomes are formulated to carry therapeutic agents either contained within the aqueous interior space (water-soluble drugs) or partitioned into the lipid bilayer(s) (water-insoluble drugs). Active agents which have short half-lives in the bloodstream are particularly suited to delivery via liposomes. Many anti-neoplastic agents, for example, are known to have a short half-life in the bloodstream such that their parenteral use is not feasible. However, the use of liposomes for site-specific delivery of active agents via the bloodstream is severely limited by the rapid clearance of liposomes from the blood by cells of the reticuloendothelial system (RES).

U.S. Pat. No. 5,478,860, which issued to Wheeler et al., on Dec. 26, 1995, and which is incorporated herein by reference, discloses microemulsion compositions for the delivery of hydrophobic compounds. Such compositions have a variety of uses. In one embodiment, the hydrophobic compounds are therapeutic agents including drugs. The patent also discloses methods for in vitro and in vivo delivery of hydrophobic compounds to cells.

PCT Publication WO01/05373 to Knopov, et al., which is incorporated by reference herein, discloses techniques for preparing lipid vesicles using an ethanol injection-type process with a static mixer that provides a turbulent environment (e.g., Reynolds numbers>2000). Therapeutic agents may then be loaded after vesicle formation



Despite the apparent advances of U.S. Pat. No. 5,478,860 and WO05373, there exists a need for processes and apparatus for formulating and producing lipid vesicles, and in particular lipid vesicles encapsulating a therapeutic agent such as nucleic acid. The present invention fulfills these and other needs.

## BRIEF SUMMARY OF THE INVENTION

The present invention provides processes and apparatus for making lipid vesicles that optionally contain a therapeutic agent. The therapeutic agent can include, for example, a protein, a nucleic acid, an antisense nucleic acid, a drug, or the like. The present invention can be used to form lipid vesicles that contain encapsulated plasmid DNA or small molecule drugs. In one aspect, the lipid vesicles are prepared rapidly at low pressure and the approach is fully scalable. In certain preferred embodiments, the process does not involve a static mixer or specialized extrusion equipment.

As such, in one embodiment, the present invention provides a process for producing a liposome. The process typically includes providing an aqueous solution in a first reservoir, the first reservoir in fluid communication with an organic lipid solution in a second reservoir, and mixing the aqueous solution with the organic lipid solution, wherein the organic lipid solution undergoes a continuous stepwise dilution to produce a liposome.

In certain aspects, the aqueous solution such as a buffer, comprises a therapeutic product, such that the therapeutic product is encapsulated in the liposome. Suitable therapeutic products include, but are not limited to, a protein, a nucleic acid, an antisense nucleic acid, a ribozyme, tRNA, snRNA, siRNA (small interfering RNA), pre-condensed DNA, and an antigen. In certain preferred aspects, the therapeutic product is nucleic acid.

In another embodiment, the present invention provides a process for producing a liposome encapsulating a therapeutic product. The process typically includes providing an aqueous solution in a first reservoir, and providing an organic lipid solution in a second reservoir, wherein one of the aqueous solution and the organic lipid solution includes a therapeutic product. The process also typically includes mixing the aqueous solution with the organic lipid solution, wherein the organic lipid solution mixes with the aqueous solution so as to substantially instantaneously produce a liposome encapsulating the therapeutic product. In certain aspects, the therapeutic product is a nucleic acid included in the aqueous solution. In certain aspects, the therapeutic product is lipophilic and is included in the organic lipid solution. In certain aspects, the initial therapeutic product encapsulation efficiency is as high as about 90%.

In still yet another embodiment, the present invention provides apparatus for producing a liposome encapsulating a therapeutic product. The apparatus typically includes a first reservoir for holding an aqueous solution, and a second reservoir for holding an organic lipid solution, wherein one of the aqueous solution and the organic lipid solution includes a therapeutic product. the apparatus also typically includes a pump mechanism configured to pump the aqueous and the organic lipid solutions into a mixing region at substantially equal flow rates. In operation, the organic lipid solution mixes with the aqueous solution in the mixing region to substantially instantaneously form a therapeutic product encapsulated liposome.

These and other aspects will be more apparent when read with the accompanying drawings and detailed descriptions that follow.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** provides a flow diagram for a manufacturing process according to one embodiment of the present invention.

FIG. **2** provides a schematic of a process of making liposomes in one embodiment of the present invention.

FIG. **3** provides a schematic of an apparatus according to one embodiment of the present invention.

FIG. **4** provides a schematic of an apparatus having an ultrafiltration system according to one embodiment of the present invention.

FIG. **5** shows the effect of varying the ethanol concentration of the initial lipid solution on SPLP mean diameter and DNA encapsulation. DNA encapsulation efficiency and vesicle sizes determined after the dilution step.

FIG. **6** shows the effect of varying pH of the initial plasmid solution on SPLP mean diameter and DNA encapsulation. DNA encapsulation efficiency and vesicle sizes were determined after the dilution step.

FIG. **7** shows the effect of varying pH of the buffer used for the dilution step on pDNA encapsulation efficiency.

FIG. **8** shows the effect of varying the salt concentration of the buffer used for the dilution step on pDNA encapsulation efficiency.

FIG. **9**A-B shows a schematic process of making liposomes of the present invention.

FIG. **10** shows encapsulation of safranine in certain liposomes of the present invention.

FIG. **11** shows a schematic process of making liposomes of the present invention.

FIG. **12** illustrates a comparison between one embodiment of the present invention and an ethanol drop method for encapsulating pDNA.

FIG. **13** shows a T-connector and associated flow dynamics according to one embodiment.

FIG. **14** shows various parameters associated with flow in the T-connector of FIG. **13**.

## DETAILED DESCRIPTION OF THE INVENTION AND PREFERRED EMBODIMENTS

### I. Definitions

The term "nucleic acid" refers to a polymer containing at least two nucleotides. "Nucleotides" contain a sugar deoxyribose (DNA) or ribose (RNA), a base, and a phosphate group. Nucleotides are linked together through the phosphate groups. "Bases" include purines and pyrimidines, which further include natural compounds adenine, thymine, guanine, cytosine, uracil, inosine, and natural analogs, and synthetic derivatives of purines and pyrimidines, which include, but are not limited to, modifications which place new reactive groups such as, but not limited to, amines, alcohols, thiols, carboxylates, and alkylhalides.

DNA may be in the form of antisense, plasmid DNA, parts of a plasmid DNA, pre-condensed DNA, product of a polymerase chain reaction (PCR), vectors (P1, PAC, BAC, YAC, artificial chromosomes), expression cassettes, chimeric sequences, chromosomal DNA, or derivatives of these groups. RNA may be in the form of oligonucleotide RNA, tRNA (transfer RNA), snRNA (small nuclear RNA), rRNA (ribosomal RNA), mRNA (messenger RNA), antisense RNA, siRNA (small interfering RNA), ribozymes, chimeric sequences, or derivatives of these groups.

"Antisense" is a polynucleotide that interferes with the function of DNA and/or RNA. This may result in suppression of expression. Natural nucleic acids have a phosphate backbone, artificial nucleic acids may contain other types of backbones and bases. These include PNAs (peptide nucleic acids), phosphothionates, and other variants of the phosphate backbone of native nucleic acids. In addition, DNA and RNA may be single, double, triple, or quadruple stranded.

The term "gene" refers to a nucleic acid (e.g., DNA) sequence that comprises coding sequences necessary for the production of a polypeptide or precursor (e.g., herpes simplex virus). The polypeptide can be encoded by a full length coding sequence or by any portion of the coding sequence so long as the desired activity or functional properties (e.g., enzymatic activity, ligand binding, signal transduction, and the like) of the full-length or fragment are retained.

As used herein, the term "aqueous solution" refers to a composition comprising in whole, or in part, water.

As used herein, the term "organic lipid solution" refers to a composition comprising in whole, or in part, an organic solvent having a lipid.

The term "lipid" refers to a group of organic compounds that are esters of fatty acids and are characterized by being insoluble in water but soluble in many organic solvents. They are usually divided in at least three classes: (1) "simple lipids" which include fats and oils as well as waxes; (2) "compound lipids" which include phospholipids and glycolipids; (3) "derived lipids" such as steroids.

The term "amphipathic lipid" refers, in part, to any suitable material wherein the hydrophobic portion of the lipid material orients into a hydrophobic phase, while a hydrophilic portion orients toward the aqueous phase. Amphipathic lipids are usually the major component of a lipid vesicle. Hydrophilic characteristics derive from the presence of polar or charged groups such as carbohydrates, phosphato, carboxylic, sulfato, amino, sulfhydryl, nitro, hydroxy and other like groups. Hydrophobicity can be conferred by the inclusion of apolar groups that include, but are not limited to, long chain saturated and unsaturated aliphatic hydrocarbon groups and such groups substituted by one or more aromatic, cycloaliphatic or heterocyclic group(s). Examples of amphipathic compounds include, but are not limited to, phospholipids, aminolipids and sphingolipids. Representative examples of phospholipids include, but are not limited to, phosphatidylcholine, phosphatidylethanolamine, phosphatidylserine, phosphatidylinositol, phosphatidic acid, palmitoyloleoyl phosphatidylcholine, lysophosphatidylcholine, lysophosphatidylethanolamine, dipalmitoylphosphatidylcholine, dioleoylphosphatidylcholine, distearoylphosphatidylcholine or dilinoleoylphosphatidylcholine. Other compounds lacking in phosphorus, such as sphingolipid, glycosphingolipid families, diacylglycerols and β-acyloxyacids, are also within the group designated as amphipathic lipids. Additionally, the amphipathic lipid described above can be mixed with other lipids including triglycerides and sterols.

The term "anionic lipid" refers to any lipid that is negatively charged at physiological pH. These lipids include, but are not limited to, phosphatidylglycerol, cardiolipin, diacylphosphatidylserine, diacylphosphatidic acid, N-dodecanoyl phosphatidylethanolamines, N-succinyl phosphatidyletha-

nolamines, N-glutarylphosphatidylethanolamines, lysylphosphatidylglycerols, and other anionic modifying groups joined to neutral lipids.

The term "cationic lipid" refers to any of a number of lipid species which carry a net positive charge at a selective pH, such as physiological pH. Such lipids include, but are not limited to, N,N-dioleyl-N,N-dimethylammonium chloride ("DODAC"); N-(2,3-dioleyloxy)propyl)-N,N,N-trimethylammonium chloride ("DOTMA"); N,N-distearyl-N,N-dimethylammonium bromide ("DDAB"); N-(2,3-dioleoyloxy)propyl)-N,N,N-trimethylammonium chloride ("DOTAP"); 3-(N—(N',N'-dimethylaminoethane)-carbamoyl)cholesterol ("DC-Chol") and N-(1,2-dimyristyloxyprop-3-yl)-N,N-dimethyl-N-hydroxyethyl ammonium bromide ("DMRIE"). Additionally, a number of commercial preparations of cationic lipids are available which can be used in the present invention. These include, for example, LIPOFECTIN® (commercially available cationic liposomes comprising DOTMA and 1,2-dioleoyl-sn-3-phosphoethanolamine ("DOPE"), from GIBCO/BRL, Grand Island, N.Y., USA); LIPOFECTAMINE® (commercially available cationic liposomes comprising N-(1-(2,3-dioleyloxy)propyl)-N-(2-(sperminecarboxamido)ethyl)-N,N-dimethylammonium trifluoroacetate ("DOSPA") and ("DOPE"), from GIBCO/BRL); and TRANSFECTAM® (commercially available cationic lipids comprising dioctadecylamidoglycyl carboxyspermine ("DOGS") in ethanol from Promega Corp., Madison, Wis., USA). The following lipids are cationic and have a positive charge at below physiological pH: DODAP, DODMA, DMDMA and the like.

"Lipid vesicle" refers to any lipid composition that can be used to deliver a compound including, but not limited to, liposomes, wherein an aqueous volume is encapsulated by an amphipathic lipid bilayer; or wherein the lipids coat an interior comprising a large molecular component, such as a plasmid, with a reduced aqueous interior; or lipid aggregates or micelles, wherein the encapsulated component is contained within a relatively disordered lipid mixture.

As used herein, "lipid encapsulated" can refer to a lipid formulation which provides a compound with full encapsulation, partial encapsulation, or both.

As used herein, the term "SPLP" refers to a stable plasmid lipid particle. A SPLP represents a vesicle of lipids coating an interior comprising a nucleic acid such as a plasmid with a reduced aqueous interior.

## II. General

The present invention provides processes and apparatus for making lipid vesicles. The processes can be used to make lipid vesicles possessing a wide range of lipid components including, but not limited to, cationic lipids, anionic lipids, neutral lipids, polyethylene glycol (PEG) lipids, hydrophilic polymer lipids, fusogenic lipids and sterols. Hydrophobic actives can be incorporated into the organic solvent (e.g., ethanol) with the lipid, and nucleic acid and hydrophilic actives can be added to an aqueous component. In certain aspects, the processes of the present invention can be used in preparing microemulsions where a lipid monolayer surrounds an oil-based core. In certain preferred aspects, the processes and apparatus are used in preparing lipid vesicles, or liposomes, wherein a therapeutic agent is encapsulated within a liposome coincident with liposome formation.

## III. Processes of Making

FIG. **1** is an example of a representative flow chart **100** of a method of the present invention. This flow chart is merely an illustration and should not limit the scope of the claims herein. One of ordinary skill in the art will recognize other variations, modifications, and alternatives.

In one aspect, the present method provides a lipid solution **110** such as a clinical grade lipid synthesized under Good Manufacturing Practice (GMP), which is thereafter solubilized in an organic solution **120** (e.g., ethanol). Similarly, a therapeutic product, e.g., a therapeutic active agent such as nucleic acid **112** or other agent, is prepared under GMP. Thereafter, a therapeutic agent solution (e.g., plasmid DNA) **115** containing a buffer (e.g., citrate) is mixed with a lipid solution **120** solubilized in a lower alkanol to form a liposomal formulation **130**. In preferred aspects of the present invention, the therapeutic agent is "passively entrapped" in the liposome substantially coincident with formation of the liposome. However, those of skill in the art will realize that the processes and apparatus of the present invention are equally applicable to active entrapment or loading of the liposomes after formation of the vesicle.

According to the processes and apparatus of the present invention, the action of continuously introducing lipid and buffer solutions into a mixing environment, such as in a mixing chamber, causes a continuous dilution of the lipid solution with the buffer solution, thereby producing a liposome substantially instantaneously upon mixing. As used herein, the phrase "continuously diluting a lipid solution with a buffer solution" (and variations) generally means that the lipid solution is diluted sufficiently rapidly in an hydration process with sufficient force to effectuate vesicle generation. By mixing the aqueous solution with the organic lipid solution, the organic lipid solution undergoes a continuous stepwise dilution in the presence of the buffer (aqueous) solution to produce a liposome.

In the processes of the present invention, the organic lipid solution preferably includes an organic solvent, such as a lower alkanol. In one aspect, the liposomes are then diluted **140** with a buffer (e.g., citrate) to increase nucleic acid (e.g., plasmid) entrapment. Before sample concentration **160**, free therapeutic agent (e.g., nucleic acid) is removed by using, for example, an anion exchange cartridge **150**. Further, by using an ultrafiltration step **170** to remove the alkanol, the sample is concentrated (e.g., to about 0.9 mg/mL plasmid DNA), the alkanol is removed, and the buffer is replaced with a substitute buffer (e.g., with a saline buffer) **180**. Thereafter, the sample is filtered **190** and filled in vials **195**. The process will now be discussed in more detail herein below using the steps as set forth in FIG. **1**.

1. Lipid Solubilization and Therapeutic Agent Dissolution

In one embodiment, the liposome vesicles of the present processes are stable plasmid lipid particle (i.e., SPLP) formulations. Those of skill in the art will appreciate that the following description is for illustration purposes only. The processes of the present invention are applicable to a wide range of lipid vesicle types and sizes. These lipid vesicles include, but are not limited to, single bilayer lipid vesicles known as unilamellar lipid vesicles which can be made small (SUVs) or large (LUVs), as well as multilamellar lipid vesicles (MLVs). Further vesicles include, micelles, lipid-nucleic acid particles, virosomes, and the like. Those of skill in the art will know of other lipid vesicles for which the processes and apparatus of the present invention will be suitable.

The preferred size for liposomes made in accordance with the present processes and apparatus are between about 50-550 nm in diameter. In certain preferred aspects, the liposome preparation has a size distribution in which the mean size (e.g., diameter) is about 70 nm to about 300 nm,

and more preferably the mean size is less than about 200 nm, such as about 150 nm or less (e.g., about 100 nm).

In certain aspects, the liposome formulation (e.g., SPLP formulation) of the present invention includes four lipid components: a phospholipid; cholesterol; a PEG-lipid; and a cationic lipid. In one preferred aspect, the phospholipid is DSPC, the PEG-lipid is PEG-DSG and the cationic lipid is DODMA. In one preferred aspect, the molar composition is about 20:45:10:25 DSPC:Chol:PEG-DSG:DODMA. In certain embodiments, the organic solvent concentration wherein the lipids are solubilized is about 45% v/v to about 90% v/v. In certain preferred aspects, the organic solvent is a lower alkanol. Suitable lower alkanols include, but are not limited to, methanol, ethanol, propanol, butanol, pentanol, their isomers and combinations thereof. In one embodiment, the solvent is preferably ethanol with a volume of about 50-90% v/v. Preferably, the lipids occupy a volume of about 1 mL/g to about 5 mL/g.

The lipids are solubilized **120** using for example, an overhead stirrer at a suitable temperature. In one aspect, the total lipid concentration of the solution is about 15.1 mg/mL (20 mM). In certain preferred aspects, the therapeutic agent (e.g., nucleic acid) is included in an aqueous solution (e.g., buffer) and is diluted to a final concentration. In one preferred aspect, for example, the final concentration is about 0.9 mg/mL in citrate buffer, with a pH of about 4.0. In this instance, the volume of the plasmid solution is the same as the alkanol-lipid solution. In one embodiment, the preparation of the therapeutic agent (e.g., nucleic acid) solution is performed in a jacketed stainless steel vessel with an overhead mixer. The sample does not need to be heated to be prepared, although in certain instances it is at the same temperature as the lipid solution prior to lipid vesicle formation.

In one embodiment, the therapeutic agent is included in the lipid solution. In certain preferred aspects, the therapeutic agent in the lipid solution is lipophilic. Suitable lipophilic agents include taxol, taxol derivatives, including, for example, protax III and paclitaxol, lipophilic benzoporphyrins, verteporfin the lipid prodrug of foscarnet, 1-O-octadecyl-sn-glycerol-3-phosphonoformate (ODG-PFA), dioleoyl [3H]iododeoxyuridine ([3H]IDU-O12), lipid derivatized HIV protease inhibitory peptides such as iBOC-[L-Phe]-[D-beta-Nal]-Pip-[alpha-(OH)-Leu]-Val (7194) and other lipid derivatized drugs or prodrugs.

2. Liposome Formation

After the solutions, e.g., lipid solution **120** and aqueous therapeutic agent (e.g., nucleic acid) solution **115**, have been prepared, they are mixed together **130** using, for example, a peristaltic pump mixer. In one aspect, the solutions are pumped at substantially equal flow rates into a mixing environment. In certain aspects, the mixing environment includes a "T"-connector or mixing chamber. In this instance, it is preferred that the fluid lines, and hence fluid flows, meet in a narrow aperture within the "T"-connector as opposing flows at approximately 180° relative to each other. Other relative introduction angles may be used, such as for example between 27° and 90° and between 90° and 180°. Upon meeting and mixing of the solution flows in the mixing environment, lipid vesicles are substantially instantaneously formed. Lipid vesicles are formed when an organic solution including dissolved lipid and an aqueous solution (e.g., buffer) are simultaneously and continuously mixed. Advantageously, and surprisingly, by mixing the aqueous solution with the organic lipid solution, the organic lipid solution undergoes a continuous stepwise dilution to substantially instantaneously produce a liposome. The pump mechanism can be configured to provide equivalent or different flow rates of the lipid and aqueous solutions into the mixing environment which creates lipid vesicles in a high alkanol environment.

Advantageously, and surprisingly, the processes and apparatus for mixing of the lipid solution and the aqueous solution as taught herein provides for encapsulation of therapeutic agent in the formed liposome substantially coincident with liposome formation with an encapsulation efficiency of up to about 90%. Further processing steps as discussed herein can be used to further refine the encapsulation efficiency and concentration if desired.

In one preferred aspect, using the processes and apparatus of the present invention, it is possible to form lipid vesicles instantaneously in a continuous two-step process that is fully scaleable. In one aspect, lipid vesicles are formed having a mean diameter of less than about 200 nm, which do not require further size reduction by high-energy processes such as membrane extrusion, sonication or microfluidization.

In one embodiment, lipid vesicles form when lipids dissolved in an organic solvent (e.g., ethanol) are diluted in a stepwise manner by mixing with an aqueous solution (e.g., buffer). This controlled stepwise dilution is achieved by mixing the aqueous and lipid streams together in an aperture, such as a T-connector. The resultant lipid, solvent and solute concentrations can be kept constant throughout the vesicle formation process.

One embodiment of the inventive process is shown in FIG. **2**. In one aspect, using the processes of the present invention, a vesicle is prepared by a two-stage step-wise dilution without gradients. For example, in the first stepwise dilution, vesicles are formed in a high alkanol (e.g., ethanol) environment (e.g., about 30% to about 50% v/v ethanol). These vesicles can then be stabilized by lowering the alkanol (e.g., ethanol) concentration to less than or equal to about 25% v/v, such as about 17% v/v to about 25% v/v, in a stepwise manner. In preferred aspects, with therapeutic agent present in the aqueous solution, or in the lipid solution, the therapeutic agent is encapsulated coincident with liposome formation.

As shown in FIG. **2**, in one embodiment, lipids are initially dissolved in an alkanol environment of about 40% v/v to about 90% v/v, more preferably about 65% v/v to about 90% v/v, and most preferably about 80% v/v to about 90% v/v (A). Next, the lipid solution is diluted stepwise by mixing with an aqueous solution resulting in the formation of vesicles at an alkanol (e.g., ethanol) concentration of between about 37.5-50% (B). By mixing the aqueous solution with the organic lipid solution, the organic lipid solution undergoes a continuous stepwise dilution to produce a liposome. Further, lipid vesicles such as SPLPs (a lipid-particle) can be further stabilized by an additional stepwise dilution of the vesicles to an alkanol concentration of less than or equal to about 25%, preferably between about 19-25% (C).

In certain aspects, for both stepwise dilutions (A→B and B→C), the resulting ethanol, lipid and solute concentrations are kept at constant levels in the receiving vessel. At these higher ethanol concentrations following the initial mixing step, the rearrangement of lipid monomers into bilayers proceeds in a more orderly fashion compared to vesicles that are formed by dilution at lower ethanol concentrations. Without being bound by any particular theory, it is believed that these higher ethanol concentrations promote the association of nucleic acid with cationic lipids in the bilayers. In

one preferred aspect, nucleic acid encapsulation occurs within a range of alkanol (e.g., ethanol) concentrations above 22%.

In certain aspects, after the lipid vesicles are formed, they are collected in another vessel, for example, a stainless steel vessel. In one aspect, the lipid vesicles are formed at a rate of about 60 to about 80 mL/min. In one aspect, after the mixing step **130**, the lipid concentration is about 1-10 mg/mL and the therapeutic agent (e.g., plasmid DNA) concentration is about 0.1-3 mg/mL. In certain preferred aspects, the lipid concentration is about 7.0 mg/mL and the therapeutic agent (e.g., plasmid DNA) concentration is about 0.4 mg/mL to give a DNA:lipid ratio of about 0.06 mg/mg. The buffer concentration is about 1-3 mM and the alkanol concentration is about 45% v/v to about 90% v/v. In preferred aspects, the buffer concentration is about 3 mM and the alkanol concentration is about 45% v/v to about 60% v/v.

3. Liposome Dilution

Turning back to FIG. **1**, after the mixing step **130**, the degree of therapeutic agent (e.g., nucleic acid) encapsulation can be enhanced if the lipid vesicle suspension is optionally diluted **140** prior to removal of free plasmid. For example, prior to dilution step **140**, if the therapeutic agent entrapment is at about 30-40%, it can be increased to about 70-80% following incubation after the dilution step **140**. In step **140**, the liposome formulation is diluted to about 10% to about 40%, preferably about 20% alkanol, by mixing with an aqueous solution such as a buffer (e.g., 1:1 with citrate buffer, 100 mM NaCl, pH 4.0). Such further dilution is preferably accomplished with a buffer. In certain aspects, such further diluting the liposome solution is a continuous stepwise dilution. The diluted sample is then optionally allowed to incubate at room temperature.

4. Removal of Free Therapeutic Agent

After the optional dilution step **140**, about 70-80% or more of the therapeutic agent (e.g., nucleic acid) is entrapped within the lipid vesicle (e.g., SPLP) and the free therapeutic agent can be removed from the formulation **150**. In certain aspects, anion exchange chromatography is used. Advantageously, the use of an anion exchange resin results in a high dynamic nucleic acid removal capacity, is capable of single use, may be pre-sterilized and validated, and is fully scaleable. In addition, the method preferably results in removal of free therapeutic agent (e.g., nucleic acid such as approximately 25% of total plasmid). The volume of sample after chromatography is unchanged, and the therapeutic agent (e.g., nucleic acid) and lipid concentrations are about 0.64 and 14.4 mg/mL, respectively. At this point, the sample can be assayed for encapsulated therapeutic agent and adjusted to about 0.55 mg/mL.

5. Sample Concentration

In certain instances, the liposome solution is optionally concentrated about 2-6 fold, preferably about 4 fold, using for example, ultrafiltration **160** (e.g., tangential flow dialysis). In one embodiment, the sample is transferred to a feed reservoir of an ultrafiltration system and the buffer is removed. The buffer can be removed using various processes, such as by ultrafiltration. In one aspect, buffer is removed using cartridges packed with polysulfone hollow fibers, for example, having internal diameters of about 0.5 mm and a 30,000 nominal molecular weight cut-off (NMWC). The liposomes are retained within the hollow fibers and recirculated while the solvent and small molecules are removed from the formulation by passing through the pores of the hollow fibers. In this procedure, the filtrate is known as the permeate solution. On completion of the concentration step, the therapeutic agent (e.g., nucleic acid) and lipid concentrations increase to about 0.90 and 15.14 mg/mL, respectively. In one embodiment, the alkanol concentration remains unchanged, but the alkanol:lipid ratio decreases about four fold.

6. Alkanol Removal

In one embodiment, the concentrated formulation is then diafiltrated against about 5-15 volumes, preferably about 10 volumes, of aqueous solution (e.g., buffer) (e.g., citrate buffer pH 4.0 (25 mM citrate, 100 mM NaCl) to remove the alkanol **170**. The alkanol concentration at the completion of step **170** is less than about 1%. Preferably, lipid and therapeutic agent (e.g., nucleic acid) concentrations remain unchanged and the level of therapeutic agent entrapment also remains constant.

7. Buffer Replacement

After the alkanol has been removed, the aqueous solution (e.g., buffer) is then replaced by dialfiltration against another buffer **180** (e.g., against 10 volumes of saline 150 mM NaCl with 10 mM Hepes pH 7.4). Preferably, the ratio of concentrations of lipid to therapeutic agent (e.g., nucleic acid) remain unchanged and the level of nucleic acid entrapment is about constant. In certain instances, sample yield can be improved by rinsing the cartridge with buffer at about 10% volume of the concentrated sample. In certain aspects, this rinse is then added to the concentrated sample.

8. Sterile Filtration

In certain preferred embodiments, sterile filtration **190** of the sample at lipid concentrations of about 12-14 mg/mL can optionally be performed. In certain aspects, filtration is conducted at pressures below about 40 psi, using a capsule filter and a pressurized dispensing vessel with a heating jacket. Heating the sample slightly can improve the ease of filtration.

9. Sterile Fill

The sterile fill step **195** is performed using similar processes as for conventional liposomal formulations. The processes of the present invention result in about 50-60% of the input therapeutic agent (e.g., nucleic acid) in the final product. In certain preferred aspects, the therapeutic agent to lipid ratio of the final product is approximately 0.04 to 0.07.

IV. Therapeutic Agents

The lipid-based drug formulations and compositions of the present invention are useful for the systemic or local delivery of therapeutic agents or bioactive agents and are also useful in diagnostic assays. The following discussion refers generally to liposomes; however, it will be readily apparent to those of skill in the art that this same discussion is fully applicable to the other drug delivery systems of the present invention.

As described above, therapeutic agent is preferably incorporated into the lipid vesicle during formation of the vesicle. In one embodiment, hydrophobic actives can be incorporated into the organic solvent with the lipid, while nucleic acid and hydrophilic actives can be added to the aqueous component. In certain instances, the therapeutic agent includes one of a protein, a nucleic acid, an antisense nucleic acid, ribozymes, tRNA, snRNA, siRNA, pre-condensed DNA, an antigen and combinations thereof. In preferred aspects, the therapeutic agent is nucleic acid. The nucleic acid may encode a protein such as, for example, a herpes simplex virus, thymidine kinase (HSV-TK), a cytosine deaminase, a xanthine-guaninephosphoribosyl transferase, a p53, a purine nucleoside phosphorylase, a carboxylesterase,

a deoxycytidine kinase, a nitroreductase, a thymidine phosphorylase, or cytochrome P450 2B1.

In certain aspects, therapeutic agent is incorporated into the organic lipid component. In certain instances, the therapeutic agent is lipophilic. Suitable lipophilic agents include taxol, taxol derivatives, including, for example, protax III and Paclitaxol, lipophilic benzoporphyrins, verteporfin the lipid prodrug of foscarnet, 1-O-octadecyl-sn-glycerol-3-phosphonoformate (ODG-PFA), dioleoyl[3H]iododeoxyuridine ([3H]IDU-O12), lipid derivatized HIV protease inhibitory peptides such as iBOC-[L-Phe]-[D-beta-Nal]-Pip-[alpha-(OH)-Leu]-Val (7194) and other lipid derivatized drugs or prodrugs.

In another embodiment, the lipid vesicles of the present invention can be loaded with one or more therapeutic agents after formation of the vesicle. In certain aspects, the therapeutic agents which are administered using the present invention can be any of a variety of drugs which are selected to be an appropriate treatment for the disease to be treated. Often the drug is an antineoplastic agent, such as vincristine, doxorubicin, mitoxantrone, camptothecin, cisplatin, bleomycin, cyclophosphamide, methotrexate, streptozotocin, and the like. Especially preferred antitumor agents include, for example, actinomycin D, vincristine, vinblastine, cystine arabinoside, anthracyclines, alkylative agents, platinum compounds, antimetabolites, and nucleoside analogs, such as methotrexate and purine and pyrimidine analogs. It may also be desirable to deliver anti-infective agents to specific tissues by the present processes. The compositions of the present invention can also be used for the selective delivery of other drugs including, but not limited to, local anesthetics, e.g., dibucaine and chlorpromazine; beta-adrenergic blockers, e.g., propranolol, timolol and labetolol; antihypertensive agents, e.g., clonidine and hydralazine; anti-depressants, e.g., imipramine, amitriptyline and doxepim; anti-conversants, e.g., phenytoin; antihistamines, e.g., diphenhydramine, chlorphenirimine and promethazine; antibiotic/antibacterial agents, e.g., gentamycin, ciprofloxacin, and cefoxitin; antifungal agents, e.g., miconazole, terconazole, econazole, isoconazole, butaconazole, clotrimazole, itraconazole, nystatin, naftifine and amphotericin B; antiparasitic agents, hormones, hormone antagonists, immunomodulators, neurotransmitter antagonists, antiglaucoma agents, vitamins, narcotics, and imaging agents.

## V. Apparatus

In another embodiment, the present invention provides apparatus for carrying out the processes of the present invention. FIG. **3** is an example of a representative schematic of an apparatus **300** according to one embodiment of the present invention. This schematic is merely an illustration and should not limit the scope of the claims herein. One of ordinary skill in the art will recognize other variations, modifications, and alternatives.

In one embodiment, the apparatus of the present invention includes two reservoirs, an aqueous solution reservoir **310** and an organic solution reservoir **320**, for holding aqueous solution and organic solution, respectively. In certain aspects, the lipid vesicle formulations are prepared rapidly, at low pressure (e.g., <10 psi) and the apparatus and processes of the present invention are fully scaleable (e.g., 0.5 mL-5000 L). At a 1-L scale, lipid vesicles are formed at about 0.4-0.8 L/min. In certain preferred aspects, the apparatus do not use static mixers nor specialized extrusion equipment.



The mixing chamber **340** is, in one embodiment, a T-connector, having optional hose barbs, wherein fluid lines **334** and **336** impact each other at about 180°. The angle of mixing can also be changed, and lipid vesicles less than about 100 nm can be formed at angles of between about 27° and about 90° or even between 90° and 180°. In preferred aspects, lipid vesicles of well defined and reproducible mean diameters are prepared using substantially equal flow rates of the flow lines. In other aspects, lipid vesicles of well defined and reproducible mean diameters are prepared by changing the flow rate of the fluid lines, e.g., to ensure sufficient mixing in some cases. In preferred aspects, the variance between flow rates is less that 50%, more preferably less than about 25% and even more preferably less than about 5%.

FIG. **13** shows a T-connector and associated flow dynamics according to one embodiment. Examples of flow rates, and resulting shear rates and Reynolds numbers (turbulence measure) are shown in FIG. **14** and discussed in more detail hereafter in Example 8. In comparison with prior systems, the present invention provides non-turbulent flow and increased shear rates at much lower (and substantially equivalent) flow rates. For example, the present invention advantageously provides non-turbulent flow ($N_{re}$<2000) in the mixing environment with a shear rate between about 500/s and about 3300/s at a flow rate (both flow lines) of between about 0.075 and about 0.3 L/min.

Mixing of the two fluid components can be driven using, for example, a peristaltic pump **330**, a positive displacement pump, or by pressurizing both the lipid-ethanol and buffer vessels **320**, **310**. In one aspect, a Watson-Marlow 505Di/L pump fitted with a 505 L pump head is used; silicone tubing (e.g., platinum cured with 3.2 mm ID, 2.4 mm wall thickness; available from Watson Marlow as catalog no. 913A032024) can be used for flow lines into a polypropylene or stainless steel T-connector (e.g., with a ⅛" ID). Lipid vesicles are typically formed at room temperature, but lipid vesicles may be formed at elevated temperatures according to the present invention. Unlike other existing approaches, there are no general requirements for buffer composition. In fact, the processes and apparatus of the present invention can formulate a lipid vesicle by mixing lipid in an alkanol with water. In certain aspects, the processes and apparatus of the present invention form lipid vesicles that are less than 200 nm in diameter.

When lipid vesicles are prepared containing plasmid DNA (such as SPLPs), the ratio of plasmid to cationic lipid and counter ions can be optimized. For refined formulations, 70-95% plasmid DNA ("pDNA") encapsulation after mixing, and ethanol removal steps is preferred. The level of pDNA encapsulation can be increased by diluting this initial SPLP formulation. Surprisingly, the processes and apparatus of the present invention provide an encapsulation efficiency, upon mixing the solutions (with therapeutic agent in one of the solution components) in the mixing environment, of up

to about 90%. Further refinement, e.g., dilution, may be performed as discussed herein.

In certain aspects, liposome producing apparatus **300** of the present invention further includes a temperature control mechanism (not shown) for controlling the temperature of the reservoirs **310** and **320**. Preferably, fluid from the first reservoir **310** and the second reservoirs **320** flows into mixing chamber **340** simultaneously at separate apertures. Apparatus **300** further includes a collection reservoir **350** downstream of the mixing chamber for liposome collection. Moreover, in certain aspects, apparatus **300** further includes storage vessels upstream of either or both of the reservoirs **310** and **320**. Further, either or both of the reservoirs **310** and **320** are preferably jacketed stainless steel vessels equipped with an overhead mixer.

the pores of these hollow fibers. This filtrate is known as the permeate solution and is discarded via vessel **470**. After the SPLPs are concentrated to the desired plasmid concentration, the buffer in which the SPLPs are suspended is removed by ultrafiltration and replaced by an equal volume of the final buffer. Ultrafiltration can be replaced with other methods such as conventional dialysis.

## VI. Examples

### Example 1

This Example illustrates various physical and chemical properties of SPLPs made in accordance with one embodiment of the present invention.

Table I the amount of ethanol, pDNA and lipid content in process steps according to the present invention.

TABLE I

| STEP | % Initial Volume | [Ethanol] (%) | [pDNA] (mg/ml) | pDNA Recovery (%) | [Lipid] (mg/ml) | Lipid Recovery (%) |
|---|---|---|---|---|---|---|
| SPLP formation | 100 | 45 | 0.45 | 95 | 7.6 | 95 |
| Dilution | 200 | 22.5 | 0.23 | 90 | 3.8 | 90 |
| Concentration | 50 | 22.5 | 0.90 | 90 | 15.1 | 90 |
| Ethanol removal | 50 | <1% | 0.90 | 90 | 15.1 | 90 |
| Buffer replacement* | 45 | <0.1% | 0.90 | 81 | 15.1 | 81 |
| Free DNA Removal** | 45 | <0.1% | 0.64 (0.55) | 55 | 14.4 (12.4) | 76 |
| Sterile filtration & Vial fill*** | 49 | <0.1% | 0.50 | 50 | 11.1 | 68 |

*Estimate 10% total volume and SPLP loss after buffer replacement step.

**Assume that 75% of pDNA is encapsulated and all free DNA is removed. Estimate 5% loss of SPLP on anion exchange cartridge. At this step the sample will be assayed for encapsulated pDNA and adjusted to 0.55 mg/ml to anticipate loss of SPLP during the filtration step (concentrations after adjustment to 0.55 mg/ml pDNA shown in brackets).

***Assume a maximum 5% volume loss and up to 10% total SPLP loss.

In another embodiment, the present invention provides an apparatus having an ultrafiltration system for carrying out the processes of the present invention. FIG. **4** is an example of a representative schematic of an apparatus **400** according to one embodiment of the present invention. This schematic is merely an illustration and should not limit the scope of the claims herein. One of ordinary skill in the art will recognize other variations, modifications, and alternatives.

In certain aspects, apparatus **400** includes a plurality of reservoirs and is equipped with an ultrafiltration system. An aqueous solution reservoir **440** and an organic solution reservoir **430** each have upstream preparation vesicles **433** and **425**, respectively. In one aspect, lipid preparation vessel **425** is optionally equipped with an alkanol storage vessel **421** in fluid communication therewith.

As shown in FIG. **4**, the ultrafiltration system includes an incubation vessel **450** in fluid communication with a collection vessel **455**, an exchange column **460** and a tangential flow ultrafiltration cartridge **465**. The ultrafiltration system optionally includes a permeate vessel **470**. In certain aspects, ultrafiltration is used to concentrate SPLP samples and then remove ethanol from the formulation by buffer replacement.

In one embodiment of operation, the diluted SPLPs are transferred to the feed reservoir of the ultrafiltration system. Concentration is performed by removing buffer and ethanol using, for example, cross flow cartridges **465** packed with polysulfone hollow fibers that possess internal diameters of about 0.5 mm and a 100,000 molecular weight cut-off (MWCO). The SPLPs are retained within the hollow fibers and re-circulated, whereas the ethanol and buffer components are removed from the formulation by passing through

Table II sets forth the plasmid specification made according to one aspect of the present invention.

TABLE II

| | Plasmid Specification | |
|---|---|---|
| | Test | Specification |
| 1. | Appearance | Clear, Colorless solution. |
| 2. | Electrophoresis | Relative migration vs. standard. |
| 3. | Circular plasmid | >90% |
| 4. | Potentiometric pH value | 6.5-8.5 |
| 5. | Electrophoresis | RNA undetectable |
| 6. | BCA protein assay | Undetectable |
| 7. | Spectrometric $A_{260}/A_{280}$ | 1.7-2.0 |
| 8. | DNA hybridization assay | <1% *E. coli* DNA |
| 9. | Sterility Testing | No growth observed in bacteriologic media |
| 10. | LAL | <20 EU/mg. |
| 11. | UV Absorbance | 2.0-3.0 mg/mL. |

Table III sets forth the SPLP specification made according to one aspect of the present invention.

TABLE III

| | Test | Specification |
|---|---|---|
| 1. | Appearance | Homogenous, opaque white solution |
| 2. | pH | 7.4 (6.0-8.5) |
| 3. | Osmolality | 320 mOsm/kg (290-500 mOsm/kg) |

TABLE III-continued

| | Test | Specification |
|---|---|---|
| 4. | Plasmid Content | 0.5 mg/mL (0.25-1.0 mg/mL) |
| 5. | DSPC Content | 20 +/− 4.0 mol % |
| 6. | DODMA Content | 25 +/− 5.0 mol % |
| 7. | PEG-DSG Content | 10 +/− 2.0 mol % |
| 8. | Cholesterol Content | 45 +/− 5.0 mol % |
| 9. | Particle size | Mean diameter 100 ± 25 nm |
| 10. | Plasmid Encapsulation | >85% |
| 11. | Plasmid Integrity | >80% |
| | Supercoiled | <20% |
| | Nicked | <2% |
| | Linear | |
| 12. | LAL | <50 EU/mg DNA |
| 13. | Sterility | Pass |

Example 2

This Example illustrates various process parameters in one embodiment of the present invention.

In one SPLP embodiment, varying the initial ethanol concentration for lipid dissolution had little impact on either vesicle size or DNA encapsulation, providing that the ethanol concentration was high enough to ensure that none of the individual lipid components precipitated (see, FIG. **5**). Below 75% ethanol, lipids were not soluble even with heating to 55° C. Lipids dissolved in 75% ethanol at 55° C. formed SPLP with larger mean diameters and lower DNA encapsulation (see, FIG. **5**).

The initial DNA to lipid ratio has been varied from 0.048-0.081 mg DNA: mg lipid formulation and vesicles of similar size with 77-90% DNA encapsulation were formed.

SPLPs have been prepared at a pH range of about 3.5-6 for the initial mixing step and all formulations possessed mean particle diameters of less than 150 nm and DNA encapsulation efficiencies of greater than 50% (see, FIG. **6**). At higher pH, vesicles can also be prepared with similar vesicle sizes, but with lower DNA encapsulation efficiencies.

In certain aspects, mean vesicle diameters of empty vesicles prepared using one process of the present invention depend upon the salt concentration of the diluting buffer, (e.g., Sphingomyelin:cholestesterol vesicles, EPC:EPG vesicles). Varying the ionic conditions in the buffer, influences the tendency for a given lipid to arrange itself into bilayers and vesicles.

During the development of one SPLP formulation, it was found that both the pH and salt concentration of the diluting buffer had a significant effect on the DNA encapsulation efficiency. Naturally, diluting buffers with pH values lower than the pKa for the cationic lipid component (DODMA) gave higher encapsulation values (FIG. **7**). Interestingly, a final salt concentration of 150 mM was also optimal for DNA encapsulation (FIG. **8**).

Example 3

This Example illustrates the use of one process of the present invention to make EPC and POPC vesicles.

POPC vesicles are useful as "sink" vesicles for membrane fusion assays. In particular, they can be used in excess to remove PEG lipids from other liposomes, thus destabilizing the other liposomes and allowing them to fuse with the desired membrane. EPC vesicles are useful for removing cholesterol from arterial plaques.



The vesicles were prepared at an initial ethanol concentration of 80%, and lipid concentration of 10 mM. After mixing and dilution, the ethanol concentration was 20%, and lipid concentration was 5 mM. The EPC formulation was mixed and diluted with PBS, and the POPC was mixed and diluted with HBS. Both preparations were concentrated and ethanol removed using an ultrafiltration cartridge, i.e., the EPC against PBS, and the POPC against HBS. Both preparations were then sterile filtered using 0.22 um syringe filters.

TABLE IV

EPC and POPC vesicle data

| Sample | Lot Number | Vesicle Size (nm) Diam | SD | $Chi^2$ | Lipid Concentration mg/mL |
|---|---|---|---|---|---|
| POPC | 25031302-02 | 125 | 62 | 7 | 22.0 |
| EPC | 25031302-01 | 89 | 39 | 9 | 18.2 |

Example 4

This Example illustrates the use of one process of the present invention to make EPC/Cholesterol vesicles with a pH gradient.

Unilamellar lipid vesicles (LUV) comprising EPC and Cholesterol have traditionally been prepared by hydrating lipid films to form multilamellar lipid vesicles (MLV) that have been subjected to vesicle size reduction using high-pressure extrusion. It is well known that these vesicles can be prepared with acidic aqueous interiors and a pH gradient across the lipid bilayer. Weakly basic lipophilic molecules have been shown to accumulate in these vesicles at high internal concentrations. Various drug-loaded liposomes that are currently in late stage clinical trials utilize this approach (e.g., Myocet: doxorubicin loaded vesicles).

In one aspect, safranine was used to determine whether such a pH gradient was present. Safranine is a lipophilic basic dye that has been used to study membrane pH gradients

EPC/Chol vesicles were prepared using the present processes and apparatus at an initial ethanol concentration of 80%, and lipid concentration of 10 mM (See FIG. **9**A-B). After mixing and dilution, the ethanol concentration was 20%, and lipid concentration was 5 mM. Three different formulations were prepared:

1. Mixed and diluted with PBS (control).
2. Mixed and diluted with 150 mM citrate (final citrate concentration is 94 mM).
3. Mixed and diluted with 300 mM citrate (final citrate concentration is 188 mM).

After mixing and dilution, each sample was concentrated and ethanol was removed using ultrafiltration. After the concentration step, each sample was diafiltrated against its diluting buffer to ensure that the acidic citrate buffer present within vesicles would not leak out during ethanol removal. All samples were finally formulated with an external buffer of phosphate-buffered saline at pH 7.4. After sterile filtration, the mean vesicle diameters of these formulations were very similar (90-92 nm) and possessed acceptable standard deviation and Chi squared values (Table V).

Following dialysis, the vesicles were assayed for lipid concentration using the Infinity cholesterol assay. Solutions were then prepared containing 5 mM lipid and 0.2 mM safranine obtained from a filtered 10 mM stock solution. The

solutions were incubated at 37° C. for 30 minutes. A 500 ul aliquot of each incubated solution was then passed down a 2-mL Sepharose CL4B gel filtration column. The free dye was separated from the vesicles, and the lipid-containing fractions were collected and analyzed. The safranine concentration was determined by measuring the fluorescence of the samples at 516 nm excitation and 585 nm emission.

The vesicles with acidic interiors accumulated safranine, with the 94 mM citrate-containing vesicles showing the highest encapsulation. In contrast, the PBS control vesicles encapsulated very little safranine. The 188 mM citrate vesicles also encapsulated some safranine, but not as much as the 94 mM citrate-containing vesicles (See FIG. **10**).

TABLE V

Safranine-Loaded EPC/Chol Vesicles

| Sample | Safranine Encapsulation | Vesicle Size (nm) Diam | SD | $Chi^2$ | Dye:Lipid Ratio Mg:mg | mol:mol |
|---|---|---|---|---|---|---|
| PBS Control | 9% | 90 | 33 | 2.7 | 0.002 | 0.003 |
| 94 mM Citrate | 54% | 92 | 41 | 1.7 | 0.011 | 0.019 |
| 188 mM Citrate | 31% | 91 | 35 | 4.8 | 0.007 | 0.011 |

Example 5

This Example illustrates the use of one process of the present invention to make sphingomyelin/cholesterol vesicles.

Sphingomyelin/cholesterol vesicles are desirable due to their durability and strength. These vesicles can also be used to encapsulate drugs using a pH gradient. However, these LUV have traditionally needed to be formed at temperatures greater than 65° C. and using high pressure extrusion. In order to form these vesicles with the lipomixer, a number of variables needed to be taken into consideration, such as ethanol concentration, lipid concentration, and the salt concentration of the mixing and dilution buffer.

The vesicles were formulated at a ratio of 55/45 SM/Chol (mol:mol), while the initial ethanol concentration after mixing varied from 50 to 25%. Dilution buffers tested included PBS, water, 10 mM citrate, 150 mM citrate, and 300 mM citrate. Final lipid concentrations ranged from 0.5 to 2.5 mM. The vesicles formulated in the presence of salt (i.e., using buffers) were 200-500 nm, indicating an MLV. Aliquots of these samples were dialyzed against both 150 mM citrate and water in an attempt to remove ethanol and stabilize the vesicles.

Example 6

This Example illustrates the use of one process of the present invention to prepare vesicles that passively encapsulation small molecules such as calcein.

Calcein is a fluorescent dye that is self-quenching at concentrations greater than 10 mM. Vesicles encapsulating calcein can be used in fusion assays to determine whether vesicles have fused together. Fusion decreases the internal calcein concentration, causing it to fluoresce. Vesicles were prepared with DSPC:CHOL:PEG-DLG:DODMA (20:55:10:15) at an ethanol concentration of 19% and 2 mM lipid after mixing and dilution (See FIG. **11**). Lipids dissolved in ethanol were mixed with a solution containing 20 mM citrate and 75 mM calcein, and then the resulting vesicles were diluted with 300 mM NaCl and 37.5 mM Calcein. The



calcein was obtained from a 100 mM stock solution. The final calcein concentration in the vesicles was 37.5 mM.

After mixing and dilution the vesicles were dialyzed overnight against HBS to remove unencapsulated dye. This was unsuccessful at removing all of the free dye, so the vesicles were passed down a gel filtration column. The lipid fraction was collected and analyzed. It was found that the calcein was indeed self quenching at the concentration inside the vesicles. This is a clear demonstration that the processes and apparatus of the present invention can be used to prepare vesicles that passively encapsulate small molecules.

TABLE VI

Calcein-encapsulated vesicles

| Step | Vesicle Size (nm) Diam | SD | $Chi^2$ | Fluorescence $rF_{without\ triton}$ | $rF_{with\ triton}$ |
|---|---|---|---|---|---|
| Post Dilution | 205 | 109 | 0.4 | N/d | N/d |
| Post Dialysis | 173 | 74 | 0.5 | N/d | N/d |
| Post Gel Filtration | 178 | 77 | 5.4 | 0.4 | 4.1 |

Example 7

This Example illustrates the use of one process of the present invention versus prior art methods.

With reference to FIG. **12**, lipids were dissolved in 90% ethanol (A) and diluted either: step-wise using an apparatus of the present invention to 45% (B) and 22.5% ethanol (C), represented by the solid line ("LipoMixer"); or added dropwise with into stirred buffer to a final ethanol concentration of 22.5% (C), represented by the dotted line. Even though the final ethanol concentrations for both preparations were the same, the SPLP formed according to the processes of the present invention had 85% DNA encapsulation whereas vesicles prepared by ethanol drop had only 5% DNA encapsulation.

Example 8

This example illustrates various conditions and properties for forming liposomes according to the present invention. It should be appreciated that other conditions and parameters may be used and that those used herein are merely exemplary.

With reference to FIGS. **13** and **14**, various flow rates (substantially equivalent for both lipid and aqueous solution flows) are modeled and analyzed to show various parameters such as shear rate and Reynolds number ($N_{re}$) and vesicle size. Parameters and conditions were determined at the outlet of the T-connector correcting for the density and viscosity of the resulting ethanol solution. Additional turbulence as a result of the two streams meeting one another in opposition has not been accounted for, nor has additional turbulence as a result of the streams having to turn a 90 degree corner.

It is understood that the examples and embodiments described herein are for illustrative purposes only and that various modifications or changes in light thereof will be suggested to persons skilled in the art and are to be included within the spirit and purview of this application and scope of the appended claims. All publications, patents, and patent

applications cited herein are hereby incorporated by reference in their entirety for all purposes.

What is claimed is:

1. A lipid vesicle formulation comprising:
(a) a plurality of lipid vesicles, wherein each lipid vesicle comprises:
a cationic lipid;
an amphipathic lipid; and
a polyethyleneglycol (PEG)-lipid; and
(b) messenger RNA (mRNA), wherein at least 70% of the mRNA in the formulation is fully encapsulated in the lipid vesicles.

2. The lipid vesicle formulation of claim 1, wherein the amphipathic lipid is a phospholipid.

3. The lipid vesicle formulation of claim 2, wherein the phospholipid is selected from the group consisting of phosphatidylcholine, phosphatidylethanolamine, phosphatidylserine, phosphatidylinositol, phosphatidic acid, palmitoyloleoyl phosphatidylcholine, lysophosphatidylcholine, lysophosphatidylethanolamine, dipalmitoylphosphatidylcholine, dioleoylphosphatidylcholine, di stearoylphosphatidylcholine, and dilinoleoylphosphatidylcholine.

4. The lipid vesicle formulation of claim 1, wherein each lipid vesicle further comprises a sterol.

5. The lipid vesicle formulation of claim 4, wherein the sterol is cholesterol.

6. The lipid vesicle formulation of claim 4, wherein the sterol is cholesterol and the amphipathic lipid is a phospholipid.

7. The lipid vesicle formulation of claim 6, wherein the phospholipid is selected from the group consisting of phosphatidylcholine, phosphatidylethanolamine, phosphatidylserine, phosphatidylinositol, phosphatidic acid, palmitoyloleoyl phosphatidylcholine, lysophosphatidylcholine, lysophosphatidylethanolamine, dipalmitoylphosphatidylcholine, dioleoylphosphatidylcholine, di stearoylphosphatidylcholine, and dilinoleoylphosphatidylcholine.

8. The lipid vesicle formulation of claim 1, wherein each lipid vesicle is a liposome.

9. The lipid vesicle formulation of claim 1, wherein each lipid vesicle is a lipid-nucleic acid particle.

10. The lipid vesicle formulation of claim 1, wherein each lipid vesicle is about 150 nm or less in diameter.

11. The lipid vesicle formulation of claim 1, wherein the cationic lipid only carries a positive charge at below physiological pH.

12. The lipid vesicle formulation of claim 1, wherein each lipid vesicle is about 100 nm or less in diameter.

13. The lipid vesicle formulation of claim 1, wherein at least 80% of the mRNA in the formulation is fully encapsulated in the lipid vesicles.

14. The lipid vesicle formulation of claim 1, wherein about 90% of the mRNA in the formulation is fully encapsulated in the lipid vesicles.

* * * * *

# Exhibit F

US011141378B2

(12) **United States Patent**
**Yaworski et al.**

(10) **Patent No.: US 11,141,378 B2**
(45) **Date of Patent: *Oct. 12, 2021**

(54) **LIPID FORMULATIONS FOR NUCLEIC ACID DELIVERY**

(71) Applicant: **ARBUTUS BIOPHARMA CORPORATION**, Vancouver (CA)

(72) Inventors: **Edward Yaworski**, Maple Ridge (CA); **Kieu Lam**, Surrey (CA); **Lloyd Jeffs**, Delta (CA); **Lorne Palmer**, Vancouver (CA); **Ian MacLachlan**, Mission (CA)

(73) Assignee: **ARBUTUS BIOPHARMA CORPORATION**, Vancouver (CA)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **17/227,802**

(22) Filed: **Apr. 12, 2021**

(65) **Prior Publication Data**

US 2021/0267895 A1 Sep. 2, 2021

**Related U.S. Application Data**

(63) Continuation of application No. 17/094,724, filed on Nov. 10, 2020, which is a continuation of application No. 16/422,441, filed on May 24, 2019, now abandoned, which is a continuation of application No. 15/840,933, filed on Dec. 13, 2017, now abandoned, which is a continuation of application No. 15/670,742, filed on Aug. 7, 2017, now abandoned, which is a continuation of application No. 15/164,803, filed on May 25, 2016, now abandoned, which is a continuation of application No. 14/462,441, filed on Aug. 18, 2014, now Pat. No. 9,364,435, which is a continuation of application No. 13/928,309, filed on Jun. 26, 2013, now Pat. No. 8,822,668, which is a continuation of application No. 13/253,917, filed on Oct. 5, 2011, now Pat. No. 8,492,359, which is a continuation of application No. 12/424,367, filed on Apr. 15, 2009, now Pat. No. 8,058,069.

(60) Provisional application No. 61/045,228, filed on Apr. 15, 2008.

(51) **Int. Cl.**

| | |
|---|---|
| ***C07H 21/02*** | (2006.01) |
| ***C07H 21/04*** | (2006.01) |
| ***A61K 9/127*** | (2006.01) |
| ***A61K 48/00*** | (2006.01) |
| ***C07H 21/00*** | (2006.01) |
| ***C07J 9/00*** | (2006.01) |
| ***C12N 15/113*** | (2010.01) |
| ***A61K 31/713*** | (2006.01) |
| ***C12N 15/11*** | (2006.01) |

(52) **U.S. Cl.**
CPC .......... ***A61K 9/1272*** (2013.01); ***A61K 9/1271*** (2013.01); ***A61K 31/713*** (2013.01); ***A61K 48/0025*** (2013.01); ***C07H 21/00*** (2013.01); ***C07J 9/00*** (2013.01); ***C12N 15/111*** (2013.01); ***C12N 15/113*** (2013.01); ***C12N 15/1137*** (2013.01); *C12N 2310/14* (2013.01); *C12N 2320/32* (2013.01)

(58) **Field of Classification Search**
CPC .................................................. C12N 15/113
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,394,448 | A | 7/1983 | Szoka, Jr. et al. |
| 4,438,052 | A | 3/1984 | Weder et al. |
| 4,515,736 | A | 5/1985 | Deamer |
| 4,598,051 | A | 7/1986 | Papahadjopoulos et al. |
| 4,897,355 | A | 1/1990 | Eppstein et al. |
| 5,013,556 | A | 5/1991 | Woodle et al. |
| 5,171,678 | A | 12/1992 | Behr et al. |
| 5,208,036 | A | 5/1993 | Eppstein et al. |
| 5,225,212 | A | 7/1993 | Martin et al. |
| 5,264,618 | A | 11/1993 | Felgner et al. |
| 5,279,833 | A | 1/1994 | Rose |
| 5,283,185 | A | 2/1994 | Epand et al. |
| 5,320,906 | A | 6/1994 | Eley et al. |
| 5,334,761 | A | 8/1994 | Gebeyehu et al. |
| 5,545,412 | A | 8/1996 | Eppstein et al. |
| 5,578,475 | A | 11/1996 | Jessee |
| 5,627,159 | A | 5/1997 | Shih et al. |
| 5,641,662 | A | 6/1997 | Debs et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| CA | 2309727 | A1 | 4/1999 |
| CA | 2271582 | A1 | 11/1999 |

(Continued)

OTHER PUBLICATIONS

Basarkar et al. (Int J Nanomedicine, 2007, 2(3), 353-360).*

(Continued)

*Primary Examiner* — Amy H Bowman
(74) *Attorney, Agent, or Firm* — Kilpatrick Townsend & Stockton LLP

(57) **ABSTRACT**

The present invention provides novel, stable lipid particles comprising one or more active agents or therapeutic agents, methods of making the lipid particles, and methods of delivering and/or administering the lipid particles. More particularly, the present invention provides stable nucleic acid-lipid particles (SNALP) comprising a nucleic acid (such as one or more interfering RNA), methods of making the SNALP, and methods of delivering and/or administering the SNALP.

**30 Claims, 24 Drawing Sheets**

**Specification includes a Sequence Listing.**

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,656,743 | A | 8/1997 | Busch et al. |
| 5,674,908 | A | 10/1997 | Haces et al. |
| 5,703,055 | A | 12/1997 | Felgner et al. |
| 5,705,385 | A | 1/1998 | Bally et al. |
| 5,736,392 | A | 4/1998 | Hawley-Nelson et al. |
| 5,753,613 | A | 5/1998 | Ansell et al. |
| 5,820,873 | A | 10/1998 | Choi et al. |
| 5,877,220 | A | 3/1999 | Schwartz et al. |
| 5,885,613 | A | 3/1999 | Holland et al. |
| 5,958,901 | A | 9/1999 | Dwyer et al. |
| 5,976,567 | A | 11/1999 | Wheeler et al. |
| 5,981,501 | A | 11/1999 | Wheeler et al. |
| 6,020,202 | A | 2/2000 | Jessee |
| 6,020,526 | A | 2/2000 | Schwartz et al. |
| 6,034,135 | A | 3/2000 | Schwartz et al. |
| 6,051,429 | A | 4/2000 | Hawley-Nelson et al. |
| 6,075,012 | A | 6/2000 | Gebeyehu et al. |
| 6,165,501 | A | 12/2000 | Tirosh et al. |
| 6,172,049 | B1 | 1/2001 | Dwyer et al. |
| 6,251,939 | B1 | 6/2001 | Schwartz et al. |
| 6,284,267 | B1 | 9/2001 | Aneja |
| 6,287,591 | B1 | 9/2001 | Semple et al. |
| 6,339,173 | B1 | 1/2002 | Schwartz et al. |
| 6,376,248 | B1 | 4/2002 | Hawley-Nelson et al. |
| 6,534,484 | B1 | 3/2003 | Wheeler et al. |
| 6,586,410 | B1 | 7/2003 | Wheeler et al. |
| 6,638,529 | B2 | 10/2003 | Schwartz et al. |
| 6,649,780 | B1 | 11/2003 | Eibl et al. |
| 6,671,393 | B2 | 12/2003 | Hays et al. |
| 6,696,424 | B1 | 2/2004 | Wheeler et al. |
| 6,815,432 | B2 | 11/2004 | Wheeler et al. |
| 6,858,224 | B2 | 2/2005 | Wheeler et al. |
| 7,166,745 | B1 | 1/2007 | Chu et al. |
| 7,422,902 | B1 | 9/2008 | Wheeler et al. |
| 7,479,573 | B2 | 1/2009 | Chu et al. |
| 7,491,409 | B1 | 2/2009 | Meers et al. |
| 7,601,872 | B2 | 10/2009 | Chu et al. |
| 7,687,070 | B2 | 3/2010 | Gebeyehu et al. |
| 7,745,651 | B2 | 6/2010 | Heyes et al. |
| 7,799,565 | B2 | 9/2010 | MacLachlan et al. |
| 7,803,397 | B2 | 9/2010 | Heyes et al. |
| 7,807,815 | B2 | 10/2010 | MacLachlan et al. |
| 7,838,658 | B2 | 11/2010 | MacLachlan et al. |
| 7,901,708 | B2 | 3/2011 | MacLachlan et al. |
| 7,915,450 | B2 | 3/2011 | Chu et al. |
| 7,939,505 | B2 | 5/2011 | Quay et al. |
| 7,982,027 | B2 | 7/2011 | MacLachlan et al. |
| 8,058,068 | B2 | 11/2011 | Hawley-Nelson et al. |
| 8,058,069 | B2 | 11/2011 | Yaworski et al. |
| 8,101,741 | B2 | 1/2012 | MacLachlan et al. |
| 8,158,601 | B2 | 4/2012 | Chen et al. |
| 8,158,827 | B2 | 4/2012 | Chu et al. |
| 8,188,263 | B2 | 5/2012 | MacLachlan et al. |
| 8,227,443 | B2 | 7/2012 | MacLachlan et al. |
| 8,236,943 | B2 | 8/2012 | Lee et al. |
| 8,283,333 | B2 | 10/2012 | Yaworski et al. |
| 8,455,455 | B1 | 6/2013 | Robbins et al. |
| 8,466,122 | B2 | 6/2013 | Heyes et al. |
| 8,492,359 | B2 | 7/2013 | Yaworski et al. |
| 8,513,403 | B2 | 8/2013 | MacLachlan et al. |
| 8,569,256 | B2 | 10/2013 | Heyes et al. |
| 8,598,333 | B2 | 12/2013 | MacLachlan et al. |
| 8,716,464 | B2 | 5/2014 | Geisbert et al. |
| 8,822,668 | B2 | 9/2014 | Yaworski et al. |
| 8,865,675 | B2 | 10/2014 | Heyes et al. |
| 8,999,950 | B2 | 4/2015 | MacLachlan et al. |
| 9,006,191 | B2 | 4/2015 | MacLachlan et al. |
| 9,006,417 | B2 | 4/2015 | Yaworski et al. |
| 9,018,187 | B2 | 4/2015 | Heyes et al. |
| 9,035,039 | B2 | 5/2015 | Dhillon et al. |
| 9,126,966 | B2 | 9/2015 | Martin et al. |
| 9,139,554 | B2 | 9/2015 | Hope et al. |
| 9,187,748 | B2 | 11/2015 | Geisbert et al. |
| 9,364,435 | B2 | 6/2016 | Yaworski et al. |
| 9,404,127 | B2 | 8/2016 | Yaworski et al. |
| 9,504,651 | B2 | 11/2016 | MacLachlan et al. |
| 9,518,272 | B2 | 12/2016 | Yaworski et al. |
| 9,878,042 | B2 | 1/2018 | Yaworski et al. |
| 10,053,689 | B2 | 8/2018 | Fitzgerald et al. |
| 10,077,232 | B2 | 9/2018 | Heyes et al. |
| 10,415,037 | B2 | 9/2019 | Cross et al. |
| 2001/0048940 | A1 | 12/2001 | Tousignant et al. |
| 2003/0069173 | A1 | 4/2003 | Hawley-Nelson et al. |
| 2003/0072794 | A1 | 4/2003 | Boulikas |
| 2003/0077829 | A1 | 4/2003 | MacLachlan |
| 2003/0143732 | A1 | 7/2003 | Fosnaugh et al. |
| 2004/0063654 | A1 | 4/2004 | Davis et al. |
| 2004/0142892 | A1 | 7/2004 | Finn et al. |
| 2004/0253723 | A1 | 12/2004 | Tachas et al. |
| 2004/0259247 | A1 | 12/2004 | Tuschi et al. |
| 2005/0064595 | A1 | 3/2005 | MacLachlan et al. |
| 2005/0118253 | A1 | 6/2005 | MacLachlan et al. |
| 2005/0260757 | A1 | 11/2005 | Gebeyehu et al. |
| 2006/0008910 | A1 | 1/2006 | MacLachlan et al. |
| 2006/0134189 | A1 | 6/2006 | MacLachlan et al. |
| 2006/0147514 | A1 | 7/2006 | Gebeyehu et al. |
| 2006/0228406 | A1 | 10/2006 | Chiou et al. |
| 2006/0240093 | A1 | 10/2006 | MacLachlan et al. |
| 2006/0240554 | A1 | 10/2006 | Chen et al. |
| 2007/0042031 | A1 | 2/2007 | MacLachlan et al. |
| 2007/0135372 | A1 | 6/2007 | MacLachlan et al. |
| 2007/0202598 | A1 | 8/2007 | Chu et al. |
| 2007/0202600 | A1 | 8/2007 | Chu et al. |
| 2008/0020058 | A1 | 1/2008 | Chen et al. |
| 2008/0317839 | A1 | 12/2008 | Quay et al. |
| 2009/0143583 | A1 | 6/2009 | Chu et al. |
| 2009/0291131 | A1 | 11/2009 | MacLachlan et al. |
| 2010/0130588 | A1 | 5/2010 | Yaworski et al. |
| 2010/0159593 | A1 | 6/2010 | Chu et al. |
| 2011/0076335 | A1 | 3/2011 | Yaworski et al. |
| 2012/0058188 | A1 | 3/2012 | MacLachlan et al. |
| 2012/0136073 | A1 | 5/2012 | Zhiwei et al. |
| 2012/0183581 | A1 | 7/2012 | Yaworski et al. |
| 2012/0238747 | A1 | 9/2012 | Chu et al. |
| 2013/0116307 | A1 | 5/2013 | Heyes et al. |
| 2013/0122104 | A1 | 5/2013 | Yaworski et al. |
| 2013/0303587 | A1 | 11/2013 | Yaworski et al. |
| 2014/0065228 | A1 | 3/2014 | Yaworski et al. |
| 2014/0294937 | A1 | 10/2014 | MacLachlan et al. |
| 2015/0164799 | A1 | 6/2015 | Yaworski et al. |
| 2015/0374834 | A1 | 12/2015 | Yaworski et al. |
| 2016/0032320 | A1 | 2/2016 | Yaworski et al. |
| 2016/0251681 | A1 | 9/2016 | Yaworski et al. |
| 2017/0042814 | A1 | 2/2017 | Yaworski et al. |
| 2017/0260523 | A1 | 9/2017 | Yaworski et al. |
| 2017/0307608 | A1 | 10/2017 | Bettencourt |
| 2018/0071397 | A1 | 3/2018 | Yaworski et al. |
| 2018/0085312 | A1 | 3/2018 | Yaworski et al. |
| 2018/0092848 | A1 | 4/2018 | Yaworski et al. |
| 2019/0032051 | A1 | 1/2019 | Yaworski et al. |
| 2019/0240339 | A1 | 8/2019 | Yaworski et al. |
| 2020/0113832 | A1 | 4/2020 | Yaworski et al. |
| 2021/0207140 | A1 | 7/2021 | Yaworski et al. |
| 2021/0220274 | A1 | 7/2021 | Yaworski et al. |

FOREIGN PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| CA | 2330741 | A1 | | 11/1999 | |
| CA | 2397016 | A1 | | 7/2001 | |
| CA | 2513623 | | | 8/2004 | |
| CA | 2637931 | | * | 7/2007 | ........... C12N 15/113 |
| EP | 1 648 519 | B1 | | 10/2014 | |
| EP | 2 567 693 | B1 | | 10/2015 | |
| JP | 03-126211 | | | 5/1991 | |
| JP | 05-202085 | | | 8/1993 | |
| JP | 06-080560 | | | 3/1994 | |
| JP | 2002-525063 | | | 8/2002 | |
| JP | 2003-505401 | | | 2/2003 | |
| JP | 2007-524349 | | | 8/2007 | |
| WO | 91/16024 | A1 | | 10/1991 | |
| WO | 93/05162 | A1 | | 3/1993 | |
| WO | 93/12240 | A1 | | 6/1993 | |
| WO | 93/12756 | A2 | | 7/1993 | |
| WO | 93/24640 | A2 | | 12/1993 | |

(56) **References Cited**

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| WO | 93/25673 | A1 | 12/1993 |
| WO | 95/02698 | A1 | 1/1995 |
| WO | 95/18863 | A1 | 7/1995 |
| WO | 95/35301 | A1 | 12/1995 |
| WO | 96/02655 | A1 | 2/1996 |
| WO | 96/10390 | A1 | 4/1996 |
| WO | 96/40964 | A2 | 12/1996 |
| WO | 96/41873 | A1 | 12/1996 |
| WO | 98/51285 | A2 | 11/1998 |
| WO | 00/03683 | A2 | 1/2000 |
| WO | 00/15820 | A1 | 3/2000 |
| WO | 00/62813 | A2 | 10/2000 |
| WO | 01/05374 | A1 | 1/2001 |
| WO | 01/05873 | A1 | 1/2001 |
| WO | 01/75164 | A2 | 10/2001 |
| WO | 01/93836 | | 12/2001 |
| WO | 02/034236 | A2 | 5/2002 |
| WO | 02/087541 | A1 | 11/2002 |
| WO | 03/097805 | A2 | 11/2003 |
| WO | 2004/065546 | A2 | 8/2004 |
| WO | 2004/110499 | A1 | 12/2004 |
| WO | 2005/007196 | A2 | 1/2005 |
| WO | 2005/026372 | A1 | 3/2005 |
| WO | 2005/035764 | A1 | 4/2005 |
| WO | 2005/120152 | A2 | 12/2005 |
| WO | 2006/002538 | A1 | 1/2006 |
| WO | 2006/053430 | A1 | 5/2006 |
| WO | 2007/056861 | A1 | 5/2007 |
| WO | 2009/086558 | A1 | 7/2009 |
| WO | 2009/111658 | A2 | 9/2009 |
| WO | 2010/042877 | A1 | 4/2010 |
| WO | 2010/048228 | A2 | 4/2010 |
| WO | 2010/088537 | A2 | 8/2010 |
| WO | 2010/105209 | A1 | 9/2010 |
| WO | 2013/090648 | A1 | 6/2013 |
| WO | 2017/223135 | A1 | 12/2017 |
| WO | 2018/232357 | A1 | 12/2018 |

OTHER PUBLICATIONS

Shimada et al. (International Journal of Pharmaceutics, 203, 2000, 255-263).*

Gallie (Plant Cell Reports, 1993, 13, 119-122).*

Semple et al. (Biochemistry, 1996, 35, 2521-2525).*

Li et al. (Trends in Pharmacological Sciences, 23, 5, 2002, 206-209).*

Arima et al. (Biomaterials, 29, 2008, 551-560).*

Ahmad, A. et al., "New multivalent cationic lipids reveal bell curve for transfection efficiency versus membrane charge density: lipid-DNA complexes for gene delivery," J. Gene Med., 7(6):739-48, 2005.

Akinc, A. et al., "The Onpattro story and the clinical translation of nanomedicines containing nucleic acid-based drugs," Nature Nanotechnology, 14:1084-1087, 2019.

Alnylam Pharmaceuticals, Inc., ONPATTRO Label, Revised Aug. 2018.

Ambegia, E. et al., "Stabilized plasmid-lipid particles containing PEG-diacylglycerols exhibit extended circulation lifetimes and tumor selective gene expression," Biochimica et Biophysica Acta, 1669:155-163, 2005.

Arbutus Biopharma Corporation, "Arbutus' LNP Licensee Alnylam Announces FDA Approval of ONPATTRO™ (patisiran), for the Treatment of ATTR Amyloidosis," Press Release, https://investor.arbutusbio.com/news-releases/news-release-details/arbutus-lnp-licensee-alnylam-announces-fda-approval-onpattrotm, Aug. 13, 2018, 2 pages.

Arpicco, S. et al., "Preparation and characterization of novel cationic lipids developed for gene transfection," Proceed. Int'l Symp. Control. Rel. Bioact. Mater. (Controlled Release Society, Inc.), 26:759-760, 1999.

Arpicco, S. et al., "Synthesis, characterization and transfection activity of new saturated and unsaturated cationic lipids," IL Farmaco, 59:869-878, 2004.

Bahl, K. et al., "Preclinical and Clinical Demonstration of Immunogenicity by mRNA Vaccines against H10N8 and H7N9 Influenza Viruses," Molecular Therapy, 25(6):1316-1327, 2017.

Ballas, N. et al., "Liposomes bearing a quaternary ammonium detergent as an efficient vehicle for functional transfer of TMV-RNA into plant protoplasts," Biochimica et Biophysica Acta, 939:8-18, 1988.

Barinaga, M., "Step taken toward improved vectors for gene transfer," Science, 266:1326, 1994.

Bass, B. "The short answer," Nature, 411:428-429, 2001.

Beale, G. et al., "Gene silencing nucleic acids designed by scanning arrays: Anti-EGFR activity of siRNA, ribozyme and DNA enzymes targeting a single hybridization-accessible region using the same delivery system," Journal of Drug Targeting, 11(7):449-456, 2003.

Behr, J., "Synthetic gene-transfer vectors," Acc. Chem. Res., 26:274-278, 1993.

Bennett et al., "Cholesterol enhances cationic liposome-mediated DNA transfection of human respiratory epithelial cells," Bioscience Reports, 15:47-53, 1995.

Brigham, K. et al., "Rapid communication: In vivo transfection of murine lungs with a functioning prokaryotic gene using a liposome vehicle," The American Journal of the Medical Sciences, 298(4):278-281, 1989.

Brummelkamp, T. et al., "A system for stable expression of short interfering RNAs in mammalian cells," Science, 296:550-553, 2002.

Cevc, G., "How membrane chain-melting phase-transition temperature is affected by the lipid chain asymmetry and degree of unsaturation: an effective chain-length model," Biochemistry, 30:7186-7193, 1991.

Check, E., "RNA to the Rescue? Disease therapies based on a technique for gene silencing called RNA interference are racing towards the clinic. Erika Check investigates molecular medicine's next big thing," Nature, 425:10-12, 2003.

Chonn, A. et al., "Recent advances in liposomal drug-delivery systems," Current Opinion in Biotechnology, 6:698-708, 1995.

Cortesi, R. et al., "Effect of cationic liposome composition on in vitro cytotoxicity and protective effect on carried DNA," International Journal of Pharmaceutics, 139:69-78, 1996.

Crystal, R., "Transfer of genes to humans: early lessons and obstacles to success," Science, 270:404-410, 1995.

Culver, K., "The first human gene therapy experiment," Gene Therapy: A Handbook for Physicians, 1994, pp. 33-40.

Duzgunes, N., "Membrane fusion," Subcellular Biochemistry, 11:195-286, 1985.

Dwarki, V. et al., "Cationic liposome-mediated RNA transfection," Methods in Enzymology, 217:644-654, 1993.

Elbashir, S. et al., "Duplexes of 21-nucleotide RNAs mediate RNA interference in cultured mammalian cells," Nature, 411:494-498, 2001.

Enoch, H. et al., "Formation and properties of 1000-Å-diameter, single-bilayer phospholipid vesicles," Proc. Natl. Acad. Sci. USA, 76(1):145-149, 1979.

European Medicines Agency, "New Medicine for Hereditary Rare Disease," Press Release, https://www.ema.europa.eu/en/news/new-medicine-hereditary-rare-disease, Jul. 27, 2018, 2 pages.

Felgner, J. et al., "Cationic lipid-mediated transfection in mammalian cells: 'Lipofection,'" J. Tiss. Cult. Meth., 15:63-68, 1993.

Felgner, J. et al., "Enhanced gene delivery and mechanism studies with a novel series of cationic lipid formulations," The Journal of Biological Chemistry, 269(4):2550-2561, 1994.

Felgner, P. et al., "Cationic liposome mediated transfection," Proc. West. Pharmacol. Soc., 32:115-121, 1989.

Felgner, P. et al., "Lipofection: A highly efficient, lipid-mediated DNA-transfection procedure," Proc. Natl. Acad. Sci. USA, 84:7413-7417, 1987.

Filion, M.C. and Phillips, N.C., "Toxicity and immunomodulatory activity of liposomal vectors formulated with cationic lipids towards immune effector cells," Biochim. Biophys. Acta., 1329(2):345-356, 1997.

(56) **References Cited**

OTHER PUBLICATIONS


Gao, X. et al., "A novel cationic liposome reagent for efficient transfection of mammalian cells," Biochem. Biophys. Res. Comm., 179(1):280-285, 1991.

Gao, X. et al., "Nonviral gene Delivery: What we know and what is next," AAPS Journal, 9(1):E92-104, 2007.

Gershon, H. et al., "Mode of formation and structural feature of DNA-cationic liposome complexes used for transfection," Biochemistry, 32:7143-7151, 1993.

Global Newswire, retrieved from http://globalnewswire.com on Feb. 27, 2013, Tekmira sues Alnylam Pharmaceuticals for repeated misuse of trade secrets and confidential information, Mar. 16, 2011, pp. 1-3.

Guy-Caffey, J. et al., "Novel polyaminolipids enhance the cellular uptake of oligonucleotides," The Journal of Biological Chemistry, 270(52):31391-31396, 1995.

Hausseker, D., "The Business of RNAi Therapeutics in 2012,"Molecular Therapy-Nucleic Acids, 2:e8, 2012, 12 pages.

Hawley-Nelson, P. et al., "LipofectAmine™ reagent: a new, higher efficiency polycationic liposome transfection reagent," Focus, 15(3):73-80, 1993.

Heyes, J. et al., "Cationic lipid saturation influences intracellular delivery of encapsulated nucleic acids," Journal of Controlled Release, 107:276-287, 2005.

Heyes, J. et al., "Synthesis of novel cationic lipids: effect of structural modification on the efficiency of gene transfer," J. Med. Chem., 45:99-114, 2002.

Huang, L. et al., "Liposomal Gene Delivery: A Complex Package," Nature Biotechnology, 15:620-621, 1997.

Hyde, S. et al., "Correction of the ion transport defect in cystic fibrosis transgenic mice by gene therapy," Nature, 362:250-255, 1993.

Janoff, A., "Declaration of Andrew S. Janoff, Ph.D. in support of Moderna Therapeutics, Inc.'s Petition for Inter Partes Review of U.S. Pat. No. 9,364,435," Inter Partes Review of U.S. Pat. No. 9,364,435 B2, Case No. IPR2018-00739, filed Mar. 5, 2018, 69 pages.

Jiang, L. et al., "Comparison of protein precipitation methods for sample preparation prior to proteomic analysis," Journal of Chromatography A, 1023:317-320, 2004.

Juliano, R. et al., "The effect of particle size and charge on the clearance rates of liposomes and liposome encapsulated drugs," Biochem. Biophys. Res. Commun., 63(3):651-658, 1975.

Kauffman, K. et al., "Optimization of Lipid Nanoparticle Formulations for mRNA Delivery in Vivo with Fractional Factorial and Definitive Screening Designs," Nano Letters, 15(11):7300-7306, 2015.

Keough, K., "Influence of chain unsaturation and chain position on thermotropism and intermolecular interactions in membranes," Biochem. Soc. Transactions, 18(5):835-837, 1990.

Krichevsky, A. et al., "RNAi functions in cultured mammalian neurons," PNAS, 99(18):11926-29, 2002.

Lawrence, M. et al. "The formation, characterization and stability of non-ionic surfactant vesicles," S.T.P. Pharma Sciences, 6(1):49-60, 1996.

Lawrence, M. et al., "Synthesis and aggregation properties of dialkyl polyoxyethylene glycerol ethers," Chemistry and Physics of Lipids, 82(2):89-100, 1996.

Ledford, H., "Gene-Silencing Drug Approved: US Government Okays First RNA-Interference Drug—After a 20-Year Wait," Nature, 560:291-292, 2018.

Legendre, J.-Y. et al., "Delivery of plasmid DNA into mammalian cell lines using pH-sensitive liposomes: comparison with cationic liposomes," Pharm. Res., 9(10):1235-42, 1992.

Leventis, R. et al., "Interactions of mammalian cells with lipid dispersions containing novel metabolizable cationic amphiphiles," Biochem. Biophys. Acta, 1023:124-132, 1990.

Li and Szoka, "Lipid-based nanoparticles for nucleic acid delivery," Pharmaceutical Research, 2483:438-449, 2007.

Lin, A.J. et al., "Three-dimensional imaging of lipid gene-carriers: Membrane charge density controls universal transfection behavior in lamellar cationic liposome-DNA complexes," Biophys J., 84(5):3307-16, 2003.

Liu, Y. et al., "Cationic liposome-mediated intravenous gene delivery", J. Biol. Chem., 270:24864-70, 1995.

MacLachlan, "Liposomal Formulations for Nucleic Acid Delivery," Antisense Drug Technologies, Second Edition; 2007; pp. 237-270.

MacLachlan, I. and Cullis, P., "Diffusible-PEG-Lipid Stabilized Plasmid Lipid Particles," Advances in Genetics, 53:157-188, 2005.

Marshall, E., "Gene therapy's growing pains," Science, 269:1050-1055, 1995.

Middaugh, C. and Ramsey, C., "Analysis of Cationic-Lipid-Plasmid-DNA Complexes," Analytical Chemistry, American Chemical Society, 2007, pp. 7240-7248.

Murahashi, N. et al., "Synthesis and application of neoglycolipid for liposome modification," Biol. Pharm. Bull., 20(6):704-707, 1997.

Orkin, S. et al., NIH Report, Report and Recommendations of the Panel to Assess the NIH Investment in Research on Gene Therapy, 1995, 41 pages.

Ortho Biotech Products, LP, "Doxil® Label—Product Insert, Revised May 2007," https://www.accessdata.fda.gov/drugsatfda_docs/label/2007/ 050718s029lbl.pdf, 33 pages.

Pak, C. et al., "Elastase-activated liposomal delivery to nucleated cells," Biochimica et Biophysica Acta, 1419:111-126, 1999.

Parr, M. et al., "Factors influencing the retention and chemical stability of polly(ethylene glycol)-lipid conjugates incorporated into large unilamellar vesicles," Biochimica et Biophysica Acta, 1195:21-30, 1994.

Paul, C. et al., "Effective expression of small interfering RNA in human cells," Nature Biotech., 20:505-508, 2002.

Puyal, C. et al., "A new cationic liposome encapsulating genetic material: A potential delivery system for polynucleotides," Eur. J. Biochem., 228:697-703, 1995.

Sawada, K. et al., "Microemulsions in supercritical CO2 utilizing the polyethyleneglycol dialkylglycerol and their use for the solubilization of hydrophiles," Dyes and Pigments, 2005, 65:64-74.

Schmidt, C., "Therapeutic Interference: Small RNA Molecules Act as Blockers of Disease Metabolism," Modern Drug Discovery, American Chemical Society, 2003, pp. 37-42.

Sedic. M. et al., "Safety Evaluation of Lipid Nanoparticle-Formulated Modified mRNA in the Sprague-Dawley Rat and Cynomolgus Monkey," Veterinary Pathology, 2017:1-14, 2017.

Semple, S. et al., "Immunogenicity and Rapid Blood Clearance of Liposomes Containing Polyethylene Glycol-Lipid Conjugates and Nucleic Acid," The Journal Of Pharmacology and Experimental Therapeutics, 312(3):1020-1026, 2006.

Semple, S. et al., "Rational Design of Cationic Lipids for siRNA Delivery," Nature Biotechnology, 28(2):172-176, 2010.

Semple, S. et al., "Supplementary Text and Figures, Supplementary Fig. 1, Supplementary Tables 1-4 and Supplementary Syntheses 1 and 2 to Rational Design of Cationic Lipids for siRNA Delivery," Nature Biotechnology, 28(2):172-176, 2010, published online at https://www.nature.com/articles/nbt.1602?draft=collection#supplementary-information, last visited on Nov. 14, 2019, 19 pages.

Shin, J. et al. "Acid-triggered release via dePEGylation of DOPE liposomes containing acid-labile vinyl ether PEG-lipids," Journal of Controlled Release, 91:187-200, 2003.

Song, L. et al., "Characterization of the inhibitory effect of PEG-lipid conjugates on the intracellular delivery of plasmid and antisense DNA mediated by cationic lipid liposomes," Biochimica et Biophysica Acta, 1558:1-13, 2002.

Sorensen, D. et al., "Gene silencing by systemic delivery of synthetic siRNAs in adult mice", J. Biol. Chem., 327:761-766, 2003.

Spagnou, S. et al., "Lipidic carriers of siRNA: differences in the formulation, cellular uptake, and delivery with plasmid DNA," Biochemistry, 43:13348-56, 2004.

Stamatatos, L. et al., "Interactions of cationic lipid vesicles with negatively charged phospholipid vesicles and biological membranes," Biochemistry, 27:3917-3925, 1988.

(56) **References Cited**

OTHER PUBLICATIONS

Szoka, F. et al., "Comparative properties and methods of preparation of lipid vesicles (liposomes)," Ann. Rev. Biophys. Bioeng., 9:467-508, 1980.
Szoka, F. et al., "Procedure for preparation of liposomes with large internal aqueous space and high capture by reverse-phase evaporation," Proc. Natl. Acad. Sci. USA, 75(9):4194-98, 1978.
Tam P. et al., "Stabilized plasmid-lipid particles for systemic gene therapy," Gene Therapy, 7:1867-74, 2000.
Templeton, N., "Cationic liposome-mediated gene delivery in vivo", Bioscience Reports, 22(2):283-295, 2002.
Timmerman, L. "Merck's Alan Sachs, on RNAi's Big Challenge: Delivery, Delivery, Delivery," Xconomy, Inc., https://xconomy.com/national/2010/01/21/mercks-alan-sachs-on-mais-big-challenge-delivery-delivery-delivery/ -2016-, last visited on Jan. 21, 2010, 9 pages.
U.S. Department of Health and Human Services, "Liposome Drug Products: Chemistry, Manufacturing, and Controls; Human Pharmacokinetics and Bioavailability; and Labeling Documentation, Guidance for Industry," Food and Drug Administration, Center for Drug Evaluation and Research (CDER), Apr. 2018, 18 pages.
U.S. Food and Drug Administration, "FDA Approves First-of-its Kind Targeted RNA-based Therapy to Treat a Rare Disease," Press Announcement, https://www.fda.gov/newsevents/newsroom/pressannouncements/ucm616518.htm, Aug. 10, 2018, 3 pages.
U.S. Food and Drug Administration, "Orange Book: Approved Drug Products with Therapeutic Equivalence Evaluations, Patent and Exclusivity for: N210922," available at https://www.accessdata.fda.gov/scripts/cder/ob/patent_info.cfm?Product_No=001&Appl_No=210922&Appl_type=N, last visited Dec. 19, 2018, 3 pages.
U.S. Patent and Trademark Office, Patent Trial and Appeal Board, Inter Partes Review of U.S. Pat. No. 9,364,435 B2, Case No. IPR2018-00739, Final Written Decision, Sep. 11, 2019, pp. 1-52.
Uyechi-O'Brien, L. and Szoka, F., "Mechanisms for Cationic Lipids in Gene Transfer," Pharmaceutical Gene Delivery Systems, Marcel Dekker, Inc., vol. 131, pp. 79-108, 2003.
Van Der Woude, I. et al., "Parameters influencing the introduction of plasmid DNA into cells by the use of synthetic amphiphiles as a carrier system," Biochimica et Biophysica Acta, 1240:34-40, 1995.
Wheeler, J. et al., "Stabilized plasmid-lipid particles: constructions and characterization," Gene Therapy, 6:271-281, 1999.
Wilson, R. et al., "Counterion-induced condensation of deoxyribonucleic acid," A Light-Scattering Study, Biochemistry, 18(11):2192-96, 1979.
Woodle, M. et al., "Versatility in lipid compositions showing prolonged circulation with sterically stabilized liposomes," Biochimica et Biophysica Acta, 1105:193-200, 1992.
Yew, N.S. and Scheule, R.K., "Toxicity of cationic lipid-DNA complexes," Advances in Genetics, 53:189-214, 2005.
Zhang, P. et al., "Use of small RNA as antiaging cosmeceuticals," J. Cosmetic Sci., 64(6):455-68, 2013 (Abstract only).
Zhu, N. et al., "Systemic gene expression after intravenous DNA delivery into adult mice," Science, 261:209-211, 1993.
Zimmermann, T. et al, "RNAi-mediated gene silencing in non-human primates," Nature, Nature Publishing Group, London, GB, 441 (7089):111-114, 2006.

* cited by examiner


Activity of SNALP on HT29 Cell Line
Viability (% Untreated Cells)
1.2
1
0.8
0.6
0.4
0.2
0
1
10
100
nM Total siRNA
Sample 1
Sample 2
Sample 3
Sample 4
Sample 5
Sample 6
Sample 7
Sample 8

*FIG. 1A*


Activity of SNALP on HT29 Cell Line
Viability (% Untreated Cells)
1.2
1
0.8
0.6
0.4
0.2
0
1
10
100
nM Total siRNA
Sample 9
Sample 10
Sample 11
Sample 12
Sample 13
Sample 14
Sample 15
Sample 16

*FIG. 1B*


Activity of SNALP Upon Intravenous Administration in Mice
group mean ± SD (n=4)
Liver ApoB:GAPD mRNA Ratio
0.0
0.5
1.0
1.5
2.0
2.5
PBS
Group 2
Group 3
Group 4
Group 5
Group 6
Group 7
Group 8
Group 9
Group 10
Group 11
Group 12
Group 13
Group 14

*FIG. 2*



3.0
2.5
2.0
1.5
1.0
0.5
0.0
Liver ApoB:GAPD mRNA Ratio
-47% vs PBS Control
-77% vs PBS Control
PBS
2:30 SNALP 5x1 mg/kg
1:57 SNALP 5x0.1 mg/kg


*FIG. 3*


Activity of SNALP Upon Intravenous Administration in Mice
group mean ± SD (n=4)
Liver ApoB:GAPD mRNA Ratio
2.0
1.5
1.0
0.5
0.0
PBS
Group 2
Group 3
Group 4
Group 5
Group 6
Group 7
Group 8

*FIG. 4*


Activity of SNALP Upon Intravenous Administration in Mice
group mean ± SD (n=4)
Liver ApoB:GAPD mRNA Ratio
0.0
0.5
1.0
1.5
2.0
PBS
Group 2
Group 3
Group 4
Group 5
Group 6
Group 7
Group 8
Group 9
Group 10
Group 11
Group 12
Group 13
Group 14
Group 15

*FIG. 5*


Tolerability of IV 1:57 SNALP in Female BALB/c Mice, n=4, SD error
Alanine Aminotransferase
Aspartate Aminotransferase
Sorbital Dehydrogenase
Incr'd SDH, ALT levels indicate hepatocyte damage.
IU/L
168
205
PBS
Syringe Citrate 7mg/kg
Syringe PBS 7mg/kg
Gear PBS 7mg/kg
Syringe Citrate 9mg/kg
Syringe PBS 9mg/kg
Gear PBS 9mg/kg

*FIG. 6A*


Tolerability of IV 1:57 SNALP in Female BALB/c Mice, n=4, SD error
Alanine Aminotransferase
Aspartate Aminotransferase
Sorbital Dehydrogenase
2-fold increase ("3xULN") is considered clinically significant
x-Fold Upper Limit of Normal
8.7
7.9
PBS
Syringe Citrate
Syringe PBS
Gear PBS
Syringe Citrate
Syringe PBS
Gear PBS
Lipid dose
siRNA dose
77
96
7 mg/kg
79
99
123
9 mg/kg
102

*FIG. 6B*

FIG. 7A




FIG. 7B




FIG. 7C




Tolerability of 1|57 SNALP IV in BALB/c Mice, n=4 (Grp1-3 n=3), SD error
Body Weight Loss at Hour 24 (vs Pre-Dose)
6%
4%
2%
0%
-2%
-4%
-6%
PBS
9:1 7mg/kg
9:1 11mg/kg
PBS
9:1 9mg/kg
9:1 11mg /kg
6:1 11mg /kg
6:1 13mg/ kg
6:1 15mg/ kg
6:1 17mg/ kg
9:1 11mg/ kg

FIG. 8


Tolerability of IV 1|57 SNALP Prepared at 9:1 Lipid:Drug Ratio
Platelet Count
10e9 cells/L
1,400
1,200
1,000
800
600
400
200
0
881
909
921
854
854
827
813
794
828
902 ± 21
2%RSD
845 ± 16
-6% ± 2%
812 ± 17
-10% ± 2%
1
2
3
4
5
6
7
8
9
PBS
Gear PBS InLine at
7 (71) mg/kg
Gear PBS InLine at
11 (112) mg/kg

*FIG. 9*


Tolerability of IV 1:57 Gear PBS In-Line SNALP in Female BALB/c Mice, n=4, SD error
Alanine Aminotransferase
Aspartate Aminotransferase
Sorbital Dehydrogenase
Samples taken at 24 h time point except for last grp (48 h).
IU/L
1,200
1,000
800
600
400
200
0
30
22
52
37
148
60
42
27
107
49
456
129
893
220
688
61
PBS
9:1 SNALP 9mg/kg
9:1 SNALP 11mg/kg
6:1 SNALP 11mg/kg
6:1 SNALP 13mg/kg
6:1 SNALP 15mg/kg
6:1 SNALP 17mg/kg
9:1 SNALP 11mg/kg 48h

*FIG. 10A*


Tolerability of IV 1:57 Gear PBS In-Line SNALP in Female BALB/c Mice, n=4, SD error
Alanine Aminotransferase
Aspartate Aminotransferase
Sorbital Dehydrogenase
2-fold increase ("3xULN") is considered clinically significant
x-Fold Upper Limit of Normal
0
10
20
30
40
50
10 11 12 13 14 15 16 17 18 19 20 21 22 23 24 25 26 27 28 29 30 31 32 33 34 35 36 37 38 39 40 41
siRNA dose
Lipid dose
PBS
9mg/kg
92
11mg/kg
112
9:1 SNALP (10)
11mg/kg
78
13mg/kg
93
15mg/kg
107
6:1 SNALP (7)
17mg/kg
121
11mg/kg
112
9:1 (10)

*FIG. 10B*

*FIG. 11A*




*FIG. 11B*




Efficacy of SNALP Reformulations
Fresh Terminal Plasma, n=4 female Balb/c mice, SD Error Bars
Plasma Total Cholesterol (mg/dL)
60
50
40
30
20
10
0
-3%
-15%
-46%
-1%
-18%
-41%
-44%
PBS
0.05 mg/kg
0.1 mg/kg
0.2 mg/kg
0.05 mg/kg
0.1 mg/kg
0.2 mg/kg
0.4 mg/kg
1:57 SNALP (10:1)
New 1:57 SNALP (7:1)

*FIG. 12*

Case: 26-1581 Document: 56-1 Page: 282 Filed: 08/17/2026






*FIG. 13*


Control SNALP
Active SNALP
100%
80%
60%
40%
20%
0%
Survival
15 20 25 30 35 40 45 50 55 60 65 70 75 80 85 90
Days after seeding

*FIG. 14*




*FIG. 15*


1 2 3 4 5 6 7 8 9 10
500
400
300
200
100
PLK1424 5'RACE product 476bp

FIG. 16




*FIG. 17*


6x2mg/kg Mean tumor volume
Luc-DMA
PLK-DMA
PLK-DSA
Tumor volume
1000
800
600
400
200
0
8
10
12
14
16
18
20
22
24
Days

FIG. 18


PLK mRNA silencing in scid /beige mice treated with 2mg/kg 1:57 SNALP against subcutaneous Hep3B tumors
Mean hPLK1/hGAPDH ratio
0.70
0.60
0.50
0.40
0.30
0.20
0.10
0.00
100%
-30%
-15%
-65%
-37%
-52%
24h Luc cDMA 2 mg/kg
24h PLK cDMA 2 mg/kg
72h PLK cDMA 2 mg/kg
24h PLK cDSA 2 mg/kg
72h PLK cDSA 2 mg/kg
24h PLK cDSA 1 mg/kg

*FIG. 19*


6x2mg/kg Mean tumor volume
Tumor volume
Days
2200
2000
1800
1600
1400
1200
1000
800
600
400
200
0
8 10 12 14 16 18 20 22 24 26 28 30 32 34 36 38 40 42 44 46 48 50
Luc-DMA
PLK-DMA
PLK-DSA
Initial 6 x 2 mg/kg SNALP
Crossover dosing of Luc cDMA group with 6 x 2 mg/kg PLK cDSA SNALP

*FIG. 20*


Mean hPLK (1:4) : hGAPDH (1:40) minus "background"
Mean hPLK (1:4) : hGAPDH (1:40)
1.20
1.00
0.80
0.60
0.40
0.20
0.00
0.99
0.23
0.23
0.61
0.42
24h Luc 1:57 cDMA
24h PLK 1:57 cDMA
24h PLK 1:57 cDSA
96h PLK 1:57 cDMA
96h PLK 1:57 cDSA

*FIG. 21*


80
70
60
50
40
30
20
10
0
% injected dose
1:57 PEG-cDSA SNALP
1:57 PEG-cDMA SNALP
0
1
2
3
4
5
6
7
8
9
Time (h)

*FIG. 22*

# LIPID FORMULATIONS FOR NUCLEIC ACID DELIVERY

## CROSS-REFERENCE TO RELATED APPLICATIONS

The present application is a continuation of U.S. application Ser. No. 17/094,724, filed Nov. 10, 2020; which is a continuation of U.S. application Ser. No. 16/422,441, filed May 24, 2019; which is a continuation of U.S. application Ser. No. 15/840,933, filed Dec. 13, 2017; which is a continuation of U.S. application Ser. No. 15/670,742, filed Aug. 7, 2017; which is a continuation of U.S. application Ser. No. 15/164,803, filed May 25, 2016; which is a continuation of U.S. application Ser. No. 14/462,441, filed Aug. 18, 2014, which issued on Jun. 14, 2016 as U.S. Pat. No. 9,364,435; which is a continuation of U.S. application Ser. No. 13/928,309, filed Jun. 26, 2013, which issued on Sep. 2, 2014 as U.S. Pat. No. 8,822,668; which is a continuation of U.S. application Ser. No. 13/253,917, filed Oct. 5, 2011, which issued on Jul. 23, 2013 as U.S. Pat. No. 8,492,359; which is a continuation of U.S. application Ser. No. 12/424,367, filed Apr. 15, 2009, which issued on Nov. 15, 2011 as U.S. Pat. No. 8,058,069; which claims priority to U.S. Provisional Application No. 61/045,228, filed Apr. 15, 2008, the disclosures of which are herein incorporated by reference in their entirety for all purposes.

## STATEMENT REGARDING_FEDERALLY SPONSORED RESEARCH OR DEVELOPMENT

Not applicable.

## NAMES OF PARTIES TO A JOINT RESEARCH AGREEMENT

Not applicable.

## REFERENCE TO A "SEQUENCE LISTING," A TABLE, OR A COMPUTER PROGRAM LISTING_APPENDIX SUBMITTED AS AN ASCII TEXT FILE

The Sequence Listing written in file 104290-007791US-1243808_SequenceListing.txt, created on Apr. 7, 2021, 4,543 bytes, machine format IBM-PC, MS-Windows operating system, is hereby incorporated by reference in its entirety for all purposes.

## BACKGROUND OF THE INVENTION

RNA interference (RNAi) is an evolutionarily conserved process in which recognition of double-stranded RNA (dsRNA) ultimately leads to posttranscriptional suppression of gene expression. This suppression is mediated by short dsRNA, also called small interfering RNA (siRNA), which induces specific degradation of mRNA through complementary base pairing. In several model systems, this natural response has been developed into a powerful tool for the investigation of gene function (see, e.g., Elbashir et al., *Genes Dev.,* 15:188-200 (2001); Hammond et al., *Nat. Rev. Genet.,* 2:110-119 (2001)). More recently, it was discovered that introducing synthetic 21-nucleotide dsRNA duplexes into mammalian cells could efficiently silence gene expression.

Although the precise mechanism is still unclear, RNAi provides a potential new approach to downregulate or silence the transcription and translation of a gene of interest. For example, it is desirable to modulate (e.g., reduce) the expression of certain genes for the treatment of neoplastic disorders such as cancer. It is also desirable to silence the expression of genes associated with liver diseases and disorders such as hepatitis. It is further desirable to reduce the expression of certain genes for the treatment of atherosclerosis and its manifestations, e.g., hypercholesterolemia, myocardial infarction, and thrombosis.

A safe and effective nucleic acid delivery system is required for RNAi to be therapeutically useful. Viral vectors are relatively efficient gene delivery systems, but suffer from a variety of limitations, such as the potential for reversion to the wild-type as well as immune response concerns. As a result, nonviral gene delivery systems are receiving increasing attention (Worgall et al., *Human Gene Therapy,* 8:37 (1997); Peeters et al., *Human Gene Therapy,* 7:1693 (1996); Yei et al., *Gene Therapy,* 1:192 (1994); Hope et al., *Molecular Membrane Biology,* 15:1 (1998)). Furthermore, viral systems are rapidly cleared from the circulation, limiting transfection to "first-pass" organs such as the lungs, liver, and spleen. In addition, these systems induce immune responses that compromise delivery with subsequent injections.

Plasmid DNA-cationic liposome complexes are currently the most commonly employed nonviral gene delivery vehicles (Feigner, *Scientific American,* 276:102 (1997); Chonn et al., *Current Opinion in Biotechnology,* 6:698 (1995)). For instance, cationic liposome complexes made of an amphipathic compound, a neutral lipid, and a detergent for transfecting insect cells are disclosed in U.S. Pat. No. 6,458,382. Cationic liposome complexes are also disclosed in U.S. Patent Publication No. 20030073640.

Cationic liposome complexes are large, poorly defined systems that are not suited for systemic applications and can elicit considerable toxic side effects (Harrison et al., *Biotechniques,* 19:816 (1995); Li et al., The Gene, 4:891 (1997); Tam et al, *Gene Ther.,* 7:1867 (2000)). As large, positively charged aggregates, lipoplexes are rapidly cleared when administered in vivo, with highest expression levels observed in first-pass organs, particularly the lungs (Huang et al., *Nature Biotechnology,* 15:620 (1997); Templeton et al., *Nature Biotechnology,* 15:647 (1997); Hofland et al., *Pharmaceutical Research,* 14:742 (1997)).

Other liposomal delivery systems include, for example, the use of reverse micelles, anionic liposomes, and polymer liposomes. Reverse micelles are disclosed in U.S. Pat. No. 6,429,200. Anionic liposomes are disclosed in U.S. Patent Publication No. 20030026831. Polymer liposomes that incorporate dextrin or glycerol-phosphocholine polymers are disclosed in U.S. Patent Publication Nos. 20020081736 and 20030082103, respectively.

A gene delivery system containing an encapsulated nucleic acid for systemic delivery should be small (i.e., less than about 100 nm diameter) and should remain intact in the circulation for an extended period of time in order to achieve delivery to affected tissues. This requires a highly stable, serum-resistant nucleic acid-containing particle that does not interact with cells and other components of the vascular compartment. The particle should also readily interact with target cells at a disease site in order to facilitate intracellular delivery of a desired nucleic acid.

Recent work has shown that nucleic acids can be encapsulated in small (e.g., about 70 nm diameter) "stabilized plasmid-lipid particles" (SPLP) that consist of a single plasmid encapsulated within a bilayer lipid vesicle (Wheeler et al., *Gene Therapy,* 6:271 (1999)). These SPLPs typically

contain the "fusogenic" lipid dioleoylphosphatidylethanolamine (DOPE), low levels of cationic lipid, and are stabilized in aqueous media by the presence of a poly (ethylene glycol) (PEG) coating. SPLPs have systemic application as they exhibit extended circulation lifetimes following intravenous (i.v.) injection, accumulate preferentially at distal tumor sites due to the enhanced vascular permeability in such regions, and can mediate transgene expression at these tumor sites. The levels of transgene expression observed at the tumor site following i.v. injection of SPLPs containing the luciferase marker gene are superior to the levels that can be achieved employing plasmid DNA-cationic liposome complexes (lipoplexes) or naked DNA.

Thus, there remains a strong need in the art for novel and more efficient methods and compositions for introducing nucleic acids such as siRNA into cells. In addition, there is a need in the art for methods of downregulating the expression of genes of interest to treat or prevent diseases and disorders such as cancer and atherosclerosis. The present invention addresses these and other needs.

## BRIEF SUMMARY OF THE INVENTION

The present invention provides novel, serum-stable lipid particles comprising one or more active agents or therapeutic agents, methods of making the lipid particles, and methods of delivering and/or administering the lipid particles (e.g., for the treatment of a disease or disorder).

In preferred embodiments, the active agent or therapeutic agent is fully encapsulated within the lipid portion of the lipid particle such that the active agent or therapeutic agent in the lipid particle is resistant in aqueous solution to enzymatic degradation, e.g., by a nuclease or protease. In other preferred embodiments, the lipid particles are substantially non-toxic to mammals such as humans.

In one aspect, the present invention provides lipid particles comprising: (a) one or more active agents or therapeutic agents; (b) one or more cationic lipids comprising from about 50 mol % to about 85 mol % of the total lipid present in the particle; (c) one or more non-cationic lipids comprising from about 13 mol % to about 49.5 mol % of the total lipid present in the particle; and (d) one or more conjugated lipids that inhibit aggregation of particles comprising from about 0.5 mol % to about 2 mol % of the total lipid present in the particle.

More particularly, the present invention provides serum-stable nucleic acid-lipid particles (SNALP) comprising a nucleic acid (e.g., one or more interfering RNA molecules such as siRNA, aiRNA, and/or miRNA), methods of making the SNALP, and methods of delivering and/or administering the SNALP (e.g., for the treatment of a disease or disorder).

In certain embodiments, the nucleic acid-lipid particle (e.g., SNALP) comprises: (a) a nucleic acid (e.g., an interfering RNA); (b) a cationic lipid comprising from about 50 mol % to about 85 mol % of the total lipid present in the particle; (c) a non-cationic lipid comprising from about 13 mol % to about 49.5 mol % of the total lipid present in the particle; and (d) a conjugated lipid that inhibits aggregation of particles comprising from about 0.5 mol % to about 2 mol % of the total lipid present in the particle.

In one preferred embodiment, the nucleic acid-lipid particle (e.g., SNALP) comprises: (a) an siRNA; (b) a cationic lipid comprising from about 56.5 mol % to about 66.5 mol % of the total lipid present in the particle; (c) cholesterol or a derivative thereof comprising from about 31.5 mol % to about 42.5 mol % of the total lipid present in the particle; and (d) a PEG-lipid conjugate comprising from about 1 mol % to about 2 mol % of the total lipid present in the particle. This preferred embodiment of nucleic acid-lipid particle is generally referred to herein as the "1:62" formulation.



In another preferred embodiment, the nucleic acid-lipid particle (e.g., SNALP) comprises: (a) an siRNA; (b) a cationic lipid comprising from about 52 mol % to about 62 mol % of the total lipid present in the particle; (c) a mixture of a phospholipid and cholesterol or a derivative thereof comprising from about 36 mol % to about 47 mol % of the total lipid present in the particle; and (d) a PEG-lipid conjugate comprising from about 1 mol % to about 2 mol % of the total lipid present in the particle. This preferred embodiment of nucleic acid-lipid particle is generally referred to herein as the "1:57" formulation.

The present invention also provides pharmaceutical compositions comprising a lipid particle described herein (e.g., SNALP) and a pharmaceutically acceptable carrier.

In another aspect, the present invention provides methods for introducing an active agent or therapeutic agent (e.g., nucleic acid) into a cell, the method comprising contacting the cell with a lipid particle described herein such as a nucleic acid-lipid particle (e.g., SNALP).

In yet another aspect, the present invention provides methods for the in vivo delivery of an active agent or therapeutic agent (e.g., nucleic acid), the method comprising administering to a mammalian subject a lipid particle described herein such as a nucleic acid-lipid particle (e.g., SNALP).

In a further aspect, the present invention provides methods for treating a disease or disorder in a mammalian subject in need thereof, the method comprising administering to the mammalian subject a therapeutically effective amount of a lipid particle described herein such as a nucleic acid-lipid particle (e.g., SNALP).

Other objects, features, and advantages of the present invention will be apparent to one of skill in the art from the following detailed description and figures.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1**A (Samples 1-8) and FIG. **1**B (Samples 9-16) illustrate data demonstrating the activity of 1:57 SNALP containing Eg5 siRNA in a human colon cancer cell line.

FIG. **2** illustrates data demonstrating the activity of 1:57 SNALP containing ApoB siRNA following intravenous administration in mice.

FIG. **3** illustrates additional data demonstrating the activity of 1:57 SNALP containing ApoB siRNA following intravenous administration in mice. Each bar represents the group mean of five animals. Error bars indicate the standard deviation.

FIG. **4** illustrates data demonstrating the activity of 1:57 and 1:62 SNALP containing ApoB siRNA following intravenous administration in mice.

FIG. **5** illustrates data demonstrating the activity of 1:62 SNALP containing ApoB siRNA following intravenous administration in mice.

FIG. **6**A (expressed as IU/L) and FIG. **6**B (expressed as x-Fold Upper Limit of Normal) illustrate data demonstrating that the tolerability of 1:57 SNALP containing ApoB siRNA prepared by citrate buffer versus PBS direct dilution did not differ significantly in terms of blood clinical chemistry parameters.

FIG. **7**A (expressed as liver ApoB:GAPD mRNA ratio), FIG. **7**B (expressed as relative plasma ApoB-100 concentration), and FIG. **7**C (expressed as plasma total cholesterol illustrate data demonstrating that the efficacy of 1:57

SNALP containing ApoB siRNA prepared by gear pump was similar to the same SNALP prepared by syringe press.

FIG. **8** illustrates data demonstrating that there was very little effect on body weight 24 hours after administration of 1:57 SNALP containing ApoB siRNA.

FIG. **9** illustrates data demonstrating that there were no obvious changes in platelet count after administration of 1:57 SNALP containing ApoB siRNA.

FIG. **10**A (expressed as IU/L) and FIG. **10**B (expressed as x-Fold Upper Limit of Normal) illustrate data demonstrating that clinically significant liver enzyme elevations (3×ULN) occurred at particular drug dosages of 1:57 SNALP containing ApoB siRNA.

FIG. **11**A (expressed as liver ApoB:GAPD mRNA ratio) and FIG. **11**B (expressed as relative plasma ApoB-100 concentration) illustrate data demonstrating that the potency of the lower lipid:drug (L:D) 1:57 SNALP containing ApoB siRNA was as good as that of the higher L:D SNALP at the tested drug dosages.

FIG. **12** illustrates data demonstrating that ApoB protein and total cholesterol levels were reduced to a similar extent by 1:57 SNALP containing ApoB siRNA at a 6:1 input L:D ratio (final ratio of 7:1) and 1:57 SNALP at a 9:1 input L:D ratio (final ratio of 10:1).

FIG. **13** illustrates data demonstrating that a treatment regimen of 1:57 SNALP with siRNA targeting PLK-1 is well tolerated with no apparent signs of treatment related toxicity in mice bearing Hep3B liver tumors.

FIG. **14** illustrates data demonstrating that treatment with 1:57 SNALP containing PLK-1 siRNA caused a significant increase in the survival of Hep3B tumor-bearing mice.

FIG. **15** illustrates data demonstrating that treatment with 1:57 SNALP containing PLK-1 siRNA reduced PLK-1 mRNA levels by 50% in intrahepatic Hep3B tumors growing in mice 24 hours after SNALP administration.

FIG. **16** illustrates data demonstrating that a specific cleavage product of PLK-1 mRNA was detectable by 5' RACE-PCR in mice treated with 1:57 SNALP containing PLK-1 siRNA. 10 μl PCR product/well were loaded onto a 1.5% agarose gel. Lane Nos.: (1) molecular weight (MW) marker; (2) PBS mouse 1; (3) PBS mouse 2; (4) PBS mouse 3; (5) Luc SNALP mouse 1; (6) Luc SNALP mouse 2; (7) PLK SNALP mouse 1; (8) PLK SNALP mouse 2; (9) PLK SNALP mouse 3; and (10) no template control.

FIG. **17** illustrates data demonstrating that control (Luc) 1:57 SNALP-treated mice displayed normal mitoses in Hep3B tumors (top panels), whereas mice treated with 1:57 SNALP containing PLK-1 siRNA exhibited numerous aberrant mitoses and tumor cell apoptosis in Hep3B tumors (bottom panels).

FIG. **18** illustrates data demonstrating that multiple doses of 1:57 PLK-1 SNALP containing PEG-cDSA induced the regression of established Hep3B subcutaneous (S.C.) tumors.

FIG. **19** illustrates data demonstrating PLK-1 mRNA silencing using 1:57 PLK SNALP in S.C. Hep3B tumors following a single intravenous SNALP administration.

FIG. **20** illustrates data demonstrating that PLK-1 PEG-cDSA SNALP inhibited the growth of large S.C. Hep3B tumors.

FIG. **21** illustrates data demonstrating tumor-derived PLK-1 mRNA silencing in Hep3B intrahepatic tumors.

FIG. **22** illustrates data demonstrating the blood clearance profile of 1:57 PLK-1 SNALP containing either PEG-cDMA or PEG-cDSA.



## DETAILED DESCRIPTION OF THE INVENTION

### I. Introduction

The present invention is based, in part, upon the surprising discovery that lipid particles comprising from about 50 mol % to about 85 mol % of a cationic lipid, from about 13 mol % to about 49.5 mol % of a non-cationic lipid, and from about 0.5 mol % to about 2 mol % of a lipid conjugate provide advantages when used for the in vitro or in vivo delivery of an active agent, such as a therapeutic nucleic acid (e.g., an interfering RNA). In particular, as illustrated by the Examples herein, the present invention provides stable nucleic acid-lipid particles (SNALP) that advantageously impart increased activity of the encapsulated nucleic acid (e.g., an interfering RNA such as siRNA) and improved tolerability of the formulations in vivo, resulting in a significant increase in the therapeutic index as compared to nucleic acid-lipid particle compositions previously described. Additionally, the SNALP of the invention are stable in circulation, e.g., resistant to degradation by nucleases in serum, and are substantially non-toxic to mammals such as humans. As a non-limiting example, FIG. **3** of Example 4 shows that one SNALP embodiment of the invention ("1:57 SNALP") was more than 10 times as efficacious as compared to a nucleic acid-lipid particle previously described ("2:30 SNALP") in mediating target gene silencing at a 10-fold lower dose. Similarly, FIG. **2** of Example 3 shows that the "1:57 SNALP" formulation was substantially more effective at silencing the expression of a target gene as compared to nucleic acid-lipid particles previously described ("2:40 SNALP").

In certain embodiments, the present invention provides improved compositions for the delivery of interfering RNA such as siRNA molecules. In particular, the Examples herein illustrate that the improved lipid particle formulations of the invention are highly effective in downregulating the mRNA and/or protein levels of target genes. Furthermore, the Examples herein illustrate that the presence of certain molar ratios of lipid components results in improved or enhanced activity of these lipid particle formulations of the present invention. For instance, the "1:57 SNALP" and "1:62 SNALP" formulations described herein are exemplary formulations of the present invention that are particularly advantageous because they provide improved efficacy and tolerability in vivo, are serum-stable, are substantially non-toxic, are capable of accessing extravascular sites, and are capable of reaching target cell populations.

The lipid particles and compositions of the present invention may be used for a variety of purposes, including the delivery of associated or encapsulated therapeutic agents to cells, both in vitro and in vivo. Accordingly, the present invention provides methods for treating diseases or disorders in a subject in need thereof, by contacting the subject with a lipid particle described herein comprising one or more suitable therapeutic agents.

Various exemplary embodiments of the lipid particles of the invention, as well as compositions and formulations comprising the same, and their use to deliver therapeutic agents and modulate target gene and protein expression, are described in further detail below.

### II. DEFINITIONS

As used herein, the following terms have the meanings ascribed to them unless specified otherwise.

The term "interfering RNA" or "RNAi" or "interfering RNA sequence" refers to single-stranded RNA (e.g., mature miRNA) or double-stranded RNA (i.e., duplex RNA such as siRNA, aiRNA, or pre-miRNA) that is capable of reducing or inhibiting the expression of a target gene or sequence (e.g., by mediating the degradation or inhibiting the translation of mRNAs which are complementary to the interfering RNA sequence) when the interfering RNA is in the same cell as the target gene or sequence. Interfering RNA thus refers to the single-stranded RNA that is complementary to a target mRNA sequence or to the double-stranded RNA formed by two complementary strands or by a single, self-complementary strand. Interfering RNA may have substantial or complete identity to the target gene or sequence, or may comprise a region of mismatch (i.e., a mismatch motif). The sequence of the interfering RNA can correspond to the full-length target gene, or a subsequence thereof.

Interfering RNA includes "small-interfering RNA" or "siRNA," e.g., interfering RNA of about 15-60, 15-50, or 15-40 (duplex) nucleotides in length, more typically about 15-30, 15-25, or 19-25 (duplex) nucleotides in length, and is preferably about 20-24, 21-22, or 21-23 (duplex) nucleotides in length (e.g., each complementary sequence of the double-stranded siRNA is 15-60, 15-50, 15-40, 15-30, 15-25, or 19-25 nucleotides in length, preferably about 20-24, 21-22, or 21-23 nucleotides in length, and the double-stranded siRNA is about 15-60, 15-50, 15-40, 15-30, 15-25, or 19-25 base pairs in length, preferably about 18-22, 19-20, or 19-21 base pairs in length). siRNA duplexes may comprise 3' overhangs of about 1 to about 4 nucleotides or about 2 to about 3 nucleotides and 5' phosphate termini. Examples of siRNA include, without limitation, a double-stranded polynucleotide molecule assembled from two separate stranded molecules, wherein one strand is the sense strand and the other is the complementary antisense strand; a double-stranded polynucleotide molecule assembled from a single stranded molecule, where the sense and antisense regions are linked by a nucleic acid-based or non-nucleic acid-based linker; a double-stranded polynucleotide molecule with a hairpin secondary structure having self-complementary sense and antisense regions; and a circular single-stranded polynucleotide molecule with two or more loop structures and a stem having self-complementary sense and antisense regions, where the circular polynucleotide can be processed in vivo or in vitro to generate an active double-stranded siRNA molecule.

Preferably, siRNA are chemically synthesized. siRNA can also be generated by cleavage of longer dsRNA (e.g., dsRNA greater than about 25 nucleotides in length) with the *E. coli* RNase III or Dicer. These enzymes process the dsRNA into biologically active siRNA (see, e.g., Yang et al., *Proc. Natl. Acad. Sci. USA,* 99:9942-9947 (2002); Calegari et al., *Proc. Natl. Acad. Sci. USA,* 99:14236 (2002); Byrom et al., *Ambion TechNotes,* 10(1):4-6 (2003); Kawasaki et al., *Nucleic Acids Res.,* 31:981-987 (2003); Knight et al., *Science,* 293:2269-2271 (2001); and Robertson et al., *J. Biol. Chem.,* 243:82 (1968)). Preferably, dsRNA are at least 50 nucleotides to about 100, 200, 300, 400, or 500 nucleotides in length. A dsRNA may be as long as 1000, 1500, 2000, 5000 nucleotides in length, or longer. The dsRNA can encode for an entire gene transcript or a partial gene transcript. In certain instances, siRNA may be encoded by a plasmid (e.g., transcribed as sequences that automatically fold into duplexes with hairpin loops).

As used herein, the term "mismatch motif" or "mismatch region" refers to a portion of an interfering RNA (e.g., siRNA, aiRNA, miRNA) sequence that does not have 100% complementarity to its target sequence. An interfering RNA may have at least one, two, three, four, five, six, or more mismatch regions. The mismatch regions may be contiguous or may be separated by 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, or more nucleotides. The mismatch motifs or regions may comprise a single nucleotide or may comprise two, three, four, five, or more nucleotides.

An "effective amount" or "therapeutically effective amount" of an active agent or therapeutic agent such as an interfering RNA is an amount sufficient to produce the desired effect, e.g., an inhibition of expression of a target sequence in comparison to the normal expression level detected in the absence of an interfering RNA. Inhibition of expression of a target gene or target sequence is achieved when the value obtained with an interfering RNA relative to the control is about 90%, 85%, 80%, 75%, 70%, 65%, 60%, 55%, 50%, 45%, 40%, 35%, 30%, 25%, 20%, 15%, 10%, 5%, or 0%. Suitable assays for measuring expression of a target gene or target sequence include, e.g., examination of protein or RNA levels using techniques known to those of skill in the art such as dot blots, northern blots, in situ hybridization, ELISA, immunoprecipitation, enzyme function, as well as phenotypic assays known to those of skill in the art.

By "decrease," "decreasing," "reduce," or "reducing" of an immune response by an interfering RNA is intended to mean a detectable decrease of an immune response to a given interfering RNA (e.g., a modified interfering RNA). The amount of decrease of an immune response by a modified interfering RNA may be determined relative to the level of an immune response in the presence of an unmodified interfering RNA. A detectable decrease can be about 5%, 10%, 15%, 20%, 25%, 30%, 35%, 40%, 45%, 50%, 55%, 60%, 65%, 70%, 75%, 80%, 85%, 90%, 95%, 100%, or more lower than the immune response detected in the presence of the unmodified interfering RNA. A decrease in the immune response to interfering RNA is typically measured by a decrease in cytokine production (e.g., IFNγ, IFNα, TNFα, IL-6, or IL-12) by a responder cell in vitro or a decrease in cytokine production in the sera of a mammalian subject after administration of the interfering RNA.

As used herein, the term "responder cell" refers to a cell, preferably a mammalian cell, that produces a detectable immune response when contacted with an immunostimulatory interfering RNA such as an unmodified siRNA. Exemplary responder cells include, e.g., dendritic cells, macrophages, peripheral blood mononuclear cells (PBMCs), splenocytes, and the like. Detectable immune responses include, e.g., production of cytokines or growth factors such as TNF-α, IFN-α, IFN-β, IFN-γ, IL-1, IL-2, IL-3, IL-4, IL-5, IL-6, IL-10, IL-12, IL-13, TGF, and combinations thereof.

"Substantial identity" refers to a sequence that hybridizes to a reference sequence under stringent conditions, or to a sequence that has a specified percent identity over a specified region of a reference sequence.

The phrase "stringent hybridization conditions" refers to conditions under which a nucleic acid will hybridize to its target sequence, typically in a complex mixture of nucleic acids, but to no other sequences. Stringent conditions are sequence-dependent and will be different in different circumstances. Longer sequences hybridize specifically at higher temperatures. An extensive guide to the hybridization of nucleic acids is found in Tijessen, *Techniques in Biochemistry and Molecular Biology-Hybridization with Nucleic Probes*, "Overview of principles of hybridization and the strategy of nucleic acid assays" (1993). Generally,

stringent conditions are selected to be about 5-10° C. lower than the thermal melting point ($T_m$) for the specific sequence at a defined ionic strength pH. The $T_m$ is the temperature (under defined ionic strength, pH, and nucleic concentration) at which 50% of the probes complementary to the target hybridize to the target sequence at equilibrium (as the target sequences are present in excess, at $T_m$, 50% of the probes are occupied at equilibrium). Stringent conditions may also be achieved with the addition of destabilizing agents such as formamide. For selective or specific hybridization, a positive signal is at least two times background, preferably 10 times background hybridization.

Exemplary stringent hybridization conditions can be as follows: 50% formamide, 5× SSC, and 1% SDS, incubating at 42° C., or, 5× SSC, 1% SDS, incubating at 65° C., with wash in 0.2× SSC, and 0.1% SDS at 65° C. For PCR, a temperature of about 36° C. is typical for low stringency amplification, although annealing temperatures may vary between about 32° C. and 48° C. depending on primer length. For high stringency PCR amplification, a temperature of about 62° C. is typical, although high stringency annealing temperatures can range from about 50° C. to about 65° C., depending on the primer length and specificity. Typical cycle conditions for both high and low stringency amplifications include a denaturation phase of 90° C.-95° C. for 30 sec.-2 min., an annealing phase lasting 30 sec.-2 min., and an extension phase of about 72° C. for 1-2 min. Protocols and guidelines for low and high stringency amplification reactions are provided, e.g., in Innis et al., *PCR Protocols, A Guide to Methods and Applications*, Academic Press, Inc. N.Y. (1990).

Nucleic acids that do not hybridize to each other under stringent conditions are still substantially identical if the polypeptides which they encode are substantially identical. This occurs, for example, when a copy of a nucleic acid is created using the maximum codon degeneracy permitted by the genetic code. In such cases, the nucleic acids typically hybridize under moderately stringent hybridization conditions. Exemplary "moderately stringent hybridization conditions" include a hybridization in a buffer of 40% formamide, 1 M NaCl, 1% SDS at 37° C., and a wash in 1× SSC at 45° C. A positive hybridization is at least twice background. Those of ordinary skill will readily recognize that alternative hybridization and wash conditions can be utilized to provide conditions of similar stringency. Additional guidelines for determining hybridization parameters are provided in numerous references, e.g., Current Protocols in Molecular Biology, Ausubel et al., eds.

The terms "substantially identical" or "substantial identity," in the context of two or more nucleic acids, refer to two or more sequences or subsequences that are the same or have a specified percentage of nucleotides that are the same (i.e., at least about 60%, preferably at least about 65%, 70%, 75%, 80%, 85%, 90%, or 95% identity over a specified region), when compared and aligned for maximum correspondence over a comparison window, or designated region as measured using one of the following sequence comparison algorithms or by manual alignment and visual inspection. This definition, when the context indicates, also refers analogously to the complement of a sequence. Preferably, the substantial identity exists over a region that is at least about 5, 10, 15, 20, 25, 30, 35, 40, 45, 50, 55, or 60 nucleotides in length.

For sequence comparison, typically one sequence acts as a reference sequence, to which test sequences are compared. When using a sequence comparison algorithm, test and reference sequences are entered into a computer, subsequence coordinates are designated, if necessary, and sequence algorithm program parameters are designated. Default program parameters can be used, or alternative parameters can be designated. The sequence comparison algorithm then calculates the percent sequence identities for the test sequences relative to the reference sequence, based on the program parameters.

A "comparison window," as used herein, includes reference to a segment of any one of a number of contiguous positions selected from the group consisting of from about 5 to about 60, usually about 10 to about 45, more usually about 15 to about 30, in which a sequence may be compared to a reference sequence of the same number of contiguous positions after the two sequences are optimally aligned. Methods of alignment of sequences for comparison are well known in the art. Optimal alignment of sequences for comparison can be conducted, e.g., by the local homology algorithm of Smith and Waterman, *Adv. Appl. Math.,* 2:482 (1981), by the homology alignment algorithm of Needleman and Wunsch, *J. Mol. Biol.,* 48:443 (1970), by the search for similarity method of Pearson and Lipman, *Proc. Natl. Acad. Sci. USA,* 85:2444 (1988), by computerized implementations of these algorithms (GAP, BESTFIT, FASTA, and TFASTA in the Wisconsin Genetics Software Package, Genetics Computer Group, 575 Science Dr., Madison, Wis.), or by manual alignment and visual inspection (see, e.g., *Current Protocols in Molecular Biology*, Ausubel et al., eds. (1995 supplement)).

A preferred example of algorithms that are suitable for determining percent sequence identity and sequence similarity are the BLAST and BLAST 2.0 algorithms, which are described in Altschul et al., *Nuc. Acids Res.,* 25:3389-3402 (1977) and Altschul et al., *J. Mol. Biol.,* 215:403-410 (1990), respectively. BLAST and BLAST 2.0 are used, with the parameters described herein, to determine percent sequence identity for the nucleic acids of the invention. Software for performing BLAST analyses is publicly available through the National Center for Biotechnology Information (www.ncbi.nlm.nih.gov/).

The BLAST algorithm also performs a statistical analysis of the similarity between two sequences (see, e.g., Karlin and Altschul, *Proc. Natl. Acad. Sci. USA,* 90:5873-5787 (1993)). One measure of similarity provided by the BLAST algorithm is the smallest sum probability (P(N)), which provides an indication of the probability by which a match between two nucleotide sequences would occur by chance. For example, a nucleic acid is considered similar to a reference sequence if the smallest sum probability in a comparison of the test nucleic acid to the reference nucleic acid is less than about 0.2, more preferably less than about 0.01, and most preferably less than about 0.001.

The term "nucleic acid" as used herein refers to a polymer containing at least two deoxyribonucleotides or ribonucleotides in either single- or double-stranded form and includes DNA and RNA. DNA may be in the form of, e.g., antisense molecules, plasmid DNA, pre-condensed DNA, a PCR product, vectors (P1, PAC, BAC, YAC, artificial chromosomes), expression cassettes, chimeric sequences, chromosomal DNA, or derivatives and combinations of these groups. RNA may be in the form of siRNA, asymmetrical interfering RNA (aiRNA), microRNA (miRNA), mRNA, tRNA, rRNA, tRNA, viral RNA (vRNA), and combinations thereof. Nucleic acids include nucleic acids containing known nucleotide analogs or modified backbone residues or linkages, which are synthetic, naturally occurring, and non-naturally occurring, and which have similar binding properties as the reference nucleic acid. Examples of such

analogs include, without limitation, phosphorothioates, phosphoramidates, methyl phosphonates, chiral-methyl phosphonates, 2'-O-methyl ribonucleotides, and peptide-nucleic acids (PNAs). Unless specifically limited, the term encompasses nucleic acids containing known analogues of natural nucleotides that have similar binding properties as the reference nucleic acid. Unless otherwise indicated, a particular nucleic acid sequence also implicitly encompasses conservatively modified variants thereof (e.g., degenerate codon substitutions), alleles, orthologs, SNPs, and complementary sequences as well as the sequence explicitly indicated. Specifically, degenerate codon substitutions may be achieved by generating sequences in which the third position of one or more selected (or all) codons is substituted with mixed-base and/or deoxyinosine residues (Batzer et al., *Nucleic Acid Res.,* 19:5081 (1991); Ohtsuka et al., *J. Biol. Chem.,* 260:2605-2608 (1985); Rossolini et al., *Mol. Cell. Probes,* 8:91-98 (1994)). "Nucleotides" contain a sugar deoxyribose (DNA) or ribose (RNA), a base, and a phosphate group. Nucleotides are linked together through the phosphate groups. "Bases" include purines and pyrimidines, which further include natural compounds adenine, thymine, guanine, cytosine, uracil, inosine, and natural analogs, and synthetic derivatives of purines and pyrimidines, which include, but are not limited to, modifications which place new reactive groups such as, but not limited to, amines, alcohols, thiols, carboxylates, and alkylhalides.

The term "gene" refers to a nucleic acid (e.g., DNA or RNA) sequence that comprises partial length or entire length coding sequences necessary for the production of a polypeptide or precursor polypeptide.

"Gene product," as used herein, refers to a product of a gene such as an RNA transcript or a polypeptide.

The term "lipid" refers to a group of organic compounds that include, but are not limited to, esters of fatty acids and are characterized by being insoluble in water, but soluble in many organic solvents. They are usually divided into at least three classes: (1) "simple lipids," which include fats and oils as well as waxes; (2) "compound lipids," which include phospholipids and glycolipids; and (3) "derived lipids" such as steroids.

A "lipid particle" is used herein to refer to a lipid formulation that can be used to deliver an active agent or therapeutic agent, such as a nucleic acid (e.g., an interfering RNA), to a target site of interest. In the lipid particle of the invention, which is typically formed from a cationic lipid, a non-cationic lipid, and a conjugated lipid that prevents aggregation of the particle, the active agent or therapeutic agent may be encapsulated in the lipid, thereby protecting the agent from enzymatic degradation.

As used herein, the term "SNALP" refers to a stable nucleic acid-lipid particle. A SNALP represents a particle made from lipids (e.g., a cationic lipid, a non-cationic lipid, and a conjugated lipid that prevents aggregation of the particle), wherein the nucleic acid (e.g., siRNA, aiRNA, miRNA, ssDNA, dsDNA, ssRNA, short hairpin RNA (shRNA), dsRNA, or a plasmid, including plasmids from which an interfering RNA is transcribed) is fully encapsulated within the lipid. As used herein, the term "SNALP" includes an SPLP, which is the term used to refer to a nucleic acid-lipid particle comprising a nucleic acid (e.g., a plasmid) encapsulated within the lipid. SNALP and SPLP typically contain a cationic lipid, a non-cationic lipid, and a lipid conjugate (e.g., a PEG-lipid conjugate). SNALP and SPLP are extremely useful for systemic applications, as they can exhibit extended circulation lifetimes following intravenous (i.v.) injection, they can accumulate at distal sites (e.g., sites physically separated from the administration site), and they can mediate expression of the transfected gene or silencing of target gene expression at these distal sites. SPLP include "pSPLP," which comprise an encapsulated condensing agent-nucleic acid complex as set forth in PCT Publication No. WO 00/03683, the disclosure of which is herein incorporated by reference in its entirety for all purposes.

The lipid particles of the invention (e.g., SNALP) typically have a mean diameter of from about 40 nm to about 150 nm, from about 50 nm to about 150 nm, from about 60 nm to about 130 nm, from about 70 nm to about 110 nm, or from about 70 to about 90 nm, and are substantially nontoxic. In addition, nucleic acids, when present in the lipid particles of the invention, are resistant in aqueous solution to degradation with a nuclease. Nucleic acid-lipid particles and their method of preparation are disclosed in, e.g., U.S. Patent Publication Nos. 20040142025 and 20070042031, the disclosures of which are herein incorporated by reference in their entirety for all purposes.

As used herein, "lipid encapsulated" can refer to a lipid particle that provides an active agent or therapeutic agent, such as a nucleic acid (e.g., an interfering RNA), with full encapsulation, partial encapsulation, or both. In a preferred embodiment, the nucleic acid is fully encapsulated in the lipid particle (e.g., to form an SPLP, pSPLP, SNALP, or other nucleic acid-lipid particle).

The term "lipid conjugate" refers to a conjugated lipid that inhibits aggregation of lipid particles. Such lipid conjugates include, but are not limited to, polyamide oligomers (e.g., ATTA-lipid conjugates), PEG-lipid conjugates, such as PEG coupled to dialkyloxypropyls, PEG coupled to diacylglycerols, PEG coupled to cholesterol, PEG coupled to phosphatidylethanolamines, PEG conjugated to ceramides (see, e.g., U.S. Pat. No. 5,885,613, the disclosure of which is herein incorporated by reference in its entirety for all purposes), cationic PEG lipids, and mixtures thereof. PEG can be conjugated directly to the lipid or may be linked to the lipid via a linker moiety. Any linker moiety suitable for coupling the PEG to a lipid can be used including, e.g., non-ester containing linker moieties and ester-containing linker moieties. In preferred embodiments, non-ester containing linker moieties are used.

The term "amphipathic lipid" refers, in part, to any suitable material wherein the hydrophobic portion of the lipid material orients into a hydrophobic phase, while the hydrophilic portion orients toward the aqueous phase. Hydrophilic characteristics derive from the presence of polar or charged groups such as carbohydrates, phosphate, carboxylic, sulfato, amino, sulfhydryl, nitro, hydroxyl, and other like groups. Hydrophobicity can be conferred by the inclusion of apolar groups that include, but are not limited to, long-chain saturated and unsaturated aliphatic hydrocarbon groups and such groups substituted by one or more aromatic, cycloaliphatic, or heterocyclic group(s). Examples of amphipathic compounds include, but are not limited to, phospholipids, aminolipids, and sphingolipids.

Representative examples of phospholipids include, but are not limited to, phosphatidylcholine, phosphatidylethanolamine, phosphatidylserine, phosphatidylinositol, phosphatidic acid, palmitoyloleoyl phosphatidylcholine, lysophosphatidylcholine, lysophosphatidylethanolamine, dipalmitoylphosphatidylcholine, dioleoylphosphatidylcholine, di stearoylphosphatidylcholine, and dilinoleoylphosphatidylcholine. Other compounds lacking in phosphorus, such as sphingolipid, glycosphingolipid families, diacylglycerols, and β-acyloxyacids, are also within the group designated as amphipathic lipids. Additionally, the amphip-

athic lipids described above can be mixed with other lipids including triglycerides and sterols.

The term "neutral lipid" refers to any of a number of lipid species that exist either in an uncharged or neutral zwitterionic form at a selected pH. At physiological pH, such lipids include, for example, diacylphosphatidylcholine, diacylphosphatidylethanolamine, ceramide, sphingomyelin, cephalin, cholesterol, cerebrosides, and diacylglycerols.

The term "non-cationic lipid" refers to any amphipathic lipid as well as any other neutral lipid or anionic lipid.

The term "anionic lipid" refers to any lipid that is negatively charged at physiological pH. These lipids include, but are not limited to, phosphatidylglycerols, cardiolipins, diacylphosphatidylserines, diacylphosphatidic acids, N-dodecanoyl phosphatidylethanolamines, N-succinyl phosphatidylethanolamines, N-glutarylphosphatidylethanolamines, lysylphosphatidylglycerols, palmitoyloleyolphosphatidylglycerol (POPG), and other anionic modifying groups joined to neutral lipids.

The term "cationic lipid" refers to any of a number of lipid species that carry a net positive charge at a selected pH, such as physiological pH (e.g., pH of about 7.0). It has been surprisingly found that cationic lipids comprising alkyl chains with multiple sites of unsaturation, e.g., at least two or three sites of unsaturation, are particularly useful for forming lipid particles with increased membrane fluidity. A number of cationic lipids and related analogs, which are also useful in the present invention, have been described in U.S. Patent Publication Nos. 20060083780 and 20060240554; U.S. Pat. Nos. 5,208,036; 5,264,618; 5,279,833; 5,283,185; 5,753,613; and 5,785,992; and PCT Publication No. WO 96/10390, the disclosures of which are herein incorporated by reference in their entirety for all purposes. Non-limiting examples of cationic lipids are described in detail herein. In some cases, the cationic lipids comprise a protonatable tertiary amine (e.g., pH titratable) head group, $C_{18}$ alkyl chains, ether linkages between the head group and alkyl chains, and 0 to 3 double bonds. Such lipids include, e.g., DSDMA, DLinDMA, DLenDMA, and DODMA.

The term "hydrophobic lipid" refers to compounds having apolar groups that include, but are not limited to, long-chain saturated and unsaturated aliphatic hydrocarbon groups and such groups optionally substituted by one or more aromatic, cycloaliphatic, or heterocyclic group(s). Suitable examples include, but are not limited to, diacylglycerol, dialkylglycerol, N-N-dialkylamino, 1,2-diacyloxy-3-aminopropane, and 1,2-dialkyl-3-aminopropane.

The term "fusogenic" refers to the ability of a lipid particle, such as a SNALP, to fuse with the membranes of a cell. The membranes can be either the plasma membrane or membranes surrounding organelles, e.g., endosome, nucleus, etc.

As used herein, the term "aqueous solution" refers to a composition comprising in whole, or in part, water.

As used herein, the term "organic lipid solution" refers to a composition comprising in whole, or in part, an organic solvent having a lipid.

"Distal site," as used herein, refers to a physically separated site, which is not limited to an adjacent capillary bed, but includes sites broadly distributed throughout an organism.

"Serum-stable" in relation to nucleic acid-lipid particles such as SNALP means that the particle is not significantly degraded after exposure to a serum or nuclease assay that would significantly degrade free DNA or RNA. Suitable assays include, for example, a standard serum assay, a DNAse assay, or an RNAse assay.

"Systemic delivery," as used herein, refers to delivery of lipid particles that leads to a broad biodistribution of an active agent or therapeutic agent such as an interfering RNA within an organism. Some techniques of administration can lead to the systemic delivery of certain agents, but not others. Systemic delivery means that a useful, preferably therapeutic, amount of an agent is exposed to most parts of the body. To obtain broad biodistribution generally requires a blood lifetime such that the agent is not rapidly degraded or cleared (such as by first pass organs (liver, lung, etc.) or by rapid, nonspecific cell binding) before reaching a disease site distal to the site of administration. Systemic delivery of lipid particles can be by any means known in the art including, for example, intravenous, subcutaneous, and intraperitoneal. In a preferred embodiment, systemic delivery of lipid particles is by intravenous delivery.

"Local delivery," as used herein, refers to delivery of an active agent or therapeutic agent such as an interfering RNA directly to a target site within an organism. For example, an agent can be locally delivered by direct injection into a disease site such as a tumor or other target site such as a site of inflammation or a target organ such as the liver, heart, pancreas, kidney, and the like.

The term "mammal" refers to any mammalian species such as a human, mouse, rat, dog, cat, hamster, guinea pig, rabbit, livestock, and the like.

The term "cancer" refers to any member of a class of diseases characterized by the uncontrolled growth of aberrant cells. The term includes all known cancers and neoplastic conditions, whether characterized as malignant, benign, soft tissue, or solid, and cancers of all stages and grades including pre- and post-metastatic cancers. Examples of different types of cancer include, but are not limited to, lung cancer, colon cancer, rectal cancer, anal cancer, bile duct cancer, small intestine cancer, stomach (gastric) cancer, esophageal cancer; gallbladder cancer, liver cancer, pancreatic cancer, appendix cancer, breast cancer, ovarian cancer; cervical cancer, prostate cancer, renal cancer (e.g., renal cell carcinoma), cancer of the central nervous system, glioblastoma, skin cancer, lymphomas, choriocarcinomas, head and neck cancers, osteogenic sarcomas, and blood cancers. Non-limiting examples of specific types of liver cancer include hepatocellular carcinoma (HCC), secondary liver cancer (e.g., caused by metastasis of some other non-liver cancer cell type), and hepatoblastoma. As used herein, a "tumor" comprises one or more cancerous cells.

## III. DESCRIPTION OF THE EMBODIMENTS

The present invention provides novel, serum-stable lipid particles comprising one or more active agents or therapeutic agents, methods of making the lipid particles, and methods of delivering and/or administering the lipid particles (e.g., for the treatment of a disease or disorder).

In one aspect, the present invention provides lipid particles comprising: (a) one or more active agents or therapeutic agents; (b) one or more cationic lipids comprising from about 50 mol % to about 85 mol % of the total lipid present in the particle; (c) one or more non-cationic lipids comprising from about 13 mol % to about 49.5 mol % of the total lipid present in the particle; and (d) one or more conjugated lipids that inhibit aggregation of particles comprising from about 0.5 mol % to about 2 mol % of the total lipid present in the particle.

In certain embodiments, the active agent or therapeutic agent is fully encapsulated within the lipid portion of the lipid particle such that the active agent or therapeutic agent

in the lipid particle is resistant in aqueous solution to enzymatic degradation, e.g., by a nuclease or protease. In certain other embodiments, the lipid particles are substantially non-toxic to mammals such as humans.

In some embodiments, the active agent or therapeutic agent comprises a nucleic acid. In certain instances, the nucleic acid comprises an interfering RNA molecule such as, e.g., an siRNA, aiRNA, miRNA, or mixtures thereof. In certain other instances, the nucleic acid comprises single-stranded or double-stranded DNA, RNA, or a DNA/RNA hybrid such as, e.g., an antisense oligonucleotide, a ribozyme, a plasmid, an immunostimulatory oligonucleotide, or mixtures thereof.

In other embodiments, the active agent or therapeutic agent comprises a peptide or polypeptide. In certain instances, the peptide or polypeptide comprises an antibody such as, e.g., a polyclonal antibody, a monoclonal antibody, an antibody fragment; a humanized antibody, a recombinant antibody, a recombinant human antibody, a Primatized™ antibody, or mixtures thereof. In certain other instances, the peptide or polypeptide comprises a cytokine, a growth factor, an apoptotic factor, a differentiation-inducing factor, a cell-surface receptor, a ligand, a hormone, a small molecule (e.g., small organic molecule or compound), or mixtures thereof.

In preferred embodiments, the active agent or therapeutic agent comprises an siRNA. In one embodiment, the siRNA molecule comprises a double-stranded region of about 15 to about 60 nucleotides in length (e.g., about 15-60, 15-50, 15-40, 15-30, 15-25, or 19-25 nucleotides in length, or 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, or 25 nucleotides in length). The siRNA molecules of the invention are capable of silencing the expression of a target sequence in vitro and/or in vivo.

In some embodiments, the siRNA molecule comprises at least one modified nucleotide. In certain preferred embodiments, the siRNA molecule comprises one, two, three, four, five, six, seven, eight, nine, ten, or more modified nucleotides in the double-stranded region. In certain instances, the siRNA comprises from about 1% to about 100% (e.g., about 1%, 5%, 10%, 15%, 20%, 25%, 30%, 35%, 40%, 45%, 50%, 55%, 60%, 65%, 70%, 75%, 80%, 85%, 90%, 95%, or 100%) modified nucleotides in the double-stranded region. In preferred embodiments, less than about 25% (e.g., less than about 25%, 20%, 15%, 10%, or 5%) or from about 1% to about 25% (e.g., from about 1%-25%, 5%-25%, 10%-25%, 15%-25%, 20%-25%, or 10%-20%) of the nucleotides in the double-stranded region comprise modified nucleotides.

In other embodiments, the siRNA molecule comprises modified nucleotides including, but not limited to, 2'-O-methyl (2'OMe) nucleotides, 2'-deoxy-2'-fluoro (2'F) nucleotides, 2'-deoxy nucleotides, 2'-O-(2-methoxyethyl) (MOE) nucleotides, locked nucleic acid (LNA) nucleotides, and mixtures thereof. In preferred embodiments, the siRNA comprises 2'OMe nucleotides (e.g., 2'OMe purine and/or pyrimidine nucleotides) such as, for example, 2'OMe-guanosine nucleotides, 2'OMe-uridine nucleotides, 2'OMe-adenosine nucleotides, 2'OMe-cytosine nucleotides, and mixtures thereof. In certain instances, the siRNA does not comprise 2'OMe-cytosine nucleotides. In other embodiments, the siRNA comprises a hairpin loop structure.

The siRNA may comprise modified nucleotides in one strand (i.e., sense or antisense) or both strands of the double-stranded region of the siRNA molecule. Preferably, uridine and/or guanosine nucleotides are modified at selective positions in the double-stranded region of the siRNA duplex. With regard to uridine nucleotide modifications, at least one, two, three, four, five, six, or more of the uridine nucleotides in the sense and/or antisense strand can be a modified uridine nucleotide such as a 2'OMe-uridine nucleotide. In some embodiments, every uridine nucleotide in the sense and/or antisense strand is a 2'OMe-uridine nucleotide. With regard to guanosine nucleotide modifications, at least one, two, three, four, five, six, or more of the guanosine nucleotides in the sense and/or antisense strand can be a modified guanosine nucleotide such as a 2'OMe-guanosine nucleotide. In some embodiments, every guanosine nucleotide in the sense and/or antisense strand is a 2'OMe-guanosine nucleotide.

In certain embodiments, at least one, two, three, four, five, six, seven, or more 5'-GU-3' motifs in an siRNA sequence may be modified, e.g., by introducing mismatches to eliminate the 5'-GU-3' motifs and/or by introducing modified nucleotides such as 2'OMe nucleotides. The 5'-GU-3' motif can be in the sense strand, the antisense strand, or both strands of the siRNA sequence. The 5'-GU-3' motifs may be adjacent to each other or, alternatively, they may be separated by 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, or more nucleotides.

In some preferred embodiments, a modified siRNA molecule is less immunostimulatory than a corresponding unmodified siRNA sequence. In such embodiments, the modified siRNA molecule with reduced immunostimulatory properties advantageously retains RNAi activity against the target sequence. In another embodiment, the immunostimulatory properties of the modified siRNA molecule and its ability to silence target gene expression can be balanced or optimized by the introduction of minimal and selective 2'OMe modifications within the siRNA sequence such as, e.g., within the double-stranded region of the siRNA duplex. In certain instances, the modified siRNA is at least about 5%, 10%, 15%, 20%, 25%, 30%, 35%, 40%, 45%, 50%, 55%, 60%, 65%, 70%, 75%, 80%, 85%, 90%, 91%, 92%, 93%, 94%, 95%, 96%, 97%, 98%, 99%, or 100% less immunostimulatory than the corresponding unmodified siRNA. It will be readily apparent to those of skill in the art that the immunostimulatory properties of the modified siRNA molecule and the corresponding unmodified siRNA molecule can be determined by, for example, measuring INF-α and/or IL-6 levels from about two to about twelve hours after systemic administration in a mammal or transfection of a mammalian responder cell using an appropriate lipid-based delivery system (such as the SNALP delivery system disclosed herein).

In certain embodiments, a modified siRNA molecule has an $IC_{50}$ (i.e., half-maximal inhibitory concentration) less than or equal to ten-fold that of the corresponding unmodified siRNA (i.e., the modified siRNA has an $IC_{50}$ that is less than or equal to ten-times the $IC_{50}$ of the corresponding unmodified siRNA). In other embodiments, the modified siRNA has an $IC_{50}$ less than or equal to three-fold that of the corresponding unmodified siRNA sequence. In yet other embodiments, the modified siRNA has an $IC_{50}$ less than or equal to two-fold that of the corresponding unmodified siRNA. It will be readily apparent to those of skill in the art that a dose-response curve can be generated and the $IC_{50}$ values for the modified siRNA and the corresponding unmodified siRNA can be readily determined using methods known to those of skill in the art.

In yet another embodiment, a modified siRNA molecule is capable of silencing at least about 5%, 10%, 15%, 20%, 25%, 30%, 35%, 40%, 45%, 50%, 55%, 60%, 65%, 70%,

75%, 80%, 85%, 90%, 95%, or 100% of the expression of the target sequence relative to the corresponding unmodified siRNA sequence.

In some embodiments, the siRNA molecule does not comprise phosphate backbone modifications, e.g., in the sense and/or antisense strand of the double-stranded region. In other embodiments, the siRNA comprises one, two, three, four, or more phosphate backbone modifications, e.g., in the sense and/or antisense strand of the double-stranded region. In preferred embodiments, the siRNA does not comprise phosphate backbone modifications.

In further embodiments, the siRNA does not comprise 2'-deoxy nucleotides, e.g., in the sense and/or antisense strand of the double-stranded region. In yet further embodiments, the siRNA comprises one, two, three, four, or more 2'-deoxy nucleotides, e.g., in the sense and/or antisense strand of the double-stranded region. In preferred embodiments, the siRNA does not comprise 2'-deoxy nucleotides.

In certain instances, the nucleotide at the 3'-end of the double-stranded region in the sense and/or antisense strand is not a modified nucleotide. In certain other instances, the nucleotides near the 3'-end (e.g., within one, two, three, or four nucleotides of the 3'-end) of the double-stranded region in the sense and/or antisense strand are not modified nucleotides.

The siRNA molecules described herein may have 3' overhangs of one, two, three, four, or more nucleotides on one or both sides of the double-stranded region, or may lack overhangs (i.e., have blunt ends) on one or both sides of the double-stranded region. Preferably, the siRNA has 3' overhangs of two nucleotides on each side of the double-stranded region. In certain instances, the 3' overhang on the antisense strand has complementarity to the target sequence and the 3' overhang on the sense strand has complementarity to a complementary strand of the target sequence. Alternatively, the 3' overhangs do not have complementarity to the target sequence or the complementary strand thereof. In some embodiments, the 3' overhangs comprise one, two, three, four, or more nucleotides such as 2'-deoxy (2'H) nucleotides. In certain preferred embodiments, the 3' overhangs comprise deoxythymidine (dT) and/or uridine nucleotides. In other embodiments, one or more of the nucleotides in the 3' overhangs on one or both sides of the double-stranded region comprise modified nucleotides. Non-limiting examples of modified nucleotides are described above and include 2'OMe nucleotides, 2'-deoxy-2'F nucleotides, 2'-deoxy nucleotides, 2'-O-2-MOE nucleotides, LNA nucleotides, and mixtures thereof. In preferred embodiments, one, two, three, four, or more nucleotides in the 3' overhangs present on the sense and/or antisense strand of the siRNA comprise 2'OMe nucleotides (e.g., 2'OMe purine and/or pyrimidine nucleotides) such as, for example, 2'OMe-guanosine nucleotides, 2'OMe-uridine nucleotides, 2'OMe-adenosine nucleotides, 2'OMe-cytosine nucleotides, and mixtures thereof.

The siRNA may comprise at least one or a cocktail (e.g., at least two, three, four, five, six, seven, eight, nine, ten, or more) of unmodified and/or modified siRNA sequences that silence target gene expression. The cocktail of siRNA may comprise sequences which are directed to the same region or domain (e.g., a "hot spot") and/or to different regions or domains of one or more target genes. In certain instances, one or more (e.g., at least two, three, four, five, six, seven, eight, nine, ten, or more) modified siRNA that silence target gene expression are present in a cocktail. In certain other instances, one or more (e.g., at least two, three, four, five, six, seven, eight, nine, ten, or more) unmodified siRNA sequences that silence target gene expression are present in a cocktail.

In some embodiments, the anti sense strand of the siRNA molecule comprises or consists of a sequence that is at least about 80%, 85%, 90%, 95%, 96%, 97%, 98%, or 99% complementary to the target sequence or a portion thereof. In other embodiments, the antisense strand of the siRNA molecule comprises or consists of a sequence that is 100% complementary to the target sequence or a portion thereof. In further embodiments, the antisense strand of the siRNA molecule comprises or consists of a sequence that specifically hybridizes to the target sequence or a portion thereof.

In further embodiments, the sense strand of the siRNA molecule comprises or consists of a sequence that is at least about 80%, 85%, 90%, 95%, 96%, 97%, 98%, or 99% identical to the target sequence or a portion thereof. In additional embodiments, the sense strand of the siRNA molecule comprises or consists of a sequence that is 100% identical to the target sequence or a portion thereof.

In the lipid particles of the invention (e.g., SNALP comprising an interfering RNA such as siRNA), the cationic lipid may comprise, e.g., one or more of the following: 1,2-dilinoleyloxy-N,N-dimethylaminopropane (DLinDMA), 1,2-dilinolenyloxy-N,N-dimethylaminopropane (DLenDMA), 2,2-dilinoleyl-4-(2-dimethylaminoethyl)[1,3]-dioxolane (DLin-K-$C_2$-DMA; "XTC2"), 2,2-dilinoleyl-4-(3-dimethylaminopropyl)[1,3]-dioxolane (DLin-K-$C_3$-DMA), 2,2-dilinoleyl-4-(4-dimethylaminobutyl)[1,3]-dioxolane (DLin-K-$C_4$-DMA), 2,2-dilinoleyl-5-dimethylaminomethyl-[1,3]-dioxane (DLin-K6-DMA), 2,2-dilinoleyl-4-N-methylpepiazino-[1,3]-dioxolane (DLin-K-MPZ), 2,2-dilinoleyl-4-dimethylaminomethyl-[1,3]-dioxolane (DLin-K-DMA), 1,2-dilinoleylcarbamoyloxy-3-dimethylaminopropane (DLin-C-DAP), 1,2-dilinoleyoxy-3-(dimethylamino)acetoxypropane (DLin-DAC), 1,2-dilinoleyoxy-3-morpholinopropane (DLin-MA), 1,2-dilinoleoyl-3-dimethylaminopropane (DLinDAP), 1,2-dilinoleylthio-3-dimethylaminopropane (DLin-S-DMA), 1-linoleoyl-2-linoleyloxy-3-dimethylaminopropane (DLin-2-DMAP), 1,2-dilinoleyloxy-3-trimethylaminopropane chloride salt (DLin-TMA.Cl), 1,2-dilinoleoyl-3-trimethylaminopropane chloride salt (DLin-TAP.Cl), 1,2-dilinoleyloxy-3-(N-methylpiperazino)propane (DLin-MPZ), 3-(N,N-dilinoleylamino)-1,2-propanediol (DLinAP), 3-(N,N-dioleylamino)-1,2-propanedio (DOAP), 1,2-dilinoleyloxo-3-(2-N,N-dimethylamino)ethoxypropane (DLin-EG-DMA), N,N-dioleyl-N,N-dimethylammonium chloride (DODAC), 1,2-dioleyloxy-N,N-dimethylaminopropane (DODMA), 1,2-distearyloxy-N,N-dimethylaminopropane (DSDMA), N-(1-(2,3-dioleyloxy)propyl)-N,N,N-trimethylammonium chloride (DOTMA), N,N-distearyl-N,N-dimethylammonium bromide (DDAB), N-(1-(2,3-dioleoyloxy)propyl)-N,N,N-trimethylammonium chloride (DOTAP), 3-(N-(N',N'-dimethylaminoethane)-carbamoyl)cholesterol (DC-Chol), N-(1,2-dimyristyloxyprop-3-yl)-N,N-dimethyl-N-hydroxyethyl ammonium bromide (DMRIE), 2,3-dioleyloxy-N-[2(spermine-carboxamido)ethyl]-N,N-dimethyl-1-propanaminiumtrifluoroacetate (DOSPA), dioctadecylamidoglycyl spermine (DOGS), 3-dimethylamino-2-(cholest-5-en-3-beta-oxybutan-4-oxy)-1-(cis,cis-9,12-octadecadienoxy)propane (CLinDMA), 2-[5'-(cholest-5-en-3-beta-oxy)-3'-oxapentoxy)-3-dimethy-1-(cis,cis-9',1-2'-octadecadienoxy) propane (CpLinDMA), N,N-dimethyl-3,4-dioleyloxybenzylamine (DMOBA), 1,2-N,N'-dioleylcarbamyl-3-dimethylaminopropane (DOcarbDAP), 1,2-N,N'-dilinoleylcarbamyl-3-dimethylaminopropane

(DLincarbDAP), or mixtures thereof. In certain preferred embodiments, the cationic lipid is DLinDMA, DLin-K-$C_2$-DMA ("XTC2"), or mixtures thereof.

The synthesis of cationic lipids such as DLin-K-$C_2$-DMA ("XTC2"), DLin-K-$C_3$-DMA, DLin-K-$C_4$-DMA, DLin-K6-DMA, and DLin-K-MPZ, as well as additional cationic lipids, is described in U.S. Provisional Application No. 61/104,212, filed Oct. 9, 2008, the disclosure of which is herein incorporated by reference in its entirety for all purposes. The synthesis of cationic lipids such as DLin-K-DMA, DLin-C-DAP, DLin-DAC, DLin-MA, DLinDAP, DLin-S-DMA, DLin-2-DMAP, DLin-TMA.Cl, DLin-TAP.Cl, DLin-MPZ, DLinAP, DOAP, and DLin-EG-DMA, as well as additional cationic lipids, is described in PCT Application No. PCT/US08/88676, filed Dec. 31, 2008, the disclosure of which is herein incorporated by reference in its entirety for all purposes. The synthesis of cationic lipids such as CLinDMA, as well as additional cationic lipids, is described in U.S. Patent Publication No. 20060240554, the disclosure of which is herein incorporated by reference in its entirety for all purposes.

In some embodiments, the cationic lipid may comprise from about 50 mol % to about 90 mol %, from about 50 mol % to about 85 mol %, from about 50 mol % to about 80 mol %, from about 50 mol % to about 75 mol %, from about 50 mol % to about 70 mol %, from about 50 mol % to about 65 mol %, or from about 50 mol % to about 60 mol % of the total lipid present in the particle.

In other embodiments, the cationic lipid may comprise from about 55 mol % to about 90 mol %, from about 55 mol % to about 85 mol %, from about 55 mol % to about 80 mol %, from about 55 mol % to about 75 mol %, from about 55 mol % to about 70 mol %, or from about 55 mol % to about 65 mol % of the total lipid present in the particle.

In yet other embodiments, the cationic lipid may comprise from about 60 mol % to about 90 mol %, from about 60 mol % to about 85 mol %, from about 60 mol % to about 80 mol %, from about 60 mol % to about 75 mol %, or from about 60 mol % to about 70 mol % of the total lipid present in the particle.

In still yet other embodiments, the cationic lipid may comprise from about 65 mol % to about 90 mol %, from about 65 mol % to about 85 mol %, from about 65 mol % to about 80 mol %, or from about 65 mol % to about 75 mol % of the total lipid present in the particle.

In further embodiments, the cationic lipid may comprise from about 70 mol % to about 90 mol %, from about 70 mol % to about 85 mol %, from about 70 mol % to about 80 mol %, from about 75 mol % to about 90 mol %, from about 75 mol % to about 85 mol %, or from about 80 mol % to about 90 mol % of the total lipid present in the particle.

In additional embodiments, the cationic lipid may comprise (at least) about 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67, 68, 69, 70, 71, 72, 73, 74, 75, 76, 77, 78, 79, 80, 81, 82, 83, 84, 85, 86, 87, 88, 89, or 90 mol % (or any fraction thereof or range therein) of the total lipid present in the particle.

In the lipid particles of the invention (e.g., SNALP comprising an interfering RNA such as siRNA), the non-cationic lipid may comprise, e.g., one or more anionic lipids and/or neutral lipids. In preferred embodiments, the non-cationic lipid comprises one of the following neutral lipid components: (1) cholesterol or a derivative thereof; (2) a phospholipid; or (3) a mixture of a phospholipid and cholesterol or a derivative thereof.

Examples of cholesterol derivatives include, but are not limited to, cholestanol, cholestanone, cholestenone, coprostanol, cholesteryl-2'-hydroxyethyl ether, cholesteryl-4'-hydroxybutyl ether, and mixtures thereof. The synthesis of cholesteryl-2'-hydroxyethyl ether is described herein.

The phospholipid may be a neutral lipid including, but not limited to, dipalmitoylphosphatidylcholine (DPPC), distearoylphosphatidylcholine (DSPC), dioleoylphosphatidylethanolamine (DOPE), palmitoyloleoyl-phosphatidylcholine (POPC), palmitoyloleoyl-phosphatidylethanolamine (POPE), palmitoyloleyol-phosphatidylglycerol (POPG), dipalmitoyl-phosphatidylethanolamine (DPPE), dimyristoyl-phosphatidylethanolamine (DMPE), distearoyl-phosphatidylethanolamine (DSPE), monomethyl-phosphatidylethanolamine, dimethyl-phosphatidylethanolamine, dielaidoyl-phosphatidylethanolamine (DEPE), stearoyloleoyl-phosphatidylethanolamine (SOPE), egg phosphatidylcholine (EPC), and mixtures thereof. In certain preferred embodiments, the phospholipid is DPPC, DSPC, or mixtures thereof.

In some embodiments, the non-cationic lipid (e.g., one or more phospholipids and/or cholesterol) may comprise from about 10 mol % to about 60 mol %, from about 15 mol % to about 60 mol %, from about 20 mol % to about 60 mol %, from about 25 mol % to about 60 mol %, from about 30 mol % to about 60 mol %, from about 10 mol % to about 55 mol %, from about 15 mol % to about 55 mol %, from about 20 mol % to about 55 mol %, from about 25 mol % to about 55 mol %, from about 30 mol % to about 55 mol %, from about 13 mol % to about 50 mol %, from about 15 mol % to about 50 mol % or from about 20 mol % to about 50 mol % of the total lipid present in the particle. When the non-cationic lipid is a mixture of a phospholipid and cholesterol or a cholesterol derivative, the mixture may comprise up to about 40, 50, or 60 mol % of the total lipid present in the particle.

In other embodiments, the non-cationic lipid (e.g., one or more phospholipids and/or cholesterol) may comprise from about 10 mol % to about 49.5 mol %, from about 13 mol % to about 49.5 mol %, from about 15 mol % to about 49.5 mol %, from about 20 mol % to about 49.5 mol %, from about 25 mol % to about 49.5 mol %, from about 30 mol % to about 49.5 mol %, from about 35 mol % to about 49.5 mol %, or from about 40 mol % to about 49.5 mol % of the total lipid present in the particle.

In yet other embodiments, the non-cationic lipid (e.g., one or more phospholipids and/or cholesterol) may comprise from about 10 mol % to about 45 mol %, from about 13 mol % to about 45 mol %, from about 15 mol % to about 45 mol %, from about 20 mol % to about 45 mol %, from about 25 mol % to about 45 mol %, from about 30 mol % to about 45 mol %, or from about 35 mol % to about 45 mol % of the total lipid present in the particle.

In still yet other embodiments, the non-cationic lipid (e.g., one or more phospholipids and/or cholesterol) may comprise from about 10 mol % to about 40 mol %, from about 13 mol % to about 40 mol %, from about 15 mol % to about 40 mol %, from about 20 mol % to about 40 mol %, from about 25 mol % to about 40 mol %, or from about 30 mol % to about 40 mol % of the total lipid present in the particle.

In further embodiments, the non-cationic lipid (e.g., one or more phospholipids and/or cholesterol) may comprise from about 10 mol % to about 35 mol %, from about 13 mol % to about 35 mol %, from about 15 mol % to about 35 mol %, from about 20 mol % to about 35 mol %, or from about 25 mol % to about 35 mol % of the total lipid present in the particle.

In yet further embodiments, the non-cationic lipid (e.g., one or more phospholipids and/or cholesterol) may comprise

from about 10 mol % to about 30 mol %, from about 13 mol % to about 30 mol %, from about 15 mol % to about 30 mol %, from about 20 mol % to about 30 mol %, from about 10 mol % to about 25 mol %, from about 13 mol % to about 25 mol %, or from about 15 mol % to about 25 mol % of the total lipid present in the particle.

In additional embodiments, the non-cationic lipid (e.g., one or more phospholipids and/or cholesterol) may comprise (at least) about 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, or 60 mol % (or any fraction thereof or range therein) of the total lipid present in the particle.

In certain preferred embodiments, the non-cationic lipid comprises cholesterol or a derivative thereof of from about 31.5 mol % to about 42.5 mol % of the total lipid present in the particle. As a non-limiting example, a phospholipid-free lipid particle of the invention may comprise cholesterol or a derivative thereof at about 37 mol % of the total lipid present in the particle. In other preferred embodiments, a phospholipid-free lipid particle of the invention may comprise cholesterol or a derivative thereof of from about 30 mol % to about 45 mol %, from about 30 mol % to about 40 mol %, from about 30 mol % to about 35 mol %, from about 35 mol % to about 45 mol %, from about 40 mol % to about 45 mol %, from about 32 mol % to about 45 mol %, from about 32 mol % to about 42 mol %, from about 32 mol % to about 40 mol %, from about 34 mol % to about 45 mol %, from about 34 mol % to about 42 mol %, from about 34 mol % to about 40 mol %, or about 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, or 45 mol % (or any fraction thereof or range therein) of the total lipid present in the particle.

In certain other preferred embodiments, the non-cationic lipid comprises a mixture of: (i) a phospholipid of from about 4 mol % to about 10 mol % of the total lipid present in the particle; and (ii) cholesterol or a derivative thereof of from about 30 mol % to about 40 mol % of the total lipid present in the particle. As a non-limiting example, a lipid particle comprising a mixture of a phospholipid and cholesterol may comprise DPPC at about 7 mol % and cholesterol at about 34 mol % of the total lipid present in the particle. In other embodiments, the non-cationic lipid comprises a mixture of: (i) a phospholipid of from about 3 mol % to about 15 mol %, from about 4 mol % to about 15 mol %, from about 4 mol % to about 12 mol %, from about 4 mol % to about 10 mol %, from about 4 mol % to about 8 mol %, from about 5 mol % to about 12 mol %, from about 5 mol % to about 9 mol %, from about 6 mol % to about 12 mol %, from about 6 mol % to about 10 mol %, or about 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, or 15 mol % (or any fraction thereof or range therein) of the total lipid present in the particle; and (ii) cholesterol or a derivative thereof of from about 25 mol % to about 45 mol %, from about 30 mol % to about 45 mol %, from about 25 mol % to about 40 mol %, from about 30 mol % to about 40 mol %, from about 25 mol % to about 35 mol %, from about 30 mol % to about 35 mol %, from about 35 mol % to about 45 mol %, from about 40 mol % to about 45 mol %, from about 28 mol % to about 40 mol %, from about 28 mol % to about 38 mol %, from about 30 mol % to about 38 mol %, from about 32 mol % to about 36 mol %, or about 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, or 45 mol % (or any fraction thereof or range therein) of the total lipid present in the particle.

In further preferred embodiments, the non-cationic lipid comprises a mixture of: (i) a phospholipid of from about 10 mol % to about 30 mol % of the total lipid present in the particle; and (ii) cholesterol or a derivative thereof of from about 10 mol % to about 30 mol % of the total lipid present in the particle. As a non-limiting example, a lipid particle comprising a mixture of a phospholipid and cholesterol may comprise DPPC at about 20 mol % and cholesterol at about 20 mol % of the total lipid present in the particle. In other embodiments, the non-cationic lipid comprises a mixture of: (i) a phospholipid of from about 10 mol % to about 30 mol %, from about 10 mol % to about 25 mol %, from about 10 mol % to about 20 mol %, from about 15 mol % to about 30 mol %, from about 20 mol % to about 30 mol %, from about 15 mol % to about 25 mol %, from about 12 mol % to about 28 mol %, from about 14 mol % to about 26 mol %, or about 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, or 30 mol % (or any fraction thereof or range therein) of the total lipid present in the particle; and (ii) cholesterol or a derivative thereof of from about 10 mol % to about 30 mol %, from about 10 mol % to about 25 mol %, from about 10 mol % to about 20 mol %, from about 15 mol % to about 30 mol %, from about 20 mol % to about 30 mol %, from about 15 mol % to about 25 mol %, from about 12 mol % to about 28 mol %, from about 14 mol % to about 26 mol %, or about 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, or 30 mol % (or any fraction thereof or range therein) of the total lipid present in the particle.

In the lipid particles of the invention (e.g., SNALP comprising an interfering RNA such as siRNA), the conjugated lipid that inhibits aggregation of particles may comprise, e.g., one or more of the following: a polyethyleneglycol (PEG)-lipid conjugate, a polyamide (ATTA)-lipid conjugate, a cationic-polymer-lipid conjugates (CPLs), or mixtures thereof. In one preferred embodiment, the nucleic acid-lipid particles comprise either a PEG-lipid conjugate or an ATTA-lipid conjugate. In certain embodiments, the PEG-lipid conjugate or ATTA-lipid conjugate is used together with a CPL. The conjugated lipid that inhibits aggregation of particles may comprise a PEG-lipid including, e.g., a PEG-diacylglycerol (DAG), a PEG dialkyloxypropyl (DAA), a PEG-phospholipid, a PEG-ceramide (Cer), or mixtures thereof. The PEG-DAA conjugate may be PEG-dilauryloxypropyl ($C_{12}$), a PEG-dimyristyloxypropyl ($C_{14}$), a PEG-dipalmityloxypropyl (C16), a PEG-distearyloxypropyl ($C_{18}$), or mixtures thereof.

Additional PEG-lipid conjugates suitable for use in the invention include, but are not limited to, mPEG2000-1,2-di-O-alkyl-sn3-carbomoylglyceride (PEG-C-DOMG). The synthesis of PEG-C-DOMG is described in PCT Application No. PCT/US08/88676, filed Dec. 31, 2008, the disclosure of which is herein incorporated by reference in its entirety for all purposes. Yet additional PEG-lipid conjugates suitable for use in the invention include, without limitation, 1-[8'-(1,2-dimyristoyl-3-propanoxy)-carboxamido-3',6'-dioxaoctanyl]carbamoyl-ω-methyl-poly(ethylene glycol) (2KPEG-DMG). The synthesis of 2KPEG-DMG is described in U.S. Pat. No. 7,404,969, the disclosure of which is herein incorporated by reference in its entirety for all purposes.

The PEG moiety of the PEG-lipid conjugates described herein may comprise an average molecular weight ranging from about 550 daltons to about 10,000 daltons. In certain instances, the PEG moiety has an average molecular weight of from about 750 daltons to about 5,000 daltons (e.g., from about 1,000 daltons to about 5,000 daltons, from about 1,500 daltons to about 3,000 daltons, from about 750 daltons to about 3,000 daltons, from about 750 daltons to about 2,000

daltons, etc.). In preferred embodiments, the PEG moiety has an average molecular weight of about 2,000 daltons or about 750 daltons.

In some embodiments, the conjugated lipid that inhibits aggregation of particles is a CPL that has the formula: A-W-Y, wherein A is a lipid moiety, W is a hydrophilic polymer, and Y is a polycationic moiety. W may be a polymer selected from the group consisting of polyethyleneglycol (PEG), polyamide, polylactic acid, polyglycolic acid, polylactic acid/polyglycolic acid copolymers, or combinations thereof, the polymer having a molecular weight of from about 250 to about 7000 daltons. In some embodiments, Y has at least 4 positive charges at a selected pH. In some embodiments, Y may be lysine, arginine, asparagine, glutamine, derivatives thereof, or combinations thereof.

In certain instances, the conjugated lipid that inhibits aggregation of particles (e.g., PEG-lipid conjugate) may comprise from about 0.1 mol % to about 2 mol %, from about 0.5 mol % to about 2 mol %, from about 1 mol % to about 2 mol %, from about 0.6 mol % to about 1.9 mol %, from about 0.7 mol % to about 1.8 mol %, from about 0.8 mol % to about 1.7 mol %, from about 1 mol % to about 1.8 mol %, from about 1.2 mol % to about 1.8 mol %, from about 1.2 mol % to about 1.7 mol %, from about 1.3 mol % to about 1.6 mol %, from about 1.4 mol % to about 1.5 mol %, or about 1, 1.1, 1.2, 1.3, 1.4, 1.5, 1.6, 1.7, 1.8, 1.9, or 2 mol % (or any fraction thereof or range therein) of the total lipid present in the particle.

In the lipid particles of the invention, the active agent or therapeutic agent may be fully encapsulated within the lipid portion of the particle, thereby protecting the active agent or therapeutic agent from enzymatic degradation. In preferred embodiments, a SNALP comprising a nucleic acid such as an interfering RNA (e.g., siRNA) is fully encapsulated within the lipid portion of the particle, thereby protecting the nucleic acid from nuclease degradation. In certain instances, the nucleic acid in the SNALP is not substantially degraded after exposure of the particle to a nuclease at 37° C. for at least about 20, 30, 45, or 60 minutes. In certain other instances, the nucleic acid in the SNALP is not substantially degraded after incubation of the particle in serum at 37° C. for at least about 30, 45, or 60 minutes or at least about 2, 3, 4, 5, 6, 7, 8, 9, 10, 12, 14, 16, 18, 20, 22, 24, 26, 28, 30, 32, 34, or 36 hours. In other embodiments, the active agent or therapeutic agent (e.g., nucleic acid such as siRNA) is complexed with the lipid portion of the particle. One of the benefits of the formulations of the present invention is that the lipid particle compositions are substantially non-toxic to mammals such as humans.

The term "fully encapsulated" indicates that the active agent or therapeutic agent in the lipid particle is not significantly degraded after exposure to serum or a nuclease or protease assay that would significantly degrade free DNA, RNA, or protein. In a fully encapsulated system, preferably less than about 25% of the active agent or therapeutic agent in the particle is degraded in a treatment that would normally degrade 100% of free active agent or therapeutic agent, more preferably less than about 10%, and most preferably less than about 5% of the active agent or therapeutic agent in the particle is degraded. In the context of nucleic acid therapeutic agents, full encapsulation may be determined by an Oligreen® assay. Oligreen® is an ultra-sensitive fluorescent nucleic acid stain for quantitating oligonucleotides and single-stranded DNA or RNA in solution (available from Invitrogen Corporation; Carlsbad, Calif.). "Fully encapsulated" also indicates that the lipid particles are serum-stable, that is, that they do not rapidly decompose into their component parts upon in vivo administration.

In another aspect, the present invention provides a lipid particle (e.g., SNALP) composition comprising a plurality of lipid particles. In preferred embodiments, the active agent or therapeutic agent (e.g., nucleic acid) is fully encapsulated within the lipid portion of the lipid particles (e.g., SNALP), such that from about 30% to about 100%, from about 40% to about 100%, from about 50% to about 100%, from about 60% to about 100%, from about 70% to about 100%, from about 80% to about 100%, from about 90% to about 100%, from about 30% to about 95%, from about 40% to about 95%, from about 50% to about 95%, from about 60% to about 95%, %, from about 70% to about 95%, from about 80% to about 95%, from about 85% to about 95%, from about 90% to about 95%, from about 30% to about 90%, from about 40% to about 90%, from about 50% to about 90%, from about 60% to about 90%, from about 70% to about 90%, from about 80% to about 90%, or at least about 30%, 35%, 40%, 45%, 50%, 55%, 60%, 65%, 70%, 75%, 80%, 85%, 90%, 91%, 92%, 93%, 94%, 95%, 96%, 97%, 98%, or 99% (or any fraction thereof or range therein) of the lipid particles (e.g., SNALP) have the active agent or therapeutic agent encapsulated therein.

Typically, the lipid particles (e.g., SNALP) of the invention have a lipid:active agent (e.g., lipid:nucleic acid) ratio (mass/mass ratio) of from about 1 to about 100. In some instances, the lipid:active agent (e.g., lipid:nucleic acid) ratio (mass/mass ratio) ranges from about 1 to about 50, from about 2 to about 25, from about 3 to about 20, from about 4 to about 15, or from about 5 to about 10. In preferred embodiments, the lipid particles of the invention have a lipid:active agent (e.g., lipid:nucleic acid) ratio (mass/mass ratio) of from about 5 to about 15, e.g., about 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, or 15 (or any fraction thereof or range therein).

Typically, the lipid particles (e.g., SNALP) of the invention have a mean diameter of from about 40 nm to about 150 nm. In preferred embodiments, the lipid particles (e.g., SNALP) of the invention have a mean diameter of from about 40 nm to about 130 nm, from about 40 nm to about 120 nm, from about 40 nm to about 100 nm, from about 50 nm to about 120 nm, from about 50 nm to about 100 nm, from about 60 nm to about 120 nm, from about 60 nm to about 110 nm, from about 60 nm to about 100 nm, from about 60 nm to about 90 nm, from about 60 nm to about 80 nm, from about 70 nm to about 120 nm, from about 70 nm to about 110 nm, from about 70 nm to about 100 nm, from about 70 nm to about 90 nm, from about 70 nm to about 80 nm, or less than about 120 nm, 110 nm, 100 nm, 90 nm, or 80 nm (or any fraction thereof or range therein).

In one specific embodiment of the invention, the SNALP comprises: (a) one or more unmodified and/or modified interfering RNA (e.g., siRNA, aiRNA, miRNA) that silence target gene expression; (b) a cationic lipid comprising from about 56.5 mol % to about 66.5 mol % of the total lipid present in the particle; (c) a non-cationic lipid comprising from about 31.5 mol % to about 42.5 mol % of the total lipid present in the particle; and (d) a conjugated lipid that inhibits aggregation of particles comprising from about 1 mol % to about 2 mol % of the total lipid present in the particle. This specific embodiment of SNALP is generally referred to herein as the "1:62" formulation. In a preferred embodiment, the cationic lipid is DLinDMA or DLin-K-$C_2$-DMA ("XTC2"), the non-cationic lipid is cholesterol, and the conjugated lipid is a PEG-DAA conjugate. Although these are preferred embodiments of the 1:62 formulation, those of

skill in the art will appreciate that other cationic lipids, non-cationic lipids (including other cholesterol derivatives), and conjugated lipids can be used in the 1:62 formulation as described herein.

In another specific embodiment of the invention, the SNALP comprises: (a) one or more unmodified and/or modified interfering RNA (e.g., siRNA, aiRNA, miRNA) that silence target gene expression; (b) a cationic lipid comprising from about 52 mol % to about 62 mol % of the total lipid present in the particle; (c) a non-cationic lipid comprising from about 36 mol % to about 47 mol % of the total lipid present in the particle; and (d) a conjugated lipid that inhibits aggregation of particles comprising from about 1 mol % to about 2 mol % of the total lipid present in the particle. This specific embodiment of SNALP is generally referred to herein as the "1:57" formulation. In one preferred embodiment, the cationic lipid is DLinDMA or DLin-K-$C_2$-DMA ("XTC2"), the non-cationic lipid is a mixture of a phospholipid (such as DPPC) and cholesterol, wherein the phospholipid comprises from about 5 mol % to about 9 mol % of the total lipid present in the particle (e.g., about 7.1 mol %) and the cholesterol (or cholesterol derivative) comprises from about 32 mol % to about 37 mol % of the total lipid present in the particle (e.g., about 34.3 mol %), and the PEG-lipid is a PEG-DAA (e.g., PEG-cDMA). In another preferred embodiment, the cationic lipid is DLinDMA or DLin-K-$C_2$-DMA ("XTC2"), the non-cationic lipid is a mixture of a phospholipid (such as DPPC) and cholesterol, wherein the phospholipid comprises from about 15 mol % to about 25 mol % of the total lipid present in the particle (e.g., about 20 mol %) and the cholesterol (or cholesterol derivative) comprises from about 15 mol % to about 25 mol % of the total lipid present in the particle (e.g., about 20 mol %), and the PEG-lipid is a PEG-DAA (e.g., PEG-cDMA). Although these are preferred embodiments of the 1:57 formulation, those of skill in the art will appreciate that other cationic lipids, non-cationic lipids (including other phospholipids and other cholesterol derivatives), and conjugated lipids can be used in the 1:57 formulation as described herein.

In preferred embodiments, the 1:62 SNALP formulation is a three-component system which is phospholipid-free and comprises about 1.5 mol % PEG-cDMA (or PEG-cDSA), about 61.5 mol % DLinDMA (or XTC2), and about 36.9 mol % cholesterol (or derivative thereof). In other preferred embodiments, the 1:57 SNALP formulation is a four-component system which comprises about 1.4 mol % PEG-cDMA (or PEG-cDSA), about 57.1 mol % DLinDMA (or XTC2), about 7.1 mol % DPPC, and about 34.3 mol % cholesterol (or derivative thereof). In yet other preferred embodiments, the 1:57 SNALP formulation is a four-component system which comprises about 1.4 mol % PEG-cDMA (or PEG-cDSA), about 57.1 mol % DLinDMA (or XTC2), about 20 mol % DPPC, and about 20 mol % cholesterol (or derivative thereof). It should be understood that these SNALP formulations are target formulations, and that the amount of lipid (both cationic and non-cationic) present and the amount of lipid conjugate present in the SNALP formulations may vary.

The present invention also provides a pharmaceutical composition comprising a lipid particle (e.g., SNALP) described herein and a pharmaceutically acceptable carrier.

In a further aspect, the present invention provides a method for introducing one or more active agents or therapeutic agents (e.g., nucleic acid) into a cell, comprising contacting the cell with a lipid particle (e.g., SNALP) described herein. In one embodiment, the cell is in a mammal and the mammal is a human. In another embodiment, the present invention provides a method for the in vivo delivery of one or more active agents or therapeutic agents (e.g., nucleic acid), comprising administering to a mammalian subject a lipid particle (e.g., SNALP) described herein. In a preferred embodiment, the mode of administration includes, but is not limited to, oral, intranasal, intravenous, intraperitoneal, intramuscular, intra-articular, intralesional, intratracheal, subcutaneous, and intradermal. Preferably, the mammalian subject is a human.

In one embodiment, at least about 5%, 10%, 15%, 20%, or 25% of the total injected dose of the lipid particles (e.g., SNALP) is present in plasma about 8, 12, 24, 36, or 48 hours after injection. In other embodiments, more than about 20%, 30%, 40% and as much as about 60%, 70% or 80% of the total injected dose of the lipid particles (e.g., SNALP) is present in plasma about 8, 12, 24, 36, or 48 hours after injection. In certain instances, more than about 10% of a plurality of the particles is present in the plasma of a mammal about 1 hour after administration. In certain other instances, the presence of the lipid particles (e.g., SNALP) is detectable at least about 1 hour after administration of the particle. In certain embodiments, the presence of an active agent or therapeutic agent such as an interfering RNA (e.g., siRNA) is detectable in cells of the lung, liver, tumor, or at a site of inflammation at about 8, 12, 24, 36, 48, 60, 72 or 96 hours after administration. In other embodiments, downregulation of expression of a target sequence by an active agent or therapeutic agent such as an interfering RNA (e.g., siRNA) is detectable at about 8, 12, 24, 36, 48, 60, 72 or 96 hours after administration. In yet other embodiments, downregulation of expression of a target sequence by an active agent or therapeutic agent such as an interfering RNA (e.g., siRNA) occurs preferentially in tumor cells or in cells at a site of inflammation. In further embodiments, the presence or effect of an active agent or therapeutic agent such as an interfering RNA (e.g., siRNA) in cells at a site proximal or distal to the site of administration or in cells of the lung, liver, or a tumor is detectable at about 12, 24, 48, 72, or 96 hours, or at about 6, 8, 10, 12, 14, 16, 18, 19, 20, 22, 24, 26, or 28 days after administration. In additional embodiments, the lipid particles (e.g., SNALP) of the invention are administered parenterally or intraperitoneally.

In some embodiments, the lipid particles (e.g., SNALP) of the invention are particularly useful in methods for the therapeutic delivery of one or more nucleic acids comprising an interfering RNA sequence (e.g., siRNA). In particular, it is an object of this invention to provide in vitro and in vivo methods for treatment of a disease or disorder in a mammal (e.g., a rodent such as a mouse or a primate such as a human, chimpanzee, or monkey) by downregulating or silencing the transcription and/or translation of one or more target nucleic acid sequences or genes of interest. As a non-limiting example, the methods of the invention are useful for in vivo delivery of interfering RNA (e.g., siRNA) to the liver and/or tumor of a mammalian subject. In certain embodiments, the disease or disorder is associated with expression and/or overexpression of a gene and expression or overexpression of the gene is reduced by the interfering RNA (e.g., siRNA). In certain other embodiments, a therapeutically effective amount of the lipid particle (e.g., SNALP) may be administered to the mammal. In some instances, an interfering RNA (e.g., siRNA) is formulated into a SNALP, and the particles are administered to patients requiring such treatment. In other instances, cells are removed from a patient,

the interfering RNA (e.g., siRNA) is delivered in vitro (e.g., using a SNALP described herein), and the cells are reinjected into the patient.

In an additional aspect, the present invention provides lipid particles (e.g., SNALP) comprising asymmetrical interfering RNA (aiRNA) molecules that silence the expression of a target gene and methods of using such particles to silence target gene expression.

In one embodiment, the aiRNA molecule comprises a double-stranded (duplex) region of about 10 to about 25 (base paired) nucleotides in length, wherein the aiRNA molecule comprises an antisense strand comprising 5' and 3' overhangs, and wherein the aiRNA molecule is capable of silencing target gene expression.

In certain instances, the aiRNA molecule comprises a double-stranded (duplex) region of about 12-20, 12-19, 12-18, 13-17, or 14-17 (base paired) nucleotides in length, more typically 12, 13, 14, 15, 16, 17, 18, 19, or 20 (base paired) nucleotides in length. In certain other instances, the 5' and 3' overhangs on the antisense strand comprise sequences that are complementary to the target RNA sequence, and may optionally further comprise nontargeting sequences. In some embodiments, each of the 5' and 3' overhangs on the antisense strand comprises or consists of one, two, three, four, five, six, seven, or more nucleotides.

In other embodiments, the aiRNA molecule comprises modified nucleotides selected from the group consisting of 2'OMe nucleotides, 2'F nucleotides, 2'-deoxy nucleotides, 2'-O-MOE nucleotides, LNA nucleotides, and mixtures thereof. In a preferred embodiment, the aiRNA molecule comprises 2'OMe nucleotides. As a non-limiting example, the 2'OMe nucleotides may be selected from the group consisting of 2'OMe-guanosine nucleotides, 2'OMe-uridine nucleotides, and mixtures thereof.

In a related aspect, the present invention provides lipid particles (e.g., SNALP) comprising microRNA (miRNA) molecules that silence the expression of a target gene and methods of using such compositions to silence target gene expression.

In one embodiment, the miRNA molecule comprises about 15 to about 60 nucleotides in length, wherein the miRNA molecule is capable of silencing target gene expression.

In certain instances, the miRNA molecule comprises about 15-50, 15-40, or 15-30 nucleotides in length, more typically about 15-25 or 19-25 nucleotides in length, and are preferably about 20-24, 21-22, or 21-23 nucleotides in length. In a preferred embodiment, the miRNA molecule is a mature miRNA molecule targeting an RNA sequence of interest.

In some embodiments, the miRNA molecule comprises modified nucleotides selected from the group consisting of 2'OMe nucleotides, 2'F nucleotides, 2'-deoxy nucleotides, 2'-O-MOE nucleotides, LNA nucleotides, and mixtures thereof. In a preferred embodiment, the miRNA molecule comprises 2'OMe nucleotides. As a non-limiting example, the 2'OMe nucleotides may be selected from the group consisting of 2'OMe-guanosine nucleotides, 2'OMe-uridine nucleotides, and mixtures thereof.

As such, the lipid particles of the invention (e.g., SNALP) are advantageous and suitable for use in the administration of active agents or therapeutic agents such as nucleic acid (e.g., interfering RNA such as siRNA, aiRNA, and/or miRNA) to a subject (e.g., a mammal such as a human) because they are stable in circulation, of a size required for pharmacodynamic behavior resulting in access to extravascular sites, and are capable of reaching target cell populations.

## IV. ACTIVE AGENTS

Active agents (e.g., therapeutic agents) include any molecule or compound capable of exerting a desired effect on a cell, tissue, organ, or subject. Such effects may be, e.g., biological, physiological, and/or cosmetic. Active agents may be any type of molecule or compound including, but not limited to, nucleic acids, peptides, polypeptides, small molecules, and mixtures thereof. Non-limiting examples of nucleic acids include interfering RNA molecules (e.g., siRNA, aiRNA, miRNA), antisense oligonucleotides, plasmids, ribozymes, immunostimulatory oligonucleotides, and mixtures thereof. Examples of peptides or polypeptides include, without limitation, antibodies (e.g., polyclonal antibodies, monoclonal antibodies, antibody fragments; humanized antibodies, recombinant antibodies, recombinant human antibodies, Primatized™ antibodies), cytokines, growth factors, apoptotic factors, differentiation-inducing factors, cell-surface receptors and their ligands, hormones, and mixtures thereof. Examples of small molecules include, but are not limited to, small organic molecules or compounds such as any conventional agent or drug known to those of skill in the art.

In some embodiments, the active agent is a therapeutic agent, or a salt or derivative thereof. Therapeutic agent derivatives may be therapeutically active themselves or they may be prodrugs, which become active upon further modification. Thus, in one embodiment, a therapeutic agent derivative retains some or all of the therapeutic activity as compared to the unmodified agent, while in another embodiment, a therapeutic agent derivative is a prodrug that lacks therapeutic activity, but becomes active upon further modification.

### A. Nucleic Acids

In certain embodiments, lipid particles of the present invention are associated with a nucleic acid, resulting in a nucleic acid-lipid particle (e.g., SNALP). In some embodiments, the nucleic acid is fully encapsulated in the lipid particle. As used herein, the term "nucleic acid" includes any oligonucleotide or polynucleotide, with fragments containing up to 60 nucleotides generally termed oligonucleotides, and longer fragments termed polynucleotides. In particular embodiments, oligonucletoides of the invention are from about 15 to about 60 nucleotides in length. Nucleic acid may be administered alone in the lipid particles of the invention, or in combination (e.g., co-administered) with lipid particles of the invention comprising peptides, polypeptides, or small molecules such as conventional drugs.

In the context of this invention, the terms "polynucleotide" and "oligonucleotide" refer to a polymer or oligomer of nucleotide or nucleoside monomers consisting of naturally-occurring bases, sugars and intersugar (backbone) linkages. The terms "polynucleotide" and "oligonucleotide" also include polymers or oligomers comprising non-naturally occurring monomers, or portions thereof, which function similarly. Such modified or substituted oligonucleotides are often preferred over native forms because of properties such as, for example, enhanced cellular uptake, reduced immunogenicity, and increased stability in the presence of nucleases.

Oligonucleotides are generally classified as deoxyribooligonucleotides or ribooligonucleotides. A deoxyribooligonucleotide consists of a 5-carbon sugar called deoxyribose

joined covalently to phosphate at the 5' and 3' carbons of this sugar to form an alternating, unbranched polymer. A ribooligonucleotide consists of a similar repeating structure where the 5-carbon sugar is ribose.

The nucleic acid that is present in a lipid-nucleic acid particle according to this invention includes any form of nucleic acid that is known. The nucleic acids used herein can be single-stranded DNA or RNA, or double-stranded DNA or RNA, or DNA-RNA hybrids. Examples of double-stranded DNA are described herein and include, e.g., structural genes, genes including control and termination regions, and self-replicating systems such as viral or plasmid DNA. Examples of double-stranded RNA are described herein and include, e.g., siRNA and other RNAi agents such as aiRNA and pre-miRNA. Single-stranded nucleic acids include, e.g., antisense oligonucleotides, ribozymes, mature miRNA, and triplex-forming oligonucleotides.

Nucleic acids of the invention may be of various lengths, generally dependent upon the particular form of nucleic acid. For example, in particular embodiments, plasmids or genes may be from about 1,000 to about 100,000 nucleotide residues in length. In particular embodiments, oligonucleotides may range from about 10 to about 100 nucleotides in length. In various related embodiments, oligonucleotides, both single-stranded, double-stranded, and triple-stranded, may range in length from about 10 to about 60 nucleotides, from about 15 to about 60 nucleotides, from about 20 to about 50 nucleotides, from about 15 to about 30 nucleotides, or from about 20 to about 30 nucleotides in length.

In particular embodiments, an oligonucleotide (or a strand thereof) of the invention specifically hybridizes to or is complementary to a target polynucleotide sequence. The terms "specifically hybridizable" and "complementary" as used herein indicate a sufficient degree of complementarity such that stable and specific binding occurs between the DNA or RNA target and the oligonucleotide. It is understood that an oligonucleotide need not be 100% complementary to its target nucleic acid sequence to be specifically hybridizable. In preferred embodiments, an oligonucleotide is specifically hybridizable when binding of the oligonucleotide to the target sequence interferes with the normal function of the target sequence to cause a loss of utility or expression therefrom, and there is a sufficient degree of complementarity to avoid non-specific binding of the oligonucleotide to non-target sequences under conditions in which specific binding is desired, i.e., under physiological conditions in the case of in vivo assays or therapeutic treatment, or, in the case of in vitro assays, under conditions in which the assays are conducted. Thus, the oligonucleotide may include 1, 2, 3, or more base substitutions as compared to the region of a gene or mRNA sequence that it is targeting or to which it specifically hybridizes.

1. siRNA

The siRNA component of the nucleic acid-lipid particles of the present invention is capable of silencing the expression of a target gene of interest. Each strand of the siRNA duplex is typically about 15 to about 60 nucleotides in length, preferably about 15 to about 30 nucleotides in length. In certain embodiments, the siRNA comprises at least one modified nucleotide. The modified siRNA is generally less immunostimulatory than a corresponding unmodified siRNA sequence and retains RNAi activity against the target gene of interest. In some embodiments, the modified siRNA contains at least one 2'OMe purine or pyrimidine nucleotide such as a 2'OMe-guanosine, 2'OMe-uridine, 2'OMe-adenosine, and/or 2'OMe-cytosine nucleotide. In preferred embodiments, one or more of the uridine and/or guanosine nucleotides are modified. The modified nucleotides can be present in one strand (i.e., sense or antisense) or both strands of the siRNA. The siRNA sequences may have overhangs (e.g., 3' or 5' overhangs as described in Elbashir et al., *Genes Dev.,* 15188 (2001) or Nykäanen et al., *Cell,* 107:309 (2001)), or may lack overhangs (i.e., have blunt ends).

The modified siRNA generally comprises from about 1% to about 100% (e.g., about 1%, 2%, 3%, 4%, 5%, 6%, 7%, 8%, 9%, 10%, 11%, 12%, 13%, 14%, 15%, 16%, 17%, 18%, 19%, 20%, 21%, 22%, 23%, 24%, 25%, 26%, 27%, 28%, 29%, 30%, 35%, 40%, 45%, 50%, 55%, 60%, 65%, 70%, 75%, 80%, 85%, 90%, 95%, or 100%) modified nucleotides in the double-stranded region of the siRNA duplex. In certain embodiments, one, two, three, four, five, six, seven, eight, nine, ten, or more of the nucleotides in the double-stranded region of the siRNA comprise modified nucleotides.

In some embodiments, less than about 25% (e.g., less than about 25%, 24%, 23%, 22%, 21%, 20%, 19%, 18%, 17%, 16%, 15%, 14%, 13%, 12%, 11%, 10%, 9%, 8%, 7%, 6%, 5%, 4%, 3%, 2%, or 1%) of the nucleotides in the double-stranded region of the siRNA comprise modified nucleotides.

In other embodiments, from about 1% to about 25% (e.g., from about 1%-25%, 2%-25%, 3%-25%, 4%-25%, 5%-25%, 6%-25%, 7%-25%, 8%-25%, 9%-25%, 10%-25%, 11%-25%, 12%-25%, 13%-25%, 14%-25%, 15%-25%, 16%-25%, 17%-25%, 18%-25%, 19%-25%, 20%-25%, 21%-25%, 22%-25%, 23%-25%, 24%-25%, etc.) or from about 1% to about 20% (e.g., from about 1%-20%, 2%-20%, 3%-20%, 4%-20%, 5%-20%, 6%-20%, 7%-20%, 8%-20%, 9%-20%, 10%-20%, 11%-20%, 12%-20%, 13%-20%, 14%-20%, 15%-20%, 16%-20%, 17%-20%, 18%-20%, 19%-20%, 1%-19%, 2%-19%, 3%-19%, 4%-19%, 5%-19%, 6%-19%, 7%-19%, 8%-19%, 9%-19%, 10%-19%, 11%-19%, 12%-19%, 13%-19%, 14%-19%, 15%-19%, 16%-19%, 17%-19%, 18%-19%, 1%-18%, 2%-18%, 3%-18%, 4%-18%, 5%-18%, 6%-18%, 7%-18%, 8%-18%, 9%-18%, 10%-18%, 11%-18%, 12%-18%, 13%-18%, 14%-18%, 15%-18%, 16%-18%, 17%-18%, 1%-17%, 2%-17%, 3%-17%, 4%-17%, 5%-17%, 6%-17%, 7%-17%, 8%-17%, 9%-17%, 10%-17%, 11%-17%, 12%-17%, 13%-17%, 14%-17%, 15%-17%, 16%-17%, 1%-16%, 2%-16%, 3%-16%, 4%-16%, 5%-16%, 6%-16%, 7%-16%, 8%-16%, 9%-16%, 10%-16%, 11%-16%, 12%-16%, 13%-16%, 14%-16%, 15%-16%, 1%-15%, 2%-15%, 3%-15%, 4%-15%, 5%-15%, 6%-15%, 7%-15%, 8%-15%, 9%-15%, 10%-15%, 11%-15%, 12%-15%, 13%-15%, 14%-15%, etc.) of the nucleotides in the double-stranded region of the siRNA comprise modified nucleotides.

In further embodiments, e.g., when one or both strands of the siRNA are selectively modified at uridine and/or guanosine nucleotides, the resulting modified siRNA can comprise less than about 30% modified nucleotides (e.g., less than about 30%, 29%, 28%, 27%, 26%, 25%, 24%, 23%, 22%, 21%, 20%, 19%, 18%, 17%, 16%, 15%, 14%, 13%, 12%, 11%, 10%, 9%, 8%, 7%, 6%, 5%, 4%, 3%, 2%, or 1% modified nucleotides) or from about 1% to about 30% modified nucleotides (e.g., from about 1%-30%, 2%-30%, 3%-30%, 4%-30%, 5%-30%, 6%-30%, 7%-30%, 8%-30%, 9%-30%, 10%-30%, 11%-30%, 12%-30%, 13%-30%, 14%-30%, 15%-30%, 16%-30%, 17%-30%, 18%-30%, 19%-30%, 20%-30%, 21%-30%, 22%-30%, 23%-30%, 24%-30%, 25%-30%, 26%-30%, 27%-30%, 28%-30%, or 29%-30% modified nucleotides).

a. Selection of siRNA Sequences

Suitable siRNA sequences can be identified using any means known in the art. Typically, the methods described in Elbashir et al., *Nature,* 411:494-498 (2001) and Elbashir et al., *EMBO* 1, 20:6877-6888 (2001) are combined with rational design rules set forth in Reynolds et al., *Nature Biotech.,* 22(3):326-330 (2004).

Generally, the nucleotide sequence 3' of the AUG start codon of a transcript from the target gene of interest is scanned for dinucleotide sequences (e.g., AA, NA, CC, GG, or UU, wherein N=C, G, or U) (see, e.g., Elbashir et al., *EMBO J.,* 20:6877-6888 (2001)). The nucleotides immediately 3' to the dinucleotide sequences are identified as potential siRNA sequences (i.e., a target sequence or a sense strand sequence). Typically, the 19, 21, 23, 25, 27, 29, 31, 33, 35, or more nucleotides immediately 3' to the dinucleotide sequences are identified as potential siRNA sequences. In some embodiments, the dinucleotide sequence is an AA or NA sequence and the 19 nucleotides immediately 3' to the AA or NA dinucleotide are identified as potential siRNA sequences. siRNA sequences are usually spaced at different positions along the length of the target gene. To further enhance silencing efficiency of the siRNA sequences, potential siRNA sequences may be analyzed to identify sites that do not contain regions of homology to other coding sequences, e.g., in the target cell or organism. For example, a suitable siRNA sequence of about 21 base pairs typically will not have more than 16-17 contiguous base pairs of homology to coding sequences in the target cell or organism. If the siRNA sequences are to be expressed from an RNA Pol III promoter, siRNA sequences lacking more than 4 contiguous A's or T's are selected.

Once a potential siRNA sequence has been identified, a complementary sequence (i.e., an antisense strand sequence) can be designed. A potential siRNA sequence can also be analyzed using a variety of criteria known in the art. For example, to enhance their silencing efficiency, the siRNA sequences may be analyzed by a rational design algorithm to identify sequences that have one or more of the following features: (1) G/C content of about 25% to about 60% G/C; (2) at least 3 A/Us at positions 15-19 of the sense strand; (3) no internal repeats; (4) an A at position 19 of the sense strand; (5) an A at position 3 of the sense strand; (6) a U at position 10 of the sense strand; (7) no G/C at position 19 of the sense strand; and (8) no G at position 13 of the sense strand. siRNA design tools that incorporate algorithms that assign suitable values of each of these features and are useful for selection of siRNA can be found at, e.g., boz094.ust.hk/RNAi/siRNA. One of skill in the art will appreciate that sequences with one or more of the foregoing characteristics may be selected for further analysis and testing as potential siRNA sequences.

Additionally, potential siRNA sequences with one or more of the following criteria can often be eliminated as siRNA: (1) sequences comprising a stretch of 4 or more of the same base in a row; (2) sequences comprising homopolymers of Gs (i.e., to reduce possible non-specific effects due to structural characteristics of these polymers; (3) sequences comprising triple base motifs (e.g., GGG, CCC, AAA, or TTT); (4) sequences comprising stretches of 7 or more G/Cs in a row; and (5) sequences comprising direct repeats of 4 or more bases within the candidates resulting in internal fold-back structures. However, one of skill in the art will appreciate that sequences with one or more of the foregoing characteristics may still be selected for further analysis and testing as potential siRNA sequences.

In some embodiments, potential siRNA sequences may be further analyzed based on siRNA duplex asymmetry as described in, e.g., Khvorova et al., *Cell,* 115:209-216 (2003); and Schwarz et al., *Cell,* 115:199-208 (2003). In other embodiments, potential siRNA sequences may be further analyzed based on secondary structure at the target site as described in, e.g., Luo et al., *Biophys. Res. Commun.,* 318:303-310 (2004). For example, secondary structure at the target site can be modeled using the Mfold algorithm (available at www.bioinfo.rpi.edu/applications/mfold/rna/form1.cgi) to select siRNA sequences which favor accessibility at the target site where less secondary structure in the form of base-pairing and stem-loops is present.

Once a potential siRNA sequence has been identified, the sequence can be analyzed for the presence of any immunostimulatory properties, e.g., using an in vitro cytokine assay or an in vivo animal model. Motifs in the sense and/or antisense strand of the siRNA sequence such as GU-rich motifs (e.g., 5'-GU-3', 5'-UGU-3', 5'-GUGU-3', 5'-UGUGU-3', etc.) can also provide an indication of whether the sequence may be immunostimulatory. Once an siRNA molecule is found to be immunostimulatory, it can then be modified to decrease its immunostimulatory properties as described herein. As a non-limiting example, an siRNA sequence can be contacted with a mammalian responder cell under conditions such that the cell produces a detectable immune response to determine whether the siRNA is an immunostimulatory or a non-immunostimulatory siRNA. The mammalian responder cell may be from a naïve mammal (i.e., a mammal that has not previously been in contact with the gene product of the siRNA sequence). The mammalian responder cell may be, e.g., a peripheral blood mononuclear cell (PBMC), a macrophage, and the like. The detectable immune response may comprise production of a cytokine or growth factor such as, e.g., TNF-α, IFN-α, IFN-β, IFN-γ, IL-6, IL-12, or a combination thereof. An siRNA molecule identified as being immunostimulatory can then be modified to decrease its immunostimulatory properties by replacing at least one of the nucleotides on the sense and/or antisense strand with modified nucleotides. For example, less than about 30% (e.g., less than about 30%, 25%, 20%, 15%, 10%, or 5%) of the nucleotides in the double-stranded region of the siRNA duplex can be replaced with modified nucleotides such as 2'OMe nucleotides. The modified siRNA can then be contacted with a mammalian responder cell as described above to confirm that its immunostimulatory properties have been reduced or abrogated.

Suitable in vitro assays for detecting an immune response include, but are not limited to, the double monoclonal antibody sandwich immunoassay technique of David et al. (U.S. Pat. No. 4,376,110); monoclonal-polyclonal antibody sandwich assays (Wide et al., in Kirkham and Hunter, eds., *Radioimmunoassay Methods*, E. and S. Livingstone, Edinburgh (1970)); the "Western blot" method of Gordon et al. (U.S. Pat. No. 4,452,901); immunoprecipitation of labeled ligand (Brown et al., *J. Biol. Chem.,* 255:4980-4983 (1980)); enzyme-linked immunosorbent assays (ELISA) as described, for example, by Raines et al., *J. Biol. Chem.,* 257:5154-5160 (1982); immunocytochemical techniques, including the use of fluorochromes (Brooks et al., *Clin. Exp. Immunol.,* 39:477 (1980)); and neutralization of activity (Bowen-Pope et al., *Proc. Natl. Acad. Sci. USA,* 81:2396-2400 (1984)). In addition to the immunoassays described above, a number of other immunoassays are available, including those described in U.S. Pat. Nos. 3,817,827; 3,850,752; 3,901,654; 3,935,074; 3,984,533; 3,996,345;

4,034,074; and 4,098,876. The disclosures of these references are herein incorporated by reference in their entirety for all purposes.

A non-limiting example of an in vivo model for detecting an immune response includes an in vivo mouse cytokine induction assay as described in, e.g., Judge et al., *Mol. Ther.,* 13:494-505 (2006). In certain embodiments, the assay that can be performed as follows: (1) siRNA can be administered by standard intravenous injection in the lateral tail vein; (2) blood can be collected by cardiac puncture about 6 hours after administration and processed as plasma for cytokine analysis; and (3) cytokines can be quantified using sandwich ELISA kits according to the manufacturer's instructions (e.g., mouse and human IFN-α (PBL Biomedical; Piscataway, N.J.); human IL-6 and TNF-α (eBioscience; San Diego, Calif.); and mouse IL-6, TNFα, and IFN-γ (BD Biosciences; San Diego, Calif.)).

Monoclonal antibodies that specifically bind cytokines and growth factors are commercially available from multiple sources and can be generated using methods known in the art (see, e.g., Kohler et al., *Nature,* 256: 495-497 (1975) and Harlow and Lane, ANTIBODIES, A LABORATORY MANUAL, Cold Spring Harbor Publication, New York (1999)). Generation of monoclonal antibodies has been previously described and can be accomplished by any means known in the art (Buhring et al., in Hybridoma, Vol. 10, No. 1, pp. 77-78 (1991)). In some methods, the monoclonal antibody is labeled (e.g., with any composition detectable by spectroscopic, photochemical, biochemical, electrical, optical, or chemical means) to facilitate detection.

b. Generating siRNA Molecules

siRNA can be provided in several forms including, e.g., as one or more isolated small-interfering RNA (siRNA) duplexes, as longer double-stranded RNA (dsRNA), or as siRNA or dsRNA transcribed from a transcriptional cassette in a DNA plasmid. The siRNA sequences may have overhangs (e.g., 3' or 5' overhangs as described in Elbashir et al., *Genes Dev.,* 15:188 (2001) or Nykänen et al., *Cell,* 107:309 (2001), or may lack overhangs (i.e., to have blunt ends).

An RNA population can be used to provide long precursor RNAs, or long precursor RNAs that have substantial or complete identity to a selected target sequence can be used to make the siRNA. The RNAs can be isolated from cells or tissue, synthesized, and/or cloned according to methods well known to those of skill in the art. The RNA can be a mixed population (obtained from cells or tissue, transcribed from cDNA, subtracted, selected, etc.), or can represent a single target sequence. RNA can be naturally occurring (e.g., isolated from tissue or cell samples), synthesized in vitro (e.g., using T7 or SP6 polymerase and PCR products or a cloned cDNA), or chemically synthesized.

To form a long dsRNA, for synthetic RNAs, the complement is also transcribed in vitro and hybridized to form a dsRNA. If a naturally occurring RNA population is used, the RNA complements are also provided (e.g., to form dsRNA for digestion by *E. coli* RNAse III or Dicer), e.g., by transcribing cDNAs corresponding to the RNA population, or by using RNA polymerases. The precursor RNAs are then hybridized to form double stranded RNAs for digestion. The dsRNAs can be directly administered to a subject or can be digested in vitro prior to administration.

Methods for isolating RNA, synthesizing RNA, hybridizing nucleic acids, making and screening cDNA libraries, and performing PCR are well known in the art (see, e.g., Gubler and Hoffman, *Gene,* 25:263-269 (1983); Sambrook et al., supra; Ausubel et al., supra), as are PCR methods (see, U.S. Pat. Nos. 4,683,195 and 4,683,202; *PCR Protocols: A Guide to Methods and Applications* (Innis et al., eds, 1990)). Expression libraries are also well known to those of skill in the art. Additional basic texts disclosing the general methods of use in this invention include Sambrook et al., *Molecular Cloning, A Laboratory Manual* (2nd ed. 1989); Kriegler, *Gene Transfer and Expression: A Laboratory Manual* (1990); and *Current Protocols in Molecular Biology* (Ausubel et al., eds., 1994). The disclosures of these references are herein incorporated by reference in their entirety for all purposes.

Preferably, siRNA are chemically synthesized. The oligonucleotides that comprise the siRNA molecules of the invention can be synthesized using any of a variety of techniques known in the art, such as those described in Usman et al., *J. Am. Chem. Soc.,* 109:7845 (1987); Scaringe et al., *Nucl. Acids Res.,* 18:5433 (1990); Wincott et al., *Nucl. Acids Res.,* 23:2677-2684 (1995); and Wincott et al., *Methods Mol. Bio.,* 74:59 (1997). The synthesis of oligonucleotides makes use of common nucleic acid protecting and coupling groups, such as dimethoxytrityl at the 5'-end and phosphoramidites at the 3'-end. As a non-limiting example, small scale syntheses can be conducted on an Applied Biosystems synthesizer using a 0.2 μmol scale protocol. Alternatively, syntheses at the 0.2 μmol scale can be performed on a 96-well plate synthesizer from Protogene (Palo Alto, Calif.). However, a larger or smaller scale of synthesis is also within the scope of this invention. Suitable reagents for oligonucleotide synthesis, methods for RNA deprotection, and methods for RNA purification are known to those of skill in the art.

siRNA molecules can also be synthesized via a tandem synthesis technique, wherein both strands are synthesized as a single continuous oligonucleotide fragment or strand separated by a cleavable linker that is subsequently cleaved to provide separate fragments or strands that hybridize to form the siRNA duplex. The linker can be a polynucleotide linker or a non-nucleotide linker. The tandem synthesis of siRNA can be readily adapted to both multiwell/multiplate synthesis platforms as well as large scale synthesis platforms employing batch reactors, synthesis columns, and the like. Alternatively, siRNA molecules can be assembled from two distinct oligonucleotides, wherein one oligonucleotide comprises the sense strand and the other comprises the antisense strand of the siRNA. For example, each strand can be synthesized separately and joined together by hybridization or ligation following synthesis and/or deprotection. In certain other instances, siRNA molecules can be synthesized as a single continuous oligonucleotide fragment, where the self-complementary sense and antisense regions hybridize to form an siRNA duplex having hairpin secondary structure.

c. Modifying siRNA Sequences

In certain aspects, siRNA molecules comprise a duplex having two strands and at least one modified nucleotide in the double-stranded region, wherein each strand is about 15 to about 60 nucleotides in length. Advantageously, the modified siRNA is less immunostimulatory than a corresponding unmodified siRNA sequence, but retains the capability of silencing the expression of a target sequence. In preferred embodiments, the degree of chemical modifications introduced into the siRNA molecule strikes a balance between reduction or abrogation of the immunostimulatory properties of the siRNA and retention of RNAi activity. As a non-limiting example, an siRNA molecule that targets a gene of interest can be minimally modified (e.g., less than about 30%, 25%, 20%, 15%, 10%, or 5% modified) at selective uridine and/or guanosine nucleotides within the

siRNA duplex to eliminate the immune response generated by the siRNA while retaining its capability to silence target gene expression.

Examples of modified nucleotides suitable for use in the invention include, but are not limited to, ribonucleotides having a 2'-O-methyl (2'OMe), 2'-deoxy-2'-fluoro (2'F), 2'-deoxy, 5-C-methyl, 2'-O-(2-methoxyethyl) (MOE), 4'-thio, 2'-amino, or 2'-C-allyl group. Modified nucleotides having a Northern conformation such as those described in, e.g., Saenger, *Principles of Nucleic Acid Structure*, Springer-Verlag Ed. (1984), are also suitable for use in siRNA molecules. Such modified nucleotides include, without limitation, locked nucleic acid (LNA) nucleotides (e.g., 2'-O, 4'-C-methylene-(D-ribofuranosyl) nucleotides), 2'-O-(2-methoxyethyl) (MOE) nucleotides, 2'-methyl-thio-ethyl nucleotides, 2'-deoxy-2'-fluoro (2'F) nucleotides, 2'-deoxy-2'-chloro (2'Cl) nucleotides, and 2'-azido nucleotides. In certain instances, the siRNA molecules described herein include one or more G-clamp nucleotides. A G-clamp nucleotide refers to a modified cytosine analog wherein the modifications confer the ability to hydrogen bond both Watson-Crick and Hoogsteen faces of a complementary guanine nucleotide within a duplex (see, e.g., Lin et al., *J. Am. Chem. Soc.,* 120:8531-8532 (1998)). In addition, nucleotides having a nucleotide base analog such as, for example, C-phenyl, C-naphthyl, other aromatic derivatives, inosine, azole carboxamides, and nitroazole derivatives such as 3-nitropyrrole, 4-nitroindole, 5-nitroindole, and 6-nitroindole (see, e.g., Loakes, *Nucl. Acids Res.,* 29:2437-2447 (2001)) can be incorporated into siRNA molecules.

In certain embodiments, siRNA molecules may further comprise one or more chemical modifications such as terminal cap moieties, phosphate backbone modifications, and the like. Examples of terminal cap moieties include, without limitation, inverted deoxy abasic residues, glyceryl modifications, 4', 5'-methylene nucleotides, 1-((3-D-erythrofuranosyl) nucleotides, 4'-thio nucleotides, carbocyclic nucleotides, 1,5-anhydrohexitol nucleotides, L-nucleotides, α-nucleotides, modified base nucleotides, threo-pentofuranosyl nucleotides, acyclic 3', 4'-seco nucleotides, acyclic 3,4-dihydroxybutyl nucleotides, acyclic 3,5-dihydroxypentyl nucleotides, 3'-3'-inverted nucleotide moieties, 3'-3'-inverted abasic moieties, 3'-2'-inverted nucleotide moieties, 3'-2'-inverted abasic moieties, 5'-5'-inverted nucleotide moieties, 5'-5'-inverted abasic moieties, 3'-5'-inverted deoxy abasic moieties, 5'-amino-alkyl phosphate, 1,3-diamino-2-propyl phosphate, 3-aminopropyl phosphate, 6-aminohexyl phosphate, 1,2-aminododecyl phosphate, hydroxypropyl phosphate, 1,4-butanediol phosphate, 3'-phosphoramidate, 5'-phosphoramidate, hexylphosphate, aminohexyl phosphate, 3'-phosphate, 5'-amino, 3'-phosphorothioate, 5'-phosphorothioate, phosphorodithioate, and bridging or non-bridging methylphosphonate or 5'-mercapto moieties (see, e.g., U.S. Pat. No. 5,998,203; Beaucage et al., Tetrahedron 49:1925 (1993)). Non-limiting examples of phosphate backbone modifications (i.e., resulting in modified internucleotide linkages) include phosphorothioate, phosphorodithioate, methylphosphonate, phosphotriester, morpholino, amidate, carbamate, carboxymethyl, acetamidate, polyamide, sulfonate, sulfonamide, sulfamate, formacetal, thioformacetal, and alkylsilyl substitutions (see, e.g., Hunziker et al., *Nucleic Acid Analogues: Synthesis and Properties, in Modern Synthetic Methods*, VCH, 331-417 (1995); Mesmaeker et al., *Novel Backbone Replacements for Oligonucleotides*, in *Carbohydrate Modifications in Antisense Research*, ACS, 24-39 (1994)). Such chemical modifications can occur at the 5'-end and/or 3'-end of the sense strand, antisense strand, or both strands of the siRNA. The disclosures of these references are herein incorporated by reference in their entirety for all purposes.

In some embodiments, the sense and/or antisense strand of the siRNA molecule can further comprise a 3'-terminal overhang having about 1 to about 4 (e.g., 1, 2, 3, or 4) 2'-deoxy ribonucleotides and/or any combination of modified and unmodified nucleotides. Additional examples of modified nucleotides and types of chemical modifications that can be introduced into siRNA molecules are described, e.g., in UK Patent No. GB 2,397,818 B and U.S. Patent Publication Nos. 20040192626, 20050282188, and 20070135372, the disclosures of which are herein incorporated by reference in their entirety for all purposes.

The siRNA molecules described herein can optionally comprise one or more non-nucleotides in one or both strands of the siRNA. As used herein, the term "non-nucleotide" refers to any group or compound that can be incorporated into a nucleic acid chain in the place of one or more nucleotide units, including sugar and/or phosphate substitutions, and allows the remaining bases to exhibit their activity. The group or compound is abasic in that it does not contain a commonly recognized nucleotide base such as adenosine, guanine, cytosine, uracil, or thymine and therefore lacks a base at the 1'-position.

In other embodiments, chemical modification of the siRNA comprises attaching a conjugate to the siRNA molecule. The conjugate can be attached at the 5' and/or 3'-end of the sense and/or antisense strand of the siRNA via a covalent attachment such as, e.g., a biodegradable linker. The conjugate can also be attached to the siRNA, e.g., through a carbamate group or other linking group (see, e.g., U.S. Patent Publication Nos. 20050074771, 20050043219, and 20050158727). In certain instances, the conjugate is a molecule that facilitates the delivery of the siRNA into a cell. Examples of conjugate molecules suitable for attachment to siRNA include, without limitation, steroids such as cholesterol, glycols such as polyethylene glycol (PEG), human serum albumin (HSA), fatty acids, carotenoids, terpenes, bile acids, folates (e.g., folic acid, folate analogs and derivatives thereof), sugars (e.g., galactose, galactosamine, N-acetyl galactosamine, glucose, mannose, fructose, fucose, etc.), phospholipids, peptides, ligands for cellular receptors capable of mediating cellular uptake, and combinations thereof (see, e.g., U.S. Patent Publication Nos. 20030130186, 20040110296, and 20040249178; U.S. Pat. No. 6,753,423). Other examples include the lipophilic moiety, vitamin, polymer, peptide, protein, nucleic acid, small molecule, oligosaccharide, carbohydrate cluster, intercalator, minor groove binder, cleaving agent, and cross-linking agent conjugate molecules described in U.S. Patent Publication Nos. 20050119470 and 20050107325. Yet other examples include the 2'-O-alkyl amine, 2'-O-alkoxyalkyl amine, polyamine, C5-cationic modified pyrimidine, cationic peptide, guanidinium group, amidininium group, cationic amino acid conjugate molecules described in U.S. Patent Publication No. 20050153337. Additional examples include the hydrophobic group, membrane active compound, cell penetrating compound, cell targeting signal, interaction modifier, and steric stabilizer conjugate molecules described in U.S. Patent Publication No. 20040167090. Further examples include the conjugate molecules described in U.S. Patent Publication No. 20050239739. The type of conjugate used and the extent of conjugation to the siRNA molecule can be evaluated for improved pharmacokinetic profiles, bioavailability, and/or stability of the siRNA while retaining RNAi activity. As

such, one skilled in the art can screen siRNA molecules having various conjugates attached thereto to identify ones having improved properties and full RNAi activity using any of a variety of well-known in vitro cell culture or in vivo animal models. The disclosures of the above-described patent documents are herein incorporated by reference in their entirety for all purposes.

d. Target Genes

The siRNA component of the nucleic acid-lipid particles described herein can be used to downregulate or silence the translation (i.e., expression) of a gene of interest. Genes of interest include, but are not limited to, genes associated with viral infection and survival, genes associated with metabolic diseases and disorders (e.g., liver diseases and disorders), genes associated with tumorigenesis and cell transformation (e.g., cancer), angiogenic genes, immunomodulator genes such as those associated with inflammatory and autoimmune responses, ligand receptor genes, and genes associated with neurodegenerative disorders.

Genes associated with viral infection and survival include those expressed by a virus in order to bind, enter, and replicate in a cell. Of particular interest are viral sequences associated with chronic viral diseases. Viral sequences of particular interest include sequences of Filoviruses such as Ebola virus and Marburg virus (see, e.g., Geisbert et al., *J. Infect. Dis.,* 193:1650-1657 (2006)); Arenaviruses such as Lassa virus, Junin virus, Machupo virus, Guanarito virus, and Sabia virus (Buchmeier et al., *Arenaviridae*: the viruses and their replication, In: Fields Virology, Knipe et al. (eds.), 4th ed., Lippincott-Raven, Philadelphia, (2001)); Influenza viruses such as Influenza A, B, and C viruses, (see, e.g., Steinhauer et al., *Annu Rev Genet.,* 36:305-332 (2002); and Neumann et al., *J Gen Virol.,* 83:2635-2662 (2002)); Hepatitis viruses (see, e.g., Hamasaki et al., *FEBS Lett.,* 543:51 (2003); Yokota et al., *EMBO Rep.,* 4:602 (2003); Schlomai et al., *Hepatology,* 37:764 (2003); Wilson et al., *Proc. Natl. Acad. Sci. USA,* 100:2783 (2003); Kapadia et al., *Proc. Natl. Acad. Sci. USA,* 100:2014 (2003); and Fields Virology, Knipe et al. (eds.), 4th ed., Lippincott-Raven, Philadelphia (2001)); Human Immunodeficiency Virus (HIV) (Banerjea et al., *Mol. Ther.,* 8:62 (2003); Song et al., J Virol., 77:7174 (2003); Stephenson, *JAMA,* 289:1494 (2003); Qin et al., *Proc. Natl. Acad. Sci. USA,* 100:183 (2003)); Herpes viruses (Jia et al., J. Virol., 77:3301 (2003)); and Human Papilloma Viruses (HPV) (Hall et al., *J. Virol.,* 77:6066 (2003); Jiang et al., *Oncogene,* 21:6041 (2002)).

Exemplary Filovirus nucleic acid sequences that can be silenced include, but are not limited to, nucleic acid sequences encoding structural proteins (e.g., VP30, VP35, nucleoprotein (NP), polymerase protein (L-pol)) and membrane-associated proteins (e.g., VP40, glycoprotein (GP), VP24). Complete genome sequences for Ebola virus are set forth in, e.g., Genbank Accession Nos. NC_002549; AY769362; NC_006432; NC_004161; AY729654; AY354458; AY142960; AB050936; AF522874; AF499101; AF272001; and AF086833. Ebola virus VP24 sequences are set forth in, e.g., Genbank Accession Nos. U77385 and AY058897. Ebola virus L-pol sequences are set forth in, e.g., Genbank Accession No. X67110. Ebola virus VP40 sequences are set forth in, e.g., Genbank Accession No. AY058896. Ebola virus NP sequences are set forth in, e.g., Genbank Accession No. AY058895. Ebola virus GP sequences are set forth in, e.g., Genbank Accession No. AY058898; Sanchez et al., *Virus Res.,* 29:215-240 (1993); Will et al., *J. Virol.,* 67:1203-1210 (1993); Volchkov et al., *FEBS Lett.,* 305:181-184 (1992); and U.S. Pat. No. 6,713, 069. Additional Ebola virus sequences are set forth in, e.g., Genbank Accession Nos. L11365 and X61274. Complete genome sequences for Marburg virus are set forth in, e.g., Genbank Accession Nos. NC_001608; AY430365; AY430366; and AY358025. Marburg virus GP sequences are set forth in, e.g., Genbank Accession Nos. AF005734; AF005733; and AF005732. Marburg virus VP35 sequences are set forth in, e.g., Genbank Accession Nos. AF005731 and AF005730. Additional Marburg virus sequences are set forth in, e.g., Genbank Accession Nos. X64406; Z29337; AF005735; and Z12132. Non-limiting examples of siRNA molecules targeting Ebola virus and Marburg virus nucleic acid sequences include those described in U.S. Patent Publication No. 20070135370, the disclosure of which is herein incorporated by reference in its entirety for all purposes.

Exemplary Influenza virus nucleic acid sequences that can be silenced include, but are not limited to, nucleic acid sequences encoding nucleoprotein (NP), matrix proteins (M1 and M2), nonstructural proteins (NS1 and NS2), RNA polymerase (PA, PB1, PB2), neuraminidase (NA), and haemagglutinin (HA). Influenza A NP sequences are set forth in, e.g., Genbank Accession Nos. NC_004522; AY818138; AB166863; AB188817; AB189046; AB189054; AB189062; AY646169; AY646177; AY651486; AY651493; AY651494; AY651495; AY651496; AY651497; AY651498; AY651499; AY651500; AY651501; AY651502; AY651503; AY651504; AY651505; AY651506; AY651507; AY651509; AY651528; AY770996; AY790308; AY818138; and AY818140. Influenza A PA sequences are set forth in, e.g., Genbank Accession Nos. AY818132; AY790280; AY646171; AY818132; AY818133; AY646179; AY818134; AY551934; AY651613; AY651610; AY651620; AY651617; AY651600; AY651611; AY651606; AY651618; AY651608; AY651607; AY651605; AY651609; AY651615; AY651616; AY651640; AY651614; AY651612; AY651621; AY651619; AY770995; and AY724786. Non-limiting examples of siRNA molecules targeting Influenza virus nucleic acid sequences include those described in U.S. Patent Publication No. 20070218122, the disclosure of which is herein incorporated by reference in its entirety for all purposes.

Exemplary hepatitis virus nucleic acid sequences that can be silenced include, but are not limited to, nucleic acid sequences involved in transcription and translation (e.g., En1, En2, X, P) and nucleic acid sequences encoding structural proteins (e.g., core proteins including C and C-related proteins, capsid and envelope proteins including S, M, and/or L proteins, or fragments thereof) (see, e.g., Fields Virology, supra). Exemplary Hepatits C virus (HCV) nucleic acid sequences that can be silenced include, but are not limited to, the 5'-untranslated region (5'-UTR), the 3'-untranslated region (3'-UTR), the polyprotein translation initiation codon region, the internal ribosome entry site (IRES) sequence, and/or nucleic acid sequences encoding the core protein, the E1 protein, the E2 protein, the p7 protein, the NS2 protein, the NS3 protease/helicase, the NS4A protein, the NS4B protein, the NSSA protein, and/or the NSSB RNA-dependent RNA polymerase. HCV genome sequences are set forth in, e.g., Genbank Accession Nos. NC_004102 (HCV genotype 1a), AJ238799 (HCV genotype 1b), NC_009823 (HCV genotype 2), NC_009824 (HCV genotype 3), NC_009825 (HCV genotype 4), NC_009826 (HCV genotype 5), and NC_009827 (HCV genotype 6). Hepatitis A virus nucleic acid sequences are set forth in, e.g., Genbank Accession No. NC_001489; Hepatitis B virus nucleic acid sequences are set forth in, e.g., Genbank Accession No. NC_003977; Hepatitis D virus nucleic acid sequence are set forth in, e.g., Genbank Accession No. NC_001653; Hepatitis E virus nucleic acid sequences are set

forth in, e.g., Genbank Accession No. NC_001434; and Hepatitis G virus nucleic acid sequences are set forth in, e.g., Genbank Accession No. NC_001710. Silencing of sequences that encode genes associated with viral infection and survival can conveniently be used in combination with the administration of conventional agents used to treat the viral condition. Non-limiting examples of siRNA molecules targeting hepatitis virus nucleic acid sequences include those described in U.S. Patent Publication Nos. 20060281175, 20050058982, and 20070149470; U.S. Pat. No. 7,348,314; and U.S. Provisional Application No. 61/162,127, filed Mar. 20, 2009, the disclosures of which are herein incorporated by reference in their entirety for all purposes.

Genes associated with metabolic diseases and disorders (e.g., disorders in which the liver is the target and liver diseases and disorders) include, for example, genes expressed in dyslipidemia (e.g., liver X receptors such as LXRa and LXRI3 (Genback Accession No. NM_007121), farnesoid X receptors (FXR) (Genbank Accession No. NM_005123), sterol-regulatory element binding protein (SREBP), site-1 protease (SIP), 3-hydroxy-3-methylglutaryl coenzyme-A reductase (HMG coenzyme-A reductase), apolipoprotein B (ApoB) (Genbank Accession No. NM_000384), apolipoprotein CIII (ApoC3) (Genbank Accession Nos. NM_000040 and NG_008949 REGION: 5001 . . . 8164), and apolipoprotein E (ApoE) (Genbank Accession Nos. NM_000041 and NG_007084 REGION: 5001.8612)); and diabetes (e.g., glucose 6-phosphatase) (see, e.g., Forman et al., *Cell,* 81:687 (1995); Seol et al., *Mol. Endocrinol.,* 9:72 (1995), Zavacki et al., *Proc. Natl. Acad. Sci. USA,* 94:7909 (1997); Sakai et al., *Cell,* 85:1037-1046 (1996); Duncan et al., *J. Biol. Chem.,* 272:12778-12785 (1997); Willy et al., *Genes Dev.,* 9:1033-1045 (1995); Lehmann et al., *J. Biol. Chem.,* 272:3137-3140 (1997); Janowski et al., *Nature,* 383:728-731 (1996); and Peet et al., *Cell,* 93:693-704 (1998)). One of skill in the art will appreciate that genes associated with metabolic diseases and disorders (e.g., diseases and disorders in which the liver is a target and liver diseases and disorders) include genes that are expressed in the liver itself as well as and genes expressed in other organs and tissues. Silencing of sequences that encode genes associated with metabolic diseases and disorders can conveniently be used in combination with the administration of conventional agents used to treat the disease or disorder. Non-limiting examples of siRNA molecules targeting the ApoB gene include those described in U.S. Patent Publication No. 20060134189, the disclosure of which is herein incorporated by reference in its entirety for all purposes. Non-limiting examples of siRNA molecules targeting the ApoC3 gene include those described in U.S. Provisional Application No. 61/147,235, filed Jan. 26, 2009, the disclosure of which is herein incorporated by reference in its entirety for all purposes.

Examples of gene sequences associated with tumorigenesis and cell transformation (e.g., cancer or other neoplasia) include mitotic kinesins such as Eg5 (KSP, KIF11; Genbank Accession No. NM_004523); serine/threonine kinases such as polo-like kinase 1 (PLK-1) (Genbank Accession No. NM_005030; Barr et al., *Nat. Rev. Mol. Cell Biol.,* 5:429-440 (2004)); tyrosine kinases such as WEE1 (Genbank Accession Nos. NM_003390 and NM_001143976); inhibitors of apoptosis such as XIAP (Genbank Accession No. NM_001167); COPS signalosome subunits such as CSN1, CSN2, CSN3, CSN4, CSNS (JAB 1; Genbank Accession No. NM_006837); CSN6, CSN7A, CSN7B, and CSNS; ubiquitin ligases such as COP1 (RFWD2; Genbank Accession Nos. NM_022457 and NM_001001740); and histone deacetylases such as HDAC1, HDAC2 (Genbank Accession No. NM_001527), HDAC3, HDAC4, HDACS, HDAC6, HDAC7, HDAC8, HDAC9, etc. Non-limiting examples of siRNA molecules targeting the Eg5 and XIAP genes include those described in U.S. patent application Ser. No. 11/807,872, filed May 29, 2007, the disclosure of which is herein incorporated by reference in its entirety for all purposes. Non-limiting examples of siRNA molecules targeting the PLK-1 gene include those described in U.S. Patent Publication Nos. 20050107316 and 20070265438; and U.S. patent application Ser. No. 12/343,342, filed Dec. 23, 2008, the disclosures of which are herein incorporated by reference in their entirety for all purposes. Non-limiting examples of siRNA molecules targeting the CSNS gene include those described in U.S. Provisional Application No. 61/045,251, filed Apr. 15, 2008, the disclosure of which is herein incorporated by reference in its entirety for all purposes.

Additional examples of gene sequences associated with tumorigenesis and cell transformation include translocation sequences such as MLL fusion genes, BCR-ABL (Wilda et al., *Oncogene,* 21:5716 (2002); Scherr et al., *Blood,* 101:1566 (2003)), TEL-AML1, EWS-FLI1, TLS-FUS, PAX3-FKHR, BCL-2, AML1-ETO, and AML1-MTG8 (Heidenreich et al., *Blood,* 101:3157 (2003)); overexpressed sequences such as multidrug resistance genes (Nieth et al., *FEBS Lett.,* 545:144 (2003); Wu et al, *Cancer Res.* 63:1515 (2003)), cyclins (Li et al., *Cancer Res.,* 63:3593 (2003); Zou et al., *Genes Dev.,* 16:2923 (2002)), beta-catenin (Verma et al., *Clin Cancer Res.,* 9:1291 (2003)), telomerase genes (Kosciolek et al., *Mol Cancer Ther.,* 2:209 (2003)), c-MYC, N-MYC, BCL-2, growth factor receptors (e.g., EGFRI-ErbB1 (Genbank Accession Nos. NM_005228, NM_201282, NM_201283, and NM_201284; see also, Nagy et al. *Exp. Cell Res.,* 285:39-49 (2003), ErbB2/HER-2 (Genbank Accession Nos. NM_004448 and NM_001005862), ErbB3 (Genbank Accession Nos. NM_001982 and NM_001005915), and ErbB4 (Genbank Accession Nos. NM_005235 and NM_001042599); and mutated sequences such as RAS (reviewed in Tuschl and Borkhardt, *Mol. Interventions,* 2:158 (2002)). Non-limiting examples of siRNA molecules targeting the EGFR gene include those described in U.S. patent application Ser. No. 11/807,872, filed May 29, 2007, the disclosure of which is herein incorporated by reference in its entirety for all purposes.

Silencing of sequences that encode DNA repair enzymes find use in combination with the administration of chemotherapeutic agents (Collis et al., *Cancer Res.,* 63:1550 (2003)). Genes encoding proteins associated with tumor migration are also target sequences of interest, for example, integrins, selectins, and metalloproteinases. The foregoing examples are not exclusive. Those of skill in the art will understand that any whole or partial gene sequence that facilitates or promotes tumorigenesis or cell transformation, tumor growth, or tumor migration can be included as a template sequence.

Angiogenic genes are able to promote the formation of new vessels. Of particular interest is vascular endothelial growth factor (VEGF) (Reich et al., *Mol. Vis.,* 9:210 (2003)) or VEGFR. siRNA sequences that target VEGFR are set forth in, e.g., GB 2396864; U.S. Patent Publication No. 20040142895; and CA 2456444, the disclosures of which are herein incorporated by reference in their entirety for all purposes.

Anti-angiogenic genes are able to inhibit neovascularization. These genes are particularly useful for treating those cancers in which angiogenesis plays a role in the pathologi-

cal development of the disease. Examples of anti-angiogenic genes include, but are not limited to, endostatin (see, e.g., U.S. Pat. No. 6,174,861), angiostatin (see, e.g., U.S. Pat. No. 5,639,725), and VEGFR2 (see, e.g., Decaussin et al., J. Pathol., 188: 369-377 (1999)), the disclosures of which are herein incorporated by reference in their entirety for all purposes.

Immunomodulator genes are genes that modulate one or more immune responses. Examples of immunomodulator genes include, without limitation, cytokines such as growth factors (e.g., TGF-α, TGF-□⊕, EGF, FGF, IGF, NGF, PDGF, CGF, GM-CSF, SCF, etc.), interleukins (e.g., IL-2, IL-4, IL-12 (Hill et al., *J. Immunol.,* 171:691 (2003)), IL-15, IL-18, IL-20, etc.), interferons (e.g., IFN-α, IFN-β, IFN-γ, etc.) and TNF. Fas and Fas ligand genes are also immunomodulator target sequences of interest (Song et al., *Nat. Med.,* 9:347 (2003)). Genes encoding secondary signaling molecules in hematopoietic and lymphoid cells are also included in the present invention, for example, Tec family kinases such as Bruton's tyrosine kinase (Btk) (Heinonen et al., *FEBS Lett.,* 527:274 (2002)).

Cell receptor ligands include ligands that are able to bind to cell surface receptors (e.g., insulin receptor, EPO receptor, G-protein coupled receptors, receptors with tyrosine kinase activity, cytokine receptors, growth factor receptors, etc.), to modulate (e.g., inhibit, activate, etc.) the physiological pathway that the receptor is involved in (e.g., glucose level modulation, blood cell development, mitogenesis, etc.). Examples of cell receptor ligands include, but are not limited to, cytokines, growth factors, interleukins, interferons, erythropoietin (EPO), insulin, glucagon, G-protein coupled receptor ligands, etc. Templates coding for an expansion of trinucleotide repeats (e.g., CAG repeats) find use in silencing pathogenic sequences in neurodegenerative disorders caused by the expansion of trinucleotide repeats, such as spinobulbular muscular atrophy and Huntington's Disease (Caplen et al., *Hum. Mol. Genet.,* 11:175 (2002)).

In addition to its utility in silencing the expression of any of the above-described genes for therapeutic purposes, the siRNA described herein are also useful in research and development applications as well as diagnostic, prophylactic, prognostic, clinical, and other healthcare applications. As a non-limiting example, the siRNA can be used in target validation studies directed at testing whether a gene of interest has the potential to be a therapeutic target. The siRNA can also be used in target identification studies aimed at discovering genes as potential therapeutic targets.

2. aiRNA

Like siRNA, asymmetrical interfering RNA (aiRNA) can recruit the RNA-induced silencing complex (RISC) and lead to effective silencing of a variety of genes in mammalian cells by mediating sequence-specific cleavage of the target sequence between nucleotide 10 and 11 relative to the 5' end of the antisense strand (Sun et al., *Nat. Biotech.,* 26:1379-1382 (2008)). Typically, an aiRNA molecule comprises a short RNA duplex having a sense strand and an antisense strand, wherein the duplex contains overhangs at the 3' and 5' ends of the antisense strand. The aiRNA is generally asymmetric because the sense strand is shorter on both ends when compared to the complementary antisense strand. In some aspects, aiRNA molecules may be designed, synthesized, and annealed under conditions similar to those used for siRNA molecules. As a non-limiting example, aiRNA sequences may be selected and generated using the methods described above for selecting siRNA sequences.

In another embodiment, aiRNA duplexes of various lengths (e.g., about 10-25, 12-20, 12-19, 12-18, 13-17, or 14-17 base pairs, more typically 12, 13, 14, 15, 16, 17, 18, 19, or 20 base pairs) may be designed with overhangs at the 3' and 5' ends of the antisense strand to target an mRNA of interest. In certain instances, the sense strand of the aiRNA molecule is about 10-25, 12-20, 12-19, 12-18, 13-17, or 14-17 nucleotides in length, more typically 12, 13, 14, 15, 16, 17, 18, 19, or 20 nucleotides in length. In certain other instances, the antisense strand of the aiRNA molecule is about 15-60, 15-50, or 15-40 nucleotides in length, more typically about 15-30, 15-25, or 19-25 nucleotides in length, and is preferably about 20-24, 21-22, or 21-23 nucleotides in length.

In some embodiments, the 5' antisense overhang contains one, two, three, four, or more nontargeting nucleotides (e.g., "AA", "UU", "dTdT", etc.). In other embodiments, the 3' antisense overhang contains one, two, three, four, or more nontargeting nucleotides (e.g., "AA", "UU", "dTdT", etc.). In certain aspects, the aiRNA molecules described herein may comprise one or more modified nucleotides, e.g., in the double-stranded (duplex) region and/or in the antisense overhangs. As a non-limiting example, aiRNA sequences may comprise one or more of the modified nucleotides described above for siRNA sequences. In a preferred embodiment, the aiRNA molecule comprises 2'OMe nucleotides such as, for example, 2'OMe-guanosine nucleotides, 2'OMe-uridine nucleotides, or mixtures thereof.

In certain embodiments, aiRNA molecules may comprise an antisense strand which corresponds to the antisense strand of an siRNA molecule, e.g., one of the siRNA molecules described herein. In other embodiments, aiRNA molecules may be used to silence the expression of any of the target genes set forth above, such as, e.g., genes associated with viral infection and survival, genes associated with metabolic diseases and disorders, genes associated with tumorigenesis and cell transformation, angiogenic genes, immunomodulator genes such as those associated with inflammatory and autoimmune responses, ligand receptor genes, and genes associated with neurodegenerative disorders.

3. miRNA

Generally, microRNAs (miRNA) are single-stranded RNA molecules of about 21-23 nucleotides in length which regulate gene expression. miRNAs are encoded by genes from whose DNA they are transcribed, but miRNAs are not translated into protein (non-coding RNA); instead, each primary transcript (a pri-miRNA) is processed into a short stem-loop structure called a pre-miRNA and finally into a functional mature miRNA. Mature miRNA molecules are either partially or completely complementary to one or more messenger RNA (mRNA) molecules, and their main function is to downregulate gene expression. The identification of miRNA molecules is described, e.g., in Lagos-Quintana et al., *Science,* 294:853-858; Lau et al., *Science,* 294:858-862; and Lee et al., *Science,* 294:862-864.

The genes encoding miRNA are much longer than the processed mature miRNA molecule. miRNA are first transcribed as primary transcripts or pri-miRNA with a cap and poly-A tail and processed to short, ~70-nucleotide stem-loop structures known as pre-miRNA in the cell nucleus. This processing is performed in animals by a protein complex known as the Microprocessor complex, consisting of the nuclease Drosha and the double-stranded RNA binding protein Pasha (Denli et al., *Nature,* 432:231-235 (2004)). These pre-miRNA are then processed to mature miRNA in the cytoplasm by interaction with the endonuclease Dicer, which also initiates the formation of the RNA-induced silencing complex (RISC) (Bernstein et al., *Nature,* 409:

363-366 (2001). Either the sense strand or antisense strand of DNA can function as templates to give rise to miRNA.

When Dicer cleaves the pre-miRNA stem-loop, two complementary short RNA molecules are formed, but only one is integrated into the RISC complex. This strand is known as the guide strand and is selected by the argonaute protein, the catalytically active RNase in the RISC complex, on the basis of the stability of the 5' end (Preall et al., *Curr. Biol.,* 16:530-535 (2006)). The remaining strand, known as the anti-guide or passenger strand, is degraded as a RISC complex substrate (Gregory et al., *Cell,* 123:631-640 (2005)). After integration into the active RISC complex, miRNAs base pair with their complementary mRNA molecules and induce target mRNA degradation and/or translational silencing.

Mammalian miRNA molecules are usually complementary to a site in the 3' UTR of the target mRNA sequence. In certain instances, the annealing of the miRNA to the target mRNA inhibits protein translation by blocking the protein translation machinery. In certain other instances, the annealing of the miRNA to the target mRNA facilitates the cleavage and degradation of the target mRNA through a process similar to RNA interference (RNAi). miRNA may also target methylation of genomic sites which correspond to targeted mRNA. Generally, miRNA function in association with a complement of proteins collectively termed the miRNP.

In certain aspects, the miRNA molecules described herein are about 15-100, 15-90, 15-80, 15-75, 15-70, 15-60, 15-50, or 15-40 nucleotides in length, more typically about 15-30, 15-25, or 19-25 nucleotides in length, and are preferably about 20-24, 21-22, or 21-23 nucleotides in length. In certain other aspects, miRNA molecules may comprise one or more modified nucleotides. As a non-limiting example, miRNA sequences may comprise one or more of the modified nucleotides described above for siRNA sequences. In a preferred embodiment, the miRNA molecule comprises 2'OMe nucleotides such as, for example, 2'OMe-guanosine nucleotides, 2'OMe-uridine nucleotides, or mixtures thereof.

In some embodiments, miRNA molecules may be used to silence the expression of any of the target genes set forth above, such as, e.g., genes associated with viral infection and survival, genes associated with metabolic diseases and disorders, genes associated with tumorigenesis and cell transformation, angiogenic genes, immunomodulator genes such as those associated with inflammatory and autoimmune responses, ligand receptor genes, and genes associated with neurodegenerative disorders.

In other embodiments, one or more agents that block the activity of a miRNA targeting an mRNA of interest are administered using a lipid particle of the invention (e.g., a nucleic acid-lipid particle). Examples of blocking agents include, but are not limited to, steric blocking oligonucleotides, locked nucleic acid oligonucleotides, and Morpholino oligonucleotides. Such blocking agents may bind directly to the miRNA or to the miRNA binding site on the target mRNA.

4. Antisense Oligonucleotides

In one embodiment, the nucleic acid is an antisense oligonucleotide directed to a target gene or sequence of interest. The terms "antisense oligonucleotide" or "antisense" include oligonucleotides that are complementary to a targeted polynucleotide sequence. Antisense oligonucleotides are single strands of DNA or RNA that are complementary to a chosen sequence. Antisense RNA oligonucleotides prevent the translation of complementary RNA strands by binding to the RNA. Antisense DNA oligonucleotides can be used to target a specific, complementary (coding or non-coding) RNA. If binding occurs, this DNA/RNA hybrid can be degraded by the enzyme RNase H. In a particular embodiment, antisense oligonucleotides comprise from about 10 to about 60 nucleotides, more preferably from about 15 to about 30 nucleotides. The term also encompasses antisense oligonucleotides that may not be exactly complementary to the desired target gene. Thus, the invention can be utilized in instances where non-target specific-activities are found with antisense, or where an antisense sequence containing one or more mismatches with the target sequence is the most preferred for a particular use.

Antisense oligonucleotides have been demonstrated to be effective and targeted inhibitors of protein synthesis, and, consequently, can be used to specifically inhibit protein synthesis by a targeted gene. The efficacy of antisense oligonucleotides for inhibiting protein synthesis is well established. For example, the synthesis of polygalactauronase and the muscarine type 2 acetylcholine receptor are inhibited by antisense oligonucleotides directed to their respective mRNA sequences (see, U.S. Pat. Nos. 5,739,119 and 5,759,829). Furthermore, examples of antisense inhibition have been demonstrated with the nuclear protein cyclin, the multiple drug resistance gene (MDR1), ICAM-1, E-selectin, STK-1, striatal GABAA receptor, and human EGF (see, Jaskulski et al., *Science,* 240:1544-6 (1988); Vasanthakumar et al., *Cancer Commun.,* 1:225-32 (1989); Penis et al., *Brain Res Mot Brain Res.,* 15;57:310-20 (1998); and U.S. Pat. Nos. 5,801,154; 5,789,573; 5,718,709 and 5,610,288). Moreover, antisense constructs have also been described that inhibit and can be used to treat a variety of abnormal cellular proliferations, e.g., cancer (see, U.S. Pat. Nos. 5,747,470; 5,591,317; and 5,783,683). The disclosures of these references are herein incorporated by reference in their entirety for all purposes.

Methods of producing antisense oligonucleotides are known in the art and can be readily adapted to produce an antisense oligonucleotide that targets any polynucleotide sequence. Selection of antisense oligonucleotide sequences specific for a given target sequence is based upon analysis of the chosen target sequence and determination of secondary structure, $T_m$, binding energy, and relative stability. Antisense oligonucleotides may be selected based upon their relative inability to form dimers, hairpins, or other secondary structures that would reduce or prohibit specific binding to the target mRNA in a host cell. Highly preferred target regions of the mRNA include those regions at or near the AUG translation initiation codon and those sequences that are substantially complementary to 5' regions of the mRNA. These secondary structure analyses and target site selection considerations can be performed, for example, using v.4 of the OLIGO primer analysis software (Molecular Biology Insights) and/or the BLASTN 2.0.5 algorithm software (Altschul et al., *Nucleic Acids Res.,* 25:3389-402 (1997)).

5. Ribozymes

According to another embodiment of the invention, nucleic acid-lipid particles are associated with ribozymes. Ribozymes are RNA-protein complexes having specific catalytic domains that possess endonuclease activity (see, Kim et al., *Proc. Natl. Acad. Sci. USA.,* 84:8788-92 (1987); and Forster et al., *Cell,* 49:211-20 (1987)). For example, a large number of ribozymes accelerate phosphoester transfer reactions with a high degree of specificity, often cleaving only one of several phosphoesters in an oligonucleotide substrate (see, Cech et al., *Cell,* 27:487-96 (1981); Michel et al., *J. Mol. Biol.,* 216:585-610 (1990); Reinhold-Hurek et al., *Nature,* 357:173-6 (1992)). This specificity has been

attributed to the requirement that the substrate bind via specific base-pairing interactions to the internal guide sequence ("IGS") of the ribozyme prior to chemical reaction.

At least six basic varieties of naturally-occurring enzymatic RNA molecules are known presently. Each can catalyze the hydrolysis of RNA phosphodiester bonds in trans (and thus can cleave other RNA molecules) under physiological conditions. In general, enzymatic nucleic acids act by first binding to a target RNA. Such binding occurs through the target binding portion of an enzymatic nucleic acid which is held in close proximity to an enzymatic portion of the molecule that acts to cleave the target RNA. Thus, the enzymatic nucleic acid first recognizes and then binds a target RNA through complementary base-pairing, and once bound to the correct site, acts enzymatically to cut the target RNA. Strategic cleavage of such a target RNA will destroy its ability to direct synthesis of an encoded protein. After an enzymatic nucleic acid has bound and cleaved its RNA target, it is released from that RNA to search for another target and can repeatedly bind and cleave new targets.

The enzymatic nucleic acid molecule may be formed in a hammerhead, hairpin, hepatitis δ virus, group I intron or RNaseP RNA (in association with an RNA guide sequence), or Neurospora VS RNA motif, for example. Specific examples of hammerhead motifs are described in, e.g., Rossi et al., *Nucleic Acids Res.,* 20:4559-65 (1992). Examples of hairpin motifs are described in, e.g., EP 0360257, Hampel et al., *Biochemistry,* 28:4929-33 (1989); Hampel et al., *Nucleic Acids Res.,* 18:299-304 (1990); and U.S. Pat. No. 5,631,359. An example of the hepatitis 6 virus motif is described in, e.g., Perrotta et al., *Biochemistry,* 31:11843-52 (1992). An example of the RNaseP motif is described in, e.g., Guerrier-Takada et al., *Cell,* 35:849-57 (1983). Examples of the Neurospora VS RNA ribozyme motif is described in, e.g., Saville et al., *Cell,* 61:685-96 (1990); Saville et al., *Proc. Natl. Acad. Sci. USA,* 88:8826-30 (1991); Collins et al., *Biochemistry,* 32:2795-9 (1993). An example of the Group I intron is described in, e.g., U.S. Pat. No. 4,987,071. Important characteristics of enzymatic nucleic acid molecules used according to the invention are that they have a specific substrate binding site which is complementary to one or more of the target gene DNA or RNA regions, and that they have nucleotide sequences within or surrounding that substrate binding site which impart an RNA cleaving activity to the molecule. Thus, the ribozyme constructs need not be limited to specific motifs mentioned herein. The disclosures of these references are herein incorporated by reference in their entirety for all purposes.

Methods of producing a ribozyme targeted to any polynucleotide sequence are known in the art. Ribozymes may be designed as described in, e.g., PCT Publication Nos. WO 93/23569 and WO 94/02595, and synthesized to be tested in vitro and/or in vivo as described therein. The disclosures of these PCT publications are herein incorporated by reference in their entirety for all purposes.

Ribozyme activity can be optimized by altering the length of the ribozyme binding arms or chemically synthesizing ribozymes with modifications that prevent their degradation by serum ribonucleases (see, e.g., PCT Publication Nos. WO 92/07065, WO 93/15187, WO 91/03162, and WO 94/13688; EP 92110298.4; and U.S. Pat. No. 5,334,711, which describe various chemical modifications that can be made to the sugar moieties of enzymatic RNA molecules, the disclosures of which are each herein incorporated by reference in their entirety for all purposes), modifications which enhance their efficacy in cells, and removal of stem II bases to shorten RNA synthesis times and reduce chemical requirements.

6. Immunostimulatory Oligonucleotides

Nucleic acids associated with lipid particles of the present invention may be immunostimulatory, including immunostimulatory oligonucleotides (ISS; single-or double-stranded) capable of inducing an immune response when administered to a subject, which may be a mammal such as a human. ISS include, e.g., certain palindromes leading to hairpin secondary structures (see, Yamamoto et al., *J. Immunol.,* 148: 4072-6 (1992)), or CpG motifs, as well as other known ISS features (such as multi-G domains; see; PCT Publication No. WO 96/11266, the disclosure of which is herein incorporated by reference in its entirety for all purposes).

Immunostimulatory nucleic acids are considered to be non-sequence specific when it is not required that they specifically bind to and reduce the expression of a target sequence in order to provoke an immune response. Thus, certain immunostimulatory nucleic acids may comprise a sequence corresponding to a region of a naturally-occurring gene or mRNA, but they may still be considered non-sequence specific immunostimulatory nucleic acids.

In one embodiment, the immunostimulatory nucleic acid or oligonucleotide comprises at least one CpG dinucleotide. The oligonucleotide or CpG dinucleotide may be unmethylated or methylated. In another embodiment, the immunostimulatory nucleic acid comprises at least one CpG dinucleotide having a methylated cytosine. In one embodiment, the nucleic acid comprises a single CpG dinucleotide, wherein the cytosine in the CpG dinucleotide is methylated. In an alternative embodiment, the nucleic acid comprises at least two CpG dinucleotides, wherein at least one cytosine in the CpG dinucleotides is methylated. In a further embodiment, each cytosine in the CpG dinucleotides present in the sequence is methylated. In another embodiment, the nucleic acid comprises a plurality of CpG dinucleotides, wherein at least one of the CpG dinucleotides comprises a methylated cytosine. Examples of immunostimulatory oligonucleotides suitable for use in the compositions and methods of the present invention are described in PCT Application No. PCT/US08/88676, filed Dec. 31, 2008, PCT Publication Nos. WO 02/069369 and WO 01/15726, U.S. Pat. No. 6,406,705, and Raney et al., *J. Pharm. Exper. Ther.,* 298: 1185-92 (2001), the disclosures of which are each herein incorporated by reference in their entirety for all purposes. In certain embodiments, the oligonucleotides used in the compositions and methods of the invention have a phosphodiester ("PO") backbone or a phosphorothioate ("PS") backbone, and/or at least one methylated cytosine residue in a CpG motif.

B. Other Active Agents

In certain embodiments, the active agent associated with the lipid paticles of the invention may comprise one or more therapeutic proteins, polypeptides, or small organic molecules or compounds. Non-limiting examples of such therapeutically effective agents or drugs include oncology drugs (e.g., chemotherapy drugs, hormonal therapaeutic agents, immunotherapeutic agents, radiotherapeutic agents, etc.), lipid-lowering agents, anti-viral drugs, anti-inflammatory compounds, antidepressants, stimulants, analgesics, antibiotics, birth control medication, antipyretics, vasodilators, anti-angiogenics, cytovascular agents, signal transduction inhibitors, cardiovascular drugs such as anti-arrhythmic agents, hormones, vasoconstrictors, and steroids. These active agents may be administered alone in the lipid particles

of the invention, or in combination (e.g., co-administered) with lipid particles of the invention comprising nucleic acid such as interfering RNA.

Non-limiting examples of chemotherapy drugs include platinum-based drugs (e.g., oxaliplatin, cisplatin, carboplatin, spiroplatin, iproplatin, satraplatin, etc.), alkylating agents (e.g., cyclophosphamide, ifosfamide, chlorambucil, busulfan, melphalan, mechlorethamine, uramustine, thiotepa, nitrosoureas, etc.), anti-metabolites (e.g., 5-fluorouracil (5-FU), azathioprine, methotrexate, leucovorin, capecitabine, cytarabine, floxuridine, fludarabine, gemcitabine, pemetrexed, raltitrexed, etc.), plant alkaloids (e.g., vincristine, vinblastine, vinorelbine, vindesine, podophyllotoxin, paclitaxel (taxol), docetaxel, etc.), topoisomerase inhibitors (e.g., irinotecan (CPT-11; Camptosar), topotecan, amsacrine, etoposide (VP16), etoposide phosphate, teniposide, etc.), antitumor antibiotics (e.g., doxorubicin, adriamycin, daunorubicin, epirubicin, actinomycin, bleomycin, mitomycin, mitoxantrone, plicamycin, etc.), tyrosine kinase inhibitors (e.g., gefitinib (Iressa®), sunitinib (Sutent®; SU11248), erlotinib (Tarceva®; OSI-1774), lapatinib (GW572016; GW2016), canertinib (CI 1033), semaxinib (SU5416), vatalanib (PTK787/ZK222584), sorafenib (BAY 43-9006), imatinib (Gleevec®; STI571), dasatinib (BMS-354825), leflunomide (SU101), vandetanib (Zactima™; ZD6474), etc.), pharmaceutically acceptable salts thereof, stereoisomers thereof, derivatives thereof, analogs thereof, and combinations thereof.

Examples of conventional hormonal therapaeutic agents include, without limitation, steroids (e.g., dexamethasone), finasteride, aromatase inhibitors, tamoxifen, and goserelin as well as other gonadotropin-releasing hormone agonists (GnRH).

Examples of conventional immunotherapeutic agents include, but are not limited to, immunostimulants (e.g., Bacillus Calmette-Guérin (BCG), levamisole, interleukin-2, alpha-interferon, etc.), monoclonal antibodies (e.g., anti-CD20, anti-HER2, anti-CD52, anti-HLA-DR, and anti-VEGF monoclonal antibodies), immunotoxins (e.g., anti-CD33 monoclonal antibody-calicheamicin conjugate, anti-CD22 monoclonal antibody-pseudomonas exotoxin conjugate, etc.), and radioimmunotherapy (e.g., anti-CD20 monoclonal antibody conjugated to $^{111}$In, $^{90}$Y, or $^{131}$I, etc.).

Examples of conventional radiotherapeutic agents include, but are not limited to, radionuclides such as $^{47}$Sc, $^{64}$Cu, $^{67}$Cu, 89Sr, 86Y, 87Y, 90Y, 105Rh, $^{111}$Ag, $^{111}$In, $^{117}$Sn, $^{149}$Pm, $^{153}$Sm, $^{166}$Ho, $^{177}$Lu, $^{186}$Re, $^{188}$Re, $^{211}$At, and $^{212}$Bi, optionally conjugated to antibodies directed against tumor antigens.

Additional oncology drugs that may be used according to the invention include, but are not limited to, alkeran, allopurinol, altretamine, amifostine, anastrozole, araC, arsenic trioxide, bexarotene, biCNU, carmustine, CCNU, celecoxib, cladribine, cyclosporin A, cytosine arabinoside, cytoxan, dexrazoxane, DTIC, estramustine, exemestane, FK506, gemtuzumab-ozogamicin, hydrea, hydroxyurea, idarubicin, interferon, letrozole, leustatin, leuprolide, litretinoin, megastrol, L-PAM, mesna, methoxsalen, mithramycin, nitrogen mustard, pamidronate, Pegademase, pentostatin, porfimer sodium, prednisone, rituxan, streptozocin, STI-571, taxotere, temozolamide, VM-26, toremifene, tretinoin, ATRA, valrubicin, and velban. Other examples of oncology drugs that may be used according to the invention are ellipticin and ellipticin analogs or derivatives, epothilones, intracellular kinase inhibitors, and camptothecins.

Non-limiting examples of lipid-lowering agents for treating a lipid disease or disorder associated with elevated triglycerides, cholesterol, and/or glucose include statins, fibrates, ezetimibe, thiazolidinediones, niacin, beta-blockers, nitroglycerin, calcium antagonists, fish oil, and mixtures thereof.



Examples of anti-viral drugs include, but are not limited to, abacavir, aciclovir, acyclovir, adefovir, amantadine, amprenavir, arbidol, atazanavir, atripla, cidofovir, combivir, darunavir, delavirdine, didanosine, docosanol, edoxudine, efavirenz, emtricitabine, enfuvirtide, entecavir, entry inhibitors, famciclovir, fixed dose combinations, fomivirsen, fosamprenavir, foscarnet, fosfonet, fusion inhibitors, ganciclovir, ibacitabine, imunovir, idoxuridine, imiquimod, indinavir, inosine, integrase inhibitors, interferon type III (e.g., IFN-λ, molecules such as IFN-λ1, IFN-λ2, and IFN-λ3), interferon type II (e.g., IFN-γ), interferon type I (e.g., IFN-α such as PEGylated IFN-α, IFN-β, IFN-κ, IFN-δ, IFN-ε, IFN-τ, IFN-ω, and IFN-ζ, interferon, lamivudine, lopinavir, loviride, MK-0518, maraviroc, moroxydine, nelfinavir, nevirapine, nexavir, nucleoside analogues, oseltamivir, penciclovir, peramivir, pleconaril, podophyllotoxin, protease inhibitors, reverse transcriptase inhibitors, ribavirin, rimantadine, ritonavir, saquinavir, stavudine, synergistic enhancers, tenofovir, tenofovir disoproxil, tipranavir, trifluridine, trizivir, tromantadine, truvada, valaciclovir, valganciclovir, vicriviroc, vidarabine, viramidine, zalcitabine, zanamivir, zidovudine, pharmaceutically acceptable salts thereof, stereoisomers thereof, derivatives thereof, analogs thereof, and mixtures thereof.

## V. Lipid Particles

The lipid particles of the invention typically comprise an active agent or therapeutic agent, a cationic lipid, a non-cationic lipid, and a conjugated lipid that inhibits aggregation of particles. In some embodiments, the active agent or therapeutic agent is fully encapsulated within the lipid portion of the lipid particle such that the active agent or therapeutic agent in the lipid particle is resistant in aqueous solution to enzymatic degradation, e.g., by a nuclease or protease. In other embodiments, the lipid particles described herein are substantially non-toxic to mammals such as humans. The lipid particles of the invention typically have a mean diameter of from about 40 nm to about 150 nm, from about 50 nm to about 150 nm, from about 60 nm to about 130 nm, from about 70 nm to about 110 nm, or from about 70 to about 90 nm.

In preferred embodiments, the lipid particles of the invention are serum-stable nucleic acid-lipid particles (SNALP) which comprise an interfering RNA (e.g., siRNA, aiRNA, and/or miRNA), a cationic lipid (e.g., a cationic lipid of Formulas I, II, and/or III), a non-cationic lipid (e.g., cholesterol alone or mixtures of one or more phospholipids and cholesterol), and a conjugated lipid that inhibits aggregation of the particles (e.g., one or more PEG-lipid conjugates). The SNALP may comprise at least 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, or more unmodified and/or modified interfering RNA molecules. Nucleic acid-lipid particles and their method of preparation are described in, e.g., U.S. Pat. Nos. 5,753,613; 5,785,992; 5,705,385; 5,976,567; 5,981,501; 6,110,745; and 6,320,017; and PCT Publication No. WO 96/40964, the disclosures of which are each herein incorporated by reference in their entirety for all purposes.

### A. Cationic Lipids

Any of a variety of cationic lipids may be used in the lipid particles of the invention (e.g., SNALP), either alone or in combination with one or more other cationic lipid species or non-cationic lipid species.

Cationic lipids which are useful in the present invention can be any of a number of lipid species which carry a net positive charge at physiological pH. Such lipids include, but are not limited to, N,N-dioleyl-N,N-dimethylammonium chloride (DODAC), 1,2-dioleyloxy-N,N-dimethylamino-propane (DODMA), 1,2-distearyloxy-N,N-dimethylamino-propane (DSDMA), N-(1-(2,3-dioleyloxy)propyl)-N,N,N-trimethylammonium chloride (DOTMA), N,N-distearyl-N,N-dimethylammonium bromide (DDAB), N-(1-(2,3-dioleoyloxy)propyl)-N,N,N-trimethylammonium chloride (DOTAP), 3-(N-(N',N'-dimethylaminoethane)-carbamoyl) cholesterol (DC-Chol), N-(1,2-dimyristyloxyprop-3-yl)-N,N-dimethyl-N-hydroxyethyl ammonium bromide (DMRIE), 2,3-dioleyloxy-N-[2(spermine-carboxamido)ethyl]-N,N-dimethyl-1-propanaminiumtrifluoroacetate (DOSPA), dioctadecylamidoglycyl spermine (DOGS), 3-dimethylamino-2-(cholest-5-en-3-beta-oxybutan-4-oxy)-1-(cis,cis-9,12-octadecadienoxy)propane (CLinDMA), 2-[5'-(cholest-5-en-3.beta.-oxy)-3'-oxapentoxy)-3-dimethy-1-(cis,cis-9',1-2'-octadecadienoxy)propane (CpLinDMA), N,N-dimethyl-3,4-dioleyloxybenzylamine (DMOBA), 1,2-N,N'-dioleylcarbamyl-3-dimethylaminopropane (DOcarbDAP), 1,2-N,N'-Dilinoleylcarbamyl-3-dimethylaminopropane (DLincarbDAP), 1,2-Dilinoleoylcarbamyl-3-dimethylaminopropane (DLinCDAP), and mixtures thereof. A number of these lipids and related analogs have been described in U.S. Patent Publication Nos. 20060083780 and 20060240554; U.S. Pat. Nos. 5,208,036; 5,264,618; 5,279,833; 5,283,185; 5,753,613; and 5,785,992; and PCT Publication No. WO 96/10390, the disclosures of which are each herein incorporated by reference in their entirety for all purposes. Additionally, a number of commercial preparations of cationic lipids are available and can be used in the present invention. These include, e.g., LIPOFECTIN® (commercially available cationic liposomes comprising DOTMA and DOPE, from GIBCO/BRL, Grand Island, N.Y., USA); LIPOFECTAMINE® (commercially available cationic liposomes comprising DOSPA and DOPE, from GIBCO/BRL); and TRANSFECTAM® (commercially available cationic liposomes comprising DOGS from Promega Corp., Madison, Wis., USA).

Additionally, cationic lipids of Formula I having the following structures are useful in the present invention.


(I)

wherein $R^1$ and $R^2$ are independently selected and are H or $C_1$-$C_3$ alkyls, $R^3$ and $R^4$ are independently selected and are alkyl groups having from about 10 to about 20 carbon atoms, and at least one of $R^3$ and $R^4$ comprises at least two sites of unsaturation. In certain instances, $R^3$ and $R^4$ are both the same, i.e., $R^3$ and $R^4$ are both linoleyl ($C_{18}$), etc. In certain other instances, $R^3$ and $R^4$ are different, i.e., $R^3$ is tetradectrienyl ($C_{14}$) and $R^4$ is linoleyl ($C_{18}$). In a preferred embodiment, the cationic lipid of Formula I is symmetrical, i.e., $R^3$ and $R^4$ are both the same. In another preferred embodiment, both $R^3$ and $R^4$ comprise at least two sites of unsaturation. In some embodiments, $R^3$ and $R^4$ are independently selected from the group consisting of dodecadienyl, tetradecadienyl, hexadecadienyl, linoleyl, and icosadienyl. In a preferred embodiment, $R^3$ and $R^4$ are both linoleyl. In some embodiments, $R^3$ and $R^4$comprise at least three sites of unsaturation and are independently selected from, e.g., dodecatrienyl, tetradectrienyl, hexadecatrienyl, linolenyl, and icosatrienyl. In particularly preferred embodiments, the cationic lipid of Formula I is 1,2-dilinoleyloxy-N,N-dimethylaminopropane (DLinDMA) or 1,2-dilinolenyloxy-N,N-dimethylaminopropane (DLenDMA).

Furthermore, cationic lipids of Formula II having the following structures are useful in the present invention.


(II)

wherein $R^1$ and $R^2$ are independently selected and are H or $C_1$-$C_3$ alkyls, $R^3$ and $R^4$ are independently selected and are alkyl groups having from about 10 to about 20 carbon atoms, and at least one of $R^3$ and $R^4$ comprises at least two sites of unsaturation. In certain instances, $R^3$ and $R^4$ are both the same, i.e., $R^3$ and $R^4$ are both linoleyl ($C_{18}$), etc. In certain other instances, $R^3$ and $R^4$ are different, i.e., $R^3$ is tetradectrienyl ($C_{14}$) and $R^4$ is linoleyl ($C_{18}$). In a preferred embodiment, the cationic lipids of the present invention are symmetrical, i.e., $R^3$ and $R^4$ are both the same. In another preferred embodiment, both $R^3$ and $R^4$ comprise at least two sites of unsaturation. In some embodiments, $R^3$ and $R^4$ are independently selected from the group consisting of dodecadienyl, tetradecadienyl, hexadecadienyl, linoleyl, and icosadienyl. In a preferred embodiment, $R^3$ and $R^4$ are both linoleyl. In some embodiments, $R^3$ and $R^4$comprise at least three sites of unsaturation and are independently selected from, e.g., dodecatrienyl, tetradectrienyl, hexadecatrienyl, linolenyl, and icosatrienyl.

Moreover, cationic lipids of Formula III having the following structures (or salts thereof) are useful in the present invention.


(III)

Wherein $R^1$ and $R^2$ are either the same or different and independently optionally substituted $C_{12}$-$C_{24}$ alkyl, optionally substituted $C_{12}$-$C_{24}$ alkenyl, optionallysubstituted $C_{12}$-$C_{24}$ alkynyl, or optionally substituted $C_{12}$-$C_{24}$ acyl; $R^3$ and $R^4$ are either the same or different and independently optionally substituted $C_1$-$C_6$ alkyl, optionally substituted $C_1$-$C_6$ alkenyl, or optionally substituted $C_1$-$C_6$ alkynyl or $R^3$ and $R^4$ may join to form an optionally substituted heterocyclic ring of 4 to 6 carbon atoms and 1 or 2 heteroatoms chosen from nitrogen and oxygen; $R^5$ is either absent or hydrogen or $C_1$-$C_6$ alkyl to provide a quaternary amine; m, n, and p are either the same or different and independently either 0 or 1 with the proviso that m, n, and p are not simultaneously O; q is 0, 1, 2, 3, or 4; and Y and Z are either the same or different and independently O, S, or NH.

In some embodiments, the cationic lipid of Formula III is 2,2-dilinoleyl-4-(2-dimethylaminoethyl)-[1,3]-dioxolane (DLin-K-$C_2$-DMA; “XTC2”), 2,2-dilinoleyl-4-(3-dimethylaminopropyl)-[1,3]-dioxolane (DLin-K-$C_3$-DMA), 2,2-dilinoleyl-4-(4-dimethylaminobutyl)-[1,3]-dioxolane (DLin-K-

$C_4$-DMA), 2,2-dilinoleyl-5-dimethylaminomethyl-[1,3]-dioxane (DLin-K6-DMA), 2,2-dilinoleyl-4-N-methylpepiazino-[1,3]-dioxolane (DLin-K-MPZ), 2,2-dilinoleyl-4-dimethylaminomethyl-[1,3]-dioxolane (DLin-K-DMA), 1,2-dilinoleylcarbamoyloxy-3-dimethylaminopropane (DLin-C-DAP), 1,2-dilinoleyoxy-3-(dimethylamino)acetoxypropane (DLin-DAC), 1,2-dilinoleyoxy-3-morpholinopropane (DLin-MA), 1,2-dilinoleoyl-3-dimethylaminopropane (DLinDAP), 1,2-dilinoleylthio-3-dimethylaminopropane (DLin-S-DMA), 1-linoleoyl-2-linoleyloxy-3-dimethylaminopropane (DLin-2-DMAP), 1,2-dilinoleyloxy-3-trimethylaminopropane chloride salt (DLin-TMA.Cl), 1,2-dilinoleoyl-3-trimethylaminopropane chloride salt (DLin-TAP.Cl), 1,2-dilinoleyloxy-3-(N-methylpiperazino)propane (DLin-MPZ), 3-(N,N-dilinoleylamino)-1,2-propanediol (DLinAP), 3-(N,N-dioleylamino)-1,2-propanedio (DOAP), 1,2-dilinoleyloxo-3-(2-N,N-dimethylamino)ethoxypropane (DLin-EG-DMA), or mixtures thereof. In preferred embodiments, the cationic lipid of Formula III is DLin-K-$C_2$-DMA (XTC2).

The cationic lipid typically comprises from about 50 mol % to about 90 mol %, from about 50 mol % to about 85 mol %, from about 50 mol % to about 80 mol %, from about 50 mol % to about 75 mol %, from about 50 mol % to about 70 mol %, from about 50 mol % to about 65 mol %, or from about 55 mol % to about 65 mol % of the total lipid present in the particle.

It will be readily apparent to one of skill in the art that depending on the intended use of the particles, the proportions of the components can be varied and the delivery efficiency of a particular formulation can be measured using, e.g., an endosomal release parameter (ERP) assay.

B. Non-Cationic Lipids

The non-cationic lipids used in the lipid particles of the invention (e.g., SNALP) can be any of a variety of neutral uncharged, zwitterionic, or anionic lipids capable of producing a stable complex.

Non-limiting examples of non-cationic lipids include phospholipids such as lecithin, phosphatidylethanolamine, lysolecithin, lysophosphatidylethanolamine, phosphatidylserine, phosphatidylinositol, sphingomyelin, egg sphingomyelin (ESM), cephalin, cardiolipin, phosphatidic acid, cerebrosides, dicetylphosphate, di stearoylphosphatidylcholine (DSPC), dioleoylphosphatidylcholine (DOPC), dipalmitoylphosphatidylcholine (DPPC), dioleoylphosphatidylglycerol (DOPG), dipalmitoylphosphatidylglycerol (DPPG), dioleoylphosphatidylethanolamine (DOPE), palmitoyloleoyl-phosphatidylcholine (POPC), palmitoyloleoyl-phosphatidylethanolamine (POPE), palmitoyloleyol-phosphatidylglycerol (POPG), dioleoylphosphatidylethanolamine 4-(N-maleimidomethyl)-cyclohexane-1-carboxylate (DOPE-mal), dipalmitoyl-phosphatidylethanolamine (DPPE), dimyristoyl-phosphatidylethanolamine (DMPE), distearoyl-phosphatidylethanolamine (DSPE), monomethyl-phosphatidylethanolamine, dimethyl-phosphatidylethanolamine, dielaidoyl-phosphatidylethanolamine (DEPE), stearoyloleoyl-phosphatidylethanolamine (SOPE), lysophosphatidylcholine, dilinoleoylphosphatidylcholine, and mixtures thereof. Other diacylphosphatidylcholine and diacylphosphatidylethanolamine phospholipids can also be used. The acyl groups in these lipids are preferably acyl groups derived from fatty acids having $C_{10}$-$C_{24}$ carbon chains, e.g., lauroyl, myristoyl, palmitoyl, stearoyl, or oleoyl.



Additional examples of non-cationic lipids include sterols such as cholesterol and derivatives thereof such as cholestanol, cholestanone, cholestenone, coprostanol, cholesteryl-2'-hydroxyethyl ether, cholesteryl-4'-hydroxybutyl ether, and mixtures thereof.

In some embodiments, the non-cationic lipid present in the lipid particles (e.g., SNALP) comprises or consists of cholesterol or a derivative thereof, e.g., a phospholipid-free lipid particle formulation. In other embodiments, the non-cationic lipid present in the lipid particles (e.g., SNALP) comprises or consists of one or more phospholipids, e.g., a cholesterol-free lipid particle formulation. In further embodiments, the non-cationic lipid present in the lipid particles (e.g., SNALP) comprises or consists of a mixture of one or more phospholipids and cholesterol or a derivative thereof.

Other examples of non-cationic lipids suitable for use in the present invention include nonphosphorous containing lipids such as, e.g., stearylamine, dodecylamine, hexadecylamine, acetyl palmitate, glycerolricinoleate, hexadecyl stereate, isopropyl myristate, amphoteric acrylic polymers, triethanolamine-lauryl sulfate, alkyl-aryl sulfate polyethyloxylated fatty acid amides, dioctadecyldimethyl ammonium bromide, ceramide, sphingomyelin, and the like.

In some embodiments, the non-cationic lipid comprises from about 13 mol % to about 49.5 mol %, from about 20 mol % to about 45 mol %, from about 25 mol % to about 45 mol %, from about 30 mol % to about 45 mol %, from about 35 mol % to about 45 mol %, from about 20 mol % to about 40 mol %, from about 25 mol % to about 40 mol %, or from about 30 mol % to about 40 mol % of the total lipid present in the particle.

In certain embodiments, the cholesterol present in phospholipid-free lipid particles comprises from about 30 mol % to about 45 mol %, from about 30 mol % to about 40 mol %, from about 35 mol % to about 45 mol %, or from about 35 mol % to about 40 mol % of the total lipid present in the particle. As a non-limiting example, a phospholipid-free lipid particle may comprise cholesterol at about 37 mol % of the total lipid present in the particle.

In certain other embodiments, the cholesterol present in lipid particles containing a mixture of phospholipid and cholesterol comprises from about 30 mol % to about 40 mol %, from about 30 mol % to about 35 mol %, or from about 35 mol % to about 40 mol % of the total lipid present in the particle. As a non-limiting example, a lipid particle comprising a mixture of phospholipid and cholesterol may comprise cholesterol at about 34 mol % of the total lipid present in the particle.

In further embodiments, the cholesterol present in lipid particles containing a mixture of phospholipid and cholesterol comprises from about 10 mol % to about 30 mol %, from about 15 mol % to about 25 mol %, or from about 17 mol % to about 23 mol % of the total lipid present in the particle. As a non-limiting example, a lipid particle comprising a mixture of phospholipid and cholesterol may comprise cholesterol at about 20 mol % of the total lipid present in the particle.

In embodiments where the lipid particles contain a mixture of phospholipid and cholesterol or a cholesterol derivative, the mixture may comprise up to about 40, 45, 50, 55, or 60 mol % of the total lipid present in the particle. In certain instances, the phospholipid component in the mixture may comprise from about 2 mol % to about 12 mol %, from about 4 mol % to about 10 mol %, from about 5 mol % to about 10 mol %, from about 5 mol % to about 9 mol %, or from about 6 mol % to about 8 mol % of the total lipid

present in the particle. As a non-limiting example, a lipid particle comprising a mixture of phospholipid and cholesterol may comprise a phospholipid such as DPPC or DSPC at about 7 mol % (e.g., in a mixture with about 34 mol % cholesterol) of the total lipid present in the particle. In certain other instances, the phospholipid component in the mixture may comprise from about 10 mol % to about 30 mol %, from about 15 mol % to about 25 mol %, or from about 17 mol % to about 23 mol % of the total lipid present in the particle. As another non-limiting example, a lipid particle comprising a mixture of phospholipid and cholesterol may comprise a phospholipid such as DPPC or DSPC at about 20 mol % (e.g., in a mixture with about 20 mol % cholesterol) of the total lipid present in the particle.

C. Lipid Conjugate

In addition to cationic and non-cationic lipids, the lipid particles of the invention (e.g., SNALP) comprise a lipid conjugate. The conjugated lipid is useful in that it prevents the aggregation of particles. Suitable conjugated lipids include, but are not limited to, PEG-lipid conjugates, ATTA-lipid conjugates, cationic-polymer-lipid conjugates (CPLs), and mixtures thereof. In certain embodiments, the particles comprise either a PEG-lipid conjugate or an ATTA-lipid conjugate together with a CPL.

In a preferred embodiment, the lipid conjugate is a PEG-lipid. Examples of PEG-lipids include, but are not limited to, PEG coupled to dialkyloxypropyls (PEG-DAA) as described in, e.g., PCT Publication No. WO 05/026372, PEG coupled to diacylglycerol (PEG-DAG) as described in, e.g., U.S. Patent Publication Nos. 20030077829 and 2005008689, PEG coupled to phospholipids such as phosphatidylethanolamine (PEG-PE), PEG conjugated to ceramides as described in, e.g., U.S. Pat. No. 5,885,613, PEG conjugated to cholesterol or a derivative thereof, and mixtures thereof. The disclosures of these patent documents are herein incorporated by reference in their entirety for all purposes. Additional PEG-lipids include, without limitation, PEG-C-DOMG, 2KPEG-DMG, and a mixture thereof.

PEG is a linear, water-soluble polymer of ethylene PEG repeating units with two terminal hydroxyl groups. PEGs are classified by their molecular weights; for example, PEG 2000 has an average molecular weight of about 2,000 daltons, and PEG 5000 has an average molecular weight of about 5,000 daltons. PEGs are commercially available from Sigma Chemical Co. and other companies and include, for example, the following: monomethoxypolyethylene glycol (MePEG-OH), monomethoxypolyethylene glycol-succinate (MePEG-S), monomethoxypolyethylene glycol-succinimidyl succinate (MePEG-S-NHS), monomethoxypolyethylene glycol-amine (MePEG-NH2), monomethoxypolyethylene glycol-tresylate (MePEG-TRES), and monomethoxypolyethylene glycol-imidazolyl-carbonyl (MePEG-IM). Other PEGs such as those described in U.S. Pat. Nos. 6,774,180 and 7,053,150 (e.g., mPEG (20 KDa) amine) are also useful for preparing the PEG-lipid conjugates of the present invention. The disclosures of these patents are herein incorporated by reference in their entirety for all purposes. In addition, monomethoxypolyethyleneglycol-acetic acid (MePEG-$CH_2COOH$) is particularly useful for preparing PEG-lipid conjugates including, e.g., PEG-DAA conjugates.

The PEG moiety of the PEG-lipid conjugates described herein may comprise an average molecular weight ranging from about 550 daltons to about 10,000 daltons. In certain instances, the PEG moiety has an average molecular weight of from about 750 daltons to about 5,000 daltons (e.g., from about 1,000 daltons to about 5,000 daltons, from about 1,500 daltons to about 3,000 daltons, from about 750 daltons to about 3,000 daltons, from about 750 daltons to about 2,000 daltons, etc.). In preferred embodiments, the PEG moiety has an average molecular weight of about 2,000 daltons or about 750 daltons.

In certain instances, the PEG can be optionally substituted by an alkyl, alkoxy, acyl, or aryl group. The PEG can be conjugated directly to the lipid or may be linked to the lipid via a linker moiety. Any linker moiety suitable for coupling the PEG to a lipid can be used including, e.g., non-ester containing linker moieties and ester-containing linker moieties. In a preferred embodiment, the linker moiety is a non-ester containing linker moiety. As used herein, the term "non-ester containing linker moiety" refers to a linker moiety that does not contain a carboxylic ester bond (—OC(O)—). Suitable non-ester containing linker moieties include, but are not limited to, amido (—C(O)NH—), amino (—NR—), carbonyl (—C(O)—), carbamate (—NHC(O)O—), urea (—NHC(O)NH—), disulphide (—S—S—), ether (—O—), succinyl (—(O)CCH2CH2C(O)—), succinamidyl (—NHC(O)CH2CH2C(O)NH—), ether, disulphide, as well as combinations thereof (such as a linker containing both a carbamate linker moiety and an amido linker moiety). In a preferred embodiment, a carbamate linker is used to couple the PEG to the lipid.

In other embodiments, an ester containing linker moiety is used to couple the PEG to the lipid. Suitable ester containing linker moieties include, e.g., carbonate (—OC(O)O—), succinoyl, phosphate esters (—O—(O)POH—O—), sulfonate esters, and combinations thereof.

Phosphatidylethanolamines having a variety of acyl chain groups of varying chain lengths and degrees of saturation can be conjugated to PEG to form the lipid conjugate. Such phosphatidylethanolamines are commercially available, or can be isolated or synthesized using conventional techniques known to those of skilled in the art. Phosphatidyl-ethanolamines containing saturated or unsaturated fatty acids with carbon chain lengths in the range of $C_{10}$ to $C_{20}$ are preferred. Phosphatidylethanolamines with mono- or diunsaturated fatty acids and mixtures of saturated and unsaturated fatty acids can also be used. Suitable phosphatidylethanolamines include, but are not limited to, dimyristoyl-phosphatidylethanolamine (DMPE), dipalmitoyl-phosphatidylethanolamine (DPPE), dioleoylphosphatidylethanolamine (DOPE), and distearoyl-phosphatidylethanolamine (DSPE).

The term "ATTA" or "polyamide" refers to, without limitation, compounds described in U.S. Pat. Nos. 6,320,017 and 6,586,559, the disclosures of which are herein incorporated by reference in their entirety for all purposes. These compounds include a compound having the formula:

(IV)



wherein R is a member selected from the group consisting of hydrogen, alkyl and acyl; $R^1$ is a member selected from the group consisting of hydrogen and alkyl; or optionally, R and $R^1$ and the nitrogen to which they are bound form an azido moiety; $R^2$ is a member of the group selected from hydrogen, optionally substituted alkyl, optionally substituted aryl and a side chain of an amino acid; $R^3$ is a member

selected from the group consisting of hydrogen, halogen, hydroxy, alkoxy, mercapto, hydrazino, amino and $NR^4R^5$, wherein $R^4$ and $R^5$ are independently hydrogen or alkyl; n is 4 to 80; m is 2 to 6; p is 1 to 4; and q is 0 or 1. It will be apparent to those of skill in the art that other polyamides can be used in the compounds of the present invention.

The term "diacylglycerol" refers to a compound having 2 fatty acyl chains, $R^1$ and $R^2$, both of which have independently between 2 and 30 carbons bonded to the 1- and 2-position of glycerol by ester linkages. The acyl groups can be saturated or have varying degrees of unsaturation. Suitable acyl groups include, but are not limited to, lauryl ($C_{12}$), myristyl ($C_{14}$), palmityl (C16), stearyl ($C_{18}$), and icosyl ($C_{20}$). In preferred embodiments, $R^1$ and $R^2$ are the same, i.e., $R^1$ and $R^2$ are both myristyl (i.e., dimyristyl), $R^1$ and $R^2$ are both stearyl (i.e., distearyl), etc. Diacylglycerols have the following general formula:

(V)



The term "dialkyloxypropyl" refers to a compound having 2 alkyl chains, $R^1$ and $R^2$, both of which have independently between 2 and 30 carbons. The alkyl groups can be saturated or have varying degrees of unsaturation. Dialkyloxypropyls have the following general formula:

(VI)



In a preferred embodiment, the PEG-lipid is a PEG-DAA conjugate having the following formula:

(VII)



wherein $R^1$ and $R^2$ are independently selected and are long-chain alkyl groups having from about 10 to about 22 carbon atoms; PEG is a polyethyleneglycol; and L is a non-ester containing linker moiety or an ester containing linker moiety as described above. The long-chain alkyl groups can be saturated or unsaturated. Suitable alkyl groups include, but are not limited to, lauryl ($C_{12}$), myristyl ($C_{14}$), palmityl (C16), stearyl ($C_{18}$), and icosyl (C20). In preferred embodiments, $R^1$ and $R^2$ are the same, i.e., $R^1$ and $R^2$ are both myristyl (i.e., dimyristyl), $R^1$ and $R^2$ are both stearyl (i.e., distearyl), etc.

In Formula VII above, the PEG has an average molecular weight ranging from about 550 daltons to about 10,000 daltons. In certain instances, the PEG has an average molecular weight of from about 750 daltons to about 5,000 daltons (e.g., from about 1,000 daltons to about 5,000 daltons, from about 1,500 daltons to about 3,000 daltons, from about 750 daltons to about 3,000 daltons, from about 750 daltons to about 2,000 daltons, etc.). In preferred embodiments, the PEG has an average molecular weight of about 2,000 daltons or about 750 daltons. The PEG can be optionally substituted with alkyl, alkoxy, acyl, or aryl. In certain embodiments, the terminal hydroxyl group is substituted with a methoxy or methyl group.

In a preferred embodiment, "L" is a non-ester containing linker moiety. Suitable non-ester containing linkers include, but are not limited to, an amido linker moiety, an amino linker moiety, a carbonyl linker moiety, a carbamate linker moiety, a urea linker moiety, an ether linker moiety, a disulphide linker moiety, a succinamidyl linker moiety, and combinations thereof. In a preferred embodiment, the non-ester containing linker moiety is a carbamate linker moiety (i.e., a PEG-C-DAA conjugate). In another preferred embodiment, the non-ester containing linker moiety is an amido linker moiety (i.e., a PEG-A-DAA conjugate). In yet another preferred embodiment, the non-ester containing linker moiety is a succinamidyl linker moiety (i.e., a PEG-S-DAA conjugate).

In particular embodiments, the PEG-lipid conjugate is selected from:



(PEG-C-DMA); and



(PEG-C-DOMG).

The PEG-DAA conjugates are synthesized using standard techniques and reagents known to those of skill in the art. It will be recognized that the PEG-DAA conjugates will contain various amide, amine, ether, thio, carbamate, and urea linkages. Those of skill in the art will recognize that methods and reagents for forming these bonds are well known and readily available. See, e.g., March, ADVANCED ORGANIC CHEMISTRY (Wiley 1992); Larock, COMPREHENSIVE ORGANIC TRANSFORMATIONS (VCH 1989); and Furniss, VOGEL'S TEXTBOOK OF PRACTICAL ORGANIC CHEMISTRY, 5th ed. (Longman 1989). It will also be appreciated that any functional groups present may require protection and deprotection at different points in the synthesis of the PEG-DAA conjugates. Those of skill in the art will recognize that such techniques are well known. See, e.g., Green and Wuts, PROTECTIVE GROUPS IN ORGANIC SYNTHESIS (Wiley 1991).

Preferably, the PEG-DAA conjugate is a dilauryloxypropyl ($C_{12}$)-PEG conjugate, dimyristyloxypropyl ($C_{14}$)-PEG conjugate, a dipalmityloxypropyl (C16)-PEG conjugate, or a distearyloxypropyl ($C_{18}$)-PEG conjugate. Those of skill in the art will readily appreciate that other dialkyloxypropyls can be used in the PEG-DAA conjugates of the present invention.

In addition to the foregoing, it will be readily apparent to those of skill in the art that other hydrophilic polymers can be used in place of PEG. Examples of suitable polymers that can be used in place of PEG include, but are not limited to, polyvinylpyrrolidone, polymethyloxazoline, polyethyloxazoline, polyhydroxypropyl methacrylamide, polymethacrylamide and polydimethylacrylamide, polylactic acid, polyglycolic acid, and derivatized celluloses such as hydroxymethylcellulose or hydroxyethylcellulose.

In addition to the foregoing components, the particles (e.g., SNALP or SPLP) of the present invention can further comprise cationic poly(ethylene glycol) (PEG) lipids or CPLs (see, e.g., Chen et al., *Bioconj. Chem.,* 11:433-437 (2000)). Suitable SPLPs and SPLP-CPLs for use in the present invention, and methods of making and using SPLPs and SPLP-CPLs, are disclosed, e.g., in U.S. Pat. No. 6,852,334 and PCT Publication No. WO 00/62813, the disclosures of which are herein incorporated by reference in their entirety for all purposes.

Suitable CPLs include compounds of Formula VIII:

$$\text{A-W-Y} \qquad \text{(VIII)},$$

wherein A, W, and Y are as described below.

With reference to Formula VIII, "A" is a lipid moiety such as an amphipathic lipid, a neutral lipid, or a hydrophobic lipid that acts as a lipid anchor. Suitable lipid examples include, but are not limited to, diacylglycerolyls, dialkylglycerolyls, N-N-dialkylaminos, 1,2-diacyloxy-3-aminopropanes, and 1,2-dialkyl-3-aminopropanes.

"W" is a polymer or an oligomer such as a hydrophilic polymer or oligomer. Preferably, the hydrophilic polymer is a biocompatable polymer that is nonimmunogenic or possesses low inherent immunogenicity. Alternatively, the hydrophilic polymer can be weakly antigenic if used with appropriate adjuvants. Suitable nonimmunogenic polymers include, but are not limited to, PEG, polyamides, polylactic acid, polyglycolic acid, polylactic acid/polyglycolic acid copolymers, and combinations thereof. In a preferred embodiment, the polymer has a molecular weight of from about 250 to about 7,000 daltons.

"Y" is a polycationic moiety. The term polycationic moiety refers to a compound, derivative, or functional group having a positive charge, preferably at least 2 positive charges at a selected pH, preferably physiological pH. Suitable polycationic moieties include basic amino acids and their derivatives such as arginine, asparagine, glutamine, lysine, and histidine; spermine; spermidine; cationic dendrimers; polyamines; polyamine sugars; and amino polysaccharides. The polycationic moieties can be linear, such as linear tetralysine, branched or dendrimeric in structure. Polycationic moieties have between about 2 to about 15 positive charges, preferably between about 2 to about 12 positive charges, and more preferably between about 2 to about 8 positive charges at selected pH values. The selection of which polycationic moiety to employ may be determined by the type of particle application which is desired.

The charges on the polycationic moieties can be either distributed around the entire particle moiety, or alternatively, they can be a discrete concentration of charge density in one particular area of the particle moiety e.g., a charge spike. If the charge density is distributed on the particle, the charge density can be equally distributed or unequally distributed. All variations of charge distribution of the polycationic moiety are encompassed by the present invention.

The lipid "A" and the nonimmunogenic polymer "W" can be attached by various methods and preferably by covalent attachment. Methods known to those of skill in the art can be used for the covalent attachment of "A" and "W." Suitable linkages include, but are not limited to, amide, amine, carboxyl, carbonate, carbamate, ester, and hydrazone linkages. It will be apparent to those skilled in the art that "A" and "W" must have complementary functional groups to effectuate the linkage. The reaction of these two groups, one on the lipid and the other on the polymer, will provide the desired linkage. For example, when the lipid is a diacylglycerol and the terminal hydroxyl is activated, for instance with NHS and DCC, to form an active ester, and is then reacted with a polymer which contains an amino group, such as with a polyamide (see, e.g., U.S. Pat. Nos. 6,320,017 and 6,586,559, the disclosures of which are herein incorporated by reference in their entirety for all purposes), an amide bond will form between the two groups.

In certain instances, the polycationic moiety can have a ligand attached, such as a targeting ligand or a chelating moiety for complexing calcium. Preferably, after the ligand is attached, the cationic moiety maintains a positive charge. In certain instances, the ligand that is attached has a positive charge. Suitable ligands include, but are not limited to, a compound or device with a reactive functional group and include lipids, amphipathic lipids, carrier compounds, bioaffinity compounds, biomaterials, biopolymers, biomedical devices, analytically detectable compounds, therapeutically active compounds, enzymes, peptides, proteins, antibodies, immune stimulators, radiolabels, fluorogens, biotin, drugs, haptens, DNA, RNA, polysaccharides, liposomes, virosomes, micelles, immunoglobulins, functional groups, other targeting moieties, or toxins.

The lipid conjugate (e.g., PEG-lipid) typically comprises from about 0.1 mol % to about 2 mol %, from about 0.5 mol % to about 2 mol %, from about 1 mol % to about 2 mol %, from about 0.6 mol % to about 1.9 mol %, from about 0.7 mol % to about 1.8 mol %, from about 0.8 mol % to about 1.7 mol %, from about 0.9 mol % to about 1.6 mol %, from about 0.9 mol % to about 1.8 mol %, from about 1 mol % to about 1.8 mol %, from about 1 mol % to about 1.7 mol %, from about 1.2 mol % to about 1.8 mol %, from about 1.2 mol % to about 1.7 mol %, from about 1.3 mol % to about 1.6 mol %, or from about 1.4 mol % to about 1.5 mol % of the total lipid present in the particle.

One of ordinary skill in the art will appreciate that the concentration of the lipid conjugate can be varied depending on the lipid conjugate employed and the rate at which the nucleic acid-lipid particle is to become fusogenic.

By controlling the composition and concentration of the lipid conjugate, one can control the rate at which the lipid conjugate exchanges out of the nucleic acid-lipid particle and, in turn, the rate at which the nucleic acid-lipid particle becomes fusogenic. For instance, when a PEG-phosphatidylethanolamine conjugate or a PEG-ceramide conjugate is used as the lipid conjugate, the rate at which the nucleic acid-lipid particle becomes fusogenic can be varied, for example, by varying the concentration of the lipid conjugate, by varying the molecular weight of the PEG, or by varying the chain length and degree of saturation of the acyl chain groups on the phosphatidylethanolamine or the ceramide. In addition, other variables including, for example, pH, temperature, ionic strength, etc. can be used to vary and/or control the rate at which the nucleic acid-lipid particle becomes fusogenic. Other methods which can be used to control the rate at which the nucleic acid-lipid particle becomes fusogenic will become apparent to those of skill in the art upon reading this disclosure.

## VI. PREPARATION OF LIPID PARTICLES

The lipid particles of the present invention, e.g., SNALP, in which an active agent or therapeutic agent such as an interfering RNA is encapsulated in a lipid bilayer and is protected from degradation, can be formed by any method known in the art including, but not limited to, a continuous mixing method or a direct dilution process.

In preferred embodiments, the cationic lipids are lipids of Formula I, II, and III, or combinations thereof. In other preferred embodiments, the non-cationic lipids are egg sphingomyelin (ESM), distearoylphosphatidylcholine (DSPC), dioleoylphosphatidylcholine (DOPC), 1-palmitoyl-2-oleoyl-phosphatidylcholine (POPC), dipalmitoyl-phosphatidylcholine (DPPC), monomethyl-phosphatidylethanolamine, dimethyl-phosphatidylethanolamine, 14:0 PE (1,2-dimyristoyl-phosphatidylethanolamine (DMPE)), 16:0 PE (1,2-dipalmitoyl-phosphatidylethanolamine (DPPE)), 18:0 PE (1,2-distearoyl-phosphatidylethanolamine (DSPE)), 18:1 PE (1,2-dioleoyl-phosphatidylethanolamine (DOPE)), 18:1 trans PE (1,2-dielaidoyl-phosphatidylethanolamine (DEPE)), 18:0-18:1 PE (1-stearoyl-2-oleoyl-phosphatidylethanolamine (SOPE)), 16:0-18:1 PE (1-palmitoyl-2-oleoyl-phosphatidylethanolamine (POPE)), polyethylene glycol-based polymers (e.g., PEG 2000, PEG 5000, PEG-modified diacylglycerols, or PEG-modified dialkyloxypropyls), cholesterol, or combinations thereof.

In certain embodiments, the present invention provides for SNALP produced via a continuous mixing method, e.g., a process that includes providing an aqueous solution comprising a nucleic acid such as an interfering RNA in a first reservoir, providing an organic lipid solution in a second reservoir, and mixing the aqueous solution with the organic lipid solution such that the organic lipid solution mixes with the aqueous solution so as to substantially instantaneously produce a liposome encapsulating the nucleic acid (e.g., interfering RNA). This process and the apparatus for carrying this process are described in detail in U.S. Patent Publication No. 20040142025, the disclosure of which is herein incorporated by reference in its entirety for all purposes.

The action of continuously introducing lipid and buffer solutions into a mixing environment, such as in a mixing chamber, causes a continuous dilution of the lipid solution with the buffer solution, thereby producing a liposome substantially instantaneously upon mixing. As used herein, the phrase "continuously diluting a lipid solution with a buffer solution" (and variations) generally means that the lipid solution is diluted sufficiently rapidly in a hydration process with sufficient force to effectuate vesicle generation. By mixing the aqueous solution comprising a nucleic acid with the organic lipid solution, the organic lipid solution undergoes a continuous stepwise dilution in the presence of the buffer solution (i.e., aqueous solution) to produce a nucleic acid-lipid particle.

The SNALP formed using the continuous mixing method typically have a size of from about 40 nm to about 150 nm, from about 50 nm to about 150 nm, from about 60 nm to about 130 nm, from about 70 nm to about 110 nm, or from about 70 nm to about 90 nm. The particles thus formed do not aggregate and are optionally sized to achieve a uniform particle size.

In another embodiment, the present invention provides for SNALP produced via a direct dilution process that includes forming a liposome solution and immediately and directly introducing the liposome solution into a collection vessel containing a controlled amount of dilution buffer. In preferred aspects, the collection vessel includes one or more elements configured to stir the contents of the collection vessel to facilitate dilution. In one aspect, the amount of dilution buffer present in the collection vessel is substantially equal to the volume of liposome solution introduced thereto. As a non-limiting example, a liposome solution in 45% ethanol when introduced into the collection vessel containing an equal volume of dilution buffer will advantageously yield smaller particles.

In yet another embodiment, the present invention provides for SNALP produced via a direct dilution process in which a third reservoir containing dilution buffer is fluidly coupled to a second mixing region. In this embodiment, the liposome solution formed in a first mixing region is immediately and directly mixed with dilution buffer in the second mixing region. In preferred aspects, the second mixing region includes a T-connector arranged so that the liposome solution and the dilution buffer flows meet as opposing 180° flows; however, connectors providing shallower angles can be used, e.g., from about 27° to about 180°. A pump mechanism delivers a controllable flow of buffer to the second mixing region. In one aspect, the flow rate of dilution buffer provided to the second mixing region is controlled to be substantially equal to the flow rate of liposome solution introduced thereto from the first mixing region. This embodiment advantageously allows for more control of the flow of dilution buffer mixing with the liposome solution in the second mixing region, and therefore also the concentration of liposome solution in buffer throughout the second mixing process. Such control of the dilution buffer flow rate advantageously allows for small particle size formation at reduced concentrations.

These processes and the apparatuses for carrying out these direct dilution processes are described in detail in U.S. Patent Publication No. 20070042031, the disclosure of which is herein incorporated by reference in its entirety for all purposes.

The SNALP formed using the direct dilution process typically have a size of from about 40 nm to about 150 nm, from about 50 nm to about 150 nm, from about 60 nm to about 130 nm, from about 70 nm to about 110 nm, or from

about 70 nm to about 90 nm. The particles thus formed do not aggregate and are optionally sized to achieve a uniform particle size.

If needed, the lipid particles of the invention (e.g., SNALP) can be sized by any of the methods available for sizing liposomes. The sizing may be conducted in order to achieve a desired size range and relatively narrow distribution of particle sizes.

Several techniques are available for sizing the particles to a desired size. One sizing method, used for liposomes and equally applicable to the present particles, is described in U.S. Pat. No. 4,737,323, the disclosure of which is herein incorporated by reference in its entirety for all purposes. Sonicating a particle suspension either by bath or probe sonication produces a progressive size reduction down to particles of less than about 50 nm in size. Homogenization is another method which relies on shearing energy to fragment larger particles into smaller ones. In a typical homogenization procedure, particles are recirculated through a standard emulsion homogenizer until selected particle sizes, typically between about 60 and about 80 nm, are observed. In both methods, the particle size distribution can be monitored by conventional laser-beam particle size discrimination, or QELS.

Extrusion of the particles through a small-pore polycarbonate membrane or an asymmetric ceramic membrane is also an effective method for reducing particle sizes to a relatively well-defined size distribution. Typically, the suspension is cycled through the membrane one or more times until the desired particle size distribution is achieved. The particles may be extruded through successively smaller-pore membranes, to achieve a gradual reduction in size.

In some embodiments, the nucleic acids in the SNALP are precondensed as described in, e.g., U.S. patent application Ser. No. 09/744,103, the disclosure of which is herein incorporated by reference in its entirety for all purposes.

In other embodiments, the methods will further comprise adding non-lipid polycations which are useful to effect the lipofection of cells using the present compositions. Examples of suitable non-lipid polycations include, hexadimethrine bromide (sold under the brandname POLYBRENE®, from Aldrich Chemical Co., Milwaukee, Wis., USA) or other salts of hexadimethrine. Other suitable polycations include, for example, salts of poly-L-ornithine, poly-L-arginine, poly-L-lysine, poly-D-lysine, polyallylamine, and polyethyleneimine. Addition of these salts is preferably after the particles have been formed.

In some embodiments, the nucleic acid to lipid ratios (mass/mass ratios) in a formed SNALP will range from about 0.01 to about 0.2, from about 0.02 to about 0.1, from about 0.03 to about 0.1, or from about 0.01 to about 0.08. The ratio of the starting materials also falls within this range. In other embodiments, the SNALP preparation uses about 400 μg nucleic acid per 10 mg total lipid or a nucleic acid to lipid mass ratio of about 0.01 to about 0.08 and, more preferably, about 0.04, which corresponds to 1.25 mg of total lipid per 50 μg of nucleic acid. In other preferred embodiments, the particle has a nucleic acid:lipid mass ratio of about 0.08.

In other embodiments, the lipid to nucleic acid ratios (mass/mass ratios) in a formed SNALP will range from about 1 (1:1) to about 100 (100:1), from about 5 (5:1) to about 100 (100:1), from about 1 (1:1) to about 50 (50:1), from about 2 (2:1) to about 50 (50:1), from about 3 (3:1) to about 50 (50:1), from about 4 (4:1) to about 50 (50:1), from about 5 (5:1) to about 50 (50:1), from about 1 (1:1) to about 25 (25:1), from about 2 (2:1) to about 25 (25:1), from about 3 (3:1) to about 25 (25:1), from about 4 (4:1) to about 25 (25:1), from about 5 (5:1) to about 25 (25:1), from about 5 (5:1) to about 20 (20:1), from about 5 (5:1) to about 15 (15:1), from about 5 (5:1) to about 10 (10:1), about 5 (5:1), 6(6:1), 7(7:1), 8 (8:1), 9 (9:1), 10 (10:1), 11 (11:1), 12 (12:1), 13 (13:1), 14 (14:1), or 15 (15:1). The ratio of the starting materials also falls within this range.

As previously discussed, the conjugated lipid may further include a CPL. A variety of general methods for making SNALP-CPLs (CPL-containing SNALP) are discussed herein. Two general techniques include "post-insertion" technique, that is, insertion of a CPL into, for example, a pre-formed SNALP, and the "standard" technique, wherein the CPL is included in the lipid mixture during, for example, the SNALP formation steps. The post-insertion technique results in SNALP having CPLs mainly in the external face of the SNALP bilayer membrane, whereas standard techniques provide SNALP having CPLs on both internal and external faces. The method is especially useful for vesicles made from phospholipids (which can contain cholesterol) and also for vesicles containing PEG-lipids (such as PEG-DAAs and PEG-DAGs). Methods of making SNALP-CPL, are taught, for example, in U.S. Pat. Nos. 5,705,385; 6,586,410; 5,981,501; 6,534,484; and 6,852,334; U.S. Patent Publication No. 20020072121; and PCT Publication No. WO 00/62813, the disclosures of which are herein incorporated by reference in their entirety for all purposes.

## VII. KITS

The present invention also provides lipid particles (e.g., SNALP) in kit form. The kit may comprise a container which is compartmentalized for holding the various elements of the lipid particles (e.g., the active agents or therapeutic agents such as nucleic acids and the individual lipid components of the particles). In some embodiments, the kit may further comprise an endosomal membrane destabilizer (e.g., calcium ions). The kit typically contains the lipid particle compositions of the present invention, preferably in dehydrated form, with instructions for their rehydration and administration.

As explained herein, the lipid particles of the invention (e.g., SNALP) can be tailored to preferentially target particular tissues, organs, or tumors of interest. In certain instances, preferential targeting of lipid particles such as SNALP may be carried out by controlling the composition of the particle itself. For instance, as set forth in Example 11, it has been found that the 1:57 PEG-cDSA SNALP formulation can be used to preferentially target tumors outside of the liver, whereas the 1:57 PEG-cDMA SNALP formulation can be used to preferentially target the liver (including liver tumors).

In certain other instances, it may be desirable to have a targeting moiety attached to the surface of the lipid particle to further enhance the targeting of the particle. Methods of attaching targeting moieties (e.g., antibodies, proteins, etc.) to lipids (such as those used in the present particles) are known to those of skill in the art.

## VII. ADMINISTRATION OF LIPID PARTICLES

Once formed, the lipid particles of the invention (e.g., SNALP) are useful for the introduction of active agents or therapeutic agents (e.g., nucleic acids such as interfering RNA) into cells. Accordingly, the present invention also provides methods for introducing an active agent or therapeutic agent such as a nucleic acid (e.g., interfering RNA)

into a cell. The methods are carried out in vitro or in vivo by first forming the particles as described above and then contacting the particles with the cells for a period of time sufficient for delivery of the active agent or therapeutic agent to the cells to occur.

The lipid particles of the invention (e.g., SNALP) can be adsorbed to almost any cell type with which they are mixed or contacted. Once adsorbed, the particles can either be endocytosed by a portion of the cells, exchange lipids with cell membranes, or fuse with the cells. Transfer or incorporation of the active agent or therapeutic agent (e.g., nucleic acid) portion of the particle can take place via any one of these pathways. In particular, when fusion takes place, the particle membrane is integrated into the cell membrane and the contents of the particle combine with the intracellular fluid.

The lipid particles of the invention (e.g., SNALP) can be administered either alone or in a mixture with a pharmaceutically-acceptable carrier (e.g., physiological saline or phosphate buffer) selected in accordance with the route of administration and standard pharmaceutical practice. Generally, normal buffered saline (e.g., 135-150 mM NaCl) will be employed as the pharmaceutically-acceptable carrier. Other suitable carriers include, e.g., water, buffered water, 0.4% saline, 0.3% glycine, and the like, including glycoproteins for enhanced stability, such as albumin, lipoprotein, globulin, etc. Additional suitable carriers are described in, e.g., REMINGTON'S PHARMACEUTICAL SCIENCES, Mack Publishing Company, Philadelphia, Pa., 17th ed. (1985). As used herein, "carrier" includes any and all solvents, dispersion media, vehicles, coatings, diluents, antibacterial and antifungal agents, isotonic and absorption delaying agents, buffers, carrier solutions, suspensions, colloids, and the like. The phrase "pharmaceutically-acceptable" refers to molecular entities and compositions that do not produce an allergic or similar untoward reaction when administered to a human.

The pharmaceutically-acceptable carrier is generally added following particle formation. Thus, after the particle is formed, the particle can be diluted into pharmaceutically-acceptable carriers such as normal buffered saline.

The concentration of particles in the pharmaceutical formulations can vary widely, i.e., from less than about 0.05%, usually at or at least about 2 to 5%, to as much as about 10 to 90% by weight, and will be selected primarily by fluid volumes, viscosities, etc., in accordance with the particular mode of administration selected. For example, the concentration may be increased to lower the fluid load associated with treatment. This may be particularly desirable in patients having atherosclerosis-associated congestive heart failure or severe hypertension. Alternatively, particles composed of irritating lipids may be diluted to low concentrations to lessen inflammation at the site of administration.

The pharmaceutical compositions of the present invention may be sterilized by conventional, well-known sterilization techniques. Aqueous solutions can be packaged for use or filtered under aseptic conditions and lyophilized, the lyophilized preparation being combined with a sterile aqueous solution prior to administration. The compositions can contain pharmaceutically-acceptable auxiliary substances as required to approximate physiological conditions, such as pH adjusting and buffering agents, tonicity adjusting agents and the like, for example, sodium acetate, sodium lactate, sodium chloride, potassium chloride, and calcium chloride. Additionally, the particle suspension may include lipid-protective agents which protect lipids against free-radical and lipid-peroxidative damages on storage. Lipophilic free-radical quenchers, such as alphatocopherol and water-soluble iron-specific chelators, such as ferrioxamine, are suitable.

A. In Vivo Administration

Systemic delivery for in vivo therapy, e.g., delivery of a therapeutic nucleic acid to a distal target cell via body systems such as the circulation, has been achieved using nucleic acid-lipid particles such as those described in PCT Publication Nos. WO 05/007196, WO 05/121348, WO 05/120152, and WO 04/002453, the disclosures of which are herein incorporated by reference in their entirety for all purposes. The present invention also provides fully encapsulated lipid particles that protect the nucleic acid from nuclease degradation in serum, are nonimmunogenic, are small in size, and are suitable for repeat dosing.

For in vivo administration, administration can be in any manner known in the art, e.g., by injection, oral administration, inhalation (e.g., intransal or intratracheal), transdermal application, or rectal administration. Administration can be accomplished via single or divided doses. The pharmaceutical compositions can be administered parenterally, i.e., intraarticularly, intravenously, intraperitoneally, subcutaneously, or intramuscularly. In some embodiments, the pharmaceutical compositions are administered intravenously or intraperitoneally by a bolus injection (see, e.g., U.S. Pat. No. 5,286,634). Intracellular nucleic acid delivery has also been discussed in Straubringer et al., *Methods Enzymol.,* 101:512 (1983); Mannino et al., *Biotechniques,* 6:682 (1988); Nicolau et al., *Crit. Rev. Ther. Drug Carrier Syst.,* 6:239 (1989); and Behr, *Acc. Chem. Res.,* 26:274 (1993). Still other methods of administering lipid-based therapeutics are described in, for example, U.S. Pat. Nos. 3,993,754; 4,145,410; 4,235,871; 4,224,179; 4,522,803; and 4,588,578. The lipid particles can be administered by direct injection at the site of disease or by injection at a site distal from the site of disease (see, e.g., Culver, HUMAN GENE THERAPY, MaryAnn Liebert, Inc., Publishers, New York. pp.70-71 (1994)). The disclosures of the above-described references are herein incorporated by reference in their entirety for all purposes.

The compositions of the present invention, either alone or in combination with other suitable components, can be made into aerosol formulations (i.e., they can be "nebulized") to be administered via inhalation (e.g., intranasally or intratracheally) (see, Brigham et al., *Am. J. Sci.,* 298:278 (1989)). Aerosol formulations can be placed into pressurized acceptable propellants, such as dichlorodifluoromethane, propane, nitrogen, and the like.

In certain embodiments, the pharmaceutical compositions may be delivered by intranasal sprays, inhalation, and/or other aerosol delivery vehicles. Methods for delivering nucleic acid compositions directly to the lungs via nasal aerosol sprays have been described, e.g., in U.S. Pat. Nos. 5,756,353 and 5,804,212. Likewise, the delivery of drugs using intranasal microparticle resins and lysophosphatidyl-glycerol compounds (U.S. Pat. No. 5,725,871) are also well-known in the pharmaceutical arts. Similarly, transmucosal drug delivery in the form of a polytetrafluoroetheylene support matrix is described in U.S. Pat. No. 5,780,045. The disclosures of the above-described patents are herein incorporated by reference in their entirety for all purposes.

Formulations suitable for parenteral administration, such as, for example, by intraarticular (in the joints), intravenous, intramuscular, intradermal, intraperitoneal, and subcutaneous routes, include aqueous and non-aqueous, isotonic sterile injection solutions, which can contain antioxidants, buffers, bacteriostats, and solutes that render the formulation

isotonic with the blood of the intended recipient, and aqueous and non-aqueous sterile suspensions that can include suspending agents, solubilizers, thickening agents, stabilizers, and preservatives. In the practice of this invention, compositions are preferably administered, for example, by intravenous infusion, orally, topically, intraperitoneally, intravesically, or intrathecally.

Generally, when administered intravenously, the lipid particle formulations are formulated with a suitable pharmaceutical carrier. Many pharmaceutically acceptable carriers may be employed in the compositions and methods of the present invention. Suitable formulations for use in the present invention are found, for example, in REMINGTON'S PHARMACEUTICAL SCIENCES, Mack Publishing Company, Philadelphia, Pa., 17th ed. (1985). A variety of aqueous carriers may be used, for example, water, buffered water, 0.4% saline, 0.3% glycine, and the like, and may include glycoproteins for enhanced stability, such as albumin, lipoprotein, globulin, etc. Generally, normal buffered saline (135-150 mM NaCl) will be employed as the pharmaceutically acceptable carrier, but other suitable carriers will suffice. These compositions can be sterilized by conventional liposomal sterilization techniques, such as filtration. The compositions may contain pharmaceutically acceptable auxiliary substances as required to approximate physiological conditions, such as pH adjusting and buffering agents, tonicity adjusting agents, wetting agents and the like, for example, sodium acetate, sodium lactate, sodium chloride, potassium chloride, calcium chloride, sorbitan monolaurate, triethanolamine oleate, etc. These compositions can be sterilized using the techniques referred to above or, alternatively, they can be produced under sterile conditions. The resulting aqueous solutions may be packaged for use or filtered under aseptic conditions and lyophilized, the lyophilized preparation being combined with a sterile aqueous solution prior to administration.

In certain applications, the lipid particles disclosed herein may be delivered via oral administration to the individual. The particles may be incorporated with excipients and used in the form of ingestible tablets, buccal tablets, troches, capsules, pills, lozenges, elixirs, mouthwash, suspensions, oral sprays, syrups, wafers, and the like (see, e.g., U.S. Pat. Nos. 5,641,515, 5,580,579, and 5,792,451, the disclosures of which are herein incorporated by reference in their entirety for all purposes). These oral dosage forms may also contain the following: binders, gelatin; excipients, lubricants, and/or flavoring agents. When the unit dosage form is a capsule, it may contain, in addition to the materials described above, a liquid carrier. Various other materials may be present as coatings or to otherwise modify the physical form of the dosage unit. Of course, any material used in preparing any unit dosage form should be pharmaceutically pure and substantially non-toxic in the amounts employed.

Typically, these oral formulations may contain at least about 0.1% of the lipid particles or more, although the percentage of the particles may, of course, be varied and may conveniently be between about 1% or 2% and about 60% or 70% or more of the weight or volume of the total formulation. Naturally, the amount of particles in each therapeutically useful composition may be prepared is such a way that a suitable dosage will be obtained in any given unit dose of the compound. Factors such as solubility, bioavailability, biological half-life, route of administration, product shelf life, as well as other pharmacological considerations will be contemplated by one skilled in the art of preparing such pharmaceutical formulations, and as such, a variety of dosages and treatment regimens may be desirable.

Formulations suitable for oral administration can consist of: (a) liquid solutions, such as an effective amount of a packaged therapeutic agent such as nucleic acid (e.g., interfering RNA) suspended in diluents such as water, saline, or PEG 400; (b) capsules, sachets, or tablets, each containing a predetermined amount of a therapeutic agent such as nucleic acid (e.g., interfering RNA), as liquids, solids, granules, or gelatin; (c) suspensions in an appropriate liquid; and (d) suitable emulsions. Tablet forms can include one or more of lactose, sucrose, mannitol, sorbitol, calcium phosphates, corn starch, potato starch, microcrystalline cellulose, gelatin, colloidal silicon dioxide, talc, magnesium stearate, stearic acid, and other excipients, colorants, fillers, binders, diluents, buffering agents, moistening agents, preservatives, flavoring agents, dyes, disintegrating agents, and pharmaceutically compatible carriers. Lozenge forms can comprise a therapeutic agent such as nucleic acid (e.g., interfering RNA) in a flavor, e.g., sucrose, as well as pastilles comprising the therapeutic agent in an inert base, such as gelatin and glycerin or sucrose and acacia emulsions, gels, and the like containing, in addition to the therapeutic agent, carriers known in the art.

In another example of their use, lipid particles can be incorporated into a broad range of topical dosage forms. For instance, a suspension containing nucleic acid-lipid particles such as SNALP can be formulated and administered as gels, oils, emulsions, topical creams, pastes, ointments, lotions, foams, mousses, and the like.

When preparing pharmaceutical preparations of the lipid particles of the invention, it is preferable to use quantities of the particles which have been purified to reduce or eliminate empty particles or particles with therapeutic agents such as nucleic acid associated with the external surface.

The methods of the present invention may be practiced in a variety of hosts. Preferred hosts include mammalian species, such as primates (e.g., humans and chimpanzees as well as other nonhuman primates), canines, felines, equines, bovines, ovines, caprines, rodents (e.g., rats and mice), lagomorphs, and swine.

The amount of particles administered will depend upon the ratio of therapeutic agent (e.g., nucleic acid) to lipid, the particular therapeutic agent (e.g., nucleic acid) used, the disease or disorder being treated, the age, weight, and condition of the patient, and the judgment of the clinician, but will generally be between about 0.01 and about 50 mg per kilogram of body weight, preferably between about 0.1 and about 5 mg/kg of body weight, or about $10^8$-$10^{10}$ particles per administration (e.g., injection).

B. In Vitro Administration

For in vitro applications, the delivery of therapeutic agents such as nucleic acids (e.g., interfering RNA) can be to any cell grown in culture, whether of plant or animal origin, vertebrate or invertebrate, and of any tissue or type. In preferred embodiments, the cells are animal cells, more preferably mammalian cells, and most preferably human cells.

Contact between the cells and the lipid particles, when carried out in vitro, takes place in a biologically compatible medium. The concentration of particles varies widely depending on the particular application, but is generally between about 1 μmol and about 10 mmol. Treatment of the cells with the lipid particles is generally carried out at physiological temperatures (about 37° C.) for periods of time of from about 1 to 48 hours, preferably of from about 2 to 4 hours.

In one group of preferred embodiments, a lipid particle suspension is added to 60-80% confluent plated cells having

a cell density of from about $10^3$ to about $10^5$ cells/ml, more preferably about $2\times10^4$ cells/ml. The concentration of the suspension added to the cells is preferably of from about 0.01 to 0.2 μg/ml, more preferably about 0.1 μg/ml.

Using an Endosomal Release Parameter (ERP) assay, the delivery efficiency of the SNALP or other lipid particle of the invention can be optimized. An ERP assay is described in detail in U.S. Patent Publication No. 20030077829, the disclosure of which is herein incorporated by reference in its entirety for all purposes. More particularly, the purpose of an ERP assay is to distinguish the effect of various cationic lipids and helper lipid components of SNALP based on their relative effect on binding/uptake or fusion with/destabilization of the endosomal membrane. This assay allows one to determine quantitatively how each component of the SNALP or other lipid particle affects delivery efficiency, thereby optimizing the SNALP or other lipid particle. Usually, an ERP assay measures expression of a reporter protein (e.g., luciferase, β-galactosidase, green fluorescent protein (GFP), etc.), and in some instances, a SNALP formulation optimized for an expression plasmid will also be appropriate for encapsulating an interfering RNA. In other instances, an ERP assay can be adapted to measure downregulation of transcription or translation of a target sequence in the presence or absence of an interfering RNA (e.g., siRNA). By comparing the ERPs for each of the various SNALP or other lipid particles, one can readily determine the optimized system, e.g., the SNALP or other lipid particle that has the greatest uptake in the cell.

C. Cells for Delivery of Lipid Particles

The compositions and methods of the present invention are used to treat a wide variety of cell types, in vivo and in vitro. Suitable cells include, e.g., hematopoietic precursor (stem) cells, fibroblasts, keratinocytes, hepatocytes, endothelial cells, skeletal and smooth muscle cells, osteoblasts, neurons, quiescent lymphocytes, terminally differentiated cells, slow or noncycling primary cells, parenchymal cells, lymphoid cells, epithelial cells, bone cells, and the like. In preferred embodiments, an active agent or therapeutic agent such as an interfering RNA (e.g., siRNA) is delivered to cancer cells such as, e.g., lung cancer cells, colon cancer cells, rectal cancer cells, anal cancer cells, bile duct cancer cells, small intestine cancer cells, stomach (gastric) cancer cells, esophageal cancer cells, gallbladder cancer cells, liver cancer cells, pancreatic cancer cells, appendix cancer cells, breast cancer cells, ovarian cancer cells, cervical cancer cells, prostate cancer cells, renal cancer cells, cancer cells of the central nervous system, glioblastoma tumor cells, skin cancer cells, lymphoma cells, choriocarcinoma tumor cells, head and neck cancer cells, osteogenic sarcoma tumor cells, and blood cancer cells.

In vivo delivery of lipid particles such as SNALP encapsulating an interfering RNA (e.g., siRNA) is suited for targeting cells of any cell type. The methods and compositions can be employed with cells of a wide variety of vertebrates, including mammals, such as, e.g, canines, felines, equines, bovines, ovines, caprines, rodents (e.g., mice, rats, and guinea pigs), lagomorphs, swine, and primates (e.g. monkeys, chimpanzees, and humans).

To the extent that tissue culture of cells may be required, it is well-known in the art. For example, Freshney, Culture of Animal Cells, a Manual of Basic Technique, 3rd Ed., Wiley-Liss, N.Y. (1994), Kuchler et al., Biochemical Methods in Cell Culture and Virology, Dowden, Hutchinson and Ross, Inc. (1977), and the references cited therein provide a general guide to the culture of cells. Cultured cell systems often will be in the form of monolayers of cells, although cell suspensions are also used.

D. Detection of Lipid Particles

In some embodiments, the lipid particles of the present invention (e.g., SNALP) are detectable in the subject at about 1, 2, 3, 4, 5, 6, 7, 8 or more hours. In other embodiments, the lipid particles of the present invention (e.g., SNALP) are detectable in the subject at about 8, 12, 24, 48, 60, 72, or 96 hours, or about 6, 8, 10, 12, 14, 16, 18, 19, 22, 24, 25, or 28 days after administration of the particles. The presence of the particles can be detected in the cells, tissues, or other biological samples from the subject. The particles may be detected, e.g., by direct detection of the particles, detection of a therapeutic nucleic acid such as an interfering RNA (e.g., siRNA) sequence, detection of the target sequence of interest (i.e., by detecting expression or reduced expression of the sequence of interest), or a combination thereof.

1. Detection of Particles

Lipid particles of the invention such as SNALP can be detected using any method known in the art. For example, a label can be coupled directly or indirectly to a component of the lipid particle using methods well-known in the art. A wide variety of labels can be used, with the choice of label depending on sensitivity required, ease of conjugation with the lipid particle component, stability requirements, and available instrumentation and disposal provisions. Suitable labels include, but are not limited to, spectral labels such as fluorescent dyes (e.g., fluorescein and derivatives, such as fluorescein isothiocyanate (FITC) and Oregon Green™; rhodamine and derivatives such Texas red, tetrarhodimine isothiocynate (TRITC), etc., digoxigenin, biotin, phycoerythrin, AMCA, CyDyes™, and the like; radiolabels such as 3H, $^{125}I$, $^{35}S$, $^{14}C$, $^{32}P$, $^{33}P$, etc.; enzymes such as horse radish peroxidase, alkaline phosphatase, etc.; spectral colorimetric labels such as colloidal gold or colored glass or plastic beads such as polystyrene, polypropylene, latex, etc. The label can be detected using any means known in the art.

2. Detection of Nucleic Acids

Nucleic acids (e.g., interfering RNA) are detected and quantified herein by any of a number of means well-known to those of skill in the art. The detection of nucleic acids may proceed by well-known methods such as Southern analysis, Northern analysis, gel electrophoresis, PCR, radiolabeling, scintillation counting, and affinity chromatography. Additional analytic biochemical methods such as spectrophotometry, radiography, electrophoresis, capillary electrophoresis, high performance liquid chromatography (HPLC), thin layer chromatography (TLC), and hyperdiffusion chromatography may also be employed.

The selection of a nucleic acid hybridization format is not critical. A variety of nucleic acid hybridization formats are known to those skilled in the art. For example, common formats include sandwich assays and competition or displacement assays. Hybridization techniques are generally described in, e.g., "Nucleic Acid Hybridization, A Practical Approach," Eds. Hames and Higgins, IRL Press (1985).

The sensitivity of the hybridization assays may be enhanced through use of a nucleic acid amplification system which multiplies the target nucleic acid being detected. In vitro amplification techniques suitable for amplifying sequences for use as molecular probes or for generating nucleic acid fragments for subsequent subcloning are known. Examples of techniques sufficient to direct persons of skill through such in vitro amplification methods, including the polymerase chain reaction (PCR) the ligase chain reaction (LCR), Qβ-replicase amplification and other RNA

polymerase mediated techniques (e.g., NASBA™) are found in Sambrook et al., *In Molecular Cloning: A Laboratory Manual*, Cold Spring Harbor Laboratory Press (2000); and Ausubel et al., Short Protocols in Molecular Biology, eds., Current Protocols, Greene Publishing Associates, Inc. and John Wiley & Sons, Inc. (2002); as well as U.S. Pat. No. 4,683,202; PCR Protocols, A Guide to Methods and Applications (Innis et al. eds.) Academic Press Inc. San Diego, Calif. (1990); Arnheim & Levinson (Oct. 1, 1990), *C&EN* 36; *The Journal Of NIH Research,* 3:81 (1991); Kwoh et al., *Proc. Natl. Acad. Sci. USA,* 86:1173 (1989); Guatelli et al., *Proc. Natl. Acad. Sci. USA,* 87:1874 (1990); Lomell et al., *J. Clin. Chem.,* 35:1826 (1989); Landegren et al., *Science,* 241:1077 (1988); Van Brunt, *Biotechnology,* 8:291 (1990); Wu and Wallace, *Gene,* 4:560 (1989); Barringer et al., *Gene,* 89:117 (1990); and Sooknanan and Malek, *Biotechnology,* 13:563 (1995). Improved methods of cloning in vitro amplified nucleic acids are described in U.S. Pat. No. 5,426,039. Other methods described in the art are the nucleic acid sequence based amplification (NASBA™, Cangene, Mississauga, Ontario) and Qβ-replicase systems. These systems can be used to directly identify mutants where the PCR or LCR primers are designed to be extended or ligated only when a select sequence is present. Alternatively, the select sequences can be generally amplified using, for example, nonspecific PCR primers and the amplified target region later probed for a specific sequence indicative of a mutation. The disclosures of the above-described references are herein incorporated by reference in their entirety for all purposes.

Nucleic acids for use as probes, e.g., in in vitro amplification methods, for use as gene probes, or as inhibitor components are typically synthesized chemically according to the solid phase phosphoramidite triester method described by Beaucage et al., *Tetrahedron Letts.,* 22:1859 1862 (1981), e.g., using an automated synthesizer, as described in Needham VanDevanter et al., *Nucleic Acids Res.,* 12:6159 (1984). Purification of ploynucleotides, where necessary, is typically performed by either native acrylamide gel electrophoresis or by anion exchange HPLC as described in Pearson et al., *J. Chrom.,* 255:137 149 (1983). The sequence of the synthetic poluyucleotides can be verified using the chemical degradation method of Maxam and Gilbert (1980) in Grossman and Moldave (eds.) Academic Press, New York, *Methods in Enzymology,* 65:499.

An alternative means for determining the level of transcription is in situ hybridization. In situ hybridization assays are well-known and are generally described in Angerer et al., *Methods Enzymol.,* 152:649 (1987). In an in situ hybridization assay, cells are fixed to a solid support, typically a glass slide. If DNA is to be probed, the cells are denatured with heat or alkali. The cells are then contacted with a hybridization solution at a moderate temperature to permit annealing of specific probes that are labeled. The probes are preferably labeled with radioisotopes or fluorescent reporters.

## VIII. EXAMPLES

The present invention will be described in greater detail by way of specific examples. The following examples are offered for illustrative purposes, and are not intended to limit the invention in any manner. Those of skill in the art will readily recognize a variety of noncritical parameters which can be changed or modified to yield essentially the same results.

### Example 1. Materials and Methods

siRNA: All siRNA molecules used in these studies were chemically synthesized by the University of Calgary (Calgary, AB) or Dharmacon Inc. (Lafayette, Colo.). The siRNAs were desalted and annealed using standard procedures.

Lipid Encapsulation of siRNA: In some embodiments, siRNA molecules were encapsulated into nucleic acid-lipid particles composed of the following lipids: the lipid conjugate PEG-cDMA (3-N-[(-Methoxypoly(ethylene glycol) 2000)carbamoyl]-1,2-dimyristyloxypropylamine); the cationic lipid DLinDMA (1,2-Dilinoleyloxy-3-(N,N-dimethyl) aminopropane); the phospholipid DPPC (1,2-Dipalmitoyl-sn-glycero-3-phosphocholine; Avanti Polar Lipids; Alabaster, AL); and synthetic cholesterol (Sigma-Aldrich Corp.; St. Louis, Mo.) in the molar ratio 1.4:57.1:7.1:34.3, respectively. In other words, siRNAs were encapsulated into SNALP of the following "1:57" formulation: 1.4% PEG-cDMA; 57.1% DLinDMA; 7.1% DPPC; and 34.3% cholesterol. In other embodiments, siRNA molecules were encapsulated into phospholipid-free SNALP composed of the following lipids: the lipid conjugate PEG-cDMA; the cationic lipid DLinDMA; and synthetic cholesterol in the molar ratio 1.5:61.5:36.9, respectively. In other words, siRNAs were encapsulated into phospholipid-free SNALP of the following "1:62" formulation: 1.5% PEG-cDMA; 61.5% DLinDMA; and 36.9% cholesterol. For vehicle controls, empty particles with identical lipid composition were formed in the absence of siRNA. It should be understood that the 1:57 formulation and 1:62 formulation are target formulations, and that the amount of lipid (both cationic and non-cationic) present and the amount of lipid conjugate present in the formulation may vary. Typically, in the 1:57 formulation, the amount of cationic lipid will be 57 mol %±5 mol %, and the amount of lipid conjugate will be 1.5 mol %±0.5 mol %, with the balance of the 1:57 formulation being made up of non-cationic lipid (e.g., phospholipid, cholesterol, or a mixture of the two). Similarly, in the 1:62 formulation, the amount of cationic lipid will be 62 mol %±5 mol %, and the amount of lipid conjugate will be 1.5 mol %±0.5 mol %, with the balance of the 1:62 formulation being made up of the non-cationic lipid (e.g., cholesterol).

### Example 2. Eg5 siRNA Formulated as 1:57 SNALP Are Potent Inhibitors of Cell Growth In Vitro

SNALP formulations were prepared with an siRNA targeting Eg5 as the nucleic acid component. Eg5 is a member of kinesin-related proteins that are involved in functions related to movements of organelles, microtubules, or chromosomes along microtubules. These functions include axonal transport, microtubule sliding during nuclear fusion or division, and chromosome disjunction during meiosis and early mitosis. Eg5 plays a critical role in mitosis of mammalian cells. The Eg5 siRNA used in this study is provided in Table 1. The modifications involved introducing 2'OMe-uridine at selected positions in the sense and antisense strands of the Eg5 2263 siRNA sequence, in which the siRNA duplex contained less than about 20% 2'OMe-modified nucleotides.

TABLE 1

siRNA duplex comprising sense and antisense Eg5 RNA polynucleotides.

| Modification | Eg5 2263 siRNA sequence | SEQ ID NO: | % 2'OMe-Modified | % Modified in DS Region |
|---|---|---|---|---|
| U/U | 5'-C**U**GAAGACC**U**GAAGACAA**U**dTdT-3'<br>3'-dTdTGAC**U**UC**U**GGAC**U**UCUGUUA-5' | 1<br>2 | 6/42 = 14.3% | 6/38 = 15.8% |

Column 1: "U/U" = 2'OMe-uridine modified siRNA duplex. Column 2: 2'OMe-modified nucleotides are indicated in bold and underlined. The siRNA duplex can alternatively or additionally comprise 2'-deoxy-2'-fluoro (2'F) nucleotides, 2'-deoxy nucleotides, 2'-O-(2-methoxyethyl) (MOE) nucleotides, and/or locked nucleic acid (LNA) nucleotides. "dT" = deoxythymidine. Column 3: The number and percentage of 2'OMe-modified nucleotides in the siRNA duplex are provided. Column 4: The number and percentage of modified nucleotides in the double-stranded (DS) region of the siRNA duplex are provided.

The lipid components and physical characteristics of the SNALP formulations are summarized in Table 2. The lipid: drug ratio is described in units of mg total lipid per mg nucleic acid. Mean particle size and polydispersity were measured on a Malvern Instruments Zetasizer. Encapsulation of nucleic acid was measured using a Ribogreen assay essentially as described in Heyes et al., *Journal of Controlled Release,* 107:276-287 (2005).

TABLE 2

Characteristics of the SNALP formulations used in this study.

| Sample No. | Formulation Composition, Mole % PEG(2000)-C-DMA \| DLinDMA \| DPPC \| Cholesterol | Lipid/Drug Ratio | Finished Product Characterization: Size (nm) | Polydispersity | % Encapsulation |
|---|---|---|---|---|---|
| 1 | 2 \| 40 \| 10 \| 48 | 12.4 | 57 | 0.07 | 90 |
| 2 | 1.8 \| 36.4 \| 18.2 \| 43.6 | 14.0 | 72 | 0.12 | 89 |
| 3 | 1.4 \| 27.0 \| 6.8 \| 64.9 | 16.5 | 70 | 0.12 | 92 |
| 4 | 1.3 \| 25.3 \| 12.7 \| 60.8 | 18.1 | 76 | 0.07 | 93 |
| 5 | 3.9 \| 39.2 \| 9.8 \| 47.1 | 13.5 | 53 | 0.27 | 86 |
| 6 | 3.6 \| 35.7 \| 17.9 \| 42.9 | 15.1 | 58 | 0.18 | 87 |
| 7 | 2.7 \| 26.7 \| 6.7 \| 64.0 | 17.6 | 56 | 0.17 | 92 |
| 8 | 2.5 \| 25.0 \| 12.5 \| 60.0 | 19.2 | 61 | 0.13 | 92 |
| 9 | 1.4 \| 57.1 \| 7.1 \| 34.3 | 17.8 | 84 | 0.10 | 88 |
| 10 | 1.3 \| 53.3 \| 13.3 \| 32.0 | 19.5 | 83 | 0.10 | 89 |
| 11 | 1.1 \| 42.6 \| 5.3 \| 51.1 | 22.0 | 80 | 0.10 | 93 |
| 12 | 1.0 \| 40.4 \| 10.1 \| 48.5 | 23.6 | 78 | 0.11 | 88 |
| 13 | 2.8 \| 56.3 \| 7.0 \| 33.8 | 19.0 | 62 | 0.14 | 80 |
| 14 | 2.6 \| 52.6 \| 13.2 \| 31.6 | 20.6 | 66 | 0.14 | 82 |
| 15 | 2.1 \| 42.1 \| 5.3 \| 50.5 | 23.1 | 71 | 0.16 | 91 |
| 16 | 2 \| 40 \| 10 \| 48 | 24.7 | 67 | 0.14 | 92 |

Silencing of Eg5 by siRNA transfection causes mitotic arrest and apoptosis in mammalian cells. Cell viability following transfection with SNALP containing an siRNA targeting Eg5 therefore provides a simple biological readout of in vitro transfection efficiency. Cell viability of in vitro cell cultures was assessed using the commercial reagent CellTiter-Blue® (Promega Corp.; Madison, Wis.), a resazurin dye that is reduced by metabolically active cells to the flourogenic product resorufin. The human colon cancer cell line HT29 was cultured using standard tissue culture techniques. 72 hours after SNALP application, CellTiter-Blue® reagent was added to the culture to quantify the metabolic activity of the cells, which is a measure of cell viability. Data are presented as a percent of cell viability relative to ("untreated") control cells that received phosphate buffered saline (PBS) vehicle only.

FIG. **1** shows that the 1:57 SNALP formulation containing Eg5 2263 U/U siRNA was among the most potent inhibitors of tumor cell growth at all siRNA concentrations tested (see, FIG. **1**B, Sample 9).

## Example 3. ApoB siRNA Formulated as 1:57 SNALP Have Potent Silencing Activity In Vivo

SNALP formulations were prepared with an siRNA targeting apolipoprotein B (ApoB) as the nucleic acid component. ApoB is the main apolipoprotein of chylomicrons and low density lipoproteins (LDL). Mutations in ApoB are associated with hypercholesterolemia. ApoB occurs in the plasma in 2 main forms, ApoB48 and ApoB100, which are synthesized in the intestine and liver, respectively, due to an organ-specific stop codon. The ApoB siRNA used in this study is provided in Table 3. The modifications involved introducing 2'OMe-uridine or 2'OMe-guanosine at selected positions in the sense and antisense strands of the ApoB siRNA sequence, in which the siRNA duplex contained less than about 20% 2'OMe-modified nucleotides.

TABLE 3

| siRNA duplex comprising sense and antisense ApoB RNA polynucleotides. | | | | | |
|---|---|---|---|---|---|
| Position | Modification | ApoB siRNA sequence | SEQ ID NO: | % 2'OMe-Modified | % Modified in DS Region |
| 10048 | U2/2 G1/2 | 5'-AGU**G**UCA**U**CACAC**U**GAAUACC-3'<br>3'-GU**U**CACAGUAGU**G**U**G**AC**U**UAU-5' | 3<br>4 | 7/42 = 16.7% | 7/38 = 18.4% |

Column 1: The number refers to the nucleotide position of the 5' base of the sense strand relative to the mouse ApoB mRNA sequence XM_137955. Column 2: The numbers refer to the distribution of 2'OMe chemical modifications in each strand. Column 3: 2'OMe-modified nucleotides are indicated in bold and underlined. The siRNA duplex can alternatively or additionally comprise 2'-deoxy-2'-fluoro (2'F) nucleotides, 2'-deoxy nucleotides, 2'-O-(2-methoxyethyl) (MOE) nucleotides, and/or locked nucleic acid (LNA) nucleotides. Column 4: The number and percentage of 2'OMe-modified nucleotides in the siRNA duplex are provided. Column 5: The number and percentage of modified nucleotides in the doubld-stranded (DS) region of the siRNA duplex are provided.

The lipid components and physical characteristics of the formulations are summarized in Table 4. The lipid:drug ratio is described in units of mg total lipid per mg nucleic acid. Mean particle size and polydispersity were measured on a Malvern Instruments Zetasizer. Encapsulation of nucleic acid was measured using a Ribogreen assay essentially as described in Heyes et al., *Journal of Controlled Release,* 107:276-287 (2005).

TABLE 4

| Characteristics of the SNALP formulations used in this study. | | | | | |
|---|---|---|---|---|---|
| | Formulation Composition | Lipid/Drug | Finished Product Characterization | | |
| Group | Lipid Name & Mole % | Ratio | Size (nm) | Polydispersity | % Encapsulation |
| 2 | PEG(2000)-C-DMA \| DLinDMA \| DPPC \| Cholesterol<br>2 \| 40 \| 10 \| 48 | 12.4 | 59 | 0.15 | 93 |
| 3 | PEG(2000)-C-DMA \| DLinDMA \| Cholesterol<br>2.2 \| 44.4 \| 53.3 | 10.7 | 55 | 0.17 | 91 |
| 4 | PEG(2000)-C-DMA \| DLinDMA \| DOPC \| Cholesterol<br>2 \| 40 \| 10 \| 48 | 12.5 | 59 | 0.16 | 92 |
| 5 | PEG(2000)-C-DMA \| DLinDMA \| DMPC \| Cholesterol<br>2 \| 40 \| 10 \| 48 | 12.2 | 56 | 0.11 | 92 |
| 6 | PEG(2000)-C-DMA \| DLinDMA \| DPPE \| Cholesterol<br>1.8 \| 36.4 \| 18.2 \| 43.6 | 13.8 | 66 | 0.16 | 93 |
| 7 | PEG(2000)-C-DMA \| DLinDMA \| DPPC \| Cholestanol<br>2 \| 40 \| 10 \| 48 | 12.4 | 56 | 0.12 | 92 |
| 8 | PEG(2000)-C-DMA \| DLinDMA \| DPPC \| Cholesterol<br>1.4 \| 27.0 \| 6.8 \| 64.9 | 16.5 | 60 | 0.10 | 93 |
| 9 | PEG(2000)-C-DMA \| DLinDMA \| DPPC \| Cholesterol<br>1.3 \| 25.3 \| 12.7 \| 60.8 | 18.1 | 74 | 0.13 | 92 |
| 10 | PEG(2000)-C-DMA \| DLinDMA \| DPPC \| Cholesterol<br>2.5 \| 25.0 \| 12.5 \| 60.0 | 19.2 | 60 | 0.13 | 93 |
| 11 | PEG(2000)-C-DMA \| DLinDMA \| DPPC \| Cholesterol<br>1.4 \| 57.1 \| 7.4 \| 34.3 | 17.8 | 79 | 0.09 | 94 |
| 12 | PEG(2000)-C-DMA \| DLinDMA \| DPPC \| Cholesterol<br>1.0 \| 40.4 \| 10.1 \| 48.5 | 23.6 | 72 | 0.11 | 93 |
| 13 | PEG(2000)-C-DMA \| DLinDMA \| DPPC<br>2 \| 70 \| 28 | 8.7 | 73 | 0.09 | 87 |
| 14 | PEG(2000)-C-DMA \| DLinDMA \| DPPC<br>1.6 \| 54.7 \| 43.8 | 11.3 | 65 | 0.11 | 87 |

BALB/c mice (female, at least 4 weeks old) were obtained from Harlan Labs. After an acclimation period (of at least 7 days), animals were administered SNALP by intravenous (IV) injection in the lateral tail vein once daily on Study Day 0 (1 dose total per animal). Dosage was 1 mg encapsulated siRNA per kg body weight, corresponding to 10 ml/kg (rounded to the nearest 10 μl). As a negative control, one group of animals was given an IV injection of phosphate buffered saline (PBS) vehicle. On Study Day 2, animals were euthanized and liver tissue was collected in RNAlater.

Liver tissues were analyzed for ApoB mRNA levels normalized against glyceraldehyde-3-phosphate dehydrogenase (GAPDH) mRNA levels using the QuantiGene assay (Panomics; Fremont, Calif.) essentially as described in Judge et al., *Molecular Therapy,* 13:494 (2006).

FIG. **2** shows that the 1:57 SNALP formulation containing ApoB 10048 U2/2 G1/2 siRNA was the most potent at reducing ApoB expression in vivo (see, Group 11).

## Example 4. ApoB siRNA Formulated as 1:57 SNALP Have Potent Silencing Activity In Vivo

SNALP formulations were prepared with the ApoB siRNA set forth in Table 3. The lipid components and physical characteristics of the formulations are summarized in Table 5. The lipid:drug ratio is described in units of mg total lipid per mg nucleic acid. Mean particle size and polydispersity were measured on a Malvern Instruments Zetasizer. Encapsulation of nucleic acid was measured using a Ribogreen assay essentially as described in Heyes et al., *rnal of Controlled Release,* 107:276-287 (2005).

TABLE 5

| Characteristics of the SNALP formulations used in this study. | | | |
|---|---|---|---|
| SNALP (L:D ratio) | siRNA Payload | Particle Size (Polydispersity) | % Encapsulation |
| 2:30 (13) | ApoB-10048 U2/2 G1/2 | 65 nm (0.16) | 88 |
| 1:57 (9) | ApoB-10048 U2/2 G1/2 | 74 nm (0.10) | 89 |

The 2:30 SNALP formulation used in this study is lipid composition 2:30:20:48 as described in molar percentages of PEG-C-DMA, DLinDMA, DSPC, and cholesterol (in that order). This formulation was prepared by syringe press at an input lipid to drug (L:D) ratio (mg:mg) of 13:1.

The 1:57 SNALP formulation used in this study is lipid composition 1.5:57.1:7:34.3 as described in molar percentages of PEG-C-DMA, DLinDMA, DPPC, and cholesterol (in that order). This formulation was prepared by syringe press at an input lipid to drug (L:D) ratio (mg:mg) of 9:1.

BALB/c mice (female, 4 weeks old) were obtained from Harlan Labs. After an acclimation period (of at least 7 days), animals were administered SNALP by intravenous (IV) injection in the lateral tail vein once daily on Study Days 0, 1, 2, 3 & 4 for a total of 5 doses per animal. Daily dosage was either 1.0 (for 2:30 SNALP) or 0.1 (for 1:57 SNALP) mg encapsulated siRNA per kg body weight, corresponding to 10 ml/kg (rounded to the nearest 10 μl). As a negative control, one group of animals was given IV injections of phosphate buffered saline (PBS) vehicle. On Study Day 7, 72 h after the last treatment, animals were euthanized and liver tissue was collected in RNAlater.

Liver tissues were analyzed for ApoB mRNA levels normalized against glyceraldehyde-3-phosphate dehydrogenase (GAPDH) mRNA levels using the QuantiGene assay (Panomics; Fremont, Calif.) essentially as described in Judge et al., *Molecular Therapy,* 13:494 (2006).

FIG. **3** shows that the 1:57 SNALP containing ApoB 10048 U2/2 G1/2 siRNA was more than 10 times as efficacious as the 2:30 SNALP in mediating ApoB gene silencing in mouse liver at a 10-fold lower dose.

### Example 5. ApoB siRNA Formulated as 1:57 or 1:62 SNALP Have Potent Silencing Activity In Vivo

SNALP formulations were prepared with the ApoB siRNA set forth in Table 3. The lipid components and physical characteristics of the formulations are summarized in Table 6. The lipid:drug ratio is described in units of mg total lipid per mg nucleic acid. Mean particle size and polydispersity were measured on a Malvern Instruments Zetasizer. Encapsulation of nucleic acid was measured using a Ribogreen assay essentially as described in Heyes et al., *Journal of Controlled Release,* 107:276-287 (2005).

TABLE 6

Characteristics of the SNALP formulations used in this study.

| Group | Formulation Composition Lipid Name & Mole % | Lipid/Drug Ratio | Finished Product Characterization Size (nm) | Polydispersity | % Encapsulation |
|---|---|---|---|---|---|
| 2 | PEG(2000)-C-DMA \| DLinDMA \| DPPC \| Cholesterol 1.4 \| 57.1 \| 7.1 \| 34.3 | 8.9 | 76 | 0.06 | 89 |
| 3 | PEG(2000)-C-DMA \| DLinDMA \| Cholesterol 1.5 \| 61.5 \| 36.9 | 8.1 | 76 | 0.04 | 86 |
| 4 | PEG(2000)-C-DMA \| DODMA \| DPPC \| Cholesterol 1.4 \| 57.1 \| 7.1 \| 34.3 | 9.0 | 72 | 0.05 | 95 |
| 5 | PEG(5000)-C-DMA \| DLinDMA \| DPPC \| Cholesterol 1.4 \| 57.1 \| 7.1 \| 34.3 | 9.6 | 52 | 0.16 | 89 |
| 6 | PEG(2000)-C-DMA \| DLinDMA \| DPPC \| Cholestanol 1.4 \| 57.1 \| 7.1 \| 34.3 | 8.9 | 68 | 0.10 | 94 |
| 7 | PEG(2000)-C-DMA \| DLinDMA \| DPPE \| Cholesterol 1.4 \| 57.1 \| 7.1 \| 34.3 | 8.9 | 72 | 0.07 | 95 |
| 8 | PEG(2000)-C-DMA \| DLinDMA \| DPPC 1.8 \| 70.2 \| 28.1 | 8.6 | 74 | 0.13 | 86 |

BALB/c mice (female, at least 4 weeks old) were obtained from Harlan Labs. After an acclimation period (of at least 7 days), animals were administered SNALP by intravenous (IV) injection in the lateral tail vein once daily on Study Day 0 (1 dose total per animal). Dosage was 0.75 mg encapsulated siRNA per kg body weight, corresponding to 10 ml/kg (rounded to the nearest 10 μl). As a negative control, one group of animals was given an IV injection of phosphate buffered saline (PBS) vehicle. On Study Day 2, animals were euthanized and liver tissue was collected in RNAlater.

Liver tissues were analyzed for ApoB mRNA levels normalized against glyceraldehyde-3-phosphate dehydrogenase (GAPDH) mRNA levels using the QuantiGene assay (Panomics; Fremont, Calif.) essentially as described in Judge et al., *Molecular Therapy,* 13:494 (2006).

FIG. **4** shows that the 1:57 and 1:62 SNALP formulations had comparable ApoB silencing activity in vivo (see, e.g., Groups 2 & 3).

### Example 6. ApoB siRNA Formulated as 1:62 SNALP Have Potent Silencing Activity In Vivo

SNALP formulations were prepared with the ApoB siRNA set forth in Table 3. The lipid components and physical characteristics of the formulations are summarized in Table 7. The lipid:drug ratio is described in units of mg total lipid per mg nucleic acid. Mean particle size and polydispersity were measured on a Malvern Instruments Zetasizer. Encapsulation of nucleic acid was measured using a Ribogreen assay essentially as described in Heyes et al., *Journal of Controlled Release,* 107:276-287 (2005).

TABLE 7

Characteristics of the SNALP formulations used in this study.

| Group | Formulation Composition, Mole % PEG(2000)-C-DMA \| DLinDMA \| Cholesterol | Lipid/Drug Ratio | Finished Product Characterization Size (nm) | Polydispersity | % Encapsulation |
|---|---|---|---|---|---|
| 2 | 1.5 \| 61.5 \| 36.9 | 6.1 | 80 | 0.07 | 92 |
| 3 | 1.4 \| 54.8 \| 43.8 | 6.6 | 74 | 0.05 | 89 |
| 4 | 2.0 \| 61.2 \| 36.7 | 6.2 | 71 | 0.11 | 91 |
| 5 | 1.8 \| 54.5 \| 43.6 | 6.7 | 67 | 0.09 | 91 |
| 6 | 1.3 \| 68.1 \| 30.6 | 7.4 | 91 | 0.06 | 89 |
| 7 | 1.2 \| 61.8 \| 37.1 | 8.0 | 87 | 0.10 | 90 |
| 8 | 1.7 \| 67.8 \| 30.5 | 7.6 | 81 | 0.07 | 91 |
| 9 | 1.4 \| 56.3 \| 42.3 | 8.6 | 75 | 0.11 | 92 |
| 10 | 1.9 \| 61.3 \| 36.8 | 8.2 | 72 | 0.10 | 91 |
| 11 | 1.8 \| 56.1 \| 42.1 | 8.8 | 70 | 0.10 | 90 |
| 12 | 1.3 \| 66.7 \| 32.0 | 9.5 | 89 | 0.09 | 89 |
| 13 | 1.2 \| 61.7 \| 37.0 | 10.0 | 87 | 0.10 | 91 |
| 14 | 1.7 \| 66.4 \| 31.9 | 9.6 | 82 | 0.11 | 90 |
| 15 | 1.5 \| 61.5 \| 36.9 | 10.1 | 79 | 0.10 | 91 |

BALB/c mice (female, at least 4 weeks old) were obtained from Harlan Labs. After an acclimation period (of at least 7 days), animals were administered SNALP by intravenous (IV) injection in the lateral tail vein once daily on Study Day 0 (1 dose total per animal). Dosage was 0.1 mg encapsulated siRNA per kg body weight, corresponding to 10 ml/kg (rounded to the nearest 10 μl). As a negative control, one group of animals was given an IV injection of phosphate buffered saline (PBS) vehicle. On Study Day 2, animals were euthanized and liver tissue was collected in RNAlater.

Liver tissues were analyzed for ApoB mRNA levels normalized against glyceraldehyde-3-phosphate dehydrogenase (GAPDH) mRNA levels using the QuantiGene assay (Panomics; Fremont, Calif.) essentially as described in Judge et al., *Molecular Therapy,* 13:494 (2006).

FIG. **5** shows that the 1:62 SNALP formulation was one of the most potent inhibitors of ApoB expression at two different lipid:drug ratios (i.e., 6.1 & 10.1) among the phospholipid-free SNALP formulations tested (see, Groups 2 & 15).

## Example 7. In Vivo Silencing of ApoB Expression Using 1:57 SNALP Prepared Via a Syringe Press or Gear Pump Process

This study illustrates a comparison of the tolerability and efficacy of the 1:57 SNALP formulation with ApoB-targeting siRNA as prepared by various manufacturing processes. In particular, 1:57 SNALP was prepared by a syringe press or gear pump process using either PBS or citrate buffer (post-blend dilution) and administered intravenously in mice.

Experimental Design

Animal Model: Female BALB/c mice, 5 wks old, n=4 per group/cage.

siRNA payload: ApoB10048 U2/2 G1/2 siRNA.

Tolerability:

| Group | Formulation | IV Injection siRNA mg/kg | IV Injection Lipid mg/kg |
|---|---|---|---|
| 1 | PBS vehicle | Standard 10 mL/kg volume | |
| 2 | 1\|57 Citrate Direct Dil, Syringe Press | 7 | 77 |
| 3 | 1\|57 PBS Direct Dil, Syringe Press | 7 | 96 |
| 4 | 1\|57 PBS Direct Dil, Gear Pump | 7 | 79 |
| 5 | 1\|57 Citrate Direct Dil, Syringe Press | 9 | 99 |
| 6 | 1\|57 PBS Direct Dil, Syringe Press | 9 | 123 |
| 7 | 1\|57 PBS Direct Dil, Gear Pump | 9 | 102 |

Efficacy:

| Group | Formulation | IV Injection siRNA mg/kg | IV Injection Lipid mg/kg |
|---|---|---|---|
| 8 | PBS vehicle | Standard 10 mL/kg volume | |
| 9 | 1\|57 PBS Direct Dil, Syringe Press | 0.05 | 0.68 |
| 10 | 1\|57 PBS Direct Dil, Gear Pump | 0.05 | 0.57 |
| 11 | 1\|57 PBS Direct Dil, Syringe Press | 0.1 | 1.36 |
| 12 | 1\|57 PBS Direct Dil, Gear Pump | 0.1 | 1.13 |

Formulation:

Formulations are provided at 0.005 to 0.9 mg siRNA/mL, 0.22 μm filter sterilized in crimp top vials.

Formulation Details:

1. Lipid composition "1|57 Citrate blend" used in this study is 1.4:57.1:7.1:34.3 as described in molar percentages of PEG-C-DMA, DLinDMA, DPPC, and cholesterol (in that order). This formulation has an input lipid to drug ratio of 8.9.
2. Gear pump set up included 0.8 mm T-connector and 400 mL/min speed.
3. siRNA used in this study is apoB-10048 U2/2 G1/2 siRNA.

Formulation Summary:

| | 1:57 (9:1) + DOW siRNA | Particle Size Zavg (nm) | Poly | % Encap | Final L:D (mg:mg) |
|---|---|---|---|---|---|
| 322-050807-1 | Syringe PBS Blend | 79 | 0.12 | 92 | 13.6 |
| 322-050807-2 | Syringe Citrate Blend | 86 | 0.11 | 91 | 11.0 |
| 322-050807-3 | Gear PBS Blend | 80 | 0.09 | 93 | 11.3 |

Procedures

Treatment: Just prior to the first treatment, animals are weighed and dose amounts are calculated based on the weight of individual animals (equivalent to 10 mL/kg, rounded to the nearest 10 μl). Test article is administered by IV injection through the tail vein once on Day 0 (1 dose total per animal). Body weight is measured daily (every 24 h) for the duration of the study. Cage-side observations are taken daily in concert with body weight measurements and additionally as warranted.

Group 1-7 Endpoint: Animals are sacrificed on Day 1, 24 h after test article administration. Blood is collected by cardiac puncture upon sacrifice. Whole amount is collected into a SST microtainer for serum. Clot for 30 (to 60) min at room temp., centrifuge for 5 min at 16,000xg & 16° C., invert to confirm centrifugation is complete, and store at 4° C. Analyze complete small-animal clinical chemistry panel plus AST and SDH. Top priority list: ALT, AST, SDH, Bilirubin, Alkaline Phosphatase, GGT, BUN, CPK, Glucose. Secondary priority list: Creatinine, Albumin, Globulin, Total Protein.

Group 8-12 Endpoint: Animals are sacrificed on Day 2, 48 h after test article administration. Blood is collected by cardiac puncture and processed for plasma. Immediately centrifuge for 5 min at 16,000×g (at 16° C.). Record any observations of unusual plasma appearance. Pipette off clear plasma supernatant into a clean microfuge tube and store at −80° C. The following tissues are removed and weighed separately: liver and spleen. The bottom (unattached) half of the left liver lobe is detached and submerged in ≥5 volumes of RNAlater 0.3 gin 1.5 mL RNAlater in 2.0 mL tube), stored at least 16 hours at 4° C. prior to analysis and long term storage at −20° C. or −80° C. for archival purposes. Formulations are expected to be well tolerated. Mice which exhibit signs of distress associated with the treatment are terminated at the discretion of the vivarium staff.

Termination: Mice are anaesthetized with a lethal dose of ketamine/xylazine; then cardiac puncture is performed followed by cervical dislocation.

Data Analysis: Tolerability of treatment regime is monitored by animal appearance and behavior as well as body weight. Blood clinical chemistry is measured by automated analyzer. ApoB and GAPDH mRNA levels in liver are measured via QG assay. ApoB protein in plasma is measured via ELISA. Total cholesterol in plasma is measured via standard enzymatic/colorimetric assay.

Results

There was no body weight loss or change in animal appearance/behavior upon administration of the 1:57 SNALP formulations. FIG. **6** shows that the tolerability of SNALP prepared by citrate buffer versus PBS direct dilution did not differ significantly in terms of blood clinical chemistry parameters. There was a tolerability difference between syringe citrate and syringe PBS at constant siRNA dosage, but that was likely an artifact dependent on the different final lipid:drug (L:D) ratios of these two preparations.

FIG. **7** shows that the efficacy of the 1:57 SNALP prepared by gear pump was similar to the same SNALP prepared by syringe press. The tolerability profile was improved with the gear pump process, which could be attributed to increased initial encapsulation rate and decreased final L:D ratio.

## Example 8. In Vivo Silencing of ApoB Expression Using 1:57 SNALP Prepared Via a Direct Dilution or In-Line Dilution Process

This study illustrates a comparison of the tolerability and efficacy of the 1:57 SNALP formulation with ApoB-targeting siRNA as prepared by a direct dilution or in-line dilution process at an input lipid to drug ratio of 6:1 or 9:1.

Experimental Design

Animal Model: Female BALB/c mice, 7 wks old.

siRNA payload: ApoB10048 U2/2 G1/2 siRNA.

CBC/Diff:

| Group | # Mice | Test Article | IV Dosage Encap. siRNA | Total Lipid |
|---|---|---|---|---|
| 1 | 3 | PBS | — | — |
| 2 | 3 | 1\|57 SNALP (9:1) | 7 mg/kg | 71 mg/kg |
| 3 | 3 | 1\|57 SNALP (9:1) | 11 mg/kg | 112 mg/kg |

Clinical Chemistry:

| Group | # Mice | Test Article | IV Dosage Encap. siRNA | Total Lipid |
|---|---|---|---|---|
| 4 | 4 | PBS | — | — |
| 5 | 4 | 1\|57 SNALP (9:1) | 9 mg/kg | 92 mg/kg |
| 6 | 4 | 1\|57 SNALP (9:1) | 11 mg/kg | 112 mg/kg |
| 7 | 4 | (6:1) New 1\|57 SNALP | 11 mg/kg | 78 mg/kg |
| 8 | 4 | (6:1) New 1\|57 SNALP | 13 mg/kg | 93 mg/kg |
| 9 | 4 | (6:1) New 1\|57 SNALP | 15 mg/kg | 107 mg/kg |
| 10 | 4 | (6:1) New 1\|57 SNALP | 17 mg/kg | 121 mg/kg |
| 11 | 4 | 1\|57 SNALP (9:1) | 11 mg/kg | 112 mg/kg |

Activity:

| Group | # Mice | Test Article | IV Dosage Encap. siRNA | Total Lipid |
|---|---|---|---|---|
| 12 | 4 | PBS | — | — |
| 13 | 4 | 1\|57 SNALP (9:1) | 0.05 mg/kg | 0.51 mg/kg |
| 14 | 4 | 1\|57 SNALP (9:1) | 0.1 mg/kg | 1.02 mg/kg |
| 15 | 4 | 1\|57 SNALP (9:1) | 0.2 mg/kg | 2.04 mg/kg |
| 16 | 4 | (6:1) New 1\|57 SNALP | 0.05 mg/kg | 0.36 mg/kg |
| 17 | 4 | (6:1) New 1\|57 SNALP | 0.1 mg/kg | 0.71 mg/kg |
| 18 | 4 | (6:1) New 1\|57 SNALP | 0.2 mg/kg | 1.42 mg/kg |
| 19 | 4 | (6:1) New 1\|57 SNALP | 0.4 mg/kg | 2.85 mg/kg |

Formulation:

Formulations are provided at 0.005 to 1.7 mg siRNA/mL, 0.22 μm filter sterilized in crimp top vials.

Formulation Details:

"1|157 SNALP" used in this study is lipid composition 1.4:57.1:7.1:34.3 as described in molar percentages of PEG-C-DMA, DLinDMA, DPPC, and cholesterol (in that order). This formulation was prepared by gear

pump at an input lipid to drug ratio of 9:1 (28 mM lipids) or 6:1 (14 mM lipids).

2. siRNA used in this study is apoB-10048 U2/2 G1/2 siRNA.

Formulation Summary:

| | | Particle Size | | | |
|---|---|---|---|---|---|
| | 1\|57 SNALP Gear PBS In-Line | Zavg (nm) | Poly | % Encap | Final L:D (mg:mg) |
| 322-051407-1 | Input 9:1 | 78 | 0.07 | 93 | 10.2 |
| 322-051407-2 | Input 6:1 | 81 | 0.05 | 92 | 7.1 |

Procedures

Treatment: Just prior to the first treatment, animals are weighed and dose amounts are calculated based on the weight of individual animals (equivalent to 10 mL/kg, rounded to the nearest 10 μl). Test article is administered by IV injection through the tail vein once on Day 0 (1 dose total per animal). Body weight is measured daily (every 24 h) for the duration of the study. Cage-side observations are taken daily in concert with body weight measurements and additionally as warranted.

Endpoint: Animals are sacrificed on Day 1, 24 h after test article administration (Grps 1-10) or on Day 2, 48 h after test article administration (Grps 11-19).

Groups 1-3: Blood is collected by cardiac puncture upon sacrifice. Whole amount is collected into an EDTA microtainer, mixed immediately to prevent coagulation, and sent for analysis of CBC/Diff profile. Perform brief necropsy.

Groups 4-11: Blood is collected by cardiac puncture into a SST microtainer for serum. Clot for 30 (to 60) min at room temp., centrifuge for 5 min at 16,000×g & 16° C., invert to confirm centrifugation is complete, and store at 4° C. Analyze complete small-animal clinical chemistry panel plus AST and SDH. Top priority list: ALT, AST, SDH, Bilirubin, Alkaline Phosphatase, GGT, BUN, CPK, Glucose. Secondary priority list: Creatinine, Albumin, Globulin, Total Protein. Perform brief necropsy.

Groups 12-19: Blood is collected by cardiac puncture and processed for plasma: immediately centrifuge for 5 min at 16,000×g (at 16° C.). Record any observations of unusual plasma appearance. Pipette off clear plasma supernatant into a clean microfuge tube and store at −80° C. The following tissues are removed: liver. The liver is not weighed; the bottom (unattached) half of the left liver lobe is detached and submerged in ≥5 volumes of RNAlater (<0.3 g in 1.5 mL RNAlater in 2.0 mL tube), stored at least 16 hours at 4° C. prior to analysis and long term storage at −80° C. Formulations are expected to be well tolerated. Mice which exhibit signs of distress associated with the treatment are terminated at the discretion of the vivarium staff.

Termination: Mice are anaesthetized with a lethal dose of ketamine/xylazine; then cardiac puncture is performed followed by cervical dislocation.

Data Analysis: Tolerability of treatment regime is monitored by animal appearance and behavior, and body weight. Blood clinical chemistry and CBC/Diff profile is measured by automated analyzer. Liver ApoB mRNA is measured using the QuantiGene Assay. Plasma ApoB-100 is measured using ELISA. Plasma total cholesterol is measured using a standard enzymatic assay.

Results

Tolerability:

FIG. **8** shows that there was very little effect on body weight 24 hours after 1:57 SNALP administration. The maximum weight loss of 3.6±0.7% was observed at the highest drug dose of 17 mg/kg. There was also no obvious change in animal appearance/behavior at any of the dosages tested.

FIG. **9** shows that there were no obvious changes in platelet count. Reduction of platelets can cause the mean platelet volume to increase as the body produces new platelets in compensation for the treatment-related decrease. Under the conditions of this study, the mean platelet volume did not change in SNALP-treated groups.

FIG. **10** shows that clinically significant liver enzyme elevations (3xULN) occurred at drug dosages of 11 mg/kg for 1:57 SNALP at a lipid:drug (L:D) ratio of 10, and at 13 mg/kg at a L:D of 7. A slight dose response trend upwards in plasma total protein and globulin was also observed.

Efficacy:

FIG. **11** shows that based on the liver mRNA QuantiGene analysis, the potency of the lower L:D SNALP was as good as that of the higher L:D SNALP at the tested drug dosages. In fact, the ApoB silencing activity was identical at the 0.05 and 0.1 mg/kg dosages. As such, the potency of the 1:57 SNALP at a 6:1 input L:D ratio (final ratio of 7:1) was similar to the potency of the 1:57 SNALP at a 9:1 input L:D ratio (final ratio of 10:1) at reducing ApoB expression.

FIG. **12** shows that ApoB protein and total cholesterol levels were reduced to a similar extent by the 1:57 SNALP at a 6:1 input L:D ratio (final ratio of 7:1) and the 1:57 SNALP at a 9:1 input L:D ratio (final ratio of 10:1).

Therapeutic Index:

This study demonstrates that both the 1:57 SNALP at a 6:1 input L:D ratio (final ratio of 7:1) and the 1:57 SNALP at a 9:1 input L:D ratio (final ratio of 10:1) caused about 60% ApoB liver mRNA silencing with a drug dose of 0.1 mg/kg. Interpolating from the available data points in FIG. **10**, a 10:1 final L:D ratio at 10 mg/kg may cause a similar degree of enzyme elevation as a 7:1 final L:D ratio at 13 mg/kg. Using these activity and toxicity points, the therapeutic index for the 1:57 SNALP at a 10:1 final L:D ratio is (10 mg/kg)/(0.1 mg/kg)=100 and the therapeutic index for the 1:57 SNALP at a 7:1 final L:D ratio is (13 mg/kg)/(0.1 mg/kg)=130. Using this dataset, the therapeutic index for the 1:57 SNALP at a 7:1 final L:D ratio is 30% greater than the therapeutic index for the 1:57 SNALP at a 10:1 final L:D ratio.

## Example 9. In Vivo Silencing of PLK-1 Expression Using 1:57 SNALP Increases Survival of Hep3B Tumor-Bearing Mice

SNALP containing polo-like kinase 1 (PLK-1) siRNA (1:57 SNALP formulation: 1.4% PEG-cDMA; 57.1% DLinDMA; 7.1% DPPC; and 34.3% cholesterol) were tested for their effects on the survival of CD1 nu/nu mice bearing Hep3B liver tumors. PLK-1 is a serine/threonine kinase containing two functional domains: (1) a kinase domain; and (2) a polo-box domain (see, e.g., Barr et al., *Nat. Rev. Mol. Cell Biol.,* 5:429-440 (2004)). The activity and cellular concentration of PLK-1 are crucial for the precise regulation of cell division. PLK-1 is overexpressed in many cancer types including hepatoma and colon cancer, and PLK-1 expression often correlates with poor patient prognosis. Overexpression of PLK-1 (wild-type or kinase inactive) results in multinucleation (genetic instability). Hyperactive PLK-1 overrides the DNA damage checkpoint. Constitutive PLK-1 expression causes transformation of NIH 3T3 cells. PLK-1 phosphorylates the p53 tumor suppressor, thereby inhibiting the pro-apoptotic effects of p53. The PLK-1 siRNA used in this study are provided in Table 8. The

modifications involved introducing 2'OMe-uridine or 2'OMe-guanosine at selected positions in the sense and antisense strands of the PLK-1 siRNA sequence, in which the siRNA duplex contained less than about 20% 2'OMe-modified nucleotides.

TABLE 8

siRNA duplexes comprising sense and antisense PLK-1 RNA polynucleotides.

| siRNA | PLK-1 siRNA Sequence | SEQ ID NO: | % Modified is DS Region |
|---|---|---|---|
| PLK1424 U4/GU | 5'-AGA**U**CACCC**U**CCU**U**AAA**U**ANN-3' | 5 | 6/38 = 15.8% |
| | 3'-NNUC**U**AGUGGGAG**G**AAUUUAU-5' | 6 | |
| PLK1424 U4/G | 5'-AGA**U**CACCC**U**CCU**U**AAA**U**ANN-3' | 5 | 7/38 = 18.4% |
| | 3'-NNUCUA**G**UG**G**GA**G**GAAUUUAU-5' | 7 | |

Column 1: The number after "PLK" refers to the nucleotide position of the 5' base of the sense strand relative to the start codon (ATG) of the human PLK-1 mRNA sequence NM_005030. Column 2: 2'-O-methyl (2'OMe) nucleotides are indicated in bold and underlined. The siRNA duplex can alternatively or additionally comprise 2'-deoxy-2'-fluoro (2'F) nucleotides, 2'-deoxy nucleotides, 2'-O-(2-methoxyethyl) (MOE) nucleotides, and/or locked nucleic acid (LNA) nucleotides. N = deoxythymidine (dT) nucleotide, uridine (U) ribonucleotide, or ribonucleotide having complementarity to the target sequence (antisense strand) or the complementary strand thereof (sense strand). Column 3: The number and percentage of modified nucleotides in the double-stranded (DS) region of the siRNA duplex are provided.

Experimental Groups

20 CD1 nu/nu mice were seeded as follows:

| Group | # Mice | Tumor seeding | SNALP | # Mice | SNALP dosing IV | SNALP dose | Sacrifice | Assay |
|---|---|---|---|---|---|---|---|---|
| A | 20 to | I.H. | Luc 1:57 | 9 | Days 11, 14, | 10 × 2 | When | Survival |
| B | seed | 1.5 × $10^6$ | PLK 1424 | 9 | 17, 21, 25, 28, | mg/kg | moribund | Body Weights |
| | | Hep3B | 1:57 | | 32, 35, 39, 42 | | | |

Test Articles

All samples were filter-sterilized prior to dilution to working concentration. All tubes were labeled with the formulation date, lipid composition, and nucleic acid concentration. SNALP samples were provided at 0.2 mg/ml nucleic acid. A minimum of 20 ml of each SNALP was required to perform the study. Formulations for this study contained:

| Group | Test Article Description |
|---|---|
| A | Luc U/U SNALP 1:57 (28 mM lipid) |
| B | PLK1424 U4/GU SNALP 1:57 (28 mM lipid) |
| | PLK1424 U4/G SNALP 1:57 (28 mM lipid) |

Procedures

Day 0 Mice will receive Anafen by SC injection (100 µg in 20 µl saline) immediately prior to surgery. Individual mice are anesthetized by isoflourane gas inhalation and eye lube applied to prevent excessive eye drying. While maintained under gas anesthesia from a nose cone, a single 1.5 cm incision across the midline will be made below the sternum. The left lateral hepatic lobe is then exteriorized using an autoclaved cotton wool bud. 25 µl of tumor cells suspended in PBS is injected into the lobe at a shallow angle using a leur tip Hamilton syringe (50 µl) and 30G (⅜") needle. Cells will be injected slowly (~30 s) and a swab applied to the puncture wound immediately after needle withdrawal. After any bleeding has stopped (~1 min), the incision is closed with 5-6 sutures in the muscle wall and 3-4 skin clips. Cell suspensions will be thoroughly mixed immediately prior to each injection. Mice will recover from anesthesia in a clean cage lined with paper towel and monitored closely for 2-4 hours. Animals are then returned to normal housing.

Day 1 All mice will be lightly anesthetized by isoflourane gas and the sutures examined. Animals will then receive Anafen by SC injection (100 µg in 20 µl saline).

Day 10 Mice will be randomized into the appropriate treatment groups.

Day 11 Groups A, B—Day 11: All Animals will be administered SNALP at 2 mg/kg by IV injection via the lateral tail vein. Mice will be dosed according to body weight (10 ml/kg). Dosing will be repeated for 5 consecutive days based on initial weight.

Day 14-35 Groups A, B—Days 14, 17, 21, 25, 28, 32, 35: All Animals will be re-administered SNALP at 2 mg/kg by IV injection via the lateral tail vein. Mice will be dosed according to body weight (10 ml/kg).

Body weights Groups: Mice will be weighed on the day of dosing for 5 weeks, then twice weekly until close of the study.

Endpoint: Tumor burden and formulations are expected to be well tolerated. Mice that exhibit signs of distress associated with the treatment or tumor burden are terminated at the discretion of the vivarium staff.

Termination: Mice are anesthetized with a lethal dose of ketamine/xylazine followed by cervical dislocation.

Data Analysis: Survival and body weights are assayed.

Results

FIG. **13** shows the mean body weights of mice during therapeutic dosing of PLK1424 SNALP in the Hep3B intra-

hepatic (I. H.) tumor model. The treatment regimen was well tolerated with no apparent signs of treatment-related toxicity.

FIG. **14** shows that treatment with 1:57 SNALP-formulated PLK1424 caused a significant increase in the survival of Hep3B tumor-bearing mice. This in vivo anti-tumor effect was observed in the absence of any apparent toxicity or immune stimulation.

### Example 10. In Vivo Silencing of PLK-1 Expression Using 1:57 SNALP Induces Tumor Cell Apoptosis in Hep3B Tumor-Bearing Mice

The objectives of this study were as follows:

1. To determine the level of mRNA silencing in established Hep3B liver tumors following a single IV administration of PLK1424 SNALP.
2. To confirm the mechanism of mRNA silencing by detecting specific RNA cleavage products using RACE-PCR.
3. To confirm induction of tumor cell apoptosis by histopathology.

The 1:57 SNALP formulation (1.4% PEG-cDMA; 57.1% DLinDMA; 7.1% DPPC; and 34.3% cholesterol) was used for this study.

Experimental Groups

20 SCID/beige mice were seeded as follows:

skin clips. Cell suspensions will be thoroughly mixed immediately prior to each injection. Mice will recover from anesthesia in a clean cage lined with paper towel and monitored closely for 2-4 hours. Animals are then returned to normal housing.

Day 1 All mice will be lightly anesthetized by isoflourane gas and the sutures examined. Animals will then receive Anafen by SC injection (100 μg in 20 μl saline).

Day 7 Mice will be randomized into the appropriate treatment groups.

Day 20 Groups A-C: Mice will be weighed and then administered either PBS, Luc, or PLK1424 SNALP by IV injection via the lateral tail vein. SNALP will be dosed at 2 mg/kg or equivalent volume (10 ml/kg) according to body weight.

Day 21 Groups A-C: All mice will be weighed and then euthanized by lethal anesthesia.

Tumor bearing liver lobes from all mice in each group will be weighed and collected into RNALater for RNA analysis.

Endpoint: Tumor burden and formulations are expected to be well tolerated. Mice that exhibit signs of distress associated with the treatment or tumor burden are terminated at the discretion of the vivarium staff.

Termination: Mice are anaesthetized with a lethal dose of ketamine/xylazine followed by cervical dislocation.

| Group | # Mice | Tumor seeding | SNALP | # Mice | SNALP dosing IV | Sacrifice | Assay |
|---|---|---|---|---|---|---|---|
| A | 20 to | I.H. | PBS | 6 | 1 × 2 | 24 h after | Tumor QG |
| B | seed | $1 \times 10^6$ | Luc 1:57 | 7 | mg/kg | treatment | Tumor RACE-PCR |
| C | | Hep3B | PLK 1424 1:57 | 7 | Day 20 | | Histopathology |

Test Articles

All samples were filter-sterilized prior to dilution to working concentration. All tubes were labeled with the formulation date, lipid composition, and nucleic acid concentration. SNALP samples were provided at 0.2 mg/ml nucleic acid. A minimum of 2 ml of SNALP was required to perform the study. Formulations for this study contained:

| Group | Test Article Description |
|---|---|
| A | PBS |
| B | Luc U/U 1:57 SNALP |
| C | PLK1424 U4/GU 1:57 SNALP |

Procedures

Day 0 Mice will receive Anafen by SC injection (100 μg in 20 μl saline) immediately prior to surgery. Individual mice are anesthetized by isoflourane gas inhalation and eye lube applied to prevent excessive eye drying. While maintained under gas anesthesia from a nose cone, a single 1.5 cm incision across the midline will be made below the sternum. The left lateral hepatic lobe is then exteriorized using an autoclaved cotton wool bud. 25 μl of tumor cells suspended in PBS is injected into the lobe at a shallow angle using a leur tip Hamilton syringe (50 μl) and 30G (3/8") needle. Cells will be injected slowly (~30 s) and a swab applied to the puncture wound immediately after needle withdrawal. After any bleeding has stopped (~1 min), the muscle wall incision is closed with 5-6 sutures. The skin incision is then closed with 3-4 metal

Data Analysis: mRNA analysis of liver tumors by bDNA (QG) assay and RACE-PCR. Tumor cell apoptosis by histopathology.

Results

Body weights were monitored from Day 14 onwards to assess tumor progression. On Day 20, 6 mice showing greatest weight loss were randomized into each of the 3 groups and treated. All six mice had substantial-large I.H. tumors at sacrifice (Day 21). Treatment of the remaining 14 mice was therefore initiated on the Day 21 (sacrifice Day 22). 10/14 mice had substantial tumors; 2/14 mice had small/probable tumors; and 2/14 mice had no visible tumor burden.

FIG. **15** shows data from Quantigene assays used to measure human (tumor)-specific PLK-1 mRNA levels. A single 2 mg/kg dose of 1:57 SNALP reduced PLK-1 mRNA levels by about 50% in intrahepatic Hep3B tumors growing in mice.

FIG. **16** shows that a specific cleavage product of PLK-1 mRNA was detectable in mice treated with PLK1424 SNALP by 5' RACE-PCR. No specific PCR product was detectable in mice treated with either PBS or control (Luc) SNALP. Nucleotide sequencing of the PCR product confirmed the predicted cleavage site by PLK1424 siRNA-mediated RNA interference in the PLK-1 mRNA.

FIG. **17** shows Hep3B tumor histology in mice treated with either Luc SNALP (top) or PLK1424 SNALP (bottom). Luc SNALP-treated mice displayed normal mitoses in Hep3B tumors, whereas PLK1424 SNALP-treated mice exhibited numerous aberrant mitoses and tumor cell apoptosis in Hep3B tumors.

Conclusion

This example illustrates that a single administration of PLK1424 1:57 SNALP to Hep3B tumor-bearing mice induced significant in vivo silencing of PLK-1 mRNA. This reduction in PLK-1 mRNA was confirmed to be mediated by RNA interference using 5' RACE-PCR analysis. Importantly, PLK-1 mRNA silencing by the 1:57 SNALP formulation profoundly disrupted tumor cell proliferation (mitosis), causing subsequent apoptosis of tumor cells. As demonstrated in the previous example, this anti-tumor effect translated into extended survival times in the tumor-bearing mice.

Example 11. Comparison of 1:57 PLK-1 SNALP Containing Either PEG-cDMA or PEG-cDSA in a Subcutaneous Hep3B Tumor Model

This example demonstrates the utility of the PEG-lipid PEG-cDSA (3-N-[(-Methoxypoly(ethylene glycol)2000) carbamoyl]-1,2-distearyloxypropylamine) in the 1:57 formulation for systemically targeting distal (e.g., subcutaneous) tumors. In particular, this example compares the tumor targeting ability of 1:57 PLK-1 SNALPs containing either PEG-cDMA ($C_{14}$) or PEG-cDSA ($C_{18}$). Readouts are tumor growth inhibition and PLK1 mRNA silencing. The PLK-1 siRNA used was PLK1424 U4/GU, the sequence of which is provided in Table 8.

Subcutaneous (S.C.) Hep3B tumors were established in scid/beige mice. Multidose anti-tumor efficacy of 1:57 PLK-1 SNALP was evaluated for the following groups (n=5 for each group): (1) "Luc-cDMA"-PEG-cDMA Luc SNALP; (2) "PLK-cDMA"-PEG-cDMA PLK-1 SNALP; and (3) "PLK-cDSA"-PEG-cDSA PLK-1 SNALP. Administration of 6×2 mg/kg siRNA was initiated once tumors reached about 5 mm in diameter (Day 10). Dosing was performed on Days 10, 12, 14, 17, 19, and 21. Tumors were measured by caliper twice weekly.

FIG. **18** shows that multiple doses of 1:57 PLK-1 SNALP containing PEG-cDSA induced the regression of established Hep3B S.C. tumors. In particular, 5/5 tumors in the PLK1-cDSA treated mice appeared flat, measurable only by discoloration at the tumor site.

FIG. **19** shows the mRNA silencing of 1:57 PLK SNALP in S.C. Hep3B tumors following a single intravenous SNALP administration. The extent of silencing observed with the PLK1-cDSA SNALP correlated with the anti-tumor activity in the multi-dose study shown in FIG. **18**.

The Luc-cDMA SNALP-treated group, which had developed large S.C. tumors at Day 24, were then administered PLK-cDSA SNALP on Days 24, 26, 28, 31, 33, and 35. There was no additional dosing of the original PLK-1 SNALP-treated groups. The results from this crossover dosing study with large established tumors is provided in FIG. **20**, which shows that PLK1-cDSA SNALP inhibited the growth of large S.C. Hep3B tumors.

A comparison of the effect of PEG-cDMA and PEG-cDSA 1:57 SNALPs on PLK-1 mRNA silencing was performed using established intrahepatic Hep3B tumors in scid/beige mice. A single 2 mg/kg dose of 1:57 PLK-1 SNALP containing either PEG-cDMA or PEG-cDSA was administered intravenously. Liver/tumor samples were collected at 24 and 96 hours after SNALP treatment. Control=2 mg/kg Luc-cDMA SNALP at 24 hours.

FIG. **21** shows that PLK-cDMA SNALP and PLK-cDSA SNALP had similar silencing activities after 24 hours, but that the PLK-cDSA SNALP may increase the duration of mRNA silencing in intrahepatic tumors.



FIG. **22** shows the blood clearance profile of 1:57 PLK-1 SNALP containing either PEG-cDMA or PEG-cDSA. The extended blood circulation times observed for the PLK-cDSA SNALP may enable the increased accumulation and activity at distal (e.g., subcutaneous) tumor sites.

Thus, this study shows that the 1:57 PEG-cDSA SNALP formulation can be used to preferentially target tumors outside of the liver, whereas the 1:57 PEG-cDMA SNALP can be used to preferentially target the liver.

Example 12. Synthesis of Cholesteryl-2'-Hydroxyethyl Ether

Step 1: A 250 ml round bottom flask containing cholesterol (5.0 g, 12.9 mmol) and a stir bar was sealed and flushed with nitrogen. Toluenesulphonyl chloride (5.0 g, 26.2 mmol) was weighed into a separate 100-mL round bottom flask, also sealed and flushed with nitrogen. Anhydrous pyridine (2×50 ml) was delivered to each flask. The toluenesulphonyl chloride solution was then transferred, via cannula, into the 250 ml flask, and the reaction stirred overnight. The pyridine was removed by rotovap, and methanol (80 ml) added to the residue. This was then stirred for 1 hour until a homogeneous suspension was obtained. The suspension was filtered, washed with acetonitrile (50 ml), and dried under vacuum to yield cholesteryl tosylate as a fluffy white solid (6.0 g, 86%).

Step 2: Cholesteryl tosylate (2.0 g, 3.7 mmol), 1,4-dioxane (50 mL), and ethylene glycol (4.6 g, 74 mmol) were added to a 100 ml flask containing a stir bar. The flask was fitted with a condenser, and refluxed overnight. The dioxane was then removed by rotovap, and the reaction mixture suspended in water (100 ml). The solution was transferred to a separating funnel and extracted with chloroform (3×100 ml). The organic phases were combined, washed with water (2×150 ml), dried over magnesium sulphate, and the solvent removed. The crude product was purified by column chromatography (5% acetone/hexane) to yield the product as a white solid (1.1 g, 69%).

The structures of the cholesterol derivatives cholesteryl-2'-hydroxyethyl ether and cholesteryl-4'-hydroxybutyl ether are as follows:




Cholesteryl-2'-hydroxyethyl ether




Cholesteryl-4'-hydroxybutyl ether

It is to be understood that the above description is intended to be illustrative and not restrictive. Many embodiments will be apparent to those of skill in the art upon reading the above description. The scope of the invention

should, therefore, be determined not with reference to the above description, but should instead be determined with reference to the appended claims, along with the full scope of equivalents to which such claims are entitled. The disclosures of all articles and references, including patent applications, patents, PCT publications, and Genbank Accession Nos., are incorporated herein by reference for all purposes.

SEQUENCE LISTING

<160> NUMBER OF SEQ ID NOS: 7

<210> SEQ ID NO 1
<211> LENGTH: 21
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: synthetic E5 kinesin-related protein 2263 U/U siRNA sense strand of siRNA duplex
<220> FEATURE:
<223> OTHER INFORMATION: Description of Combined DNA/RNA Molecule: synthetic E5 kinesin-related protein 2263 U/U siRNA sense strand of siRNA duplex
<221> NAME/KEY: modified_base
<222> LOCATION: (2)...(19)
<223> OTHER INFORMATION: n = um
<221> NAME/KEY: modified_base
<222> LOCATION: (20)...(21)
<223> OTHER INFORMATION: n = deoxythimidine (dT)

<400> SEQUENCE: 1

cngaagaccn gaagacaann n 21

<210> SEQ ID NO 2
<211> LENGTH: 21
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: synthetic E5 kinesin-related protein 2263 U/U siRNA antisense strand of siRNA duplex
<220> FEATURE:
<223> OTHER INFORMATION: Description of Combined DNA/RNA Molecule: synthetic E5 kinesin-related protein 2263 U/U siRNA antisense strand of siRNA duplex
<221> NAME/KEY: modified_base
<222> LOCATION: (8)...(16)
<223> OTHER INFORMATION: n = um
<221> NAME/KEY: modified_base
<222> LOCATION: (20)...(21)
<223> OTHER INFORMATION: n = deoxythimidine (dT)

<400> SEQUENCE: 2

auugucunca ggncuncagn n 21

<210> SEQ ID NO 3
<211> LENGTH: 21
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: synthetic apolipoprotein B (ApoB) 10048 U2/2 G1/2 siRNA sense strand of siRNA duplex
<221> NAME/KEY: modified_base
<222> LOCATION: (4)...(4)
<223> OTHER INFORMATION: n = gm
<221> NAME/KEY: modified_base
<222> LOCATION: (8)...(14)
<223> OTHER INFORMATION: n = um

<400> SEQUENCE: 3

agunucanca cacngaauac c 21

<210> SEQ ID NO 4
<211> LENGTH: 21
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:

```
<223> OTHER INFORMATION: synthetic apolipoprotein B (ApoB) 10048 U2/2
      G1/2 siRNA antisense strand of siRNA duplex
<221> NAME/KEY: modified_base
<222> LOCATION: (4)...(4)
<223> OTHER INFORMATION: n = um
<221> NAME/KEY: modified_base
<222> LOCATION: (7)...(9)
<223> OTHER INFORMATION: n = gm
<221> NAME/KEY: modified_base
<222> LOCATION: (19)...(19)
<223> OTHER INFORMATION: n = um

<400> SEQUENCE: 4

uauncanunu gaugacacnu g                                              21


<210> SEQ ID NO 5
<211> LENGTH: 21
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: synthetic polo-like kinase 1 (PLK-1) PLK1424
      U4/GU and PLK1424 U4/G siRNA sense strand of siRNA
      duplex
<220> FEATURE:
<223> OTHER INFORMATION: Description of Combined DNA/RNA Molecule:
      synthetic polo-like kinase 1 (PLK-1) PLK1424 U4/GU and PLK1424
      U4/G siRNA sense strand of siRNA duplex
<221> NAME/KEY: modified_base
<222> LOCATION: (4)...(18)
<223> OTHER INFORMATION: n = um
<221> NAME/KEY: modified_base
<222> LOCATION: (20)...(21)
<223> OTHER INFORMATION: n = deoxythimidine (dT), u or a ribonucleotide
      complementary to target complementary sequence

<400> SEQUENCE: 5

agancacccn ccunaaanan n                                              21


<210> SEQ ID NO 6
<211> LENGTH: 21
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: synthetic polo-like kinase 1 (PLK-1) PLK1424
      U4/GU siRNA antisense strand of siRNA duplex
<220> FEATURE:
<223> OTHER INFORMATION: Description of Combined DNA/RNA Molecule:
      synthetic polo-like kinase 1 (PLK-1) PLK1424 U4/GU siRNA
      antisense strand of siRNA duplex
<221> NAME/KEY: modified_base
<222> LOCATION: (8)...(8)
<223> OTHER INFORMATION: n = gm
<221> NAME/KEY: modified_base
<222> LOCATION: (17)...(17)
<223> OTHER INFORMATION: n = um
<221> NAME/KEY: modified_base
<222> LOCATION: (20)...(21)
<223> OTHER INFORMATION: n = deoxythimidine (dT), u or a ribonucleotide
      complementary to target sequence

<400> SEQUENCE: 6

uauuuaanga gggugancun n                                              21


<210> SEQ ID NO 7
<211> LENGTH: 21
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: synthetic polo-like kinase 1 (PLK-1) PLK1424
      U4/G siRNA antisense strand of siRNA duplex
<220> FEATURE:
<223> OTHER INFORMATION: Description of Combined DNA/RNA Molecule:
      synthetic polo-like kinase 1 (PLK-1) PLK1424 U4/G siRNA
```

-continued

```
      antisense strand of siRNA duplex
<221> NAME/KEY: modified_base
<222> LOCATION: (9)...(15)
<223> OTHER INFORMATION: n = gm
<221> NAME/KEY: modified_base
<222> LOCATION: (20)...(21)
<223> OTHER INFORMATION: n = deoxythimidine (dT), u or a ribonucleotide
      complementary to target sequence

<400> SEQUENCE: 7

uauuuaagna gngunaucun n                                            21
```

What is claimed is:

1. A nucleic acid-lipid particle consisting essentially of:

(a) an RNA;

(b) a cationic lipid having a protonatable tertiary amine;

(c) a mixture of a phospholipid and cholesterol of from 30 mol % to 55 mol % of the total lipid present in the particle, wherein the phospholipid consists of from 3 mol % to 15 mol % of the total lipid present in the particle; and

(d) a polyethyleneglycol (PEG)-lipid conjugate consisting of from 0.1 mol % to 2 mol % of the total lipid present in the particle.

2. The nucleic acid-lipid particle of claim 1, wherein the cholesterol consists of from 25 mol % to 45 mol % of the total lipid present in the particle.

3. The nucleic acid-lipid particle of claim 2, wherein the phospholipid is distearoylphosphatidylcholine (DSPC).

4. The nucleic acid-lipid particle of claim 3, wherein the PEG has an average molecular weight of about 2,000 daltons.

5. The nucleic acid-lipid particle of claim 4, wherein the PEG has a terminal methoxy group.

6. The nucleic acid-lipid particle of claim 5, wherein the PEG-lipid conjugate is a PEG-diacylglycerol (PEG-DAG) conjugate having the same saturated acyl groups.

7. The nucleic acid-lipid particle of claim 6, wherein the cholesterol consists of from 35 mol % to 45 mol % of the total lipid present in the particle.

8. A pharmaceutical composition comprising a nucleic acid-lipid particle of claim 6 and a pharmaceutically acceptable carrier.

9. The pharmaceutical composition of claim 8, wherein the RNA is fully encapsulated in the nucleic acid-lipid particle.

10. A pharmaceutical composition comprising a nucleic acid-lipid particle of claim 7 and a pharmaceutically acceptable carrier.

11. The pharmaceutical composition of claim 10, wherein the RNA is fully encapsulated in the nucleic acid-lipid particle.

12. The nucleic acid-lipid particle of claim 1, wherein the RNA is an mRNA.

13. The nucleic acid-lipid particle of claim 12, wherein the cholesterol consists of from 25 mol % to 45 mol % of the total lipid present in the particle.

14. The nucleic acid-lipid particle of claim 13, wherein the phospholipid is DSPC.

15. The nucleic acid-lipid particle of claim 14, wherein the PEG has an average molecular weight of about 2,000 daltons.

16. The nucleic acid-lipid particle of claim 15, wherein the PEG has a terminal methoxy group.

17. The nucleic acid-lipid particle of claim 16, wherein the PEG-lipid conjugate is a PEG-DAG conjugate having the same saturated acyl groups.

18. The nucleic acid-lipid particle of claim 17, wherein the cholesterol consists of from 35 mol % to 45 mol % of the total lipid present in the particle.

19. A pharmaceutical composition comprising a nucleic acid-lipid particle of claim 17 and a pharmaceutically acceptable carrier.

20. The pharmaceutical composition of claim 19, wherein the mRNA is fully encapsulated in the nucleic acid-lipid particle.

21. A pharmaceutical composition comprising a nucleic acid-lipid particle of claim 18 and a pharmaceutically acceptable carrier.

22. The pharmaceutical composition of claim 21, wherein the mRNA is fully encapsulated in the nucleic acid-lipid particle.

23. The nucleic acid-lipid particle of claim 5, wherein the PEG-lipid conjugate comprises an amido linker moiety.

24. The nucleic acid-lipid particle of claim 3, wherein the cholesterol consists of from 35 mol % to 45 mol % of the total lipid present in the particle.

25. The nucleic acid-lipid particle of claim 24, wherein the PEG-lipid conjugate consists of from 0.5 mol % to 2 mol % of the total lipid present in the particle.

26. A pharmaceutical composition comprising a nucleic acid-lipid particle of claim 25 and a pharmaceutically acceptable carrier.

27. The pharmaceutical composition of claim 26, wherein the RNA is fully encapsulated in the nucleic acid-lipid particle.

28. The nucleic acid-lipid particle of claim 16, wherein the PEG-lipid conjugate comprises an amido linker moiety.

29. The nucleic acid-lipid particle of claim 28, wherein the DSPC consists of from 4 mol % to 10 mol % of the total lipid present in the particle.

30. A pharmaceutical composition comprising a nucleic acid-lipid particle of claim 29 and a pharmaceutically acceptable carrier.

* * * * *

CLOSED,APPEAL,Multi−Media Docs,PATENT

# U.S. District Court
# District of Delaware (Wilmington)
# CIVIL DOCKET FOR CASE #: 1:22−cv−00252−JDW

Arbutus Biopharma Corporation et al v. Moderna, Inc. et al
Assigned to: Judge Joshua D. Wolson
Case in other court: USCA, 26−01581
Cause: 35:1 Patent Infringement

Date Filed: 02/28/2022
Date Terminated: 03/04/2026
Jury Demand: Plaintiff
Nature of Suit: 830 Patent
Jurisdiction: Federal Question

**Plaintiff**

**Arbutus Biopharma Corporation** represented by

**John W. Shaw**
Shaw Keller LLP
I.M. Pei Building
1105 North Market Street
12th Floor
Wilmington, DE 19801
302−298−0701
Email: jshaw@shawkeller.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nathan Roger Hoeschen**
Shaw Keller LLP
1105 North Market Street, 12th Floor
Wilmington, DE 19801
302−298−0709
Email: nhoeschen@shawkeller.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adam R. Brausa**
Email: abrausa@mofo.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Annie A. Lee**
Email: annielee@mofo.com
*TERMINATED: 02/13/2026*
*PRO HAC VICE*

**David N. Tan**
Email: ntan@mofo.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Emily DiBenedetto**
Shaw Keller LLP
DE
1105 N Market St
Ste 12th Floor
Wilmington, DE 19801
302−298−0713
Email: edibenedetto@shawkeller.com
*ATTORNEY TO BE NOTICED*

**Eric C. Wiener**
Email: ewiener@mofo.com
*PRO HAC VICE*

**Jackson T. Lane**
Email: jlane@mofo.com

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Karen Elizabeth Keller**
Shaw Keller LLP
1105 North Market Street, 12th Floor
Wilmington, DE 19801
302−298−0700
Email: kkeller@shawkeller.com
*ATTORNEY TO BE NOTICED*

**Kira A. Davis**
Email: kiradavis@mofo.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lindsey Michelle Gellar**
Shaw Keller LLP
1105 North Market Street, 12th Floor
Wilmington, DE 19801
302−298−0717
Email: lgellar@shawkeller.com
*ATTORNEY TO BE NOTICED*

**Shaelyn K. Dawson**
Email: shaelyndawson@mofo.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Genevant Sciences GmbH** represented by

**John W. Shaw**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adam D. Harber**
Email: aharber@wc.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Andrei Iancu**
Email: iancua@sullcrom.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Andrew L. Hoffman**
Email: ahoffman@wc.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Anthony H. Sheh**
Email: asheh@wc.com
*TERMINATED: 01/03/2025*
*PRO HAC VICE*

**Arthur J. Argall , III**
Email: aargall@wc.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Daralyn J. Durie**
Email: ddurie@mofo.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**David I. Berl**
Email: dberl@wc.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Denis R Hurley**
Email: dhurley@wc.com
*TERMINATED: 12/27/2022*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Emily DiBenedetto**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Falicia C. Elenberg**
Email: felenberg@wc.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jeffrey B. Wall**
Email: wallj@sullcrom.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jessica Palmer Ryen**
Email: jryen@wc.com
*TERMINATED: 08/05/2024*
*PRO HAC VICE*

**Karen Elizabeth Keller**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kathryn E. Larkin**
Email: klarkin@wc.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lindsey Michelle Gellar**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lydia B. Cash**
Email: lcash@mofo.com
*TERMINATED: 06/02/2023*
*PRO HAC VICE*

**Matthew W. Lachman**
Email: mlachman@wc.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nathan Roger Hoeschen**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Philip N. Haunschild**
Email: phaunschild@wc.com
*PRO HAC VICE*

**Ricardo Leyva**
Email: rleyva@wc.com
*PRO HAC VICE*

*ATTORNEY TO BE NOTICED*

**Shaun P. Mahaffy**
Email: SMahaffy@wc.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Thomas S. Fletcher**
Email: tfletcher@wc.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Moderna, Inc.** represented by

**Brian P. Egan**
Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
302−351−9454
Email: began@mnat.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elizabeth Elrod**
Email: elizabeth.elrod@kirkland.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jack B. Blumenfeld**
Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658−9200
Email: Jbbefiling@mnat.com
*TERMINATED: 05/21/2025*

**James F. Hurst**
Email: james.hurst@kirkland.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jeanna M. Wacker**
Email: jeanna.wacker@kirkland.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mara L. Greenberg**
Email: mara.greenberg@kirkland.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mark C. McLennan**
Email: mark.mclennan@kirkland.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nancy Kaye Horstman**
Email: kaye.horstman@kirkland.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Noah Frank**
Email: noah.frank@kirkland.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Patricia A. Carson**
Email: patricia.carson@kirkland.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Travis J Murray**
Morris Nichols Arsht and Tunnell
Intellectual Property
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899−1347
302−351−9176
Fax: 302−658−3989
Email: tmurray@morrisnichols.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**ModernaTX, Inc.** represented by

**Brian P. Egan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elizabeth Elrod**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jack B. Blumenfeld**
(See above for address)
*TERMINATED: 05/21/2025*

**James F. Hurst**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jeanna M. Wacker**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mara L. Greenberg**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mark C. McLennan**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nancy Kaye Horstman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Noah Frank**
(See above for address)
*PRO HAC VICE*

*ATTORNEY TO BE NOTICED*

**Patricia A. Carson**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Travis J Murray**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Adam Mossoff** represented by **Stephen B. Brauerman**
Bayard, P.A.
600 N. King Street
Suite 400
Wilmington, DE 19801
(302) 655−5000
Fax: (302) 658−6395
Email: sbrauerman@bayardlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Bayh−Dole Coalition** represented by **Stephanie S. Riley**
Womble Bond Dickinson (US) LLP
1313 North Market Street
Suite 1200
Wilmington, DE 19801
302−559−8528
Email: Stephanie.Riley@wbd−us.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Alliance of U.S. Startups and Inventors for Jobs** represented by **Denise Seastone Kraft**
Heyman Enerio Gattuso & Hirzel LLP
Heyman Enerio Gattuso & Hirzel LLP
222 Delaware Avenue
Suite 900
Wilmington, DE 19801
302−472−7300
Fax: 302−472−7320
Email: dkraft@hegh.law
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kurt M. Heyman**
Heyman Enerio Gattuso & Hirzel
222 Delaware Avenue
Suite 900
Wilmington, DE 19801
302−472−7300
Fax: 302−472−7320
Email: kheyman@hegh.law
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**ModernaTX, Inc.** represented by **Brian P. Egan**
(See above for address)
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**Elizabeth Elrod**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jack B. Blumenfeld**
(See above for address)
*TERMINATED: 05/21/2025*

**James F. Hurst**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jeanna M. Wacker**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mara L. Greenberg**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mark C. McLennan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nancy Kaye Horstman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Noah Frank**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Patricia A. Carson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Travis J Murray**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Moderna, Inc.** represented by **Brian P. Egan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elizabeth Elrod**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jack B. Blumenfeld**
(See above for address)
*TERMINATED: 05/21/2025*

**James F. Hurst**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jeanna M. Wacker**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mara L. Greenberg**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mark C. McLennan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nancy Kaye Horstman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Noah Frank**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Patricia A. Carson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Travis J Murray**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**<u>Counter Defendant</u>**

**Arbutus Biopharma Corporation** represented by

**John W. Shaw**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nathan Roger Hoeschen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adam R. Brausa**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Annie A. Lee**
(See above for address)
*TERMINATED: 02/13/2026*
*PRO HAC VICE*

**David N. Tan**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Emily DiBenedetto**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Eric C. Wiener**
(See above for address)
*PRO HAC VICE*

**Jackson T. Lane**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Karen Elizabeth Keller**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kira A. Davis**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lindsey Michelle Gellar**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Shaelyn K. Dawson**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Counter Defendant**

**Genevant Sciences GmbH** represented by **John W. Shaw**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adam D. Harber**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Anthony H. Sheh**
(See above for address)
*TERMINATED: 01/03/2025*
*PRO HAC VICE*

**Daralyn J. Durie**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**David I. Berl**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Denis R Hurley**
(See above for address)
*TERMINATED: 12/27/2022*
*ATTORNEY TO BE NOTICED*

**Emily DiBenedetto**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Falicia C. Elenberg**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jessica Palmer Ryen**
(See above for address)
*TERMINATED: 08/05/2024*
*PRO HAC VICE*

**Karen Elizabeth Keller**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kathryn E. Larkin**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lindsey Michelle Gellar**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lydia B. Cash**
(See above for address)
*TERMINATED: 06/02/2023*
*PRO HAC VICE*

**Matthew W. Lachman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nathan Roger Hoeschen**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Philip N. Haunschild**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ricardo Leyva**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shaun P. Mahaffy**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Thomas S. Fletcher**
(See above for address)
*ATTORNEY TO BE NOTICED*

**<u>Counter Claimant</u>**

**Moderna, Inc.** represented by **Brian P. Egan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elizabeth Elrod**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jack B. Blumenfeld**
(See above for address)

*TERMINATED: 05/21/2025*

**James F. Hurst**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jeanna M. Wacker**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mara L. Greenberg**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mark C. McLennan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nancy Kaye Horstman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Noah Frank**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Patricia A. Carson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Travis J Murray**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**ModernaTX, Inc.** represented by **Brian P. Egan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elizabeth Elrod**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jack B. Blumenfeld**
(See above for address)
*TERMINATED: 05/21/2025*

**James F. Hurst**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jeanna M. Wacker**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mara L. Greenberg**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mark C. McLennan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nancy Kaye Horstman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Noah Frank**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Patricia A. Carson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Travis J Murray**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Counter Defendant**

**Arbutus Biopharma Corporation** represented by **John W. Shaw**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nathan Roger Hoeschen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adam R. Brausa**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Annie A. Lee**
(See above for address)
*TERMINATED: 02/13/2026*
*PRO HAC VICE*

**David N. Tan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Emily DiBenedetto**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Eric C. Wiener**
(See above for address)

**Jackson T. Lane**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Karen Elizabeth Keller**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kira A. Davis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lindsey Michelle Gellar**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Shaelyn K. Dawson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Defendant**

**Genevant Sciences GmbH** represented by **John W. Shaw**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adam D. Harber**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Anthony H. Sheh**
(See above for address)
*TERMINATED: 01/03/2025*

**Daralyn J. Durie**
(See above for address)
*ATTORNEY TO BE NOTICED*

**David I. Berl**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Denis R Hurley**
(See above for address)
*TERMINATED: 12/27/2022*
*ATTORNEY TO BE NOTICED*

**Emily DiBenedetto**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Falicia C. Elenberg**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jessica Palmer Ryen**
(See above for address)
*TERMINATED: 08/05/2024*
*PRO HAC VICE*

**Karen Elizabeth Keller**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kathryn E. Larkin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lindsey Michelle Gellar**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lydia B. Cash**
(See above for address)
*TERMINATED: 06/02/2023*
*PRO HAC VICE*

**Matthew W. Lachman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nathan Roger Hoeschen**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Philip N. Haunschild**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ricardo Leyva**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Shaun P. Mahaffy**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Thomas S. Fletcher**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/28/2022 | 1 | COMPLAINT FOR PATENT INFRINGEMENT − filed with Jury Demand against Moderna, Inc., ModernaTX, Inc. − Magistrate Consent Notice to Pltf. ( Filing fee $ 402, receipt number ADEDC−3812080.) − filed by Genevant Sciences GmbH, Arbutus Biopharma Corporation. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Civil Cover Sheet)(mal) (Entered: 02/28/2022) |
| 02/28/2022 | 2 | Notice, Consent and Referral forms re: U.S. Magistrate Judge jurisdiction. (mal) (Entered: 02/28/2022) |
| 02/28/2022 | 3 | Report to the Commissioner of Patents and Trademarks for Patent/Trademark Number(s) US 8,058,069 B2 ;US 8,492,359 B2 ;US 8,822,668 B2 ;US 9,364,435 B2 ;US 9,504,651 B2. (mal) (Entered: 02/28/2022) |
| 02/28/2022 | 4 | Report to the Commissioner of Patents and Trademarks for Patent/Trademark Number(s) US 11,141,378 B2. (mal) (Entered: 02/28/2022) |
| 02/28/2022 | 5 | Disclosure Statement pursuant to Rule 7.1: identifying Corporate Parent Roivant Sciences Ltd. for Genevant Sciences GmbH. Roivant Sciences Ltd., a publicly−held company, owns 10% or more of the stock of Arbutus Biopharma Corp. − filed by Arbutus Biopharma Corporation and Genevant Sciences GmbH. (mal) (Entered: 02/28/2022) |
| 02/28/2022 | 6 | Summons Issued with Magistrate Consent Notice attached as to Moderna, Inc. on 2/28/2022; ModernaTX, Inc. on 2/28/2022. (Attachments: # 1 Summons Issued Modernatx)(mal) (Entered: 02/28/2022) |
| 03/02/2022 | | Case Assigned to Judge Maryellen Noreika. Please include the initials of the Judge (MN) after the case number on all documents filed. (rjb) (Entered: 03/02/2022) |
| 03/02/2022 | 7 | SUMMONS Returned Executed by Genevant Sciences GmbH, Arbutus Biopharma Corporation. Moderna, Inc. served on 3/1/2022, answer due 3/22/2022. (Shaw, John) (Entered: 03/02/2022) |

| | | |
|---|---|---|
| 03/02/2022 | 8 | SUMMONS Returned Executed by Genevant Sciences GmbH, Arbutus Biopharma Corporation. ModernaTX, Inc. served on 3/1/2022, answer due 3/22/2022. (Shaw, John) (Entered: 03/02/2022) |
| 03/02/2022 | 9 | MOTION for Pro Hac Vice Appearance of Attorney James F. Hurst, Patricia A. Carson, Jeanna M. Wacker and Mark C. McLennan − filed by Moderna, Inc., ModernaTX, Inc.. (Blumenfeld, Jack) (Entered: 03/02/2022) |
| 03/03/2022 | | SO ORDERED re 9 MOTION for Pro Hac Vice Appearance of Attorney James F. Hurst, Patricia A. Carson, Jeanna M. Wacker and Mark C. McLennan filed by Moderna, Inc., ModernaTX, Inc. ORDERED by Judge Maryellen Noreika on 3/3/2022. (dlw) (Entered: 03/03/2022) |
| 03/07/2022 | 10 | STIPULATION TO EXTEND TIME for the defendants to move, answer, or otherwise respond to the Complaint to May 6, 2022 − filed by Moderna, Inc., ModernaTX, Inc.. (Blumenfeld, Jack) (Entered: 03/07/2022) |
| 03/07/2022 | | SO ORDERED re 10 STIPULATION TO EXTEND TIME for the defendants to move, answer, or otherwise respond to the Complaint to May 6, 2022 (Set/Reset Answer Deadlines: Moderna, Inc. answer due 5/6/2022; ModernaTX, Inc. answer due 5/6/2022). ORDERED by Judge Maryellen Noreika on 3/7/2022. (dlw) (Entered: 03/07/2022) |
| 03/15/2022 | 11 | MOTION for Pro Hac Vice Appearance of Attorney David I. Berl, Thomas S. Fletcher, Jessica Palmer Ryen, Denis R. Hurley and Lydia B. Cash − filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Keller, Karen) (Entered: 03/15/2022) |
| 03/15/2022 | 12 | MOTION for Pro Hac Vice Appearance of Attorney Daralyn J. Durie and Eric C. Wiener − filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Keller, Karen) (Entered: 03/15/2022) |
| 03/15/2022 | | SO ORDERED re 12 MOTION for Pro Hac Vice Appearance of Attorney Daralyn J. Durie and Eric C. Wiener, 11 MOTION for Pro Hac Vice Appearance of Attorney David I. Berl, Thomas S. Fletcher, Jessica Palmer Ryen, Denis R. Hurley and Lydia B. Cash filed by Genevant Sciences GmbH, Arbutus Biopharma Corporation. ORDERED by Judge Maryellen Noreika on 3/15/2022. (dlw) (Entered: 03/15/2022) |
| 03/17/2022 | | Pro Hac Vice Attorney David I. Berl, Thomas S. Fletcher, Denis R Hurley, Jessica Palmer Ryen, Lydia B Cash, Daralyn J. Durie, and Eric C. Wiener for Genevant Sciences GmbH added for electronic noticing. Pursuant to Local Rule 83.5 (d)., Delaware counsel shall be the registered users of CM/ECF and shall be required to file all papers. (mpb) (Entered: 03/17/2022) |
| 03/17/2022 | 13 | MOTION for Pro Hac Vice Appearance of Attorney Adam D. Harber − filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Keller, Karen) (Entered: 03/17/2022) |
| 03/18/2022 | | SO ORDERED re 13 MOTION for Pro Hac Vice Appearance of Attorney Adam D. Harber filed by Genevant Sciences GmbH, Arbutus Biopharma Corporation. ORDERED by Judge Maryellen Noreika on 3/18/2022. (dlw) (Entered: 03/18/2022) |
| 03/21/2022 | | Pro Hac Vice Attorney Adam D. Harber for Genevant Sciences GmbH added for electronic noticing. Pursuant to Local Rule 83.5 (d)., Delaware counsel shall be the registered users of CM/ECF and shall be required to file all papers. (srs) (Entered: 03/21/2022) |
| 05/02/2022 | 14 | NOTICE of Change of Address of the law firm of Williams & Connolly LLP by Arbutus Biopharma Corporation, Genevant Sciences GmbH (Hoeschen, Nathan) (Entered: 05/02/2022) |
| 05/04/2022 | 15 | MOTION for Pro Hac Vice Appearance of Attorney Kira A. Davis − filed by Arbutus Biopharma Corporation. (Hoeschen, Nathan) (Entered: 05/04/2022) |
| 05/05/2022 | | Case Reassigned to Judge Mitchell S. Goldberg. Please include the initials of the Judge (MSG) after the case number on all documents filed. (gvw) (Entered: 05/05/2022) |
| 05/06/2022 | | Pro Hac Vice Attorneys James F. Hurst, Patricia A. Carson, Jeanna M. Wacker, Mark C. McLennan for Moderna, Inc., ModernaTX, Inc. added for electronic noticing. |

| | | |
|---|---|---|
| | | Pursuant to Local Rule 83.5 (d)., Delaware counsel shall be the registered users of CM/ECF and shall be required to file all papers. (twk) (Entered: 05/06/2022) |
| 05/06/2022 | 16 | MOTION to Dismiss for Failure to State a Claim − filed by Moderna, Inc., ModernaTX, Inc.. (Egan, Brian) (Entered: 05/06/2022) |
| 05/06/2022 | 17 | OPENING BRIEF in Support re 16 MOTION to Dismiss for Failure to State a Claim filed by Moderna, Inc., ModernaTX, Inc..Answering Brief/Response due date per Local Rules is 5/20/2022. (Attachments: # 1 Exhibits A−B)(Egan, Brian) (Entered: 05/06/2022) |
| 05/06/2022 | 18 | Disclosure Statement pursuant to Rule 7.1: identifying Corporate Parent Moderna, Inc. for ModernaTX, Inc. filed by Moderna, Inc., ModernaTX, Inc.. (Egan, Brian) (Entered: 05/06/2022) |
| 05/13/2022 | 19 | STIPULATION TO EXTEND TIME for plaintiffs to file an answering brief in opposition to Defendants' Partial Motion to Dismiss and for defendants to file a reply brief in support of its motion to June 3, 2022 and June 24, 2022 respectively − filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Keller, Karen) (Entered: 05/13/2022) |
| 05/16/2022 | 20 | STIPULATION AND ORDER TO EXTEND TIME, The deadline for plaintiffs to file an answering brief in opposition to Defendants Partial Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6) (D.I. 17 ) is extended to and including June 3, 2022. The parties further stipulate that the time for defendants to file a reply brief in support of its motion to dismiss is extended through and including June 24, 2022. Signed by Judge Mitchell S. Goldberg on 5/16/2022. (apk) (Entered: 05/16/2022) |
| 06/03/2022 | 21 | ANSWERING BRIEF in Opposition re 16 MOTION to Dismiss for Failure to State a Claim filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.Reply Brief due date per Local Rules is 6/10/2022. (Keller, Karen) (Entered: 06/03/2022) |
| 06/08/2022 | 22 | ORDER granting 15 Motion to Appear Pro Hac Vice of Attorney Kira A. Davis. Signed by Judge Mitchell S. Goldberg on 6/8/2022. (twk) (Entered: 06/08/2022) |
| 06/22/2022 | | Pro Hac Vice Attorney Kira A. Davis for Arbutus Biopharma Corporation added for electronic noticing. Pursuant to Local Rule 83.5 (d)., Delaware counsel shall be the registered users of CM/ECF and shall be required to file all papers. (twk) (Entered: 06/22/2022) |
| 06/24/2022 | 23 | REPLY BRIEF re 16 MOTION to Dismiss for Failure to State a Claim − filed by Moderna, Inc., ModernaTX, Inc.. (Attachments: # 1 Ex. C)(Egan, Brian) (Entered: 06/24/2022) |
| 07/01/2022 | 24 | Letter to The Honorable Mitchell S. Goldberg from John W. Shaw regarding request for Oral Argument − re 16 MOTION to Dismiss for Failure to State a Claim . (Shaw, John) (Entered: 07/01/2022) |
| 07/20/2022 | 25 | MOTION for Pro Hac Vice Appearance of Attorney Shaun P. Mahaffy − filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Keller, Karen) (Entered: 07/20/2022) |
| 07/21/2022 | 26 | ORDER granting 25 Motion to Appear Pro Hac Vice of Attorney Shaun P. Mahaffy. Signed by Judge Mitchell S. Goldberg on 07/20/2022. (smg) (Entered: 07/21/2022) |
| 07/21/2022 | | Pro Hac Vice Attorney Shaun P. Mahaffy for Genevant Sciences GmbH added for electronic noticing. Pursuant to Local Rule 83.5 (d)., Delaware counsel shall be the registered users of CM/ECF and shall be required to file all papers. (mpb) (Entered: 07/21/2022) |
| 07/26/2022 | 27 | NOTICE OF SERVICE of Plaintiffs' Initial Identification of Asserted Patents, Accused Products, and Damages Model filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.(Shaw, John) (Entered: 07/26/2022) |
| 08/01/2022 | 28 | Letter to Honorable Mitchell S. Goldberg from John W. Shaw regarding a Proposed Scheduling Order. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Shaw, John) (Entered: 08/01/2022) |

| | | |
|---|---|---|
| 08/02/2022 | 29 | Letter to The Honorable Mitchell S. Goldberg from Jack B. Blumenfeld regarding scheduling conference − re 28 Letter. (Blumenfeld, Jack) (Entered: 08/02/2022) |
| 08/11/2022 | 30 | ORDER: upon consideration of Plaintiffs' August 1, 2022 letter (D.I. 28 ) and Defendants' responsive letter of August 2, 2022 (D.I. 29 ), it is hereby ORDERED that the parties need not participate in a Rule 26(f) conference until after the disposition of the pending Motion to Dismiss. Signed by Judge Mitchell S. Goldberg on 08/11/2022. (smg) (Entered: 08/11/2022) |
| 11/02/2022 | 31 | MEMORANDUM. Signed by Judge Mitchell S. Goldberg on 11/2/2022. (twk) (Entered: 11/02/2022) |
| 11/02/2022 | 32 | ORDER, upon consideration of Defendants' Motion to Dismiss (D.I. 16 ), Plaintiffs' Response (D.I. 21 ), and Defendants' Reply Brief (D.I. 23 ), it is hereby ORDERED that the Motion is DENIED. Within fourteen (14) days from the date of this Order, Defendants shall file an answer to the Complaint. Signed by Judge Mitchell S. Goldberg on 11/2/2022. (twk) (Entered: 11/02/2022) |
| 11/16/2022 | 33 | STIPULATION TO EXTEND TIME for Defendants to answer the Complaint to November 30, 2022 − filed by Moderna, Inc., ModernaTX, Inc.. (Egan, Brian) (Entered: 11/16/2022) |
| 11/16/2022 | 34 | STIPULATION AND ORDER regarding D.I. 33 . Signed by Judge Mitchell S. Goldberg on 11/16/2022. (apk) (Entered: 11/16/2022) |
| 11/30/2022 | 35 | ANSWER to 1 Complaint, with Jury Demand , COUNTERCLAIM against Arbutus Biopharma Corporation, Genevant Sciences GmbH by ModernaTX, Inc., Moderna, Inc..(Blumenfeld, Jack) (Entered: 11/30/2022) |
| 12/20/2022 | 36 | NOTICE OF SERVICE of (1) Defendants' First Set of Interrogatories (Nos. 1−7); and (2) Defendants' First Set of Requests for Productions to Plaintiffs (Nos. 1−100) filed by Moderna, Inc., ModernaTX, Inc..(Egan, Brian) (Entered: 12/20/2022) |
| 12/21/2022 | 37 | NOTICE OF SERVICE of Plaintiffs' First Set of Requests for Production to Defendants (Nos. 1 − 98) filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.(Hoeschen, Nathan) (Entered: 12/21/2022) |
| 12/21/2022 | 38 | ANSWER to 35 Answer to Complaint, Counterclaim *[Plaintiffs Arbutus Biopharma Corporation and Genevant Sciences GmbH's Answer to Defendants Moderna, Inc. and Modernatx, Inc.'s Counterclaims]* by Arbutus Biopharma Corporation, Genevant Sciences GmbH.(Keller, Karen) (Entered: 12/21/2022) |
| 12/27/2022 | 39 | NOTICE requesting Clerk to remove Denis R. Hurley as co−counsel.. (Keller, Karen) (Entered: 12/27/2022) |
| 01/05/2023 | 40 | ORDER, An Inital Pretrial Conference is set for 2/16/2023 at 02:00 PM via telephone and held on the record before Judge Mitchell S. Goldberg. (SEE ORDER FOR DETAILS) Signed by Judge Mitchell S. Goldberg on 1/5/2023. (srs) (Entered: 01/05/2023) |
| 01/06/2023 | 41 | NOTICE of Change of Firm Affiliation by Arbutus Biopharma Corporation, Genevant Sciences GmbH (Hoeschen, Nathan) (Entered: 01/06/2023) |
| 02/02/2023 | 42 | NOTICE OF SERVICE of Defendants' Objections and Responses to Plaintiffs' First Set of Requests for Production (Nos. 1−98) filed by Moderna, Inc., ModernaTX, Inc..(Egan, Brian) (Entered: 02/02/2023) |
| 02/02/2023 | 43 | NOTICE OF SERVICE of 1. Plaintiffs Arbutus Biopharma Corporation and Genevant Sciences GmbH's Responses and Objections to Defendants Moderna, Inc. and ModernaTX Inc.'s First Set of Requests for Production (Nos. 1−100) 2. Plaintiff Genevant Sciences GmbH's Responses and Objections to Defendants Moderna, Inc. and ModernaTX Inc.'s First Set of Interrogatories (Nos. 17) 3. Plaintiff Arbutus Biopharma Corporation's Responses and Objections to Defendants Moderna, Inc. and ModernaTX Inc.'s First Set of Interrogatories (Nos. 17) filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.(Hoeschen, Nathan) (Entered: 02/02/2023) |
| 02/09/2023 | | Pro Hac Vice Attorney Eric C. Wiener for Arbutus Biopharma Corporation added for electronic noticing. Pursuant to Local Rule 83.5 (d)., Delaware counsel shall be the registered users of CM/ECF and shall be required to file all papers. (mkr) (Entered: |

| | | |
|---|---|---|
| | | 02/09/2023) |
| 02/09/2023 | 44 | NOTICE requesting Clerk to remove Eric C. Wiener as co−counsel.. (Shaw, John) (Entered: 02/09/2023) |
| 02/10/2023 | 45 | MOTION for Pro Hac Vice Appearance of Attorney Anthony H. Sheh − filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Shaw, John) (Entered: 02/10/2023) |
| 02/13/2023 | 46 | Letter to The Honorable Mitchell S. Goldberg from Nathan R. Hoeschen regarding Proposed Scheduling Order. (Attachments: # 1 Text of Proposed Order [Proposed] Scheduling Order)(Hoeschen, Nathan) (Entered: 02/13/2023) |
| 02/13/2023 | 47 | REPORT of Rule 26(f) Planning Meeting. (Hoeschen, Nathan) (Entered: 02/13/2023) |
| 02/13/2023 | 48 | SO ORDERED, re 45 MOTION for Pro Hac Vice Appearance of Attorney Anthony H. Sheh. Signed by Judge Mitchell S. Goldberg on 2/13/2023. (twk) (Entered: 02/14/2023) |
| 02/14/2023 | | Pro Hac Vice Attorney Anthony H. Sheh for Genevant Sciences GmbH added for electronic noticing. Pursuant to Local Rule 83.5 (d)., Delaware counsel shall be the registered users of CM/ECF and shall be required to file all papers. (mpb) (Entered: 02/14/2023) |
| 02/14/2023 | 49 | STATEMENT *OF INTEREST* by The United States of America. (Sternhell, Philip) (Main Document 49 replaced on 2/15/2023) (apk). (Entered: 02/14/2023) |
| 02/15/2023 | 50 | ORDER: The Initial Pretrial Conference scheduled for **Thursday, February 16, 2023 at 2:00 p.m.** is **RESCHEDULED** to **February 16, 2023 at 11:00 a.m.** The conference will be conducted via telephone and held on the record. (See Order for further details) Signed by Judge Mitchell S. Goldberg on 02/15/2023. (smg) (Entered: 02/15/2023) |
| 02/15/2023 | | CORRECTING ENTRY: D.I. 49 replaced per filers request. The signature page on the initial filing was erroneous. (apk) (Entered: 02/15/2023) |
| 02/16/2023 | 51 | ORDER, Within fourteen (14) days from the date of this Order, the parties and the U.S. Government shall submit a letter of no more than ten pages regarding the impact of the Governments Statement of Interest on the scheduling of this matter. Signed by Judge Mitchell S. Goldberg on 2/16/2023. (apk) (Entered: 02/16/2023) |
| 02/16/2023 | 52 | NOTICE OF SERVICE of Plaintiffs' First Set of Interrogatories to Defendants filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.(Hoeschen, Nathan) (Entered: 02/16/2023) |
| 02/16/2023 | | Minute Entry for proceedings held before Judge Mitchell S. Goldberg − Telephonic Initial Pretrial Conference held on 2/16/2023. (Court Reporter: Jimmy Cruz). (twk) (Entered: 02/16/2023) |
| 02/21/2023 | 53 | Official Transcript of Initial Pretrial Conference held on February 16, 2023 before Judge Mitchell S. Goldberg. Court Reporter/Transcriber: Victoria O'Connor. Transcript may be viewed at the court public terminal or order/purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date, it may be obtained through PACER. Redaction Request due 3/14/2023. Redacted Transcript Deadline set for 3/24/2023. Release of Transcript Restriction set for 5/22/2023. (twk) (Entered: 02/21/2023) |
| 02/22/2023 | 54 | MOTION for Pro Hac Vice Appearance of Attorney Nancy Kaye Horstman − filed by Moderna, Inc., ModernaTX, Inc.. (Egan, Brian) (Entered: 02/22/2023) |
| 02/22/2023 | 55 | SO ORDERED, re 54 MOTION for Pro Hac Vice Appearance of Attorney Nancy Kaye Horstman. Signed by Judge Mitchell S. Goldberg on 2/22/2023. (twk) (Entered: 02/22/2023) |
| 03/02/2023 | 56 | MOTION for Leave to permit Stephen B. Brauerman to File an Amicus Brief − filed by Adam Mossoff. (Attachments: # 1 [Proposed] Order, # 2 Exhibit A)(Brauerman, Stephen) (Attachment 2 replaced on 3/3/2023) (smg). (Entered: 03/02/2023) |

| | | |
|---|---|---|
| 03/02/2023 | 57 | RESPONSE to Order re 51 Order, *U.S. Government Letter re Statement of Interest.* (Sternhell, Philip) (Entered: 03/02/2023) |
| 03/02/2023 | 58 | Letter to The Honorable Mitchell S. Goldberg from Jack B. Blumenfeld regarding impact of the Governments Statement of Interest on scheduling − re 51 Order,. (Blumenfeld, Jack) (Entered: 03/02/2023) |
| 03/02/2023 | 59 | Letter to The Honorable Mitchell S. Goldberg from Nathan R. Hoeschen regarding the impact of the Government's Statement of Interest on the scheduling of this matter − re 51 Order,. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11)(Hoeschen, Nathan) (Entered: 03/02/2023) |
| 03/02/2023 | 60 | MOTION to Intervene − filed by Emanuel McCray (proposed Intervenor, non−party). (Attachments: # 1 Proposed Class Action Complaint, # 2 Notice of Motion for Class Certification, # 3 Exhibit 1, # 4 Exhibit 2, # 5 Exhibit 3, # 6 Exhibit 4)(twk) (Entered: 03/03/2023) |
| 03/03/2023 | | CORRECTING ENTRY: Exhibit A of D.I. 56 replaced per request of counsel to remove notation of document security. (smg) (Entered: 03/03/2023) |
| 03/06/2023 | 61 | MOTION for Leave to permit Stephanie S. Riley to File an Amicus Brief − filed by Bayh−Dole Coalition. (Attachments: # 1 Exhibit A, # 2 Text of Proposed Order)(Riley, Stephanie) (Entered: 03/06/2023) |
| 03/07/2023 | 62 | RESPONSE to Motion re 56 MOTION for Leave to permit Stephen B. Brauerman to File an Amicus Brief , 61 MOTION for Leave to permit Stephanie S. Riley to File an Amicus Brief filed by Moderna, Inc., ModernaTX, Inc.. (Blumenfeld, Jack) (Entered: 03/07/2023) |
| 03/08/2023 | 63 | ORDER denying D.I. 60 Motion to Intervene. (See Order for further details. Copy of Order mailed to Pro Se Movant.) Signed by Judge Mitchell S. Goldberg on 03/08/2023. (smg) (Entered: 03/08/2023) |
| 03/10/2023 | 64 | MEMORANDUM OPINION. Signed by Judge Mitchell S. Goldberg on 03/10/2023. (apk) (Entered: 03/10/2023) |
| 03/10/2023 | 65 | ORDER, The Motions for Leave to File Amicus Briefs (D.I. 56 and 61 ) are GRANTED. Any requested reconsideration of the November 2, 2022 Memorandum and Order in light of the Government's statement of Interest is DENIED. A Pretrial Scheduling Conference will be held on Thursday March 16, 2023 at 10:00 a.m. The conference will be conducted via telephone and held on the record. Counsel are directed to dial in as follows (1) Call: 888−684−8852; (2) Enter access code: 2187450#; (3) Press # to enter as a participant. Signed by Judge Mitchell S. Goldberg on 03/10/2023. (apk) (Entered: 03/10/2023) |
| 03/10/2023 | 66 | Letter to The Honorable Mitchell S. Goldberg from Stephen B. Brauerman regarding Letter Brief from Amici Curiae Law Professors, Scholars, and Former Government Officials in Response to the Statement of Interest filed by the United States of America − re 65 Order,,, Terminate Motions,,, Set Hearings,, 49 Statement, 51 Order,. (Brauerman, Stephen) (Entered: 03/10/2023) |
| 03/13/2023 | 67 | MOTION for Pro Hac Vice Appearance of Attorney David Nathaniel Tan and Shaelyn K. Dawson − filed by Arbutus Biopharma Corporation. (Keller, Karen) (Entered: 03/13/2023) |
| 03/16/2023 | | Minute Entry for a Phone Conference Hearing held before Judge Mitchell S. Goldberg − Phone Conference Hearing held on 3/16/2023. All Counsel were present. Matters were taken under advisement. (Court Reporter Jimmy Cruz.) (apk) (Entered: 03/16/2023) |
| 03/16/2023 | 68 | NOTICE OF SERVICE of Plaintiffs' Second Set of Interrogatories to Defendants filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.(Hoeschen, Nathan) (Entered: 03/16/2023) |
| 03/20/2023 | 69 | NOTICE OF SERVICE of Defendants' Objections and Responses to Plaintiffs' First Set of Interrogatories (Nos. 1−10) filed by Moderna, Inc., ModernaTX, Inc..(Egan, Brian) (Entered: 03/20/2023) |

| | | |
|---|---|---|
| 03/20/2023 | 70 | NOTICE OF SERVICE of 1) Subpoena to Testify at a Deposition in a Civil Action directed to Department of Health and Human Services 2) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action directed to Department of Health and Human Services filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.(Hoeschen, Nathan) (Entered: 03/20/2023) |
| 03/21/2023 | 71 | Official Transcript of Telephonic Conference held on 03/16/2023 before Judge Mitchell S. Goldberg. Court Reporter/Transcriber O'Connor Legal, Medical & Media Services, Inc., contact: 912−689−0090. Transcript may be viewed at the court public terminal or order/purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date, it may be obtained through PACER Redaction Request due 4/11/2023. Redacted Transcript Deadline set for 4/21/2023. Release of Transcript Restriction set for 6/20/2023. (smg) (Entered: 03/21/2023) |
| 03/21/2023 | 72 | SCHEDULING ORDER: Joinder of Parties due by 10/16/2023. Fact Discovery completed by 3/1/2024. Opening Expert Reports due by 4/5/2024. Rebuttal Expert Reports due by 6/7/2024. Expert Discovery due by 7/10/2024. Joint Claim Construction Brief due by 6/29/2023.(PLEASE SEE ORDER FOR FURTHER DETAILS). Signed by Judge Mitchell S. Goldberg on 03/21/2023. (apk) (Entered: 03/21/2023) |
| 03/24/2023 | 73 | NOTICE OF SERVICE of 1. Subpoena to Testify at a Deposition in a Civil Action directed to Department of the Army 2. Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action directed to Department of the Army filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.(Hoeschen, Nathan) (Entered: 03/24/2023) |
| 03/31/2023 | 74 | NOTICE OF SERVICE of Defendants' Rule 26(a) Initial Disclosure Statement filed by Moderna, Inc., ModernaTX, Inc..(Murray, Travis) (Entered: 03/31/2023) |
| 03/31/2023 | 75 | NOTICE OF SERVICE of 1. Rule 26(a) Initial Disclosures of Plaintiff Arbutus Biopharma Corporation 2. Rule 26(a) Initial Disclosures of Plaintiff Genevant Sciences GmbH filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.(Hoeschen, Nathan) (Entered: 03/31/2023) |
| 04/11/2023 | 76 | STIPULATION TO EXTEND TIME for the Parties to submit a proposed Protective Order to April 14, 2023 − filed by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) (Entered: 04/11/2023) |
| 04/11/2023 | 77 | NOTICE OF SERVICE of 1. Plaintiff Genevant Sciences GmbH's First Supplemental Responses and Objections to Defendants Moderna, Inc. and ModernaTX Inc.'s First Set of Interrogatories (No. 4) 2. Plaintiff Arbutus Biopharma Corporation's First Supplemental Responses and Objections to Defendants Moderna, Inc. and ModernaTX Inc.'s First Set of Interrogatories (No. 4) filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.(Hoeschen, Nathan) (Entered: 04/11/2023) |
| 04/11/2023 | 78 | SO ORDERED, re 76 STIPULATION TO EXTEND TIME for the Parties to submit a proposed Protective Order to April 14, 2023. Signed by Judge Mitchell S. Goldberg on 4/11/2023. (twk) (Entered: 04/11/2023) |
| 04/12/2023 | 79 | MOTION for Pro Hac Vice Appearance of Attorney Yan−Xin Li and Alina Afinogenova − filed by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) (Entered: 04/12/2023) |
| 04/12/2023 | 80 | SO ORDERED, re 79 MOTION for Pro Hac Vice Appearance of Attorneys Yan−Xin Li and Alina Afinogenova. Signed by Judge Mitchell S. Goldberg on 4/12/2023. (mpb) (Entered: 04/12/2023) |
| 04/14/2023 | 81 | STIPULATION TO EXTEND TIME for the Parties to submit a proposed Protective Order to April 19, 2023 − filed by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) (Entered: 04/14/2023) |
| 04/14/2023 | 82 | STIPULATION AND ORDER regarding D.I. 81 (Notice of Compliance deadline set for 4/19/2023.) Signed by Judge Mitchell S. Goldberg on 04/14/2023. (apk) (Entered: 04/14/2023) |

| | | |
|---|---|---|
| 04/17/2023 | 83 | NOTICE OF SERVICE of Defendants' Objections and Responses to Plaintiffs' Second Set of Interrogatories (No. 11) filed by Moderna, Inc., ModernaTX, Inc..(Murray, Travis) (Entered: 04/17/2023) |
| 04/19/2023 | 84 | SO ORDERED, re 67 MOTION for Pro Hac Vice Appearance of Attorney David Nathaniel Tan and Shaelyn K. Dawson filed by Arbutus Biopharma Corporation. Signed by Judge Mitchell S. Goldberg on 4/19/2023. (mpb) (Entered: 04/19/2023) |
| 04/19/2023 | | Pro Hac Vice Attorney Shaelyn K. Dawson and David N. Tan for Arbutus Biopharma Corporation added for electronic noticing. Pursuant to Local Rule 83.5 (d)., Delaware counsel shall be the registered users of CM/ECF and shall be required to file all papers. (mpb) (Entered: 04/19/2023) |
| 04/19/2023 | 85 | PROPOSED ORDER [Proposed] Protective Order by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Keller, Karen) (Entered: 04/19/2023) |
| 04/20/2023 | 86 | NOTICE OF SERVICE of 1. Plaintiff Arbutus's Initial Disclosures Pursuant to Paragraph 3 of the District of Delaware Default Standard for Discovery 2. Plaintiff Genevant's Initial Disclosures Pursuant to Paragraph 3 of the District of Delaware Default Standard for Discovery filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.(Hoeschen, Nathan) (Entered: 04/20/2023) |
| 04/20/2023 | 87 | NOTICE OF SERVICE of Defendants' Initial Disclosures Pursuant to Paragraph 3 of the Delaware Default Standard for Discovery − filed by Moderna, Inc., ModernaTX, Inc..(Murray, Travis) (Entered: 04/20/2023) |
| 04/24/2023 | 88 | NOTICE OF SERVICE of Plaintiffs' Initial Infringement Contentions filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.(Keller, Karen) (Entered: 04/24/2023) |
| 04/24/2023 | 89 | NOTICE OF SERVICE of (1) Defendants' Second Set of Requests for Productions to Plaintiffs (Nos. 101−126) and (2) Defendants' First Set of Requests for Admissions (Nos. 1−8) to Plaintiffs − filed by Moderna, Inc., ModernaTX, Inc..(Murray, Travis) (Entered: 04/24/2023) |
| 04/27/2023 | 90 | PROPOSED ORDER −− Revised [Proposed] Stipulated Protective Order −− by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) (Entered: 04/27/2023) |
| 04/28/2023 | 91 | PROTECTIVE ORDER. Signed by Judge Mitchell S. Goldberg on 04/28/2023. (smg) (Entered: 04/28/2023) |
| 05/05/2023 | 92 | STIPULATION TO EXTEND TIME for the Parties to submit a proposed Electronically Stored Information ("ESI") Order to May 12, 2023 − filed by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) (Entered: 05/05/2023) |
| 05/05/2023 | 93 | NOTICE OF SERVICE of (1) Plaintiff Genevant Sciences GmbHs Second Supplemental Responses and Objections to Defendants Moderna, Inc. and ModernaTX Inc.s First Set of Interrogatories (Nos. 1 & 2) and (2) Plaintiff Arbutus Biopharma Corporations Second Supplemental Responses and Objections to Defendants Moderna, Inc. and ModernaTX, Inc.s First Set of Interrogatories (Nos. 1 & 2) filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.(Keller, Karen) (Entered: 05/05/2023) |
| 05/05/2023 | 94 | SO ORDERED, re 92 STIPULATION TO EXTEND TIME for the Parties to submit a proposed Electronically Stored Information ("ESI") Order to May 12, 2023. Signed by Judge Mitchell S. Goldberg on 5/5/2023. (twk) (Entered: 05/08/2023) |
| 05/11/2023 | 95 | MOTION for Pro Hac Vice Appearance of Attorney Adam R. Brausa and Annie A. Lee − filed by Arbutus Biopharma Corporation. (DiBenedetto, Emily) (Entered: 05/11/2023) |
| 05/12/2023 | 96 | ORDER granting 95 MOTION for Pro Hac Vice Appearance of Attorney Adam R. Brausa and Annie A. Lee. Signed by Judge Mitchell S. Goldberg on 5/12/2023. (twk) (Entered: 05/12/2023) |
| 05/12/2023 | 97 | NOTICE OF SERVICE of 1. Plaintiff Genevant Sciences GmbH's Third Supplemental Responses and Objections to Defendants Moderna, Inc. and Modernatx, Inc.'s First Set of Interrogatories (No. 3) 2. Plaintiff Arbutus Biopharma Corporation's Third Supplemental Responses and Objections to Defendants Moderna, Inc. and Modernatx, |

| | | |
|---|---|---|
| | | Inc.'s First Set of Interrogatories (Nos. 1 7) filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.(Keller, Karen) (Entered: 05/12/2023) |
| 05/12/2023 | | Pro Hac Vice Attorney Adam R. Brausa and Annie A. Lee for Arbutus Biopharma Corporation added for electronic noticing. Pursuant to Local Rule 83.5 (d)., Delaware counsel shall be the registered users of CM/ECF and shall be required to file all papers. (mpb) (Entered: 05/12/2023) |
| 05/12/2023 | 98 | STIPULATION TO EXTEND TIME to submit a proposed Electronically Stored Information (ESI) Order to May 26, 2023 − filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Keller, Karen) (Entered: 05/12/2023) |
| 05/15/2023 | 99 | STIPULATION AND ORDER regarding D.I. 98 (Notice of Compliance deadline set for 5/26/2023.) Signed by Judge Mitchell S. Goldberg on 5/15/2023. (apk) (Entered: 05/15/2023) |
| 05/22/2023 | 100 | NOTICE OF SERVICE of Moderna's Initial Invalidity Contentions filed by Moderna, Inc., ModernaTX, Inc..(Egan, Brian) (Entered: 05/22/2023) |
| 05/24/2023 | 101 | NOTICE OF SERVICE of 1. Plaintiffs Arbutus Biopharma Corporation and Genevant Sciences GmbH's Responses and Objections to Defendants Moderna, Inc. and ModernaTX Inc.'s Second Set of Requests for Production (Nos. 101−126) 2. Plaintiff Genevant Sciences GmbH's Responses and Objections to Defendants Moderna, Inc. and ModernaTX Inc.'s First Set of Requests for Admission (No. 1−8) and 3. Plaintiff Arbutus Biopharma Corporation's Responses and Objections to Defendants Moderna, Inc. and ModernaTX Inc.'s First Set of Requests for Admission (No. 1−8) filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.(Hoeschen, Nathan) (Entered: 05/24/2023) |
| 05/25/2023 | 102 | NOTICE OF SERVICE of Plaintiffs' Second Set of Requests for Production to Defendants (Nos. 99−127) filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.(Hoeschen, Nathan) (Entered: 05/25/2023) |
| 05/26/2023 | 103 | STIPULATION TO EXTEND TIME for the Parties to submit a proposed Electronically Stored Information ("ESI") Order to June 9, 2023 − filed by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) (Entered: 05/26/2023) |
| 05/30/2023 | 104 | STIPULATION AND ORDER regarding D.I. 103 (Notice of Compliance deadline set for 6/9/2023.) Signed by Judge Mitchell S. Goldberg on 5/30/2023. (apk) (Entered: 05/30/2023) |
| 05/30/2023 | 105 | NOTICE OF SERVICE of Defendants' Second Set of Interrogatories (Nos. 8−10) − filed by Moderna, Inc., ModernaTX, Inc..(Murray, Travis) (Entered: 05/30/2023) |
| 06/02/2023 | 106 | NOTICE requesting Clerk to remove Lydia B. Cash as co−counsel.. (Hoeschen, Nathan) (Entered: 06/02/2023) |
| 06/09/2023 | 107 | STIPULATION TO EXTEND TIME Claim Construction Deadlines to Various Dates − filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Hoeschen, Nathan) (Entered: 06/09/2023) |
| 06/09/2023 | 108 | NOTICE OF SERVICE of 1. Amended Rule 26(a) Disclosures of Plaintiff Genevant Sciences GmbH 2. Plaintiff Genevant's Amended Initial Disclosures pursuant to Paragraph 3 of the District of Delaware Default Standard for Discovery filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.(Hoeschen, Nathan) (Entered: 06/09/2023) |
| 06/09/2023 | 109 | SO ORDERED, re D.I. 107 STIPULATION TO EXTEND TIME Claim Construction Deadlines to Various Dates. Signed by Judge Mitchell S. Goldberg on 06/09/2023. (smg) (Entered: 06/09/2023) |
| 06/09/2023 | 110 | PROPOSED ORDER Regarding Discovery, Including Discovery of Electronically Stored Information ("ESI") by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Hoeschen, Nathan) (Entered: 06/09/2023) |
| 06/12/2023 | 111 | STIPULATION AND ORDER regarding D.I. 110 . Signed by Judge Mitchell S. Goldberg on 6/12/2023. (apk) (Entered: 06/12/2023) |

| | | |
|---|---|---|
| 06/15/2023 | 112 | MOTION for Pro Hac Vice Appearance of Attorney Philip N. Haunschild and Jihad J. Komis − filed by Genevant Sciences GmbH. (Hoeschen, Nathan) (Entered: 06/15/2023) |
| 06/15/2023 | 113 | ORDER granting D.I. 112 Motion to Appear Pro Hac Vice of Philip N. Haunschild and Jihad J. Komis. Signed by Judge Mitchell S. Goldberg on 6/15/2023. (apk) (Entered: 06/15/2023) |
| 06/21/2023 | 114 | MOTION for Pro Hac Vice Appearance of Attorney Eric C. Wiener − filed by Arbutus Biopharma Corporation. (Hoeschen, Nathan) (Entered: 06/21/2023) |
| 06/22/2023 | | Pro Hac Vice Attorney Philip N. Haunschild for Genevant Sciences GmbH added for electronic noticing. Pursuant to Local Rule 83.5 (d)., Delaware counsel shall be the registered users of CM/ECF and shall be required to file all papers. (twk) (Entered: 06/22/2023) |
| 06/22/2023 | 115 | ORDER granting D.I. 114 Motion to Appear Pro Hac Vice of Eric C. Wiener. Signed by Judge Mitchell S. Goldberg on 6/22/2023. (apk) (Entered: 06/22/2023) |
| 06/22/2023 | | Pro Hac Vice Attorney Eric C. Wiener for Arbutus Biopharma Corporation added for electronic noticing. Pursuant to Local Rule 83.5 (d)., Delaware counsel shall be the registered users of CM/ECF and shall be required to file all papers. (mpb) (Entered: 06/22/2023) |
| 06/23/2023 | 116 | NOTICE OF SERVICE of 1) Plaintiff Arbutus's Amended Initial Disclosures Pursuant to Paragraph 3 of the District of Delaware Default Standard for Discovery 2) Plaintiff Genevant's Second Amended Initial Disclosures Pursuant to Paragraph 3 of the District of Delaware Default Standard for Discovery filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.(Keller, Karen) (Entered: 06/23/2023) |
| 06/26/2023 | 117 | NOTICE OF SERVICE of Defendants' Responses and Objections to Plaintiffs' Second Set of Requests for Production to Defendants (Nos. 99−127) filed by Moderna, Inc., ModernaTX, Inc..(Egan, Brian) (Entered: 06/26/2023) |
| 07/14/2023 | 118 | NOTICE OF SERVICE of 1. Plaintiff Genevant Sciences GmbH's Responses and Objections to Defendants Moderna, Inc's and Modernatx, Inc.'s Second Set of Interrogatories (Nos. 8−10) 2. Plaintiff Arbutus Biopharma Corporation's Responses and Objections to Defendants Moderna, Inc. and Modernatx, Inc's Second Ser of Interrogatories (Nos. 8−10) filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.(Keller, Karen) (Entered: 07/14/2023) |
| 07/20/2023 | 119 | NOTICE OF SERVICE of 1. Subpoena to Testify at a Deposition in a Civil Action directed to McKesson Corporation 2. Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action directed to McKesson Corporation filed by Genevant Sciences GmbH.(Keller, Karen) (Entered: 07/20/2023) |
| 07/28/2023 | 120 | NOTICE OF SERVICE of 1) Plaintiff Genevant Sciences GmbH's First Supplemental Responses and Objections to Defendants Moderna, Inc's and Modernatx, Inc.'s First Set of Requests for Admission (Nos. 5 − 8); and 2) Plaintiff Arbutus Biopharma Corporation's First Supplemental Responses and Objections to Defendants Moderna, Inc. and Modernatx, Inc.'s First Set of Requests for Admission (Nos. 5 8) filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.(Hoeschen, Nathan) (Entered: 07/28/2023) |
| 07/31/2023 | 121 | NOTICE OF SERVICE of Defendants' Notice of Subpoenas to Roivant Sciences Ltd. filed by Moderna, Inc., ModernaTX, Inc..(Egan, Brian) (Entered: 07/31/2023) |
| 08/01/2023 | 122 | NOTICE OF SERVICE of Moderna's Preliminary List of Terms and Proposed Constructions filed by Moderna, Inc., ModernaTX, Inc..(Egan, Brian) (Entered: 08/01/2023) |
| 08/01/2023 | 123 | NOTICE OF SERVICE of Plaintiff's Construction Issue identification filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.(DiBenedetto, Emily) (Entered: 08/01/2023) |
| 08/03/2023 | 124 | NOTICE OF SERVICE of Plaintiffs' Third Set of Requests for Production to Defendants (Nos. 128−173) filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.(DiBenedetto, Emily) (Entered: 08/03/2023) |

| | | |
|---|---|---|
| 08/04/2023 | 125 | NOTICE OF SERVICE of (1) Defendants' Notice of Subpoena Ad Testificandum to Alnylam Pharmaceuticals, Inc. and (2) Defendants' Notice of Subpoena Duces Tecum to Alnylam Pharmaceuticals, Inc. filed by Moderna, Inc., ModernaTX, Inc..(Murray, Travis) (Entered: 08/04/2023) |
| 08/15/2023 | 126 | NOTICE OF SERVICE of Plaintiffs' Preliminary Counter Proposed Constructions filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.(Keller, Karen) (Entered: 08/15/2023) |
| 08/28/2023 | 127 | Joint STIPULATION TO EXTEND TIME for the parties to file their joint claim construction chart to August 29, 2023 − filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Hoeschen, Nathan) (Entered: 08/28/2023) |
| 08/28/2023 | 128 | SO ORDERED, re 127 Joint STIPULATION TO EXTEND TIME for the parties to file their joint claim construction chart to August 29, 2023. Signed by Judge Mitchell S. Goldberg on 8/28/2023. (twk) (Entered: 08/28/2023) |
| 08/29/2023 | 129 | CLAIM Construction Chart by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Hoeschen, Nathan) (Entered: 08/29/2023) |
| 08/31/2023 | 130 | NOTICE OF SERVICE of 1. Third Party Roivant Sciences Ltd. Responses and Objections to Moderna, Inc. and Modernatx, Inc.'s Rule 45 Document Subpoena 2. Third Party Roivant Sciences Ltd. Responses and Objections to Moderna, Inc. and Modernatx, Inc.'s Rule 45 Deposition Subpoena filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.(Hoeschen, Nathan) (Entered: 08/31/2023) |
| 09/06/2023 | 131 | NOTICE OF SERVICE of Defendants' Responses and Objections to Plaintiffs' Third Set of Requests for Production to Defendants (Nos. 128−173) − filed by Moderna, Inc., ModernaTX, Inc..(Murray, Travis) (Entered: 09/06/2023) |
| 09/15/2023 | 132 | NOTICE OF SERVICE of 1. Subpoena to Testify at a Deposition in a Civil Action as to Dr. Moncef Slaoui 2. Subpoena to Produce Documents, Information, or Objections or to Permit Inspection of Premises in a Civil Action as to Dr. Moncef Slaoui filed by Genevant Sciences GmbH.(Keller, Karen) (Entered: 09/15/2023) |
| 09/26/2023 | | CORRECTING ENTRY: D.I. 133 previously removed per counsels request. Counsel will re−file a corrected version of this docket item. (apk) (Entered: 09/26/2023) |
| 09/27/2023 | 133 | Letter to The Honorable Mitchell S. Goldberg from Nathan R. Hoeschen regarding Discovery Dispute. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G)(Hoeschen, Nathan) (Entered: 09/27/2023) |
| 10/03/2023 | 134 | Letter to The Honorable Mitchell S. Goldberg from Travis Murray regarding opposition to Plaintiffs Arbutus and Genevant's Motion to Compel (D.I. 133) − re 133 Letter,. (Attachments: # 1 Ex H, # 2 Ex I, # 3 Ex J, # 4 Ex K, # 5 Ex L, # 6 Ex M, # 7 Ex N, # 8 Ex O)(Murray, Travis) (Entered: 10/03/2023) |
| 10/04/2023 | 135 | ORDER, a Telephone Conference on pending discovery disputes will be held on Thursday, October 12, 2023 at 1:30 p.m. The Conference will be held on the record. Counsel is directed to dial in as follows: (1) Call: 888−684−8852; (2) Enter access code: 2187450#; (3) Press # to enter as a participant. Signed by Judge Mitchell S. Goldberg on 10/4/2023. (mpb) (Entered: 10/04/2023) |
| 10/04/2023 | 136 | MOTION for Pro Hac Vice Appearance of Attorney Shaoyao Yu and Caitlin Dean − filed by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) (Entered: 10/04/2023) |
| 10/04/2023 | 137 | SO ORDERED, re 136 MOTION for Pro Hac Vice Appearance of Attorney Shaoyao Yu and Caitlin Dean filed by Moderna, Inc., ModernaTX, Inc. Signed by Judge Mitchell S. Goldberg on 10/4/2023. (mpb) (Entered: 10/04/2023) |
| 10/11/2023 | 138 | NOTICE OF SERVICE of Defendants' Third Set of Interrogatories (Nos. 11−13) filed by Moderna, Inc., ModernaTX, Inc..(Murray, Travis) (Entered: 10/11/2023) |
| 10/12/2023 | 139 | ORDER, Plaintiffs' request for the production of documents and ESI from Moderna, Inc.s CEO Stephane Ban§el is DENIED WITHOUT PREJUDICE. Plaintiffs may, if necessary, re−raise this request at a later date. Plaintiffs' request for the production of documents produced by Defendant in the Moderna, Inc. v. Pfizer, Inc. litigation is DENIED WITHOUT PREJUDICE. Plaintiffs shall submit to Defendant requests for |

| | | |
|---|---|---|
| | | specific categories of documents from that litigation, and thereafter, counsel shall meet and confer regarding production of those categories of documents. Signed by Judge Mitchell S. Goldberg on 10/12/2023. (mpb) (Entered: 10/12/2023) |
| 10/12/2023 | | Minute Entry for proceedings held before Judge Mitchell S. Goldberg − Phone Conference Hearing held on 10/12/2023. (Court Reporter Jimmy Cruz.) (apk) (Entered: 10/12/2023) |
| 10/12/2023 | 142 | Official Transcript of Telephone Conference held on 10/12/2023 before Judge Mitchell S. Goldberg. Court Reporter/Transcriber: O'Connor Legal, Medical & Media Services, Inc. Transcript may be viewed at the court public terminal or order/purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date, it may be obtained through PACER. Redaction Request due 11/2/2023. Redacted Transcript Deadline set for 11/13/2023. Release of Transcript Restriction set for 1/10/2024. (twk) (Entered: 10/16/2023) |
| 10/13/2023 | 140 | NOTICE OF SERVICE of Plaintiffs Fourth Set of Requests for Production to Defendants (Nos. 174−175) filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.(Keller, Karen) (Entered: 10/13/2023) |
| 10/13/2023 | 141 | STIPULATION TO EXTEND TIME (1) for the Substantial Completion of Document Production to December 1, 2023; and (2) to file Motions to Join other Parties and to Amend or Supplement Pleadings to December 4, 2023 − filed by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) (Entered: 10/13/2023) |
| 10/16/2023 | 143 | Amended Disclosure Statement pursuant to Rule 7.1: identifying Corporate Parent Roivant Sciences Ltd. for Genevant Sciences GmbH filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Hoeschen, Nathan) (Entered: 10/16/2023) |
| 10/18/2023 | 144 | SO ORDERED, re 141 STIPULATION TO EXTEND TIME (1) for the Substantial Completion of Document Production to December 1, 2023; and (2) to file Motions to Join other Parties and to Amend or Supplement Pleadings to December 4, 2023. Signed by Judge Mitchell S. Goldberg on 10/18/2023. (twk) (Entered: 10/18/2023) |
| 10/20/2023 | 145 | NOTICE OF SERVICE of Defendants' Second Supplemental Objections and Responses to Plaintiffs' First Set of Interrogatories (Nos. 110) filed by Moderna, Inc., ModernaTX, Inc..(Murray, Travis) (Entered: 10/20/2023) |
| 10/24/2023 | 146 | NOTICE OF SERVICE of (1) Non−Party Moncef Slaoui's Responses and Objections to Genevant's September 15, 2023 Document Subpoena and (2) Non−Party Moncef Slaoui's Letter Regarding Responses and Objections to Genevant's September 15, 2023 Document Subpoena − filed by Moderna, Inc., ModernaTX, Inc..(Murray, Travis) (Entered: 10/24/2023) |
| 10/27/2023 | 147 | NOTICE OF SERVICE of 1. Plaintiff Genevant Sciences GmbH's Fourth Supplemental Responses and Objections to Defendants Moderna, Inc. and ModernaTX, Inc.'s First Set of Interrogatories (No. 1) 2. Plaintiff Arbutus Biopharma Corporation's Fourth Supplemental Responses and Objections toDefendants Moderna, Inc. and ModernaTX, Inc.'s First Set of Interrogatories (No. 1) filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.(Hoeschen, Nathan) (Entered: 10/27/2023) |
| 10/27/2023 | 148 | NOTICE OF SERVICE of Moderna's Answering Claim Construction Brief filed by Moderna, Inc., ModernaTX, Inc..(Murray, Travis) (Entered: 10/27/2023) |
| 11/01/2023 | 149 | NOTICE OF SERVICE of 1. Plaintiff Genevant Sciences GmbH's Fifth Supplemental Responses and Objections to Defendants Moderna, Inc. and ModernaTX, Inc.'s First Set of Interrogatories (Nos. 3, 5) 2. Plaintiff Arbutus Biopharma Corporation's Fifth Supplemental Responses and Objections to Defendants Moderna, Inc. and ModernaTX, Inc.'s First Set of Interrogatories (No. 5) filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.(Keller, Karen) (Entered: 11/01/2023) |
| 11/02/2023 | 150 | MOTION for Pro Hac Vice Appearance of Attorney Matthew W. Lachman − filed by Genevant Sciences GmbH. (Hoeschen, Nathan) (Main Document 150 replaced on 11/3/2023) (mpb). Modified on 11/3/2023 (mpb). (Entered: 11/02/2023) |
| 11/03/2023 | | CORRECTING ENTRY: Per Counsel's request, D.I. 150 Main Document has been replaced to reflect the correct first name of the proposed Pro Hac Vice Attorney. (mpb) |

| | | |
|---|---|---|
| | | (Entered: 11/03/2023) |
| 11/06/2023 | 151 | SO ORDERED, D.I. 150 MOTION for Pro Hac Vice Appearance of Attorney Michael W. Lachman filed by Genevant Sciences GmbH. Signed by Judge Mitchell S. Goldberg on 11/06/2023. (smg) (Entered: 11/06/2023) |
| 11/06/2023 | | Pro Hac Vice Attorney Matthew W. Lachman for Genevant Sciences GmbH added for electronic noticing. Pursuant to Local Rule 83.5 (d)., Delaware counsel shall be the registered users of CM/ECF and shall be required to file all papers. (mpb) (Entered: 11/06/2023) |
| 11/10/2023 | 152 | NOTICE to Take Deposition of David H. Thompson, Ph.D. on November 14, 2023 filed by Moderna, Inc., ModernaTX, Inc..(Murray, Travis) (Entered: 11/10/2023) |
| 11/13/2023 | 153 | STIPULATION and [Proposed] Order Regarding Sealed Filings re 91 Protective Order by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Hoeschen, Nathan) (Entered: 11/13/2023) |
| 11/13/2023 | 154 | NOTICE OF SERVICE of Defendants' Responses and Objections to Plaintiffs' Fourth Set of Requests for Production to Defendants (Nos. 174−175) − filed by Moderna, Inc., ModernaTX, Inc..(Murray, Travis) (Entered: 11/13/2023) |
| 11/14/2023 | 155 | SO ORDERED, re D.I. 153 STIPULATION Regarding Sealed Filings re D.I. 91 Protective Order. Signed by Judge Mitchell S. Goldberg on 11/14/2023. (smg) (Entered: 11/14/2023) |
| 11/14/2023 | 156 | NOTICE OF SERVICE of (1) Plaintiff Genevant Sciences GmbHs Responses and Objections to Defendants Moderna, Inc. and Modernatx, Inc.s Third Set of Interrogatories (Nos. 11 − 13) and (2) Plaintiff Arbutus Biopharma Corporations Responses and Objections to Defendants Moderna, Inc. and Modernatx, Inc.s Third Set of Interrogatories (Nos. 11 − 13) filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.(Hoeschen, Nathan) (Entered: 11/14/2023) |
| 12/01/2023 | 157 | STIPULATION TO EXTEND TIME for the substantial completion of document production and to file Motions to Join other Parties and to Amend or Supplement Pleadings to December 1, 2023 and January 5, 2024 − filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Hoeschen, Nathan) (Entered: 12/01/2023) |
| 12/06/2023 | 158 | STIPULATION AND ORDER, regarding D.I. 157 . The deadline for the Substantial Completion of Document Production shall be extended from December 1, 2023 to December 22, 2023, and the deadline to file Motions to Join other Parties and to Amend or Supplement Pleadings be extended from December 4, 2023 to January 5, 2024. No other deadlines set forth in the Scheduling Order (D.I. 72 ) are altered by way of this Stipulation. Signed by Judge Mitchell S. Goldberg on 12/6/2023. (mpb) (Entered: 12/06/2023) |
| 12/11/2023 | 159 | NOTICE OF SERVICE of Defendants' Fourth Supplemental Objections and Responses to Plaintiffs' First Set of Interrogatories (Nos. 1−10) − filed by Moderna, Inc., ModernaTX, Inc..(Murray, Travis) (Entered: 12/11/2023) |
| 12/15/2023 | 160 | MOTION for Pro Hac Vice Appearance of Attorney Falicia Elenberg − filed by Genevant Sciences GmbH. (Hoeschen, Nathan) (Entered: 12/15/2023) |
| 12/15/2023 | 161 | [SEALED] Letter to The Honorable Mitchell S. Goldberg from Nathan R. Hoeschen regarding Discovery Dispute. (Attachments: # 1 Rule 7.1.1 Statement, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11)(Hoeschen, Nathan) (Entered: 12/15/2023) |
| 12/15/2023 | 162 | ORDER Granting D.I. 160 MOTION for Pro Hac Vice Appearance of Attorney Falicia Elenberg filed by Genevant Sciences GmbH. Signed by Judge Mitchell S. Goldberg on 12/15/2023. (smg) (Entered: 12/15/2023) |
| 12/15/2023 | 163 | NOTICE OF SERVICE of (1) Defendants' First Supplemental Objections and Responses to Plaintiffs' Second Set of Interrogatories (No. 11) and (2) Defendants' Fifth Supplemental Objections and Responses to Plaintiffs' First Set of Interrogatories (Nos. 1−10) − filed by Moderna, Inc., ModernaTX, Inc..(Egan, Brian) (Entered: 12/15/2023) |

| | | |
|---|---|---|
| 12/18/2023 | | Pro Hac Vice Attorney Falicia C. Elenberg for Genevant Sciences GmbH added for electronic noticing. Pursuant to Local Rule 83.5 (d)., Delaware counsel shall be the registered users of CM/ECF and shall be required to file all papers. (mkr) (Entered: 12/18/2023) |
| 12/18/2023 | 164 | STIPULATION TO EXTEND TIME to submit Joint Claim Construction Brief, Technology Tutorials and Defendants' Response to Plaintiffs' Discovery Dispute Letter to December 20, 2023; January 19, 2024 and January 5, 2024 (respectively) − filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Hoeschen, Nathan) (Entered: 12/18/2023) |
| 12/18/2023 | 165 | NOTICE OF SERVICE of 1. Plaintiff Genevant Sciences GmbH's Sixth Supplemental Responses and Objections to Defendants Moderna, Inc. and Modernatx, Inc.'s First Set of Interrogatories (Nos. 2, 3 & 6) 2. Plaintiff Arbutus Biopharma Corporation's Sixth Supplemental Responses and Objections to Defendants Moderna, Inc. and Modernatx, Inc.'s First Set of Interrogatories (Nos. 2, 3 & 6) filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.(Hoeschen, Nathan) (Entered: 12/18/2023) |
| 12/18/2023 | 166 | STIPULATION AND ORDER regarding D.I 164 . The following deadlines are extended as follows: Submission of Joint Claim Construction Brief due by 12/20/2023, Submission of Technology Tutorials 01/19/2024, and Submission of Defendants' Response to Plaintiffs' Discovery Dispute Letter (D.I. 161 ) is due by 1/5/2024. No other deadlines set forth in the Scheduling Order (D.I. 72 ), as amended (D.I. 109 ; D.I. 158 ), are altered by way of this Stipulation. Signed by Judge Mitchell S. Goldberg on 12/18/2023. (mpb) (Entered: 12/18/2023) |
| 12/20/2023 | 167 | ORDER, the Claim Construction Hearing in the above matter scheduled for February 7, 2024 is RESCHEDULED for Wednesday, February 21, 2024 at 10:00 a.m. in Courtroom 17−A, U.S. Courthouse, 601 Market Street, Philadelphia, Pa. Signed by Judge Mitchell S. Goldberg on 12/20/2023. (mpb) (Entered: 12/20/2023) |
| 12/20/2023 | 168 | MOTION to Seal *Portions of Plaintiffs' Letter Brief and Exhibits (D.I. 161)* − filed by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) (Entered: 12/20/2023) |
| 12/20/2023 | 169 | [SEALED] OPENING BRIEF in Support re 168 MOTION to Seal *Portions of Plaintiffs' Letter Brief and Exhibits (D.I. 161)* − filed by Moderna, Inc., ModernaTX, Inc..Answering Brief/Response due date per Local Rules is 1/3/2024. (Attachments: # 1 Ex. A − Wojciechowski Declaration, # 2 Plaintiffs' Letter (Highlighted), # 3 Plaintiffs' Letter (Redacted Version))(Murray, Travis) (Entered: 12/20/2023) |
| 12/20/2023 | 170 | [SEALED] JOINT CLAIM CONSTRUCTION BRIEF filed by Genevant Sciences GmbH, Arbutus Biopharma Corporation. (Hoeschen, Nathan) (Main Document 170 replaced on 12/21/2023) (mkr). (Entered: 12/20/2023) |
| 12/20/2023 | 171 | [SEALED] Joint APPENDIX re 170 Joint Claim Construction Brief by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Attachments: # 1 J.A. 1 − 22, # 2 J.A. 23 − 44, # 3 J.A. 45 − 68, # 4 J.A. 69 − 89)(Hoeschen, Nathan) (Entered: 12/20/2023) |
| 12/20/2023 | 172 | Joint Letter to The Honorable Mitchell S. Goldberg from Nathan R. Hoeschen regarding the claim construction hearing scheduled for February 21, 2024. (Hoeschen, Nathan) (Entered: 12/20/2023) |
| 12/21/2023 | 173 | ORDER Granting D.I. 168 MOTION to Seal Portions of Plaintiffs' Letter Brief and Exhibits (D.I. 161 ). Leave is given for Moderna to file Plaintiffs Letter Brief (D.I. 161 ) and Exhibits 1, 2, 4−8, 10, and 11 thereto in redacted form. Signed by Judge Mitchell S. Goldberg on 12/21/2023. (smg) (Entered: 12/21/2023) |
| 12/21/2023 | 174 | REDACTED VERSION of 169 Opening Brief in Support, by Moderna, Inc., ModernaTX, Inc.. (Attachments: # 1 Ex. A − Wojciechowski Declaration, # 2 Redacted version of Plaintiffs' D.I. 161 Letter Brief (Highlighted), # 3 Redacted version of Plaintiffs' Letter Brief and Exhibits (D.I. 161))(Murray, Travis) (Entered: 12/21/2023) |
| 12/21/2023 | | CORRECTING ENTRY: Joint Claims Constriction Brief (D.I. 170) has been replaced per counsel's request to include counsel's signature. (mkr) (Entered: 12/21/2023) |

| | | |
|---|---|---|
| 12/26/2023 | 175 | MOTION to Seal *Portions of the Joint Claim Construction Brief (D.I. 170) and the Joint Claim Construction Appendix (D.I. 171)* − filed by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) (Entered: 12/26/2023) |
| 12/26/2023 | 176 | [SEALED] OPENING BRIEF in Support re 175 MOTION to Seal *Portions of the Joint Claim Construction Brief (D.I. 170) and the Joint Claim Construction Appendix (D.I. 171)* − filed by Moderna, Inc., ModernaTX, Inc..Answering Brief/Response due date per Local Rules is 1/9/2024. (Attachments: # 1 Wojciechowski Declaration ISO Motion to Seal − SEALED, # 2 Joint Markman Brief − SEALED & Highlighted, # 3 Joint Markman Brief − Redacted, # 4 Joint Appendix Exhibit 77 − SEALED, # 5 Joint Appendix Exhibit 77 − Redacted, # 6 Joint Appendix Exhibit 81 − SEALED, # 7 Joint Appendix Exhibit 81 − Redacted)(Murray, Travis) (Entered: 12/26/2023) |
| 12/27/2023 | 177 | ORDER, the Claim Construction Hearing in the matter scheduled for February 21, 2024 is RESCHEDULED for Thursday, February 8, 2024 at 11:00 a.m. in Courtroom 17−A, U.S. Courthouse, 601 Market Street, Philadelphia, Pa. Signed by Judge Mitchell S. Goldberg on 12/27/2023. (mpb) (Entered: 12/27/2023) |
| 01/02/2024 | 178 | ORDER: The Motion (D.I. 175 ) is GRANTED and leave is given for Moderna to file the following documents in redacted form: (1) Joint Claim Construction Brief (D.I. 170 )(sealed) (2) Exhibit 77 in the Joint Claim Construction Appendix (D.I. 171 )(sealed) and (3) Exhibit 81 in the Joint Claim Construction Appendix (D.I. 171 ) (sealed). Signed by Judge Mitchell S. Goldberg on 1/2/2024. (apk) (Entered: 01/02/2024) |
| 01/03/2024 | 179 | NOTICE OF SERVICE of (1) Defendants' Third Set of Requests for Productions to Plaintiffs (Nos. 127−132) and (2) Defendants' Sixth Supplemental Objections and Responses to Plaintiffs' First Set of Interrogatories (Nos. 1−10) − filed by Moderna, Inc., ModernaTX, Inc..(Murray, Travis) (Entered: 01/03/2024) |
| 01/03/2024 | 180 | REDACTED VERSION of 170 Joint Claim Construction Brief by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) (Entered: 01/03/2024) |
| 01/03/2024 | 181 | REDACTED VERSION of 171 Appendix by Moderna, Inc., ModernaTX, Inc.. (Attachments: # 1 JA 1−22, # 2 JA 23−44, # 3 JA 45−68, # 4 JA 69−89)(Murray, Travis) (Entered: 01/03/2024) |
| 01/03/2024 | 182 | REDACTED VERSION of 176 Opening Brief in Support,, by Moderna, Inc., ModernaTX, Inc.. (Attachments: # 1 Wojciechowski Declaration, # 2 Joint Markman Brief − Highlighted, # 3 Joint Markman Brief − Redacted, # 4 Exhibit 77, # 5 Exhibit 77 − Redacted, # 6 Exhibit 81, # 7 Exhibit 81 − Redacted)(Murray, Travis) (Entered: 01/03/2024) |
| 01/05/2024 | 183 | [SEALED] Letter to The Honorable Mitchell S. Goldberg from Travis Murray regarding Opposition to Plaintiffs' Motion to Compel Samples − re 161 Letter,. (Attachments: # 1 Ex. 1 − 2023−04−18 − Letter from A. Sheh to M. McLennan re Moderna Core Technical Production, # 2 Ex. 2 − 2022−09−20 − Email from M. Shaun to M. McLennan re Regulatory Files, # 3 Ex. 3 − Invensas − D.I. 53 Slip Op. (Nov. 21, 2012), # 4 Ex. 4 − 2023−12−15 − Moderna's 5th Supp Resps to Plaintiffs' 1st Set of ROGs (Nos. 1−10), # 5 Ex. 5 − 2023−08−29 − Letter from M. Shaun to M. McLennan re Aug. 23 Meet&Confer, # 6 Ex. 6 − Moderna Certificate of Analysis, # 7 Ex. 7 − Arbutus Lab Notebook Excerpt, # 8 Ex. 8 − 2023.10.27 [HC−OAEO] Genevant 4th Supp. R&Os to Moderna 1st Set of Rogs (No. 1), # 9 Ex. 9 − DI171 JA7 − Thompson Markman Declaration Excerpt, # 10 Ex. 10 Genevant Analytical Method − Redacted, # 11 Ex. 11 − Genevant Email re Analytical Methods_Redacted, # 12 Ex. 12 − 2023.11.13 [HC−OCEO] Arbutus ROs to Moderna 3d Set of Rogs (Nos. 11−13), # 13 Ex. 13 − 2023.11.13 [HC−OCEO] Genevant ROs to Moderna 3d Set of Rogs (Nos. 11−13), # 14 Ex. 14 − Byrn Declaration, # 15 Ex. 15 − 2023.04.23 [HC− OAEO] Plaintiffs' Initial Infringement Contentions, # 16 Ex. 16 − 2023−04−23 − Ltr from A. Afinogenova to A. Sheh re Sample Production, # 17 Ex. 17 − 2018−05−14 − Par Pharms. v. Hospira (D.I. 63), # 18 Ex. 18 − Osterby Declaration, # 19 Ex. 19 − 2023−11−20 − Email from A. Sheh to Counsel re Prod of Samples, # 20 Ex. 20 − 2023−10−20 − Ltr from M. McLennan to A. Sheh re Samples, # 21 Ex. 21 − Griswold Declaration, # 22 Ex. 22 − 2023−09−19 − Ltr from M. McLennan to A. Sheh re Samples, # 23 Ex. 23 − 2023−08−16 − Letter from A. Sheh to M. McLennan re Samples, # 24 Ex. 24 − Arbutus Presentation re Stability, # 25 Ex. 25 − 2023−11−13 − [HC] Moderna's Resps to Plaintiffs' 4th Set of RFPs (Nos. 174−175), # 26 Ex. 26 − |

| | | |
|---|---|---|
| | | 2023−11−06 − Ltr from M. McLennan to M. Shaun re Pls' Second Set of RFPs)(Murray, Travis) (Entered: 01/05/2024) |
| 01/09/2024 | 184 | [SEALED] Letter to The Honorable Mitchell S. Goldberg from Nathan R. Hoeschen regarding Discovery Dispute. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16)(Hoeschen, Nathan) (Attachment 1 replaced on 1/10/2024) (mpb). (Attachment 7 replaced on 1/10/2024) (mpb). (Entered: 01/09/2024) |
| 01/10/2024 | | CORRECTING ENTRY: Per Counsel's request, Exhibits 1 & 7 of D.I. 184 have been replaced to reflect the removal of unnecessary additional pages. (mpb) (Entered: 01/10/2024) |
| 01/10/2024 | 185 | Joint MOTION to Seal *Portions of Moderna's Opposition to Plaintiffs Motion to Compel Samples (D.I. 183)* − filed by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) (Entered: 01/10/2024) |
| 01/10/2024 | 186 | [SEALED] Joint OPENING BRIEF in Support re 185 Joint MOTION to Seal *Portions of Moderna's Opposition to Plaintiffs Motion to Compel Samples (D.I. 183)* filed by Moderna, Inc., ModernaTX, Inc..Answering Brief/Response due date per Local Rules is 1/24/2024. (Attachments: # 1 Ex. A − Peter Wojciechowski Declaration, # 2 Ex. B − Ed Yaworski Declaration, # 3 Highlighted − Opposition Letter Brief re Motion to Compel Samples, # 4 Redacted − Opposition Letter Brief re Motion to Compel Samples, # 5 Highlighted − Ex. 4 to Opposition Letter Brief, # 6 Redacted − Ex. 4 to Opposition Letter Brief, # 7 Highlighted − Ex. 5 to Opposition Letter Brief, # 8 Redacted − Ex. 5 to Opposition Letter Brief, # 9 Highlighted − Ex. 6 to Opposition Letter Brief, # 10 Redacted − Ex. 6 to Opposition Letter Brief, # 11 Highlighted − Ex. 7 to Opposition Letter Brief, # 12 Redacted − Ex. 7 to Opposition Letter Brief, # 13 Highlighted − Ex. 8 to Opposition Letter Brief, # 14 Redacted − Ex. 8 to Opposition Letter Brief, # 15 Highlighted − Ex. 10 to Opposition Letter Brief, # 16 Redacted − Ex. 10 to Opposition Letter Brief, # 17 Highlighted − Ex. 11 to Opposition Letter Brief, # 18 Redacted − Ex. 11 to Opposition Letter Brief, # 19 Highlighted − Ex. 14 to Opposition Letter Brief, # 20 Redacted − Ex. 14 to Opposition Letter Brief, # 21 Highlighted − Ex. 15 to Opposition Letter Brief, # 22 Redacted − Ex. 15 to Opposition Letter Brief, # 23 Highlighted − Ex. 19 to Opposition Letter Brief, # 24 Redacted − Ex. 19 to Opposition Letter Brief, # 25 Highlighted − Ex. 20 to Opposition Letter Brief, # 26 Redacted − Ex. 20 to Opposition Letter Brief, # 27 Highlighted − Ex. 21 to Opposition Letter Brief, # 28 Redacted − Ex. 21 to Opposition Letter Brief, # 29 Highlighted − Ex. 22 to Opposition Letter Brief, # 30 Redacted − Ex. 22 to Opposition Letter Brief, # 31 Highlighted − Ex. 23 to Opposition Letter Brief, # 32 Redacted − Ex. 23 to Opposition Letter Brief, # 33 Highlighted − Ex. 24 to Opposition Letter Brief, # 34 Redacted − Ex. 24 to Opposition Letter Brief, # 35 Highlighted − Ex. 25 to Opposition Letter Brief, # 36 Redacted − Ex. 25 to Opposition Letter Brief, # 37 Highlighted − Ex. 26 to Opposition Letter Brief, # 38 Redacted − Ex. 26 to Opposition Letter Brief)(Murray, Travis) (Entered: 01/10/2024) |
| 01/10/2024 | 187 | NOTICE to Take Deposition of Stephen Bryn, Allison Griswold, and Daniel Osterby filed by Genevant Sciences GmbH.(Hoeschen, Nathan) (Entered: 01/10/2024) |
| 01/12/2024 | 188 | MOTION to Seal *Portions of Plaintiffs' Motion to Compel (D.I. 184)* − filed by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) (Entered: 01/12/2024) |
| 01/12/2024 | 189 | [SEALED] OPENING BRIEF in Support re 188 MOTION to Seal *Portions of Plaintiffs' Motion to Compel (D.I. 184)* filed by Moderna, Inc., ModernaTX, Inc..Answering Brief/Response due date per Local Rules is 1/26/2024. (Attachments: # 1 Exhibit A − Declaration of Peter Wojciechowski, # 2 Attachment − 010924 SEALED Arbutus Ltr to Court re Disco Dispute (D.I. 184) − Highlights, # 3 Attachment − 010924 SEALED Arbutus Ltr to Court re Disco Dispute (D.I. 184) (Redacted))(Murray, Travis) (Entered: 01/12/2024) |
| 01/16/2024 | 190 | ORDER: The Court, having considered the parties' Joint Motion to Seal (the "Motion"), ITS IS HEREBY ORDERED this 16th day of January, 2024 that the Motion is GRANTED. Leave is given for Moderna to file Moderna's Opposition (D.I. 183 ) and Exhibits 4−5, 7−8, 14−15, 19−23, 25−26 thereto in redacted form and leave Exhibits 6, 10, 11, and 24 under seal. Signed by Judge Mitchell S. Goldberg on 1/16/2024. (apk) (Entered: 01/16/2024) |

| | | |
|---|---|---|
| 01/16/2024 | 191 | ORDER: The Court, having considered Defendants' Motion to Seal (the "Motion"), IT IS HEREBY ORDERED this 16th day of January, 2024 that the Motion is GRANTED. Leave is given for Defendants to file Plaintiffs' Motion to Compel (D.I. 184 ) and 1, 7, and 10−11 thereto in redacted form. Signed by Judge Mitchell S. Goldberg on 1/16/2024. (apk) (Entered: 01/16/2024) |
| 01/16/2024 | 192 | REDACTED VERSION of 183 Letter,,,,,,,, by Moderna, Inc., ModernaTX, Inc.. (Attachments: # 1 Ex. 1, # 2 Ex. 2, # 3 Ex. 3, # 4 Ex. 4, # 5 Ex. 5, # 6 Ex. 6, # 7 Ex. 7, # 8 Ex. 8, # 9 Ex. 9, # 10 Ex. 10, # 11 Ex. 11, # 12 Ex. 12, # 13 Ex. 13, # 14 Ex. 14, # 15 Ex. 15, # 16 Ex. 16, # 17 Ex. 17, # 18 Ex. 18, # 19 Ex. 19, # 20 Ex. 20, # 21 Ex. 21, # 22 Ex. 22, # 23 Ex. 23, # 24 Ex. 24, # 25 Ex. 25, # 26 Ex. 26)(Murray, Travis) (Entered: 01/16/2024) |
| 01/16/2024 | 193 | REDACTED VERSION of 184 Letter,, by Moderna, Inc., ModernaTX, Inc.. (Attachments: # 1 Ex. 1, # 2 Ex. 2, # 3 Ex. 3, # 4 Ex. 4, # 5 Ex. 5, # 6 Ex. 6, # 7 Ex. 7, # 8 Ex. 8, # 9 Ex. 9, # 10 Ex. 10, # 11 Ex. 11, # 12 Ex. 12, # 13 Ex. 13, # 14 Ex. 14, # 15 Ex. 15, # 16 Ex. 16)(Murray, Travis) (Entered: 01/16/2024) |
| 01/16/2024 | 194 | REDACTED VERSION of 189 Opening Brief in Support,, by Moderna, Inc., ModernaTX, Inc.. (Attachments: # 1 Declaration of Peter Wojciechowski, # 2 Highlighted D.I. 184 Letter Brief, # 3 Redacted D.I. 184 Letter Brief)(Murray, Travis) (Entered: 01/16/2024) |
| 01/16/2024 | 195 | REDACTED VERSION of 186 Opening Brief in Support,,,,,,,, by Moderna, Inc., ModernaTX, Inc.. (Attachments: # 1 Ex. A − Peter Wojciechowski Declaration, # 2 Ex. B − Yaworski Declaration, # 3 Highlighted − Opposition Letter Brief re Motion to Compel Samples, # 4 Redacted − Opposition Letter Brief re Motion to Compel Samples, # 5 Highlighted − Ex. 4, # 6 Redacted − Ex. 4, # 7 Highlighted − Ex. 5, # 8 Redacted − Ex. 5, # 9 Highlighted − Ex. 6, # 10 Redacted − Ex. 6, # 11 Highlighted − Ex. 7, # 12 Redacted − Ex. 7, # 13 Highlighted − Ex. 8, # 14 Redacted − Ex. 8, # 15 Highlighted − Ex. 10, # 16 Redacted − Ex. 10, # 17 Highlighted − Ex. 11, # 18 Redacted − Ex. 11, # 19 Highlighted − Ex. 14, # 20 Redacted − Ex. 14, # 21 Highlighted − Ex. 15, # 22 Redacted − Ex. 15, # 23 Highlighted − Ex. 19, # 24 Redacted − Ex. 19, # 25 Highlighted − Ex. 20, # 26 Redacted − Ex. 20, # 27 Highlighted − Ex. 21, # 28 Redacted − Ex. 21, # 29 Highlighted − Ex. 22, # 30 Redacted − Ex. 22, # 31 Highlighted − Ex. 23, # 32 Redacted − Ex. 23, # 33 Highlighted − Ex. 24, # 34 Redacted − Ex. 24, # 35 Highlighted − Ex. 25, # 36 Redacted − Ex. 25, # 37 Highlighted − Ex. 26, # 38 Redacted − Ex. 26)(Murray, Travis) (Entered: 01/16/2024) |
| 01/17/2024 | 196 | [SEALED] Letter to The Honorable Mitchell S. Goldberg from Travis J. Murray regarding Opposition to Plaintiffs' Motion to Compel (D.I. 184) − re 184 Letter,,. (Attachments: # 1 Ex A − 2023−09−05 Moderna Resps to Plaintiffs' RFPs 163−167, # 2 Ex B − 2023−11−30 Email from A. Sheh to C. Dean re Plaintiffs' INDs, # 3 Ex C − Search Terms for Moderna's ESI, # 4 Ex D − 2023−11−06 Ltr from M. McLennan to A. Sheh re Moderna's R&D Docs, # 5 Ex E − Moderna's Website − Product Pipeline, # 6 Ex F − 2023−10−19 Ltr fr Haunschild to McLennan re Moderna ROGs RFPs, # 7 Ex G − 2023−12−15 Moderna 1st Supp Resp to Plfs Rog 11, # 8 Ex H − Batch Distribution, # 9 Ex I − 2023−02−02 Resps to Plaintiffs' 1st Set of RFPs, # 10 Ex J − 2023−05−11 Ltr re Moderna RFP Resp M&Cs, # 11 Ex K − 2023.07.28 Genevant 1st Supp ROs to Moderna 1st RFAs (Nos. 5−8), # 12 Ex L − Roivant Presentation re Patent Litigation Against Moderna, # 13 Ex M − GENV−00031179 Email patent prosecution, # 14 Ex N − GENV−00321640 Email LNP license, # 15 Ex O − 2023−10−25 − Ltr re Plaintiffs' RFPs, # 16 Ex P − 2023−08−01 Ltr re Moderna Resp to 1st RFPs)(Murray, Travis) (Entered: 01/17/2024) |
| 01/19/2024 | 197 | NOTICE of filing the following Non−Paper material(s) in multi media format: Plaintiffs Technology Tutorial. Original Non−paper material(s) to be filed with the Clerk's Office. Notice filed by Nathan Roger Hoeschen on behalf of Arbutus Biopharma Corporation, Genevant Sciences GmbH (Hoeschen, Nathan) (Entered: 01/19/2024) |
| 01/19/2024 | 198 | NOTICE OF SERVICE of 1. Plaintiff Arbutus Biopharma Corporation's Corrected and Supplemental Responses and Objections to Defendants Moderna, Inc. and ModernaTX, Inc.'s First Set of Interrogatories (Nos. 3 & 7) 2. Plaintiff Genevant Sciences GmbH's Seventh Supplemental Responses and Objections to Defendants Moderna, Inc. and ModernaTX, Inc.'s First Set of Interrogatories (No. 7) 3. Plaintiff |

| | | |
|---|---|---|
| | | Genevant Sciences GmbH's First Supplemental Responses and Objections to Defendants Moderna, Inc. and ModernaTX, Inc.'s First Set of Interrogatories (No. 9) 4. Plaintiff Arbutus Biopharma Corporation's First Supplemental Responses and Objections to Defendants Moderna, Inc. and ModernaTX, Inc.'s First Set of Interrogatories (No. 9) filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.(Hoeschen, Nathan) (Entered: 01/19/2024) |
| 01/22/2024 | 199 | NOTICE OF SERVICE of Defendants' Seventh Supplemental Objections and Responses to Plaintiffs' First Set of Interrogatories (Nos. 1−10) − filed by Moderna, Inc., ModernaTX, Inc..(Murray, Travis) (Entered: 01/22/2024) |
| 01/22/2024 | 200 | NOTICE of filing the following Non−Paper material(s) in multi media format: Defendants' Technology Tutorial. Original Non−paper material(s) to be filed with the Clerk's Office. Notice filed by Travis J Murray on behalf of Moderna, Inc., ModernaTX, Inc. (Murray, Travis) (Entered: 01/22/2024) |
| 01/22/2024 | 201 | STIPULATION TO EXTEND TIME to file a motion to seal Defendants' Opposition Letter (D.I. 196) to January 25, 2024 − filed by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) (Entered: 01/22/2024) |
| 01/23/2024 | 202 | STIPULATION AND ORDER regarding D.I. 201 . The deadline to file a motion to seal Defendants' Opposition Letter (D.I. 196 ) shall be extended to January 25, 2024 ( Notice of Compliance deadline set for 1/25/2024) Signed by Judge Mitchell S. Goldberg on 1/23/2024. (apk) (Entered: 01/23/2024) |
| 01/25/2024 | 203 | Joint MOTION to Seal *Portions of Moderna's Opposition to Plaintiffs' Motion to Compel and Exhibits (D.I. 196)* − filed by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) (Entered: 01/25/2024) |
| 01/25/2024 | 204 | [SEALED] Joint OPENING BRIEF in Support re 203 Joint MOTION to Seal *Portions of Moderna's Opposition to Plaintiffs' Motion to Compel and Exhibits (D.I. 196)* − filed by Moderna, Inc., ModernaTX, Inc..Answering Brief/Response due date per Local Rules is 2/8/2024. (Attachments: # 1 Ex. 1 − Wojciechowski Declaration ISO Motion to Seal, # 2 Ex. 2 − Dan Staner Declaration ISO Motion to Seal, # 3 Ex. 3 − Zorn Declaration ISO Motion to Seal, # 4 Highlighed 011224 CONFIDENTIAL Opposition to Plaintiffs Motion to Compel, # 5 Redacted 011224 CONFIDENTIAL Opposition to Plaintiffs Motion to Compel, # 6 Ex C − [Highlighted] Search Terms for Moderna's ESI, # 7 Ex C − [Redacted] Search Terms for Moderna's ESI, # 8 Ex F − [Highlighted] 2023−10−19 Ltr fr Haunschild to McLennan, # 9 Ex F − [Redacted] 2023−10−19 Ltr fr Haunschild to McLennan, # 10 Ex G − [Highlighted] 2023−12−15 Moderna 1st Supp Resp to Plfs, # 11 Ex G − [Redacted] 2023−12−15 Moderna 1st Supp Resp to Plfs Rog 11, # 12 Ex H − [Highlighted] Batch Distribution, # 13 Ex H − [Redacted] Batch Distribution, # 14 Ex K − [Highlighted] 2023.07.28 Genevant 1st Supp ROs to Moderna 1st RFAs (Nos. 5−8), # 15 Ex K − [Redacted] 2023.07.28 Genevant 1st Supp ROs to Moderna 1st RFAs (Nos. 5−8), # 16 Ex M − [Highlighted] GENV−00031179 Email patent prosecution, # 17 Ex M − [Redacted] GENV−00031179 Email patent prosecution, # 18 Ex N − [Highlighted] GENV−00321640 Email LNP license, # 19 Ex N − [Redacted] GENV−00321640 Email LNP license)(Murray, Travis) (Entered: 01/25/2024) |
| 01/26/2024 | 205 | ORDER: The February 8, 2024 Claim Construction Hearing in the above matter is RESCHEDULED to begin at 10:00 a.m. on February 8, 2024 in Courtroom 17−A U.S. Courthouse, 601 Market Street, Philadelphia, Pa. Signed by Judge Mitchell S. Goldberg on 1/26/2024. (apk) (Entered: 01/26/2024) |
| 01/30/2024 | 206 | [SEALED] Letter to The Honorable Mitchell S. Goldberg from Nathan R. Hoeschen regarding Discovery Dispute. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O, # 16 Exhibit P, # 17 Exhibit Q, # 18 Exhibit R, # 19 Exhibit S, # 20 Exhibit T, # 21 Exhibit U, # 22 Exhibit V)(Hoeschen, Nathan) (Entered: 01/30/2024) |
| 02/01/2024 | 207 | ORDER: Having considered the parties' Joint Motion to Seal (D.I. 203 ), IT IS HEREBY ORDERED this 1st day of February, 2024 that the Motion is GRANTED. Leave is given for Moderna to file Moderna's Opposition (D.I. 196 ) and Exhibits C,F,G,H,K,M, and N in redacted form. Signed by Judge Mitchell S. Goldberg on 2/1/2024. (apk) (Entered: 02/01/2024) |

| | | |
|---|---|---|
| 02/01/2024 | 208 | NOTICE OF SERVICE of Plaintiffs Arbutus Biopharma Corporation and Genevant Sciences GmbH's Responses and Objections to Defendants Moderna, Inc. and ModernaTX, Inc.'s Third Set of Requests for Production (Nos. 127 − 132) filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.(Hoeschen, Nathan) (Entered: 02/01/2024) |
| 02/02/2024 | 209 | Joint NOTICE of Unsealing by Arbutus Biopharma Corporation, Genevant Sciences GmbH re 206 Letter,, (Hoeschen, Nathan) (Entered: 02/02/2024) |
| 02/02/2024 | 210 | REDACTED VERSION of 196 Letter,,,, by Moderna, Inc., ModernaTX, Inc.. (Attachments: # 1 Ex A − 2023−09−05 Moderna Resps to Plaintiffs' RFPs 163−167_, # 2 Ex B − 2023−11−30 Email from A. Sheh to C. Dean re Plaintiffs' INDs, # 3 Ex C − [Redacted] Search Terms for Moderna's ESI, # 4 Ex D − 2023−11−06 Ltr from M. McLennan to A. Sheh re Moderna's R&D Docs, # 5 Ex E − Moderna's Website − Product Pipeline, # 6 Ex F − [Redacted] 2023−10−19 Ltr fr Haunschild to McLennan, # 7 Ex G − [Redacted] 2023−12−15 Moderna 1st Supp Resp to Plfs Rog 11, # 8 Ex H − [Redacted] Batch Distribution, # 9 Ex I − 2023−02−02 Resps to Plaintiffs' 1st Set of RFPs, # 10 Ex J − 2023−05−11 Ltr re Moderna RFP Resp M&Cs, # 11 Ex K − [Redacted] 2023.07.28 Genevant 1st Supp ROs to Moderna 1st RFAs (Nos. 5−8), # 12 Ex L − Roivant Presentation re Patent Litigation Against Moderna, # 13 Ex M − [Redacted] GENV−00031179 Email patent prosecution, # 14 Ex N − [Redacted] GENV−00321640 Email LNP license, # 15 Ex O − 2023−10−25 − Ltr re Plaintiffs' RFPs, # 16 Ex P − 2023−08−01 Ltr re Moderna Resp to 1st RFPs)(Murray, Travis) (Entered: 02/02/2024) |
| 02/02/2024 | 211 | REDACTED VERSION of 204 Opening Brief in Support,,,,,, by Moderna, Inc., ModernaTX, Inc.. (Attachments: # 1 Ex. 1 − Wojciechowski Declaration ISO Mot to Seal, # 2 Ex. 2 − Dan Staner Declaration ISO Motion to Seal, # 3 Ex. 3 − Zorn Declaration ISO Motion to Seal, # 4 Ex. 4 − [Highlighted] 011224 CONFIDENTIAL Opposition to Plaintiffs Motion to Compel, # 5 Ex. 5 − [Redacted] 011224 CONFIDENTIAL Opposition to Plaintiffs Motion to Compel, # 6 Ex. 6 − Ex C − [Highlighted] Search Terms for Moderna's ESI, # 7 Ex. 7 − Ex C − [Redacted] Search Terms for Moderna's ESI, # 8 Ex. 8 − Ex F − [Highlighted] 2023−10−19 Ltr fr Haunschild to McLennan, # 9 Ex. 9 − Ex F − [Redacted] 2023−10−19 Ltr fr Haunschild to McLennan, # 10 Ex. 10 − Ex G − [Highlighted] 2023−12−15 Moderna 1st Supp Resp to Plfs Rog 11, # 11 Ex. 11 − Ex G − [Redacted] 2023−12−15 Moderna 1st Supp Resp to Plfs Rog 11, # 12 Ex. 12 − Ex H − [Highlighted] Batch Distribution, # 13 Ex. 13 − Ex H − [Redacted] Batch Distribution, # 14 Ex. 14 − Ex K − [Highlighted] 2023.07.28 Genevant 1st Supp ROs to Moderna 1st RFAs (Nos. 5−8), # 15 Ex. 15 − Ex K − [Redacted] 2023.07.28 Genevant 1st Supp ROs to Moderna 1st RFAs (Nos. 5−8), # 16 Ex. 16 − Ex M − [Highlighted] GENV−00031179 Email patent prosecution, # 17 Ex. 17 − Ex M − [Redacted] GENV−00031179 Email patent prosecution, # 18 Ex. 18 − Ex N − [Highlighted] GENV−00321640 Email LNP license, # 19 Ex. 19 − Ex N − [Redacted] GENV−00321640 Email LNP license)(Murray, Travis) (Entered: 02/02/2024) |
| 02/06/2024 | 212 | [SEALED] Letter to The Honorable Mitchell S. Goldberg from Travis Murray regarding Opposition to Plaintiffs' Dispute Letter (D.I. 206). (Attachments: # 1 Exh W, # 2 Exh X, # 3 Exh Y, # 4 Exh Z, # 5 Exh AA, # 6 Exh BB, # 7 Exh CC, # 8 Exh DD, # 9 Exh EE, # 10 Exh FF)(Murray, Travis) (Entered: 02/06/2024) |
| 02/07/2024 | 213 | MOTION for Pro Hac Vice Appearance of Attorney Laura Ashley Harris − filed by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) (Entered: 02/07/2024) |
| 02/07/2024 | 214 | Pro Hac Vice Fee − Credit Card Payment received for Laura Ashley Harris. ( re 213 MOTION for Pro Hac Vice Appearance of Attorney Laura Ashley Harris )( Payment of $ 50, receipt number ADEDC−4332418).(Murray, Travis) (Entered: 02/07/2024) |
| 02/07/2024 | 215 | ORDER granting D.I. 213 Motion to Appear Pro Hac Vice of Laura Ashley Harris. Signed by Judge Mitchell S. Goldberg on 2/7/2024. (apk) (Entered: 02/07/2024) |
| 02/07/2024 | 216 | Letter to The Honorable Mitchell S. Goldberg from Nathan R. Hoeschen regarding Request for Argument − re 206 Letter,,. (Hoeschen, Nathan) (Entered: 02/07/2024) |
| 02/08/2024 | 217 | ORDER: A Hearing on Discovery Disputes is scheduled for Thursday, February 22, 2024 at 0:00 a.m. in Courtroom 17−A, U.S. Courthouse, 601 Market Street, Philadelphia, Pa. Signed by Judge Mitchell S. Goldberg on 2/8/2024. (mpb) (Entered: |

| | | |
|---|---|---|
| | | 02/08/2024) |
| 02/08/2024 | | Minute Entry for proceedings held before Judge Mitchell S. Goldberg − Claim Construction Hearing held on 2/8/2024. (Court Reporter Jimmy Cruz.) (mpb) (Entered: 02/09/2024) |
| 02/09/2024 | 218 | STIPULATION TO EXTEND TIME to file any motion to seal Defendants' Opposition Letter (D.I. 212) pursuant to the Stipulation and Order Regarding Sealed Filings (D.I. 155) to February 16, 2024 − filed by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) (Entered: 02/09/2024) |
| 02/09/2024 | 219 | SO ORDERED, re D.I. 218 STIPULATION TO EXTEND TIME to file any motion to seal Defendants' Opposition Letter (D.I. 212 ) pursuant to the Stipulation and Order Regarding Sealed Filings (D.I. 155 ) to February 16, 2024. Signed by Judge Mitchell S. Goldberg on 02/09/2024. (smg) (Entered: 02/09/2024) |
| 02/12/2024 | 220 | Official Transcript of Claim Construction Hearing held on 02/08/2024 before Judge Mitchell S. Goldberg. Court Reporter/Transcriber O'Connor Legal, Medical & Media Services, Inc., Contact: 912−567−3889. Transcript may be viewed at the court public terminal or order/purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date, it may be obtained through PACER Redaction Request due 3/4/2024. Redacted Transcript Deadline set for 3/14/2024. Release of Transcript Restriction set for 5/13/2024. (vfm) (Entered: 02/12/2024) |
| 02/12/2024 | 221 | NOTICE OF SERVICE of Plaintiffs' Third Set of Interrogatories (Nos. 12−17) filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.(DiBenedetto, Emily) (Entered: 02/12/2024) |
| 02/16/2024 | 222 | Joint NOTICE of Unsealing by Arbutus Biopharma Corporation, Genevant Sciences GmbH re 212 Letter, (Hoeschen, Nathan) (Entered: 02/16/2024) |
| 02/22/2024 | 223 | [SEALED] Letter to The Honorable Mitchell S. Goldberg from Travis Murray regarding Moderna's Motion to Compel Discovery from Roivant Sciences Ltd.. (Attachments: # 1 Exhibit A − Roivant Document Subpoena, # 2 Exhibit B − Roivant's Resp & Obj to Moderna's Document Subpoena, # 3 Exhibit C − Letter to Roivant re M&C, # 4 Exhibit D − Letter to Y. Li re Roivant Subpoenas, # 5 Exhibit E −Letter to Roivant, # 6 Exhibit F − Letter to Y. Li re Roivant Subpoena, # 7 Exhibit G − Response to Roivant 12−12−2023 Letter, # 8 Exhibit H − Letter to Y. Li re Roivant Subpoenas, # 9 Exhibit I − Email from A. Sheh to M. McLennan, # 10 Exhibit J − GENV−00508209−219, # 11 Exhibit K − Roivant website, # 12 Exhibit L − Roivant Presentation, # 13 Exhibit M − Genevant First Supp R&O to RFAs, # 14 Exhibit N − GENV−00027708; 28826; 31179, # 15 Exhibit O − GENV−00262478, # 16 Exhibit P − GENV−00517314, # 17 Exhibit Q − GENV−00273343, # 18 Exhibit R − Email re Roivant doc subpoena, # 19 Exhibit S − Kishnani LinkedIn Profile)(Murray, Travis) (Entered: 02/22/2024) |
| 02/22/2024 | | Minute Entry for proceedings held before Judge Mitchell S. Goldberg − Discovery Hearing held on 2/22/2024. (nmg) (Entered: 02/22/2024) |
| 02/22/2024 | 224 | [SEALED] ORDER. Signed by Judge Mitchell S. Goldberg on 2/22/2024. This order has been emailed to local counsel. (nmg) (Entered: 02/22/2024) |
| 02/26/2024 | 225 | [SEALED] STIPULATION and [Proposed] Order Regarding Samples Production & Testing and Discovery Disputes by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) (Entered: 02/26/2024) |
| 02/26/2024 | 226 | STIPULATION and [Proposed] Order Regarding Scheduling Order Extension re 72 Scheduling Order, by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) (Entered: 02/26/2024) |
| 02/27/2024 | 227 | Joint NOTICE of the parties to Unseal by Moderna, Inc., ModernaTX, Inc. re 225 Stipulation (Murray, Travis) (Entered: 02/27/2024) |
| 02/27/2024 | 228 | [SEALED] STIPULATION AND ORDER Regarding Samples Production & Testing And Discovery Disputes Signed by Judge Mitchell S. Goldberg on 2/27/2024.This order has been emailed to local counsel. (mpb) (Entered: 02/27/2024) |

| | | |
|---|---|---|
| 02/27/2024 | 229 | ORDER regarding Plaintiffs' Discovery Dispute (D.I. 161 , 184 , 206 ) and Defendant's Response (D.I. 183 , 196 , 212 ). (See Order for timing of production of samples and formal decision of discovery requests.) Signed by Judge Mitchell S. Goldberg on 2/27/2024. (mpb) (Entered: 02/27/2024) |
| 02/27/2024 | 230 | ORDER: A Conference on expert reports in the above−captioned matter is scheduled for Tuesday, March 26, 2024 at 2:00 p.m. The conference will be conducted via telephone and held on the record. Counsel should dial in as follows: (1) Call: 888−684−8852; (2) Enter access code: 2187450#; (3) Press # to enter as a participant. Signed by Judge Mitchell S. Goldberg on 2/27/2024. (mpb) (Entered: 02/27/2024) |
| 02/27/2024 | 231 | Official Transcript of Discovery Hearing held on 2/22/2024 before Judge Mitchell S. Goldberg. Court Reporter/Transcriber ESR. Transcript may be viewed at the court public terminal or order/purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date, it may be obtained through PACER Redaction Request due 3/19/2024. Redacted Transcript Deadline set for 4/1/2024. Release of Transcript Restriction set for 5/28/2024. (apk) (Entered: 02/27/2024) |
| 02/27/2024 | 232 | [SEALED] Transcript of Discovery Hearing (Sealed Sidebar) held on 02/22/2024 before Judge Mitchell S. Goldberg. (vfm) (Entered: 02/27/2024) |
| 02/27/2024 | 233 | STIPULATION AND ORDER Regarding Scheduling Order Extension. (See Order for further details) Signed by Judge Mitchell S. Goldberg on 2/27/2024. (mpb) (Entered: 02/27/2024) |
| 02/27/2024 | 234 | STIPULATION TO EXTEND TIME to file any motion to seal Moderna's Motion to Compel Discovery (D.I. 223) and the time for Roivant Sciences Ltd. to serve its opposition to Moderna's Motion to Compel Discovery (D.I. 223) to March 5, 2024 and March 7, 2024, respectively − filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH, Roivant Sciences Ltd.. (Hoeschen, Nathan) (Entered: 02/27/2024) |
| 02/28/2024 | 235 | STIPULATION AND ORDER regarding D.I. 234 STIPULATION TO EXTEND TIME to file any motion to seal Moderna's Motion to Compel Discovery (D.I. 223 ) and the time for Roivant Sciences Ltd. to serve its opposition to Moderna's Motion to Compel Discovery (D.I. 223 ) to March 5, 2024 and March 7, 2024, respectively. Signed by Judge Mitchell S. Goldberg on 2/28/2024. (apk) (Entered: 02/28/2024) |
| 02/29/2024 | 236 | NOTICE OF SERVICE of Plaintiffs' Fourth Set of Interrogatories (No. 18) filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.(Hoeschen, Nathan) (Entered: 02/29/2024) |
| 03/01/2024 | 237 | NOTICE to Take Deposition of James Heyes, Lloyd Jeffs, Sunny Jeng, Adam Judge, Kieu Lam, Peter Lutwyche, Ian MacLachlan, Michael McElhaugh, Mark Murray, Lorne Palmer, Edward Yaworski and Peter Zorn on various dates (see notice) filed by Moderna, Inc., ModernaTX, Inc..(Murray, Travis) (Entered: 03/01/2024) |
| 03/04/2024 | 238 | NOTICE to Take Deposition of Orn Almarsson, Kerry Benenato, Hamilton Bennett, Christoph Brackman, Said Francis, Kimberly Hassett, Stephen Hoge, Jack Kramarczyk, Don Parsons, Michael Smith, and Al Thomas on various dates (see notice) filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.(Keller, Karen) (Entered: 03/04/2024) |
| 03/07/2024 | 239 | NOTICE OF SERVICE of Defendants' Fourth Set of Interrogatories (Nos. 14−17) − filed by Moderna, Inc., ModernaTX, Inc..(Murray, Travis) (Entered: 03/07/2024) |
| 03/07/2024 | 240 | [SEALED] Letter to The Honorable Mitchell S. Goldberg from Karen E. Keller regarding Opposition to Motion to Compel − re 223 Letter,,,,. (Attachments: # 1 Exhibit T, # 2 Exhibit U, # 3 Exhibit V, # 4 Exhibit W, # 5 Exhibit X, # 6 Exhibit Y, # 7 Exhibit Z)(Keller, Karen) (Entered: 03/07/2024) |
| 03/07/2024 | 241 | MOTION to Seal Document: 223 Letter,,,, *[Motion to Seal Portions of Moderna's Motion to Compel and Exhibits (D.I. 223)]* − filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Attachments: # 1 Text of Proposed Order)(DiBenedetto, Emily) (Entered: 03/07/2024) |
| 03/07/2024 | 242 | [SEALED] OPENING BRIEF in Support re 241 MOTION to Seal Document: 223 Letter,,,, *[Motion to Seal Portions of Moderna's Motion to Compel and Exhibits (D.I.* |

| | | |
|---|---|---|
| | | *223)]* filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.Answering Brief/Response due date per Local Rules is 3/21/2024. (Attachments: # 1 Exhibit A − Declaration of Pete Zorn, # 2 Exhibit B − Declaration of Christopher Naftzger, # 3 Redacted Version of D.I. 223 (Highlighted), # 4 Redacted Version of D.I. 223)(DiBenedetto, Emily) (Entered: 03/07/2024) |
| 03/08/2024 | 243 | NOTICE OF SERVICE of Moderna's Notice of Deposition to Plaintiffs Pursuant to Fed. R. Civ. P. 30(b)(6) − filed by Moderna, Inc., ModernaTX, Inc..(Murray, Travis) (Entered: 03/08/2024) |
| 03/11/2024 | 244 | NOTICE OF SERVICE of Notice of Rule 30(b)(6) Deposition to Moderna filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.(Keller, Karen) (Entered: 03/11/2024) |
| 03/11/2024 | 245 | ORDER: Plaintiff's Motion to Seal (D.I. 241 ) is GRANTED. Leave is given for Plaintiffs to file Moderna's Motion to Compel (D.I. 223 ) and Exhibits C, D, E, F, G, H, J, M, N, O, P, Q, and R in redacted form. Signed by Judge Mitchell S. Goldberg on 3/11/2024. (mpb) (Entered: 03/11/2024) |
| 03/11/2024 | 246 | NOTICE OF SERVICE of Defendants' Objections and Responses to Plaintiffs' Third Set of Interrogatories (Nos. 12−17) − filed by Moderna, Inc., ModernaTX, Inc..(Murray, Travis) (Entered: 03/11/2024) |
| 03/11/2024 | 247 | REDACTED VERSION of 223 Letter,,,, 245 Order,, Terminate Motions, by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Keller, Karen) (Entered: 03/11/2024) |
| 03/12/2024 | 248 | NOTICE of Unsealing by Arbutus Biopharma Corporation, Genevant Sciences GmbH re 240 Letter, 242 Opening Brief in Support,, (Keller, Karen) (Entered: 03/12/2024) |
| 03/12/2024 | 249 | STIPULATION TO EXTEND TIME for Defendants to produce to Plaintiffs all samples from the three lots/batches selected by Defendant to March 19, 2024 − filed by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) (Entered: 03/12/2024) |
| 03/13/2024 | 250 | SO ORDERED, re 249 STIPULATION TO EXTEND TIME for Defendants to produce to Plaintiffs all samples from the three lots/batches selected by Defendant to March 19, 2024. Signed by Judge Mitchell S. Goldberg on 3/13/2024. (mpb) (Entered: 03/13/2024) |
| 03/13/2024 | 251 | NOTICE OF SERVICE of Defendants' Second Supplemental Objections and Responses to Plaintiffs' Second Set of Interrogatories (No. 11) filed by Moderna, Inc., ModernaTX, Inc..(Murray, Travis) (Entered: 03/13/2024) |
| 03/15/2024 | 252 | NOTICE OF SERVICE of Plaintiff Genevant Sciences GmbH's Eighth Supplemental Responses and Objections to Defendants Moderna, Inc. and ModernaTX, Inc.'s First Set of Interrogatories (No. 3) filed by Genevant Sciences GmbH.(Keller, Karen) (Entered: 03/15/2024) |
| 03/18/2024 | 253 | NOTICE OF SERVICE of Defendants' Eighth Supplemental Objections and Responses to Plaintiffs' First Set of Interrogatories (Nos. 1−10) − filed by Moderna, Inc., ModernaTX, Inc..(Murray, Travis) (Entered: 03/18/2024) |
| 03/18/2024 | 254 | NOTICE to Take Deposition of Joseph Schariter on April 18, 2024 filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.(Keller, Karen) (Entered: 03/18/2024) |
| 03/20/2024 | 255 | NOTICE OF SERVICE of (1) Defendants' Fourth Set of Requests for Productions to Plaintiffs (Nos. 133−138) and (2) Defendants' Fifth Set of Interrogatories (Nos. 18−22) − filed by Moderna, Inc., ModernaTX, Inc..(Murray, Travis) (Entered: 03/20/2024) |
| 03/21/2024 | 256 | NOTICE requesting Clerk to remove Laura Ashley Harris as co−counsel. Reason for request: no longer with the firm. (Murray, Travis) (Entered: 03/21/2024) |
| 03/22/2024 | 257 | NOTICE OF SERVICE of (1) Defendants' First Supplemental Objections and Responses to Plaintiffs' Third Set of Interrogatories (Nos. 13−14) and (2) Defendants' Ninth Supplemental Objections and Responses to Plaintiffs' First Set of Interrogatories (Nos. 1−10) − filed by Moderna, Inc., ModernaTX, Inc..(Murray, Travis) (Entered: 03/22/2024) |

| | | |
|---|---|---|
| 03/22/2024 | 258 | STIPULATION TO EXTEND TIME for the parties to serve objections to Fed. R. Civ. P. 30(b)(6) deposition notices to March 25, 2024 − filed by Roivant Sciences Ltd.. (DiBenedetto, Emily) (Entered: 03/22/2024) |
| 03/25/2024 | 259 | STIPULATION AND ORDER regarding D.I. 258 . The time for the parties to serve objections to Fed. R. Civ. P. 30(b)(6) deposition notices is extended from March 22, 2024 (D.I. 233 ) through and including March 25, 2024. Signed by Judge Mitchell S. Goldberg on 3/25/2024. (apk) (Entered: 03/25/2024) |
| 03/25/2024 | 260 | NOTICE OF SERVICE of Moderna's Objections and Responses to Plaintiffs' Rule 30(b)(6) Deposition Notice to Moderna − filed by Moderna, Inc., ModernaTX, Inc..(Murray, Travis) (Entered: 03/25/2024) |
| 03/25/2024 | 261 | NOTICE OF SERVICE of 1. Genevant Sciences GmbH's Responses and Objections to Defendants' Notice of Deposition Pursuant to Fed. R. Civ. P. 30(b)(6) 2. Plaintiff Arbutus Biopharma Corporation's Objections and Responses to Defendants' Notice of 30(b)(6) Deposition filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.(DiBenedetto, Emily) (Entered: 03/25/2024) |
| 03/26/2024 | | Minute Entry for proceedings held before Judge Mitchell S. Goldberg − Telephone Conference held on 3/26/2024. (Court Reporter Jimmy Cruz.) (mpb) (Entered: 03/26/2024) |
| 03/27/2024 | 262 | ORDER: Defendant's Motion to Compel Discovery from Roivant Sciences Ltd. (D.I. 223 ) is DENIED WITHOUT PREJUDICE. After the parties' production of documents from the already agreed−upon custodians, and following an additional meet and confer, the parties may, if necessary, re−raise issues regarding production of lobbying and government communication documents. Signed by Judge Mitchell S. Goldberg on 3/27/2024. (mpb) (Entered: 03/27/2024) |
| 03/27/2024 | 263 | ORDER: The February 27, 2024 Scheduling Order is AMENDED to provide that by no late than June 7, 2024 the parties shall meet and confer to narrow the asserted patent claims and defenses. Signed by Judge Mitchell S. Goldberg on 3/27/2024. (mpb) (Entered: 03/27/2024) |
| 03/28/2024 | 264 | Official Transcript of Telephonic Conference held on 03/26/2024 before Judge Mitchell S. Goldberg. Court Reporter/Transcriber RedDoor Legal Services, LLC, Phone: (973)985−3668. Transcript may be viewed at the court public terminal or order/purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date, it may be obtained through PACER. Redaction Request due 4/18/2024. Redacted Transcript Deadline set for 4/29/2024. Release of Transcript Restriction set for 6/26/2024. (vfm) (Entered: 03/28/2024) |
| 04/02/2024 | 265 | NOTICE OF SERVICE of Defendants' Objections and Responses to Plaintiffs' Fourth Set of Interrogatories (No. 18) − filed by Moderna, Inc., ModernaTX, Inc..(Murray, Travis) (Entered: 04/02/2024) |
| 04/03/2024 | 266 | MEMORANDUM OPINION. Signed by Judge Mitchell S. Goldberg on 4/3/2024. (apk) (Entered: 04/03/2024) |
| 04/03/2024 | 267 | ORDER: Upon consideration of the parties' Joint Claim Construction Brief (Doc. No. 170 ) and following claim construction hearing, it is hereby ORDERED that the disputed claim terms in this case are construed as follows: (PLEASE SEE ORDER FOR FURTHER DETAILS) Signed by Judge Mitchell S. Goldberg on 4/3/2024. (apk) (Entered: 04/03/2024) |
| 04/04/2024 | 268 | NOTICE OF SERVICE of Defendants' Tenth Supplemental Objections and Responses to Plaintiffs' First Set of Interrogatories (Nos. 1−10) − filed by Moderna, Inc., ModernaTX, Inc..(Murray, Travis) (Entered: 04/04/2024) |
| 04/04/2024 | 269 | NOTICE OF SERVICE of 1) Subpoena to Testify at a Deposition in a Civil Action directed to Flagship Pioneering, Inc.; and 2) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action directed to Flagship Pioneering, Inc. filed by Genevant Sciences GmbH.(Hoeschen, Nathan) (Entered: 04/04/2024) |
| 04/05/2024 | 270 | STIPULATION TO EXTEND TIME to raise disputes with the Court concerning 30(b)(6) notices to April 15, 2024 − filed by Arbutus Biopharma Corporation, |

| | | |
|---|---|---|
| | | Genevant Sciences GmbH. (Hoeschen, Nathan) (Entered: 04/05/2024) |
| 04/05/2024 | 271 | SO ORDERED, re 270 STIPULATION TO EXTEND TIME to raise disputes with the Court concerning 30(b)(6) notices to April 15, 2024 filed by Genevant Sciences GmbH, Arbutus Biopharma Corporation. Signed by Judge Mitchell S. Goldberg on 4/5/2024. (mpb) (Entered: 04/08/2024) |
| 04/12/2024 | 272 | NOTICE OF SERVICE of 1. Plaintiff Genevant Sciences GmbH's Ninth Supplemental Responses and Objections to Defendant Modera, Inc. and ModernaTX, Inc.'s First Set of Interrogatories (No. 7) 2. Plaintiff Arbutus Biopharma Corporation's Eighth Supplemental Responses and Objections to Defendants Moderna, Inc. and ModernaTX, Inc.'s First Set of Interrogatories (No. 7) filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.(Hoeschen, Nathan) (Entered: 04/12/2024) |
| 04/15/2024 | 273 | STIPULATION TO EXTEND TIME to raise disputes with the Court concerning 30(b)(6) notices to April 17, 2024 − filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Hoeschen, Nathan) (Entered: 04/15/2024) |
| 04/15/2024 | 274 | STIPULATION TO EXTEND TIME regarding D.I. 273 . The time for parties to raise disputes with the Court concerning 30(b)(6) notices is extended to April 17, 2024. Signed by Judge Mitchell S. Goldberg on 04/15/2024. (vfm) (Entered: 04/15/2024) |
| 04/15/2024 | 275 | NOTICE OF SERVICE of Subpoena to Testify at a Deposition in a Civil Action directed to John Podobinski filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.(DiBenedetto, Emily) (Entered: 04/15/2024) |
| 04/15/2024 | 276 | NOTICE OF SERVICE of 1) Plaintiff Arbutus Biopharma Corporation's Responses and Objections to Defendants Moderna, Inc. and ModernaTX, Inc.'s Fourth Set of Interrogatories (Nos. 1417); 2)Plaintiff Genevant Sciences GmbH's Responses and Objections to Defendants Moderna, Inc. and ModernaTX, Inc.'s Fourth Set of Interrogatories (Nos. 1417); 3) Plaintiff Arbutus Biopharma Corporation's Second Supplemental Responses and Objections to Defendants Moderna, Inc. and ModernaTX, Inc.'s First Set of Requests for Admission (Nos.14); and 4) Plaintiff Genevant Sciences GmH's Second Supplemental Responses and Objections to Defendants Moderna, Inc. and ModernaTX, Inc.'s First Set of Requests for Admission (Nos.14) filed by Genevant Sciences GmbH.(Hoeschen, Nathan) (Entered: 04/15/2024) |
| 04/17/2024 | 277 | MOTION for Leave to File *to Amend the Complaint* − filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Hoeschen, Nathan) (Entered: 04/17/2024) |
| 04/17/2024 | 278 | [SEALED] Letter to The Honorable Mitchell S. Goldberg from Nathan R. Hoeschen regarding Letter Brief in Support of Plaintiffs' Motion for Leave to Amend Complaint − re 277 MOTION for Leave to File *to Amend the Complaint*. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M − Redline version of Amended Complaint, # 14 Exhibit N − Amended Complaint)(Hoeschen, Nathan) (Entered: 04/17/2024) |
| 04/17/2024 | 279 | STIPULATION TO EXTEND TIME to raise disputes with the Court concerning 30(b)(6) notices to April 22, 2024 − filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Hoeschen, Nathan) (Entered: 04/17/2024) |
| 04/18/2024 | 280 | STIPULATION AND ORDER regarding D.I. 279 . The time to raise disputes with the Court concerning 30(b)(6) notices (D.I. 273 ) is extended through and including April 22, 2024 (Notice of Compliance deadline set for 4/22/2024) Signed by Judge Mitchell S. Goldberg on 4/18/2024. (apk) (Entered: 04/18/2024) |
| 04/19/2024 | 281 | STIPULATION TO EXTEND TIME to file a motion to seal Plaintiffs' Letter Brief (D.I. 278) to April 29, 2024 − filed by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) (Entered: 04/19/2024) |
| 04/19/2024 | 282 | STIPULATION AND ORDER regarding D.I. 281 . The deadline to file a motion to seal Plaintiffs' Letter Brief (D.I. 278 ) shall be extended until and through April 29, 2024. Signed by Judge Mitchell S. Goldberg on 4/19/2024. (apk) (Entered: 04/19/2024) |

| | | |
|---|---|---|
| 04/22/2024 | 283 | NOTICE OF SERVICE of 1. Plaintiff Arbutus Biopharma Corporation's Responses and Objections to Defendants Moderna, Inc. and ModernaTX, Inc.'s Fifth Set of Interrogatories (Nos. 18 − 22) 2. Plaintiff Genevant Sciences GmbH's Responses and Objections to Defendants Moderna, Inc. and ModernaTX, Inc.'s Fifth Set of Interrogatories (Nos. 18 − 22) 3. Plaintiffs Arbutus Biopharma Corporation and Genevant Sciences GmbH's Responses and Objections to Defendants Moderna, Inc. and ModernaTX, Inc.'s Fourth Set of Requests for Production (Nos. 133 − 138) filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.(Hoeschen, Nathan) (Entered: 04/22/2024) |
| 04/22/2024 | 284 | STIPULATION TO EXTEND TIME for Moderna to file its Letter Brief in Opposition to Plaintiffs Letter (D.I. 278) to April 25, 2024 − filed by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) (Entered: 04/22/2024) |
| 04/23/2024 | 285 | [SEALED] Letter to The Honorable Mitchell S. Goldberg from Nathan R. Hoeschen regarding Plaintiffs' Motion to Compel. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O, # 16 Exhibit P, # 17 Exhibit Q, # 18 Exhibit R)(Hoeschen, Nathan) (Entered: 04/23/2024) |
| 04/23/2024 | 286 | STIPULATION AND ORDER TO EXTEND TIME regarding D.I. 284 . The deadline for Moderna to serve its Letter Brief in Opposition to Plaintiffs Letter (D.I. 278 ) shall be extended until and through April 23, 2024, and the deadline to file shall be extended until and through April 25, 2024. Signed by Judge Mitchell S. Goldberg on 04/23/2024. (vfm) (Entered: 04/23/2024) |
| 04/24/2024 | 287 | [UNSEALED Pursuant to D.I. 489 ] Letter to The Honorable Mitchell S. Goldberg from Nathan R. Hoeschen regarding 30(b)(6) Disputes. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13)(Hoeschen, Nathan) Modified on 6/27/2025 (mpb). (Entered: 04/24/2024) |
| 04/25/2024 | 288 | STIPULATION TO EXTEND TIME for Defendants to file their response to Plaintiffs' Motion to Amend (D.I. 277) to April 26, 2024 − filed by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) (Entered: 04/25/2024) |
| 04/26/2024 | 289 | STIPULATION AND ORDER regarding D.I. 288 . The deadline for Defendants to file their response to Plaintiffs' Motion to Amend (D.I. 277 ) shall be extended to April 26, 2024. (Response due 4/26/2024) Signed by Judge Mitchell S. Goldberg on 4/26/2024. (apk) (Entered: 04/26/2024) |
| 04/26/2024 | 290 | NOTICE to Take Deposition of Dave Kille and Stephen Reid on May 21, 2024 and May 28, 2024, respectively − filed by Moderna, Inc., ModernaTX, Inc..(Murray, Travis) (Entered: 04/26/2024) |
| 04/26/2024 | 291 | STIPULATION and [Proposed] Order Regarding Motions to Seal by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) (Entered: 04/26/2024) |
| 04/26/2024 | 292 | STIPULATION TO EXTEND TIME for Defendants to file their response to Plaintiffs' Motion to Amend (D.I. 277) to April 29, 2024 − filed by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) (Entered: 04/26/2024) |
| 04/29/2024 | 293 | STIPULATION AND ORDER regarding D.I. 292 . The deadline for Defendants to file their response to Plaintiffs' Motion to Amend (D.I. 277 ) shall be extended to April 29, 2024. Signed by Judge Mitchell S. Goldberg on 4/29/2024. (apk) (Entered: 04/29/2024) |
| 04/29/2024 | 294 | [SEALED] Letter to The Honorable Mitchell S. Goldberg from Brian P. Egan regarding Opposition to Plaintiffs' Motion to Compel Search of Stephane Bancel's Documents. (Attachments: # 1 Ex. S HC−OCEO − 2024−04−10 Dean Email, # 2 Ex. T HC−OCEO − 2024−04−05 McLennan Letter, # 3 Ex. U 2024−02−22 − Discovery Hearing Tr., # 4 Ex. V HC−OCEO − 2024−02−22 − [SEALED] Discovery Hearing Tr.)(Egan, Brian) (Entered: 04/29/2024) |
| 04/29/2024 | 295 | STIPULATION Concerning Plaintiffs' Motion for Leave to Amend Complaint re 277 MOTION for Leave to File *to Amend the Complaint* by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) (Entered: 04/29/2024) |

| | | |
|---|---|---|
| 04/30/2024 | 296 | NOTICE OF SERVICE of (1) Defendants' Eleventh Supplemental Objections and Responses to Plaintiffs' First Set of Interrogatories (Nos. 1−10), (2) Defendants' Third Supplemental Objections and Responses to Plaintiffs' Second Set of Interrogatories (No. 11) and (3) Defendants' First Supplemental Objections and Responses to Plaintiffs' Third Set of Interrogatories (Nos. 13−14) − filed by Moderna, Inc., ModernaTX, Inc..(Murray, Travis) (Entered: 04/30/2024) |
| 04/30/2024 | 297 | NOTICE OF SERVICE of (1) Defendants' Sixth Set of Interrogatories (No. 23−25) and (2) Defendants' Second Set of Requests for Admissions (Nos. 9−44) to Plaintiffs − filed by Moderna, Inc., ModernaTX, Inc..(Murray, Travis) (Entered: 04/30/2024) |
| 04/30/2024 | 298 | NOTICE OF SERVICE of 1. Plaintiffs Arbutus Biopharma Corporation and Genevant Sciences GmbH's First Set of Requests for Admission (Nos. 1 − 50) 2. Plaintiffs' Fifth Set of Interrogatories (Nos. 19 − 25) filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.(Hoeschen, Nathan) (Entered: 04/30/2024) |
| 05/01/2024 | 299 | STIPULATION AND ORDER regarding D.I. 295 STIPULATION Concerning Plaintiffs' Motion for Leave to Amend Complaint re 277 MOTION for Leave to File to Amend the Complaint. Signed by Judge Mitchell S. Goldberg on 05/01/2024. (vfm) (Entered: 05/01/2024) |
| 05/01/2024 | 300 | ORDER: The Motion for Leave to Amend the Complaint (Doc. No. 277 ) is DENIED AS MOOT. Signed by Judge Mitchell S. Goldberg on 5/1/2024. (apk) (Entered: 05/01/2024) |
| 05/01/2024 | 301 | [SEALED] AMENDED COMPLAINT *for Patent Infringement* against Moderna, Inc., ModernaTX, Inc.− filed by Genevant Sciences GmbH, Arbutus Biopharma Corporation. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F)(Hoeschen, Nathan) (Entered: 05/01/2024) |
| 05/01/2024 | 302 | [SEALED] Letter to The Honorable Mitchell S. Goldberg from Travis Murray regarding Opposition to Plaintiffs' Motion to Compel Rule 30(b)(6) Testimony − re 287 Letter,. (Attachments: # 1 Exhibit 14 − 30(b)(6) Topic Scope)(Murray, Travis) (Entered: 05/01/2024) |
| 05/01/2024 | 303 | NOTICE OF SERVICE of (1) Non−Party Flagship Pioneering, Inc.'s Responses and Objections to Genevant's April 3, 2024 Document Subpoena and (2) Non−Party Flagship Pioneering, Inc.'s Responses and Objections to Genevant's April 3, 2024 Deposition Subpoena − filed by Moderna, Inc., ModernaTX, Inc..(Murray, Travis) (Entered: 05/01/2024) |
| 05/06/2024 | 304 | NOTICE OF SERVICE of Defendants' First Supplemental Objections and Responses to Plaintiffs' Fourth Set of Interrogatories (No. 18) − filed by Moderna, Inc., ModernaTX, Inc..(Murray, Travis) (Entered: 05/06/2024) |
| 05/06/2024 | 305 | NOTICE to Take Deposition of Stephane Bancel on May 30, 2024 filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.(Hoeschen, Nathan) (Entered: 05/06/2024) |
| 05/06/2024 | 306 | STIPULATION TO EXTEND TIME to file a motion to seal Plaintiffs' Amended Complaint (D.I. 301), pursuant to D.I. 299, to May 9, 2024 − filed by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) (Entered: 05/06/2024) |
| 05/07/2024 | 307 | NOTICE OF SERVICE of Supplemental Infringement Contentions filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.(Keller, Karen) (Entered: 05/07/2024) |
| 05/08/2024 | 308 | STIPULATION AND ORDER: The deadline to file a motion to seal Plaintiff's Amended Complaint (D.I. 301 ), pursuant to D.I. 299 , shall be extended from May 6, 2024 to May 9, 2024. Signed by Judge Mitchell S. Goldberg on 5/8/2024. (mpb) (Entered: 05/08/2024) |
| 05/08/2024 | 309 | MOTION for Pro Hac Vice Appearance of Attorney Ricardo Leyva and Kathryn Larkin − filed by Genevant Sciences GmbH. (Hoeschen, Nathan) (Entered: 05/08/2024) |
| 05/08/2024 | 310 | Pro Hac Vice Fee − Credit Card Payment received for Ricardo Leyva and Kathryn Larkin. ( re 309 MOTION for Pro Hac Vice Appearance of Attorney Ricardo Leyva and Kathryn Larkin )( Payment of $ 100, receipt number |

| | | |
|---|---|---|
| | | ADEDC−4402486).(Hoeschen, Nathan) (Entered: 05/08/2024) |
| 05/09/2024 | 311 | ORDER granting D.I. 309 MOTION for Pro Hac Vice Appearance of Attorney Ricardo Leyva and Kathryn Larkin. Signed by Judge Mitchell S. Goldberg on 5/9/2024. (mpb) (Entered: 05/09/2024) |
| 05/09/2024 | | Pro Hac Vice Attorney Ricardo Leyva for Genevant Sciences GmbH added for electronic noticing. Pursuant to Local Rule 83.5 (d)., Delaware counsel shall be the registered users of CM/ECF and shall be required to file all papers. (oam) (Entered: 05/09/2024) |
| 05/09/2024 | | Pro Hac Vice Attorney Kathryn E. Larkin for Genevant Sciences GmbH added for electronic noticing. Pursuant to Local Rule 83.5 (d)., Delaware counsel shall be the registered users of CM/ECF and shall be required to file all papers. (oam) (Entered: 05/09/2024) |
| 05/09/2024 | 312 | MOTION and [Proposed] Order to Seal Portions of Plaintiffs' Amended Complaint (D.I. 301) − filed by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) (Entered: 05/09/2024) |
| 05/09/2024 | 313 | [SEALED] OPENING BRIEF in Support re 312 MOTION and [Proposed] Order to Seal Portions of Plaintiffs' Amended Complaint (D.I. 301) − filed by Moderna, Inc., ModernaTX, Inc..Answering Brief/Response due date per Local Rules is 5/23/2024. (Attachments: # 1 Ex. A (Parsons Declaration), # 2 Ex. B − Highlighted Amended Complaint, # 3 Ex. C − Redacted Amended Complaint, # 4 Amended Complaint Exhibits A−C, # 5 Amended Complaint Exhibits D−F)(Murray, Travis) (Entered: 05/09/2024) |
| 05/13/2024 | 314 | ORDER, granting re 312 MOTION and [Proposed] Order to Seal Portions of Plaintiffs' Amended Complaint (D.I. 301 ). Signed by Judge Mitchell S. Goldberg on 05/13/2024. (vfm) (Entered: 05/13/2024) |
| 05/13/2024 | 315 | NOTICE OF SERVICE of (1) Defendants' Third Supplemental Objections and Responses to Plaintiffs' Third Set of Interrogatories (Nos. 12−17) and (2) Defendants' Twelfth Supplemental Objections and Responses to Plaintiffs' First Set of Interrogatories (Nos. 1−10) − filed by Moderna, Inc., ModernaTX, Inc..(Murray, Travis) (Entered: 05/13/2024) |
| 05/13/2024 | 316 | REDACTED VERSION of 313 Opening Brief in Support, by Moderna, Inc., ModernaTX, Inc.. (Attachments: # 1 Ex. A (Parsons Declaration), # 2 Ex. B − Highlighted Amended Complaint, # 3 Ex. C − Redacted Amended Complaint, # 4 Amended Complaint Exhibits A−C, # 5 Amended Complaint Exhibits D−F)(Murray, Travis) (Entered: 05/13/2024) |
| 05/14/2024 | 317 | STIPULATION TO EXTEND TIME for the parties to file an Omnibus Motion to Seal to May 17, 2024 − filed by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) (Entered: 05/14/2024) |
| 05/14/2024 | 318 | STIPULATION AND ORDER re 317 STIPULATION TO EXTEND TIME for the parties to file an Omnibus Motion to Seal to May 17, 2024. Signed by Judge Mitchell S. Goldberg on 5/14/2024. (nmg) (Entered: 05/14/2024) |
| 05/15/2024 | 319 | ORDER: A Discovery Hearing in the above−captioned matter is scheduled for Thursday, June 13, 2024 at 2:00 p.m. in Courtroom 17A, U.S. Courthouse, 601 Market Street, Philadelphia, Pa. Signed by Judge Mitchell S. Goldberg on 05/15/2024. (vfm) (Entered: 05/15/2024) |
| 05/15/2024 | 320 | [SEALED] MOTION and [Proposed] Order to Seal Portions of Moderna's Answer to the Amended Complaint − filed by Moderna, Inc., ModernaTX, Inc.. (Attachments: # 1 Exhibit A − proposed redactions, # 2 Exhibit B − REDACTED Answer to Amended Complaint and Counterclaims)(Egan, Brian) (Entered: 05/15/2024) |
| 05/15/2024 | 321 | [SEALED] ANSWER to Amended Complaint, re: 301 Amended Complaint, with Jury Demand , COUNTERCLAIM against Arbutus Biopharma Corporation, Genevant Sciences GmbH by Moderna, Inc., ModernaTX, Inc..(Egan, Brian) (Entered: 05/15/2024) |

| | | |
|---|---|---|
| 05/17/2024 | 322 | MOTION to Seal Document: 302 Letter, 285 Letter, 278 Letter,, 294 Letter, *(Defendants' Omnibus Motion to Seal and [Proposed] Order)* − filed by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) (Entered: 05/17/2024) |
| 05/17/2024 | 323 | [SEALED] OPENING BRIEF in Support re 322 MOTION to Seal Document: 302 Letter, 285 Letter, 278 Letter,, 294 Letter, *(Defendants' Omnibus Motion to Seal and [Proposed] Order)* − filed by Moderna, Inc., ModernaTX, Inc..Answering Brief/Response due date per Local Rules is 5/31/2024. (Attachments: # 1 Exhibit A − Parsons Declaration ISO Omnibus Motion to Seal, # 2 Exhibit B − Bennett Declaration ISO Omnibus Motion to Seal, # 3 [Highlighted] D.I. 278 − Motion to Amend and exhibits, # 4 [Redacted] D.I. 278 − Motion to Amend and exhibits, # 5 [Highlighted] D.I. 285 − Motion to Compel and exhibits, # 6 [Redacted] D.I. 285 − Motion to Compel and exhibits, # 7 [Highlighted] D.I. 294 − Bancel Opposition, # 8 [Redacted] D.I. 294 − Bancel Opposition, # 9 [Highlighted] D.I. 302 − 30(b)(6) Opposition, # 10 [Redacted] D.I. 302 − 30(b)(6) Opposition)(Murray, Travis) (Entered: 05/17/2024) |
| 05/20/2024 | 324 | ORDER granting D.I. 322 Motion to Seal Document. Signed by Judge Mitchell S. Goldberg on 5/20/2024. (apk) (Entered: 05/20/2024) |
| 05/20/2024 | 325 | REDACTED VERSION of 323 Opening Brief in Support,,, by Moderna, Inc., ModernaTX, Inc.. (Attachments: # 1 Exhibit A − Parsons Declaration ISO Omnibus Motion to Seal, # 2 Exhibit B − Bennett Declaration ISO Omnibus Motion to Seal, # 3 [Highlighted] D.I. 278 − Motion to Amend and exhibits, # 4 [Redacted] D.I. 278 − Motion to Amend and exhibits, # 5 [Highlighted] D.I. 285 − Motion to Compel and exhibits, # 6 [Redacted] D.I. 285 − Motion to Compel and exhibits, # 7 [Highlighted] D.I. 294 − Bancel Opposition, # 8 [Redacted] D.I. 294 − Bancel Opposition, # 9 [Highlighted] D.I. 302 − 30(b)(6) Opposition, # 10 [Redacted] D.I. 302 − 30(b)(6) Opposition)(Murray, Travis) (Entered: 05/20/2024) |
| 05/24/2024 | 326 | NOTICE OF SERVICE of (1) Amended Rule 26(a) Initial Disclosures of Plaintiff Arbutus Biopharma Corporation; and (2) Amended Rule 26(a) Initial Disclosures of Plaintiff Genevant Sciences GmbH filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.(Hoeschen, Nathan) (Entered: 05/24/2024) |
| 05/28/2024 | 327 | NOTICE OF SERVICE of Plaintiff Genevant Sciences GmbHs First Supplemental Responses and Objections to Dfendants Moderna, Inc. and ModernaTX, Inc.s Fifth Set of Interrogatories (No. 20) filed by Genevant Sciences GmbH.(Hoeschen, Nathan) (Entered: 05/28/2024) |
| 05/29/2024 | 328 | NOTICE OF SERVICE of Plaintiff Arbutus Biopharma Corporation's Eighth Supplemental Responses and Objections to Defendants Moderna, Inc. and ModernaTX, Inc.'s First Set of Interrogatories (Nos. 3) filed by Arbutus Biopharma Corporation.(Hoeschen, Nathan) (Entered: 05/29/2024) |
| 05/30/2024 | 329 | NOTICE to Take Deposition of Huijuan Li on June 11, 2024 filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.(Hoeschen, Nathan) (Entered: 05/30/2024) |
| 05/31/2024 | 330 | STIPULATION TO EXTEND TIME for fact discovery to dates as outlined in stipulation − filed by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) (Entered: 05/31/2024) |
| 06/03/2024 | 331 | [SEALED] Letter to The Honorable Mitchell S. Goldberg from Nathan R. Hoeschen regarding Discovery Dispute. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15)(Hoeschen, Nathan) (Entered: 06/03/2024) |
| 06/04/2024 | 332 | STIPULATION TO EXTEND TIME for any motion to seal Plaintiffs' Opening Letter (D.I. 331) and Moderna's Opposition Letter to be filed in one motion to seal to June 18, 2024 − filed by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) (Entered: 06/04/2024) |
| 06/04/2024 | 333 | STIPULATION AND ORDER regarding D.I. 332 STIPULATION TO EXTEND TIME for any motion to seal Plaintiffs' Opening Letter (D.I. 331 ) and Moderna's Opposition Letter to be filed in one motion to seal to June 18, 2024. Signed by Judge Mitchell S. Goldberg on 6/4/2024. (apk) (Entered: 06/04/2024) |

| | | |
|---|---|---|
| 06/05/2024 | 334 | ANSWER to 321 Answer to Amended Complaint, Counterclaim *[Plaintiffs Arbutus Biopharma Corporation and Genevant Sciences GmbH's Answer to Defendants Moderna, Inc. and ModernaTX, Inc.'s Counterclaims]* by Arbutus Biopharma Corporation, Genevant Sciences GmbH.(Hoeschen, Nathan) (Entered: 06/05/2024) |
| 06/06/2024 | 335 | STIPULATION AND ORDER regarding D.I. 330 STIPULATION TO EXTEND TIME for fact discovery to dates as outlined in stipulation. Signed by Judge Mitchell S. Goldberg on 6/5/2024. (apk) (Entered: 06/06/2024) |
| 06/06/2024 | 336 | NOTICE OF SERVICE of 1. Plaintiff Genevant Science GmbH's Tenth Supplemental Responses and Objections to Defendant Moderna, Inc. and ModernaTX, Inc.'s First Set of Interrogatories (No. 5) 2.Plaintiff Arbutus Biopharma Corporation's Ninth Supplemental Responses and Objections to Defendant Moderna, Inc. and ModernaTX, Inc.'s First Set of Interrogatories (No. 5) filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.(Hoeschen, Nathan) (Entered: 06/06/2024) |
| 06/07/2024 | 337 | ORDER: The Discovery Hearing in the above−captioned matter originally scheduled for Thursday, June 13, 2024 at 2:00 p.m. shall be RESCHEDULED to 11:00 a.m. on Thursday, June 13 2024 in Courtroom 17A, U.S. Courthouse, 601 Market Street, Philadelphia, PA. Signed by Judge Mitchell S. Goldberg on 6/7/2024. (apk) (Entered: 06/07/2024) |
| 06/10/2024 | 338 | ORDER granting D.I. 320 MOTION and [Proposed] Order to Seal Portions of Moderna's Answer to the Amended Complaint. Signed by Judge Mitchell S. Goldberg on 6/10/2024. (apk) (Entered: 06/10/2024) |
| 06/10/2024 | 339 | MOTION for Pro Hac Vice Appearance of Attorney Noah Frank and Mara L. Greenberg of KIRKLAND & ELLIS LLP − filed by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) (Entered: 06/10/2024) |
| 06/10/2024 | 340 | Pro Hac Vice Fee − Credit Card Payment received for Noah Frank and Mara L. Greenberg. ( re 339 MOTION for Pro Hac Vice Appearance of Attorney Noah Frank and Mara L. Greenberg of KIRKLAND & ELLIS LLP )( Payment of $ 100, receipt number ADEDC−4426263).(Murray, Travis) (Entered: 06/10/2024) |
| 06/10/2024 | 341 | [SEALED] Letter to The Honorable Mitchell S. Goldberg from Travis J. Murray regarding Motion to Compel Discovery from Plaintiffs and Roivant Sciences. (Attachments: # 1 Exhibit 1 − Genevant Confidential Document, # 2 Exhibit 2 − Feb. to Apr. 2024 Email Chain, # 3 Exhibit 3 − Zorn Rough Deposition Transcript, # 4 Exhibit 4 − Modernas RFPs, # 5 Exhibit 5 − Roivant Subpoena, # 6 Exhibit 6 − Genevant Lobbying Report, # 7 Exhibit 7 − Roivant Lobbying Expenditures, # 8 Exhibit 8 − May to June 2024 Email Chain)(Murray, Travis) (Entered: 06/10/2024) |
| 06/10/2024 | 342 | NOTICE OF SERVICE of 1. Plaintiffs' Second Supplemental Infringement Contentions 2. Plaintiff Genevant Sciences GmbH's Responses and Objections to Defendants Moderna, Inc. and ModernaTX, Inc.'s Second Set of Requests for Admission (Nos. 9 − 44) 3. Plaintiff Genevant Sciences GmbH's Responses and Objections to Defendants Moderna, Inc. and ModernaTX, Inc.'s Sixth Set of Interrogatories (Nos. 23 − 25) 4. Plaintiff Genevant Sciences GmbH's Eleventh Supplemental Responses and Objections to Defendants Moderna, Inc. and ModernaTX, Inc.'s First Set of Interrogatories (Nos. 1 − 7) 5. Plaintiff Genevant Sciences GmbH's Second Supplemental Responses and Objections to Defendants Moderna, Inc. and ModernaTX, Inc.'s Second Set of Interrogatories (No. 8 − 10) 6. Plaintiff Genevant Sciences GmbH's Second Supplemental Responses and Objections to Defendants Moderna, Inc. and ModernaTX, Inc.'s Fifth Set of Interrogatories (Nos. 18 − 22) 7. Plaintiff Genevant Sciences GmbH's First Supplemental Responses and Objections to Defendants Moderna, Inc. and ModernaTX, Inc.'s Fourth Set of Interrogatories (Nos. 14 − 17) 8. Plaintiff Genevant Sciences GmbH's First Supplemental Responses and Objections to Defendants Moderna, Inc. and ModernaTX, Inc.'s Third Set of Interrogatories (Nos. 11 − 13) 9. Plaintiff Arbutus Biopharma Corporation's Responses and Objections to Defendants Moderna, Inc. and ModernaTX's Sixth Set of Interrogatories (Nos. 23 − 25) 10. Plaintiff Arbutus Biopharma Corporation's Responses and Objections to Defendants Moderna, Inc. and ModernaTX's Second Set of Requests for Admission (Nos. 9 − 44) 11. Plaintiff Arbutus Biopharma Corporation's First Supplemental Responses and Objections to Defendants Moderna, Inc. and ModernaTX, Inc.'s Fifth Set of Interrogatories (Nos. 18 − 22) 12. Plaintiff Arbutus Biopharma Corporation's First Supplemental Responses |

| | | |
|---|---|---|
| | | and Objections to Defendants Moderna, Inc. and ModernaTX, Inc.'s Third Set of Interrogatories (Nos. 11− 13) 13. Plaintiff Arbutus Biopharma Corporation's Tenth Supplemental Responses and Objections to Defendants Moderna, Inc. and ModernaTX, Inc.'s First Set of Interrogatories (Nos. 1 − 7 ) 14. Plaintiff Arbutus Biopharma Corporation's First Supplemental Responses and Objections to Defendants Moderna, Inc. and ModernaTX, Inc.'s Fourth Set of Interrogatories (Nos.14 − 17) 15. Plaintiff Arbutus Biopharma Corporation's Second Supplemental Responses and Objections to Defendants Moderna, Inc. and ModernaTX, Inc.'s Second Set of Interrogatories (Nos. 8 − 10) filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.(Keller, Karen) (Entered: 06/10/2024) |
| 06/10/2024 | 343 | REDACTED VERSION of 320 MOTION and [Proposed] Order to Seal Portions of Moderna's Answer to the Amended Complaint by Moderna, Inc., ModernaTX, Inc.. (Attachments: # 1 Exhibit A − proposed redactions, # 2 Exhibit B − REDACTED Answer to Amended Complaint and Counterclaims)(Murray, Travis) (Entered: 06/10/2024) |
| 06/10/2024 | 344 | REDACTED VERSION of 321 Answer to Amended Complaint, Counterclaim by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) (Entered: 06/10/2024) |
| 06/10/2024 | 345 | [SEALED] Letter to The Honorable Mitchell S. Goldberg from Brian P. Egan regarding Opposition to Plaintiffs' Motion to Compel (D.I. 313) − re 313 Opening Brief in Support,. (Attachments: # 1 Ex A − 03/13/24 Email from Lachman to Y. Li re Interrogatory 18, # 2 Ex. B − 04/10/24 Letter from M. Lachman to Y. Li re ROG No. 18, # 3 Ex. C − 04/19/24 Letter to Lachman re Interrogatory 18)(Egan, Brian) (Entered: 06/10/2024) |
| 06/10/2024 | 346 | REQUEST for Oral Argument by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Hoeschen, Nathan) (Entered: 06/10/2024) |
| 06/11/2024 | 347 | NOTICE OF SERVICE of (1) Amended Defendants' Rule 26(a) Initial Disclosure Statement; (2) Defendants' Responses and Objections to Plaintiffs' First Set of Requests for Admission to Defendants (Nos. 1−50); (3) Defendants' Objections and Responses to Plaintiffs' Fifth Set of Interrogatories (Nos. 19−25); (4) Defendants' Fourth Supplemental Objections and Responses to Plaintiffs' Third Set of Interrogatories (Nos. 12−17); (5) Defendants' Thirteenth Supplemental Objections and Responses to Plaintiffs' First Set of Interrogatories (Nos. 1−10); and (6) Defendants' Fourteenth Supplemental Objections and Responses to Plaintiffs' First Set of Interrogatories (Nos. 1−10) − filed by Moderna, Inc., ModernaTX, Inc..(Murray, Travis) (Entered: 06/11/2024) |
| 06/11/2024 | 348 | [SEALED] Letter to The Honorable Mitchell S. Goldberg from Nathan R. Hoeschen regarding Opposition to Motion to Compel Plaintiffs & Roivant − re 341 Letter,. (Attachments: # 1 Exhibit 9, # 2 Exhibit 10, # 3 Exhibit 11, # 4 Exhibit 12, # 5 Exhibit 13, # 6 Exhibit 14)(Hoeschen, Nathan) (Main Document 348 replaced on 6/11/2024) (jfm). Modified on 6/11/2024 (jfm). (Entered: 06/11/2024) |
| 06/11/2024 | | Remark: Letter filed at D.I. 348 has been replaced per Counsel's request and linked to the correct D.I. number. (jfm) (Entered: 06/11/2024) |
| 06/11/2024 | 349 | REQUEST for Oral Argument by Moderna, Inc., ModernaTX, Inc.. (Egan, Brian) (Entered: 06/11/2024) |
| 06/12/2024 | 350 | ORDER granting 339 Motion to Appear Pro Hac Vice of Noah Frank and Mara L. Greenberg. Signed by Judge Mitchell S. Goldberg on 6/12/2024. (apk) (Entered: 06/12/2024) |
| 06/13/2024 | | Minute Entry for proceedings held before Judge Mitchell S. Goldberg − Discovery Hearing held on 6/13/2024. (Court Reporter Jimmy Cruz.) (rlr) (Entered: 06/13/2024) |
| 06/13/2024 | 351 | STIPULATION TO EXTEND TIME to file any motions to seal the letters (D.I. 331, 341, 345 and 348) to June 20, 2024 − filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Hoeschen, Nathan) (Entered: 06/13/2024) |
| 06/14/2024 | 352 | STIPULATION AND ORDER regarding D.I. 351 STIPULATION TO EXTEND TIME to file any motions to seal the letters (D.I. 331, 341, 345 and 348) to June 20, 2024. Signed by Judge Mitchell S. Goldberg on 6/14/2024. (rlr) (Entered: 06/14/2024) |

| | | |
|---|---|---|
| 06/17/2024 | 353 | Letter to The Honorable Mitchell S. Goldberg from Travis Murray regarding Bancel Deposition − re 285 Letter,. (Murray, Travis) (Entered: 06/17/2024) |
| 06/17/2024 | 354 | Official Transcript of Discovery Conference Hearing held on 06/13/2024 before Judge Mitchell S. Goldberg. Court Reporter/Transcriber Sue DiPierro, Email: jjcourt@jjcourt.com. Transcript may be viewed at the court public terminal or order/purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date, it may be obtained through PACER Redaction Request due 7/8/2024. Redacted Transcript Deadline set for 7/18/2024. Release of Transcript Restriction set for 9/16/2024. (jfm) (Entered: 06/17/2024) |
| 06/20/2024 | 355 | ORDER: The discovery motions are GRANTED IN PART and DENIED IN PART as set forth herein. The fact discovery deadline is extended to July 17, 2024, for the sole purpose of completing the ordered discovery. No other deadlines in the current schedule shall be amended at this time. Signed by Judge Mitchell S. Goldberg on 6/20/2024. (apk) (Entered: 06/20/2024) |
| 06/20/2024 | 356 | MOTION to Seal Document: 341 Letter,, *[Motion to Seal Exhibit 1 to Moderna's Motion to Compel (D.I. 341)]* − filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Attachments: # 1 Text of Proposed Order)(Hoeschen, Nathan) (Entered: 06/20/2024) |
| 06/20/2024 | 357 | MOTION to Seal Document: 331 Letter, 345 Letter, *(Defendants' Omnibus Motion to Seal and [Proposed] Order)* − filed by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) (Entered: 06/20/2024) |
| 06/20/2024 | 358 | [SEALED] OPENING BRIEF in Support re 357 MOTION to Seal Document: 331 Letter, 345 Letter, *(Defendants' Omnibus Motion to Seal and [Proposed] Order)* −− filed by Moderna, Inc., ModernaTX, Inc..Answering Brief/Response due date per Local Rules is 7/5/2024. (Attachments: # 1 Ex. A − Executed Friebertshaeuser Declaration, # 2 D.I. 331 HIGHLIGHTED − Letter to Judge Goldberg re Discovery Dispute, # 3 D.I. 331 HIGHLIGHTED − Exhibit 1, # 4 D.I. 331 HIGHLIGHTED − Exhibit 2, # 5 D.I. 331 HIGHLIGHTED − Exhibit 3, # 6 D.I. 331 HIGHLIGHTED − Exhibit 4, # 7 D.I. 331 HIGHLIGHTED − Exhibit 5, # 8 D.I. 331 HIGHLIGHTED − Exhibit 6, # 9 D.I. 331 HIGHLIGHTED − Exhibit 7, # 10 D.I. 331 HIGHLIGHTED − Exhibit 8, # 11 D.I. 331 HIGHLIGHTED − Exhibit 9, # 12 D.I. 331 HIGHLIGHTED − Exhibit 10, # 13 D.I. 331 HIGHLIGHTED − Exhibit 11, # 14 D.I. 331 HIGHLIGHTED − Exhibit 12, # 15 D.I. 331 HIGHLIGHTED − Exhibit 13, # 16 D.I. 331 HIGHLIGHTED − Exhibit 14, # 17 D.I. 331 HIGHLIGHTED − Exhibit 15, # 18 D.I. 331 REDACTED − Letter to Judge Goldberg re Discovery Dispute, # 19 D.I. 331 REDACTED − Exhibit 1, # 20 D.I. 331 REDACTED −Exhibit 2, # 21 D.I. 331 REDACTED −Exhibit 3, # 22 D.I. 331 REDACTED − Exhibit 4, # 23 D.I. 331 REDACTED −Exhibit 5, # 24 D.I. 331 REDACTED − Exhibit 6, # 25 D.I. 331 REDACTED − Exhibit 7, # 26 D.I. 331 REDACTED − Exhibit 8, # 27 D.I. 331 REDACTED − Exhibit 9, # 28 D.I. 331 REDACTED − Exhibit 10, # 29 D.I. 331 REDACTED − Exhibit 11, # 30 D.I. 331 REDACTED − Exhibit 12, # 31 D.I. 331 REDACTED −Exhibit 13, # 32 D.I. 331 REDACTED − Exhibit 14, # 33 D.I. 331 REDACTED −Exhibit 15, # 34 HIGHLIGHTED D.I. 345 Letter to Judge Goldberg, # 35 HIGHLIGHTED D.I. 345 Ex. A, # 36 HIGHLIGHTED D.I. 345 Ex. B, # 37 HIGHLIGHTED D.I. 345 Ex. C, # 38 REDACTED D.I. 345 Letter to Judge Goldberg, # 39 REDACTED D.I. 345 Ex. A, # 40 REDACTED D.I. 345 Ex. B, # 41 REDACTED D.I. 345 Ex. C)(Murray, Travis) (Entered: 06/20/2024) |
| 06/21/2024 | 359 | ORDER: Upon consideration of Plaintiffs' Motion to Seal (D.I. 356 ) IT IS HEREBY ORDERED, this 21st day of June, 2024 that the Motion is GRANTED. Leave is given for Plaintiffs to file a public version of D.I. 341 which redacts Exhibit 1 in its entirety. Signed by Judge Mitchell S. Goldberg on 6/21/2024. (apk) (Entered: 06/21/2024) |
| 06/21/2024 | 360 | ORDER: The Court having considered Moderna's Omnibus Motion to Seal (D.I. 357 ), IT IS HEREBY ORDERED this 21st, day of June 2024 that the Motion is GRANTED. Leave is given for the Parties to file Plaintiffs' June 6, 2024 Letter to Judge Goldberg regarding Discovery Disputes (D.I. 331 ) and Exhibits 2−3 and 5−15 thereto as well as Moderna's Opposition (D.I. 345 ) and Exhibits B and C thereto in redacted form. Signed by Judge Mitchell S. Goldberg on 6/21/2024. (apk) (Entered: 06/21/2024) |
| 06/21/2024 | 361 | REDACTED VERSION of 358 Opening Brief in Support,,,,,,, by Moderna, Inc., ModernaTX, Inc.. (Attachments: # 1 Ex. A − Executed Friebertshaeuser Declaration, # |

| | | |
|---|---|---|
| | | 2 D.I. 331 HIGHLIGHTED − Letter to Judge Goldberg re Discovery Dispute, # 3 D.I. 331 HIGHLIGHTED − Exhibit 1, # 4 D.I. 331 HIGHLIGHTED − Exhibit 2, # 5 D.I. 331 HIGHLIGHTED − Exhibit 3, # 6 D.I. 331 HIGHLIGHTED − Exhibit 4, # 7 D.I. 331 HIGHLIGHTED − Exhibit 5, # 8 D.I. 331 HIGHLIGHTED − Exhibit 6, # 9 D.I. 331 HIGHLIGHTED − Exhibit 7, # 10 D.I. 331 HIGHLIGHTED − Exhibit 8, # 11 D.I. 331 HIGHLIGHTED − Exhibit 9, # 12 D.I. 331 HIGHLIGHTED − Exhibit 10, # 13 D.I. 331 HIGHLIGHTED − Exhibit 11, # 14 D.I. 331 HIGHLIGHTED − Exhibit 12, # 15 D.I. 331 HIGHLIGHTED − Exhibit 13, # 16 D.I. 331 HIGHLIGHTED − Exhibit 14, # 17 D.I. 331 HIGHLIGHTED − Exhibit 15, # 18 D.I. 331 REDACTED − Letter to Judge Goldberg re Discovery Dispute, # 19 D.I. 331 REDACTED − Exhibit 1, # 20 D.I. 331 REDACTED − Exhibit 2, # 21 D.I. 331 REDACTED − Exhibit 3, # 22 D.I. 331 REDACTED − Exhibit 4, # 23 D.I. 331 REDACTED − Exhibit 5, # 24 D.I. 331 REDACTED − Exhibit 6, # 25 D.I. 331 REDACTED − Exhibit 7, # 26 D.I. 331 REDACTED − Exhibit 8, # 27 D.I. 331 REDACTED − Exhibit 9, # 28 D.I. 331 REDACTED − Exhibit 10, # 29 D.I. 331 REDACTED − Exhibit 11, # 30 D.I. 331 REDACTED − Exhibit 12, # 31 D.I. 331 REDACTED − Exhibit 13, # 32 D.I. 331 REDACTED − Exhibit 14, # 33 D.I. 331 REDACTED − Exhibit 15, # 34 HIGHLIGHTED D.I. 345 Letter to Judge Goldberg, # 35 HIGHLIGHTED D.I. 345 Ex. A, # 36 HIGHLIGHTED D.I. 345 Ex. B, # 37 HIGHLIGHTED D.I. 345 Ex. C, # 38 REDACTED D.I. 345 Letter to Judge Goldberg, # 39 REDACTED D.I. 345 Ex. A, # 40 REDACTED D.I. 345 Ex. B, # 41 REDACTED D.I. 345 Ex. C)(Murray, Travis) (Entered: 06/21/2024) |
| 06/21/2024 | 362 | STIPULATION TO EXTEND TIME regarding various scheduling order deadlines to various dates (see Stipulation) − filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Hoeschen, Nathan) (Entered: 06/21/2024) |
| 06/24/2024 | 363 | STIPULATION AND ORDER regarding D.I. 362 STIPULATION TO EXTEND TIME regarding various scheduling order deadlines to various dates. Signed by Judge Mitchell S. Goldberg on 6/24/2024. (apk) (Entered: 06/24/2024) |
| 06/24/2024 | 364 | REDACTED VERSION of 341 Letter,, by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (DiBenedetto, Emily) (Entered: 06/24/2024) |
| 06/27/2024 | 365 | NOTICE OF SERVICE of Defendants' Fifteenth Supplemental Objections and Responses to Plaintiffs' First Set of Interrogatories (Nos. 1−10) filed by Moderna, Inc., ModernaTX, Inc..(Murray, Travis) (Entered: 06/27/2024) |
| 06/27/2024 | 366 | Letter to The Honorable Mitchell S. Goldberg from Brian P. Egan regarding clarification of June 20, 2024 Order − re 355 Order,, Set Scheduling Order Deadlines,. (Egan, Brian) (Entered: 06/27/2024) |
| 06/28/2024 | 367 | NOTICE OF SERVICE of Moderna's Final Invalidity Contentions − filed by Moderna, Inc., ModernaTX, Inc..(Murray, Travis) (Entered: 06/28/2024) |
| 07/01/2024 | 368 | NOTICE OF SERVICE of Plaintiffs' Third Supplemental Infringement Contentions filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.(DiBenedetto, Emily) (Entered: 07/01/2024) |
| 07/01/2024 | 369 | [SEALED] Unopposed MOTION for Issuance of a Request for Judicial Assistance Under the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters − filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Hoeschen, Nathan) (Entered: 07/01/2024) |
| 07/01/2024 | 370 | STIPULATION TO EXTEND TIME to exchange lobbying documents to July 5, 2024 − filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (DiBenedetto, Emily) (Entered: 07/01/2024) |
| 07/02/2024 | 371 | SO ORDERED, re 370 STIPULATION TO EXTEND TIME to exchange lobbying documents to July 5, 2024 filed by Genevant Sciences GmbH, Arbutus Biopharma Corporation. Signed by Judge Mitchell S. Goldberg on 7/2/2024. (mpb) (Entered: 07/02/2024) |
| 07/02/2024 | 372 | STIPULATION TO EXTEND TIME to file a motion to seal Plaintiffs' Unopposed Motion for Issuance of a Request for Judicial Assistance Under the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters (D.I. 369) to July |

| | | |
|---|---|---|
| | | 12, 2024 − filed by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) (Entered: 07/02/2024) |
| 07/02/2024 | 373 | STIPULATION AND ORDER TO EXTEND regarding D.I. 372 STIPULATION TO EXTEND TIME to file a motion to seal Plaintiffs' Unopposed Motion for Issuance of a Request for Judicial Assistance Under the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters (D.I. 369 ) to July 12, 2024. Signed by Judge Mitchell S. Goldberg on 07/02/2024. (vfm) (Entered: 07/02/2024) |
| 07/05/2024 | 374 | Joint NOTICE of the parties to unseal by Moderna, Inc., ModernaTX, Inc. re 369 Unopposed MOTION for Issuance of a Request for Judicial Assistance Under the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters (Murray, Travis) (Entered: 07/05/2024) |
| 07/05/2024 | 375 | STIPULATION and [Proposed] Order Regarding the Parties' Production of Lobbying and Other Non−Lobbying Documents − by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) (Entered: 07/05/2024) |
| 07/08/2024 | 376 | [SEALED] ORDER granting D.I. 369 Unopposed MOTION for Issuance of a Request for Judicial Assistance Under the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters. Signed by Judge Mitchell S. Goldberg on 7/8/2024. (Attachments: # 1 Letters Rogatory (1), # 2 Letters Rogatory (2), # 3 Letters Rogatory (3))This order has been emailed to local counsel. (apk) (Entered: 07/08/2024) |
| 07/08/2024 | 377 | STIPULATION AND ORDER: The deadline to request re−argument of the Court's June 20, 2024 Order is hereby extended to five business days following the Court's resolution of Moderna's request for clarification. Moderna will produce communications between Moderna and the U.S. Government concerning section 1498 and/or the Statement of Interest on July 5, 2024, but reserves all rights in the event that the Court's determination regarding common interest is later modified. (See Order for further details) Signed by Judge Mitchell S. Goldberg on 7/8/2024. (mpb) (Entered: 07/08/2024) |
| 07/08/2024 | 378 | ORDER: It is hereby CLARIFIED that the June 20, 2024 Order determined only that there is no common interest as to communications with the U.S. Government regarding Section 1498 and the Governments Statement of Interest. (See Order for further details) Signed by Judge Mitchell S. Goldberg on 7/8/2024. (mpb) (Entered: 07/08/2024) |
| 07/11/2024 | 379 | NOTICE OF SERVICE of Defendants' Sixteenth Supplemental Objections and Responses to Plaintiffs' First Set of Interrogatories (Nos. 1−10) − filed by Moderna, Inc., ModernaTX, Inc..(Murray, Travis) (Entered: 07/11/2024) |
| 07/15/2024 | 380 | SUBPOENA Returned Executed as to Baxter Pharmaceutical Solutions LLC on July 3, 2024 (Hoeschen, Nathan) (Entered: 07/15/2024) |
| 07/15/2024 | 381 | SUBPOENA Returned Executed as to Lonza Biologics, Inc. on July 2, 2024 (Hoeschen, Nathan) (Entered: 07/15/2024) |
| 07/15/2024 | 382 | SUBPOENA Returned Executed as to Patheon Manufacturing Services LLC on July 2, 2024 (Hoeschen, Nathan) (Entered: 07/15/2024) |
| 07/15/2024 | 383 | SUBPOENA Returned Executed as to Catalent Indiana LLC on July 2, 2024 (Hoeschen, Nathan) (Entered: 07/15/2024) |
| 07/16/2024 | 384 | NOTICE OF SERVICE of Defendants' Corrected Sixteenth Supplemental Objections and Responses to Plaintiffs' First Set of Interrogatories (Nos. 1−10) − filed by Moderna, Inc., ModernaTX, Inc..(Murray, Travis) (Entered: 07/16/2024) |
| 07/17/2024 | 385 | STIPULATION TO EXTEND TIME to file a stipulation or motion to extend the fact discovery deadline related to various subpoenas to July 23, 2024 − filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Hoeschen, Nathan) (Entered: 07/17/2024) |
| 07/18/2024 | 386 | STIPULATION AND ORDER: The Stipulation to Extend Time (D.I. 385 ) is GRANTED. The deadline for the parties to file a stipulation or motion to extend the fact discovery deadline related to these subpoenas is extended through and including |

| | | |
|---|---|---|
| | | July 23, 2024. Signed by Judge Mitchell S. Goldberg on 7/18/2024. (mpb) (Entered: 07/18/2024) |
| 07/19/2024 | | Pro Hac Vice Attorney Noah Frank,Mara L. Greenberg for Moderna, Inc., ModernaTX, Inc. added for electronic noticing. Pursuant to Local Rule 83.5 (d)., Delaware counsel shall be the registered users of CM/ECF and shall be required to file all papers. (mws) (Entered: 07/19/2024) |
| 07/22/2024 | 387 | STIPULATION TO EXTEND TIME regarding expert discovery deadlines and deadlines regarding Daubert and summary judgment motions to various dates (see Stipulation) − filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Hoeschen, Nathan) (Entered: 07/22/2024) |
| 07/23/2024 | 388 | STIPULATION AND ORDER granting the Stipulation to Extend Time (D.I. 387 ). Opening Expert Reports due by 8/5/2024. Rebuttal Expert Reports due by 9/16/2024. Reply Expert Reports due by 10/18/2024. Close of Expert Discovery due by 11/15/2024. Summary Judgment and Daubert Motions due by 12/23/2024. (See Order for further details) Signed by Judge Mitchell S. Goldberg on 7/23/2024. (mpb) (Entered: 07/23/2024) |
| 07/23/2024 | 389 | STIPULATION TO EXTEND TIME for the completion of fact discovery relating to the subpoenas to Lonza Biologics, Inc., Catalent Indiana, LLC; Patheon Manufacturing Services, LLC, and Baxter Pharmaceutical Solutions, LLC and for fact discovery relating to the requests for international judicial assistance to August 23, 2024 and October 17, 2024, respectively − filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Hoeschen, Nathan) (Entered: 07/23/2024) |
| 07/24/2024 | 390 | STIPULATION AND ORDER granting D.I. 389 STIPULATION TO EXTEND TIME. The deadline for the completion of Fact Discovery relating to the subpoenas to Lonza Biologics, Inc., Catalent Indiana, LLC; Patheon Manufacturing Services, LLC, and Baxter Pharmaceutical Solutions, LLC is extended through and including August 23, 2024. The deadline for the completion of Fact Discovery relating to the requests for international judicial assistance is extended through and including October 17, 2024. (See Order for further details) Signed by Judge Mitchell S. Goldberg on 7/24/2024. (mpb) (Entered: 07/24/2024) |
| 08/02/2024 | 391 | NOTICE requesting Clerk to remove Jessica Palmer Ryen as co−counsel.. (Keller, Karen) (Entered: 08/02/2024) |
| 08/05/2024 | 392 | STIPULATION TO EXTEND TIME regarding various Scheduling Order deadlines to various dates (see Stipulation) − filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (DiBenedetto, Emily) (Entered: 08/05/2024) |
| 08/06/2024 | 393 | NOTICE requesting Clerk to remove Philip N. Haunschild as co−counsel.. (Hoeschen, Nathan) (Entered: 08/06/2024) |
| 08/07/2024 | 394 | ORDER: A Status Conference on the record in the above−captioned matter is scheduled for Thursday, August 15, 2024 at 10:00 a.m. The conference will be conducted via telephone and will be on the record. Counsel are directed to dial in as follows: (1) Call: 888−684−8852; (2) Enter access code: 2187450#; (3) Press # to enter as a participant. Ordered by Judge Mitchell S. Goldberg on 08/07/2024. (vfm) (Entered: 08/07/2024) |
| 08/14/2024 | 395 | ORDER: The Status Conference scheduled for Thursday, August 15, 2024 at 10:00 a.m. will now take place at 9:00 a.m. The conference will be conducted via telephone and will be on the record. Counsel are directed to dial in as follows: (1) Call: 888−684−8852; (2) Enter access code: 2187450#; (3) Press # to enter as a participant. Signed by Judge Mitchell S. Goldberg on 8/15/2024. (mpb) (Entered: 08/14/2024) |
| 08/15/2024 | | Minute Entry for proceedings held before Judge Mitchell S. Goldberg − Status Conference held on 8/15/2024. (Court Reporter Jimmy Cruz.) (mpb) (Entered: 08/15/2024) |
| 08/15/2024 | 396 | Order, granting 392 STIPULATION TO EXTEND TIME regarding various Scheduling Order deadlines to various dates (see Stipulation) − filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.. Signed by Judge Mitchell S. Goldberg on 8/15/2024. (jfm) (Entered: 08/15/2024) |

| | | |
|---|---|---|
| 08/15/2024 | 397 | ORDER: The parties shall appear for a conference on April 24, 2025 at 10:00 a.m. in Courtroom 17A. The parties should be prepared to address the following issues: 1. The subject of any proposed summary judgment motion and the basis for that motion; 2. The subject of any proposed Daubert motion and the basis for that motion; 3. The number of Daubert motions each party should be permitted to file; and 4. The number of claims and prior art references that will be litigated at trial. It is FURTHER ORDERED that one week prior to the conference, each party shall submit a letter of no more than four (4) pages addressing the above topics. Signed by Judge Mitchell S. Goldberg on 8/15/2024. (jfm) (Entered: 08/16/2024) |
| 08/16/2024 | 398 | MOTION for Pro Hac Vice Appearance of Attorney Andrew L. Hoffman − filed by Genevant Sciences GmbH. (Hoeschen, Nathan) (Entered: 08/16/2024) |
| 08/16/2024 | 399 | Pro Hac Vice Fee − Credit Card Payment received for Andrew L. Hoffman. ( re 398 MOTION for Pro Hac Vice Appearance of Attorney Andrew L. Hoffman )( Payment of $ 50, receipt number ADEDC−4477741).(Hoeschen, Nathan) (Entered: 08/16/2024) |
| 08/23/2024 | 400 | Unopposed MOTION to Take Depositions of Third−Party Government Witnesses After the Close of Fact Discovery − filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Attachments: # 1 Text of Proposed Order)(Hoeschen, Nathan) (Entered: 08/23/2024) |
| 08/23/2024 | 401 | ORDER: Plaintiffs' Unopposed Motion to take Depositions of Third−Party Government Witnesses After the Close of Fact Discovery (D.I. 400 ), it is hereby ORDERED that the motion is GRANTED. (See Order for further details and dates.) Signed by Judge Mitchell S. Goldberg on 08/23/2024. (vfm) (Entered: 08/23/2024) |
| 08/23/2024 | 402 | STIPULATION TO EXTEND TIME Completion of fact discovery related to subpoenas to September 27, 2024 − filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Hoeschen, Nathan) (Entered: 08/23/2024) |
| 08/26/2024 | 403 | STIPULATION AND ORDER granting D.I. 402 Stipulation to Extend Time. The deadline for the completion of fact discovery relating to the subpoenas to Lonza Biologics, Inc., Catalent Indiana, LLC; Patheon Manufacturing Services, LLC, and Baxter Pharmaceutical Solutions, LLC is extended through and including September 27, 2024. Signed by Judge Mitchell S. Goldberg on 8/26/2024. (mpb) (Entered: 08/26/2024) |
| 08/26/2024 | 404 | Official Transcript of Telephonic Status Conference held on 8/15/2024 before Judge Mitchell S. Goldberg. Court Reporter/Transcriber Coleen Rand, Email: RedDoor Legal Services, LLC (973)−985−3668. Transcript may be viewed at the court public terminal or order/purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date, it may be obtained through PACER Redaction Request due 9/16/2024. Redacted Transcript Deadline set for 9/26/2024. Release of Transcript Restriction set for 11/25/2024. (mpb) (Entered: 08/26/2024) |
| 09/26/2024 | 405 | STIPULATION TO EXTEND TIME for the completion of fact discovery relating to subpoenas to October 17, 2024 − filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (DiBenedetto, Emily) (Entered: 09/26/2024) |
| 09/27/2024 | 406 | STIPULATION AND ORDER granting D.I. 405 Stipulation to Extend Time. The deadline for the completion of fact discovery relating to the subpoenas to Lonza Biologics, Inc., Catalent Indiana, LLC, Patheon Manufacturing Services, LLC, and Baxter Pharmaceutical Solutions, LLC is extended through and including October 17, 2024. Signed by Judge Mitchell S. Goldberg on 9/27/2024. (mpb) (Entered: 09/27/2024) |
| 09/30/2024 | 407 | ORDER granting D.I. 398 MOTION for Pro Hac Vice Appearance of Attorney Andrew L. Hoffman. Signed by Judge Mitchell S. Goldberg on 09/30/2024. (oam) (Entered: 09/30/2024) |
| 10/15/2024 | 408 | STIPULATION TO EXTEND TIME for the completion of fact discovery relating to the subpoenas and Letters of Request to the third−party manufacturers to November 20, 2024 − filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Hoeschen, Nathan) (Entered: 10/15/2024) |

| | | |
|---|---|---|
| 10/15/2024 | 409 | STIPULATION AND ORDER granting D.I. 408 Stipulation to Extend Time. The deadline for the completion of fact discovery relating to the subpoenas and Letters of Request to the third−party manufacturers is extended through and including November 20, 2024. Signed by Judge Mitchell S. Goldberg on 10/15/2024. (mpb) (Entered: 10/16/2024) |
| 10/25/2024 | 410 | MOTION for Extension of Time to *Depose Third−Party Government Witnesses* − filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Attachments: # 1 Certificate of Compliance with Local Rule 7.1.1, # 2 Text of Proposed Order, # 3 Exhibit A, # 4 Exhibit B)(Hoeschen, Nathan) (Entered: 10/25/2024) |
| 10/29/2024 | 411 | ORDER: Having considered Plaintiffs' Motion for a Two−Week Extension of the Deadline to Depose Third−Party Government Witnesses (D.I. 410 ), it is HEREBY ORDERED that the motion is GRANTED and the deadline is extended through and including November 8, 2024. Signed by Judge Mitchell S. Goldberg on 10/29/2024. (mpb) (Entered: 10/29/2024) |
| 11/08/2024 | 412 | STIPULATION TO EXTEND TIME to Depose Third−Party Government Witnesses to November 22, 2024 − filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Hoeschen, Nathan) (Entered: 11/08/2024) |
| 11/14/2024 | 413 | ORDER: The Court having considered the Parties' Stipulation to Extend Time (D.I. 412 ), it is HEREBY ORDERED that the documents referenced may be produced outside the fact discovery deadline. Plaintiffs are directed to produce the documents as soon as practically possible. Signed by Judge Mitchell S. Goldberg on 11/14/2024. (jfm) (Entered: 11/14/2024) |
| 11/19/2024 | 414 | STIPULATION TO EXTEND TIME for the completion of fact discovery relating to the Letters of Request to the foreign third−party manufacturers to December 20, 2024 − filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Hoeschen, Nathan) (Entered: 11/19/2024) |
| 11/20/2024 | 415 | ORDER: The Court having considered the Parties' Stipulation to Extend Time (D.I. 414 ), it is HEREBY ORDERED that the documents referenced may be produced outside the fact discovery deadline. Plaintiffs are directed to produce the documents as soon as practically possible. Signed by Judge Mitchell S. Goldberg on 11/19/2024. (mpb) (Entered: 11/20/2024) |
| 11/22/2024 | 416 | NOTICE OF SERVICE of Plaintiff Genevant Sciences GmbH's Sixth Supplemental Responses and Objections to Defendants Moderna, Inc. and ModernaTX, Inc.'s Interrogatory No. 3 filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.(Keller, Karen) (Entered: 11/22/2024) |
| 11/26/2024 | 417 | NOTICE OF SERVICE of (1) Opening Expert Report of Dr. George W. Rutherford; (2) Opening Expert Report of Christopher A. Vellturo, Ph.D.; (3) Opening Expert Report of Robert Prud'homme, Ph.D.; (4) Expert Report of Pierre Meulien, Ph.D.; and (5) Opening Expert Report of Daniel Griffith Anderson − filed by Moderna, Inc., ModernaTX, Inc..(Murray, Travis) (Entered: 11/26/2024) |
| 11/26/2024 | 418 | NOTICE OF SERVICE of 1) Opening Expert Report of Kimberly A. Benton, Ph.D. 2) Opening Expert Report by Dr. Michael Mitchell 3) Opening Expert Report of Dr. Frederick W. Porter, Ph.D. 4) Opening Report of Dr. Georg Schuster of Coriolis Pharma 5) Expert Report of Catherine M. Lawton filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.(Hoeschen, Nathan) (Entered: 11/26/2024) |
| 01/03/2025 | 419 | NOTICE requesting Clerk to remove Anthony H. Sheh as co−counsel. Reason for request: No Longer with Firm. (Hoeschen, Nathan) (Entered: 01/03/2025) |
| 01/14/2025 | 420 | NOTICE requesting Clerk to remove Jihad J. Komis as co−counsel.. (Hoeschen, Nathan) (Entered: 01/14/2025) |
| 01/15/2025 | 421 | NOTICE OF SERVICE of Plaintiff Genevant Sciences GmbH's Seventh Supplemental Responses and Objections to Defendants Monderna, Inc. and ModernaTX, Inc.'s Interrogatory No. 3 filed by Genevant Sciences GmbH.(Hoeschen, Nathan) (Entered: 01/15/2025) |
| 01/28/2025 | 422 | NOTICE OF SERVICE of First Supplemental Expert Report of Catharine M. Lawton filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.(Keller, Karen) |

| | | |
|---|---|---|
| | | (Entered: 01/28/2025) |
| 01/28/2025 | 423 | NOTICE OF SERVICE of Defendants' Seventeenth Supplemental Objections and Responses to Plaintiffs' First Set of Interrogatories (Nos. 1−10) filed by Moderna, Inc., ModernaTX, Inc..(Murray, Travis) (Entered: 01/28/2025) |
| 02/03/2025 | 424 | MOTION for Pro Hac Vice Appearance of Attorney Andrei Iancu and Jeffrey B. Wall − filed by Genevant Sciences GmbH. (Hoeschen, Nathan) (Entered: 02/03/2025) |
| 02/03/2025 | 425 | Pro Hac Vice Fee − Credit Card Payment received for Andrei Iancu and Jeffrey B. Wall. ( re 424 MOTION for Pro Hac Vice Appearance of Attorney Andrei Iancu and Jeffrey B. Wall )( Payment of $ 100, receipt number ADEDC−4606512).(Hoeschen, Nathan) (Entered: 02/03/2025) |
| 02/11/2025 | 426 | MOTION for Pro Hac Vice Appearance of Attorney Leslie M. Schmidt − filed by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) (Entered: 02/11/2025) |
| 02/11/2025 | 427 | Pro Hac Vice Fee − Credit Card Payment received for Leslie M. Schmidt. ( re 426 MOTION for Pro Hac Vice Appearance of Attorney Leslie M. Schmidt )( Payment of $ 50, receipt number ADEDC−4612112).(Murray, Travis) (Entered: 02/11/2025) |
| 02/11/2025 | 428 | ORDER, granting 424 MOTION for Pro Hac Vice Appearance of Attorney Andrei Iancu and Jeffrey B. Wall. Signed by Judge Mitchell S. Goldberg on 2/11/2025. (jfm) (Entered: 02/11/2025) |
| 02/11/2025 | 429 | ORDER, granting 426 MOTION for Pro Hac Vice Appearance of Attorney Leslie M. Schmidt. Signed by Judge Mitchell S. Goldberg on 2/11/2025. (jfm) (Entered: 02/11/2025) |
| 02/11/2025 | | Pro Hac Vice Attorney Andrei Iancu,Jeffrey B. Wall for Genevant Sciences GmbH added for electronic noticing. Pursuant to Local Rule 83.5 (d)., Delaware counsel shall be the registered users of CM/ECF and shall be required to file all papers. (scs) (Entered: 02/11/2025) |
| 02/18/2025 | 430 | NOTICE OF SERVICE of (1) Rebuttal Expert Report of Owen Shea Fenton, Ph.D., (2) Expert Report of John Godshalk, (3) Rebuttal Expert Report of Pierre Meulien, Ph.D., (4) Rebuttal Expert Report of Robert Prud'homme, Ph.D., and (5) Rebuttal Expert Report of Christopher A. Vellturo, Ph.D. − filed by Moderna, Inc., ModernaTX, Inc..(Murray, Travis) (Entered: 02/18/2025) |
| 02/18/2025 | 431 | NOTICE OF SERVICE of 1) Responsive Expert Report of Dr. Michael Mitchell 2) Responsive Expert Report of Dr. Niren Murthy Regarding Validity 3) Responsive Expert Report of Alex M. Brill 4) Rebuttal Expert Report of Catharine M. Lawton 5) Rebuttal Expert Report of Peter J. Pitts filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.(Keller, Karen) (Entered: 02/18/2025) |
| 02/19/2025 | 432 | MOTION for Pro Hac Vice Appearance of Attorney Arthur J. Argall III − filed by Genevant Sciences GmbH. (Hoeschen, Nathan) (Entered: 02/19/2025) |
| 02/19/2025 | 433 | Pro Hac Vice Fee − Credit Card Payment received for Arthur J. Argall III. ( re 432 MOTION for Pro Hac Vice Appearance of Attorney Arthur J. Argall III )( Payment of $ 50, receipt number ADEDC−4618132).(Hoeschen, Nathan) (Entered: 02/19/2025) |
| 02/19/2025 | 434 | ORDER, granting 432 MOTION for Pro Hac Vice Appearance of Attorney Arthur J. Argall III. Signed by Judge Mitchell S. Goldberg on 02/19/2025. (jfm) (Entered: 02/19/2025) |
| 02/20/2025 | | Pro Hac Vice Attorney Arthur J. Argall, III for Genevant Sciences GmbH added for electronic noticing. Pursuant to Local Rule 83.5 (d)., Delaware counsel shall be the registered users of CM/ECF and shall be required to file all papers. (scs) (Entered: 02/20/2025) |
| 02/20/2025 | 435 | NOTICE OF SERVICE of (1) [Corrected] Rebuttal Expert Report of Christopher A. Vellturo, Ph.D. and (2) [Corrected] Expert Report of John Godshalk − filed by Moderna, Inc., ModernaTX, Inc..(Murray, Travis) (Entered: 02/20/2025) |
| 02/26/2025 | 436 | MOTION for Pro Hac Vice Appearance of Attorney Hannah Suh, Andrew Lee, and Brad Deem − filed by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) (Entered: 02/26/2025) |

| | | |
|---|---|---|
| 02/26/2025 | 437 | Pro Hac Vice Fee − Credit Card Payment received for Hannah Suh, Andrew Lee, and Brad Deem. ( re 436 MOTION for Pro Hac Vice Appearance of Attorney Hannah Suh, Andrew Lee, and Brad Deem )( Payment of $ 150, receipt number ADEDC−4623137).(Murray, Travis) (Entered: 02/26/2025) |
| 02/28/2025 | 438 | ORDER, granting 436 MOTION for Pro Hac Vice Appearance of Attorney Hannah Suh, Andrew Lee, and Brad Deem. Signed by Judge Mitchell S. Goldberg on 2/28/2025. (cdd) (Entered: 02/28/2025) |
| 03/07/2025 | 439 | Joint Letter to The Honorable Mitchell S. Goldberg from Nathan R. Hoeschen regarding the trial date. (Hoeschen, Nathan) (Entered: 03/07/2025) |
| 03/21/2025 | 440 | Letter to The Honorable Mitchell S. Goldberg from Travis J. Murray regarding the Parties SJ Motion and Daubert Motion Letters, April 24, 2025 Hearing and Expert Discovery Deadline. (Attachments: # 1 Ex. A. − Emails, # 2 Ex. B. − Vaxcel International Co. Ltd. v. HeathCo LLC, # 3 Proposed Order)(Murray, Travis) (Entered: 03/21/2025) |
| 03/24/2025 | 441 | NOTICE OF SERVICE of (1) Reply Expert Report of Daniel Griffith Anderson, (2) Reply Expert Report of Pierre Meulien, Ph.D., (3) Reply Invalidity Expert Report of Robert PrudHomme, Ph.D., (4) Reply Expert Report of Dr. George W. Rutherford, (5) Reply Expert Report of Christopher A. Vellturo, Ph.D. Regarding 28 U.S.C. § 1498, and (6) Reply Expert Report of Christopher A. Vellturo, Ph.D. Regarding Commercial Success & Licensing filed by Moderna, Inc., ModernaTX, Inc..(Murray, Travis) (Entered: 03/24/2025) |
| 03/24/2025 | 442 | Letter to The Honorable Mitchell S. Goldberg from Nathan R. Hoeschen regarding Case Schedule. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Hoeschen, Nathan) (Entered: 03/24/2025) |
| 03/24/2025 | 443 | NOTICE OF SERVICE of 1) Reply Expert Report of Dr. Georg Schuster 2) Reply Expert Report of Dr. Niren Murthy 3) Reply Expert Report of Kimberly A. Benton, Ph.D. 4) Reply Expert Report of Dr. Michael Mitchell 5) Reply Expert Report of Dr. Frederick W. Porter 6) Reply Expert Report of Catharine M. Lawton filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.(Keller, Karen) (Entered: 03/24/2025) |
| 03/24/2025 | | Pro Hac Vice Attorney Andrew L. Hoffman for Genevant Sciences GmbH added for electronic noticing. Pursuant to Local Rule 83.5 (d)., Delaware counsel shall be the registered users of CM/ECF and shall be required to file all papers. (scs) (Entered: 03/24/2025) |
| 03/24/2025 | 444 | NOTICE to Take Deposition of Defendants' Experts on Various Dates (See Notice for details) filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.(Hoeschen, Nathan) (Entered: 03/24/2025) |
| 03/25/2025 | 445 | NOTICE of Expert Depositions by Moderna, Inc., ModernaTX, Inc. (Murray, Travis) (Entered: 03/25/2025) |
| 03/28/2025 | 446 | ORDER: The conference to discuss Daubert & summary judgment motions will take place on May 7, 2025. The Jury Trial is scheduled to begin on September 29, 2025. No other dates set forth in the Scheduling Order are amended. Signed by Judge Mitchell S. Goldberg on 3/28/2025. (mpb) (Entered: 03/31/2025) |
| 04/03/2025 | 447 | MOTION for Pro Hac Vice Appearance of Attorney Jason M. Wilcox, P.C. of KIRKLAND & ELLIS LLP − filed by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) (Entered: 04/03/2025) |
| 04/03/2025 | 448 | Pro Hac Vice Fee − Credit Card Payment received for Jason M. Wilcox, P.C.. ( re 447 MOTION for Pro Hac Vice Appearance of Attorney Jason M. Wilcox, P.C. of KIRKLAND & ELLIS LLP )( Payment of $ 50, receipt number ADEDC−4653134).(Murray, Travis) (Entered: 04/03/2025) |
| 04/21/2025 | 449 | NOTICE OF SERVICE of Sur−Reply Expert Report of Dr. Niren Murthy Regarding Validity filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.(Keller, Karen) (Entered: 04/21/2025) |

| | | |
|---|---|---|
| 04/24/2025 | 450 | Emergency Letter to The Honorable Mitchell S. Goldberg from Travis J. Murray regarding Discovery Dispute. (Attachments: # 1 Proposed Order, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12)(Murray, Travis) Modified on 5/5/2025 (jfm). (Entered: 04/24/2025) |
| 04/25/2025 | 451 | Letter to The Honorable Mitchell S. Goldberg from Nathan R. Hoeschen regarding response to Moderna defendants' emergency letter − re 450 Letter,. (Hoeschen, Nathan) (Entered: 04/25/2025) |
| 04/30/2025 | 453 | ORDER: Granting 447 MOTION for Pro Hac Vice Appearance of Attorney Jason M. Wilcox, P.C. of KIRKLAND & ELLIS LLP to represent defendants Moderna, Inc. and ModernaTX, Inc. Signed by Judge Mitchell S. Goldberg on 04/30/2025. (oam) (Entered: 04/30/2025) |
| 04/30/2025 | | CORRECTING ENTRY: Documents previously filed as D.I. 452 on 4/29/2025 have been removed per Counsel's request. Counsel will file and amended letter with the exhibits. (jfm) (Entered: 04/30/2025) |
| 04/30/2025 | 454 | [SEALED] Letter to The Honorable Mitchell S. Goldberg from Nathan R. Hoeschen regarding response to Moderna Defendants' Emergency Letter − re 450 Letter,. (Attachments: # 1 Text of Proposed Order, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H, # 10 Exhibit I, # 11 Exhibit J, # 12 Exhibit K, # 13 Exhibit L)(Hoeschen, Nathan) (Entered: 04/30/2025) |
| 04/30/2025 | 455 | Joint NOTICE of the parties to unseal by Moderna, Inc., ModernaTX, Inc. re 450 Letter, (Murray, Travis) (Entered: 04/30/2025) |
| 05/02/2025 | 456 | Letter to The Honorable Mitchell S. Goldberg from Nathan R. Hoeschen regarding response to the Court's Order of March 28, 2025 − re 446 Order,, Terminate Hearings,, Terminate Scheduling Order Deadlines,, Set Scheduling Order Deadlines,. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G)(Hoeschen, Nathan) Modified on 6/13/2025 (jfm). (Entered: 05/02/2025) |
| 05/02/2025 | 457 | Letter to The Honorable Mitchell S. Goldberg from Brian P. Egan regarding Summary Judgment and Daubert Motions. (Egan, Brian) Modified on 6/13/2025 (jfm). (Entered: 05/02/2025) |
| 05/06/2025 | 458 | NOTICE requesting Clerk to remove Caitlin Dean as co−counsel. Reason for request: No longer with firm. (Murray, Travis) (Entered: 05/06/2025) |
| 05/06/2025 | 459 | MOTION to Seal *Portions of Plaintiffs' Response to Defendants' Emergency Letter (D.I. 454)* − filed by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) (Entered: 05/06/2025) |
| 05/06/2025 | 460 | [SEALED] OPENING BRIEF in Support re 459 MOTION to Seal *Portions of Plaintiffs' Response to Defendants' Emergency Letter (D.I. 454)* filed by Moderna, Inc., ModernaTX, Inc..Answering Brief/Response due date per Local Rules is 5/20/2025. (Attachments: # 1 Attachment 1 Declaration of Jason Fernandez, # 2 Attachment 2 Highlighted version of D.I. 454, # 3 Attachment 3 Redacted version of D.I. 454)(Murray, Travis) (Entered: 05/06/2025) |
| 05/07/2025 | 461 | Minute Entry for proceedings held before Judge Mitchell S. Goldberg − Status Conference held on 5/7/2025. (cdd) (Entered: 05/07/2025) |
| 05/07/2025 | 462 | ORDER: The Parties will meet and confer regarding proposed summary judgment motions and narrowing. It is FURTHER ORDERED that the parties will submit proposals, of no more than four (4) pages, no later than May 13th addressing: 1. The subject of all proposed summary judgment motions, and 2. The Parties' proposal to narrow the number of asserted claims and invalidity defenses. Signed by Judge Mitchell S. Goldberg on 05/07/2025. (jfm) (Entered: 05/07/2025) |
| 05/09/2025 | 463 | Joint NOTICE of the Parties to unseal D.I. 456 and 457 − filed by Moderna, Inc., ModernaTX, Inc. re 457 Letter, 456 Letter, (Murray, Travis) (Entered: 05/09/2025) |

| | | |
|---|---|---|
| 05/09/2025 | 464 | Official Transcript of Status Conference held on 05/07/2025 before Judge Mitchell S. Goldberg. Court Reporter/Transcriber Coleen Rand, AAERT Cert. No. 341, Email: PAEDml_TranscriptRequest@paed.uscourts.gov. Transcript may be viewed at the court public terminal or order/purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date, it may be obtained through PACER Redaction Request due 5/30/2025. Redacted Transcript Deadline set for 6/9/2025. Release of Transcript Restriction set for 8/7/2025. (jfm) (Entered: 05/12/2025) |
| 05/13/2025 | 465 | REDACTED VERSION of 460 Opening Brief in Support, by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) (Entered: 05/13/2025) |
| 05/13/2025 | 466 | Letter to The Honorable Mitchell S. Goldberg from Nathan R. Hoeschen regarding Summary Judgment and Case Narrowing − re 462 Order,, Set Deadlines,. (Attachments: # 1 Text of Proposed Order, # 2 Attachment 1, # 3 Exhibit A, # 4 Exhibit B, # 5 Exhibit C, # 6 Exhibit D)(Hoeschen, Nathan) Modified on 6/13/2025 (jfm). (Entered: 05/13/2025) |
| 05/13/2025 | 467 | Letter to The Honorable Mitchell S. Goldberg from Brian P. Egan regarding Summary Judgment Motions and Case Narrowing − re 462 Order,, Set Deadlines,. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6)(Egan, Brian) Modified on 6/13/2025 (jfm). (Entered: 05/13/2025) |
| 05/16/2025 | 468 | ORDER: An on the record telephone conference will be held on May 26, 2025, at 11:00 AM, to discuss proposed summary judgment and Daubert motions; The deadline to file summary judgment and Daubert motions, and successive briefing, is hereby STAYED, pending the May 26, 2025 teleconference; The trial date of September 29, 2025, is postponed to be rescheduled after consultation with counsel (see order for further details). Signed by Judge Mitchell S. Goldberg on 05/16/2025. (jfm) (Entered: 05/16/2025) |
| 05/16/2025 | 469 | Letter to Chief Judge Goldberg from Nathan Hoeschen regarding Reconsideration of Patent Narrowing Order − re 468 Order,, Set Deadlines,, Terminate Trial Management Order Deadlines,. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Hoeschen, Nathan) (Entered: 05/16/2025) |
| 05/19/2025 | 470 | Letter to The Honorable Mitchell S. Goldberg from Brian P. Egan regarding Opposition to Plaintiffs' Request for Reconsideration − re 469 Letter,. (Attachments: # 1 Appendix A)(Egan, Brian) (Entered: 05/19/2025) |
| 05/20/2025 | 471 | Joint NOTICE of the Parties to unseal D.I. 466 and 467 − by Moderna, Inc., ModernaTX, Inc. re 467 Letter, 466 Letter, (Murray, Travis) (Entered: 05/20/2025) |
| 05/21/2025 | 472 | NOTICE of Withdrawal of Counsel by Moderna, Inc., ModernaTX, Inc. (Egan, Brian) (Entered: 05/21/2025) |
| 05/22/2025 | 473 | ORDER: It is hereby ORDERED that the conference originally scheduled for May 26, 2025, is hereby STAYED. Signed by Judge Mitchell S. Goldberg on 05/22/2025. (oam) (Entered: 05/22/2025) |
| 05/23/2025 | 474 | Official Transcript of Telephone Conference held on 05/19/2025 before Judge Judge Mitchell Goldberg. Court Reporter/Transcriber Cherilyn M. McCollum,Email: cherilyn_mccollum@paed.uscourts.gov. Transcript may be viewed at the court public terminal or order/purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date, it may be obtained through PACER Redaction Request due 6/13/2025. Redacted Transcript Deadline set for 6/23/2025. Release of Transcript Restriction set for 8/21/2025. (oam) (Entered: 05/23/2025) |
| 05/29/2025 | 475 | ORDER: On or before June 3, 2025, Plaintiffs will narrow the number of asserted patents to no more than four (4). Plaintiffs shall also narrow the number of asserted claims to no more than fifteen (15). On or before June 9, 2025, Defendants shall narrow the number of asserted invalidity grounds under 35 U.S.C. §§ 102103 to no more than eight (8) per asserted claim, and the number of asserted invalidity grounds under 35 U.S.C. § 112, to no more than six (6) per asserted claim. A conference will be held on June 12, 2025, at 2:00 PM, in Courtroom 17A, U.S. Courthouse, 601 Market Street, Philadelphia, Pa. During that conference, the Parties will discuss proposed summary judgment and Daubert motions. Paragraph 5 of my May 16 Order |

| | | |
|---|---|---|
| | | (D.I. 468 ) is STAYED. A conference to discuss further narrowing will be scheduled pending the resolution of summary judgment and Daubert motions. (See Order for further details) Signed by Judge Mitchell S. Goldberg on 5/29/2025. (mpb) (Entered: 05/29/2025) |
| 05/29/2025 | 476 | STIPULATION Regarding Mutual Exchange of Previously Served Sur−Reply Expert Reports − by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) (Entered: 05/29/2025) |
| 06/04/2025 | 477 | NOTICE OF SERVICE of Plaintiffs Disclosure of Asserted Patents and Claims pursuant to the Court's Order regarding narrowing (D.I. 475) filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.(Hoeschen, Nathan) (Entered: 06/04/2025) |
| 06/09/2025 | 478 | ORDER: It is hereby ORDERED that the conference scheduled for June 12, 2025, at 2:00 PM, is hereby RESCHEDULED to June 12, 2025, at 9:30 AM, in Courtroom 17A, U.S. Courthouse, 601 Market Street, Philadelphia, Pa. before Judge Mitchell S. Goldberg. Signed by Judge Mitchell S. Goldberg on 06/09/2025. (oam) (Entered: 06/09/2025) |
| 06/09/2025 | 479 | NOTICE OF SERVICE of Moderna's Identification of § 102/103 and § 112 Invalidity Defenses Pursuant to D.I. 475 − filed by Moderna, Inc., ModernaTX, Inc..(Murray, Travis) (Entered: 06/09/2025) |
| 06/12/2025 | | Minute Entry for proceedings held before Judge Mitchell S. Goldberg − Status Conference held on 6/12/2025. Counsel for Plaintiff(s): David Berl, Esq., Matthew Lachman, Esq., Shaun McHaffy, Esq. Counsel for Defendant(s): Michael McLennan, Esq., Patricia Carson, Esq., Brian Eagan, Esq. (Court Reporter Nelson Quiles Malave, Deputy Clerk/ESR.) (jfm) (Entered: 06/13/2025) |
| 06/16/2025 | 480 | Letter to The Honorable Mitchell S. Goldberg from Travis J. Murray regarding December Trial Conflict. (Murray, Travis) (Entered: 06/16/2025) |
| 06/17/2025 | 481 | Letter to The Honorable Mitchell S. Goldberg from Nathan R. Hoeschen regarding Response to the Letter Submitted by Moderna − re 480 Letter. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Hoeschen, Nathan) (Entered: 06/17/2025) |
| 06/18/2025 | 482 | Letter to The Honorable Mitchell S. Goldberg from Travis J. Murray regarding response to Plaintiffs' June 17, 2025 correspondence − re 481 Letter. (Attachments: # 1 Exhibit 1)(Murray, Travis) (Entered: 06/18/2025) |
| 06/18/2025 | 483 | Letter to The Honorable Mitchell S. Goldberg from Nathan R. Hoeschen regarding brief response to Moderna's letter − re 482 Letter. (Hoeschen, Nathan) (Entered: 06/18/2025) |
| 06/23/2025 | 484 | Official Transcript of Status Conference held on 06/12/2025 before Judge Judge Mitchell S. Goldberg. Court Reporter/Transcriber Coleen Rand,Email: PAEDml_TranscriptRequest@paed.uscourts.gov. Transcript may be viewed at the court public terminal or order/purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date, it may be obtained through PACER Redaction Request due 7/14/2025. Redacted Transcript Deadline set for 7/24/2025. Release of Transcript Restriction set for 9/22/2025. (oam) (Entered: 06/23/2025) |
| 06/25/2025 | 485 | SCHEDULING ORDER: Dispositive Motions due by 7/25/2025. Answering Brief due 8/22/2025. Reply Brief due 9/19/2025. Daubert motions due by 11/07/2025, Oppositions to Daubert motions 11/21/2025, Replies in support of Daubert motions (if necessary) 12/05/2025. A Pretrial Conference is set for 3/2/2026 before Judge Mitchell S. Goldberg. A Jury Trial is set for 3/9/2026 before Judge Mitchell S. Goldberg. Signed by Judge Mitchell S. Goldberg on 06/25/205. (oam) (Entered: 06/25/2025) |
| 06/25/2025 | 486 | ORDER: Granting 459 MOTION to Seal Portions of Plaintiffs' Response to Defendants' Emergency Letter (D.I. 454 ). Signed by Judge Mitchell S. Goldberg on 06/25/2025. (oam) (Entered: 06/25/2025) |
| 06/25/2025 | 487 | ORDER: Granting 476 STIPULATION Regarding Mutual Exchange of Previously Served Sur−Reply Expert Reports. Signed by Judge Mitchell S. Goldberg on 06/25/2025. (oam) (Entered: 06/25/2025) |

| | | |
|---|---|---|
| 06/25/2025 | 488 | NOTICE OF SERVICE of (1) Second Sur−Reply Expert Report of Owen Shea Fenton, Ph.D., (2) Second Sur−Reply Expert Report of Robert Prud'Homme, Ph.D., (3) Sur−Reply Expert Report of Robert Prud'Homme, Ph.D., and (4) Sur−Reply Expert Report of Owen Shea Fenton, Ph.D. − filed by Moderna, Inc., ModernaTX, Inc..(Murray, Travis) (Entered: 06/25/2025) |
| 06/27/2025 | 489 | Joint NOTICE of the Parties to Unseal D.I. 287 by Moderna, Inc., ModernaTX, Inc. re 287 Letter, (Murray, Travis) (Entered: 06/27/2025) |
| 07/07/2025 | 490 | MOTION for Pro Hac Vice Appearance of Attorney Laura Ashley Harris − filed by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) (Entered: 07/07/2025) |
| 07/07/2025 | 491 | Pro Hac Vice Fee − Credit Card Payment received for Laura Ashley Harris. ( re 490 MOTION for Pro Hac Vice Appearance of Attorney Laura Ashley Harris )( Payment of $ 50, receipt number ADEDC−4726849).(Murray, Travis) (Entered: 07/07/2025) |
| 07/08/2025 | 492 | ORDER: Granting 490 MOTION for Pro Hac Vice Appearance of Attorney Laura Ashley Harris. Signed by Judge Mitchell S. Goldberg on 07/08/2025. (oam) (Entered: 07/08/2025) |
| 07/09/2025 | 493 | [SEALED] Letter to The Honorable Mitchell S. Goldberg from Nathan R. Hoeschen regarding expert discovery dispute. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8)(Hoeschen, Nathan) (Attachment 2 replaced on 7/10/2025) (slk). (Entered: 07/09/2025) |
| 07/09/2025 | 494 | [SEALED] PROPOSED ORDER regarding Plaintiffs' expert discovery dispute re 493 Letter, by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Hoeschen, Nathan) (Entered: 07/09/2025) |
| 07/10/2025 | 495 | ORDER: DESIGNATION OF DISTRICT JUDGE TO HOLD A DISTRICT COURT WITHIN THE CIRCUIT, designating and assigning the Honorable Joshua D. Wolson of the United States District Court for the Eastern District of Pennsylvania. Signed by Judge Michael A Chagares, Chief Judge of the United States Court of Appeals for the Third Circuit, on 7/9/2025. (alb) (Entered: 07/10/2025) |
| 07/10/2025 | | Case Reassigned to Judge Joshua D. Wolson of the United States District Court for the Eastern District of Pennsylvania. Please include the initials of the Judge (JDW) after the case number on all documents filed. (alb) (Entered: 07/10/2025) |
| 07/10/2025 | | CORRECTING ENTRY: D.I. 493 exhibit 2 replaced per counsel request. (slk) (Entered: 07/10/2025) |
| 07/11/2025 | 496 | NOTICE of Withdrawal of Motion by Arbutus Biopharma Corporation, Genevant Sciences GmbH re 493 Letter, 494 Proposed Order (Russell, Andrew) (Entered: 07/11/2025) |
| 07/11/2025 | 497 | Letter to The Honorable Joshua D. Wolson from Andrew E. Russell regarding circumstances relating to the case schedule. (Russell, Andrew) (Entered: 07/11/2025) |
| 07/14/2025 | 498 | Letter to The Honorable Joshua D. Wolson from Brian P. Egan regarding Plaintiffs' letter on the schedule and request to withdraw letter brief − re 496 Notice (Other), 497 Letter. (Attachments: # 1 Exhibit A − Letter to Judge Goldberg, # 2 Exhibit 1 to Exhibit A − Redacted Credit Card Statements)(Egan, Brian) (Attachment 1 replaced on 7/15/2025) (scs). (Entered: 07/14/2025) |
| 07/15/2025 | | CORRECTING ENTRY: Attachment #1 for D.I. 498 was replaced to correct a formatting error, per counsel's request. (scs) (Entered: 07/15/2025) |
| 07/15/2025 | 499 | NOTICE OF SERVICE of Plaintiff Genevant Sciences GmbH's Eighth Supplemental Responses and Objections to Defendants Moderna, Inc. and ModernaTX, Inc.'s Interrogatory No. 3 filed by Genevant Sciences GmbH.(Keller, Karen) (Entered: 07/15/2025) |
| 07/23/2025 | 500 | STIPULATION and [Proposed] Order Regarding Sealing Motions by Moderna, Inc., ModernaTX, Inc.. (Egan, Brian) (Entered: 07/23/2025) |
| 07/25/2025 | 501 | NOTICE OF SERVICE of 1. Plaintiffs' Motion for Summary Judgment, and Proposed Order 2. Plaintiffs' Opening Brief in Support of Motion for Summary Judgment 3. |

| | | |
|---|---|---|
| | | Plaintiffs' Statement of Uncontested Facts in Support of Motion for Summary Judgment 4. Plaintiffs' Motion to Exclude Certain Expert Testimony of Drs. Anderson and Prudhomme, and Proposed Order 5. Plaintiffs' Opening Brief in Support of Motion to Exclude Certain Expert Testimony of Drs. Anderson and Prudhomme 6. Declaration of Matthew W. Lachman, Esq. with Exhibits 1 − 29 filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.(Hoeschen, Nathan) (Entered: 07/25/2025) |
| 07/25/2025 | 502 | NOTICE OF SERVICE of (1) Moderna's Motion to Exclude Mr. Pitts' and Mr. Brill's Expert Reports, (2) Moderna's Memorandum in Support of its Motion to Exclude Mr. Pitts' and Mr. Brill's Expert Reports, (3) Moderna's Motion for Summary Judgment, (4) Moderna's Memorandum in Support of its Motion for Summary Judgment, (5) Statement of Facts in Support of Moderna's Motion for Summary Judgment, (6) Declaration of Mark McLennan in Support of Moderna's Summary Judgment and Daubert Motions − filed by Moderna, Inc., ModernaTX, Inc..(Murray, Travis) (Entered: 07/25/2025) |
| 07/28/2025 | 503 | STIPULATION AND ORDER: subject to the approval of the Court, that the parties shall serve upon one another by 5:00pm ET on July 25, 2025 the final versions of all papers associated with the aforementioned motions due on that date, and will confer in good faith thereafter concerning whether there is any information for which one or both parties shall seek leave to file under seal and whether there is any information that can be excerpted to remove unnecessary confidential information; and IT IS FURTHER STIPULATED that the parties shall file both sealed and redacted versions of their respective motion papers and any supporting motions to seal on July 31, 2025. The redacted versions of any papers shall include both parties proposed redactions; IT IS FURTHER STIPULATED that the party designating information as confidential shall be responsible for filing any motion to seal concerning that information, irrespective of which partys filings contains that information; and IT IS FURTHER STIPULATED that after the initial service is made of the final version of the aforementioned motion papers, no changes can be made to any papers absent consent of the other party (See STIPULATION AND ORDER for further details). Signed by Judge Joshua D. Wolson on 7/28/2025. (cdd) (Entered: 07/28/2025) |
| 07/31/2025 | 504 | STIPULATION TO EXTEND TIME for the parties to file both sealed and redacted versions of their respective motion papers that were served on July 25, 2025 and for the party designating information as confidential to file any motion to seal to August 1, 2025 − filed by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) (Entered: 07/31/2025) |
| 07/31/2025 | 505 | NOTICE to Take Deposition of Dr. Georg Schuster on August 6, 2025 filed by Moderna, Inc., ModernaTX, Inc..(Murray, Travis) (Entered: 07/31/2025) |
| 07/31/2025 | 506 | ORDER: Granting re 504 STIPULATION TO EXTEND TIME for the parties to file both sealed and redacted versions of their respective motion papers that were served on July 25, 2025 and for the party designating information as confidential to file any motion to seal to August 1, filed by Moderna, Inc., ModernaTX, Inc. Signed by Judge Joshua D. Wolson on 07/31/2025. (oam) (Entered: 07/31/2025) |
| 08/01/2025 | 507 | MOTION for Summary Judgment *Pursuant to Federal Rules of Civil Procedure 56* − filed by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) (Entered: 08/01/2025) |
| 08/01/2025 | 508 | [SEALED] OPENING BRIEF in Support re 507 MOTION for Summary Judgment *Pursuant to Federal Rules of Civil Procedure 56* filed by Moderna, Inc., ModernaTX, Inc..Answering Brief/Response due date per Local Rules is 8/15/2025. (Murray, Travis) (Entered: 08/01/2025) |
| 08/01/2025 | 509 | [SEALED] STATEMENT re 507 MOTION for Summary Judgment *Pursuant to Federal Rules of Civil Procedure 56* by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) (Entered: 08/01/2025) |
| 08/01/2025 | 510 | MOTION to Preclude *Mr. Pitt's and Mr. Brill's Expert Reports* − filed by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) (Entered: 08/01/2025) |
| 08/01/2025 | 511 | OPENING BRIEF in Support re 510 MOTION to Preclude *Mr. Pitt's and Mr. Brill's Expert Reports* filed by Moderna, Inc., ModernaTX, Inc..Answering Brief/Response due date per Local Rules is 8/15/2025. (Murray, Travis) (Entered: 08/01/2025) |

| | | |
|---|---|---|
| 08/01/2025 | 512 | [SEALED] DECLARATION of Mark C. McLennan re 508 Opening Brief in Support, 511 Opening Brief in Support by Moderna, Inc., ModernaTX, Inc.. (Attachments: # 1 Ex. 01 − W911QY20C0100 Contract, # 2 Ex. 02 − U.S. Patent No. 8,058,069, # 3 Ex. 03 − U.S. Patent No. 8,822,668, # 4 Ex. 04 − U.S. Patent No. 9,504,651, # 5 Ex. 05 − U.S. Patent No. 8,492,359, # 6 Ex. 06 − U.S. Patent No. 9,364,435, # 7 Ex. 07 − U.S. Patent No. 11,141,378, # 8 Ex. 08 − White House Proclamation, # 9 Ex. 09 − 75A50120C00034 Contract, # 10 Ex. 10 − White House Proclamation, # 11 Ex. 11 − HHS Covid−19 Vaccine Strategy, # 12 Ex. 12 − HHS Explaining Operation Warp Speed, # 13 Ex. 13 − Aug 11, 2020 DoD Press Release, # 14 Ex. 14 − June 3, 2025 Letter from F. Elenberg), # 15 Ex. 15 − Bennett Dep. Tr. [EXCERPT], # 16 Ex. 16 − W911QY20C0081 Solication, Offer and Award, # 17 Ex. 17 − Barda Technical Evaluation, # 18 Ex. 18 − P00003 Amendment of C−100)(Murray, Travis) (Entered: 08/01/2025) |
| 08/01/2025 | 513 | [SEALED] DECLARATION of Mark C. McLennan re 508 Opening Brief in Support, 511 Opening Brief in Support −−*Volume 2*−− by Moderna, Inc., ModernaTX, Inc.. (Attachments: # 1 Ex. 19 − P00004 Amendment of C−100, # 2 Ex. 20 − P00007 Amendment of C−100, # 3 Ex. 21 − P00031 Amendment of C−100, # 4 Ex. 22 − Thomas Declaration, # 5 Ex. 23 − Dec 18 2020 FDA EUA Letter, # 6 Ex. 24 − BARDA Web Announcement, # 7 Ex. 25 − Thomas Dep. Tr. [EXCERPT], # 8 Ex. 26 − Santoli Dep. Tr. [EXCERPT], # 9 Ex. 27 − Johnson Dep. Tr. [EXCERPT], # 10 Ex. 28 − C−100 Contract Sales Spreadsheet, # 11 Ex. 29 − Lawton Op. Rpt. [EXCERPT], # 12 Ex. 30 − Rutherford Declaration, # 13 Ex. 31 − Vellturo Declaration, # 14 Ex. 32 − Jan 15, 2021 White House Fact Sheet, # 15 Ex. 33 − Dec 8, 2020 White House Remarks, # 16 Ex. 34 − Dec 2021 ASPE Research Report, # 17 Ex. 35 − BARDA Memo re Purchase of Moderna Vaccine, # 18 Ex. 36 − COVAX Data Brief, # 19 Ex. 37 − Sept 20, 2021 Moderna US Monitoring Report [EXCERPT], # 20 Ex. 38 − Natl Strategy for Covid−19 Response [EXCERPT]), # 21 Ex. 39 − June 3, 2021 White House Statement, # 22 Ex. 40 − Covid−19 Dose Tracking Template, # 23 Ex. 41 − Feb 8, 2024 Markman Tr. [EXCERPT], # 24 Ex. 42 − Nov 25, 2024 Mitchell Rep. [EXCERPT]), # 25 Ex. 43 − Feb 8, 2024 Plaintiffs Markman Demonstratives [EXCERPT]), # 26 Ex. 44 − June 7, 2024 Genevant Resp. Rog. 10 [EXCERPT], # 27 Ex. 45 − June 7, 2024 Arbutus Resp. Rog. No. 10 [EXCERPT], # 28 Ex. 46 − Mar 21, 2025 Mitchell Rep. [EXCERPT], # 29 Ex. 47 − MacLachlan Dep. Tr. [EXCERPT])(Murray, Travis) (Entered: 08/01/2025) |
| 08/01/2025 | 514 | [SEALED] DECLARATION of Mark C. McLennan re 508 Opening Brief in Support, 511 Opening Brief in Support −−*Volume 3*−− by Moderna, Inc., ModernaTX, Inc.. (Attachments: # 1 Ex. 48 − Jeffs Dep. Tr. [EXCERPT], # 2 Ex. 49 − Judge Dep. Tr. [EXCERPT], # 3 Ex. 50 − Reid Dep. Tr. [EXCERPT], # 4 Ex. 51 − Jeng Dep. Tr. [EXCERPT], # 5 Ex. 52 − Heyes Dep. Tr. IPR2018−00680, Ex. 1026 [EXCERPT], # 6 Ex. 53 − Schuster Dep. Tr. [EXCERPT], # 7 Ex. 54 − Thompson Dep. Tr. [EXCERPT], # 8 Ex. 55 − Murthy Reb. Rep. [EXCERPT], # 9 Ex. 56 − Prudhomme Dep. Tr. [EXCERPT], # 10 Ex. 57 − US20060008910A1, # 11 Ex. 58 − Meulien Dep. Tr. [EXCERPT], # 12 Ex. 59 − Murthy Dep. Tr. [EXCERPT], # 13 Ex. 60 − Blenke 2018, # 14 Ex. 61 − Prudhomme Decl [EXCERPT], # 15 Ex. 62 − Feb 14, 2024 − Brill Rpt, # 16 Ex. 63 − Feb 14, 2024 − Pitts Rpt, # 17 Ex. 64 − 435 Appeal, D.I. 67 [EXCERPT], # 18 Ex. 65 − 069 IPR, Paper 15 [EXCERPT], # 19 Ex. 66 − 069 IPR, Ex. 2004 [EXCERPT], # 20 Ex. 67 − 435 IPR, Paper 24 [EXCERPT], # 21 Ex. 68 − 2024−06−07 Arbutus Resp. to RFAs [EXCERPT], # 22 Ex. 69 − 2024−06−07 Genevant Resp. to RFAs [EXCERPT], # 23 Ex. 70 − 069 P.H. Nov. 12, 2009, # 24 Ex. 71 − 069 P.H. June 1, 2010, # 25 Ex. 72 − 069 PH, Jan. 31, 2011, # 26 Ex. 73 − 069 P.H. Jul. 30, 2010, # 27 Ex. 74 − 069 P.H., May 12, 2011, # 28 Ex. 75 − 069 P.H., Aug. 11, 2011, # 29 Ex. 76 − 359 P.H. Oct. 5, 2011 [EXCERPT], # 30 Ex. 77 − 359 P.H. Mar. 28, 2012, # 31 Ex. 78 − 435 P.H. Aug. 18, 2014 [EXCERPT], # 32 Ex. 79 − 435 P.H. Feb. 26, 2015, # 33 Ex. 80 − 2024−06−07 Arbutus Resp. Rog. No. 16 [EXCERPT], # 34 Ex. 81 − 2024−06−07 Genevant Resp. Rog. 16 [EXCERPT])(Murray, Travis) (Entered: 08/01/2025) |
| 08/01/2025 | 515 | NOTICE of filing the following Non−Paper material(s) in Multimedia format: A thumb drive containing Sealed Exhibit 40 to Declaration of Mark C. McLennan (D.I. 513 ). Original Non−paper material(s) to be filed with the Clerk's Office. Notice filed by Travis J Murray on behalf of Moderna, Inc., and ModernaTX, Inc. (Murray, Travis) (Main Document 515 replaced on 8/1/2025) (nms). Modified on 8/1/2025 (nms). (Entered: 08/01/2025) |

| | | |
|---|---|---|
| 08/01/2025 | | CORRECTING ENTRY: The pdf for D.I. 515 has been replaced with a corrected version that reflects multimedia materials are being lodged with the Court. The docket text for the entry has been amended as well. Counsel shall submit the multimedia item to the Clerk' Office for filing on the docket. The NEF for D.I. 515 has been regenerated. (nms) (Entered: 08/01/2025) |
| 08/01/2025 | 516 | REDACTED VERSION of 508 Opening Brief in Support, by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) (Entered: 08/01/2025) |
| 08/01/2025 | 517 | REDACTED VERSION of 509 Statement by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) (Entered: 08/01/2025) |
| 08/01/2025 | 518 | MOTION for Summary Judgment − filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Attachments: # 1 Text of Proposed Order)(Gellar, Lindsey) (Entered: 08/01/2025) |
| 08/01/2025 | 519 | [SEALED] OPENING BRIEF in Support re 518 MOTION for Summary Judgment filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.Answering Brief/Response due date per Local Rules is 8/15/2025. (Gellar, Lindsey) (Entered: 08/01/2025) |
| 08/01/2025 | 520 | REDACTED VERSION of 512 Declaration,,,, by Moderna, Inc., ModernaTX, Inc.. (Attachments: # 1 Ex. 01 − W911QY20C0100 Contract_Redacted, # 2 Ex. 02 − U.S. Patent No. 8,058,069, # 3 Ex. 03 − U.S. Patent No. 8,822,668, # 4 Ex. 04 − U.S. Patent No. 9,504,651, # 5 Ex. 05 − U.S. Patent No. 8,492,359, # 6 Ex. 06 − U.S. Patent No. 9,364,435, # 7 Ex. 07 − U.S. Patent No. 11,141,378, # 8 Ex. 08 − White House Proclamation, # 9 Ex. 09 −75A50120C00034 Contract_Redacted, # 10 Ex. 10 − White House Proclamation, # 11 Ex. 11 − HHS Covid−19 Vaccine Strategy, # 12 Ex. 12 − HHS Explaining Operation Warp Speed, # 13 Ex. 13 − Aug 11, 2020 DoD Press Release, # 14 Ex. 14 − June 3, 2025 Letter from F. Elenberg), # 15 Ex. 15 − Bennett Dep. Tr. [EXCERPT], # 16 Ex. 16 − W911QY20C0081 Solication, Offer and Award_Redacted, # 17 Ex. 17 − Barda Technical Evaluation_Redacted, # 18 Ex. 18 − P00003 Amendment of C−100_Redacted)(Murray, Travis) (Attachment 1 replaced on 8/22/2025) (mrr). (Attachment 9 replaced on 8/22/2025) (mrr). (Attachment 16 replaced on 8/22/2025) (mrr). (Attachment 17 replaced on 8/22/2025) (mrr). (Attachment 18 replaced on 8/22/2025) (mrr). (Entered: 08/01/2025) |
| 08/01/2025 | 521 | [SEALED] STATEMENT re 519 Opening Brief in Support, 518 MOTION for Summary Judgment *[Plaintiffs' Statements of Uncontested Facts in Support of Motion for Summary Judgment]* by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Gellar, Lindsey) (Entered: 08/01/2025) |
| 08/01/2025 | 522 | MOTION to Exclude Certain Expert Testimony of Drs. Anderson and Prud'homme − filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Attachments: # 1 Text of Proposed Order)(Gellar, Lindsey) (Entered: 08/01/2025) |
| 08/01/2025 | 523 | REDACTED VERSION of 513 Declaration,,,,,, by Moderna, Inc., ModernaTX, Inc.. (Attachments: # 1 Ex. 19 − P00004 Amendment of C−100_Redacted, # 2 Ex. 20 − P00007 Amendment of C−100_Redacted, # 3 Ex. 21 − P00031 Amendment of C−100_Redacted, # 4 Ex. 22 − Thomas Declaration, # 5 Ex. 23 − Dec 18 2020 FDA EUA Letter, # 6 Ex. 24 − BARDA Web Announcement, # 7 Ex. 25 − Thomas Dep. Tr. [EXCERPT], # 8 Ex. 26 − Santoli Dep. Tr. [EXCERPT], # 9 Ex. 27 − Johnson Dep. Tr. [EXCERPT], # 10 Ex. 28 − C−100 Contract Sales Spreadsheet, # 11 Ex. 29 − Lawton Op. Rpt. [EXCERPT]_Redacted, # 12 Ex. 30 − Rutherford Declaration, # 13 Ex. 31 − Vellturo Declaration, # 14 Ex. 32 − Jan 15, 2021 White House Fact Sheet, # 15 Ex. 33 − Dec 8, 2020 White House Remarks, # 16 Ex. 34 − Dec 2021 ASPE Research Report, # 17 Ex. 35 − BARDA Memo re Purchase of Moderna Vaccine, # 18 Ex. 36 − COVAX Data Brief, # 19 Ex. 37 − Sept 20, 2021 Moderna US Monitoring Report [EXCERPT], # 20 Ex. 38 − Natl Strategy for Covid−19 Response [EXCERPT]), # 21 Ex. 39 − June 3, 2021 White House Statement, # 22 Ex. 40 − Covid−19 Dose Tracking Template, # 23 Ex. 41 − Feb 8, 2024 Markman Tr. [EXCERPT], # 24 Ex. 42 − Nov 25, 2024 Mitchell Rep. [EXCERPT]_Redacted, # 25 Ex. 43 − Feb 8, 2024 Plaintiffs Markman Demonstratives [EXCERPT]), # 26 Ex. 44 − June 7, 2024 Genevant Resp. Rog. 10 [EXCERPT]_Redacted, # 27 Ex. 45 − June 7, 2024 Arbutus Resp. Rog. No. 10 [EXCERPT]_Redacted, # 28 Ex. 46 − Mar 21, 2025 Mitchell Rep. [EXCERPT], # 29 Ex. 47 − MacLachlan Dep. Tr. [EXCERPT])(Murray, Travis) (Attachment 1 replaced on 8/22/2025) (mrr). |

| | | |
|---|---|---|
| | | (Attachment 2 replaced on 8/22/2025) (mrr). (Attachment 3 replaced on 8/22/2025) (mrr). (Attachment 24 replaced on 8/22/2025) (mrr). (Attachment 26 replaced on 8/22/2025) (mrr). (Attachment 27 replaced on 8/22/2025) (mrr). (Entered: 08/01/2025) |
| 08/01/2025 | 524 | [SEALED] OPENING BRIEF in Support re 522 MOTION to Exclude Certain Expert Testimony of Drs. Anderson and Prud'homme filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.Answering Brief/Response due date per Local Rules is 8/15/2025. (Gellar, Lindsey) (Main Document 524 replaced on 10/7/2025) (oam). (Entered: 08/01/2025) |
| 08/01/2025 | 525 | REDACTED VERSION of 514 Declaration,,,,,, by Moderna, Inc., ModernaTX, Inc.. (Attachments: # 1 Ex. 48 − Jeffs Dep. Tr. [EXCERPT], # 2 Ex. 49 − Judge Dep. Tr. [EXCERPT], # 3 Ex. 50 − Reid Dep. Tr. [EXCERPT], # 4 Ex. 51 − Jeng Dep. Tr. [EXCERPT], # 5 Ex. 52 − Heyes Dep. Tr. IPR2018−00680, Ex. 1026 [EXCERPT], # 6 Ex. 53 − Schuster Dep. Tr. [EXCERPT], # 7 Ex. 54 − Thompson Dep. Tr. [EXCERPT], # 8 Ex. 55 − Murthy Reb. Rep. [EXCERPT], # 9 Ex. 56 − Prudhomme Dep. Tr. [EXCERPT], # 10 Ex. 57 (US20060008910A1), # 11 Ex. 58 − Meulien Dep. Tr. [EXCERPT], # 12 Ex. 59 − Murthy Dep. Tr. [EXCERPT], # 13 Ex. 60 − Blenke 2018, # 14 Ex. 61 − Prudhomme Decl [EXCERPT]_Redacted, # 15 Ex. 62 − Feb 14, 2024 − Brill Rpt, # 16 Ex. 63 − Feb 14, 2024 − Pitts Rpt, # 17 Ex. 64 − 435 Appeal, D.I. 67 [EXCERPT], # 18 Ex. 65 − 069 IPR, Paper 15 [EXCERPT], # 19 Ex. 66 − 069 IPR, Ex. 2004 [EXCERPT], # 20 Ex. 67 − 435 IPR, Paper 24 [EXCERPT], # 21 Ex. 68 − 2024−06−07 Arbutus Resp. to RFAs [EXCERPT], # 22 Ex. 69 − 2024−06−07 Genevant Resp. to RFAs [EXCERPT], # 23 Ex. 70 − 069 P.H. Nov. 12, 2009, # 24 Ex. 71 − 069 P.H. June 1, 2010, # 25 Ex. 72 − 069 PH, Jan. 31, 2011, # 26 Ex. 73 − 069 P.H. Jul. 30, 2010, # 27 Ex. 74 − 069 P.H., May 12, 2011, # 28 Ex. 75 − 069 P.H., Aug. 11, 2011, # 29 Ex. 76 − 359 P.H. Oct. 5, 2011 [EXCERPT], # 30 Ex. 77 − 359 P.H. Mar. 28, 2012, # 31 Ex. 78 − 435 P.H. Aug. 18, 2014 [EXCERPT], # 32 Ex. 79 − 435 P.H. Feb. 26, 2015, # 33 Ex. 80 − 2024−06−07 Arbutus Resp. Rog. No. 16 [EXCERPT], # 34 Ex. 81 − 2024−06−07 Genevant Resp. Rog. 16 [EXCERPT])(Murray, Travis) (Entered: 08/01/2025) |
| 08/01/2025 | 526 | [SEALED] DECLARATION of Matthew W. Lachman, Esq. re 518 MOTION for Summary Judgment , 522 MOTION to Exclude Certain Expert Testimony of Drs. Anderson and Prud'homme by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Attachments: # 1 Exhibit 1 − Moderna Invalidity Disclosures, # 2 Exhibit 2 − Sept. 19, 2023 Letter, # 3 Exhibit 3 − Moderna's Final Invalidity Contentions, # 4 Exhibit 4 − Anderson Opening Report, # 5 Exhibit 5 − Murthy Validity Report, # 6 Exhibit 6 − Anderson Reply Report, # 7 Exhibit 7 − Prud'homme Opening Report, # 8 Exhibit 8 − Meulien Opening Report, # 9 Exhibit 9 − Prud'homme Reply Report, # 10 Exhibit 10 − Prud'homme Dep. Tr., # 11 Exhibit 11 − Meulien Reply Report, # 12 Exhibit 12 − Dr. Palmer 11/29/2013 Lab Notebook, # 13 Exhibit 13 − Mr. Reid 2/12/2009 Lab Notebook, # 14 Exhibit 14 − Reid Dep. Tr., # 15 Exhibit 15 − Geall 2012, # 16 Exhibit 16 − Sedic 2018, # 17 Exhibit 17 − Leung 2023, # 18 Exhibit 18 − WO 2013/090648, # 19 Exhibit 19 − Check 2003, # 20 Exhibit 20 − Mitchell Opening Report, # 21 Exhibit 21 − December 2016 Acuitas Sublicense, # 22 Exhibit 22 − May 2015 Acuitas Sublicense, # 23 Exhibit 23 − October 2016 Acuitas Sublicense, # 24 Exhibit 24 − August 2016 Acuitas Sublicense, # 25 Exhibit 25 − Himansu Dep. Tr., # 26 Exhibit 26 − Arbutus 2018 8−K, # 27 Exhibit 27 − Corbett 2020 Preprint, # 28 Exhibit 28 − Corbett 2020, # 29 Exhibit 29 − Moderna 435 IPR Reply)(Gellar, Lindsey) (Attachment 5 replaced on 9/29/2025) (jfm). (Attachment 7 replaced on 9/29/2025) (jfm). (Attachment 14 replaced on 9/29/2025) (jfm). (Entered: 08/01/2025) |
| 08/01/2025 | 527 | REDACTED VERSION of 519 Opening Brief in Support by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Gellar, Lindsey) (Entered: 08/01/2025) |
| 08/01/2025 | 528 | REDACTED VERSION of 521 Statement, by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Gellar, Lindsey) (Entered: 08/01/2025) |
| 08/01/2025 | 529 | REDACTED VERSION of 524 Opening Brief in Support, by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Gellar, Lindsey) (Main Document 529 replaced on 10/7/2025) (oam). (Entered: 08/01/2025) |
| 08/01/2025 | 530 | Unopposed MOTION to Seal *and For Limited Intervention for the Purposes of Sealing* − filed by The United States of America. (Attachments: # 1 Memorandum of Law in Support of Motion for Limited Intervention and Motion to Seal, # 2 Exhibit Ex. A In |

| | | |
|---|---|---|
| | | Support of Memorandum of Law)(Sternhell, Philip) Modified on 8/4/2025 (oam). (Entered: 08/01/2025) |
| 08/01/2025 | 531 | Opposed MOTION to Seal *Portions of Plaintiffs' and Moderna's Opening Dispositive Filings* − filed by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) Modified on 8/4/2025 (scs). (Entered: 08/01/2025) |
| 08/01/2025 | 532 | OPENING BRIEF in Support re 531 Opposed MOTION to Seal *Portions of Plaintiffs' and Moderna's Opening Dispositive Filings* filed by Moderna, Inc., ModernaTX, Inc..Answering Brief/Response due date per Local Rules is 8/15/2025. (Attachments: # 1 Exhibit A − Cao Declaration ISO Motion to Seal, # 2 Exhibit B − Fernandez Declaration ISO Motion to Seal)(Murray, Travis) Modified on 8/4/2025 (scs). (Entered: 08/01/2025) |
| 08/04/2025 | | CORRECTING ENTRY: The docket text at D.I. 531 and 532 was modified per counsel's request. The text was changed to reflect that it is an opposed motion, as stated in the document. (scs) (Entered: 08/04/2025) |
| 08/04/2025 | 536 | NOTICE OF SERVICE of Third Sur−Reply Expert Report of Robert Prud'Homme, Ph.D. filed by Moderna, Inc., ModernaTX, Inc..(Murray, Travis) (Entered: 08/04/2025) |
| 08/05/2025 | 537 | ORDER: Plaintiffs' exhibits at D.I. 533, 534, and 535 are STRICKEN for failure to comply with Section I.C.1 of my Policies and Procedures. It is FURTHER ORDERED that Plaintiffs shall refile conforming exhibits on or before August 6, 2025. Signed by Judge Joshua D. Wolson on 8/5/2025. (nms) (Entered: 08/05/2025) |
| 08/05/2025 | | Remark: D.I. 533, 534, and 535 have been removed from the docket per the Order at D.I. 537 . (nms) (Entered: 08/05/2025) |
| 08/05/2025 | 538 | REDACTED VERSION of 526 Declaration,,,,,, by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Attachments: # 1 Exhibit 1 − Moderna Invalidity Disclosures, # 2 Exhibit 2 − Sept. 19, 2023 Letter, # 3 Exhibit 3 − Moderna's Final Invalidity Contentions, # 4 Exhibit 4 − Anderson Opening Report, # 5 Exhibit 5 − Murthy Validity Report, # 6 Exhibit 6 − Anderson Reply Report, # 7 Exhibit 7 − Prud'homme Opening Report, # 8 Exhibit 8 − Meulien Opening Report, # 9 Exhibit 9 − Prud'homme Reply Report, # 10 Exhibit 10 − Prud'homme Dep. Tr., # 11 Exhibit 11 − Meulien Reply Report, # 12 Exhibit 12 − Dr. Palmer 11/29/2013 Lab Notebook, # 13 Exhibit 13 − Mr. Reid 2/12/2009 Lab Notebook, # 14 Exhibit 14 − Reid Dep. Tr., # 15 Exhibit 15 − Geall 2012, # 16 Exhibit 16 − Sedic 2018, # 17 Exhibit 17 − Leung 2023, # 18 Exhibit 18 − WO 2013/090648, # 19 Exhibit 19 − Check 2003, # 20 Exhibit 20 − Mitchell Opening Report, # 21 Exhibit 21 − December 2016 Acuitas Sublicense, # 22 Exhibit 22 − May 2015 Acuitas Sublicense, # 23 Exhibit 23 − October 2016 Acuitas Sublicense, # 24 Exhibit 24 − August 2016 Acuitas Sublicense, # 25 Exhibit 25 − Himansu Dep. Tr., # 26 Exhibit 26 − Arbutus 2018 8−K, # 27 Exhibit 27 − Corbett 2020 Preprint, # 28 Exhibit 28 − Corbett 2020, # 29 Exhibit 29 − Moderna 435 IPR Reply)(Gellar, Lindsey) (Attachment 2 replaced on 8/22/2025) (mrr). (Attachment 5 replaced on 8/22/2025) (mrr). (Attachment 6 replaced on 8/22/2025) (mrr). (Attachment 21 replaced on 8/22/2025) (mrr). (Attachment 22 replaced on 8/22/2025) (mrr). (Attachment 23 replaced on 8/22/2025) (mrr). (Attachment 24 replaced on 8/22/2025) (mrr). (Attachment 5 replaced on 9/29/2025) (jfm). (Attachment 7 replaced on 9/29/2025) (jfm). (Attachment 14 replaced on 9/29/2025) (jfm). (Entered: 08/05/2025) |
| 08/05/2025 | 539 | [SEALED] MULTIMEDIA DOCUMENT filed by Moderna, Inc. and ModernaTX, Inc. in the form of a thumb drive containing Exhibit 40 to Declaration at D.I. 513 . Filing related to 515 Notice of Multimedia Material. (*Media on file in Clerk's Office). (nms) (Entered: 08/05/2025) |
| 08/07/2025 | 540 | ORDER: Plaintiffs shall file any opposition to either the Governments or Modernas Motion To Seal on or before August 11, 2025; Going forward in this case, if any Party intends to oppose a motion to seal (D.I. 530 / 531 ), that Party must file its opposition within 3 business days of the filing of the motion to seal; and If a Party seeking leave to file materials under seal, or with redactions, fails to comply with Section I.D.2 of my Policies and Procedures, I will strike that Partys filing (See ORDER for Further Details). Signed by Judge Joshua D. Wolson on 8/7/2025. (cdd) (Entered: 08/07/2025) |

| | | |
|---|---|---|
| 08/12/2025 | | CORRECTING ENTRY: DI's 541 and 542 were removed per counsels request. An Answering Brief was inadvertently filed as a reply brief. Counsel has been advised to refile the Answering Brief using the correct event code, with the Proposed Order attached. (scs) (Entered: 08/12/2025) |
| 08/12/2025 | 541 | ANSWERING BRIEF in Opposition re 531 Unopposed MOTION to Seal *Portions of Plaintiffs' and Moderna's Opening Dispositive Filings* filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.Reply Brief due date per Local Rules is 8/19/2025. (Attachments: # 1 Exhibit 1− August 2025 Law360 Article, # 2 Exhibit 2− May 2025 Law360 Article, # 3 Exhibit 3− Fierce Pharma Article, # 4 Exhibit 4− Japan Vaccine Label, # 5 Exhibit 5− Japan Omicron Label, # 6 Exhibit 6− Google Translate Vaccine Label, # 7 Exhibit 7− Google Translate Omicron Label, # 8 Exhibit 8− Certified Translation Vaccine Label, # 9 Exhibit 9− Certified Translation Omicron Label, # 10 Exhibit 10− Suzuki 2021, # 11 Exhibit 11− FDA Summary Basis, # 12 Exhibit 12− U.S. Patent No. 10,933,127, # 13 Exhibit 13− U.S. Patent No. 10,195,156, # 14 Exhibit 14− Sabnis 2018, # 15 Exhibit 15− EMA Report, # 16 Exhibit 16− Settlement Announcement, # 17 Exhibit 17− Corden Article, # 18 Exhibit 18− Lonza Article, # 19 Text of Proposed Order [Proposed] Order)(Hoeschen, Nathan) (Entered: 08/12/2025) |
| 08/12/2025 | 542 | [SEALED] REPLY BRIEF re 531 Unopposed MOTION to Seal *Portions of Plaintiffs' and Moderna's Opening Dispositive Filings −− Moderna's Reply to Plaintiffs' Opposition to Moderna's Motion to Seal (D.I. 541) −−* filed by Moderna, Inc., ModernaTX, Inc.. (Attachments: # 1 Exhibit 21 − December 2016 Acuitas Sublicense, # 2 Exhibit 22 − May 2015 Acuitas Sublicense, # 3 Exhibit 23 − October 2016 Acuitas Sublicense, # 4 Exhibit 24 − August 2016 Acuitas Sublicense, # 5 Proposed Order)(Murray, Travis) (Entered: 08/12/2025) |
| 08/12/2025 | 543 | REDACTED VERSION of 542 Reply Brief,, by Moderna, Inc., ModernaTX, Inc.. (Attachments: # 1 Exhibit 21 − December 2016 Acuitas Sublicense, # 2 Exhibit 22 − May 2015 Acuitas Sublicense, # 3 Exhibit 23 − October 2016 Acuitas Sublicense, # 4 Exhibit 24 − August 2016 Acuitas Sublicense, # 5 Proposed Order)(Murray, Travis) (Entered: 08/12/2025) |
| 08/18/2025 | 544 | STIPULATION and [Proposed] Order Regarding Extension of Certain Deadlines − by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) (Entered: 08/18/2025) |
| 08/19/2025 | 545 | ORDER: Granting 544 STIPULATION and Order Regarding Extension of Certain Deadlines. Signed by Judge Joshua D. Wolson on 08/19/2025. (oam) (Entered: 08/19/2025) |
| 08/19/2025 | 546 | ORDER: The United States' Combined Motion To Intervene And Seal (D.I. 530 ) is GRANTED IN PART and DENIED IN PART. Modernas Opposed Motion To Seal Portions Of Plaintiffs And ModernasOpening Dispositive Motion Filings (D.I. 531 ) is DENIED IN PART and GRANTED INPART (See order for further details). Signed by Judge Joshua D. Wolson on 08/19/2025 (oam) (Entered: 08/19/2025) |
| 08/22/2025 | | CORRECTING ENTRY: Per Order 546 , refiled exhibits in D.I. 520 , 523 , 538 . (mrr) (Entered: 08/22/2025) |
| 08/22/2025 | 547 | MOTION for Leave to permit Stephen B. Brauerman to File an Amicus Brief − filed by Adam Mossoff. (Attachments: # 1 [Proposed] Order, # 2 Certification Pursuant to D. Del. LR. 7.1.1, # 3 Exhibit A)(Brauerman, Stephen) (Entered: 08/22/2025) |
| 08/25/2025 | 548 | NOTICE of Appearance by Kurt M. Heyman on behalf of Alliance of U.S. Startups and Inventors for Jobs (Heyman, Kurt) (Entered: 08/25/2025) |
| 08/25/2025 | 549 | NOTICE of Appearance by Denise Seastone Kraft on behalf of Alliance of U.S. Startups and Inventors for Jobs (Kraft, Denise) (Entered: 08/25/2025) |
| 08/25/2025 | 550 | MOTION for Leave to permit Denise S. Kraft to File an Amicus Brief − filed by Alliance of U.S. Startups and Inventors for Jobs. (Attachments: # 1 Proposed Order, # 2 Exhibit Exhibit A)(Kraft, Denise) (Entered: 08/25/2025) |
| 08/25/2025 | 551 | NOTICE OF SERVICE of (1) Moderna's Response to Plaintiffs' Motions for Summary Judgment, (2) Moderna's Response to Plaintiffs' Statements of Uncontested Facts in Support of Motion for Summary Judgment, (3) Moderna's Brief in Opposition of Plaintiffs' Motions to Exclude Certain Expert Testimony of Drs. Anderson and |

| | | |
|---|---|---|
| | | Prud'homme, (4) Declaration of Mark C. McLennan in Support of Moderna's Opposition to Plaintiffs' Motion to Exclude, Plaintiffs' Motion for Summary Judgment, and Plaintiffs' Statement of Uncontested Facts, and (5) Moderna's Corrected Response to Plaintiffs' Statements of Uncontested Facts in Support of Motion for Summary Judgment − filed by Moderna, Inc., ModernaTX, Inc..(Murray, Travis) (Entered: 08/25/2025) |
| 08/26/2025 | 552 | ORDER: The Motion for Leave to permit Stephen B. Brauerman to File an Amicus Brief (D.I. 547 ) is GRANTED. It is ordered that the brief appended as Exhibit A to the Motion shall be deemed filed with the court. Signed by Judge Joshua D. Wolson on 8/26/2025. (mpb) Modified on 8/26/2025 (mpb). (Entered: 08/26/2025) |
| 08/26/2025 | | CORRECTING ENTRY: The docket text of D.I. 552 has been modified to reflect the correct motion that was ruled on. (mpb) (Entered: 08/26/2025) |
| 08/26/2025 | 553 | ORDER: it is hereby ORDERED that the Motion (D.I. 550 ) is GRANTED; and it is further ORDERED that the brief appended as Exhibit A (D.I. 550 −2) to the Motion shall be deemed filed with the Court. Signed by Judge Joshua D. Wolson on 08/26/2025. (jfm) (Entered: 08/26/2025) |
| 08/26/2025 | 554 | NOTICE OF SERVICE of 1. Plaintiffs' Cross−Motion for Summary Judgment, and Proposed Order 2. Plaintiffs' Motion to Exclude Certain Expert Testimony of Rutherford, Vellturo, and Prud'homme, and Proposed Order 3. Plaintiffs' Responsive Brief in Opposition to Moderna's Motion for Summary Judgment and in Support of Plaintiffs' Cross−Motion for Summary Judgment 4. Plaintiffs' Response to Moderna's Motion to Exclude Brill and Pitts and Opening Brief in Support of Motion to Exclude Certain Expert Testimony of Rutherford, Vellturo and Prudhomme 5. Plaintiffs' Affirmative Statement of Uncontested Facts in Support of their Cross−Motion for Summary Judgment 6. Plaintiffs' Counterstatement of Facts to Moderna's Motion for Summary Judgment 7. Declaration of Matthew W. Lachman, Esq. with Exhibits 30 − 99 filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.(Keller, Karen) (Entered: 08/26/2025) |
| 08/27/2025 | 555 | MOTION for Leave to permit Stephanie S. Riley to File an Amicus Brief − filed by Bayh−Dole Coalition. (Attachments: # 1 Exhibit A, # 2 Text of Proposed Order)(Riley, Stephanie) (Entered: 08/27/2025) |
| 08/29/2025 | 556 | ANSWERING BRIEF in Opposition re 518 MOTION for Summary Judgment filed by Moderna, Inc., ModernaTX, Inc..Reply Brief due date per Local Rules is 9/5/2025. (Egan, Brian) (Entered: 08/29/2025) |
| 08/29/2025 | 557 | ANSWERING BRIEF in Opposition re 522 MOTION to Exclude Certain Expert Testimony of Drs. Anderson and Prud'homme filed by Moderna, Inc., ModernaTX, Inc..Reply Brief due date per Local Rules is 9/5/2025. (Egan, Brian) (Entered: 08/29/2025) |
| 08/29/2025 | 558 | MOTION to Preclude *[Plaintiffs' Motion to Exclude Certain Expert Testimony of Rutherford, Vellturo and Prud'homme]* − filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Hoeschen, Nathan) (Entered: 08/29/2025) |
| 08/29/2025 | 559 | STATEMENT re 521 Statement, −−*Moderna's Corrected Response to Plaintiffs' Statement of Uncontested Facts in Support of Motion for Summary Judgment*−− by Moderna, Inc., ModernaTX, Inc.. (Egan, Brian) (Entered: 08/29/2025) |
| 08/29/2025 | 560 | PROPOSED ORDER re 558 MOTION to Preclude *[Plaintiffs' Motion to Exclude Certain Expert Testimony of Rutherford, Vellturo and Prud'homme]* by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Hoeschen, Nathan) (Entered: 08/29/2025) |
| 08/29/2025 | 561 | ANSWERING BRIEF in Opposition re 510 MOTION to Preclude *Mr. Pitt's and Mr. Brill's Expert Reports,* 558 MOTION to Preclude *[Plaintiffs' Motion to Exclude Certain Expert Testimony of Rutherford, Vellturo and Prud'homme] − Plaintiffs' Response to Moderna's Motion to Exclude Brill and Pitts and Opening Brief in Support of Motion to Exclude Certain Expert Testimony of Rutherford, Vellturo and Prud'homme* − filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.Reply Brief due date per Local Rules is 9/5/2025. (Hoeschen, Nathan) (Entered: 08/29/2025) |

| | | |
|---|---|---|
| 08/29/2025 | 562 | Cross MOTION for Summary Judgment − filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Hoeschen, Nathan) (Entered: 08/29/2025) |
| 08/29/2025 | 563 | PROPOSED ORDER re 562 Cross MOTION for Summary Judgment by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Hoeschen, Nathan) (Entered: 08/29/2025) |
| 08/29/2025 | 564 | [SEALED] ANSWERING BRIEF in Opposition re 507 MOTION for Summary Judgment *Pursuant to Federal Rules of Civil Procedure 56*, 562 Cross MOTION for Summary Judgment *[Plaintiffs' Responsive Brief in Opposition to Moderna's Motion for Summary Judgment and Opening Brief in Support of Plaintiffs' Cross−Motion for Summary Judgment]* filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.Reply Brief due date per Local Rules is 9/5/2025. (Hoeschen, Nathan) (Entered: 08/29/2025) |
| 08/29/2025 | 565 | [SEALED] STATEMENT re 562 Cross MOTION for Summary Judgment *[Plaintiffs' Affirmative Statement of Uncontested Facts in Support of their Cross−Motion for Summary Judgment]* by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Hoeschen, Nathan) (Entered: 08/29/2025) |
| 08/29/2025 | 566 | DECLARATION of Mark C. McLennan re 559 Statement, 557 Answering Brief in Opposition −−*Volume 1*−− by Moderna, Inc., ModernaTX, Inc.. (Attachments: # 1 Ex. 30 − 12−22−17 Frolich Email [EXCERPT], # 2 Ex. 31 − 2024−11−25 − Anderson Report [Excerpt], # 3 Ex. 32 − 2024−11−25 − Prud'homme Report [EXCERPT], # 4 Ex. 33 − 069 IPR, POR [EXCERPT], # 5 Ex. 34 − '069 IPR Thompson Decl Exh 2031 [EXCERPT], # 6 Ex. 37 − US8058069, # 7 Ex. 38 − 2025.04.18 − Murthy Sur−Reply Report [EXCERPT], # 8 Ex. 39 − 069 P.H., Aug. 11, 2011 Amendment, # 9 Ex. 41 − 2025.02.14 − Mitchell Report [EXCERPT], # 10 Ex. 42 − '069 IPR POPR [EXCERPT], # 11 Ex. 43 − 2024−05−28 − S. Reid Dep Tr [EXCERPT], # 12 Ex. 45 − 2024−11−24 − Meulien Report [EXCERPT], # 13 Ex. 46 − 2025−03−21 − Reply Meulien Report [EXCERPT], # 14 Ex. 47 − 2018−08−24 Hong Email, # 15 Ex. 48 − Genevant Presentation [EXCERPT], # 16 Ex. 49 − US9364435, # 17 Ex. 50 − US9504651, # 18 Ex. 51 − Tekmira 2013 Report, # 19 Ex. 52 −2013−12−06 MacLachlan Email, # 20 Ex. 53 − US8492359, # 21 Ex. 54 − US11141378, # 22 Ex. 55 − Genevant LNP Presentation, # 23 Ex. 56 − 2025−05−19 − Teleconference Tr. [EXCERPT], # 24 Ex. 57 − 2014−01−11 Heyes Email, # 25 Ex. 58 − '435 IPR POR [EXCERPT])(Egan, Brian) (Entered: 08/29/2025) |
| 08/29/2025 | 567 | DECLARATION of Mark C. McLennan re 556 Answering Brief in Opposition, 559 Statement, 557 Answering Brief in Opposition −−*Volume 2*−− by Moderna, Inc., ModernaTX, Inc.. (Attachments: # 1 Ex. 59 − 2016−05−12 Heyes Decl, # 2 Ex. 61 − 2024−05−24 − Heyes Dep Tr [EXCERPT], # 3 Ex. 62 − 2014−02−19 Heyes Email, # 4 Ex. 63 − 651 FH Excerpts, # 5 Ex. 64 − 2025.06.03 Plaintiffs Narrowing Ltr, # 6 Ex. 65 − 060925 Moderna Narrowing of 102,103,112 Defenses, # 7 Ex. 66 − Jadhav 218)(Egan, Brian) (Entered: 08/29/2025) |
| 08/29/2025 | 568 | [SEALED] STATEMENT re 507 MOTION for Summary Judgment *Pursuant to Federal Rules of Civil Procedure 56 [Plaintiffs' Counterstatement of Facts to Moderna's Motion for Summary Judgment]* by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Hoeschen, Nathan) (Main Document 568 replaced on 9/5/2025) (mpb). (Entered: 08/29/2025) |
| 08/29/2025 | 569 | DECLARATION of Mark C. McLennan re 556 Answering Brief in Opposition, 559 Statement, 557 Answering Brief in Opposition −−*Volume 3*−− by Moderna, Inc., ModernaTX, Inc.. (Attachments: # 1 Ex. 67 − Chen 554, # 2 Ex. 68 − 2025−04−09 − Meulien Dep Tr [EXCERPT], # 3 Ex. 69 − 2024.06.07 Genevant 11th R&Os to 1st ROGs (Nos. 1−7) [EXCERPT], # 4 Ex. 70 − 2024.04.15 Genevant 2nd R&Os to 1st RFAs (1−4), # 5 Ex. 71 − 2024.04.15 − Arbutus 2nd R&Os to 1st RFAs (1−4), # 6 Ex. 72 − 2024−02−08 Plaintiffs' Markman Demonstratives [EXCERPT], # 7 Ex. 73 − 2021−02−23 − Moderna's Mtn to Supp'l Record, # 8 Ex. 74 − 2006−09−21 Jeffs Email [EXCERPT], # 9 Ex. 75 − 2006−12−05 Yaworski Email, # 10 Ex. 76 − Ratio Patents Presentation [EXCERPT], # 11 Ex. 78 − 2024−06−28 − Moderna's Invalidity Contentions [EXCERPT], # 12 Ex. 79 − Genevant July 2018 Presentation [EXCERPT], # 13 Ex. 80 − 2024.06.07 − Arbutus R&Os to 2nd Set of RFAs (Nos. 9−44) [EXCERPT], # 14 Ex. 81 − 2024.06.07 − Arbutus' 10th R&Os to 1st Set of ROGs (Nos. 1−7) [EXCERPT], # 15 Ex. 82 − 2009−12−07 Yaworski Email, # 16 Ex. 83 − Arbutus 2013 mRNA Report, # 17 Ex. 84 − 2025−04−22 Murthy Dep Tr |

| | | |
|---|---|---|
| | | [EXCERPT], # 18 Ex. 85 − Jeffs 2005, # 19 Ex. 86 − 2024−05−03 − Judge Dep Tr [EXCERPT], # 20 Ex. 87 − Blenke 2018, # 21 Ex. 88 − 2011−06−03 − Amended Complaint, # 22 Ex. 89 − Tekmira Trade Secret List (Alnylam), # 23 Ex. 90 − Heyes Dep Tr [EXCERPT], # 24 Ex. 91 − Tekmira Trade Secret List (Alcana), # 25 Ex. 92 − Jeffs Dep Tr [EXCERPT], # 26 Ex. 93 − Lutwyche Dep Tr [EXCERPT], # 27 Ex. 94 − Sofou Trade Secret Report [EXCERPT], # 28 Ex. 95 − 2024−05−30 − Bossone Dep Tr [EXCERPT], # 29 Ex. 96 − Tekmira Trade Secret Settlement Agreement [EXCERPT], # 30 Ex. 97 − 2014−10−20 Heyes Decl, # 31 Ex. 98 − 887 Provisional)(Egan, Brian) (Entered: 08/29/2025) |
| 08/29/2025 | 570 | [SEALED] DECLARATION of Mark C. McLennan re 556 Answering Brief in Opposition, 559 Statement, 557 Answering Brief in Opposition −−*Volume 4*−− by Moderna, Inc., ModernaTX, Inc.. (Attachments: # 1 Ex. 35 − 2025.02.14 − Murthy Report [EXCERPT], # 2 Ex. 36 − 2025−03−21 − Anderson Reply Report [EXCERPT], # 3 Ex. 44 − 2025−03−21 − Reply Prud'homme Report [EXCERPT], # 4 Ex. 60 − 2025−04−16 − Prud'Homme Dep Tr [EXCERPT], # 5 Ex. 77 − 2024.11.25 −Mitchell Op Rpt)(Egan, Brian) (Entered: 08/29/2025) |
| 08/29/2025 | 571 | [SEALED] DECLARATION of Matthew W. Lachman, Esq. re 564 Answering Brief in Opposition,, 561 Answering Brief in Opposition,, 565 Statement, by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Attachments: # 1 Exhibit 30− C−100 Contract Excel, # 2 Exhibit 31− HHS Distribution Data, # 3 Exhibit 32− Johnson Tr., # 4 Exhibit 33− Dialysis Partners Vaccine Distribution, # 5 Exhibit 34− Santoli Affidavit, # 6 Exhibit 35− HRSA COVID−19 FAQs, # 7 Exhibit 36− CBO Prescription Drugs, # 8 Exhibit 37− HHS Drug Spending, # 9 Exhibit 38− N.Y. Times Editorial, # 10 Exhibit 39− Yale J. Art., # 11 Exhibit 40− Sen. Warren Ltr, # 12 Exhibit 41− Sen. Sanders Ltr, # 13 Exhibit 42− CMS Hepatitis C Proposal, # 14 Exhibit 43− '069 IPR Petition, # 15 Exhibit 44− Prudhomme Opening Report, # 16 Exhibit 45− Prud'homme Reply Report, # 17 Exhibit 46− Prud'homme Dep. Tr., # 18 Exhibit 47−Murthy Validity Report, # 19 Exhibit 48−Mitchell Opening Report, # 20 Exhibit 49− Prud'homme Patent Application, # 21 Exhibit 50− Celebrating 30 Years of VFCVaccines for Children Program, # 22 Exhibit 51− Thomas Tr., # 23 Exhibit 52− FDA COA Requirements, # 24 Exhibit 53− CBO Study, # 25 Exhibit 54− Vaccine Sharing Fact Sheet, # 26 Exhibit 55− Apr. 2022 Funding Memo, # 27 Exhibit 56− Rutherford Tr., # 28 Exhibit 57− July 6 Interview (069 File History), # 29 Exhibit 58− July 13 Interview (069 File History), # 30 Exhibit 59− Initial Infringement Contentions, # 31 Exhibit 60− MacLachlan Tr., # 32 Exhibit 61− Jeffs Tr., # 33 Exhibit 62− Judge Tr., # 34 Exhibit 63− Reid Tr., # 35 Exhibit 64− Jeng Tr., # 36 Exhibit 65− Heyes IPR Tr., # 37 Exhibit 66− Heyes Tr., # 38 Exhibit 67− Schuster Tr., # 39 Exhibit 68− Thompson Tr., # 40 Exhibit 69− Prud'homme Patent Declaration, # 41 Exhibit 70− Science Day Tr., # 42 Exhibit 71− Meulien Opening Report, # 43 Exhibit 72− Murthy Tr., # 44 Exhibit 73− OWS Email, # 45 Exhibit 74− OWS−Moderna Email, # 46 Exhibit 75− Bennett Tr., # 47 Exhibit 76− OWS Meeting Invite, # 48 Exhibit 77− OWS−Moderna Meeting, # 49 Exhibit 78− Kramarczyk Tr., # 50 Exhibit 79− Francis Tr., # 51 Exhibit 80− Whoriskey Email, # 52 Exhibit 81− Bancel Email, # 53 Exhibit 82− Lawton Opening Report, # 54 Exhibit 83− 2017 Platform Objectives, # 55 Exhibit 84− Moderna Presentation, # 56 Exhibit 85− Hoge Email, # 57 Exhibit 86− Parsons Email, # 58 Exhibit 87− Miracco Email, # 59 Exhibit 88− Nov. 2019 Benenato Email, # 60 Exhibit 89− Moderna Rog Response, # 61 Exhibit 90− '069 IPR Response, # 62 Exhibit 91− 2020 Specification Minutes, # 63 Exhibit 92− Moderna FDA Submission, # 64 Exhibit 93− FDA Communication, # 65 Exhibit 94− 435 IPR Response, # 66 Exhibit 95− Schariter Tr., # 67 Exhibit 96− Goodell 2009, # 68 Exhibit 97− Baumgardner 2012, # 69 Exhibit 98− Pjils 2021, # 70 Exhibit 99− Murthy Sur−Reply Report)(Hoeschen, Nathan) (Attachment 19 replaced on 9/15/2025) (oam). (Attachment 3 replaced on 9/29/2025) (jfm). (Attachment 15 replaced on 9/29/2025) (jfm). (Attachment 16 replaced on 9/29/2025) (jfm). (Attachment 17 replaced on 9/29/2025) (jfm). (Attachment 18 replaced on 9/29/2025) (jfm). (Attachment 42 replaced on 9/29/2025) (jfm). (Entered: 08/29/2025) |
| 08/29/2025 | 572 | REDACTED VERSION of 564 Answering Brief in Opposition,, by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Hoeschen, Nathan) (Main Document 572 replaced on 10/2/2025) (jfm). (Entered: 08/29/2025) |
| 08/29/2025 | 573 | REDACTED VERSION of 565 Statement, by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Hoeschen, Nathan) (Entered: 08/29/2025) |

| | | |
|---|---|---|
| 08/29/2025 | 574 | REDACTED VERSION of 568 Statement, by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Hoeschen, Nathan) (Main Document 574 replaced on 9/5/2025) (mpb). (Main Document 574 replaced on 10/2/2025) (jfm). (Entered: 08/29/2025) |
| 08/29/2025 | 575 | REDACTED VERSION of 570 Declaration,, by Moderna, Inc., ModernaTX, Inc.. (Attachments: # 1 Ex. 35 − 2025.02.14 − Murthy Report [EXCERPT]_Redacted, # 2 Ex. 36 − 2025−03−21 − Anderson Reply Report [EXCERPT]_Redacted, # 3 Ex. 44 − 2025−03−21 − Reply Prud'homme Report [EXCERPT]_Redacted, # 4 Ex. 60 − 2025−04−16 − Prud'Homme Dep Tr EXCERPT (003)_Redacted, # 5 Ex. 77 − 2024.11.25 −Mitchell Op Rpt_Redacted)(Murray, Travis) (Entered: 08/29/2025) |
| 08/29/2025 | 576 | MOTION to Seal −−*Defendants' Partially Opposed Motion to Seal Portions of Plaintiffs' and Moderna's Answering Dispositive Motion Filings*−− − filed by Moderna, Inc., ModernaTX, Inc.. (Attachments: # 1 [Proposed] Order, # 2 7.1.1 Certifcation)(Murray, Travis) (Entered: 08/29/2025) |
| 08/29/2025 | 577 | OPENING BRIEF in Support re 576 MOTION to Seal −−*Defendants' Partially Opposed Motion to Seal Portions of Plaintiffs' and Moderna's Answering Dispositive Motion Filings*−− filed by Moderna, Inc., ModernaTX, Inc..Answering Brief/Response due date per Local Rules is 9/12/2025. (Murray, Travis) (Entered: 08/29/2025) |
| 08/29/2025 | 578 | DECLARATION of Brian Doyle re 576 MOTION to Seal −−*Defendants' Partially Opposed Motion to Seal Portions of Plaintiffs' and Moderna's Answering Dispositive Motion Filings*−− by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) (Entered: 08/29/2025) |
| 08/29/2025 | 579 | REDACTED VERSION of 571 Declaration,,,,,,,,,, by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Attachments: # 1 Exhibit 30− C−100 Contract Excel, # 2 Exhibit 31− HHS Distribution Data, # 3 Exhibit 32− Johnson Tr., # 4 Exhibit 33− Dialysis Partners Vaccine Distribution, # 5 Exhibit 34− Santoli Affidavit, # 6 Exhibit 35− HRSA COVID−19 FAQs, # 7 Exhibit 36− CBO Prescription Drugs, # 8 Exhibit 37− HHS Drug Spending, # 9 Exhibit 38− N.Y. Times Editorial, # 10 Exhibit 39− Yale J. Art, # 11 Exhibit 40− Sen. Warren Ltr, # 12 Exhibit 41− Sen. Sanders Ltr, # 13 Exhibit 42− CMS Hepatitis C Proposal, # 14 Exhibit 43− '069 IPR Petition, # 15 Exhibit 44− Prud'homme Opening Report, # 16 Exhibit 45− Prud'homme Reply Report, # 17 Exhibit 46− Prud'homme Dep. Tr., # 18 Exhibit 47− Murthy Validity Report, # 19 Exhibit 48− Mitchell Opening Report, # 20 Exhibit 49− Prud'homme Patent Application, # 21 Exhibit 50− Celebrating 30 Years of VFCVaccines for Children Program, # 22 Exhibit 51− Thomas Tr., # 23 Exhibit 52− FDA COA RequiremenTS, # 24 Exhibit 53− CBO Study, # 25 Exhibit 54− Vaccine Sharing Fact Sheet, # 26 Exhibit 55− Apr. 2022 Funding Memo, # 27 Exhibit 56− Rutherford Tr., # 28 Exhibit 57− July 6 Interview (069 File History),, # 29 Exhibit 58− July 13 Interview (069 File History), # 30 Exhibit 59− Initial Infringement Contentions, # 31 Exhibit 60− MacLachlan Tr., # 32 Exhibit 61− Jeffs Tr., # 33 Exhibit 62− Judge Tr., # 34 Exhibit 63− Reid Tr., # 35 Exhibit 64− Jeng Tr.,, # 36 Exhibit 65− Heyes IPR Tr., # 37 Exhibit 66− Heyes Tr., # 38 Exhibit 67− Schuster Tr.,, # 39 Exhibit 68− Thompson Tr., # 40 Exhibit 69− Prud'homme Patent Declaration, # 41 Exhibit 70− Science Day Tr.,, # 42 Exhibit 71− Meulien Opening Report, # 43 Exhibit 72− Murthy Tr., # 44 Exhibit 73− OWS Email, # 45 Exhibit 74− OWS−Moderna Email, # 46 Exhibit 75− Bennett Tr., # 47 Exhibit 76− OWS Meeting Invite, # 48 Exhibit 77− OWS−Moderna Meeting, # 49 Exhibit 78− Kramarczyk Tr.,, # 50 Exhibit 79− Francis Tr., # 51 Exhibit 80− Whoriskey Email, # 52 Exhibit 81− Bancel Email, # 53 Exhibit 82− Lawton Opening Report,, # 54 Exhibit 83− 2017 Platform Objectives,, # 55 Exhibit 84− Moderna Presentation, # 56 Exhibit 85− Hoge Email, # 57 Exhibit 86− Parsons Email, # 58 Exhibit 87− Miracco Email, # 59 Exhibit 87− Miracco Email, # 60 Exhibit 89− Moderna Rog Response, # 61 Exhibit 90− '069 IPR Response, # 62 Exhibit 91− 2020 Specification Minutes, # 63 Exhibit 92− Moderna FDA Submission, # 64 Exhibit 93− FDA Communication, # 65 Exhibit 94− 435 IPR Response, # 66 Exhibit 95− Schariter Tr, # 67 Exhibit 96− Goodell 2009, # 68 Exhibit 97− Baumgardner 2012,, # 69 Exhibit 98− Pjils 2021, # 70 Exhibit 99− Murthy Sur−Reply Report)(Hoeschen, Nathan) (Attachment 19 replaced on 9/15/2025) (oam). (Attachment 3 replaced on 9/29/2025) (jfm). (Attachment 15 replaced on 9/29/2025) (jfm). (Attachment 16 replaced on 9/29/2025) (jfm). (Attachment 17 replaced on 9/29/2025) (jfm). (Attachment 18 replaced on 9/29/2025) |

| | | |
|---|---|---|
| | | (jfm). (Attachment 42 replaced on 9/29/2025) (jfm). (Attachment 19 replaced on 10/2/2025) (jfm). (Attachment 55 replaced on 10/2/2025) (jfm). (Attachment 56 replaced on 10/2/2025) (jfm). (Attachment 62 replaced on 10/2/2025) (jfm). (Attachment 64 replaced on 10/2/2025) (jfm). (Entered: 08/29/2025) |
| 09/03/2025 | 580 | Order, granting 555 MOTION for Leave to permit Stephanie S. Riley to File an Amicus Brief. Signed by Judge Joshua D. Wolson on 09/03/2025. (jfm) (Entered: 09/03/2025) |
| 09/04/2025 | 581 | ANSWERING BRIEF in Opposition re 576 MOTION to Seal −−*Defendants' Partially Opposed Motion to Seal Portions of Plaintiffs' and Moderna's Answering Dispositive Motion Filings*−− filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.Reply Brief due date per Local Rules is 9/11/2025. (Attachments: # 1 Exhibit A − Corbett 2020 Preprint, # 2 Exhibit B − bioRxiv Metrics, # 3 Exhibit C − Bahl 2017, # 4 Exhibit D − Richner 2017, # 5 Exhibit E − John 2018, # 6 Exhibit F − Hassett 2019, # 7 Exhibit G − 2025.08.29 Lachman Email, # 8 Exhibit H − Understanding General Chemistry Excerpt, # 9 Exhibit I − Bioanalyical Techniques Excerpt, # 10 Exhibit J − Prud'homme Excerpt, # 11 Exhibit K − Agilent LNP Composition, # 12 Exhibit L − SM−102 Compound Summary (Excerpt), # 13 Exhibit M − Mitchell Report Excerpt, # 14 Exhibit N − Ryan Declaration Excerpt, # 15 Exhibit O − Hermosilla 2023, # 16 Exhibit P − Grau 2022, # 17 Exhibit Q − Moderna UPC Response)(Hoeschen, Nathan) (Entered: 09/04/2025) |
| 09/05/2025 | | CORRECTING ENTRY: Per Counsel's request, the main documents of D.I. 568 and D.I. 574 have been replaced to reflect proper corrections. (mpb) (Entered: 09/05/2025) |
| 09/08/2025 | 582 | NOTICE of Change of Address by Travis J Murray (Murray, Travis) (Entered: 09/08/2025) |
| 09/08/2025 | 583 | NOTICE OF SERVICE of (1) Declaration of Mark C. McLennan in Support of Moderna's Reply Papers in Support of Its Motion to Exclude and Motion for Summary Judgment; (2) Moderna's Responses to Plaintiffs' Affirmative Statement of Uncontested Facts in Support of their Cross−Motion for Summary Judgment; (3) Moderna's Reply in Support of its Motion to Exclude Expert Opinions of Mr. Pitts and Mr. Brill; Moderna's Opposition to Plaintiffs' Motion to Exclude Certain Expert Testimony of Dr. Rutherford, Dr. Vellturo, and Dr. Prud'Homme; and Moderna's Motion to Exclude Expert Opinions of Dr. Mitchell Regarding Plaintiffs' Cross−Motion for Summary Judgment; (4) Moderna's Responses to Plaintiffs' Counterstatement of Facts to Moderna's Motion for Summary Judgment; and (5) Moderna's Reply Brief in Support of its Motions for Summary Judgment filed by Moderna, Inc., ModernaTX, Inc..(Murray, Travis) (Entered: 09/08/2025) |
| 09/08/2025 | 584 | NOTICE OF SERVICE of 1. Plaintiffs' Reply Brief in Support of Motion for Summary Judgment 2. Plaintiffs' Reply Statement of Uncontested Facts in Support of Plaintiffs' Motion for Summary Judgment 3. Plaintiffs' Reply Brief in Support Motion to Exclude Certain Expert Testimony of Drs. Anderson and Prudhomme, with revised proposed order and attachments A − B 4. Declaration of Matthew W. Lachman, Esq. with Exhibits 100 − 121 filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.(Hoeschen, Nathan) (Entered: 09/08/2025) |
| 09/10/2025 | 585 | [SEALED] REPLY BRIEF re 576 MOTION to Seal −−*Defendants' Partially Opposed Motion to Seal Portions of Plaintiffs' and Moderna's Answering Dispositive Motion Filings*−− filed by Moderna, Inc., ModernaTX, Inc.. (Attachments: # 1 Ex. 1 − 2025.09.02 Email re Doyle Deposition, # 2 Plaintiffs Exhibit 48, # 3 Plaintiffs Exhibit 59)(Murray, Travis) (Entered: 09/10/2025) |
| 09/10/2025 | 586 | REDACTED VERSION of 585 Reply Brief, by Moderna, Inc., ModernaTX, Inc.. (Attachments: # 1 Ex. 1 − 2025.09.02 Email re Doyle Deposition, # 2 Plaintiffs Exhibit 48, # 3 Plaintiffs Exhibit 59)(Murray, Travis) (Entered: 09/10/2025) |
| 09/11/2025 | 587 | STIPULATION TO EXTEND TIME and [Proposed] Order regarding Extension of Certain Deadlines to − filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Hoeschen, Nathan) (Entered: 09/11/2025) |
| 09/12/2025 | 588 | ORDER, granting 587 Stipulation and Order Regarding Extension of Certain Deadlines. Signed by Judge Joshua D. Wolson on 09/12/2025. (jfm) (Entered: 09/12/2025) |

| | | |
|---|---|---|
| 09/15/2025 | | CORRECTING ENTRY: Document replaced at D.I. 571 −19 and 579 −19 per order 588 . (oam) (Entered: 09/15/2025) |
| 09/15/2025 | 589 | REPLY BRIEF re 522 MOTION to Exclude Certain Expert Testimony of Drs. Anderson and Prud'homme filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Hoeschen, Nathan) (Entered: 09/15/2025) |
| 09/15/2025 | 590 | PROPOSED ORDER − [Revised] re 522 MOTION to Exclude Certain Expert Testimony of Drs. Anderson and Prud'homme by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Attachments: # 1 Attachment A− Portions of Prud'homme Opening Report, # 2 Attachment B− Portions of Prud'homme Reply Report)(Hoeschen, Nathan) (Entered: 09/15/2025) |
| 09/15/2025 | 591 | REPLY BRIEF re 518 MOTION for Summary Judgment filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Hoeschen, Nathan) (Entered: 09/15/2025) |
| 09/15/2025 | 592 | STATEMENT re 591 Reply Brief *[ Plaintiffs' Reply Statement of Uncontested Facts in Support of Plaintiffs' Motion for Summary Judgment]* by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Hoeschen, Nathan) (Entered: 09/15/2025) |
| 09/15/2025 | 593 | [SEALED] DECLARATION of Matthew Lachman, Esq. re 592 Statement, 589 Reply Brief, 591 Reply Brief by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Attachments: # 1 Exhibit 100− Mitchell Opening Report, # 2 Exhibit 101− Heyes Tr., # 3 Exhibit 102− Reid Dep. Tr., # 4 Exhibit 103− Prud'homme Infringement Report, # 5 Exhibit 104− Prud'homme Reply Report, # 6 Exhibit 105− Prud'homme Opening Report, # 7 Exhibit 106− mRNA Formulation Development, # 8 Exhibit 107− '435 Appeal Notice, # 9 Exhibit 108− Jan. 23, 2020 Moderna Press Release, # 10 Exhibit 109− Conrad 2021, # 11 Exhibit 110− '069 Appeal Notice, # 12 Exhibit 111− Green 2008, # 13 Exhibit 112− Akinc 2008, # 14 Exhibit 113− Anderson Opening Report, # 15 Exhibit 114− Akinc 2009, # 16 Exhibit 115− 2013 MacLachlan Email, # 17 Exhibit 116− Murthy Validity Report, # 18 Exhibit 117− 2009 Collaboration Email, # 19 Exhibit 118− 2009 Reid Email, # 20 Exhibit 119− 2014 MacLachlan Email Chain, # 21 Exhibit 120− Hassett Tr., # 22 Exhibit 121− Mitchell Reply Report)(Hoeschen, Nathan) (Attachment 3 replaced on 9/29/2025) (jfm). (Entered: 09/15/2025) |
| 09/15/2025 | 594 | REDACTED VERSION of 593 Declaration,,,, *of Matthew Lachman, Esq.* by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Attachments: # 1 Exhibit 100− Mitchell Opening Report, # 2 Exhibit 101− Heyes Tr., # 3 Exhibit 102− Reid Dep. Tr., # 4 Exhibit 103− Prud'homme Infringement Report, # 5 Exhibit 104− Prud'homme Reply Report (redacted), # 6 Exhibit 105− Prud'homme Opening Report, # 7 Exhibit 106− mRNA Formulation Development, # 8 Exhibit 107− '435 Appeal Notice, # 9 Exhibit 108− Jan. 23, 2020 Moderna Press Release, # 10 Exhibit 109− Conrad 2021, # 11 Exhibit 110− '069 Appeal Notice, # 12 Exhibit 111− Green 2008, # 13 Exhibit 112− Akinc 2008, # 14 Exhibit 113− Anderson Opening Report, # 15 Exhibit 114− Akinc 2009, # 16 Exhibit 115− 2013 MacLachlan Email, # 17 Exhibit 116− Murthy Validity Report, # 18 Exhibit 117− 2009 Collaboration Email, # 19 Exhibit 118− 2009 Reid Email, # 20 Exhibit 119− 2014 MacLachlan Email Chain, # 21 Exhibit 120− Hassett Tr., # 22 Exhibit 121− Mitchell Reply Report)(Hoeschen, Nathan) (Attachment 3 replaced on 9/29/2025) (jfm). (Entered: 09/15/2025) |
| 09/15/2025 | 595 | MOTION to Preclude *Dr. Mitchell's Expert Report in Deciding Summary Judgment* − filed by Moderna, Inc., ModernaTX, Inc.. (Attachments: # 1 7.1.1 Statement, # 2 Text of Proposed Order)(Murray, Travis) (Entered: 09/15/2025) |
| 09/15/2025 | 596 | REPLY BRIEF re 510 MOTION to Preclude *Mr. Pitt's and Mr. Brill's Expert Reports*, 558 MOTION to Preclude *[Plaintiffs' Motion to Exclude Certain Expert Testimony of Rutherford, Vellturo and Prud'homme]*, 595 MOTION to Preclude *Dr. Mitchell's Expert Report in Deciding Summary Judgment* filed by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) (Entered: 09/15/2025) |
| 09/15/2025 | 597 | [SEALED] REPLY BRIEF re 507 MOTION for Summary Judgment *Pursuant to Federal Rules of Civil Procedure 56* filed by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) (Main Document 597 replaced on 10/7/2025) (oam). (Entered: 09/15/2025) |
| 09/15/2025 | 598 | [SEALED] STATEMENT re 565 Statement, − − *Moderna's Responses to Plaintiffs' Affirmative Statement of Uncontested Facts in Support of Their Cross−Motion for Summary Judgment* − − by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) (Main |

| | | |
|---|---|---|
| | | Document 598 replaced on 10/8/2025) (jfm). (Entered: 09/15/2025) |
| 09/15/2025 | 599 | [SEALED] STATEMENT re 568 Statement, −− *Moderna's Responses to Plaintiffs' Counterstatement of Facts to Moderna's Motion for Summary Judgment* −− by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) (Main Document 599 replaced on 10/8/2025) (jfm). (Entered: 09/15/2025) |
| 09/15/2025 | 600 | DECLARATION of Mark C. McLennan re 596 Reply Brief, 597 Reply Brief by Moderna, Inc., ModernaTX, Inc.. (Attachments: # 1 Ex. 82 − Brill Dep. Tr. [EXCERPT], # 2 Ex. 83 − Prud'homme Op. Rpt. [EXCERPT], # 3 Ex. 85 − Prud'homme Dep. Tr. [EXCERPT], # 4 Ex. 86 − 2024.11.25 Mitchell Opening Report EXCERPT, # 5 Ex. 87 − 11−2024 Email Chain, # 6 Ex. 88 − Mitchell Dep Tr EXCERPT, # 7 Ex. 90 − Johnson Dep Tr EXCERPT, # 8 Ex. 92 − W9113M−10−C−0057 Award, # 9 Ex. 93 − Tekmira Technical Proposal [EXCERPT], # 10 Ex. 94 − WO 2024220609, # 11 Ex. 95 − Genevant Resp. RFA No. 34 [EXCERPT], # 12 Ex. 96 − Arbutus Resp. RFA No. 34 [EXCERPT], # 13 Ex. 98 − Prud'Homme Third Sur−Reply Rpt, # 14 Ex. 99 − Genevant Presentation Aug 22, 2024, # 15 Ex. 100 − Genevant Presentation Sep 18, 2024, # 16 Ex. 101 − Rutherford Dep. Tr. [EXCERPT], # 17 Ex. 102 − 069 FH Sept 12, 2011 NOA, # 18 Ex. 103 − 2024−05−29 MacLachlan Dep Tr EXCERPT, # 19 Ex. 104 − Thomspon Dep. Tr. [EXCERPT], # 20 Ex. 105 − Meulien Op. Rpt. [EXCERPT], # 21 Ex. 106 − Bennett Dep. Tr. [EXCERPT], # 22 Ex. 108 − Parsons Dep. Tr. [EXCERPT], # 23 Ex. 109 − Murthy Dep. Tr. [EXCERPT], # 24 Ex. 110 − Nov 11, 2027 Email from L. Jeffs, # 25 Ex. 111 − Anderson Op. Rpt [EXCERPT], # 26 Ex. 114 − USG Contract C0017, # 27 Ex. 115 − Moderna Std. Form 30, # 28 Ex. 116 − Jeffs Dep. Tr. [EXCERPT], # 29 Ex. 117 − Yaworkski Dep. Tr. [EXCERPT], # 30 Ex. 118 − US Pat. Pub. 2005−0064595 [EXCERPT], # 31 Ex. 119 − Genevant Supp. Resp. to Rog No. 14 [EXCERPT])(Murray, Travis) (Entered: 09/15/2025) |
| 09/15/2025 | 601 | [SEALED] DECLARATION of Mark C. McLennan re 597 Reply Brief, 596 Reply Brief, by Moderna, Inc., ModernaTX, Inc.. (Attachments: # 1 Ex. 84 − Prud'homme Reply Rpt. [EXCERPT], # 2 Ex. 89 − Schuster Op. Rpt. [EXCERPT], # 3 Ex. 91 − Prud'Homme Reb. Rpt [EXCERPT], # 4 Ex. 97 − Murthy Validity Rpt. [EXCERPT], # 5 Ex. 107 − 7−31−2020 Email, # 6 Ex. 112 − Li Dep. Tr. [EXCERPT], # 7 Ex. 113 − Plfs' 3rd Supp. Infringement Contentions)(Murray, Travis) (Attachment 1 replaced on 10/8/2025) (jfm). (Attachment 2 replaced on 10/8/2025) (jfm). (Entered: 09/15/2025) |
| 09/15/2025 | 602 | REDACTED VERSION of 601 Declaration, by Moderna, Inc., ModernaTX, Inc.. (Attachments: # 1 REDACTED Ex. 84 − Prud'homme Reply Rpt. [EXCERPT], # 2 REDACTED Ex. 89 − Schuster Op. Rpt. [EXCERPT], # 3 REDACTED Ex. 91 − Prud'Homme Reb. Rpt [EXCERPT], # 4 REDACTED Ex. 97 − Murthy Validity Rpt. [EXCERPT], # 5 REDACTED Ex. 107 − 7−31−2020 Email_Redacted, # 6 REDACTED Ex. 112 − Li Dep. Tr. [EXCERPT], # 7 REDACTED Ex. 113 − Plfs' 3rd Supp. Infringement Contentions)(Murray, Travis) (Attachment 1 replaced on 10/8/2025) (jfm). (Attachment 2 replaced on 10/8/2025) (jfm). (Entered: 09/15/2025) |
| 09/15/2025 | 603 | MOTION to Seal *Portions of Plaintiffs' and Moderna's Reply Dispositive Motion Filings* − filed by Moderna, Inc., ModernaTX, Inc.. (Attachments: # 1 7.1.1 Statement, # 2 Text of Proposed Order)(Murray, Travis) (Entered: 09/15/2025) |
| 09/15/2025 | 604 | OPENING BRIEF in Support re 603 MOTION to Seal *Portions of Plaintiffs' and Moderna's Reply Dispositive Motion Filings* filed by Moderna, Inc., ModernaTX, Inc..Answering Brief/Response due date per Local Rules is 9/29/2025. (Attachments: # 1 Exhibit A − Doyle Declaration)(Murray, Travis) (Entered: 09/15/2025) |
| 09/15/2025 | 605 | REDACTED VERSION of 597 Reply Brief by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) (Main Document 605 replaced on 10/7/2025) (oam). (Entered: 09/15/2025) |
| 09/15/2025 | 606 | REDACTED VERSION of 598 Statement, by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) (Main Document 606 replaced on 10/8/2025) (jfm). (Entered: 09/15/2025) |
| 09/15/2025 | 607 | REDACTED VERSION of 599 Statement by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) (Main Document 607 replaced on 10/8/2025) (jfm). (Entered: 09/15/2025) |

| | | |
|---|---|---|
| 09/18/2025 | 608 | ANSWERING BRIEF in Opposition re 603 MOTION to Seal *Portions of Plaintiffs' and Moderna's Reply Dispositive Motion Filings* filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.Reply Brief due date per Local Rules is 9/25/2025. (Hoeschen, Nathan) (Entered: 09/18/2025) |
| 09/22/2025 | 609 | NOTICE OF SERVICE of 1. Plaintiffs' Sur−Reply Brief In Support of Plaintiffs' Cross−Motion for Summary Judgment 2. Plaintiffs' Reply Affirmative Statement of Uncontested Facts in Support of their Cross−Motion for Summary Judgment 3. Plaintiffs' Reply in Support of Motion to Exclude Certain Expert Testimony of Rutherford, Vellturo, and Prud'homme, and Opposition to Motion to Exclude Certain Testimony of Mitchell 4. Declaration of Matthew W. Lachman with Exhibits 122 − 140 filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.(Hoeschen, Nathan) (Entered: 09/22/2025) |
| 09/23/2025 | 610 | [SEALED] SUR−REPLY BRIEF re 562 Cross MOTION for Summary Judgment filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Hoeschen, Nathan) (Main Document 610 replaced on 10/8/2025) (jfm). (Entered: 09/23/2025) |
| 09/23/2025 | 611 | [SEALED] REPLY BRIEF re 558 MOTION to Preclude *[Plaintiffs' Motion to Exclude Certain Expert Testimony of Rutherford, Vellturo and Prud'homme] and Opposition to Motion to Exclude Certain Testimony of Mitchell* filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Hoeschen, Nathan) (Entered: 09/23/2025) |
| 09/23/2025 | 612 | [SEALED] STATEMENT re 610 Sur−Reply Brief − *Plaintiffs' Reply Affirmative Statement of Uncontested Facts in Support of their Cross−Motion for Summary Judgment* by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Hoeschen, Nathan) (Main Document 612 replaced on 10/8/2025) (jfm). (Entered: 09/23/2025) |
| 09/23/2025 | 613 | [SEALED] DECLARATION of Matthew W. Lachman, Esq. re 611 Reply Brief, 612 Statement, 610 Sur−Reply Brief by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Attachments: # 1 Exhibit 122 − Fenton Infringement Report, # 2 Exhibit 123 − Prud'homme Infringement Report, # 3 Exhibit 124 − Mitchell Opening Report, # 4 Exhibit 125 − August 2025 Schuster Tr., # 5 Exhibit 126 Method Development Data, # 6 Exhibit 127 − April 2025 Schuster Tr., # 7 Exhibit 128 − Mitchell Reply Report, # 8 Exhibit 129 − Judge Goldberg Policies, # 9 Exhibit 130 − Anderson Tr., # 10 Exhibit 131 − Email Re Mitchell Exhibit Scripts, # 11 Exhibit 132 − Mitchell Tr., # 12 Exhibit 133 − Fenton Tr., # 13 Exhibit 134 − Godshalk Tr., # 14 Exhibit 135 − Godshalk Report, # 15 Exhibit 136 − Anderson Opening Report, # 16 Exhibit 137 − Prud'homme Tr., # 17 Exhibit 138 − Tekmira Press Release, # 18 Exhibit 139 Mitchell Accounting Record, # 19 Exhibit 140 − Anderson Reply Report)(Hoeschen, Nathan) (Attachment 3 replaced on 10/8/2025) (jfm). (Attachment 5 replaced on 10/8/2025) (jfm). (Attachment 11 replaced on 10/8/2025) (jfm). (Entered: 09/23/2025) |
| 09/23/2025 | 614 | REDACTED VERSION of 610 Sur−Reply Brief by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Hoeschen, Nathan) (Main Document 614 replaced on 10/8/2025) (jfm). (Entered: 09/23/2025) |
| 09/23/2025 | 615 | REDACTED VERSION of 611 Reply Brief, by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Hoeschen, Nathan) (Entered: 09/23/2025) |
| 09/23/2025 | 616 | REDACTED VERSION of 612 Statement, by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Hoeschen, Nathan) (Main Document 616 replaced on 10/8/2025) (jfm). (Entered: 09/23/2025) |
| 09/23/2025 | 617 | REDACTED VERSION of 613 Declaration,,,, *of Matthew W. Lachman* by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Attachments: # 1 Exhibit ) Exhibit 122 − Fenton Infringement Report, # 2 Exhibit Exhibit 123 − Prud'homme Infringement Report, # 3 Exhibit ) Exhibit 124 − Mitchell Opening Report, # 4 Exhibit Exhibit 125 − August 2025 Schuster Tr., # 5 Exhibit Exhibit 126 Method Development Data, # 6 Exhibit Exhibit 127 − April 2025 Schuster Tr., # 7 Exhibit Exhibit 128 − Mitchell Reply Report, # 8 Exhibit Exhibit 129 − Judge Goldberg Policies, # 9 Exhibit Exhibit 130 − Anderson Tr., # 10 Exhibit Exhibit 131 − Email Re Mitchell Exhibit Scripts, # 11 Exhibit Exhibit 132 − Mitchell Tr., # 12 Exhibit Exhibit 133 − Fenton Tr., # 13 Exhibit Exhibit 134 − Godshalk Tr., # 14 Exhibit Exhibit 135 − Godshalk Report, # 15 Exhibit Exhibit 136 − Anderson Opening Report, # 16 Exhibit |

| | | |
|---|---|---|
| | | Exhibit 137 − Prud'homme Tr., # 17 Exhibit Exhibit 138 − Tekmira Press Release, # 18 Exhibit Exhibit 139 − Mitchell Accounting Record, # 19 Exhibit Exhibit 140 − Anderson Reply Report)(Hoeschen, Nathan) (Attachment 3 replaced on 10/8/2025) (jfm). (Attachment 5 replaced on 10/8/2025) (jfm). (Attachment 11 replaced on 10/8/2025) (jfm). (Entered: 09/23/2025) |
| 09/23/2025 | 618 | STIPULATION to Correct Exhibits re 545 Order by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Hoeschen, Nathan) (Entered: 09/23/2025) |
| 09/23/2025 | 619 | MOTION to Seal *Portions of Exhibits to Plaintiffs' Reply and Sur−Reply Dispositive Motion Filings (Partially Opposed)* − filed by Moderna, Inc., ModernaTX, Inc.. (Attachments: # 1 Proposed Order, # 2 7.1.1 Certification)(Murray, Travis) (Entered: 09/23/2025) |
| 09/23/2025 | 620 | OPENING BRIEF in Support re 619 MOTION to Seal *Portions of Exhibits to Plaintiffs' Reply and Sur−Reply Dispositive Motion Filings (Partially Opposed)* filed by Moderna, Inc., ModernaTX, Inc..Answering Brief/Response due date per Local Rules is 10/7/2025. (Attachments: # 1 Exhibit 1 − Declaration of Brian Doyle)(Murray, Travis) (Entered: 09/23/2025) |
| 09/26/2025 | 621 | STIPULATION AND ORDER: Re D.I. 618 , The versions exhibits 5, 7, 14, 32, 44−47, 71 and 102 to the Declarations of Mathew Lachman filed in sealed form at D.I. Nos. 526−5, 526−7, 526−14, 571−3, 571−15, 571−16, 571−17, 571−18, 571−42 and 593−3 and in redacted form at D.I. Nos. 538−5, 538−7, 538−14, 579−3, 579−15, 579−16, 579−17, 579−18, 579−42 and 594−3 shall be replaced with corrected versions. Plaintiffs shall submit the corrected version to the Clerk via email. Signed by Judge Joshua D. Wolson on 9/26/2025. (cdd) (Entered: 09/26/2025) |
| 09/26/2025 | 622 | ORDER: it is ORDERED that Moderna's Partially Opposed Motion to Seal Portions of Plaintiffs' and Moderna's Answering Dispositive Motions Filings (D.I. 576 ) is DENIED IN PART and GRANTED IN PART (see order for further details). Signed by Judge Joshua D. Wolson on 09/26/2025. (jfm) (Entered: 09/26/2025) |
| 09/26/2025 | 623 | REPLY BRIEF re 595 MOTION to Preclude *Dr. Mitchell's Expert Report in Deciding Summary Judgment* − filed by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) (Entered: 09/26/2025) |
| 09/26/2025 | 624 | DECLARATION of Mark C. McLennan re 623 Reply Brief by Moderna, Inc., ModernaTX, Inc.. (Attachments: # 1 Ex 120 − 2024−04−19 − Email from S. Yu to Counsel re Anderson)(Murray, Travis) (Entered: 09/26/2025) |
| 09/29/2025 | | CORRECTING ENTRY: D.I. Nos. 526−5, 526−7, 526−14, 538−5, 538−7, 538−14, 571−3, 571−15, 571−16, 571−17, 571−18, 571−42, 579−3, 579−15, 579−16, 579−17, 579−18, 579−42, 593−3, and 594−3 have been replaced with corrected versions, per the Order at D.I. 621 . (jfm) (Entered: 09/29/2025) |
| 09/29/2025 | 625 | REQUEST for Oral Argument by Arbutus Biopharma Corporation, Genevant Sciences GmbH re 510 MOTION to Preclude *Mr. Pitt's and Mr. Brill's Expert Reports*, 507 MOTION for Summary Judgment *Pursuant to Federal Rules of Civil Procedure 56*, 562 Cross MOTION for Summary Judgment , 558 MOTION to Preclude *[Plaintiffs' Motion to Exclude Certain Expert Testimony of Rutherford, Vellturo and Prud'homme]*, 595 MOTION to Preclude *Dr. Mitchell's Expert Report in Deciding Summary Judgment*, 518 MOTION for Summary Judgment , 522 MOTION to Exclude Certain Expert Testimony of Drs. Anderson and Prud'homme . (Hoeschen, Nathan) (Entered: 09/29/2025) |
| 09/29/2025 | 626 | ORDER: The Clerk of Court shall SEAL Moderna's Responses To Plaintiffs'Counterstatement Of Facts To Modernas Motion For Summary Judgment (D.I. 607 ), which contains confidential material that is identical (or substantially similar) to material that I permitted Moderna to file under seal on prior occasions (see D.I. 546 , 622 ). On or before October 1, 2025, Moderna shall provide the Clerk of Court with a redacted version of D.I. 607 for substitution on the docket. Signed by Judge Joshua D. Wolson on 9/29/2025. (mpb) (Entered: 09/29/2025) |
| 09/29/2025 | 627 | Joint STIPULATION to Extend Case Deadlines − by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) (Entered: 09/29/2025) |

| | | |
|---|---|---|
| 09/30/2025 | 628 | ORDER: Granting 627 Joint STIPULATION to Extend Case Deadlines. IT IS HEREBY STIPULATED AND AGREED by the parties, subject to the approval ofthe Court, that the time for Plaintiffs to file any opposition brief to Modernas Motion to Seal Sur−Reply Filings shall be extended from September 29, 2025 to October 1, 2025. The parties willnotify the Court by October 1, 2025 if the parties are able to narrow their disputes and if Modernawill withdraw any of its proposed redactions in Moderna's Motion to Seal Sur−Reply Filings. IT IS FURTHER STIPULATED AND AGREED by the parties, subject to the approval ofthe Court, that the parties will notify the Court by October 3, 2025 if the parties are able to narrowtheir disputes and if Moderna will withdraw any of its proposed redactions in Modernas Motionto Seal Reply Filings. Signed by Judge Joshua D. Wolson on 09/30/2025. (oam) (Entered: 09/30/2025) |
| 10/01/2025 | 629 | MOTION for Pro Hac Vice Appearance of Attorney Jaime A. Santos and William M. Jay − filed by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) (Entered: 10/01/2025) |
| 10/01/2025 | 630 | Pro Hac Vice Fee − Credit Card Payment received for Jaime A. Santos and William M. Jay. ( re 629 MOTION for Pro Hac Vice Appearance of Attorney Jaime A. Santos and William M. Jay )( Payment of $ 100, receipt number ADEDC−4802938).(Murray, Travis) (Entered: 10/01/2025) |
| 10/01/2025 | 631 | STIPULATION and Order regarding Pending Motions to Seal by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Hoeschen, Nathan) (Entered: 10/01/2025) |
| 10/02/2025 | | CORRECTING ENTRY: D.I. Nos. 572, 574, 579−19. 579−55, 579−56, 579−62, and 579−64 have been replaced with corrected versions, per the Order at D.I. 622 . (jfm) (Entered: 10/02/2025) |
| 10/02/2025 | 632 | ORDER granting D.I. 629 Motion to Appear Pro Hac Vice of Jaime A. Santos and William M. Jay. Signed by Judge Joshua D. Wolson on 10/2/2025. (cdd) (Entered: 10/02/2025) |
| 10/03/2025 | 633 | ORDER: Granting 631 STIPULATION and Order regarding Pending Motions to Seal. Signed by Judge Joshua D. Wolson on 10/03/2025. (oam) (Entered: 10/03/2025) |
| 10/03/2025 | 634 | ORDER: Moderna's Partially Opposed Motion to Seal Portions of Plaintiffs' and Moderna's Reply Dispositive Motion Filings (D.I. 603 ) is GRANTED, consistent with the Parties' Stipulation at D.I. 633 . Moderna's Partially Opposed Motion to Seal Portions of Plaintiffs' and Moderna's Answering Dispositive Motion Filings (D.I. 619 ) is GRANTED, consistent with the Parties' Stipulation at D.I. 633 ; and Consistent with this Order and the Parties' Stipulation at D.I. 633 , on or before October 7, 2025, the Parties shall either: (a) re−file any documents for which Moderna has withdrawn its requests to seal and/or redact, or (b) coordinate with the Clerk's Office to substitute those documents on the docket where necessary. Signed by Judge Joshua D. Wolson on 10/03/2025. (jfm) (Main Document 634 replaced on 10/3/2025) (jfm). Modified on 10/3/2025 (jfm). (Entered: 10/03/2025) |
| 10/03/2025 | 635 | STIPULATION and [Proposed] Order to Correct Briefing re 524 Opening Brief in Support, 605 Redacted Document, 597 Reply Brief, 529 Redacted Document − by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) (Entered: 10/03/2025) |
| 10/06/2025 | 636 | ORDER: Granting re 635 the parties stipulate and agree, subject to the approval of the Court, that Docket Items 524 , 529 , 597 , and 605 shall be replaced with coITected versions. The parties shall submit the coITected versions to the Clerk via email upon the Court approving this stipulation, and the Clerk shall make the substitutions on the docket. Signed by Judge Joshua D. Wolson on 10/06/2025. (oam) (Entered: 10/06/2025) |
| 10/07/2025 | | CORRECTING ENTRY: Documents at D.I. 524 , 529 , 59 7, and 605 replaced per Order D.I. 636 (oam) (Entered: 10/07/2025) |
| 10/08/2025 | | CORRECTING ENTRY: D.I. Nos. 598 , 599 , 601 −1, 601 −2, 602 −1, 602 −2, 606 , 607 , 610 , 612 , 613 −3, 613 −5, 613 −11, 614 , 616 , 617 −3, 617 −5, and 617 −11 have been replaced with corrected versions per the Orders at D.I. 633 & 636 . (jfm) (Entered: 10/08/2025) |

| | | |
|---|---|---|
| 10/16/2025 | 637 | STIPULATION and [Proposed] Order Regarding Modification of Daubert Motion Deadlines − by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) (Entered: 10/16/2025) |
| 10/21/2025 | 638 | ORDER, granting 637 STIPULATION Regarding Modification of Daubert Motion Deadlines. Signed by Judge Joshua D. Wolson on 10/21/2025. (jfm) (Entered: 10/21/2025) |
| 10/22/2025 | 639 | MOTION for Pro Hac Vice Appearance of Attorney Jordan Bock and Gabriel B. Ferrante − filed by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) (Entered: 10/22/2025) |
| 10/22/2025 | 640 | Pro Hac Vice Fee − Credit Card Payment received for Jordan Bock and Gabriel B. Ferrante. ( re 639 MOTION for Pro Hac Vice Appearance of Attorney Jordan Bock and Gabriel B. Ferrante )( Payment of $ 100, receipt number ADEDC−4819616).(Murray, Travis) (Entered: 10/22/2025) |
| 10/23/2025 | 641 | ORDER: Granting 639 MOTION for Pro Hac Vice Appearance of Attorney Jordan Bock and Gabriel B. Ferrante. Signed by Judge Joshua D. Wolson on 10/23/2025. (oam) (Entered: 10/23/2025) |
| 11/05/2025 | 642 | STIPULATION and Order regarding Pretrial Exchanges by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Hoeschen, Nathan) (Entered: 11/05/2025) |
| 11/10/2025 | 643 | NOTICE OF SERVICE of (1) Moderna's Daubert Motion; (2) Moderna's Motion to Exclude the Expert Opinions of Catharine Lawton, Georg Schuster, Ph.D., Michael Mitchell, Ph.D., Peter J. Pitts, and Alex M. Brill; and (3) Declaration of Mark C. McLennan in Support of Moderna's Motion to Exclude the Expert Opinions of Catharine Lawton, Georg Schuster, Ph.D., Michael Mitchell, Ph.D., Peter J. Pitts, and Alex M. Brill filed by Moderna, Inc., ModernaTX, Inc..(Murray, Travis) (Entered: 11/10/2025) |
| 11/10/2025 | 644 | NOTICE OF SERVICE of (1) Plaintiffs' Motion to Exclude Expert Testimony and Proposed Order and (2) Plaintiffs' Opening Brief in Support of Motion to Exclude Expert Testimony and supporting exhibits filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.(Hoeschen, Nathan) (Entered: 11/10/2025) |
| 11/11/2025 | 645 | NOTICE of Withdrawal of Appearance of Lindsey M. Gellar by Arbutus Biopharma Corporation, Genevant Sciences GmbH (Keller, Karen) (Entered: 11/11/2025) |
| 11/12/2025 | 646 | ORDER, granting 642 STIPULATION and Order regarding Pretrial Exchanges. Signed by Judge Joshua D. Wolson on 11/12/2025. (jfm) (Entered: 11/12/2025) |
| 11/21/2025 | 647 | NOTICE OF SERVICE of (1) Moderna's Opposition to Plaintiffs' Motion to Exclude Expert Testimony; and (2) Declaration of Yan−Xin Li in Support of Moderna's Opposition to Plaintiffs' Motion to Exclude Expert Testimony filed by Moderna, Inc., ModernaTX, Inc..(Murray, Travis) (Entered: 11/21/2025) |
| 11/24/2025 | 648 | NOTICE OF SERVICE of Plaintiffs' Responsive Brief in Opposition to Moderna's Daubert Motion filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.(Hoeschen, Nathan) (Entered: 11/24/2025) |
| 12/05/2025 | 649 | NOTICE OF SERVICE of (1) Moderna's Daubert Reply; and (2) Declaration of Yan−Xin Li in Support of Moderna's Daubert Reply filed by Moderna, Inc., ModernaTX, Inc..(Murray, Travis) (Entered: 12/05/2025) |
| 12/08/2025 | 650 | NOTICE OF SERVICE of Plaintiffs' Reply Brief in Support of Motion to Exclude Expert Testimony with Exhibits 1 − 42 filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.(Hoeschen, Nathan) (Entered: 12/08/2025) |
| 12/09/2025 | 651 | STIPULATION TO EXTEND TIME for Daubert motions and sealing deadlines set forth in D.I. 638 to dates as outlined in the stipulation − filed by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) (Entered: 12/09/2025) |
| 12/11/2025 | 652 | SO ORDERED, re 651 STIPULATION TO EXTEND TIME for Daubert motions and sealing deadlines set forth in D.I. 638 to dates as outlined in the stipulation filed by Moderna, Inc., ModernaTX, Inc. Signed by Judge Joshua D. Wolson on 12/11/2025. (mpb) (Entered: 12/11/2025) |

| | | |
|---|---|---|
| 12/16/2025 | 653 | Unopposed MOTION to Seal Document: *[PLAINTIFFS' UNOPPOSED MOTION TO SEAL PORTIONS OF DAUBERT BRIEFING]* − filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Attachments: # 1 Text of Proposed Order)(Hoeschen, Nathan) (Entered: 12/16/2025) |
| 12/16/2025 | 654 | OPENING BRIEF in Support re 653 Unopposed MOTION to Seal Document: *[PLAINTIFFS' UNOPPOSED MOTION TO SEAL PORTIONS OF DAUBERT BRIEFING]* filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.Answering Brief/Response due date per Local Rules is 12/30/2025. (Attachments: # 1 Exhibit A − Declaration of P. Zorn ISO Motion to Seal Daubert Briefing)(Hoeschen, Nathan) (Entered: 12/16/2025) |
| 12/16/2025 | 655 | MOTION to Preclude *the Expert Opinions of Catharine Lawton, Georg Schuster, Ph.D., Michael Mitchell, Ph.D., Peter J. Pitts, and Alex M. Brill* − filed by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) (Entered: 12/16/2025) |
| 12/16/2025 | 656 | [SEALED] OPENING BRIEF in Support re 655 MOTION to Preclude *the Expert Opinions of Catharine Lawton, Georg Schuster, Ph.D., Michael Mitchell, Ph.D., Peter J. Pitts, and Alex M. Brill* filed by Moderna, Inc., ModernaTX, Inc..Answering Brief/Response due date per Local Rules is 12/30/2025. (Murray, Travis) (Entered: 12/16/2025) |
| 12/16/2025 | 657 | MOTION to Preclude *[PLAINTIFFS' MOTION TO EXCLUDE EXPERT TESTIMONY]* − filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Attachments: # 1 Text of Proposed Order)(Hoeschen, Nathan) (Entered: 12/16/2025) |
| 12/16/2025 | 658 | [SEALED] DECLARATION of Mark C. McLennan re 656 Opening Brief in Support, −−*Volume 1*−− by Moderna, Inc., ModernaTX, Inc.. (Attachments: # 1 Exhibit A − Lawton Opening Report (Excerpts) (Part 1), # 2 Exhibit A − Lawton Opening Report (Excerpts) (Part 2))(Murray, Travis) (Entered: 12/16/2025) |
| 12/16/2025 | 659 | [SEALED] DECLARATION of Mark C. McLennan re 656 Opening Brief in Support, −−*Volume 2*−− by Moderna, Inc., ModernaTX, Inc.. (Attachments: # 1 Exhibit B − Lawton Rebuttal Report (Excerpts), # 2 Exhibit C − Lawton Reply Report (Excerpts), # 3 Exhibit D − Lawton Dep. Transcript (Excerpts), # 4 Exhibit E− Mitchell Opening Report (Excerpts))(Murray, Travis) (Entered: 12/16/2025) |
| 12/16/2025 | 660 | [SEALED] DECLARATION of Mark C. McLennan re 656 Opening Brief in Support, −−*Volume 3*−− by Moderna, Inc., ModernaTX, Inc.. (Attachments: # 1 Exhibit F − Mitchell Reply Report v2 (Excerpts), # 2 Exhibit I − Fenton Rebuttal Report (Excerpts), # 3 Exhibit J − Prud'Homme Rebuttal (Excerpts), # 4 Exhibit O − May 8, 2024 Deposition of J. Schariter (Excerpts), # 5 Exhibit P − June 7, 2024 Deposition of D. Parsons (Excerpts), # 6 Exhibit R − Genevant License (GENV−00023616), # 7 Exhibit S − Genevant License (GENV−00022307), # 8 Exhibit U − Schuster Reply Report, # 9 Exhibit V − Lawton First Supplemental Opening Report)(Murray, Travis) (Entered: 12/16/2025) |
| 12/16/2025 | 661 | DECLARATION of Mark C. McLennan re 656 Opening Brief in Support, −−*Volume 4*−− by Moderna, Inc., ModernaTX, Inc.. (Attachments: # 1 Exhibit G − Schuster Opening Report [Excerpt], # 2 Exhibit H − April 11, 2025 Deposition of G. Schuster [Excerpt], # 3 Exhibit K − Prud'Homme Third Sur−Reply Report, # 4 Exhibit L − Aug. 6, 2025 Deposition of G. Schuster [Excerpt], # 5 Exhibit M − Pitts Rebuttal Report, # 6 Exhibit N − Brill Responsive Report, # 7 Exhibit Q − Schuster Presentation (GENV−01102754), # 8 Exhibit T − April 30, 2025 Deposition of M. Mitchell [Excerpt])(Murray, Travis) (Entered: 12/16/2025) |
| 12/16/2025 | 662 | [SEALED] ANSWERING BRIEF in Opposition re 657 MOTION to Preclude *[PLAINTIFFS' MOTION TO EXCLUDE EXPERT TESTIMONY]* filed by Moderna, Inc., ModernaTX, Inc..Reply Brief due date per Local Rules is 12/23/2025. (Murray, Travis) (Entered: 12/16/2025) |
| 12/16/2025 | 663 | [SEALED] OPENING BRIEF in Support re 657 MOTION to Preclude *[PLAINTIFFS' MOTION TO EXCLUDE EXPERT TESTIMONY]* filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.Answering Brief/Response due date per Local Rules is 12/30/2025. (Attachments: # 1 Exhibit 01 − Vellturo Rebuttal Report, # 2 Exhibit 02 − 2017 Hoge Email, # 3 Exhibit 03 − Zorn Tr, # 4 Exhibit 04 − Vellturo Tr, # 5 Exhibit 05 − Lawton Reply, # 6 Exhibit 06 − Moderna Press Release re Phase 1 Data, # 7 Exhibit 07 − Moderna Press Release re Phase II Trial, # 8 Exhibit 08 − |

| | | |
|---|---|---|
| | | Moderna Press Release re BARDA Grant, # 9 Exhibit 09 − CRS Report re OWS Contracts, # 10 Exhibit 10 − CBC Article, # 11 Exhibit 11 − National Post Article, # 12 Exhibit 12 − Providence Slide Deck, # 13 Exhibit 13 − Vellturo Ex. 7, # 14 Exhibit 14 − Vellturo Ex. 6, # 15 Exhibit 15 − Moderna five−year plan, # 16 Exhibit 16 − Hoge Tr, # 17 Exhibit 17 − May 2020 Moderna Board Deck, # 18 Exhibit 18 − Benenato Tr, # 19 Exhibit 19 − Parsons Tr, # 20 Exhibit '20 − Prud'homme Tr, # 21 Exhibit 21 − Prud'homme Rebuttal, # 22 Exhibit 22 − Mitchell Opening Report, # 23 Exhibit 23 − Anderson Tr., # 24 Exhibit 24 − Moderna Internal Report, # 25 Exhibit 25 − Moderna Stability Report, # 26 Exhibit 26 − Moderna Slide Deck, # 27 Exhibit 27 − Anderson Reply Report, # 28 Exhibit 28 − Anderson Opening Report, # 29 Exhibit 29 − Prud'homme Opening Excerpt., # 30 Exhibit 30 − Prud"homme Reply Excerpt)(Hoeschen, Nathan) (Entered: 12/16/2025) |
| 12/16/2025 | 664 | [SEALED] DECLARATION of Yan−Xin Li re 662 Answering Brief in Opposition, −−*Volume 1*−− by Moderna, Inc., ModernaTX, Inc.. (Attachments: # 1 Exhibit 31 − Exhibit 4 Corrected Vellturo Rebuttal Report, # 2 Exhibit 33 − May 2020 Genevant License (GENV−00022307) (excerpts), # 3 Exhibit 36 − Exhibit 10 Corrected Vellturo Rebuttal Report, # 4 Exhibit 37 − Jan 2021 Genevant License (GENV−00022689) (excerpts), # 5 Exhibit 38 − Opening Expert Report of Catharine M. Lawton (excerpt))(Murray, Travis) (Entered: 12/16/2025) |
| 12/16/2025 | 665 | DECLARATION of Yan−Xin Li re 662 Answering Brief in Opposition, −−*Volume 2*−− by Moderna, Inc., ModernaTX, Inc.. (Attachments: # 1 Exhibit 32 − Exhibit 5 to Corrected Vellturo Rebuttal Report, # 2 Exhibit 34 − Exhibit 8 to Corrected Vellturo Rebuttal Report, # 3 Exhibit 35 − Exhibit 9 to Corrected Vellturo Rebuttal Report, # 4 Exhibit 39 − Genevant Second Suppl Rsp. to Moderna's 2nd Set of ROGs (Nos. 8−10) (excerpt))(Murray, Travis) (Entered: 12/16/2025) |
| 12/16/2025 | 666 | [SEALED] REPLY BRIEF re 655 MOTION to Preclude *the Expert Opinions of Catharine Lawton, Georg Schuster, Ph.D., Michael Mitchell, Ph.D., Peter J. Pitts, and Alex M. Brill* filed by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) (Entered: 12/16/2025) |
| 12/16/2025 | 667 | REDACTED VERSION of 663 Opening Brief in Support,,,,,, by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Attachments: # 1 Exhibit 01 − Vellturo Rebuttal Report, # 2 Exhibit 02 − 2017 Hoge Email, # 3 Exhibit 03 − Zorn Tr, # 4 Exhibit 04 − Vellturo Tr, # 5 Exhibit 05 − Lawton Reply, # 6 Exhibit 06 − Moderna Press Release re Phase 1 Data, # 7 Exhibit 07 − Moderna Press Release re Phase II Trial, # 8 Exhibit 08 − Moderna Press Release re BARDA Grant, # 9 Exhibit 09 − CRS Report re OWS Contracts, # 10 Exhibit 10 − CBC Article, # 11 Exhibit 11 − National Post Article, # 12 Exhibit 12 − Providence Slide Deck, # 13 Exhibit 13 − Vellturo Ex. 7, # 14 Exhibit 14 − Vellturo Ex. 6, # 15 Exhibit 15 − Moderna five−year plan, # 16 Exhibit 16 − Hoge Tr, # 17 Exhibit 17 − May 2020 Moderna Board Deck, # 18 Exhibit 18 − Benenato Tr, # 19 Exhibit 19 − Parsons Tr, # 20 Exhibit 20 − Prud'homme Tr, # 21 Exhibit 21 − Prud'homme Rebuttal, # 22 Exhibit 22 − Mitchell Opening Report, # 23 Exhibit 23 − Anderson Tr., # 24 Exhibit 24 − Moderna Internal Report, # 25 Exhibit 25 − Moderna Stability Report, # 26 Exhibit 26 − Moderna Slide Deck, # 27 Exhibit 27 − Anderson Reply Report, # 28 Exhibit 28 − Anderson Opening Report, # 29 Exhibit 29 − Prud'homme Opening Excerpt, # 30 Exhibit 30 − Prud'homme Reply Excerpt)(Hoeschen, Nathan) (Entered: 12/16/2025) |
| 12/16/2025 | 668 | [SEALED] DECLARATION of Yan−Xin Li re 666 Reply Brief, by Moderna, Inc., ModernaTX, Inc.. (Attachments: # 1 Exhibit RR − Prud'homme Sur−Reply Report (Excerpts))(Murray, Travis) (Entered: 12/16/2025) |
| 12/16/2025 | 669 | DECLARATION of Yan−Xin Li re 666 Reply Brief, by Moderna, Inc., ModernaTX, Inc.. (Attachments: # 1 Exhibit QQ − Fenton Sur−Reply Report (excerpt))(Murray, Travis) (Entered: 12/16/2025) |
| 12/16/2025 | 670 | REDACTED VERSION of 656 Opening Brief in Support, by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) (Entered: 12/16/2025) |
| 12/16/2025 | 671 | [SEALED] ANSWERING BRIEF in Opposition re 655 MOTION to Preclude *the Expert Opinions of Catharine Lawton, Georg Schuster, Ph.D., Michael Mitchell, Ph.D., Peter J. Pitts, and Alex M. Brill* filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.Reply Brief due date per Local Rules is 12/23/2025. (Attachments: # 1 Exhibit W − June 2020 Board Deck, # 2 Exhibit X − Moderna July |

| | | |
|---|---|---|
| | | 10 Proposal, # 3 Exhibit Y − May 31 Offer Letter, # 4 Exhibit Z − May 2020 Board Deck, # 5 Exhibit AA − Porter Opening Report, # 6 Exhibit BB − Tal Zaks Email, # 7 Exhibit CC − Malackowski Report Excerpt, # 8 Exhibit DD − Heterogeneity Presentation, # 9 Exhibit EE − Schuster Data, # 10 Exhibit FF − Moderna Fractionation Presentation, # 11 Exhibit GG − Schuster Validation, # 12 Exhibit HH − BARDA Presentation, # 13 Exhibit II − Moderna Whitepaper, # 14 Exhibit JJ − Moderna Process Development, # 15 Exhibit KK − Schariter Email, # 16 Exhibit LL − Esco., # 17 Exhibit MM − 2015 Moderna Slides, # 18 Exhibit NN − Benenato Tr, # 19 Exhibit OO − 2018 Moderna Presentation, # 20 Exhibit PP − Francis Tr)(Hoeschen, Nathan) (Attachment 8 replaced on 12/17/2025) (scs). (Attachment 10 replaced on 12/17/2025) (scs). (Attachment 12 replaced on 12/17/2025) (scs). (Entered: 12/16/2025) |
| 12/16/2025 | 672 | REDACTED VERSION of 671 Answering Brief in Opposition,,,, by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Attachments: # 1 Exhibit W − June 2020 Board Deck, # 2 Exhibit X − Moderna July 10 Proposal, # 3 Exhibit Y − May 31 Offer Letter, # 4 Exhibit Z − May 2020 Board Deck, # 5 Exhibit AA − Porter Opening Report, # 6 Exhibit BB − Tal Zaks Email, # 7 Exhibit CC − Malackowski Report Excerpt, # 8 Exhibit DD − Heterogeneity Presentation, # 9 Exhibit EE − Schuster Data, # 10 Exhibit FF − Moderna Fractionation Presentation, # 11 Exhibit GG − Schuster Validation, # 12 Exhibit HH − BARDA Presentation, # 13 Exhibit II − Moderna Whitepaper, # 14 Exhibit JJ − Moderna Process Development, # 15 Exhibit KK − Schariter Email, # 16 Exhibit LL − Esco, # 17 Exhibit MM − 2015 Moderna Slides, # 18 Exhibit Exhibit NN − Benenato Tr, # 19 Exhibit OO − 2018 Moderna Presentation, # 20 Exhibit PP − Francis Tr)(Hoeschen, Nathan) (Attachment 8 replaced on 12/17/2025) (scs). (Attachment 10 replaced on 12/17/2025) (scs). (Attachment 12 replaced on 12/17/2025) (scs). (Entered: 12/16/2025) |
| 12/16/2025 | 673 | REDACTED VERSION of 658 Declaration, −−*Volume 1*−− by Moderna, Inc., ModernaTX, Inc.. (Attachments: # 1 Exhibit A − Lawton Opening Report (Excerpts) (Part 1), # 2 Exhibit A − Lawton Opening Report (Excerpts) (Part 2))(Murray, Travis) (Entered: 12/16/2025) |
| 12/16/2025 | 674 | [SEALED] REPLY BRIEF re 657 MOTION to Preclude *[PLAINTIFFS' MOTION TO EXCLUDE EXPERT TESTIMONY]* filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Attachments: # 1 Exhibit 40 Himansu Dep. Tr, # 2 Exhibit 41 − Rog Response, # 3 Exhibit 42 − Mitchell Reply Report)(Hoeschen, Nathan) (Entered: 12/16/2025) |
| 12/16/2025 | 675 | REDACTED VERSION of 659 Declaration, −−*Volume 2*−− by Moderna, Inc., ModernaTX, Inc.. (Attachments: # 1 Exhibit B − Lawton Rebuttal Report (Excerpts), # 2 Exhibit C − Lawton Reply Report (Excerpts), # 3 Exhibit D − Lawton Dep. Transcript (Excerpts), # 4 Exhibit E− Mitchell Opening Report (Excerpts))(Murray, Travis) (Entered: 12/16/2025) |
| 12/16/2025 | 676 | REDACTED VERSION of 674 Reply Brief, by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Attachments: # 1 Exhibit 40 − Himansu Dep. Tr, # 2 Exhibit 41 − Rog Response, # 3 Exhibit 42 − Mitchell Reply Report)(Hoeschen, Nathan) (Entered: 12/16/2025) |
| 12/16/2025 | 677 | REDACTED VERSION of 660 Declaration,, −−*Volume 3*−− by Moderna, Inc., ModernaTX, Inc.. (Attachments: # 1 Exhibit F − Mitchell Reply Report v2 (Excerpts), # 2 Exhibit I − Fenton Rebuttal Report (Excerpts), # 3 Exhibit J − Prud'Homme Rebuttal (Excerpts), # 4 Exhibit O − May 8, 2024 Deposition of J. Schariter (Excerpts), # 5 Exhibit P − June 7, 2024 Deposition of D. Parsons (Excerpts), # 6 Exhibit R − Genevant License (GENV−00023616), # 7 Exhibit S − Genevant License (GENV−00022307), # 8 Exhibit U − Schuster Reply Report, # 9 Exhibit V − Lawton First Supplemental Opening Report)(Murray, Travis) (Entered: 12/16/2025) |
| 12/16/2025 | 678 | REDACTED VERSION of 662 Answering Brief in Opposition, by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) (Entered: 12/16/2025) |
| 12/16/2025 | 679 | REDACTED VERSION of 664 Declaration,, by Moderna, Inc., ModernaTX, Inc.. (Attachments: # 1 Exhibit 31 − Exhibit 4 Corrected Vellturo Rebuttal Report, # 2 Exhibit 33 − May 2020 Genevant License (GENV−00022307) (excerpts), # 3 Exhibit 36 − Exhibit 10 Corrected Vellturo Rebuttal Report, # 4 Exhibit 37 − Jan 2021 Genevant License (GENV−00022689) (excerpts), # 5 Exhibit 38 − Opening Expert |

| | | |
|---|---|---|
| | | Report of Catharine M. Lawton (excerpt))(Murray, Travis) (Entered: 12/16/2025) |
| 12/16/2025 | 680 | REDACTED VERSION of 666 Reply Brief, by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) (Entered: 12/16/2025) |
| 12/16/2025 | 681 | REDACTED VERSION of 668 Declaration by Moderna, Inc., ModernaTX, Inc.. (Attachments: # 1 Exhibit RR − Prud'homme Sur−Reply Report (Excerpts))(Murray, Travis) (Entered: 12/16/2025) |
| 12/16/2025 | 682 | Unopposed MOTION to Seal *Portions of the parties' Daubert motion papers* − filed by Moderna, Inc., ModernaTX, Inc.. (Attachments: # 1 Proposed Order, # 2 Rule 7.1.1 Certificate)(Murray, Travis) (Entered: 12/16/2025) |
| 12/16/2025 | 683 | OPENING BRIEF in Support re 682 Unopposed MOTION to Seal *Portions of the parties' Daubert motion papers* filed by Moderna, Inc., ModernaTX, Inc..Answering Brief/Response due date per Local Rules is 12/30/2025. (Attachments: # 1 Exhibit A − Declaration of Brian Doyle, # 2 Exhibit B − Declaration of Al Thomas, # 3 Exhibit C − Declaration of Paul Baranello, # 4 Exhibit D − Declaration of Henry Hagen, # 5 Attachment 1 − Aptiv Techs., Ltd. v. Microchip Tech. Inc., C.A. No. 23−307−JDW, D.I. 163 (D. Del. Apr. 1, 2024), # 6 Attachment 2 − Guardant Health, Inc. v. Found. Med., Inc., C.A. No. 17−1616−LPS−CJB, D.I. 447 (D. Del. June 16, 2020), # 7 Attachment 3 − SmartSky Networks, LLC v. Gogo Bus. Aviation, LLC, C.A. No. 22−266−JDW, D.I. 487 (D. Del. Mar. 11, 2025), # 8 Attachment 4 − MED−EL Elektromedizinische Gerte Ges.m.B.H. v. Advanced Bionics, LLC, C.A. No. 18−1530−JDW (D. Del. Apr. 18, 2022), # 9 Attachment 5 − SmartSky Networks, LLC v. Gogo Bus. Aviation, LLC, C.A. No. 22−266−JDW, D.I. 544 (D. Del. May 26, 2025), # 10 Attachment 6 − Koninklijke KPN N.V. v. Sierra Wireless, Inc., C.A. No. 17−90−LPS, D.I. 230 (D. Del. Sep. 16, 2019), # 11 Attachment 7 − EIS Inc. v. IntiHealth Ger GmbH, C.A. No. 19−1227−GBW, D.I. 696 (D. Del. Feb. 25, 2025), # 12 Attachment 8 − SmartSky Networks, LLC v. Gogo Business Aviation, LLC, C.A. No. 22−266−JDW, D.I. 578 (D. Del. Nov. 5, 2025))(Murray, Travis) (Entered: 12/16/2025) |
| 12/17/2025 | | CORRECTING ENTRY: The documents at D.I. 671 (attachments DD, FF, & HH) and D.I. 672 (attachments DD, FF, & HH) were replaced per counsel's request. The requested change corrects the format of the referenced attachments. (scs) (Entered: 12/17/2025) |
| 12/18/2025 | 684 | REQUEST for Oral Argument by Moderna, Inc., ModernaTX, Inc. re 657 MOTION to Preclude *[PLAINTIFFS' MOTION TO EXCLUDE EXPERT TESTIMONY]*, 655 MOTION to Preclude *the Expert Opinions of Catharine Lawton, Georg Schuster, Ph.D., Michael Mitchell, Ph.D., Peter J. Pitts, and Alex M. Brill*. (Murray, Travis) (Entered: 12/18/2025) |
| 12/19/2025 | | CORRECTING ENTRY: D.I. 684 Amended to reflect Travis J. Murray as the filer, per counsel's request. (cdd) (Entered: 12/19/2025) |
| 01/06/2026 | 685 | ORDER: The final pretrial conference is RESCHEDULED for March 3, 2026, at 10:00a.m. in Chambers Room 12613, at United States District Court, 601 Market Street,Philadelphia, PA 19106. (See Order for further details). Signed by Judge Joshua D. Wolson on 1/6/2025. (mpb) (Main Document 685 replaced on 1/8/2026) (mpb). (Entered: 01/06/2026) |
| 01/16/2026 | 686 | MOTION for Protective Order *Under Court's Discovery Dispute Procedures Regarding Plaintiffs' Improper Deposition Designations* − filed by Moderna, Inc., ModernaTX, Inc.. (Attachments: # 1 Ex 1 − 2024−05−24 − Arbutus Amended Initial Disclosures, # 2 Ex 2 − 2024−05−24 − Genevant Amended Initial Disclosures, # 3 Appendix A, # 4 Rule 7.1.1 Certification, # 5 Text of Proposed Order)(Murray, Travis) (Entered: 01/16/2026) |
| 01/16/2026 | 687 | NOTICE of Withdrawal of Counsel by Moderna, Inc., ModernaTX, Inc. (Murray, Travis) (Entered: 01/16/2026) |
| 01/16/2026 | 688 | ORDER: Plaintiff's Unopposed Motion to Seal (D.I. 653 ) is GRANTED. Defendants' Unopposed Motion To Seal (D.I. 682 ) is GRANTED. (See Order for further details). Signed by Judge Joshua D. Wolson on 1/16/2026. (mpb) (Entered: 01/16/2026) |

| | | |
|---|---|---|
| 01/16/2026 | 689 | Letter to The Honorable Joshua D. Wolson from Nathan R. Hoeschen regarding Response to Moderna's Motion for a Protective Order − re 686 MOTION for Protective Order *Under Court's Discovery Dispute Procedures Regarding Plaintiffs' Improper Deposition Designations*. (Hoeschen, Nathan) (Entered: 01/16/2026) |
| 01/20/2026 | 690 | ORDER: Defendants Moderna, Inc. and ModernaTx, Inc.'s Motion for Protective Order Under Court's Discovery Dispute Procedures Regarding Plaintiffs' Improper Deposition Designations (D.I. 686 ) is DENIED WITHOUT PREJUDICE to Moderna raising the issues when it files its in limine motions (see order for further details). Signed by Judge Joshua D. Wolson on 01/20/2026. (jfm) (Entered: 01/20/2026) |
| 01/23/2026 | 691 | Proposed Pretrial Order by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Attachments: # 1 Exhibit 1 − Joint Statement of Uncontested Facts, # 2 Exhibit 2P − Plaintiffs' Statement of Contested Facts, # 3 Exhibit 2D − Moderna's Statement of Disputed Issues of Fact, # 4 Exhibit 3P − Plaintiffs' Statement of Contested Issues of Law, # 5 Exhibit 3D − Moderna's Statement of Contested Issues of Law, # 6 Exhibit 5P − Plaintiffs' Witness List, # 7 Exhibit 5P−A − Moderna's Objections to Plaintiffs Witness List, # 8 Exhibit 5D − Moderna's Witness List)(Hoeschen, Nathan) (Entered: 01/23/2026) |
| 01/27/2026 | 692 | NOTICE OF SERVICE of 1. Plaintiffs' Motion in Limine 2. Plaintiffs' Brief in Support of Motions in Limine filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.(Hoeschen, Nathan) (Entered: 01/27/2026) |
| 01/27/2026 | 693 | NOTICE OF SERVICE of (1) Moderna's Motions in Limine with Rule 7.1.1 Certification; (2) Moderna's Memorandum in Support of Its Motions in Limine; and (3) Declaration of Mark McLennan in Support of Moderna's Motions in Limine filed by Moderna, Inc., ModernaTX, Inc..(Murray, Travis) (Entered: 01/27/2026) |
| 01/30/2026 | 694 | NOTICE of Withdrawal of Counsel by Moderna, Inc., ModernaTX, Inc. (Murray, Travis) (Entered: 01/30/2026) |
| 02/02/2026 | 695 | MOTION for Pro Hac Vice Appearance of Attorney Elizabeth Elrod − filed by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) (Entered: 02/02/2026) |
| 02/02/2026 | 696 | Pro Hac Vice Fee − Credit Card Payment received for Elizabeth Elrod. ( re 695 MOTION for Pro Hac Vice Appearance of Attorney Elizabeth Elrod )( Payment of $ 50, receipt number ADEDC−4890610).(Murray, Travis) (Entered: 02/02/2026) |
| 02/02/2026 | 697 | MEMORANDUM OPINION. Signed by Judge Joshua D. Wolson on 02/02/2026. (oam) (Entered: 02/02/2026) |
| 02/02/2026 | 698 | ORDER: Accompanying Memorandum Opinion 697 , It is ORDERED as follows: Defendants Moderna, Inc. and ModernaTX, Inc.'s Motion For SummaryJudgment (D.I. 507 ) is GRANTED IN PART and DENIED IN PART. Defendants' Motion To Exclude Mr. Pitts' And Mr. Brill's Expert Reports (D.I. 510 ) is GRANTED. Plaintiffs Arbutus Biopharma Corporation and Genevant Sciences GmbH's Cross Motion For Summary Judgment (D.I. 562 ) is GRANTED IN PART and DENIED IN PART. Plaintiffs' Motion To Exclude Certain Expert Testimony Of Dr. Rutherford, Dr. Vellturo, and Dr. Prudhomme (D.I. 558 ) is GRANTED IN PART and DENIED IN PART. Defendants' Motion To Exclude Certain Expert Testimony Of Dr. Mitchell (D.I. 595 ) is GRANTED IN PART and DENIED IN PART (See order for further details). Signed by Judge Joshua D. Wolson on 02/02/2026. (oam) (Entered: 02/02/2026) |
| 02/02/2026 | 699 | ORDER, granting 695 MOTION for Pro Hac Vice Appearance of Attorney Elizabeth Elrod. Signed by Judge Joshua D. Wolson on 02/02/2026. (jfm) (Entered: 02/02/2026) |
| 02/02/2026 | 700 | STIPULATION TO EXTEND TIME for the parties to file and email the Jury Materials to February 6, 2026 − filed by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) (Entered: 02/02/2026) |
| 02/03/2026 | 701 | ORDER: Granting re 700 STIPULATION TO EXTEND TIME for the parties to file and email the Jury Materials to February 6, 2026. Signed by Judge Joshua D. Wolson on 02/03/2026. (oam) (Entered: 02/03/2026) |
| 02/04/2026 | 702 | NOTICE OF SERVICE of Moderna's Notice of Disclosure of Prior Art Pursuant to 35 U.S.C. § 282 filed by Moderna, Inc., ModernaTX, Inc..(Murray, Travis) (Entered: |

| | | |
|---|---|---|
| | | 02/04/2026) |
| 02/06/2026 | | Pro Hac Vice Attorney Elizabeth Elrod for Moderna, Inc. & ModernaTX, Inc. added for electronic noticing. Pursuant to Local Rule 83.5 (d)., Delaware counsel shall be the registered users of CM/ECF and shall be required to file all papers. (slk) (Entered: 02/06/2026) |
| 02/06/2026 | 703 | STIPULATION TO EXTEND TIME for the parties to file and email the Jury Materials to February 9, 2026 − filed by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) (Entered: 02/06/2026) |
| 02/07/2026 | 704 | STIPULATION TO EXTEND TIME for the parties to file opening and opposition briefs for the motions in limine, and any motions to seal to February 11, 2026 − filed by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) (Entered: 02/07/2026) |
| 02/09/2026 | 705 | ORDER, granting 703 STIPULATION TO EXTEND TIME for the parties to file and email the Jury Materials to February 9, 2026. Signed by Judge Joshua D. Wolson on 02/06/2026. (jfm) (Entered: 02/09/2026) |
| 02/09/2026 | 706 | NOTICE OF SERVICE of (1) Moderna's Opposition to Plaintiffs' Motions in Limine; (2) [Proposed] Order Denying Plaintiffs' Motions in Limine; and (3) Declaration of Mark McLennan in Support of Moderna's Opposition to Plaintiffs' Motions in Limine filed by Moderna, Inc., ModernaTX, Inc..(Murray, Travis) (Entered: 02/09/2026) |
| 02/09/2026 | 707 | ORDER: Granting D.I. 704 STIPULATION TO EXTEND TIME for the parties to file opening and opposition briefs for the motions in limine, and any motions to seal to February 11, 2026. Signed by Judge Joshua D. Wolson on 02/09/2026. (oam) (Entered: 02/09/2026) |
| 02/09/2026 | 708 | NOTICE OF SERVICE of Plaintiffs' Brief in Opposition to Moderna's Motions in Limine with Exhibits filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.(Hoeschen, Nathan) (Entered: 02/09/2026) |
| 02/09/2026 | 709 | VERDICT SHEET by Moderna, Inc., ModernaTX, Inc. . (Murray, Travis) (Entered: 02/09/2026) |
| 02/09/2026 | 710 | VERDICT SHEET by Arbutus Biopharma Corporation, Genevant Sciences GmbH *[Plaintiffs' Proposed Verdict Sheet]*. (Hoeschen, Nathan) (Entered: 02/09/2026) |
| 02/09/2026 | 711 | Proposed Voir Dire by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Attachments: # 1 Exhibit 1− Fulawka 2024, # 2 Exhibit 2− Taubert 2024, # 3 Exhibit 3− Zilinsky 2025)(Hoeschen, Nathan) (Entered: 02/09/2026) |
| 02/09/2026 | 712 | Proposed Jury Instructions by Arbutus Biopharma Corporation, Genevant Sciences GmbH *[Proposed Preliminary and Final Jury Instructions]*. (Hoeschen, Nathan) (Entered: 02/09/2026) |
| 02/11/2026 | 713 | MOTION in Limine − filed by Moderna, Inc., ModernaTX, Inc.. (Attachments: # 1 [Proposed] Order, # 2 7.1.1 Certification)(Murray, Travis) (Entered: 02/11/2026) |
| 02/11/2026 | 714 | [SEALED] OPENING BRIEF in Support re 713 MOTION in Limine filed by Moderna, Inc., ModernaTX, Inc..Answering Brief/Response due date per Local Rules is 2/25/2026. (Murray, Travis) (Entered: 02/11/2026) |
| 02/11/2026 | 715 | REDACTED VERSION of 714 Opening Brief in Support by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) (Entered: 02/11/2026) |
| 02/11/2026 | 716 | DECLARATION of Mark McLennan re 714 Opening Brief in Support −−*Volume 1*−− by Moderna, Inc., ModernaTX, Inc.. (Attachments: # 1 Ex A − PTX−65 − MRNA−GEN−01430937, # 2 Ex E − Mitchell Reply Rpt [Excerpts], # 3 Ex G − Benenato Kerry − 05−17−24, # 4 Ex H − Hoge, Stephen − 05−22−2024, # 5 Ex I − PTX−63 − Paper 1 (Petition) − IPR2019−00554 ('069), # 6 Ex J − PTX−565 − Ex 1008 (Janoff Declaration) − IPR2019−00554 ('069) (GENV−01087543), # 7 Ex K − PTX−641 − Paper 21−Petitioner's Reply to POR, # 8 Ex L − PTX−768 − Final Written Decision, IPR2019−00554, Paper No. 40 (GENV−01013979), # 9 Ex M − PTX−971 − ModernaTx Inc v Arbutus Biopharma Corporation, 18 F.4th 1364, # 10 Ex N − Arbutus 8−K, # 11 Ex O − PTX−64 − Paper 28 (Petitioners Reply to Patent Owner Response) − IPR2018−00739, # 12 Ex P − PTX−511 − Ex 1007 (Janoff Declaration) − IPR2018−00739 ('435) (GENV−00030241), # 13 Ex Q − PTX−512 − IPR2018−00739 |

| | | |
|---|---|---|
| | | Paper 2−435 Petition (GENV−00030150), # 14 Ex R − PTX−514 − Paper 29 − Opposition to Motion to Amend, # 15 Ex S − PTX−531 − Paper 12 (Patent Owners Preliminary Response) (MRNA−GEN−02671754))(Murray, Travis) (Entered: 02/11/2026) |
| 02/11/2026 | 717 | DECLARATION of Mark McLennan re 714 Opening Brief in Support −−*Volume 2*−− by Moderna, Inc., ModernaTX, Inc.. (Attachments: # 1 Ex T − PTX−572 − Ex 1020 − Thompson Deposition Tr. Vol. II, # 2 Ex U − PTX−577 − Ex 1021 Janoff Reply Declaration, # 3 Ex V − PTX−602 − Paper 51 (Final Written Decision) − IPR2018−00739 ('435) (GENV−00028924), # 4 Ex W − PTX−972 − ModernaTx Inc v Arbutus Biopharma Corporation, 18 F.4th 1352, # 5 Ex X − Murthy Validity Report, # 6 Ex Y − 2024−05−20 − Bennett, Hamilton, # 7 Ex AB − PTX−1396 − GENV−01079456, # 8 Ex AC − PTX−1290 − MRNA−GEN−01720811, # 9 Ex AE − McLennan Decl., # 10 Ex AF − 2023−12−15 − Stewart−Jones, Guillaume [Excerpts], # 11 Ex AG − PTX−1134 − GENV−00963807, # 12 Ex AI − PTX−1397 − Ex 2198 (Chan Declaration) − IPR2023−01358 (GENV−01099106))(Murray, Travis) (Entered: 02/11/2026) |
| 02/11/2026 | 718 | DECLARATION of Mark McLennan re 714 Opening Brief in Support −−*Volume 3*−− by Moderna, Inc., ModernaTX, Inc.. (Attachments: # 1 Ex AJ − PTX−1398 − Ex 2201 (Fuller Declaration) − IPR2023−01358 (GENV−01099242), # 2 Ex AK − 2024−05−24 − Arbutus Amended Initial Disclosures, # 3 Ex AL − 2024−05−24 − Genevant Amended Initial Disclosures, # 4 Ex AM − 2026−01−21 − Email from M. McLennan to M. Lachman re MILs, # 5 Ex AN − 2020−11−23 − Ltr from Arbutus & Genevant to Moderna re Arbutus, Genevant LNP Tech & IP, # 6 Ex AO − 2021−10−12 − Ltr from Arbutus & Genevant to Moderna re Arbutus, Genevant LNP Tech & IP − COPY, # 7 Ex AU − PTX−0941, # 8 Ex AX − 2025−04−17 − Vellturo, Christopher)(Murray, Travis) (Entered: 02/11/2026) |
| 02/11/2026 | 719 | MOTION in Limine − filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Attachments: # 1 Text of Proposed Order)(Hoeschen, Nathan) (Entered: 02/11/2026) |
| 02/11/2026 | 720 | DECLARATION of Mark McLennan re 714 Opening Brief in Support −−*Volume 4*−− by Moderna, Inc., ModernaTX, Inc.. (Attachments: # 1 Ex AZ − PTX−0662, # 2 Ex BA − Native Slipsheet, # 3 Ex BB − 2025−04−30 − Lawton, Catharine, # 4 Ex BC − PTX−765 − GENV−01011429, # 5 Ex BD − PTX−82 − GENV−01012204, # 6 Ex BE − PTX−445 − GENV−01009060, # 7 Ex BF − PTX−684 − GENV−00994895, # 8 Ex BH − PTX−683 − GENV−00997084, # 9 Ex BI − PTX−1325 − MRNA−GEN−01725263)(Murray, Travis) (Entered: 02/11/2026) |
| 02/11/2026 | 721 | [SEALED] OPENING BRIEF in Support re 719 MOTION in Limine filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.Answering Brief/Response due date per Local Rules is 2/25/2026. (Attachments: # 1 Exhibit 1− 2021.04.05 Email to Moderna re Samples, # 2 Exhibit 2− Plaintiffs' 1st Set of RFPs (Nos. 1−98), # 3 Exhibit 3− 2023.03.03 − Letter re Moderna RFP Responses, # 4 Exhibit 4− 2023.05.11 − Letter to M. McLennan re Moderna RFP Responses, # 5 Exhibit 5− 2023.08.16 − Letter to M. McLennan re Samples, # 6 Exhibit 6− 2023.09.06 − Letter to M. McLennan re Samples, # 7 Exhibit 7− 2023.12.11 − Email Correspondence re Samples, # 8 Exhibit 8− 2024.11.25 − Mithcell Opening Infringement Report, # 9 Exhibit 9− 2024.11.24 − Schuster Opening Report, # 10 Exhibit 10− 2024.11.24 − Schuster Opening Report Ex. J, # 11 Exhibit 11− 2025.04.11 − Schuster Deposition Transcript, # 12 Exhibit 12− 2025.02.14 − Prud'Homme Rebuttal Expert Report, # 13 Exhibit 13− 2024.05.30 − Bossone Deposition Transcript, # 14 Exhibit 14− 2025.06.09 − Moderna's Disclosure of Invalidity Defenses, # 15 Exhibit 15− 2026.01.21 − Email re MIL Objections, # 16 Exhibit 16− 2025.03.21 − Prud'Homme Reply Invalidity Report, # 17 Exhibit 17− 2025.03.21 − Mitchell Reply Report, # 18 Exhibit 18− 2025.02.14 − Mitchell Validity Report, # 19 Exhibit 19− 2024.11.25 − Prud'Homme Expert Report, # 20 Exhibit 20− Moderna's 17th Supp. Rog. Resp., # 21 Exhibit 21−2024.04.22 − Email re 30(b)(6) notices, # 22 Exhibit 22− Plaintiffs' 3rd Set of RFPs (Nos. 128−173), # 23 Exhibit 23− 2023.12.08 − Letter from M. McLennan re RD Documents, # 24 Exhibit 24− 2024.06.13 − Hearing Transcript, # 25 Exhibit 25− Plaintiffs' 2nd Set of RFPs (Nos. 99−127), # 26 Exhibit 26− 2023.11.06 − Letter from M. McLennan re Plaintiffs' 2nd Set of RFPs, # 27 Exhibit 27− 2023.10.25 − Letter from M. McLennan re Plaintiffs' 3rd Set of RFPs, # 28 Exhibit 28− 2023.12.06 − Letter to M. McLennan re Plaintiffs' 3rd Set of RFPs, # 29 Exhibit 29− 2024.04.26 − |

| | | |
|---|---|---|
| | | Hassett Deposition Transcript, # 30 Exhibit 30− 2024.05.17 − Benenato Deposition Transcript, # 31 Exhibit 31− Tekmira v. Alnylam Amended Complaint, # 32 Exhibit 32− Tekmira−Alnylam Settlement Press Release, # 33 Exhibit 33− Merck−Sirna−Protiva Settlement Agreement, # 34 Exhibit 34− 2025.02.14 − Corrected Vellturo Rebuttal Report, # 35 Exhibit 35− 2024.05.22 − Hoge Deposition Transcript, # 36 Exhibit 36− 2024.11.25 − Lawton Opening Report, # 37 Exhibit 37− 2021.08.09 − Hoge Email to WSJ Reporter − MRNA−GEN−01656989, # 38 Exhibit 38− 2021.06.04 − Hoge Email to WSJ Reporter − MRNA−GEN−01654918, # 39 Exhibit 39− 2026.01.23 − Email re MILs, # 40 Exhibit 40− 2024.06.05 − Zorn Deposition Transcript, # 41 Exhibit 41− 2024.02.22 − Discovery Dispute Hearing Transcript, # 42 Exhibit 42− Sample Expiration Worksheet, # 43 Exhibit 43− 2025.02.14 − Murthy Validity Report)(Hoeschen, Nathan) (Entered: 02/11/2026) |
| 02/11/2026 | 722 | [SEALED] DECLARATION of Mark McLennan re 714 Opening Brief in Support by Moderna, Inc., ModernaTX, Inc.. (Attachments: # 1 Ex B − Mitchell Opening Rpt [Excerpts], # 2 Ex C − Lawton Opening Rep [Excerpts], # 3 Ex D − Zorn Depo, # 4 Ex F − MRNA−GEN−01430938, # 5 Ex Z − PTX−106 − MRNA−GEN−02616560, # 6 Ex AA − PTX−1374 − MRNA−GEN−02615980, # 7 Ex AD − 2024−07−12 − Bennett, Hamilton, # 8 Ex AH− PTX−1375 − MRNA−GEN−0261604, # 9 Ex AP − Email from Pete Zorn to Neal Dahiya (Apr. 5, 2021), # 10 Ex AQ − Email from Neal Dahiya to Pete Zorn (June 30, 2021), # 11 Ex AR − Email from Pete Zorn to Shaun Ryan regarding Revised CDA (Jan. 28, 2021), # 12 Ex AS − PTX 70 − Moderna 5−year accelerated plan [Excerpts], # 13 Ex AT − PTX−0808 − Moderna 2020 LRP [Excerpts], # 14 Ex AV − Native Slipsheet, # 15 Ex AW − Native Slipsheet, # 16 Ex AY − PTX−0068 [Excerpts], # 17 Ex BG − PTX−26 − 2024.11.25 Opening Report of Lawton Schs. 3.1−3.15, # 18 Ex BJ − Vellturo Rebuttal [Excerpts], # 19 Ex BK− Meulien Rebuttal)(Murray, Travis) (Entered: 02/11/2026) |
| 02/11/2026 | 723 | [SEALED] ANSWERING BRIEF in Opposition re 713 MOTION in Limine filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.Reply Brief due date per Local Rules is 2/18/2026. (Attachments: # 1 Exhibit BL− 2025.02.14 − Prud'Homme Rebuttal Report, # 2 Exhibit BM− Chemistry Update − MRNA−GEN−02390476, # 3 Exhibit BN− Hassett Presentation − MRNA−GEN−02390476, # 4 Exhibit BO− LNP Cheat Sheet − MRNA−GEN−00498073, # 5 Exhibit BP− LNP Characterization PowerPoint − MRNA−GEN−00511974, # 6 Exhibit BQ− 2024.05.22 − Francis Deposition Transcript, # 7 Exhibit BR − Francis, Said − 05−22−2024 Transcript, # 8 Exhibit BS− Hoge Email − MRNA−GEN−01746643, # 9 Exhibit BT− Hennessy Email − MRNA−GEN−01439484, # 10 Exhibit BU− MRNA−GEN−01430930, # 11 Exhibit BV− MRNA−GEN−01430946, # 12 Exhibit BW− 2025.06.09 − Moderna's Disclosure of Invalidity Defenses, # 13 Exhibit BX− 2024.11.25 − Anderson Opening Report, # 14 Exhibit BY− 2025.03.21 − Lawton Reply Report, # 15 Exhibit BZ− Moderna's Response to Motion to Dismiss, Appeal Nos. 20−1184, −1186, # 16 Exhibit CA− Moderna's 17th Supp. Rog. Resp., # 17 Exhibit CB− Shaun Ryan Declaration, # 18 Exhibit CC− Himansu Deposition Transcript, # 19 Exhibit CD− 2025.03.21 − Porter Reply Report, # 20 Exhibit CE− de Fougerolles Deposition Transcript, # 21 Exhibit CF− Zaks Email − MRNA−GEN−01572804, # 22 Exhibit CG− Ciaramella Deposition Transcript, # 23 Exhibit CH− Moderna−NIAD Agenda − MRNA−GEN−01572804, # 24 Exhibit CI− Bennett Deposition Transcript, # 25 Exhibit CJ− Carfi Deposition Transcript, # 26 Exhibit CK− Francis Deposition Transcript, # 27 Exhibit CL− Hassett Deposition Transcript, # 28 Exhibit CM− Hoge Deposition Transcript, # 29 Exhibit CN− Parsons Deposition Transcript, # 30 Exhibit CO− Zaks Deposition Transcript, # 31 Exhibit CP− Benenato Deposition Transcript, # 32 Exhibit CQ− Lawton Opening Report Schedules 2.1−2.3, # 33 Exhibit CR− 2024.05.22 − Hoge Deposition Transcript, # 34 Exhibit CS− Moderna RSV Approval Press Release, # 35 Exhibit CT− Bennet Email − MRNA−GEN−01724046)(Hoeschen, Nathan) (Entered: 02/11/2026) |
| 02/11/2026 | 724 | REDACTED VERSION of 722 Declaration,,,, by Moderna, Inc., ModernaTX, Inc.. (Attachments: # 1 Ex B − Mitchell Opening Rpt [Excerpts], # 2 Ex C − Lawton Opening Rep [Excerpts], # 3 Ex D − Zorn Depo, # 4 Ex F − MRNA−GEN−01430938, # 5 Ex Z − PTX−106 − MRNA−GEN−02616560, # 6 Ex AA − PTX−1374 − MRNA−GEN−02615980, # 7 Ex AD − 2024−07−12 − Bennett, Hamilton, # 8 ) Ex AH− PTX−1375 − MRNA−GEN−0261604, # 9 Ex AP − Email from Pete Zorn to Neal Dahiya (Apr. 5, 2021),, # 10 Ex AQ − Email from Neal Dahiya to Pete Zorn (June 30, 2021), # 11 ) Ex AR − Email from Pete Zorn to Shaun Ryan regarding |

| | | |
|---|---|---|
| | | Revised CDA (Jan. 28, 2021), # 12 Ex AS − PTX 70 − Moderna 5−year accelerated plan [Excerpts], # 13 Ex AT − PTX−0808 − Moderna 2020 LRP [Excerpts], # 14 Ex AV − Native Slipsheet, # 15 Ex AW − Native Slipsheet, # 16 Ex AY − PTX−0068 [Excerpts], # 17 Ex BG − PTX−26 − 2024.11.25 Opening Report of Lawton Schs. 3.1−3.15, # 18 Ex BJ − Vellturo Rebuttal [Excerpts], # 19 Ex BK− Meulien Rebuttal)(Murray, Travis) (Entered: 02/11/2026) |
| 02/11/2026 | 725 | Unopposed MOTION to Seal *Portions of Motions in Limine Briefing* − filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Hoeschen, Nathan) (Entered: 02/11/2026) |
| 02/11/2026 | 726 | PROPOSED ORDER Granting Plaintiffs' Motion to Seal re 725 Unopposed MOTION to Seal *Portions of Motions in Limine Briefing* by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Hoeschen, Nathan) (Entered: 02/11/2026) |
| 02/11/2026 | 727 | OPENING BRIEF in Support re 725 Unopposed MOTION to Seal *Portions of Motions in Limine Briefing* filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH.Answering Brief/Response due date per Local Rules is 2/25/2026. (Hoeschen, Nathan) (Entered: 02/11/2026) |
| 02/11/2026 | 728 | NOTICE of Lodging of Multimedia Filings by Moderna, Inc., ModernaTX, Inc. re 722 Declaration,,,, 720 Declaration, (Murray, Travis) (Entered: 02/11/2026) |
| 02/11/2026 | 729 | REDACTED VERSION of 721 Opening Brief in Support,,,,,,,,,,, by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Attachments: # 1 Exhibit 1− 2021.04.05 Email to Moderna re Samples, # 2 Exhibit 2− Plaintiffs' 1st Set of RFPs (Nos. 1−98),, # 3 Exhibit 3− 2023.03.03 − Letter re Moderna RFP Responses, # 4 Exhibit 4− 2023.05.11 − Letter to M. McLennan re Moderna RFP Responses, # 5 Exhibit 5− 2023.08.16 − Letter to M. McLennan re Samples, # 6 Exhibit 6− 2023.09.06 − Letter to M. McLennan re Samples, # 7 Exhibit 7− 2023.12.11 − Email Correspondence re Samples, # 8 Exhibit 8− 2024.11.25 − Mithcell Opening Infringement Report, # 9 Exhibit 9− 2024.11.24 − Schuster Opening Report, # 10 Exhibit 10− 2024.11.24 − Schuster Opening Report Ex. J, # 11 Exhibit 11− 2025.04.11 − Schuster Deposition Transcript, # 12 Exhibit 12− 2025.02.14 − Prud'Homme Rebuttal Expert Report, # 13 Exhibit 13− 2024.05.30 − Bossone Deposition Transcript, # 14 Exhibit 14− 2025.06.09 − Moderna's Disclosure of Invalidity Defenses, # 15 Exhibit 15− 2026.01.21 − Email re MIL Objections, # 16 Exhibit 16− 2025.03.21 − Prud'Homme Reply Invalidity Report, # 17 Exhibit 17− 2025.03.21 − Mitchell Reply Report, # 18 Exhibit 18− 2025.02.14 − Mitchell Validity Report, # 19 Exhibit 19− 2024.11.25 − Prud'Homme Expert Report, # 20 Exhibit 20− Moderna's 17th Supp. Rog. Resp.,, # 21 Exhibit 21−2024.04.22 − Email re 30(b)(6) notices, # 22 Exhibit 22− Plaintiffs' 3rd Set of RFPs (Nos. 128−173), # 23 Exhibit 23− 2023.12.08 − Letter from M. McLennan re RD Documents, # 24 Exhibit 24− 2024.06.13 − Hearing Transcript, # 25 Exhibit 25− Plaintiffs' 2nd Set of RFPs (Nos. 99−127), # 26 Exhibit 26− 2023.11.06 − Letter from M. McLennan re Plaintiffs' 2nd Set of RFPs, # 27 Exhibit 27− 2023.10.25 − Letter from M. McLennan re Plaintiffs' 3rd Set of RFPs, # 28 Exhibit 28− 2023.12.06 − Letter to M. McLennan re Plaintiffs' 3rd Set of RFPs, # 29 Exhibit 29− 2024.04.26 − Hassett Deposition Transcript, # 30 Exhibit 30− 2024.05.17 − Benenato Deposition Transcript, # 31 Exhibit 31− Tekmira v. Alnylam Amended Complaint, # 32 Exhibit 32− Tekmira−Alnylam Settlement Press Release, # 33 Exhibit 33− Merck−Sirna−Protiva Settlement Agreement, # 34 Exhibit 34− 2025.02.14 − Corrected Vellturo Rebuttal Report, # 35 Exhibit 35− 2024.05.22 − Hoge Deposition Transcript, # 36 Exhibit 36− 2024.11.25 − Lawton Opening Report, # 37 Exhibit 37− 2021.08.09 − Hoge Email to WSJ Reporter − MRNA−GEN−01656989, # 38 Exhibit 38− 2021.06.04 − Hoge Email to WSJ Reporter − MRNA−GEN−01654918, # 39 Exhibit 39− 2026.01.23 − Email re MILs, # 40 Exhibit 40− 2024.06.05 − Zorn Deposition Transcript, # 41 Exhibit 41− 2024.02.22 − Discovery Dispute Hearing Transcript, # 42 Exhibit 42− Sample Expiration Worksheet, # 43 Exhibit 43− 2025.02.14 − Murphy Validity Report))(Hoeschen, Nathan) (Entered: 02/11/2026) |
| 02/11/2026 | 730 | [SEALED] ANSWERING BRIEF in Opposition re 719 MOTION in Limine filed by Moderna, Inc., ModernaTX, Inc..Reply Brief due date per Local Rules is 2/18/2026. (Attachments: # 1 [Proposed] Order)(Murray, Travis) (Entered: 02/11/2026) |

| | | |
|---|---|---|
| 02/11/2026 | 731 | REDACTED VERSION of 730 Answering Brief in Opposition by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) (Entered: 02/11/2026) |
| 02/11/2026 | 732 | REDACTED VERSION of 723 Answering Brief in Opposition,,,,,,, by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Attachments: # 1 Exhibit BL− 2025.02.14 − Prud'Homme Rebuttal Report, # 2 Exhibit BM− Chemistry Update − MRNA−GEN−02390476, # 3 Exhibit BN− Hassett Presentation − MRNA−GEN−02390476, # 4 Exhibit BO− LNP Cheat Sheet − MRNA−GEN−00498073, # 5 Exhibit BP− LNP Characterization PowerPoint − MRNA−GEN−00511974, # 6 Exhibit BQ− 2024.05.22 − Francis Deposition Transcript, # 7 Exhibit BR − Francis, Said − 05−22−2024 Transcript, # 8 Exhibit Exhibit BS− Hoge Email − MRNA−GEN−01746643, # 9 Exhibit BT− Hennessy Email − MRNA−GEN−01439484, # 10 Exhibit BU− MRNA−GEN−01430930, # 11 Exhibit BV− MRNA−GEN−01430946, # 12 Exhibit BW− 2025.06.09 − Moderna's Disclosure of Invalidity Defenses, # 13 Exhibit BX− 2024.11.25 − Anderson Opening Report, # 14 Exhibit BY− 2025.03.21 − Lawton Reply Report, # 15 Exhibit BZ− Moderna's Response to Motion to Dismiss, Appeal Nos. 20−1184, −1186, # 16 Exhibit CA− Moderna's 17th Supp. Rog. Resp, # 17 Exhibit CB− Shaun Ryan Declaration, # 18 Exhibit CC− Himansu Deposition Transcript, # 19 Exhibit CD− 2025.03.21 − Porter Reply Report, # 20 Exhibit CE− de Fougerolles Deposition Transcript, # 21 Exhibit CF− Zaks Email − MRNA−GEN−01572804, # 22 Exhibit Exhibit CG− Ciaramella Deposition Transcript, # 23 Exhibit CH− Moderna−NIAD Agenda − MRNA−GEN−01572804, # 24 Exhibit CI− Bennett Deposition Transcript, # 25 Exhibit CJ− Carfi Deposition Transcript, # 26 Exhibit CK− Francis Deposition Transcript, # 27 Exhibit CL− Hassett Deposition Transcript, # 28 Exhibit CM− Hoge Deposition Transcript, # 29 Exhibit CN− Parsons Deposition Transcript, # 30 Exhibit CO− Zaks Deposition Transcript, # 31 Exhibit CP− Benenato Deposition Transcript, # 32 Exhibit CQ− Lawton Opening Report Schedules 2.1−2.3, # 33 Exhibit CR− 2024.05.22 − Hoge Deposition Transcript,, # 34 Exhibit CS− Moderna RSV Approval Press Release, # 35 Exhibit CT− Bennet Email − MRNA−GEN−01724046)(Hoeschen, Nathan) (Entered: 02/11/2026) |
| 02/11/2026 | 733 | DECLARATION of Mark McLennan re 730 Answering Brief in Opposition by Moderna, Inc., ModernaTX, Inc.. (Attachments: # 1 Ex. 44 − 2023−08−24 McLennan Ltr, # 2 Ex. 45 − Yaworski Dep Tr, # 3 Ex. 46 − Bossone Dep Tr, # 4 Ex. 47 − Bossone Exh 31, # 5 Ex. 48 − ALNY−00114323, # 6 Ex. 49 − ALNY−00115642, # 7 Ex. 50 − ALNY−00116080, # 8 Ex. 51 − GENV−00701595, # 9 Ex. 52 − Mitchell Op Rpt, # 10 Ex. 53 − US9814777, # 11 Ex. 55 − Prud'Homme Op Rpt, # 12 Ex. 56 − Prud'Homme Rep Rpt, # 13 Ex. 57 − Mitchell Rep Rpt, # 14 Ex. 58 − Almarsson Dep Tr, # 15 Ex. 60 − Hassett Dep Tr, # 16 Ex. 61 − 2024−04−20 − McLennan 30(b)(6) Email, # 17 Ex. 63 − 2023−10−25 − McLennan RFPs Ltr, # 18 Ex. 67 − PTX−311, # 19 Ex. 68 − PTX−938, # 20 Ex. 69 − MacLachlan Dep Tr, # 21 Ex. 70 − Defs Pretrial Statement (FULL), # 22 Ex. 71 − US8158601, # 23 Ex. 72 [Excerpted], # 24 Ex. 73 [Excerpted], # 25 Ex. 74 − PTX−1347, # 26 Ex. 75 − GENV−00037195, # 27 Ex. 76 − ROIV−0006723, # 28 Ex. 80 − Zorn Dep Tr)(Murray, Travis) (Entered: 02/11/2026) |
| 02/11/2026 | 734 | [SEALED] DECLARATION of Mark McLennan re 730 Answering Brief in Opposition by Moderna, Inc., ModernaTX, Inc.. (Attachments: # 1 Ex. 54 − Lawton Opening Rpt, # 2 Ex. 59 − Benenato Dep Tr − Excerpt, # 3 Ex. 62 − Moderna 4th 30(b)(6) Designations, # 4 Ex. 64 − 2023−12−08 − Search Term Compromise Email, # 5 Ex. 65 − Agreed−to Search Terms, # 6 Ex. 66 − Smith Dep Tr, # 7 Ex. 77 − GENV−00517314, # 8 Ex. 79 − GENV−00262513)(Murray, Travis) (Entered: 02/11/2026) |
| 02/11/2026 | 735 | REDACTED VERSION of 734 Declaration, by Moderna, Inc., ModernaTX, Inc.. (Attachments: # 1 Ex. 54 − Lawton Opening Rpt, # 2 Ex. 59 − Benenato Dep Tr − Excerpt, # 3 Ex. 62 − Moderna 4th 30(b)(6) Designations, # 4 Ex. 64 − 2023−12−08 − Search Term Compromise Email, # 5 Ex. 65 − Agreed−to Search Terms, # 6 Ex. 66 − Smith Dep Tr, # 7 Ex. 77 − GENV−00517314, # 8 Ex. 79 − GENV−00262513)(Murray, Travis) (Entered: 02/11/2026) |
| 02/11/2026 | 736 | Unopposed MOTION to Seal *Portions of D.I. Nos. 714, 721, 722, 723, 730 and 734* − filed by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) (Entered: 02/11/2026) |
| 02/11/2026 | 737 | OPENING BRIEF in Support re 736 Unopposed MOTION to Seal *Portions of D.I. Nos. 714, 721, 722, 723, 730 and 734* filed by Moderna, Inc., ModernaTX, |

| | | |
|---|---|---|
| | | Inc..Answering Brief/Response due date per Local Rules is 2/25/2026. (Attachments: # 1 Exhibit A Declaration of Brian Doyle, # 2 Exhibit B Declaration of Albert Thomas, # 3 Exhibit C Declaration of Paul Baranello, # 4 Exhibit D Declaration of Henry Hagen)(Murray, Travis) (Entered: 02/11/2026) |
| 02/12/2026 | | Pro Hac Vice Attorney Nancy Kaye Horstman for Moderna, Inc. & ModernaTX, Inc. added for electronic noticing. Pursuant to Local Rule 83.5 (d)., Delaware counsel shall be the registered users of CM/ECF and shall be required to file all papers. (slk) (Entered: 02/12/2026) |
| 02/12/2026 | 738 | Letter to The Honorable Joshua D. Wolson from Nathan R. Hoeschen regarding hyperlinked courtesy copies of the parties' briefing on their motions in limine − re 721 Opening Brief in Support,,,,,,,,,,, 714 Opening Brief in Support, 723 Answering Brief in Opposition,,,,,,, 730 Answering Brief in Opposition. (Hoeschen, Nathan) (Entered: 02/12/2026) |
| 02/13/2026 | 739 | ORDER: it is ORDERED that Moderna's Unopposed Motion to Seal (D.I. 736 ) is GRANTED (see order for further details). Signed by Judge Joshua D. Wolson on 02/13/2026. (jfm) (Entered: 02/13/2026) |
| 02/13/2026 | 740 | NOTICE requesting Clerk to remove Annie A. Lee as co−counsel.. (Hoeschen, Nathan) (Entered: 02/13/2026) |
| 02/17/2026 | 741 | MOTION for Pro Hac Vice Appearance of Attorney Philip N. Haunschild and Jackson T. Lane − filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Hoeschen, Nathan) (Entered: 02/17/2026) |
| 02/17/2026 | 742 | Pro Hac Vice Fee − Credit Card Payment received for Philip N. Haunschild and Jackson T. Lane. ( re 741 MOTION for Pro Hac Vice Appearance of Attorney Philip N. Haunschild and Jackson T. Lane )( Payment of $ 100, receipt number ADEDC−4901614).(Hoeschen, Nathan) (Entered: 02/17/2026) |
| 02/17/2026 | 743 | MEMORANDUM OPINION. Signed by Judge Joshua D. Wolson on 2/17/2026. (slk) (Entered: 02/17/2026) |
| 02/17/2026 | 744 | ORDER: it is ORDERED as follows: Plaintiffs Motion for Summary Judgment (D.I. 518 ) is GRANTED IN PART and DENIED IN PART. Plaintiffs' Motion to Exclude Certain Expert Testimony of Dr. Anderson and Dr. Prud'homme (D.I. 522 ) is GRANTED IN PART and DENIED IN PART. (See Order for Further Details). Signed by Judge Joshua D. Wolson on 2/17/2026. (slk) (Entered: 02/17/2026) |
| 02/19/2026 | 745 | ORDER: Granting 741 MOTION for Pro Hac Vice Appearance of Attorney Philip N. Haunschild and Jackson T. Lane. Signed by Judge Joshua D. Wolson on 02/19/2026. (oam) (Entered: 02/19/2026) |
| 02/19/2026 | | Pro Hac Vice Attorney Jackson T. Lane for Arbutus Biopharma Corporation, Philip N. Haunschild for Genevant Sciences GmbH added for electronic noticing. Pursuant to Local Rule 83.5 (d)., Delaware counsel shall be the registered users of CM/ECF and shall be required to file all papers. (lah) (Entered: 02/19/2026) |
| 02/23/2026 | 746 | EXHIBIT re 691 Proposed Pretrial Order,, −− *Exhibit 6D Moderna's Deposition Designations* −− by Moderna, Inc., ModernaTX, Inc.. (Murray, Travis) (Entered: 02/23/2026) |
| 02/23/2026 | 747 | EXHIBIT re 691 Proposed Pretrial Order,, *[Exhibit 6P − Plaintiffs' Deposition Designations]* by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Hoeschen, Nathan) (Entered: 02/23/2026) |
| 02/23/2026 | 748 | STIPULATION TO EXTEND TIME for the parties to submit an exhibit list identifying any outstanding exhibit objections to February 24, 2026 − filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Hoeschen, Nathan) (Entered: 02/23/2026) |
| 02/24/2026 | 749 | ORDER, granting 748 STIPULATION TO EXTEND TIME for the parties to submit an exhibit list identifying any outstanding exhibit objections to February 24, 2026. Signed by Judge Joshua D. Wolson on 02/24/2026. (jfm) (Entered: 02/24/2026) |

| | | |
|---|---|---|
| 02/24/2026 | 750 | ORAL ORDER: The location of the Final Pretrial Conference on March 3, 2026 at 10:00 a.m. is CHANGED from Chambers Room 12613 to Conference Room 3001 on the 3rd Floor of the James Byrne Courthouse, located at 601 Market Street, Phila., PA. Conference Room 3001 is in a secured area and cannot be accessed by counsel without Chambers staff. The room has the capacity for 22 people, so each side can bring no more than 11 people. When all the parties/counsel have arrived at the third floor lobby on March 3, 2026, counsel shall designate one person to call Chambers at 267−299−7320, and someone from my Chambers will then bring all the parties to Conference Room 3001. Ordered by Judge Joshua D. Wolson on 02/24/2026. (oam) (Entered: 02/24/2026) |
| 02/24/2026 | 751 | EXHIBIT re 691 Proposed Pretrial Order,, *[Exhibit 4 − Exhibit List]* by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Hoeschen, Nathan) (Main Document 751 replaced on 2/26/2026) (scs). (Entered: 02/24/2026) |
| 02/24/2026 | 752 | STIPULATION TO EXTEND TIME to submit a hard drive containing the joint set of exhibits the parties intend to use at trial to February 26, 2026 − filed by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Hoeschen, Nathan) (Entered: 02/24/2026) |
| 02/24/2026 | 753 | MEMORANDUM. Signed by Judge Joshua D. Wolson on 2/24/2026. (mpb) (Entered: 02/24/2026) |
| 02/24/2026 | 754 | ORDER: Upon consideration of Plaintiffs' Motion To Exclude Expert Testimony (D.I. 657 ) and for the reasons stated in the accompanying Memorandum, it is ORDERED that the Motion is GRANTED IN PART and DENIED IN PART. The Motion is GRANTED as to (a) Plaintiffs' request to exclude Dr. Vellturo's reasonable royalty opinion and (b) Plaintiffs' request to exclude Dr. Vellturo's opinion on non−infringing alternatives. The Motion is DENIED in all other respects. Signed by Judge Joshua D. Wolson on 2/24/2026. (mpb) (Entered: 02/24/2026) |
| 02/26/2026 | 755 | ORDER: Granting 752 STIPULATION TO EXTEND TIME to submit a hard drive containing the joint set of exhibits the parties intend to use at trial to February 26, 2026. Signed by Judge Joshua D. Wolson on 02/26/2026. (oam) (Entered: 02/26/2026) |
| 02/26/2026 | 756 | Letter to The Honorable Joshua D. Wolson from Nathan R. Hoeschen regarding the hard drive containing a joint set of exhibits that the parties intend to use at trial. (Hoeschen, Nathan) (Entered: 02/26/2026) |
| 02/26/2026 | | CORRECTING ENTRY: The main document at 751 was replaced with a corrected version, per counsel's request. (scs) (Entered: 02/26/2026) |
| 03/02/2026 | | Remark: The jury trial scheduled to begin on March 9, 2026 before the Honorable Joshua D. Wolson shall be held in Courtroom 6A on the sixth floor of the J. Caleb Boggs Federal Building in Wilmington, Delaware. (mpb) (Entered: 03/02/2026) |
| 03/03/2026 | 757 | PROPOSED CONSENT JUDGMENT *AND ORDER* by Arbutus Biopharma Corporation, Genevant Sciences GmbH. (Hoeschen, Nathan) (Entered: 03/03/2026) |
| 03/04/2026 | 758 | CONSENT JUDGMENT AND ORDER. Civil Case TERMINATED. Signed by Judge Joshua D. Wolson on 3/4/2026. (lah) (Entered: 03/04/2026) |
| 03/04/2026 | 759 | Report to the Commissioner of Patents and Trademarks for Patent/Trademark Number(s) US 8,058,069 B2; US 8,492,359 B2; US 8,822,668 B2; US 9,364,435 B2 ; US 9,504,651 B2. (Attachments: # 1 Consent Judgment and Order) (lah) (Entered: 03/04/2026) |
| 03/04/2026 | 760 | Report to the Commissioner of Patents and Trademarks for Patent/Trademark Number(s) US 11,141,378 B2. (Attachments: # 1 Consent Judgment and Order) (lah) (Entered: 03/04/2026) |
| 03/24/2026 | 761 | NOTICE OF APPEAL to the Federal Circuit of 698 Order,,, 758 Consent Judgment, 697 Memorandum Opinion . Appeal filed by Moderna, Inc., ModernaTX, Inc.. (Egan, Brian) (Entered: 03/24/2026) |
| 03/24/2026 | | APPEAL − Credit Card Payment received re 761 Notice of Appeal (Federal Circuit) filed by Moderna, Inc., ModernaTX, Inc.. ( Filing fee $605, receipt number ADEDC−4931293.) (Egan, Brian) (Entered: 03/24/2026) |

| | | |
|---|---|---|
| 03/30/2026 | 762 | NOTICE of Docketing Record on Appeal from USCA for the Federal Circuit re 761 Notice of Appeal (Federal Circuit) filed by Moderna, Inc., ModernaTX, Inc.. USCA Case Number 26−1581. (lah) (Entered: 03/30/2026) |
| 05/01/2026 | 763 | NOTICE of Withdrawal of Counsel by Moderna, Inc., ModernaTX, Inc. (Egan, Brian) (Entered: 05/01/2026) |

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ARBUTUS BIOPHARMA CORPORATION and GENEVANT SCIENCES GmbH, | ) | |
| Plaintiffs, | ) | |
| v. | ) | C.A. No. ______________ |
| MODERNA, INC. and MODERNATX, INC., | ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) | |

**COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiffs Arbutus Biopharma Corporation ("Arbutus") and Genevant Sciences GmbH ("Genevant") file this Complaint seeking patent infringement damages against Defendants Moderna, Inc. and ModernaTX, Inc. (collectively, "Moderna") and allege the following:

**INTRODUCTION**

1. The impact of the COVID-19 pandemic, one of the greatest public health challenges in modern history, would be immeasurably worse but for the rapid, widespread availability of cutting-edge mRNA-based vaccines like Moderna's. Moderna brought its vaccine from lab bench to arms in record speed. That unprecedented accomplishment was made possible by Moderna's use of breakthrough technology Arbutus had already created and patented—a revolutionary lipid nanoparticle ("LNP") delivery platform that took the scientists of Arbutus years of painstaking work to develop and refine. Moderna was well aware of Arbutus's LNP patents and licensed them for other product programs, but it chose not to do so for its COVID-19 vaccine. Instead, it attempted to invalidate several of the patents before the United States Patent

and Trademark Office, and when those efforts largely failed, Moderna simply used the patented technology without paying for it or even asking for a license. Plaintiffs do not seek an injunction or any relief in this case that would impede the sale or manufacture of Moderna's life-saving vaccine. They seek only fair compensation for the use of patented technology they developed with great effort and at great expense, without which Moderna's COVID-19 vaccine would not have been successful.

2. Medicines using messenger ribonucleic acid (or "mRNA") technology, like Moderna's COVID-19 vaccine, rely on synthetic mRNA that enters the body's cells and instructs them to make proteins they would not necessarily make on their own. Moderna's COVID-19 vaccine, in particular, uses mRNA to cause cells to make a small piece of the virus that causes COVID-19 called the "spike protein." That small piece, which is harmless in isolation, prompts the body's immune system to produce antibodies that will recognize the spike protein if it is encountered in the future and destroy it. In this way, the vaccine equips a person's body ahead of time with antibodies to fight the COVID-19 virus if that person experiences a subsequent exposure.

3. Ever since the vast potential for mRNA-based vaccines and other mRNA-based medicines began to catch the attention of scientists more than two decades ago, the biggest technological hurdle to developing and deploying them has been devising a safe and effective way to deliver the mRNA to the cell. Without adequate protection, mRNA quickly degrades in the body. For mRNA vaccines like Moderna's to work, they must incorporate a mechanism for protecting the fragile mRNA, delivering it through cell membranes, and then releasing it inside

the cell. In the words of one Nobel Prize winning scientist, the secret for making RNA-based products work has always been "delivery, delivery, delivery."[1]

4. Having vexed experts in the field for years, that problem eventually found a solution in the innovative research of Arbutus scientists. Their solution was ingenious: microscopic particles built from four carefully selected types of fat-like molecules, so small that they are measured in nanometers but still stable enough to shelter and protect an RNA molecule on a voyage through the human body to a target cell, and then through the target cell's membrane, before finally releasing the RNA. These tiny fat-like particles are called "lipid nanoparticles," or "LNPs." The United States Patent and Trademark Office has granted Arbutus several patents for its groundbreaking LNP technologies.

5. LNPs identified through Arbutus's pioneering work have been described as "crucial" to Moderna's COVID-19 vaccine, the first mRNA product the company was able to commercialize and the keystone of its financial success.[2] Without the LNPs Arbutus invented to safeguard the mRNA and deliver it into cells, the mRNA in Moderna's vaccine would degrade before ever reaching the cells it needs to enter and the vaccine would not work.

6. Moderna has long been aware of Arbutus's LNP intellectual property and its importance as a component of mRNA-based vaccines and other mRNA-based medicines. Several years before the pandemic, Moderna obtained licenses to use Arbutus's LNP patents for certain mRNA products directed to specific viral targets. But those licenses did not grant Moderna rights to use the technology for products targeting SARS-CoV-2, the virus that causes

---

[1] Erika Check, "RNA to the Rescue," *Nature* 425:10-12 (2003), *available at* https://www.nature.com/articles/425010a.
[2] Nathan Vardi, "Moderna's Mysterious Coronavirus Vaccine Delivery System," *Forbes.com*, July 29, 2020, *available at* https://www.forbes.com/sites/nathanvardi/2020/07/29/modernas-mysterious-coronavirus-vaccine-delivery-system/.

COVID-19 and that the vaccines at issue here target. Before it decided to use Arbutus's proven and patented technology as a crucial part of its COVID-19 vaccine, Moderna did not ask for a license to do so. Instead, it tried to convince the United States Patent and Trademark Office and, later, the United States Court of Appeals for the Federal Circuit to cancel several of Arbutus's LNP-related patents. But despite the failure of Moderna's attempts to eliminate Arbutus's patents, and despite Plaintiffs' efforts to resolve this dispute without litigation, Moderna has remained unwilling to pay for its use of Arbutus's technology in a vaccine that has earned Moderna billions of dollars in profits.

7. Moderna's intransigence has forced Arbutus and Genevant, a company spearheaded by former Arbutus scientists, to bring this infringement action. Plaintiffs are proud that their LNP technology has had such a profound impact on the heroic fight against the COVID-19 pandemic, and they do not seek to impede by an injunction or otherwise the production or distribution of Moderna's COVID-19 vaccine, including boosters. All Plaintiffs seek is the compensation due to them under the patent laws of the United States and as a matter of simple fairness.

## NATURE OF THE ACTION

8. This is a civil action under the patent laws of the United States, 35 U.S.C. § 101 *et seq.*, seeking damages for Moderna's infringing manufacture, use, sale, offer for sale, and/or importation of its mRNA-1273 COVID-19 mRNA LNP vaccine product ("Moderna's COVID-19 vaccine") or any supplemental or booster COVID-19 mRNA LNP vaccine product (collectively, the "Accused Product").

9. As alleged herein, the manufacture, use, sale, offer to sell, and/or importation of the Accused Product infringes or will infringe, actively induces or will actively induce

infringement of, or contributes or will contribute to the infringement of, one or more claims of the following patents relating to nucleic acid-lipid particles, compositions thereof, and their use to deliver nucleic acid-based medicines: U.S. Patent Nos. 8,058,069 (Exhibit A), 8,492,359 (Exhibit B), 8,822,668 (Exhibit C), 9,364,435 (Exhibit D), 9,504,651 (Exhibit E), and 11,141,378 (Exhibit F) (collectively, the "Asserted Patents"). At all relevant times, Arbutus owned the Asserted Patents and licensed exclusive rights to sublicense, practice, and sue for infringement of them to Genevant in certain fields of use that include the vaccine application at issue in this Complaint, with certain exceptions not relevant here (hereinafter, Genevant's "Exclusive Rights").

**THE PARTIES**

10. Plaintiff Arbutus Biopharma Corporation is a corporation organized and existing under the laws of Canada, with its principal place of business at 701 Veterans Circle, Warminster, Pennsylvania, 18974. The company's research and development efforts include discovering, developing, and commercializing a cure for chronic hepatitis B virus, as well as drug discovery and development efforts for treating coronaviruses, including SARS-CoV-2, which causes COVID-19.

11. Plaintiff Genevant Sciences GmbH is a company organized and existing under the laws of Switzerland, with its principal place of business at Viaduktstrasse 8, 4051 Basel, Switzerland. Genevant is a technology-focused nucleic acid delivery solutions company with cutting-edge LNP platforms. Genevant owns or licenses the industry's most important LNP intellectual property—that of Arbutus—and has decades of experience and expertise in nucleic acid drug delivery and development. Genevant, together with its affiliated companies, maintains offices in Cambridge, Massachusetts and Vancouver, British Columbia, Canada. Genevant's

mission is to utilize its LNP and other technologies to deliver innovative new medicines that use mRNA or other nucleic acids.

12. Defendant Moderna, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 200 Technology Square, Cambridge, Massachusetts, 02139. Moderna, Inc., itself and through its subsidiary ModernaTX, Inc., develops, manufactures, imports, markets, distributes, offers to sell, and/or sells vaccines and other medicines in the State of Delaware and throughout the United States, for use in the State of Delaware and throughout the United States.

13. Defendant ModernaTX, Inc. is a wholly owned subsidiary of Moderna, Inc. (collectively, "Moderna"). ModernaTX, Inc. is also a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 200 Technology Square, Cambridge, Massachusetts, 02139. ModernaTX, Inc. develops, manufactures, imports, markets, distributes, offers to sell, and/or sells vaccines and other medicines in the State of Delaware and throughout the United States, for use in the State of Delaware and throughout the United States.

## JURISDICTION AND VENUE

### A. Subject-Matter Jurisdiction

14. Because this is an action for infringement under the patent laws of the United States, Title 35 of the United States Code, the Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

### B. Personal Jurisdiction

15. This Court has personal jurisdiction over Moderna because, among other things, Moderna, Inc. and ModernaTX, Inc. have purposefully availed themselves of the benefits and protections of Delaware's laws such that they should reasonably anticipate being haled into court

here. Because Defendants are organized and exist under the laws of Delaware, are qualified to do business in Delaware, and have appointed registered agents for service of process in Delaware, Moderna, Inc. and ModernaTX, Inc. have consented to general jurisdiction in Delaware.

16. Additionally, Moderna, Inc. and ModernaTX, Inc., directly or through others, make, use, induce others to use, offer for sale, and/or sell the Accused Product, and/or a component, combination, or composition constituting a material part of the Accused Product, within the United States, and/or import the same into the United States, including into the District of Delaware. For example, on December 18, 2020, Moderna received Emergency Use Authorization ("EUA") from the United States Food and Drug Administration ("FDA") for its COVID-19 vaccine to be distributed and administered to people throughout the United States, including in the District of Delaware and, on January 31, 2022, the FDA approved Moderna's Biologics License Application ("BLA") for its COVID-19 vaccine. Upon information and belief, as of February 24, 2022, over 835,000 doses of Moderna's COVID-19 vaccine have been delivered to the State of Delaware.[3] Therefore, Moderna, Inc. and ModernaTX, Inc. transact business within Delaware relating to Plaintiffs' claims and have engaged in systematic and continuous business contacts here.

17. For the above reasons, there is nothing unreasonable or fundamentally unfair about requiring Moderna, Inc. and ModernaTX, Inc. to litigate this action in this District, and the Court has personal jurisdiction over them here.

---

[3] Delaware Environmental Public Health Tracking Network, Vaccine Tracker, https://myhealthycommunity.dhss.delaware.gov/locations/state/vaccine-tracker (last visited Feb. 25, 2022).

**C. Venue**

18. Venue is proper in this District under 28 U.S.C. §§ 1391(c)(2) and 1400(b) because both Moderna, Inc. and ModernaTX, Inc. are corporations organized and existing under the laws of the State of Delaware and are therefore subject to suit in this District.

## BACKGROUND

**A. How Vaccines Work**

19. Viruses are typically small packets of DNA or RNA. If a virus enters a living host cell—for example, after being ingested, transmitted through bodily fluids, or inhaled through a person's mouth or nose—the virus's DNA or RNA hijacks the cell's machinery and instructs the cell to make copies of the virus. These copies, often numbering into the millions, leave the infected cell and enter other cells where the process repeats. Infected cells can be damaged or die while hosting the virus. Left unchecked, the host organism itself can die.

20. Although vaccines targeting viruses have different mechanisms of action, they traditionally work by injecting into the body a weakened or inactive form of the virus that is unable to cause infection, but nonetheless retains features of the infectious virus and can teach the immune system to recognize and attack the infectious virus if it invades in the future.

**B. Nucleic Acid Medicines and Delivery Technologies**

21. Moderna's COVID-19 vaccine belongs to a new class of medicines that deliver nucleic acids into the cells of the body to treat diseases or, in the case of Moderna's COVID-19 vaccine, to trigger an immune response to protect a person from future infection.

22. Nucleic acids are molecules that encode the genetic information essential to sustain all forms of life. One type of nucleic acid is deoxyribonucleic acid, or "DNA," which is found in our chromosomes. In humans, each person (except identical twins) has a unique set of

genetic information in the "genes" within his or her chromosomes. Among other things, these genes spell out the instructions for producing proteins that make our cells and bodies function.

23. In order to make the protein encoded by a particular gene, the cell first converts the genetic code in the gene's DNA into another type of nucleic acid known as messenger ribonucleic acid, or "mRNA." mRNA is effectively a copy of the portion of DNA that the cell's protein-making machinery uses as a blueprint to assemble the protein encoded by the gene.

24. Vaccines and other medicines using ribonucleic acid, or "RNA," technologies are an emerging frontier with the potential to revolutionize medicine. RNA-based medicines can employ a type of RNA called small interfering RNA ("siRNA") to treat certain diseases by interfering with the expression of unwanted proteins to reduce the amounts produced—a process called RNA interference ("RNAi"). RNA-based medicines also can employ mRNA to cause or increase the production of certain proteins. mRNA vaccines, for example, cause cells to express a protein (or a piece of a protein) that is normally found on a particular tumor or that is part of a particular virus. The presence of that protein (or piece of a protein) teaches the body's immune system to recognize it if it is encountered in the future and destroy it. These and other RNA-based medicines hold great promise for addressing many previously intractable diseases and, as in the present circumstances, new viruses that cause or threaten worldwide pandemics.

25. Despite their promise, however, RNA-based medicines have been difficult to develop. By their nature, RNA molecules are fragile. Without adequate protection, RNA molecules are susceptible to degradation in the body, and, if and when they get to a cell, cannot cross the cell membrane to enter the cell. For decades, the need for an effective delivery technology had been the most significant challenge in the development of RNA-based products.

In particular, without the means to protect mRNA and facilitate its entry into target cells, mRNA-based vaccines and other medicines have been ineffective.

26. Indeed, functional RNA-based medicines eluded researchers until the pioneering work by Arbutus scientists, many now at Genevant companies, resulting in the discovery and development of the leading nucleic acid delivery technology in use today. Decades ago, a group of ambitious research scientists working at a predecessor company to Arbutus began to tackle the nucleic acid delivery problem that had long stymied the field. Years of tireless effort by these scientists resulted in a solution to the problem. The solution was LNP technology that relies on fat-like molecules called lipids that encapsulate and protect nucleic acids like mRNA from degradation in the body and enable them to cross cell membranes. Once inside a cell, the LNP releases the nucleic acid it encapsulates so that, in the case of an mRNA vaccine for example, the nucleic acid can express the protein it encodes.

27. The lipid components of the Arbutus technology include: structural lipids, such as phospholipids and cholesterol; "cationic" (positive charge-bearing) lipids, including "ionizable" lipids that are positive charge-bearing at certain pH levels; and conjugated lipids, which are lipids attached to a polymer such as polyethyleneglycol ("PEG"). Arbutus scientists discovered that nucleic acid-lipid particles combining particular lipid components in particular ratios could achieve much more effective delivery of nucleic acids through cell membranes and into cells.

28. These Arbutus scientists spent more than a decade researching and developing this nucleic acid-lipid delivery technology. Their efforts led to the first FDA-approved RNA-based therapeutic in the form of a drug called Onpattro®, an RNAi treatment for a form of amyloidosis, a rare disease that causes certain proteins to accumulate in organs. The company that developed Onpattro®, Alnylam Pharmaceuticals, did so under an LNP license from Arbutus

and received FDA approval in August 2018. Building on this initial success, Arbutus has granted licenses to its LNP technology to other companies, and Genevant now has several ongoing LNP product development collaborations, some directed to COVID-19 and some directed to other diseases and disorders. Several entities developing mRNA-LNP vaccines against COVID-19 have come to Genevant for a license to Arbutus's technology, including companies that have produced promising candidates in clinical trials. And Genevant's COVID-19 development collaborations include efforts to provide a vaccine to parts of the developing world.

**C. The United States Awards Patents Recognizing Arbutus's Innovations**

29. In recognition of Arbutus's extensive and groundbreaking research and development efforts, the United States Patent and Trademark Office has granted several families of patents claiming nucleic acid-lipid particles and lipid vesicles, as well as compositions and methods of using them. The Asserted Patents are among them:

a. U.S. Patent No. 8,058,069, "Lipid Formulations for Nucleic Acid Delivery," issued on November 15, 2011 (the "'069 Patent").

b. U.S. Patent No. 8,492,359, "Lipid Formulations for Nucleic Acid Delivery," issued on July 23, 2013 (the "'359 Patent").

c. U.S. Patent No. 8,822,668, "Lipid Formulations for Nucleic Acid Delivery," issued on September 2, 2014 (the "'668 Patent").

d. U.S. Patent No. 9,364,435, "Lipid Formulations for Nucleic Acid Delivery," issued on June 14, 2016 (the "'435 Patent").

e. U.S. Patent No. 9,504,651, "Lipid Compositions for Nucleic Acid Delivery," issued on November 29, 2016 (the "'651 Patent").

f. U.S. Patent No. 11,141,378, "Lipid Formulations for Nucleic Acid Delivery," issued on October 12, 2021 (the "'378 Patent").

30. True and correct copies of the Asserted Patents are attached hereto as Exhibits A through F. All are valid and enforceable under United States patent laws. All are assigned to and owned by Arbutus, and, at all times since Arbutus and Genevant entered into a license agreement, Genevant has held Exclusive Rights to all of the Asserted Patents in various fields of use including the vaccine application at issue here. Under the terms of the license, Genevant's Exclusive Rights include the right to sue for the infringement alleged in this Complaint.

**D. Moderna's Knowledge of, and Background with, the Asserted Patents**

31. Moderna has been on actual notice of Arbutus's patents since before its development of the Accused Product and has knowingly used Arbutus's technology as an essential component of its nucleic acid products and product candidates, including its COVID-19 vaccine.

32. Years before the COVID-19 pandemic, Moderna recognized that Arbutus's LNP technology could fuel its own work in RNA-based vaccines and other medicines. Accordingly, in or about May 2015, Moderna attempted to acquire rights to Arbutus's LNP delivery technology for four specific viral targets (none of which is COVID-19) through sublicense from a Canadian company called Acuitas Therapeutics. Although Acuitas had licensed Arbutus's LNP technology in 2012, its license agreement expressly limited Acuitas's ability to grant sublicenses. That limitation prohibited Acuitas from granting the sublicense that it granted to Moderna.

33. In August 2016, after learning of the Moderna-Acuitas sublicense agreements, Arbutus notified Acuitas of material breach. In October 2016, Acuitas filed suit in the Supreme

Court of British Columbia seeking to prevent Arbutus from terminating the Arbutus-Acuitas agreement. Arbutus counterclaimed for a declaration that the license had been terminated and sought an injunction barring Acuitas from further sublicensing Arbutus's LNP technology.

34. In February 2018, Arbutus and Acuitas settled their dispute. The settlement agreement provided that Acuitas no longer could use Arbutus's LNP technology, with the four specific sublicenses to Moderna for vaccines targeting specific viruses remaining in effect. SARS-CoV-2, the virus that causes COVID-19 and the target of the vaccine accused of infringement in this Complaint, is not among the surviving sublicenses.

35. Deprived of a broad license to Arbutus's valuable LNP technology and hoping to make unrestricted use of that technology without having to pay royalties, Moderna began filing *inter partes* review ("IPR") petitions requesting that the Patent and Trademark Office cancel certain of Arbutus's patents, including some asserted here.

36. Moderna's first IPR petition, filed in February 2018, challenged Arbutus's U.S. Patent No. 9,404,127 ("the '127 Patent"), which, like the Asserted Patents, is directed to Arbutus's LNP technology. The Patent Trial and Appeal Board ("PTAB") ruled that all claims of the '127 Patent should be cancelled. An appeal of that decision remains pending before the United States Court of Appeals for the Federal Circuit.

37. Moderna's IPRs against the Asserted Patents were less successful. Its second IPR petition, filed in March 2018, ended with the PTAB rejecting Moderna's arguments challenging the validity of ten of the '435 Patent's twenty claims. Moderna challenged that ruling on appeal,

but in a December 2021 decision, the United States Court of Appeals for the Federal Circuit dismissed Moderna's appeal for lack of standing.[4]

38. Moderna's third IPR petition, filed in January 2019, was even less successful. The PTAB completely rejected Moderna's challenge to all claims of the '069 Patent, and the United States Court of Appeals for the Federal Circuit affirmed that ruling in December 2021.

### E. Moderna Designs Its COVID-19 Vaccine Over a Single Weekend Aided by the Unauthorized Use of Arbutus's LNP Technology

39. On January 10, 2020, with the novel SARS-CoV-2 virus quickly spreading around the world, scientists identified the virus's complete genetic sequence and posted it for free on the internet. This public disclosure revealed the complete RNA sequence that encodes the virus's components, including its distinctive "spike protein." With that information in the public domain, researchers around the world were able to begin designing vaccines to target the virus.

40. Moderna was one of many companies that began work on a vaccine in earnest once the genetic sequence was published.

41. Relying on Arbutus's LNP technology covered by the Asserted Patents, Moderna was able to begin producing its COVID-19 vaccine *within just a few days* of the SARS-CoV-2 genomic sequence entering the public domain. The design component of the effort was even faster: According to Moderna President Stephen Hoge, "[w]e did it in an hour, and it worked brilliantly."[5] Compared to the timelines of prior vaccine-development efforts, Moderna's accomplishment was unprecedented. In the words of Moderna's CEO Stéphane Bancel, "11

---

[4] Arbutus cross-appealed the PTAB's decision, challenging the invalidation of the ten claims of the '435 Patent that were not upheld. On December 1, 2021, the Federal Circuit affirmed the PTAB's decision as to those claims.

[5] "Stephen Hoge, MD '03: Turns out, designing a COVID vaccine was easy," UCSF Alumni, *available at* https://alumni.ucsf.edu/stories/stephen-hoge.

months since the DNA sequence of the virus became available, you will have two approved mRNA vaccines, which has never happened before with any technology. That is amazing."[6]

42. Moderna's success was chronicled in an article first published online on June 11, 2020, by individuals affiliated with the company and collaborators at the National Institutes of Health. According to this article—the "Moderna/NIH preprint"—"the release of SARS-CoV-2 sequences triggered immediate rapid manufacturing of an mRNA vaccine" by Moderna.[7] Moderna "decide[d] on [the] mRNA-1273 sequence" on January 13, 2020, just three days after the publication of the viral sequence, and "initiate[d] cGMP production" the very next day, on January 14, 2020.[8] On February 24, 2020, Moderna shipped clinical drug product, and, less than a month later, Phase I trials began.[9]

43. Moderna's COVID-19 vaccine could not have been developed, much less on a timeline unprecedented in human history, without Arbutus's proven and patented LNP delivery technology—technology that had transformed vaccine design from a years-long project into one that could be performed within an hour over a January weekend.

44. Moderna's co-founder Robert Langer has been quoted as saying "I don't think people realized just how important the delivery systems are . . . ."[10] LNPs are so crucial to

---

[6] Antonio Regalado, "'None of us were ready' to manufacture genetic vaccines for a billion people," MIT Technology Review (December 17, 2020), *available at* https://www.technologyreview.com/2020/12/17/1014989/moderna-vaccine-availability-stephane-bancel-ceo/.

[7] "SARS-CoV-2 mRNA Vaccine Development Enabled by Prototype Pathogen Preparedness," bioRvix.org (June 11, 2020) *available at* https://www.biorxiv.org/content/10.1101/2020.06.11.145920v1.full.

[8] *Id.*

[9] *Id.*

[10] Tim Loh, "Lipids Are Delivering the Vaccine Revolution," Bloomberg (March 6, 2021), *available at* https://www.bloomberg.com/news/newsletters/2021-03-06/lipids-are-delivering-the-vaccine-revolution.

Moderna's mRNA vaccines that Giuseppe Ciaramella, head of infectious diseases at Moderna from 2014 to 2018, called LNPs "the unsung hero of the whole thing,"[11] while Moderna CEO Stéphane Bancel stated in December 2020 that "[w]e always said it is . . . about developing the right delivery technology. And this is something that takes years, not two weeks."[12]

45. The Moderna/NIH preprint detailed Moderna's use of Arbutus's LNP technology and its infringement of the Asserted Patents. The scientists who worked on the vaccine and contributed to the article explained that Moderna's COVID-19 vaccine is composed of mRNA encoding a modified version of the SARS-CoV-2 spike (S) protein that was synthesized, purified, "and encapsulated into lipid nanoparticles (LNP)," with a lipid molar ratio of "50:10:38.5:1.5 (ionizable lipid:DSPC:cholesterol:PEG-lipid)." Specifically, the Moderna/NIH preprint indicates that the Accused Product includes lipid particles comprising the following lipids in the following ratio: 50 mol % of an ionizable lipid that is cationic; 10 mol % of a phospholipid (DSPC); 38.5 mol % of cholesterol; and 1.5 mol % of a conjugated lipid that inhibits aggregation of particles (PEG-lipid).

46. These components are within the ranges of, among other claims of the Asserted Patents, Claim 1 of Arbutus's '069 Patent, which recites a "nucleic acid-lipid particle comprising (a) a nucleic acid; (b) a cationic lipid comprising from 50 mol % to 65 mol % of the total lipid present in the particle: (c) a non-cationic lipid comprising a mixture of a phospholipid and cholesterol or a derivative thereof, wherein the phospholipid comprises from 4 mol % to 10 mol % of the total lipid present in the particle and the cholesterol or derivative thereof comprises

---

[11] Ryan Cross, "Without these lipid shells, there would be no mRNA vaccines for COVID-19," C&EN (March 6, 2021), *available at* https://cen.acs.org/pharmaceuticals/drug-delivery/Without-lipid-shells-mRNA-vaccines/99/i8.
[12] Regalado, *supra* note 7.

from 30 mol % to 40 mol % of the total lipid present in the particle; and (d) a conjugated lipid that inhibits aggregation of particles comprising from 0.5 mol % to 2 mol % of the total lipid present in the particle."

47. A month after the Moderna/NIH preprint appeared, the PTAB rejected Moderna's IPR challenge to the '069 Patent in its entirety, triggering a ten percent drop in Moderna's share price in a single day. Although Moderna promptly issued public statements denying any infringement, it has been conspicuously silent about what LNP technology is used in its vaccine, if not what is described by its own co-authors in the Moderna/NIH preprint. Moderna has not requested retraction of the Moderna/NIH preprint or otherwise submitted a correction of it. Instead, when it came time to publish the official version of that preprint in the scientific publication *Nature*, it simply excised the relevant details about the LNP technology it was using.

48. Nonetheless, another preclinical study of Moderna's COVID-19 vaccine, authored by Corbett et al. and published on the website of *The New England Journal of Medicine* on July 28, 2020, confirmed that the mRNA was encapsulated in an LNP "as described previously" and cited a prior Moderna publication that discloses the same lipid molar ratio as the Moderna/NIH preprint.[13] Four of the article's authors were affiliated with Moderna at the time of the article's publication. Moderna has not requested retraction of the Corbett 2020 *The New England Journal of Medicine* article or otherwise submitted a correction of the Corbett 2020 *The New England Journal of Medicine* article.

---

[13] *See* Corbett et al., "Evaluation of the mRNA-1273 Vaccine against SARS-CoV-2 in Nonhuman Primates," *NEJM* 383;16:1544-1555, 1546 (2020) (citing Hassett et al., "Optimization of Lipid Nanoparticles for Intramuscular Administration of mRNA Vaccines," *Mol. Ther. Nucl. Acids* 15:1-11, 8 (2019)), *available at* https://www.nejm.org/doi/full/10.1056/nejmoa2024671#.

49. What is more, on May 14, 2021, Moderna submitted an international patent application titled "Coronavirus RNA Vaccines and Methods of Use," which published on August 12, 2021, as International Patent Publication WO 2021/159130. In that application, "Example 1:Phase 1 Clinical Trial" identifies the specific ionizable lipid used in the Phase I clinical trial of Moderna's vaccine as "heptadecan-9-yl 8 ((2 hydroxyethyl)(6 oxo 6-(undecyloxy)hexyl) amino)octanoate 20," also known as SM-102, which in its ionized state is positively charged (cationic).[14] Example 1 also recites that the particles used in the Phase I clinical trial of Moderna's vaccine are prepared with the same lipid molar ratio identified in the Moderna/NIH preprint, i.e.: 50 mol % of an ionizable lipid that is cationic; 10 mol % of a phospholipid (DSPC); 38.5 mol % of cholesterol; and 1.5 mol % of a conjugated lipid that inhibits aggregation of particles (PEG-lipid).[15]

50. Notwithstanding its repeated statements in published articles and its patent application, Moderna publicly denied infringement of Arbutus's patents, ostensibly on the basis that the LNPs in Moderna's COVID-19 vaccine manufactured and sold initially on the basis of EUA and now with full FDA approval differed from the LNPs in its Phase I clinical trial. But while Moderna was denying infringement in public statements, its Senior Vice President and Deputy General Counsel, Shaun Ryan, submitted on February 23, 2021, a sworn statement under penalty of perjury in support of one of its IPR appeals to the United States Court of Appeals for

---

[14] *See* International Patent Publication WO 2021/159130 at 49.

[15] *See id.* ("The SARS-CoV-2 mRNA vaccine. . . was a lipid nanoparticle (LNP) dispersion of an mRNA encoding the prefusion stabilized spike protein SARS-CoV-2 formulated in LNPs composed of four (4) lipids (50 mol% ionizable lipid heptadecan-9-yl 8 ((2 hydroxyethyl)(6 oxo 6-(undecyloxy)hexyl)amino)octanoate 20 (Compound 1); 10 mol% 1,2 distearoyl sn glycero-3 phosphocholine (DSPC); 38.5 mol% cholesterol; and 1.5 mol% l-monomethoxypolyethyleneglycol-2,3-dimyristylglycerol with polyethylene glycol of average molecular weight 2000 (PEG2000 DMG)).").

the Federal Circuit. In that sworn declaration, he stated that the "lipid carrier particle" used in its Phase I study—described in the Moderna/NIH preprint and WO 2021/159130 as being within the scope at least of Claim 1 of the '069 Patent—is the same as the one that was "ultimately approved" for use in its product.[16]

51. Distribution of the Accused Product and its administration to persons in the United States and around the world commenced immediately after the FDA granted Moderna's COVID-19 vaccine an EUA on December 18, 2020. In 2021, Moderna shipped 807 million doses.[17] As of February 24, 2022, Moderna had signed advanced purchase agreements worth approximately $19 billion for all of 2022.[18] As of May 6, 2021, Moderna had signed advance purchase agreements covering more than one billion doses.[19] And from December 18, 2020, through February 24, 2022, more than 200 million doses of Moderna's COVID-19 vaccine had been administered to people throughout the United States.[20] Moderna's vaccine doses made in the United States and administered in the United States were distributed to hospitals, pharmacies, clinics, and numerous other entities for the benefit of individual vaccine recipients in the United States. All of the manufacturing and sales of vaccines distributed in the United States were for

---

[16] Declaration of Shaun Ryan, Mot. to Supplement the Record to Provide Evidence of Standing, Dkt. No. 18, 11-12 ¶¶ 3-4, *Moderna TX, Inc. v. Arbutus Biopharma Corp.*, No. 2020-2329 (Fed. Cir.).

[17] Press Release, Moderna, Moderna Reports Fourth Quarter and Fiscal Year 2021 Financial Results and Provides Business Updates (Feb. 24, 2022), https://investors.modernatx.com/news/news-details/2022/Moderna-Reports-Fourth-Quarter-and-Fiscal-Year-2021-Financial-Results-and-Provides-Business-Updates/default.aspx.

[18] *Id.*

[19] Press Release, Moderna, Moderna Reports First Quarter Fiscal Year 2021 Financial Results and Provides Business Updates (May 6, 2021), https://investors.modernatx.com/news-releases/news-release-details/moderna-reports-first-quarter-fiscal-year-2021-financial-results.

[20] COVID-19 Vaccinations in the United States, CDC (last visited Feb. 25, 2022), https://covid.cdc.gov/covid-data-tracker/#vaccinations_vacc-total-admin-rate-total.

the benefit of the American public. Millions more doses, including doses made in the United States, have been administered abroad.

52. On June 1, 2021, Moderna announced that it had initiated the FDA process for a BLA—i.e., for the full-fledged licensure of its COVID-19 vaccine. As of February 24, 2022, Moderna's COVID-19 vaccine had received at least emergency authorization from more than 70 countries,[21] including Canada, Israel, the United Kingdom, Switzerland, Singapore, Qatar, Taiwan, and the Philippines, as well as from the European Union.[22] On January 31, 2022, the FDA approved Moderna's BLA for its COVID-19 vaccine.[23]

53. In May 2021, Moderna announced that it had begun exporting from the United States doses of its COVID-19 vaccine that were manufactured in facilities in the United States.[24] Those doses were made in the United States and sold to foreign governments or other foreign entities for the benefit of individuals outside the United States.

---

21 Press Release, Moderna, Moderna Reports Fourth Quarter and Fiscal Year 2021 Financial Results and Provides Business Updates (Feb. 24, 2022), https://investors.modernatx.com/news/news-details/2022/Moderna-Reports-Fourth-Quarter-and-Fiscal-Year-2021-Financial-Results-and-Provides-Business-Updates/default.aspx.

22 *See id.*

23 Press Release, Moderna, Moderna Receives Full U.S. FDA Approval for COVID-19 Vaccine Spikevax (Jan. 31, 2022), https://investors.modernatx.com/news/news-details/2022/Moderna-Receives-Full-U.S.-FDA-Approval-for-COVID-19-Vaccine-Spikevax/default.aspx.

24 Moderna Reply Br. at 22, Dkt. No. 41, *Moderna TX, Inc. v. Arbutus Biopharma Corp*. (Fed. Cir. No. 2020-2329) (citing Vaccine Exports From U.S. Accelerate as Moderna Ships Abroad, Bloomberg.com (May 20, 2021), https://www.bloomberg.com/news/articles/2021-05-20/moderna-starts-shipping-vaccine-from-u-s-boosting-shot-exports).

54. Moderna also has contracted with a number of companies around the world to manufacture its COVID-19 vaccine.[25] This includes several companies that employ facilities in the United States to manufacture Moderna's vaccine.[26]

**F. Arbutus and Genevant Attempt to Negotiate a License with Moderna**

55. Plaintiffs tried to avoid the need to file this lawsuit.

56. Many companies have paid Plaintiffs for a license to use the breakthrough LNP technology at issue here, including several companies developing COVID-19 vaccines and several other companies with which Genevant has ongoing development collaborations. The research and development facilitated by these and other licenses has resulted in product candidates across a variety of conditions.

57. Plaintiffs would have preferred to resolve their dispute with Moderna with a mutually acceptable license from Genevant. And Plaintiffs have long sought to do just that. In proposing such a license, Plaintiffs did not wish to minimize the importance of Moderna's extensive efforts to manufacture and distribute billions of doses of its COVID-19 vaccine in the midst of a global pandemic. Those efforts have been vitally important and have saved countless lives. Rather, Plaintiffs sought only the fair and reasonable compensation to which they are entitled by law for their contributions to Moderna's COVID-19 vaccine—contributions that were the product of decades of pioneering work by Arbutus scientists, many now at Genevant

[25] *See*, *e.g.*, Press Release, Moderna, Moderna and Lonza Announce Worldwide Strategic Collaboration to Manufacture Moderna's Vaccine (mRNA-1273) Against Novel Coronavirus (May 1, 2020), https://investors.modernatx.com/news-releases/news-release-details/moderna-and-lonza-announce-worldwide-strategic-collaboration.

[26] *Id.*; *see also, e.g.*, Press Release, Moderna, Baxter BioPharma Solutions and Moderna Announce Agreement for Fill/Finish Manufacturing of the Moderna COVID-19 Vaccine in the U.S. (Mar. 8, 2021), https://investors.modernatx.com/news-releases/news-release-details/baxter-biopharma-solutions-and-moderna-announce-agreement.

companies, including during periods when it was uncertain whether mRNA vaccines could ultimately be made to work.

58. Unfortunately, Moderna has consistently declined to engage meaningfully in licensing discussion, necessitating this lawsuit.

59. On November 23, 2020, Arbutus and Genevant sent Moderna a letter stating that the Accused Product may infringe claims of each of the then-issued Asserted Patents and offering to discuss the terms of a collaboration or license to further both parties' goal of ending the COVID-19 pandemic. Moderna acknowledged receipt of this letter on November 25, 2020.

60. On December 10, 2020, Moderna sent a letter to Arbutus and Genevant stating that Moderna was "open to hearing [Genevant's] proposal for a partnership or patent license."

61. Upon receiving the Arbutus and Genevant proposal, however, Moderna declined to negotiate. Moderna also declined repeated requests to provide samples or non-public documents, even under a confidentiality agreement, to support any assertion that it does not infringe the Asserted Patents, including those in which it invested substantial resources and time to challenge, throughout 2020 and 2021, before the United States Patent and Trademark Office and the United States Court of Appeals for the Federal Circuit.

### G. Moderna Refuses to Compensate Arbutus and Genevant for Using Their Technology

62. Despite Arbutus and Genevant's repeated efforts, Moderna has refused to take a license from, partner with, or otherwise compensate Plaintiffs for their contribution to Moderna's COVID-19 vaccine. Instead, Moderna continues to infringe the Asserted Patents directly and indirectly, without authority and with actual knowledge of, or reckless disregard for, the fact that its actions constitute infringement of the Asserted Patents.

63. Arbutus and Genevant fully support Moderna's efforts to supply vaccines to people in the United States and worldwide and in no way seek to interfere with those efforts. Accordingly, no injunctive relief is sought in this case.

64. However, Moderna has made extensive use of, and earned billions in profits exploiting, Arbutus's patented technology, including the technology described and claimed in the Asserted Patents. Moderna's actions have caused harm, and continue to cause harm, to Arbutus and Genevant. Arbutus and Genevant have no choice but to defend their proprietary and patented technology and seek fair and reasonable compensation for the value of their innovation.[27]

**COUNT 1: INFRINGEMENT OF U.S. PATENT NO. 8,058,069**

65. Paragraphs 1 through 64 are incorporated by reference as if fully set forth herein.

66. The United States Patent and Trademark Office duly and legally issued the '069 Patent to one of Arbutus's predecessor companies on November 15, 2011. The '069 Patent is titled "Novel Lipid Formulations for Nucleic Acid Delivery."

67. Arbutus owns, and at all relevant times has owned, the '069 Patent.

68. Genevant holds, and at all relevant times has held, a license to Exclusive Rights in the '069 Patent for certain fields of use, which include the Accused Product. Genevant has the right to sue and seek damages for the infringement alleged herein.

69. Claims of the '069 Patent cover, among other things, nucleic acid-lipid particles and compositions thereof.

[27] The allegations herein are exemplary and without prejudice to Arbutus and Genevant's infringement contentions. In providing these allegations, Arbutus and Genevant do not convey or imply any particular claim constructions or the precise scope of the claims. Arbutus and Genevant's claim construction contentions regarding the meaning and scope of the claim terms will be provided under the Court's scheduling order and this District's Local Rules.

70. Moderna has directly infringed and continues to directly infringe claims of the '069 Patent under 35 U.S.C. § 271(a) by manufacturing, offering to sell, selling, or using within the United States, or importing into the United States, the Accused Product incorporating Arbutus's patented LNP delivery technology covered by the '069 Patent, without authority or license to do so, during the term of the '069 Patent.

71. Moderna actively, knowingly, and intentionally has induced, and continues to induce, infringement of one or more claims of the '069 Patent under 35 U.S.C. § 271(b) by encouraging others to make and use the Accused Product in the United States in a manner specifically intended to infringe the '069 Patent.

72. Moderna has contributed, and continues to contribute, to the infringement of one or more claims of the '069 Patent by others under 35 U.S.C. § 271(c) by offering to sell and selling within the United States, or importing into the United States, a component of a patented manufacture, combination or composition, constituting a material part of the invention of the '069 Patent, knowing the same to be especially made or especially adapted for use in the infringement of the '069 Patent and not a staple article or commodity of commerce suitable for substantial non-infringing use.

73. For example, Claim 1 of the '069 Patent recites a "nucleic acid-lipid particle comprising: (a) a nucleic acid; (b) a cationic lipid comprising from 50 mol % to 65 mol % of the total lipid present in the particle; (c) a non-cationic lipid comprising a mixture of a phospholipid and cholesterol or a derivative thereof, wherein the phospholipid comprises from 4 mol % to 10 mol % of the total lipid present in the particle and the cholesterol or derivative thereof comprises from 30 mol % to 40 mol % of the total lipid present in the particle; and (d) a conjugated lipid

that inhibits aggregation of particles comprising from 0.5 mol % to 2 mol % of the total lipid present in the particle."

74. The Accused Product is a pharmaceutical composition of nucleic acid-lipid particles. The nucleic acid in the Asserted Product is an mRNA which encodes the COVID-19 spike protein.

75. The Accused Product comprises nucleic acid-lipid particles comprising the following lipids: an ionizable cationic lipid (SM-102); a phospholipid (DSPC); cholesterol; and a conjugated lipid that inhibits aggregation of particles (a PEG-lipid conjugate).

76. On information and belief, as indicated in the Moderna/NIH preprint and in International Patent Publication WO 2021/159130, the Accused Product comprises nucleic acid-lipid particles comprising the following lipids in the following ratio of the total lipid present in the particle: 50 mol % of an ionizable cationic lipid; 10 mol % of a phospholipid; 38.5 mol % of cholesterol; and 1.5 mol % of a conjugated lipid that inhibits aggregation of particles.

77. Moderna has known of the '069 Patent since before it commenced the infringing conduct or has been willfully blind to its existence and contents since then. Moderna has long been aware of, and has actively monitored Arbutus's patent estate, including the '069 Patent.[28] Moderna secured unauthorized limited sublicenses to Arbutus's LNP-related patents through Acuitas; Moderna later sought to invalidate three of Arbutus's LNP-related patents, including the '069 Patent, through *inter partes* review; and Moderna has repeatedly made public representations regarding Arbutus's LNP technology and patents.[29] Despite such knowledge,

[28] *See, e.g.*, Moderna Mot. at 4-5, Dkt. No. 18, *Moderna TX, Inc. v. Arbutus Biopharma Corp.* (Fed. Cir. No. 2020-2329).
[29] *See, e.g.*, Moderna Mot. at 5, Dkt. No. 18, *Moderna TX, Inc. v. Arbutus Biopharma Corp.* (Fed. Cir. No. 2020-2329); Press Release, Moderna, Statement from Moderna on Patent Trial

Moderna nonetheless has engaged in the manufacture, offer for sale, sale or use of the Accused Product within the United States, and/or the importation of the Accused Product into the United States, in violation of Plaintiffs' patent rights.

78. Moderna actively and knowingly has infringed the '069 Patent and actively and knowingly has induced infringement of the '069 Patent by others. After Moderna knew or should have known that the Accused Product infringed, it applied for and obtained EUA and then full approval from the FDA[30] to market and sell its vaccine in the United States with the specific intent to induce customers to purchase the Accused Product. At all times after Moderna knew or should have known that the Accused Product infringed, it contracted with multiple companies to manufacture the Accused Product, both in the United States and abroad,[31] with the specific intent to induce those companies to make its infringing product. Upon information and belief, Moderna markets the Accused Product to governments and other entities with the intent for healthcare professionals to administer the Accused Product to millions and potentially billions of people as a means of protection against SARS-CoV-2 infection.

79. Moderna actively and knowingly contributes to the infringement of healthcare professionals in the United States who administer or otherwise use the Accused Product in the

---

and Appeal Board (PTAB) Ruling (July 24, 2020), https://investors.modernatx.com/news-releases/news-release-details/statement-moderna-patent-trial-and-appeal-board-ptab-ruling.

[30] Press Release, Moderna, Moderna Announces Initiation of Rolling Submission of Biologics License Application (BLA) with U.S. FDA for the Moderna COVID-19 Vaccine (June 1, 2021), https://investors.modernatx.com/news-releases/news-release-details/moderna-announces-initiation-rolling-submission-biologics; Press Release, Moderna, Moderna Receives Full U.S. FDA Approval for COVID-19 Vaccine Spikevax (Jan. 31, 2022), https://investors.modernatx.com/news/news-details/2022/Moderna-Receives-Full-U.S.-FDA-Approval-for-COVID-19-Vaccine-Spikevax/default.aspx.

[31] Press Release, Moderna, Moderna and Lonza Announce Worldwide Strategic Collaboration to Manufacture Moderna's Vaccine (mRNA-1273) Against Novel Coronavirus (May 1, 2020), https://investors.modernatx.com/news-releases/news-release-details/moderna-and-lonza-announce-worldwide-strategic-collaboration.

United States. After Moderna knew or should have known that the Accused Product constituted a material part of the invention of the ’069 Patent, knowing the same to be especially made or especially adapted for use in the infringement of the ’069 Patent and not a staple article or commodity of commerce suitable for substantial non-infringing use, it pursued and obtained EUA and then full approval from the FDA to market and sell the Accused Product in the United States with the specific intent to induce customers to purchase the Accused Product and for people to have the Accused Product administered to them within the United States. At all times after Moderna knew or should have known that the Accused Product constituted a material part of the invention of the ’069 Patent, it contracted with others to manufacture the Accused Product, both in the United States and abroad, knowing healthcare professionals would directly infringe one or more claims of the ’069 Patent by administering the Accused Product in the United States.

80. Arbutus and Genevant are entitled to a judgment that Moderna infringes the claims of the ’069 Patent by engaging in the manufacture, use, sale, or offer for sale of the Accused Product within the United States, and/or the importation of the Accused Product into the United States, and/or by actively inducing others to do the same, and/or by contributing to the same.

81. Moderna’s infringement has damaged and continues to damage Genevant and Arbutus in an amount yet to be determined, of at least a reasonable royalty.

82. Moderna has undertaken its infringing actions despite knowing that such actions infringe one or more claims of the ’069 Patent. As such, Moderna has and continues to willfully infringe one or more claims of the ’069 Patent.

83. This is an exceptional case. Genevant and Arbutus are entitled to attorneys’ fees and costs under 35 U.S.C. § 285 as a result of Moderna’s infringement of the ’069 Patent.

**COUNT 2: INFRINGEMENT OF U.S. PATENT NO. 8,492,359**

84. Paragraphs 1 through 83 are incorporated by reference as if fully set forth herein.

85. The United States Patent and Trademark Office duly and legally issued the ’359 Patent to one of Arbutus’s predecessor companies on July 23, 2013. The ’359 Patent is titled “Lipid Formulations for Nucleic Acid Delivery.”

86. Arbutus owns, and at all relevant times has owned, the ’359 Patent.

87. Genevant holds, and at all relevant times has held, a license to Exclusive Rights in the ’359 Patent for certain fields of use, which include the Accused Product. Genevant has the right to sue and seek damages for the infringement alleged herein.

88. Claims of the ’359 Patent cover, among other things, nucleic acid-lipid particles and compositions thereof.

89. Moderna has directly infringed and continues to directly infringe claims of the ’359 Patent under 35 U.S.C. § 271(a) by manufacturing, offering to sell, selling, or using within the United States, or importing into the United States, the Accused Product incorporating Arbutus’s patented LNP delivery technology covered by the ’359 Patent, without authority or license to do so, during the term of the ’359 Patent.

90. Moderna actively, knowingly, and intentionally has induced, and continues to induce, infringement of one or more claims of the ’359 Patent under 35 U.S.C. § 271(b) by actively encouraging others to make and use the Accused Product in the United States in a manner specifically intended to infringe the ’359 Patent.

91. Moderna has contributed, and continues to contribute to the infringement of one or more claims of the ’359 Patent by others under 35 U.S.C. § 271(c) by offering to sell and selling within the United States, or importing into the United States, a component of a patented manufacture, combination or composition, constituting a material part of the invention of the

Case: 26-1581 Document: 56-1 Page: 452 Filed: 08/21/2026

’359 Patent, knowing the same to be especially made or especially adapted for use in the infringement of the ’359 Patent and not a staple article or commodity of commerce suitable for substantial non-infringing use.

92. For example, Claim 1 of the ’359 Patent recites a “nucleic acid-lipid particle comprising: (a) a nucleic acid; (b) a cationic lipid comprising from 50 mol % to 65 mol % of the total lipid present in the particle; (c) a non-cationic lipid comprising a mixture of a phospholipid and cholesterol or a derivative thereof, wherein the phospholipid comprises from 3 mol % to 15 mol % of the total lipid present in the particle and the cholesterol or derivative thereof comprises from 30 mol % to 40 mol % of the total lipid present in the particle; and (d) a conjugated lipid that inhibits aggregation of particles comprising from 0.5 mol % to 2 mol % of the total lipid present in the particle.”

93. The Accused Product is a pharmaceutical composition of nucleic acid-lipid particles. The nucleic acid in the Accused Product is an mRNA which encodes the COVID-19 spike protein.

94. The Accused Product comprises nucleic acid-lipid particles comprising the following lipids: an ionizable cationic lipid (SM-102); a phospholipid (DSPC); cholesterol; and a conjugated lipid that inhibits aggregation of particles (a PEG-lipid conjugate).

95. On information and belief, as indicated in the Moderna/NIH preprint and in International Patent Publication WO 2021/159130, the Accused Product comprises nucleic acid-lipid particles comprising the following lipids in the following ratio of the total lipid present in the particle: 50 mol % of an ionizable cationic lipid; 10 mol % of a phospholipid; 38.5 mol % of cholesterol; and 1.5 mol % of a conjugated lipid that inhibits aggregation of particles.

96. Moderna has known of the '359 Patent since before it commenced the infringing conduct or has been willfully blind to its existence and contents since then. Moderna has long been aware of and actively monitored Arbutus's patent estate. Moderna secured unauthorized limited sublicenses to Arbutus's LNP-related patents through Acuitas; Moderna later sought to invalidate three of Arbutus's LNP-related patents through *inter partes* review; and Moderna has repeatedly made public statements regarding Arbutus's LNP technology and patents. The '359 Patent is in the same family as, and is cited on the face of, the '435 Patent that Moderna challenged in *inter partes* review. Despite such knowledge, Moderna nonetheless has engaged in the manufacture, offer for sale, sale or use of the Accused Product within the United States, and/or the importation of the Accused Product into the United States, in violation of Plaintiffs' patent rights.

97. Moderna actively and knowingly has infringed the '359 Patent and actively and knowingly has induced infringement of the '359 Patent by others. After Moderna knew or should have known that the Accused Product infringed, it applied for and obtained EUA and then full approval from the FDA to market and sell the Accused Product in the United States, with the specific intent to induce customers to purchase the Accused Product. At all times after Moderna knew or should have known that the Accused Product infringed, it contracted with multiple companies to manufacture the Accused Product, both in the United States and abroad, with the specific intent to induce those companies to make its infringing product. Upon information and belief, Moderna actively markets the Accused Product to governments and other entities with the intent for healthcare professionals to administer the Accused Product to millions and potentially billions of people as a means of protection against SARS-CoV-2 infection.

98. Moderna actively and knowingly contributes to the infringement of healthcare professionals in the United States who administer or otherwise use the Accused Product in the United States. After Moderna knew or should have known that the Accused Product constituted a material part of the invention of the ’359 Patent, knowing the same to be especially made or especially adapted for use in the infringement of the ’359 Patent and not a staple article or commodity of commerce suitable for substantial non-infringing use, it pursued and obtained EUA and then full approval from the FDA to market and sell the Accused Product in the United States with the specific intent to induce customers to purchase the Accused Product and for people to have the Accused Product administered to them within the United States. At all times after Moderna knew or should have known that the Accused Product constituted a material part of the invention of the ’359 Patent, it contracted with others to manufacture the Accused Product, both in the United States and abroad, knowing healthcare professionals would directly infringe one or more claims of the ’359 Patent by administering the Accused Product in the United States.

99. Arbutus and Genevant are entitled to a judgment that Moderna infringes the claims of the ’359 Patent by engaging in the manufacture, use, sale, or offer for sale of the Accused Product within the United States, and/or the importation of the Accused Product into the United States, and/or by actively inducing others to do the same, and/or by contributing to the same.

100. Moderna’s infringement has damaged and continues to damage Genevant and Arbutus in an amount yet to be determined, of at least a reasonable royalty.

101. Moderna has undertaken its infringing actions despite knowing that such actions infringe one or more claims of the ’359 Patent. As such, Moderna has and continues to willfully infringe one or more claims of the ’359 Patent.

102. This is an exceptional case. Genevant and Arbutus are entitled to attorneys' fees and costs under 35 U.S.C. § 285 as a result of Moderna's infringement of the '359 Patent.

**COUNT 3: INFRINGEMENT OF U.S. PATENT NO. 8,822,668**

103. Paragraphs 1 through 102 are incorporated by reference as if fully set forth herein.

104. The United States Patent and Trademark Office duly and legally issued the '668 Patent to one of Arbutus's predecessor companies on September 2, 2014. The '668 Patent is titled "Lipid Formulations for Nucleic Acid Delivery."

105. Arbutus owns, and at all relevant times has owned, the '668 Patent.

106. Genevant holds, and at all relevant times has held, a license to Exclusive Rights in the '668 Patent for certain fields of use, which include the Accused Product. Genevant has the right to sue and seek damages for the infringement alleged herein.

107. Claims of the '668 Patent cover, among other things, nucleic acid-lipid particles and compositions thereof and methods of using them.

108. Moderna has directly infringed and continues to directly infringe claims of the '668 Patent under 35 U.S.C. § 271(a) by manufacturing, offering to sell, selling, or using within the United States, or importing into the United States, the Accused Product incorporating Arbutus's patented LNP delivery technology covered by the '668 Patent, without authority or license to do so, during the term of the '668 Patent.

109. Moderna actively, knowingly, and intentionally has induced, and continues to induce, infringement of one or more claims of the '668 Patent under 35 U.S.C. § 271(b) by actively encouraging others to make and use the Accused Product in the United States in a manner specifically intended to infringe the '668 Patent.

110. Moderna has contributed, and continues to contribute, to the infringement of one or more claims of the '668 Patent by others under 35 U.S.C. § 271(c) by offering to sell and

selling within the United States, or importing into the United States, a component of a patented manufacture, combination or composition, constituting a material part of the invention of the ’668 Patent, knowing the same to be especially made or especially adapted for use in the infringement of the ’668 Patent and not a staple article or commodity of commerce suitable for substantial non-infringing use.

111. For example, Claim 1 of the ’668 Patent recites a “nucleic acid-lipid particle comprising: (a) a nucleic acid; (b) a cationic lipid comprising from 50 mol % to 65 mol % of the total lipid present in the particle; (c) a non-cationic lipid comprising up to 49.5 mol % of the total lipid present in the particle and comprising a mixture of a phospholipid and cholesterol or a derivative thereof, wherein the cholesterol or derivative thereof comprises from 30 mol % to 40 mol % of the total lipid present in the particle; and (d) a conjugated lipid that inhibits aggregation of particles comprising from 0.5 mol % to 2 mol % of the total lipid present in the particle.”

112. The Accused Product is a pharmaceutical composition of nucleic acid-lipid particles. The nucleic acid in the Accused Product is an mRNA which encodes the COVID-19 spike protein.

113. The Accused Product comprises nucleic acid-lipid particles comprising the following lipids: an ionizable cationic lipid (SM-102); a non-cationic lipid comprising a mixture of a phospholipid and cholesterol; and a conjugated lipid that inhibits aggregation of particles (a PEG-lipid conjugate).

114. On information and belief, as indicated in the Moderna/NIH preprint and in International Patent Publication WO 2021/159130, the Accused Product comprises nucleic acid-lipid particles comprising the following lipids in the following ratio of the total lipid present in

the particle: 50 mol % of an ionizable cationic lipid; 10 mol % of a phospholipid; 38.5 mol % of cholesterol; and 1.5 mol % of a conjugated lipid that inhibits aggregation of particles.

115. When used as intended, the Accused Product infringes the ’668 Patent’s method claims.

116. For example, Claim 20 of the ’668 patent recites “[a] method for treating a disease or disorder in a mammalian subject in need thereof, the method comprising: administering to the mammalian subject a therapeutically effective amount of a nucleic acid-lipid particle of claim 1.”

117. Moderna’s COVID-19 vaccine is intended for use in a method for treating a disease or disorder in a mammalian subject in need thereof, namely vaccination of a human against COVID-19. Moderna’s COVID-19 vaccine comprises the nucleic acid-lipid particles of Claim 1 and it is intended for administration to a human in need thereof. Moderna’s COVID-19 vaccine comprises a therapeutically effective amount of a nucleic acid-lipid particle of Claim 1. When used as intended, and as Moderna specifically instructs and encourages that it be used, the Accused Product infringes Claim 20.

118. Moderna has known of the ’668 Patent since before it commenced the infringing conduct or has been willfully blind to its existence and contents since then. Moderna has long been aware of and actively monitored Arbutus’s patent estate. Moderna secured unauthorized limited sublicenses to Arbutus’s LNP-related patents through Acuitas; Moderna later sought to invalidate three of Arbutus’s LNP-related patents through *inter partes* review; and Moderna has repeatedly made public statements regarding Arbutus’s LNP technology and patents. The ’668 Patent is in the same family as, and is cited on the face of, the ’435 Patent that Moderna challenged in *inter partes* review. Despite such knowledge, Moderna nonetheless has engaged in

the manufacture, offer for sale, sale or use of the Accused Product within the United States, and/or the importation of the Accused Product into the United States, in violation of Plaintiffs' patent rights.

119. Moderna actively and knowingly has infringed the '668 Patent and actively and knowingly has induced infringement of the '668 Patent by others. After Moderna knew or should have known that the Accused Product infringed, it applied for and obtained EUA and then full approval from the FDA to market and sell the Accused Product in the United States, with the specific intent to induce customers to purchase the Accused Product and for people to have the Accused Product administered to them within the United States. At all times after Moderna knew or should have known that the Accused Product infringed, it contracted with multiple companies to manufacture the Accused Product, both in the United States and abroad, with the specific intent to induce those companies to make its infringing product. Upon information and belief, Moderna actively markets the Accused Product to governments and other entities with the intent for healthcare professionals to infringe by administering the Accused Product to millions and potentially billions of people as a means of protection against SARS-CoV-2 infection.

120. Moderna actively and knowingly contributes to the infringement of healthcare professionals in the United States who administer or otherwise use the Accused Product in the United States. After Moderna knew or should have known that the Accused Product constituted a material part of the invention of the '668 Patent, knowing the same to be especially made or especially adapted for use in the infringement of the '668 Patent and not a staple article or commodity of commerce suitable for substantial non-infringing use, it pursued and obtained EUA and then full approval from the FDA to market and sell the Accused Product in the United States with the specific intent to induce customers to purchase the Accused Product and for

people to have the Accused Product administered to them within the United States. At all times after Moderna knew or should have known that the Accused Product constituted a material part of the invention of the ’668 Patent, it contracted with others to manufacture the Accused Product, both in the United States and abroad, knowing healthcare professionals would directly infringe one or more claims of the ’668 Patent by administering the Accused Product in the United States.

121. Arbutus and Genevant are entitled to a judgment that Moderna infringes the claims of the ’668 Patent by engaging in the manufacture, use, sale, or offer for sale of the Accused Product within the United States, and/or the importation of the Accused Product into the United States, and/or by actively inducing others to do the same, and/or by contributing to the same.

122. Moderna’s infringement has damaged and continues to damage Genevant and Arbutus in an amount yet to be determined, of at least a reasonable royalty.

123. Moderna has undertaken its infringing actions despite knowing that such actions infringe one or more claims of the ’668 Patent. As such, Moderna has and continues to willfully infringe one or more claims of the ’668 Patent.

124. This is an exceptional case. Genevant and Arbutus are entitled to attorneys’ fees and costs under 35 U.S.C. § 285 as a result of Moderna’s infringement of the ’668 Patent.

**COUNT 4: INFRINGEMENT OF U.S. PATENT NO. 9,364,435**

125. Paragraphs 1 through 124 are incorporated by reference as if fully set forth herein.

126. The United States Patent and Trademark Office duly and legally issued the ’435 Patent to one of Arbutus’s predecessor companies on June 14, 2016. The ’435 Patent is titled “Lipid Formulations for Nucleic Acid Delivery.”

127. Arbutus owns, and at all relevant times has owned, the ’435 Patent.

128. Genevant holds, and at all relevant times has held, a license to Exclusive Rights in the ’435 Patent for certain fields of use, which include the Accused Product. Genevant has the right to sue and seek damages for the infringement alleged herein.

129. Claims of the ’435 Patent cover, among other things, nucleic acid-lipid particles and compositions thereof and methods of using them.

130. Moderna has directly infringed and continues to directly infringe claims of the ’435 Patent under 35 U.S.C. § 271(a) by manufacturing, offering to sell, selling, or using within the United States, or importing into the United States, the Accused Product incorporating Arbutus’s patented LNP delivery technology covered by the ’435 Patent, without authority or license to do so, during the term of the ’435 Patent.

131. Moderna actively, knowingly, and intentionally has induced, and continues to induce, infringement of one or more claims of the ’435 Patent under 35 U.S.C. § 271(b) by actively encouraging others to make and use the Accused Product in the United States in a manner specifically intended to infringe the ’435 Patent.

132. Moderna has contributed, and continues to contribute, to the infringement of one or more claims of the ’435 Patent by others under 35 U.S.C. § 271(c) by offering to sell and selling within the United States, or importing into the United States, a component of a patented manufacture, combination or composition, constituting a material part of the invention of the ’435 Patent, knowing the same to be especially made or especially adapted for use in the infringement of the ’435 Patent and not a staple article or commodity of commerce suitable for substantial non-infringing use.

133. The Accused Product infringes at least Claim 7 of the ’435 Patent.

134. Claim 7 of the '435 Patent depends from Claims 1 and 5. Claim 1 of the '435 Patent recites a "nucleic acid-lipid particle comprising: (a) a nucleic acid; (b) a cationic lipid comprising from 50 mol % to 85 mol % of the total lipid present in the particle; (c) non-cationic lipid comprising from 13 mol % to 49.5 mol % of the total lipid present in the particle; and (d) a conjugated lipid that inhibits aggregation of particles comprising from 0.5 mol % to 2 mol % of the total lipid present in the particle." Claim 5 further requires "[t]he nucleic acid-lipid particle of claim 1, wherein the non-cationic lipid comprises a mixture of a phospholipid and cholesterol or a derivative thereof." Claim 7 further requires "[t]he nucleic acid-lipid particle of claim 5, wherein the phospholipid comprises from 3 mol % to 15 mol % of the total lipid present in the particle."

135. The Accused Product is a pharmaceutical composition of nucleic acid-lipid particles. The nucleic acid in the Accused Product is an mRNA which encodes the COVID-19 spike protein.

136. The Accused Product comprises an ionizable cationic lipid (SM-102), a non-cationic lipid (a mixture of phospholipid and cholesterol), and a conjugated lipid that inhibits aggregation of particles (a PEG-lipid conjugate).

137. On information and belief, as indicated in the Moderna/NIH preprint and in International Patent Publication WO 2021/159130, the Accused Product comprises nucleic acid-lipid particles comprising the following lipids in the following ratio of the total lipid present in the particle: 50 mol % of an ionizable cationic lipid; 48.5 mol % of a non-cationic lipid; and 1.5 mol % of a conjugated lipid that inhibits aggregation of particles.

138. On information and belief, as indicated in the Moderna/NIH preprint and in International Patent Publication WO 2021/159130, the Accused Product comprises nucleic acid-

Case: 26-1581 Document: 15-1 Page: 462 Filed: 08/21/2026

lipid particles where the non-cationic lipid comprises a mixture of a phospholipid and cholesterol. On information and belief, as indicated in the Moderna/NIH preprint and in International Patent Publication WO 2021/159130, the Accused Product comprises nucleic acid-lipid particles where 10 mol % of the total lipid present in the particle is a phospholipid.

139. When used as intended, the Accused Product infringes the ’435 Patent’s method claims.

140. For example, Claim 17 of the ’435 Patent recites a “method for treating a disease or disorder in a mammalian subject in need thereof, the method comprising: administering to the mammalian subject a therapeutically effective amount of a nucleic acid-lipid particle of claim 1.”

141. The Accused Product is intended for use in a method for treating a disease or disorder in a mammalian subject in need thereof, namely vaccination of a human against COVID-19. The Accused Product comprises the nucleic acid-lipid particles of Claim 1 and it is intended for administration to a human in need thereof. The Accused Product comprises a therapeutically effective amount of a nucleic acid-lipid particle of Claim 1. When used as intended, and as Moderna specifically instructs and encourages that it be used, the Accused Product infringes Claim 17.

142. Moderna has known of the ’435 Patent since before it commenced the infringing conduct or has been willfully blind to its existence and contents since then. Moderna has long been aware of and actively monitored Arbutus’s patent estate. Moderna secured unauthorized limited sublicenses to Arbutus’s LNP-related patents through Acuitas; Moderna later sought to invalidate three of Arbutus’s LNP-related patents, including the ’435 Patent, through *inter partes* review, and Moderna has repeatedly made public statements regarding Arbutus’s LNP technology and patents. Despite such knowledge, Moderna nonetheless has engaged in the

manufacture, offer for sale, sale or use of the Accused Product within the United States, and/or the importation of the Accused Product into the United States, in violation of Plaintiffs' patent rights.

143. Modern actively and knowingly has infringed the '435 Patent and actively and knowingly induced infringement of the '435 Patent by others. After Moderna knew or should have known that the Accused Product infringed, it applied for and obtained EUA and then full approval from the FDA to market and sell the Accused Product in the United States with the specific intent to induce customers to purchase the Accused Product and for people to have the Accused Product administered to them within the United States. At all times after Moderna knew or should have known that the Accused Product infringed, it contracted with multiple companies to manufacture the Accused Product, both in the United States and abroad, with the specific intent to induce those companies to make its infringing product. Upon information and belief, Moderna actively markets the Accused Product to governments and other entities with the intent for healthcare professionals to infringe by administering the Accused Product to millions and potentially billions of people as a means of protection against SARS-CoV-2 infection.

144. Moderna actively and knowingly contributes to the infringement of healthcare professionals in the United States who administer or otherwise use the Accused Product in the United States. After Moderna knew or should have known that the Accused Product constituted a material part of the invention of the '435 Patent, knowing the same to be especially made or especially adapted for use in the infringement of the '435 Patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use, it pursued and obtained EUA and then full approval from the FDA to market and sell the Accused Product in the United States with the specific intent to induce customers to purchase the Accused Product and for

people to have the Accused Product administered to them within the United States. At all times after Moderna knew or should have known that the Accused Product constituted a material part of the invention of the ’435 Patent, it contracted with others to manufacture the Accused Product, both in the United States and abroad, knowing healthcare professionals would directly infringe one or more claims of the ’435 Patent by administering the Accused Product in the United States.

145. Arbutus and Genevant are entitled to a judgment that Moderna infringes the claims of the ’435 Patent by engaging in the manufacture, use, sale, or offer for sale of the Accused Product within the United States, and/or the importation of the Accused Product into the United States, and/or by actively inducing others to do the same, and/or by contributing to the same.

146. Moderna’s infringement has damaged and continues to damage Genevant and Arbutus in an amount yet to be determined, of at least a reasonable royalty.

147. Moderna has undertaken its infringing actions despite knowing that such actions infringed one or more claims of the ’435 Patent. As such, Moderna has and continues to willfully infringe one or more claims of the ’435 Patent.

148. This is an exceptional case. Genevant and Arbutus are entitled to attorneys’ fees and costs under 35 U.S.C. § 285 as a result of Moderna’s infringement of the ’435 Patent.

## COUNT 5: INFRINGEMENT OF U.S. PATENT NO. 9,504,651

149. Paragraphs 1 through 148 are incorporated by reference as if fully set forth herein.

150. The United States Patent and Trademark Office duly and legally issued the ’651 Patent to one of Arbutus’s predecessor companies on November 29, 2016. The ’651 Patent is titled “Lipid Compositions for Nucleic Acid Delivery.”

151. Arbutus owns, and at all relevant times has owned, the ’651 Patent.

152. Genevant holds, and at all relevant times has held, a license to Exclusive Rights in the ’651 Patent for certain fields of use, which include the Accused Product. Genevant has the right to sue and seek damages for the infringement alleged herein.

153. Claims of the ’651 Patent cover, among other things, lipid vesicle formulations comprising mRNA.

154. Moderna has directly infringed and continues to directly infringe the claims of the ’651 Patent under 35 U.S.C. § 271(a) by manufacturing, offering to sell, selling, or using within the United States, or importing into the United States, the Accused Product, incorporating Arbutus’s patented LNP delivery technology covered by the ’651 Patent, without authority or license to do so, during the term of the ’651 Patent.

155. Moderna actively, knowingly, and intentionally has induced, and continues to induce, infringement of one or more claims of the ’651 Patent under 35 U.S.C. § 271(b) by actively encouraging others to make and use the Accused Product in the United States in a manner specifically intended to infringe the ’651 Patent.

156. Moderna has contributed, and continues to contribute, to the infringement of one or more claims of the ’651 Patent by others under 35 U.S.C. § 271(c) by offering to sell and selling within the United States, or importing into the United States, a component of a patented manufacture, combination or composition, constituting a material part of the invention of the ’651 Patent, knowing the same to be especially made or especially adapted for use in the infringement of the ’651 Patent and not a staple article or commodity of commerce suitable for substantial non-infringing use.

157. For example, Claim 1 of the ’651 Patent recites a “lipid vesicle formulation comprising: (a) a plurality of lipid vesicles, wherein each lipid vesicle comprises: a cationic

lipid; an amphipathic lipid; and a polyethyleneglycol (PEG)-lipid; and (b) messenger RNA (mRNA), wherein at least 70% of the mRNA in the formulation is fully encapsulated in the lipid vesicles." Claim 9 of the '651 Patent further requires "[t]he lipid vesicle formulation of claim 1, wherein each lipid vesicle is a lipid-nucleic acid particle."

158. The Accused Product is a lipid vesicle formulation comprising mRNA and lipid vesicles. The mRNA in the Accused Product encodes the COVID-19 spike protein.

159. The Accused Product comprises a lipid vesicle comprising the following lipids: an ionizable cationic lipid (SM-102); an amphipathic lipid (DSPC); and a PEG-lipid.

160. Upon information and belief, in connection with the Accused Product, Moderna makes a lipid vesicle formulation wherein at least 70% of the mRNA in the formulation is fully encapsulated in the lipid vesicles.

161. On information and belief, Moderna has known of the '651 Patent since before it commenced the infringing conduct or has been willfully blind to its existence and contents since then. Moderna has long been aware of and actively monitored Arbutus's patent estate. Moderna secured unauthorized limited sublicenses to Arbutus's LNP-related patents through Acuitas; Moderna later sought to invalidate three of Arbutus's LNP-related patents through *inter partes* review, and Moderna has repeatedly made public statements regarding Arbutus's LNP technology and patents. Despite such knowledge, Moderna nonetheless has engaged in the manufacture, offer for sale, sale or use of the Accused Product within the United States, and/or the importation of the Accused Product into the United States, in violation of Plaintiffs' patent rights.

162. Moderna actively and knowingly has infringed the '651 Patent and actively and knowingly induced infringement of the '651 Patent by others. After Moderna knew or should

have known that the Accused Product infringed, it applied for and obtained EUA and then full approval from the FDA to market and sell the Accused Product in the United States, with the specific intent to induce customers to purchase the Accused Product and for people to have the Accused Product administered to them within the United States. At all times after Moderna knew or should have known that the Accused Product infringed, it contracted with multiple companies to manufacture the Accused Product, both in the United States and abroad, with the specific intent to induce those companies to make its infringing product. Upon information and belief, Moderna actively markets the Accused Product to governments and other entities with the intent for healthcare professionals to administer the Accused Product to millions and potentially billions of people as a means of protection against SARS-CoV-2 infection.

163. Moderna actively and knowingly contributes to the infringement of healthcare professionals in the United States who administer or otherwise use the Accused Product in the United States. After Moderna knew or should have known that the Accused Product constituted a material part of the invention of the '651 Patent, knowing the same to be especially made or especially adapted for use in the infringement of the '651 Patent and not a staple article or commodity of commerce suitable for substantial non-infringing use, it pursued and obtained EUA and then full approval from the FDA to market and sell the Accused Product in the United States with the specific intent to induce customers to purchase the Accused Product and for people to have the Accused Product administered to them within the United States. At all times after Moderna knew or should have known that the Accused Product constituted a material part of the invention of the '651 Patent, it contracted with others to manufacture the Accused Product, both in the United States and abroad, knowing healthcare professionals would directly infringe one or more claims of the '651 Patent by administering the Accused Product in the United States.

164. Arbutus and Genevant are entitled to a judgment that Moderna infringes the claims of the ’651 Patent by engaging in the manufacture, use, sale, or offer for sale of the Accused Product within the United States, and/or the importation of Moderna’s COVID-19 vaccine into the United States, and/or by actively inducing others to do the same, and/or by contributing to the same.

165. Moderna’s infringement has damaged and continues to damage Genevant and Arbutus in an amount yet to be determined, of at least a reasonable royalty.

166. Moderna has undertaken their infringing actions despite knowing that such actions infringed one or more claims of the ’651 Patent. As such, Moderna has and continues to willfully infringe one or more claims of the ’651 Patent.

167. This is an exceptional case. Genevant and Arbutus are entitled to attorneys’ fees and costs under 35 U.S.C. § 285 as a result of Moderna’s infringement of the ’651 Patent.

**COUNT 6: INFRINGEMENT OF U.S. PATENT NO. 11,141,378**

168. Paragraphs 1 through 167 are incorporated by reference as if fully set forth herein.

169. The United States Patent and Trademark Office duly and legally issued the ’378 Patent to Arbutus on October 12, 2021. The ’378 Patent is titled “Lipid Formulations for Nucleic Acid Delivery.”

170. Arbutus owns, and at all relevant times has owned, the ’378 Patent.

171. Genevant holds, and at all relevant times has held, a license to Exclusive Rights in the ’378 Patent for certain fields of use, which include the Accused Product. Genevant has the right to sue and seek damages for the infringement alleged herein.

172. Claims of the ’378 Patent cover, among other things, nucleic acid-lipid particles and compositions thereof.

173. Moderna has directly infringed and continues to directly infringe claims of the ’378 Patent under 35 U.S.C. § 271(a) by manufacturing, offering to sell, selling, or using within the United States, or importing into the United States, the Accused Product incorporating Arbutus’s patented LNP delivery technology covered by the ’378 Patent, without authority or license to do so, during the term of the ’378 Patent.

174. Moderna actively, knowingly, and intentionally has induced, and continues to induce, infringement of one or more claims of the ’378 Patent under 35 U.S.C. § 271(b) by actively encouraging others to make and use the Accused Product in the United States in a manner specifically intended to infringe the ’378 Patent.

175. Moderna has and continues to contribute to the infringement of one or more claims of the ’378 Patent by others under 35 U.S.C. § 271(c) by offering to sell and selling within the United States, or importing into the United States, a component of a patented manufacture, combination or composition, constituting a material part of the invention of the ’378 Patent, knowing the same to be especially made or especially adapted for use in the infringement of the ’378 Patent and not a staple article or commodity of commerce suitable for substantial non-infringing use.

176. For example, Claim 1 of the ’378 Patent recites a “nucleic acid-lipid particle consisting essentially of: (a) an RNA; (b) a cationic lipid having a protonatable tertiary amine; (c) a mixture of a phospholipid and cholesterol of from 30 mol % to 55 mol % of the total lipid present in the particle, wherein the phospholipid consists of from 3 mol % to 15 mol % of the total lipid present in the particle; and (d) a polyethyleneglycol (PEG)-lipid conjugate consisting of from 0.1 mol % to 2 mol % of the total lipid present in the particle.” An ionizable lipid having a protonatable tertiary amine becomes a cationic lipid.

177. The Accused Product is a pharmaceutical composition of nucleic acid-lipid particles. The nucleic acid in the Accused Product is an mRNA which encodes the COVID-19 spike protein.

178. The Accused Product comprises nucleic acid-lipid particles comprising the following lipids: an ionizable cationic lipid (SM-102); a non-cationic lipid comprising a mixture of a phospholipid and cholesterol; and a conjugated lipid that inhibits aggregation of particles (a PEG-lipid).

179. On information and belief, as indicated in the Moderna/NIH preprint and in International Patent Publication WO 2021/159130, the Accused Product comprises a cationic lipid having a protonatable tertiary amine; 10 mol % of a phospholipid; 38.5 mol % of cholesterol; and 1.5 mol % of a conjugated lipid that inhibits aggregation of particles.

180. The ’378 Patent issued on October 12, 2021. That day, Genevant sent Moderna an email notice that Moderna may be infringing one or more claims of the ’378 Patent.

181. Despite such knowledge, Moderna nonetheless has engaged in the manufacture, offer for sale, sale or use of the Accused Product within the United States, and/or the importation of the Accused Product into the United States, in violation of Plaintiffs’ patent rights.

182. Moderna actively and knowingly has infringed the ’378 Patent and actively and knowingly induced infringement of the ’378 Patent by others. After Moderna knew or should have known that the Accused Product infringed, Moderna continued to seek and has now received full FDA approval for its Accused Product, with the specific intent to induce customers to purchase them and for people to have the Accused Product administered to them within the United States. At all times after Moderna knew or should have known that the Accused Product infringed, it has maintained active contracts with multiple companies to manufacture the

Accused Product, both in the United States and abroad, with the specific intent to induce those companies to make its infringing product. Upon information and belief, Moderna is continuing to seek and negotiate similar contracts with companies to manufacture the Accused Product. Upon information and belief, Moderna actively markets the Accused Product to governments and other entities with the intent for healthcare professionals to infringe by administering the Accused Product to millions and potentially billions of people as a means of protection against SARS-CoV-2 infection.

183. Moderna actively and knowingly contributes to the infringement of healthcare professionals in the United States who administer or otherwise use the Accused Product in the United States. After Moderna knew or should have known that the Accused Product constituted a material part of the invention of the ’378 Patent, knowing the same to be especially made or especially adapted for use in the infringement of the ’378 Patent and not a staple article or commodity of commerce suitable for substantial non-infringing use, it continued to pursue and has now obtained full FDA approval to market and sell the Accused Product in the United States. At all times after Moderna knew or should have known that the Accused Product constituted a material part of the invention of the ’378 Patent, it contracted with others to manufacture the Accused Product, both in the United States and abroad, knowing healthcare professionals would directly infringe one or more claims of the ’378 Patent by administering the Accused Product in the United States.

184. Arbutus and Genevant are entitled to a judgment that Moderna infringes the claims of the ’378 Patent by engaging in the manufacture, use, sale, or offer for sale of the Accused Product within the United States, and/or the importation of the Accused Product into

the United States, and/or by actively inducing others to do the same, and/or by contributing to the same.

185. Moderna's infringement has damaged and continues to damage Genevant and Arbutus in an amount yet to be determined, of at least a reasonable royalty.

186. Moderna has undertaken its infringing actions despite knowing that such actions infringe one or more claims of the '378 Patent. As such, Moderna has and continues to willfully infringe one or more claims of the '378 Patent.

187. This is an exceptional case. Genevant and Arbutus are entitled to attorneys' fees and costs under 35 U.S.C. § 285 as a result of Moderna's infringement of the '378 Patent.

## PRAYER FOR RELIEF

WHEREFORE, Arbutus and Genevant respectfully request that this Court enter judgment in their favor against Moderna and grant the following relief:

A. A judgment that Moderna has infringed or will infringe each of the Asserted Patents under 35 U.S.C. § 271(a), (b), or (c) by making, offering to sell, selling, or using within the United States, or importing into the United States, the Accused Product, or actively inducing someone to do the same or contributing to the same, during the term of each of the Asserted Patents;

B. An award of damages sufficient to compensate Arbutus and Genevant for Moderna's infringement under 35 U.S.C. § 284, in no event less than a reasonable royalty on all infringing sales or other dispositions of Accused Product;

C. A judgment that the infringement has been willful and an enhancement of damages;

D. A declaration that this is an exceptional case and an award of attorneys' fees pursuant to 35 U.S.C. § 285;

E. An award of Arbutus's and Genevant's costs and expenses in this action;

F. An award of pre- and post-judgement interest; and

G. Such other and further relief as this court may deem just and proper, except that Arbutus and Genevant DO NOT seek any form of injunctive relief concerning the Accused Product.

**JURY DEMAND**

Arbutus and Genevant, by and through undersigned counsel, hereby demand, pursuant to Fed. R. Civ. P. 38, a trial by jury on all claims so triable in this action.

*<u>/s/ John W. Shaw</u>*
John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
SHAW KELLER LLP
I.M. Pei Building
1105 N. Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
kkeller@shawkeller.com
*Attorneys for Plaintiffs*

OF COUNSEL:
David I. Berl
Adam D. Harber
Thomas S. Fletcher
Jessica Palmer Ryen
Denis R. Hurley
WILLIAMS & CONNOLLY LLP
725 Twelfth St. NW
Washington, DC 20005
(202) 434-5000
*Attorneys for Plaintiff Genevant Sciences GmbH*

Daralyn J. Durie
Eric C. Wiener
DURIE TANGRI LLP
217 Leidesdorff St
San Francisco, CA 94111
(415) 362-6666
*Attorneys for Plaintiff Arbutus Biopharma Corporation*

Dated: February 28, 2022

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ARBUTUS BIOPHARMA CORPORATION and GENEVANT SCIENCES GMBH, | ) | |
| Plaintiffs, | ) | |
| v. | ) | C.A. No. 22-252 (MSG) |
| MODERNA, INC. and MODERNATX, INC. | ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) | |

**DEFENDANTS' PARTIAL MOTION TO DISMISS**
**PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(B)(6)**

Pursuant to Federal Rule of Civil Procedure 12(b)(6) and 28 U.S.C. § 1498(a), Defendants Moderna, Inc. and ModernaTX, Inc. (collectively, "Moderna") respectfully move to dismiss, with prejudice, the claims of Plaintiffs Arbutus Biopharma Corporation's and Genevant Sciences GmbH's Complaint relating to Moderna's sale and provision of COVID-19 Vaccine doses to the U.S. Government. The grounds for this motion are set forth more fully in Moderna's opening brief, submitted herewith.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Brian P. Egan*

Jack B. Blumenfeld (#1014)
Brian P. Egan (#6227)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
began@morrisnichols.com

*Attorneys for Defendants*

OF COUNSEL:

James F. Hurst
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
(312) 862-2000

Patricia A. Carson, Ph.D.
Jeanna M. Wacker, P.C.
Mark C. McLennan
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800

May 6, 2022

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ARBUTUS BIOPHARMA CORPORATION and GENEVANT SCIENCES GMBH, | ) | |
| Plaintiffs, | ) | |
| v. | ) | C.A. No. 22-252 (MSG) |
| MODERNA, INC. and MODERNATX, INC. | ) | |
| Defendants. | ) | |

**[PROPOSED] ORDER**

At Wilmington this ______ day of _________________, 2022:

**IT IS HEREBY ORDERED** that Defendants Moderna, Inc.'s and ModernaTX, Inc.'s Partial Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6) is **GRANTED** and Plaintiffs' claims relating to Moderna's sale and provision of COVID-19 Vaccine doses to the U.S. Government are **DISMISSED** with prejudice.

______________________________
The Honorable Mitchell S. Goldberg
United States District Judge

## CERTIFICATE OF SERVICE

I hereby certify that on May 6, 2022, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on May 6, 2022, upon the following in the manner indicated:

John W. Shaw, Esquire *VIA ELECTRONIC MAIL*
Karen E. Keller, Esquire
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
*Attorneys for Plaintiffs Arbutus Biopharma Corporation and Genevant Sciences GmbH*

Daralyn J. Durie, Esquire *VIA ELECTRONIC MAIL*
Eric C. Wiener, Esquire
DURIE TANGRI LLP
217 Leidesdorff Street
San Francisco, CA 94111
*Attorneys for Plaintiff Arbutus Biopharma Corporation*

Kira A. Davis, Esquire *VIA ELECTRONIC MAIL*
DURIE TANGRI LLP
953 East 3rd Street
Los Angeles, CA 90013
*Attorneys for Plaintiff Genevant Sciences GmbH*

David I. Berl, Esquire
Adam D. Harber, Esquire
Thomas S. Fletcher, Esquire
Jessica Palmer Ryen, Esquire
Denis R. Hurley, Esquire
Lydia B. Cash, Esquire
WILLIAMS & CONNOLLY LLP
680 Maine Avenue S.W.
Washington, DC 20024
*Attorneys for Plaintiff Genevant Sciences GmbH*

*VIA ELECTRONIC MAIL*

*/s/ Brian P. Egan*

Brian P. Egan (#6227)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ARBUTUS BIOPHARMA CORPORATION and GENEVANT SCIENCES GMBH, | ) | |
| Plaintiffs, | ) | |
| v. | ) | C.A. No. 22-252 (MSG) |
| MODERNA, INC. and MODERNATX, INC. | ) | |
| Defendants. | ) | |

**DEFENDANTS' OPENING BRIEF IN SUPPORT OF THEIR PARTIAL MOTION TO DISMISS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(B)(6)**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Brian P. Egan (#6227)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
began@morrisnichols.com

*Attorneys for Defendants*

OF COUNSEL:

James F. Hurst
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
(312) 862-2000

Patricia A. Carson, Ph.D.
Jeanna M. Wacker, P.C.
Mark C. McLennan
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800

May 6, 2022

TABLE OF CONTENTS


Page

I. INTRODUCTION ........ 1

II. NATURE AND STAGE OF THE PROCEEDINGS ........ 3

III. SUMMARY OF ARGUMENT ........ 3

IV. STATEMENT OF FACTS ........ 3

A. The Parties ........ 4

B. Moderna's Government Contract ........ 4

C. The Complaint ........ 6

V. ARGUMENT ........ 7

A. Legal Standards ........ 7

B. The Court Should Dismiss Plaintiffs' Claims Based on U.S. Sales under 28 U.S.C. § 1498(a) ........ 9

1. Moderna Sold and Provided COVID-19 Vaccine Doses to the U.S. Government "for the Government" ........ 11

2. Moderna Had "the Authorization and Consent of the Government" ........ 12

3. Plaintiffs' Indirect Infringement Allegations Are Also Subject to Section 1498(a) ........ 14

VI. CONCLUSION ........ 14

TABLE OF AUTHORITIES[1]

Page(s)

**Cases**

*Advanced Software Design Corp. v. Fed. Rsrv. Bank of St. Louis*,
583 F.3d 1371 (Fed. Cir. 2009)....................11

*ALA, Inc. v. CCAIR, Inc.*,
29 F.3d 855 (3d Cir. 1994)....................7

*Angstadt v. Midd-West Sch. Dist.*,
377 F.3d 338 (3d Cir. 2004)....................7

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................7

*Astornet Techs. Inc. v. BAE Systems, Inc.*,
802 F.3d 1271 ....................10, 14

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....................7

*Carrier Corp. v. United States*,
534 F.2d 244 (Ct. Cl. 1976)....................13

*Circuit City Stores, Inc. v. Citgo Petroleum Corp.*,
No. CIV. A. 92-CV-7394, 1994 WL 483463 (E.D. Pa. Sept. 7, 1994) ....................3

*Coakwell v. United States*,
372 F.2d 508 (Ct. Cl. 1967)....................10

*Crater Corp. v. Lucent Tech., Inc.*,
255 F.3d 1361 (Fed. Cir. 1976)....................12

*D3D Techs., Inc. v. Microsoft Corp.*,
No. 6:20-CV-1699-PGB-DCI, 2021 WL 2194601 (M.D. Fla. Mar. 22, 2021)....................7, 12, 14

*Godlewski v. Affiliated Comput. Servs., Inc.*,
210 F.R.D. 571 (E.D. Va. 2002)....................3

*Hughes Aircraft Co. v. United States*,
534 F.2d 889 (Ct. Cl. 1976)....................11

[1] Unless otherwise indicated, internal quotation marks and citations have been omitted from quoted material.

*In re Burlington Coat Factory Sec. Litig.*,
114 F.3d 1410 (3d Cir. 1997).....7, 9

*Inman v. Technicolor USA, Inc.*,
No. CIV.A. 11-666, 2011 WL 5829024 (W.D. Pa. Nov. 18, 2011).....8

*IRIS Corp. v. Japan Airlines Corp.*,
769 F.3d 1359 (Fed. Cir. 2014).....11, 14

*London v. Del. Dep't of Corr.*,
No. CV 19-1518-MN-SRF, 2021 WL 3422360 (D. Del. Aug. 5, 2021)
*report and recommendation adopted*,
No. CV 19-1518 (MN), 2021 WL 4262458 (D. Del. Sept. 20, 2021).....8

*Madey v. Duke Univ.*,
413 F. Supp. 2d 601 (M.D.N.C. 2006).....11

*Moderna TX, Inc. v. Arbutus Biopharma Corp.*,
No. 2020-2329 (Fed. Cir.) (cited at Compl. ¶ 50 n.16).....4, 6

*Morpho Detection, Inc. v. Smiths Detection Inc.*,
No. 2:11CV498, 2013 WL 5701522 (E.D. Va. Oct. 17, 2013).....14

*Novartis Pharms. Corp. v. Handa Neuroscience, LLC*,
No. CV 21-645-LPS, 2022 WL 610771 (D. Del. Mar. 1, 2022).....8

*Saint Switch v. Gen. Motors of Can.*,
No. 95 C 0250, 1996 U.S. Dist. LEXIS 2762 (N.D. Ill. Mar. 7, 1996).....10

*Saint-Gobain Ceramics & Plastics, Inc. v. II-VI Inc.*,
369 F. Supp. 3d 963 (C.D. Cal. 2019).....13

*Sevenson Env't Servs., Inc. v. Shaw Env't, Inc.*,
477 F.3d 1361 (Fed. Cir. 2007).....11

*Southmark Prime Plus, L.P. v. Falzone*,
776 F. Supp. 888 (D. Del. 1991).....9

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007).....7

*Thermalon Indus., Ltd. v. United States*,
34 Fed. Cl. 411 (Fed. Cl. 1995).....12

*TVI Energy Corp. v. Blane*,
806 F.2d 1057 (Fed. Cir. 1986).....12

*W.L. Gore & Assocs., Inc. v. Garlock, Inc.*,
842 F.2d 1275 (Fed. Cir. 1988)..........9

*Williams v. Magee*,
No. 1:19-CV-720, 2019 WL 3337085 (M.D. Pa. July 24, 2019) ..........7, 8

**Rules and Statutes**

28 U.S.C. § 1498.......... *passim*

Fed. R. Civ. P. 12..........3, 7, 14

Fed. R. Evid. 201 ..........7, 8

**Other Authorities**

48 C.F.R. § 27.201-2(a)(2)..........13

48 C.F.R. § 52.227–1 ..........6, 12, 13

## I. INTRODUCTION

The COVID-19 pandemic presented an urgent and historic public health challenge that, in Plaintiffs' own words, would have been "immeasurably worse but for the rapid, widespread availability of cutting-edge mRNA-based vaccines like Moderna's." Moderna acted swiftly and worked tirelessly to provide the U.S. Government with vaccine supply—precisely as Congress envisioned when it enacted 28 U.S.C. § 1498(a) many years ago to encourage suppliers "to furnish what [is] needed by the government, without fear of becoming liable themselves for infringements to . . . the owners or assignees of patents." This is an important statutory protection that covers all those who supply the U.S. Government with its authorization and consent, and played a critical role in encouraging companies to step up to help fight the COVID-19 pandemic.

When the pandemic started, Moderna was a comparatively small biotech company in Cambridge, Massachusetts, pioneering a new class of medicines made of messenger RNA ("mRNA") for therapeutic and prophylactic uses, such as vaccines. These medicines have the potential to treat and prevent a wide range of diseases—from infectious diseases like influenza and HIV, to autoimmune and cardiovascular diseases and rare forms of cancer. Over the past twelve years, Moderna has worked diligently in its laboratories to pioneer several fundamental breakthroughs in the field of mRNA technology. These discoveries span all aspects of mRNA medicines—from the characteristics and design of the mRNA itself and the protein it encodes, to the technologies to deliver mRNA to patients safely and effectively. Based on Moderna's experience, and believing its mRNA technology could make a difference in combating the pandemic, Moderna quickly pivoted when the crisis struck, developing the COVID-19 Vaccine in record time, "sav[ing] countless lives."

Plaintiffs now seek royalties for Moderna's COVID-19 Vaccine,[2] also called "Spikevax®." But Moderna supplied COVID-19 Vaccine to the U.S. Government pursuant to a contract, as part "of the national emergency response to . . . COVID-19[], for the United States Government . . . and the US population." In that contract, the Government expressly invoked its sovereign authority to "authorize[] and consent[] to all use and manufacture . . . of any invention described in and covered by a United States patent." Accordingly, Plaintiffs' claims concerning the sale and provision of COVID-19 Vaccine doses to the U.S. Government can only proceed against the Government in the Court of Federal Claims under Section 1498.

Moderna will demonstrate that its COVID-19 Vaccine does not infringe any valid patents, including those held by Plaintiffs Arbutus and Genevant—but that dispute is for later. The only issue is where, against whom, and how the dispute should be decided with respect to U.S. Government sales. Under Section 1498, when an allegedly infringing product is "used or manufactured by or for the United States," the only remedy for the alleged infringement is an "action against the United States in the United States Court of Federal Claims." Thus, because Plaintiffs seek royalties on the sale and provision of COVID-19 Vaccine doses to the U.S. Government, such claims should be dismissed in this Court, and they can only proceed against the Government in the Court of Federal Claims.

---

[2] As used herein, "COVID-19 Vaccine" refers to the accused "mRNA-1273 COVID-19 mRNA LNP vaccine product . . . or any supplemental or booster COVID mRNA LNP vaccine product." Compl. ¶ 8.

## II. NATURE AND STAGE OF THE PROCEEDINGS

On February 28, 2022, Plaintiffs Arbutus Biopharma Corporation ("Arbutus") and Genevant Sciences GmbH ("Genevant") filed this action for patent infringement against Moderna, Inc. and ModernaTX, Inc. (together, "Moderna"). Plaintiffs' Complaint alleges that Moderna's mRNA-1273 COVID-19 Vaccine infringes Plaintiffs' patents. D.I. 1 ("Compl."), ¶¶ 1, 8.

## III. SUMMARY OF ARGUMENT

The Court should dismiss Plaintiffs' infringement claims (both direct and indirect) relating to Moderna's sale and provision of COVID-19 Vaccine doses to the U.S. Government because, under 28 U.S.C. § 1498(a), Plaintiffs' only remedy is an action against the U.S. Government in the Court of Federal Claims.[3] Specifically, in accordance with the requirements of Section 1498(a), Moderna acted for the U.S. Government and with its authorization and consent. As a result, Plaintiffs should seek any such alleged damages for those claims from the Government in the Court of Federal Claims, not from Moderna in this Court.

## IV. STATEMENT OF FACTS

The facts here come from the Complaint and matters of public record, including Moderna's COVID-19 Vaccine contract with the U.S. government. Among other places, the contract is available on the website for the Department of Health and Human Services.[4] Moderna attaches the contract as Exhibit A to this brief for the Court's convenience.

---

[3] Moderna's motion addresses part of the complaint and thus suspends the time to respond to the remaining allegations in the complaint. *See* Fed. R. Civ. P. 12(a)(4)(A); *see also Circuit City Stores, Inc. v. Citgo Petroleum Corp.*, No. CIV. A. 92-CV-7394, 1994 WL 483463, at *4 (E.D. Pa. Sept. 7, 1994) ("A partial 12(b) motion enlarges the time to file an answer."); *Godlewski v. Affiliated Comput. Servs., Inc.*, 210 F.R.D. 571, 572 (E.D. Va. 2002) ("A majority of courts . . . hold that the filing of a motion that only addresses part of a complaint suspends the time to respond to the entire complaint, not just to the claims that are the subject of the motion.").

[4] *See, e.g.*, https://www.hhs.gov/sites/default/files/moderna-covid-19-vaccine-contract.pdf.

### A. The Parties

Plaintiffs Arbutus and Genevant allegedly own several patents related to lipid nanoparticles, or "LNPs." Compl. ¶¶ 1, 9, 29–30, 67, 86, 105, 127, 151, 170. LNPs are part of the delivery system for Moderna's mRNA, and Plaintiffs allege that Moderna's COVID-19 Vaccine employs Plaintiffs' LNPs. Compl. ¶¶ 41, 43, 45, 70, 89, 108, 130, 154, 173.

"[I]n the midst of a global pandemic," Defendant Moderna undertook "extensive" and "vitally important" efforts to develop, manufacture and sell its COVID-19 Vaccine doses to the U.S. Government and others around the world—efforts that "have saved countless lives." Compl. ¶¶ 1, 57. Since its founding in 2010, Moderna has worked to build a leading mRNA technology platform to develop and test candidates for its "cutting-edge," "new class" of mRNA-based vaccines and therapies, spanning several therapeutic areas. Compl. ¶¶ 1, 21; Ex. B, Decl. of Shaun Ryan, Mot. to Supplement the Record to Provide Evidence of Standing, D.I. No. 18, 11 ¶ 2, *Moderna TX, Inc. v. Arbutus Biopharma Corp.*, No. 2020-2329 (Fed. Cir.) ("Ryan Decl.") (cited at Compl. ¶ 50 n.16). Moderna created this platform to improve the pharmaceutical properties of its mRNA medicines, investing years of work and resources to develop LNPs that would work with mRNA (*id.*), whereas Plaintiffs' work had a very different focus (Compl. ¶¶ 24, 28). Ultimately, "with the novel SARS-CoV-2 virus quickly spreading around the world," and believing its mRNA technology could make a difference in combating the pandemic, Moderna mobilized its mRNA platform to develop, study, and manufacture its COVID-19 Vaccine in such a short period that "[c]ompared to the timelines of prior vaccine-development efforts, Moderna's accomplishment was unprecedented." Compl. ¶¶ 39, 41.

### B. Moderna's Government Contract

As stated in the Complaint, the COVID-19 pandemic has been "one of the greatest public health challenges in modern history"; it would have been "immeasurably worse but for the rapid,

widespread availability of cutting-edge mRNA-based vaccines like Moderna's." Compl. ¶ 1. An important ingredient in accelerating that "widespread availability" was the U.S. Government's use of emergency powers in contracting with Moderna to supply it with doses of the COVID-19 Vaccine. *See* Ex. A.

The contract sets out the background of the pandemic and the Government's response. "In December 2019, a novel coronavirus now known as SARS-CoV-2 was first detected . . . , causing outbreaks of the coronavirus disease COVID-19 that has now spread globally." Ex. A at 19 C. 1.1. As a result, the "Secretary of Health and Human Service declared a public health emergency on January 31, 2020," and "[o]n March 1, 2020, the President of the United States . . . proclaimed that the COVID-19 outbreak in the United States constitute[d] a national emergency." *Id.* Under Operation Warp Speed, "the Department of Defense and HHS [led] a whole of nation effort to ensure development of promising vaccine, diagnostic and therapeutic candidates and ensure that these medical countermeasures" would be "available in the quantities required to reduce SARS-CoV-2 transmission, identify prior and/or current infection, and improve patient care, thereby mitigating the impact of COVID-19 on the nation and its people." *Id.* at C.1.1.1.

Contracting expertise was critical to the effort. "The DoD Joint Program Executive Office for Chemical, Biological, Radiological and Nuclear Defense" provided "expertise and contracting support to HHS[.]" *Id.* As candidate products progressed "to clinical trials to evaluate the safety and efficacy of vaccines and therapeutics," it was "critical that, in parallel," the Government would support "large scale manufacturing so that vaccine doses or therapeutic treatment courses are immediately available for nationwide access as soon as a positive efficacy signal is obtained and the medical countermeasures are authorized for widespread use." *Id.*

Consistent with that mission, the U.S. Army Contracting Command contracted with Moderna in August 2020 (Ex. A at 1-2), even before the FDA had granted Emergency Use Approval to Moderna's COVID-19 Vaccine in December 2020 (Compl. ¶¶ 16, 51). The contract includes a list of "Federal Acquisition Regulations" that were "incorporated by reference." Ex. A at 45–47, 51. Among these is the express "authorization and consent" provision of FAR 52.227-1 (*id.* at 46), by which "[t]he Government authorizes and consents to all use and manufacture, in performing this contract or any subcontract at any tier, of any invention described in and covered by a United States patent. . . " (Federal Acquisition Regulation ("FAR") 48 C.F.R. § 52.227–1(a) (2020)). This authorization and consent is broad, covering among other things patents on "the structure or composition of any article the delivery of which is accepted by the Government under this contract." FAR 52.227-1(a)(1).

**C. The Complaint**

Plaintiffs' Complaint completely ignores the terms of Moderna's contract with the Government. This was not by mistake—in prior disputes with Plaintiffs, Moderna informed Plaintiffs that sales to the U.S. Government are subject to Section 1498.[5] Nevertheless, the

---

[5] In a declaration filed in an IPR appeal between Moderna and Arbutus on February 23, 2021, Moderna's Senior Vice President and Deputy General Counsel, Shaun Ryan, explained that Moderna's sales of its COVID-19 vaccine "went to the U.S. government . . . and are subject to 28 U.S.C. § 1498." Ex. B (Ryan Decl.) ¶ 8. Plaintiffs cite this declaration in their Complaint (*see* Compl. ¶ 50 n.16), but ignore the statements showing that their claims are subject to Section 1498 and that they must seek their royalties from the U.S. Government in a separate judicial forum. Other public documents cited in the Complaint similarly flag Moderna's sales to the U.S. Government. *See* Press Release, Moderna, Moderna Reports Fourth Quarter and Fiscal Year 2021 Financial Results and Provides Business Updates (Feb. 24, 2022), https://investors.modernatx.com/news/news-details/2022/Moderna-Reports-Fourth-Quarter-and-Fiscal-Year-2021-Financial-Results-and-Provides-Business-Updates/default.aspx ("The U.S. government has agreed to purchase supply of mRNA-1273 under U.S. Department of Defense contract no. W911QY-20-C-0100.") (cited at Compl. ¶ 52 n.21); Vaccine Exports From U.S. Accelerate as Moderna Ships Abroad, Bloomberg.com (May 20, 2021), https://www.bloomberg.com/news/articles/2021-05-20/moderna-starts-shipping-vaccine-from-u-

Complaint contains no indication that Plaintiffs ever approached the Government to seek compensation. Plaintiffs instead brought this action, which includes and does not carve-out purchases by the U.S. Government. Compl. ¶¶ 51, 70–72, 89–91, 108–110, 130132, 154–156, 173–175.

## V. ARGUMENT

### A. Legal Standards

Under Rule 12(b)(6), a complaint should be dismissed, in whole or in part, if the allegations fail to give rise to a "plausible" claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). As an affirmative defense, Section 1498 immunity provides a basis for dismissal under Rule 12(b)(6) when the elements of the defense appear on the face of the complaint. *D3D Techs., Inc. v. Microsoft Corp.*, No. 6:20-CV-1699-PGB-DCI, 2021 WL 2194601, at *2 (M.D. Fla. Mar. 22, 2021); *ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 (3d Cir. 1994).

In considering a 12(b)(6) motion, the Court must take the complaint's plausible allegations as true, and may also consider any "document integral to or explicitly relied upon in the complaint," matters of public record, and items subject to judicial notice. *Angstadt v. Midd-West Sch. Dist.*, 377 F.3d 338, 342 (3d Cir. 2004); *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007) (court may consider "matters of which [it] may take judicial notice"); *Twombly*, 550 U.S. at 568 n.13 (court may consider "the full content of the published articles referenced in the complaint . . ."); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (holding that "document[s] integral to or explicitly relied upon in the complaint" may be considered in connection with a motion to dismiss); Fed. R. Evid. 201; *Williams v. Magee*,

s-boosting-shot-exports ("[Moderna's] early U.S. production had been fully absorbed by a single buyer -- the federal government.") (cited at Compl. ¶ 53 n.24).

No. 1:19-CV-720, 2019 WL 3337085, at *4 (M.D. Pa. July 24, 2019) (court may consider "matters of public record").

Here, Moderna's government contract is a matter of public record subject to judicial notice. The contract is published on the website of the Department of Health and Human Services, one of the agreement's parties. *See* Ex. A, https://www.hhs.gov/sites/default/files/moderna-covid-19-vaccine-contract.pdf. Courts may, and routinely do, take judicial notice of government websites and contracts whose existence and contents are not subject to reasonable dispute. *Williams*, 2019 WL 3337085, at *4 ("The Court may take judicial notice of publicly available documents, including publicly-executed contracts involving governmental entities . . . ."); *Inman v. Technicolor USA, Inc.*, No. CIV.A. 11-666, 2011 WL 5829024, at *4 (W.D. Pa. Nov. 18, 2011) (taking judicial notice of publicly available user agreement when there was no dispute as to authenticity); *London v. Del. Dep't of Corr.*, No. CV 19-1518-MN-SRF, 2021 WL 3422360, at *7 n.15 (D. Del. Aug. 5, 2021), *report and recommendation adopted*, No. CV 19-1518 (MN), 2021 WL 4262458 (D. Del. Sept. 20, 2021) (taking judicial notice of government website as a matter of public record).

In addition to being cited on HHS.gov, the contract is also publicly available on other government websites, like SEC.gov, as part of Moderna, Inc.'s Form 10-Q with the Securities and Exchange Commission ("SEC"). Moderna (Form 10-Q) Quarterly Report (Oct. 30, 2020) at 30 (https://www.sec.gov/ix?doc=/Archives/edgar/data/0001682852/000168285220000023/mrna-20200930.htm); Exhibit 10.3 (Contract No. W911QY20C0100) https://www.sec.gov/Archives/edgar/data/1682852/000168285220000023/exhibit103.htm. Courts may also take judicial notice of public filings, like those with the SEC. *Novartis Pharms. Corp. v. Handa Neuroscience, LLC*, No. CV 21-645-LPS, 2022 WL 610771, at *4 n.1 (D. Del.

Mar. 1, 2022); *cf. Southmark Prime Plus, L.P. v. Falzone*, 776 F. Supp. 888, 892 (D. Del. 1991) (taking judicial notice of SEC filings when considering motion for judgment on the pleadings, applying the same standards as for a motion to dismiss under 12(b)(6)).

In other words, Plaintiffs' calculated avoidance of the terms of the contract in their Complaint cannot deprive this Court of the ability to consider it. *See In re Burlington*, 114 F.3d at 1426 ("Plaintiffs cannot prevent a court from looking at the texts of the documents on which its claim is based by failing to attach or explicitly cite them."). Nor would it make sense to proceed as if the contract does not exist. The whole point of the authorization and consent term in the contract is to ensure that the case proceeds in the correct forum (the Court of Federal Claims) against the correct party (the Government). The Court accordingly should consider the contract here and dismiss the claims that are based on it.

**B. The Court Should Dismiss Plaintiffs' Claims Based on U.S. Sales under 28 U.S.C. § 1498(a)**

Every patent granted by the U.S. Government comes with an important caveat—the patentee may not inhibit the Government from having its suppliers work on its behalf to make or use an invention, subject to compensation in the Court of Federal Claims. To that end, the "government has graciously consented" in Section 1498 "to be sued in the Claims Court for reasonable and entire compensation, for what would be infringement if by a private person." *W.L. Gore & Assocs., Inc. v. Garlock, Inc.*, 842 F.2d 1275, 1283 (Fed. Cir. 1988).

Section 1498(a) provides that, whenever "an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without license . . . or lawful right to use or manufacture the same," "the owner's remedy shall be by action against the United States in the United States Court of Federal Claims[.]" The statute thus seeks "to stimulate contractors to furnish what [is] needed by the government, without fear of becoming liable

themselves for infringements to inventors or the owners or assignees of patents" (*Astornet Techs. Inc. v. BAE Systems, Inc.*, 802 F.3d 1271, 1277) and to "enabl[e] the Government to purchase goods for the performance of its functions without the threat of having the supplier enjoined from selling patented goods to the Government" (*Coakwell v. United States*, 372 F.2d 508, 511 (Ct. Cl. 1967)). The statute was amended over a century ago specifically "to prevent patent infringement suits from interfering with the supply of war materials during World War I," as "Congressional concern was that if contractors feared an infringement suit, they might decide not to manufacture desperately-needed products for the United States' war effort." *Saint Switch v. Gen. Motors of Can.*, No. 95 C 0250, 1996 U.S. Dist. LEXIS 2762, at *5–6 (N.D. Ill. Mar. 7, 1996) (internal citations omitted).

Short of war, it is difficult to conceive of a situation more within the heart of Section 1498 than the COVID-19 crisis, "one of the greatest public health challenges in modern history." Compl. ¶ 1. The Government declared emergencies twice in the pandemic's wake—a "public health emergency" in January 2020 and a "national emergency" in March 2020. Ex. A at 19 C.1.1. The Government then enlisted the Department of Defense to help the Department of Health and Human Services rally the private sector to develop and distribute a vaccine as quickly as possible. *Id.* at 19 C.1.1.1. Moderna answered the call. Then a relatively small biotech company, Moderna had the right expertise at the right time. Moderna scientists and their collaborators worked to develop and produce a COVID-19 vaccine for distribution on a massive scale while much of the rest of the country quarantined, as government and private industry worked together to respond to the most severe crisis facing the nation. This is exactly when Section 1498 is meant to apply.

By its terms, Section 1498(a) has only two requirements. The allegedly infringing use must be "for the Government," and it must have "the authorization and consent of the

Government." *Sevenson Env't Servs., Inc. v. Shaw Env't, Inc.*, 477 F.3d 1361, 1365 (Fed. Cir. 2007) (citing *Hughes Aircraft Co. v. United States*, 534 F.2d 889, 897–98 (Ct. Cl. 1976)). Moderna's sale and provision of COVID-19 Vaccine doses to the U.S. Government directly satisfy these criteria.

**1. Moderna Sold and Provided COVID-19 Vaccine Doses to the U.S. Government "for the Government"**

Moderna's supply of its COVID-19 Vaccine is deemed "for the Government" under Section 1498(a) so long as the supply is "for the benefit of the [G]overnment." *Advanced Software Design Corp. v. Fed. Rsrv. Bank of St. Louis*, 583 F.3d 1371, 1378 (Fed. Cir. 2009). In other words, "[a] use is 'for the Government' if it is 'in furtherance and fulfillment of a stated Government policy' which serves the Government's interests and which is 'for the Government's benefit.'" *IRIS Corp. v. Japan Airlines Corp.*, 769 F.3d 1359, 1362 (Fed. Cir. 2014) (quoting *Madey v. Duke Univ.*, 413 F. Supp. 2d 601, 607 (M.D.N.C. 2006)).

Moderna's contract is explicit that it is for the benefit of the Government, describing the agreement as "for the United States Government . . . and the US population." Ex. A at 19 C.1. The contract then goes further and contains provisions explaining how the agreement fits into government policy. The contract's "Scope" section recounts the COVID crisis, the Government's emergency declarations in response, and the commencement of Operation Warp Speed. *Id.* at 19 C.1.1, C.1.1.1. Under the operation, "the Department of Defense and HHS" led "a whole of nation effort to ensure development of promising vaccine, diagnostic and therapeutic candidates and ensure that these medical countermeasures." *Id.* at C.1.1.1. The Department of Defense "Joint Program Executive Office for Chemical, Biological, Radiological and Nuclear Defense" provided "expertise and contracting support to HHS[.]" *Id.* The Government's whole purpose was to support "large scale manufacturing so that vaccine doses . . . are immediately available for

Case: 26-1581 Document: 15-1 Page: 495 Filed: 08/21/2026

nationwide access as soon as a positive efficacy signal is obtained and the medical countermeasures are authorized for widespread use." *Id*.

In short, Moderna supplied, and continues to supply, COVID-19 Vaccine doses to the U.S. Government for the Government to achieve a specific government objective (i.e., supporting a nationwide vaccination effort). *Cf. Thermalon Indus., Ltd. v. United States*, 34 Fed. Cl. 411, 420 (Fed. Cl. 1995) ("Hence, for example, if the United States purchases vaccines for administration to the public in order to eradicate a particular disease, the government not only would be engaged in the purchase and sale of specific goods, but also would be concurrently exercising its sovereign power for the general public welfare.").

### 2. Moderna Had "the Authorization and Consent of the Government"

Moderna supplied, and continues to supply, COVID-19 Vaccine under express authorization and consent from the Government, regardless of any issued patents.

Under Section 1498(a), the Government's "authorization or consent" can be express or implied. *TVI Energy Corp. v. Blane*, 806 F.2d 1057, 1060 (Fed. Cir. 1986). An authorization and consent provision in a government contract establishes "authorization and consent" under Section 1498(a). *Crater Corp. v. Lucent Tech., Inc.*, 255 F.3d 1361, 1368 (Fed. Cir. 1976); *see also D3D Techs.*, 2021 WL 2194601, at *2 (satisfying authorization and consent prong when contract "show[ed] the Government expressly authorized the alleged infringing activity").

Here, the Government explicitly authorized and consented to Moderna's manufacture and sale of the COVID-19 Vaccine. The contract incorporates by reference FAR 52.227-1, entitled "Authorization and Consent." Ex. A at 46. That regulation provides that:

> ***The Government authorizes and consents to all use and manufacture, in performing this contract or any subcontract at any tier, of any invention described in and covered by a United States patent- (1) Embodied in the structure or composition of any article the delivery of which is accepted by the Government under this contract***; or (2) Used in machinery, tools, or methods whose use

> necessarily results from compliance by the Contractor or a subcontractor with (i) specifications or written provisions forming a part of this contract or (ii) specific written instructions given by the Contracting Officer directing the manner of performance.

FAR 52.227-1(a) (2020) (emphasis added).[6]

Plaintiffs allege that Moderna's COVID-19 Vaccine includes LNPs covered by Plaintiffs' patents. Compl. ¶¶ 41, 43, 45, 70, 89, 108, 130, 154, 173. Plaintiffs further allege that these particles facilitate delivery of the operative mRNA. *Id.* at ¶¶ 26, 27, 44. As alleged, the LNPs are accordingly part of and embodied in the "structure or composition" of the article covered by the contract—namely, the COVID-19 Vaccine. In these circumstances—when a patented article of manufacture is incorporated into a supply contract—the first clause of FAR 52.227-1 controls. *See Carrier Corp. v. United States*, 534 F.2d 244, 247 n.5 (Ct. Cl. 1976) ("The portion of the authorization and consent clause that provides that the Government authorizes and consents to infringement of any patent 'embodied in the structure or composition of any article the delivery of which is accepted by the Government' is applicable to hardware and other goods procured by and delivered to the Government for its own use, generally through supply contracts."). This clause applies with respect to all patent claims asserted by Plaintiffs—both composition and method claims[7]—because the same "article the delivery of which is accepted by the Government under this contract" is implicated by both sets of claims. *See Saint-Gobain Ceramics & Plastics, Inc. v. II-VI Inc.*, 369 F. Supp. 3d 963, 973–77 (C.D. Cal. 2019) (explaining that including FAR 52.227-

---

6 The contract also incorporates by reference FAR 52.227-1 Alternate I (Ex. A at 46), which provides an alternate and broader provision, used in contracts for research and development (*see* FAR 27.201-2(a)(2) (2020)).

7 According to the Complaint, U.S. Patent Nos. 8,882,668 and 9,364,435 contain both composition and method claims. Compl. ¶¶ 107, 129.

Case: 26-1581 Document: 17 Page: 497 Filed: 08/21/2026

1(a)(1) in a supply contract provides "authorization and consent" to defendants' alleged infringement of apparatus and method claims).

Accordingly, the agreement meets both prongs of Section 1498(a). Insofar as Plaintiffs continue to pursue allegations based on U.S. sales, they must do so in the Court of Federal Claims.

### 3. Plaintiffs' Indirect Infringement Allegations Are Also Subject to Section 1498(a)

Plaintiffs also allege that Moderna indirectly infringes by supplying COVID-19 vaccine doses to the Government. *See* Compl. ¶¶ 71–72, 78–79, 90–91, 97–98, 109–110, 119–120, 131–132, 143–144, 155–156, 162–163, 174–175, 182–183. These allegations do not circumvent Section 1498(a).

Section 1498(a) bars indirect infringement claims when the underlying act of direct infringement is performed by or for the Government. *Astornet*, 802 F.3d at 1277–78 (indirect infringement claim against government contractor barred where the alleged infringement was performed by the Transportation Security Administration using the contractor's equipment). Put differently, simply appending claims of indirect infringement here is "insufficient to undercut the clear directive in § 1498(a) as to the exclusive nature of the remedy provided therein." *Morpho Detection, Inc. v. Smiths Detection Inc.*, No. 2:11CV498, 2013 WL 5701522, at *4–5 (E.D. Va. Oct. 17, 2013).

## VI. CONCLUSION

Moderna respectfully requests that the Court grant its motion pursuant to Rule 12(b)(6) and dismiss with prejudice Plaintiffs' claims based on Moderna's sale and provision of COVID-19 Vaccine doses to the U.S. Government. *D3D Techs.*, 2021 WL 2194601, at *2 (granting Rule 12(b)(6) motion, dismissing claims involving sales to the U.S. Government under § 1498); *IRIS Corp.*, 769 F.3d at 1283 (affirming Rule 12(b)(6) dismissal under § 1498).

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Brian P. Egan*

Jack B. Blumenfeld (#1014)
Brian P. Egan (#6227)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
began@morrisnichols.com

*Attorneys for Defendants*

OF COUNSEL:

James F. Hurst
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
(312) 862-2000

Patricia A. Carson, Ph.D.
Jeanna M. Wacker, P.C.
Mark C. McLennan
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800

May 6, 2022

**CERTIFICATE OF SERVICE**

I hereby certify that on May 6, 2022, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on May 6, 2022, upon the following in the manner indicated:

John W. Shaw, Esquire *VIA ELECTRONIC MAIL*
Karen E. Keller, Esquire
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
*Attorneys for Plaintiffs Arbutus Biopharma Corporation and Genevant Sciences GmbH*

Daralyn J. Durie, Esquire *VIA ELECTRONIC MAIL*
Eric C. Wiener, Esquire
DURIE TANGRI LLP
217 Leidesdorff Street
San Francisco, CA 94111
*Attorneys for Plaintiff Arbutus Biopharma Corporation*

Kira A. Davis, Esquire *VIA ELECTRONIC MAIL*
DURIE TANGRI LLP
953 East 3rd Street
Los Angeles, CA 90013
*Attorneys for Plaintiff Genevant Sciences GmbH*

David I. Berl, Esquire
Adam D. Harber, Esquire
Thomas S. Fletcher, Esquire
Jessica Palmer Ryen, Esquire
Denis R. Hurley, Esquire
Lydia B. Cash, Esquire
WILLIAMS & CONNOLLY LLP
680 Maine Avenue S.W.
Washington, DC 20024
*Attorneys for Plaintiff Genevant Sciences GmbH*

*VIA ELECTRONIC MAIL*

*/s/ Brian P. Egan*

Brian P. Egan (#6227)

# EXHIBIT A

# AWARD/CONTRACT

1. THIS CONTRACT IS A RATED ORDER UNDER DPAS (15 CFR 700)

RATING

PAGE 1 OF PAGES 53

2. CONTRACT (Proc. Inst. Ident.) NO. W911QY20C0100

3. EFFECTIVE DATE 09 Aug 2020

4. REQUISITION/PURCHASE REQUEST/PROJECT NO. 0011534693

5. ISSUED BY CODE W911QY
W6QK ACC-APG NATICK
CONTRACTING DIVISION
BLDG 1 GENERAL GREENE AVENUE
NATICK MA 01760-5011

6. ADMINISTERED BY (If other than Item 5) CODE S2206A
DEFENSE CONTRACT MANAGEMENT AGENCY
DCMA BOSTON
495 SUMMER STREET
BOSTON MA 02210-2138

7. NAME AND ADDRESS OF CONTRACTOR (No., street, city, country, state and zip code)
MODERNATX, INC.
[redacted]
200 TECHNOLOGY SQ
CAMBRIDGE MA 02139-3578

CODE 6RP85 FACILITY CODE

8. DELIVERY
[ ] FOB ORIGIN [ X ] OTHER (See below)

9. DISCOUNT FOR PROMPT PAYMENT

10. SUBMIT INVOICES 1 (4 copies unless otherwise specified) TO THE ADDRESS SHOWN IN: ITEM Section G

11. SHIP TO/MARK FOR CODE
See Schedule

12. PAYMENT WILL BE MADE BY CODE HQ0337
DEFENSE FINANCE AND ACCOUNTING SERVICE
DFAS - COLUMBUS CENTER (HQ0337)
NORTH ENTITLEMENT OPERATIONS
P.O. BOX 182317
COLUMBUS OH 43218-2266

13. AUTHORITY FOR USING OTHER THAN FULL AND OPEN COMPETITION:
[ X ] 10 U.S.C. 2304(c)( 2 ) [ ] 41 U.S.C. 253(c)( )

14. ACCOUNTING AND APPROPRIATION DATA
See Schedule

| 15A. ITEM NO. | 15B. SUPPLIES/ SERVICES | 15C. QUANTITY | 15D. UNIT | 15E. UNIT PRICE | 15F. AMOUNT |
|---|---|---|---|---|---|
| | SEE SCHEDULE | | | | |

15G. TOTAL AMOUNT OF CONTRACT **$1,525,000,000.00**

16. TABLE OF CONTENTS

| (X) | SEC. | DESCRIPTION | PAGE(S) | (X) | SEC. | DESCRIPTION | PAGE(S) |
|---|---|---|---|---|---|---|---|
| | | **PART I - THE SCHEDULE** | | | | **PART II - CONTRACT CLAUSES** | |
| X | A | SOLICITATION/ CONTRACT FORM | 1 - 2 | X | I | CONTRACT CLAUSES | 45 - 51 |
| X | B | SUPPLIES OR SERVICES AND PRICES/ COSTS | 3 - 18 | | | **PART III - LIST OF DOCUMENTS, EXHIBITS AND OTHER ATTACH.** | |
| X | C | DESCRIPTION/ SPECS./ WORK STATEMENT | 19 - 27 | X | J | LIST OF ATTACHMENTS | 52 - 53 |
| X | D | PACKAGING AND MARKING | 28 | | | **PART IV - REPRESENTATIONS AND INSTRUCTIONS** | |
| X | E | INSPECTION AND ACCEPTANCE | 29 - 30 | | K | REPRESENTATIONS, CERTIFICATIONS AND OTHER STATEMENTS OF OFFERORS | |
| X | F | DELIVERIES OR PERFORMANCE | 31 - 33 | | | | |
| X | G | CONTRACT ADMINISTRATION DATA | 34 - 38 | | L | INSTRS., CONDS., AND NOTICES TO OFFERORS | |
| X | H | SPECIAL CONTRACT REQUIREMENTS | 39 - 44 | | M | EVALUATION FACTORS FOR AWARD | |

CONTRACTING OFFICER WILL COMPLETE ITEM 17 (SEALED-BID OR NEGOTIATED PROCUREMENT) OR 18 (SEALED-BID PROCUREMENT) AS APPLICABLE

17. [ ] CONTRACTOR'S NEGOTIATED AGREEMENT Contractor is required to sign this document and return ___ copies to issuing office.) Contractor agrees to furnish and deliver all items or perform all the services set forth or otherwise identified above and on any continuation sheets for the consideration stated herein. The rights and obligations of the parties to this contract shall be subject to and governed by the following documents: (a) this award/contract, (b) the solicitation, if any, and (c) such provisions, representations, certifications, and specifications, as are attached or incorporated by reference herein. (Attachments are listed herein.)

18. [ ] SEALED-BID AWARD (Contractor is not required to sign this document.) Your bid on Solicitation Number W911QY20R0043 including the additions or changes made by you which additions or changes are set forth in full above, is hereby accepted as to the terms listed above and on any continuation sheets. This award consummates the contract which consists of the following documents: (a) the Government's solicitation and your bid, and (b) this award/contract. No further contractual document is necessary. (Block 18 should be checked only when awarding a sealed-bid contract.)

19A. NAME AND TITLE OF SIGNER (Type or print)

20A. NAME OF CONTRACTING OFFICER
[redacted] / BRANCH CHIEF
TEL: EMAIL: [redacted]

19B. NAME OF CONTRACTOR
BY [redacted]
(Signature of person authorized to sign)

19C. DATE SIGNED

20B. UNITED STATES OF AMERICA
BY [redacted]
(Signature of Contracting Officer)

20C. DATE SIGNED 11-Aug-2020

AUTHORIZED FOR LOCAL REPRODUCTION
Previous edition is NOT usable

STANDARD FORM 26 (REV. 5/2011)
Prescribed by GSA - FAR (48 CFR) 53.214(a)

Section A - Solicitation/Contract Form

**A.1** The U.S. Army Contracting Command - Aberdeen Proving Ground (ACC-APG), Natick Division has a requirement for up to 500 million SARS-CoV-2 mRNA-1273 Vaccine doses (100 µg) in support of Joint Program Executive Office - Chemical Biological Radiological Nuclear Defense (JPEO-CBRND), the Assistant Secretary for Preparedness and Response (ASPR), and Biomedical Advanced Research and Development Authority (BARDA). All doses of mRNA-1273 Vaccine referenced herein are 100 µg doses. All doses will be delivered in a multi- dose vial with a volume sufficient for 10 doses per vial.

Section B - Supplies or Services and Prices

| ITEM NO | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 0001 | | | | | $0.00 |
| | SARS-CoV-2 mRNA-1273 Vaccine<br>FFP<br>The contractor shall produce and deliver 100M doses of the SARS-CoV-2 mRNA-1273 Vaccine filled drug product (FDP), IAW Section C, Statement of Work (SOW) and CDRLs (Exhibit A) on this contract.<br>PROJECT: Operation Warp Speed | | | | |
| | | | | NET AMT | $0.00 |

| ITEM NO | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 0001AA | | 15,000,000 | Each | $12.25 | $183,750,000.00 |
| | 15M Doses<br>FFP<br>FOB: Origin (Shipping Point)<br>PURCHASE REQUEST NUMBER: 0011534693<br>PROJECT: Operation Warp Speed<br>PSC CD: 6505 | | | | |
| | | | | NET AMT | $183,750,000.00 |

ACRN AA $183,750,000.00
CIN: GFEBS001153469300001

| ITEM NO | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 0001AB | | 22,000,000 | Each | $12.25 | $269,500,000.00 |

22M Doses
FFP

FOB: Origin (Shipping Point)
PURCHASE REQUEST NUMBER: 0011534693
PROJECT: Operation Warp Speed
PSC CD: 6505

NET AMT $269,500,000.00

ACRN AB $269,500,000.00
CIN: GFEBS001153469300002

| ITEM NO | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 0001AC | | 30,000,000 | Each | $12.25 | $367,500,000.00 |

30M Doses
FFP
FOB: Destination
PURCHASE REQUEST NUMBER: 0011534693
PROJECT: Operation Warp Speed
PSC CD: 6505

NET AMT $367,500,000.00

ACRN AA $367,500,000.00
CIN: GFEBS001153469300003

| ITEM NO | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 0001AD | | 33,000,000 | Each | $12.25 | $404,250,000.00 |

33M Doses
FFP
FOB: Destination
PURCHASE REQUEST NUMBER: 0011534693
PROJECT: Operation Warp Speed
PSC CD: 6505

NET AMT $404,250,000.00

ACRN AA $404,250,000.00
CIN: GFEBS001153469300004

| ITEM NO | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 0002 | | 1 | Job | | $0.00 TBN |

Vendor Managed Inventory
FFP
a. The contractor shall secure, manage and maintain storage for up to 100M doses of mRNA-1273 vaccine and deliver to the designated government facility in accordance with Section F.
b. (b) (4) [redacted]
FOB: Destination
PROJECT: Operation Warp Speed
PSC CD: 6505

NET AMT $0.00

| ITEM NO | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 0003 | | | | | $0.00 |

EUA or BLA Incentive
FFP
This is an incentive CLIN and will be earned only if an Emergency Use Authorization (EUA) or Biologics License Application (BLA) is obtained no later than 31 January 2021.
PROJECT: Operation Warp Speed

NET AMT $0.00

| ITEM NO | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 0003AA | | 15,000,000 | Each | $3.00 | $45,000,000.00 |

EUA or BLA Incentive
FFP
If earned, this incentive shall be paid at final acceptance of subCLIN 0001AA.
FOB: Destination
PSC CD: 6505

NET AMT $45,000,000.00

| ITEM NO | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 0003AB | | 22,000,000 | Each | $3.00 | $66,000,000.00 |

EUA or BLA Incentive
FFP
If earned, this incentive shall be paid at final acceptance of subCLIN 0001AB.
FOB: Destination
PSC CD: 6505

NET AMT $66,000,000.00

| ITEM NO | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 0003AC | | 30,000,000 | Each | $3.00 | $90,000,000.00 |

EUA or BLA Incentive
FFP
If earned, this incentive shall be paid at final acceptance of subCLIN 0001AC.
FOB: Destination
PSC CD: 6505

NET AMT $90,000,000.00

| ITEM NO | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 0003AD | | 33,000,000 | Each | $3.00 | $99,000,000.00 |

EUA or BLA Incentive
FFP
If earned, this incentive shall be paid at final acceptance of subCLIN 0001AD.
FOB: Destination
PSC CD: 6505

NET AMT $99,000,000.00

| ITEM NO | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 0004 | | 1 | Job | | NSP |

Technical Data
FFP
The contractor shall deliver technical Data IAW Contract Data Requirements List (CDRL) IAW deliveries in Section C.4 and Section J, Exhibit A.
FOB: Destination
PROJECT: Operation Warp Speed
PSC CD: 6505

NET AMT

| ITEM NO | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 1001 OPTION | | | | | $0.00 |

SARS-CoV-2 mRNA-1273 Vaccine
FFP
The contractor shall produce and deliver 100M doses of the SARS-CoV-2 mRNA-1273 Vaccine filled drug product (FDP), IAW Section C, Statement of Work (SOW) and CDRLs (Exhibit A) on this contract.
PROJECT: Operation Warp Speed

NET AMT $0.00

| ITEM NO | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 1001AA | | 33,200,000 | Each | $16.50 | $547,800,000.00 |
| OPTION | 33.2M Doses | | | | |

FFP
a. If executed, the option shall be awarded upon EUA or no later than [redacted].
b. The government shall provide [redacted] notification to exercise the option.

FOB: Destination
PROJECT: Operation Warp Speed
PSC CD: 6505

NET AMT $547,800,000.00

| ITEM NO | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 1001AB | | 33,400,000 | Each | $16.50 | $551,100,000.00 |
| OPTION | 33.4M Doses | | | | |

FFP
a. If executed, the option shall be awarded upon EUA or no later than [redacted]
b. The government shall provide [redacted] notification to exercise the option.

FOB: Destination
PROJECT: Operation Warp Speed
PSC CD: 6505

NET AMT $551,100,000.00

| ITEM NO | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 1001AC<br>OPTION | 33.4M Doses<br>FFP<br>a. If executed, the option shall be awarded upon EUA or no later than [redacted].<br>b. The government shall provide [redacted] notification to exercise the option.<br>FOB: Destination<br>PROJECT: Operation Warp Speed<br>PSC CD: 6505 | 33,400,000 | Each | $16.50 | $551,100,000.00 |
| | | | | NET AMT | $551,100,000.00 |

| ITEM NO | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 1002<br>OPTION | Vendor Managed Inventory<br>FFP<br>a. The contractor shall secure, manage and maintain storage for up to 100M doses of mRNA-1273 vaccine and deliver to the designated government facility in accordance with Section F.<br>b. [redacted]<br>FOB: Destination<br>PROJECT: Operation Warp Speed<br>PSC CD: 6505 | 1 | Job | | $0.00 TBN |
| | | | | NET AMT | $0.00 |

| ITEM NO | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 2001 | | | | | $0.00 |
| OPTION | SARS-CoV-2 mRNA-1273 Vaccine<br>FFP<br>The contractor shall produce and deliver 100M doses of the SARS-CoV-2 mRNA-1273 Vaccine filled drug product (FDP), IAW Section C, Statement of Work (SOW) and CDRLs (Exhibit A) on this contract.<br>PROJECT: Operation Warp Speed | | | | |

NET AMT $0.00

| ITEM NO | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 2001AA | | 33,400,000 | Each | $16.50 | $551,100,000.00 |
| OPTION | 33.4M Doses<br>FFP<br>a. If executed, the option shall be awarded upon EUA or no later than [redacted]<br>b. The government shall provide [redacted] notification to exercise the option.<br>FOB: Destination<br>PROJECT: Operation Warp Speed<br>PSC CD: 6505 | | | | |

NET AMT $551,100,000.00

| ITEM NO | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 2001AB<br>OPTION | | 33,400,000 | Each | $16.50 | $551,100,000.00 |

33.4M Doses
FFP
a. If executed, the option shall be awarded upon EUA or no later than (b) (4) [redacted]
b. The government shall provide (b) (4) [redacted] notification to exercise the option.
FOB: Destination
PROJECT: Operation Warp Speed
PSC CD: 6505

NET AMT $551,100,000.00

| ITEM NO | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 2001AC<br>OPTION | | 33,200,000 | Each | $16.50 | $547,800,000.00 |

33.2M Doses
FFP
a. If executed, the option shall be awarded upon EUA or no later than (b) (4) [redacted].
b. The government shall provide (b) (4) [redacted] notification to exercise the option.
FOB: Destination
PROJECT: Operation Warp Speed
PSC CD: 6505

NET AMT $547,800,000.00

| ITEM NO | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 2002 | | 1 | Job | | $0.00 TBN |
| OPTION | Vendor Managed Inventory | | | | |

FFP

a. The contractor shall secure, manage and maintain storage for up to 100M doses of mRNA-1273 vaccine and deliver to the designated government facility in accordance with Section F.

b. (b) (4) [redacted]

FOB: Destination

PROJECT: Operation Warp Speed

PSC CD: 6505

NET AMT $0.00

| ITEM NO | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 3001 | | | | | $0.00 |
| OPTION | SARS-CoV-2 mRNA-1273 Vaccine | | | | |

FFP

The contractor shall produce and deliver 100M doses of the SARS-CoV-2 mRNA-1273 Vaccine filled drug product (FDP), IAW Section C, Statement of Work (SOW) and CDRLs (Exhibit A) on this contract.

PROJECT: Operation Warp Speed

NET AMT $0.00

| ITEM NO | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 3001AA<br>OPTION | 33.4M Doses<br>FFP<br>a. If executed, the option shall be awarded upon EUA or no later than [redacted].<br>b. The government shall provide [redacted] notification to exercise the option.<br>FOB: Destination<br>PROJECT: Operation Warp Speed<br>PSC CD: 6505 | 33,400,000 | Each | $16.50 | $551,100,000.00 |
| | | | | NET AMT | $551,100,000.00 |

| ITEM NO | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 3001AB<br>OPTION | 33.4M Doses<br>FFP<br>a. If executed, the option shall be awarded upon EUA or no later than [redacted].<br>b. The government shall provide [redacted] notification to exercise the option.<br>FOB: Destination<br>PROJECT: Operation Warp Speed<br>PSC CD: 6505 | 33,400,000 | Each | $16.50 | $551,100,000.00 |
| | | | | NET AMT | $551,100,000.00 |

| ITEM NO | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 3001AC<br>OPTION | 33.2M Doses<br>FFP<br>a. If executed, the option shall be awarded upon EUA or no later than [redacted].<br>b. The government shall provide [redacted] notification to exercise the option.<br>FOB: Destination<br>PROJECT: Operation Warp Speed<br>PSC CD: 6505 | 33,200,000 | Each | $16.50 | $547,800,000.00 |
| | | | | NET AMT | $547,800,000.00 |

| ITEM NO | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 3002<br>OPTION | Vendor Managed Inventory<br>FFP<br>The contractor shall secure, manage and maintain storage for up to 100M doses of mRNA-1273 vaccine and deliver to the designated government facility in accordance with Section F.<br>[redacted]<br>FOB: Destination<br>PROJECT: Operation Warp Speed<br>PSC CD: 6505 | 1 | Job | | $0.00 TBN |
| | | | | NET AMT | $0.00 |

| ITEM NO | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 4001 | | | | | $0.00 |
| OPTION | SARS-CoV-2 mRNA-1273 Vaccine<br>FFP<br>The contractor shall produce and deliver 100M doses of the SARS-CoV-2 mRNA-1273 Vaccine filled drug product (FDP), IAW Section C, Statement of Work (SOW) and CDRLs (Exhibit A) on this contract.<br><br>PROJECT: Operation Warp Speed | | | | |
| | | | | NET AMT | $0.00 |

| ITEM NO | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 4001AA | | 33,400,000 | Each | $16.50 | $551,100,000.00 |
| OPTION | 33.4M Doses<br>FFP<br>a. If executed, the option shall be awarded upon EUA or no later than [redacted].<br>b. The government shall provide [redacted] notification to exercise the option.<br>FOB: Destination<br>PROJECT: Operation Warp Speed<br>PSC CD: 6505 | | | | |
| | | | | NET AMT | $551,100,000.00 |

| ITEM NO | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 4001AB<br>OPTION | | 33,400,000 | Each | $16.50 | $551,100,000.00 |

33.4M Doses
FFP
a. If executed, the option shall be awarded upon EUA or no later than [redacted].
b. The government shall provide [redacted] notification to exercise the option.
FOB: Destination
PROJECT: Operation Warp Speed
PSC CD: 6505

NET AMT $551,100,000.00

| ITEM NO | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 4001AC<br>OPTION | | 33,200,000 | Each | $16.50 | $547,800,000.00 |

33.2M Doses
FFP
a. If executed, the option shall be awarded upon EUA or no later than [redacted].
b. The government shall provide [redacted] notification to exercise the option.
FOB: Destination
PROJECT: Operation Warp Speed
PSC CD: 6505

NET AMT $547,800,000.00

| ITEM NO | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 4002<br>OPTION | Vendor Managed Inventory<br>FFP<br>The contractor shall secure, manage and maintain storage for up to 100M doses of mRNA-1273 vaccine and deliver to the designated government facility in accordance with Section F.<br>b. (b) (4) [redacted]<br>FOB: Destination<br>PROJECT: Operation Warp Speed<br>PSC CD: 6505 | 1 | Job | | $0.00 TBN |

NET AMT $0.00

Section C - Descriptions and Specifications

## STATEMENT OF WORK
## LARGE SCALE PRODUCTION OF SARS-CoV-2 VACCINE

C.1 **SCOPE**. The Department of Defense and Health and Human Services (HHS) require large scale manufacturing of vaccine doses in support of the national emergency response to the Coronavirus Disease 2019 (COVID-19) for the United States Government (USG) and the US population.

C.1.1 Background. In December 2019, a novel coronavirus now known as SARS-CoV-2 was first detected in Wuhan, Hubei Province, People's Republic of China, causing outbreaks of the coronavirus disease COVID-19 that has now spread globally. The Secretary of Health and Human Service declared a public health emergency on January 31, 2020, under section 319 of the Public Health Service Act (42 U.S.C. 247d), in response to COVID-19. On March 1, 2020, the President of the United States, pursuant to sections 01 and 301 of the National Emergencies Act (50 U.S.C. 1601 et seq.) and consistent with section 1135 of the Social Security Act (SSA), as amended (42 U.S.C. 1320b-5), proclaimed that the COVID-19 outbreak in the United States constitutes a national emergency.

C.1.1.1 Under Operation Warp Speed (OWS), the Department of Defense and HHS are leading a whole of nation effort to ensure development of promising vaccine, diagnostic and therapeutic candidates and ensure that these medical countermeasures are available in the quantities required to reduce SARS-CoV-2 transmission, identify prior and/or current infection, and improve patient care, thereby mitigating the impact of COVID-19 on the nation and its people. The DoD Joint Program Executive Office for Chemical, Biological, Radiological and Nuclear Defense (JPEO-CBRD) is providing expertise and contracting support to HHS, in compliance with PL 115-92 Authorization Letter for DoD Medical Priorities, through an Interagency Agreement, signed April 23, 2020. As OWS products progress to clinical trials to evaluate the safety and efficacy of vaccines and therapeutics, it is critical that, in parallel, the USG supports large scale manufacturing so that vaccine doses or therapeutic treatment courses are immediately available for nationwide access as soon as a positive efficacy signal is obtained and the medical countermeasures are authorized for widespread use.

C.1.2 Objective: The objective of this effort is to obtain the following:

a. Base Period: Large scale manufacturing of 100 million vaccine doses
b. Option Period 1: Large scale manufacturing of 100 million vaccine doses
c. Option Period 2: Large scale manufacturing of 100 million vaccine doses
d. Option Period 3: Large scale manufacturing of 100 million vaccine doses
e. Option Period 4: Large scale manufacturing of 100 million vaccine doses

The Base Period is 9 months, with overlapping options for a total of 20 months if all options are exercised.

C.2 **APPLICABLE DOCUMENTS**.

C.2.1 Federal Documents:

C.2.1.1 Title 21 Code of Federal Regulations (CFR), Food and Drugs: Part 210, Current Good Manufacturing Practice in Manufacturing, Processing, Packing, or Holding of Drugs; General; and, Part 211, Current Good Manufacturing Practice In Manufacturing, Processing, Packing, or Holding of Drugs; General. (https://www.ecfr.gov/cgi-bin/text-idx?SID=a95cab20f443897a400bb7e44a27cf4c&mc=true&tpl=/ecfrbrowse/Title21/21cfrv4_02.tpl#0)

C.3 **REQUIREMENTS**. Independently, and not as an agent of the USG, in accordance with the Proposal submitted by ModernaTX, Inc. in response to Solicitation Number W911QY20R0043, Titled, "Advanced Procurement of mRNA-1273 Vaccine for Prevention of SARS-CoV-2 Coronavirus (COVID-19)"), dated July 10, 2020 (and any subsequent USG-approved revisions thereto), the contractor shall provide all necessary services,

qualified personnel, material, equipment and facilities (not otherwise provided by the USG under the terms of this contract) to perform the specific tasks set forth below.

C.3.1 **Contract Line Item Number (CLIN) 0001 - Base Period: Large Scale Manufacturing of 100 Million Vaccine Doses**.

C.3.1.1 The contractor shall complete all scope required for the production, release and delivery use of 100 million Final Drug Product (FDP) doses of a SARS-CoV-2 mRNA-1273 vaccine. This shall include, the following tasks and other activities reasonably contemplated by such task:

C.3.1.1.1 Storage of FDP doses prior to delivery consistent with all FDA requirements to ensure that the product remains available for use in target populations. Storage and maintenance of the vaccine prior to delivery shall be under conditions and at temperatures necessary to retain stability for use as prescribed in this contract for a period of 12 months. (Based on FDP stability data that supports a 12-month shelf-life, subject to FDA confirmation of the assigned shelf-life.) Ensure requirements of 21CFR207, Registration of Producers of Drugs and Listing of Drugs in Commercial Distribution are met prior to distribution to the CDC. Documents shall be provided under CDRL A002, FDA Interactions and Inspections Documentation.

C.3.1.1.2 cGMP manufacturing of 100 million doses fully compliant with 21 CFR 210 and 211.

C.3.1.1.3 Ensuring that vial labeling and packaging is consistent with FDA guidance for use in target populations and that labeling is updated as appropriate.

C.3.1.1.4 Coordinating with FDA to establish an approved commercial vial label, carton and packaging insert (printed or electronic).

C.3.1.1.5 Ensuring the product complies with the Drug Supply Chain Security Act (DSCSA), Sections 581-585 of PL 113-54 (Nov. 27, 22013), including product verification, serialization, traceability and detection and response requirements, subject to any exceptions established by or the enforcement discretion of the FDA, including "Exemption from Certain Product Tracing and Product Identification Requirements Under Section 582 of the FD&C Act" (April 2020).

C.3.1.1.6 In coordination with the USG, the contractor shall conduct a demonstration of the vaccine shipping process prior to the first delivery of FDP doses at a time mutually agreed to by the contractor and the USG. Moderna shall provide specifications and details associated with the shipping process and containers (IAW CDRL A005) to enable the USG to adequately plan and prepare for potential distribution of the vaccine.

C.3.1.1.7 Following release of product the contractor shall, promptly deliver product to the designated delivery site via a qualified distribution vendor in accordance with Section F and paragraph C.7 below. In the unforeseen event that a designated delivery site cannot receive product and the contractor provides storage beyond 20 days of product release, the contract will be subject to modification for acceptance purposes.

C.3.1.2 Site Visits and Audits. The contractor shall accommodate periodic or ad hoc site visits by BARDA and FDA representatives for required site visits and audits at facilities used to support this contract throughout the period of performance of the contract.

C.3.1.2.1 BARDA Audits. If issues are identified during an audit, the contractor shall submit a report detailing the finding and corrective action(s) in accordance with CDRL A001.

C.3.1.2.2 FDA Audits. The Contractor shall notify the Contracting Officer and Contracting Officer's Representative (COR) within [redacted] of a scheduled FDA audit or within [redacted] of an ad hoc site visit or audit if the FDA does not provide advance notice. The contractor shall provide copies of any FDA Audit Report received from subcontractors that occur as a result of this contract or for this product within [redacted] of receiving correspondence from the FDA or third party in accordance with CDRL A002. The Contractor shall

provide the Contracting Officer with a plan for addressing areas of nonconformance, if any are identified, within [redacted] of submittal of the audit report in accordance with CDRL A002.

C.3.1.2.3 FDA Interactions. The contractor shall provide copies of the plan and processes that will ensure the USG has visibility and input on all FDA communications regarding the drugs and biologics for the following, but not limited to: FDA interactions, FDA meetings, communications, submissions, inspections, and enforcement documentation in accordance with CDRL A002.

C.3.2 **<u>CLIN 1001 - Option Period 1: Large Scale Manufacturing of 100 Million Vaccine Doses</u>**.

C.3.2.1 The contractor shall complete all scope required for the production, release and delivery use of 100 million FDP doses of a SARS-CoV-2 mRNA-1273 vaccine. This shall include the following tasks and other activities reasonably contemplated by such tasks:

C.3.2.1.1 Storage of FDP doses prior to delivery consistent with all FDA requirements to ensure that the product remains available for use in target populations. Storage and maintenance of the vaccine prior to delivery shall be under conditions and at temperatures necessary to retain stability for use as prescribed in this contract for a period of 12 months. (Based on FDP stability data that supports a 12-month shelf-life, subject to FDA confirmation of the assigned shelf-life.) Ensure requirements of 21CFR207, Registration of Producers of Drugs and Listing of Drugs in Commercial Distribution are met prior to distribution to the CDC. Documents shall be provided under CDRL A002, FDA Interactions and Inspections Documentation.

C.3.2.1.2 cGMP manufacturing of 100 million doses, subject to any exceptions established by or the enforcement discretion of the FDA.

C.3.2.1.3 Ensuring that vial labeling and packaging is consistent with FDA guidance for use in target populations and that labeling is updated.

C.3.2.1.4 Ensuring the product complies with the Drug Supply Chain Security Act (DSCSA), Sections 581-585 of PL 113-54 (Nov. 27, 22013), including product verification, serialization, traceability and detection and response requirements subject to any exceptions established by or the enforcement discretion of the FDA.

C.3.2.1.5 Following release of the product the contractor shall deliver the product to the designated distribution site via a qualified distribution vendor in accordance with Section F and paragraph C.7 below. To the extent a natural disaster or other emergency affecting a designated delivery site restricts such site's ability to receive product, the Contractor and the USG will promptly agree on an alternate USG delivery location, or storage as Vendor Managed Inventory (VMI) at the contractor site.

C.3.2.2 Site Visits and Audits. The contractor shall accommodate periodic or ad hoc site visits by BARDA and FDA representatives for required site visits and audits at facilities used to support this contract throughout the period of performance of the contract.

C.3.2.2.1 BARDA Audits. If issues are identified during an audit, the contractor shall submit a report detailing the finding and corrective action(s) in accordance with CDRL A001.

C.3.2.2.2 FDA Audits. The Contractor shall notify the Contracting Officer and COR within [redacted] of a scheduled FDA audit or within [redacted] of an ad hoc site visit or audit if the FDA does not provide advance notice. The contractor shall provide copies of any FDA Audit Report received from subcontractors that occur as a result of this contract or for this product within [redacted] of receiving correspondence from the FDA or third party in accordance with CDRL A015. The Contractor shall provide the Contracting Officer with a plan for addressing areas of nonconformance, if any are identified, within [redacted] of submittal of the audit report in accordance with CDRL A002.

C.3.2.2.3 FDA Interactions. The contractor shall provide copies of the plan and processes that will ensure the USG has visibility and input on all FDA communications regarding the drugs and biologics for the following, but

not limited to: FDA interactions, FDA meetings, communications, submissions, inspections, and enforcement documentation in accordance with CDRL A002.

C.3.3 **CLIN 2001 - Option Period 2: Large Scale Manufacturing of 100 Million Vaccine Doses.**

C.3.3.1 The contractor shall complete all scope required for the production, release and delivery use of 100 million FDP doses of a SARS-CoV-2 mRNA-1273 vaccine. This shall include the following tasks and other activities reasonably contemplated by such tasks:

C.3.3.1.1 Storage of FDP doses prior to delivery consistent with all FDA requirements to ensure that the product remains available for use in target populations. Storage and maintenance of the vaccine prior to delivery shall be under conditions and at temperatures necessary to retain stability for use as prescribed in this contract for a period of 12 months. (Based on FDP stability data that supports a 12-month shelf-life, subject to FDA confirmation of the assigned shelf-life.) Ensure requirements of 21CFR207, Registration of Producers of Drugs and Listing of Drugs in Commercial Distribution are met prior to distribution to the CDC. Documents shall be provided under CDRL A002, FDA Interactions and Inspections Documentation.

C.3.3.1.2 cGMP manufacturing of 100 million doses, subject to any exceptions established by or the enforcement discretion of the FDA.

C.3.3.1.3 Ensuring that vial labeling and packaging is consistent with FDA guidance for use in target populations and that labeling is updated as appropriate.

C.3.3.1.4 Ensuring that the product complies with the Drug Supply Chain Security Act (DSCSA), Sections 581-585 of PL 113-54 (Nov. 27, 2013), including product verification, serialization, traceability and detection and response requirements, subject to any exceptions established by or the enforcement discretion of the FDA.

C.3.3.1.5 Following release the contractor shall deliver product to the nearest designated distribution site via a qualified distribution vendor in accordance with Section F and paragraph C.7 below. To the extent a natural disaster or other emergency affecting a designated delivery site restricts such site's ability to receive product, the Contractor and the USG will promptly agree on an alternate USG delivery location, or storage as Vendor Managed Inventory (VMI) at the contractor site.

C.3.3.2 Site Visits and Audits. The contractor shall accommodate periodic or ad hoc site visits by BARDA and FDA representatives for required site visits and audits at facilities used to support this contract throughout the period of performance of the contract.

C.3.3.2.1 BARDA Audits. If issues are identified during an audit, the contractor shall submit a report detailing the finding and corrective action(s) in accordance with CDRL A001.

C.3.3.2.2 FDA Audits. The Contractor shall notify the Contracting Officer and COR within [redacted] of a scheduled FDA audit or within [redacted] of an ad hoc site visit or audit if the FDA does not provide advance notice. The contractor shall provide copies of any FDA Audit Report received from subcontractors that occur as a result of this contract or for this product within [redacted] of receiving correspondence from the FDA or third party in accordance with CDRL A002. The Contractor shall provide the Contracting Officer with a plan for addressing areas of nonconformance, if any are identified, within [redacted] of submittal of the audit report in accordance with CDRL A002.

C.3.3.2.3 FDA Interactions. The contractor shall provide copies of the plan and processes that will ensure the USG has visibility and input on all FDA communications regarding the drugs and biologics for the following, but not limited to: FDA interactions, FDA meetings, communications, submissions, inspections, and enforcement documentation in accordance with CDRL A002.

C.3.4 **CLIN 3001 - Option Period 3: Large Scale Manufacturing of 100 Million Vaccine Doses.**

C.3.4.1 The contractor shall complete all scope required for the production, release and delivery use of 100 million FDP doses of a SARS-CoV-2 mRNA-1273 vaccine. This shall include the following tasks and other activities reasonably contemplated by such tasks:

C.3.4.1.1 Storage of FDP doses prior to delivery consistent with all FDA requirements to ensure that the product remains available for use in target populations. Storage and maintenance of the vaccine prior to delivery shall be under conditions and at temperatures necessary to retain stability for use as prescribed in this contract for a period of 12 months. (Based on FDP stability data that supports a 12-month shelf-life, subject to FDA confirmation of the assigned shelf-life.) Ensure requirements of 21CFR207, Registration of Producers of Drugs and Listing of Drugs in Commercial Distribution are met prior to distribution to the CDC. Documents shall be provided under CDRL A002, FDA Interactions and Inspections Documentation.

C.3.4.1.2 cGMP manufacturing of 100 million doses, subject to any exceptions established by or the enforcement discretion of the FDA.

C.3.4.1.3 Ensuring that vial labeling and packaging is consistent with FDA guidance for use in target populations and that labeling is updated.

C.3.4.1.4 Ensuring the product complies with the Drug Supply Chain Security Act (DSCSA), Sections 581-585 of PL 113-54 (Nov. 27, 22013), including product verification, serialization, traceability and detection and response requirements subject to any exceptions established by or the enforcement discretion of the FDA.

C.3.4.1.5 Following release of the product the contractor shall deliver the product to the designated distribution site via a qualified distribution vendor in accordance with Section F and paragraph C.7 below. To the extent a natural disaster or other emergency affecting a designated delivery site restricts such site's ability to receive product, the Contractor and the USG will promptly agree on an alternate USG delivery location, or storage as Vendor Managed Inventory (VMI) at the contractor site.

C.3.4.2 Site Visits and Audits. The contractor shall accommodate periodic or ad hoc site visits by BARDA and FDA representatives for required site visits and audits at facilities used to support this contract throughout the period of performance of the contract.

C.3.4.2.1 BARDA Audits. If issues are identified during an audit, the contractor shall submit a report detailing the finding and corrective action(s) in accordance with CDRL A001.

C.3.4.2.2 FDA Audits. The Contractor shall notify the Contracting Officer and COR within [redacted] of a scheduled FDA audit or within [redacted] of an ad hoc site visit or audit if the FDA does not provide advance notice. The contractor shall provide copies of any FDA Audit Report received from subcontractors that occur as a result of this contract or for this product within [redacted] of receiving correspondence from the FDA or third party in accordance with CDRL A015. The Contractor shall provide the Contracting Officer with a plan for addressing areas of nonconformance, if any are identified, within [redacted] of submittal of the audit report in accordance with CDRL A002.

C.3.4.2.3 FDA Interactions. The contractor shall provide copies of the plan and processes that will ensure the USG has visibility and input on all FDA communications regarding mRNA-1273 for the following, but not limited to: FDA interactions, FDA meetings, communications, submissions, inspections, and enforcement documentation in accordance with CDRL A002.

C.3.5 **<u>CLIN 4001 - Option Period 4: Large Scale Manufacturing of 100 Million Vaccine Doses</u>**.

C.3.5.1 The contractor shall complete all scope required for the production, release and delivery use of 100 million FDP doses of a SARS-CoV-2 mRNA-1273 vaccine. This shall include the following tasks and other activities reasonably contemplated by such tasks:

C.3.5.1.1 Storage of FDP doses prior to delivery consistent with all FDA requirements to ensure that the product remains available for use in target populations. Storage and maintenance of the vaccine prior to delivery shall be under conditions and at temperatures necessary to retain stability for use as prescribed in this contract for a period of 12 months. (Based on FDP stability data that supports a 12-month shelf-life, subject to FDA confirmation of the assigned shelf-life.) Ensure requirements of 21CFR207, Registration of Producers of Drugs and Listing of Drugs in Commercial Distribution are met prior to distribution to the CDC. Documents shall be provided under CDRL A002, FDA Interactions and Inspections Documentation.

C.3.5.1.2 cGMP manufacturing of 100 million doses, subject to any exceptions established by or the enforcement discretion of the FDA.

C.3.5.1.3 Ensuring that vial labeling and packaging is consistent with FDA guidance for use in target populations and that labeling is updated.

C.3.5.1.4 Ensuring the product complies with the Drug Supply Chain Security Act (DSCSA), Sections 581-585 of PL 113-54 (Nov. 27, 22013), including product verification, serialization, traceability and detection and response requirements subject to any exceptions established by or the enforcement discretion of the FDA.

C.3.5.1.5 Following release of the product the contractor shall deliver the product to the designated distribution site via a qualified distribution vendor in accordance with Section F and paragraph C.7 below. To the extent a natural disaster or other emergency affecting a designated delivery site restricts such site's ability to receive product, the Contractor and the USG will promptly agree on an alternate USG delivery location, or storage as Vendor Managed Inventory (VMI) at the contractor site.

C.3.5.2 Site Visits and Audits. The contractor shall accommodate periodic or ad hoc site visits by BARDA and FDA representatives for required site visits and audits at facilities used to support this contract throughout the period of performance of the contract.

C.3.5.2.1 BARDA Audits. If issues are identified during an audit, the contractor shall submit a report detailing the finding and corrective action(s) in accordance with CDRL A001.

C.3.5.2.2 FDA Audits. The Contractor shall notify the Contracting Officer and COR within [redacted] of a scheduled FDA audit or within [redacted] of an ad hoc site visit or audit if the FDA does not provide advance notice. The contractor shall provide copies of any FDA Audit Report received from subcontractors that occur as a result of this contract or for this product within [redacted] of receiving correspondence from the FDA or third party in accordance with CDRL A015. The Contractor shall provide the Contracting Officer with a plan for addressing areas of nonconformance, if any are identified, within [redacted] of submittal of the audit report in accordance with CDRL A002.

C.3.5.2.3 FDA Interactions. The contractor shall provide copies of the plan and processes that will ensure the USG has visibility and input on all FDA communications regarding the drugs and biologics for the following, but not limited to: FDA interactions, FDA meetings, communications, submissions, inspections, and enforcement documentation in accordance with CDRL A002.

C.4 **<u>CLIN 0002: Data Deliverables</u>**. The contractor shall provide the following in accordance with the Contract Data Requirements List (CDRL), DD Forms 1423, provided at Appendix A.

C.4.1 Monthly Inventory Report (CDRL A003), detailing at a minimum, raw materials, Bulk mRNA, formulated LNPs, and the fill, finish, and released product.

C.4.2 Quality Management Plan. The contractor shall provide a Quality Management Plan, in accordance with CDRL A004, describing the quality policy and objectives, management review, competencies and training, process document control, feedback, evaluation, corrective action and preventive action, process improvement, measurement, and data analysis processes. The framework is normally divided into infrastructure, senior

management responsibility, resource management, lifecycle management, and quality management system evaluation.

C.4.3 Shipping Documentation (CDRL A005) for all Finished Drug Product (FDP) transferring from the contractor's fill/finish facility to a USG facility. The contractor shall obtain concurrence on planned shipment protocols prior to transport.

C.4.4 Expiring Items Report (CDRL A006) for all FDP in the USG's possession.

C.4.5 Key Personnel Listing (CDRL A007).

C.4.6 Monthly Technical Progress Report (CDRL A008), to include an Integrated Master Schedule, identifying key activities and contract status.

C.4.7 Final Technical Report (CDRL A009), documenting the work performed and results obtained for the entire contract period of performance.

C.4.8 Supply Chain Resiliency Plan (SCRP). The contractor shall provide, in accordance with CDRL A010 and CDRL Attachment 0001, a comprehensive SCRP that provides for identification and reporting of critical components associated with the secure supply of drug substance, drug product, and work-in-process through to finished goods, and key equipment suppliers and their locations, including addresses, points of contact, and work performed per location, to include subcontractors.

C.4.9 Risk Management Plan (RMP). The Contractor shall provide an RMP in accordance with CDRL A011 that outlines the impacts of each risk in relation to the cost, schedule, and performance objectives. The plan shall include risk mitigation strategies. Each risk mitigation strategy shall capture how the corrective action will reduce impacts on cost, schedule and performance.

C.4.10 Manufacturing Reports and Dose Tracking. The Contractor shall provide, in accordance with CDRL A013, manufacturing reports and manufacturing dose tracking projections and actuals utilizing the USG-provided "COVID-19 Dose Tracking Template" (CDRL Attachment 0003).

C.4.11 Product Acceptance Report (for each lot of Drug Product). The contractor shall provide, in accordance with CDRL A014, pictures of the drug product with lot number, drug product lot tree, list of associated deviations (from drug substance and product), and a Certificate of Analysis.

C.4.12 Incident Report. The contractor shall communicate to BARDA and document all critical programmatic concerns, issues, or probable risks that have or are likely to significantly impact project schedule and/or cost and/or performance in accordance with CDRL A016. "Significant" is frequently defined as a 10% or greater cost or schedule variance within a control account, but should be confirmed in consultation with the COR. Incidents that present liability to the project even without cost/schedule impact, such as breach of GCP during a clinical study, shall also be reported.

C.4.13 FDA Correspondence. The contractor shall provide any correspondence between Contractor and FDA relevant to the scope of this contract and submit in accordance with CDRL A017.

C.4.14 Press Releases. The contractor shall accurately and factually represent the work conducted under this contract in all press releases. The contractor shall provide an advance copy of any press release in accordance with CDRL A018.

C.4.15 Manufacturing Development Plan. The contractor shall provide a Manufacturing Development Plan, in accordance with CDRL A025, describing the manufacturing process for the drug/biologic product to ensure conformity with §501(a)(2)(B) of the Food, Drug, and Cosmetics Act (FD&C Act, Title 21 United States Code (USC) §351 (a)(2)(B)), regarding good manufacturing practices (GMP).

Case: 22-1581 Document: 56-1 Page: 527 Filed: 08/16/2022



C.5 **Administration**.

C.5.1 Post Award Teleconference. The contractor shall host a Post Award Teleconference within 7 calendar days after contract award.

C.5.1.1 The contractor shall provide an Agenda, IAW CDRL A020, detailing the planned activities for the subsequent 30 calendar days and shall discuss agenda items for the Post Award Kickoff Meeting.

C.5.1.2 The contractor shall provide Meeting Minutes IAW CDRL A021.

C.5.2 Post Award Kickoff Meeting. The contracting officer may request the contractor host a contract Kick-Off Meeting within 30 calendar days after contract award via teleconference. The contracting officer shall establish the date and time of the conference and prepare the agenda to include discussion on contract activities and schedule.

C.5.3 Bi-Weekly Teleconference. The contractor shall participate in bi-weekly teleconferences (or more frequent meetings required by the USG if warranted based on contract activities) to discuss performance on the contract.

C.5.4 The contractor shall provide an Agenda, IAW CDRL A020; Meeting Minutes in accordance with CDRL A021; and, Presentation Material in accordance with CDRL A022 for each of the aforementioned teleconferences or meetings throughout the contract period of performance.

C.5.5 Daily "Check-In". The contractor shall participate in a daily "check-in" (via teleconference or email) to address key cost, schedule and technical updates. Daily updates may be shared with senior USG leaders during the COVID- 19 response and should be provided on a non-confidential basis, unless the update includes confidential information in which case, the contractor shall provide the update in both confidential and non-confidential formats. Daily check-ins may occur on weekdays, excluding federal holidays. Upon request of the USG, check-ins may also occur on weekends and on federal holidays, provided at least 24 hours' notice.

C.6 **Security**.

C.6.1 Access and General Protection/Security Policy and Procedures. The contractor shall provide all information required for background checks necessary to access critical information related to OWS, and to meet USG installation access requirements to be accomplished by the installation Director of Emergency Services or Security Office. The contractor employees shall comply with all personnel identity verification requirements as directed by the USG and/or local policy. In addition to the changes otherwise authorized by the changes clause of this contract, should the security status of OWS change the USG may require changes in the contractor's security matters or processes. In addition to the industry standards for employment background checks, the contractor shall be willing to have key individuals, in exceptionally sensitive positions, identified for additional vetting by the United States USG.

C.6.2 Security Program and Plan. The contractor shall implement a comprehensive security program that provides overall protection of personnel, information, data, and facilities associated with fulfilling the USG's requirement. The contractor's security practices and procedures shall be detailed in a Security Plan, in accordance with CDRL A019, and shall demonstrate how the contractor shall meet and adhere to the security requirements outlined in CDRL Attachment 0002. This plan shall be delivered to the USG within 45 days of award, and the USG will review in detail and submit comments within ten (10) business days to the Contracting Officer (CO) to be forwarded to the Contractor. The Contractor shall review the Security Plan comments, and, submit a final Security Plan to the U.S. USG within thirty (30) calendar days after receipt of the comments. The Security Plan shall include a timeline for compliance of all the required security measures outlined in CDRL Attachment 0002.

C.6.3 Operational Security (OPSEC). The contractor shall develop and submit an OPSEC Standard Operating Procedure (SOP)/Plan IAW CDRL A024. The contractor shall identify in the SOP/Plan critical information related to this contract, why it needs to be protected, where it is located, who is responsible for it, and how to protect it.

C.7 **<u>CLIN 0002 Vendor Managed Inventory (VMI)</u>**. The Contractor shall provide the capability to store the vaccine for up to 52 weeks, up to 100M doses of mRNA-1273 vaccine, in accordance with product labeling. The contractor shall, in accordance with paragraph C.3.1.1.6, ensure the product storage of FDP doses for up to 12 months prior to delivery consistent with all FDA requirements to ensure that the product remains available for use in target populations . (b) (4) [redacted]. The contractor shall store the product to insure product quality with audible alarms and contacting. The contractor shall notify the USG within (b) (4) [redacted] of detection of an incident with the potential to impact product quality, and implement corrective actions to mitigate the incident. . BARDA/JPEO-CBRND personnel may conduct Quality Audits of the storage facility, when deemed necessary. The contractor shall notify the USG of Corrective/Preventive actions within (b) (4) [redacted] of detection of an incident with potential to impacts product quality. BARDA/JPEO-CBRND personnel may conduct Quality Audits of the storage facility, when deemed necessary.

C.7.1 The USG will provide the contractor advance notice of the required delivery locations for the vaccine. The contractor shall ship mRNA-1273 vaccines to designated locations (b) (4) [redacted] in the United States. The contractor shall be responsible for shipment of all vaccine product whether acceptance is conducted at origin or destination. (b) (4) [redacted]

C.7.2 The vaccine product shall be shipped and tracked by the distribution vendor's shipping tracking number, to the USG-designated sites within the continental United States.

C.7.3 (b) (4) [redacted] Implementation of a Vendor Managed Inventory Plan/SOP (CDRL A012) shall be provided to the USG. (b) (4) [redacted] Notwithstanding either of the foregoing sentences, the contractor shall not be liable for loss of or damage to supplies caused by the negligence of officers, agents, or employees of the USG acting within the scope of their employment.

Section D - Packaging and Marking

D.1 Vaccine markings and labeling will be in accordance with FDA and will be finalized through a contract modification.

Section E - Inspection and Acceptance

INSPECTION AND ACCEPTANCE TERMS

Supplies/services will be inspected/accepted at:

| CLIN | INSPECT AT | INSPECT BY | ACCEPT AT | ACCEPT BY |
|---|---|---|---|---|
| 0001 | N/A | N/A | N/A | N/A |
| 0001AA | Origin | Government | Origin | Government |
| 0001AB | Origin | Government | Origin | Government |
| 0001AC | Destination | Government | Destination | Government |
| 0001AD | Destination | Government | Destination | Government |
| 0002 | Destination | Government | Destination | Government |
| 0003 | N/A | N/A | N/A | N/A |
| 0003AA | Destination | Government | Destination | Government |
| 0003AB | Destination | Government | Destination | Government |
| 0003AC | Destination | Government | Destination | Government |
| 0003AD | Destination | Government | Destination | Government |
| 0004 | Destination | Government | Destination | Government |
| 1001 | N/A | N/A | N/A | N/A |
| 1001AA | Destination | Government | Destination | Government |
| 1001AB | Destination | Government | Destination | Government |
| 1001AC | Destination | Government | Destination | Government |
| 1002 | Destination | Government | Destination | Government |
| 2001 | N/A | N/A | N/A | N/A |
| 2001AA | Destination | Government | Destination | Government |
| 2001AB | Destination | Government | Destination | Government |
| 2001AC | Destination | Government | Destination | Government |
| 2002 | Destination | Government | Destination | Government |
| 3001 | N/A | N/A | N/A | N/A |
| 3001AA | Destination | Government | Destination | Government |
| 3001AB | Destination | Government | Destination | Government |
| 3001AC | Destination | Government | Destination | Government |
| 3002 | Destination | Government | Destination | Government |
| 4001 | N/A | N/A | N/A | N/A |
| 4001AA | Destination | Government | Destination | Government |
| 4001AB | Destination | Government | Destination | Government |
| 4001AC | Destination | Government | Destination | Government |
| 4002 | Destination | Government | Destination | Government |

CLAUSES INCORPORATED BY REFERENCE

| | | |
|---|---|---|
| 52.246-16 | Responsibility For Supplies | APR 1984 |

E1. Inspection:

Initial quality inspection of Filled Drug Product (FDP) shall occur when the Contractor performs release testing to confirm that products complies with Contractor's release specifications and criteria. Contractor will submit in WAWF to the Contracting Officer or the duly authorized representative of the Government with a Certificate of Analysis for quality inspection of all deliverables. Initial Inspection under this contract will be performed at the Contractor's facility, or the subcontractor facility, by the BARDA Contracting Officer Technical Representative (COTR).

Final inspection of product shall occur when the Government inspects each shipment of product delivered to it hereunder for visible damage and quantity within (b) (4) [redacted] of such delivery. In the event Contractor supplies any product to the Government and it is established that such Product was damaged or does not include the required quantities at the time of delivery, the Government shall promptly notify Contractor in writing within [redacted]. Final inspection shall be conducted at the CDC location identified as destination.

In the event the USG requires storage of the FDP to a Vendor Managed Inventory (VMI) location, final quantity inspection shall be conducted by submission into WAWF of shipping or other documentation confirming quantity to VMI location. Final physical inspection of the FDP shall be conducted upon receipt of product to USG location.

Inspection of all reports and Contract Data Requirement List (CDRL) under this contract will be performed at Destination by duly authorized representative of the Government.

E.2 Acceptance

a. Acceptance at origin shall occur at (b) (4) [redacted]. Acceptance at destination shall occur (b) (4) [redacted] Regardless of where acceptance occurs, the contractor is responsible for final delivery of Filled Drug Product (FDP) to a government designated CDC location.

b. Acceptance under this agreement will be performed by Army Contracting Command Aberdeen Proving Ground (ACC-APG) Natick Contracting Division (NCD) Contracting Officer.

c. Acceptance of services under VMI SubCLINs ( List CLINS) shall occur upon satisfactory physical and quantity inspection of FDP upon delivery at USG designated CDC location.

d. The parties acknowledge that acceptance may depend on the compliance with the Contractor's product specifications. The KO and COR may prior to acceptance consult with FDA under its authority under Public Law 115-92 to determine whether the material to be delivered meets the Contractor's product specifications. To this end, Contractor agrees to provide a letter to FDA authorizing the Government to engage in dialog with FDA about the ultimate compliance of this product with the Contractor's product specifications prior to acceptance. BARDA/COR will accept product according to the approved Product Acceptance Procedure.

Section F - Deliveries or Performance

DELIVERY INFORMATION

| CLIN | DELIVERY DATE | QUANTITY | SHIP TO ADDRESS | DODAAC / CAGE |
|---|---|---|---|---|
| (b) (4) [redacted] | | | N/A | N/A |
| | | | N/A<br>FOB: Origin (Shipping Point) | |
| | | | N/A<br>FOB: Origin (Shipping Point) | |
| | | | N/A<br>FOB: Destination | |
| | | | N/A<br>FOB: Destination | |
| | | | N/A<br>FOB: Destination | |
| | | | N/A | N/A |
| | | | N/A<br>FOB: Destination | |
| | | | N/A<br>FOB: Destination | |
| | | | N/A<br>FOB: Destination | |
| | | | N/A<br>FOB: Destination | |
| | | | (b) (4) [redacted]<br>(b) (6) [redacted]<br>(b) (4) [redacted] DC 20024<br>202-260-6798<br>FOB: Destination | (b) (4) [redacted] |
| | | | N/A | N/A |
| | | | N/A<br>FOB: Destination | |

(b) (4) [redacted]

N/A
FOB: Destination

N/A
FOB: Destination

N/A
FOB: Destination

N/A N/A

N/A
FOB: Destination

N/A
FOB: Destination

N/A
FOB: Destination

N/A
FOB: Destination

N/A N/A

N/A
FOB: Destination

N/A
FOB: Destination

N/A
FOB: Destination

N/A
FOB: Destination

N/A N/A

N/A
FOB: Destination

N/A
FOB: Destination

N/A
FOB: Destination

N/A
FOB: Destination

CLAUSES INCORPORATED BY REFERENCE

| | | |
|---|---|---|
| 52.211-17 | Delivery of Excess Quantities | SEP 1989 |
| 52.242-15 | Stop-Work Order | AUG 1989 |
| 52.247-34 | F.O.B. Destination | NOV 1991 |

F.1 The contractor shall ship mRNA-1273 vaccines to designated locations in up to (b) (4) [redacted] in the United States. The contractor shall be responsible for secure shipment of all vaccine product whether acceptance is conducted at origin or destination.

Section G - Contract Administration Data

## ACCOUNTING AND APPROPRIATION DATA

AA: 021202020212040000664643255 S.0074658.5.6 6100.9000021001
COST CODE: A5XAH
AMOUNT: $955,500,000.00

AB: 021202020212040000664643255 S.0074658.5.6.1 6100.9000021001
COST CODE: A5XAH
AMOUNT: $269,500,000.00

| ACRN | CLIN/SLIN | CIN | AMOUNT |
|---|---|---|---|
| AA | 0001AA | GFEBS001153469300001 | $183,750,000.00 |
| | 0001AC | GFEBS001153469300003 | $367,500,000.00 |
| | 0001AD | GFEBS001153469300004 | $404,250,000.00 |
| AB | 0001AB | GFEBS001153469300002 | $269,500,000.00 |

## CLAUSES INCORPORATED BY REFERENCE

| | | |
|---|---|---|
| 252.204-7006 | Billing Instructions | OCT 2005 |
| 252.232-7003 | Electronic Submission of Payment Requests and Receiving Reports | DEC 2018 |

## CLAUSES INCORPORATED BY FULL TEXT

252.232-7006 WIDE AREA WORKFLOW PAYMENT INSTRUCTIONS (DEC 2018)

(a) Definitions. As used in this clause—

"Department of Defense Activity Address Code (DoDAAC)" is a six position code that uniquely identifies a unit, activity, or organization.

"Document type" means the type of payment request or receiving report available for creation in Wide Area WorkFlow (WAWF).

"Local processing office (LPO)" is the office responsible for payment certification when payment certification is done external to the entitlement system.

"Payment request" and "receiving report" are defined in the clause at 252.232-7003, Electronic Submission of Payment Requests and Receiving Reports.

(b) Electronic invoicing. The WAWF system provides the method to electronically process vendor payment requests and receiving reports, as authorized by Defense Federal Acquisition Regulation Supplement (DFARS) 252.232-7003, Electronic Submission of Payment Requests and Receiving Reports.

(c) WAWF access. To access WAWF, the Contractor shall—

(1) Have a designated electronic business point of contact in the System for Award Management at https://www.sam.gov; and

(2) Be registered to use WAWF at https://wawf.eb.mil/ following the step-by-step procedures for self-registration available at this web site.

(d) WAWF training. The Contractor should follow the training instructions of the WAWF Web-Based Training Course and use the Practice Training Site before submitting payment requests through WAWF. Both can be accessed by selecting the "Web Based Training" link on the WAWF home page at https://wawf.eb.mil/.

(e) WAWF methods of document submission. Document submissions may be via web entry, Electronic Data Interchange, or File Transfer Protocol.

(f) WAWF payment instructions. The Contractor shall use the following information when submitting payment requests and receiving reports in WAWF for this contract or task or delivery order:

(1) Document type. The Contractor shall submit payment requests using the following document type(s):

COMBO

(ii) For fixed price line items—

(A) That require shipment of a deliverable, submit the invoice and receiving report specified by the Contracting Officer.

Invoice and receiving report document type

(B) For services that do not require shipment of a deliverable, submit either the Invoice 2in1, which meets the requirements for the invoice and receiving report, or the applicable invoice and receiving report, as specified by the Contracting Officer.

N/A

(iii) For customary progress payments based on costs incurred, submit a progress payment request.

(iv) For performance based payments, submit a performance based payment request.

(v) For commercial item financing, submit a commercial item financing request.

(2) Fast Pay requests are only permitted when Federal Acquisition Regulation (FAR) 52.213-1 is included in the contract.

(3) Document routing. The Contractor shall use the information in the Routing Data Table below only to fill in applicable fields in WAWF when creating payment requests and receiving reports in the system.

Routing Data Table

| *Field Name in WAWF* | *Data to be entered in WAWF* |
|---|---|
| Pay Official DoDAAC | HQ0337 |
| Issue By DoDAAC | W911QY |
| Admin DoDAAC** | S2206A |

| | |
|---|---|
| Inspect By DoDAAC | S2206A / BARDA |
| Acceptor | W911QY |
| Ship To | TDB |

(4) Payment request. The Contractor shall ensure a payment request includes documentation appropriate to the type of payment request in accordance with the payment clause, contract financing clause, or Federal Acquisition Regulation 52.216-7, Allowable Cost and Payment, as applicable.

(5) Receiving report. The Contractor shall ensure a receiving report meets the requirements of DFARS Appendix F.

(g) WAWF point of contact.

(1) The Contractor may obtain clarification regarding invoicing in WAWF from the following contracting activity's WAWF point of contact.

[redacted] / DCMA Boston-AFAW, Administrative Contracting Officer / [redacted]

(2) Contact the WAWF helpdesk at [redacted], if assistance is needed.

(End of clause)

FOR REFERANCE:

**DFARS PGI 204.7108 Payment Instructions Table**

https://www.acq.osd.mil/dpap/dars/pgi/pgi_htm/current/PGI204_71.htm#payment_instructions

**G.1 GOVERNMENT CONTRACT ADMINISTRATION**

In no event shall any understanding or agreement, contract modification, change order, or other matter in deviation from the terms of this contract between the Contractor and a person other than the Contracting Officer be effective or binding upon the Government. All such actions must be formalized by a proper contractual document executed by the Contracting Officer.

Procuring Contracting Officer:
[redacted]
Bldg. 1, General Greene Avenue
Natick, MA 01760-5011

Contract Specialist:

(b) (6) [redacted]
Bldg. 1, General Greene Avenue
Natick, MA 01760-5011

## G.2 GOVERNMENT TECHNICAL POINT OF CONTACT

(b) (6) [redacted]
Biologist/Project Officer
200 C Street, SW
Washington, DC 20201

## G.3 CONTRACTOR'S CONTRACT ADMINISTRATION

(b) (6) [redacted]
ModernaTX, Inc.
200 Technology SQ.
Cambridge, MA 02139-3578

## G.4 PLACES OF PERFORMANCE

ModernaTX, Inc.
200 Technology SQ.
Cambridge, MA 02139-3578

## G.5 NOTIFICATION OF REVISIONS AND CHANGE

Notification of revision or changes to names or email addresses will be provided by official correspondence from the PCO/ACO or office of the PCO/ACO in lieu of a contract modification. This does not apply to any such revisions or changes in the event this contract includes a key personnel clause.

## G.6 PERFORMANCE BASED PAYMENT

Performance-based payments (PBP) are authorized under this contract in accordance with FAR 52.232-32. The contractor shall bill for the PBP upon achievement of the completion criteria identified in Attachment 0008, Performance-based Payment Milestone Table. Upon achievement of the completion criteria, the contractor shall bill for the PBP for the base and each option IAW the following schedule:

| CLIN | PERIOD | AMOUNT | |
|---|---|---|---|
| 0001AA | BASE | $ | 90,210,000 |
| 0001AA | BASE | $ | 132,308,000 |
| 0001AA | BASE | $ | 180,420,000 |
| 0001AA | BASE | $ | 198,462,000 |
| TOTAL | | $ | 601,400,000 |
| | | | |
| (b) (4) [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | | [redacted] | [redacted] |
| | | | |
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |

| | | | |
|---|---|---|---|
| (b) (4) [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | | [redacted] | [redacted] |

Delivery Invoicing: PBPs are a type of contract financing and are recouped by the Government through deductions of payments otherwise due to the contractor for the partial or complete delivery of contract items. The deductions are made by applying a liquidation rate to the price of delivered contract items. Attachment 0009, Performance-based Payment Milestone Billing Plan, identifies the contractor invoicing schedule for liquidation. The contractor shall submit all invoices IAW Attachment 0009.

Section H - Special Contract Requirements

## H.1 Key Personnel

Any key personnel specified in this contract are considered to be essential to work performance. At least thirty (30) calendar days prior to the Contractor voluntarily diverting any of the specified individuals to other programs or contracts the Contractor shall notify the Contracting Officer and shall submit a justification for the diversion or replacement and a request to replace the individual. The request must identify the proposed replacement and provide an explanation of how the replacement's skills, experience, and credentials meet or exceed the requirements of the contract (including, when applicable, Human Subjects Testing requirements). If the employee of the Contractor is terminated for cause or separates from the Contractor voluntarily with less than thirty (30) calendar-day notice, the Contractor shall provide the maximum notice practicable under the circumstances. The Contractor shall not divert, replace, or announce any such change to key personnel without the written consent of the Contracting Officer. The contract will be modified to add or delete key personnel as necessary to reflect the agreement of the parties. The following individuals are determined to be key personnel:

| Name | Title |
|---|---|
| (b) (6) [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |

## H.2 Substitution of Key Personnel

The Contractor agrees to assign to the contract those persons whose resumes/CVs were submitted with the proposal who are necessary to fill the requirements of the contract. No substitutions shall be made except in accordance with this clause.

All requests for substitution must provide a detailed explanation of the circumstance necessitating the proposed substitution, a complete resume for the proposed substitute and any other information requested by the contracting officer to approve or disapprove the proposed substitution. All proposed substitutes must have qualifications that are equal to or higher than the qualifications of the person to be replaced. The contracting officer or authorized representative will evaluate such requests and promptly notify the contractor of his approval or disapproval thereof.

## H.3 Disclosure of Information:

Performance under this contract may require the Contractor to access non-public data and information proprietary to a Government agency, another Government Contractor or of such nature that its dissemination or use other than as specified in the work statement would be adverse to the interests of the Government or others. Neither the Contractor, nor Contractor personnel, shall divulge nor release data nor information developed or obtained under performance of this contract, except authorized by Government personnel or upon written approval of the CO which the KO will provide in accordance with OWS or other Government policies and/or guidance. The Contractor shall not use, disclose, or reproduce proprietary data that bears a restrictive legend, other than as specified in this contract, or any information at all regarding this agency.

The Contractor shall comply with all applicable Government requirements for protection of non-public information. Unauthorized disclosure of nonpublic information is prohibited by the Government's rules. Unauthorized disclosure may result in termination of the contract, replacement of a Contractor employee, or other appropriate redress. Neither the Contractor nor the Contractor's employees shall disclose or cause to be disseminated, any information concerning the operations of the activity, which could result in, or increase the likelihood of, the possibility of a breach of the activity's security or interrupt the continuity of its operations.

No information related to data obtained under this contract shall be released or publicized without the prior written consent of the COR, whose approval shall not be unreasonably withheld, conditioned, or delayed, provided that no such consent is required to comply with any law, rule, regulation, court ruling or similar order; for submission to any government entity' for submission to any securities exchange on which the Contractor's (or its parent corporation's) securities may be listed for trading; or to third parties relating to securing, seeking, establishing or maintaining regulatory or other legal approvals or compliance, financing and capital raising activities, or mergers, acquisitions, or other business transactions. The exceptions identified in this paragraph apply to all disclosures under this Section H.3 except to the extent that a disclosure is otherwise prohibited by law.

**H.4 Publication and Publicity**

The contractor shall not release any reports, manuscripts, press releases, or abstracts about the work being performed under this contract without written notice in advance to the Government.

(a) Unless otherwise specified in this contract, the contractor may publish the results of its work under this contract. The contractor shall promptly send a copy of each submission to the COR for security review prior to submission. The contractor shall also inform the COR when the abstract article or other publication is published, and furnish a copy of it as finally published.

(b) Unless authorized in writing by the CO, the contractor shall not display the DoD logo including Operating Division or Staff Division logos on any publications.

(c) The contractor shall not reference the products(s) or services(s) awarded under this contract in commercial advertising, as defined in FAR 31.205-1, in any manner which states or implies DoD approval or endorsement of the product(s) or service(s) provided.

(d) The contractor shall include this clause, including this section (d) in all subcontracts where the subcontractor may propose publishing the results of its work under the subcontract. The contractor shall acknowledge the support of the Department of Health and Human Services, Office of the Assistant Secretary for Preparedness and Response, Biomedical Advanced Research and Development Authority whenever publicizing the work under this contract in any media by including an acknowledgement substantially as follows:

"This project has been funded in whole or in part with Federal funds from the Office of the Assistant Secretary for Preparedness and Response, Biomedical Advanced Research and Development Authority, under Contract Number W911QY-20-C-0100."

**H.5 Confidentiality of Information**

a. Confidential information, as used in this article, means non-public information or data of a personal nature about an individual, or proprietary information or data submitted by or pertaining to an institution or organization.

b. The Contracting Officer and the Contractor may, by mutual consent, identify elsewhere in this contract specific information and/or categories of information which the Government will furnish to the Contractor or that the Contractor is expected to generate which is confidential. Similarly, the Contracting Officer and the Contractor may, by mutual consent, identify such confidential information from time to time during the performance of the contract. Failure to agree will be settled pursuant to the "Disputes" clause.

c. If it is established elsewhere in this contract that information to be utilized under this contract, or a portion thereof, is subject to the Privacy Act, the Contractor will follow the rules and procedures of disclosure set forth in the Privacy Act of 1974, 5 U.S.C. 552a, and implementing regulations and policies, with respect to systems of records determined to be subject to the Privacy Act.

d. Confidential information, as defined in paragraph (a) of this article, shall not be disclosed without the prior written consent of the individual, institution, or organization.

e. Whenever the Contractor is uncertain with regard to the proper handling of material under the contract, or if the material in question is subject to the Privacy Act or is confidential information subject to the provisions of this article, the Contractor shall obtain a written determination from the Contracting Officer prior to any release, disclosure, dissemination, or publication.

f. Contracting Officer Determinations will reflect the result of internal coordination with appropriate program and legal officials.

g. The provisions of paragraph (d) of this article shall not apply to conflicting or overlapping provisions in other Federal, State or local laws.

**ALL REQUIREMENTS OF THIS SECTION H.5 MUST BE PASSED TO ALL SUB-CONTRACTOR.**

**H.6 Regulatory Rights**

This contract involves supply of a product that requires FDA pre-market approval or clearance before commercial authorization. Contractor is seeking FDA authorization or clearance for the commercialization of mRNA-1273, Moderna vaccine for SARS-CoV-2 Coronavirus (the "Technology"). The Contractor is the Sponsor of the Regulatory Application (an investigational new drug application (IND), investigational device exemption (IDE), emergency use authorization (EUA), new drug application (NDA), biologics license application (BLA), premarket approval application (PMA), or 510(k) pre-market notification filing (510(k)) or another regulatory filing submitted to FDA) for the technology. As the Sponsor of the Regulatory Application to FDA (as the terms "sponsor" and "applicant" are defined or used in at 21 CFR §§3.2(c), 312.5, 600.3(t), 812.2(b), 812 Subpart C, or 814.20), the Contractor has certain standing before the FDA that entitles it to exclusive communications related to the Regulatory Application.

Accordingly, the Contractor and the Government agree to the following:

a. DoD Medical Product Priority. PL 115-92 allows the DoD to request, and FDA to provide, assistance to expedite development of products to diagnose, treat, or prevent serious or life-threatening diseases or conditions facing American military personnel. The contractor recognizes that only the DoD can utilize PL 115-92. As such, the contractor will work proactively with the Government to leverage this law to its maximum potential under this contract. The contractor shall submit Public Law 115-92 Sponsor Authorization Letter that will be delivered to the designated OWS POC(s) within 30 days of award.

(b) (4) [redacted]

**H.7 Performance Based Payment Liquidated under Termination**

Performance Based Payments (PBPs) have been authorized as a method of financing under this contract. In the event the Moderna's mRNA-1273 COVID Vaccine is unsuccessful in its bid to obtain EUA or FDA approval, the Government may issue a Termination for Convenience (T4C) in whole or in part, on this contract. Upon notice of a T4C, the contractor shall submit a termination settlement proposal, IAW FAR 52.249-2, Termination for Convenience of the Government (Fixed-Price).

**H.8 Public Readiness and Emergency Preparedness (PREP) Act:**

In accordance with the Public Readiness and Emergency Preparedness Act ("PREP Act"), Pub. L. No. 109-148, Division C, Section 2, as amended (codified at 42 U.S.C. § 247d-6d and 42 U.S.C. § 247d-6e), as well as the Secretary of HHS's Declaration Under the Public Readiness and Emergency Preparedness Act for Medical Countermeasures Against COVID-19, 85 Fed. Reg. 15198 (Mar. 17, 2020, effective Feb. 4, 2020), and amended on April 15, 2020, 85 Fed. Reg. 21012 (together, the "Prep Act Declaration"):

(i) This Agreement is being entered into for purposes of facilitating the manufacture, testing, development, distribution, administration, and use of "Covered Countermeasures" for responding to the COVID-19 public health emergency, in accordance with Section VI of the PREP Act Declaration;

(ii) Contractor's performance of this Agreement falls within the scope of the "Recommended Activities" for responding to the COVID-19 public health emergency, to the extent it is in accordance with Section III of the PREP Act Declaration; and

(iii) Contractor is a "Covered Person" to the extent it is a person defined in Section V of the PREP Act

Declaration.

Therefore, in accordance with Sections IV and VII of the PREP Act Declaration as well as the PREP Act (42 U.S.C. § 247d-6d), the Department of Defense contracting via assisted acquisition on behalf of the HHS, expressly acknowledges and agrees that the HHS Declaration cited above, specifically its language providing immunity from suit and liability is applicable to this acquisition as long as Contractors activities fall within the terms and conditions of the PREP Act and the PREP Act Declaration.

The Government may not use, or authorize the use of, any products or materials provided under this contract, unless such use occurs in the United States (or a U.S. territory where U.S. law applies such as embassies, military and NATO installations) and is protected from liability under a declaration issued under the PREP Act, or a successor COVID-19 PREP Act Declaration of equal or greater scope. Any use where the application of the PREP Act is in question will be discussed with Moderna prior to use and, if the parties disagree on such use, the dispute will be resolved according to the "Disputes Clause" (52.233-1)

The items and technology covered by this Contract are being developed for both civil and military applications.

(b)(4) [redacted]

[redacted]

[redacted]

(b)(4) [redacted]

**H.10 Ensuring Sufficient Supply of the Product**

1. In recognition of the Government's significant funding for the development and manufacturing of the product in this contract and the Government's need to provide sufficient quantities of a COVID-19 vaccine to protect the United States population, the Government shall have the remedy described in this section to ensure sufficient supply of the product to meet the needs of the public health or national security. This remedy is not available to the Government unless and until both of the following conditions ((a) and (b)) are met:

a. Moderna gives written notice, required to be submitted to the Government (b) (4) [redacted], of:

i. any formal management decision to terminate manufacturing of this product vaccine prior to delivery of any doses to USG under this contract, including all exercised options, other than as a result of clinical failure, or serious technical or safety reasons or;

ii. any formal management decision to discontinue sale of this product vaccine to the Government prior to delivery of any doses to USG under this contract, including all exercised options, other than as a result of clinical failure, or serious technical or safety reasons; or

iii. any filing that anticipates Federal bankruptcy protection; and

b. Moderna has submitted an Emergency Use Authorization application under §564 of the FD&C Act or a biologics license application provisions of §351(a) of the Public Health Service Act (PHSA).

2. If both conditions listed in section 1 occur, Moderna, upon the request of the Government, shall provide the following items necessary for the Government to pursue manufacturing of this product vaccine with a third party for exclusive sale to the U.S. Government:

a. a writing evidencing a non-exclusive, nontransferable, irrevocable (except for cause), royalty-free paid-up license to practice or have practiced for or on behalf of the U.S. Government any Moderna Background Patent, Copyright, other Moderna Intellectual Property, Moderna Know-How, Moderna Technical Data rights necessary to manufacture doses of the mRNA-1273 vaccine;

b. necessary FDA regulatory filings or authorizations owned or controlled by Moderna related to this product vaccine and any confirmatory instrument pertaining thereto; and

c. any outstanding Deliverables contemplated or materials purchased under this contract.

3. This remedy will remain available until the end of the contract.

(b)(4) [redacted]

(b) (4) [redacted]

### H.12 Transportation to Final Destination

During the course of performance under this contract, the Government may require storage of the filled drug product (FDP) before delivery to the final government location. In these circumstances, the Government will accept FDP at the contractor facility (Origin). The contractor; however, shall continue to be responsible for secure delivery of the vaccine to its final destination as identified on this contract. (b) (4) [redacted].

### H.13 Validation of IP/Data

The Parties acknowledge that background intellectual property and technical data assertions have been made and evaluated by the parties. The parties agree that, should additional information relevant to these assertions become available, the parties will reevaluate said assertions as necessary in the future.

### H.14 Novation

Upon Moderna, US, Inc.'s registration in the System for Award Management, the Government will, at the Contractor's request, complete a novation of this Contract to recognize Moderna US, Inc. as a counterparty instead of Moderna TX, Inc. This novation will be completed through a modification executed by the Government that identifies Moderna US, Inc. as the contracting party for all purposes as if it had originally executed the Contract.

Section I - Contract Clauses

CLAUSES INCORPORATED BY REFERENCE

| | | |
|---|---|---|
| 52.202-1 | Definitions | JUN 2020 |
| 52.203-3 | Gratuities | APR 1984 |
| 52.203-5 | Covenant Against Contingent Fees | MAY 2014 |
| 52.203-6 | Restrictions On Subcontractor Sales To The Government | JUN 2020 |
| 52.203-7 | Anti-Kickback Procedures | JUN 2020 |
| 52.203-8 | Cancellation, Rescission, and Recovery of Funds for Illegal or Improper Activity | MAY 2014 |
| 52.203-10 | Price Or Fee Adjustment For Illegal Or Improper Activity | MAY 2014 |
| 52.203-12 | Limitation On Payments To Influence Certain Federal Transactions | JUN 2020 |
| 52.203-13 | Contractor Code of Business Ethics and Conduct | JUN 2020 |
| 52.203-17 | Contractor Employee Whistleblower Rights and Requirement To Inform Employees of Whistleblower Rights | JUN 2020 |
| 52.204-1 | Approval of Contract | DEC 1989 |
| 52.204-4 | Printed or Copied Double-Sided on Postconsumer Fiber Content Paper | MAY 2011 |
| 52.204-10 | Reporting Executive Compensation and First-Tier Subcontract Awards | JUN 2020 |
| 52.204-13 | System for Award Management Maintenance | OCT 2018 |
| 52.204-18 | Commercial and Government Entity Code Maintenance | JUL 2016 |
| 52.204-19 | Incorporation by Reference of Representations and Certifications. | DEC 2014 |
| 52.204-23 | Prohibition on Contracting for Hardware, Software, and Services Developed or Provided by Kaspersky Lab and Other Covered Entities. | JUL 2018 |
| 52.204-25 | Prohibition on Contracting for Certain Telecommunications and Video Surveillance Services or Equipment. | AUG 2019 |
| 52.209-6 | Protecting the Government's Interest When Subcontracting With Contractors Debarred, Suspended, or Proposed for Debarment | JUN 2020 |
| 52.209-10 | Prohibition on Contracting With Inverted Domestic Corporations | NOV 2015 |
| 52.210-1 | Market Research | JUN 2020 |
| 52.215-2 | Audit and Records--Negotiation | JUN 2020 |
| 52.215-8 | Order of Precedence--Uniform Contract Format | OCT 1997 |
| 52.215-11 | Price Reduction for Defective Certified Cost or Pricing Data--Modifications | JUN 2020 |
| 52.215-13 | Subcontractor Certified Cost or Pricing Data--Modifications | JUN 2020 |
| 52.215-14 | Integrity of Unit Prices | JUN 2020 |
| 52.215-15 | Pension Adjustments and Asset Reversions | OCT 2010 |
| 52.215-18 | Reversion or Adjustment of Plans for Postretirement Benefits (PRB) Other than Pensions | JUL 2005 |
| 52.215-19 | Notification of Ownership Changes | OCT 1997 |
| 52.215-21 | Requirements for Certified Cost or Pricing Data and Data Other Than Certified Cost or Pricing Data -- Modifications | JUN 2020 |
| 52.217-4 | Evaluation Of Options Exercised At The Time Of Contract Award | JUN 1988 |
| 52.217-7 | Option For Increased Quantity-Separately Priced Line Item | MAR 1989 |
| 52.217-8 | Option To Extend Services | NOV 1999 |
| 52.219-8 | Utilization of Small Business Concerns | OCT 2018 |

| | | |
|---|---|---|
| 52.219-28 | Post-Award Small Business Program Rerepresentation | MAY 2020 |
| 52.222-1 | Notice To The Government Of Labor Disputes | FEB 1997 |
| 52.222-3 | Convict Labor | JUN 2003 |
| 52.222-19 | Child Labor -- Cooperation with Authorities and Remedies | JAN 2020 |
| 52.222-21 | Prohibition Of Segregated Facilities | APR 2015 |
| 52.222-26 | Equal Opportunity | SEP 2016 |
| 52.222-35 | Equal Opportunity for Veterans | JUN 2020 |
| 52.222-36 | Equal Opportunity for Workers with Disabilities | JUN 2020 |
| 52.222-37 | Employment Reports on Veterans | JUN 2020 |
| 52.222-40 | Notification of Employee Rights Under the National Labor Relations Act | DEC 2010 |
| 52.222-50 | Combating Trafficking in Persons | JAN 2019 |
| 52.222-54 | Employment Eligibility Verification | OCT 2015 |
| 52.223-6 | Drug-Free Workplace | MAY 2001 |
| 52.223-18 | Encouraging Contractor Policies To Ban Text Messaging While Driving | JUN 2020 |
| 52.225-13 | Restrictions on Certain Foreign Purchases | JUN 2008 |
| 52.227-1 | Authorization and Consent | JUN 2020 |
| 52.227-1 Alt I | Authorization And Consent (JUN 2020) - Alternate I | APR 1984 |
| 52.227-2 | Notice And Assistance Regarding Patent And Copyright Infringement | JUN 2020 |
| 52.227-11 | Patent Rights--Ownership By The Contractor | MAY 2014 |
| 52.232-9 | Limitation On Withholding Of Payments | APR 1984 |
| 52.232-17 | Interest | MAY 2014 |
| 52.232-23 | Assignment Of Claims | MAY 2014 |
| 52.232-25 | Prompt Payment | JAN 2017 |
| 52.232-33 | Payment by Electronic Funds Transfer--System for Award Management | OCT 2018 |
| 52.232-39 | Unenforceability of Unauthorized Obligations | JUN 2013 |
| 52.232-40 | Providing Accelerated Payments to Small Business Subcontractors | DEC 2013 |
| 52.233-1 | Disputes | MAY 2014 |
| 52.233-3 | Protest After Award | AUG 1996 |
| 52.233-4 | Applicable Law for Breach of Contract Claim | OCT 2004 |
| 52.242-13 | Bankruptcy | JUL 1995 |
| 52.243-1 | Changes--Fixed Price | AUG 1987 |
| 52.243-7 | Notification Of Changes | JAN 2017 |
| 52.244-5 | Competition In Subcontracting | DEC 1996 |
| 52.245-9 | Use And Charges | APR 2012 |
| 52.249-2 | Termination For Convenience Of The Government (Fixed-Price) | APR 2012 |
| 52.249-8 | Default (Fixed-Price Supply & Service) | APR 1984 |
| 52.249-14 | Excusable Delays | APR 1984 |
| 252.203-7000 | Requirements Relating to Compensation of Former DoD Officials | SEP 2011 |
| 252.203-7002 | Requirement to Inform Employees of Whistleblower Rights | SEP 2013 |
| 252.203-7003 | Agency Office of the Inspector General | AUG 2019 |
| 252.211-7003 | Item Unique Identification and Valuation | MAR 2016 |
| 252.222-7006 | Restrictions on the Use of Mandatory Arbitration Agreements | DEC 2010 |
| 252.225-7048 | Export-Controlled Items | JUN 2013 |
| 252.227-7013 | Rights in Technical Data--Noncommercial Items | FEB 2014 |
| 252.227-7014 | Rights in Noncommercial Computer Software and Noncommercial Computer Software Documentation | FEB 2014 |
| 252.227-7016 | Rights in Bid or Proposal Information | JAN 2011 |

| | | |
|---|---|---|
| 252.227-7017 | Identification and Assertion of Use, Release, or Disclosure Restrictions | JAN 2011 |
| 252.227-7019 | Validation of Asserted Restrictions--Computer Software | SEP 2016 |
| 252.227-7028 | Technical Data or Computer Software Previously Delivered to the Government | JUN 1995 |
| 252.227-7030 | Technical Data--Withholding Of Payment | MAR 2000 |
| 252.227-7037 | Validation of Restrictive Markings on Technical Data | SEP 2016 |
| 252.232-7007 | Limitation Of Government's Obligation | APR 2014 |
| 252.244-7000 | Subcontracts for Commercial Items | JUN 2013 |

CLAUSES INCORPORATED BY FULL TEXT

52.217-9 OPTION TO EXTEND THE TERM OF THE CONTRACT (MAR 2000)

(a) The Government may extend the term of this contract by written notice to the Contractor within 5 days for; provided that the Government gives the Contractor a preliminary written notice of its intent to extend at least 30 days for Options 1 and 2, 60 days for Option 3 and 4 before the contract expires. The preliminary notice does not commit the Government to an extension.

(b) If the Government exercises this option, the extended contract shall be considered to include this option clause.

(c) The total duration of this contract, including the exercise of any options under this clause, shall not exceed 20 months.

(End of clause)

52.232-32 PERFORMANCE-BASED PAYMENTS (APR 2012)

(a) Amount of payments and limitations on payments. Subject to such other limitations and conditions as are specified in this contract and this clause, the amount of payments and limitations on payments shall be specified in the contract's description of the basis for payment.

(b) Contractor request for performance-based payment. The Contractor may submit requests for payment of performance-based payments not more frequently than monthly, in a form and manner acceptable to the Contracting Officer. Unless otherwise authorized by the Contracting Officer, all performance-based payments in any period for which payment is being requested shall be included in a single request, appropriately itemized and totaled. The Contractor's request shall contain the information and certification detailed in paragraphs (l) and (m) of this clause.

(c) Approval and payment of requests.

(1) The Contractor shall not be entitled to payment of a request for performance-based payment prior to successful accomplishment of the event or performance criterion for which payment is requested. The Contracting Officer shall determine whether the event or performance criterion for which payment is requested has been successfully accomplished in accordance with the terms of the contract. The Contracting Officer may, at any time, require the Contractor to substantiate the successful performance of any event or performance criterion which has been or is represented as being payable.

(2) A payment under this performance-based payment clause is a contract financing payment under the Prompt Payment clause of this contract and not subject to the interest penalty provisions of the Prompt Payment Act. The designated payment office will pay approved requests on the 30th day after receipt of the request for performance-based payment by the designated payment office. However, the designated payment office is not required to provide

payment if the Contracting Officer requires substantiation as provided in paragraph (c)(1) of this clause, or inquiries into the status of an event or performance criterion, or into any of the conditions listed in paragraph (e) of this clause, or into the Contractor certification. The payment period will not begin until the Contracting Officer approves the request.

(3) The approval by the Contracting Officer of a request for performance-based payment does not constitute an acceptance by the Government and does not excuse the Contractor from performance of obligations under this contract.

(d) Liquidation of performance-based payments.

(1) Performance-based finance amounts paid prior to payment for delivery of an item shall be liquidated by deducting a percentage or a designated dollar amount from the delivery payment. If the performance-based finance payments are on a delivery item basis, the liquidation amount for each such line item shall be the percent of that delivery item price that was previously paid under performance-based finance payments or the designated dollar amount. If the performance-based finance payments are on a whole contract basis, liquidation shall be by either predesignated liquidation amounts or a liquidation percentage.

(2) If at any time the amount of payments under this contract exceeds any limitation in this contract, the Contractor shall repay to the Government the excess. Unless otherwise determined by the Contracting Officer, such excess shall be credited as a reduction in the unliquidated performance-based payment balance(s), after adjustment of invoice payments and balances for any retroactive price adjustments.

(e) Reduction or suspension of performance-based payments. The Contracting Officer may reduce or suspend performance-based payments, liquidate performance-based payments by deduction from any payment under the contract, or take a combination of these actions after finding upon substantial evidence any of the following conditions:

(1) The Contractor failed to comply with any material requirement of this contract (which includes paragraphs (h) and (i) of this clause).

(2) Performance of this contract is endangered by the Contractor's --

(i) Failure to make progress; or

(ii) Unsatisfactory financial condition.

(3) The Contractor is delinquent in payment of any subcontractor or supplier under this contract in the ordinary course of business.

(f) Title.

(1) Title to the property described in this paragraph (f) shall vest in the Government. Vestiture shall be immediately upon the date of the first performance-based payment under this contract, for property acquired or produced before that date. Otherwise, vestiture shall occur when the property is or should have been allocable or properly chargeable to this contract

(2) "Property," as used in this clause, includes all of the following described items acquired or produced by the Contractor that are or should be allocable or properly chargeable to this contract under sound and generally accepted accounting principles and practices:

(i) Parts, materials, inventories, and work in process;

(ii) Special tooling and special test equipment to which the Government is to acquire title;

(iii) Nondurable (i.e., noncapital) tools, jigs, dies, fixtures, molds, patterns, taps, gauges, test equipment and other similar manufacturing aids, title to which would not be obtained as special tooling under subparagraph (f)(2)(ii) of this clause; and

(iv) Drawings and technical data, to the extent the Contractor or subcontractors are required to deliver them to the Government by other clauses of this contract.

(3) Although title to property is in the Government under this clause, other applicable clauses of this contract (e.g., the termination or clauses) shall determine the handling and disposition of the property.

(4) The Contractor may sell any scrap resulting from production under this contract, without requesting the Contracting Officer's approval, provided that any significant reduction in the value of the property to which the Government has title under this clause is reported in writing to the Contracting Officer.

(5) In order to acquire for its own use or dispose of property to which title is vested in the Government under this clause, the Contractor shall obtain the Contracting Officer's advance approval of the action and the terms. If approved, the basis for payment (the events or performance criteria) to which the property is related shall be deemed to be not in compliance with the terms of the contract and not payable (if the property is part of or needed for performance), and the Contractor shall refund the related performance-based payments in accordance with paragraph (d) of this clause.

(6) When the Contractor completes all of the obligations under this contract, including liquidation of all performance-based payments, title shall vest in the Contractor for all property (or the proceeds thereof) not --

(i) Delivered to, and accepted by, the Government under this contract; or

(ii) Incorporated in supplies delivered to, and accepted by, the Government under this contract and to which title is vested in the Government under this clause.

(7) The terms of this contract concerning liability for Government-furnished property shall not apply to property to which the Government acquired title solely under this clause.

(g) Risk of loss. Before delivery to and acceptance by the Government, the Contractor shall bear the risk of loss for property, the title to which vests in the Government under this clause, except to the extent the Government expressly assumes the risk. If any property is lost (see 45.101), the basis of payment (the events or performance criteria) to which the property is related shall be deemed to be not in compliance with the terms of the contract and not payable (if the property is part of or needed for performance), and the Contractor shall refund the related performance-based payments in accordance with paragraph (d) of this clause.

(h) Records and controls. The Contractor shall maintain records and controls adequate for administration of this clause. The Contractor shall have no entitlement to performance-based payments during any time the Contractor's records or controls are determined by the Contracting Officer to be inadequate for administration of this clause.

(i) Reports and Government access. The Contractor shall promptly furnish reports, certificates, financial statements, and other pertinent information requested by the Contracting Officer for the administration of this clause and to determine that an event or other criterion prompting a financing payment has been successfully accomplished. The Contractor shall give the Government reasonable opportunity to examine and verify the Contractor's records and to examine and verify the Contractor's performance of this contract for administration of this clause.

(j) Special terms regarding default. If this contract is terminated under the Default clause,

(1) the Contractor shall, on demand, repay to the Government the amount of unliquidated performance-based payments, and

(2) title shall vest in the Contractor, on full liquidation of all performance-based payments, for all property for which

the Government elects not to require delivery under the Default clause of this contract. The Government shall be liable for no payment except as provided by the Default clause.

(k) Reservation of rights.

(1) No payment or vesting of title under this clause shall --

(i) Excuse the Contractor from performance of obligations under this contract; or

(ii) Constitute a waiver of any of the rights or remedies of the parties under the contract.

(2) The Government's rights and remedies under this clause --

(i) Shall not be exclusive, but rather shall be in addition to any other rights and remedies provided by law or this contract; and

(ii) Shall not be affected by delayed, partial, or omitted exercise of any right, remedy, power, or privilege, nor shall such exercise or any single exercise preclude or impair any further exercise under this clause or the exercise of any other right, power, or privilege of the Government.

(l) Content of Contractor's request for performance-based payment. The Contractor's request for performance-based payment shall contain the following:

(1) The name and address of the Contractor;

(2) The date of the request for performance-based payment;

(3) The contract number and/or other identifier of the contract or order under which the request is made;

(4) Such information and documentation as is required by the contract's description of the basis for payment; and

(5) A certification by a Contractor official authorized to bind the Contractor, as specified in paragraph (m) of this clause.

(m) Content of Contractor's certification. As required in paragraph (l)(5) of this clause, the Contractor shall make the following certification in each request for performance-based payment:

I certify to the best of my knowledge and belief that --

(1) This request for performance-based payment is true and correct; this request (and attachments) has been prepared from the books and records of the Contractor, in accordance with the contract and the instructions of the Contracting Officer;

(2) (Except as reported in writing on __________), all payments to subcontractors and suppliers under this contract have been paid, or will be paid, currently, when due in the ordinary course of business;

(3) There are no encumbrances (except as reported in writing on _________) against the property acquired or produced for, and allocated or properly chargeable to, the contract which would affect or impair the Government's title;

(4) There has been no materially adverse change in the financial condition of the Contractor since the submission by the Contractor to the Government of the most recent written information dated _____________; and

(5) After the making of this requested performance-based payment, the amount of all payments for each deliverable item for which performance-based payments have been requested will not exceed any limitation in the contract, and

the amount of all payments under the contract will not exceed any limitation in the contract.

(End of Clause)

52.252-2 CLAUSES INCORPORATED BY REFERENCE (FEB 1998)

This contract incorporates one or more clauses by reference, with the same force and effect as if they were given in full text. Upon request, the Contracting Officer will make their full text available. Also, the full text of a clause may be accessed electronically at this/these address(es):

https://www.acquisition.gov/content/regulations

(End of clause)

52.252-6 AUTHORIZED DEVIATIONS IN CLAUSES (APR 1984)

(a) The use in this solicitation or contract of any Federal Acquisition Regulation (48 CFR Chapter 1) clause with an authorized deviation is indicated by the addition of "(DEVIATION)" after the date of the clause.

(b) The use in this solicitation or contract of any Defense Federal Acquisition Regulation Supplement (48 CFR Chapter 2) clause with an authorized deviation is indicated by the addition of "(DEVIATION)" after the name of the regulation.

(End of clause)

Section J - List of Documents, Exhibits and Other Attachments

| Document Type | Description | Page # | Date |
|---|---|---|---|
| Exhibit A | CDRLs | 14 | 18 July 2020 |
| Attachment 0001 | Supply Chain Resiliency Plan for CDRL A010 | 2 | 23 July 2020 |
| Attachment 0002 | Security Plan | 6 | 23 July 2020 |
| Attachment 0003 | Dose Tracking Template Draft Moderna | Excel | 15 July 2020 |
| Attachment 0004 | Data Rights | 1 | 7 August 2020 |
| Attachment 0005 | (b) (4) [redacted] | 1 | 7 August 2020 |
| Attachment 0006 | ModernaTx, Inc. Background Intellectual Property | 2 | 6 August 2020 |
| Attachment 0007 | Performance Base Payment Milestone Schedule | 1 | 7 August 2020 |
| Attachment 0008 | Performance Base Payment Milestone Billing Plan | 15 | 7 August 2020 |

**Exhibit A**
**Contract Data Requirements List (CDRL)**

| Data Item # | Title of Data Item | Subtitle | Date |
|---|---|---|---|
| A001 | Quality Audit Finding and Response Record (QAFRR) | BARDA Audit Findings Report | 18-Jul-20 |
| A002 | Quality Audit Finding and Response Record (QAFRR) | FDA Audit Findings Report | 18-Jul-20 |
| A003 | Contractor Furnished Material (CFM) Report | Monthly Inventory Report | 18-Jul-20 |
| A004 | Quality Program Plan | Quality Program Plan | 18-Jul-20 |
| A005 | Task Directive Documentation | Shipping Documentation - Finished Drag Products (FDP) | 18-Jul-20 |
| A006 | Task Directive Documentation | Expiring Item Report | 18-Jul-20 |
| A007 | Contractor's Personnel Roster | Key Personnel Listing | 18-Jul-20 |
| A008 | Status Report | Monthly Technical Progress Report | 18-Jul-20 |
| A009 | Contract Summary Report | Final Technical Report | 18-Jul-20 |
| A010 | Supply Chain Risk Management Plan | Supply Chain Resiliency Plan (SCRP) | 18-Jul-20 |
| A011 | Contractor's Risk Management Plan | Risk Management Plan (RMP) | 18-Jul-20 |
| A012 | Research and Development of Medical Products Regulated by the U.S. Food and Drug Administration | Vendor Managed Inventory Plan/SOP | 18 Jul 20 |
| A013 | Internal Contractor Technical Data | Manufacturing Reports and Dose Tracking Projections/Actuals | 18-Jul-20 |
| A014 | Certificate of Compliance (Analysis) | Product Acceptance Report | 18-Jul-20 |
| A015 | N/A | - | - |
| A016 | Accident Incident Report | Incident Report | 18-Jul-20 |
| A017 | Internal Contractor Technical Data Report | FDA Correspondence | 18-Jul-20 |
| A018 | Acquisition Support Documentation | Press Releases | 18-Jul-20 |
| A019 | Contractor's Standard Operating Procedures | Security Plan | 18-Jul-20 |
| A020 | Conference Agenda | Conference Agenda | 18-Jul-20 |

| | | | |
|---|---|---|---|
| A021 | Report, Record of Meeting/Minutes | Meeting Minutes | 18-Jul-20 |
| A022 | Presentation Material | Presentation Material | 18-Jul-20 |
| A023 | N/A | - | - |
| A024 | Operations Security (OPSEC) Plan | Operational Security (OPSEC) SOP/Plan | 18 Jul 20 |
| A025 | Research and Development of Medical Products Regulated by the U.S. Food & Drug Administration (FDA) | Manufacturing Development Plan | 18 Jul 20 |

# EXHIBIT B

**No. 2020-2329**

---

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

---

MODERNA TX, INC., fka Moderna Therapeutics, Inc.,

*Appellant*,

v.

ARBUTUS BIOPHARMA CORPORATION,

*Appellee*.

---

Appeal from the United States Patent and Trademark Office,
Patent Trial and Appeal Board in No. IPR2019-00554.

---

**NON-CONFIDENTIAL DECLARATION OF SHAUN RYAN IN SUPPORT OF APPELLANT MODERNA TX, INC.'S STANDING TO APPEAL**

---

I, Shaun Ryan, hereby declare as follows:

1. I am Senior Vice President and Deputy General Counsel for Appellant ModernaTX, Inc. ("Moderna"). I submit this Declaration in support of Moderna's standing in this appeal. I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, could and would testify competently to such facts under oath.

2. Since its founding in 2010, Moderna has worked to build a leading mRNA technology platform to develop and test candidates for mRNA-based vaccines and therapies spanning several therapeutic areas. Moderna created this platform to improve the pharmaceutical properties of its mRNA medicines. The platform consists of three core areas: mRNA technologies, delivery technologies, and manufacturing processes.

3. Moderna most recently harnessed its own proprietary mRNA technology, delivery technologies, and manufacturing processes to develop its COVID-19 vaccine, mRNA-1273. Moderna was able to leverage its experience in vaccines to move rapidly to design and manufacture material for the mRNA Phase 1 clinical trial. Shortly after the SARS-CoV-2 genetic sequence was determined in January 2020 by the Chinese government, Moderna developed mRNA-1273, a lipid-nanoparticle (LNP)–encapsulated mRNA vaccine expressing the prefusion-stabilized spike glycoprotein. mRNA-1273 uses an mRNA payload delivered by a

CONFIDENTIAL MATERIAL FILED UNDER SEAL REDACTED

lipid carrier particle, [redacted] Proprietary formulation information [redacted]. A timeline of Moderna's efforts in developing mRNA-1273 is presented at https://www.modernatx.com/modernas-work-potential-vaccine-against-covid-19. Ex. 1.

4. As of September 23, 2020, Moderna had made concrete plans for the release of mRNA-1273. Just days after the Chinese authorities released the genetic sequence of the novel coronavirus, Moderna finalized the sequence for mRNA-1273. On March 16, 2020, Moderna and its government partners began a Phase 1 study for mRNA-1273 using the payload and lipid carrier particle ultimately approved. It began Phase 2 enrollment in May 2020 and Phase 3 enrollment in July 2020.

5. Preliminary Phase 1 results showing safety and efficacy were published in July 2020. On August 11, 2020, Moderna entered into a Supply Agreement with the Army Contracting Command of the U.S. Department of Defense for the manufacture and delivery of an initial 100 million doses of mRNA-1273 for $1.225 billion, plus additional incentive payments. Moderna began manufacturing the vaccine for commercial sale in June 2020.

CONFIDENTIAL MATERIAL FILED UNDER SEAL REDACTED

6. By September 2020, Moderna had spent hundreds of millions of dollars developing the vaccine. Thus, as of September 23, 2020, there was a strong likelihood that Moderna would sell mRNA-1273 commercially.

7. On December 18, 2020, Moderna received emergency use authorization in the United States for mRNA-1273 and began shipping the vaccine to the U.S. government immediately. In January 2021, Moderna received additional emergency use authorizations for mRNA-1273 for Canada, Israel, the European Union, and the United Kingdom.

8. Moderna's first commercial shipments of mRNA-1273 manufactured in the United States went to the U.S. government—in keeping with Moderna's commitment to assisting the national response to the pandemic—and are subject to 28 U.S.C. § 1498. Moderna is also currently supplying foreign governments with mRNA-1273 manufactured abroad. [redacted]

Moderna's plans for future commercial activity

[redacted]

[redacted] Moderna's plans for future commercial activity [redacted]

9. In view of Arbutus's statements and actions, which I describe below, there is a substantial risk that Arbutus may bring an infringement action relating to Moderna's COVID-19 vaccine, mRNA-1273. Although Moderna has communicated to Arbutus that its COVID-19 vaccine rests on its own innovations and does not practice the '069 patent, there is nonetheless a substantial risk of litigation concerning Moderna's vaccine given Arbutus's aggressive stance regarding its patent portfolio, regardless of the merits of its claims.

10. Arbutus has long proclaimed that its patent estate covers virtually all lipid nanoparticle ("LNP") delivery systems. For example, their former CEO, Mark Murray, has stated:

- "In our view what they are reporting as theirs appears to be dominated by our intellectual property." Ex. 2 (*Forbes,* May 2017).
- "There is an umbrella of intellectual property here that we think dominates the field.… Even if there was a particular lipid that was unique we still don't think these things escape the broad umbrella." Ex. 2 (*Forbes,* May 2017).
- "We invented, developed and dominate the field of LNP." Ex. 2 (*Forbes,* May 2017).
- "From our perspective anything we've seen in the scientific or patent literature clearly falls under the scope of our intellectual property …

> Nothing they've done is free of our IP." Ex. 3 (*Financial Times,* September 2017).

Moderna has tracked these statements and Arbutus's position regarding the expansive scope of its IP rights.

11. As of September 23, 2020, Arbutus's statements and actions showed that Moderna's activities regarding mRNA-1273 created a significant risk that Arbutus would sue for infringement of the '069 patent. Arbutus and its affiliate, Genevant Sciences, have consistently taken the position with Moderna that it requires a license to its patents, including the '069 patent. Arbutus has not granted Moderna a covenant not to sue on the '069 patent. Thus, while Moderna strongly disagrees that any infringement assertion has merit, given Arbutus's longstanding aggressive stance, there was a substantial risk as of September 23, 2020, and there continues to be a substantial risk, that Arbutus will bring an infringement action concerning mRNA-1273.

12. The uncertainty created by Arbutus's aggressive stance regarding the scope of its patents is causing harm to Moderna's valuation in the eyes of investors. Although Moderna has repeatedly communicated to its investors and the public that it does not believe that mRNA-1273 practices Arbutus's patents, Ex. 4 (https://investors.modernatx.com/news-releases/news-release-details/statement-moderna-patent-trial-and-appeal-board-ptab-ruling), [redacted] Confidential communication [redacted]. When the PTAB's final written decision

was issued, Moderna's stock price fell 10% in one day—equivalent to over $1 billion in market capitalization at the time—even though there was no actual infringement action against Moderna, Ex. 5 (https://www.fool.com/investing/2020/07/24/tiny-arbutus-biopharma-wins-patent-litigation-figh.aspx).

13. A finding that the '069 patent's claims were invalid would eliminate the risk that Moderna could be sued for infringement for making, using, and selling its mRNA-1273 COVID-19 vaccine under that patent.

14. Further, Moderna is a current licensee to U.S. Patent No. 8,058,069 ("'069 patent") under four product sublicenses (which do not include COVID-19 vaccines). As part of a November 12, 2012 agreement, Protiva Biotherapeutics, Inc. ("Protiva"), then a wholly owned subsidiary of Arbutus, licensed the '069 patent to Acuitas Biotherapeutics ("Acuitas"). Ex. 6 at 8, 10, Sch. D Protiva Patents at 13 (Protiva/Acuitas 2012 License); Ex. 7 (Arbutus press release). Acuitas redacted the attached copy of the agreement to remove financial terms.

[redacted] License agreement terms [redacted]

CONFIDENTIAL MATERIAL FILED UNDER SEAL REDACTED

[redacted] License agreement terms [redacted] Protiva merged into Arbutus in January 2018.

15. Acuitas sublicensed the Protiva/Arbutus pre-April 15, 2010 LNP technology, including the '069 patent, to Moderna for certain products against four viral targets: Influenza A, Chikungunya virus, Respiratory Syncytial Virus ("RSV"), and Zika virus. Exs. 8-11 (Acuitas 2015-2016 sub-licenses to Moderna). [redacted] License agreement terms [redacted]

16. Moderna has milestone obligations pursuant to the Acuitas sublicenses to the '069 patent for certain clinical activities. For example, Section 5.2 of each sublicense sets out the milestone payment obligations for Licensed Products:

CONFIDENTIAL MATERIAL FILED UNDER SEAL REDACTED

[redacted] License agreement terms

[redacted] License agreement terms

17. Moderna has made Phase 1 milestone payments of [redacted] Number under all four sublicense agreements for Phase 1 projects with LNP ranges that overlap with the ranges claimed in certain patents in the licensed portfolio, including the '069 patent. Those projects generated Phase 1 safety and tolerability data in early candidates that would support additional dose escalation or clinical advancements. Although these projects have not so far been pursued to further phases, they have not been abandoned either and still remain as options Moderna may pursue depending on a variety of factors, including cost and freedom to operate. Additionally, [redacted] Moderna's plans for research and development. Because the carrier particle in these early candidates practices,

among other licensed technology, the '069 patent, if and when Phase II clinical trials are initiated [redacted] Moderna's plans for research and development, a [redacted] Number milestone payment will come due for each target.

18. The royalty and milestone obligations owed to Acuitas for the use of the '069 patent, among others, increase the financial burdens on the RSV, Chikungunya, Zika, and Influenza A programs and impact Moderna's ability to attract partners for those viral targets. If the '069 patent is found to be invalid, Moderna's financial obligations to Acuitas for practicing the '069 patent would extinguish.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed at Cambridge, Massachusetts, this 22nd day of February, 2020.

By: ______________________
Shaun Ryan

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ARBUTUS BIOPHARMA CORPORATION and GENEVANT SCIENCES GmbH, | ) | |
| Plaintiffs, | ) | |
| v. | ) | C.A. No. 22-252-MSG |
| MODERNA, INC. and MODERNATX, INC., | ) | |
| Defendants. | ) | |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' PARTIAL MOTION TO DISMISS**

OF COUNSEL:
David I. Berl
Adam D. Harber
Thomas S. Fletcher
Jessica Palmer Ryen
Denis R. Hurley
Lydia B. Cash
WILLIAMS & CONNOLLY LLP
680 Maine Avenue S.W.
Washington, DC 20024
(202) 434-5000

Daralyn J. Durie
Eric C. Wiener
DURIE TANGRI LLP
217 Leidesdorff St
San Francisco, CA 94111
(415) 362-6666

Kira A. Davis
DURIE TANGRI LLP
953 East 3rd Street
Los Angeles, CA 90013
(213) 992-4499

John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
kkeller@shawkeller.com
*Attorneys for Plaintiffs*

Dated: June 3, 2022

# TABLE OF CONTENTS

I. INTRODUCTION ....1

II. NATURE AND STAGE OF PROCEEDINGS ....2

III. SUMMARY OF ARGUMENT ....2

IV. STATEMENT OF FACTS ....4

A. mRNA Vaccines ....4

B. Plaintiffs and The Asserted Patents ....5

C. Moderna's Knowledge of Plaintiffs' LNP Patents ....5

D. Moderna's Unauthorized Use of Plaintiffs' LNP Technology ....6

E. Acts of Infringement Alleged in the Complaint ....7

V. LEGAL STANDARD ....8

VI. ARGUMENT ....9

A. Moderna Has Not and Cannot Establish, Particularly at the Pleading Stage, That the Acts of Infringement Alleged in the Complaint Were "For the Government" Under 28 U.S.C. § 1498(a) ....9

1. An Infringing Act is Not "For the Government" Under Section 1498(a) Unless the Government Itself was a Direct Beneficiary ....9

2. The Complaint Plausibly Alleges That Moderna's Infringing Sales Were Not "For the Government" ....12

3. The Complaint Plausibly Alleges That Moderna's Inducement of, and Contribution to, Infringing Uses By Healthcare Providers and Individual Vaccine Recipients Was Not "For the Government" ....15

4. At the Very Least, Moderna's Motion is Premature ....17

B. Moderna Cannot Establish at the Pleading Stage That Its Infringement was with the Government's "Authorization or Consent" Under 28 U.S.C. § 1498(a) ....18

VII. CONCLUSION ....20

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Advanced Software Design Corp. v. Fed. Rsrv. Bank of St. Louis*,
583 F.3d 1371 (Fed. Cir. 2009)....12, 17, 18

*Arlton v. Aerovironment, Inc.*,
No. 2:20-CV-07438-AB-GJS, 2021 WL 1589302 (C.D. Cal. Apr. 22, 2021)....20

*Astornet Techs. v. BAE Systems, Inc.*,
802 F.3d 1271 (Fed. Cir. 2015)....16

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....8

*Campbell v. Doe*,
No. CV 12-2750 (SDW), 2017 WL 349289 (D.N.J. Jan. 24, 2017)....8

*Carrier Corporation v. United States*,
534 F.2d 244 (Ct. Cl. 1976)....11

*Delgado v. ILWU-PMA Welfare Plan*,
No. CV 2:18-CV-5539 CBM, 2019 WL 2864427 (C.D. Cal. Apr. 26, 2019)....9

*DelRio-Mocci v. Connolly Properties Inc*.,
672 F.3d 241 (3d Cir. 2012)....3, 8, 13

*Ehrlich v. Alvarez*,
2022 WL 1487021 (3d Cir. May 11, 2022)....20

*Evancho v. Fisher*,
423 F.3d 347 (3d Cir. 2005)....8, 13, 20

*Host Int'l, Inc. v. MarketPlace, PHL, LLC*,
32 F.4th 242 (3d Cir. 2022)....8, 13

*Inman v. Technicolor USA, Inc*.,
No. CIV.A. 11-666, 2011 WL 5829024 (W.D. Pa. Nov. 18, 2011)....19

*In re Adams Golf, Inc. Sec. Litig.*,
381 F.3d 267 (3d Cir. 2004)....17

*In re Chandler*,
56 F.3d 80 (Fed. Cir. 1995)....10

*In re Peregrine Sys., Inc.,*
311 B.R. 679 (D. Del. 2004)....18

*IRIS Corp. v. Japan Airlines Corp.*,
769 F.3d 1359 (Fed. Cir. 2014) ....................2, 9, 14, 19

*IV Sols., Inc. v. United HealthCare Servs., Inc.*,
No. CV1609598MWFAGRX, 2017 WL 3018079 (C.D. Cal. July 12, 2017)...........8, 9, 18, 19

*Larson v. United States*,
26 Cl. Ct. 365 (1992) ....................3, 10, 11, 12, 14, 16

*Leupold & Stevens, Inc. v. Lightforce USA, Inc.*,
449 F. Supp. 3d 1015 (D. Or. 2020) ....................19

*London v. Delaware Dep't of Corr.*,
No. CV 19-1518-MN-SRF, 2021 WL 3422360 (D. Del. Aug. 5, 2021),
*report and recommendation adopted*, No. CV 19-1518 (MN),
2021 WL 4262458 (D. Del. Sept. 20, 2021)....................19

*Madey v. Duke Univ*.,
307 F.3d 1351 (Fed. Cir. 2002)....................17

*Madey v. Duke Univ.*,
413 F. Supp. 2d 601 (M.D.N.C. 2006) ....................9, 10

*Molinaro v. Watkins-Johnson CEI Division*,
359 F. Supp. 467 (D. Md. 1973)....................14

*Network Managing Sols., LLC v. AT&T Inc.*,
No. CV 16-295-RGA-MPT, 2017 WL 5195863 (D. Del. Nov. 9, 2017),
*report and recommendation adopted sub nom.* ....................9, 18

*Network Managing Sols., LLC v. AT&T Mobility, LLC*,
No. CV 16-295-RGA, 2017 WL 11553316 (D. Del. Dec. 1, 2017)....................9

*Novartis Pharms. Corp. v. Handa Neuroscience, LLC*,
No. CV 21-645-LPS, 2022 WL 610771 (D. Del. Mar. 1, 2022) ....................19

*O'Donnell v. United States*,
No. CIV.A. 04-00101, 2006 WL 166531 (E.D. Pa. Jan. 20, 2006)....................3, 13

*Richmond Screw Anchor Co. v. United States,*
275 U.S. 331 (1928)....................9

*Riles v. Amerada Hess Corp.*,
999 F. Supp. 938 (S.D. Tex. 1998) ....................4, 10, 11, 16, 20

*Saint-Gobain Ceramics & Plastics, Inc. v. II-VI Inc.*,
369 F. Supp. 3d 963 (C.D. Cal. 2019) ....................10

*Schmidt v. Skolas*,
770 F.3d 241 (3d Cir. 2014).....8

*Se. Ready Mix, LLC v. Argos N. Am. Corp.*,
No. 1:17-CV-02792-ELR, 2018 WL 8263138 (N.D. Ga. Aug. 22, 2018).....9, 19

*Sheridan v. United States*,
120 Fed. Cl. 127 *aff'd* 629 F. App'x 948 (Fed. Cir. 2015).....12

*Southmark Prime Plus, L.P. v. Falzone*,
776 F. Supp. 888 (D. Del. 1991).....19

*Stanziale v. Nachtomi (In re Tower Air, Inc.)*,
416 F.3d 229 (3d Cir. 2005).....17

*Thermalon Industries, Ltd. v. United States*,
34 Fed. Cl. 411 (1995).....12

*Toxgon Corp. v. BNFL, Inc.*,
312 F.3d 1379 (Fed. Cir. 2002).....4, 17

*Williams v. Magee*,
No. 1:19-CV-720, 2019 WL 3337085 (M.D. Pa. July 24, 2019).....18

*Windsurfing International v. Ostermann*,
534 F. Supp. 581 (S.D.N.Y. 1982).....11

**Rules and Statutes**

48 C.F.R. § 52.227-1.....19

Fed. R. Evid. § 201(b).....8

28 U.S.C. § 1498(a).....6

35 U.S.C. § 315(e)(2)..... *passim*

**Other Authorities**

Moderna 2021 10-K (2022).....1

## I. INTRODUCTION

Though the COVID-19 pandemic has caused immeasurable human suffering and economic devastation, one company has benefited uniquely from this health crisis, transforming from an impecunious, product-less biotechnology company to a fifty-billion-dollar behemoth that has enriched its shareholders and executives enormously. That company, Moderna, requested and received over a billion dollars in grant assistance from the U.S. government[1] for its efforts to develop a COVID-19 vaccine, which it did by employing key technology invented and patented by others. Moderna then sold hundreds of millions of doses of its infringing COVID-19 vaccine to the U.S. government, for the purpose of distribution to, and use by, the U.S. population as a whole. Having leveraged government grant money to realize eighteen billion dollars in sales in 2021 alone,[2] Moderna was still not satisfied. When the bill for its willful patent infringement came due, by way of this lawsuit asserting, among others, patents that Moderna spent the last three years attempting to invalidate before two different tribunals, Moderna's response was not to accept responsibility or to defend its product or conduct on the merits. Rather, Moderna moved to dismiss part of this case on the misguided basis that, though the billions it received in grants and payments from the U.S. government and credit for the vaccine belong to Moderna and its executives alone, the liability for its blatant patent infringement belongs to the U.S. government.

The law does not countenance that result; it forecloses it. Remarkably, Moderna seeks partial dismissal without citing a shred of authority for the proposition that the requirement of 28 U.S.C. § 1498(a) that the infringement be "for the government" is satisfied where, as here, the U.S. government purchases a product for distribution to, and the benefit of, the population as a whole,

---

[1] *See* Moderna 2021 10-K (2022), at 41. The facts and materials cited in this paragraph are for context only; they are not evidence Plaintiffs ask the Court to consider to decide this motion.
[2] *See id.* at 19.

rather than for the benefit of the U.S. government itself. Even more remarkably, Moderna does not even acknowledge, let alone seek to distinguish, precedent holding squarely that U.S. government-funded sales of a medical product are ***not*** "for the government," and therefore not subject to a defense under section 1498(a), when the government pays for the product for the benefit of the population as a whole rather than for the government itself. Rather than address this precedent that compels denial of its motion, Moderna relies, improperly, on redacted government contracts and cases that do not even implicate the statutory framework at issue—materials that cannot justify partial dismissal as a matter of law. Moderna's motion should be denied.

## II. NATURE AND STAGE OF PROCEEDINGS

On February 28, 2022, Plaintiffs Arbutus Biopharma Corporation ("Arbutus") and Genevant Sciences GmbH ("Genevant") filed a Complaint against Defendants Moderna, Inc. and ModernaTX, Inc. (collectively, "Moderna") seeking damages for Moderna's willful infringement of several patents related to the crucial lipid nanoparticle technology used in Moderna's COVID-19 vaccine. D.I. 1. On May 6, Moderna filed a partial motion to dismiss some unidentified subset of Plaintiffs' claims that relate to sales to the U.S. government pursuant to 28 U.S.C. § 1498(a).

## III. SUMMARY OF ARGUMENT

Whatever section 1498(a) was enacted to promote, it certainly is not Moderna's unprecedented request to shift liability to the U.S. government for vaccine doses administered to private citizens in CVSs, Walgreens, and private medical practices throughout the country. That defense cannot apply unless Moderna satisfies both prongs of section 1498(a)'s two-part test: that the "use or manufacture" of its U.S.-funded vaccine doses was (i) "for the Government" and (ii) with the "authorization or consent" of the government. *See IRIS Corp. v. Japan Airlines Corp.*, 769 F.3d 1359, 1362 (Fed. Cir. 2014). Because section 1498(a) is an affirmative defense, Moderna

bears the burden of establishing both prongs and, at the pleading stage, it must do so based solely on allegations in the Complaint and information amenable to judicial notice.

Moderna cannot meet its burden at all, much less at the pleading stage. On the "for the government" prong, the Complaint alleges that "Moderna's vaccine doses made in the United States and administered in the United States were distributed to hospitals, pharmacies, clinics, and numerous other entities ***for the benefit of individual vaccine recipients in the United States***. All of the manufacturing and sales of vaccines distributed in the United States were ***for the benefit of the American public***." D.I. 1 ("Compl.") ¶ 51 (emphasis added). Moderna ignores these allegations entirely, even though they are controlling at the motion to dismiss stage. *See DelRio-Mocci v. Connolly Properties Inc.*, 672 F.3d 241, 245 (3d Cir. 2012); *O'Donnell v. United States*, No. CIV.A. 04-00101, 2006 WL 166531, at *7 (E.D. Pa. Jan. 20, 2006) (denying motion to dismiss where "the allegations in the complaint, which are controlling at this juncture of the litigation, are to the contrary [of defendant's claims]."). Moderna's position seems to be that the Complaint somehow is irrelevant and that such doses were "for the government" because the government funded them. But that is no more true than it would be for medical treatments purchased for elderly and low-income Americans through Medicare and Medicaid, which a court has concluded is not "for the government" under section 1498(a). *Larson v. United States*, 26 Cl. Ct. 365, 371 (1992).

Even setting aside this infirmity fatal to Moderna's motion, Moderna fails to address the particular allegations of infringement in the Complaint. Those allegations are not limited to the ***sale*** of vaccine doses, but also allege that Moderna infringed by inducing the ***use*** of its infringing COVID-19 vaccine by healthcare professionals and vaccine recipients. Compl. ¶ 16. As to these acts of infringement—use by nurses and pharmacists injecting individuals at nongovernment facilities, like Walgreens, across the nation—the government is nowhere to be found, and the

notion that the infringement is "for the government" in those instances is that much more specious.

Moderna attempts to meet the "authorization or consent" prong by using a heavily redacted copy of its contract with the government that it attaches to its motion. That document is incomplete, devoid of context, and not properly amenable to judicial notice on a motion to dismiss.

As with other affirmative defenses, the Federal Circuit has made clear that "a defense arising under section 1498(a) should be resolved by summary judgment under Rule 56 rather than a motion to dismiss under Rule 12," upon a full factual record. *Toxgon Corp. v. BNFL, Inc.*, 312 F.3d 1379, 1382 (Fed. Cir. 2002). That admonition—also ignored by Moderna—applies more forcefully here, where Moderna's motion ***would not streamline or remove any issue in the case***. By filing a partial motion to dismiss, Moderna acknowledges that, even under its flawed legal framework, not all of its acts of infringement are covered by section 1498(a). The litigation over the remaining doses, which Moderna agrees are not subject to its motion, involves the same issues of infringement, willfulness, validity, and damages as the doses that are subject to its motion.

Section 1498 is not an "insurance plan" for companies that deliberately infringe others' patents for their own benefit. *Riles v. Amerada Hess Corp.*, 999 F. Supp. 938, 940 (S.D. Tex. 1998). This Court should reject Moderna's attempt to make it so and deny its motion.

## IV. STATEMENT OF FACTS

### A. mRNA Vaccines

Moderna's COVID-19 vaccine belongs to a cutting-edge class of medicines that rely on the delivery of bits of messenger ribonucleic acid (mRNA) to the body's cells to instruct them to make certain proteins. Compl. ¶ 2. mRNA-based medicines have long shown great promise but have proven particularly difficult to develop. *Id.* ¶ 3. By their nature, mRNA molecules are fragile and, without adequate protection, quickly degrade in the body. *Id.* For mRNA vaccines like Moderna's to work, they must incorporate a mechanism for protecting the fragile mRNA,

delivering it through cell membranes, and then releasing it inside the cell. *Id.* In the words of one Nobel Prize winning scientist, the secret for making RNA-based products work has always been "delivery, delivery, delivery." *Id.* (citation omitted).

**B. Plaintiffs and The Asserted Patents**

Through years of painstaking effort and investment, scientists at Arbutus eventually found a solution to the mRNA delivery challenge that had vexed experts for years: microscopic particles formed from fat-like molecules—called lipid nanoparticles, or LNPs—which shelter and protect the mRNA and ensure that it is properly released inside target cells. *Id.* ¶¶ 1, 4.

For its groundbreaking work, the United States Patent and Trademark Office (PTO) awarded Arbutus a number of patents, including the six patents asserted here. *Id.* ¶¶ 4, 9. These patents claim nucleic acid-lipid particles and lipid vesicles, as well as compositions and methods of using them. *Id.* ¶¶ 9, 29. Arbutus has licensed Exclusive Rights to sublicense, practice, and sue for infringement of these patents to Plaintiff Genevant (a company spearheaded by former Arbutus scientists) in certain fields that include the vaccine application at issue here, with certain exceptions not relevant to this case. *Id.* ¶¶ 9, 30.

**C. Moderna's Knowledge of Plaintiffs' LNP Patents**

Moderna has long been aware of Arbutus's LNP-related patents. *Id.* ¶ 6. In 2015, Moderna attempted to acquire rights to Arbutus's LNP delivery technology through a sublicense from a company called Acuitas Therapeutics. *Id.* ¶ 32. Acuitas had licensed Arbutus's LNP technology in 2012 under a license agreement that expressly limited Acuitas's ability to grant sublicenses. *Id.* That limitation prohibited Acuitas from granting the sublicense that it granted to Moderna. *Id.*

After learning of the Moderna-Acuitas sublicense agreement in August 2016, Arbutus and Acuitas engaged in legal proceedings in Canada to address whether Acuitas's sublicense to Moderna constituted a breach of the Arbutus-Acuitas agreement. *Id.* ¶ 33. The parties eventually

reached a settlement that barred Moderna from using Arbutus's LNP technology, except for four specific sublicenses for vaccines targeting specific viruses. SARS-CoV-2, the virus that causes COVID-19, is not among those surviving sublicenses. *Id.* ¶ 34.

Deprived of a broad license to use Arbutus's valuable LNP technology and hoping to use the technology without paying royalties, Moderna began filing *inter partes* review (IPR) petitions requesting that the PTO cancel Arbutus's patents, including some of those asserted here. *Id.* ¶ 35. The PTO rejected many of Moderna's arguments and the U.S. Court of Appeals for the Federal Circuit rejected Moderna's attempts to reverse those decisions. *Id.* ¶¶ 37, 38. Thus, the validity of many of the claims asserted in this case already has been confirmed by both the PTO and Federal Circuit. *Id.* Moderna's unsuccessful challenges have a clear and important consequence in this case: Moderna now cannot raise any invalidity defense in this case that it raised or could have raised in those proceedings. 35 U.S.C. § 315(e)(2).

### D. Moderna's Unauthorized Use of Plaintiffs' LNP Technology

Several years after Moderna filed its first IPR petition, with the novel SARS-CoV-2 virus quickly spreading around the world, scientists identified the virus's complete genetic sequence and posted it on the internet. Compl. ¶ 39. With that information, pharmaceutical companies, including Moderna, began developing a COVID vaccine. *Id.* ¶ 40. Relying on Arbutus's LNP technology covered by the Asserted Patents, Moderna was able to begin producing its COVID-19 vaccine ***within just a few days*** of the SARS-CoV-2 sequence entering the public domain. *Id.* ¶ 41.

Moderna was successful on such an unprecedented timeline because it used LNP technology that was covered by Plaintiffs' patents, as Moderna knew. *See id.* ¶¶ 6-9, 39-50. That technology is no small part of the vaccine's success, either. *See id.* ¶ 5. LNPs identified through Arbutus's pioneering work have been described as "crucial" to Moderna's COVID-19 vaccine. *Id.* Without the LNPs Arbutus invented to safeguard the mRNA and deliver it into cells, the mRNA

in Moderna's vaccine would degrade before ever reaching the cells it needs to enter, and the vaccine would not work. *Id.*

After FDA authorized emergency use of Moderna's COVID-19 vaccine on December 18, 2020, Moderna began distributing doses in the United States and around the world. *Id.* ¶ 51. As the Complaint alleges, these vaccine doses were distributed to hospitals, pharmacies, clinics, and numerous other entities for the benefit of individual vaccine recipients in the United States. *Id.* Although some of these doses were paid for by the U.S. government, all of the manufacturing and sales of vaccines distributed in the United States were for the benefit of the American public. *Id.*

Since that time, Moderna has enjoyed incredible financial success, virtually entirely based on sales of its COVID-19 vaccine. In 2021, Moderna shipped 807 million doses of its COVID-19 vaccine. *Id.* As of February 24, 2022, Moderna had signed advanced purchase agreements worth approximately $19 billion for all of 2022. *Id.* As of May 6, 2021, Moderna had signed advance purchase agreements covering more than one billion doses. *Id.*

### E. Acts of Infringement Alleged in the Complaint

The Complaint alleges various distinct acts of infringement that Moderna's motion improperly aggregates. The Complaint alleges that Moderna infringed directly, and continues to infringe directly, by manufacturing its vaccine with LNPs covered by the asserted patents for distribution to the American people. *Id.* ¶¶ 70, 89, 108, 130, 154, 173. The Complaint further, and separately, alleges that Moderna has and continues to engage in indirect infringement. That is, Moderna "actively, knowingly, and intentionally has induced, and continues to induce" infringement of the asserted patents by "encouraging others to make and use" its infringing vaccine, *id.* ¶¶ 71, 90, 109, 131, 155, 174, and Moderna has "contributed, and continues to contribute, to" others' infringement of the asserted patents, *id.* ¶¶ 72, 91, 110, 132, 156, 175. Specifically, the Complaint alleges that Moderna induces infringement by individuals who receive

Moderna's vaccine and the healthcare professionals who administer vaccines doses to those individuals. *Id.* ¶¶ 78-79, 97-98, 119-20, 143-44, 162-63, 182-83.

## V. LEGAL STANDARD

When deciding a motion to dismiss under Rule 12(b)(6), the Court must "accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the plaintiff." *Evancho v. Fisher*, 423 F.3d 347, 350 (3d Cir. 2005); *Host Int'l, Inc. v. MarketPlace, PHL, LLC*, 32 F.4th 242, 248 (3d Cir. 2022) ("Surviving a motion to dismiss requires 'only enough facts to state a claim to relief that is plausible on its face.'" (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007))). "A motion to dismiss pursuant to 12(b)(6) may be granted 'only if, accepting all well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, a court finds that plaintiff[']s claims lack facial plausibility.'" *DelRio-Mocci v. Connolly Properties Inc.*, 672 F.3d 241, 245 (3d Cir. 2012) (quotation omitted).

"To decide a motion to dismiss, courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record." *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014). With respect to a contract with a government entity, "[a]lthough that document may be public[ly] available," such a document "goes beyond the type of matter of public record that a court can consider in a motion to dismiss." *Campbell v. Doe*, No. CV 12-2750 (SDW), 2017 WL 349289, at *3 (D.N.J. Jan. 24, 2017) (citing *Schmidt*, 770 F.3d at 249).

A court also may "judicially notice a fact that is not subject to reasonable dispute." Fed. R. Evid. 201(b). While courts can take judicial notice of the fact or existence of a document or its contents, the "truth of the content, and the inferences properly drawn from them . . . is not a proper subject of judicial notice under Rule 201." *IV Sols., Inc. v. United HealthCare Servs., Inc.*, No.

CV1609598MWFAGRX, 2017 WL 3018079, at *2 (C.D. Cal. July 12, 2017); *Network Managing Sols., LLC v. AT&T Inc.*, No. CV 16-295-RGA-MPT, 2017 WL 5195863, at *4 (D. Del. Nov. 9, 2017), *report and recommendation adopted sub nom. Network Managing Sols., LLC v. AT&T Mobility, LLC*, No. CV 16-295-RGA, 2017 WL 11553316 (D. Del. Dec. 1, 2017) ("Taking judicial notice of the truth of the documents' contents could breach the boundaries of judicial notice.").

In addition, courts regularly decline to take judicial notice of redacted documents because "redactions make[] it difficult to evaluate the contract holistically." *IV Sols., Inc.*, 2017 WL 3018079, at *3; *see also Delgado v. ILWU-PMA Welfare Plan*, No. CV 2:18-CV-5539 CBM, 2019 WL 2864427, at *2 (C.D. Cal. Apr. 26, 2019) (denying judicial notice of "highly redacted" documents where parties "hotly-dispute[d] many of the facts allegedly established" by the documents); *Se. Ready Mix, LLC v. Argos N. Am. Corp.*, No. 1:17-CV-02792-ELR, 2018 WL 8263138, at *9 n.13 (N.D. Ga. Aug. 22, 2018) ("[T]he Court declines to take judicial notice of the contents of the Agreement as the attached version is heavily redacted.").

## VI. ARGUMENT

### A. Moderna Has Not and Cannot Establish, Particularly at the Pleading Stage, That the Acts of Infringement Alleged in the Complaint Were "For the Government" Under 28 U.S.C. § 1498(a)

#### 1. An Infringing Act is Not "For the Government" Under Section 1498(a) Unless the Government Itself was a Direct Beneficiary

Section 1498 is a World War I-era statute enacted to ensure that the government could procure and use weapons that met the military's particular specifications and requirements. *See Madey v. Duke University*, 413 F. Supp. 2d 601, 606 (M.D.N.C. 2006) (citing *Richmond Screw Anchor Co. v. United States,* 275 U.S. 331, 345 (1928)). Under 1498(a), a "use is 'for the Government' if it is 'in furtherance and fulfillment of a stated Government policy' which serves the Government's interests and which is 'for ***the Government's*** benefit.'" *Japan Airlines*, 769

F.3d at 1362 (quoting *Madey*, 413 F. Supp. 2d at 607) (emphasis added). To qualify, the government benefit must be direct. *Id.* ("[I]ncidental benefit to the government is insufficient . . . ."). Thus, "[w]hen the Government authorizes an 'action' by a third party, it is not therefore liable for *any* infringement the third party may choose to undertake within the sphere of the authorized activity," but rather only for infringement "actually done for the United States Government." *Riles*, 999 F. Supp. at 941. "[T]he purpose of § 1498 dictates that its strongest protection should be extended to contractors who sell military goods to the government"—for use by the government. *Saint-Gobain Ceramics & Plastics, Inc. v. II-VI Inc.*, 369 F. Supp. 3d 963, 976 (C.D. Cal. 2019).

Applying these principles, the United States Claims Court[3] held in *Larson v. United States* that the government's payment for medical products for use by American citizens is not "for the government" under section 1498(a)—even where the government "funds or reimburses all of part of" their cost. 26 Cl. Ct. at 369. There, the issue was whether the government was liable for a private contactor's patent infringement in making splints and casts paid for by Medicare. The court held it was not: "Medical care is provided for the benefit of the patient, not the government," and so the "use of plaintiffs' casts and splints was for the benefit and convenience ***of the patient and provider, with no benefit to the government***." *Id.* (emphasis added).

It is telling that Moderna does not even acknowledge *Larson*, a case that addresses squarely the crucial issue here—whether the government's payment for medical care products used by individual citizens constitutes infringement "for the government" under section 1498(a). Indeed, not a single case Moderna cites involves that inquiry. The fact that *Larson* involved a statutory scheme where the government reimbursed, rather than directly purchased, the medical products at

[3] Now called the Court of Federal Claims. *See In re Chandler*, 56 F.3d 80 (Fed. Cir. 1995).

issue was immaterial to the court's reasoning. The court held that medical care provided for citizens is not "for the government" under section 1498(a) regardless of whether the government "***funds*** or reimburses" its cost. 26 Cl. Ct. at 369 (emphasis added). And, just as in *Larson*, where the government "neither require[d], recommend[ed], nor suggest[ed] that providers use particular types, models, or brand names of casts and splints," *id.* at 367, there is no evidence that the government here required or recommended that Americans opt for Moderna's COVID-19 vaccine over any other FDA-authorized or approved option.

Outside of the medical-care context, courts regularly hold that a government's policy interest underlying a purchase of goods—even if important—does not render such purchase "for the government" under section 1498(a). In *Windsurfing International, Inc. v. Ostermann*, the court held that the U.S. Olympic Committee's purchase and use of a patented sailboard for the U.S. windsurfing team was not a use "for the government" because "[w]hile the United States has great interest in the running of the Olympics generally," "[t]his indirect interest is simply too remote from the purposes underlying § 1498 to support the conclusion that the use of sailboards . . . is use 'for' for the United States entitling the patentee to sue the government for compensation." 534 F. Supp. 581, 588 (S.D.N.Y. 1982). Likewise, in *Carrier Corporation v. United States*, the court held that a government contractor's use of a patented device to remove refuse was not a use "by the Government" because "if there was any use of plaintiff's patented invention, such use was by the contractor and not by the Government." 534 F.2d 244, 247 (Ct. Cl. 1976). And in *Riles v. Amerada Hess Corporation*, the court held that the fact the government received a royalty from defendant's oil-drilling activities on federal land did not render defendant's use of a patented drilling method "for the government" under section 1498(a). 999 F. Supp. 938, 940 (S.D. Tex. 1998). Rather, even though the royalty benefited the government, that benefit was incidental and

did not render the accused infringement itself "for the government." *See id.*; *see also Sheridan v. United States*, 120 Fed. Cl. 127, 131, *aff'd*, 629 F. App'x 948 (Fed. Cir. 2015) ("Where benefits to the Government are merely an incidental effect of private conduct, they do not constitute 'use or manufacture for the Government' within the meaning of § 1498." (citing *Advanced Software Design Corp. v. Fed. Rsrv. Bank of St. Louis*, 583 F.3d 1371, 1379 (Fed. Cir. 2009))).

Rather than confront the principle articulated in these cases, Moderna's brief seeks to misdirect the Court, suggesting that *Thermalon Industries, Ltd. v. United States*, 34 Fed. Cl. 411 (1995), applies section 1498(a) to the government's purchase of vaccines to eradicate a specific disease. Mot. at 12. Though preceded by a "*Cf*" citation, Moderna's brief does not advise that *Thermalon Industries* has nothing whatsoever to do with the scope of section 1498(a). Instead, though it mentions section 1498 in passing, that case addresses only whether the government had executed a contract for purposes of Court of Federal Claims jurisdiction under a different statutory ground, the Tucker Act, which is governed by a different legal standard. *Thermalon Industries* manifestly did not address the question of whether the government's financial contribution to the purchase of goods used for medical care satisfies the section 1498(a) mandate for sales "for the government." That Moderna chose to suggest otherwise by way of citation to that case, while ignoring the *Larson* precedent that actually addresses section 1498(a), is, charitably put, revealing.

### 2. The Complaint Plausibly Alleges That Moderna's Infringing Sales Were Not "For the Government"

Under the applicable legal standard, Moderna cannot meet its burden at the pleading stage to show that the government-funded sales of its vaccine—let alone the use by private healthcare workers and individual vaccine recipients, addressed in section VI.A.3—were "for the government."

As the Complaint alleges, "Moderna's vaccine doses made in the United States and

administered in the United States were distributed to hospitals, pharmacies, clinics, and numerous other entities ***for the benefit of individual vaccine recipients in the United States***. All of the manufacturing and sales of vaccines distributed in the United States were ***for the benefit of the American public***." Compl. ¶ 51 (emphasis added). The American people—including private citizens who lined up at drug stores, grocery stores, medical clinics, and hospitals—were the recipients and beneficiaries of the vaccine doses the government purchased. Although Moderna, remarkably, ignores these allegations altogether in its motion, they must be accepted as true, and they are dispositive at the motion to dismiss stage. *See Evancho*, 423 F.3d at 350; *Host Int'l, Inc.*, 32 F.4th at 248; *DelRio-Mocci*, 672 F.3d at 245; *O'Donnell*, 2006 WL 166531, at *7 (denying motion to dismiss where "the allegations in the complaint, which are controlling at this juncture of the litigation, are to the contrary [of defendant's claims]").

The redacted contract that Moderna improperly asks the Court to consider in deciding its motion to dismiss (*see* Section VI.B, *infra*) is not to the contrary. Even accepting it at face value and weighing it against the Complaint's allegations—something this Court cannot do at the pleading stage—the redacted contract provides no basis to refute the Complaint's allegations that the sales of Moderna's vaccine to the government were for the benefit of the individual vaccine recipients, not the government itself. The unredacted portions of the contract merely emphasize the importance of the goal of finding an effective COVID-19 vaccine, Mot. at 11-12, and in fact state that the agreement is "for the United States Government . . . ***and the US population***," with the goal of providing "***nationwide access*** [to the vaccine] as soon as a positive efficacy signal is obtained," *id.* (quoting Mot. Ex. A at 19 C.1.1.1) (emphasis added). Far from conclusively establishing that the intended beneficiary of the contract was the government itself, these excerpts (to say nothing of the additional evidence to which Plaintiffs and the Court lack access, *see* Section

VI.A.4) underscore that the beneficiary of this medical product, as in *Larson*, was the American public.

Eliding this fact, Moderna attempts to shift focus to the importance of the government's policy goal in purchasing COVID-19 vaccines. It posits that, "[s]hort of war, it is difficult to conceive of a situation more within the heart of Section 1498 than the COVID-19 crisis." Mot. at 10. That assertion is unaccompanied by any citation, with good reason: it finds no support anywhere in the law. As the cases above make clear, the lynchpin of the "for the government" inquiry is not whether the infringement at issue implicates an important policy interest or goal of the U.S. government, the standard Moderna invented out of whole cloth and applies throughout its motion. Rather, the legally relevant question, avoided assiduously by Moderna, is whether ***the government itself*** is the beneficiary of that infringing conduct. *See, e.g.*, *Japan Airlines*, 769 F.3d at 1362; *Molinaro v. Watkins-Johnson CEI Div*., 359 F. Supp. 467, 470 (D. Md. 1973). In that regard, the vaccine sales at issue are nothing like the archetypal section 1498(a) application to military equipment sold to the government, for use by and for the direct benefit of the government. Nor are they even like the sale of desks or windows for use in a government office building.

Under Moderna's invented standard, every government-funded product used to advance any policy goal Congress articulates, or any emergency or "war" it declares—from cancer drugs to fight the war on cancer, to IV needles to fight the war on HIV, to condoms to fight teen pregnancy—would be subject to the draconian liability shield of section 1498(a). No court has so held, and Moderna's argument here would expand the section 1498 defense so dramatically that it would, in essence, permit infringement with impunity for any product purchased, subsidized, or reimbursed by the government with any connection, no matter how tenuous, to any of the innumerable policy goals the government has articulated. That is not the law. As *Larson* and the

cases cited above make clear, "[t]he fact that the government has an interest in the program generally, or funds or reimburses all or part of its costs, is too remote to make the government the program's beneficiary for purposes underlying § 1498." 26 Cl. Ct. at 369. That is especially true in the context of treating and preventing disease. "Medical care is provided for the benefit of the patient, not the government." *Id.* Neither does Moderna point to any authority for the proposition that a national emergency or state of so-called "war" is pertinent to whether the government's funding or reimbursement of vaccines for the general population is "for the government" under section 1498(a). *See* Mot. at 10, 11. The existence of an emergency, even if artificially labelled a "war," does not transform the government into more than an "incidental" beneficiary.

### 3. The Complaint Plausibly Alleges That Moderna's Inducement of, and Contribution to, Infringing Uses By Healthcare Providers and Individual Vaccine Recipients Was Not "For the Government"

Even were Moderna correct that it can escape liability for its sales to the government (it cannot), Moderna neither acknowledges nor provides any basis to invoke the section 1498(a) defense for the distinct acts of infringement alleged in the Complaint—Moderna's inducement of, and contribution to, infringement by healthcare providers and individual vaccine recipients. In particular, the Complaint alleges that Moderna "actively, knowingly, and intentionally has induced, and continues to induce" infringement of the asserted patents by "encouraging others to . . . use" its infringing COVID-19 vaccine and encouraging healthcare professionals to administer it. Compl. ¶¶ 71, 90, 109, 131, 155, 174. As the Complaint explains, Moderna markets its vaccine to healthcare professionals and instructs them, via standard labeling, to administer those doses to individual recipients nationwide. *Id.* ¶¶ 78-79, 97-98, 119-20, 143-44, 162-63, 182-83. Moderna sought and obtained FDA emergency use authorization and later full-fledged approval for its vaccine for this particular purpose, with the knowledge and intent that the American people would seek and receive its vaccine. *See, e.g.*, *id.* ¶ 16. With respect to these infringing uses (i.e.,

where a healthcare provider injects Moderna's vaccine into a recipient at the local drug store or some other venue), the government plays no role whatsoever, and the notion that this infringement is "for the government" is as implausible as it is unsubstantiated in Moderna's motion.

To the extent Moderna addresses this issue, which independently mandates denial of its motion, it does so on a perfunctory basis in a section entitled "Plaintiffs' Indirect Infringement Allegations Are Also Subject to Section 1498(a)." Mot at 14. That section is utterly bereft of analysis or discussion of how uses of a vaccine by healthcare providers and individual recipients at a CVS possibly could be for the government's direct benefit. And the legal analysis it does include only confirms the inapplicability of section 1498. As Moderna itself explains, "[s]ection 1498 bars indirect infringement claims when the underlying act of infringement is performed by or for the Government," citing as supportive authority *Astornet Technologies*, a case involving use of patented technology ***by the Transportation Security Administration***. Mot. at 14 (citing *Astornet Techs. v. BAE Systems, Inc.*, 802 F.3d 1271, 1277-78 (Fed. Cir. 2015)).

The problem for Moderna is that the "underlying act of infringement" here—unlike in *Astornet Technologies*—is not "performed by or for the government," as Moderna acknowledges is required to invoke section 1498 against a claim of indirect infringement. Rather, it is performed by nongovernmental healthcare providers at grocery stores, drug stores, and doctors' offices across the nation, administering the infringing vaccine into millions of individuals' arms. The government is nowhere to be found in this infringing use. Although the government has subsidized the individuals' infringing use, Moderna provides no basis to contend that these healthcare providers and individuals are acting "for the government," because there is none. Rather, individuals are receiving vaccines for their own benefit, at the direction of Moderna's instructions for use of its infringing product. *See Larson*, 26 Cl. Ct at 269; *Riles*, 999 F. Supp. at 941.

Accordingly, Moderna's section 1498(a) defense cannot succeed as to the Complaint's allegations of infringing uses by healthcare providers and individual vaccine recipients as a matter of law.

**4. At the Very Least, Moderna's Motion is Premature**

Moderna's motion is not only fatally flawed on the merits, it is also plainly premature. Section 1498(a) is an affirmative defense. As the Third Circuit repeatedly has made clear, "affirmative defenses generally will not form the basis for dismissal under Rule 12(b)(6)." *Stanziale v. Nachtomi (In re Tower Air, Inc.)*, 416 F.3d 229, 242 (3d Cir. 2005); *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 277 (3d Cir. 2004) ("[A]n affirmative defense may not be used to dismiss a plaintiff's complaint under Rule 12(b)(6)."). In the specific context of this provision, the Federal Circuit has confirmed that "a defense arising under section 1498(a) should be resolved by summary judgment under Rule 56 rather than a motion to dismiss under Rule 12." *Toxgon*, 312 F.3d at 1382; *see also Advanced Software Design Corp.,* 583 F.3d at 1375 ("When raised between private parties, reliance on § 1498(a) is deemed an affirmative defense.").

That rule makes good sense, particularly here. Discovery may shed light on a host of factual questions impacting the applicability of section 1498(a). For example, Plaintiffs will take discovery on such issues as: (i) the complete and unredacted terms of Moderna's contract with the government and any other related agreements and communications; (ii) the negotiations that culminated in the terms of those agreements; (iii) the nature and extent of the government's involvement in the development and specifications of the vaccine, if any, *cf. Madey v. Duke Univ.*, 307 F.3d 1351, 1359 (Fed. Cir. 2002) (reversing and remanding dismissal order in part for further findings on whether university's research grant activities were "for the government"); (iv) how the purchased doses were distributed and to whom—whether to customers of drug stores, grocery stores, private medical practices, or on military bases; and (v) Moderna's and the government's respective understandings of who were the true beneficiaries of the contract, *see Advanced*

*Software Design Corp.*, 583 F.3d at 1376-78 (analyzing correspondence between private party and government agencies in deciding applicability of 1498(a) defense). This information may further demonstrate the inapplicability of section 1498(a).

Moderna has provided no reason to short-circuit this discovery and deprive the Court of a full record when deciding this important issue. Because Moderna filed only a partial motion to dismiss, the relief Moderna seeks here would not remove any issue of infringement, validity, willfulness, or damages from the case. At most, it would change only the quantum of damages. So regardless of the disposition of Moderna's motion, the parties will have to litigate every stage of the merits claim. No count would be dismissed, no issue would be removed, and no discovery relating to validity or infringement would be avoided.

### B. Moderna Cannot Establish at the Pleading Stage That Its Infringement was with the Government's "Authorization or Consent" Under 28 U.S.C. § 1498(a)

Moderna also cannot meet its burden to establish the "authorization or consent" prong of section 1498(a) at the pleading stage, a failure that independently merits denial of its motion. Here, again, Moderna relies on a selective excerpt of a heavily redacted contract with the government.

In so doing, Moderna plainly exceeds the bounds of what is proper on a motion to dismiss. While courts may take judicial notice of the fact or existence of a document or its contents, "[t]he truth of the content, and the inferences properly drawn from them . . . is not a proper subject of judicial notice under Rule 201." *IV Sols.*, 2017 WL 3018079, at *2; *see also Network Managing Sols., LLC*, 2017 WL 5195863, at *4 ("Taking judicial notice of the truth of the documents' contents could breach the boundaries of judicial notice."); *In re Peregrine Sys., Inc.*, 311 B.R. 679, 692 (D. Del. 2004) (same).[4] Yet, both here and on the "for the government" prong, Moderna asks

[4] None of the cases Moderna cites are to the contrary. *See Williams v. Magee*, No. 1:19-CV-720, 2019 WL 3337085, at *4 (M.D. Pa. July 24, 2019) (judicial notice of which entity provided

the Court to find truth in, and draw inferences from, the limited portions of the heavily redacted Exhibit A that are visible. With good reason, courts regularly decline to take judicial notice of redacted documents when deciding a motion to dismiss. *IV Sols.*, 2017 WL 3018079, at *2-3; *Phillips*, 2020 WL 3128595, at *3; *Se. Ready Mix, LLC*, 2018 WL 8263138, at *9.

Thus, while it is true that an unredacted portion of Exhibit A incorporates the FAR 52.227-1 authorization and consent clause, Mot. at 12-13 (citing Ex. A at 46), neither the Court nor Plaintiffs have any way of understanding the full context of that statement, which may have been modified, limited, or conditioned in the redacted parts of Exhibit A—or in another document entirely. As just one potential example, the government may have clarified that its authorization or consent does not apply to willful patent infringement by Moderna, which is what Plaintiffs allege here. Indeed, a court has declined even to grant summary judgment where, as here, the information of record was insufficient to preclude factual questions as to whether FAR 52.227-1 actually applied to the contracts at issue, despite being invoked specifically in several of them. *See Leupold & Stevens, Inc. v. Lightforce USA, Inc.*, 449 F. Supp. 3d 1015, 1021 (D. Or. 2020).

In that regard, it is telling that the government has not filed a Statement of Interest in this case or otherwise indicated to the Court that it agrees with Moderna that Plaintiffs' claims fall within the ambit of section 1498(a). While not dispositive, courts frequently look to the government's position for evidence on the "authorization or consent" prong. *See Japan Airlines*,

---

services to the government under a contract); *Inman v. Technicolor USA, Inc.*, No. CIV.A. 11-666, 2011 WL 5829024, at *4 (W.D. Pa. Nov. 18, 2011) (judicial notice of website user agreement where plaintiff's complaint relied on website but not specifically user agreement); *London v. Delaware Dep't of Corr.*, No. CV 19-1518-MN-SRF, 2021 WL 3422360, at *7 (D. Del. Aug. 5, 2021), *report and recommendation adopted*, No. CV 19-1518 (MN), 2021 WL 4262458 (D. Del. Sept. 20, 2021) (judicial notice of website showing fact of a job vacancy at a government agency); *Novartis Pharms. Corp. v. Handa Neuroscience, LLC*, No. CV 21-645-LPS, 2022 WL 610771, at *4 (D. Del. Mar. 1, 2022) (judicial notice of certain facts in securities filings); *Southmark Prime Plus, L.P. v. Falzone*, 776 F. Supp. 888, 892 (D. Del. 1991) (judicial notice of "facts").

769 F.3d at 1363 (noting "that the United States has unequivocally stated its position that suit under § 1498(a) is appropriate here"); *Arlton v. Aerovironment, Inc.*, No. 2:20-CV-07438-AB-GJS, 2021 WL 1589302, at *9 (C.D. Cal. Apr. 22, 2021) ("[T]he Government also filed a Statement of Interest in this case providing express consent to the accused activities.").[5]

As with the "for the government" prong, Moderna has failed to meet its burden to establish that the "authorization or consent" prong applies at the pleading stage.

## VII. CONCLUSION

For the above reasons, "accept[ing] as true all allegations and all reasonable inferences" in the Complaint, *Evancho*, 423 F.3d at 350, Plaintiffs' claims against Moderna do not "lack facial plausibility," *Ehrlich v. Alvarez*, 2022 WL 1487021, *2 (3d Cir. May 11, 2022). Although Moderna's decision to file this motion without legal support is at first blush perplexing, there is a simple explanation: Moderna's preferred defense to the infringement claims asserted here—that the patents are obvious—has failed both before the PTO and the Federal Circuit, and it is estopped statutorily from raising that defense against the claims upheld in those proceedings. With its arsenal nearly empty, Moderna beseeches the Court to expand the section 1498(a) defense, hoping that it can escape liability so the government can attempt to advance defenses Moderna cannot. Put another way, were Moderna's substantive defenses viable, it likely would not attempt to shift liability to the very government that enriched it enormously. Section 1498 is not Moderna's "insurance plan" for its willful infringement of Plaintiffs' patents, *Riles*, 999 F. Supp. at 940.

---

[5] Moderna also cites a Declaration from its Senior Vice President and Deputy General Counsel, Shaun Ryan, stating his belief that Moderna's sales to the government "are subject to 28 U.S.C. 1498(a)." Mot. 6-7 n.6. Needless to say, Moderna's in-house attorney's untested, self-serving beliefs about the scope of section 1498(a) do not justify dismissal. That is a question for the Court or jury to decide, on the basis of a full record that includes discovery and cross-examination.

/s/ *Karen E. Keller*
John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
kkeller@shawkeller.com
*Attorneys for Plaintiffs*

OF COUNSEL:
David I. Berl
Adam D. Harber
Thomas S. Fletcher
Jessica Palmer Ryen
Denis R. Hurley
Lydia B. Cash
WILLIAMS & CONNOLLY LLP
680 Maine Avenue S.W.
Washington, DC 20024
(202) 434-5000

Daralyn J. Durie
Eric C. Wiener
DURIE TANGRI LLP
217 Leidesdorff St
San Francisco, CA 94111
(415) 362-6666

Kira A. Davis
DURIE TANGRI LLP
953 East 3rd Street
Los Angeles, CA 90013
(213) 992-4499

Dated: June 3, 2022

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **ARBUTUS BIOPHARMA CORPORATION and GENEVANT SCIENCES GMBH,** | : | **CIVIL ACTION** |
| **Plaintiffs,** | : | |
| **v.** | : | |
| **MODERNA, INC. and MODERNATX, INC.,** | : | **NO. 22-252** |

**MEMORANDUM**

**Goldberg, J.** **November 2, 2022**

During the course of the COVID-19 pandemic, Defendants Moderna, Inc. and ModernaTX, Inc. (collectively, "Moderna") brought to market an mRNA-based vaccine in an effort to combat the effect of the COVID-19 virus. Plaintiffs Arbutus Biopharma Corporation ("Arbutus") and Genevant Sciences GmbH ("Genevant") (collectively "Plaintiffs") claim that, in order for the vaccine to succeed, Moderna used a revolutionary lipid nanoparticule ("LNP") delivery platform—created and patented by Plaintiffs—without paying for it or requesting a license.

On February 28, 2022, Plaintiffs filed suit seeking compensation for the use of the patented technology they claim to have developed. On May 6, 2022, Moderna filed a partial Motion to Dismiss, arguing that to the extent Plaintiffs seek royalties on the sale and provision of COVID-19 Vaccine doses to the United States Government, such claims can only proceed in the Court of Federal Claims and must be dismissed from this Court. For the following reasons, I will deny Moderna's Motion.[1]

[1] On May 18, 2017, then Chief Judge D. Brooks Smith of the United States Court of Appeals for the Third Circuit designated me as a visiting judge for the District of Delaware, pursuant to 28 U.S.C. § 292(b), to handle this matter and other District of Delaware cases.

## I. FACTUAL BACKGROUND

The following facts are taken from Plaintiff's Complaint.[2]

### A. General Background Regarding Virus Vaccines

As explained in the Complaint, viruses are typically described as small packets of deoxyribonucleic acid ("DNA") or ribonucleic acid ("RNA"). If a virus enters a living host cell, the virus's DNA or RNA can hijack the cell's machinery and instruct the cell to make copies of the virus. These copies, often numbering into the millions, leave the infected cell and enter other cells where the process repeats. Infected cells can be damaged or die while hosting the virus, and, left unchecked, the host organism itself can die. Vaccines traditionally work by injecting into the body a weakened or inactive form of the virus that is unable to cause infection, but nonetheless retains features of the infectious virus and can teach the immune system to recognize and attack the infectious virus it if it invades in the future. (Id. ¶¶ 19–20.)

Moderna's COVID-19 vaccine belongs to a new class of medicines that deliver nucleic acids into the cells of the body to treat diseases or trigger an immune response to protect a person from future infection. Nucleic acids are molecules that encode the genetic information essential to sustain life. One type of nucleic acid is DNA, which is found within chromosomes and contains genetic information. In order to make the protein encoded by a particular gene, the cell first converts the genetic code in the gene's DNA into another type of nucleic acid known as messenger ribonucleic acid, or "mRNA," which is effectively a copy of the portion of DNA that the cell's protein-making machinery uses as a blueprint to assemble the protein encoded by the gene. (Id. ¶¶ 21–23.)

[2] In deciding a motion under Federal Rule of Civil Procedure, the court must accept all factual allegations in the complaint as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading, the plaintiff may be entitled to relief. See Erickson v. Pardus, 551 U.S. 89, 93–94 (2007).

Vaccines using RNA technologies are an emerging frontier in medicine to address many previously intractable diseases and new viruses. RNA-based medicines, however, have been difficult to develop because RNA molecules are fragile and, without adequate protection, are susceptible to degradation in the body. For decades, the need for an effective delivery technology had been the most significant challenge in the development of RNA-based products since, without the means to protect the mRNA, mRNA-based vaccines have been ineffective. (Id. ¶¶ 24–25.)

**B. Plaintiffs' Invention**

Plaintiffs allege that functional RNA-based medicines eluded researchers until the work by Plaintiffs' scientists. After years of research, Plaintiffs developed lipid nano-particle ("LNP") technology that relies on fat-like molecules called lipids to encapsulate and protect nucleic acids like mRNA from degradation in the body. Once inside, the LNP releases the nucleic acid so that it can express the protein it encodes. The lipid components of Plaintiffs' technology include structural lipids, such as phospholipids and cholesterol; "cationic" (positive charge-bearing) lipids, including "ionizable" lipids that are positive charge-bearing at certain pH levels; and conjugated lipids, which are lipids attached to a polymer such polyethyleneglycol ("PEG"). (Id. ¶¶ 26–27.)

Plaintiffs' scientists' efforts led to the first FDA-approved RNA-based therapeutic in the form of a drug called Onpattro®, used to treat a rare disease called amyloidosis. The company that developed Onpattro® did so under an LNP license from Plaintiffs. Building on this initial success, Plaintiffs have granted licenses for its LNP technology to other companies. From 2011 to 2021, the United States Patent and Trademark Office ("PTO") issued to Plaintiffs six different patents for its LNP-based inventions. (Id. ¶ 28–29.)

**C. The Alleged Infringement and Related Litigation**

According to the Complaint, Moderna has been on actual notice of Plaintiffs' patents before development of its COVID-19 vaccine, the "Accused Product" in this matter. Indeed, in May 2015, Moderna attempted to acquire rights to Plaintiffs' LNP delivery technology for four specific viral targets

through sublicense from a Canadian company called Acuitas Therapeutics ("Acuitas"). Although Acuitas had licensed the LNP technology in 2012, its license agreement limited its ability to grant sublicenses. Nonetheless, Acuitas granted Moderna the sublicense. In August 2016, after learning of the sublicense agreements, Plaintiffs notified Acuitas of material breach, and Acuitas filed suit in the Supreme Court of British Columbia seeking to prevent Plaintiffs from terminating the license. In February 2018, Plaintiffs and Acuitas settled their dispute and agreed that Acuitas could no longer use the LNP technology except for the specific sublicenses given to Moderna for vaccines targeting specific viruses remaining in effect. SARS-CoV-2, the virus that causes COVID-19, was not among the surviving sublicenses. (Id. ¶¶ 31–34.)

Moderna then began filing *inter partes* review ("IPR") petitions, requesting that the PTO cancel certain of Plaintiffs' patents, including some asserted here. Although the first IPR petition was successful, the remaining IPR petitions were not. (Id. ¶¶ 35–38.)

On January 10, 2020, with the novel SARS-CoV-2 virus quickly spreading around the world, scientists identified the virus's complete genetic sequence and posted it for free on the internet, thus revealing the complete RNA sequence that encodes the virus's components, including its distinctive "spike protein." With that information in the public domain, researchers around the world, including Moderna, begin designing vaccines to target the virus. (Id. ¶ 39.)

Relying on Plaintiffs' LNP technology covered by the Asserted Patents, Moderna was able to begin producing its COVID-19 vaccine within just a few days of the genomic sequence entering the public domain. Moderna's success was unprecedented. On February 24, 2020, Moderna shipped clinical drug product, and, less than one month later, Phase I trials began. Plaintiffs contend that Moderna's COVID-19 vaccine could not have been developed on such a short timeline without Plaintiffs' proven and patented LNP delivery technology. Plaintiffs further allege that published articles and statements released by Moderna explicitly showed Moderna's use of Plaintiff's patents. (Id. ¶¶ 41–49.)

Moderna's distribution of its Accused Product and its administration to persons in the United States and worldwide commenced around December 18, 2020, immediately after the FDA granted Moderna's COVID-19 vaccine an Emergency Use Authorization ("EUA"). In 2021, Moderna shipped 807 million doses, and, as of February 2022, Moderna had signed advance purchase agreements worth approximately $19 billion for all of 2022. The Complaint alleges that the vaccine doses made and administered in the United States were distributed to hospitals, pharmacies, clinics, and numerous other entities for the benefit of individual vaccine recipients in the United States. (Id. ¶ 51.)

On June 1, 2021, Moderna announced that it had initiated the FDA process for a Biologics License Application ("BLA")—full-fledged licensure of its COVID-19 vaccine. The FDA approved the BLA on January 31, 2022. As of February 24, 2022, the vaccine had received at least emergency authorization from more than seventy countries. Moderna has contracted with a number of companies around the world to manufacture its COVID-19 vaccine, including companies that employ facilities in the United States. (Id. ¶¶ 52–54.)

Plaintiffs claim that they did not seek to inhibit development and distribution of the vaccine but only requested fair and reasonable compensation. As such, they proposed that Moderna pay for a mutually acceptable license, but Moderna has declined to engage meaningfully in licensing discussion, necessitating this lawsuit. (Id. ¶¶ 55–61.)

On February 28, 2022, Plaintiffs filed suit alleging infringement of six different patents, prompting Modern to file the partial motion to dismiss currently pending before me. [3]

## II. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 12(b)(6), a defendant bears the burden of demonstrating that the plaintiff has not stated a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6); see

[3] The Complaint seeks damages for all sales of the COVID-19 Vaccine within the United States. Moderna's Motion to Dismiss addresses only those sales that were made to the United States Government and does not seek dismissal of claims relating to any other sales.

also Hedges v. United States, 404 F.3d 744, 750 (3d Cir. 2005). The United States Supreme Court has recognized that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quotations omitted). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" and "only a complaint that states a plausible claim for relief survives a motion to dismiss." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. A complaint does not show an entitlement to relief when the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct. Id.

The United States Court of Appeals for the Third Circuit has detailed a three-step process to determine whether a complaint meets the pleadings standard.[4] Bistrian v. Levi, 696 F.3d 352 (3d Cir. 2014). First, the court outlines the elements a plaintiff must plead to state a claim for relief. Id. at 365. Next, the court must "peel away those allegations that are no more than conclusions and thus not entitled to the assumption of truth." Id. Finally, the court "look[s] for well-pled factual allegations, assume[s] their veracity, and then 'determine[s] whether they plausibly give rise to an entitlement to relief.'" Id. (quoting Iqbal, 556 U.S. at 679). The last step is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. (quoting Iqbal, 556 U.S. at 679).

## III. DISCUSSION

Moderna contends that it contracted with the Government for production and delivery of the vaccine for use in combatting the pandemic. It presses that, under 28 U.S.C. § 1498(a), any infringement claims relating to a Government contract must be litigated exclusively in the Court of Federal Claims.

[4] The Federal Circuit applies the law of the circuit in which the district court sits to nonpatent issues such as the standard for motions to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). In re TLI Commc'ns LLC Patent Litig., 823 F.3d 607, 610 (Fed. Cir. 2016).

Accordingly, Moderna seeks dismissal, under Federal Rule of Civil Procedure 12(b)(6),[5] of any of Plaintiffs' infringement claims premised on Moderna's sale and provision of COVID-19 vaccine doses to the United States Government.

28 U.S.C § 1498(a) provides:

> Whenever an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without license of the owner thereof or lawful right to use or manufacture the same, the owner's remedy shall be by action against the United States in the United States Court of Federal Claims for the recovery of his reasonable and entire compensation for such use and manufacture. Reasonable and entire compensation shall include the owner's reasonable costs, including reasonable fees for expert witnesses and attorneys, in pursuing the action if the owner is an independent inventor, a nonprofit organization, or an entity that had no more than 500 employees at any time during the 5-year period preceding the use or manufacture of the patented invention by or for the United States. Not[]withstanding the preceding sentences, unless the action has been pending for more than 10 years from the time of filing to the time that the owner applies for such costs and fees, reasonable and entire compensation shall not include such costs and fees if the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.
>
> For the purposes of this section, the use or manufacture of an invention described in and covered by a patent of the United States by a contractor, a subcontractor, or any person, firm or corporation for the Government and with the authorization of the consent of the Government, shall be construed as use or manufacture for the United States.

Id. at § 1498(a).

The "intention and purpose of Congress" in enacting this statute was "to stimulate contractors to furnish what was needed" by the government, "without fear of becoming liable themselves for infringements to inventors or the owners or assignees of patents." Richmond Screw Anchor Co. v. United States, 275 U.S. 331, 345 (1928). "Th[is] provision provides a cause of action against the United

---

[5] Since section 1498(a) is an affirmative defense rather than a jurisdictional bar, a court may not dismiss such an action under Federal Rule of Civil Procedure 12(b)(1). Toxgon Corp. v. BNFL, Inc., 312 F.3d 1379, 1382 (Fed. Cir. 2002).

States (waiving sovereign immunity) for a patent owner to recover damages for the unauthorized use or manufacture of a patented invention '*by or for* the United States." Astornet Techs. Inc. v. BAE Sys., Inc., 802 F.3d 1271, 1277 (Fed. Cir. 2015) (internal quotations omitted) (emphasis in original). Section 1498 "creates an independent cause of action for direct infringement by the Government or its contractors that is not dependent on 35 U.S.C. § 271(a)." Zoltek Corp. v. United States, 672 F.3d 1309, 1326–27 (Fed. Cir. 2012). For claims that fall within the statute's ambit, the remedy against the United States is exclusive. Astornet, 802 F.3d at 1277.[6]

Section 1498(a) establishes an affirmative defense, not a jurisdictional bar. Manville Sales Corp. v. Paramount Sys., Inc., 917 F.2d 544, 554 (Fed. Cir. 1990). A section 1498 affirmative defense is a highly factual determination. Saint-Gobain Ceramics & Plastics, Inc. v. II-VI, Inc., 369 F. Supp. 3d 963, 970 (C.D. Cal. 2019). A defendant bears the burden of establishing that "(1) the [infring]ing use is 'for the Government' and (2) the [infringing] use is 'with the authorization and consent of the Government.'" Sevenson Envt'l Servs., Inc. v. Shaw Envt'l, Inc., 477 F.3d 1361, 1365 (Fed. Cir. 2007).

### A. "For the Government"

The first part of the test under § 1498 is whether the infringing use was "for the Government." "A use is 'for the Government' if it is 'in furtherance and fulfillment of a stated Government policy' which serves the Government's interests and which is 'for the Government's benefit.'" BAE Sys. Info. & Elec. Sys. Integration Inc. v. Aeroflex Inc., No. 09-cv-769, 2011 WL 3474344, at *9 (D. Del. Aug. 2, 2011) (quoting Madey v. Duke Univ., 413 F. Supp. 2d 601, 607 (M.D.N.C. 2006)). The Federal Circuit has remarked that this prong is satisfied where "the use or manufacture of a patented method or apparatus occur[s] pursuant to a contract with the government and for the benefit of the government." Sevenson, 477 F.3d at 1365. The Government's benefit need not be the "primary purpose" of a government contract. Id. at 1365. Likewise, the Government need not be the sole beneficiary. IRIS Corp. v. Japan

[6] Federal Circuit law applies to issues of substantive patent law. In re Spalding Sports Worldwide, Inc., 203 F.3d 800, 803 (Fed. Cir. 2000).

Airlines Corp., 769 F.3d 1359, 1362 (Fed. Cir. 2014) (quoting Advanced Software Design Corp. v. Fed. Reserve Bank of St. Louis, 583 F.3d 1371, 1378 (Fed. Cir. 2009)). This provision must be applied on a "case-by-case basis to determine whether a use meets the articulated statutory requirements." Madey, 413 F. Supp. 2d at 607.

Nonetheless, "[i]ncidental benefit to the government is insufficient." IRIS Corp. v. Japan Airlines Corp., 769 F.3d 1359, 1361 (Fed. Cir. 2014). Moreover, a governmental grant of authorization or consent, standing alone, does not mean that the alleged use or manufacture is done "for the United States" under § 1498(a). Id. at 1362. "Even where 'the government has an interest in the program generally, or funds or reimburses all or part of [that program's] costs,' the Government's interest is too remote 'to make the government the program's beneficiary for the purposes underlying § 1498.'" Sheridan v. United States, 120 Fed. Cl. 127, 131 (Fed. Cl. 2015) (quoting Larson v. United States, 26 Cl. Ct. 365, 369 (1992)).

Here, Moderna alleges that, under its contract with the United States Government, its supply of the COVID-19 vaccine is for the benefit of the Government and thus § 1498(a) is applicable. Moderna reasons that, in August 2020, the Government used its emergency powers to contract with Moderna to supply doses of the COVID-19 vaccine. (Def.'s Ex. A.) [7] The Contract notes that the novel coronavirus had spread globally resulting in an outbreak in the United States, which constituted a national emergency. (Id. § C.1.1.) The Contract further provides that, "[t]he Department of Defense and Health and Human Services (HHS) require large scale manufacturing of vaccine doses in support of the national

[7] The Contract is a public document published on the internet at https://www.hhs.gov/sites/Default/files/moderna-covid-19-vaccine-contract.pdf. Federal Rule of Evidence 201(b) permits a district court to take judicial notice of facts that are "not subject to reasonable dispute" in that they are either (1) "generally known within the territorial jurisdiction of the trial court" or (2) "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Courts regularly take notice of similar documents, particularly federal government or federal agency documents published on websites or otherwise. See U.S. ex rel. Spay v. CVS Caremark Corp., 913 F. Supp. 2d 125, 140 (E.D. Pa. Dec. 20, 2012) (citing cases).

emergency response to the Coronavirus Disease 2019 (COVID-19) for the United States Government (USG) and the US population." (Id. § C.1.) Specifically, the Contract states:

> Under Operation Warp Speed (OWS), the Department of Defense and HHS are leading a whole of nation effort to ensure development of promising vaccine, diagnostic and therapeutic candidates and ensure that these medical countermeasures are available in the quantities required to reduce SARS-CoV-2 transmission, identify prior and/or current infection, and improve patient care, thereby mitigating the impact of COVID-19 on the nation and its people. The DoD Joint Program Executive Office for Chemical, Biological, Radiological and Nuclear Defense (JPEO-CBRD) is providing expertise and contracting support to HHS, in compliance with PL 115-92 Authorization Letter for DoD Medical Priorities, through an Interagency Agreement, signed April 23, 2020. As OWS products progress to clinical trials to evaluate the safety and efficacy of vaccines and therapeutics, it is critical that, in parallel, the USG supports large scale manufacturing so that vaccine doses or therapeutic treatment courses are immediately available for nationwide access as soon as a positive efficacy signal is obtained and the medical countermeasures are authorized for widespread use.

(Id. § C.1.1.1.)

Moderna contends that this contract language unequivocally demonstrates that its production of the COVID-19 vaccine was "for the Government." It claims that it supplied, and continues to supply, COVID-19 vaccine doses to the U.S. Government for the Government to achieve a specific government objective, *i.e.*, supporting a nationwide vaccination effort.

Plaintiffs respond that for the infringing acts to be "for the Government," the Government benefit must be direct and not merely incidental. Thus, when the Government authorizes third-party action, it is not liable for any infringement caused by the third party, but rather only for the infringement actually done for the U.S. Government. Under this standard, Plaintiffs claim that Moderna cannot meet its burden at the pleading stage to show that the government-funded sales of the vaccine were "for the Government." Plaintiff presses that the Complaint alleges that the infringing acts were not for the *Government's* benefit, but rather for the benefit of individual vaccine recipients in the United States, *i.e.*, the American people. (See Compl. ¶ 51 ("Moderna's vaccine doses made in the United States and administered in the United States were distributed to hospitals, pharmacies, clinics, and numerous other

entities for the benefit of individual vaccine recipients in the United States. All of the manufacturing and sales of vaccines distributed in the United States were for the benefit of the American public.").) According to Plaintiffs, the Contract between Moderna and the Government is not contrary as it merely emphasizes the importance of the goal in finding an effective COVID-19 vaccine.

In Advanced Software Design Co. v. Fed. Reserve Bank of St. Louis, 583 F.3d 1371 (Fed. Cir. 2009), the Federal Circuit considered what constituted a use "for the government." There, the United States Treasury required privately owned and operated Federal Reserve Banks to use a certain "seal encoding" system to identify fraudulent bank checks. Id. at 1373. Subsequently, the plaintiff sued three Federal Reserve Banks and the company that supplied their fraud detection technologies, alleging that the use of the mandatory seal encoding system constituted infringement of its patented methods. Id. The Federal Circuit found that the Government benefitted from averting fraud in Treasury checks and in saving Treasury resources through more efficient technology. Id. at 1378. Affirming the district court's grant of judgment for the plaintiff, the court noted that "the benefits to the government of using the seal encoding technology on Treasury checks are not incidental effects of private interests." Id. at 1379.

Similarly, in Saint-Gobain Ceramics & Plastics, Inc. v. II-VII Inc., 369 F. Supp. 3d 963 (C.D. Cal. 2019), the plaintiff filed an infringement suit against defendants based on defendants' manufacturing and sale of single crystal sapphire sheets used in the manufacture of windows for aircrafts. Following discovery, defendants moved for summary judgment raising a defense under § 1498. Id. at 966–67. In granting summary judgment, the United States District Court for the Central District of California found that defendants' research and development of the sapphire sheets was "for the government" in order to fulfill the window panel contracts defendants had executed with government contractor, Lockheed Martin, and that defendants sold their sapphire sheets exclusively to the United States Government through Lockheed Martin. Id. at 980. Although the court recognized that defendants

stood to benefit financially from developing the capability to grow sapphire sheets, it noted that, for § 1498(a) to be triggered, the United States did not need to be the sole beneficiary. Id.

By contrast, the United States Claims Court[8] reached the opposite conclusion in Larson v. United States, 26 Cl. Ct. 365 (Cl. Ct. 1992). There, the plaintiffs were the owner of patents for splints used in treating patients for broken bones, strains, arthritis, and burn injuries, as well as for application of the split to the patient under certain specified conditions. Id. at 367. Health care providers participating in the government programs of Medicare, Medicaid, and the Civilian Health and Medical Program for the Uniformed Services used the plaintiff's splints in medical treatment, the costs of which were reimbursed by the government programs. Id. The plaintiffs argued that the language of the Medicare Act supported the assertion that the infringing activity was "for" the benefit of the government because the government has an interest in providing treatment to certain segments of the population and it received a benefit from services reimbursed under Medicare. Id. at 369. The Claims Court disagreed, finding that "[m]edical care is provided for the benefit of the patient, not the government." Id. It reasoned that "[a]ny use of plaintiffs' casts and splints was for the benefit and convenience of the patient and provider, with no benefit to the government. The fact that the government has an interest in the program generally, or funds or reimburses all or part of its costs, is too remote to make the government the program's beneficiary for the purposes underlying § 1498." Id.

At this early stage of the litigation, I find this case more akin to Larson than Advanced Software Design or Saint-Gobain Ceramics. Based on the allegations of the Complaint, which I must accept as true, the development and sale of the vaccines was for the benefit of the vaccine's recipients. According to the Complaint, the U.S. Government was an incidental beneficiary who bore an interest in ensuring the safety of its citizens. As Plaintiffs convincingly note, to credit Moderna's argument based on the

---

8 In the Court of Federal Claims Technical and Procedural Improvements Act of 1992, the statute substituted the "Court of Federal Claims for the "Claims Court." See Keene Corp. v. United States, 508 U.S. 200, 206 n.2 (1993).

preamble language of the contract—a contract produced here only in redacted form—could mean that every government-funded product used to advance any policy goal articulated by the U.S. Government-—such as IV needles to fight HIV to cancer drugs to fight the war on cancer—would be subject to a § 1498(a) defense. This is particularly true in this case where the race to develop a COVID-19 vaccine may have occurred even in the absence of Government involvement and was simply expedited by the national effort to hasten the process.

Absent clear language, either in the Complaint or the Contract, establishing that the development of the vaccine was "for the Government," I find that this dispute is not appropriate for resolution in a Rule 12(b)(6) motion. As noted above, section 1498(a) is an affirmative defense rather than a jurisdictional bar. Toxgon Corp. v. BNFL, Inc., 312 F.3d 1379 (Fed. Cir. 2002). Accordingly, the moving party bears the burden of proving that defense, and, if appropriate, a § 1498(a) dispute should be resolved by summary judgment rather than on a motion to dismiss. Id. at 1382–83. Consistent with this principle, every case cited by the parties on this issue resolved the matter on a motion for summary judgment, after the parties had taken discovery, and not on motions to dismiss.[9] Such an issue cannot be resolved without some inquiry into the full and complete terms of the contract regarding

[9] In its reply brief, Moderna cites cases wherein the court granted Rule 12(b)(6) motions to dismiss claims under § 1498(a). These cases do not undermine the general principle that an analysis under § 1498(a) is a highly factual inquiry that *generally* should not be resolved on a motion to dismiss. Nor do these cases detract from the fact that the vast majority of § 1498(a) arguments are resolved on summary judgment motions.

Indeed, upon review, the cases cited by Moderna are aligned with these precepts. In IRIS Corp. v. Japan Airlines Corp., 769 F.3d 1359, 1363 (Fed. Cir. 2014), the district court placed heavy reliance on the facts that (a) the contract at issue involved a "uniquely governmental function" and (b) the Government had "unequivocally stated its position that suit under § 1498(a) is appropriate." Id. at 1363. In D3D Technologies, Inc. v. Microsoft Corp., No. 20-cv-1699, 2021 WL 2194601, at *1 (M.D. Fla. Mar. 22, 2021), the district court, in a truncated analysis, observed that the complaint explicitly conceded that the alleged infringing technology was developed pursuant to a contract with the United States Army to supply the Army with augmented reality technology. Id. at *2. Finally, in Astornet Technologies Inc. v. BAE Systems, Inc., 802 F.3d 1271, 1277–78 (Fed. Cir. 2015), the complaint alleged no claims of direct infringement against the defendant, but rather pled only indirect infringement based solely on the Government's use—through the Transportation Security Administration—of the alleged infringing technology. Accordingly, there was no factual dispute that the alleged infringement was "for the Government." Id.

compensation for the vaccine, the parties' negotiations, and the parties' understandings as to the precise beneficiaries. While discovery may reveal that all, some, or none of the alleged infringing activity was "for the Government," the limited record appropriate for consideration at this stage does not allow me to make any such determination.

**B. With the "Authorization and Consent" of the Government**

I also decline to find that Moderna has unequivocally met its Rule 12(b)(6) burden of establishing that the alleged infringement was with the "authorization and consent" of the Government. Under § 1498, the "authorization and consent" of the government may be express or implied. Golden v. United States, 137 Fed. Cl. 155, 175 (Fed. Cl. 2018); TVI Energy Corp v. Blane, 806 F.2d 1057, 1060 (Fed. Cir. 1986). "When the Government provides express consent, that consent may be very broad, extending to any patented invention and any infringing use, or may be limited to only certain patented inventions or to only those uses that are necessary or are specifically consented to by the Government." Madey, 413 F. Supp. 2d at 608. "Where . . . a government contract contains an explicit authorization and consent clause (and the parties have alleged no alternative source for government authorization and consent), the scope of the government's authorization and consent to liability naturally hinges on the language of that clause." Sevenson, 477 F.3d at 1366–67. "For example, the government may give its authorization or consent to patent infringement by including in a contract 'instructions, . . . specifications[,] or drawings which impliedly sanction and necessitate infringement.'" Power Density Solutions LLC v. United States, 159 Fed. Cl. 208, 214 (Fed. Cl. 2022) (quoting Hughes Aircraft Co. v. United States, 534 F.2d 889. 901 (Ct. Cl. 1976)).

An implied authorization to infringe may be found where: "(1) the government expressly contracted for work to meet certain specifications; (2) the specifications cannot be met without infringing on a patent; and (3) the government had some knowledge of the infringement." Larson, 26 Cl. Ct. at 370. "Even when the government expressly consents to infringement in order to perform a government contract, a government contractor's use of a patented device d[oes] not constitute authorization or

consent where the choice of the device was the contractor's and where there was nothing in the contract that could not be performed without using the device." Id. at 370–71 (citing Carrier Corp. v. U.S., 534 F.2d 678, 247–48 (Ct. Cl. 1976)). "Implied government consent to infringement has been found only where particular government specifications required a particular patent infringement." Windsurfing Int'l, Inc. v. Ostermann, 534 F. Supp. 581, 588 (S.D.N.Y. 1982).

Here, Moderna argues that the Government explicitly authorized and consented to Moderna's manufacture and sale of the COVID-19 vaccine. The contract incorporates by reference Federal Acquisition Regulation 48 C.F.R. § 52.227-1(a) (2020), which states that "[t]he Government authorizes and consents to all use and manufacture, in performing this contract or any subcontract at any tier, of any invention described in and covered by a United States patent—(1) [e]mbodied in the structure or composition of any article the delivery of which is accepted by the Government under this contract . . ." Id. Moderna presses that because the LNPs covered by Plaintiffs' patents are part of and embodied in the "structure or composition" of the COVID-19 vaccine covered by the contract, the Government has given its authorization and consent to the alleged infringement.

Although the incorporation of FAR 52.227-1 in contracts has been deemed to constitute "authorization and consent," see Saint-Gobain Ceramics & Plastics, Inc. v. II-VII Inc., 369 F. Supp. 3d 963, 980 (C.D. Cal. 2019), even express authorization and consent may be limited by other clauses in a contract. Golden v. United States, 137 Fed. Cl. 155, 172 (Fed. Cl. Ct. 2018). The contract before me here is incomplete and heavily redacted. While Moderna posits that all of the relevant portions of the contract are available, any ruling as to authorization and consent would be premature given that it remains unsettled whether the Government, in seeking to hasten the development of a vaccine, actually consented to the use of a patented invention and agreed to accept any liability for such use. Moreover, unlike many of the cases in which the courts find authorization and consent based on the inclusion of FAR 52.227-1 in the contract, the Government has not filed any statement of interest indicating its express consent to the accused activities. See, e.g., Arlton v. Aerovironment, Inc., No. 20-cv-7438, 2021

WL 1589302, at *9 (C.D. Cal. Apr. 22, 2021) (finding "authorization and consent" prong met where Government filed a statement of interest in the case providing express consent to the accused activities). Given that "authorization and consent" prong is best considered under a more fully developed record, I decline to resolve this issue here.

Accordingly, Moderna's Motion to Dismiss will be denied. An appropriate Order follows.

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**DISTRICT OF DELAWARE**

| | |
|---|---|
| ARBUTUS BIOPHARMA CORPORATION AND GENEVANT SCIENCES GMBH,<br><br>Plaintiffs,<br><br>v.<br><br>MODERNA, INC. and MODERNATX, INC.<br><br>Defendants. | C.A. No. 22-252 (MSG) |

**STATEMENT OF INTEREST OF THE UNITED STATES**


DAVID C. WEISS
United States Attorney

MICHAEL GRANSTON
Deputy Assistant Attorney General

GARY L. HAUSKEN
Director

PHILIP CHARLES STERNHELL
Assistant Director

HAYLEY A. DUNN
KAVYASRI NAGUMOTU
Trial Attorneys
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Washington, DC 20530
Telephone: (202) 307-0342
Facsimile: (202) 307-0345
Email: Gary.L.Hausken@usdoj.gov
Philip.C.Sternhell@usdoj.gov
Hayley.A.Dunn@usdoj.gov
Kavyasri.Nagumotu@usdoj.gov


February 14, 2023

# TABLE OF CONTENTS

I. THE INTEREST OF THE UNITED STATES ........ 1

II. BACKGROUND ........ 3

III. ANALYSIS ........ 5

## TABLE OF AUTHORITIES

**Cases**

*Adv. Software Design Corp. v. Fed. Rsrv. Bank of St. Louis*,
583 F.3d 1371 (Fed. Cir. 2009) ............................................................ *passim*

*Bereslavsky v. Esso Stand. Oil Co.*,
175 F.2d 148 (4th Cir. 1949) ............................................................ 7

*Carrier Corp. v. United States*,
534 F.2d 244 (Ct. Cl. 1976) ............................................................ 8, 9

*Cramp & Sons Ship & Engine Bldg. Co. v. Int'l Curtis Marine Turbine Co.*,
246 U.S. 28 (1918) ............................................................ 5

*Croll-Reynolds Co. v. Perini-Leavell-Jones-Vinell*,
399 F.2d 913 (5th Cir. 1968) ............................................................ 9

*Hughes Aircraft Co. v. United States*,
534 F.2d 889 (Ct. Cl. 1976) ............................................................ 7, 8, 10

*IRIS Corp. v. Japan Airlines Corp.*,
769 F.3d 1359 (Fed. Cir. 2014) ............................................................ 7, 11

*Larson v. United States*,
26 Cl. Ct. 365 (1992) ............................................................ 11, 12

*Leesona Corp. v. United States*,
599 F.2d 958 (Ct. Cl. 1979) ............................................................ 6

*Madey v. Duke Univ.*,
307 F.3d 1351 (Fed. Cir. 2002) ............................................................ 5

*Madey v. Duke Univ.*,
413 F. Supp. 2d 601 (M.D.N.C. 2006) ............................................................ 8

*Manville Sales Corp. v. Paramount Sys., Inc.*,
917 F.2d 544 (Fed. Cir. 1990) ............................................................ 5

*Richmond Screw Anchor Co. v. United States*,
275 U.S. 331 (1928) ............................................................ 6

*Riles v. Amerada Hess Corp.*,
999 F. Supp. 938 (S.D. Tex. 1998) ............................................................ 8

Case: 26-1581 Document: 6 Page: 612 Filed: 08/21/2026

*S.Corp. v. United States*,
690 F.2d 1368 (Fed. Cir. 1982) ........................................ 6

*Saint-Gobain Ceramics & Plastics, Inc. v. II-VI Inc.*,
369 F. Supp. 3d 963 (C.D. Cal. 2019) ........................................ 9, 10, 11

*Sevenson Env't Servs., Inc. v. Shaw Env't, Inc.*,
477 F.3d 1361 (Fed. Cir. 2007) ........................................ 7, 9

*Sperry Gyroscope Co. v. Arma Eng'g Co.*,
271 U.S. 232 (1926) ........................................ 5

*TVI Energy Corp. v. Blane*,
806 F.2d 1057 (Fed. Cir. 1986) ........................................ 7, 8

**Statutes & Regulations**

28 U.S.C. § 1498 ........................................ *passim*

28 U.S.C. § 517 ........................................ 1

48 C.F.R § 52.227-1, Alternate I ........................................ *passim*

48 C.F.R. § 52.227-1 ........................................ *passim*

Act of June 25, 1910, 61st Cong., 2d Sess., 36 Stat. 851–52 ........................................ 5, 6

Act of October 31, 1942, Pub. L. 768, § 6, 77th Cong. 2d Sess., 56 Stat. 1013, 1014 .................. 6

Naval Appropriations Act of July 1, 1918, 65 Cong. 2d Sess., 40 Stat. 704, 705 .................. 6

**Other Authorities**

2 Bulletin of the Judge Advocate General of the Army, 75–76 (1943) ........................................ 7

5 *Chisum on Patents* § 16.06 (2019) ........................................ 9

The United States (the Government) appears on behalf of its Department of Health and Human Services and Department of Defense pursuant to 28 U.S.C. § 517[1] to inform the Court of its interest in this litigation. The Government is aware of the Court's resolution of Moderna's motion to dismiss, D.I. 31 at 15–16, where the Court noted that the Government had not provided a statement of interest. In light of the Court's hesitance to find authorization and consent absent a statement of interest from the United States, the United States appears to present its position.[2]

## I. THE INTEREST OF THE UNITED STATES

In accordance with 28 U.S.C. § 1498, the United States granted Moderna, Inc. and ModernaTX, Inc. ("Moderna")[3] its "authorization and consent" to manufacture and use inventions covered by United States patents under Contract No. W911QY-20-C-0100 (the '-0100 Contract), which is at issue in this litigation. The Government granted its authorization and consent by inserting the Federal Acquisition Regulation (FAR) clauses 52.227-1 and 52.227-1, Alternate I, in the contract. The Government's acceptance of liability in this instance is limited to the '-0100 Contract and does not extend to all of Moderna's allegedly infringing activity as described in the Complaint.

In pertinent part, section 1498 provides:

---

[1] Section 517 provides, in pertinent part, that "any officer of the Department of Justice[] may be sent by the Attorney General to any … district to attend to the interests of the United States in a suit pending in a court of the United States…or to attend to any other interest of the United States."

[2] The United States is prepared to appear, should the Court have questions regarding this statement of interest or require other assistance with respect to this statement.

[3] For the purposes of this statement of interest, the Government refers to Moderna, Inc. and ModernaTX, Inc. collectively as "Moderna."

> Whenever an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without license of the owner thereof or lawful right to use or manufacture the same, the owner's remedy shall be by action against the United States in the United States Court of Federal Claims for the recovery of his reasonable and entire compensation for such use and manufacture. . . .
>
> . . . .
>
> For the purposes of this section, the use or manufacture of an invention described in and covered by a patent of the United States *by a contractor, a subcontractor, or any person, firm, or corporation for the Government and with the authorization or consent of the Government*, shall be construed as use or manufacture for the United States. . . .

(emphasis added). As explained below, the effect of the Government's "authorization and consent" is to relieve Moderna of any liability for patent infringement resulting in performance of the '-0100 Contract and to transfer to the United States any liability for the manufacture or use of the inventions claimed in the Patents-in-Suit resulting from the authorized and consented acts.[4] Accordingly, and to the extent that liability exists for such acts, the patentee is limited to pursuing a claim against the United States in the Court of Federal Claims pursuant to 28 U.S.C. § 1498.

The inclusion of FAR clauses 52.227-1 and 52.227-1, Alternate I in the '-0100 Contract constitutes the Government's express authorization and consent. Section 1498(a), therefore, provides the exclusive remedy for any infringement occurring in the course of Moderna's performance of the '-0100 Contract. The Government is not aware of any other contract at issue in this litigation where it granted authorization and consent, and therefore its authorization and consent does not extend to any other procurement of vaccine in this litigation beyond what has

[4] As used in this Statement, "liability" is defined as having legal responsibility for any acts that may constitute the alleged infringement; it is not an admission that the vaccine infringes. All issues relating to the merits of Arbutus's claim and the Government's defenses must be presented to, and addressed by, the Court of Federal Claims.

been procured under the '-0100 Contract. Accordingly, claims for infringement in the course of performance of the '-0100 Contract should be dismissed.

## II. BACKGROUND

In response to the SARS-CoV-2 (COVID-19) pandemic, the United States engaged in a multi-agency effort to ensure the availability of medical supplies needed to alleviate shortages and to counteract the contagion; that effort was known as "Operation Warp Speed" (OWS). As part of OWS, the Department of Health and Human Services (HHS) and the Department of Defense (DOD) collaborated to coordinate the nation's efforts to accelerate the development, acquisition, and distribution of COVID-19 vaccines. Pursuant to a memorandum of understanding between HHS and DOD, COVID-19 vaccines were to be procured through contracts issued by DOD, with HHS providing subject-matter expertise and support in inspecting and accepting vaccine deliveries.

On August 11, 2020, the U.S. Army, on behalf of HHS and DOD, executed the '-0100 Contract[5] with ModernaTX, Inc. to purchase production quantities of Moderna's mRNA-1273 vaccine for prevention of COVID-19, which was then under development. *See* D.I. 17-1 at 2. The '-0100 Contract incorporates by reference standardized "authorization and consent" clauses: FAR clauses 52.227-1 (also referred to as the base or "narrow" clause) and 52.227-1, Alternate I (the Alternate I or "broad" clause). D.I. 17-1 at 47. Although there were multiple modifications to that contract, none removed or revised these FAR clauses.

---

[5] The '-0100 Contract contains information that Moderna considers proprietary and other information that may be sensitive government information. We understand that the Court has not issued a protective order in this case. The United States, however, is prepared to produce an unredacted copy of the '-0100 Contract either for the Court's inspection *in camera* or under a suitable protective order, should the Court find it useful.

The base version of FAR clause 52.227-1, 48 C.F.R. § 52.227-1, in pertinent part, provides that "(a) [t]he Government authorizes and consents to all use and manufacture, in performing this contract or any subcontract at any tier, of any invention described in and covered by a United States patent – (1) [e]mbodied in the structure or composition of any article the delivery of which is accepted by the Government under this contract; . . . ." The Alternate I version of FAR clause 52.227-1 is broader in scope than the base version by omitting the requirement that the patented invention be "embodied" in the structure or composition of a delivered article. The Alternate I version provides, in pertinent part: "(a) [t]he Government authorizes and consents to all use and manufacture of any invention described in and covered by a United States patent in the performance of this contract or any subcontract at any tier."

The U.S. Army also entered into Contract No. W58P05-22-C-0017[6] (the '-0017 Contract) on July 28, 2022. This contract procures additional quantities of Moderna's COVID-19 vaccine. The '-0017 Contract contains neither FAR clause 52.227-1 nor FAR clause 52.227-1, Alternate I. The United States has not granted its authorization and consent, either explicitly or by implication, for use of patented inventions in the performance of the '-0017 Contract. To the contrary, the '-0017 Contract contains a special provision, H.14, that states the contracting parties' express agreement that the terms of the contract do not constitute express or implied Government authorization or consent under section 1498.

At this time, the Government is only aware of these two procurement contracts between the Government and Moderna that relate to the purchase of Moderna's mRNA-1273 vaccine at

[6] The '-0017 Contract will be administered by HHS pursuant to a modification recently executed by the parties.

issue here. And, as stated, only the '-0100 Contract grants the Government's authorization and consent.

## III. ANALYSIS

In a suit between private parties, the invocation of 28 U.S.C. § 1498 is an affirmative defense. *Sperry Gyroscope Co. v. Arma Eng'g Co.*, 271 U.S. 232, 235–36 (1926); *Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d 544, 554–55 (Fed. Cir. 1990). However, the Federal Circuit has also recognized that section 1498 "relieves a third party from patent infringement liability, and acts as a waiver of sovereign immunity and consent to liability" by the United States. *Madey v. Duke Univ.*, 307 F.3d 1351, 1359 (Fed. Cir. 2002). The Federal Circuit has noted that these two views of the statute are not inconsistent:

> Without deciding, we see no inconsistency between interpreting section 1498(a) as a jurisdictional statute (waiving sovereign immunity) in suits against the United States and as merely codifying a defense that private parties who are alleged infringers may raise on the merits. That two different effects occur depending on the party raising section 1498(a) is the clear implication of *Sperry* [271 U.S. 232], and the other cases [*Trojan, Inc. v. Shat–R–Shield, Inc.*, 885 F.2d 854 (Fed.Cir.1989), and *W.L. Gore & Associates v. Garlock, Inc.*, 842 F.2d 1275, (Fed.Cir.1988)], read together.

*Manville Sales*, 917 F.2d at 555 n.6. In providing this statement of interest, the United States defines the parameters of its waiver of sovereign immunity with respect to this litigation and the liability that, if proven, the Government has consented to accept.

The origins of section 1498 began with the Act of June 25, 1910, 61st Cong., 2d Sess., 36 Stat. 851–52, which permitted a suit in the Court of Claims to recover for uses of the owner's patent by the Government. That statute was subsequently found to be limited to use of the invention by the Government, but not government contractors. *See Cramp & Sons Ship & Engine Bldg. Co. v. Int'l Curtis Marine Turbine Co.*, 246 U.S. 28, 42, 45 (1918).

Faced with the prospect that patent suits against government contractors may prevent the Government from procuring necessary war materials at the advent of this country's entry into World War I, Congress amended the 1910 Act to provide that the owner could sue to recover for "use or manufacture by or for the United States without license of the owner." Naval Appropriations Act of July 1, 1918, 65 Cong. 2d Sess., 40 Stat. 704, 705. In reviewing the statutory history, the Supreme Court concluded that,

> [t]he purpose of the amendment was to relieve the contractor entirely from liability of every kind for the infringement of patents in manufacturing anything for the government, and to limit the owner of the patent and his assigns and all claiming through or under him to suit against the United States in the Court of Claims[[7]] for the recovery of his reasonable and entire compensation for such use and manufacture.

*Richmond Screw Anchor Co. v. United States*, 275 U.S. 331, 345 (1928); *Leesona Corp. v. United States*, 599 F.2d 958, 967 (Ct. Cl. 1979) (en banc).[8]

The statute was further amended at the beginning of World War II by the Act of October 31, 1942, Pub. L. 768, § 6, 77th Cong. 2d Sess., 56 Stat. 1013, 1014 (The Royalty Renegotiation Act). That Act provided, in pertinent part, that,

> for the purposes of the Act of June 25, 1910, as amended [now section 1498] . . ., the use or manufacture of an invention described in or covered by a patent of the United States by a contractor, a subcontractor, or any person, firm, or corporation for the Government and with the authorization or consent of the Government, shall be construed as use or manufacture for the United States.

The purpose of the "authorization and consent" provision "was to broaden the scope of the act of June 25, 1910, as amended, so to remove any further doubt that subcontractors and other suppliers

---

[7] The trial division of the Court of Claims became the Court of Federal Claims.

[8] Upon its creation, the Court of Appeals for the Federal Circuit adopted "the holdings of the Court of Claims and the Court of Customs and Patent Appeals announced before the close of business on September 30, 1982 . . . within the substantive jurisdiction" of the court as its precedent. *S. Corp. v. United States*, 690 F.2d 1368, 1370 (Fed. Cir. 1982).

of goods and materials to the government were included within the terms of that act to the same extent as prime contractors to the government were . . . ." *Bereslavsky v. Esso Stand. Oil Co.*, 175 F.2d 148, 150–51 (4th Cir. 1949) (quoting 2 Bulletin of the Judge Advocate General of the Army, 75–76 (1943) (internal quotation marks omitted)).

The Federal Circuit reads section 1498 broadly "so as not to limit the Government's freedom in procurement by considerations of private patent infringement." *TVI Energy Corp. v. Blane*, 806 F.2d 1057, 1060 (Fed. Cir. 1986). The structure of the statute describes the conditions that must be met for its invocation. Where the use or manufacture of the invention is "by the Government"—which is not the case here—the application of the statute is automatic and no further inquiry is required. *Hughes Aircraft Co. v. United States*, 534 F.2d 889, 902 (Ct. Cl. 1976) (direct and exclusive control of British satellite for launch in Florida was sufficient to meet "use by the Government").

Where the use or manufacture is "by a contractor, a subcontractor, or any person, firm, or corporation for the Government," a two-part inquiry is employed: whether "(1) the [allegedly infringing] use is 'for the Government' and (2) the [allegedly infringing] use is 'with the authorization and consent of the Government.'" *Sevenson Env't Servs., Inc. v. Shaw Env't Inc.*, 477 F.3d 1361, 1365 (Fed. Cir. 2007).

The "for the Government" requirement is met if the allegedly infringing manufacture or use is "for the benefit of the Government," and not merely an incidental benefit from private activity. *IRIS Corp. v. Japan Airlines Corp.*, 769 F.3d 1359, 1362 (Fed. Cir. 2014); *see also Hughes Aircraft*, 534 F.2d at 897 (equating "for the Government" with "for the Government's benefit"). The Federal Circuit has cautioned against attempting to fathom the "primary purpose" of a contract. *Sevenson Env't*, 477 F.3d at 1365. Rather, the inquiry is focused on whether the

alleged infringing activity is addressed to a policy interest or objective of the United States. *See generally Adv. Software Design Corp. v. Fed. Rsrv. Bank of St. Louis*, 583 F.3d 1371, 1379 (Fed. Cir. 2009) ("benefits to the government of using the seal encoding technology on Treasury checks are not incidental effects" of private activity where the Government participated in providing the Treasury checks with the required technology); *Hughes Aircraft*, 534 F.2d at 898–99, 901 (stating the broad policy objectives of interoperability and common defense of Great Britain and United States were sufficient to meet "for the Government" standard); *cf. Riles v. Amerada Hess Corp.*, 999 F. Supp. 938, 940 (S.D. Tex. 1998) (finding that, while the oil lease may have satisfied "Congressional statements of national policy" of making the offshore oil field available for public use, the oil drilling activities carried out under the lease served only the interests of the lessee).

Under section 1498(a), authorization and consent may be either express or implied. *TVI Energy Corp.*, 806 F.2d at 1060. And "it is plain that the Government can limit its authorization and consent" in its contracts. *Carrier Corp. v. United States*, 534 F.2d 244, 249 (Ct. Cl. 1976). Thus, where the Government expressly states the limits of its authorization and consent in the contract, those limits will generally control. *Id.*; *see also Madey v. Duke Univ.*, 413 F. Supp. 2d 601, 608 (M.D.N.C. 2006) ("When the Government provides express consent, that consent may be very broad, extending to any patented invention and any infringing use, or may be limited to only certain patented inventions or to only those uses that are necessary or are specifically consented to by the Government.").

The '-0100 Contract contains express "authorization and consent" in the form of the well-established FAR clauses 52.227-1 and 52.227-1, Alternate I. Where, pursuant to a contract containing these FAR clauses, the Government accepts goods that allegedly infringe on a patent, those clauses typically "bring[ ] the matter within Section 1498 even if the contract could be

fulfilled with other noninfringing products." *Saint-Gobain Ceramics & Plastics, Inc. v. II-VI Inc.*, 369 F. Supp. 3d 963, 980 (C.D. Cal. 2019) (quoting 5 *Chisum on Patents* § 16.06 (2019)).[9]

As *Sevenson Environmental* further explains, the "for the Government" inquiry collapses into the "authorization and consent" inquiry where the Government directly contracts for goods or services and that contract provides the Government's authorization and consent. 477 F.3d at 1365 ("where infringing activity has been performed by a government contractor pursuant to a government contract and for the benefit of the government, courts have all but bypassed a separate inquiry into whether infringing activity was performed 'for the Government.'"). Accordingly, where the Government elects to include a contract provision expressly providing its authorization and consent, as it has done here, that decision is appropriately viewed as reflecting the Government's determination that the contract is for the Government's benefit.

In this instance, the United States submits that the truncated inquiry is appropriate. The Army procured substantial quantities of mRNA-1273 vaccine during the COVID-19 pandemic. The vehicle for purchasing that vaccine was the '-0100 Contract which contains the broad FAR clause 52.227-1, Alternate I, as well as the narrower base clause 52.227-1. And there is no question here that the Government paid for the vaccine as required by the contract and that the vaccine was delivered in accordance with the contract (indeed, Arbutus's claim of patent infringement presumes that vaccine was manufactured and distributed, and therefore it claims to be damaged). No further "for the Government" inquiry is required under these circumstances: the contract's

---

[9] Where the Government has granted express authorization and consent, the limits of that grant will generally control. *Carrier*, 534 F.2d at 249. To the extent that implied authorization and consent could be found, it would generally act to broaden the scope of the Government's liability, not to restrict it. *See id.* (discussing how the decision in *Croll-Reynolds Co. v. Perini-Leavell-Jones-Vinell*, 399 F.2d 913 (5th Cir. 1968), could be read to expand a "narrow" express authorization and consent clause through implied consent where equipment was specially assembled to comply with contractual provision to cool concrete).

provisions demonstrate that the contract was "for the Government" and therefore "for the benefit of the Government."

Where, as here, the Government directly contracts to procure the allegedly infringing goods or services in a contract that grants authorization and consent, the "benefit to the Government" is inherent. Indeed, the contractor's compliance with the contract's obligations alone demonstrate the benefit: that the Government obtains goods and services for which it pays is alone sufficient to demonstrate the procurement is "for the Government" and "for the benefit of the Government." Consequently, even if the Court chooses to examine the "benefit to the Government" prong, the Government has received the benefit of its contract, namely, procuring the vaccine that it then offered for free public distribution in an effort to thwart the COVID-19 pandemic. *See Hughes Aircraft*, 534 F.2d at 901 (finding benefit in meeting governmental objectives or interests).

Finally, we turn to the authorities and argument presented by the parties and addressed by the Court in its Order, D.I. 31. The Court noted that, given the early stage of this litigation and based on the allegations in the Complaint (which must be taken as true at the motion to dismiss stage), the case before it was more akin to *Larson*, where no authorization and consent was found and any benefit to the Government was merely incidental, rather than *Advanced Software Design* or *Saint-Gobain*, where the Government's authorization and consent was found to be implied or express, and the Government received a benefit. D.I. 31 at 12–13. As explained below, the Government submits that of the three cases discussed, *Saint-Gobain* is on point here and *Advanced Software Design*'s discussion of authorization and consent guides the present inquiry.

Like the present case, *Saint-Gobain* involved express contractual authorization and consent. 369 F. Supp. 3d at 969–70 (stating that contracts by which II-VI Inc. sold products to Lockheed contained an authorization and consent clause, and that Lockheed's prime contracts also

contained an authorization and consent clause). The court found the benefit to the Government was clear because the Government contracted with Lockheed for aircraft, while granting its authorization to Lockheed and its subcontractors. *Id.* The benefit in *Saint-Gobain* was the production of the aircraft that the Government contracted to buy. Indeed, the present case is even clearer in that the Government directly contracted with Moderna to procure a specific vaccine, and there is no intermediate contractor.

On the other hand, in both *Advanced Software Design* and *Larson*, the party claiming the benefit of section 1498 could not point to a contract with the Government. *Adv. Software Design Corp.*, 583 F.3d at 1374 (no contract between Government and Federal Reserve Bank); *Larson v. United States*, 26 Cl. Ct. 365, 367–68 (1992) (government contracts were with carriers and fiscal intermediaries, not doctors). As a result, the courts in those cases had to engage in a more detailed inquiry into whether the Government had granted authorization and consent. *Cf. IRIS Corp*, 769 F.3d at 1362 (providing that "a governmental grant of authorization or consent does not mean that the alleged use or manufacture is done 'for the United States' under § 1498(a)" where the court determined that a *regulatory statute*, rather than a *direct procurement contract*, provided authorization and consent).

In *Larson*, plaintiff owned patents for plastic medical splints. 26 Cl. Ct. at 367. Health care providers participating in government programs including Medicare, Medicaid, and the medical health plan for military families provided medical treatment to patients using splints that allegedly infringed plaintiffs' patents. *Id.* The healthcare providers submitted claims for reimbursement, and the programs "through their carriers and fiscal intermediaries, determine the rates and amounts of payments to providers, and reimburse health care providers for the procedure rendered to the patient." *Id.*

The *Larson* court began by addressing the "authorization and consent" prong. *Id.* at 369. Plaintiffs conceded that the Government had not expressly granted authorization and consent, but asserted implied authorization and consent based on the provision of "reasonable and necessary" medical services to patients that government health plans reimbursed. *Id.* at 370. Based on that record, the trial court found that the Government did not grant its authorization and consent by implication. *Id.* at 371. While the health plans reimbursed "reasonable and necessary" medical services, only "code numbers" were provided to the government programs, the "details of the treatment . . . remain[ed] with the patient and his or her provider." *Id.* In rejecting Larson's argument that the reimbursement of these medical devices was "for the Government" under section 1498, the court noted that the Government "has no interest in the particular medical products used in treatment . . . [and] [t]he fact that the Government has an interest in the program generally, or funds or reimburses all or part of its costs, is too remote to make the Government the program's beneficiary for the purposes underlying § 1498." *Id.* at 369. Moreover, the court noted that "mere reimbursement is not authorization to infringe on patent rights." *Id.* Nor could such authorization to infringe "be reasonably inferred" from the public health statutes at issue in that case. *Id.* at 370. Further, the facts demonstrated that the doctor—not the Government—determined the type of splinting material to be used from a variety of available types. *Id.* at 370–71 (stating that 16 types of splints and casts were available and describing reimbursement of medical expenses as a "billing arrangement"). And, importantly, in *Larson* the Government affirmatively denied the existence of authorization and consent in the litigation.

*Advanced Software Design* also presents a factually different scenario because no contract existed between the Federal Reserve Bank or its supplier and the United States. 583 F.3d at 1376. Nonetheless, the trial court found, and the Federal Circuit affirmed, that the Bank had been granted

the Government's authorization and consent by means of correspondence between the Treasury and the Bank, both before and after the infringement claim arose. *Id.* at 1377. Importantly, in *Advanced Software Design*, the Federal Circuit also recognized that, to the extent that the Government's earlier statements were ambiguous, the Government's appearance and assertion of authorization and consent before that court resolved the issue. *Id.* at 1378.

Under the facts of this case, the sales of the vaccine to the Government pursuant to the terms of the '-0100 Contract, which expressly includes the FAR clauses granting the Government's authorization and consent, satisfy the requirements of 28 U.S.C. § 1498(a) that the procurement was "for the Government" and with its authorization and consent. And to the extent that any doubt otherwise existed, the Government's filing of this statement of interest and confirmation of its authorization and consent should resolve the issue. Accordingly, to the extent that any liability exists for infringement of the Patents-in-Suit by the manufacture or use of vaccine procured under the '-0100 Contract, the patentee is limited to pursuing a claim against the United States in the Court of Federal Claims under 28 U.S.C. § 1498(a).

Respectfully submitted,

DAVID C. WEISS
United States Attorney

MICHAEL GRANSTON
Deputy Assistant Attorney General

GARY L. HAUSKEN
Director

*/s/ Philip Charles Sternhell*
PHILIP CHARLES STERNHELL
Assistant Director

HAYLEY A. DUNN
KAVYASRI NAGUMOTU
Trial Attorneys
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Washington, DC 20530
Telephone: (202) 307-0342
Facsimile: (202) 307-0345
Email: Gary.L.Hausken@usdoj.gov
Philip.C.Sternhell@usdoj.gov
Hayley.A.Dunn@usdoj.gov
Kavyasri.Nagumotou@usdoj.gov

February 14, 2023

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **ARBUTUS BIOPHARMA CORPORATION and GENEVANT SCIENCES GMBH,** | : | |
| | : | **CIVIL ACTION** |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | |
| | : | **NO. 22-252** |
| **MODERNA, INC. and MODERNATX, INC.,** | : | |

**MEMORANDUM OPINION**

**Goldberg, J.** **March 10, 2023**

Context is important. This is particularly so in litigation and in considering the stage of a proceeding. In the patent infringement matter before me, which is at the pleading stage, the parties, now joined by the United States and several *Amici Curiae*, hotly contest the application of 28 U.S.C. § 1498(a). This statute instructs that whenever it is alleged that a patent has been used by the United States in an infringing manner, litigation shall occur in the United States Court of Federal Claims, which is where Defendants Moderna, Inc. and Modernatx, Inc. (collectively, "Moderna") urge that a majority of this case must be decided.

It is well settled that an accused infringer, such as Moderna, bears the burden of establishing under § 1498(a) that the infringing use is "for the Government" and "with authorization and consent of the Government." Sevenson Envt'l Servs., Inc. v. Shaw Envt'l, Inc., 477 F.3d 1361, 1365 (Fed. Cir. 2007). These standards clearly implicate factual considerations, and in the context of the pleading stage of this case, where I am obligated to assume the veracity of the facts pled in the Complaint, weighing facts is inappropriate. Burtch v. Milberg Factors, Inc., 662 F.3d 212, 221 (3d Cir. 2011). Consequently, the Government's recently filed Statement of Interest does not change

my view that Moderna's request to transfer a portion of this matter to the Federal Claims Court is premature and must be denied at this time. My brief reasoning follows.

Most of the necessary background regarding § 1498(a) is set forth in my November 2, 2022 Opinion that addressed Moderna's partial motion to dismiss. That motion asserted that some of Plaintiff's patent infringement claims should proceed in the Court of Federal Claims pursuant to 28 U.S.C. § 1498(a). I denied that request on November 2, 2022, finding that Moderna's Rule 12(b)(6) motion was not an appropriate vehicle to resolve the § 1498(a) issue. Arbutus Biopharma Corp. v. Moderna, Inc., No. 22-cv-252, 2022 WL 16635341, at *7–8 (D. Del. Nov. 2, 2022). Following submission of the parties' Answers and Counterclaims, I set a Rule 16 scheduling conference to be held on February 16, 2023.

Two days prior to that conference, the United States Government filed a Statement of Interest, asserting that any doses of the vaccine produced by Moderna pursuant to the terms of Contract No. W911QY-20-0100 (the '-0100 Contract) were "for the Government" and "with the authorization and consent of the Government." During the Rule 16 conference, counsel for the parties and the Government (who I invited to participate) addressed the import of this Statement of Interest. Letter briefs, including those of *Amici*, have subsequently been submitted and considered.

As set out in my November 2, 2022 Opinion, § 1498(a) establishes an affirmative defense, not a jurisdictional bar. Manville Sales Corp. v. Paramount Sys., Inc., 917 F.2d 544, 554 (Fed. Cir. 1990). Importantly, I also noted that a § 1498(a) affirmative defense presents a highly factual determination. Toxgon Corp. v. BNFL, Inc., 312 F.3d 1379, 1382–83 (Fed. Cir. 2002). Viewing as true the well-pled facts in the Complaint, I found that Moderna had not established as a matter of law that § 1498(a) applied, and that the issue was best resolved after discovery.

Moderna continues to press its point that § 1498(a) requires transfer of part of this case to the Court of Federal Claims. Now, heavily relying on the recently filed Statement of Interest,

Moderna urges that, "the Government is in the best position to decide what is for its benefit." (Moderna Letter brief, p. 2.) But neither the Government nor Moderna have provided any authority suggesting that the Government's interpretation of § 1498(a) trumps a court's analysis of this issue. And I note that the very contract that Moderna relies upon also states that vaccine was to be developed to "improve *patient care*," thereby "mitigating the impact of COVID-19 on the nation and *its people*." (D.I. 17-1, Ex. A (emphasis added)); see Larson v. United States, 26 Cl. Ct. 365 (Cl. Ct. 1992) ("[M]edical care is provided for the benefit of the patient, not the government.").

While the Statement of Interest does point to certain evidence that Moderna's sales under the '-0100 Contract may have been with the "authorization and consent" of the Government, Moderna offers no evidence that sales were "for the Government" which is also a necessary factor under §1498(a). But in any event, examination of evidence in the context of Fed. R. Civ. P. 12(b)(6) is not proper. Rather, I will consider the § 1498(a) issue after both parties have engaged in discovery, which will provide Plaintiff an opportunity to review the entire unredacted version of the '-0100 Contract and discover facts regarding that Contract.

The recent submissions by the parties underscore why discovery on this issue is needed. Moderna originally moved to dismiss Plaintiffs' claims as to *all* of its sales of COVID-19 vaccine doses to the U.S. Government. But now, both the Government and Moderna acknowledge that claims regarding sales under a second Government contract (W58P05-22-C-0017 (the '-0017 Contract)) were not with the authorization and consent of the Government and should not be dismissed. Had I granted the relief Moderna sought in its original motion to dismiss, this fact would not have come to light and the relief ordered could have been incorrect. Discovery is necessary to ensure that any application of § 1498(a) is based upon developed facts and not solely on the Government's say-so.

I reaffirm the analysis and conclusions set forth in my November 2, 2022 Memorandum Opinion and again conclude that the Complaint should not be partially dismissed based on 28 U.S.C. § 1498(a). An appropriate Order follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| ARBUTUS BIOPHARMA CORPORATION and GENEVANT SCIENCES GmbH,<br><br>Plaintiffs,<br><br>v.<br><br>MODERNA, INC. and MODERNATX, INC.,<br><br>Defendants. | ) | C. A. No. 22-252-MSG<br><br>**JURY TRIAL DEMANDED**<br><br>**HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY - FILED UNDER SEAL** |

**AMENDED COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiffs Arbutus Biopharma Corporation ("Arbutus") and Genevant Sciences GmbH ("Genevant") file this Complaint seeking patent infringement damages against Defendants Moderna, Inc. and ModernaTX, Inc. (collectively, "Moderna") and allege the following:

**INTRODUCTION**

1. The impact of the COVID-19 pandemic, one of the greatest public health challenges in modern history, would be immeasurably worse but for the rapid, widespread availability of cutting-edge mRNA-based vaccines like Moderna's. Moderna brought its vaccine from lab bench to arms in record speed. That unprecedented accomplishment was made possible by Moderna's use of breakthrough technology Arbutus had already created and patented—a revolutionary lipid nanoparticle ("LNP") delivery platform that took the scientists of Arbutus years of painstaking work to develop and refine. Moderna was well aware of Arbutus's LNP patents and licensed them for other product programs, but it chose not to do so for its COVID-19 vaccine. Instead, it attempted to invalidate several of the patents before the United States Patent and Trademark Office, and when those efforts largely failed, Moderna simply used the patented

technology without paying for it or even asking for a license. Plaintiffs do not seek an injunction or any relief in this case that would impede the sale or manufacture of Moderna's life-saving vaccine. They seek only fair compensation for the use of patented technology they developed with great effort and at great expense, without which Moderna's COVID-19 vaccine would not have been successful.

2. Medicines using messenger ribonucleic acid (or "mRNA") technology, like Moderna's COVID-19 vaccine, rely on synthetic mRNA that enters the body's cells and instructs them to make proteins they would not necessarily make on their own. Moderna's COVID-19 vaccine, in particular, uses mRNA to cause cells to make a small piece of the virus that causes COVID-19 called the "spike protein." That small piece, which is harmless in isolation, prompts the body's immune system to produce antibodies that will recognize the spike protein if it is encountered in the future and destroy it. In this way, the vaccine equips a person's body ahead of time with antibodies to fight the COVID-19 virus if that person experiences a subsequent exposure.

3. Ever since the vast potential for mRNA-based vaccines and other mRNA-based medicines began to catch the attention of scientists more than two decades ago, the biggest technological hurdle to developing and deploying them has been devising a safe and effective way to deliver the mRNA to the cell. Without adequate protection, mRNA quickly degrades in the body. For mRNA vaccines like Moderna's to work, they must incorporate a mechanism for protecting the fragile mRNA, delivering it through cell membranes, and then releasing it inside

the cell. In the words of one Nobel Prize winning scientist, the secret for making RNA-based products work has always been "delivery, delivery, delivery."[1]

4. Having vexed experts in the field for years, that problem eventually found a solution in the innovative research of Arbutus scientists. Their solution was ingenious: microscopic particles built from four carefully selected types of fat-like molecules, so small that they are measured in nanometers but still stable enough to shelter and protect an RNA molecule on a voyage through the human body to a target cell, and then through the target cell's membrane, before finally releasing the RNA. These tiny fat-like particles are called "lipid nanoparticles," or "LNPs." The United States Patent and Trademark Office has granted Arbutus several patents for its groundbreaking LNP technologies.

5. LNPs identified through Arbutus's pioneering work have been described as "crucial" to Moderna's COVID-19 vaccine, the first mRNA product the company was able to commercialize and the keystone of its financial success.[2] Without the LNPs Arbutus invented to safeguard the mRNA and deliver it into cells, the mRNA in Moderna's vaccine would degrade before ever reaching the cells it needs to enter and the vaccine would not work.

6. Moderna has long been aware of Arbutus's LNP intellectual property and its importance as a component of mRNA-based vaccines and other mRNA-based medicines. Several years before the pandemic, Moderna obtained licenses to use Arbutus's LNP patents for certain mRNA products directed to specific viral targets. But those licenses did not grant Moderna rights to use the technology for products targeting SARS-CoV-2, the virus that causes

---

[1] Erika Check, "RNA to the Rescue," *Nature* 425:10-12 (2003), *available at* https://www.nature.com/articles/425010a.

[2] Nathan Vardi, "Moderna's Mysterious Coronavirus Vaccine Delivery System," *Forbes.com*, July 29, 2020, *available at* https://www.forbes.com/sites/nathanvardi/2020/07/29/modernas-mysterious-coronavirus-vaccine-delivery-system/.

COVID-19 and that the vaccines at issue here target. Before it decided to use Arbutus's proven and patented technology as a crucial part of its COVID-19 vaccine, Moderna did not ask for a license to do so. Instead, it tried to convince the United States Patent and Trademark Office and, later, the United States Court of Appeals for the Federal Circuit to cancel several of Arbutus's LNP-related patents. But despite the failure of Moderna's attempts to eliminate Arbutus's patents, and despite Plaintiffs' efforts to resolve this dispute without litigation, Moderna has remained unwilling to pay for its use of Arbutus's technology in a vaccine that has earned Moderna billions of dollars in profits.

7. Moderna's intransigence has forced Arbutus and Genevant, a company spearheaded by former Arbutus scientists, to bring this infringement action. Plaintiffs are proud that their LNP technology has had such a profound impact on the heroic fight against the COVID-19 pandemic, and they do not seek to impede by an injunction or otherwise the production or distribution of Moderna's COVID-19 vaccine, including boosters. All Plaintiffs seek is the compensation due to them under the patent laws of the United States and as a matter of simple fairness.

**NATURE OF THE ACTION**

8. This is a civil action under the patent laws of the United States, 35 U.S.C. § 101 *et seq.*, seeking damages for Moderna's infringing manufacture, use, sale, offer for sale, and/or importation of, and/or the supplying from the United States of a component or all or a substantial portion of the components of, its mRNA-1273 COVID-19 mRNA LNP vaccine product ("Moderna's COVID-19 vaccine") or any supplemental or booster COVID-19 mRNA LNP vaccine product (collectively, the "Accused Product").

9. As alleged herein, the manufacture, use, sale, offer to sell, and/or importation of the Accused Product, and/or the supplying from the United States of a component or all or a substantial portion of the components of the Accused Product infringes or will infringe, actively induces or will actively induce infringement of, or contributes or will contribute to the infringement of, one or more claims of the following patents relating to nucleic acid-lipid particles, compositions thereof, and their use to deliver nucleic acid-based medicines: U.S. Patent Nos. 8,058,069 (Exhibit A), 8,492,359 (Exhibit B), 8,822,668 (Exhibit C), 9,364,435 (Exhibit D), 9,504,651 (Exhibit E), and 11,141,378 (Exhibit F) (collectively, the "Asserted Patents"). At all relevant times, Arbutus owned the Asserted Patents and licensed exclusive rights to sublicense, practice, and sue for infringement of them to Genevant in certain fields of use that include the vaccine application at issue in this Complaint, with certain exceptions not relevant here (hereinafter, Genevant's "Exclusive Rights").

**THE PARTIES**

10. Plaintiff Arbutus Biopharma Corporation is a corporation organized and existing under the laws of Canada, with its principal place of business at 701 Veterans Circle, Warminster, Pennsylvania, 18974. The company's research and development efforts include discovering, developing, and commercializing a cure for chronic hepatitis B virus, as well as drug discovery and development efforts for treating coronaviruses, including SARS-CoV-2, which causes COVID-19.

11. Plaintiff Genevant Sciences GmbH is a company organized and existing under the laws of Switzerland, with its principal place of business at Viaduktstrasse 8, 4051 Basel, Switzerland. Genevant is a technology-focused nucleic acid delivery solutions company with cutting-edge LNP platforms. Genevant owns or licenses the industry's most important LNP

intellectual property—that of Arbutus—and has decades of experience and expertise in nucleic acid drug delivery and development. Genevant, together with its affiliated companies, maintains offices in Cambridge, Massachusetts and Vancouver, British Columbia, Canada. Genevant's mission is to utilize its LNP and other technologies to deliver innovative new medicines that use mRNA or other nucleic acids.

12. Defendant Moderna, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 200 Technology Square, Cambridge, Massachusetts, 02139. Moderna, Inc., itself and through its subsidiary ModernaTX, Inc., develops, manufactures, imports, markets, distributes, offers to sell, and/or sells vaccines and other medicines in the State of Delaware and throughout the United States, for use in the State of Delaware and throughout the United States.

13. Defendant ModernaTX, Inc. is a wholly owned subsidiary of Moderna, Inc. (collectively, "Moderna"). ModernaTX, Inc. is also a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 200 Technology Square, Cambridge, Massachusetts, 02139. ModernaTX, Inc. develops, manufactures, imports, markets, distributes, offers to sell, and/or sells vaccines and other medicines in the State of Delaware and throughout the United States, for use in the State of Delaware and throughout the United States.

## JURISDICTION AND VENUE

### A. Subject-Matter Jurisdiction

14. Because this is an action for infringement under the patent laws of the United States, Title 35 of the United States Code, the Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

**B. Personal Jurisdiction**

15. This Court has personal jurisdiction over Moderna because, among other things, Moderna, Inc. and ModernaTX, Inc. have purposefully availed themselves of the benefits and protections of Delaware's laws such that they should reasonably anticipate being haled into court here. Because Defendants are organized and exist under the laws of Delaware, are qualified to do business in Delaware, and have appointed registered agents for service of process in Delaware, Moderna, Inc. and ModernaTX, Inc. have consented to general jurisdiction in Delaware.

16. Additionally, Moderna, Inc. and ModernaTX, Inc., directly or through others, make, use, induce others to use, offer for sale, and/or sell the Accused Product, and/or a component, combination, or composition constituting a material part of the Accused Product, within the United States, and/or import the same into the United States, including into the District of Delaware. For example, on December 18, 2020, Moderna received Emergency Use Authorization ("EUA") from the United States Food and Drug Administration ("FDA") for its COVID-19 vaccine to be distributed and administered to people throughout the United States, including in the District of Delaware and, on January 31, 2022, the FDA approved Moderna's Biologics License Application ("BLA") for its COVID-19 vaccine. Upon information and belief, as of February 24, 2022, over 835,000 doses of Moderna's COVID-19 vaccine have been delivered to the State of Delaware.[3] Therefore, Moderna, Inc. and ModernaTX, Inc. transact business within Delaware relating to Plaintiffs' claims and have engaged in systematic and continuous business contacts here.

[3] Delaware Environmental Public Health Tracking Network, Vaccine Tracker, https://myhealthycommunity.dhss.delaware.gov/locations/state/vaccine-tracker (last visited Feb. 25, 2022).

17. For the above reasons, there is nothing unreasonable or fundamentally unfair about requiring Moderna, Inc. and ModernaTX, Inc. to litigate this action in this District, and the Court has personal jurisdiction over them here.

**C. Venue**

18. Venue is proper in this District under 28 U.S.C. §§ 1391(c)(2) and 1400(b) because both Moderna, Inc. and ModernaTX, Inc. are corporations organized and existing under the laws of the State of Delaware and are therefore subject to suit in this District.

## BACKGROUND

**A. How Vaccines Work**

19. Viruses are typically small packets of DNA or RNA. If a virus enters a living host cell—for example, after being ingested, transmitted through bodily fluids, or inhaled through a person's mouth or nose—the virus's DNA or RNA hijacks the cell's machinery and instructs the cell to make copies of the virus. These copies, often numbering into the millions, leave the infected cell and enter other cells where the process repeats. Infected cells can be damaged or die while hosting the virus. Left unchecked, the host organism itself can die.

20. Although vaccines targeting viruses have different mechanisms of action, they traditionally work by injecting into the body a weakened or inactive form of the virus that is unable to cause infection, but nonetheless retains features of the infectious virus and can teach the immune system to recognize and attack the infectious virus if it invades in the future.

**B. Nucleic Acid Medicines and Delivery Technologies**

21. Moderna's COVID-19 vaccine belongs to a new class of medicines that deliver nucleic acids into the cells of the body to treat diseases or, in the case of Moderna's COVID-19 vaccine, to trigger an immune response to protect a person from future infection.

22. Nucleic acids are molecules that encode the genetic information essential to sustain all forms of life. One type of nucleic acid is deoxyribonucleic acid, or "DNA," which is found in our chromosomes. In humans, each person (except identical twins) has a unique set of genetic information in the "genes" within his or her chromosomes. Among other things, these genes spell out the instructions for producing proteins that make our cells and bodies function.

23. In order to make the protein encoded by a particular gene, the cell first converts the genetic code in the gene's DNA into another type of nucleic acid known as messenger ribonucleic acid, or "mRNA." mRNA is effectively a copy of the portion of DNA that the cell's protein-making machinery uses as a blueprint to assemble the protein encoded by the gene.

24. Vaccines and other medicines using ribonucleic acid, or "RNA," technologies are an emerging frontier with the potential to revolutionize medicine. RNA-based medicines can employ a type of RNA called small interfering RNA ("siRNA") to treat certain diseases by interfering with the expression of unwanted proteins to reduce the amounts produced—a process called RNA interference ("RNAi"). RNA-based medicines also can employ mRNA to cause or increase the production of certain proteins. mRNA vaccines, for example, cause cells to express a protein (or a piece of a protein) that is normally found on a particular tumor or that is part of a particular virus. The presence of that protein (or piece of a protein) teaches the body's immune system to recognize it if it is encountered in the future and destroy it. These and other RNA-based medicines hold great promise for addressing many previously intractable diseases and, as in the present circumstances, new viruses that cause or threaten worldwide pandemics.

25. Despite their promise, however, RNA-based medicines have been difficult to develop. By their nature, RNA molecules are fragile. Without adequate protection, RNA molecules are susceptible to degradation in the body, and, if and when they get to a cell, cannot

cross the cell membrane to enter the cell. For decades, the need for an effective delivery technology had been the most significant challenge in the development of RNA-based products. In particular, without the means to protect mRNA and facilitate its entry into target cells, mRNA-based vaccines and other medicines have been ineffective.

26. Indeed, functional RNA-based medicines eluded researchers until the pioneering work by Arbutus scientists, many now at Genevant companies, resulting in the discovery and development of the leading nucleic acid delivery technology in use today. Decades ago, a group of ambitious research scientists working at a predecessor company to Arbutus began to tackle the nucleic acid delivery problem that had long stymied the field. Years of tireless effort by these scientists resulted in a solution to the problem. The solution was LNP technology that relies on fat-like molecules called lipids that encapsulate and protect nucleic acids like mRNA from degradation in the body and enable them to cross cell membranes. Once inside a cell, the LNP releases the nucleic acid it encapsulates so that, in the case of an mRNA vaccine for example, the nucleic acid can express the protein it encodes.

27. The lipid components of the Arbutus technology include: structural lipids, such as phospholipids and cholesterol; "cationic" (positive charge-bearing) lipids, including "ionizable" lipids that are positive charge-bearing at certain pH levels; and conjugated lipids, which are lipids attached to a polymer such as polyethyleneglycol ("PEG"). Arbutus scientists discovered that nucleic acid-lipid particles combining particular lipid components in particular ratios could achieve much more effective delivery of nucleic acids through cell membranes and into cells.

28. These Arbutus scientists spent more than a decade researching and developing this nucleic acid-lipid delivery technology. Their efforts led to the first FDA-approved RNA-based therapeutic in the form of a drug called Onpattro®, an RNAi treatment for a form of

amyloidosis, a rare disease that causes certain proteins to accumulate in organs. The company that developed Onpattro®, Alnylam Pharmaceuticals, did so under an LNP license from Arbutus and received FDA approval in August 2018. Building on this initial success, Arbutus has granted licenses to its LNP technology to other companies, and Genevant now has several ongoing LNP product development collaborations, some directed to COVID-19 and some directed to other diseases and disorders. Several entities developing mRNA-LNP vaccines against COVID-19 have come to Genevant for a license to Arbutus's technology, including companies that have produced promising candidates in clinical trials. And Genevant's COVID-19 development collaborations include efforts to provide a vaccine to parts of the developing world.

**C. The United States Awards Patents Recognizing Arbutus's Innovations**

29. In recognition of Arbutus's extensive and groundbreaking research and development efforts, the United States Patent and Trademark Office has granted several families of patents claiming nucleic acid-lipid particles and lipid vesicles, as well as compositions and methods of using them. The Asserted Patents are among them:

a. U.S. Patent No. 8,058,069, "Lipid Formulations for Nucleic Acid Delivery," issued on November 15, 2011 (the "'069 Patent").

b. U.S. Patent No. 8,492,359, "Lipid Formulations for Nucleic Acid Delivery," issued on July 23, 2013 (the "'359 Patent").

c. U.S. Patent No. 8,822,668, "Lipid Formulations for Nucleic Acid Delivery," issued on September 2, 2014 (the "'668 Patent").

d. U.S. Patent No. 9,364,435, "Lipid Formulations for Nucleic Acid Delivery," issued on June 14, 2016 (the "'435 Patent").

e. U.S. Patent No. 9,504,651, "Lipid Compositions for Nucleic Acid Delivery," issued on November 29, 2016 (the "'651 Patent").

f. U.S. Patent No. 11,141,378, "Lipid Formulations for Nucleic Acid Delivery," issued on October 12, 2021 (the "'378 Patent").

30. True and correct copies of the Asserted Patents are attached hereto as Exhibits A through F. All are valid and enforceable under United States patent laws. All are assigned to and owned by Arbutus, and, at all times since Arbutus and Genevant entered into a license agreement, Genevant has held Exclusive Rights to all of the Asserted Patents in various fields of use including the vaccine application at issue here. Under the terms of the license, Genevant's Exclusive Rights include the right to sue for the infringement alleged in this Complaint.

**D. Moderna's Knowledge of, and Background with, the Asserted Patents**

31. Moderna has been on actual notice of Arbutus's patents since before its development of the Accused Product and has knowingly used Arbutus's technology as an essential component of its nucleic acid products and product candidates, including its COVID-19 vaccine.

32. Years before the COVID-19 pandemic, Moderna recognized that Arbutus's LNP technology could fuel its own work in RNA-based vaccines and other medicines. Accordingly, in or about May 2015, Moderna attempted to acquire rights to Arbutus's LNP delivery technology for four specific viral targets (none of which is COVID-19) through sublicense from a Canadian company called Acuitas Therapeutics. Although Acuitas had licensed Arbutus's LNP technology in 2012, its license agreement expressly limited Acuitas's ability to grant sublicenses. That limitation prohibited Acuitas from granting the sublicense that it granted to Moderna.

33. In August 2016, after learning of the Moderna-Acuitas sublicense agreements, Arbutus notified Acuitas of material breach. In October 2016, Acuitas filed suit in the Supreme Court of British Columbia seeking to prevent Arbutus from terminating the Arbutus-Acuitas agreement. Arbutus counterclaimed for a declaration that the license had been terminated and sought an injunction barring Acuitas from further sublicensing Arbutus's LNP technology.

34. In February 2018, Arbutus and Acuitas settled their dispute. The settlement agreement provided that Acuitas no longer could use Arbutus's LNP technology, with the four specific sublicenses to Moderna for vaccines targeting specific viruses remaining in effect. SARS-CoV-2, the virus that causes COVID-19 and the target of the vaccine accused of infringement in this Complaint, is not among the surviving sublicenses.

35. Deprived of a broad license to Arbutus's valuable LNP technology and hoping to make unrestricted use of that technology without having to pay royalties, Moderna began filing *inter partes* review ("IPR") petitions requesting that the Patent and Trademark Office cancel certain of Arbutus's patents, including some asserted here.

36. Moderna's first IPR petition, filed in February 2018, challenged Arbutus's U.S. Patent No. 9,404,127 ("the '127 Patent"), which, like the Asserted Patents, is directed to Arbutus's LNP technology. The Patent Trial and Appeal Board ("PTAB") ruled that all claims of the '127 Patent should be cancelled. An appeal of that decision remains pending before the United States Court of Appeals for the Federal Circuit.

37. Moderna's IPRs against the Asserted Patents were less successful. Its second IPR petition, filed in March 2018, ended with the PTAB rejecting Moderna's arguments challenging the validity of ten of the '435 Patent's twenty claims. Moderna challenged that ruling on appeal,

but in a December 2021 decision, the United States Court of Appeals for the Federal Circuit dismissed Moderna's appeal for lack of standing.[4]

38. Moderna's third IPR petition, filed in January 2019, was even less successful. The PTAB completely rejected Moderna's challenge to all claims of the '069 Patent, and the United States Court of Appeals for the Federal Circuit affirmed that ruling in December 2021.

**E. Moderna Designs Its COVID-19 Vaccine Over a Single Weekend Aided by the Unauthorized Use of Arbutus's LNP Technology**

39. On January 10, 2020, with the novel SARS-CoV-2 virus quickly spreading around the world, scientists identified the virus's complete genetic sequence and posted it for free on the internet. This public disclosure revealed the complete RNA sequence that encodes the virus's components, including its distinctive "spike protein." With that information in the public domain, researchers around the world were able to begin designing vaccines to target the virus.

40. Moderna was one of many companies that began work on a vaccine in earnest once the genetic sequence was published.

41. Relying on Arbutus's LNP technology covered by the Asserted Patents, Moderna was able to begin producing its COVID-19 vaccine *within just a few days* of the SARS-CoV-2 genomic sequence entering the public domain. The design component of the effort was even faster: According to Moderna President Stephen Hoge, "[w]e did it in an hour, and it worked brilliantly."[5] Compared to the timelines of prior vaccine-development efforts, Moderna's

---

[4] Arbutus cross-appealed the PTAB's decision, challenging the invalidation of the ten claims of the '435 Patent that were not upheld. On December 1, 2021, the Federal Circuit affirmed the PTAB's decision as to those claims.

[5] "Stephen Hoge, MD '03: Turns out, designing a COVID vaccine was easy," UCSF Alumni, *available at* https://alumni.ucsf.edu/stories/stephen-hoge.

accomplishment was unprecedented. In the words of Moderna's CEO Stéphane Bancel, "11 months since the DNA sequence of the virus became available, you will have two approved mRNA vaccines, which has never happened before with any technology. That is amazing."[6]

42. Moderna's success was chronicled in an article first published online on June 11, 2020, by individuals affiliated with the company and collaborators at the National Institutes of Health. According to this article—the "Moderna/NIH preprint"—"the release of SARS-CoV-2 sequences triggered immediate rapid manufacturing of an mRNA vaccine" by Moderna.[7] Moderna "decide[d] on [the] mRNA-1273 sequence" on January 13, 2020, just three days after the publication of the viral sequence, and "initiate[d] cGMP production" the very next day, on January 14, 2020.[8] On February 24, 2020, Moderna shipped clinical drug product, and, less than a month later, Phase I trials began.[9]

43. Moderna's COVID-19 vaccine could not have been developed, much less on a timeline unprecedented in human history, without Arbutus's proven and patented LNP delivery technology—technology that had transformed vaccine design from a years-long project into one that could be performed within an hour over a January weekend.

---

[6] Antonio Regalado, "'None of us were ready' to manufacture genetic vaccines for a billion people," MIT Technology Review (December 17, 2020), *available at* https://www.technologyreview.com/2020/12/17/1014989/moderna-vaccine-availability-stephane-bancel-ceo/.

[7] "SARS-CoV-2 mRNA Vaccine Development Enabled by Prototype Pathogen Preparedness," bioRvix.org (June 11, 2020) *available at* https://www.biorxiv.org/content/10.1101/2020.06.11.145920v1.full.

[8] *Id.*

[9] *Id.*

44. Moderna's co-founder Robert Langer has been quoted as saying "I don't think people realized just how important the delivery systems are . . . ."[10] LNPs are so crucial to Moderna's mRNA vaccines that Giuseppe Ciaramella, head of infectious diseases at Moderna from 2014 to 2018, called LNPs "the unsung hero of the whole thing,"[11] while Moderna CEO Stéphane Bancel stated in December 2020 that "[w]e always said it is . . . about developing the right delivery technology. And this is something that takes years, not two weeks."[12]

45. The Moderna/NIH preprint detailed Moderna's use of Arbutus's LNP technology and its infringement of the Asserted Patents. The scientists who worked on the vaccine and contributed to the article explained that Moderna's COVID-19 vaccine is composed of mRNA encoding a modified version of the SARS-CoV-2 spike (S) protein that was synthesized, purified, "and encapsulated into lipid nanoparticles (LNP)," with a lipid molar ratio of "50:10:38.5:1.5 (ionizable lipid:DSPC:cholesterol:PEG-lipid)." Specifically, the Moderna/NIH preprint indicates that the Accused Product includes lipid particles comprising the following lipids in the following ratio: 50 mol % of an ionizable lipid that is cationic; 10 mol % of a phospholipid (DSPC); 38.5 mol % of cholesterol; and 1.5 mol % of a conjugated lipid that inhibits aggregation of particles (PEG-lipid).

46. These components are within the ranges of, among other claims of the Asserted Patents, Claim 1 of Arbutus's '069 Patent, which recites a "nucleic acid-lipid particle comprising (a) a nucleic acid; (b) a cationic lipid comprising from 50 mol % to 65 mol % of the total lipid

---

[10] Tim Loh, "Lipids Are Delivering the Vaccine Revolution," Bloomberg (March 6, 2021), *available at* https://www.bloomberg.com/news/newsletters/2021-03-06/lipids-are-delivering-the-vaccine-revolution.

[11] Ryan Cross, "Without these lipid shells, there would be no mRNA vaccines for COVID-19," C&EN (March 6, 2021), *available at* https://cen.acs.org/pharmaceuticals/drug-delivery/Without-lipid-shells-mRNA-vaccines/99/i8.

[12] Regalado, *supra* note 7.

present in the particle: (c) a non-cationic lipid comprising a mixture of a phospholipid and cholesterol or a derivative thereof, wherein the phospholipid comprises from 4 mol % to 10 mol % of the total lipid present in the particle and the cholesterol or derivative thereof comprises from 30 mol % to 40 mol % of the total lipid present in the particle; and (d) a conjugated lipid that inhibits aggregation of particles comprising from 0.5 mol % to 2 mol % of the total lipid present in the particle."

47. A month after the Moderna/NIH preprint appeared, the PTAB rejected Moderna's IPR challenge to the '069 Patent in its entirety, triggering a ten percent drop in Moderna's share price in a single day. Although Moderna promptly issued public statements denying any infringement, it has been conspicuously silent about what LNP technology is used in its vaccine, if not what is described by its own co-authors in the Moderna/NIH preprint. Moderna has not requested retraction of the Moderna/NIH preprint or otherwise submitted a correction of it. Instead, when it came time to publish the official version of that preprint in the scientific publication *Nature*, it simply excised the relevant details about the LNP technology it was using.

48. Nonetheless, another preclinical study of Moderna's COVID-19 vaccine, authored by Corbett et al. and published on the website of *The New England Journal of Medicine* on July 28, 2020, confirmed that the mRNA was encapsulated in an LNP "as described previously" and cited a prior Moderna publication that discloses the same lipid molar ratio as the Moderna/NIH preprint.[13] Four of the article's authors were affiliated with Moderna at the time of the article's publication. Moderna has not requested retraction of the Corbett 2020 *The New England Journal*

[13] *See* Corbett et al., "Evaluation of the mRNA-1273 Vaccine against SARS-CoV-2 in Nonhuman Primates," *NEJM* 383;16:1544-1555, 1546 (2020) (citing Hassett et al., "Optimization of Lipid Nanoparticles for Intramuscular Administration of mRNA Vaccines," *Mol. Ther. Nucl. Acids* 15:1-11, 8 (2019)), *available at* https://www.nejm.org/doi/full/10.1056/nejmoa2024671#.

*of Medicine* article or otherwise submitted a correction of the Corbett 2020 *The New England Journal of Medicine* article.

49. What is more, on May 14, 2021, Moderna submitted an international patent application titled "Coronavirus RNA Vaccines and Methods of Use," which published on August 12, 2021, as International Patent Publication WO 2021/159130. In that application, "Example 1:Phase 1 Clinical Trial" identifies the specific ionizable lipid used in the Phase I clinical trial of Moderna's vaccine as "heptadecan-9-yl 8 ((2 hydroxyethyl)(6 oxo 6-(undecyloxy)hexyl) amino)octanoate 20," also known as SM-102, which in its ionized state is positively charged (cationic).[14] Example 1 also recites that the particles used in the Phase I clinical trial of Moderna's vaccine are prepared with the same lipid molar ratio identified in the Moderna/NIH preprint, i.e.: 50 mol % of an ionizable lipid that is cationic; 10 mol % of a phospholipid (DSPC); 38.5 mol % of cholesterol; and 1.5 mol % of a conjugated lipid that inhibits aggregation of particles (PEG-lipid).[15]

50. Notwithstanding its repeated statements in published articles and its patent application, Moderna publicly denied infringement of Arbutus's patents, ostensibly on the basis that the LNPs in Moderna's COVID-19 vaccine manufactured and sold initially on the basis of EUA and now with full FDA approval differed from the LNPs in its Phase I clinical trial. But while Moderna was denying infringement in public statements, its Senior Vice President and

---

[14] *See* International Patent Publication WO 2021/159130 at 49.
[15] *See id.* ("The SARS-CoV-2 mRNA vaccine. . . was a lipid nanoparticle (LNP) dispersion of an mRNA encoding the prefusion stabilized spike protein SARS-CoV-2 formulated in LNPs composed of four (4) lipids (50 mol% ionizable lipid heptadecan-9-yl 8 ((2 hydroxyethyl)(6 oxo 6-(undecyloxy)hexyl)amino)octanoate 20 (Compound 1); 10 mol% 1,2 distearoyl sn glycero-3 phosphocholine (DSPC); 38.5 mol% cholesterol; and 1.5 mol% l-monomethoxypolyethyleneglycol-2,3-dimyristylglycerol with polyethylene glycol of average molecular weight 2000 (PEG2000 DMG)).").

Deputy General Counsel, Shaun Ryan, submitted on February 23, 2021, a sworn statement under penalty of perjury in support of one of its IPR appeals to the United States Court of Appeals for the Federal Circuit. In that sworn declaration, he stated that the "lipid carrier particle" used in its Phase I study—described in the Moderna/NIH preprint and WO 2021/159130 as being within the scope at least of Claim 1 of the '069 Patent—is the same as the one that was "ultimately approved" for use in its product.[16]

51. Distribution of the Accused Product and its administration to persons in the United States and around the world commenced immediately after the FDA granted Moderna's COVID-19 vaccine an EUA on December 18, 2020. In 2021, Moderna shipped 807 million doses.[17] As of February 24, 2022, Moderna had signed advanced purchase agreements worth approximately $19 billion for all of 2022.[18] As of May 6, 2021, Moderna had signed advance purchase agreements covering more than one billion doses.[19] And from December 18, 2020, through February 24, 2022, more than 200 million doses of Moderna's COVID-19 vaccine had been administered to people throughout the United States.[20] Moderna's vaccine doses made in the United States and administered in the United States were distributed to hospitals, pharmacies,

---

[16] Declaration of Shaun Ryan, Mot. to Supplement the Record to Provide Evidence of Standing, Dkt. No. 18, 11-12 ¶¶ 3-4, *Moderna TX, Inc. v. Arbutus Biopharma Corp.*, No. 2020-2329 (Fed. Cir.).

[17] Press Release, Moderna, Moderna Reports Fourth Quarter and Fiscal Year 2021 Financial Results and Provides Business Updates (Feb. 24, 2022), https://investors.modernatx.com/news/news-details/2022/Moderna-Reports-Fourth-Quarter-and-Fiscal-Year-2021-Financial-Results-and-Provides-Business-Updates/default.aspx.

[18] *Id.*

[19] Press Release, Moderna, Moderna Reports First Quarter Fiscal Year 2021 Financial Results and Provides Business Updates (May 6, 2021), https://investors.modernatx.com/news-releases/news-release-details/moderna-reports-first-quarter-fiscal-year-2021-financial-results.

[20] COVID-19 Vaccinations in the United States, CDC (last visited Feb. 25, 2022), https://covid.cdc.gov/covid-data-tracker/#vaccinations_vacc-total-admin-rate-total.

clinics, and numerous other entities for the benefit of individual vaccine recipients in the United States. All of the manufacturing and sales of vaccines distributed in the United States were for the benefit of the American public. Millions more doses, including doses made in the United States, have been administered abroad.

52. On June 1, 2021, Moderna announced that it had initiated the FDA process for a BLA—i.e., for the full-fledged licensure of its COVID-19 vaccine. As of February 24, 2022, Moderna's COVID-19 vaccine had received at least emergency authorization from more than 70 countries,[21] including Canada, Israel, the United Kingdom, Switzerland, Singapore, Qatar, Taiwan, and the Philippines, as well as from the European Union.[22] On January 31, 2022, the FDA approved Moderna's BLA for its COVID-19 vaccine.[23]

53. In May 2021, Moderna announced that it had begun exporting from the United States doses of its COVID-19 vaccine that were manufactured in facilities in the United States.[24] Those doses were made in the United States and sold to foreign governments or other foreign entities for the benefit of individuals outside the United States.

---

[21] Press Release, Moderna, Moderna Reports Fourth Quarter and Fiscal Year 2021 Financial Results and Provides Business Updates (Feb. 24, 2022), https://investors.modernatx.com/news/news-details/2022/Moderna-Reports-Fourth-Quarter-and-Fiscal-Year-2021-Financial-Results-and-Provides-Business-Updates/default.aspx.

[22] *See id.*

[23] Press Release, Moderna, Moderna Receives Full U.S. FDA Approval for COVID-19 Vaccine Spikevax (Jan. 31, 2022), https://investors.modernatx.com/news/news-details/2022/Moderna-Receives-Full-U.S.-FDA-Approval-for-COVID-19-Vaccine-Spikevax/default.aspx.

[24] Moderna Reply Br. at 22, Dkt. No. 41, *Moderna TX, Inc. v. Arbutus Biopharma Corp*. (Fed. Cir. No. 2020-2329) (citing Vaccine Exports From U.S. Accelerate as Moderna Ships Abroad, Bloomberg.com (May 20, 2021), https://www.bloomberg.com/news/articles/2021-05-20/moderna-starts-shipping-vaccine-from-u-s-boosting-shot-exports).

54. Moderna also has contracted with a number of companies around the world to manufacture its COVID-19 vaccine.[25] This includes several companies that employ facilities in the United States to manufacture Moderna's vaccine.[26]

55. Moderna chose to contract with companies to establish sites outside the United States that would combine the components of its COVID-19 vaccine, which it described as "independent US and international supply chains."[27]

56. However, these sites outside the United States still relied on manufacturing in the United States by Moderna or at Moderna's direction to supply them components of the Accused Product. Moderna manufactured the components of its infringing product—mRNA [redacted]—in the United States and then supplied them, or cause them to be supplied, outside of the United States to be combined to make the finished COVID-19 vaccine.[28] These components constitute a substantial portion of Moderna's COVID-19 vaccine and were combined outside the United States at Moderna's direction.

57. Moderna's COVID-19 vaccine is [redacted][29]:

[25] *See*, *e.g.*, Press Release, Moderna, Moderna and Lonza Announce Worldwide Strategic Collaboration to Manufacture Moderna's Vaccine (mRNA-1273) Against Novel Coronavirus (May 1, 2020), https://investors.modernatx.com/news-releases/news-release-details/moderna-and-lonza-announce-worldwide-strategic-collaboration.
[26] *Id.*; *see also, e.g.*, Press Release, Moderna, Baxter BioPharma Solutions and Moderna Announce Agreement for Fill/Finish Manufacturing of the Moderna COVID-19 Vaccine in the U.S. (Mar. 8, 2021), https://investors.modernatx.com/news-releases/news-release-details/baxter-biopharma-solutions-and-moderna-announce-agreement.
[27] MRNA-GEN-00854857.
[28] MRNA-GEN-01424228.
[29] MRNA-GEN-00031755 at -761.

[redacted]

58. These components are especially made or adapted for Moderna's COVID-19 vaccine. The mRNA component encodes a modified version of the SARS-CoV-2 spike (S) protein, which is specifically designed for use in the COVID-19 vaccine. [redacted] Neither component is a staple item and neither is used in any commercial product other than Moderna's COVID-19 vaccine.

**F. Arbutus and Genevant Attempt to Negotiate a License with Moderna**

59. Plaintiffs tried to avoid the need to file this lawsuit.

60. Many companies have paid Plaintiffs for a license to use the breakthrough LNP technology at issue here, including several companies developing COVID-19 vaccines and several other companies with which Genevant has ongoing development collaborations. The research and development facilitated by these and other licenses has resulted in product candidates across a variety of conditions.

61. Plaintiffs would have preferred to resolve their dispute with Moderna with a mutually acceptable license from Genevant. And Plaintiffs have long sought to do just that. In proposing such a license, Plaintiffs did not wish to minimize the importance of Moderna's extensive efforts to manufacture and distribute billions of doses of its COVID-19 vaccine in the

midst of a global pandemic. Those efforts have been vitally important and have saved countless lives. Rather, Plaintiffs sought only the fair and reasonable compensation to which they are entitled by law for their contributions to Moderna's COVID-19 vaccine—contributions that were the product of decades of pioneering work by Arbutus scientists, many now at Genevant companies, including during periods when it was uncertain whether mRNA vaccines could ultimately be made to work.

62. Unfortunately, Moderna has consistently declined to engage meaningfully in licensing discussion, necessitating this lawsuit.

63. On November 23, 2020, Arbutus and Genevant sent Moderna a letter stating that the Accused Product may infringe claims of each of the then-issued Asserted Patents and offering to discuss the terms of a collaboration or license to further both parties' goal of ending the COVID-19 pandemic. Moderna acknowledged receipt of this letter on November 25, 2020.

64. On December 10, 2020, Moderna sent a letter to Arbutus and Genevant stating that Moderna was "open to hearing [Genevant's] proposal for a partnership or patent license."

65. Upon receiving the Arbutus and Genevant proposal, however, Moderna declined to negotiate. Moderna also declined repeated requests to provide samples or non-public documents, even under a confidentiality agreement, to support any assertion that it does not infringe the Asserted Patents, including those in which it invested substantial resources and time to challenge, throughout 2020 and 2021, before the United States Patent and Trademark Office and the United States Court of Appeals for the Federal Circuit.

**G. Moderna Refuses to Compensate Arbutus and Genevant for Using Their Technology**

66. Despite Arbutus and Genevant's repeated efforts, Moderna has refused to take a license from, partner with, or otherwise compensate Plaintiffs for their contribution to Moderna's

COVID-19 vaccine. Instead, Moderna continues to infringe the Asserted Patents directly and indirectly, without authority and with actual knowledge of, or reckless disregard for, the fact that its actions constitute infringement of the Asserted Patents.

67. Arbutus and Genevant fully support Moderna's efforts to supply vaccines to people in the United States and worldwide and in no way seek to interfere with those efforts. Accordingly, no injunctive relief is sought in this case.

68. However, Moderna has made extensive use of, and earned billions in profits exploiting, Arbutus's patented technology, including the technology described and claimed in the Asserted Patents. Moderna's actions have caused harm, and continue to cause harm, to Arbutus and Genevant. Arbutus and Genevant have no choice but to defend their proprietary and patented technology and seek fair and reasonable compensation for the value of their innovation.[30]

**COUNT 1: INFRINGEMENT OF U.S. PATENT NO. 8,058,069**

69. Paragraphs 1 through 64 are incorporated by reference as if fully set forth herein.

70. The United States Patent and Trademark Office duly and legally issued the '069 Patent to one of Arbutus's predecessor companies on November 15, 2011. The '069 Patent is titled "Novel Lipid Formulations for Nucleic Acid Delivery."

71. Arbutus owns, and at all relevant times has owned, the '069 Patent.

---

[30] The allegations herein are exemplary and without prejudice to Arbutus and Genevant's infringement contentions. In providing these allegations, Arbutus and Genevant do not convey or imply any particular claim constructions or the precise scope of the claims. Arbutus and Genevant's claim construction contentions regarding the meaning and scope of the claim terms will be provided under the Court's scheduling order and this District's Local Rules.

72. Genevant holds, and at all relevant times has held, a license to Exclusive Rights in the ’069 Patent for certain fields of use, which include the Accused Product. Genevant has the right to sue and seek damages for the infringement alleged herein.

73. Claims of the ’069 Patent cover, among other things, nucleic acid-lipid particles and compositions thereof.

74. Moderna has directly infringed and continues to directly infringe claims of the ’069 Patent under 35 U.S.C. § 271(a) by manufacturing, offering to sell, selling, or using within the United States, or importing into the United States, the Accused Product incorporating Arbutus’s patented LNP delivery technology covered by the ’069 Patent, without authority or license to do so, during the term of the ’069 Patent.

75. Moderna actively, knowingly, and intentionally has induced, and continues to induce, infringement of one or more claims of the ’069 Patent under 35 U.S.C. § 271(b) by encouraging others to make and use the Accused Product in the United States in a manner specifically intended to infringe the ’069 Patent.

76. Moderna has contributed, and continues to contribute, to the infringement of one or more claims of the ’069 Patent by others under 35 U.S.C. § 271(c) by offering to sell and selling within the United States, or importing into the United States, a component of a patented manufacture, combination or composition, constituting a material part of the invention of the ’069 Patent, knowing the same to be especially made or especially adapted for use in the infringement of the ’069 Patent and not a staple article or commodity of commerce suitable for substantial non-infringing use.

77. Moderna has also infringed and continues to infringe the ’069 Patent under 35 U.S.C. § 271(f)(1) by intentionally supplying or causing to be supplied in or from the United

States all or a substantial portion of the components of the Accused Product—including mRNA and [redacted]—where such components are uncombined in whole or in part, in such manner as to actively induce the combination of such components outside of the United States in a manner that would infringe the ’069 patent if such combination occurred within the United States.

78. Moderna has also infringed and continues to infringe the ’069 Patent under 35 U.S.C. § 271(f)(2) by intentionally supplying or causing to be supplied in or from the United States a component of the Accused Product—such as mRNA or [redacted]—where such components are uncombined in whole or in part, knowing such component is especially made or especially adapted for use in the infringement of the ’069 Patent and not a staple article or commodity of commerce suitable for substantial non-infringing use.

79. For example, Claim 1 of the ’069 Patent recites a “nucleic acid-lipid particle comprising: (a) a nucleic acid; (b) a cationic lipid comprising from 50 mol % to 65 mol % of the total lipid present in the particle; (c) a non-cationic lipid comprising a mixture of a phospholipid and cholesterol or a derivative thereof, wherein the phospholipid comprises from 4 mol % to 10 mol % of the total lipid present in the particle and the cholesterol or derivative thereof comprises from 30 mol % to 40 mol % of the total lipid present in the particle; and (d) a conjugated lipid that inhibits aggregation of particles comprising from 0.5 mol % to 2 mol % of the total lipid present in the particle.”

80. The Accused Product is a pharmaceutical composition of nucleic acid-lipid particles. The nucleic acid in the Asserted Product is an mRNA which encodes the COVID-19 spike protein.

81. The Accused Product comprises nucleic acid-lipid particles comprising the following lipids: an ionizable cationic lipid (SM-102); a phospholipid (DSPC); cholesterol; and a conjugated lipid that inhibits aggregation of particles (a PEG-lipid conjugate).

82. On information and belief, as indicated in the Moderna/NIH preprint and in International Patent Publication WO 2021/159130, the Accused Product comprises nucleic acid-lipid particles comprising the following lipids in the following ratio of the total lipid present in the particle: 50 mol % of an ionizable cationic lipid; 10 mol % of a phospholipid; 38.5 mol % of cholesterol; and 1.5 mol % of a conjugated lipid that inhibits aggregation of particles.

83. Moderna has known of the '069 Patent since before it commenced the infringing conduct or has been willfully blind to its existence and contents since then. Moderna has long been aware of, and has actively monitored Arbutus's patent estate, including the '069 Patent.[31] Moderna secured unauthorized limited sublicenses to Arbutus's LNP-related patents through Acuitas; Moderna later sought to invalidate three of Arbutus's LNP-related patents, including the '069 Patent, through *inter partes* review; and Moderna has repeatedly made public representations regarding Arbutus's LNP technology and patents.[32] Despite such knowledge, Moderna nonetheless has engaged in the manufacture, offer for sale, sale or use of the Accused Product within the United States, the importation of the Accused Product into the United States, and/or the supply or causing to be supplied from the United States of a component or all or a

---

[31] *See, e.g.*, Moderna Mot. at 4-5, Dkt. No. 18, *Moderna TX, Inc. v. Arbutus Biopharma Corp.* (Fed. Cir. No. 2020-2329).

[32] *See, e.g.*, Moderna Mot. at 5, Dkt. No. 18, *Moderna TX, Inc. v. Arbutus Biopharma Corp.* (Fed. Cir. No. 2020-2329); Press Release, Moderna, Statement from Moderna on Patent Trial and Appeal Board (PTAB) Ruling (July 24, 2020), https://investors.modernatx.com/news-releases/news-release-details/statement-moderna-patent-trial-and-appeal-board-ptab-ruling.

substantial portion of components of the Accused Product, in violation of Plaintiffs' patent rights.

84. Moderna actively and knowingly has infringed the '069 Patent and actively and knowingly has induced infringement of the '069 Patent by others. After Moderna knew or should have known that the Accused Product infringed, it applied for and obtained EUA and then full approval from the FDA[33] to market and sell its vaccine in the United States with the specific intent to induce customers to purchase the Accused Product. At all times after Moderna knew or should have known that the Accused Product infringed, it contracted with multiple companies to manufacture the Accused Product, both in the United States and abroad,[34] and supplied those companies, or caused those companies to be supplied, from the United States with components especially made or especially adapted for use in the infringement of the '069 Patent and not a staple article or commodity of commerce suitable for substantial non-infringing use, all with the specific intent to induce those companies to make its infringing product. Upon information and belief, Moderna markets the Accused Product to governments and other entities with the intent for healthcare professionals to administer the Accused Product to millions and potentially billions of people as a means of protection against SARS-CoV-2 infection.

---

[33] Press Release, Moderna, Moderna Announces Initiation of Rolling Submission of Biologics License Application (BLA) with U.S. FDA for the Moderna COVID-19 Vaccine (June 1, 2021), https://investors.modernatx.com/news-releases/news-release-details/moderna-announces-initiation-rolling-submission-biologics; Press Release, Moderna, Moderna Receives Full U.S. FDA Approval for COVID-19 Vaccine Spikevax (Jan. 31, 2022), https://investors.modernatx.com/news/news-details/2022/Moderna-Receives-Full-U.S.-FDA-Approval-for-COVID-19-Vaccine-Spikevax/default.aspx.

[34] Press Release, Moderna, Moderna and Lonza Announce Worldwide Strategic Collaboration to Manufacture Moderna's Vaccine (mRNA-1273) Against Novel Coronavirus (May 1, 2020), https://investors.modernatx.com/news-releases/news-release-details/moderna-and-lonza-announce-worldwide-strategic-collaboration.

85. Moderna actively and knowingly contributes to the infringement of healthcare professionals in the United States who administer or otherwise use the Accused Product in the United States. After Moderna knew or should have known that the Accused Product constituted a material part of the invention of the '069 Patent, knowing the same to be especially made or especially adapted for use in the infringement of the '069 Patent and not a staple article or commodity of commerce suitable for substantial non-infringing use, it pursued and obtained EUA and then full approval from the FDA to market and sell the Accused Product in the United States with the specific intent to induce customers to purchase the Accused Product and for people to have the Accused Product administered to them within the United States. At all times after Moderna knew or should have known that the Accused Product constituted a material part of the invention of the '069 Patent, it contracted with others to manufacture the Accused Product, both in the United States and abroad, knowing healthcare professionals would directly infringe one or more claims of the '069 Patent by administering the Accused Product in the United States.

86. Arbutus and Genevant are entitled to a judgment that Moderna infringes the claims of the '069 Patent by engaging in the manufacture, use, sale, or offer for sale of the Accused Product within the United States, and/or the importation of the Accused Product into the United States, and/or by actively inducing others to do the same, and/or by contributing to the same, and/or by supplying or causing to be supplied from the United States a component or all or a substantial portion of components of the Accused Product.

87. Moderna's infringement has damaged and continues to damage Genevant and Arbutus in an amount yet to be determined, of at least a reasonable royalty.

88. Moderna has undertaken its infringing actions despite knowing that such actions infringe one or more claims of the ’069 Patent. As such, Moderna has and continues to willfully infringe one or more claims of the ’069 Patent.

89. This is an exceptional case. Genevant and Arbutus are entitled to attorneys’ fees and costs under 35 U.S.C. § 285 as a result of Moderna’s infringement of the ’069 Patent.

**COUNT 2: INFRINGEMENT OF U.S. PATENT NO. 8,492,359**

90. Paragraphs 1 through 83 are incorporated by reference as if fully set forth herein.

91. The United States Patent and Trademark Office duly and legally issued the ’359 Patent to one of Arbutus’s predecessor companies on July 23, 2013. The ’359 Patent is titled “Lipid Formulations for Nucleic Acid Delivery.”

92. Arbutus owns, and at all relevant times has owned, the ’359 Patent.

93. Genevant holds, and at all relevant times has held, a license to Exclusive Rights in the ’359 Patent for certain fields of use, which include the Accused Product. Genevant has the right to sue and seek damages for the infringement alleged herein.

94. Claims of the ’359 Patent cover, among other things, nucleic acid-lipid particles and compositions thereof.

95. Moderna has directly infringed and continues to directly infringe claims of the ’359 Patent under 35 U.S.C. § 271(a) by manufacturing, offering to sell, selling, or using within the United States, or importing into the United States, the Accused Product incorporating Arbutus’s patented LNP delivery technology covered by the ’359 Patent, without authority or license to do so, during the term of the ’359 Patent.

96. Moderna actively, knowingly, and intentionally has induced, and continues to induce, infringement of one or more claims of the ’359 Patent under 35 U.S.C. § 271(b) by

actively encouraging others to make and use the Accused Product in the United States in a manner specifically intended to infringe the ’359 Patent.

97. Moderna has contributed, and continues to contribute to the infringement of one or more claims of the ’359 Patent by others under 35 U.S.C. § 271(c) by offering to sell and selling within the United States, or importing into the United States, a component of a patented manufacture, combination or composition, constituting a material part of the invention of the ’359 Patent, knowing the same to be especially made or especially adapted for use in the infringement of the ’359 Patent and not a staple article or commodity of commerce suitable for substantial non-infringing use.

98. Moderna has also infringed and continues to infringe the ’359 Patent under 35 U.S.C. § 271(f)(1) by intentionally supplying or causing to be supplied in or from the United States all or a substantial portion of the components of the Accused Product—including mRNA and [redacted]—where such components are uncombined in whole or in part, in such manner as to actively induce the combination of such components outside of the United States in a manner that would infringe the ’359 patent if such combination occurred within the United States.

99. Moderna has also infringed and continues to infringe the ’359 Patent under 35 U.S.C. § 271(f)(2) by intentionally supplying or causing to be supplied in or from the United States a component of the Accused Product—such as mRNA or [redacted]—where such components are uncombined in whole or in part, knowing such component is especially made or especially adapted for use in the infringement of the ’359 Patent and not a staple article or commodity of commerce suitable for substantial non-infringing use.

100. For example, Claim 1 of the '359 Patent recites a "nucleic acid-lipid particle comprising: (a) a nucleic acid; (b) a cationic lipid comprising from 50 mol % to 65 mol % of the total lipid present in the particle; (c) a non-cationic lipid comprising a mixture of a phospholipid and cholesterol or a derivative thereof, wherein the phospholipid comprises from 3 mol % to 15 mol % of the total lipid present in the particle and the cholesterol or derivative thereof comprises from 30 mol % to 40 mol % of the total lipid present in the particle; and (d) a conjugated lipid that inhibits aggregation of particles comprising from 0.5 mol % to 2 mol % of the total lipid present in the particle."

101. The Accused Product is a pharmaceutical composition of nucleic acid-lipid particles. The nucleic acid in the Accused Product is an mRNA which encodes the COVID-19 spike protein.

102. The Accused Product comprises nucleic acid-lipid particles comprising the following lipids: an ionizable cationic lipid (SM-102); a phospholipid (DSPC); cholesterol; and a conjugated lipid that inhibits aggregation of particles (a PEG-lipid conjugate).

103. On information and belief, as indicated in the Moderna/NIH preprint and in International Patent Publication WO 2021/159130, the Accused Product comprises nucleic acid-lipid particles comprising the following lipids in the following ratio of the total lipid present in the particle: 50 mol % of an ionizable cationic lipid; 10 mol % of a phospholipid; 38.5 mol % of cholesterol; and 1.5 mol % of a conjugated lipid that inhibits aggregation of particles.

104. Moderna has known of the '359 Patent since before it commenced the infringing conduct or has been willfully blind to its existence and contents since then. Moderna has long been aware of and actively monitored Arbutus's patent estate. Moderna secured unauthorized limited sublicenses to Arbutus's LNP-related patents through Acuitas; Moderna later sought to

invalidate three of Arbutus's LNP-related patents through *inter partes* review; and Moderna has repeatedly made public statements regarding Arbutus's LNP technology and patents. The '359 Patent is in the same family as, and is cited on the face of, the '435 Patent that Moderna challenged in *inter partes* review. Despite such knowledge, Moderna nonetheless has engaged in the manufacture, offer for sale, sale or use of the Accused Product within the United States, the importation of the Accused Product into the United States, and/or the supply or causing to be supplied from the United States of a component or all or a substantial portion of components of the Accused Product, in violation of Plaintiffs' patent rights.

105. Moderna actively and knowingly has infringed the '359 Patent and actively and knowingly has induced infringement of the '359 Patent by others. After Moderna knew or should have known that the Accused Product infringed, it applied for and obtained EUA and then full approval from the FDA to market and sell the Accused Product in the United States, and supplied those companies, or caused those companies to be supplied, from the United States with components especially made or especially adapted for use in the infringement of the '359 Patent and not a staple article or commodity of commerce suitable for substantial non-infringing use, all with the specific intent to induce customers to purchase the Accused Product. At all times after Moderna knew or should have known that the Accused Product infringed, it contracted with multiple companies to manufacture the Accused Product, both in the United States and abroad, with the specific intent to induce those companies to make its infringing product. Upon information and belief, Moderna actively markets the Accused Product to governments and other entities with the intent for healthcare professionals to administer the Accused Product to millions and potentially billions of people as a means of protection against SARS-CoV-2 infection.

106. Moderna actively and knowingly contributes to the infringement of healthcare professionals in the United States who administer or otherwise use the Accused Product in the United States. After Moderna knew or should have known that the Accused Product constituted a material part of the invention of the '359 Patent, knowing the same to be especially made or especially adapted for use in the infringement of the '359 Patent and not a staple article or commodity of commerce suitable for substantial non-infringing use, it pursued and obtained EUA and then full approval from the FDA to market and sell the Accused Product in the United States with the specific intent to induce customers to purchase the Accused Product and for people to have the Accused Product administered to them within the United States. At all times after Moderna knew or should have known that the Accused Product constituted a material part of the invention of the '359 Patent, it contracted with others to manufacture the Accused Product, both in the United States and abroad, knowing healthcare professionals would directly infringe one or more claims of the '359 Patent by administering the Accused Product in the United States.

107. Arbutus and Genevant are entitled to a judgment that Moderna infringes the claims of the '359 Patent by engaging in the manufacture, use, sale, or offer for sale of the Accused Product within the United States, and/or the importation of the Accused Product into the United States, and/or by actively inducing others to do the same, and/or by contributing to the same, and/or by supplying a component or all or a substantial portion of components of the Accused Product.

108. Moderna's infringement has damaged and continues to damage Genevant and Arbutus in an amount yet to be determined, of at least a reasonable royalty.

109. Moderna has undertaken its infringing actions despite knowing that such actions infringe one or more claims of the '359 Patent. As such, Moderna has and continues to willfully infringe one or more claims of the '359 Patent.

110. This is an exceptional case. Genevant and Arbutus are entitled to attorneys' fees and costs under 35 U.S.C. § 285 as a result of Moderna's infringement of the '359 Patent.

**COUNT 3: INFRINGEMENT OF U.S. PATENT NO. 8,822,668**

111. Paragraphs 1 through 102 are incorporated by reference as if fully set forth herein.

112. The United States Patent and Trademark Office duly and legally issued the '668 Patent to one of Arbutus's predecessor companies on September 2, 2014. The '668 Patent is titled "Lipid Formulations for Nucleic Acid Delivery."

113. Arbutus owns, and at all relevant times has owned, the '668 Patent.

114. Genevant holds, and at all relevant times has held, a license to Exclusive Rights in the '668 Patent for certain fields of use, which include the Accused Product. Genevant has the right to sue and seek damages for the infringement alleged herein.

115. Claims of the '668 Patent cover, among other things, nucleic acid-lipid particles and compositions thereof and methods of using them.

116. Moderna has directly infringed and continues to directly infringe claims of the '668 Patent under 35 U.S.C. § 271(a) by manufacturing, offering to sell, selling, or using within the United States, or importing into the United States, the Accused Product incorporating Arbutus's patented LNP delivery technology covered by the '668 Patent, without authority or license to do so, during the term of the '668 Patent.

117. Moderna actively, knowingly, and intentionally has induced, and continues to induce, infringement of one or more claims of the '668 Patent under 35 U.S.C. § 271(b) by

actively encouraging others to make and use the Accused Product in the United States in a manner specifically intended to infringe the ’668 Patent.

118. Moderna has contributed, and continues to contribute, to the infringement of one or more claims of the ’668 Patent by others under 35 U.S.C. § 271(c) by offering to sell and selling within the United States, or importing into the United States, a component of a patented manufacture, combination or composition, constituting a material part of the invention of the ’668 Patent, knowing the same to be especially made or especially adapted for use in the infringement of the ’668 Patent and not a staple article or commodity of commerce suitable for substantial non-infringing use.

119. Moderna has also infringed and continues to infringe the ’668 Patent under 35 U.S.C. § 271(f)(1) by intentionally supplying or causing to be supplied in or from the United States all or a substantial portion of the components of the Accused Product—including mRNA and [redacted]—where such components are uncombined in whole or in part, in such manner as to actively induce the combination of such components outside of the United States in a manner that would infringe the ’668 patent if such combination occurred within the United States.

120. Moderna has also infringed and continues to infringe the ’668 Patent under 35 U.S.C. § 271(f)(2) by intentionally supplying or causing to be supplied in or from the United States a component of the Accused Product—such as mRNA or [redacted]—where such components are uncombined in whole or in part, knowing such component is especially made or especially adapted for use in the infringement of the ’668 Patent and not a staple article or commodity of commerce suitable for substantial non-infringing use.

121. For example, Claim 1 of the ’668 Patent recites a “nucleic acid-lipid particle comprising: (a) a nucleic acid; (b) a cationic lipid comprising from 50 mol % to 65 mol % of the total lipid present in the particle; (c) a non-cationic lipid comprising up to 49.5 mol % of the total lipid present in the particle and comprising a mixture of a phospholipid and cholesterol or a derivative thereof, wherein the cholesterol or derivative thereof comprises from 30 mol % to 40 mol % of the total lipid present in the particle; and (d) a conjugated lipid that inhibits aggregation of particles comprising from 0.5 mol % to 2 mol % of the total lipid present in the particle.”

122. The Accused Product is a pharmaceutical composition of nucleic acid-lipid particles. The nucleic acid in the Accused Product is an mRNA which encodes the COVID-19 spike protein.

123. The Accused Product comprises nucleic acid-lipid particles comprising the following lipids: an ionizable cationic lipid (SM-102); a non-cationic lipid comprising a mixture of a phospholipid and cholesterol; and a conjugated lipid that inhibits aggregation of particles (a PEG-lipid conjugate).

124. On information and belief, as indicated in the Moderna/NIH preprint and in International Patent Publication WO 2021/159130, the Accused Product comprises nucleic acid-lipid particles comprising the following lipids in the following ratio of the total lipid present in the particle: 50 mol % of an ionizable cationic lipid; 10 mol % of a phospholipid; 38.5 mol % of cholesterol; and 1.5 mol % of a conjugated lipid that inhibits aggregation of particles.

125. When used as intended, the Accused Product infringes the ’668 Patent’s method claims.

126. For example, Claim 20 of the ’668 patent recites “[a] method for treating a disease or disorder in a mammalian subject in need thereof, the method comprising:

administering to the mammalian subject a therapeutically effective amount of a nucleic acid-lipid particle of claim 1."

127. Moderna's COVID-19 vaccine is intended for use in a method for treating a disease or disorder in a mammalian subject in need thereof, namely vaccination of a human against COVID-19. Moderna's COVID-19 vaccine comprises the nucleic acid-lipid particles of Claim 1 and it is intended for administration to a human in need thereof. Moderna's COVID-19 vaccine comprises a therapeutically effective amount of a nucleic acid-lipid particle of Claim 1. When used as intended, and as Moderna specifically instructs and encourages that it be used, the Accused Product infringes Claim 20.

128. Moderna has known of the '668 Patent since before it commenced the infringing conduct or has been willfully blind to its existence and contents since then. Moderna has long been aware of and actively monitored Arbutus's patent estate. Moderna secured unauthorized limited sublicenses to Arbutus's LNP-related patents through Acuitas; Moderna later sought to invalidate three of Arbutus's LNP-related patents through *inter partes* review; and Moderna has repeatedly made public statements regarding Arbutus's LNP technology and patents. The '668 Patent is in the same family as, and is cited on the face of, the '435 Patent that Moderna challenged in *inter partes* review. Despite such knowledge, Moderna nonetheless has engaged in the manufacture, offer for sale, sale or use of the Accused Product within the United States, the importation of the Accused Product into the United States, and/or the supply or causing to be supplied from the United States of a component or all or a substantial portion of components of the Accused Product, in violation of Plaintiffs' patent rights.

129. Moderna actively and knowingly has infringed the '668 Patent and actively and knowingly has induced infringement of the '668 Patent by others. After Moderna knew or

should have known that the Accused Product infringed, it applied for and obtained EUA and then full approval from the FDA to market and sell the Accused Product in the United States, with the specific intent to induce customers to purchase the Accused Product and for people to have the Accused Product administered to them within the United States. At all times after Moderna knew or should have known that the Accused Product infringed, it contracted with multiple companies to manufacture the Accused Product, both in the United States and abroad, and supplied those companies, or caused those companies to be supplied, from the United States with components especially made or especially adapted for use in the infringement of the ’668 Patent and not a staple article or commodity of commerce suitable for substantial non-infringing use, all with the specific intent to induce those companies to make its infringing product. Upon information and belief, Moderna actively markets the Accused Product to governments and other entities with the intent for healthcare professionals to infringe by administering the Accused Product to millions and potentially billions of people as a means of protection against SARS-CoV-2 infection.

130. Moderna actively and knowingly contributes to the infringement of healthcare professionals in the United States who administer or otherwise use the Accused Product in the United States. After Moderna knew or should have known that the Accused Product constituted a material part of the invention of the ’668 Patent, knowing the same to be especially made or especially adapted for use in the infringement of the ’668 Patent and not a staple article or commodity of commerce suitable for substantial non-infringing use, it pursued and obtained EUA and then full approval from the FDA to market and sell the Accused Product in the United States with the specific intent to induce customers to purchase the Accused Product and for people to have the Accused Product administered to them within the United States. At all times

after Moderna knew or should have known that the Accused Product constituted a material part of the invention of the ’668 Patent, it contracted with others to manufacture the Accused Product, both in the United States and abroad, knowing healthcare professionals would directly infringe one or more claims of the ’668 Patent by administering the Accused Product in the United States.

131. Arbutus and Genevant are entitled to a judgment that Moderna infringes the claims of the ’668 Patent by engaging in the manufacture, use, sale, or offer for sale of the Accused Product within the United States, and/or the importation of the Accused Product into the United States, and/or by actively inducing others to do the same, and/or by contributing to the same, and/or by supplying a component or all or a substantial portion of components of the Accused Product.

132. Moderna’s infringement has damaged and continues to damage Genevant and Arbutus in an amount yet to be determined, of at least a reasonable royalty.

133. Moderna has undertaken its infringing actions despite knowing that such actions infringe one or more claims of the ’668 Patent. As such, Moderna has and continues to willfully infringe one or more claims of the ’668 Patent.

134. This is an exceptional case. Genevant and Arbutus are entitled to attorneys’ fees and costs under 35 U.S.C. § 285 as a result of Moderna’s infringement of the ’668 Patent.

**COUNT 4: INFRINGEMENT OF U.S. PATENT NO. 9,364,435**

135. Paragraphs 1 through 124 are incorporated by reference as if fully set forth herein.

136. The United States Patent and Trademark Office duly and legally issued the ’435 Patent to one of Arbutus’s predecessor companies on June 14, 2016. The ’435 Patent is titled “Lipid Formulations for Nucleic Acid Delivery.”

137. Arbutus owns, and at all relevant times has owned, the ’435 Patent.

138. Genevant holds, and at all relevant times has held, a license to Exclusive Rights in the ’435 Patent for certain fields of use, which include the Accused Product. Genevant has the right to sue and seek damages for the infringement alleged herein.

139. Claims of the ’435 Patent cover, among other things, nucleic acid-lipid particles and compositions thereof and methods of using them.

140. Moderna has directly infringed and continues to directly infringe claims of the ’435 Patent under 35 U.S.C. § 271(a) by manufacturing, offering to sell, selling, or using within the United States, or importing into the United States, the Accused Product incorporating Arbutus’s patented LNP delivery technology covered by the ’435 Patent, without authority or license to do so, during the term of the ’435 Patent.

141. Moderna actively, knowingly, and intentionally has induced, and continues to induce, infringement of one or more claims of the ’435 Patent under 35 U.S.C. § 271(b) by actively encouraging others to make and use the Accused Product in the United States in a manner specifically intended to infringe the ’435 Patent.

142. Moderna has contributed, and continues to contribute, to the infringement of one or more claims of the ’435 Patent by others under 35 U.S.C. § 271(c) by offering to sell and selling within the United States, or importing into the United States, a component of a patented manufacture, combination or composition, constituting a material part of the invention of the ’435 Patent, knowing the same to be especially made or especially adapted for use in the infringement of the ’435 Patent and not a staple article or commodity of commerce suitable for substantial non-infringing use.

143. Moderna has also infringed and continues to infringe the ’435 Patent under 35 U.S.C. § 271(f)(1) by intentionally supplying or causing to be supplied in or from the United

States all or a substantial portion of the components of the Accused Product—including mRNA and [redacted]—where such components are uncombined in whole or in part, in such manner as to actively induce the combination of such components outside of the United States in a manner that would infringe the '435 patent if such combination occurred within the United States.

144. Moderna has also infringed and continues to infringe the '435 Patent under 35 U.S.C. § 271(f)(2) by intentionally supplying or causing to be supplied in or from the United States a component of the Accused Product—such as mRNA or [redacted]—where such components are uncombined in whole or in part, knowing such component is especially made or especially adapted for use in the infringement of the '435 Patent and not a staple article or commodity of commerce suitable for substantial non-infringing use.

145. The Accused Product infringes at least Claim 7 of the '435 Patent.

146. Claim 7 of the '435 Patent depends from Claims 1 and 5. Claim 1 of the '435 Patent recites a "nucleic acid-lipid particle comprising: (a) a nucleic acid; (b) a cationic lipid comprising from 50 mol % to 85 mol % of the total lipid present in the particle; (c) non-cationic lipid comprising from 13 mol % to 49.5 mol % of the total lipid present in the particle; and (d) a conjugated lipid that inhibits aggregation of particles comprising from 0.5 mol % to 2 mol % of the total lipid present in the particle." Claim 5 further requires "[t]he nucleic acid-lipid particle of claim 1, wherein the non-cationic lipid comprises a mixture of a phospholipid and cholesterol or a derivative thereof." Claim 7 further requires "[t]he nucleic acid-lipid particle of claim 5, wherein the phospholipid comprises from 3 mol % to 15 mol % of the total lipid present in the particle."

147. The Accused Product is a pharmaceutical composition of nucleic acid-lipid particles. The nucleic acid in the Accused Product is an mRNA which encodes the COVID-19 spike protein.

148. The Accused Product comprises an ionizable cationic lipid (SM-102), a non-cationic lipid (a mixture of phospholipid and cholesterol), and a conjugated lipid that inhibits aggregation of particles (a PEG-lipid conjugate).

149. On information and belief, as indicated in the Moderna/NIH preprint and in International Patent Publication WO 2021/159130, the Accused Product comprises nucleic acid-lipid particles comprising the following lipids in the following ratio of the total lipid present in the particle: 50 mol % of an ionizable cationic lipid; 48.5 mol % of a non-cationic lipid; and 1.5 mol % of a conjugated lipid that inhibits aggregation of particles.

150. On information and belief, as indicated in the Moderna/NIH preprint and in International Patent Publication WO 2021/159130, the Accused Product comprises nucleic acid-lipid particles where the non-cationic lipid comprises a mixture of a phospholipid and cholesterol. On information and belief, as indicated in the Moderna/NIH preprint and in International Patent Publication WO 2021/159130, the Accused Product comprises nucleic acid-lipid particles where 10 mol % of the total lipid present in the particle is a phospholipid.

151. When used as intended, the Accused Product infringes the ’435 Patent’s method claims.

152. For example, Claim 17 of the ’435 Patent recites a “method for treating a disease or disorder in a mammalian subject in need thereof, the method comprising: administering to the mammalian subject a therapeutically effective amount of a nucleic acid-lipid particle of claim 1.”

153. The Accused Product is intended for use in a method for treating a disease or disorder in a mammalian subject in need thereof, namely vaccination of a human against COVID-19. The Accused Product comprises the nucleic acid-lipid particles of Claim 1 and it is intended for administration to a human in need thereof. The Accused Product comprises a therapeutically effective amount of a nucleic acid-lipid particle of Claim 1. When used as intended, and as Moderna specifically instructs and encourages that it be used, the Accused Product infringes Claim 17.

154. Moderna has known of the ’435 Patent since before it commenced the infringing conduct or has been willfully blind to its existence and contents since then. Moderna has long been aware of and actively monitored Arbutus’s patent estate. Moderna secured unauthorized limited sublicenses to Arbutus’s LNP-related patents through Acuitas; Moderna later sought to invalidate three of Arbutus’s LNP-related patents, including the ’435 Patent, through *inter partes* review, and Moderna has repeatedly made public statements regarding Arbutus’s LNP technology and patents. Despite such knowledge, Moderna nonetheless has engaged in the manufacture, offer for sale, sale or use of the Accused Product within the United States, the importation of the Accused Product into the United States, and/or the supply or causing to be supplied from the United States of a component or all or a substantial portion of components of the Accused Product, in violation of Plaintiffs’ patent rights.

155. Modern actively and knowingly has infringed the ’435 Patent and actively and knowingly induced infringement of the ’435 Patent by others. After Moderna knew or should have known that the Accused Product infringed, it applied for and obtained EUA and then full approval from the FDA to market and sell the Accused Product in the United States with the specific intent to induce customers to purchase the Accused Product and for people to have the

Accused Product administered to them within the United States. At all times after Moderna knew or should have known that the Accused Product infringed, it contracted with multiple companies to manufacture the Accused Product, both in the United States and abroad, and supplied those companies, or caused those companies to be supplied, from the United States with components especially made or especially adapted for use in the infringement of the ’435 Patent and not a staple article or commodity of commerce suitable for substantial non-infringing use, all with the specific intent to induce those companies to make its infringing product. Upon information and belief, Moderna actively markets the Accused Product to governments and other entities with the intent for healthcare professionals to infringe by administering the Accused Product to millions and potentially billions of people as a means of protection against SARS-CoV-2 infection.

156. Moderna actively and knowingly contributes to the infringement of healthcare professionals in the United States who administer or otherwise use the Accused Product in the United States. After Moderna knew or should have known that the Accused Product constituted a material part of the invention of the ’435 Patent, knowing the same to be especially made or especially adapted for use in the infringement of the ’435 Patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use, it pursued and obtained EUA and then full approval from the FDA to market and sell the Accused Product in the United States with the specific intent to induce customers to purchase the Accused Product and for people to have the Accused Product administered to them within the United States. At all times after Moderna knew or should have known that the Accused Product constituted a material part of the invention of the ’435 Patent, it contracted with others to manufacture the Accused Product,

both in the United States and abroad, knowing healthcare professionals would directly infringe one or more claims of the '435 Patent by administering the Accused Product in the United States.

157. Arbutus and Genevant are entitled to a judgment that Moderna infringes the claims of the '435 Patent by engaging in the manufacture, use, sale, or offer for sale of the Accused Product within the United States, and/or the importation of the Accused Product into the United States, and/or by actively inducing others to do the same, and/or by contributing to the same, and/or by supplying a component or all or a substantial portion of components of the Accused Product.

158. Moderna's infringement has damaged and continues to damage Genevant and Arbutus in an amount yet to be determined, of at least a reasonable royalty.

159. Moderna has undertaken its infringing actions despite knowing that such actions infringed one or more claims of the '435 Patent. As such, Moderna has and continues to willfully infringe one or more claims of the '435 Patent.

160. This is an exceptional case. Genevant and Arbutus are entitled to attorneys' fees and costs under 35 U.S.C. § 285 as a result of Moderna's infringement of the '435 Patent.

## COUNT 5: INFRINGEMENT OF U.S. PATENT NO. 9,504,651

161. Paragraphs 1 through 148 are incorporated by reference as if fully set forth herein.

162. The United States Patent and Trademark Office duly and legally issued the '651 Patent to one of Arbutus's predecessor companies on November 29, 2016. The '651 Patent is titled "Lipid Compositions for Nucleic Acid Delivery."

163. Arbutus owns, and at all relevant times has owned, the '651 Patent.

164. Genevant holds, and at all relevant times has held, a license to Exclusive Rights in the '651 Patent for certain fields of use, which include the Accused Product. Genevant has the right to sue and seek damages for the infringement alleged herein.

165. Claims of the ’651 Patent cover, among other things, lipid vesicle formulations comprising mRNA.

166. Moderna has directly infringed and continues to directly infringe the claims of the ’651 Patent under 35 U.S.C. § 271(a) by manufacturing, offering to sell, selling, or using within the United States, or importing into the United States, the Accused Product, incorporating Arbutus’s patented LNP delivery technology covered by the ’651 Patent, without authority or license to do so, during the term of the ’651 Patent.

167. Moderna actively, knowingly, and intentionally has induced, and continues to induce, infringement of one or more claims of the ’651 Patent under 35 U.S.C. § 271(b) by actively encouraging others to make and use the Accused Product in the United States in a manner specifically intended to infringe the ’651 Patent.

168. Moderna has contributed, and continues to contribute, to the infringement of one or more claims of the ’651 Patent by others under 35 U.S.C. § 271(c) by offering to sell and selling within the United States, or importing into the United States, a component of a patented manufacture, combination or composition, constituting a material part of the invention of the ’651 Patent, knowing the same to be especially made or especially adapted for use in the infringement of the ’651 Patent and not a staple article or commodity of commerce suitable for substantial non-infringing use.

169. Moderna has also infringed and continues to infringe the ’651 Patent under 35 U.S.C. § 271(f)(1) by intentionally supplying or causing to be supplied in or from the United States all or a substantial portion of the components of the Accused Product—including mRNA and [redacted]—where such components are uncombined in whole or in part, in such manner as to actively induce the combination of such components outside of the United States in a

manner that would infringe the '651 patent if such combination occurred within the United States.

170. Moderna has also infringed and continues to infringe the '069 Patent under 35 U.S.C. § 271(f)(2) by intentionally supplying or causing to be supplied in or from the United States a component of the Accused Product—such as mRNA or [redacted]—where such components are uncombined in whole or in part, knowing such component is especially made or especially adapted for use in the infringement of the '651 Patent and not a staple article or commodity of commerce suitable for substantial non-infringing use.

171. For example, Claim 1 of the '651 Patent recites a "lipid vesicle formulation comprising: (a) a plurality of lipid vesicles, wherein each lipid vesicle comprises: a cationic lipid; an amphipathic lipid; and a polyethyleneglycol (PEG)-lipid; and (b) messenger RNA (mRNA), wherein at least 70% of the mRNA in the formulation is fully encapsulated in the lipid vesicles." Claim 9 of the '651 Patent further requires "[t]he lipid vesicle formulation of claim 1, wherein each lipid vesicle is a lipid-nucleic acid particle."

172. The Accused Product is a lipid vesicle formulation comprising mRNA and lipid vesicles. The mRNA in the Accused Product encodes the COVID-19 spike protein.

173. The Accused Product comprises a lipid vesicle comprising the following lipids: an ionizable cationic lipid (SM-102); an amphipathic lipid (DSPC); and a PEG-lipid.

174. Upon information and belief, in connection with the Accused Product, Moderna makes a lipid vesicle formulation wherein at least 70% of the mRNA in the formulation is fully encapsulated in the lipid vesicles.

175. On information and belief, Moderna has known of the '651 Patent since before it commenced the infringing conduct or has been willfully blind to its existence and contents since

then. Moderna has long been aware of and actively monitored Arbutus's patent estate. Moderna secured unauthorized limited sublicenses to Arbutus's LNP-related patents through Acuitas; Moderna later sought to invalidate three of Arbutus's LNP-related patents through *inter partes* review, and Moderna has repeatedly made public statements regarding Arbutus's LNP technology and patents. Despite such knowledge, Moderna nonetheless has engaged in the manufacture, offer for sale, sale or use of the Accused Product within the United States, the importation of the Accused Product into the United States, and/or the supply or causing to be supplied from the United States of a component or all or a substantial portion of components of the Accused Product, in violation of Plaintiffs' patent rights.

176. Moderna actively and knowingly has infringed the '651 Patent and actively and knowingly induced infringement of the '651 Patent by others. After Moderna knew or should have known that the Accused Product infringed, it applied for and obtained EUA and then full approval from the FDA to market and sell the Accused Product in the United States, and supplied those companies, or caused those companies to be supplied, from the United States with components especially made or especially adapted for use in the infringement of the '651 Patent and not a staple article or commodity of commerce suitable for substantial non-infringing use, all with the specific intent to induce customers to purchase the Accused Product and for people to have the Accused Product administered to them within the United States. At all times after Moderna knew or should have known that the Accused Product infringed, it contracted with multiple companies to manufacture the Accused Product, both in the United States and abroad, with the specific intent to induce those companies to make its infringing product. Upon information and belief, Moderna actively markets the Accused Product to governments and other

entities with the intent for healthcare professionals to administer the Accused Product to millions and potentially billions of people as a means of protection against SARS-CoV-2 infection.

177. Moderna actively and knowingly contributes to the infringement of healthcare professionals in the United States who administer or otherwise use the Accused Product in the United States. After Moderna knew or should have known that the Accused Product constituted a material part of the invention of the ’651 Patent, knowing the same to be especially made or especially adapted for use in the infringement of the ’651 Patent and not a staple article or commodity of commerce suitable for substantial non-infringing use, it pursued and obtained EUA and then full approval from the FDA to market and sell the Accused Product in the United States with the specific intent to induce customers to purchase the Accused Product and for people to have the Accused Product administered to them within the United States. At all times after Moderna knew or should have known that the Accused Product constituted a material part of the invention of the ’651 Patent, it contracted with others to manufacture the Accused Product, both in the United States and abroad, knowing healthcare professionals would directly infringe one or more claims of the ’651 Patent by administering the Accused Product in the United States.

178. Arbutus and Genevant are entitled to a judgment that Moderna infringes the claims of the ’651 Patent by engaging in the manufacture, use, sale, or offer for sale of the Accused Product within the United States, and/or the importation of Moderna’s COVID-19 vaccine into the United States, and/or by actively inducing others to do the same, and/or by contributing to the same, and/or by supplying a component or all or a substantial portion of components of the Accused Product.

179. Moderna’s infringement has damaged and continues to damage Genevant and Arbutus in an amount yet to be determined, of at least a reasonable royalty.

180. Moderna has undertaken their infringing actions despite knowing that such actions infringed one or more claims of the ’651 Patent. As such, Moderna has and continues to willfully infringe one or more claims of the ’651 Patent.

181. This is an exceptional case. Genevant and Arbutus are entitled to attorneys’ fees and costs under 35 U.S.C. § 285 as a result of Moderna’s infringement of the ’651 Patent.

**COUNT 6: INFRINGEMENT OF U.S. PATENT NO. 11,141,378**

182. Paragraphs 1 through 167 are incorporated by reference as if fully set forth herein.

183. The United States Patent and Trademark Office duly and legally issued the ’378 Patent to Arbutus on October 12, 2021. The ’378 Patent is titled “Lipid Formulations for Nucleic Acid Delivery.”

184. Arbutus owns, and at all relevant times has owned, the ’378 Patent.

185. Genevant holds, and at all relevant times has held, a license to Exclusive Rights in the ’378 Patent for certain fields of use, which include the Accused Product. Genevant has the right to sue and seek damages for the infringement alleged herein.

186. Claims of the ’378 Patent cover, among other things, nucleic acid-lipid particles and compositions thereof.

187. Moderna has directly infringed and continues to directly infringe claims of the ’378 Patent under 35 U.S.C. § 271(a) by manufacturing, offering to sell, selling, or using within the United States, or importing into the United States, the Accused Product incorporating Arbutus’s patented LNP delivery technology covered by the ’378 Patent, without authority or license to do so, during the term of the ’378 Patent.

188. Moderna actively, knowingly, and intentionally has induced, and continues to induce, infringement of one or more claims of the ’378 Patent under 35 U.S.C. § 271(b) by

actively encouraging others to make and use the Accused Product in the United States in a manner specifically intended to infringe the '378 Patent.

189. Moderna has and continues to contribute to the infringement of one or more claims of the '378 Patent by others under 35 U.S.C. § 271(c) by offering to sell and selling within the United States, or importing into the United States, a component of a patented manufacture, combination or composition, constituting a material part of the invention of the '378 Patent, knowing the same to be especially made or especially adapted for use in the infringement of the '378 Patent and not a staple article or commodity of commerce suitable for substantial non-infringing use.

190. Moderna has also infringed and continues to infringe the '378 Patent under 35 U.S.C. § 271(f)(1) by intentionally supplying or causing to be supplied in or from the United States all or a substantial portion of the components of the Accused Product—including mRNA and [redacted]—where such components are uncombined in whole or in part, in such manner as to actively induce the combination of such components outside of the United States in a manner that would infringe the '378 patent if such combination occurred within the United States.

191. Moderna has also infringed and continues to infringe the '378 Patent under 35 U.S.C. § 271(f)(2) by intentionally supplying or causing to be supplied in or from the United States a component of the Accused Product—such as mRNA or [redacted]—where such components are uncombined in whole or in part, knowing such component is especially made or especially adapted for use in the infringement of the '378 Patent and not a staple article or commodity of commerce suitable for substantial non-infringing use.

192. For example, Claim 1 of the '378 Patent recites a "nucleic acid-lipid particle consisting essentially of: (a) an RNA; (b) a cationic lipid having a protonatable tertiary amine; (c) a mixture of a phospholipid and cholesterol of from 30 mol % to 55 mol % of the total lipid present in the particle, wherein the phospholipid consists of from 3 mol % to 15 mol % of the total lipid present in the particle; and (d) a polyethyleneglycol (PEG)-lipid conjugate consisting of from 0.1 mol % to 2 mol % of the total lipid present in the particle." An ionizable lipid having a protonatable tertiary amine becomes a cationic lipid.

193. The Accused Product is a pharmaceutical composition of nucleic acid-lipid particles. The nucleic acid in the Accused Product is an mRNA which encodes the COVID-19 spike protein.

194. The Accused Product comprises nucleic acid-lipid particles comprising the following lipids: an ionizable cationic lipid (SM-102); a non-cationic lipid comprising a mixture of a phospholipid and cholesterol; and a conjugated lipid that inhibits aggregation of particles (a PEG-lipid).

195. On information and belief, as indicated in the Moderna/NIH preprint and in International Patent Publication WO 2021/159130, the Accused Product comprises a cationic lipid having a protonatable tertiary amine; 10 mol % of a phospholipid; 38.5 mol % of cholesterol; and 1.5 mol % of a conjugated lipid that inhibits aggregation of particles.

196. The '378 Patent issued on October 12, 2021. That day, Genevant sent Moderna an email notice that Moderna may be infringing one or more claims of the '378 Patent.

197. Despite such knowledge, Moderna nonetheless has engaged in the manufacture, offer for sale, sale or use of the Accused Product within the United States, the importation of the Accused Product into the United States, and/or the supply or causing to be supplied from the

United States of a component or all or a substantial portion of components of the Accused Product, in violation of Plaintiffs' patent rights.

198. Moderna actively and knowingly has infringed the '378 Patent and actively and knowingly induced infringement of the '378 Patent by others. After Moderna knew or should have known that the Accused Product infringed, Moderna continued to seek and has now received full FDA approval for its Accused Product, with the specific intent to induce customers to purchase them and for people to have the Accused Product administered to them within the United States. At all times after Moderna knew or should have known that the Accused Product infringed, it has maintained active contracts with multiple companies to manufacture the Accused Product, both in the United States and abroad, and supplied those companies, or caused those companies to be supplied, from the United States with components especially made or especially adapted for use in the infringement of the '378 Patent and not a staple article or commodity of commerce suitable for substantial non-infringing use, all with the specific intent to induce those companies to make its infringing product. Upon information and belief, Moderna is continuing to seek and negotiate similar contracts with companies to manufacture the Accused Product. Upon information and belief, Moderna actively markets the Accused Product to governments and other entities with the intent for healthcare professionals to infringe by administering the Accused Product to millions and potentially billions of people as a means of protection against SARS-CoV-2 infection.

199. Moderna actively and knowingly contributes to the infringement of healthcare professionals in the United States who administer or otherwise use the Accused Product in the United States. After Moderna knew or should have known that the Accused Product constituted a material part of the invention of the '378 Patent, knowing the same to be especially made or

especially adapted for use in the infringement of the ’378 Patent and not a staple article or commodity of commerce suitable for substantial non-infringing use, it continued to pursue and has now obtained full FDA approval to market and sell the Accused Product in the United States. At all times after Moderna knew or should have known that the Accused Product constituted a material part of the invention of the ’378 Patent, it contracted with others to manufacture the Accused Product, both in the United States and abroad, knowing healthcare professionals would directly infringe one or more claims of the ’378 Patent by administering the Accused Product in the United States.

200. Arbutus and Genevant are entitled to a judgment that Moderna infringes the claims of the ’378 Patent by engaging in the manufacture, use, sale, or offer for sale of the Accused Product within the United States, and/or the importation of the Accused Product into the United States, and/or by actively inducing others to do the same, and/or by contributing to the same, and/or by supplying a component or all or a substantial portion of components of the Accused Product.

201. Moderna’s infringement has damaged and continues to damage Genevant and Arbutus in an amount yet to be determined, of at least a reasonable royalty.

202. Moderna has undertaken its infringing actions despite knowing that such actions infringe one or more claims of the ’378 Patent. As such, Moderna has and continues to willfully infringe one or more claims of the ’378 Patent.

203. This is an exceptional case. Genevant and Arbutus are entitled to attorneys’ fees and costs under 35 U.S.C. § 285 as a result of Moderna’s infringement of the ’378 Patent.

## PRAYER FOR RELIEF

WHEREFORE, Arbutus and Genevant respectfully request that this Court enter judgment in their favor against Moderna and grant the following relief:

A. A judgment that Moderna has infringed or will infringe each of the Asserted Patents under 35 U.S.C. § 271(a), (b), (c) or (f) by making, offering to sell, selling, or using within the United States, or importing into the United States, the Accused Product, or actively inducing someone to do the same or contributing to the same, or supplying or causing to be supplied from the United States a component or all or a substantial portion of components of the Accused Product, during the term of each of the Asserted Patents;

B. An award of damages sufficient to compensate Arbutus and Genevant for Moderna's infringement under 35 U.S.C. § 284, in no event less than a reasonable royalty on all infringing sales or other dispositions of Accused Product;

C. A judgment that the infringement has been willful and an enhancement of damages;

D. A declaration that this is an exceptional case and an award of attorneys' fees pursuant to 35 U.S.C. § 285;

E. An award of Arbutus's and Genevant's costs and expenses in this action;

F. An award of pre- and post-judgement interest; and

G. Such other and further relief as this court may deem just and proper, except that Arbutus and Genevant DO NOT seek any form of injunctive relief concerning the Accused Product.

**JURY DEMAND**

Arbutus and Genevant, by and through undersigned counsel, hereby demand, pursuant to Fed. R. Civ. P. 38, a trial by jury on all claims so triable in this action.

Dated: May 1, 2024

*<u>/s/ Nathan R. Hoeschen</u>*
John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
kkeller@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Plaintiffs*

OF COUNSEL:
David I. Berl
Adam D. Harber
Thomas S. Fletcher
Jessica Palmer Ryen
Shaun P. Mahaffy
Anthony H. Sheh
Matthew W. Lachman
Jihad J. Komis
Philip N. Haunschild
Falicia Elenberg
WILLIAMS & CONNOLLY LLP
680 Maine Avenue S.W.
Washington, DC 20024
(202) 434-5000
*Attorneys for Plaintiff Genevant Sciences GmbH*

Daralyn J. Durie
Adam R. Brausa
Eric C. Wiener
Annie A. Lee
Shaelyn K. Dawson
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105-2482
(415) 268-6080

Kira A. Davis
MORRISON & FOERSTER LLP
707 Wilshire Boulevard
Los Angeles, CA 90017-3543
(213) 892-5200

David N. Tan
MORRISON & FOERSTER LLP
2100 L Street, NW, Suite 900

Washington, DC 20037
(202) 887-1500
*Attorneys for Plaintiff Arbutus Biopharma Corporation*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ARBUTUS BIOPHARMA CORPORATION and GENEVANT SCIENCES GmbH,<br><br>Plaintiffs,<br><br>v.<br><br>MODERNA, INC. and MODERNATX, INC.<br><br>Defendants. | ) | C.A. No. 22-252 (MSG)<br><br>**JURY TRIAL DEMANDED**<br><br>REDACTED - PUBLIC VERSION<br>Original filing date: May 15, 2024<br>Redacted filing date: June 10, 2024 |
| MODERNA, INC. and MODERNATX, INC.,<br><br>Counterclaim-Plaintiffs,<br><br>v.<br><br>ARBUTUS BIOPHARMA CORPORATION and GENEVANT SCIENCES GmbH,<br><br>Counterclaim-Defendants. | ) | |

**DEFENDANTS' COUNTERCLAIMS AND ANSWER TO AMENDED COMPLAINT**

**DECLARATORY JUDGMENT COUNTERCLAIMS**

Defendants/Counterclaim-Plaintiffs Moderna, Inc. and ModernaTX, Inc. (collectively, "Moderna") demand a trial by jury on all issues so triable and assert the following counterclaims against Plaintiffs/Counterclaim-Defendants Arbutus Biopharma Corporation ("Arbutus") and Genevant Sciences GmbH ("Genevant"):

**INTRODUCTION**

1. Moderna brings these counterclaims in response to Arbutus and Genevant's lawsuit, which baselessly seeks to profit from Moderna's innovations that led to its ground-breaking mRNA-1273 "COVID-19 Vaccine." Specifically, Moderna asks this Court to declare that Moderna's COVID-19 Vaccine does not infringe the Asserted Patents, and that those patents are invalid. In short, this lawsuit will confirm that Moderna and its scientists, employees, and

cols. 14–19 (Examples 1–8, none of which are directed to mRNA formulations). This is consistent with Arbutus predecessor Protiva's public statements at the time that the company was "focused on" "formulations for RNAi therapeutics."[6] As another example, the '651 Patent focuses on plasmid DNA, rather than mRNA. *See* '651 Patent at 2:17–19 ("The present invention can be used to form lipid vesicles that contain encapsulated plasmid DNA or small molecule drugs."), and cols. 14–15.

8. Tellingly, Plaintiffs/Counterclaim Defendants never developed an LNP capable of delivering mRNA, let alone manufactured or sold any approved products of their own, whether siRNA or mRNA-based.

9. Failing to develop any products of its own, Arbutus instead improperly expanded the scope of its patent estate in an attempt to cover the inventions of others, including pioneers like Moderna. Consequently, the purported inventions that Arbutus lays claim to in the Asserted Patents bear no resemblance to the rudimentary technology described in the specifications.

**C. Moderna's Development and Sale of its COVID-19 Vaccine**

10. The SARS-CoV2 virus, which causes COVID-19, was first detected in December 2019. On January 10, 2020, the genetic sequence of the SARS-CoV-2 virus became public.[7] Leveraging its decade of research and proprietary technologies, Moderna quickly responded when the pandemic struck, swiftly developing, manufacturing, and providing doses of its COVID-19 vaccine to people around the world. The COVID-19 Vaccine, also referred to as the mRNA-1273 vaccine, uses Moderna's proprietary LNP delivery technology that Moderna developed and

---

6 https://investor.arbutusbio.com/news-releases/news-release-details/tekmira-pharmaceuticals-and-protiva-biotherapeutics-announce-0.

7 "SARS-CoV-2 mRNA Vaccine Development Enabled by Prototype Pathogen Preparedness," bioRvix.org, at 5–6 (June 11, 2020) ("Moderna/NIH Preprint").

**ANSWER**: Moderna admits that Moderna brought its COVID-19 vaccine from concept to production in record speed through its own hard work and by building on its decade-plus of research and development perfecting the mRNA biological process and advancing its LNP delivery technology. Moderna admits that the article linked at https://alumni.ucsf.edu/stories/stephen-hoge includes a quote from Moderna President Stephen Hoge that states: "We did it in an hour, and it worked brilliantly. But it was not accomplished in that hour. It was accomplished over the two to three decades of work leading up to that moment, not only at Moderna but across the scientific community." Moderna further admits that the article linked at https://www.technologyreview.com/2020/12/17/1014989/moderna-vaccine-availability-stephane-bancel-ceo/ includes a quote from Moderna's CEO Stéphane Bancel that states: "11 months since the DNA sequence of the virus became available, you will have two approved mRNA vaccines, which has never happened before with any technology. That is amazing." Moderna denies the remaining allegations in Paragraph 41.

42. Moderna's success was chronicled in an article first published online on June 11, 2020, by individuals affiliated with the company and collaborators at the National Institutes of Health. According to this article—the "Moderna/NIH preprint"—"the release of SARS-CoV-2 sequences triggered immediate rapid manufacturing of an mRNA vaccine" by Moderna.[8] Moderna "decide[d] on [the] mRNA-1273 sequence" on January 13, 2020, just three days after the publication of the viral sequence, and "initiate[d] cGMP production" the very next day, on January 14, 2020.[9] On February 24, 2020, Moderna shipped clinical drug product, and, less than a month later, Phase I trials began.[10]

---

[8] "SARS-CoV-2 mRNA Vaccine Development Enabled by Prototype Pathogen Preparedness," bioRvix.org (June 11, 2020) *available at* https://www.biorxiv.org/content/10.1101/2020.06.11.145920v1.full.

[9] *Id.*

[10] *Id.*

**ANSWER**: Moderna admits that the quoted text appears in the articles cited. Moderna admits that it shipped clinical drug product on February 24, 2020. To the extent there are any additional allegations in Paragraph 42, Moderna denies them.

43. Moderna's COVID-19 vaccine could not have been developed, much less on a timeline unprecedented in human history, without Arbutus's proven and patented LNP delivery technology-technology that had transformed vaccine design from a years-long project into one that could be performed within an hour over a January weekend.

**ANSWER**: Denied.

44. Moderna's co-founder Robert Langer has been quoted as saying "I don't think people realized just how important the delivery systems are ...."[11] LNPs are so crucial to Moderna's mRNA vaccines that Giuseppe Ciaramella, head of infectious diseases at Moderna from 2014 to 2018, called LNPs "the unsung hero of the whole thing,"[12] while Moderna CEO Stéphane Bancel stated in December 2020 that "[w]e always said it is ... about developing the right delivery technology. And this is something that takes years, not two weeks."[13]

**ANSWER**: Moderna admits that the article available at https://www.bloomberg.com/news/newsletters/2021-03-06/lipids-are-delivering-the- vaccine-revolution includes a quote from Robert Langer saying: "I don't think people realized just how important the delivery systems are to all kinds of medicines," and states that "[w]ithin the LNP for Covid shots, there are two highly specialized lipids. Moderna makes its own versions, while a Vancouver company called Acuitas Therapeutics licenses its technology for the Pfizer-BioNTech shot." Moderna admits that the article available at https://cen.acs.org/pharmaceuticals/drug-delivery/Without-lipid-shells-mRNA-vaccines/99/i8 includes a quote from Giuseppe Ciaramella,

---

[11] Tim Loh, "Lipids Are Delivering the Vaccine Revolution," Bloomberg (March 6, 2021), *available at* https://www.bloomberg.com/news/newsletters/2021-03-06/lipids-are-delivering-the-vaccine-revolution.

[12] Ryan Cross, "Without these lipid shells, there would be no mRNA vaccines for COVID-19," C&EN (March 6, 2021), *available at* https://cen.acs.org/pharmaceuticals/drug-delivery/Without-lipid-shells-mRNA-vaccines/99/i8.

[13] Regalado, *supra* note 7.

81. The Accused Product comprises nucleic acid-lipid particles comprising the following lipids: an ionizable cationic lipid (SM-102); a phospholipid (DSPC); cholesterol; and a conjugated lipid that inhibits aggregation of particles (a PEG-lipid conjugate).

**ANSWER**: Insofar as Paragraph 81 contains legal conclusions, no response is required. To the extent a response is required, Moderna denies the allegations in Paragraph 81.

82. On information and belief, as indicated in the Moderna/NIH preprint and in International Patent Publication WO 2021/159130, the Accused Product comprises nucleic acid-lipid particles comprising the following lipids in the following ratio of the total lipid present in the particle: 50 mol % of an ionizable cationic lipid; 10 mol % of a phospholipid; 38.5 mol % of cholesterol; and 1.5 mol % of a conjugated lipid that inhibits aggregation of particles.

**ANSWER**: Insofar as Paragraph 82 contains legal conclusions, no response is required. To the extent a response is required, Moderna denies the allegations in Paragraph 82.

83. Moderna has known of the '069 Patent since before it commenced the infringing conduct or has been willfully blind to its existence and contents since then. Moderna has long been aware of, and has actively monitored Arbutus's patent estate, including the '069 Patent.[33] Moderna secured unauthorized limited sublicenses to Arbutus's LNP-related patents through Acuitas; Moderna later sought to invalidate three of Arbutus's LNP-related patents, including the '069 Patent, through *inter partes* review; and Moderna has repeatedly made public representations regarding Arbutus's LNP technology and patents.[34] Despite such knowledge, Moderna nonetheless has engaged in the manufacture, offer for sale, sale or use of the Accused Product within the United States, the importation of the Accused Product into the United States, and/or the supply or causing to be supplied from the United States of a component or all or a substantial portion of components of the Accused Product, in violation of Plaintiffs' patent rights.

**ANSWER**: Insofar as Paragraph 83 contains legal conclusions, no response is required. To the extent a response is required, Moderna admits that Protiva licensed certain patents for LNP technology (including the '069 Patent) to Acuitas, and that in 2015 and 2016, Acuitas sublicensed

---

[33] *See, e.g.,* Moderna Mot. at 4-5, Dkt. No. 18, *Moderna TX, Inc. v. Arbutus Biopharma Corp.* (Fed. Cir. No. 2020-2329).

[34] *See, e.g.,* Moderna Mot. at 5, Dkt. No. 18, *Moderna TX, Inc. v. Arbutus Biopharma Corp.* (Fed. Cir. No. 2020-2329); Press Release, Moderna, Statement from Moderna on Patent Trial and Appeal Board (PTAB) Ruling (July 24, 2020), https://investors.Modernatx.com/news-releases/news-release-details/statement-Moderna-Patent-trial-and-appeal-board-ptab-ruling.

certain Protiva/Arbutus LNP patents to Moderna for certain products against four viral targets: Influenza A, Chikungunya virus, RSV, and Zika virus. Moderna further admits that it filed *inter partes* review petitions challenging three Arbutus patents, including the '069 Patent, before the United States Patent and Trademark Office. Moderna further admits that the Moderna press release cited in Paragraph 83, footnote 34 entitled "Statement from Moderna on Patent Trial and Appeal Board (PTAB) Ruling" from July 24, 2020 states: "The recently issued Patent Trial and Appeal Board ruling on the 8,058,069 Patent relates to Moderna's challenge to certain legacy patents held by Arbutus, commenced well before the development of mRNA-1273. These actions were taken by Moderna in response to the longstanding aggressive posture taken by Arbutus and its predecessor company against many developers of nucleic acid-based therapeutics. Through its actions, Moderna successfully overturned one legacy patent held by Arbutus and invalidated the broadest claims of a second one. Moderna's continued development of its proprietary LNP formulation technology and manufacturing processes have advanced well beyond the technology described in these legacy Arbutus patents. Our improved proprietary LNP formula, used to manufacture mRNA-1273, is not covered by the Arbutus patents. Moderna is not aware of any significant intellectual property impediments for any products we intend to commercialize, including mRNA-1273." Moderna denies the remaining allegations in Paragraph 83.

84. Moderna actively and knowingly has infringed the '069 Patent and actively and knowingly has induced infringement of the '069 Patent by others. After Moderna knew or should have known that the Accused Product infringed, it applied for and obtained EUA and then full approval from the FDA[35] to market and sell its vaccine in the United States with the specific intent

[35] Press Release, Moderna, Moderna Announces Initiation of Rolling Submission of Biologics License Application (BLA) with U.S. FDA for the Moderna COVID-19 Vaccine (June 1, 2021), https://investors.Modernatx.com/news-releases/news-release-details/Moderna-announces-initiation-rolling-submission-biologics; Press Release, Moderna, Moderna Receives Full U.S. FDA Approval for COVID-19 Vaccine Spikevax (Jan. 31, 2022), https://investors.Modernatx.com/news/news-details/2022/Moderna-Receives-Full-U.S.-FDA-Approval-for-COVID-19-Vaccine-Spikevax/default.aspx.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ARBUTUS BIOPHARMA CORPORATION and GENEVANT SCIENCES GmbH,<br><br>Plaintiffs,<br><br>v.<br><br>MODERNA, INC. and MODERNATX, INC.,<br><br>Defendants. | ) | C.A. No. 22-252-JDW |
| MODERNA, INC. and MODERNATX, INC.,<br><br>Counterclaim-Plaintiffs,<br><br>v.<br><br>ARBUTUS BIOPHARMA CORPORATION and GENEVANT SCIENCES GmbH,<br><br>Counterclaim-Defendants. | ) | |

**MODERNA'S MOTIONS FOR SUMMARY JUDGMENT**
**PURSUANT TO FEDERAL OF CIVIL PROCEDURE 56**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Moderna, Inc. and ModernaTX, Inc. (collectively, "Moderna") respectfully move for summary judgment on three grounds: (1) Arbutus Biopharma Corp. and Genevant Sciences GmbH's (collectively, "Plaintiffs") infringement claims based solely on sales under the C-100 Contract with the U.S. Government are barred by 28 U.S.C. § 1498; (2) Plaintiffs' infringement claims under the doctrine of equivalents are barred by prosecution history estoppel; and (3) claims 7, 9, 11, 13, and 14 of the '651 patent are invalid for indefiniteness. The full grounds for this motion are set forth in Moderna's Opening Brief filed contemporaneously herewith.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ARBUTUS BIOPHARMA CORPORATION and GENEVANT SCIENCES GmbH,

Plaintiffs,

v.

MODERNA, INC. and MODERNATX, INC.,

Defendants.

MODERNA, INC. and MODERNATX, INC.,

Counterclaim-Plaintiffs,

v.

ARBUTUS BIOPHARMA CORPORATION and GENEVANT SCIENCES GmbH,

Counterclaim-Defendants.

C.A. No. 22-252-JDW

[redacted]

REDACTED - PUBLIC VERSION

**MODERNA'S OPENING BRIEF IN SUPPORT OF ITS**
**MOTIONS FOR SUMMARY JUDGMENT**

OF COUNSEL:

James F. Hurst
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
(312) 862-2000

Jason M. Wilcox, P.C.
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 389-5000

Patricia A. Carson, Ph.D.
Jeanna M. Wacker, P.C.
Mark C. McLennan

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Brian P. Egan (#6227)
Travis J. Murray (#6882)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
began@morrisnichols.com
tmurray@morrisnichols.com

*Attorneys for Defendants*

## VI. PLAINTIFFS' INFRINGEMENT CLAIMS BASED ON SALES COVERED BY THE C-100 CONTRACT ARE BARRED UNDER § 1498

In March 2020, the U.S. Government declared a national emergency in response to the unprecedented public health crisis posed by the COVID-19 pandemic. SOF ¶¶ 3–4. Soon after, the Trump Administration initiated Operation Warp Speed (led by the Departments of Health and Human Services and Defense), through which the Government sought the help of private companies—and, here, Moderna in particular—to work together to develop and bring COVID-19 vaccines to the American public as quickly as possible. *Id.* ¶¶ 5–13.

In August 2020, Moderna and the U.S. Department of Defense (through the Army Contracting Command) entered into the C-100 Contract, under which Moderna agreed to provide millions of doses of COVID-19 vaccine "for the United States Government (USG) and the US population." Ex. 1 (C-100 Contract) at 302–03. In entering the contract, the Government recognized that it was not clear "whether or not these doses [of Moderna's COVID-19 vaccine] will be useable," but accepted that "risk" as "acceptable to the USG." Ex. 17 (DOD_000003510) at 515. Although the Government hoped the vaccine would "reduce SARS-CoV-2 transmission" and "mitigat[e] the impact of COVID-19 on the nation and its people," such an outcome was not guaranteed. Ex. 1 (C-100 Contract) at 302. In such circumstances, the Court need not and should not second-guess the Government's determination that it benefitted by procuring the contracted-for goods.

The C-100 contract itself explicitly outlined, in Sections A ("Solicitation/Contract Form") and C ("Descriptions and Specifications"), for example, its nature and scope (Ex. 1 at 285, 302):

> A.1. The U.S. Army Contracting Command – Aberdeen Proving Ground (ACC-APG), Natick Division has a requirement for up to 500 million SARS-CoV-2 mRNA-1273 Vaccine doses (100 μg) in support of Joint Program Executive Office – Chemical Biological Radiological Nuclear Defense (JPEO-CBRAND), the Assistant Secretary for Preparedness and Response (ASPR), and Biomedical Advanced Research and Development Authority (BARDA). All doses of mRNA-

> 1273 Vaccine referenced herein are 100 µg doses. All doses will be delivered in a multi-dose vial with a volume sufficient for 10 doses per vial. [ . . . ]
>
> C.1. **SCOPE.** The Department of Defense and Health and Human Services (HHS) require large scale manufacturing of vaccine doses in support of the national emergency response to the Coronavirus Disease 2019 (COVID-19) for the United States Government (USG) and the US population.
>
> C.1.1.1 Under Operation Warp Speed (OWS), the Department of Defense and HHS are leading a whole of nation effort to ensure development of promising vaccine, diagnostic and therapeutic candidates and ensure that these medical countermeasures are available in the quantities required to reduce SARS-CoV-2 transmission, identify prior and/or current infection, and improve patient care, thereby mitigating the impact of COVID-19 on the nation and its people. The DoD Joint Program Executive Office for Chemical, Biological, Radiological and Nuclear Defense (JPEO-CBRD) is providing expertise and contracting support to HHS, in compliance with PL 115-92 Authorization Letter for DoD Medical Priorities, through an Interagency Agreement, signed April 23, 2020. As OWS products progress to clinical trials to evaluate the safety and efficacy of vaccines and therapeutics, it is critical that, in parallel, the USG supports large scale manufacturing so that vaccine doses or therapeutic treatment courses are immediately available for nationwide access as soon as a positive efficacy signal is obtained and the medical countermeasures are authorized for widespread use.

There is no genuine dispute that Moderna's activities related to the C-100 Contract are covered by 28 U.S.C. § 1498. Under this statute, "[w]henever an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without license," "the owner's remedy shall be by action against the United States in the United States Court of Federal Claims." 28 U.S.C. § 1498(a). To prevail on a § 1498 defense, a defendant must show (1) that it had "the authorization and consent of the Government" to engage in the allegedly infringing manufacture or use—which it is undisputed is expressly present in the C-100 contract—and (2) that such manufacture or use was "for the Government"—which the four corners of the C-100 Contract also make clear. *See Sevenson Env't Servs., Inc. v. Shaw Env't, Inc.*, 477 F.3d 1361, 1365 (Fed. Cir. 2007). As such, the unambiguous language of the C-100 Contract should be dispositive here.

But even if the Court were to look beyond the contract itself, after more than three years of litigation, Plaintiffs have failed to offer any evidence (nor could they) that Moderna's contract with the Government falls outside § 1498's ambit. Because Plaintiffs have not and cannot set forth any evidence raising a genuine dispute of material fact as to § 1498, this Court should grant summary judgment in Moderna's favor and dismiss Plaintiffs' claims against Moderna concerning COVID-19 vaccines provided by Moderna to the U.S. Government pursuant to the C-100 contract.

### A. The Government Expressly Provided Authorization and Consent Through the C-100 Contract

The Government expressly authorized and consented to any allegedly infringing acts by Moderna in providing vaccine doses under the C-100 Contract. The C-100 Contract contains two broad Federal Acquisition Regulation ("FAR") clauses: 52.227-1 and 52.227-1, Alternate I. Ex. 1 (C-100 Contract) at 329. FAR 52.227-1, Alternate I, is the broader of the two and provides that "[t]he Government authorizes and consents to ***all*** use and manufacture of ***any*** invention described in and covered by a United States patent in the performance of this contract or any subcontract at any tier." 48 C.F.R. § 52.227-1, Alt. I. Nothing more is required for this Court to find authorization and consent under § 1498. 48 C.F.R. § 27.201-1(b) ("The Government may expressly authorize and consent to a contractor's use or manufacture of inventions covered by U.S. patents by inserting the clause at 52.227-1, Authorization and Consent.").

Plaintiffs have not seriously disputed that broad authorization language (like the two FAR clauses in Moderna's contract here) establishes authorization and consent as a matter of law—as courts have uniformly held. *See, e.g.*, *Saint-Gobain Ceramics & Plastics, Inc. v. II-VI Inc.*, 369 F. Supp. 3d 963, 980 (C.D. Cal. 2019) (holding incorporation of FAR 52.227-1 into contract constituted authorization and consent); *Carrier Corp. v. United States*, 534 F.2d 244, 247 n.4 (Ct. Cl. 1976) (noting that where a Government contract contains a broad authorization and consent

clause, the "alleged use need only be in the performance of the contract"); *BAE Sys. Info. & Elec. Sys. Integration Inc. v. Aeroflex Inc.*, 2011 WL 3474344, at *14–15 (D. Del. Aug. 2, 2011) (holding contract "contain[ed] an express consent and authorization" where it incorporated FAR 52.227-1, Alt. I); *Fiber Sys. Int'l, Inc. v. Applied Optical Sys., Inc.*, 2008 WL 906330, at *4 (E.D. Tex. Mar. 31, 2008) ("Consent is express when the Government contract contains an authorization and consent clause or incorporates the provision found in 48 C.F.R. § 52.227-1."); *Roberts v. Herbert Cooper Co.*, 236 F. Supp. 428, 430 (M.D. Pa. 1959) (holding that where a broad authorization and consent clause is included in a contract, "[n]o extended discussion is required on the question whether this action falls within the provisions of 28 U.S.C. § 1498 [because] Defendant's contracts are with the United States and the authorization and consent of the Government provided for in the statute is present").

Although the C-100 Contract clearly and unambiguously answers the question of authorization and consent, the Government also filed a Statement of Interest in this case explaining that "[t]he inclusion of FAR clauses 52.227-1 and 52.227-1, Alternate I in the [C-100] Contract constitutes the Government's express authorization and consent." D.I. 49 at 2; *cf. Auerbach v. Sverdrup Corp.*, 829 F.2d 175, 180 (Fed. Cir. 1987) (noting that for purposes of parallel copyright statute, "express documentary evidence" of the government's consent "[o]bviously . . . will do," and that "the form of the [Government's] consent" may include "retroactive consent"). Consistent with § 1498 jurisprudence, the Government further explained that "the effect of the Government's 'authorization and consent' is to relieve Moderna of any liability for patent infringement resulting in performance of the [C-100] Contract and to transfer to the United States any liability for the manufacture or use of the inventions claimed in the Patents-in-Suit resulting from the authorized and consented acts." D.I. 49 at 2. The Government's statement thus confirms what the C-100

Contract itself already makes plain and is an independent basis for finding authorization and consent.

### B. Moderna's Manufacture and Sale of COVID-19 Vaccine Under the C-100 Contract Was "For" the Government

The "for the Government" prong of § 1498 is also not in genuine dispute. This prong is satisfied where "the use or manufacture of a patented method or apparatus occur pursuant to a contract with the government and for the benefit of the government." *Sevenson*, 477 F.3d at 1365; *see also Pieczenik v. United States*, 2023 WL 5031507, at *2 (Fed. Cir. Aug. 8, 2023) ("A government contractor's use is for the government's benefit when undertaken pursuant to a government contract that provides services the government sought."). Moreover, the government need not be the ***sole*** beneficiary. *Sevenson*, 477 F.3d at 1365–66; *Advanced Software Design Corp. v. Fed. Reserve Bank of St. Louis*, 583 F.3d 1371, 1378 (Fed. Cir. 2009). The U.S. Government procured doses of the COVID-19 vaccine from Moderna pursuant to a direct contract. Thus, there can be no genuine dispute that the procurement of those doses was for the Government's benefit, and there is again no need to look beyond the contract itself.

#### 1. The Government Obtained a Benefit Simply by Procuring the Contracted-for Doses of COVID-19 Vaccine

Federal Circuit precedent guides the "for the Government" analysis under § 1498. Where, as here, the Government has contracted with a supplier and expressly authorized and consented to the allegedly infringing activity, "the inquiry [may be] reduced to the very simple question of whether the [accused infringers] establish that the government authorized or consented to the infringement, if such infringement in fact occurred." *Sevenson*, 477 F.3d at 1366 (cleaned up). "[W]here infringing activity has been performed by a government contractor pursuant to a

government contract and for the benefit of the government, courts have all but bypassed a separate inquiry into whether infringing activity was performed 'for the Government.'" *Id.*

Both Moderna and the Government agree that this truncated inquiry is appropriate here. *See* D.I. 49 at 9 ("[W]here the Government elects to include a contract provision expressly providing its authorization and consent, as it has done here, that decision is appropriately viewed as reflecting the Government's determination that the contract is for the Government's benefit."). ***First***, the undisputed evidence shows that the Government contracted with Moderna to "manufacture" the doses of the COVID-19 vaccine "for the United States Government." Ex. 1 (C-100 Contract) at 302. ***Second***, as explained in Section VI.A, the Government expressly authorized and consented to the allegedly infringing activity by including two broad FAR clauses in the C-100 Contract. *Id.* at 329. ***Third***, Moderna actually manufactured doses of the COVID-19 vaccine for the Government under the C-100 Contract, and the Government consequently "received the benefit of its contract, namely, procuring the vaccine that it then offered for free public distribution in an effort to thwart the COVID-19 pandemic." D.I. 49 at 10; SOF ¶¶ 14–35.

Unable to materially dispute each of these basic facts, Plaintiffs attack the § 1498 analysis endorsed by the Federal Circuit in *Sevenson*, suggesting that this Court need not follow it and instead find that the "for the Government" inquiry under § 1498 is a "factual dispute." D.I. 59 at 2. Plaintiffs cannot turn a question of statutory interpretation into a "factual dispute" by interpreting a statute contrary to Federal Circuit precedent. *See Madey v. Duke Univ.*, 307 F.3d 1351, 1359 (Fed. Cir. 2002) ("Federal Circuit law provides the applicable interpretation of § 1498(a). Section 1498(a) applies exclusively to patent law, meaning that Federal Circuit law applies."); *Deutsche Bank AG v. U.S.*, 742 F.3d 1378, 1381 (Fed. Cir. 2014) ("Statutory interpretation is a question of law."). Tellingly, Plaintiffs have not cited a single case examining

"benefit" as a factual matter where the contractor supplied the goods or services directly to the U.S. Government with the Government's express authorization and consent. Doing so here would contravene the many precedential cases holding the opposite at the summary judgment or motion to dismiss stages. *See, e.g.*, *Sevenson*, 477 F.3d at 1366 (holding that "the infringing method was practiced 'for the Government'" where "the government sought and received hazardous waste remediation services"); *Advanced Software*, 583 F.3d at 1376 (finding that "representations to this court that the accused activities are 'for the United States' and with its authorization and consent" reinforced applicability of § 1498); *IRIS Corp. v. Japan Airlines Corp.*, 769 F.3d 1359, 1363 (Fed. Cir. 2014) ("We also note that the United States has unequivocally stated its position that suit under § 1498(a) is appropriate here. . . . Although the government's statement is not dispositive, it reinforces our conclusion that the United States has waived sovereign immunity in this case and, therefore, that IRIS's exclusive remedy is suit for recovery against the United States under § 1498(a).").

Plaintiffs' argument also conflicts with Congress's objectives in enacting § 1498. As the Supreme Court has explained, "[t]he purpose of [§ 1498] was to relieve the contractor entirely from liability of every kind for the infringement of patents in manufacturing anything for the government, and to limit the owner of the patent and his assigns and all claiming through or under him to suit against the United States in the Court of Claims." *Richmond Screw Anchor Co. v. United States*, 275 U.S. 331, 343 (1928). The Federal Circuit has reaffirmed that "[t]he coverage of § 1498 [is] broad so as not to limit the Government's freedom in procurement by considerations of private patent infringement." *TVI Energy Corp. v. Blane*, 806 F.2d 1057, 1060 (Fed. Cir. 1986). In other words, § 1498 was enacted to give the Government broad freedom to contract with whomever it chooses to procure necessary goods or services while providing immunity to those

contractors. And it was designed to eliminate uncertainty for government contractors about whether they would face liability for fulfilling government contracts. *See Richmond Screw Anchor*, 275 U.S. at 345 ("The intention and purpose of Congress in the act of 1918 was to stimulate contractors to furnish what was needed for the war, without fear of becoming liable themselves for infringements to inventors or the owners or assignees of patents.").

Deferring to the Government's judgment regarding whether it received a benefit under § 1498 makes sense because policy decisions, including how to mount a response to crises like wars or pandemics, are generally left to the political branches rather than the judiciary. Engaging in a lengthy "factual dispute" over what is a benefit in every § 1498 case would impinge on the "Government's freedom in procurement" by causing contractors to become "fear[ful] of becoming liable themselves for infringements," even where the Government has expressly authorized and consented to any potential infringement. *TVI Energy*, 806 F.2d at 1060; *Richmond Screw Anchor*, 275 U.S. at 345. That is the exact result Congress sought to avoid. *See Zoltek Corp. v. United States*, 672 F.3d 1309, 1324 (Fed. Cir. 2012) ("the legislative purpose behind § 1498 is clear" and "survives today"). The Court need not and should not second-guess the Government's determination that it benefitted by procuring the contracted-for goods.

Plaintiffs also rely on *Larson v. United States*, where the Court of Federal Claims declined to apply § 1498 in the Medicare reimbursement context. 26 Cl. Ct. 365, 371 (1992). But *Larson* has no application here. To start, *Larson* did not involve a contract between the Government and the alleged infringer, and the Government expressly ***disputed*** that it had provided authorization and consent. *Id.* at 367–68. Instead, the case concerned providers who selected and purchased casts and splints from a supplier and later asked the Government for Medicare reimbursement. *Id.* Any "types, models, or brand names of casts and splints" could be reimbursed, and the Government

played no role in procuring them or in selecting which to use for any given patient. *See id.* at 367. In this context, the court concluded that "use of plaintiffs' casts and splints was for the benefit and convenience of the patient and provider, with no benefit to the government." *Id.* at 369.

Here, by contrast, the Government specifically and directly purchased and procured doses of Moderna's COVID-19 vaccine through the C-100 Contract and directed their distribution and use. SOF ¶¶ 14–35. The Government also provided its express authorization and consent in the C-100 Contract and reconfirmed through its Statement of Interest that it received a benefit by entering the C-100 Contract. Ex. 1 (C-100 Contract) at 329; D.I. 49. Although benefit is satisfied by the acceptance of goods under the contract, Moderna's COVID-19 vaccine, purchased by the Department of Defense to deploy a national mass vaccination effort, unlike the casts and splints in *Larson*, cannot be considered individual healthcare. Moderna's COVID-19 vaccine had effects far beyond individual recipients, including prevention of widespread severe infections of others across the nation and globally. SOF ¶¶ 38–41. That is clearly distinct from *Larson*.

Because it is undisputed that the Government procured the contracted-for COVID-19 vaccine doses and provided its express authorization and consent, this Court should hold as a matter of law that the "for the Government" prong of § 1498 is satisfied here.

### 2. Although the Court Need Not Consider "Benefit," the COVID-19 Vaccine Conferred Measurable Economic and Public Health Benefits on the Government

There is no need to go further to decide whether § 1498 bars Plaintiffs from accusing C-100 doses of infringement in this Court (it does). But, even if the Court were to decide that—despite the plain language of the contract and precedent to the contrary—it was appropriate to reassess whether the Government benefitted, there is still no genuine dispute that the provision of COVID-19 vaccine doses under the C-100 Contract was "for" the Government's benefit.

Moderna's expert witnesses, George Rutherford and Christopher Vellturo, analyzed years of data and academic literature and opined from epidemiologic, public health, and economic perspectives that the supplied doses of Moderna's COVID-19 vaccine significantly benefitted the Government by allowing it to robustly respond to an emergent public health crisis, suppress community transmission, and allow the nation's economy to recover. SOF ¶¶ 36–55; *see also Saint-Gobain*, 369 F. Supp. 3d at 977 ("A use is 'for the Government' if it is 'in furtherance and fulfillment of a stated Government policy' which serves the Government's interests and which is 'for the Government's benefit.'"). Plaintiffs do not dispute that these are real benefits. *See* Ex. 30-B (Rutherford Reply Rpt.) ¶¶ 9–13 (listing benefits Plaintiffs' experts do not dispute); Ex. 31-B (Vellturo Reply Rpt.) ¶ 17 (same). Plaintiffs instead argue these benefits are irrelevant because they are the product of "hindsight analysis that could not have been conducted at the time of infringement" and because they accrued to the public rather than the Government itself. Ex. 62 (Brill Rpt.) ¶¶ 17–22; Ex. 63 (Pitts Rpt.) ¶¶ 24–28. Neither of these arguments have merit.

***First***, as explained above, Plaintiffs have no support for their argument that some sort of "benefit" is required other than the one that was contracted for. Their assertion that any additional benefits that Moderna identified are irrelevant because they were not "quantified" at the time appears nowhere in § 1498. There is no reason to add an entirely new requirement to § 1498 that Congress did not see fit to include. Plaintiffs also have not identified any case law requiring the benefits of a contract—beyond the goods and services exchanged for consideration at the time of the agreement—to be quantifiable or even known at the time of contracting to satisfy the "for the Government" prong of § 1498. For good reason: such a requirement would be wholly unworkable. In *Sevenson*, for example, the Government contracted for remediation of hazardous waste at a Government site. 477 F.3d at 1363–64. Under Plaintiffs' argument, determining whether the

Government received some measurable benefit beyond the contract terms would have required the Government to conduct a multiyear environmental assessment of the effectiveness of the remediation to determine whether § 1498 even applied—before the contract was signed. Likewise, the Government may purchase military equipment like warships and weapons systems pursuant to § 1498. *See Zoltek*, 672 F.3d at 1312, 1315–17. But if Plaintiffs were right, military equipment could never be subject to § 1498 because it might not be used at all. That cannot be correct.

***Second***, Plaintiffs' argument that ***all*** benefits of the C-100 Contract purportedly accrued to members of the public rather than the Government does not create a material factual dispute.[6] Plaintiffs appear to agree that Moderna's COVID-19 vaccine afforded significant benefits to the individuals who received the vaccine, resulted in wider population-level health benefits as a result of reduced transmission and saved the Government billions of dollars. *E.g.*, Ex. 62 (Brill Rpt.) ¶¶ 17–22 (agreeing that "COVID-19 vaccines had significant benefits to the individuals who received them, as well as to the American public more generally"); Ex. 63 (Pitts Rpt.) ¶¶ 24–28 (agreeing that "things like the effectiveness of the vaccine, the infections avoided, the lives saved, and the growth of the overall economy" are "benefits" to "American public in general"). Plaintiffs only dispute whether these benefits should be considered benefits "for the Government" as a matter of policy. But Plaintiffs' subjective opinions as to what constitutes good policy or what policy decisions the Government should make are irrelevant to the § 1498 inquiry. Congress did not put limits on what benefits count, and the Court should not make policy judgments reserved for Congress. *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 649 (2012).

[6] Plaintiffs attempt to bolster their argument with expert testimony from Alex Brill and Peter Pitts. That testimony does not pass muster under *Daubert* and should not be considered here, for the reasons explained in Moderna's concurrently filed motion to exclude the testimony of Messrs. Brill and Pitts (filed pursuant to the Scheduling Order, D.I. 485).

### C. The Undisputed Evidence Confirms Which Doses Were Made and Sold Pursuant to the C-100 Contract and Should Be Dismissed from the Case

Discovery has confirmed which doses of Moderna's COVID-19 vaccine must be dismissed from the case under § 1498. Moderna manufactured and sold to the U.S. Government for its use 500,001,540 doses of COVID-19 vaccine under the C-100 Contract. SOF ¶ 32. The U.S. Government procured those doses through the original C-100 Contract and several amendments, which were all paid for and accepted by the U.S. Government. SOF ¶¶ 32–35. Plaintiffs have not raised any evidence or argument disputing that these doses were manufactured for and sold to the Government under the C-100 Contract. Accordingly, those 500,001,540 doses should be dismissed from the case.

* * *

Moderna's provision of COVID-19 vaccine doses under the C-100 Contract was for the Government and with its authorization and consent. Accordingly, § 1498 applies, and Moderna is not liable for any alleged infringement of the Patents-in-Suit for those C-100 doses. Plaintiffs' sole remedy, if any, lies in an action against the Government in the Court of Federal Claims.

## VII. PLAINTIFFS' DOE THEORIES ARE BARRED BY PROSECUTION HISTORY ESTOPPEL

"Broad application of [DOE] 'conflicts with the definitional and public-notice functions of the statutory claiming requirement.'" *MED-El Elektromedizinische Gerate GmbH v. Advanced Bionics, LLC*, 657 F. Supp. 3d 604, 615 (D. Del. 2025) (quoting *Eli Lilly and Co. v. Hospira, Inc.*, 933 F.3d 1320, 1330 (Fed. Cir. 2019)). "Unchecked, the doctrine may take on a life of its own, unbounded by the patent claims. Therefore, courts developed doctrines to limit a patentee's ability to assert infringement under the doctrine of equivalents." *Id.* (cleaned up). One such doctrine is prosecution history estoppel, which "can occur in two ways: either (1) by making a narrowing amendment to the claim ('amendment-based estoppel') or (2) by surrendering claim scope through

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ARBUTUS BIOPHARMA CORPORATION and GENEVANT SCIENCES GmbH,

Plaintiffs,

v.

MODERNA, INC. and MODERNATX, INC.,

Defendants.

MODERNA, INC. and MODERNATX, INC.,

Counterclaim-Plaintiffs,

v.

ARBUTUS BIOPHARMA CORPORATION and GENEVANT SCIENCES GmbH,

Counterclaim-Defendants.

C.A. No. 22-252-JDW

[redacted]

[redacted]

REDACTED - PUBLIC VERSION

**MODERNA'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS <u>MOTION FOR SUMMARY JUDGMENT</u>**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, the Court's Policies and Procedures for Civil Matters, Section 11, and the Court's Scheduling Order (D.I. 485), Moderna, Inc. and ModernaTX, Inc. (collectively, "Moderna") submits the following Statement of Undisputed Facts in support of its motion for summary judgment.

# I. GENERAL FACTS

1. On February 28, 2022, Plaintiffs Arbutus and Genevant filed this lawsuit against Moderna, alleging Moderna's COVID vaccine infringes the '069 patent, '359 patent, '668 patent, '435 patent, '651 patent, and '378 patent. D.I. 1. Since filing this lawsuit, and in accordance with the Court's order narrowing patents and claims, D.I. 475, Plaintiffs have narrowed their infringement allegations to the following patents and claims[2]:

- Claims 7, 9, 11, 13, and 14 of the '651 patent
- Claims 7 and 12 of the '359 patent;
- Claims 7, 8, and 16 of the '435 patent;
- Claims 2, 7, 13, 18, and 19 of the '378 patent.

*See* Ex. 14 (June 3, 2025 Letter from F. Elenberg) at 1.

2. Each of the asserted claims depend from claim 1 of each respective patent. *See* Ex. 4 ('651 patent) claims; Ex. 5 ('359 patent) claims; Ex. 6 ('435 patent) claims; Ex. 7 ('378 patent) claims.

# II. FACTS RELATED TO 28 U.S.C. § 1498

## A. U.S. Government Response to the COVID-19 Pandemic

3. After detection of COVID-19 in the United States, the Secretary of Health and Human Services declared a public health emergency on January 31, 2020, under 42 U.S.C. § 247(d). Ex. 8 (MRNA-GEN-02657322) at 322.[3]

---

2 For the convenience of the Court, Appendix A, directly following this Statement of Undisputed Facts, lists the asserted claims and their corresponding text.

3 Unless otherwise specified, page citations of documents with bates numbering use the last three digits of the bates numbering.

4. On March 13, 2020, the White House later declared that the COVID-19 outbreak in the United States constituted a national emergency, post-dating the start of the emergency to March 1, 2020. Ex. 8 (MRNA-GEN-02657322) at 323.

5. On April 16, 2020, Moderna entered into a grant agreement, the C-34 Contract, with the Biomedical Advanced Research and Development Authority ("BARDA") to support the clinical development of a COVID-19 vaccine. Ex. 9 (C-34 Contract).

6. In the C-34 Contract, the U.S. Government acknowledged that "[d]eveloping and delivering a vaccine for highly transmissible, emerging diseases such as the SAR-CoV-2 [*sic*] virus requires breaking from traditional approaches." Ex. 9 (C-34 Contract) at 775. The U.S. Government further described the "critical" importance of domestic production of the COVID-19 vaccine, stating that "[d]omestic production of the vaccine is the only assurance that Americans will have access to the finished product." Ex. 9 (C-34 Contract) at 775.

7. BARDA chose to partner with Moderna to develop the COVID-19 vaccine because "Moderna's mRNA-based vaccine platform has been used to rapidly prepare vaccine candidates against Cytomegalovirus, Zika, Respiratory Syncytial Virus, Influenza, Human Metapneumovirus and Parainfluenza virus." Ex. 9 (C-34 Contract) at 775.

8. On May 15, 2020, the Trump Administration initiated Operation Warp Speed (led by the Departments of Health and Human Services and Defense), through which the U.S. Government and private companies worked together to develop and bring COVID-19 vaccines to the American public as quickly as possible. Ex. 10 (MRNA-GEN-02696526) at 527–530.

9. The U.S. Government adopted a centralized distribution plan for vaccine doses manufactured in connection with Operation Warp Speed. Ex. 11 (MRNA-GEN-02676917) at 920.

10. Specifically, the U.S. Government exercised an option in a preexisting contract with McKesson to deliver specific amounts of vaccine to various locations across the country. Ex. 11 (MRNA-GEN-02676917) at 920.

11. "Centralized distribution allow[ed] the government full visibility, control, and ability to shift assets and use data to optimize vaccine uptake." Ex. 11 (MRNA-GEN-02676917) at 920.

12. The U.S. Government pledged that "no American will be charged for either the COVID-19 vaccine or its distribution." Ex. 11 (MRNA-GEN-02676917) at 923.

13. Moderna was one of a handful of companies selected to participate in Operation Warp Speed. Ex. 12 (MRNA-GEN-02676415) at 416–18; Ex. 13 (MRNA-GEN-02670803) at 803–04.

**B. C-100 Contract**

14. On August 9, 2020, Moderna entered into a supply contract, the C-100 Contract, with the Army Contracting Command of the U.S. Department of Defense. Ex. 1 (C-100 Contract); Ex. 15 (Bennett Dep. Tr.) at 255:5–12.

15. The first draft of the agreement that became the C-100 Contract, provided by the U.S. Government to Moderna, contained Federal Acquisition Regulation ("FAR") clause 52.227-1, providing the U.S. Government's authorization and consent. Ex. 16 (C-100 Contract Draft) at 626; *see also* Ex. 15 (Bennett Dep. Tr.) at 265:15–268:7 ("Q. This provision was included in the list of incorporated references in the first proposal that went over to Moderna, became the C0100 contract? A. Yes.").

16. The C-100 Contract provided that Moderna would supply at least 100 million doses that the U.S. Government would "own," to "be distributed and used as part of a COVID-19

vaccination campaign" coordinated by the U.S. Government and made "available to the American people at no cost." Ex. 1 (C-100 Contract) at 302; Ex. 13 (MRNA-GEN-02670803) at 803–04.

17. In evaluating Moderna's proposal for the supply contract, the U.S. Government stated that "Moderna is uniquely positioned to have an immediate impact on the United States' COVID-19 pandemic because it is one of the further along among COVID-19 vaccine candidates, having generated promising Phase I clinical data and existing development agreements with the United States Government." Ex. 17 (DOD_000003510) at 512.

18. The C-100 Contract obligated Moderna to produce and supply 100 million doses of COVID-19 vaccine to the U.S. Government. Ex. 1 (C-100 Contract) at 302. The C-100 Contract gave the Government the option to purchase additional doses of COVID-19 vaccine. *Id.*

19. Moderna and the U.S. Government later executed three amendments in which the U.S. Government exercised options for additional doses provided under the C-100 contract. Ex. 18 (C-100 Contract, Option 1 Exercise); Ex. 19 (C-100 Contract, Option 2 Exercise); Ex. 20 (C-100 Contract, Options 3–4 Exercise).

20. The C-100 Contract contains the following clause titled "A.1" (Ex. 1 at 285):

> **A.1** The U.S. Army Contracting Command - Aberdeen Proving Ground (ACC-APG), Natick Division has a requirement for up to 500 million SARS-CoV-2 mRNA-1273 Vaccine doses (100 µg) in support of Joint Program Executive Office - Chemical Biological Radiological Nuclear Defense (JPEO-CBRND), the Assistant Secretary for Preparedness and Response (ASPR), and Biomedical Advanced Research and Development Authority (BARDA). All doses of mRNA-1273 Vaccine referenced herein are 100 µg doses. All doses will be delivered in a multi- dose vial with a volume sufficient for 10 doses per vial.

21. The C-100 Contract contains the following clause titled "C.1 Scope" (Ex. 1 at 302):

**STATEMENT OF WORK**
**LARGE SCALE PRODUCTION OF SARS-CoV-2 VACCINE**

C.1 **SCOPE.** The Department of Defense and Health and Human Services (HHS) require large scale manufacturing of vaccine doses in support of the national emergency response to the Coronavirus Disease 2019 (COVID-19) for the United States Government (USG) and the US population.

C.1.1 Background. In December 2019, a novel coronavirus now known as SARS-CoV-2 was first detected in Wuhan, Hubei Province, People's Republic of China, causing outbreaks of the coronavirus disease COVID-19 that has now spread globally. The Secretary of Health and Human Service declared a public health emergency on January 31, 2020, under section 319 of the Public Health Service Act (42 U.S.C. 247d), in response to COVID-19. On March 1, 2020, the President of the United States, pursuant to sections 01 and 301 of the National Emergencies Act (50 U.S.C. 1601 et seq.) and consistent with section 1135 of the Social Security Act (SSA), as amended (42 U.S.C. 1320b-5), proclaimed that the COVID-19 outbreak in the United States constitutes a national emergency.

C.1.1.1 Under Operation Warp Speed (OWS), the Department of Defense and HHS are leading a whole of nation effort to ensure development of promising vaccine, diagnostic and therapeutic candidates and ensure that these medical countermeasures are available in the quantities required to reduce SARS-CoV-2 transmission, identify prior and/or current infection, and improve patient care, thereby mitigating the impact of COVID-19 on the nation and its people. The DoD Joint Program Executive Office for Chemical, Biological, Radiological and Nuclear Defense (JPEO-CBRD) is providing expertise and contracting support to HHS, in compliance with PL 115-92 Authorization Letter for DoD Medical Priorities, through an Interagency Agreement, signed April 23, 2020. As OWS products progress to clinical trials to evaluate the safety and efficacy of vaccines and therapeutics, it is critical that, in parallel, the USG supports large scale manufacturing so that vaccine doses or therapeutic treatment courses are immediately available for nationwide access as soon as a positive efficacy signal is obtained and the medical countermeasures are authorized for widespread use.

C.1.2 Objective: The objective of this effort is to obtain the following:

a. Base Period: Large scale manufacturing of 100 million vaccine doses
b. Option Period 1: Large scale manufacturing of 100 million vaccine doses
c. Option Period 2: Large scale manufacturing of 100 million vaccine doses
d. Option Period 3: Large scale manufacturing of 100 million vaccine doses
e. Option Period 4: Large scale manufacturing of 100 million vaccine doses

The Base Period is 9 months, with overlapping options for a total of 20 months if all options are exercised.

22. The C-100 Contract contains two FAR clauses providing the U.S. Government's authorization and consent: FAR 52.227-1 and FAR 52.227-1, Alternate I. Ex. 1 (C-100 Contract) at 329.

23. FAR 52.227-1 states:

> (a) The Government authorizes and consents to all use and manufacture, in performing this contract or any subcontract at any tier, of any invention described in and covered by a United States patent—
>
> (1) Embodied in the structure or composition of any article the delivery of which is accepted by the Government under this contract; or
>
> (2) Used in machinery, tools, or methods whose use necessarily results from compliance by the Contractor or a subcontractor with (i) specifications or

written provisions forming a part of this contract or (ii) specific written instructions given by the Contracting Officer directing the manner of performance. the entire liability to the Government for infringement of a United States patent shall be determined solely by the provisions of the indemnity clause, if any, included in this contract or any subcontract hereunder (including any lower-tier subcontract), and the Government assumes liability for all other infringement to the extent of the authorization and consent hereinabove granted.

(b) The Contractor shall include the substance of this clause, including this paragraph (b), in all subcontracts that are expected to exceed the simplified acquisition threshold, as defined in Federal Acquisition Regulation (FAR) 2.101 on the date of subcontract award. However, omission of this clause from any subcontract, including those at or below the simplified acquisition threshold, as defined in FAR 2.101 on the date of subcontract award, does not affect this authorization and consent.

48 CFR § 52.227-1.

24. FAR 52.227-1, Alternate I states:

(a) The Government authorizes and consents to all use and manufacture of any invention described in and covered by a United States patent in the performance of this contract or any subcontract at any tier.

(b) The Contractor shall include the substance of this clause, including this paragraph (b), in all subcontracts that are expected to exceed the simplified acquisition threshold, as defined in Federal Acquisition Regulation (FAR) 2.101 on the date of subcontract award. However, omission of this clause from any subcontract, including those at or below the simplified acquisition threshold, as defined in FAR 2.101 on the date of subcontract award, does not affect this authorization and consent.

48 CFR § 52.227-1, Alt. I.

25. Moderna received Emergency Use Authorization for its COVID-19 vaccine in the U.S. from the FDA on December 18, 2020. Ex. 23 (MRNA-GEN-02463357) at 358; D.I. 1 at 7.

26. The Emergency Use Authorization allowed the vaccine to be distributed and administered as a medical countermeasure for COVID-19. Ex. 23 (MRNA-GEN-02463357) at 359; Ex. 24 (MRNA-GEN-02677440) at 440.

Case: 26-1581 Document: 56 Page: 716 Filed: 08/25/2026

27. The Emergency Use Authorization conditions specified that Moderna would supply the vaccine to be distributed "as directed by the U.S. government." Ex. 23 (MRNA-GEN-02463357) at 359.

28. Under the C-100 Contract, "Moderna supplied vaccine to the CDC at one of two distribution depots in the United States. Once that product was delivered to the depots, the CDC took responsibility for allocating that product among the jurisdictions and distributing that to jurisdictions." Ex. 15 (Bennett Dep. Tr.) at 347:19–348:4; *see also* Ex. 25 (Thomas Dep. Tr.) at 32:19–22 ("Moderna would provide vaccine to the U.S. government distribution hubs. The U.S. government would then distribute to the vaccination sites.").

29. The C-100 Contract specified that lots of the COVID-19 vaccine would be accepted by the U.S. Government when Moderna produced a certificate of analysis confirming that the lot met the U.S. Government's technical requirements. Ex. 1 (C-100 Contract) at 308; Ex. 22 (Thomas Decl.) ¶ 6.

30. The C-100 Contract specified that lots may be accepted by the U.S. Government while stored for the U.S. Government at Moderna's facilities or accepted upon delivery to a U.S.-designated location. Ex. 1 (C-100 Contract) at 303, 312–316; Ex. 25 (Thomas Dep. Tr.) at 125:1–126:6. Not all doses that were sold under the C-100 Contract were ultimately directed by the U.S. Government to be shipped to U.S. Government-designated location. Ex. 25 (Thomas Dep. Tr.) at 147:21–153:15; Ex. 26 (Santoli Dep. Tr.) at 52:6–53:4; Ex. 27 (Johnson Dep. Tr.) at 92:2–18; Ex. 22 (Thomas Decl.) ¶¶ 4–7.

31. The doses manufactured, released, sold and delivered to the U.S. Government-designated sites under the C-100 Contract were tracked in U.S. Government batch trackers. Ex. 40 (MRNA-GEN-00459217); Ex. 22 (Thomas Decl.) ¶¶ 4–7.

32. The number of COVID-19 doses accepted by the U.S. Government and sold is reflected in Moderna's sales data. Ex. 28 (C-100 Doses Spreadsheet). In total, Moderna sold 500,001,540 doses of COVID-19 vaccine to the U.S. Government under the C-100 Contract. Ex. 28 (C-100 Doses Spreadsheet) at Column E (identifying doses shipped to Government under C-100 Contract); Ex. 25 (Thomas Dep. Tr.) at 74:19–77:20 (Moderna's 30(b)(6) witness confirming that C-100 Doses Spreadsheet "contain[s] all of the sales to the U.S. government under the C-100 contract"); Ex. 22 (Thomas Decl.) ¶ 8; Ex. 29 (Lawton Op. Rpt.) ¶ 1618 (Plaintiffs' damages expert agreeing that 500,001,540 doses were sold to Government pursuant to C-100 Contract).

33. In total, the U.S. Government spent $8,204,861,628 purchasing the C-100 doses from Moderna. Ex. 28 (C-100 Doses Spreadsheet) at Column F (identifying revenue associated with each shipment under the C-100 Contract); Ex. 22 (Thomas Decl.) ¶ 8.

34. Amendment No. P00031 to the C-100 Contract, dated August 9, 2020, modified the total funded value of the C-100 Contract to $8,204,906,278.12. Ex. 21 (MRNA-GEN-00457581); Ex. 22 (Thomas Decl.) ¶ 9.

35. There were various exhibits and executed amendments to the C-100 Contract that Moderna and the U.S. Government produced during discovery. *See, e.g.* MRNA-GEN-00078981; MRNA-GEN-00079015; MRNA-GEN-00079018; MRNA-GEN-00937552; MRNA-GEN-00079041; MRNA-GEN-00079769; MRNA-GEN-00079781; MRNA-GEN-00078997; MRNA-GEN-00079566; MRNA-GEN-00078999; MRNA-GEN-00079001; MRNA-GEN-00079554; MRNA-GEN-00079066; MRNA-GEN-00079013; MRNA-GEN-00079122; MRNA-GEN-00079540; MRNA-GEN-00079351; MRNA-GEN-00079514; MRNA-GEN-00079367; MRNA-GEN-00078969; MRNA-GEN-00078953; MRNA-GEN-00078957; MRNA-GEN-00079245; MRNA-GEN-00079098; MRNA-GEN-00079524; MRNA-GEN-00079268; MRNA-GEN-

00079257; MRNA-GEN-00079232; MRNA-GEN-00079112; MRNA-GEN-00079379; MRNA-GEN-00079384; MRNA-GEN-00079390; MRNA-GEN-00079404; MRNA-GEN-00079512; MRNA-GEN-00079510; MRNA-GEN-00079568; MRNA-GEN-00456319; MRNA-GEN-00456332; MRNA-GEN-00457581. Plaintiffs have not disclosed any factual contentions regarding the exhibits or amendments in connection with § 1498; therefore, Moderna did not attach them to this Motion for Summary Judgment.[4]

**C. Additional Benefits to the U.S. Government**

36. The U.S. Government's mass vaccination campaign, conducted in part using doses purchased under the C-100 Contract, allowed the U.S. Government to facilitate the reopening and recovery of the country and the economy. Ex. 30-A (Rutherford Op. Rpt.) ¶¶ 62–90; Ex. 31-A (Vellturo Op. Rpt.) ¶¶ 35–52.

37. Both the Trump and Biden White Houses identified bringing a vaccine to the public as a key government objective, with the Biden White House stating that "[t]he health and economic security of our nation depend on it." *E.g.*, Ex. 32 (MRNA-GEN-02673093) at 093; Ex. 10 (MRNA-GEN-02696526) at 527–28; Ex. 33 (Brill Dep. Ex. 3) at 2–4, 6, 8.

38. Specifically, the U.S. Government's mass vaccination campaign resulted in reduced transmission of COVID-19, leading to a decrease in severe infections, hospitalizations, and deaths from COVID-19, as well as healthcare savings to the U.S. Government. Ex. 30-A (Rutherford Op. Rpt.) ¶¶ 74–75; Ex. 34 (MRNA-GEN-02657270) at 270 (estimating $2.95 trillion in healthcare savings as a result of COVID-19 vaccines).

39. Dr. Rutherford, a renowned public health expert with decades of experience in federal, state, and local public health departments, explained the federal government's

[4] Nevertheless, Moderna is able to provide these to the Court if desired and reserves the right to rely on these in reply if Plaintiffs raise any undisclosed contentions.

longstanding role in safeguarding the public health. Ex. 30-A (Rutherford Op. Rpt.) ¶¶ 27–35. COVID-19 vaccines like Moderna's enabled the Government to achieve this objective by implementing a mass vaccination program, allowing society to reopen and recover. Ex. 30-A (Rutherford Op. Rpt.) ¶¶ 62–90; Ex. 31-A (Vellturo Op. Rpt.) ¶¶ 35–52.

40. By December 2021, the Government estimated that the vaccines were associated with 213,000 fewer deaths, 1.38 million fewer hospitalizations, and 25.32 million fewer cases. Ex. 34 (MRNA-GEN-02657270) at 270, 278–84.

41. The Government also estimated that COVID-19 vaccines saved approximately $2.95 trillion in healthcare and economic costs. Ex. 34 (MRNA-GEN-02657270) at 270, 285–86.

42. Dr. Vellturo, an economist, calculated that the C-100 Contract saved the Government approximately $8 billion in costs associated with COVID-19 hospitalizations in 2021 alone, covering the total cost of the contract to the Government. Ex. 31-A (Vellturo Op. Rpt.) ¶¶ 35–52.

43. One of the U.S. Government's strategies in entering the C-100 Contract was to "allow[] for consideration for international assistance if doses obtained exceed what is necessary for the US." Ex. 35 (HHS-0000414) at 415.

44. In addition to the immediate benefit of securing sufficient doses available for the Government to deploy across the United States, the Government's procurement of COVID-19 vaccine under the C-100 Contract allowed the Government to ship doses abroad. Ex. 30-A (Rutherford Op. Rpt.) ¶¶ 80–85.

45. Discovery from the Government confirms its strategy in contracting for the doses was to "allow[] for consideration for international assistance if doses obtained exceed what is necessary for the US." Ex. 35 (HHS-0000414) at 415.

46. The policy benefits of this strategy are twofold: the Government was able to use the COVID-19 vaccine as an important foreign policy tool while simultaneously safeguarding the United States and its people by reducing the global spread of COVID-19. Ex. 30-B (Rutherford Reply Rpt.) ¶¶ 41–42.

47. Acquiring excess doses of COVID-19 vaccine under the C-100 Contract allowed the U.S. Government to provide vaccine doses to developing countries, fulfilling foreign diplomacy objectives and slowing the global spread of COVID-19. Ex. 30-A (Rutherford Op. Rpt.) ¶¶ 80–85; Ex. 30-B (Rutherford Reply Rpt.) ¶¶ 41–42.

48. The Government engaged in vaccine diplomacy by donating vaccines directly to developing countries and provided doses to international partners through programs like COVAX, the United Nations-sponsored program to bring COVID-19 vaccines to the world. Ex. 36 (MRNA-GEN-02669317).

49. In 2021, the White House described the United States's provision of COVID-19 vaccines to the world as "American leadership on a global stage" and the "need to reassert America's leadership in the world in the fight against this and future public health threats." Ex. 37 (MRNA-GEN-02119128) at 155; Ex. 38 (MRNA-GEN-02670578) at 581.

50. The White House considered this strategy vital to national security because "ending this pandemic means ending it everywhere" and "[a]s long as this pandemic is raging anywhere in the world, the American people will still be vulnerable." Ex. 39 (GENV-01086629) at 629.

51. Dr. Christopher Vellturo calculated that the C-100 Contract resulted in $8.13–8.21 billion in Medicare and Medicaid savings from estimated reductions in COVID-19 hospitalizations in calendar year 2021 alone. Ex. 31-A (Vellturo Op. Rpt.) ¶ 42; Ex. 31-B (Vellturo Reply Rpt.) ¶¶ 40–41.

52. The savings in 2021 alone approximately offset the total cost of the C-100 Contract, benefitting the U.S. Government. Ex. 31-A (Vellturo Op. Rpt.) ¶ 42; Ex. 31-B (Vellturo Reply Rpt.) ¶¶ 40–41.

53. The mass vaccination campaign carried out by the U.S. Government resulted in an increase in income tax receipts of $32 billion in 2021 alone and an increase of $112 billion over a 3.5-year period. Ex. 31-A (Vellturo Op. Rpt.) ¶ 52.

54. Dr. Vellturo calculated Moderna's approximate share of the estimated increase in federal individual income tax receipts to be $41 billion over the 3.5-year period. Ex. 31-A (Vellturo Op. Rpt.) ¶ 52 n.160.

55. "The impact of the COVID-19 pandemic, one of the greatest public health challenges in modern history, would be immeasurably worse but for the rapid, widespread availability of cutting-edge mRNA-based vaccines like Moderna's." D.I. 1 at 1.

## III. FACTS RELATED TO PLAINTIFFS' DOE THEORY

### A. Prosecution History

56. The '069 patent's application was the first filed application in the Ratio Patent family. The '069 patent is the parent to all other Ratio Patents. *E.g.*, Ex. 7 ('378 patent) Cover.

57. Prior to review by the Examiner, the applicants of the '069 patent submitted amended claims on November 12, 2009. Ex. 70 (Nov. 12, 2009 – '069 PH) (referred to herein as the "original claims" or "original-filed claims" of the '069 patent).

58. Original claim 1 of the '069 patent recited:

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ARBUTUS BIOPHARMA CORPORATION and GENEVANT SCIENCES GmbH,

Plaintiffs,

v.

MODERNA, INC. and MODERNATX, INC.,

Defendants.

---

MODERNA, INC. and MODERNATX, INC.,

Counterclaim-Plaintiffs,

v.

ARBUTUS BIOPHARMA CORPORATION and GENEVANT SCIENCES GmbH,

Counterclaim-Defendants.

C.A. No. 22-252-JDW

**MODERNA'S OPENING BRIEF IN SUPPORT OF ITS MOTION TO EXCLUDE <u>MR. PITTS' AND MR. BRILL'S EXPERT REPORTS</u>**

OF COUNSEL:

James F. Hurst
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
(312) 862-2000

Jason M. Wilcox, P.C.
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 389-5000

Patricia A. Carson, Ph.D.
Jeanna M. Wacker, P.C.
Mark C. McLennan

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Brian P. Egan (#6227)
Travis J. Murray (#6882)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
began@morrisnichols.com
tmurray@morrisnichols.com

*Attorneys for Defendants*

otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue . . . ." Fed. R. Evid. 702(a). "This condition goes primarily to relevance. Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993) (cleaned up).

## VI. ARGUMENT

Under § 1498, a plaintiff must bring its patent infringement allegations against the United States in U.S. Court of Federal Claims "if two criteria are met: (1) the use is 'for the Government'; and (2) the use is 'with the authorization and consent of the Government.'"[4] *Sevenson*, 477 F.3d at 1365 (citation omitted). "[T]he 'for the Government' prong of the definition appears to impose only a requirement that the use or manufacture . . . occur pursuant to a contract with the government and ***for the benefit of the government***." *Id.* at 1366.

### A. The "For the Government" Prong of § 1498 Involves a Legal Question—Not a Fact Question Requiring Expert Testimony.

When "the government sought and received . . . services" "the infringing method was practiced 'for the Government'"—i.e., for the benefit of the Government. *Id.* In *Sevenson*, the Federal Circuit confirmed that what constitutes a "benefit for the Government" is a legal question of statutory interpretation—not a factual one. *Id.* (concluding plaintiffs' "factual arguments" "fail" and are "irrelevant"); *see also Merck Sharp & Dohme B.V. v. Aurobindo Pharma USA, Inc.*, 130 F.4th 1363, 1368 (Fed. Cir. 2025) ("Statutory construction is a question of law . . . ."). It is inappropriate for experts, like Mr. Pitts and Mr. Brill, to opine on questions of statutory

[4] The second prong, "with the authorization and consent of the Government," is not disputed in this motion.

interpretation, just as it would be improper to send interpretive disputes to the jury. *See, e.g.*, *In re Downey Fin. Corp.*, 593 F. App'x. 123, 126 n.3 (3d Cir. 2015) ("The . . . Declaration was inadmissible because contract interpretation is a legal question for which the court does not require expert opinion." (citation omitted)); *Ford*, 284 F. App'x at 904 ("[T]he experts' dispute was irrelevant . . . because the experts were offering their interpretations about what the guidelines meant, which interpretation a court may just as easily undertake to carry out without the assistance of expert testimony."); *Cryovac Inc. v. Pechiney Plastic Packaging, Inc.*, 430 F. Supp. 2d 346, 364 (D. Del. 2006) ("[T]estimony on substantive areas of patent or contract law is impermissible."); *Allscripts Healthcare, LLC v. Andor Health, LLC*, 2022 WL 3021560, at *44 (D. Del. July 29, 2022) ("It is well-established 'the law of contract interpretation . . . firmly prohibits expert testimony as to legal duties, standards or ramifications arising from a contract.' An expert may not opine regarding 'the scope and meaning' of a contract." (citations omitted)).

### B. To The Extent Any Factual Arguments Are Relevant, Unlike Plaintiffs' Expert Opinions, Government "Benefits" are Limited to Those Which Further The Government's Stated Policy Goals

In cases where the accused goods are not sold pursuant to a Government contract with express authorization and consent (unlike the C-100 Contract here), Courts consider "if it is 'in furtherance and fulfillment of a stated Government policy' which serves the Government's interests and which is 'for the Government's benefit.'" *IRIS*, 769 F.3d at 1362 (citation omitted). Many parts of Mr. Pitts' and Mr. Brill's reports do not opine on whether the contract is "in furtherance and fulfillment of a stated Government policy," but instead, they express their own opinion on *what constitutes a benefit* to the Government untethered from any stated policy goals. Those opinions are unhelpful to the trier of fact because what constitutes a benefit is not a factual question for the jury to resolve, and thus, paragraphs 24–38, 41–42, 45, and 49–66 of Mr. Pitts'

and paragraphs 17–20, 22–23, 25–38, 55, 65, and 68 of Mr. Brill's expert reports should be excluded.

Here, in the C-100 Contract itself, the Government explained its policy goals under Operation Warp Speed as the following: "to ensure development of promising vaccine, diagnostic and therapeutic candidates and ensure that these medical countermeasures are available in the quantities required," and "the USG supports large scale manufacturing so that vaccine doses or therapeutic treatment courses are immediately available for nationwide access as soon as a positive efficacy signal is obtained." Ex 1 (C-100 Contract) at C.1.1.1. In other words, the Government's goals were to obtain sufficient availability of vaccines and mitigate risk if certain manufacturers had challenges manufacturing the vaccine. Multiple sources throughout the Executive and Legislative branches of government repeated these goals. *See, e.g.*, Ex. 30-B (2025-03-21 Rutherford Reply Rep.) ¶¶ 23–30.

Mr. Pitts and Mr. Brill do not dispute that Moderna's vaccine had significant benefits. Instead, they argue those benefits were not for the Government and attempt to redefine what is a benefit for the Government. For example, many arguments in Mr. Brill's report revolve around a dispute as to what types of "benefits" count. Section IV of his report opines on the uncertainty of the economic benefit to the Government and the uncertainty of the efficacy of the vaccine at the time of the C-100 Contract. Ex. 62 (2025-02-14 Brill Rebuttal Rep.) ¶¶ 23–29. But the Government recognized this uncertainty in the C-100 Contract, and the Contract still furthered its policy goals for the vaccine to be "***immediately available for nationwide access as soon as a positive efficacy*** signal is obtained and the medical countermeasures are authorized for widespread use." Ex. 1 (C-100 Contract) at C.1.1.1. Moreover, a level of uncertainty nearly always exists in medical research, thus Mr. Brill's argument would foreclose § 1498 from ever applying in these circumstances—a

carve out that plainly does not exist in the statute. Section V asserts that budget impacts are not a "benefit" to the Government, but whether a positive net budgetary impact is a benefit is not for a fact finder to decide. Ex. 62 (2025-02-14 Brill Rebuttal Rep.) ¶¶ 31–38.

Likewise, Section IV of Mr. Pitts' report largely argues that the Government did not benefit from the COVID-19 vaccine, but instead the American public did. Ex. 63 (2025-02-14 Pitts Rebuttal Rep.) ¶¶ 29–38. But this contradicts the Government's stated goal to provide the vaccine to "mitigate[e] the impact of COVID-19 on the nation and its people." Ex. 1 (C-100 Contract) at C.1.1.1. Moreover, that the vaccine also has a benefit to the general public (in addition to the Government), does not take away from the benefit to the Government. *See Sevenson*, 477 F.3d at 1365 (explaining that the Government's benefit need not be the "primary purpose" and the Government need not be the sole beneficiary). As another example, Section V of Mr. Pitts' report puts significant emphasis on to ***whom*** the Government provided the vaccines it purchased. Ex. 63 (2025-02-14 Pitts Rebuttal Rep.) ¶¶ 49–58. But the Government's decision to distribute vaccines ***it purchased and received via a contract*** to downstream distributors is also irrelevant. That the Government used various downstream distributors to deliver the vaccine does not contradict the Government's goal of supplying the vaccine to the American people. Section VI of Mr. Pitts' report frets about the "consequences" of applying § 1498 to the Government's purchase of COVID-19 vaccines, but whether good or bad consequences result from the C-100 Contract and/or applying § 1498 to C-100 Contract is not a policy question for a fact finder—that question is left to Congress. Ex. 63 (2025-02-14 Pitts Rebuttal Rep.) ¶¶ 59–66.

## VII. CONCLUSION

For the reasons above, Mr. Pitts' and Mr. Brill's expert reports should be excluded in their entirety, or at the very least, paragraphs 24–38, 41–42, 45, and 49–66 of Mr. Pitts' and

paragraphs 17–20, 22–23, 25–38, 55, 65, and 68 of Mr. Brill's expert reports should be excluded as improper expert testimony.

## CERTIFICATE OF SERVICE

I hereby certify that on August 21, 2026, I electronically filed the foregoing with the Clerk of the Court for the United Sates Court of Appeals for the Federal Circuit using the Court's CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by CM/ECF system.

August 21 2026

/s/ *William M. Jay*
William M. Jay